```
 1                   UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
 2                        WESTERN SECTION


 3


 4     United States of America  )
                                 )            20cr30018-MGM
 5          vs                   )
                                 )            November 4, 2020
 6     Jonathan Michael Rathbun  )
       _____)
 7


 8


 9                  Daubert Video Hearing Held Before

10               The Honorable Mark G. Mastroianni

11                  United States District Judge.


12


13     APPEARANCES:

14
       On behalf of the government:  Risa Berkower, United States
15     Department of Justice, 950 Pennsylvania Avenue, NW,
       Washington, DC 20532.
16

17     Neil L. Desroches, Assistant United States Attorney, 300
       State Street, Suite 230, Springfield, MA 01105-2926.
18
       On behalf of the defendant: Timothy G. Watkins, Esq., 51
19     Sleeper Street, 5th Floor, Boston, MA 02210.

20     Forest J. O'Neill-Greenberg, Esq., 51 Sleeper Street, 5th
       Floor, Boston, MA 02210.
21

22                      Alice Moran, CSR, RPR, RMR
                        Official Federal Court Reporter
23                      United States Courthouse
                        300 State Street, Room 303D
24                      Springfield, MA 01105
                             (413)731-0086
25                      alice.moran@verizon.net
```

```
 1

 2                              INDEX

 3

 4    Witness:                                          Page:

 5

 6    Christopher Rigopoulos

 7

 8    Direct examination by Ms. Berkower                  7

 9
      Cross-examination by Mr. Watkins                    82
10

11    Redirect examination by Ms. Berkower              124

12

13

14
      Exhibit No.
15    Description                                        Page

16

17

18

19

20

21

22

23

24

25
```

1    **(Video hearing commenced at 9:43.)**

2    **(The defendant is present on video.)**

3                THE CLERK:  Case before the court via Zoom video

4    is Criminal Matter 20-30018, the United States of America

5    versus John Michael Rathbun.

6        Counsel, I'm going to ask you to identify yourself

7    for the record starting with the government, please?

8                MS. BERKOWER:  Good morning, Your Honor.  Risa

9    Berkower for the government.

10               MR. DESROCHES:  Good morning, Your Honor.  Neil

11   Desroches also on behalf of the government.

12               MS. O'NEILL-GREENBERG:  Good morning, Your

13   Honor.  Forest O'Neill-Greeberg for Mr. Rathbun.

14               THE COURT:  Good morning.  Is Attorney Watkins

15   connected?

16               MS. O'NEILL-GREENBERG:  He was.

17               THE CLERK:  Here he is.

18               THE COURT:  Okay.

19       Attorney Watkins, we just need to get you on the

20   record.

21               THE CLERK:  If you can identify yourself,

22   Attorney Watkins, please?

23               THE COURT:  His audio must be a problem.

24       Are you sending him a message?

25               THE CLERK:  Yes.

1          THE COURT:  All right.  There's a delay this
2   morning with everyone.
3          THE CLERK:  Attorney Watkins, can you hear the
4   court?  He's lost his audio.
5          THE COURT:  Yes.
6          MR. WATKINS:  All right.  Here I am.  Sorry all.
7          THE COURT:  Okay.
8          MR. WATKINS:  Is it my turn?
9          THE CLERK:  Yes.
10          MR. WATKINS:  Tim Watkins Federal Defender
11   Office on behalf of John Michael Rathbun who appears with
12   us by video from the Hampden County Jail.
13          THE COURT:  Okay.  Very good.  Mr. Rathbun is
14   here.  We are connected by video.  I am about 15 minutes
15   late.  My fault.  I apologize for the inconvenience to
16   everyone.
17      We are all set for the *Daubert* hearing.  Is there any
18   dispute that the government has the burden and will call
19   -- be calling the proposed expert?
20          MS. BERKOWER:  Your Honor, it's my understanding
21   that this is Mr. Watkins' motion, and so I had thought
22   that he might be going first and examining the witness
23   since the court had granted him the opportunity to examine
24   the witness.  But if the court prefers, I can proceed
25   first.

```
 1          Before we do get --

 2               THE COURT:  I'm sorry.  That is true oftentimes

 3     there's some discussion beforehand as to who would start

 4     the exam.  Oftentimes it would be the government.

 5          Is there any agreement in this case?  Attorney

 6     Watkins, did you plan on calling the witness?

 7               MR. WATKINS:  No, Your Honor.  There was not an

 8     agreement and, frankly, we did not have time to discuss

 9     it.  I actually believe the burden is on the proponent of

10     the evidence in a 702 expert witness scenario; the

11     proponent of the proposed testimony bears the burden and

12     so I would think it would be the government that would

13     call and go through his direct testimony.

14               THE COURT:  So I'm going to view this as the

15     Daubert hearing as the government having the burden to

16     establish the requirements under Daubert, and the

17     defendant's motion was exercising their right to require

18     the government to make that showing.

19          It sounds like, Attorney Berkower, that's not going

20     to be especially problematic for you.  It sounds like

21     you're ready to call the witness and begin a direct exam

22     anyway.

23               MS. BERKOWER:  We are, Your Honor.  And before I

24     do that, I should say he's here.  I think you can see him

25     on Zoom, Supervisory Special Agent Bomb Technician
```

1        Christopher Rigopoulos.

2                    THE COURT:  Yes.

3                    MS. BERKOWER:  We did not -- he is at another

4        location.  He's not at -- he's at another location for

5        training this week, and we didn't give him enough notice

6        to bring court attire.  So I just wanted to reference that

7        for the court that he's not as dressed up as I think he

8        otherwise might have been, but it was the government's

9        fault for not knowing to tell him in time to bring that

10       clothing.

11                   THE COURT:  Okay.  Not a problem at all.

12                   MS. BERKOWER:  He just disappeared.  There he

13       is.  He is back.  Okay.

14                   THE COURT:  Not a problem but I do appreciate

15       you mentioning that.

16                   MS. BERKOWER:  Thank you, Your Honor.

17                   THE COURT:  That's very thoughtful with respect

18       to the process that we're going through, but all right

19       that makes sense.  So we're ready.

20                   MS. BERKOWER:  So in that case, Your Honor, the

21       government would call Supervisory Special Agent Bomb

22       Technician Christopher Rigopoulos, and if I may proceed

23       examining the witness?  Well, do you need to swear him in?

24                   THE COURT:  Yes.  We're going to swear him in.

25                   THE CLERK:  Mr. Rigopoulos, please raise your

1    right hand.

2    **Christopher Rigopoulos (sworn)**

3            MS. BERKOWER:  May I proceed, Your Honor?

4            THE COURT:  Yes.

5    **DIRECT EXAMINATION**

6    Q.    (By Ms. Berkower)  So could you please give your name

7    for the court and spell it?

8    A.    It's Christopher Rigopoulos, C-h-r-i-s-t-o-p-h-e-r,

9    R-i-g-o-p-o-u-l-o-s.

10   Q.    And what do you do for a living?

11   A.    I'm an explosive and hazardous device examiner for

12   the explosives unit in the Federal Bureau of Investigation

13   Laboratory Division.

14   Q.    And in this case were you asked to examine a device

15   taken from 832 Converse Street in Longmeadow,

16   Massachusetts?

17   A.    Yes, I was.

18   Q.    Were you also asked to review some reports and other

19   evidence in the case?

20   A.    Yes.

21   Q.    Did you offer some conclusions based on your review

22   of that evidence?

23   A.    Yes, I did.

24   Q.    So before we get into that, I'm going to get to some

25   detail about your current job and your background.  All

1    right?

2        So how long have you held the position of explosives

3    and hazardous device examiner at the FBI explosives

4    laboratory?

5    A.    I've held this position for 14 years.

6    Q.    For these purposes, could you explain just what does

7    a general definition of a hazardous device mean?

8    A.    A hazardous device it's a consolidation of components

9    which when they're put together, if properly affected,

10   could cause property damage, personal injury, or even

11   death as the device would potentially function.

12   Q.    Let's talk briefly about the various responsibilities

13   that you have as a hazardous device examiner for the FBI

14   explosives laboratory.

15       Do you deploy out to the field to help examine crime

16   scenes?

17   A.    Yes, I do.

18   Q.    Is that domestically and abroad?

19   A.    It is.

20   Q.    And when you go to those crime scenes, are you

21   looking at instances where a hazardous or explosive device

22   has been deployed?

23   A.    Yes.

24   Q.    Do you also instruct the field on how to collect

25   evidence, package it, and submit it for further analysis?

1   A.   Yes, I do.

2   Q.   And do you also actually examine devices and other

3   evidence that are sent to your lab for review?

4   A.   Yes.

5   Q.   Now in your current job do you also train others on

6   improvised incendiary and explosive devices?

7   A.   Yes.

8   Q.   Who do you train?

9   A.   I would typically train FBI special agents from an

10  evidence response team as well as other detectives or

11  investigators who may have a nexus to do a post-blast type

12  investigation.

13  Q.   Do you also train the new hazardous device examiners

14  in your own laboratory?

15  A.   I do.

16  Q.   So you're a senior member of that laboratory and you

17  train the new people who come in?

18  A.   Yes.

19  Q.   Now before we go further into the work that you

20  currently do for the FBI, let's talk about your background

21  a little bit.

22       So when did you start working in the field of

23  explosives?

24  A.   I started in the explosive field when I enlisted in

25  the Marine Corp. which was actually in 1983.  My position

1    there was as a Marine, a combat engineer.

2    Q.   As a combat engineer, what were your job

3    responsibilities?

4    A.   Combat engineers are Marines who are responsible for

5    using explosives and demolition practices to clear

6    obstacles which may impede a Marine advance per se.

7    That's utilizing explosive landmines and other types of

8    demolitions.

9    Q.   Were you trained in order to be a combat engineer?

10   A.   Yes, I was.

11   Q.   What training did you get for that job?

12   A.   The Marine Corp. has a combat engineer school.  Back

13   in the '80s it was Camp Lejeune, North Carolina.

14   Q.   What did they train you on there?

15   A.   Explosives use, explosives handling, deployment, all

16   the different types of explosives the Marine Corp. has so

17   we would utilize to affect our craft.  Deployment and

18   recovery of landmines and how to breach them in a combat

19   operation.

20   Q.   Now can you talk a little bit more in particular

21   about the work you did relating to explosives and

22   landmines in your job in the Marines?

23   A.    Well, as my Marine career progressed, I was in the

24   Marine Corp. Reserve.  The Gulf War happened in 1990 and

25   our unit was deployed into Saudi Arabia and upon the

1    assault into Kuwait in February of 1991, I led my team

2    into the minefields where we used explosives to

3    effectively breach paths in my field so we could move

4    through them to continue the attack.

5    Q.    Did that involve the strategic use of explosives in

6    that particular instance?

7    A.    It did.

8    Q.    Now during the time period that you were in the

9    Marine Corp. Reserve, did you also work as a fire captain

10   in Knoxville, Tennessee?

11   A.    That's correct, Knox County, Tennessee, yes.

12   Q.    Could you explain what that job entailed?

13   A.    So I was a fire officer in the Rural/Metro Fire

14   Department and my responsibilities there were as a leader

15   of the team of firefighters for two fire stations and two

16   shifts.  And that included regular calls for service with

17   fire or medical or even hazardous materials response to

18   provide public safety, rescue, fire suppression for

19   hazardous material mitigation throughout our shifts.

20   Q.    What is a hazardous material as it's defined in your

21   field?

22   A.    A hazardous material is a substance which is

23   dangerous to somebody once it's outside of its container.

24   Q.    So what's an example of hazardous material that could

25   be dangerous outside of its container?

1    A.    An example could be, let's say, an acid is contained

2    inside of perhaps a jar.  If the jar tipped over and the

3    acid leaked, that acid could potentially harm somebody.

4    Q.    So in your time as the fire chief and with

5    responsibilities concerning HAZMAT response, did you

6    respond to incidents that involved hazardous materials?

7    A.    Yes, we did.

8    Q.    Including having to mitigate the danger to the public

9    in your response?

10   A.    That is correct, yes.

11   Q.    Now during the time that you are a fire chief, did

12   you experience -- excuse me, develop experience with

13   gasoline in particular?

14   A.    Yes, and just to clarify I was a fire captain, but

15   gasoline was a very common source of hazardous material

16   that we would respond to, yes.

17   Q.    And could you give an example of the kind of incident

18   when you would have to respond to a hazardous material

19   involving gasoline?

20   A.    Sure.  Certainly.

21         On many occasions there might be either maybe a truck

22   stop or perhaps on the interstate there could be

23   potentially a gas fire from potentially a tanker which is

24   a large volume of gasoline.  And when that fire is

25   occurring, it's spreading because of the volume and the

1    gravity and the movement of the gasoline.

2         We would have to not only keep people away from it,

3    keep them safe, we'd have to try to mitigate the fire,

4    contain the spread so it doesn't spread into the community

5    and to the water system and things like that.  So those

6    are things that we actually trained upon and had active

7    responses to throughout the year.

8    Q.   Now is gasoline considered a hazardous material?

9    A.   It's a hazardous material once it's outside of its

10   container.  That's out of its safe area, so to speak.

11   Q.   And is it fair to say that gasoline is a bit unique

12   in the way it burns?

13   A.   It is.  It burns because it has to have two things in

14   place for it to burn.  One would be the fuel itself and

15   the gasoline as a volatile chemical, it's vaporizing into

16   the air and those vapors would mix with air, with the

17   oxygen.  And for a fire to ensure we'd also need heat, so

18   a heat source.  We call that a fire triangle.  All of

19   those three things, the heat, the fuel, and the oxygen are

20   required for combustion.

21   Q.   Let take a step back for a moment.  You said that

22   gasoline is a volatile substance.  What does volatile

23   substance mean?

24   A.   That's where the material is going from a liquid to a

25   vapor.  It's vaporizing or even evaporating so to speak.

```
 1              MS. BERKOWER:  I think he has frozen.

 2         Can you hear us?  Okay.

 3         Ms. Rivera, what's the best way to proceed?  Should I

 4    ask him to hang up and call back in?

 5         Wait.  There he is.  Okay.

 6    Q.   (By Ms. Berkower)  I think you froze there for a

 7    minute.

 8    A.   I apologize.

 9    Q.   Maybe I will --

10    A.   So we talked about volatizing.

11    Q.   Let me ask you the question again just so that it's

12    clear on the record.

13         So you were saying that gasoline is a volatile

14    substance because it goes from a liquid to a gas quickly;

15    it's always vaporizing as it sits?

16    A.   It's vaporizing, that's correct.

17    Q.   Does that vapor production happen at a wide range of

18    temperatures including ambient temperature?

19    A.   It does.  When it's warmer, it's going to vaporize

20    faster than when it's cooler.  That's why the container

21    contains the gasoline keeping it from going outside of its

22    container so the vapors, which would be the hazardous

23    material, are not in the public domain.

24    Q.   But the gas will vaporize even in a container, right?

25    A.   To a point.  It's trying to get to that vapor state
```

1    but the container is keeping it in, so to speak.

2    Q.   And it also keeps the vapors inside, right, the

3    container does?

4    A.   Yes.

5            MR. WATKINS:  Objection to the leading at this

6    point.

7            THE COURT:  It is leading but I will allow it.

8            MS. BERKOWER:  I think, Your Honor, partly I'm

9    trying to get through the qualification stage a little bit

10   more quickly.  I'll also note this is an evidentiary

11   hearing.

12           THE COURT:  I do understand that.  I agree.  You

13   can go right ahead.

14           MS. BERKOWER:  Thank you, Your Honor.

15   Q.   (By Ms. Berkower) So let's talk a little bit more

16   about how gasoline burns.

17        Is it the gasoline itself, the liquid, that burns

18   when there's a gas fire?

19        Can you hear us?

20   A.   Yes, I can hear you.

21   Q.   I think I asked when gasoline burns, is it the liquid

22   that burns?

23   A.   The vapors are burning as they're mixing with the

24   air.

25   Q.   So it's not the liquid itself, it's the vapor?

1    A.    Correct.

2    Q.    And is the vapor lighter than air or heavier than

3    air?

4    A.    It's heavier than air.

5    Q.    Is it possible for gas fires to move quickly if they

6    are not contained -- if gasoline is not contained in a

7    container?

8    A.    That is true.  I mentioned before with gravity and

9    potentially topography that the liquid could move.  You

10   know, with gravity down a hill for an example, and if the

11   gasoline vapors were burning, you may have what we call a

12   flowing fuel fire.

13   Q.    So did you gain experience when you worked in the

14   fire department in how to safely handle gasoline fires?

15   A.    Yes.

16   Q.    And how often did you deal with gasoline fires in

17   that job?

18   A.    It was frequent.  We had lots of car fires in which

19   cases the gasoline tanks would potentially rupture and the

20   gasoline would leak and then it would move and so we would

21   have to be prepared to manage that and to deal with it as

22   well.

23   Q.    Now when did you become an FBI agent?

24   A.    I joined the FBI in 1997.

25   Q.    And after you became an FBI agent, did you work on

1    the Joint Terrorism Task Force?

2    A.   I did.  I was on the Joint Terrorism Task Force in

3    the Philadelphia field office.

4    Q.   Did you also become a special agent bomb technician?

5    A.   I did.

6    Q.   What was the training for the special agent bomb

7    technician position?

8    A.   So the special agent bomb technician position the

9    individual is trained at the hazardous devices school.

10   It's located in Redstone, Alabama and the school is run by

11   the FBI and it's a standard program for all the bomb

12   squads in the United States.

13       All the bomb technicians have to come through this

14   program to have consistent types of training with the same

15   equipment so throughout the United States bomb technicians

16   can operate between each other, the same type of training,

17   the same equipment which would keep up with the current

18   threats of devices, whatever they may be.

19       So the bomb school allows you to become proficient in

20   recognition and identification of hazardous devices and

21   how to manage those and make them in a safe condition.

22   Q.   So after you became --

23               THE COURT:  Attorney Berkower --

24               MS. BERKOWER:  Yes.

25               THE COURT:  -- I'm going to hold you right

1   there.  I think you might -- the parties might recall we
2   just have a civil scheduling conference.  I'm going to
3   call into now and take care of.  I'll be back to you
4   hopefully in less than five minutes.  All right.  That
5   will be clear my schedule for the morning and then we can
6   just continue.
7   **(A recess was taken at 10:06 until 10:13.)**
8           MS. BERKOWER:  May I proceed, Your Honor?
9           THE COURT:  Yes, you may.
10  Q.   (By Ms. Berkower)  So could you please explain your
11  job responsibilities when you first became a special agent
12  bomb technician with FBI?
13  A.   Certainly.  So the responsibilities of an SABT
14  include responding to calls for service involving
15  hazardous devices; typically those are the IEDs,
16  improvised explosive devices, that we may see in our
17  community.  We would respond with the local bomb squads to
18  render them safe, to put them in a safe condition to be
19  able to collect and submit for examination.
20       I would also coordinate with all the bomb squads in
21  our territory to ensure that their training is up to
22  speed, make sure they have the right equipment, and are
23  aware of new trends that may be coming out that we may see
24  in the FBI.
25  Q.   So your work in that position included responding to

1    incidents where there were improvised explosive devices?

2    A.   That's correct.

3    Q.   Did your job responsibilities also include responding

4    to incidents where there were improvised incendiary

5    devices?

6    A.   Yes.

7    Q.   Now, during that time period were you also on a

8    hazardous materials response team for the FBI?

9    A.   Yes.

10   Q.   Could you explain a little bit more about what that

11   team does?

12   A.   Certainly.  In 1999 the FBI started a new initiative

13   for field offices to have hazardous materials response

14   teams and based on my background, training and experience

15   in the fire department, I volunteered to be a part of that

16   and ended up being the team leader for the Philadelphia

17   field office.

18       So we had all of our special agents that were on our

19   team, we got them all trained, equipped, and began a

20   training cycle with them to become proficient and

21   comfortable with the SOPs with the tactics that we would

22   use to enter a hazardous environment and to collect

23   hazardous evidence.

24   Q.   So in that position did you train others on how to

25   respond to situations involving hazardous materials and

1    hazardous devices?

2    A.   Once we got our initial FBI training, as a team

3    leader, I did train others and kept the training going in

4    our division to ensure everybody was ready to respond.

5    Q.   And you also responded to incidents that came up

6    involving those kind of devices?

7    A.   Yes, that's correct.

8    Q.   Now during that time period did you also work as the

9    weapon of mass destruction primary coordinator?

10   A.   I did.

11   Q.   Could you explain what that position was?

12   A.   The weapons of mass destruction coordinator, or WMB

13   coordinator, in each field office in the FBI has a

14   responsibility for outreach in that division's territory.

15        In Philadelphia we had 44 counties that were in our

16   responsibility, and we conduct liaison with those county

17   emergency management agencies to ensure that there's an

18   interface between the FBI and the local EMAs, as well as

19   the fire departments and the police in case there was an

20   WMD incident.

21        A WMD involves nuclear, chemical, biological, or

22   radiological type of devices or incidents which we would

23   have to have plans in place in how to those, how to

24   respond, and how to mitigate those types of problems.

25        So as a WMD coordinator I set up task forces

1    throughout our division where each region would be able to

2    have similar plans and policies in place.

3    Q.   Now you mentioned Philadelphia, is that where you are

4    stationed during this time period that you worked as a

5    special agent bomb technician on the hazardous materials

6    response team and the WMD primary coordinator?

7    A.   That's correct.

8    Q.   Did you hold all of those positions until 2006?

9    A.   Yes.

10   Q.   In 2006 were you promoted to come to Quantico and

11   work in your current job?

12   A.   Yes.

13   Q.   And that's as an explosives and hazardous device

14   examiner, right?

15   A.   That's correct.

16   Q.   How is that job, the current position that you have,

17   different from the jobs you were doing before that you

18   just described?

19   A.   So as an explosives and hazardous device examiner,

20   cases involving hazardous devices that come to the FBI

21   would come to the FBI laboratory and they need to be in a

22   safe condition.

23        Can you hear me?

24   Q.   Yes, we can.

25        I think you just were explaining the differences

1    between your former job in the field and your current job

2    at the explosives laboratory.

3    A.   Yes, ma'am.

4         So as an explosives hazardous device examiner, the

5    evidence comes to the FBI laboratory for examination.  As

6    a bomb technician we have to ensure it's in a safe

7    condition when it arrives.

8         Now the officer we would call the request coordinator

9    for the cases that we examine.  So as we would set the lab

10   plan -- throughout the laboratory for our chemists, for

11   our fingerprint examiners, our trace examiners, we'd

12   ensure that evidence is in a safe condition for them to

13   examine.

14   Q.   Are you back with us, special agent?

15   A.   Yes.

16   Q.   Okay.

17   A.   Can you hear me?

18   Q.   Yes, we can.

19        So it sounds like in your previous position in the

20   field, were you responsible for responding to hazardous

21   devices and other scenes of that nature and collecting

22   evidence and identifying evidence?

23   A.   Yes.  In the explosives unit as an examiner, we would

24   respond to the field in certain cases where --

25   Q.   Let me stop you there.  I'm not sure that you heard

1    the question.  I was asking about your prior position.

2         As a special agent bomb technician, are you supposed

3    to identify and collect evidence?

4    A.   Yes, that is correct.

5    Q.   And in your current position do you receive evidence

6    that comes in from the field?

7    A.   Go ahead.

8    Q.   In your current position do you receive evidence that

9    comes in from the field?

10   A.   Yes, we do.

11   Q.   And do you examine that evidence rather than just

12   collect it and identify it?

13   A.   Yes.

14   Q.   So is it fair to say when you came to Quantico to

15   your current laboratory, that's sort of the next level up

16   from what you were doing before?

17        Special agent, can you hear?

18   A.   Yes, I can.

19   Q.   You can hear me.  Okay.

20        I asked in your current position is that the next

21   level up from what you were doing in the field?

22   A.   Yes, it is.

23   Q.   Was there additional training that you had to have

24   before you could take your current position?

25   A.   Yes.  As an explosive hazardous device examiner, we

1    have training that teaches you --

2            THE COURT:  If he logs off and then back on,

3    does that help with the connection at all?

4        Christina, do you know?

5            THE CLERK:  It's his connection entirely.  It

6    just -- maybe if he moves somewhere else that would help,

7    but the connection is not good.

8            THE COURT:  Is he using the audio through his

9    phone or through the computer?

10           MS. BERKOWER:  I think he's on a phone.  He's at

11   a training facility in Alabama and so he's just using his

12   phone is my understanding in the entirety.

13           THE COURT:  So he's using an iPhone.  All

14   right.

15           MS. BERKOWER:  Yeah.

16           THE COURT:  Okay.

17   Q.   (By Ms. Berkower)  Can you hear us, special agent?

18       It looks like he may have frozen again.

19           MS. BERKOWER:  I think the problem, judge, is I

20   was told that the FBI facility doesn't allow for Zoom on

21   their computers and so he had to go to like a different

22   building, like a garage building, and use his phone and so

23   that's why there's no hard wire connection there.  I

24   apologize for this.

25           THE COURT:  All right.

```
1              THE CLERK:  It looks like he's logged off and
2    he's trying to log back in, so.
3    Q.   (By Ms. Berkower)  Do we have you back?  Can you hear
4    us, special agent?
5    A.   Yes.
6    Q.   So let's pick --
7              THE COURT:  Christina, Leeann just suggested you
8    know how sometimes you have people call in so we have
9    audio coming from their phone but Zoom -- the video is
10   through zoom.
11             THE CLERK:  Yes.
12             THE COURT:  So you can walk him through that if
13   it happens again.
14             THE CLERK:  Okay.
15             THE COURT:  All right.  Let's try this.
16             MS. BERKOWER:  Okay.  Great.
17   Q.   (By Ms. Berkower)  So you were telling us about
18   additional training you had to take in order to have your
19   current position at the explosives laboratory.  Could you
20   describe that additional training?
21   A.   Yes.  So our training --
22             MS. BERKOWER:  Your Honor, one question I have
23   for you.  I know that this hearing is supposed to proceed
24   by Zoom so that he can be on video.  I don't know if the
25   defense in the interest of time would consent to him just
```

1  calling in?  That might make it a smoother hearing rather

2  than having him appear by video.  I know that's a little

3  unconventional, but I know we also want to try to conclude

4  this hearing today.

5           THE COURT:  Right.  Right.  Attorney Watkins?

6           MR. WATKINS:  Your Honor, the only difficulty is

7  I think we're both going to be showing him exhibits.  I

8  don't know how we do that if he's doing it just by

9  audio.

10          THE COURT:  Right.  Given the connection we

11 have, trying to show exhibits might be problematic too.

12          MS. BERKOWER:  I think at least for my exam, I

13 know that's much later in the exam.  So maybe if we want

14 to do it by phone until we get to that portion and then we

15 could hopefully proceed by video at that time.

16          THE COURT:  At some point we're going to need to

17 use video and it's just going to be a problem.  He's at

18 this facility for the rest of the week?

19          MS. BERKOWER:  It's my understanding he's in a

20 week-long re-certification course right now at this

21 facility, but we can ask him.  I think he just logged back

22 in.

23          MR. WATKINS:  Judge, I do think the government

24 uses its own kind of video system.  Perhaps we can try

25 using whatever the FBI will approve for a video hearing.

1              THE COURT:  Do you know anything about that,

2    Attorney Berkower?

3              MS. BERKOWER:  I know that in the past I have

4    had FBI agents on Webex and that might be an option.  I

5    don't know if the agent has access to that at the facility

6    he's currently at.

7         Can you hear us, special agent?

8              MR. WATKINS:  I think we made it worse by having

9    him go outside.

10             THE COURT:  Right.  I don't know that Webex will

11   work for the court.  I don't know if we can plug it in to

12   make it public, available for public access.

13   Q.   (By Ms. Berkower)  Special agent, can you hear us

14   now?  It looks like your screen is working again.

15        I think you're on mute.  You're on mute, special

16   agent.

17   A.   Okay.  Can you hear me now?

18   Q.   Yes.

19        We're trying to figure out if there are other options

20   that might be better for your connection.  Do you know if

21   there is any way that a computer may be in one of

22   the building -- are you in this location for the rest of

23   the week?

24   A.   Yes.

25             THE COURT:  Do you have any other possible

```
 1    access to the internet or other ways to log on that we
 2    would have a better connection?  I understand you're doing
 3    the best you can with your phone, but have you looked into
 4    if there's any other options?
 5              THE WITNESS:  Unfortunately the FBI does not
 6    allow Zoom in our facility or on our computers.
 7              THE COURT:  I didn't hear much of what you said,
 8    but I did get the gist of that, no, you're not allowed to
 9    use different ways of communicating.
10       Could you call on a hard line?
11              THE CLERK:  My suggestion would be that he would
12    call in and still stay logged on on his phone with the
13    video off.  For purposes when counsel is sharing their
14    screen for exhibits, then he would be able to see, but he
15    would be connected with us via hard line or on another
16    phone if possible.
17              THE COURT:  I agree.  I agree.  When he comes
18    back on, let's see if he has access to a hard line and we
19    can do that.
20              MS. BERKOWER:  May I try calling him and seeing
21    if we can sort this out that way?
22              THE COURT:  Sure.
23    Q.   (By Ms. Berkower)  Special agent, can you hear me?
24    A.   I can.
25    Q.   So I think one of the suggestions the court had was
```

1   if there's a possibility for you to call in on a hard
2   line, there's a way to join the Zoom by phone but also
3   maintain on your phone the video, and that way -- but with
4   the video off.
5       So connect to the Zoom through your phone with your
6   camera off but that way you can still see the screen when
7   we share exhibits with you.  You actually will be
8   participating through a different hard line phone
9   connection.  Is that something might be possible?
10  A.   Yes.  That is possible.  So let me -- I will be right
11  back with you.
12          MS. BERKOWER:  Thank you.  Sorry about this.
13  Thank you very much.
14          THE CLERK:  AUSA Berkower, I just emailed you
15  the call in information with the meeting ID and password
16  to make it easier.
17          MS. BERKOWER:  Thank you.  I will send that to
18  him.
19          THE CLERK:  You're welcome.
20  Q.   (By Ms. Berkower)  Special agent, I'm about to email
21  you the call in information so you can dial in.
22  A.   Thank you.
23  (A short suppose in proceeding.)
24          THE WITNESS:  Hello.  This is Christopher
25  Rigopoulos.

1          THE CLERK:  The court can hear you.

2   Q.   (By Ms. Berkower)  Special agent, can you hear us?

3   A.   I can.

4   Q.   That sounds much better.

5   A.   Yes.

6          THE COURT:  How we doing?

7          MS. BERKOWER:  I think the agent was able to

8   call in from a landline and it sounds like his voice is

9   much clearer now.

10  Q.   (By Ms. Berkower)  So, special agent, are you able to

11  also see the zoom on your phone so we can share exhibits

12  with you later on?

13  A.   I can do that.

14         THE CLERK:  So, special agent, you can turn off

15  your video so we don't have to see you.  That's fine.  It

16  will probably make for a better connection on your phone

17  as well.

18         THE WITNESS:  All right.

19         THE CLERK:  Perfect.

20         MS. BERKOWER:  All right.  So, Your Honor, may

21  we pick up where we left off?

22         THE COURT:  Absolutely.  Yes.

23         MS. BERKOWER:  Okay.  Thank you.

24  Q.   (By Ms. Berkower)  So, special agent, I think you

25  were telling us that you had to take additional training

1    in order to have your current position, and could you -- I

2    think that's where we left off.

3         Do you mind describing to us the training you had to

4    take when you transitioned from being a bomb technician in

5    the field to your current position in the explosive

6    laboratory?

7    A.   Yes.  So the training as an examiner is how to

8    examine evidence and that is something that takes quite a

9    long time to understand the protocols, the SOPs involved

10   in a laboratory.  And coming from the field when we bring

11   evidence in, how to catalog it, how to receive it, making

12   sure the communications back in the field are in order

13   that we received everything correctly.

14        Also, all the nuances in how to write reports to make

15   it in a clear digestible format for the contributor to

16   understand what we're seeing.  We also have training on

17   explosive materials in more depth than we would in the

18   hazardous devices school that I described earlier.

19        Some chemistry in physics, different angles to

20   understand our craft better.  And as the training cycle

21   goes on we take different tests and from those ultimately

22   at the end, when we are blessed off to perform our own

23   examinations, we're assigned our own cases and we move

24   forward.

25   Q.   All right.  And you said that you take that

1   additional training, is that internal through the
2   explosives unit part of it?
3   A.   A lot of it is.  We also take courses at different
4   universities in chemistry and physics, different
5   perspectives.
6   Q.   So did you take some classes at universities in order
7   to complete your training for the explosives laboratory?
8   A.   Yes.
9   Q.   Did you take classes in chemistry?
10  A.   I did.
11  Q.   And also physics?
12  A.   They were involved in the chemistry classes, yes.
13  Q.   So let's go a little deeper into what you do at the
14  explosives laboratory.
15       Is it fair to say that when a device is sent to your
16  laboratory, your role is to examine it for forensic value
17  and make an opinion on what it was and how it may
18  function?
19  A.   Yes.
20  Q.   Do you sometimes have evidence that's submitted to
21  you after a device has detonated?
22  A.   Yes.
23  Q.   And under those circumstances are you supposed to try
24  and figure out what happened at that scene?
25  A.   Yes.

```
1    Q.   Does the evidence you receive sometimes come in many
2    different pieces?
3    A.   Yes.
4    Q.   And is that, for instance, like in a case where an
5    explosion went off you would have to try to put the pieces
6    together afterward and to figure out what happened?
7    A.   Yes.
8    Q.   So you're working backwards based on your training
9    and experience --
10   A.   That's correct.
11   Q.   -- to understand what happened?
12   A.   Yes.
13   Q.   Do you also get some devices that are submitted to
14   you intact; that is, undetonated?
15   A.   Yes.
16   Q.   If you receive a device that has not already ignited
17   or exploded, is part of your job figuring out whether the
18   device could actually work?
19   A.   Yes.
20   Q.   What do you do to determine whether the device could
21   actually work?
22   A.   Well, we evaluate each component individually and
23   based on its merits and what it may be designed to do in
24   the configuration, you know, could it function.
25   Q.   So you're examining the components to figure out if
```

1    they would have worked as assembled?

2    A.   Yes.

3    Q.   Now, do you sometimes respond yourself to these

4    post-blast scenes where a device has gone off?

5    A.   Yes.

6    Q.   Do you do that in the United States and abroad?

7    A.   Yes.

8    Q.   When you do that, do you assist with evidence

9    collection and identification?

10   A.   Yes.

11   Q.   Do you also help analyze the cause of what happened

12   there based on what was collected?

13   A.   Yes.

14   Q.   And in addition to case investigations, do you also

15   train others on hazardous devices and explosives?

16   A.   Yes.

17   Q.   Is that work you do at something called the FBI

18   post-blast investigator school?

19   A.   Yes, it is.

20   Q.   What is the post-blast investigator school?

21   A.   Well, it's a school that is designed that we manage;

22   that we bring in special agents or detectives that may

23   respond to a post-blast incident, and we give them

24   training to recognize and identify components that may

25   have been part of a device at a post-blast scene.

1       As far as the methods that we would use to collect

2   this evidence and package it in a certain way so it can be

3   examined efficiently.

4       This type of instruction also gives a bigger picture

5   for recognition and identification of other things that

6   may harm you, you know, at these post-blast scenes because

7   the structure you may respond to may be in an unsafe

8   condition or there may be other devices out there that may

9   not have gone off.  We just want to make sure everyone is

10  aware of these potential hazardous.

11  Q.   So is one of the purposes of the post-blast

12  investigator school to teach students how to identify

13  evidence at a post-blast scene?

14  A.   Yes.

15  Q.   Is another purpose to teach students how to collect

16  that evidence?

17  A.   Yes.

18  Q.   And how to collect it in a safe fashion?

19  A.   That's correct.

20  Q.   So what do you teach at this school yourself?

21  A.   I'm a program manager for the whole FBI for this

22  program for years.  When I do teach individual courses, I

23  would teach the introduction to explosives, the

24  introduction to IEDs in the forensics block, and also we

25  have practical application sessions throughout the course

1    where the students demonstrate the skills that we have

2    shown them.

3    Q.   In order to teach those classes, did you yourself go

4    through an instructor school to ensure you were able to

5    teach those classes?

6    A.   Yes.  I went through the post-blast instructor

7    development school, yes.

8    Q.   And you described a minute ago the different classes

9    that you teach.  Do you now teach advanced courses in

10   addition to the classes you just described?

11   A.   Yes, I do.

12   Q.   Is one of those a class on IED construction?

13   A.   Not specifically IED construction, but that is a

14   block of instruction in a course we would teach.

15   Q.   What course is that?

16   A.   Well, in our basic post-blast that is one of our

17   blocks of instruction and also in our bomb scene

18   operations course.

19   Q.   I just mentioned an IED, is that an improvised

20   explosive device?  That's the term that's referenced, an

21   IED?

22   A.   Yes.

23   Q.   As part of the classes that you teach, do you also

24   discuss improvised incendiary devices?

25   A.   Yes.

1    Q.   Are those also known as IIDs?

2    A.   Yes.

3    Q.   And what is the purpose of all of this training?

4    What is the reason that students attend this school?

5    A.   Well, there's many reasons.  One is to understand the

6    components that are required to construct these devices.

7    The other is to understand the components and individually

8    what their purpose is in this device, as well as perhaps

9    the explosive or the energetic flammable or ignitable

10   material per se, understand how that fits into this

11   picture.

12       We also have a --

13   Q.   Are you trying to teach students how to --

14   A.   I'm sorry.

15   Q.   Go ahead.  Sorry.

16   A.   We also want them to have recognition and

17   identification of these materials as evidence to collect,

18   or if the device is still intact, to identify them so they

19   can be rendered safe.

20   Q.   So you want them to understand how to identify

21   evidence and collect it properly and safely?

22   A.   Yes.

23   Q.   Is it fair to say that the information you provide in

24   the course helps people ensure their own safety when

25   they're around these kinds of devices?

```
 1    A.    Yes.

 2    Q.    And also to investigate crimes?

 3    A.    Yes.

 4          MS. BERKOWER:  Your Honor, at this time I would

 5    tender Supervisory Special Agent Bomb Technician

 6    Rigopoulos as an expert in explosives, hazardous

 7    materials, and improvised incendiary and explosive devices

 8    including how they work and how they're detonated.

 9          MR. WATKINS:  Your Honor, perhaps we can wait

10    until the end of the hearing to argue that.  I think

11    that's why we are having the hearing today.

12          THE COURT:  All right.  I'm not going to rule on

13    that yet.  I'll let you continue your examination.

14          MS. BERKOWER:  All right.

15    Q.  (By Ms. Berkower)  So --

16          THE CLERK:  It seems like she froze.

17          MR. DESROCHES:  Your Honor, I sent Attorney

18    Berkower a text message.  I assume she will be trying to

19    get right back in.

20          THE COURT:  All right.  Thank you.

21          MS. BERKOWER:  Can everyone hear me now?

22          THE COURT:  We can hear you.

23          MS. BERKOWER:  All right.

24    Q.  (By Ms. Berkower)  Special agent, can you hear me as

25    well?
```

1   A.   I can.

2   Q.   Okay.  Great.

3           MS. BERKOWER:  May I proceed, Your Honor?  I'm

4   sorry.

5           THE COURT:  Sure.  We lost your video.

6           MS. BERKOWER:  You can't see me now?

7           THE COURT:  No video.

8           MS. BERKOWER:  Hold on just a minute.

9           THE COURT:  There we go.  Now your microphone is

10  off.

11      You disappeared from the chair.

12          MS. BERKOWER:  Can everyone hear me?  Your

13  Honor, would you want me to proceed just by phone?

14          THE COURT:  Yeah, if that's what we have now

15  then, yes, just proceed.  Because we hear you fine but we

16  do not have a video connection.

17          MS. BERKOWER:  I'm sorry about that.

18          THE COURT:  I'm fine with proceeding this way.

19      Any objection from the defense by proceeding this

20  way?

21          MR. WATKINS:  No, Your Honor.

22          THE COURT:  Okay.  Go right ahead, Attorney

23  Berkower.

24          MS. BERKOWER:  Okay. Thank you.

25  Q.   (By Ms. Berkower)  So, special agent, were you asked

1    to review information --

2             MR. WATKINS:  Your Honor, I'm losing her.

3             THE COURT:  Right.

4    Q.   (By Ms. Berkower) -- evidence collected in this case?

5             THE COURT:  Attorney Berkower, we did not hear

6    most of your question.  The audio quality really

7    deteriorated on your end.

8             MS. BERKOWER:  I think I'm going to do the same

9    procedure as the special agent.

10            THE COURT:  Some days this works absolutely fine

11   and some days multiple people freeze.  Everyone is using

12   different internet providers or services, but yet everyone

13   -- today it seems to be very slow.  Everyone is freezing.

14            MR. WATKINS:  I suspect there's lot of internet

15   usage this morning, Your Honor.

16            THE COURT:  It's an issue generally with how

17   many people are doing Zoom conferences, at least I think

18   that's what it is.  That what we've been told.  It's a

19   platform that Zoom uses once they get so many people on

20   it.

21            MR. DESROCHES:  Your Honor, may I ask and, madam

22   clerk, it may be a question for you, in the past when

23   we've had issues or large meetings, it's been helpful to

24   mute video so we're taking less bandwidth.  I'm not sure

25   if that will help the current situation, but it's just a

```
1    thought.  I'm not sure if your experience is the same.
2              THE CLERK:  We can definitely try to do so.
3              THE COURT:  Sure.  Everyone go off the video or
4    just the audio?
5              MR. DESROCHES:  The video, Your Honor.  So in
6    other words, you don't need to be looking at me.  I'll
7    just mute my video.
8              THE CLERK:  Right.
9              MR. DESROCHES:  So unless you're speaking, I
10   think if you mute your video you can still take part in
11   the hearing but it might take less data.
12             THE CLERK:  Yes.
13             MS. BERKOWER:  I'm back.  I called in.
14             THE CLERK:  Yes.
15             MS. BERKOWER:  So people can hear me.  Great.
16   Do you want me to keep going at this point?
17             THE COURT:  Yes.
18             MS. BERKOWER:  Okay.
19   Q.   (By Ms. Berkower)  Special agent, did you examine
20   evidence in this case --
21   A.   Yes.
22   Q.   -- that was recovered from 832 Converse Street in
23   Longmeadow, Massachusetts?
24   A.   Yes.
25   Q.   And specifically did you review physical evidence
```

1   that was sent to your lab?

2   A.   Yes.

3   Q.   Did you review reports related to that evidence?

4   A.   Yes.

5   Q.   Did you review photographs?

6   A.   Yes.

7   Q.   And to be clear, you only reviewed those items that

8   were actually sent to your lab, right?

9   A.   Yes.

10  Q.   You did not review everything in the larger case

11  file?

12  A.   No.

13  Q.   So we're going to get to your examination of what was

14  the evidence that was sent to in a moment, but first I'm

15  going to ask you some background questions about

16  incendiary and explosive devices and how they work.

17       So in your field, what makes something an incendiary

18  device?

19  A.   An incendiary device would have certain components,

20  one would be an ignitable material.  The other one would

21  be some type of a fusing system which would ignite the

22  material, and the third one is most commonly a container

23  of some sort.

24  Q.   So three things make something an incendiary device,

25  an ignitable material, a fusing system, and maybe a

1    container?

2    A.   Yes.

3    Q.   Is that a commonly understood definition of an

4    incendiary device in your field?

5    A.   In my field it is, yes.

6    Q.   So let's define each of those three terms.  What is

7    an ignitable material?

8    A.   An ignitable material is material that could be

9    liquid; it could be a solid; it could be a gel, and when a

10   heat source is applied to it, it will begin to burn.

11   Q.   What is a fusing system?

12   A.   A fusing system is a component which when -- either

13   if it's electrical or it's energized, if it combustible,

14   when it burns it provides some type of energy which would

15   ignite the explosive, the main charge or an incendiary,

16   the ignitable material.

17   Q.   So the fusing system transfers heat to the ignitable

18   material to allow it to catch fire in an IID?

19   A.   In an incendiary device, yes.

20   Q.   Is a wick a type of fusing system?

21   A.   It is considered that, yes.

22   Q.   You said the third element of an incendiary device

23   may be a container.  Why isn't a container always

24   required?

25   A.   Well, with a liquid it's logical that you would use a

1   container to contain the volume of the liquid.  But if you

2   had other materials, say it was some type of what you

3   might have seen those alcohols that can burn, they're like

4   a gel.  It's ignitable but it doesn't necessarily need a

5   container to hold its mass.  It's not going to flow all

6   over the floor or down a drain like a liquid would for

7   example.

8   Q.   So would one example of an ignitable material that is

9   not a liquid be something like Sterno?

10   A.   Certainly, yes.

11   Q.   And, of course, that's just one example, among many,

12   but to give the court an idea is that the kind of material

13   you're describing that would not require a container to be

14   part of an incendiary device?

15   A.   Yes.

16   Q.   Now, what is an improvised incendiary device?

17   A.   Well, an improvised incendiary device is one that's

18   not commercially available; it's not military made.  You

19   don't buy it off the shelf in the store.  Where an

20   individual may take those components we described and put

21   it together themselves.

22   Q.   So it's not something that can be -- that like comes

23   off a factory assembly line?

24   A.   Not with that purpose to ignite a fire; not with that

25   as part of its design.

1   Q.   And improvised means the person who put it together

2   just used components on their own, right?

3   A.   Yes.

4   Q.   Is the term that you just -- is the definition you

5   just gave for an improvised incendiary device commonly

6   understood in your field?

7   A.   Yes, it is.

8   Q.   And is the abbreviation for that an IID?

9   A.   Yes.

10   Q.   Are you also familiar with the term improvised

11   explosive device?

12   A.   Yes.

13   Q.   Is that also known as an IED?

14   A.   Yes, it is.

15   Q.   What is the difference between an IID and an IED?

16   A.   An IED has an explosive material as the energetic

17   material in this device where it's designed to explode.

18   That's its function.

19   Q.   And in an IID, is the ignitable material in the

20   device in place of an explosive?

21   A.   It's a different function.  It's designed in an IID

22   to burn or produce explosive properties.

23   Q.   So is the difference between an IID and an IED that

24   an IID has ignitable material whereas an IED has an

25   explosive?

1    A.   Yes, and you may have different types of fusing
2    systems to initiate them.
3    Q.   But a fusing system in both nonetheless?
4    A.   Yes.
5    Q.   Now going back to IIDs, does a person need to be a
6    trained expert in order to make an IID?
7    A.   No.
8    Q.   What does someone need to make an IID?
9    A.   Well, just an understanding of ignitable material
10   when ignited will burn.  Some type of a fusing system
11   typically which will not harm the individual that's
12   igniting it, although that doesn't always happen.
13   Sometimes it may backfire on them.  Some type of way to
14   transmit the heat from the fusing system to the ignitable
15   material and vapors that it produces.
16   Q.   So is it fair to say that someone who wants to make
17   an IID needs an ignitable material?
18   A.   Yes.
19   Q.   They need some kind of fusing system as you just
20   mentioned?
21   A.   Yes.
22   Q.   And maybe a container if the ignitable material is a
23   liquid?
24   A.   Yes.
25   Q.   Can a person who wants to make an IID use common

1  household items to do so?

2  A.   Yes.

3  Q.   What are examples of common items that could be used

4  to make an IID?

5  A.   Well, we mentioned earlier the term gasoline as an

6  ignitable material and that's commonly found.  Everyone

7  has automobiles or perhaps a gasoline lawn mower or weed

8  eater and those materials may be maintained in that

9  person's property.

10       They also have -- any kind of container that's going

11  to contain that material could be utilized, whether it's

12  potentially glass or perhaps even a Tupperware container

13  or a gas can perhaps could be utilized in that fashion.

14       As far as a fusing system, you can use rags; things

15  that will burn, paper, other combustible items that are

16  readily available.

17  Q.   Now taking a step back for a moment, are any two IIDs

18  exactly the same?

19  A.   No.

20  Q.   Why not?

21  A.   Well, once again, because these aren't commercially

22  off-the-shelf products.  They are improvised.  They're

23  manufactured by somebody.  They're using different

24  components to put them together.  They may want to get the

25  same outcome but the term exactly, they're going to have

1  variances.  One may have more potential to hold more

2  ignitable material than another.  One may be a breakable

3  container versus one may not.  And the fusing systems,

4  once again, they could be widely varied to produce the

5  path, the heat to that ignitable material vapors.

6  Q.   But do all IIDs have those same three components you

7  mentioned - the fusing system, the ignitable material, and

8  maybe a container?

9  A.   Yes.

10  Q.   Now, let's go onto a different area.

11       You just mentioned gasoline and you had talked a

12  little bit about gasoline as a hazardous material earlier

13  as something you have experience with.  Is gasoline very

14  flammable.

15  A.   Yes.

16  Q.   And you mentioned earlier that when gasoline burns,

17  it's actually the vapor that burns?

18  A.   Yes.  It's the vapors that are mixed with the air.

19  Q.   Let's talk more about when gasoline vapors will burn.

20       Will gasoline vapor catch fire under all conditions?

21  A.   No.

22  Q.   Under what conditions will gasoline vapors catch

23  fire?

24  A.   Well, I mentioned that you have to have that oxygen

25  fuel ratio, a mixture of the two.  And in that right ratio

1   that is called an explosive limit.  That's the area that

2   gasoline vapors will burn.  And if it's too lean, we call

3   that a lower explosive limit.  If it's too rich, if it's

4   above that level, it's too much fuel and not enough

5   oxygen.  It will not burn.  So once again --

6   Q.   Let me stop you there.  If we can just break down

7   that answer a little bit because you threw out a few

8   terms.

9        You mentioned fuel-to-air ratio; what is the -- what

10   do you mean when you say fuel-to-air ratio?

11   A.   Well, you have a percentage of the vapors that the

12   gasoline is producing and mixed with the oxygen, either

13   it's lean or it's rich, and you can go too far in one

14   direction or the other where the fire will not consume.

15   Q.   So to have a fire, you have to have the right mixture

16   of gasoline vapors and air?

17   A.   Yes.

18   Q.   And when you say too lean, do you mean too little

19   gasoline vapor in order to ignite?

20   A.   That's correct.

21   Q.   When you say too rich, do you mean it's also possible

22   there would be too much gasoline vapor present in order to

23   ignite?

24   A.   Yes.

25   Q.   So the fuel-to-air ratio determines whether the

```
 1    gasoline vapors in a particular circumstance will catch
 2    fire?
 3    A.    Yes.
 4    Q.    Fair to call it say a sweet spot?
 5    A.    That's a good term.
 6    Q.    Now can gasoline also explode?
 7    A.    The vapors produced by gasoline in the right
 8    conditions they can cause an explosion if ignited.
 9    Q.    Does that also depend on the fuel-to-air ratio?
10    A.    Yes.
11    Q.    Now let's be clear about something, is gasoline
12    itself an explosive?
13    A.    No.  It's a flammable liquid.
14    Q.    And what does that mean, a flammable liquid?
15    A.    It's a liquid that's susceptible to ignition very
16    easily.
17    Q.    So that means it's designed to burn but not to
18    explode?
19    A.    Right.
20    Q.    -- not designed to explode, excuse me.
21          Now even though it's not an explosive, can the vapors
22    produced by the gasoline cause an explosion under certain
23    circumstances?
24    A.    Yes.
25    Q.    Can you explain a little bit more about the
```

```
1    conditions under which gasoline vapors would explode?
2    A.   The gasoline vapors when they're produced if they're
3    contained in a container, if that right -- if that right
4    fuel-to-air ratio is there and the ignition source is
5    happening at the right moment, we mentioned that sweet
6    spot earlier, and the vapors are allowed to ignite and
7    combust, then that combustion can cause the container
8    itself to fail and that failure in itself is an explosion.
9    Q.   Are you familiar with the term bleve explosion?
10   A.   Yes.
11   Q.   What is that?
12   A.   A bleve is very unique condition.  It's literally
13   translated as a --
14            MR. WATKINS:  Your Honor, may I interrupt?  I
15   did not hear the word.  What is the word, bleve?
16        I'm sorry, you're muted, Your Honor.
17            THE COURT:  Yes.  I heard it like you heard it,
18   Attorney Watkins.
19            MR. WATKINS:  Could you spell that?
20            THE COURT:  Could you repeat that specific word?
21   Q.   (By Ms. Berkower)  Special agent?
22   A.   The term is bleve, b-l-e-v-e.
23            MR. WATKINS:  Thank you very much, Your Honor.
24            THE COURT:  Thank you, sir.
25            THE WITNESS:  The term itself means Boiling
```

1   Liquid Expanding Vapor Explosion and that condition

2   happens when -- let's just use the example of a gas tank

3   that is on fire with direct flame impingement.  That flame

4   is now causing the liquid gasoline inside that container

5   to begin to boil but the container itself is still

6   containing it so it's still inside.  The vapors are

7   generating -- the liquid is trying to go from a liquid to

8   a gas but container is containing it.  That fire may cause

9   significant damage to the container causing it to fail.

10         So if that container fails, this boiling gasoline is

11  now escaping from the container.  You may have seen

12  examples of that perhaps in the news where in an emergency

13  or a disaster as now the vapors are rapidly expanding into

14  an expanding fireball.  It's going from liquid to vapor

15  immediately and that's the boiling liquid expanding vapor

16  explosion phenomenon.

17  Q.   Now is it fair to say that gasoline is unpredictable

18  as an explosive?

19  A.   As an explosive I would say, yes, because it's not

20  designed to explode.

21  Q.   So is it fair to say it's more likely that gasoline

22  vapors if ignited will catch fire?

23  A.   Yes.

24  Q.   But that gasoline vapors could also explode depending

25  on the condition?

1    A.   On the conditions and the container that it's

2    contained in, yes.

3    Q.   Now you spoke earlier about gasoline vapors as being

4    heavier than air?

5    A.   Yes.

6    Q.   So if gasoline is in a container, when those vapors

7    come off the liquid, where do they go?

8    A.   They would go down.

9    Q.   Let's talk a little bit more about the significance

10   of the fact -- well, excuse me.  Let me move onto

11   something slightly different.

12        If the vapors that -- it's the vapors not the liquid

13   that ignite, right?

14   A.   Yes.

15   Q.   So does mean the volume of the gasoline in a given

16   container is determinative of whether there can be a fire?

17   A.   The volume determines how much vapor may be

18   collected, which would mean how much vapor may continue to

19   burn.

20   Q.   But in terms of whether there could be an initial

21   fire, does it matter if the container is partial empty?

22   A.   No.

23   Q.   And is that because it's the vapor not the liquid

24   that are igniting?

25   A.   Correct.

1    Q.   If a container is fully filled with gasoline, is

2    there less space in the container for vapors to form?

3    A.   Yes.

4    Q.   And if a container is partially filled with gasoline,

5    will that allow more vapor to build up?

6    A.   Yes.

7    Q.   What happens when gasoline vapors build up in a

8    container?

9    A.   Well, when it builds up the container will contain

10   them, which means it keeps them inside the container as

11   designed.  That's why gasoline is supposed to be in

12   certain containers only as being stored or transported.

13   Q.   What happens to the fuel-to-air ratio inside the

14   container when the vapors build up?

15   A.   Well, it's going to -- there's no more air coming in

16   because the container is not allowing air to come in if

17   it's working as it's supposed to be.

18   Q.   So does the fuel-to-air ratio change as gasoline

19   vapors build up in the container?

20   A.   Whatever it is, it shouldn't change because there's

21   no air coming in.

22   Q.   Well, will it initially -- when the vapors initially

23   build up off of the gasoline liquid, will that change the

24   fuel-to-air ratio in the container?

25   A.   At some point it would.

1    Q.   Does that in turn impact the likelihood of whether if
2    ignited there will be a fire?
3    A.   Yes.
4    Q.   So could a partially filled can have more vapors in
5    it than a fully filled can?
6    A.   Yes.  If the can --
7    Q.   Sorry.  Maybe I should have been more clear.
8         If you're looking at two cans of the exact same size,
9    would a partially filled can have more vapor in it than a
10   fully filled can?
11   A.   Yes, it should.
12   Q.   And vapor is what burns?
13   A.   Yes.
14   Q.   So let's go back a minute to some of the training
15   courses that you teach.
16        In the courses you teach, do you teach students about
17   these properties of gasoline?
18   A.   Yes, and we include the fire triangle on how things
19   combust.
20   Q.   Do you teach the students that it's the vapor and not
21   the liquid that burns?
22   A.   We show them that in our demonstrations.  In our
23   practical demonstrations after the introduction to
24   explosives class, we show them that property example.
25   Q.   Do you also teach them about how the gas vapors are

1    heaver than air?

2    A.    Specifically I cannot recall if we specifically touch

3    on that one point.

4    Q.    Well, do you teach them about the chemical properties

5    of gasoline and why gasoline is flammable?

6    A.    We discuss the flammability of gasoline and how it's

7    used commonly in improvised incendiary devices.

8    Q.    And when you're talking about the flammable

9    properties, that's chemistry, right?

10   A.    Yes.

11   Q.    Basic chemistry but chemistry no less?

12   A.    Yes, it is.

13   Q.    And those are some of the things that you do have to

14   instruct students about in your courses on IIDs and other

15   explosives and hazardous devices?

16   A.    Yes, we do that for recognition and identification

17   purposes.

18   Q.    Okay.  So let's go a little bit more now into how

19   IIDs work.

20        You described the components of an IID, the fusing

21   system, the ignitable material, maybe a container.  Could

22   you explain how they work when they are ignited?

23   A.    Yes.  So once a fusing system is ignited, the system

24   will burn.  That burn is transferring heat and the heat is

25   moving towards the ignitable material as designed in the

1    IID.  And when that heat source hits that ratio of fuel to

2    air that we described earlier, if it's in that sweet spot

3    that we described, it can begin to burn and that burning

4    can cause a failure of the container.  It can cause

5    potentially an explosion of those vapors if the container

6    fails.  So the device would burn and a fuel fire could

7    ensue.

8    Q.   And I think you mentioned earlier could gasoline be

9    used as the ignitable material in an IID?

10   A.   Yes.

11   Q.   So when would an IID that uses gasoline specifically

12   as the ignitable material catch fire?

13   A.   Could you repeat the question, please?

14   Q.   Well, actually let me take a step back first.

15       Before you described that when an IID is lit there is

16   a transfer of heat through the fusing system to ignitable

17   material, right?

18   A.   That's correct.

19   Q.   How -- what kinds of initiating systems could cause

20   the fuse to initially have that heat source that it

21   transfers to the ignitable material?

22   A.   Okay.  It could be something as benign as a wooden

23   match, a paper match, perhaps a lighter of some sort;

24   anything that generates fire that's commonly procured.

25   Those are some examples.

1   Q.   So something like a match or lighter or something

2   else that produces fire would ignite the fusing system, is

3   that how that would work?

4   A.   Certainly.  Those very common, simple examples, yes.

5   Q.   Okay.  You said earlier that an IID could have

6   gasoline as the ignitable material, right?

7   A.   Yes.

8   Q.   When would an IID that uses gasoline as the ignitable

9   material catch fire?

10  A.   When the heat transfers from the fusing system to the

11  ignitable material, in this case we're describing the

12  vapors produced by the gasoline.

13  Q.   And if the right fuel-to-air ratio is present, it

14  would ignite?

15  A.   Yes.

16  Q.   Could you say under what circumstances an IID using

17  gasoline as the ignitable material would explode?

18  A.   If the ratio for the fuel to gas were in that sweet

19  spot and all those vapors were ignited inside the

20  container and the container failed, that failure would be

21  an explosion if pressure opened it up.

22  Q.   So the ignition of all of those vapors at once in

23  that sweet spot of fuel-to-air ratio would cause pressure

24  inside the container?

25  A.   It's possible, yes.

1    Q.    And the pressure released through the container would

2    be the explosion you're describing?

3    A.    Yes.  The pressure couldn't escape out fast enough

4    that's why the container would fail.  That is the

5    explosion.

6    Q.    Okay.  So let's talk more about your laboratory.  We

7    will move onto a different area and talk about how you

8    analyze the evidence that gets sent to you at your

9    laboratory.

10        Now is it fair to say that when evidence is sent to

11   you from out in the field, you take steps to figure out

12   what it is that was collected and sent in?

13   A.    Yes.

14   Q.    And in particular you're trying to figure out if what

15   was sent to you is a hazardous device or not?

16   A.    Yes.

17   Q.    So that's whether it is an IID or an IED?

18   A.    Yes.

19   Q.    In order to answer that question, what are you

20   looking for in the evidence that you're reviewing?

21   A.    Well, we're looking for certain components.  Once

22   again, we mentioned for an IID we're looking to see if an

23   ignitable material is present.  Usually a sample is sent

24   to us or to a different lab and we utilize the results.

25   Or we're also looking for some type of fusing system and

1    potentially a container.

2    Q.    You said you're looking for ignitable material or a

3    fusing system, do you actually mean and?

4    A.    And a fusing system, yes.

5    Q.    So do you look for those three components, the fusing

6    system, the ignitable material, and a container in every

7    case?

8    A.    Yes.

9    Q.    Why is that?

10   A.    Well, that's the hazardous device in itself.   On

11   occasion we might have a partially constructed hazardous

12   device where only a few of the components may be present

13   and we'll recognize that and identify it in our reporting.

14   Q.    But searching for those three components, is that how

15   you determine if it's a hazardous device or not?

16   A.    Yes.

17   Q.    And if you find those three things, the fusing

18   system, the ignitable material, and the container, what

19   conclusion do you draw?

20   A.    We can draw a conclusion that the components in

21   themselves are a hazardous device.

22   Q.    Would you draw that same conclusion if all three of

23   those components were present but the device did not go

24   off?

25   A.    Yes.

1   Q.   Why is that?

2   A.   It's still a hazardous device in itself.  It's

3   potentially improvised where somebody made it on their own

4   from common materials, and once again all the components

5   are present.

6   Q.   So the components were present so in theory you could

7   make it work?

8   A.   It's possible, yes.

9   Q.   So let's talk more about devices that don't go off.

10   When you're sent a device that did not go off, what

11   steps do you take to examine it?

12   A.   Well, it's actually easier to examine those because

13   all the components first are there and they're not

14   typically in a damaged condition.  So we segregate them

15   and we identify what the components are and from

16   identification maybe there's even a comparison we may do

17   if the case warrants it.  But we conclude that the

18   summation of those components are themselves a hazardous

19   device.

20   Q.   So you're still looking for those three components of

21   an IID or an IED, the fusing system, the ignitable

22   material, and the container when you get a device that did

23   not go off?

24   A.   Yes.

25   Q.   If the device did not have those three components,

1   would it be a hazardous device?

2   A.   No.   It would potentially be a partially assembled

3   hazardous device but not in itself.

4   Q.   Could you describe more what would make you classify

5   something as a partially assembled hazardous device?

6   A.   So if we had, from examples that we're describing

7   with the fuel can, a fuel can with no fuel in it but paper

8   is rolled up in the nozzle where it may be ignited, that's

9   potentially partially assembled because it's missing the

10  fuel.

11  Q.   So it's missing one of those three components?

12  A.   Yes.

13  Q.   Is that different from a hoax device?

14  A.   It depends on the situation and the components and

15  the circumstances.

16  Q.   Well, is a hoax device a little bit different from a

17  partially assembled device in that a hoax device is

18  constructed to make people think that there is a device?

19  A.   Yes, it is.

20  Q.   And does a hoax device --

21  A.   Typically in those cases a substitution might be

22  utilized.   An example might be modeling clay might be

23  utilized to make the observer believe it's some type of a

24  high explosive.   Either way, the hoax device elicits some

25  type of a public safety response because of the potential

1    danger.

2    Q.    So a hoax device does not have to have all three of

3    those components that you would need to ignite or explode

4    a device, right?

5    A.    No.

6    Q.    But it's constructed to look as though it is?

7    A.    Yes.

8    Q.    So let's talk more about some of the reasons why IIDs

9    do not go off.

10        In the field of explosives, is it well known there

11    are three fundamental elements that must be present for

12    there to be a fire?

13    A.    Yes.

14    Q.    Is that the fire triangle you referenced earlier?

15    A.    Yes, it is.

16    Q.    Could you describe more what the fire triangle is?

17    A.    Yes.  The fire triangle, it's three elements required

18    for things to burn.  One is oxygen.  The oxygen is

19    required in conjunction with the fuel, some type of a fuel

20    is required.

21        The heat ignites the fuel with the oxygen present,

22    and the three are required to sustain themselves and

23    maintain themselves for a combustion burning process to

24    continue.  You take any one of those away and the fire

25    should go out.

1    Q.   So if a device has the three components of an IID,

2    the fusing system, the ignitable material, the container,

3    but it doesn't have all three of those things you just

4    described for a fire, fuel, oxygen, or heat, will the

5    device work?

6    A.   No.

7    Q.   So, for instance, if the initial flame goes out,

8    would there be inadequate heat to set off the device?

9    A.   Yes.

10   Q.   Or if there's an incorrect fuel-to-oxygen ratio

11   inside the container, would that mean the device does not

12   work?

13   A.   Yes.

14   Q.   Now a circumstance where you have the wrong ratio of

15   fuel and air in the container is not the same as a

16   circumstance where there is no fuel in the container,

17   right?

18   A.   Yes.

19   Q.   So an IID could have ignitable material in it and a

20   fusing system and a container and an attempt to ignite it

21   but it still might not go off for one of the reasons you

22   just described?

23   A.   Yes.

24   Q.   Are devices that contain the elements of an IID that

25   have not gone off still dangerous?

1    A.   Yes.

2    Q.   Why is that?

3    A.   Well, the potential for them to continue to produce

4    that hazard still exists.  The fuel and the oxygen ratio

5    it can change with the environmental conditions, with the

6    mechanical placement of the container if something gets

7    moved.  Once again, there's a lot of variables that can

8    still cause that to be a hazard.

9    Q.   If someone were to say bring in a heat source, if

10   heat were the only thing that were missing previously for

11   a fire, could it cause the device to go off?

12   A.   It's possible, yes.

13   Q.   So if the three components of an IID are present but

14   one of the required elements for a fire is not present,

15   the device could still go off if that missing element were

16   reintroduced?

17   A.   Yes.

18   Q.   Is a spark a source of heat?

19   A.   Yes.

20   Q.   Is a lit cigarette a source of heat?

21   A.   Yes.

22   Q.   If an IID that has inadequate heat to light the

23   fusing system is in a public place, is that a danger?

24   A.   Yes.

25   Q.   Why?

1    A.   Well, you have a container full of gasoline or

2    ignitable material in the public domain.  It's outside.

3    Once again, the environmental conditions play into this

4    because it's outside.  Perhaps the sun is shining on the

5    container and generating more vapors.  Gasoline is a

6    volatile chemical, and these vapors could now escape the

7    container potentially and be in the area of the container.

8    Once again, the introduction of a heat source could cause

9    that to function.

10   Q.   When you say function, you mean catch fire?

11   A.   To catch fire, yes.

12   Q.   Or explode?

13   A.   It's possible, yes.

14   Q.   So is it fair to say that just because a device

15   didn't go off doesn't mean it can't go off?

16   A.   No.  It can still go off.

17   Q.   As long as those three components, the ignitable

18   material, the fusing system, and the container are present

19   in a public setting, is it dangerous?

20   A.   Yes.

21   Q.   Is this something that you teach in your coursework

22   that IIIs that don't go off are still dangerous?

23   A.   Yes, they are.  They need to be managed because

24   they're not -- there's no quality control.  They're not

25   using a container that's designed to hold the material and

```
 1    it's out of its -- it's in a public domain and it needs to

 2    be managed.

 3    Q.   So let's talk now about the examination that you did

 4    in this particular case, and I think now we are getting

 5    into the part where I'm going to need to share my screen

 6    and so, special agent, if you just put -- to make you

 7    aware that you're going to need to look at your screen as

 8    well in a moment.

 9         When the evidence in this case came to your

10    laboratory, did it come in several pieces?

11    A.   Yes.

12    Q.   Was one of those a 5-gallon diesel fuel can?

13    A.   Yes.

14    Q.   I'm going to share my screen now to put up an

15    exhibit.

16         Can you see that, special agent?

17    A.   Yes.

18    Q.   Now, does that look like the can that you examined in

19    your laboratory?

20    A.   Yes.

21    Q.   Did you take this picture?

22    A.   No.

23    Q.   When you had -- but does it look like the can -- does

24    it look like a photo of the can that you examined in

25    person?
```

1   A.   Yes.

2   Q.   I'm going to show -- that's Government Exhibit 2.

3   I'm also going to show you Government Exhibit 3.

4        Does that also look like the can that you examined in

5   person in your laboratory?

6   A.   Yes.

7   Q.   I'm also going to show you Government's Exhibit 4.

8   Does that also look like the can that you examined in

9   person in your lab?

10  A.   Yes.

11  Q.   And Government's Exhibit 5, does look like the can

12  you examined?

13  A.   Yes.

14  Q.   Those are all the same can that you examined in your

15  lab?

16  A.   Yes.

17  Q.   Did you also examine paper pamphlets?

18  A.   Yes.

19  Q.   I'm going to show you some photographs.  I'm going to

20  show you Government's Exhibit 6, 7, and 8.

21       I'll start with 6.  Do you recognize what's in

22  Government's Exhibit 6?

23  A.   Yes.

24  Q.   What's that?

25  A.   That's one of the pamphlets.

1    Q.   When you examined it, did you examine it in person?

2    A.   Yes.

3    Q.   Is this photograph an accurate representation of what

4    you examined?

5    A.   Yes, it is.

6    Q.   Going to Government's Exhibit 7, do you recognize

7    that?

8    A.   Yes.

9    Q.   What is that?

10   A.   That's one of the other pamphlets.

11   Q.   Well, was that one of the pamphlets you examined in

12   connection with this case?

13   A.   Yes, it is.

14   Q.   And did you have that in person at the time you

15   examined it?

16   A.   Yes.

17   Q.   Going to Government's Exhibit 8, do you recognize

18   that?

19   A.   Yes.

20   Q.   What is that?

21   A.   That's one of the pamphlets that was utilized in this

22   examination.

23   Q.   And again you had that in person when you were

24   conducting your examination?

25   A.   Yes.

1    Q.   But this is an accurate picture of that?

2    A.   Yes.

3    Q.   Did you also look at photos taken by the Longmeadow

4    Massachusetts Police Department?

5    A.   Yes.

6    Q.   I'm going to show you Government's Exhibit 9.  Is

7    that one of the photographs you examined?

8    A.   Yes.

9    Q.   And I'm going to show you Government's Exhibit 10.

10   Is that also one of the photos that you examined?

11   A.   Yes.

12   Q.   In addition, when you did your analysis of the

13   evidence in this case, did you consider a report prepared

14   by the Longmeadow Police Department?

15   A.   Yes.

16   Q.   As well as analysis of liquid taken from inside the

17   yellow can shown in those photos?

18   A.   Yes.

19   Q.   Who did that analysis?

20   A.   The State of Massachusetts has a laboratory who

21   produced those results.

22   Q.   What did they determine the liquid to be?

23   A.   Determined as a yellow gasoline.

24   Q.   Did you rely on their determination and analysis as

25   you conducted your own examination of the evidence in this

1    case?

2    A.   Yes, because I'm not a chemist, that's not my lane of

3    expertise and so I rely on their results.

4    Q.   Did you actually have the liquid at your laboratory

5    with you?

6    A.   No.

7    Q.   So you just relied on what the Massachusetts State

8    Police Crime Lab found?

9    A.   That is correct, yes.

10   Q.   Okay.  When you examined this device, were you trying

11   to determine what exactly the police had found at the

12   scene that day?

13   A.   Can you repeat the question, please?

14   Q.   When you examined this evidence, were you trying to

15   determine what exactly the police had found at the scene

16   that day?

17   A.   Yes.

18   Q.   And did you look for the three components you

19   described earlier that you look for in every case that

20   comes into your lab?

21   A.   Yes.

22   Q.   Did you look for a container?

23   A.   Yes.

24   Q.   Did you find one?

25   A.   Yes.

1   Q.   Is that what's shown in Government's Exhibit 2

2   through 5?

3   A.   Yes, it is.

4   Q.   Did you look for a fusing system?

5   A.   Yes.

6   Q.   Did you find one?

7   A.   Yes.

8   Q.   Is that what's in Government's Exhibit 6, 7, and 8?

9   A.   Yes.

10   Q.   And how would you describe that?

11   A.   The fusing system was paper pamphlets which were

12   inserted into the nozzle area of the container and that's

13   the only open area that the liquid is designed to come in

14   and out of and also which may have air transfer.  So

15   there's evidence of burning that I can see on the paper

16   themselves.  There's charring around part of the paper

17   which shows me that this paper in itself was ignited.

18   Q.   So that was the fusing system that you identified in

19   your examination?

20   A.   Yes, it is.

21   Q.   Did you also look for an ignitable material in this

22   case?

23   A.   We noticed there was no chemical samples submitted to

24   us.  So in consultation with the case agent, we were

25   informed that the sample was done with the Massachusetts

1    State Police at their laboratory and so we requested a

2    copy of their examination report.

3    Q.    Let me clarify that question.

4         When I say look for, I mean in the evidence reviewed,

5    including all of the evidence we just discussed, including

6    the Massachusetts State Police Crime Lab report, did you

7    look for evidence of an ignitable material that was found

8    at the scene by the Longmeadow police?

9    A.    Yes.

10   Q.    What evidence of an ignitable material did you find?

11   A.    We found that there was material identified as yellow

12   gasoline as part of this device.

13   Q.    So here you have a container?  There was a container

14   here in this case?

15   A.    Yes.

16   Q.    Was there a fusing system?

17   A.    Yes.

18   Q.    And you learned from the Massachusetts State Police

19   Crime Lab there was an ignitable material, namely

20   gasoline?

21   A.    Yes.

22   Q.    Based on your review of the evidence, how were these

23   components assembled?  I'm going to pull up photos 9 and

24   10, Exhibits 9 and 10 excuse me.

25   A.    So the photo demonstrates the container that we

1    discussed.  It's located in the public domain near a
2    street, a sidewalk, and a crosswalk.  Inside the nozzle
3    area of this container are papers that are somewhat rolled
4    up, inserted inside that nozzle where the air would go in
5    and potentially mix with the fuel vapors.
6         And you can see on the container from this
7    photograph, there's even what I'll describe as a liquid
8    level of a liquid inside that container, perhaps a third
9    of the way up from the bottom.  And that shows that
10   there's a liquid present here and a potential vapor space
11   as well.
12   Q.   And is that significant to you, the liquid level in
13   this particular container?
14   A.   It is.  It shows that there's a potential for vapors
15   to accumulate inside this container if that is itself an
16   ignitable material.
17   Q.   Would you reach that same conclusion if the liquid
18   level were all the way to the top of this container?
19   A.   It would be much less vapor production because of the
20   smaller amount of what we call headspace which would
21   contain those vapors.
22   Q.   And the vapor is what burns when you're talking about
23   gasoline?
24   A.   Yes.
25   Q.   Now, based on your review of this evidence was heat

```
 1    ever applied to this fusing system --
 2    A.   Yes.
 3    Q.   -- the paper pamphlet?
 4         Can you describe what you saw there?
 5    A.   I observed charring on the paper itself where it was
 6    ignited.
 7    Q.   So what does the charring tell you about this
 8    particular device?
 9    A.   It tells me that the paper itself began to burn and
10    for reasons unknown it stopped burning.
11    Q.   Now based on your review of the evidence, did the
12    gasoline in this container ignite?
13    A.   No.
14    Q.   How do you know that?
15    A.   There's no signs as you can see that show that there
16    was any kind of burning of those vapors.  There's no
17    melting; there's no soot that was generated that we might
18    see.  There's no damage to this container that we might
19    see from a fire.
20    Q.   And to be clear, in reaching that conclusion, you
21    physically examined the container yourself, right?
22    A.   Yes.
23    Q.   Not just photographs?
24    A.   Yes, not just photographs.
25    Q.   So looking at Government's Exhibit 9, could this
```

1   device have caught fire?

2   A.   Yes.

3   Q.   How do you know that?

4   A.   Well, all the components were in play.  The ignitable

5   material was present; there's a fusing system that was

6   ignited, and there is oxygen present in the ambient

7   environment.  So all the conditions are there which would

8   support a fire had the heat source ignited those vapors.

9   Q.   And fair to say that the vapors would have caught

10  fire if the fuel-to-air ratio in the container was in the

11  right spot, right?

12  A.   Yes.

13  Q.   If the vapors had caught fire, what could have

14  happened next?

15  A.   The vapors could have ignited the container itself

16  potentially causing it, of course, to burn but to fail and

17  the ignitable material liquid inside could have left the

18  container and moved through the area which would be called

19  a flowing fuel fire.

20       There's also potential that the vapors that have

21  collected inside the container once burning could overcome

22  the container with a pressure and cause an explosion.

23  Q.   Now did your examination of this evidence allow you

24  to determine exactly what would have happened if the

25  vapors in this case had caught fire?

1    A.    No.

2    Q.    Given what you know about the chemical properties of

3    gasoline and how gasoline behaves, are the options you

4    just described possible?

5    A.    They are possible, yes.

6    Q.    You mentioned earlier that fire requires three things

7    - fuel, oxygen, and heat?

8    A.    Yes.

9    Q.    And if any one of those things is missing, there can

10   be no fire?

11   A.    Yes.

12   Q.    So if there is fuel and oxygen but not heat, there

13   can be no fire?

14   A.    Yes.

15   Q.    But if you add the heat back in, a fire is possible?

16   A.    Yes.

17   Q.    For this device sitting in the spot where it was

18   found, was it dangerous in your view?

19   A.    Yes.

20   Q.    Why?

21   A.    It's back in the public domain.  You can see that

22   this photograph had been taken during the day and you can

23   see a shadow from the sun, which means that the sunlight

24   is beaming onto the container itself which means it can

25   suck the heat up and that type of reaction causes that

1    ignitable material to produce vapors and it's possible

2    those vapors could actually leave the container and -- as

3    you mentioned gasoline is heavier than air -- and they

4    could go down on the ground and pool in low areas.  Once

5    again, it's dangerous because a heat source could be

6    brought to bear here and cause this to potentially burn

7    and potentially even a small explosion -- or an explosion

8    rather.

9    Q.   So you mentioned the vapors coming out of it could

10   have been ignited by an alternate heat source and you

11   mentioned earlier that -- could that include say a

12   cigarette thrown from a passerby?

13   A.   Yes.

14   Q.   Or a spark of some kind?

15   A.   Yes.

16   Q.   Does the fact that this device didn't go off change

17   your view of this device as dangerous?

18   A.   No.

19   Q.   Why not?

20   A.   It's still containing hazardous material.  It's in

21   the public domain outside where there's a potential for

22   ignition and, once again, that's why public safety was

23   called to come mediate this.

24   Q.   Given what you now know about this device after your

25   examination, would it have been safe for the responding

officers to have just left this sitting next to the tree

where it was found?

A.   No.

Q.   Why not?

A.   No, it wouldn't because, once again, this container

contains that material that generates potential vapors and

the public safety officer responds to this and they

recognize this as a suspicious package.  You know, we have

to address that, but let alone that there's still

potential vapors in the area which could be ignited in the

public domain and cause property damage, personal injury,

or even death.

Q.   And is that based on your training and experience in

your field of hazardous devices and explosives?

A.   Yes.

Q.   And specifically your knowledge of the flammable

properties of gasoline and how gas fires behave?

A.   Yes.

Q.   And your knowledge of how to safely handle flammable

substance like gasoline?

A.   Yes.

        MS. BERKOWER:  Your Honor, no further questions

at this point.

        THE COURT:  Thank you.  Are we at the point

where everyone needs to take about -- I think I need about

1    a 20-minute break here.

2         I just don't know for the defendant, are you able to

3    stay in that room?

4         Ms. Rivera, do you know how that works?

5              THE DEFENDANT:  I got to go actually eat lunch

6    for 20 minutes and then we can start back up whenever

7    you're ready.

8              THE COURT:  So you can be back in that room in

9    20 minutes?

10             THE DEFENDANT:  Yes, sir.

11             THE COURT:  Okay.  We'll reconvene in 20

12   minutes.  Does that sound good?  Can everyone do that?

13             MR. WATKINS:  Yes, that's fine.

14             MS. BERKOWER:  Yes, judge.

15             THE COURT:  Ms. Rivera, that's good?

16             THE CLERK:  Yes.

17             THE COURT:  All right.  Thank you.  So 20

18   minutes so that means -- okay.  I'm trying to look at my

19   clock, so probably ten after.

20             THE CLERK:  Thank you.

21   **(A recess was taken at 11:46.)**

22             THE COURT:  All set.  Whenever you're ready.

23             MR. WATKINS:  I'm ready if we have everybody.

24             MS. BERKOWER:  Your Honor, I'm on the phone with

25   my camera turned off, but I'm on here on the phone.  This

1    is Risa Berkower.

2              THE COURT:  If we have the witness, we can

3    begin.

4              MS. BERKOWER:  I believe he may be muted.

5    Special Agent Rigopoulos, can you hear us?

6         I just sent him a text to see if you can hear us.

7         Okay.  He texted me saying I can hear.  Can you hear

8    me, and I'm saying no.

9              THE CLERK:  I did ask him to unmute his phone as

10   well.  I don't have the authority to unmute the phone.

11             THE WITNESS:  Can you hear me now?

12             MS. BERKOWER:  Yes.

13             THE WITNESS:  Okay.

14             MR. WATKINS:  Thank you.  May I proceed?

15             THE COURT:  Sure.

16        Ms. Rivera, are you locked on the video?  I can't get

17   it on video.

18             THE CLERK:  No.  Try it now.

19             THE COURT:  Thank you.

20        All right.  Go right ahead.

21             MR. WATKINS:  Thank you, Your Honor.

22

23

24

25

**CROSS-EXAMINATION**

Q.   (By Mr. Watkins)   Good afternoon, Agent Rigopoulos.

A.   Good afternoon, sir.

Q.   I want to talk a little bit about your education and training for a moment.

     You have an undergraduate degree, a bachelor of science degree?

A.   That is correct.

Q.   And your degree is in social sciences education, correct?

A.   Yes.

Q.   You took courses in psychology, sociology?

A.   Yes.

Q.   Did you take courses in chemistry?

A.   Not in college.

Q.   Did you take courses in physics in college?

A.   No.

Q.   You joined the Marine Corp. at age 17?

A.   That is correct.

Q.   And was that as active duty or were you always Marine Corp. Reserve?

A.   I was a reservist until we were activated for the Gulf War.

Q.   So age 17 you went into the Marine Corp. Reserve and that's when you went to the college?

```
 1    A.    Yes.
 2    Q.    During this period of time that you were Marine Corp.
 3    reservist, you're also a fire captain in Knoxville,
 4    Tennessee?
 5    A.    Yes.
 6    Q.    And you were also a deputy sheriff in Knox County
 7    Tennessee?
 8    A.    That is correct.
 9    Q.    So those are three jobs at least for awhile, going to
10    college, being a deputy sheriff, fire captain, and the
11    reservist, I guess four jobs?
12    A.    That is correct.
13    Q.    Any of those jobs require chemistry courses?
14    A.    When I joined the fire department, the course
15    instruction as the hazardous material technician was very
16    heavy on chemistry of hazardous materials.
17    Q.    So that was specifically as to hazardous materials
18    but not again -- well, was that a university course?
19    A.    No, it was not.
20    Q.    Who was that course taught by?
21    A.    It was taught by the Rural/Metro Fire Department and
22    the State of Tennessee.
23    Q.    And again not a university-level course?
24    A.    No.
25    Q.    How long was that course that you took in hazardous
```

1    materials when you were fire captain?

2    A.   I can't remember exactly.  It was several weeks for

3    just the chemistry portion, and the hazardous materials

4    was several more weeks.

5    Q.   Was that full time or was that while you were working

6    as well?

7    A.   It was mixed.

8    Q.   So how many hours a week were you taking chemistry

9    courses?

10   A.   Well, the course itself is an 80-hour course and that

11   was a resident course where I attended the whole thing

12   from beginning to end.

13   Q.   That would be the --

14   A.   The hazardous materials course, once again, from

15   beginning to end.  It wasn't the start and stop type of

16   thing but several weeks.

17   Q.   I see.

18        So hazardous materials were taught throughout the

19   course and part of the hazardous materials involved some

20   chemistry?

21   A.   That is correct.

22   Q.   You joined the FBI at age 30, correct?

23   A.   That is right.

24   Q.   You worked first as a bomb technician, right?

25   A.   Say again, sir?

1    Q.   You worked first as a bomb technician out of

2    Philadelphia?

3    A.   Initially I was assigned to the field office and then

4    I became a bomb technician.

5    Q.   Okay.  And in your job as a bomb technician, you were

6    making evidence safe, forwarding it onto the lab in

7    Quantico?

8    A.   Yes, sir.

9    Q.   Not doing chemical analysis there as part of your job

10   --

11   A.   No, sir.

12   Q.   -- as a bomb technician?

13   A.   No, sir.

14   Q.   When you reached the FBI lab in Quantico in 2006, you

15   began as an evidence coordinator there?

16   A.   Well, the term is request coordinator which is we

17   received the evidence from the field.  We set the lab plan

18   and managed the evidence movement through the lab

19   officially.

20   Q.   So you began as a request coordinator down in

21   Quantico?

22   A.   Yes.

23   Q.   And at that point again no university-level courses

24   in chemistry or physics?

25   A.   So we took classes as an explosive device examiner at

1    the University of Rhode Island on explosives chemistry.

2    We took classes at Washington College on the chemistry of

3    pyrotechnics, and in those classes was also concepts

4    involving physics were introduced.

5    Q.   Those courses, how long were they?  How long were the

6    courses taken?

7    A.   I would say each of them was, if I remember

8    correctly, about a week.

9    Q.   A one-week course in I think you mentioned two

10   different places, Washington College and also University

11   of Rhode Island?

12   A.   That is correct.

13   Q.   Any grades given out at the end of that one-week

14   course of either of those teachings?

15   A.   I believe we received certificates of completion.

16   Q.   Were there grades?

17   A.   No, sir.

18   Q.   So as long as you showed up, you get the certificate

19   of completion, correct?

20   A.   I can't recall if there were any tests given or not.

21   Q.   And I think you said you do not consider yourself a

22   chemist, right?

23   A.   That is correct.

24   Q.   The FBI laboratory at Quantico has chemists on staff;

25   is that correct?

1    A.    They do.

2    Q.    You testified to standard operating procedures,

3    protocols, and there's also quality assurance manuals

4    produced by the FBI, correct?

5    A.    Yes.

6    Q.    Part of any scientific analysis that's done at the

7    FBI is to consider the sources of the materials that

8    you're getting; is that fair to say?

9    A.    Yes.

10   Q.    For example, you talked about this report you got

11   from the Massachusetts State Police that it was yellow

12   gasoline involved, correct?

13   A.    Yes.

14   Q.    You did not independently verify that it was yellow

15   gasoline, correct?

16   A.    That's correct.

17   Q.    And nobody in Quantico or anybody else associated

18   with the FBI verified that it was yellow gasoline?

19   A.    That's correct.

20   Q.    Now, the FBI -- as part of some of the manuals you

21   talked about, the quality assurance manual specifically,

22   requires the FBI to make an independent analysis when

23   materials are submitted to it from outside; is that

24   correct?

25   A.    Repeat the question, please?

1    Q.   Well, yes.  The FBI quality assurance manual requires
2    you as an analyst to verify, independently verify the
3    procedures and results that you're relying on when you
4    accept results from outside of the FBI laboratory,
5    correct?
6    A.   Those procedures would be verified with their quality
7    assurance programs from that lab.  We are accepting their
8    results as they stand.
9    Q.   I see, without further investigation about what kinds
10   of methods they used?
11   A.   Those methods were independent of that laboratory
12   versus ours.
13   Q.   So how do you know whether you're getting good
14   results from a laboratory when you're relying on their
15   results?
16   A.   I'm relying on the results to stand on their own.
17   The Massachusetts State Laboratory is a renowned
18   laboratory in the region and they're used quite often, and
19   I would use their results if they were submitted to us.
20   Q.   Do you know the name Annie Dookhan?
21   A.   I do not.
22   Q.   Do you know the name Sonja Farak?
23   A.   I do not.
24   Q.   I am putting in front of you a document, the FBI
25   Laboratory Quality Assurance Manual.  Do you see that?

1    A.    I do.

2    Q.    I'm going to turn to section -- well, first we can

3    look at the table of contents here.  It talks about review

4    of requests and contracts, selection, verification, and

5    validation of methods.  Do you see that?

6    A.    I do.

7            MS. BERKOWER:  Your Honor, I'm sorry to

8    interject here, but would it be possible -- I know we're

9    sort of in an unusual posture here, but this is not a

10   document that we've seen before.

11        Would it be possible, Mr. Watkins, for you to email

12   that to me just so I can see the document if you're going

13   to use it as an exhibit in this hearing?

14            MR. WATKINS:  It is possible for me to do that.

15   I will note that it was provided to me in discovery by the

16   government.  So it's part of the discovery in this matter,

17   but I will send it right now.  If I may just have a

18   moment?

19            MS. BERKOWER:  Thank you.

20   Q.    (By Mr. Watkins)  All right.  This is still up in

21   front of your -- on your screen?

22   A.    Yes, sir.

23   Q.    So as part of the -- well, perhaps I should go up to

24   the previous page.

25        Part of the Quality Assurance Manual is that the FBI

1    Laboratory should ensure that requirements are adequately

2    defined, recorded, and understood, and it refers to a

3    another manual.

4         And then it goes on to say -- it's not working for

5    me.  There we go.

6         "Externally provided products and services conform to

7    the laboratory's established requirements."  So that would

8    apply here where you're reviewing Massachusetts State

9    Police results and incorporating them into your own

10   opinion?

11   A.   In this case we didn't request them to do these

12   examinations.

13   Q.   I think what it reads here -- what I'm reading here,

14   it says "externally provided products."  This was an

15   externally provided product and service, was it not?

16   A.   It was.

17   Q.   And it cautions that a unit chief or technical leader

18   should conduct reviews of the externally provided products

19   and services.

20   A.   If the requests of those work, which were not

21   requested by us.  They were provided to us.

22   Q.   I see.  So in those kinds of cases you're saying that

23   where somebody provides it without your kind of request,

24   that the standard becomes lowered?  You need not

25   investigate the results yourself?

```
1   A.   No.  That's not what I'm saying at all.  I'm saying
2   the timing sounds different here.  These examinations were
3   conducted before we conducted our investigation and we
4   were -- we don't redo examinations.
5   Q.   So a private vendor sends you a report, whether it's
6   solicited or not, you would not reexamine the results that
7   they had done, that they've provided?
8   A.   We do not redo examinations.
9   Q.   And it doesn't matter where they come from, you would
10  not redo an examination?
11  A.   Unless there's an examination that was not done that
12  we can add value to the results, we would not redo them.
13  Q.   I'm showing you by camera the National Fire
14  Protection Association 921 Guide for Fire and Explosion
15  Investigations.  Are you able to see that?
16  A.   I do.
17  Q.   Is that a reference book that is relied upon by
18  people in your field, explosives and fire?
19  A.   No.
20  Q.   It is not?
21  A.   It's not in our inventory.
22  Q.   Do you know of the National Fire Protection
23  Association 921 Guide for Fire and Explosion
24  Investigations?
25  A.   I do.
```

1    Q.   And you certainly would become familiar with it in

2    your job as a fire captain?

3    A.   I'm familiar with it as a fire captain also as a

4    hazardous materials technician.

5    Q.   So when you say it is not relied upon by people in

6    the explosives analysis field or the fire field, what are

7    you saying?

8    A.   Well, two different jobs.  Hazardous materials

9    technicians respond to remediate hazardous materials

10   incidents.  Explosive device examiners will investigate

11   evidence of a crime involving potential explosives or

12   hazardous materials.

13   Q.   And here this is potential or hazardous explosive

14   materials that we're talking about, correct?

15   A.   It is.

16   Q.   Are you saying that no one in that field would rely

17   on in NFPA 921 as a reference?

18   A.   I didn't say that.

19   Q.   Do you people in the explosive devices field rely on

20   the NFPA 921?

21   A.   Not in the examination format.

22   Q.   Where do they rely on the NFPA 921?

23   A.   They may rely on that for more of a response as far

24   as demonstrating the competencies that might be required

25   to attend a hazardous materials incident.

1    Q.   But you are familiar with the NFPA 921, right?

2    A.   I am aware of it, yes.

3    Q.   And it has many chapters in it, true?

4    A.   Yes.

5    Q.   It goes from basic fire science all the way up to

6    physical evidence, right?

7    A.   If that's what you're telling me, sir.  Like I said,

8    I'm aware of it.  I don't have it in front of me.  It is

9    not on my desk.

10   Q.   You have read it before and you consulted it before,

11   right?

12   A.   No.

13   Q.   I thought you told us that you were hazardous

14   materials analyst at one point as well, right?

15   A.   No.  I was a hazardous materials responder.

16   Q.   I see.

17        And in your field as a hazardous materials responder,

18   you did not encounter the NFPA 21 or 921 as an

19   authoritative guide?

20   A.   The book you held up, no, I did not.

21   Q.   Is there some NFPA 921 that you did rely on?

22   A.   I can't remember specifically for a NFPA 921.

23   Q.   You have -- you testified about hazardous devices,

24   incendiary devices, improvised incendiary devices, and

25   improvised explosive devices, correct?

1    A.    Yes.

2    Q.    Starting with incendiary devices, I believe what

3    you've told us is that to be an incendiary device requires

4    a fusing system, something to burn, and in most cases, but

5    not all, a container, correct?

6    A.    Yes.

7    Q.    Under that broad definition a kerosene lamp, does

8    that quality as an incendiary device?

9    A.    No, it does not.

10   Q.    It has a container for the fuse --

11   A.    I'm sorry, sir.  It is an incendiary device but it's

12   not an improvised incendiary device.

13   Q.    It is an incendiary device then.

14         A BIC lighter, an incendiary device?

15   A.    Yes, sir.

16   Q.    Going to the next step, an improvised incendiary

17   device would be a device that has those aspects or those

18   features but is not generally manufactured in that way?

19   A.    That was my testimony earlier, yes.

20   Q.    So a propane grill bought at Home Depot, that has a

21   fuel source, has an ignition device, and it's contained,

22   correct?

23   A.    Yes.

24   Q.    So it's an incendiary device as is, true?

25   A.    True.

1    Q.   And the ignition device ordinarily a button that is

2    pushed on it that creates a spark inside as manufactured

3    that lights the gas, right?

4    A.   Yes.

5    Q.   So the ignition often -- say the ignition device no

6    longer works and one has to use a match or some other kind

7    of lighting source to start that grill, that has now

8    become an improvised incendiary device, correct?

9    A.   No, it's now an incomplete incendiary device.  It

10   doesn't work.

11   Q.   But if indeed I or somebody lights a match and puts

12   it down to the flame, we've created the heat source by

13   which it starts.  It's contained; it's an improvised

14   incendiary device now under your definition?

15   A.   Well, it's bringing in a heat source, you know, at

16   his or her own peril.  It's not necessarily an improvised

17   incendiary device.  These are two different things.

18        The purpose of that grill is to cook food.  The

19   purpose of an improvised incendiary device is to cause

20   potential property damage, personal injury, or death.  I

21   think they're two different items.

22   Q.   So from your testimony just now I think you're saying

23   it's the intent of the individual that makes the

24   difference about whether it's improvised or not; is that

25   true?

```
1    A.   The design of the container and how it may be
2    employed is a potential factor in this.
3    Q.   So here we have -- in the case here that you
4    examined, you have a fuel container, correct?
5    A.   Yes.
6    Q.   It had fuel in it, correct?
7    A.   Yes.
8    Q.   And that's what it's designed for?  It's a container
9    to --
10              COURT REPORTER:  I'm sorry, Attorney Watkins,
11   you froze.  I did not get your question.
12   Q.   (By Mr. Watkins)  So we have a fuel container here
13   with gasoline in it with I think what you're saying is an
14   alternative heat source?
15   A.   Yes.
16   Q.   So an incomplete heat source or an incomplete
17   incendiary device that someone has now added some kind of
18   a different feature to, right?
19   A.   Yes.
20   Q.   Quite like the gas grill from Home Depot that
21   somebody now lights with a match, right?
22   A.   You're leaving out the location of the gasoline
23   container in the public domain.  If someone was in the
24   middle of a football stadium and lit the gas grill in the
25   middle of a bunch of people, the conditions will be
```

1    different.

2    Q.   So I think what you're telling us is that it becomes

3    an incendiary -- an improvised incendiary device because

4    of the location that it was found at in Longmeadow here;

5    is that correct?

6    A.   Well, I think that's a consideration because each

7    incendiary device is different as I testified earlier.

8    The improvised, is, yes, is adding improvised

9    non-commercial, non-quality control items to this design

10   would make it an improvised incendiary device.

11   Q.   But I think you're telling us that it is location

12   that matters to you?  That that gives it the extra feature

13   that my gas grill example does not have?

14   A.   I think that factors into a consideration, but it is

15   an improvised incendiary device.

16   Q.   And you've never been to the scene in Longmeadow,

17   right?

18   A.   No, sir.

19   Q.   You've never taken -- you don't know what the

20   temperature was on that particular day?

21   A.   No, sir.

22   Q.   What the wind was on that particular day?

23   A.   No, sir.

24   Q.   So I understand your testimony now is that the vapors

25   from inside the fuel container up into the spout were in

1    the specific ranges that would make it -- would allow it

2    to light the vapors; is that correct?

3    A.   I never said they were in the ranges, but the vapors

4    would be present as that was gasoline.

5    Q.   You and Ms. Berkower talked about lower flammable

6    explosive limit, right?

7    A.   Yes, sir.

8    Q.   And upper flammable limit, right?

9    A.   Yes, sir.

10   Q.   You and she started calling it a sweet spot, but it's

11   actually not a sweet spot.  It's a law of chemistry and

12   physics, right?

13   A.   It's an identified range where the flammable vapors

14   will burn.

15   Q.   And at the lower end it will be too lean, meaning not

16   enough fuel; at the upper end too rich, not enough oxygen,

17   correct?

18   A.   Yes, sir.

19   Q.   Now that is a chemistry kind of conclusion, right?

20   That is based from chemistry?

21   A.   I'm sure that's where the data came from, yes, sir.

22   Q.   Well, let me ask you about the data.  Where do you

23   get the data for lower fuel and upper fuel limits?

24   A.   You can get that data from hazardous material books.

25   There's guides that give us the ranges of those.  Each

1    different chemical has a different range, and those could

2    be utilized to understand what the ranges are.

3    Q.   Did you do that in this case?

4    A.   On this case I did not.  I remember from my training

5    and experience that the range is somewhere between 1

6    percent and 7 percent approximately.

7    Q.   I'm sorry, I missed the last part between what and

8    what?

9    A.   Approximately between 1 to 7 percent I believe is the

10   range of the flammable explosive limit.

11   Q.   So this is not -- that range is not developed from

12   your training and experience.  That is from something

13   specific that you have read or you consulted with, right?

14   A.   No, it does come from training, sir.  It's training

15   from being in hazardous materials for ten years and

16   working with the FBI for all these years.  Those are

17   references.

18   Q.   What I'm trying to get at is where is the publication

19   that talks about that 1 to 7 percent concentration that

20   you are now relying on?

21   A.   It can be looked up in several hazardous materials

22   manuals.  I believe there's a NIOSH guide.  I don't have

23   it at my fingertips.  It's on my desk in my office, but

24   that's one reference you can look for.  The chemistry

25   standards identify what those ranges are.  You can look

1    them up.

2    Q.   You're the expert.  Have you looked them up for this

3    case?

4    A.   Not for this case.

5    Q.   I want to talk first about the pieces of paper that

6    were reported to you as having been found in the spout.

7    It's safe to say that paper does not burn spontaneously?

8    A.   That is correct.

9    Q.   It doesn't always burn even when a heat source is

10   directly applied to it, correct?

11   A.   Not necessarily.

12   Q.   And we saw that in this case because you've

13   identified charring but it didn't go anywhere, right?

14   A.   It did burn in fact but the paper did not fully

15   consume.

16   Q.   Correct.  And how much heat and oxygen are required

17   in order for that piece of paper to properly burn?

18   A.   I can't tell you a range for paper.  The paper, the

19   qualities of it, I don't know what they are, but the

20   evidence of burning is still there.

21   Q.   Yes.  What other conditions might affect whether a

22   piece of paper burns?

23   A.   Well, is the paper -- is it damp?  Is it too wet?

24   Does it have properties in it that will preclude it from

25   burning?

1    Q.   And did you do any kinds of test on this piece of
2    paper to see whether any of those things were present
3    here?
4    A.   I did not.
5    Q.   You've seen the pictures -- well, perhaps I can put
6    up Exhibit 9 here.
7            MS. BERKOWER:  Do you need me to do that or are
8    you able to do that yourself?
9            MR. WATKINS:  I'm able to do that myself.  I'm
10   just getting it up here.  One moment it will show.
11   Q.   (By Mr. Watkins)  Do you see Exhibit 9 up on the
12   screen in front of you?
13   A.   Yes, sir.
14   Q.   This is part of what you examined, one of the
15   pictures you examined?
16   A.   Yes, it is.
17   Q.   And this is what you saw as it appeared on site?
18   A.   That is correct.
19   Q.   And as you testified, the paper appears to be charred
20   and put into the spout?
21   A.   Yes, sir.
22   Q.   Do you know -- can you determine when that paper was
23   put into the spout?
24   A.   No, I cannot.
25   Q.   Can you determine how it was lit if it was in the

1    spout?

2    A.    I cannot.

3    Q.    But you are testifying that if this was properly

4    assembled and properly ignited, it would -- it could

5    possibly create a fire and explosion, correct?

6    A.    Yes, sir.

7    Q.    But it didn't do so here, right?

8    A.    That's correct.

9    Q.    So what went wrong here?

10   A.    I can't determine that.

11   Q.    What would a proper ignition be then under your

12   testimony?

13   A.    A proper ignition would be the paper in this case

14   would be ignited.  The flame and heat would move towards

15   the flammable vapors generated by the ignitable material.

16   That material could ignite and begin to burn potentially

17   causing the container to burn, potentially fail, and

18   having a flowing fuel fire as more vapors are now ignited,

19   or potentially the vapors could all burn and cause the

20   container to fail and thus an explosion.

21   Q.    So going back to the piece of paper here, you were

22   talking about the chemistry or physics of lighting a piece

23   of paper on fire, right?  And that would be part of the

24   proper ignition of this device, correct?

25   A.    That's what it appears to be in this photograph.

1    Q.   So to know whether this was proper ignition or could

2    have been proper ignition, would you need to know what the

3    percentage of gas vapors were around this piece of paper?

4    A.   I wouldn't need to know.  I can make an assumption

5    that it was either above or below the flammable range

6    required for gasoline to burn.

7    Q.   Or there was no vapor there whatsoever, right?

8    That's also a possibility?

9    A.   It's possible.

10   Q.   So I think what you're telling us, if properly

11   ignited -- to be an incendiary device, there would have

12   had to have been vapors to have lit it; there would have

13   had to have been vapors in that spout, or that piece of

14   paper would have had to go down into the gas somehow; is

15   that correct?

16   A.   Into the vapor space, yes, sir.

17   Q.   But, of course -- well, not, of course, did you

18   measure what the vapors were -- did you do any tests on

19   how much vapor collected in the spout?

20   A.   We did not.

21   Q.   Did I lose him?

22   A.   I'm still here.

23   Q.   Okay.  I didn't hear your answer.

24   A.   I did not.  I did not examine the amount of vapors in

25   the spout.

1   Q.   But you testified here today that it would have to be

2   between that lower and upper limit in order to function as

3   an improvised incendiary device, correct?

4   A.   Correct.

5   Q.   So sitting here today you don't know whether it could

6   have lighted in that spout and caused a fire or explosion?

7   A.   I'm saying I don't know if it was above or below that

8   flammable limit to cause the initiation.

9   Q.   Or not there at all, right --

10  A.   Or not there.

11  Q.   -- that's also a possibility?

12       So when you say if properly assembled and properly

13  ignited, it would be an improvised incendiary device that

14  would cause damage, what exactly are you relying on?

15  A.   Well, I'm relying on the paper to ignite and burn

16  into the flammable vapors produced by the ignitable

17  material.  I'm relying on that ensuing fire to damage the

18  container causing a flowing fuel fire into the surrounding

19  areas, or potentially there could be an explosion of the

20  built up vapors from the ignitable materials causing the

21  container to fail.

22  Q.   Let's go to gasoline next.

23       Gas or gasoline vapors do not ignite spontaneously,

24  that's true?

25  A.   They do not.

1  Q.   In fact, they don't always ignite even when there's a

2  flame or a heat source close by, true?

3  A.   That's possible.

4  Q.   How much heat and oxygen are required before gasoline

5  is going to ignite?

6  A.   I mentioned before that flammable range is required

7  as the heat is put into the amount of concentrated vapors.

8  The flammable range is between a lower and upper explosive

9  limit.

10 Q.   But you do not know sitting here today what the

11 flammable range was inside -- what the flammability was

12 inside of that gas can that day?

13 A.   I cannot testify to that.

14 Q.   And, in fact, you can't testify to what the

15 flammability was on any given day any time?  You haven't

16 done that test?

17 A.   I know the flammability range of gasoline exist;

18 those are constant.

19 Q.   Correct.  I'm talking about in this particular gas

20 container, you don't know what the reading, if you will,

21 inside that gas can would be?

22 A.   I do not.

23 Q.   And that's not just that day but it's any time.

24 You've never done that test?

25 A.   Not in this case, no, sir.

1  Q.   What ratio between the -- well, you talked about

2  headspace a little bit, which I understood to mean the

3  amount of gas that was actually in the container would

4  change that range; is that what you were saying?

5  A.   The amount of volume of vapors collected in the

6  container would be scaled based on how much liquid

7  occupied the rest of the container.

8  Q.   And what is your source for that?  Where do you --

9  what publication or any other kind of work do you get that

10 particular conclusion from?

11 A.   I don't recall a source off the top of my head.

12 Q.   But you said it here, so what is the basis?

13 A.   I said what here, sir?

14 Q.   You said that there will be more vapors if the can is

15 less full and therefore more volatile than a can that was

16 fully filled up?

17 A.   Okay.  So I understand your question now.

18      I can't cite a specific reference, but from my

19 training and experience that's the information I'm relying

20 on.

21 Q.   What about your training and experience that

22 particular feature, less gas versus more, where in your

23 training and experience supports that conclusion?

24 A.   Well, from the hazardous materials school the vapors

25 are creating vapor pressure as they move out and the

1    container contains those vapors inside to keep them from

2    escaping.  You know, which would mean the hazardous

3    materials are now moving outside their container making it

4    a hazardous material incident.

5    Q.    So you're telling us this today, right?

6    A.    I don't understand what your question is, sir.

7    Q.    You just told us about this headspace conclusion that

8    you're making, right?

9    A.    That's the question you're asking me.

10   Q.    Correct.  I think you told us that you're not aware

11   of any kinds of writings about it or sources that you've

12   relied on?

13   A.    I didn't say not aware.  I cannot recall.

14   Q.    And then you talked about being through hazardous

15   materials training before.  Would there be something in

16   your hazardous materials training, some source to cite for

17   that?

18   A.    As far as vapor generation and containment inside a

19   container, I would believe there would be.

20   Q.    But sitting here right now you don't know that for

21   sure?

22   A.    I just can't recall what document it was or what

23   reference, what textbook that we may have used.

24   Q.    I want to turn now to your -- well, first before we

25   leave completely from this subject, there was much talk

1    about improvised explosive device.  Is it your testimony

2    that this fuel container as described to you is an

3    improvised explosive device?

4    A.   No.  This is an improvised incendiary device.

5    Q.   Okay.  Now, you talked a little bit about or talked

6    some length about the possibility of explosion of the fuel

7    container --

8    A.   Yes, sir.

9    Q.   -- is that correct?

10        You've said before -- at least the government says

11   you've said before -- that there's a low probability that

12   the gas container would explode; is that what you're

13   saying?

14   A.   I think that's accurate, yes, sir.

15   Q.   When you rate it as a low possibility, on what kind

16   of scale is that low possibility?  Is it low?  Medium?

17   High?  Is it from one to ten?

18   A.   I can't give you a distinct number but I would say

19   low.

20   Q.   And where does that scale upon which you're relying

21   here, where does that scale come from?

22   A.   I don't have a scale to reference that to, sir.

23   Q.   So it is just your judgment then that it is a low

24   probability of explosion?

25   A.   Yes, sir.

1    Q.    Now, you've examined Molotov cocktails?

2    A.    Yes, sir.

3    Q.    And a Molotov cocktail refers to specific features;

4    is that fair to say?

5    A.    Yes, sir.

6    Q.    Ordinarily a glass or some other breakable object,

7    right?

8    A.    Yes.

9    Q.    It's got a fuel source in it?  Again gasoline

10   typically, right?

11   A.    Yes, sir.

12   Q.    And it's got a wick or some kind of heat source to

13   light it, right?

14   A.    Yes, sir.

15   Q.    And the reason Molotov cocktails are so dangerous is

16   that they're meant to be thrown and break on the ground or

17   against something, right?

18   A.    Yes, sir.

19   Q.    That's why we make them -- not we.  That's why

20   they're made out of glass, right?

21   A.    Yes, sir.

22   Q.    Or some other very, very breakable material, right?

23   A.    That is correct.

24   Q.    Molotov cocktails ordinarily don't do their damage by

25   exploding within the glass; is that safe to say?

1    A.    That's correct from my experience.

2    Q.    Right.   The damage is the glass breaks; that wick is

3    smoldering or is on fire and it lights the gas that now is

4    everywhere, right?

5    A.    Yes.

6    Q.    But that's certainly not the case here with this

7    device when we are talking about an explosion, right?

8    A.    That's correct.

9    Q.    I think what you've told us is that fuel containers

10   generally are dangerous because they contain gasoline or

11   fuel, right?

12   A.    If they're used by design, yes.

13   Q.    That they are dangerous if they're used by design?

14   A.    No, sir.   Fuel containers used within their design

15   are not dangerous.

16   Q.    Right.   So I think what you told us that this can was

17   going to be a continuing danger simply because it was left

18   outside in an open space where there was sunlight or

19   passersby, right?

20   A.    Yes, sir.

21   Q.    That's going to be true of any gas can that is left

22   in a public space with people walking by, true?

23   A.    I would imagine so, sir.

24   Q.    So generally it applies not just to this device but

25   all gas cans are potentially dangerous when left outside

1    in a public space, correct?

2    A.    If not stored in the manner that they're designed to

3    be, yes, sir.

4    Q.    So when you talk about stored in the manner, that

5    means in a shed out of the sunlight, for example?

6    A.    That's one technique to keep it safe, yes, sir.

7    Q.    So a gas can that is left outside is always going to

8    be per se dangerous and should not be left outside; is

9    that what you're saying?

10   A.    No, sir.  If it's in its condition that is designed

11   to contain the vapors by its manufacturer, it should be

12   safe.

13   Q.    So I think what you're saying is if it has its cap on

14   it as designed, it can be left outside indefinitely,

15   right?

16   A.    If that's the manufacturer's specifications, then

17   that would stand on its own.

18   Q.    So here, for instance, there wasn't a cap.  It was

19   just a spout opened to the air.  That's what made it

20   dangerous?

21   A.    Yes, sir.

22   Q.    So any individual who's lost say the cap to their

23   fuel container and instead just leaves the spout on all

24   the time has created a constantly dangerous condition?

25   A.    It's possible.

1  Q.   And it's as dangerous as this particular gas can

2  because that's what it was a spout up, right?

3  A.   There's a potential for fire or potential explosion

4  in both of your examples.

5  Q.   Including people who keep a fuel container with a

6  spout, not the cap, but a spout in their shed that would

7  be similarly dangerous?

8  A.   That's a potential hazard.

9  Q.   And that's true even if somebody takes off the cap

10 and stuffs a rag to keep it from smelling in their shed,

11 that would be a dangerous situation, right?

12 A.   Yes, sir.

13 Q.   So really I think what you're saying is that anybody

14 who loses a cap off a fuel container has created a

15 continuously dangerous situation any time that there is

16 fuel in that container?

17 A.   Yes.

18       I apologize, folks.  Apparently the building I'm in

19 they're maybe testing the alarm system.

20 Q.   You talked about an explosion being possible if there

21 was failure of the fuel container, right?

22 A.   No, sir.  The explosion could cause -- the failure of

23 the fuel container is the explosion.

24 Q.   All right.  And I think you talked about the bleve

25 condition, right?  That we get the bleve conditions?

A.   I described the bleve conditions.  I described what

their condition was.

Q.   Are you aware in the literature that you consult in

the field of any time any researcher has identified a

bleve condition with inside a fuel container, a 5-gallon

fuel container?

A.   No, sir, I'm not.

Q.   So you've described a bleve condition but you have no

basis to tie that to a fuel container at all, let alone

this fuel container in Longmeadow, right?

A.   No, sir.

Q.   And it would be -- if I understand what you're

saying, the bleve condition would be what makes the fuel

container fail or disintegrate, whatever it does when it

fails, right?

A.   Well, the fire will cause the container to fail and

the boiling gasoline would affect the boiling liquid

evaporating vapor explosion.

Q.   Have you ever seen an experiment done where that

happens, where a plastic fuel container similar to the

fuel container found here where that happened, where it

completely failed?

A.   I don't recall one, no, sir.

Q.   So when you're telling us today that that could

happen, you have no basis to say that that can happen?

1    It's never happened before so far as you know?

2    A.   I never testified that that could happen.  I

3    described the condition.

4    Q.   You described the bleve condition and you described

5    the fact that if the bleve condition happened within the

6    gas can, that then the gas can would fail but none of

7    those things are things that you're aware of actually ever

8    having happened?

9    A.   To be clear, I described what a bleve condition was,

10   and I simply described an explosion in a container similar

11   to the 5-gallon gas can.

12   Q.   So what is the relevance of a bleve condition to what

13   you examined here in your lab?

14   A.   So a bleve condition shows there are other explosions

15   that can be associated with gasoline.

16   Q.   But none that you're aware of in a gas can?

17   A.   Not to my knowledge.

18   Q.   And you've got many years of experience and have seen

19   all kinds of devices, right?

20   A.   Yes, sir.

21   Q.   And you also have the institutional knowledge of the

22   rest of the Quantico staff there to consult to see if

23   they've ever heard of such a thing?

24   A.   Yes, sir.

25   Q.   When you prepared your report or prepared for this

1    hearing, did you consult with any materials scientists

2    within Quantico?

3    A.    I did not.

4    Q.    And a materials scientist would be able to tell you

5    about the properties of that plastic gas can and whether

6    or not it would fail under certain conditions, right?

7    A.    I don't know if they can or not.  That's a specific

8    discipline that I'm not involved in.

9    Q.    And you have no expertise in it, right?

10   A.    I do not.

11   Q.    And nevertheless you talked about this could happen

12   here in this case, right?

13   A.    As a potential problem, yes, sir.

14   Q.    But you have no basis through your training and

15   experience or anything that you consulted to say that that

16   actually would happen?

17   A.    Well, from training and experience seeing the damage

18   fire can do, I believe I have the ability to make that

19   determination.

20   Q.    As to this specific gas can or any specific gas can,

21   you have no facts or data or experience with a plastic gas

22   can that has failed in the manner you described?

23   A.    No, sir, not specifically.

24   Q.    The location in Quantico is actually a large campus

25   there in Virginia, correct?

```
1    A.   Yes, sir.
2    Q.   The FBI laboratory is one part of it but there are
3    many features of the campus?
4    A.   There are.
5    Q.   One of those features is a bomb range?
6    A.   Yes, sir.
7    Q.   And the bomb range is there for devices to be tested,
8    right?
9    A.   Yes, sir.
10   Q.   Sometimes -- you talked about after the blast you
11   might try to figure out the nature of the device, rebuild
12   it, and test it to see if it came to the same conclusion
13   that you see in your lab, right?
14   A.   On occasion.
15   Q.   And that's available to you?  You can go out and test
16   items there, right?
17   A.   Yes, sir.
18   Q.   And you've told us that every improvised incendiary
19   device is unique; one is not like any other, right?
20   A.   Well, when you get down to the science of it, every
21   material is a little different.  These are improvised,
22   yes.  They're all different.
23   Q.   And we've been talking about some of these
24   measurements, the lower limits, lean versus rich and how
25   things might be lit, right?  These are all unique to
```

1   specific devices, correct?

2   A.   Yes, sir.

3   Q.   And so you've seen pictures.  You've seen the device.

4   You've looked at it quite a bit but have never tested it,

5   right?

6   A.   No, we did not.

7   Q.   And oftentimes when you test, you test it a number of

8   ways?  You try lighting the wick as one way or turning it

9   some other way, or do different things with the container

10  to see if that makes a difference?  That would be typical

11  kind of test you would do out on the range, correct?

12  A.   It could be.

13  Q.   And so here you could have taken a gas can like this,

14  put some pieces of paper in there, put the third of --

15  one-third full of gasoline and given it a go, right?

16  A.   That could have been done.

17  Q.   And then we would be done with this if and may kind

18  of thing.  You would know right away whether it actually

19  did function or could function as an improvised incendiary

20  device, true?

21  A.   That's irrelevant because it's still a hazardous

22  device.  So there's no need to even conduct this test

23  based upon the examination of the items submitted and the

24  condition that they were.  It could function.  So there's

25  no need to conduct this examination or the test to be more

1    specific.

2    Q.   Because I'm a lawyer, I've got to be crystal clear

3    here.   The issue is not whether it's a hazardous device.

4    You have testified that your opinion is that it's an

5    improvised incendiary device; is that correct?

6    A.   That is correct.

7              MS. BERKOWER:  Actually, Your Honor, I'm going

8    to object to that because he was not asked that.   At the

9    expressed direction of the court, he was not asked whether

10   this was an improvised incendiary device.   He was asked

11   about the components of it and he was asked -- he was

12   asked generally about IIDs and about the components of

13   this device, but in compliance with the court's order I

14   did not ask him that question.

15             THE COURT:  Well...

16             MR. WATKINS:  Let me rephrase it a little bit.

17   Q.   (By Mr. Watkins)  So you testified about different

18   things that could have happened with this device to make

19   it either catch fire or explode, right?

20   A.   Yes.

21             THE COURT:  Can I back up here?

22             MR. WATKINS:  Sure.

23             THE COURT:  Thank you.

24             MR. WATKINS:  Of course, Your Honor.

25             THE COURT:  Thanks very much.

1          Attorney Berkower, you're referencing my ruling on
2     the motion in limine which talked about the expert opinion
3     on the ultimate issue?
4          MS. BERKOWER:  Yes, Your Honor.  My
5     understanding was that in this hearing the court wanted to
6     hear what this expert would testify to in compliance with
7     the court's order so that, you know, whether or not the
8     testimony that this expert would provide was both reliable
9     and of assistance to the jury under the parameters
10    established by the court's order.
11         So as a result I avoided questions in which he would
12    opine on whether this device in particular that he
13    examined was an IID because the court said that that would
14    not be permitted at trial, and it didn't seem like there
15    was any purpose to previewing that opinion and the basis
16    for that is that would not ultimately be permitted to be
17    introduced to the jury.
18         THE COURT:  Well, okay.  I see your point, but a
19    *Daubert* hearing is very different from a trial in which
20    I'm assessing the basis of his opinion, his training, his
21    experience, testing, scientific reliability, consultation
22    with other materials.
23         I'm not sure -- well, Attorney Watkins, do you want
24    to work within those parameters?  I'm not going to limit
25    -- the ruling on the motion in limine does not limit the

1    testimony at a *Daubert* hearing.  It was meant to limit the
2    testimony at the trial.  I mean, you may consider it a
3    distinction without a difference.  Maybe it does make a
4    difference.
5        Attorney Watkins, you can go ahead.
6            MR. WATKINS:  Thank you, Your Honor.
7    Q.   (By Mr. Watkins)  So to get back to the testing, you
8    could have tested all of these hypotheses you've talked
9    about today that if it was properly assembled and properly
10   ignited that it could catch on fire or explode; is that
11   true?
12   A.   Yes.
13   Q.   You testified that it didn't light on fire for
14   reasons unknown.  Do you recall that?
15   A.   I do.
16   Q.   When you're using a scientific method here to
17   determine how this could have caught on fire or exploded,
18   isn't it incumbent upon you to explain why things didn't
19   work as you say they could have?
20   A.   Well, I was approaching this as the components that
21   were submitted for me for examination are in fact viable
22   components.  The fact that they did not work are
23   associated with variables that I have no idea what the
24   condition of, for example, the paper was at that moment.
25   Was it damp?  Was it wet?

1          As you mentioned, sir, the vapors perhaps they were

2     nonexistent at that area of the nozzle or perhaps there

3     was a wind that came along during that moment and blew the

4     fire out.  I'm not aware of those unbelievable amount of

5     potential angles that this thing could have taken.

6     Q.   So there are an unbelievable amount of angles that

7     would render it not possible for this fuel container to

8     light on fire or explode, correct?

9     A.   There are many angles for it not to work as well as

10    the fact that the components were there for it to possibly

11    work.

12    Q.   You talked about at the end of your testimony the

13    features of the scene in Longmeadow as you understand

14    them?

15    A.   Yes, sir.

16    Q.   You talked about the fact that perhaps this can could

17    have caused a -- a river fire is the wrong word, but a

18    fire to go everywhere, correct?

19    A.   A flowing fuel fire is the term, yes, sir.

20    Q.   Flowing fuel fire.  Thank you.

21         But again, you haven't visited the scene out there,

22    right?

23    A.   No, sir.

24    Q.   From what I understand of your testimony now there's

25    no kind of circumstance you're aware of where a fuel

1  container would so fail that gasoline would go everywhere,

2  correct?

3  A.   Could you say the question again, sir?

4  Q.   So I think what you told us is that you're not aware

5  of any time where a plastic gas can has so failed that gas

6  has gone everywhere around it, right?

7  A.   Not specifically, no, sir.

8  Q.   Right.  And that would be required before you would

9  get this flowing fuel going around that area in

10 Longmeadow, right?

11 A.   Well, a container failure, a leak of the gasoline

12 while it's burning, it's logical.

13 Q.   A leak of the gas can you're talking about?

14 A.   I'm saying a rupture, the container failure would

15 cause the liquid material to leak out.

16 Q.   Correct.  But just to be sure, you're unaware of any

17 time when that has actually happened in your training and

18 experience?

19 A.   Well, my experience I've had fires where there were

20 containers involved in fires and they burned up as well

21 and caused the fire to be bigger than it normally would

22 have been.

23 Q.   I'm talking about this kind of circumstance where the

24 only fire was internally, you're not aware of any time

25 where a container has failed in the way you said it might

```
 1    fail in this case?
 2    A.    As specifically in that condition, no.
 3              MR. WATKINS:  I have nothing further, Your
 4    Honor.
 5              THE COURT:  All right.
 6        Any follow-up, Attorney Berkower?
 7              MS. BERKOWER:  Yes, just a little bit.
 8              THE COURT:  Okay.  Can you give me an estimate
 9    of time?  Because this has gone far, far over what we
10    thought and there's not much time left that the court can
11    -- there's other matters that I have to deal with.  Do you
12    have an estimate?  Because we can continue on another day.
13    I have Thursday and Friday open now.  What we had
14    scheduled has been canceled for the next couple of days.
15              MS. BERKOWER:  I think this will be relatively
16    short, Your Honor.  I just want to clarify a few points
17    that Mr. Watkins raised.  I don't have a lengthy
18    examination planned.
19              THE COURT:  Okay.  Very good.
20              MS. BERKOWER:  Thank you.
21
22
23
24
25    REDIRECT EXAMINATION
```

1    Q.   (By Ms. Berkower)   Special Agent Rigopoulos, you were

2    asked by Mr. Watkins about --

3              MS. BERKOWER:   Well, first of all, actually,

4    Your Honor, may I back up a minute?  I think it seems that

5    I might have misunderstood the court's intention for this

6    order.

7         So would Your Honor prefer that I ask him questions

8    about his ultimate opinion so that the court can

9    understand where those come from and why he came to those

10   conclusions?  Because I had avoided that because --

11             THE COURT:   Right.  I understand why you avoided

12   it, and perhaps the ruling on the motion in limine was

13   ambiguous.  So I certainly understand your point, but I

14   mean it's clearly a motion in limine aimed at trial

15   testimony, and so my ruling on it I meant it to be

16   directly for trial testimony.

17        I will allow you to ask the ultimate opinion

18   questions here at the *Daubert* hearing.  The purpose of the

19   *Daubert* hearing is quite different.  It has a very

20   specific focus for the court.  So if you want to ask

21   questions about ultimate opinion questions at this

22   hearing, I will allow it.

23             MS. BERKOWER:   Thank you, Your Honor.  And my

24   apologies for misunderstanding the limitations that will

25   be placed on this hearing.

1       If that is the case, it may go a little bit longer
2   but it shouldn't be too much longer.  If there is a
3   specific time frame that the court would like me to wrap
4   up by, I can aim to do that.  I know we have other matters
5   to talk about as well regarding jury selection.
6           THE COURT:  Right.  First of all, absolutely no
7   apologies necessary at all.  I understand how you
8   interpreted that.
9       I think I have about 20 minutes that I can continue
10  to work with, and I think I'm going to ask that this be
11  scheduled for a telephone conference either tomorrow or
12  Friday to continue talking about our other issues, but we
13  have about 20 minutes left today for the *Daubert* hearing,
14  or we can continue on Thursday or Friday.  Go ahead and
15  see how far we can get.
16          MS. BERKOWER:  Thank you, Your Honor.  I'll do
17  that.
18  Q.  (By Ms. Berkower)  So, Special Agent Rigopoulos, I'm
19  going to share my screen now, and put on the screen for
20  you your report which is Government's Exhibit 1 for this
21  hearing.
22      Do you remember writing this report?
23  A.  I do.
24  Q.  And in this report, picking up where we left off on
25  your direct examination, were you able to come to certain

1    conclusions about the device in this case?

2    A.   Yes.

3    Q.   And with regard to the evidence that you reviewed,

4    which I think you testified on your initial examination

5    was the fuel canister recovered from the screen, the paper

6    pamphlet, the chemistry analysis conducted by the

7    Massachusetts State Crime Lab, as well as photos from the

8    scene, were you able to draw an opinion about the evidence

9    that you were given?

10   A.   I was.

11   Q.   What was the opinion you drew?

12   A.   Well, my opinion the submitted evidence were the

13   disassembled remains of an improvised incendiary device.

14   Q.   And why did you come to that conclusion?

15   A.   Well, the ignitable material was identified in this

16   examination as well as the presence of a container and a

17   fusing system.  The fusing system was even showing an

18   example of being burned which takes it to the fact that an

19   attempt was made to get this thing to function.

20   Q.   So based on your identification of a fusing system

21   that was the paper pamphlets, right?

22   A.   Yes.

23   Q.   And the ignitable material that was the gasoline,

24   right?

25   A.   Yes.

```
 1    Q.   And that was done through reliance on the
 2    Massachusetts State Crime Laboratory analysis?
 3    A.   That is correct.
 4    Q.   And your identification of a container, that was the
 5    yellow fuel can, right?
 6    A.   Yes.
 7    Q.   You came to the conclusion this was an improvised
 8    incendiary device?
 9    A.   Yes.
10    Q.   And it sounds like you also came to the conclusion
11    that someone had tried to light this improvised incendiary
12    device; is that right?
13    A.   Yes.
14    Q.   That was based on what?
15    A.   The observable charring seen on those paper
16    pamphlets.
17    Q.   And did you also reach conclusions about whether this
18    was a destructive device?
19    A.   Yes.
20    Q.   What did you determine there?
21    A.   I determined that in itself is a destructive device.
22    The incendiary device was attempted to be utilized.  It
23    was put in the public domain where it would affect
24    potentially people, potentially property which shows that
25    it was technically weaponized.
```

1    Q.   And that was based on your review of all of the

2    evidence that came to you in your lab?

3    A.   Yes, ma'am.

4    Q.   Including the physical evidence and the photographs

5    of the assembled device on scene?

6    A.   That is correct.

7    Q.   All right.  Let's go back to a few things that Mr.

8    Watkins asked you about.

9         So, first, I think he asked you about why you didn't

10   retest the gasoline at the Quantico Laboratory and why you

11   were able to rely on the Massachusetts State Crime

12   Laboratory analysis.  Do you remember being asked about

13   that?

14   A.   Yes.

15   Q.   Could you explain why you didn't retest the gasoline

16   in this case?

17   A.   It's our procedure in the laboratory that we do not

18   reexamine evidence if an examination is already conducted.

19   Q.   And is it fair to say that you do not reexamine

20   evidence that's already been examined elsewhere if the

21   other examination that's already been conducted meets

22   certain technical requirements and standards?

23   A.   Yes.

24   Q.   Does the Massachusetts State Crime Lab meet those

25   technical requirements and standards?

1    A.   It's my understanding that they're an accredited lab.

2    Q.   And what does accreditation mean under these

3    circumstances?

4    A.   Accreditation demonstrates that they have followed a

5    standard line of testing and standards for their

6    examinations to occur in those specific disciplines.

7    Q.   In your field do device examiners commonly rely on

8    testing conducted by accredited laboratories?

9    A.   Yes.

10   Q.   Is that what you did here?

11   A.   In this case, yes.

12   Q.   All right.  Now, I think you were asked on your

13   cross-examination about whether in your view the IID --

14   the device in this case became an IID because it was found

15   in a public space.  Do you remember being asked about

16   that?

17   A.   I do.

18   Q.   And you said it was a consideration as to why you

19   thought this was an IID.  Do you remember testifying to

20   that?

21   A.   I do remember saying that.

22   Q.   Can you explain what you mean when you said the

23   location, the placement of the device is a consideration

24   in whether or not it was an IID?

25   A.   So based on the way the question was asked, I was

considering my conclusion and device determination at the same time to answer the question, and I was trying not to use the word destructive device or improvised incendiary device in my answers based on our interpretation of the motion not to say those things.  So those are two separate items.

In itself, the components were an improvised incendiary device.  When they were utilized in the public setting, I believe it can be classified as a destructive device where it shows weapon characteristics in this example.  In my initial testimony I may have kind of blurred the lines and had them come together a little bit.

Q.   And that was in an effort because I instructed you about what you were and weren't allowed to say and my interpretation of the court's order.

A.   Yes, ma'am.  That was my attempt to stay within the lines there.

Q.   And in your view is the location of a device determinative as to whether it is being used as a weapon, or is it one factor?

A.   It's a factor.

Q.   Now you were asked on your cross-examination about whether there were -- whether the vapors in the gas can were in the right range.  Do you remember being asked about that, the right fuel-to-air ratio range inside the

1   can?

2   A.   Yes.

3   Q.   And is it fair to say that in this case you didn't

4   examine whether the vapor -- you didn't examine the vapors

5   in the can?

6   A.   I did not.

7   Q.   Why is that?

8   A.   Because it was identified by the chemist as gasoline.

9   So if that gasoline was in that container, somewhere in

10  that container is that flammable range, whether it's close

11  to the surface of the liquid or if it's all the way up at

12  the outer edge of the spout.

13  Q.   And is it also the case that you didn't examine the

14  device on the scene here, right?

15  A.   I did not.

16  Q.   So was there any way for you to measure the vapors in

17  that can?

18  A.   No.   There's no way with the submitted evidence.

19  Q.   By the time that you examined the can, it was

20  disassembled.   The liquid was taken out, right?

21  A.   Yes.

22  Q.   So you did not say that the vapors were in the can in

23  the right range in this case, right?

24  A.   I did not, not in the testimony I said earlier.

25  Q.   You just explained that there is an identified range

1    where vapors will burn?

2    A.    Yes.

3    Q.    All right.  So you were also asked questions about

4    anybody who has a gas can without a cap on it has created

5    a dangerous condition.  Do you remember being asked about

6    that?

7    A.    I do.

8    Q.    Are there different levels of danger depending on how

9    a gas can without a cap is stored?

10   A.    I would imagine there could be.

11   Q.    Is a gas can that is stored without a cap in a shed

12   as dangerous as one placed in a public area?

13   A.    No.

14   Q.    Why not?

15   A.    It depends where is the shed located and what's the

16   public area being described.

17   Q.    Does it all depend on the surrounding conditions at

18   the time including temperature, heat, other things like

19   that?

20   A.    Yes.

21   Q.    You were also asked about the bomb range at the FBI

22   Quantico Laboratory.  Do you remember being asked about

23   that?

24   A.    Yes.

25   Q.    And you said you did not do a test in this case?

1    A.    That's correct.

2    Q.    Could you explain why you didn't do a test in this

3    case?

4    A.    I chose not to test this evidence as the components

5    that were submitted individually were appropriate for an

6    improvised incendiary device.

7          The paper demonstrated that it can be burned; the

8    gasoline was identified as a flammable liquid, and the

9    container itself was containing the gasoline.  So all of

10   the factors were already there.  There's no need to

11   conduct another test.

12   Q.    Is it also fair to say that based upon your knowledge

13   of the chemistry of those components, you have a sense of

14   how they would behave if ignited?

15   A.    Yes.

16   Q.    Were there any open questions that you needed to

17   answer about the components that were present here that a

18   test would have answered?

19   A.    Would you say the question again, please?

20   Q.    Would the test have added anything to your

21   understanding of how the component parts of this device

22   would behave?

23   A.    No.  Because, once again, the variables are so

24   different for each day, each environment.  Like the

25   defense attorney said the weather that day, we don't know

1    the different conditions to recreate it exactly like it

2    was on that moment.

3    Q.   So was the decision made that there was no need to do

4    a test in this case?

5    A.   Yes.

6    Q.   Did you make that decision?

7    A.   I did.

8    Q.   And that was based on the evidence that you had in

9    front of you as well as your knowledge of the chemistry of

10   the components involved?

11   A.   That is correct.

12   Q.   Now you were asked about bleve explosions and

13   explosions of gas.  Are those two different things, or are

14   they the same thing?

15   A.   They're two different things.

16   Q.   Can you explain the difference between an explosion

17   of gas and a bleve explosion?

18   A.   So an explosion of gas in the situation where we're

19   describing would be the heat source comes into the

20   container and ignites the flammable vapors that are

21   generated by the ignitable material.  And as it burns, the

22   pressure generated causes the container the gasoline is

23   into fail.  That is the explosion.

24       Where a bleve is a container, whether it's large or

25   small, is exposed to the impingement of fire on its

1   surface.  That fire causes the liquid flammable material

2   inside that container to now boil.  As the container

3   boils, the pressure increases on the container.  The

4   pressure could cause it to either fail or the fire could

5   cause the container to fail, and now that boiling liquid

6   is expanding into this vapor cloud as it's igniting and

7   that's what the boiling liquid expanding vapor explosion

8   is.

9   Q.   Is it fair to say that a bleve is a type of

10  explosion?

11  A.   Yes.

12  Q.   And there are other ways -- there are other

13  conditions in which gas vapors could ignite and explode

14  that are not a bleve explosion?

15  A.   Yes.

16  Q.   Now you mentioned that you examined this particular

17  container, right?

18  A.   Yes.

19  Q.   You didn't see any signs of melting?

20  A.   No.

21  Q.   If there had been a fire in the container, would you

22  have expected to see signs of melting?

23  A.   Yes.

24  Q.   And when plastic melts, does it change shape?

25  A.   Yes.

1    Q.   If the plastic container in this case had melted,
2    could it have had a leak in some way or changed shape such
3    that the gasoline could have escaped from the container?
4    A.   Yes.
5    Q.   In fact, is that something you would expect to happen
6    if there had been an fire in this container?
7    A.   Yes.
8    Q.   And if the vapor had caught fire and the container
9    had melted and the liquid, the gas liquid had escaped,
10   would that possibly have created a flowing fuel fire?
11   A.   Yes.
12   Q.   Let's be clear about what a flowing fuel fire is.
13   Can you give a definition again about it?  I'm not sure I
14   covered that clearly enough in your direct.
15   A.   So a flowing fuel fire, an example would be a
16   container containing flammable liquid which was burning
17   that has either ruptured, the container fails.  The liquid
18   is now moving and the vapors it's producing are burning.
19   So this movement of the liquid is taking the fire in the
20   direction whichever way the topography is going and
21   gravity.  It can go down a drain, into a sewer system, and
22   pop up somewhere else, or it could go down the street into
23   a house.  There's several things that could happen, and
24   that fire could ignite other things.
25   Q.   And is that because as the fuel flows on the ground

1    in accordance with gravity, it's actually the vapors on

2    top of the fuel that continue to burn as the fuel flows?

3    A.   Yes.  And then those flames would potentially ignite

4    things that it is now encountering as it's moving.

5    Q.   Okay.  Now I think at one point you were asked it

6    wasn't possible that this device could have gone off

7    because there were a lot of conditions that you don't know

8    about that meant it wasn't possible this device could go

9    off.  Do you remember being asked about that on cross?

10   A.   Yes.

11   Q.   When you said it's not possible to know why this

12   device didn't work, is that the same as saying it can't

13   work?

14   A.   That is not the same.

15   Q.   Does it just mean that given all the variables you

16   can't know why this particular device didn't work?

17   A.   That's correct.

18   Q.   But in fact all the components were there such that

19   it could work under the right condition?

20   A.   That is correct.

21   Q.   So are you -- it doesn't mean why it didn't work in

22   this particular instance?

23   A.   Yes.

24            MS. BERKOWER:  Your Honor, just a moment?  I

25   know we're right up on 20 minutes, and I think I'm just

1    about done if I can just check my notes briefly?

2              THE COURT:  Sure.

3              MR. WATKINS:  May I ask that the exhibit be

4    taken down off the screen?

5              MS. BERKOWER:  I'm sorry.  That should have

6    fixed it.

7              MR. WATKINS:  Thank you.

8              MS. BERKOWER:   One last thing.

9    Q.   (By Ms. Berkower)  I think you were asked whether or

10   not you even knew at all if there were vapors in this

11   particular container.  Do you remember being asked about

12   that?

13   A.   Yes, I do.

14   Q.   And gasoline is a volatile substance, right?

15   A.   Yes.

16   Q.   Which means that it is always in most temperature

17   settings, most ambient temperature settings, it is always

18   trying to convert itself from liquid to gas, right?

19   A.   Liquid to vapors, yes.

20             MR. WATKINS:  Objection, Your Honor.

21             THE COURT:  I'm sorry.  I didn't hear you.

22             MR. WATKINS:  I'm objecting, Your Honor.  Ms.

23   Attorney Berkower is testifying here.

24             THE COURT:  I can balance that given the nature

25   of this hearing.  I can balance that for the purpose of

1    the hearing.

2         Go right ahead.

3    Q.    (By Ms. Berkower)   Special agent, you testified

4    earlier that a volatile substance is one that easily

5    evaporates from liquid to gas, right?

6    A.    That's correct.

7    Q.    And you testified that gasoline is a volatile

8    substance?

9    A.    Yes.

10   Q.    So in most temperature ranges if gasoline is present

11   in a container, is it vaporizing?

12   A.    Yes.

13   Q.    So is it fair to say it's not possible to know how

14   vapor was in that container --

15   A.    That's correct.

16   Q.    -- but there was vapor in that container given the

17   properties of gasoline as a volatile substance?

18   A.    Yes.   There were vapors in the container as gasoline

19   was identified.

20   Q.    But you don't know one way or the other what the

21   fuel-to-air ratio in the container was because that was

22   not presented to you to measure?

23   A.    I do not.

24            MS. BERKOWER:   All right.   Your Honor, I know

25   that we're out of time.   I know the court has to move on

1    to other matters, and so I think I'll leave it with that.

2              THE COURT:  All right.

3         Attorney Watkins, we can -- I just have to be out of

4    the building soon for an engagement outside the building

5    that was rescheduled.  I thought that we would have enough

6    time this morning.

7         Attorney Watkins, will you be ready to go on your

8    follow up at ten o'clock tomorrow morning?

9              MR. WATKINS:  Yes, as far as the agent here?

10             THE COURT:  With the agent.

11             MR. WATKINS:  Yes.

12             THE COURT:  Do you have more with the agent?

13             MR. WATKINS:  Probably, Your Honor.  I think

14   it's possible.  I'll have to think about it.

15             THE COURT:  That's fine.  So how's everyone's

16   availability at ten o'cock tomorrow?

17             MR. WATKINS:  That's fine, Your Honor, for the

18   defendant.

19             MS. BERKOWER:  We will move some stuff around,

20   Your Honor.  We will be available.  I guess the question

21   is really to the witness because I know he's at his annual

22   certification course.

23             THE COURT:  Right.  That is the question.

24             THE WITNESS:  This will take precedence.

25             THE COURT:  All right.  I certainly don't think

1    it's going to be nearly as time consuming tomorrow as it

2    was today.  So ten o'clock tomorrow morning.

3                 MR. WATKINS:  Thank you.

4                 THE DEFENDANT:  Can you let the jail know, Your

5    Honor?  Sorry.

6                 THE CLERK:  Yes.  I will put in a request for

7    tomorrow at ten o'clock with the jail.

8                 THE DEFENDANT:  Thank you, and I apologize.

9                 THE COURT:  No problem.

10        Tomorrow morning is going to be -- we're going to

11   then talk about everything else that needs to be talked

12   about to tie up all lose ends as well.  All right.

13                THE DEFENDANT:  Thank you, Your Honor.

14                MS. BERKOWER:  Thank you.

15                THE COURT:  Thanks, everyone.

16   **(Hearing concluded at 1:44.)**

17   ----------------------

1

2   (The certification of this transcript does not apply to
    any reproduction of this transcript, unless under the
3   direct control and/or supervision of the certifying
    reporter.  I assume no responsibility for the accuracy of
4   any reproduced copies not made under my control or
    direction.)

5

6                           CERTIFICATION

7

8            I certify that the foregoing is a correct

9   transcript of the record of proceedings in the

10  above-entitled matter to the best of my skill and ability.

11

12

13

14  /s/ Alice Moran                    November 4, 2020
    Alice Moran, RMR, RPR
15  Federal Official Court Reporter

16

17

18

19

20

21

22

23

24

25