1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2                           WESTERN SECTION

3

4   United States of America   )
                               )            20cr30018-MGM
5        vs                    )
                               )          November 5, 2020
6   Jonathan Michael Rathbun   )
    _____)

7

8              **Daubert** Video Hearing Held Before

9              The Honorable Mark G. Mastroianni

10               United States District Judge.

11

12  APPEARANCES:

13

    On behalf of the government:  Risa Berkower, United States
14  Department of Justice, 950 Pennsylvania Avenue, NW,
    Washington, DC 20532.

15

16  Neil L. Desroches, Assistant United States Attorney, 300
    State Street, Suite 230, Springfield, MA 01105-2926.

17
    On behalf of the defendant: Timothy G. Watkins, Esq., 51
18  Sleeper Street, 5th Floor, Boston, MA 02210.

19  Forest J. O'Neill-Greenberg, Esq., 51 Sleeper Street, 5th
    Floor, Boston, MA 02210.

20

21

22                   Alice Moran, CSR, RPR, RMR
                      Official Federal Court Reporter
23                      United States Courthouse
                       300 State Street, Room 303D
24                       Springfield, MA 01105
                            (413)731-0086
25                      alice.moran@verizon.net

```
 1                           INDEX

 2

 3    Witness:                                        Page:

 4

 5

 6    Christopher Rigopoulos

 7

 8    Recross-examination by Mr. Watkins              5

 9    Redirect examination by Ms. Berkower           9

10    Recross-examination by Mr. Watkins             11

11    Redirect examination by Ms. Berkower           15

12    Recross-examination by Mr. Watkins             18

13    Redirect examination by Ms. Berkower           23

14

15

16    Exhibit No.
      Description                                      Page

17

18

19

20

21

22

23

24

25
```

1    **(Video hearing commenced at 10:30.)**

2    **(The defendant is present via video.)**

3                THE CLERK:  Case before the court via Zoom video

4    is Criminal Matter 20-30018, the United States of America

5    versus Rathbun.

6        Counsel, I'm going to ask you to identify yourself

7    for the record starting with the government, please.

8                MS. BERKOWER:  Good morning, Your Honor.  Risa

9    Berkower for the government.

10               MR. WATKINS:  Good morning, Your Honor.  Tim

11   Watkins, Federal Defender Office on behalf of John Rathbun

12   who's with us by video from the Hampden County Jail.

13               MS. O'NEILL-GREENBERG:  Good morning, Your

14   Honor.  Forest O'Neill'Greenberg for Mr. Rathbun as

15   well.

16               THE COURT:  Okay.  We have our witness from

17   yesterday as well.  I see him signed on.  We ended, I

18   wouldn't say it was abruptly, but we ended yesterday with

19   the government wrapping up.  I felt the government might

20   have thought they were under a little bit of time

21   constraint.

22       So do you have any more follow-up questions you'd

23   like to ask, Attorney Berkower?  I don't want you to feel

24   that you were rushed.

25               MS. BERKOWER:  I think I'm good, Your Honor.

1    Thank you.

2              THE COURT:  All right.

3         All right.  Attorney Watkins, is Mr. Rigopoulos --

4    did I pronoun that correctly?

5              THE WITNESS  Good morning, Your Honor.  Chris

6    Rigopoulos on the line here.

7              THE COURT:  Mr. Rigopoulos, thank you for being

8    here.  So how's your connection?  Are you able to link in

9    by video today, or we going to go along like yesterday?

10             THE WITNESS:  No, sir.  I'm on a hard line

11   phone, but I have access to see the screen.  In case that

12   drops, whatever, I won't drop the hard line audio.

13             THE COURT:  All right.  Or if there's documents.

14   Okay.

15             THE WITNESS:  Yes, sir.

16             THE COURT:  All right.  Attorney Watkins.

17        To the witness I know this doesn't need to be said,

18   but I need to make a record.  You remain under oath from

19   yesterday.

20             THE WITNESS:  Thank you, Your Honor.

21             THE COURT:  All right.  Go ahead, Attorney

22   Watkins.

23             MR. WATKINS:  Thank you, Your Honor.

24

25

1    **Christopher Rigopoulos (previously sworn)**

2    <u>**RECROSS-EXAMINATION**</u>

3    Q.   (By Mr. Watkins) Good morning, Agent Rigopoulos.

4    A.   Good morning, sir.  How are you?

5    Q.   Good.  Thank you for asking.

6          As I understand your testimony, it's your contention

7    that the vapors inside the fuel container could if within

8    a specific range of fuel and oxygen mixture have lit on

9    fire; is that your testimony?

10   A.   Yes, it is.

11   Q.   You don't know what that range is for gasoline and

12   fuel mixture within a can, correct?

13   A.   I do not.

14   Q.   You might have heard the range at some point during

15   your training, but you cannot right now tell us the source

16   of that figure?

17   A.   That's correct, sir.

18   Q.   You also testified about what you called headspace;

19   that this range might change depending on what the

20   headspace is in the can, correct?

21   A.   The volume of the headspace, yes, sir.

22   Q.   The volume of the headspace.

23         But as to -- well, first, as to the fuel and oxygen

24   range in there, that is also from your training and

25   experience?  As I understand it, you don't actually need

1    to know yourself what the range of fuel -- what the ratio

2    of fuel to oxygen is, right?

3    A.   That's correct.  Yes, sir.

4    Q.   You just know that somewhere in that gas can is going

5    to be that range, right?

6    A.   Between the gas can and the potential heat source,

7    yes, sir.

8    Q.   But you made no attempt to reproduce conditions to

9    create that particular range within the gas can?

10   A.   No, sir.

11   Q.   You've made actually no measurements whatsoever of

12   that gas can or really any gas can?

13   A.   No, sir.

14   Q.   Regarding your contention about the headspace that's

15   the same, you did not do any kind of experiment?

16   A.   I did not.

17   Q.   And you didn't take any kind of measurements to see

18   about changing headspace and volume?

19   A.   No, sir.

20   Q.   And you haven't cited either in your report or in the

21   last two days any study, treaties, paper, or experiment to

22   support those two contentions that you've made?

23   A.   No, sir.

24   Q.   And you've made no effort to prove, or disprove, this

25   hypothesis that there would be this range and that it

1  could catch on fire given the device?

2  A.   No, sir.

3  Q.   And you didn't conduct any kind of experiment on the

4  gas can in the lab?

5  A.   No, sir.

6  Q.   You also -- it is your contention that there is a

7  probability, albeit low, that the fuel container could

8  have exploded leading to a failure of the can; is that

9  accurate?

10  A.   Yes, sir.

11  Q.   But yet sitting here today you're unaware of any

12  study, treatise, paper, or experiment in the field that

13  would confirm that is true?

14  A.   That's correct.

15  Q.   You're relying in that case completely on your

16  experience rather than training and experience, simply

17  your experience, correct?

18  A.   Yes, sir.

19  Q.   And that experience is you have been at fires where

20  gas cans were engulfed and then at that point failed,

21  right?

22  A.   Yes, sir.

23  Q.   Sitting here today you've not been at a scene where

24  it is a single gas can where a fire has begun in it and

25  the container has failed in that manner?

1    A.    No, sir.

2    Q.    You had the ability to test containers like this at

3    the bomb testing field, correct?

4    A.    Yes, sir.

5    Q.    And you chose not to do this?

6    A.    Yes, sir.

7    Q.    In this particular case you know that at the scene

8    the fuel container actually did not catch fire, right?

9    A.    Yes, sir.

10   Q.    And you know that it did not explode?

11   A.    Yes, sir.

12   Q.    And you have cited unknown reasons for why it did not

13   catch fire or explode, correct?

14   A.    Yes, sir.

15   Q.    One of those unknown reasons could be that it would

16   -- it was incapable of getting to that range of gas vapors

17   inside the can where it would catch on fire or explode in

18   the manner it was designed?

19   A.    Yes, sir.  That's one of the reasons.

20   Q.    You didn't attempt to rule out any other causes of

21   why it did not explode?

22   A.    I did not.  As I think in my testimony, there's so

23   many variables of things that we did not know; that's time

24   and space with this event.

25   Q.    And again you didn't attempt to learn any of those

1  things and did not attempt to rule out causes of why it

2  did not explode?

3  A.   No, sir.

4  Q.   So sitting here today, that is one reason why you

5  said if properly ignited, it may be a possibility of fire.

6  You never said it absolutely will catch on fire; is that

7  correct?

8  A.   Yes, sir.

9  Q.   Because you simply don't know sitting here why it did

10  not catch on fire, right?

11  A.   Yes, sir.

12         MR. WATKINS:  Your Honor, that's all I have.

13         THE COURT:  All right.

14         MS. BERKOWER:  May I ask one or two brief

15  redirect questions?

16         THE COURT:  Of course.

17  **REDIRECT EXAMINATION**

18  Q.   (By Ms. Berkower)  Special Agent Rigopoulos, you were

19  just asked if you were -- you just testified that you did

20  not rule out the causes of why this device did not go off.

21  Do you remember being asked about that?

22  A.   Yes.

23  Q.   Was that the question presented to you when you were

24  given this device for analysis, why it didn't go off?

25  A.   No, it was not.

1    Q.    What was the question presented to you?

2    A.    The question is to characterize the evidence and

3    present an opinion on what we believed the device was.

4    Q.    Meaning whether it was a hazardous device or not?

5    A.    Yes.

6    Q.    And whether it met the criteria of an IID as that

7    term is defined in your field?

8    A.    Yes.

9    Q.    You were also asked on your recross just now

10   whether -- you were asked how you didn't conduct tests on

11   this particular device.  Do you remember being asked about

12   that?

13   A.    Yes.

14   Q.    And you were asked about since -- Mr. Watkins said

15   since you didn't conduct tests, were you relying on your

16   experience and not your training and experience.  Do you

17   remember him asking you that particular question?

18   A.    Yes, he did ask it that way.

19   Q.    And, in fact, were you relying on your background and

20   training in these types of substances like gasoline?

21   A.    Yes, ma'am.  I agree that experience and training do

22   come into play in this for a holistic answer to that

23   question.

24   Q.    And does your training include a background in

25   chemistry to some degree?

1    A.   Yes, it does.

2    Q.   And in volatile and flammable substances?

3    A.   Yes, it does.

4    Q.   Including specifically gasoline?

5    A.   Yes, ma'am.

6    Q.   And I think Mr. Watkins also referred to a hypothesis

7    you had that the gasoline and air in the container in this

8    particular case were in a range that could catch on fire.

9    Do you remember being asked about that and him using that

10   word hypothesis?

11   A.   Yes.

12   Q.   Is the flammable property of gasoline a hypothesis or

13   is it facts known about the substance based on chemistry?

14   A.   It's facts about the gasoline as a material, yes.

15            MS. BERKOWER:  Nothing further, Your Honor.

16   Thank you.

17            THE COURT:  All right.

18            MR. WATKINS:  Perhaps two questions, if I may,

19   Your Honor?

20            THE COURT:  All right.

21   **RECROSS-EXAMINATION**

22   Q.   (By Mr. Watkins)  Agent Rigopoulos, you were asked

23   not about gasoline.  You were asked about the specific

24   combination of container, fuel, and ignition source,

25   correct?

1    A.   Asked about it in what respect, sir?

2    Q.   When you were asked to determine whether it was an

3    IID or not.

4    A.   That is accurate.  We hadn't identified the material

5    as gasoline at that initial request.

6    Q.   So again, you've testified here about the fuel vapor

7    inside the gas can and whether or not that would have

8    ignited given this device in question, right?

9    A.   Yes.

10   Q.   You have talked during your testimony just now about

11   the commonly understood definition of an IID, improvised

12   incendiary device.  Where is that commonly understood

13   definition found in the literature of your field?

14   A.   You'd find definitions for those things at our

15   curriculum that we would have at our bomb school in our

16   post-blast instruction.

17   Q.   And those are items that you have in your file or the

18   FBI has in its records that you could forward to us?

19   A.   I would imagine so, sir.

20        MR. WATKINS:  That's all I have, Your Honor.

21        THE COURT:  All right.

22   Agent Rigopoulos, could I -- I wanted to ask you a

23   follow up.  Attorney Watkins -- I think both lawyers at

24   various points have asked you questions about this.  I

25   want to kind of hone back in.

1          As far as this type of device, speaking specifically

2     of the setup as it was presented to you from the picture

3     in this case, a yellow gas can, a piece of paper stuffed

4     in the nozzle, talking about this item.  Had you seen a

5     device like this before?  By seen, I mean worked with one?

6     Analyzed one?  Been involved in an investigation that

7     involved one?

8               THE WITNESS:  Similar, sir.  There was -- we

9     have had gas cans in cases before.  We've had different

10    types of fusing systems or wicks, so to speak, as

11    ignitable liquids.  But this exact setup with paper

12    pamphlets put in the nozzle, this type of plastic gas can,

13    not specifically, sir.

14              THE COURT:  Okay.  And Attorney Watkins asked

15    you about you being at fire scenes or studying and knowing

16    about fire scenes where gas cans obviously failed and

17    either exploded or the integrity of them was significantly

18    compromised because they were in a fire.

19         Whether a gas can is in a barn that's burning down or

20    in a house that's burning down or a car that's binning,

21    fair to say you've been to those types of situations?

22              THE WITNESS:  Yes, Your Honor.  That's

23    correct.

24              THE COURT:  All right.  But now focusing on this

25    case specifically, we're talking gas can -- it doesn't

1   matter the color.  It happens to be yellow in this case,

2   but we're talking gas can, a piece of paper in the nozzle,

3   have you specifically seen the integrity of gas cans be

4   compromised under that scenario?

5           THE WITNESS:  No, sir.

6           THE COURT:  Have you studied that circumstance?

7           THE WITNESS:  No, sir.

8           THE COURT:  All right.  Have you come across

9   that circumstance regarding the effect of the integrity of

10  the gas can in any of your training materials or

11  educational background?

12          THE WITNESS:  There are some case studies where

13  gas cans have failed where there has been a fire and the

14  gas contributed to the fire.

15          THE COURT:  Of course, but I'm talking about the

16  circumstances of this case.  So I'm talking specifically

17  about a setup like this.

18          THE WITNESS:  I understand.  No, sir, not

19  specifically like this.

20          THE COURT:  All right.  And I guess it seems --

21  given your very significant experience, is it -- what

22  about this situation makes it so unique that you wouldn't

23  have seen something like this before?  It just seems like,

24  quite frankly, you're very experienced and you would have

25  seen just about everything there is to be seen.  What's so

```
 1    unique about this setup that you have not been exposed to
 2    it before?
 3              THE WITNESS:  The fact that I've not been
 4    exposed to this specific setup does not mean it doesn't
 5    occur.  I'm one examiner of eleven and add 50 years of
 6    existence of this discipline.  Other people may have seen
 7    this.  I'm just not aware, but it hasn't crossed my desk
 8    in my career.
 9              THE COURT:  Okay.  Well, and to go further on
10    that, it hasn't crossed your desk during your studies of
11    your field, research in your field, et cetera; is that
12    correct?
13              THE WITNESS:  Yes, sir.
14              THE COURT:  All right.  Okay.  Thank you very
15    much, sir.
16         Any follow-up on that by either attorney?
17              MS. BERKOWER:  I would ask, Your Honor, just a
18    question or two of Special Agent Rigopoulos.
19    **REDIRECT EXAMINATION**
20    Q.   (By Ms. Berkower) Special Agent Rigopoulos, I think
21    the judge asked you if you've seen a specific device like
22    this specific device with a gas can and paper.  Have you
23    seen similarly-designed devices in your time as an
24    examiner?
25    A.   Yes.
```

1    Q.   Could you elaborate on that a little bit?

2    A.   There's a case where there's a victim in a northern

3    state and the individual attempting to attack this victim

4    and this family at the residence; had plastic jugs put on

5    his porch filled with gasoline, and they had, instead of

6    paper, they had just like a rag, like a towel, put inside

7    the open lid.

8         Ignited that rag and it burned causing -- it burned

9    into the container causing an ensuing flowing fuel fire as

10   I described earlier, causing the house to catch on fire

11   attempting to eliminate the victims inside the house.

12   There was two of those at the same time and those items

13   were recovered.  We examined them and presented our

14   forensic reporting.

15   Q.   And in your field --

16             THE COURT:  By the way, where was that case?

17             THE WITNESS:  I believe it was in Connecticut.

18   It was actually a police officer who was trying to kill

19   his supervisor and their family.

20             THE COURT:  Okay.

21   Q.   (By Ms. Berkower)  And in your field are you -- now

22   actually let me take a step back.

23        Was that an IID that you just described?

24   A.   It was.

25   Q.   And that's because it's not commercially available?

1    It's something that the individual who committed that act

2    pulled together using materials of his own design?

3    A.    That is correct.

4    Q.    So are you --

5              MR. WATKINS:  I'm going to object here.  We have

6    had a lot of back and forth in discovery.  I specifically

7    requested instances where Agent Rigopoulos had tested

8    items similar to this.

9         I was told there were none, and now we're talking

10   about an event that I know nothing about; will not be able

11   to cross-examine this witness about; don't know how

12   similar it is, other than his very somewhat vague

13   description after what sounds like several years.

14        If we're going to go into this, we should really get

15   the discovery on it before we start talking about it as

16   evidence that in this particular case this device was

17   similar.

18             MS. BERKOWER:  Your Honor, I would just respond

19   to that in that we --

20             THE COURT:  I don't know.

21             MS. BERKOWER:  I don't think --

22             THE COURT:  Hold on.  I don't know that he said

23   he did any testing on it.  It was my take that he had

24   either been involved in a scene investigation or heard

25   about it, and it was a direct and fair follow up from my

1    question regarding his being exposed to very distinctly

2    similar devices to the one in this case.

3         So can you clarify whether or not the witness did any

4    type of testing or direct examination on the case that he

5    is talking about with these gas cans with rags, or if this

6    is something he's learned about through his training and

7    experience?

8              THE WITNESS:  Glad to answer the question.  That

9    was a specific case that was assigned to me and no testing

10   was done on this case either.

11             THE COURT:  All right.  So the objection is

12   overruled.  That doesn't mean you can't be heard further,

13   Attorney Watkins, on a discovery-related issue as might be

14   triggered by that.

15        Go ahead, Attorney Berkower.

16             MS. BERKOWER:  I would just say that -- I think

17   Your Honor made the point I was about to make.  I don't

18   have anything further on that.

19             THE COURT:  You want to follow up on that,

20   Attorney Watkins?

21             MR. WATKINS:  Yes.

22   **RECROSS-EXAMINATION**

23   Q.   (By Mr. Watkins)  Agent Rigopoulos, you indicated

24   that there are presently eleven examiners in the forensics

25   unit or the explosives unit, I'm sorry?

A.    There are eleven in the device examiners in the
explosives unit, that is correct.

Q.    Correct.  And there are additionally more examiners
in the explosive unit as well, right?

A.    There are, and those are chemistry examiners.

Q.    And the FBI keeps all records of examinations
indefinitely, correct?

A.    Yes, they do.

Q.    So you would be able to find that particular case
that you just talked about in the files at the FBI,
correct?

A.    Yes, sir.

Q.    And you could also consult or look through databases
to see if there were any other cases with devices similar
to this particular setup that was found in Longmeadow,
correct?

A.    It depends how specific you're being with similar.
That is why this case was not presented at the request
because my understanding was you wanted specific ones to
this case, not a deviation of containers of things.  But
there are other IID cases in FBI files.

Q.    The judge asked specifically about gas cans with
paper wicks in them, cases set ups similar to that, right?

A.    Well, paper wicks in similar cases we did not produce
anything because I did not have any.

1   Q.   So the answer to the question is that as far as FBI

2   Laboratory you were not able to find any with these

3   similar features, paper wick into the gas can with fuel in

4   it?

5   A.   That is correct.

6            MR. WATKINS:  That's it, Your Honor.

7            THE COURT:  All right.

8        Agent Rigopoulos, I'd like to ask you another few

9   questions.  The can in this case referring to as the

10  yellow can in this case, is marked on it that it's for

11  dieseal use only; is that correct?

12           THE WITNESS:  That is correct.

13           THE COURT:  All right.  And it also says on it,

14  on the can itself, that it should not be used for gasoline

15  or other flammable liquids; is that correct?

16           THE WITNESS:  That is correct.

17           THE COURT:  All right.  So now looking at that,

18  I guess I need to know what is the distinction?  Why would

19  a can that looks like this -- it looks like a gas can.  It

20  says dieseal and don't put gas in it -- what's the

21  difference between a dieseal can and a regular gas can

22  that people fill up so they can put gas in their lawn

23  mowers?  That's the first question.

24       The second question is, how is the construction

25  differ from -- we've been talking about a gas can but this

1    really is a dieseal can.  What's unique about this yellow

2    diesel can?

3                THE WITNESS:  Okay.  So that's a two-part

4    question.  I'll answer the first one first.  The cans are

5    different colors.  A yellow is reserved for diesel and red

6    is reserved for gasoline.

7         Gasoline is a flammable liquid where it has -- it can

8    ignite at a lower temperature than diesel fuel can.

9    Diesel is considered combustible liquid, and apologize I

10   can't remember the exact temperature that they ignite but

11   those are the differences.

12        And one of the other reasons is because of that lower

13   ignition temperature, it has more potential to ignite or

14   to burn or even as the label says on that can explode.  So

15   with a combustible liquid it's a dieseal fuel, it's a

16   little harder to ignite than gasoline.

17        As far as the tolerances between a gas can versus a

18   dieseal can, that's above my training.  I'm not qualified

19   to answer the differences.  I don't know what those

20   differences would be.

21                THE COURT:  You don't know anything about the

22   different composition, makeup, structure integrity of gas

23   can versus a dieseal can?

24                THE WITNESS:  They physically look similar, but

25   I don't know, once again, if there's different materials

1    used.  If there's different tolerances for each one.  I'm

2    just not familiar with that.

3              THE COURT:  All right.

4              MS. BERKOWER:  Your Honor, if I may briefly

5    interject here?  We have on our witness list a

6    representative from the Scepter gas can company, the

7    company that manufactured the gas can, and I expect

8    testimony from that witness on that topic.

9         If Your Honor would like me to just preview for the

10   court or proffer to the court what I expect he will say, I

11   expect he will say --

12             THE COURT:  Not right now.

13             MS. BERKOWER:  Okay.  Well, then we do have

14   other witnesses who have that information.

15             THE COURT:  Okay.  Thank you.

16        One more question, Agent Rigopoulos.  So I've asked

17   you this question about have you seen a can with a paper

18   wick.  We've gone down that road and I don't want to go

19   down it again except to maybe now make it even more

20   specific.

21        Now that we've drawn the distinction between a diesel

22   can and a gas can -- and thank you for that.  I didn't

23   know one was always yellow and one was always red.  I take

24   it that you had not seen this type of situation in either

25   a diesel or normal standard red colored gas can?  Would

1    that be fair to say?

2              THE WITNESS:  Yes, sir, it would.

3              THE COURT:  Okay.  All right.

4         So, Attorney Berkower, do you want to follow up?

5    **REDIRECT EXAMINATION**

6    Q.   (By Ms. Berkower)  I guess just going back -- taking

7    one step back, does your training and experience -- let me

8    rephrase that.

9         In your job as a device examiner, are you always

10   looking for three things to determine if something is a

11   hazardous device?

12   A.   Yes.

13   Q.   And those are the ignitable material or explosive

14   material, but for an IID ignitable material, the fusing

15   system, and the container?

16   A.   Yes.

17   Q.   Is that common, a common set of components you're

18   looking for across all IIDs?

19   A.   Yes.  Well, hazardous devices, yes, because sometimes

20   you don't know what's inside the container.  So once we

21   examine further to identify what the energetic material

22   is, that's where it comes down to the third item.

23        Specific with an IID, that's a flammable liquid or

24   ignitable liquid rather.  An explosive device would be an

25   explosive material.  So that I think the term energetic

1    material covers both of those.  So a container, energetic

2    material, and a fuse.

3    Q.   Sorry.  My connection is not great today.

4         Explosive device -- or hazardous devices have a

5    fusing system, energetic material meaning either ignitable

6    material or explosive material, right?

7    A.   That's correct.

8    Q.   And possibly a container?

9    A.   Yes.

10   Q.   For an improvised device, an improvised hazardous

11   device, are there enumerable types of objects that could

12   serve as the container?

13   A.   Yes.

14   Q.   Are there many, many different types of energetic

15   materials that can serve as either the ignitable liquid or

16   the explosive?

17   A.   Yes.

18   Q.   Are there enumerable objects that could serve as the

19   fusing system?

20   A.   Yes.

21   Q.   Are you able to apply -- are you still able to

22   identify a fusing system, an ignitable or explosive

23   material in a container, despite the fact they could be

24   one of enumerable types of objects?

25   A.   I apologize, can you repeat the question?

1    Q.    It wasn't a good question.

2         Are you still able to examine devices even though

3    there are enumerable types of objects that can serve as a

4    fusing system and identify whether or not a certain object

5    is serving as a fusing system?

6    A.    Yes.

7    Q.    And what about for an energetic material?

8    A.    Those items would be identified actually from our

9    forensic explosive chemists.  We rely on their expertise

10   to do that.  That's out of my lane, but we would utilize

11   their results to use in our opinion.

12   Q.    And in this case that was the Massachusetts State

13   Crime Lab identifying gasoline in the container?

14   A.    Yes.

15   Q.    But it could be enumerable different types of

16   energetic material -- I keep wanting to call it excitable

17   -- energetic material, excuse me?

18   A.    Yes, that's correct.

19   Q.    And the same for a container, you can identify a

20   container as part of an IID or hazardous device of any

21   kind from an enumerable range of containers, right?

22   A.    That is correct.

23   Q.    You don't have to have seen the exact same components

24   in the exact same way to understand whether or not they

25   are arranged as a hazardous device?

1    A.    That is correct.

2    Q.    And in terms of your assessment of those components

3    as arranged into a device, is that based on your

4    understanding of the underlying chemistry and chemical

5    composition of those three components?

6                 THE COURT:  This is way beyond my talking about

7    diesel versus regular gas can.

8                 MS. BERKOWER:  Well, that was going to be my

9    last question, Your Honor.

10                THE COURT:  That last question you just asked is

11   stricken.

12                MS. BERKOWER:  Okay.  I'm done.  Thank you.

13                THE COURT:  Attorney Watkins?

14                MR. WATKINS:  Likewise, I'm done.

15                THE COURT:  All right.

16        I'm going to ask you one last question I promise,

17   sir.  The case that you told us about, you said a police

18   officer left a gas can or gas cans, multiple, on a porch

19   with a rag in it and lit them on fire.  You told us you

20   worked on that case and you thought it was Connecticut.

21                THE WITNESS:  It was a jug but, yes, sir.  I

22   think it was either Connecticut or New Jersey, one of the

23   two states.

24                THE COURT:  Okay.  You said it was a jug?

25                THE WITNESS:  A plastic jug, yes, sir.

1          THE COURT:  All right.  Well, that's important

2     for me.  Was it a gas can?  Diesel can?  Or a jug?  If

3     it's a jug, describe it in detail for me.

4          THE WITNESS:  Okay.  Yes, sir.  It was a jug

5     similar to one you may -- that you might get a gallon of

6     water in or perhaps a gallon of milk.

7          THE COURT:  Got it.  All right.  Now, okay.

8        You would agree with me that those jugs, the plastic

9     is much thinner and designed for a very different purpose

10    than flammable liquid containers; is that fair to say?

11         THE WITNESS:  It is.  Yes, sir.

12         THE COURT:  Okay.  All right.  Thank you.

13       All right.  We are all set.  You're free to go back

14    to your seminar and training.  Thank you for participating

15    under these circumstances, agent.

16         THE WITNESS:  Thank you, Your Honor.

17         THE COURT:  All right.  So we've heard --

18    there's been a lot; there's been a lot of testimony.  It

19    went -- if you can briefly sum up where you want me

20    focusing, Attorney Watkins and then Attorney Berkower,

21    that would be important.

22       Specifically, Attorney Watkins, what are you seeking

23    to accomplish through this *Daubert* hearing?  There already

24    is the motion in limine prohibiting the expert from

25    touching on the ultimate issue.  That ruling is already

1    out, and so there's some very specific findings that were

2    made by the expert in this case.

3        Are you seeking to prevent the expert from testifying

4    as to all of those findings?  So I guess I need you to

5    make me some type of structure as to what are the findings

6    or conclusions you're trying to apply *Daubert* to?  There's

7    probably a different way to apply it to different

8    circumstances.  Walk me through it.

9              MR. WATKINS:  Thank you, Your Honor.

10       Yes, I'm seeking to exclude the testimony in its

11   entirety.  We're right back to the beginning here where

12   what the government wants to argue, wants this witness to

13   say so they can argue to the jury at the end of the day,

14   that one plus one plus one equals three.

15       The fusing -- as long as you have some identifiable

16   fusing, that you have some kind of identifiable material

17   inside a container, that that in and itself qualifies as a

18   destructive device for purposes of the statute.

19       What the government wants is for this expert to come

20   right up there and say that in no uncertain terms, perhaps

21   not asking the ultimate question but getting as close as

22   they can.

23       The problem is the expert has no scientific basis for

24   concluding those things; concluding that this gasoline in

25   this circumstance could catch on fire; concluding that if

1    this fuse were properly lit, whatever what means, that

2    indeed this would have caught on fire including that it

3    could have exploded, a low possibility of explosion but

4    nevertheless a probability.

5        The problem we've seen here is that there is no

6    scientific basis and frankly no experiential basis for him

7    to make those kinds of subsidiary findings that the

8    government is then going to use to argue to the jury, and

9    that's where the mischief --

10            THE COURT:  Okay.  That works well.  I'm fine

11   with that.

12            MR. WATKINS:  Okay.

13            THE COURT:  I didn't mean any disrespect by

14   holding my hand up to you like that.  It's just the most

15   effective way of getting a space for me to talk.

16       So the conclusions that you are seeking to attack and

17   exclude under *Daubert* are, number one, that the components

18   abandoned at the scene if properly assembled and initiated

19   could cause damage.  Is that one of the conclusions?

20            MR. WATKINS:  Correct.

21            THE COURT:  Okay.  The second conclusion is that

22   paper rolled and placed in the nozzle of a container may

23   ignite the material and it goes on; is that the second

24   conclusion you are attacking?

25            MR. WATKINS:  Correct.

1          THE COURT:  All right.  The third is that the

2    fuel container meets the technical elements of a

3    destructive device?

4          MR. WATKINS:  I believe he's not saying the fuel

5    container itself but the collection of these three items

6    is what makes it a destructive device, but that might be

7    my characterization of his testimony rather than what he

8    has said.

9          THE COURT:  All right.  So that would be the

10   third conclusion?

11         MR. WATKINS:  That's correct.  When you say the

12   third, I've heard additional conclusions or additional

13   assertions brought forward over the case of this

14   hearing.

15         THE COURT:  I'm trying to stay true to your

16   pleading to kind of guide me through this because it goes

17   back to my ultimate question I really need to be focused

18   on what you're trying to accomplish.

19      This has gone very far afield from a standard *Daubert*

20   hearing.  It has been a partial discovery hearing; it has

21   been a partial direct examination and cross-exam and

22   preview.  It's been a lot of things.

23      But *Daubert* -- well, on one hand *Daubert* can be

24   looked at as a very simple analysis.  Here's the case law;

25   everyone's familiar with it.  Well, guess what?  I found

1    out it's not nearly that easy.  It's extremely complicated

2    and there's multiple layers in *Daubert,* and now I need to

3    go through those multiple layers with some degree of

4    intensity to be true to what the case law tells me to do.

5    So that's why I'm trying to have you organize this for me

6    in a fashion that I can look at this.

7              MR. WATKINS:  That is the 30,000 foot

8    organizational view, but again we heard more things and I

9    think this particular expert cannot and should not be able

10   to testify to ultimately at trial.  So I guess I'm still

11   going to reserve my rights to argue specific things, but

12   that is a good analytical framework.

13             THE COURT:  All right.  So I understand your

14   analysis.  As far as I'm concerned, part of Daubert, and

15   it's only part of it, requires me to look at training and

16   experience and background.

17        I think the agent is very well trained.  I think he

18   has an appropriate educational background.  He may not

19   have studied chemistry in college, but he's taken

20   chemistry classes.

21        He has an impressive history as an explosive examiner

22   as a person who's a fire professional.  He teaches.  He

23   has taken several courses.  I don't really have an

24   issue -- I find that he's a qualified person in this

25   field, the fire explosive field generally, but that's only

1   one segment, one fragment of *Daubert*.

2       You are essentionally saying -- and you used the term

3   that I think was brought up in the *Ruiz-Troche v. Pepsi*

4   *Cola* case, the ipse dixit analysis of just because you say

5   so that's not enough.

6       So I heard the witness.  I know you're going to --

7   you don't need to go over again that no scientific tests

8   were done.  They didn't -- no analysis of this specific

9   thing was done.  There's nothing in training and

10  experience for this type of situation that he's seen come

11  before him, and therefore -- even though experts are

12  entitled to rely upon their experience and training,

13  they're not allowed so much, so much space to just say,

14  oh, just because.  Well, just because I said.  I'm a fire

15  expert and if it looks like it can catch on fire and/or

16  blow up, sure, it could.  You're seeking to prevent that.

17      *Daubert* does a lot of other things too.  It requires

18  a finding of relevance, reliable foundation and relevant

19  to the task at hand, and it brings in this analysis of an

20  adequate fit.  What do you say about that?

21          MR. WATKINS:  Well, I think that's the

22  difficulty we have here.  I do not dispute that Agent

23  Rigopoulos has quite a bit of experience in the field and

24  there are many, many things that I think he would be

25  qualified to testify to.

1          It is clear that, for example, identifying items at a
2    scene of evidentiary value he's supremely qualified to do
3    those kinds of tests.
4          What he does not have through his training and
5    experience, or in any other way, is the ability to testify
6    that in this case these features of this device make it an
7    improvised incendiary device.
8          He simply does not have the chemistry background, and
9    we've been talking in terms of more of *Kumho Tire* than
10   *Daubert* where we've been talking about training and
11   experience can substitute, if you will, for actually
12   scientific and we've been talking about that in terms of
13   Agent Rigopoulos's testimony.
14         But we should make no mistake he is testifying to
15   chemical processes when he's starting to talk about
16   temperature, ranges of about vapors, and headspace, things
17   of that nature.
18         We are talking now about scientific evidence, and in
19   this case is not only the fact that he's unqualified, he
20   quite firmly noted that he's not a chemist or a materials
21   chemist or materials expert.
22         Not only he's not qualified to do it on that basis,
23   he did absolutely no testing or no kinds of -- any kind of
24   review of this to make sure what he was saying was
25   correct.  That's especially important here, as the court

1   heard me follow up, where this device did not go off.  It

2   didn't work.

3        MS. BERKOWER:  I'm so sorry.  I'm sorry to

4   interrupt things.  I think I actually was kicked off of

5   this.  I'm not sure what happened.  I think I tried to

6   send a chat message to you all, and so I missed the last

7   minute or two.  I'm sorry.  I apologize.  I'm now in

8   Springfield and my internet is not as good here as it was

9   at home.  My apologies to the court and counsel.

10       MR. WATKINS:  I'm going to try to summarize what

11   I said in the last minute.

12       We've been talking in terms of Agent Rigopoulos about

13   under I think the aegis of *Kumho Tire* which talks more

14   about training and experience.  But the actual evidence

15   that we heard falls much more squarely within *Daubert*

16   concerning scientific evidence and support of scientific

17   findings.

18       Because make no mistake about it, that is what he's

19   testifying to is chemical and physical properties here

20   that inform his opinion ultimately about whether this had

21   the features of an improvised incendiary device.

22       Moreover, into that particular mix, he's also thrown

23   in the fact that details given to him about the scene and

24   about the case inform the conclusions he's made about all

25   of it, and that is inappropriate for someone who is

1    testifying in a case as an expert based on what he's done

2    in the laboratory with a background of his training and

3    experience and scientific prowess.

4         So I think, Your Honor, that's why this is -- I think

5    the court is correct, the *Daubert* and *Kumho Tire* test are

6    easy to articulate, but once we get down into the brace

7    tax of things we find out that is not the case; that

8    somebody who has experience can always testify in a case

9    in his field.

10        THE COURT:  In your view, the expert cannot

11   testify that the container in this case, this yellow

12   diesel container, qualifies under the definition of an

13   incendiary device, an improvised incendiary device.  If he

14   can't make that testimony, do all of his other conclusions

15   then as a domino effect fail?

16        MR. WATKINS:  I would say it's the opposite way

17   around.  He can't make that last conclusion because all of

18   his subsidiary findings do not hold water.

19        I would then add once you get to that point, then the

20   question is helpfulness to the jury, right, which is

21   ultimately the linchpin of 702 and *Daubert* and *Kumho Tire*.

22        At some point, because his findings are so -- are

23   untethered to any kind of scientific basis or really any

24   basis at all, other than he thinks it's right, we are in a

25   point where why do we have him up on the stand at all?

1    Other than to give the imprimatur of an expert so the

2    government at the end of the day can argue you don't even

3    have -- jury, you don't even have to think about whether

4    it qualifies as a device or not, we've taken care of that

5    for you.

6              THE COURT:  All right.  I certainly agree with

7    you that confusion the jury and other considerations are

8    part -- as I said, there's not an easy analysis under the

9    *Daubert/*Kumho Tire case.

10   Attorney Berkower, to start with, I do find that

11   Agent Rigopoulos is qualified.  I do not -- let me just

12   say interspersed in this dialogue that I'm having with you

13   now are going to be some of my findings because I'm not

14   going to have the luxury or benefit of having a couple

15   weeks to write something up on this.

16   I'm going to intersperse our discussions here as my

17   findings, and then supplement with a much shorter written

18   ruling perhaps later today or tomorrow.

19   Attorney Watkins, you made a specific argument that

20   asked me to exclude certain evidence based upon your

21   attack of the agent's background, training, and experience

22   as in the field of chemistry.  And as to that sliver, and

23   it's only a sliver of your argument, I reject your

24   contention.  I don't agree with you on that.

25   I do find that although he didn't major in chemistry,

1    as I said, it was part of -- chemistry as it applies to

2    his field of expertise he did receive and testified he

3    received training, took chemistry classes.  He mentioned a

4    couple colleges or universities.  I don't find that that's

5    going to take the day for you here.

6         Attorney Berkower, to start with, we start with

7    talking about the definition of incendiary device.

8    There's been a lot of discussion about an incendiary

9    device and a lot of opportunities for the expert to define

10   an incendiary device.

11        I'm concerned that the definition that the expert has

12   been working with -- and frankly it seems like the parties

13   have been working with and that's why maybe I can be

14   enlightened about this -- is incorrect.

15        The agent and the government have been asserting that

16   the definition of an incendiary device is three

17   components:  Ignitable material, a fusing system, and

18   sometimes a container, and that's coming straight from the

19   report of the expert at page 2.

20        Now when I look at 18 United States Code 232 Section

21   5, which is there's no dispute, that's what defines

22   incendiary device here, a couple things appear.

23        There is nothing that allows for the definition to

24   include sometimes a container.  The expert has said that

25   the definition includes "sometimes a container is

1  present."  It seems to me a container has to be present.

2      In addition, the definition that we are working

3  under, and the expert has been working under, has excluded

4  the necessity that the container be breakable.  It's

5  completely left out of the definition that was the working

6  definition of the expert in this case.

7      The definition under 18 U.S.C. 232 Section 5 is "The

8  incendiary device will consist of or includes a breakable

9  container, including a flammable liquid or compound, and a

10  wick which is composed of material when ignited is capable

11  of igniting such flammable liquid or compound, and" -- and

12  it's referring to the incendiary device -- "can be carried

13  or thrown by one individual acting alone."

14      When you look back at the history of where and how

15  that developed, the breakable component I'm not sure it

16  was inserted specifically for something like what could be

17  referred to as a Molotov cocktail, a glass bottle with a

18  wick stuffed in it, which is lit and then thrown and the

19  glass hits the ground and obviously breaks and sprays what

20  could be or likely would be liquid or vapor that catches

21  on fire.  But there's clearly that breakable component.

22      There's a couple First Circuit cases including

23  *Stackpole*, *U.S. v. Stackpole*, First Circuit, 1987, and

24  *Mena*, M-e-n-a, First Circuit, 1991.  *Stackpole* deals with

25  a plastic bag, a Ziploc bag, that the court found -- and

1   this is at trial.  This is not at a *Daubert* hearing.  It's

2   not a trial, but the cases are important because they talk

3   about the definition.  It talks about a Ziploc bag being a

4   breakable container.

5       *Mena* talks about an aluminum can which because the

6   testimony included an expert saying that they were able to

7   break the aluminum sheaf of the can, that that qualified

8   as a breakable container.

9       So having said that as the background, is your -- is

10  the government's position here completely undercut and

11  eroded because of the inaccurate or incorrect definition

12  used by the government and by the government's witness up

13  to this point?

14          MS. BERKOWER:  Your Honor, I'd submit it's not

15  an incorrect definition, and I'd like a -- I didn't mean

16  to interrupt, Your Honor.  I think my video --

17          THE COURT:  You're good.

18          MS. BERKOWER:  -- may have had a delay.

19      Your Honor, I understand where Your Honor is coming

20  from and that the definition that the agent testified to

21  is different from the statutory definition.  But I would

22  also note that the definition of what an explosive is

23  varies throughout the Federal Criminal Code.

24      There are a number of different statutes that define

25  explosives in different ways.  This particular statute is,

1  you know, the definition that Your Honor described we

2  quoted it in our brief, and I think Your Honor is very

3  familiar now with that definition.

4      Elsewhere in the Federal Criminal Code, for instance,

5  in 2332(a), the Weapons of Mass Destruction statute,

6  there's a different definition associated through a bunch

7  of different statutory machinations.

8      I think also 922, 922(g) might have a different

9  definition.  They're sprinkled throughout.  They're

10  slightly different because Congress has defined explosives

11  differently for different purposes.

12          THE COURT:  But what's the definition for the

13  indictment in this case?

14          MS. BERKOWER:  Yes, it is.  But what I'm getting

15  to, Your Honor, is in the field of explosives, the field

16  of explosives is different from whatever the law that

17  Congress enacts says, you know, in this particular

18  circumstance this is what an explosive device is.

19      In the field of explosives, which is what this

20  person, this witness is an expert in, it is simple.  It is

21  three components.  It is a fusing system, an ignitable

22  material, and possibly a container.

23      He did say there are circumstances where it wouldn't

24  require a container, such as if the incendiary material or

25  explosive is a solid such as a gel or a powder.  It

1   doesn't have to have a container.  That's why there may be

2   a container is included in his definition because he does

3   encounter devices where there's not a container required.

4       I think for purposes of an IID, the example he gave

5   was you could use Sterno.  Sterno is a solid and so you

6   don't have to put it in a container.  If you're using an

7   ignitable material that's a liquid, you do have to put it

8   in the container.  But they don't want to limit the

9   definition in the field to require a container because

10  that's not always necessary given what the ignitable

11  material may be.

12      Now in his field --

13          THE COURT:  The fact that he wrote the report on

14  generality -- on his general understanding, nonspecific to

15  this case, really is strong support for the defense

16  argument and the case law argument about he can't just say

17  that.  You can't just fire off an opinion that's been

18  referred to as *ipse dixit*; just because I say so, I have

19  no authority.  I'm familiar with definitions and other

20  sections and I'm just going to pick a definition and apply

21  it to this case and give you a conclusion.

22          MS. BERKOWER:  Your Honor, *Kumho Tire* --

23          THE COURT:  That really -- that's a red flag

24  under *Daubert/Kumho Tire* analysis for expert testimony.

25          MS. BERKOWER:  Your Honor, I would submit it's

1    not actually a red flag because *Kumho Tire* -- and I'm

2    reading from the case now -- says, "The objective of

3    *Daubert*'s requirement is to ensure the reliability and

4    relevance of expert testimony to make sure that an expert,

5    whether basing testimony upon professional studies or

6    personal experience, employs in the courtroom the same

7    level of intellectual rigor that characterizes the

8    practice of an expert in the relevant field."  And that is

9    526 U.S. Reporter at 152.

10        I would submit to the court that that is what this

11   expert did.  He is employing the same intellectual rigor

12   that an explosive hazardous device examiner uses in any

13   case to examine the evidence that was presented to him

14   here.  And it's not *ipse dixit* say so --

15             THE COURT:  Well, what is completely missing in

16   your -- in what you choose to cite in *Daubert* is

17   completely missing that there be an adequate fit.

18        So how is there are adequate fit applying the

19   definition that the government is applying in this case to

20   the definition that should be applied?  How is there an

21   adequate fit?

22             MS. BERKOWER:  And I would submit, Your Honor, I

23   agree with you and I will get to that now, but I think

24   they are two separate questions and I don't want to

25   inappropriately merge them.

1        Whether or not his method of examining this device
2   was reliable and used the same level of intellectual rigor
3   that a device examiner who's an expert in the field would
4   use is a separate question for whether there's adequate
5   fit.
6        So I just wanted to address the question that it is
7   our position he absolutely did use the appropriate level
8   of intellectual rigor in his approach to this and for that
9   reason his testimony is reliable.
10        Whether it is relevant and useful is a separate
11   question that I can turn to now, but I did want to just
12   aggregate them because I think it's important.  I would
13   also note that for purposes of 702 --
14            THE COURT:  You're correct, and I really do
15   appreciate you separating those two.  But when you're
16   talking about intellectual rigor, the expert had never
17   seen a situation that presented like this.  He did not
18   know the difference or didn't know the workable
19   differences between a diesel container yellow and a gas
20   container red and the makeup in the difference in the
21   structural integrity.
22        He had not investigated or it had not crossed his
23   desk either as a case to work on something like this;
24   hand't heard about it from other people; hadn't read about
25   it; hadn't studied it.

1    That being the backdrop, did not do any type of

2    investigation to find anything more out about this, and

3    then when he tried -- he did try to apply a case that he

4    had worked on, which is absolutely appropriate.

5    We find that the case that he had worked on contained

6    plastic jugs that would hold water or a one-gallon milk

7    container.  You don't need to be an expert to know that a

8    gas and dieseal container is very different from the

9    purpose and structural integrity of a milk container.

10   So when you're saying the intellectual rigor and

11   reliability of what he did, I'm not seeing any rigor.

12            MS. BERKOWER:  Well, Your Honor, I would submit

13   that he testified that based on his training and

14   experience he can identify the difference between

15   something that is assembled in a way that can be dangerous

16   and something that is assembled in a way that it's a hoax

17   device, or something that is not assembled in a way that

18   it's dangerous.  And that is the expertise that he is

19   bringing to bear here.

20   Improvised explosive devices no two are alike because

21   whoever is doing this can pull together different kinds of

22   materials and make them into potentially something

23   dangerous or maybe not, and that's the question he's

24   asking.  Is this dangerous given the known proper chemical

25   properties of these materials and the way they're

assembled?  That is the narrow question that he's asked to
answer, which is what he did in this case.

He can do that in any case because he's trained.  He
can look at are these components, given the chemical
makeup of these components, given the known chemical
properties of these components arranged in a way that
assembled -- that they can actually cause damage?

He explained the difference between a hoax device and
a device that doesn't go off.  So a hoax device is a
device that looks like it has all of the components
assembled but in fact there's an inert substance.  Say for
the incendiary material, it's Silly Putty.  It's not
Sterno so it's not going to go off.

So it looks like it could be a hazardous device but
it's not, and he can bring his experience to bear to look
at whether the evidence in front of him presented is a
hoax device or not.

The same for a partially assembled device.  He
testified about those as well.  I can look here and see is
this something that was partially assembled?  Was it only
-- was it a container with a fusing system that was
missing the ignitable material?  That might be a partially
assembled device.  He can bring that experience and
training to bear on materials that are presented to him
given what is found at a particular crime screen.  And I

1    think that is very relevant and it does fit when he's

2    answering that question.  That does fit in this case.

3              Because I expect the defense will argue -- and

4    Mr. Watkins has hinted at this many times -- he's going to

5    say this was not something that could have ignited.  This

6    was not something that could have exploded, and this was

7    just completely, you know, a harmless thing that was out

8    on the sidewalk that couldn't have done damage to any

9    person or property because that's what he has to prove --

10   that's what we have to prove, the opposite of that.

11        And this device examiner is going to come in and say

12   my job is to determine whether simple household items that

13   are arraigned in a certain way present a danger of fire or

14   explosion or not, and here he said that they did because

15   of the way they were arranged.

16        That doesn't require specific knowledge of the

17   intricate material properties of a gasoline can.  It

18   doesn't require him to have -- you don't have to have the

19   exact same device that he's seen in the past because he's

20   not -- he's not here to tell us about the exact same

21   device he's seen in the past.  He's here to tell us about

22   this one, and whether this has the three components

23   arranged in a way that they could cause fire and

24   explosion.

25             Now I do want to get back to the court's concern

1    about the fit as it --

2           THE COURT:  But it's not an incendiary device

3    unless it's breakable.  I don't recall any testimony about

4    breakable, and you can remind if there was.  The only

5    thing about breakable that came even close was in response

6    to a very leading question that you asked at I think at

7    the end of yesterday about, well, if something caught fire

8    could it -- if the wick caught fire, could it melt a

9    container?

10      I'm not giving any weight to his -- his answer was

11   yes.  He simply followed a very leading question, and

12   that's not the basis -- that's not an authoritative basis

13   to show or support that it was breakable.

14      Where was the testimony regarding breakable?  And let

15   me remind you, that he completely missed on any

16   distinction or difference between dieseal gas can or red

17   gas can in talking about the integrity of the plastic.

18   How they're made, et cetera, et cetera on the issue of

19   breakable.

20      So how does this work when he failed in the

21   definition of incendiary device?

22          MS. BERKOWER:  Your Honor, I would -- let me

23   answer that in two parts, and the first part I think this

24   might be helpful.  I tried to get into it and I think the

25   court thought it was not relevant, maybe it is now.

1            There is actually no structural difference between a

2      dieseal can and a gas can.  The reason that they say do

3      not put dieseal fuel in here is purely for customer

4      protection reasons.  That is a required label that has to

5      go on the side of the can so that average people who don't

6      put dieseal fuel in a gas motor and gas fuel in a dieseal

7      motor and cause some sort of problem, possibly an

8      explosion because you can't use --

9                  THE COURT:  I'll accept that as true.

10                 MS. BERKOWER:  So there's actually no

11     difference, and we have a witness from the Scepter company

12     like I mentioned where he's going to talk about that.

13                 THE COURT:  Hold on.  When I put my hands up,

14     please stop talking.

15           I accept that as completely true.  Okay.  I'll accept

16     that as completely true.  But even accepting that as

17     completely true for purpose of this argument, where was

18     the testimony regarding the container in this case being

19     breakable?

20                 MS. BERKOWER:  Yes, Your Honor, and that's what

21     I'll turn -- that was the second part of what I was going

22     to say.

23           I think, Your Honor, he did not testify about

24     breakable container, but in our view there are many

25     different pieces to the statute that could be satisfied

here.

Under 18 U.S.C. 844(j) the definition of explosive contains a wide range of things that could be explosives, including other explosives or incendiary devices under 232(5).

I'll get to that in a moment, but it also includes "any device that contains" -- and I'm skipping over words here just because they don't all apply -- "any device that contains other ingredients in such proportions that ignition by fire may cause an explosion," and I think that's one of the things that his testimony fits here.

He's answering the question of did this device contain ingredients in such proportions that ignition by fire may cause an explosion?  In our view his testimony speaks directly to that question, and that's a question the jury is going to have to assess whether the evidence in this case meets that definition.

I would note that he doesn't have to provide an opinion in order to be helpful to the jury.  Rule 702 says the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence.  That's not just opinion.  That also includes testimony about things like the fuel-to-air ratio.  When will something catch fire?

Well, the fuel-to-air ratio has to be in the right

1    spot.  Well, how do vapors collect in a gas can?  Well,

2    gas vapors -- gas is always vaporizing so gas is always

3    creating vapors that are settling, and they're heavier

4    than air so they stay in the can.  That is all relevant

5    for the jury to know that scientific, technical and other

6    specialized knowledge that this person has based on his

7    training and experience that he can describe to the jury

8    so that they can determine at the end of the case did this

9    device contain ingredients in such proportions that

10   ignition by fire may cause an explosion?

11             THE COURT:  Okay.

12             MS. BERKOWER:  It's not opining on the ultimate

13   issue.  It's giving them the tools to do it.

14             THE COURT:  Okay.  The expert specifically said,

15   and correct me if I'm wrong, that we were dealing in this

16   case with an incendiary device, not an explosive.  Not an

17   explosive, we're dealing with an incendiary device.

18        Is the government suggesting that there is a

19   different definitional section that applies beside 18

20   U.S.C. 232(5)?

21             MS. BERKOWER:  Well, Your Honor, the part I was

22   reading from a moment ago is the end portion of 844(j).

23   844(j) cross-references to 232(5) and so I would submit

24   the part I just read from 844(j) applies.

25        With regard to 232(5) --

1          THE COURT:  But it says other explosives and

2    incendiary devices within the meaning of paragraph 5.

3          MS. BERKOWER:  Are we talking about 844(j) now?

4          THE COURT:  Yeah.

5          MS. BERKOWER:  844(j) does say that.  It says,

6    "and any device that contains ingredients."  It's an and.

7    It's not exclusive one or the other.

8          THE COURT:  Okay.

9          MS. BERKOWER:  But with regard to 232(5), Your

10   Honor, that says "The term explosive or incendiary device

11   means any incendiary bomb or grenade, fire bomb, or

12   similar device," and then it goes onto talk about the

13   breakable container and the flammable liquid.

14        That section of the statute does not limit incendiary

15   bomb or grenade, firebomb, or similar device.  And we

16   would submit that his testimony does go to whether this

17   was an incendiary bomb or grenade, fire bomb, or similar

18   device.

19        And the case law I don't think we've looked at this,

20   it does not require the breakable container.  Basically

21   what they're describing is the Molotov cocktail.  That

22   additional definition is not designed to limit the

23   previous terms incendiary bomb, grenade, fire bomb, or

24   similar device.

25        We would say that his testimony again concerning the

1    -- concerning the fact that this -- you know, when could

2    this catch fire given the way -- given the chemical

3    properties of the ignitable material --

4          THE COURT:  All right.  So you're telling me

5    that the definition that you need to satisfy isn't

6    necessarily 18 U.S.C. 232(5) breakable container

7    definition?  You're telling me you can satisfy 18 U.S.C.

8    844(j)?

9       Picking up on where you pointed me to, it says "and

10   any chemical compounds, mechanical mixture, or device that

11   contains any oxidizing and combustible units, or other

12   ingredients."  You're telling me that definition can

13   apply?

14         MS. BERKOWER:  I'm saying that's one of two

15   statutory provisions that we believe we can use to satisfy

16   the crime, yes.

17         THE COURT:  And that's one and the other one is

18   what, 18 U.S.C. 232(5)?

19         MS. BERKOWER:  232(5)(c) the first piece of that

20   that says any incendiary bomb, grenade, fire bomb, or

21   similar device, and then -- or and then the statute says

22   -- sorry.  It says including any device but that including

23   does not limit the previous terms.

24         THE COURT:  Okay.  That interpretation and

25   reading, all right, I hadn't considered that.  All right.

1    Point well made.

2              MS. BERKOWER:   Thank you.

3         Did Your Honor want me to address -- I guess I don't

4    know, do you want me to address any other points?  Do you

5    want me to argue why we think this should come in at this

6    point?  Are we still working our way through?

7              THE COURT:   I mean, this is really -- you know,

8    I'm happy that you brought those to my attention, the

9    different readings and interpretations.

10        I'm just wondering if those interpretations refer

11   only to explosive devices, which this is not.  Or if they

12   refer to incendiary devices which this is.

13        I guess if you look at (j), from 18 U.S.C. 844, it

14   says "Other explosive or incendiary devices within the

15   meaning of paragraph 5," and that drops us down to 5.  But

16   then when we go to the section of (j) that you want me to

17   apply, the last sentence says, look, if you're applying

18   (j), then it has to cause an explosion.  It says "or

19   device or any part thereof may cause an explosion."  So

20   how does that apply if this is an incendiary device?

21             MS. BERKOWER:   Your Honor, I think that we have

22   charged this as -- we have charged the use of an explosive

23   which encompasses incendiary devices that cause an

24   explosion within the definition of an explosion -- of an

25   explosive, excuse me.

1          So I really think that this is the question that the
2     jury is going to have to decide.  Did knowing what the
3     material is in the container, knowing how it was
4     assembled, does it meet the statutory definition?  We
5     submit that it could under 844(j) because the expert
6     testified that this would cause -- if ignited properly,
7     this would cause a fire and it may explode.

8          It doesn't say it has to cause an explosion under the
9     statute.  It says it may cause an explosion, and he
10    described a circumstance where that could happen.  It's up
11    to the jury to determine whether, you know, the weight to
12    give that opinion and whether in their view it meets the
13    statutory definition, but we don't have to prove that it
14    will cause an explosion.  We have to prove it may cause an
15    explosion, and in our view that's why his testimony is
16    relevant because he's explaining under what conditions it
17    may cause an explosion.  It's up to the jury to decide
18    whether or not they want to give weight to that or not.

19         With regard to 232(5), that's the alternative
20    definition that we could meet in order to prove the crime.
21    It says, "explosive or incendiary device includes any
22    incendiary bomb or grenade, fire bomb, or similar device."

23         In our view knowing what the components are, what was
24    present in this case, how they were assembled, and what
25    the potential for them -- you know, are they assembled in

1    a way that could in fact catch fire is relevant for the
2    jury to know whether the evidence meets that statutory
3    definition.
4         And so in our view there are two ways in which this
5    device satisfies -- could satisfy the statute.  In our
6    view it does.  It's up to the jury to determine whether it
7    does, but in our review we should be able to present
8    evidence to give them the tools to figure out, well, given
9    what we know what was here, what the police found and how
10   it was assembled, and knowing the chemical properties and
11   other specialized information the experts can provide to
12   us, did it meet the statutory definition?  That's the
13   evidence we want to present.
14             THE COURT:  All right.  I'm wondering if Section
15   (j), 18 U.S.C. 844(j) really is the dealing with the term
16   explosives.  It's referring to things used for blasting
17   and high explosives.
18        I'm just not sure about -- you've made an excellent
19   argument that I'm going to take some time to look at.  I'm
20   just having some concerns regarding the applicability
21   here.  I definitely see 18 U.S.C. 232(5) as applying here.
22   The application of (j) is a very good legal argument that
23   you just made, and so I'm going to take a little time to
24   think about that.
25        Okay.  Let me ask you this.  Let me ask you, I was

 1    thrown off a little bit by your memorandum.  I want to

 2    find it.  In your memorandum at the bottom of page 7 and

 3    the top of page 8 you say that "If called to testify, he

 4    would explain that he made the choice not to conduct any

 5    experiments on this particular item because he had seen

 6    this type of device before.  It was comprised of

 7    components common to other devices."

 8        You go onto say it did not present a novel question.

 9    So two questions:  His testimony was that he did not, did

10    not see a device like this before, although your memo says

11    he did.  And your memo refers to this as not a novel

12    question, but the testimony seemed to clearly make this

13    out to in fact be a novel issue for him.

14             MS. BERKOWER:  Yes, Your Honor.

15             THE COURT:  What are you talking about when you

16    say he's seen devices like this before?

17             MS. BERKOWER:  I think he did testify that this

18    is a straightforward device made of components that he has

19    seen before.  He has not seen them arranged in this way

20    before, but he's familiar with -- you know, he's seen --

21             THE COURT:  But your quote was "he made the

22    choice because he's seen this type of device before."  He

23    didn't say he's seen these components before.  Where did

24    that information come from?

25             MS. BERKOWER:  Well, I think maybe if you --

1    that might have been my inartful like writing of the

2    sentence, but the next phrase says it was composed of

3    components common to other devices he is familiar with.

4         And so he has seen devices comprised of a fusing

5    system, an ignitable material, and a container and he is

6    familiar with the chemical compounds of the three that

7    were present here.  And he did testify, because I asked

8    him, why didn't you conduct an experiment?  He's like

9    there was nothing to be gained.

10        I know how gasoline behaves.  I know that paper can

11   light on fire.  I know that if the right fuel-to-air ratio

12   is in the container, it will it go off.  So there was no

13   novel question to answer.  I did ask him that at some

14   point yesterday and that's why he didn't have to do an

15   experiment.  I think --

16             THE COURT:  Okay.

17             MS. BERKOWER:  -- and I did not mean to

18   misrepresent that he had seen this particular gas can

19   setup before.

20             THE COURT:  No.  It's not an attempt to

21   misrepresent.  It's just important to me to know for sure

22   and it be uncontradicted, uncontraverted that he hadn't

23   seen something like this particular device.

24        I will say as my comments here -- I will be referring

25   to the comments I'm making here and the findings that I

1    make, my comments here are that his decision, given his

2    lack of familiarity with this type of device and not

3    seeing this specific type of device, I'm not talking about

4    the world of generalities, it does appear to be a novel

5    situation.

6        I think his testimony supports that it was a novel

7    situation, and I think his decision that there was no need

8    to conduct any type of testing is not -- was not a good

9    decision and would be one of the things -- I mean, there's

10   a lot things to consider -- but would be on the side of

11   being inconsistent with him being authoritative or

12   reliable or that there being (inaudible) in this case.

13       MS. BERKOWER:  Well, Your Honor, I really think

14   that's more of a question for cross-examination and how

15   much weight the jury should give.  I don't think --

16       THE COURT:  I think it's a finding and a

17   determination that I'm required to make at *Daubert*, so I

18   just did.  It doesn't matter what a jury would think. This

19   is a *Daubert* hearing.

20       All right.  Do you want to talk about anything else?

21       MS. BERKOWER:  Your Honor, I would just

22   reiterate that to the extent that the goal of the trial is

23   for the jury to assess and have as many facts as possible

24   to assess whether or not this device meets the statutory

25   definition, which we have spent some time looking at today

1    and it's complicated, that requires some technical and
2    specialized knowledge that the average person isn't going
3    to know.

4         The average person isn't going to know about the
5    fuel-to-air ratio; is not going to know how gasoline
6    behaves; that the vapors are heavier than air, and that is
7    something that would be helpful to the jury.

8         I would also submit the fact that we've had like six
9    hours of hearings on this speaks to the fact that this is
10   actually complicated.  It might be a straightforward
11   looking device, but there's some complicated stuff going
12   on here involved with the chemistry and the design and
13   whether or not that would be -- the jury is entitled to
14   have those facts to make its decision.

15              THE COURT:  That's a good point.  It is complex
16   and I had originally -- you know, but when you look at his
17   report and his report caused me to actually make a finding
18   in one of my motions in limine that says the report
19   doesn't show this to be very complex.  It is not a very
20   complex or detailed expert report.  It infers or invites a
21   finding of simplicity, which there's not in this case.
22   You're right it's really not simple.

23         And I think that you're correct -- and I'm going to
24   have to go back to Attorney Watkins to say what are you
25   really trying to accomplish because I may agree with you

1    that this person is an expert in some fields and should be

2    allowed -- maybe he should be allowed to testify about the

3    air-to-gas mixture and the ratio and the volatility and

4    what catches fire, vapors versus things like that.

5         Okay.  Maybe that's true.  Maybe he can testify as an

6    expert about that, but then jumping to his conclusions are

7    another thing, and I'm having a lot of problems about his

8    conclusions.  And really the heart of my problem with his

9    conclusions is just what I'm viewing as an incorrect

10   definition of an incendiary device.  I know you've made a

11   very compelling argument that I should expand my view of

12   that and I will.  I'm going to look at that.

13        Attorney Watkins.

14             MR. WATKINS:  Your Honor, the difficulty and

15   where a lot of mischief comes in since we've been talking

16   about 844(j), right, much more so than 232(5) -- I'm

17   sorry.  I heard somebody else.

18             THE COURT:  It's not you.  Somebody doesn't have

19   their microphone turned off and we were hearing a personal

20   conversation.

21             MR. WATKINS:  I'm sorry.

22             THE COURT:  You don't have to apologize.  It's

23   not your fault.  You don't have to apologize.

24             MR. WATKINS:  Okay.  844(j) goes into what

25   qualifies as an incendiary device for purposes of 844(j).

1    It's clear the government's better argument.  I don't

2    think they have arguments under either 844(j) or 232(5),

3    but their better argument is here.

4        The problem you have here is that is very specific

5    talking about "chemical compounds, mechanical mixtures, a

6    device that contains oxidizing and combustible units or

7    other ingredients" -- and this is where it gets important

8    -- "in such proportions, quantities, or packing that

9    ignition by fire, by fiction, or concussion," et cetera,

10   these are talking now in very, very scientific kinds of

11   terms.

12       For this expert to come up and say I think because of

13   these properties on a generalized basis can cause some of

14   these.  Let's be clear about this.  He has always couched

15   his testimony as being it may and can under circumstances.

16       For him to get up there and testify is exactly the

17   mischief that *Daubert* and *Kumho Tire* talk about is what

18   happens when you put up an expert to put their imprimatur

19   on what is essentially going to be a very, very -- is

20   very, very close to the finding that the jury has to make,

21   and it's not supported by science, and that's what we have

22   here.

23       For 844(j) there is nothing there that I submit that

24   this expert is qualified to talk about with the jury.

25   Even if he's qualified, he does not have the scientific

1    basis to make the kinds of assertions he is that I know

2    the government is going to argue at the end of the day

3    means that he satisfied 844(j).

4         Just to be clear, there will not be one whiff of

5    testimony about an explosion here, about somebody planning

6    an explosion, or seeing an explosion obviously.  That is

7    part of this definition, may cause an explosion.

8         The only place the jury is going to get any piece of

9    evidence is if the court let's this particular witness

10   testify, and his conclusions or his assertions are simply

11   not based in any kind of scientific method that the court

12   can rely upon.

13        THE COURT:  All right.  Let me just say I do not

14   find that the expert testified at all to inform, explain,

15   or educate about any -- really about much, if anything,

16   that 18 U.S.C. 844(j) talks about.  I didn't hear

17   explanation or discussion of gunpowders, powders, high

18   explosives, blasting materials.

19        I didn't hear any discussion about oxidizing and

20   combustible units or ingredients, fire by friction,

21   concussion, percussion.  I just didn't hear any of those

22   (j), 18 U.S.C. 844(j) discussions.

23        I heard him drawing conclusions based upon what I

24   could only find, based upon what was being said and the

25   posture of this case, was an application of 18 U.S.C

232(5).

Now, again I told Attorney Berkower that certainly doesn't mean that I'm not going to fully, fully consider her argument on that. But when I fully consider that argument, I'm going to have to reflect upon the expert not talking at all about the things that I just mentioned. These mechanical mixtures, oxidizing materials, et cetera, discussed in (j).

MS. BERKOWER: Your Honor, may I respond briefly to that?

THE COURT: Yes. So now we're going to -- yes. Very briefly on the part of both of you. I'll let you go back and forth once, and then we're going to try to plan for other things that we need to talk about.

MS. BERKOWER: Your Honor, I don't think that we are suggesting -- as you just mentioned, 844(j) is a laundry list of things that Congress has outlawed as being part of the definition of an explosive.

As with any means, we don't have to prove all of them. We just have to prove one of them. He didn't talk about gunpowder, powder used for blasting, high explosives because we don't think that happened here. The evidence doesn't support it.

There would be -- if asked -- because I did ask him in prep for this -- like, does it meet any of this? He

1    said, no.  It's not a gunpowder; it's not a blasting

2    material; it's not a detonator or a smokeless powder, and

3    so we didn't go into that.  But we don't have to prove all

4    of them to satisfy the statutory definition.  However --

5              THE COURT:  Right.  And the reason would be he

6    didn't get into any of that because under (j) there needs

7    to be an explosion, and he said this was not an explosive;

8    it was incendiary.  Therefore he kicked this in to what

9    (j), where (j) wanted it.  (j) kicks this into 18 U.S.C.

10   232(5), and that's where he went.

11             MS. BERKOWER:  Your Honor, when I did speak with

12   him -- when I went through each of the statutory terms, I

13   said what about other ingredients in such proportions that

14   ignition by fire may cause an explosion?  He said, well,

15   yeah.  Gasoline is a flammable material that can explode,

16   so, yes.

17       If you have other ingredients, which the statute

18   explicitly allows for other ingredients because Congress

19   didn't want to limit this just to the things that it

20   listed here --

21             THE COURT:  This case, this case -- please,

22   please, please, please correct me if I'm wrong -- in this

23   case he said it was not explosive.  He said it was

24   incendiary.  Am I correct?

25             MS. BERKOWER:  He said it may cause an

1   explosion.  He said it could explode.  It was lower in
2   likelihood.  It would catch fire first and it may
3   explode.
4                  THE COURT:  That wasn't an answer to my
5   question.  Did he refer to this as an incendiary device,
6   yes or no?
7                  MS. BERKOWER:  He did.
8                  THE COURT:  Did he say it was not an explosive
9   device, yes or no?
10                  MS. BERKOWER:  He did, Your Honor.
11                  THE COURT:  All right.  Go ahead.
12                  MS. BERKOWER:  That's not --
13                  THE COURT:  Go ahead.
14                  MS. BERKOWER:  But that's not what is required.
15   The definition of explosive includes things that may cause
16   an explosion.  It doesn't have to.
17       What he testified to was that if this were -- the way
18   in which this device could have exploded, was it would
19   have caught fire first and then that fire would have
20   generated an explosion.
21       He said that's because gasoline is an unpredictable
22   explosive; it's a predictable incendiary -- you know,
23   ignitable material and so when gas causes an explosion,
24   like if first it causes a fire and then if the fire
25   conditions are of a certain, in a certain sweet spot, it

1   will cause an explosion.  It's unpredictable but it will.

2   And in our view that means these contains ingredients that

3   if ignited by fire, may cause an explosion.

4          THE COURT:  Right.  And I understand -- you are

5   artfully blending 18 U.S.C. 844(j) with 18 U.S.C. 232(5),

6   and as artful as your blending is, I'm not finding it

7   persuasive.  But that's right now during this hearing and

8   it really requires some time for me sit down and study it.

9       All right.  We need, number one, to take a break.

10      Attorney Watkins, the next things that we have to

11  talk about are logistical things -- well, not really.  We

12  still need to talk about the view and then we need to talk

13  about jury voir dire and that process.

14      I just wanted to check with the Clerk Rivera.

15      Do you want Mr. Rathbun present?  Does he want to be

16  present during those parts of it?  We just need to check

17  with the facility which, by the way, the facility has been

18  unbelievably cooperative in making all of this happen.

19      Do you want him present for those parts of our

20  hearing today?

21          MR. WATKINS:  I have not spoken with Mr. Rathbun

22  about whether he wants to be present.  It sounds like if

23  he wants to be present, we would have to put it off for a

24  different day?

25          THE COURT:  No, I don't want to do that.  If you

1  don't have an answer to that question, that's a fair

2  answer if you didn't talk to him.

3       Ms. Rivera, is it going to be a problem for the jail

4  if we take a 20-minute break to have him back?

5            THE CLERK:  I originally had requested to have

6  him for two to four hours so I don't see that there would

7  be a problem.

8            THE COURT:  Okay.  Perfect.  Very good.  So

9  we'll reconvene at 2:35 to pick up on other issues.  Okay?

10            THE CLERK:  Okay.

11            THE COURT:  And let me tell the parties, you

12  know, no matter what my -- whatever comments I made here

13  in critiquing the evidence and asking you questions and

14  engaging you, was done so recognizing the extremely high

15  level with which you are both advocating.  I am very

16  impressed, and I just didn't want to take -- you to take

17  my questioning as anything different than that.  Very

18  impressive, so thank you for this.

19            MR. WATKINS:  Thank you, Your Honor.

20            MS. BERKOWER:  Thank you, judge.

21            THE CLERK:  We will reconvene in 30 minutes.

22  **(A recess was taken at 2:04.)**

23            THE COURT:  All right.  We are back on the

24  record on the Rathbun case.  Do you need to call the case,

25  Ms. Rivera?

1          THE CLERK:  I can call it.  We're reconvening

2     via Zoom video with Criminal Matter 20-30018, the United

3     States of America versus Rathbun.

4          For the record, I'm going to ask counsel to identify

5     themselves starting with the government please?

6          MR. DESROCHES:  Good afternoon, Your Honor.

7     Neil Desroches on behalf of the United States.

8          MS. BERKOWER:  Risa Berkower as well for the

9     government.  Thank you, Your Honor.

10         MR. WATKINS:  Good afternoon again, Your Honor.

11    Tim Watkins, Federal Defender Office, on behalf of John

12    Rathbun who appears with us from the Hampden County Jail

13    by video.

14         MS. O'NEILL-GREENBERG:  Along with Forest

15    O'Neill-Greenberg for Mr. Rathbun as well.

16         THE COURT:  Okay.  Very good.

17         So an outstanding issue we need to talk about -- I

18    don't have an order to talk about these things, but the

19    first one that is still out there is the reconsideration.

20    I have reconsidered and am continuing in the

21    reconsideration process about the view in light of the

22    materials that the government provided.

23         The photographs and diagrams were much more helpful

24    than what I originally had.  They do show more of a view

25    of an entire area, the street view.  They show not

certainly not perfectly, but they show more an ability to
see and appreciate distance of the campus of the location
at issue here as well as the sidewalk.

Did you want to say anything, Attorney Watkins?  What
do you think those -- why are those photos deficient?

MR. WATKINS:  Your Honor, I think it's going to
continue to be confusing to the jury.  It's always
difficult to know exactly how a case will play out at
trial and so there's a certain amount of speculation here.

As the court has heard as recently as the evidence
we've been taking over the last couple of days, the
proximity to the sidewalk is something that the jury
should see.  The busyness of the road that passes by the
JGS Campus, including the speed at which cars go by on
that particular road, I think is going to be germane to
some of the issues at trial.

The court knows the government has indicted Mr.
Rathbun for, among other things, lying about not knowing
where the JGS -- I should say it's unclear to me exactly
what the lie was, but it involves whether he knew --
whether he's being truthful when he said I don't know
exactly what you're talking about or something of that
nature.

For the jury to actually be able to see the campus,
the entire campus and its situation at that location,

1    would be germane to what they have to conclude about that;

2    as is the fact that is it the same for someone driving by

3    a campus at 15 miles per hour versus the 35 or 40 miles

4    per hour that I believe many of the cars go along.  So

5    those are just a couple of examples.

6        The government is going to play a video which is a

7    recreation of someone putting the device out in front of

8    this tree and then driving along.  Again, that is

9    something that I think a jury is going to be able to

10   better understand actually being out on the scene;

11   understanding what the agents did and whether that's

12   different from what they might have expected to have

13   happened if indeed the government is correct about its

14   theory here.

15       So I think there's just a variety of reasons.  I

16   think more importantly given how much location has

17   mattered in this case, that we are setting ourselves up

18   for disaster where a jury is simply is not getting what

19   one side or the other is talking about a relationship

20   between Genesis House, Ruth's House.

21       These are all entities that are going to be mentioned

22   at trial, and, as the court knows, the government has been

23   confused on occasion about where these particular

24   locations and which ones had to do with this particular

25   device being planted there.

1      So for those reasons, as well as the reasons we have

2    argued before, I think this is a case where a short jury

3    view can be conducted.  We will all be on the same page.

4    We will not be at court with dueling photographs and

5    videos trying to highlight things that we want to, and we

6    would all start out in a place where the jurors are in the

7    same spot we are.

8           THE COURT:  All right.  Attorney Desroches, I

9    must say my view of the need for a view has been lessened

10   by what you have given me.  You made the argument the last

11   time that you essentially said, look, the danger is to the

12   public sidewalk.  It's clear from the photographs where

13   the public sidewalk is in relation to this.

14      Is there a component to the government's case that

15   makes it important to know how close that container was to

16   the front door of any of the particular buildings on the

17   campus?

18           MR. DESROCHES:  No, Your Honor.  It's not, and

19   that's been our position that the crimes charged require

20   that the real property of JGS (audio inference) So the

21   location of those buildings is, from our perspective,

22   irrelevant.

23      I suppose some of the buildings are relevant to one

24   of the false statements as Attorney Watkins indicated by

25   the defendant's knowledge of this area, but the view won't

1    really add to the relevance -- sorry, a view won't
2    necessarily be relevant to that.
3        We have the defendant's own statements where he's
4    describing the property in jail calls.  So the jury -- the
5    utility of taking the jury down there to see these
6    buildings is just exceptionally marginal and I think it
7    comes at a great cost both in terms of time and dollars
8    for the court.
9            THE COURT:  Let me ask you this.  In the
10    multiple hours of hearings that we have just had with the
11    expert, we have gone over that expert's report, and while
12    I appreciate what you just said regarding the proximity to
13    the sidewalk is what's important here and there really
14    doesn't seem to be usefulness, as you just said, to the
15    proximity to buildings on the campus, but on page 2 of
16    your expert's conclusion it says, "The incendiary device
17    with a partially activated fusing system and placed in
18    proximity to the entrance of a senior living facility
19    indicates it could be used as a weapon."
20            MR. DESROCHES:  Your Honor, that's accurate.  It
21    is placed at the entrance.  I think entrance in this case
22    is the entry road into the facility.
23            THE COURT:  Okay.
24            MR. DESROCHES:  And also with the photographs of
25    the sidewalk --

1          THE COURT:  You're saying it's not part of the

2    government's case that that's entry -- in other words, you

3    would not be offering any evidence that it's entry to a

4    building?  You would say entry to the campus?

5          MR. DESROCHES:  That's correct.

6          THE COURT:  Okay.

7          MR. DESROCHES:  That's correct.

8          THE COURT:  Okay.

9          MR. DESROCHES:  Your Honor, also --

10         THE COURT:  On that point, Attorney Watkins,

11   that seems to be an important point.  What do you think

12   about that?

13         MR. WATKINS:  Well, I'm interested to hear the

14   government say that.  I would say it's a breakthrough in

15   this case.  As the court knows from day one, it's all

16   about whether it was to injure, intimidate, destroy one of

17   these buildings.  It started out as Ruth's House.  Lately

18   it's turned to Genesis House.

19      I know that the government has submitted plans, plot

20   plans is what I'm going to call them.  They are plot plans

21   to the court.  It now makes me wonder what the relevance

22   of those plans are if indeed we are not going to be

23   talking about proximity to buildings, but all we're going

24   to talk about is that very narrow area that is close by

25   the entrance road and that environment there.

1        Also, I should note I had understood there might be a

2    drone video also produced.  I have to say I haven't kept

3    up with all the discovery, whether that came by or not,

4    whether that came up.  So that would be the same thing

5    there is it sounds from what the government is saying

6    those items would now become irrelevant.

7              THE COURT:  Well, perhaps -- I understand what

8    you're saying, but perhaps it could make your -- the

9    arguments that you made about the need for a view also

10   lose some of their steam.

11             MR. WATKINS:  I might not characterize it that

12   way, Your Honor, but I can see where there would be less

13   of a need for a scene visit where the government is

14   representing that they are not going to argue that its

15   proximity to either of these places is an issue that the

16   jury should consider.

17             MR. DESROCHES:  Your Honor, if I can just

18   address that?  So I think the proximity to the buildings

19   is relevant only in that it's the intent is to intimidate

20   others.

21        So that there are these large residences down that

22   road where people will travel by to get to their home,

23   it's relevant in that sense that there are buildings down

24   there.

25        The proximity though, whether it be a hundred yards,

1    two hundred yards, three hundred yards, that is what's

2    irrelevant.  So I think there is -- I don't mean to be

3    misleading and split hairs, but that's really I think what

4    the view would accomplish is that they would, according to

5    the defendant's theory, highlight the exact distance from

6    where the device is found to the closest residence or the

7    furthest residence.  So it is relevant in that there were

8    residents there who were intimidated or could have been

9    intimidated.

10           THE COURT:  Attorney Desroches, let me ask you

11    this.  Putting aside the issue of cost and time, what do

12    you think -- what do you think regarding protecting the

13    overall fairness of this case, knowing that arguments for

14    both the government and the defendant have kind of

15    vacillated.  We've gone back and forth.  They have

16    evolved.  They've transformed to some extent.

17        What's your opinion about protecting the overall

18    fairness for the government and the defendant about a

19    view?  Keep in mind this is not even ten minutes down the

20    road.  Do you think -- what do you think about that?

21           MR. DESROCHES:  Your Honor, I am slightly

22    concerned given what the defendant has said about traffic.

23    I think it's difficult -- if the view is designed in part

24    to simulate the traffic flow that was going through the

25    area, I don't think that's fair.  I think that would be

impossible to recreate and would potentially mislead the
jury.

Again, who knows what the conditions will be out
there on that day in terms of traffic.  There could be an
unusually high flow of traffic or unusually low flow of
traffic.

And in terms of the speed, I would imagine that if a
car driving by two buses with a judge standing outside and
CSOs or marshals with security would draw people to look
and would slow them down and so that actually might
prejudice the defendant if their theory is the cars speed
by and they really weren't in danger.

THE COURT:  I mean, clearly there could be some
instructions given about the conditions at the time of the
view.  There's no way we can recreate or represent that
they're the same.

MR. DESROCHES:  Right.  In that sense I would
suggest that a view is not at all relevant to the traffic
flow at the time, and the defendant's assertion that
that's something they can use -- that they're using this
to support their argument I think is what the government
is pushing back on is that wouldn't be appropriate for the
view.

The spatial distances are obviously the same, but
again of such a marginal value that I think this is a big

1    ask for little return.

2           THE COURT:  And there's a drone video of the

3    campus?

4           MR. DESROCHES:  Yes, Your Honor.  Thank you.

5       So I reported to the court that JGS had a commercial

6    drone make a video of their campus.  Unfortunately they

7    weren't so interested in Converse Street.  They were more

8    interested in the buildings and the grounds.  So the drone

9    is taken from the vantage point with Converse Street

10   behind it.  So there's nothing really of value there.  We

11   can make that available for the defense attorney, to both

12   defense attorneys.  It is a large file, but we weren't

13   planning on using them.

14      What we were able to do is get a satellite image of

15   the area.  If madam clerk would allow me to share the

16   screen, I can show the court what it looks.  We just got

17   this and we also have some technical issues with this.  So

18   in all fairness, neither Attorney Watkins or Attorney

19   O'Neill-Greenberg have seen this.

20      It is a satellite video -- sorry, a satellite photo

21   that can be manipulated.  It's very similar to Google

22   Earth but it's specifically of this area.

23           THE CLERK:  You do have permission to share now,

24   so whenever you're ready.

25           MR. DESROCHES:  Okay.  Thank you.

1      So this is the satellite image.  As you can see, I'm

2    moving the mouse.  This is the area where the device was

3    found.  This does demonstrate the spatial relationship

4    between the buildings and where the device was found.

5      The road Converse Street appears on the left.  The

6    crosswalk is an identifiable object in the photographs

7    that we've seen to act as a point of reference, and I

8    think -- I'm not sure I can do it in the shared screen

9    function, but this can also be zoomed and can be panned

10   around this scene.  Like I said, it's similar to Google

11   Earth.  It's just not from Google Earth.  It's from the

12   FBI.

13              THE COURT:  Now as far as you know --

14              MR. DESROCHES:  I can do that, Your Honor.

15              THE COURT:  -- is this a current picture or is

16   this from ten years ago and there's new buildings that

17   have been constructed?

18              MR. DESROCHES:  My understanding is that this

19   was taken Wednesday.

20              THE COURT:  Okay.

21              MR. DESROCHES:  Or Tuesday, I'm sorry.  Tuesday.

22              THE COURT:  Okay.

23              MR. DESROCHES:  So there is I think, like I

24   said, the ability to move this around.  I think we can

25   probably work this into an exhibit so the defense attorney

1   would have the opportunity to do the same and point out

2   whatever they would like.

3           THE COURT:  All right.

4       Attorney Watkins, I know you're just seeing this for

5   the first time.  So in a sense it's not entirely fair, but

6   that's the way it works sometimes.  What do you think?

7           MR. WATKINS:  I think I'm thinking about it.  I

8   would like an opportunity to take a look at this and think

9   a bit more about this.

10      Certainly from a trial point of view I would like to

11  get rid of the Department of Justice at the iOperational

12  Projects Unit off of this particular video if that can be

13  or this particular satellite photo.  If I could have some

14  time perhaps to think about it and respond to the court

15  about what our position is on a view given this.

16          THE COURT:  Fine.  Can you let me know by close

17  of business tomorrow?

18          MR. WATKINS:  Yes.

19          THE COURT:  All right.  Thank you.

20      What else do we need to talk about?

21          MR. WATKINS:  Your Honor, could I ask Mr.

22  Desroches to take this down.  I can't see anything.

23          MR. DESROCHES:  Yes.  Sorry.  Thank you.  I'm

24  trying to.  Sorry.  I found it.

25          MR. WATKINS:  Thank you.

1          THE COURT:  He was just trying to hide the fact

2    that he couldn't figure out how to do it.

3          MR. WATKINS:  I know him too well.

4          THE COURT:  I've been in that position.

5       Okay.  I think Attorney O'Neill-Greenberg we needed

6    to talk about the panel voir dire.  So the court proposed

7    an order on how it would work and I invited -- I told you

8    I would invite your comments and so this is asking for

9    your comments.  It included the exercise of peremptory

10   challenges on paper as we all talked about the last time.

11   After you've had a chance to look at that, any major

12   issues that you want to bring up?

13         MS. O'NEILL-GREENBERG:  No.  I think we're fine

14   with the way the court has proposed it.  The only thing I

15   would suggest and I didn't see specifically outlined in

16   the proposal was that between the time when the parties go

17   through all the panels and do the voir dire and exercise

18   challenge causes and the portion where we do the

19   peremptories on paper, if we could just have some

20   meaningful break so both parties could sort of reassess

21   and look at what we've got and kind of think about how

22   we're going to exercise those peremptories.

23         THE COURT:  That's not a problem at all

24   especially since we're doing it on paper, jurors won't be

25   in the room so we won't feel that we have to keep moving

1    because we're wasting their time.  So, yeah, sure.

2          For the government, either Attorney Desroches or

3    Berkower, the process generally?  How are you with the

4    process?

5          MS. BERKOWER:  We have just a couple of

6    questions to clarify a few things in the order.

7          First off, I know it said that we would have 15

8    minutes a piece to question the panel.  I guess we're

9    curious how that would be calculated.  I know that there

10   was allowances for objections to questions as they were

11   being asked and possibly sidebars.  I guess we're just

12   curious how we should set our clocks for this?

13         THE COURT:  Well, the clock will be kept by me

14   excluding times stopping and starting, et cetera, based on

15   if there is a sidebar conference or if there is any delay.

16   I will, with my clerk, you know take that into

17   consideration.

18         Under any scenario I'm going to give you more time

19   than less.  So in doing the calculations, if I think we

20   get a couple of sidebars and it might have taken a minute

21   off, I'm always going to give you a minute, two minutes,

22   however it is, a little more to try to be fair.

23         It's like that when I set times for closing

24   arguments.  You know, I really don't -- I give people an

25   extra couple of minutes as a cushion and then I tell them

 1      they have one minute left.  So, yeah, there's nothing

 2      exact about doing that.

 3              Quite frankly, if something comes up and you tell me,

 4      hey, look, because of how this developed, I don't think I

 5      had enough time and you convince me that you need some

 6      more time in fairness, then I will think about giving you

 7      more time.

 8              MS. BERKOWER:  Thank you.

 9              We also had a question, I think there was -- it

10      looked like before the for cause challenges were going to

11      be done, we were going to let the jurors leave the

12      courtroom.

13              THE COURT:  Okay.  Got it.

14              MS. BERKOWER:  And I guess the question is

15      whether -- hold on a second.  Actually I think I wrote a

16      note that's confusing.

17              Can I come back to that?  I have another question

18      anyway, but I think I need to check the order because I

19      wrote something down that I'm not sure I wrote it down

20      correctly.

21              One suggestion that we had -- I know it said that we

22      would select 32 jurors through this process where people

23      would be like dismissed to another room after the for

24      cause.  We were thinking that most of the time after for

25      cause challenges are done, a juror who was cleared through

1    that has second thoughts and starts thinking, well, maybe

2    I do really have a conflict and so we were wondering if it

3    might be worth adding one or two people to have 34 people

4    say to get through that process so that there's enough to

5    exercise peremptories in the event that somebody kind of

6    later on down the road realizes this actually isn't going

7    to be possible for them?

8         THE CLERK:   Judge, I believe the court -- I'm

9    looking at my notes.   The court had down 33 jurors.   If

10   you want to add one more, that's up to you.

11        THE COURT:   Yeah, sure.   We can do more.

12       I mean, we've got to do the amount divisible by if

13   we're -- well, how many -- it's like how many panels of 14

14   are we going to bring in?   I don't want to bring in three

15   panels or multiple panels of 14 and then bring in a panel

16   of two.   I have no problem with that suggestion.   We'll

17   try to make it work and come up with a number that will

18   make it work just in case.

19        MS. BERKOWER:   Great.   Thank you.

20       The next question we had I know with regard to the

21   alternates, it said the court would identify alternates.

22   I guess we were just wondering if we could clarify how the

23   court was going to identify the alternates.   I don't know

24   that was clear in the order.

25        THE COURT:   So we'll tell the parties.   We won't

1    tell anyone -- if there's any jurors in the room, we're

2    not going to let any jurors know.  We're going to tell the

3    parties who the alternates would be because under the

4    procedural rules after you exercise -- after each side is

5    satisfied, there's still going to be jurors left and the

6    alternates would be the next two people in sequential

7    order based upon their numbers.

8              MS. BERKOWER:  Okay.

9              THE COURT:  Sometimes when everyone comes into

10   the courtroom with their numbers and no one is standing by

11   their numbers, it becomes confusing, but that's how we

12   would do it.  We will take a moment.  We would all talk

13   and make sure we knew the sequence of numbers to let you

14   know who the next two would be that would be the

15   alternates, and then you can decide about exercising your

16   challenges.

17             MS. BERKOWER:  Okay.

18             THE COURT:  Or your one challenge that you had

19   for the alternate.

20             MS. BERKOWER:  Okay.  Is the order for that

21   alternate challenge government then defendant?  I know

22   that wasn't specified but we kind of assumed that's how it

23   would go.

24             THE COURT:  That's how I believe -- I'm sorry, I

25   don't have it front of me but I believe it's government

1    defendant.

2            MS. BERKOWER:  Okay.

3            THE COURT:  I know Ms. Kim is on the line.  We

4    need to put that in the order about the order of the

5    alternates.  All right.

6            MS. BERKOWER:  Your Honor, I think I had one

7    other question, but I'm having trouble -- I'm having some

8    technical trouble pulling up the court's order.  If you

9    wanted to move onto other -- if there are topics, I can do

10   that so we don't waist time.

11       It related to the time in which the jurors were going

12   to be dismissed from the courtroom, the prospective jurors

13   were going to be dismissed from the courtroom.

14       Prior -- I think the question was are they going to

15   be dismissed before or after we make the for cause

16   challenges, and I think you had said we do it after.  They

17   would all be ushered out and we would be doing the for

18   cause challenges using the Whisper Technology in place,

19   and our question was whether --

20           THE COURT:  I thought that -- I know we exercise

21   peremptory when they're out of the room.  The for cause

22   challenges for the 14 people that just got finished with

23   attorney-conducted voir dire, I think that was going to be

24   they stay in their seats.  We use the Whisper Technology

25   where you're telling me your challenges.  I am writing

1      them down on a piece of paper and then handing them to the

2      clerk.

3          So the clerk would then call all the people who are

4      challenged and they are taken out the door in one

5      direction, essentially go home.  And the people who were

6      not challenged are going out the door with another staff

7      member to another room where they're going to wait inside

8      the courthouse.  So I think I envisioned doing it when

9      they are still in their seats, the for cause challenges.

10          MS. BERKOWER:  Right.  I think our question was

11     whether it might be just easier for everyone if they were

12     all taken out so that we can use the courtroom rather than

13     the Whisper Technology for that.  I don't know if the

14     court has a specific preference on that or the defendant,

15     but it seemed like that might facility it a little bit

16     better.

17          THE COURT:  If the parties want to agree on

18     that, I'm not adverse to that.  I'm trying to preserve as

19     much as possible that level of lawyering involvement in

20     exercise of tactical skills where you actually see --

21     there's something about seeing people and making

22     decisions, and I was trying to preserve that as much as I

23     could under all of these COVID-19 protocol circumstances.

24          What does the defense think about that?

25          MS. O'NEILL-GREENBERG:  So everyone would be

1    ushered out and then we'd do -- so we'd do cause on paper
2    too basically?
3            THE COURT:  On paper as well, yeah.
4            MS. O'NEILL-GREENBERG:  I don't know if I have
5    strong feelings about it.  I think as long as we sort of
6    are organized to know where everyone is, we will have a
7    good  --
8            THE COURT:  Yeah, that's it.  Right.  That's
9    relying upon your own ability to be organized and it's,
10   yeah, it's a high level of organization to have your
11   charts to know who you're talking about.
12       I mean, I can imagine that would be the worst thing
13   in the world.  You think you challenged -- you're
14   remembering someone's face or a jacket they were wearing
15   and you think you challenged them and then all of sudden,
16   there they are on the jury.
17           MS. O'NEILL-GREENBERG:  I think it might be
18   faster for both sides if we keep them in their spots, the
19   14 people in the panel and then use the Whisper Technology
20   to exercise for cause challenges.  Because when we're
21   doing it on papers with the peremptories, we're going to
22   have a break to sort of, you know, discombobulate our
23   minds and figure out what's going on.  You know, time
24   versus COVID concerns, COVID probably wins.  I don't have
25   strong feelings.  I don't know if Attorney Watkins does.

1           MR. WATKINS:  No.  I think you've guys got this

2      under control.

3           THE COURT:  All right.  I'll think about it and

4      let you know.  If you don't have strong feelings, then

5      maybe we're just going to do this on paper as well.  I

6      will adjust the procedural order accordingly if I think

7      that's what we're going to do.

8           MS. BERKOWER:  Thank you, Your Honor.  That was

9      all of our questions concerning the order.

10          THE COURT:  All right.  What else is out there

11     that we need to talk about?

12          MR. DESROCHES:  Your Honor, I do have one

13     administrative thing.

14        We have a legal assistant who we'd like to have

15     seated at counsel table for help with technical issues,

16     such as not being able to get out of the shared screen

17     page in a Zoom conference.  But I'm concerned that with

18     the numbers that there could be a concern there or the

19     court would be concerned with it.

20          THE COURT:  Right.  Because that's going to go

21     up.  That will bring us to 25, right, Ms. Rivera?

22          THE CLERK:  That's correct.  I believe with

23     everybody, counting everyone right now, we are already

24     over I think one.  So having an extra person is definitely

25     going to be concerning.

1          THE COURT:  Can this extra person be seated --

2     if we leave the back courtroom doors open, not the

3     courtroom doors that go to the hallway, but that first set

4     of courtroom doors if we leave that open, you know there's

5     that space with two conference rooms --

6          THE CLERK:  Correct.

7          THE COURT:  -- could your person sit there,

8     Attorney Desroches?

9          MR. DESROCHES:  I don't think so, Your Honor.

10    She would need access to a laptop computer and exhibits

11    that we're putting in.  So she would be -- that would be

12    one of her primary responsibilities would be to coordinate

13    the electronic evidence or at least the digital form of

14    the evidence that's being introduced.  Really she in that

15    way is indispensable for both I think the defendant and

16    the government.

17         THE COURT:  Right.  So that brings us to 25?

18         THE CLERK:  That's correct.

19         THE COURT:  Then, of course -- then I do leave

20    the courtroom back doors open because I reserve a seat for

21    the media as well to try to comply with the public access.

22    We're going to be broadcasting this as well trying to

23    accomplish public access.

24         THE CLERK:  Right.

25         THE COURT:  And sending it to another courtroom

1    to watch in another courtroom and it will be on Zoom.  So

2    if I keep the back doors open, we now have 25 and then if

3    there's any media coverage, which would allow for one

4    person, that's 26 but they could stay in the area with the

5    doors opened.

6                    THE CLERK:  Yes.

7                    THE COURT:  It's a very good reason to have

8    another person in the room.  I'll allow you to do that.

9    We're going to just have to make sure, Ms. Rivera, that we

10   have court security leave those two doors open and maybe

11   now all the doors open to the hallway because then that

12   will increase air flow in and increases the square footage

13   assignable to that courtroom.  We'll talk about it, but

14   the answer is, yes, that person can sit at your table.

15                   MR. DESROCHES:  Thank you, Your Honor.

16                   MS. BERKOWER:  There was one other thing that we

17   wanted to raise today.  I think we let the defense know

18   the other day that there's an additional witness that we

19   didn't include on our witness list that we wanted to

20   provide to the court.

21       We can file that if Your Honor would prefer, but we

22   have one definite additional witness.  It's a woman named

23   Mary Jacob Sherry.  She works for the company that manages

24   Genesis House.  We disclosed her name to the defense

25   several days ago and they should already have an FBI

report of summary interview with her from quite some time

ago.

There may also be another witness we're considering

adding.  I know that originally we were supposed to have

all those names in by Sunday in anticipation of jury

selection that was going to be on the 2nd.  But since the

jury selection is now on Monday, we wanted to provide that

notice.  I think we can -- if it would be possible for us

to make a final decision on that last witness by close of

business tomorrow, is that something the court would

permit?

THE COURT:  Do you have any objection, Attorney

Watkins?

MR. WATKINS:  To the one witness that the court

or that the government did notify us no, there would be no

objection to adding.  I don't know who the other witness

is, assuming it's not a serious surprise to us.

MS. BERKOWER:  It is someone who's been

previously interviewed and I think the defense has the

report of interview and so I don't think it would be a

surprise.  I am not a 100 percent sure on that, but even

so it would be a relatively short witness.

MR. WATKINS:  So assuming that is as the

government represents, no, we don't have any objection to

late disclosure of those witnesses.

```
 1              THE COURT:  All right.  Now, Attorney Watkins,
 2    you filed a motion this morning; is that right?
 3              MR. WATKINS:  Actually it was last night, but
 4    this morning would be the first time that the parties got
 5    to it.  It's, yes, a motion in limine.
 6              THE COURT:  All right.  So the government do you
 7    want an opportunity -- I mean there's not much of an
 8    opportunity, but do you want until tomorrow you know
 9    around this time to file a response?
10              MS. BERKOWER:  I think if the court would like a
11    written response, we did review the motion.  In our view
12    it is just relitigating something the court has already
13    decided.  I don't think there's a lot more we have to add.
14    We can file something if the court wants.
15              THE COURT:  To be honest with you, I haven't
16    looked at it other than being told the nature of it.  If
17    you wanted to talk about it now because you think we can
18    resolve it right now, that's fine.  I'm not indicating
19    that you have to file anything.  If you think we've
20    already taken care of it, then once I dig into it, then I
21    can just rule on the papers.
22              MS. BERKOWER:  Yes, Your Honor.  Well, in that
23    case it might be worth just taking this up now and if Your
24    Honor has further concerns we can file something to
25    supplement our discussion today.
```

1              THE COURT:  All right.

2              MS. BERKOWER:  I don't know if Mr. Watkins wants

3      to go first since it was his motion.

4              THE COURT:  I'm going to go print it out.  All

5      right?  So hang on one second.

6          Attorney Watkins?

7              MR. WATKINS:  Your Honor, it's a quite short

8      motion.  This concerns one witness and a number of

9      exhibits that the government has proposed putting in.

10         As I've written in there, I think the fundamental

11     problem with both of them is logical relevance.  I simply

12     don't understand what it is that the government is trying

13     to get at with putting the pastor up.  And perhaps as

14     important it seems to me to violate the court's ruling,

15     which was that we were not going to get into the family

16     religious issues as a possible motivation for Mr.

17     Rathbun's offenses.

18         The same -- it's a similar argument as to all the

19     exhibits.  These are photographs of items that the FBI

20     took on April 15th when they came into the house.  They

21     involve pictures of materials belonging to Mr. Rathbun's

22     parents.  They include writings on index cards, a

23     particular pamphlet that was in the living room next to

24     his father's chair.  It includes this pamphlet about

25     explaining the Messiah to Your Jewish Friend that Mrs.

1   Rathbun possessed.

2         The evidence at trial would be from the FBI agent

3   that that particular pamphlet was found inside a Bible

4   that Ms. Rathbun possessed.  It was not Mr. Rathbun's.

5         I think the government has a simple proof problem --

6   even if there was some kind of logical relevance -- how

7   they show that Mr. Rathbun was aware or let alone cared

8   about any of these items.

9         At the end of the day I simply don't see how it moves

10  the ball forward on anything at this trial.  It gets into

11  exactly the kind of issues, the 403 issues, that the court

12  cited in its ruling and that we previously argued.  So for

13  all reasons I simply don't see how this comes in.

14             THE COURT:  All right.  Government?

15             MS. BERKOWER:  Yes, Your Honor.

16        There are two issues raised in the defendant's

17  motion.  The testimony of the pastor and the religious

18  materials at the home, and I'll start with the second

19  first if I may?

20        I think the court has already ruled that the

21  religious materials in the defendant's home are admissible

22  to show that these materials were all around him.  These

23  were found in the common areas of his home, and they tend

24  to show -- that combined with other evidence linking the

25  defendant's family to the pamphlet used as a wick has a

1    circumstantial tendency to show that those materials were

2    accessible to him.

3         We had argument on this several weeks ago.  I think

4    Your Honor made an analogy to an environmentalist who has

5    pamphlets concerning clean water and clean air in his home

6    and then at the scene of the crime there's a pamphlet

7    about, you know, clean coal or something.

8         These tend to show that he was in an environment

9    where he had access to similar materials.  In our view

10   that part of the motion is just an effort to relitigate

11   something that the court has already decided, and we would

12   ask that the court, you know, that the court deny that

13   piece of the order for that reason.

14        This is relevant as the court already found and I

15   don't think there's more to say about that.  Unless the

16   court has questions, I can move onto the other piece of

17   the motion.

18             THE COURT:  All right.  What about -- I agree

19   with you about the availability of pamphlets similar to

20   what was either in the mother's car or similar to the

21   pamphlet that was in the gas can.

22        Does that necessarily extend to things like index

23   cards with personal index cards from bibles that are in

24   someone's private location though?

25             MS. BERKOWER:  Well, they were found on tables

1    in the living room.  I think like to the extent that, you

2    know, this is -- I understand that maybe -- my

3    understanding is that one of the -- the Presenting Messiah

4    to Your Jewish Friend was found in a cabinet in the

5    kitchen which is a common area of the home, and there were

6    other pieces of paper that were religious materials found

7    on tables in the living room.

8        This is not something that's someone kept in a

9    bedroom or in a private space.  These were accessible to

10   the defendant, and some of it was writings, handwriting,

11   and some of it was printed materials.

12       We view that the jury is entitled to know that to the

13   extent that he's looking around for -- the defendant has

14   access to materials of all types involving religious

15   materials and he picked a pamphlet that we know his mother

16   at one point, you know, was at a location where that was

17   distributed.  So that in our view it is circumstantial

18   evidence that jury is entitled to know.

19       Certainly no negative inference is going to be drawn

20   about the fact that these were present in the home other

21   than the fact that the defendant had access to them.

22       There's not going to be any judgment or accusation

23   against anybody for having these materials in the home.

24   But the fact of the matter is they were in common spaces

25   that the defendant routinely had access to.  These are not

private papers secreted away in a bedroom or other closet
or, you know, locked away somewhere in a safe.  We think
that's relevant.

THE COURT:  It seems to me my previous ruling
was regarding the connection between the availability to
him of materials like was used as the funnel for purposes
of identifying who the person was that placed it there;
that he had access to those types of materials.  Okay.
This is under advisement.

How about the pastor testimony?

MS. BERKOWER:  Yes.  With regard to the pastor,
I think the court has also already ruled that the
conditions in the defendant's life in the lead up to this
crime are relevant to understanding the context in which
the offense occurred.

To the extent that the pastor is a close family
friend who has had personal interactions with the
defendant as he has, you know, gone through struggles in
life in the recent time leading up to this offense that's
relevant.

This pastor is someone who has observed the
defendant; who is familiar with his life struggles; who
has tried to help him by giving him odd jobs around the
church.  I think that's something the court has also ruled
is relevant in terms of the defendant's state of mind at

the time of this offense.

I know that Mr. Watkins made a special mention of the voice mail.  You know, I understand that we can argue specifically about the admissibility of that recording.  There are circumstances in which I could see that it would come in into evidence and other circumstances where perhaps he would have the better of the argument.  But as a general matter the testimony of this pastor we believe that it is within this scope of the court's order and it's relevant.  It's something the jury is entitled to know.

THE COURT:  All right.

MR. WATKINS:  Judge, I think the court's going to need a better offer of proof.  I did not attach the 302s from the pastor.

I think what the court is going to hear at trial is this pastor had very, very little interaction in recent years and this is years not weeks, not months, but years with Mr. Rathbun.  Essentially since he was in high school he stopped going to church on any kind of regular basis.

So what the pastor is able to talk about was what Mr. Rathbun was like on a regular basis when he went to church decades ago, and then add bits and pieces of this kind of thing where he came over and helped me one day with some repairs.  He reached out to me and I reached back to him about maybe helping me out to fix a couple things at the

1    church, but it went nowhere.  He didn't come over and I

2    actually didn't see him.

3        I simply -- I've never fully understood the state of

4    mind theory on this.  I know the court has ruled and I

5    respect that, but there has to be some kind of relevance

6    even to this kind of theory and this just isn't there.

7        This is simply put on there to try to get through, I

8    would suggest, through a back door that there is this

9    religious issue going on that; the family was immersed in

10   religion.  It's the only way I would respectfully suggest

11   the government gets some kind of way to argue a motive for

12   putting this gas can out at the Jewish Geriatric Society.

13   So regardless whether it's 401 or 403, I just don't see a

14   way that this comes in.

15       THE COURT:  What's the recent -- how recent, is

16   that correct, this is a couple of years ago that the

17   pastor had testimony with?  A couple years before the

18   event that he had this conversation with the defendant?

19       MS. BERKOWER:  No, Your Honor.  The voice mail

20   was left I think two weeks before the crime.  He was

21   reaching out to Mr. Rathbun, and he's also going to

22   testify -- I should also say that to the extent the motion

23   was to exclude his testimony in its entirety, the pastor

24   also provides evidence of the circumstantial link between

25   this particular pamphlet and the defendant's family.

1    He is going to testify that he was a paid organizer

2    for the Billy Graham Evangelical Association and that he

3    helped them with their events here.  He recognized the

4    pamphlet.  He knew it was distributed, and so in that way

5    -- I know that that wasn't addressed by Mr. Watkins'

6    motion, but that is partly why we are offering up this

7    witness because he has crucial evidence about that

8    circumstantial link.

9        With regard to his interaction with the defendant in

10   recent years, I think he's actually going to say that -- I

11   don't think it was weeks before, but certainly in the

12   months before this offense he had the defendant come to

13   the church to do an odd job and had to send him home

14   because he was high.

15       Like I think that goes to the kind of, you know,

16   state of mind where he is in his life that is relevant to

17   this offense.  It's not as disconnected in time as I think

18   Mr. Watkins believes it will be.

19           MR. WATKINS:  In the 302 it says the fall of

20   2019; the pastor can't exactly remember.  If I'm

21   understanding the 302s and the way I think they are, the

22   pastor does not have exact dates but it's very sporadic.

23       How a state of mind in the fall of 2019 can translate

24   to a state of mind on a specific date in April is beyond

25   me.  It's simply too temporally distinct.

1        The government, as I've argued before, all of sudden

2   we are into propensity here.  That he was like this way

3   back then; he's like this now.  That was his state of mind

4   and that means he must have done this.  It's excludable,

5   Your Honor.

6            THE COURT:  All right.  I'll let you know.

7   Under advisement.

8        All right.  Does anyone else know of any other issues

9   that we should talk about right now?

10           MR. WATKINS:  Your Honor, as I reported before,

11  we are still going through the jail tapes.  I know the

12  government is trying to get some in.  We are still looking

13  through that.  I think that is something that can be

14  deferred on an ongoing basis.  It may be that this gets

15  right up including trial.

16       I will tell the court I think we're going to concede

17  that there are recordings that the government gets to put

18  in.  So I don't think that this is a case where we need --

19  the government is going to refer to them in the opening.

20  I think that won't be a problem.  I think it's where the

21  issues are going to be are the margins and also whether

22  the defendant might seek to put in, out of rule of

23  completeness, some other calls that are in the queue.

24           THE COURT:  All right.  Then can you get me by

25  o'clock tomorrow -- maybe I'm changing the times on you.

1   I don't know -- one o'clock tomorrow your response on the

2   view?

3               MR. WATKINS:  Judge, you did say at the close of

4   business tomorrow.  I would prefer that if the court were

5   willing?  It's been a busy couple of weeks here.

6               THE COURT:  That's why I said I thought I was

7   kind of changing it on you.  I just have a lot to put out.

8               MR. WATKINS:  If you also are going to the jail

9   call issue, if you wanted that by tomorrow, I would have

10  check with Ms. O'Neill-Greenberg.

11              THE COURT:  I'm not saying the jail calls.  The

12  jail call issue is probably something we take up as the

13  trial is rolling out.

14              MR. WATKINS:  Your Honor, I'm going to go out on

15  a limb and say I can get you the response before the end

16  of the day today, not before the close of business but

17  before the end of the day today.

18              THE COURT:  I'll still give you technically

19  until the close of business tomorrow if you need it, but

20  if there's any way you can get in the response.  It's just

21  really kind of lost the thunder here, the view given what

22  was shown on that overhead.

23          Now I've actually never even seen this happen in

24  practice, but if somehow the need for a view raises itself

25  as an issue during the trial, then we can take -- you

1   don't have to take a view at the beginning of a trial.

2   You can take it at another point in the trial.  But right

3   now, perhaps you'll persuade me otherwise, right now as I

4   said that overhead really looked really helpful in

5   accomplishing everything we need to accomplish.  All

6   right.  Thanks.  See you soon.

7           MS. BERKOWER:  Thank you, judge.

8           MR. WATKINS:  Thank you, Your Honor.

9           MR. DESROCHES:  Thank you.

10           THE CLERK:  Thank you, everyone.

11   **(Hearing concluded at 1:29.)**

12   -------------------

13   (The certification of this transcript does not apply to
     any reproduction of this transcript, unless under the
14   direct control and/or supervision of the certifying
     reporter.  I assume no responsibility for the accuracy of
15   any reproduced copies not made under my control or
     direction.)

16

17                     CERTIFICATION

18

19           I certify that the foregoing is a correct

20   transcript of the record of proceedings in the

21   above-entitled matter to the best of my skill and ability.

22

23   /s/ Alice Moran                    November 5, 2020
     Alice Moran, RMR, RPR
24   Federal Official Court Reporter

25