<pre>
 1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2                         WESTERN SECTION


 3


 4    United States of America  )
                                )           20cr30018-MGM
 5         vs                   )
                                )           November 13, 2020
 6    Jonathan Michael Rathbun  )
      _____)

 7


 8                    Jury Trial Held Before

 9               The Honorable Mark G. Mastroianni

10                  United States District Judge.


11


12    APPEARANCES:


13

      On behalf of the government:  Risa Berkower, United States
14    Department of Justice, 950 Pennsylvania Avenue, NW,
      Washington, DC 20532.
15
      Neil L. Desroches, Assistant United States Attorney, 300
16    State Street, Suite 230, Springfield, MA 01105-2926.

17    On behalf of the defendant: Timothy G. Watkins, Esq., 51
      Sleeper Street, 5th Floor, Boston, MA 02210.
18
      Forest J. O'Neill-Greenberg, Esq., 51 Sleeper Street, 5th
19    Floor, Boston, MA 02210.

20


21
                         Alice Moran, CSR, RPR, RMR
22                      Official Federal Court Reporter
                          United States Courthouse
23                      300 State Street, Room 303D
                           Springfield, MA 01105
24                            (413)731-0086
                          alice.moran@verizon.net
25
</pre>

INDEX

Witness:                                                           Page:


**Stephen Rhoads**

Voir dire examination by Ms. Berkower                               11

Voir dire examination by Ms. O'Neill-Greenberg                     13



**Stephen Rhoads**

Direct examination by Ms. Berkower                                 16

Cross-examination by Ms. O'Neill-Greenberg                         34



**Robert Hill**

Direct examination by Ms. Berkower                                 42

Cross-examination by Ms. O'Neill-Greenberg                         61

Redirect examination by Ms. Berkower                               63



**Natalie Rathbun**

Direct examination by Ms. Berkower                                 65

Cross-examination by Ms. O'Neill-Greenberg                        104

Redirect examination by Ms. Berkower                              112

Witness:                                                    Page:


**Alana Darby**


Direct examination by Mr. Desroches                        126

Cross-examination by Mr. Watkins                           158

Redirect examination by Mr. Desroches                      160

Recross-examination by Mr. Watkins                         161



**Jessee Dabrae**


Direct examination by Mr. Desroches                        172

Cross-examination by Mr. Watkins                           185



**Dustin Wong**


Direct examination by Mr. Desroches                        191

Cross-examination by Mr. Watkins                           206

Redirect examination by Mr. Desroches                      229

| | Exhibit No. | Description | Page |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | PX-4 | Steps to Peace With God pamphlet | 24 |
| 4 | PX-54 | Electronic copy of Steps to Peace With God | 25 |
| 5 | PX-106 | Complete copy of the Steps to Peace With God | 30 |
| 6 | PX-86 | Sheila Rathbun's account profile report | 50 |
| 7 | PX-87 | Jeffrey Rathbun's account profile report | 55 |
| 8 | PX-85 | Billy Graham Association mailings | 59 |
| 9 | PX-56 | Photo of living room table | 74 |
| 10 | PX-105 | Photo of vehicles | 78 |
| 11 | PX-82 | Map | 85 |
| 12 | PX-42 | DNA profile of known standard | 149 |
| 13 | PX-43 | DNA profile from the two evidence samples | 153 |
| 14 | PX-83 | Cruiser cam video | 178 |
| 15 | PX-83-A | Photo from cruiser cam video | 187 |
| 16 | PX 52-A | Pages 184-193 from Exhibit 52 | 220 |
| 17 | PX 52-A | Pages 193-202 from Exhibit 52 | 221 |
| 18 | PX 52-A | Pages 356-365 from Exhibit 52 | 223 |
| 19 | PX 52-A | Pages 402-411 from Exhibit 52 | 224 |
| 20 | PX 52-A | Pages 421-429 from Exhibit 52 | 226 |
| 21 | PX 52-A | Pages 445-454 from Exhibit 52 | 227 |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

```
 1   (Trial commenced at 9:03.)
 2              THE COURT:  Hi, everyone.
 3              MR. WATKINS:  Good morning.
 4              MR. DESROCHES:  Good morning.
 5              THE COURT:  What is the issue?
 6       Mr. Rathbun is not here.  How long do we need to talk
 7   this morning?  How many issues came up?
 8              MR. WATKINS:  Sorry?
 9              THE COURT:  How many issues do we need to talk
10   about this morning?
11              MR. WATKINS:  I think just the one.
12              THE COURT:  Will it take up much time?
13              MR. WATKINS:  Ten minutes.
14              THE COURT:  Okay.  So five minutes.
15   (Mr. Rathbun entered the courtroom.)
16              THE COURT:  We are going to call it and we are
17   going to deal with whatever the preliminary issue is.
18              THE CLERK:  Court resumes in the matter of
19   criminal case 20-30018, the United States of America
20   versus Rathbun.
21       Counsel, I am going to ask you to identify yourself
22   for the record starting with the government, please.
23              MS. BERKOWER:  Risa Berkower for the
24   government.
25              MR. DESROCHES:  Good morning, Your Honor.  Neil
```

1    Desroches also for the United States.

2              MR. WATKINS:  Good morning, Your Honor.  Tim

3    Watkins, Federal Defender Office, on behalf of John

4    Rathbun who's here in court.

5              MS. O'NEILL-GREENBERG:  Good morning, Your

6    Honor.  Forest O'Neill-Greenberg also for Mr. Rathbun.

7              THE DEFENDANT:  Good morning.

8              THE COURT:  Good morning.  What's going on?

9              MS. O'NEILL-GREENBERG:  So yesterday we got

10   notice from the government that there is another different

11   Steps to Peace With God pamphlet that some agents went

12   into Heritage Church, which is the church that you know,

13   and there was a stack of different Steps to God pamphlet

14   and so they want to authenticate it through the next

15   witness and admit it, and we are objecting to that.

16             THE COURT:  When you say different, it's

17   different than what we've seen in evidence so far?

18             MS. O'NEILL-GREENBERG:  Yes.  It's not the same

19   Steps to Peace With God that was in the nozzle.  It's got

20   different graphics.  It's got different lettering.  It's

21   the same substance but it's a completely different

22   pamphlet.  It's a year later.

23             THE COURT:  Is it similar to anything that was

24   found in the parents' house or the parents' car?

25             MS. O'NEILL-GREENBERG:  No.  There's no proof

1    that Sheila Rathbun ever took it, had it in her house,

2    touched it, and it's something that's being offered now,

3    not a year ago.

4            THE COURT:  So you're saying the printing

5    publications of the pamphlets are different as well?  One

6    is older; one is newer?

7            MS. O'NEILL-GREENBERG:  I think -- yes.  They're

8    all coming from the Billy Graham Association but it's

9    completely different, and so I don't see any relevance.

10           THE COURT:  Okay.  All right.  Government?

11           MS. BERKOWER:  Yes, Your Honor.

12       This pamphlet is -- well, first of all, I would like

13   to just say that for purposes of today we are not looking

14   to admit it but merely to authenticate through the Billy

15   Graham witnesses who will be here.

16       It's not something we are planning for the jury to

17   see, and I think that the relevance of the pamphlet may

18   become more clear with a subsequent witness.  But to the

19   extent that a witness could authenticate it without the

20   jury ever seeing it, that's all we would like to do today

21   with it so I don't know the court needs to rule on the

22   admissibility of the pamphlet.  Even if he authenticates

23   it, the court could later rule that it's not admissible.

24       I can speak to the relevance if Your Honor would like

25   just to give you more context.

1          THE COURT:  All you want to do is authenticate

2     it?  As long as the jury is not going to see it and not be

3     talking about it, and so if the authentication -- you

4     think they need to authenticate it with the jury outside

5     the room or in the room?

6          MS. BERKOWER:  It's a physical document so what

7     I was planning to do is just have him say -- have you seen

8     Government's Exhibit 107 for identification?

9          Yes.

10          What is it?  Do you recognize it?

11          Yes.

12          What is it?

13          It is a Steps to Peace With God pamphlet.

14          That's it.  And that way I would think that -- is it

15     published by the Billy Graham Association?

16          Yes.

17          And then I wouldn't plan to do anything more with it.

18     We could do it out of the hearing of the jury if that

19     would be more agreeable to the defense.

20          MS. O'NEILL-GREENBERG:  I think -- we're

21     objecting to it obviously.  Authenticating it, I don't

22     know when they're going to try to admit it or if they're

23     trying to get it in through Natalie or.

24          THE COURT:  But the authentication step -- this

25     witness will be gone if you waited.  This witness isn't

```
 1   from the area so they will be gone back to wherever
 2   they're from.  I'll let you authenticate it.  You can tell
 3   me the right time.  The right time for authentication is
 4   probably going to be when we're going to take a break.
 5   Authentication is going to take two minutes.
 6           MS. BERKOWER:  Yes, judge.  He was the first
 7   witness up so if you'd like, instead of releasing him from
 8   his subpoena, we can just recall him during the break.
 9           THE COURT:  He's the first witness?
10           MS. BERKOWER:  He is.
11           THE COURT:  Why don't we put him on right now
12   before the bring the jury and go right to that issue?
13           MS. BERKOWER:  We can do that.
14           THE COURT:  I'll let you lead him.  It's just
15   for the very small portion of authentication and that's
16   it.
17           MS. BERKOWER:  Your Honor, if it's all right, I
18   think he's going to have to -- can I have him re-sworn in
19   and reintroduce himself when the jury comes in then?
20           THE COURT:  Sure.
21           MS. BERKOWER:  Thank you.
22           THE COURT:  Is that okay with the defense, or
23   you want to object to that?
24           MS. O'NEILL-GREENBERG:  We are objecting to
25   it.
```

```
 1              THE COURT:  You're objecting to it coming in.
 2    I'm not ruling that it can come in.
 3              MS. O'NEILL-GREENBERG:  Fine.  Then that seems
 4    like the most pragmatic way to authenticate it.  I think
 5    we'd like to know who the government is going to try to
 6    get in through.
 7              MS. BERKOWER:  Steve Rhoads is the first witness
 8    today.  Oh, who are we going to get it in through?  I'm
 9    sorry.  I think that when we offer this into evidence, it
10    would be through the case agent Ryan McGonigle who we
11    expect will testify next week.
12              MS. O'NEILL-GREENBERG:  Well, we can object.
13              THE COURT:  Of course, you can object.  I'm not
14    saying you can't object.  This is just authentication just
15    in case so this witness doesn't have to fly back here if
16    somehow this becomes an issue.
17              MS. O'NEILL-GREENBERG:  Sure.  That's fine.
18              THE COURT:  Okay.  So if he's around, let's call
19    him.
20              MS. BERKOWER:  I'm sorry for the delay.  We have
21    been trying to keep the witnesses further down since you
22    can hear in the hallway.
23              THE COURT:  I understand.
24              THE CLERK:  Please raise your right hand.
25
```

1   **Stephen Rhoads (sworn)**

2            THE CLERK:  Thank you.  You may be seated.

3   **VOIR DIRE DIRECT EXAMINATION**

4   Q.   (By Ms. Berkower)  Good morning, sir.  You can take

5   your mask off.  Thank you.

6        Could you please say your name and spell it for the

7   court reporter?

8   A.   Stephen Rhoads, S-t-e-p-h-e-n R-h-o-a-d-s.

9   Q.   What state do you live in, sir?

10  A.   North Carolina.

11  Q.   Are you employed?

12  A.   Yes.

13  Q.   Where do you work?

14  A.   The Billy Graham Evangelistic Association.

15  Q.   In connection with your work there, are you aware

16  that the organization publishes religious literature?

17  A.   Yes.

18  Q.   And do you know those to be called tracts?

19  A.   Yes.

20           THE COURT:  Called what?

21           MS. BERKOWER:  Tracts.

22  Q.   (By Ms. Berkower)  Could you spell tract, sir?

23  A.   T-r-a-c-t-s.

24           THE COURT:  Okay.

25  Q.   (By Ms. Berkower)  And in connection with your work,

1    are you familiar with tracts that your organization

2    publishes?

3    A.   Yes.

4    Q.   If you could look on the table in front of you, there

5    is an exhibit marked PX-107.  Do you see that?

6    A.   I do.

7    Q.   Do you recognize what that is?

8    A.   I do, yes.

9    Q.   What is it?

10   A.   It's one of our tracts called Steps to Peace With

11   God.

12   Q.   Is that a tract that your organization publishes?

13   A.   Yes.

14   Q.   How do you know that?

15   A.   How do I know that we publish it?

16   Q.   Yes.

17   A.   Well, I'm just familiar with the document.  I am

18   familiar with Steps to Peace With God.  We've used it for

19   decades.

20   Q.   Is that a fair and accurate copy of one of the Steps

21   to Peace With God pamphlet that your organization

22   publishes?

23   A.   Yes.

24   Q.   Are there more than one version of Steps to Peace?

25   A.   Yes.

1    Q.   Is that one of the versions?

2    A.   It is.

3    Q.   Could you turn the pamphlet to the back?

4    A.   Uh-huh.

5    Q.   And could you read what's on the back of that?

6    A.   Billy Graham Evangelistic Association; Always Good

7    News; 1 Billy Graham Parkway, Charlotte, North Carolina,

8    28201-0001.  Billy Graham --

9    Q.   Continue.  Sorry.

10   A.   BillyGraham.org and then 1-877-2-G-r-a-h-a-m,

11   1-877-247-2426.

12   Q.   And is that part of how you know that this document

13   is in fact published by your organization?

14   A.   Yes, it is.

15   Q.   Okay.

16        MS. BERKOWER:  Nothing further with regard to

17   that topic, Your Honor.

18   **VOIR DIRE EXAMINATION**

19   Q.   (Ms. O'Neill-Greenberg) Do you know when that version

20   started to be published?

21   A.   I don't.

22   Q.   You don't?  Thank you.

23   A.   Okay.

24        THE COURT:  All right.  Thank you.

25        MS. BERKOWER:  Do you want the witness to step

1    down?

2         THE COURT:  Yeah, and he can come back in and we

3    will introduce him.

4       Sir, we had to take care of this matter outside the

5    presence of a jury.  So we're going to bring the jury in

6    and you're going to come back in and we're going to start

7    over to reintroduce you to the jury.

8         THE WITNESS:  Sure.

9         THE COURT:  So you can put your mask on now.

10   You're going to come back and you're going to go to that

11   same witness stand.  No one is going to use that witness

12   stand because he's the next witness?

13        MS. BERKOWER:  He is.

14        THE COURT:  So you will go right back to that

15   witness stand.

16        THE WITNESS:  Okay.  Thank you.

17        THE COURT:  Thank you.

18   (The witness left the courtroom.)

19        THE CLERK:  All rise for the jury.

20   **(The jury entered at 9:27.)**

21        THE CLERK:  You may be seated.

22        THE COURT:  We have all our jurors.

23      Good morning, everyone.

24        THE JURY:  (Good morning.)

25        THE COURT:  All right.  I have to ask you, was

1    everyone able to follow my instructions?  Several of them,

2    not to talk to each other about the case?  Not to talk to

3    anyone else about the case?  Not to look at, if there

4    were, any media reports about the case?  Not to post

5    anything on the internet or websites or blogs and not to

6    read anything, anything about the case?  Not just about

7    the case happening, but about anything you might have

8    learned so far about this type of incident?  Was everyone

9    able to follow the instructions?

10                    THE JURY:  (Yes.)

11                    THE COURT:  Okay.  Very good.  Thanks.

12           So when we are leaving the courtroom, I just want to

13    ask to avoid a situation of everyone coming too close.

14    When you leave the courtroom at breaks, can we just start

15    with the first two people go first and then just do row by

16    row so we don't have a situation where everyone is lined

17    up closer than they should be to each other.  So we'll do

18    it that way.  Okay?

19           Is there anything else that anyone needs to talk to

20    me about?  No.  Okay.  I know I saw one juror outside by

21    the water bubbler and said good morning.  That's okay if

22    you say good morning to me.  I'm very friendly.  You can

23    talk to me.

24           Okay.  We're all set.

25                    MS. BERKOWER:  Your Honor, the government calls

1    Stephen Rhoads.  May I get him from the witness room?

2              THE COURT:  Yes.

3              MR. WATKINS:  Before we begin, would you note

4    our objection please?

5              THE COURT:  Yes.

6              THE CLERK:  Please raise your right hand.

7    **Stephen Rhoads (sworn)**

8    <u>**DIRECT EXAMINATION**</u>

9    Q.   Good morning, sir.

10   A.   Good morning.

11   Q.   Could you please say your name and spell it for the

12   court reporter?

13   A.   Stephen Rhoads, S-t-e-p-h-e-n R-h-o-a-d-s.

14   Q.   Who state do you live in, sir?

15   A.   North Carolina.

16   Q.   What town do you live in?

17   A.   Charlotte.

18   Q.   Prior to coming here, did you ensure that you

19   complied with the Commonwealth of Massachusetts' health

20   rules concerning COVID-19 precautions for out-of-state

21   travelers?

22   A.   Yes, I did.

23   Q.   Are you employed?

24   A.   I am.

25   Q.   Where do you work?

1    A.    The Billy Graham Evangelistic Association.

2    Q.    What is the Billy Graham Evangelistic Association?

3    A.    It's a Christian non-profit organization that exists

4    to proclaim the gospel of Jesus Christ.

5    Q.    What do you do for the Billy Graham Evangelistic

6    Association?

7    A.    I'm the vice president.

8    Q.    Vice president of what?

9    A.    Of church ministry.

10    Q.    What does your job entail as the vice president of

11    church ministry?

12    A.    To work with churches to encourage and equip them to

13    preach the gospel of Jesus Christ.

14    Q.    How long have you had that job?

15    A.    About eight years.

16    Q.    Now as part of its mission, does the Billy Graham

17    Evangelistic Association hold events in different cities

18    around the United States and internally?

19    A.    Yes, we do.

20    Q.    Do you have job responsibilities relating to those

21    events?

22    A.    I do.

23    Q.    What are your responsibilities for those events?

24    A.    Sort of to act as the organizer of those events.

25    Meeting with churches, Christian organizations, generally

```
 1    Christians in the area where there's going to be an event
 2    held.
 3    Q.   In 2019, did the Billy Graham Evangelistic
 4    Association conduct a tour of New England in the United
 5    States?
 6    A.   Yes, we did?
 7    Q.   What was the name of that tour?
 8    A.   It was called Decision America Northeast Tour.
 9    Q.   What kind of event was that?
10    A.   What kind of event?
11    Q.   Yes.
12    A.   Well, it's a series of events that culminates in
13    Franklin Graham, who is the son of Billy Graham, he would
14    come and he would preach.  But my responsibility is to get
15    it to that point when Franklin gets here.
16    Q.   And --
17              THE COURT:  I'm sorry, did you mention a year?
18    I'm missed the time.
19    Q.   (By Ms. Berkower)  Was that 2019?
20    A.   It was in 2019, yes.
21    Q.   Did the tour go to Massachusetts in 2019?
22    A.   Yes, it did.
23    Q.   Where did the tour go in Massachusetts in 2019?
24    A.   Here in Springfield.
25    Q.   Were you involved with the Massachusetts leg of the
```

1   tour?

2   A.   I was.

3   Q.   And at what venue was the event in Springfield held?

4   A.   At the Big E.

5   Q.   When was that event?

6   A.   When was the event?  It would have been in late May.

7   Q.   Of 2019?

8   A.   Yes, 2019.  I don't remember the exact date to be

9   honest.  It would have been the last -- probably the last

10   week in May of 2019.

11   Q.   So let's talk more about that Springfield,

12   Massachusetts event.

13       Were you the primary organizer for that stop on the

14   tour?

15   A.   I was.

16   Q.   When you organize events such as the one in West

17   Springfield, how much planning goes into it?

18   A.   Months and months.  I think we started preparing for

19   that tour in Thanksgiving of 2018 so it would have been

20   about six months of prep.

21   Q.   What do the early stages of planning entail?

22   A.   We generally start with determining which churches we

23   want to start working with in West Springfield and

24   probably within 60 miles, 60, 70 miles of Springfield.  We

25   would come in.  I would do maybe meetings with pastors and

1    Christians in the area leading up to the first event which
2    would be a kick-off event.
3    Q.   Does the Billy Graham Evangelistic Association
4    sponsor events then in the lead-up to the main event?
5    A.   Yes.
6    Q.   Could you explain a little more about the kinds of
7    events that are held in the lead-up to the main event?
8    A.   Yes.  So it would be pastors' meetings, meetings with
9    pastors in the area.  We would also do a kick-off event
10   which is open to the general public.
11        We would also hold a prayer meeting at a church
12   inviting Christians from all over, and we would also do
13   training events to prepare Christians to share their faith
14   and then also to participate as counselors at the actual
15   event when Franklin shows up?
16   Q.   Now do you enlist local assistance in order to
17   organize all of those events you just described?
18   A.   Yeah, we sure do.
19   Q.   What kinds of local assistance do you get?
20   A.   Well, we would reach out to Christians as best as we
21   can tell from our database and then also churches that
22   we've known over the years because we've been around
23   awhile, and then we would also be introduced to new
24   churches just as a result of being in the area.
25   Q.   Do you hire contractors to help you with some of

```
1    those events?
2    A.   We do.
3    Q.   For the Springfield event, did you hire a contractor?
4    A.   We did, yes.
5    Q.   Who did you hire?
6    A.   We hired two people here, one by the name of Reggie
7    Colt and then another guy called Curtis Rowe.
8    Q.   And who is Curtis Rowe?
9    A.   He was a church coordinator for us, which means he's
10   sort of like a volunteer months prior.  But because of our
11   history with him, we thought he would be a good contractor
12   and so we put him under contract.  Since he was a pastor
13   as well, he was a long-serving pastor in the area, so we
14   thought he was probably a good match for us.
15   Q.   So he has his own congregation here?
16   A.   He does.
17   Q.   Now for the role of contractors in these events, are
18   they expected to do community outreach?
19   A.   What do you mean by community outreach?
20   Q.   Are they expected to try and get people to go to that
21   main event?
22   A.   Yes.
23   Q.   And are they expected to get their own congregants
24   involved?
25   A.   Yes.
```

```
1    Q.    In both the main event and in the kick-off events?
2    A.    Yeah, in all the preliminary events.
3    Q.    Do they also help staff and organize the preliminary
4    events?
5    A.    They do.
6    Q.    Now, did you expect that Curtis Row would conduct
7    outreach?
8    A.    Yes.
9    Q.    Did you expect he would get his congregation
10   involved?
11   A.    Yes.
12   Q.    And do you believe that he did those things as far as
13   you know?
14   A.    I do.
15   Q.    So let's take a step back for a moment.
16         Does your organization publish religious literature?
17   A.    Yes, we do.
18   Q.    Does that include something known as evangelistic
19   literature?
20   A.    Yes.
21   Q.    Could you explain what evangelistic literature is?
22   A.    Yeah, it's all kind of different pieces of literature
23   that we would publish in order to explain the gospel that
24   is described in the Bible.  So it would be a way for
25   people to understand what the Bible teaches about the love
```

1   of God and the offer of salvation.

2   Q.   Are you familiar with the word tract?

3   A.   Yes.

4   Q.   Could you spell that word?

5   A.   T-r-a-c-t.

6   Q.   What is a tract?

7   A.   It's a shorter little piece.  It would be maybe a

8   couple of pages long that would sort of be a synopsis of

9   the gospel, a shorter piece.

10   Q.   Are you familiar with a publication called Steps to

11   Peace With God?

12   A.   Yes, I am.

13   Q.   If I could direct your attention to an item that

14   should on the shelf maybe to your right marked

15   Government's Exhibit PX-4.

16       If we could also have -- if you can just look at

17   that.

18           MS. BERKOWER:  If we can have, Ms. McKenna, have

19   Government's Exhibit 54 pulled up just for the court and

20   counsel and the witness?

21           THE WITNESS:  Okay.  I have PX-4 in front of me.

22   Q.   (ByMs. Berkower)  Okay.  Now directing your attention

23   first to what's been marked as Government's Exhibit PX-4,

24   do you recognize it?

25   A.   Yes, I do.

1    Q.    What is it?

2    A.    Well, it's the cover of Steps to Peace With God; the

3    tract that we use -- that's the tract that we used in

4    Springfield.

5    Q.    Can you take that out of the sleeve?

6    A.    Sure.

7    Q.    In that in fact a full tract?

8    A.    Yes.

9    Q.    Who publishes that tract?

10   A.    We do.

11   Q.    Is that a complete copy?

12   A.    It is.

13          MS. BERKOWER:  Your Honor, I would ask to admit

14   Government's Exhibit 4 into evidence.

15          MS. O'NEILL-GREENBERG:  No objection.

16          THE COURT:  All right.  Is it being introduced

17   at PX-54?

18          MS. BERKOWER:  I think we are going to get to

19   PX-54 in a moment.  He has the physical Exhibit 4 on the

20   witness stand with him.

21          THE COURT:  All right.  That will be admitted.

22   **(PX-4 was admitted.)**

23   Q.    (By Ms. Berkower)  Turning your attention now to

24   Government's Exhibit PX-54 on the screen in front of you,

25   do you recognize what that is?

1    A.   I do.

2              MS. BERKOWER  And, Ms. McKenna, if you could

3    page through that for the witness please?

4    Q.   (By Ms. Berkower)  Do you recognize what that is?

5    A.   Yeah.  I assume you're just scrolling through the

6    pages of Steps to Peace With God.

7    Q.   So is that an electronic version, an electronic copy

8    of the Steps to Peace With God pamphlet that's in

9    Government's Exhibit 4 that you just looked at?

10   A.   Yes.

11   Q.   Is that a complete copy?

12   A.   It is.

13   Q.   And that's what your organization publishes?

14   A.   Yes.

15             MS. BERKOWER:  Your Honor, I would ask to admit

16   Government's Exhibit 54, PX-54 please.

17             MS. O'NEILL-GREENBERG:  No objection.

18             THE COURT:  All right.  That will be admitted.

19   **(PX-54 was admitted.)**

20             MS. BERKOWER:  If we may publish that to the

21   jury?

22             THE COURT:  Yes.

23   Q.   (By Ms. Berkower) Sir, can you also hold that up so

24   the jury can see Government's Exhibit 4?

25        Thank you.

```
 1          Now through your work at the Billy Graham
 2   Evangelistic Association how familiar are you with the
 3   content of the Steps to Peace With God pamphlet?
 4   A.   I'm very familiar with it.
 5   Q.   How did you become familiar with it?
 6   A.   Well, I've used it over the years myself personally,
 7   but I've also in my role I've taught it as a device that
 8   Christians can use and in the run-up to a tour.  So I've
 9   taught this plenty.
10   Q.   Do you also see a plastic sleeve with the marking
11   Government's Exhibit 3 on it in front of you?
12   A.   PX-3?
13   Q.   Yes.  PX-3, excuse me.
14   A.   Yeah, I have that.
15   Q.   And could you --
16          MS. BERKOWER:  That's already in evidence, Your
17   Honor, I believe from yesterday.
18          THE COURT:  Is that correct?
19          MR. WATKINS:  Yes.
20          THE COURT:  As far as I can tell, we are
21   verifying.
22          THE CLERK:  What number is that?
23          MS. BERKOWER:  Number 3.
24          THE COURT:  We are not showing it admitted.  It
25   just might be a difference in numbering.
```

```
 1              MS. BERKOWER:  I think this is a physical
 2    exhibit, Your Honor, that Captain Fontaine testified about
 3    yesterday and we admitted it through him.
 4         I think both parties' records reflect it was
 5    admitted, Your Honor.
 6              THE COURT:  Do we have a record of that?
 7         We do have it.  LeeAnn has it coming in too.  The
 8    records do indicate it has been previously admitted.
 9              MS. BERKOWER:  May I proceed?
10              THE COURT:  Yes.
11    Q.   (By Ms. Berkower)  Could you hold up Government's
12    Exhibit 3 so the jury can see it?
13    A.   (Indicating.)
14    Q.   Before coming to court today, did you look at what is
15    Government's Exhibit 3?
16    A.   I did.
17    Q.   What is it?  Do you recognize it?
18    A.   Yeah.  It's a couple of pages out of Steps to Peace
19    With God that, larger piece.
20    Q.   How do you know that?
21    A.   Well, just familiarity with it.  I've taught it and
22    this is just -- these are pages from a copy of this tract.
23    Q.   How certain are you that Government's Exhibit 3 is
24    pages from the Steps to Peace With God tract?
25    A.   I'm very certain.
```

1    Q.   Now in connection with this case, did you also review

2    photographs of several pamphlet pages collected by the

3    Longmeadow, Massachusetts Police Department?

4    A.   Yes, I did.

5    Q.   And specifically did you review --

6              MS. BERKOWER:  If we could have, Ms. McKenna,

7    what's been admitted as Government's Exhibit PX-16, 17,

8    18, 19, and 20?  You can just put each of them up for a

9    moment so the witness can look at them.

10             Your Honor, I think this exhibit has been admitted so

11   if we could please have it for the jury as well?

12             THE COURT:  Yes.

13   Q.   (By Ms. Berkower)  Do you recognize those exhibits,

14   sir?

15   A.   Yes.

16   Q.   What are those?

17   A.   Well, those are the digital photographs I've seen

18   before that have the pages from Steps to Peace With God.

19   Q.   Are those the same as what's in Government's Exhibit

20   3?

21   A.   Yes.

22   Q.   Now when you look at the pages --

23             MS. BERKOWER:  Actually hold on just a moment.

24   Q.   (By Ms. Berkower)  Sir, you'll see there's a pair of

25   gloves to your right.  If you could put those on and then

1    remove the pages of Government's Exhibit 3 from the

2    sleeve?

3    A.   Okay.  Three has two pages.  Do you want me to take

4    all of it out?

5    Q.   Yes, sir.

6    A.   Okay.

7    Q.   Now when you look at the pages in Government's

8    Exhibit 3, as well as the photographs that you just saw of

9    Government's Exhibits 16, 17, 18, 19, and 20, do the pages

10   appear to be in the same order as Government's Exhibit 4,

11   the complete Steps to Peace With God tract?

12   A.   You're asking me whether these kind of like fragments

13   are in the same order as the book?

14   Q.   As the complete booklet, yes.

15   A.   As the complete booklet.  Well, they're -- I mean,

16   they're not in any order because they're separate.  I

17   don't understand your question.

18   Q.   When the Steps to Peace With God pamphlet is printed,

19   how is it printed?

20   A.   Well, it's not -- it's printed as single sheets and

21   then stacked and stapled together.

22   Q.   So when you take those sheets apart, do the pages

23   appear to be out of order?

24   A.   Yes, they do because they're not printed one by one

25   if that makes any sense.  They're printed as one sheet and

1    then as they're stacked because it's a book, it makes

2    sense once it's stapled together.  If you take them apart,

3    not so much.

4    Q.    Okay.  When you look at Government's Exhibit 3, are

5    they in that format where they don't make as much sense

6    because they're taken apart that you just described?

7    A.    Right, yes.

8    Q.    Okay.  Now if you could look at Government's Exhibit

9    PX-106 also on the shelf in front of you.  Do you see what

10   that is?

11   A.    Yes.

12   Q.    What is that?

13   A.    Well, this is Steps to Peace With God taken apart.

14   Like if you took the staple out in the middle, these are

15   the pages.

16   Q.    And did you review that before coming to court today?

17   A.    Yes.

18   Q.    Is that a complete copy of the Steps to Peace

19   pamphlet just with the staple taken out?

20   A.    Yes, it is.

21          MS. BERKOWER:  Your Honor, I'd ask for the

22   admission of Government's Exhibit 106.

23          MS. O'NEILL-GREENBERG:  No objection.

24          THE COURT:  No objection, that will be admitted.

25   **(PX-106 was admitted.)**

```
 1            MS. BERKOWER:  May we publish portions of 106 as
 2   we go through?
 3            THE COURT:  Yes.
 4            MS. BERKOWER:  Now, Ms. McKenna, if you can
 5   please pull up Government's Exhibit 16 on the screen?
 6   That's admitted into evidence.
 7   Q.   (By Ms. Berkower)  Mr. Rhoads, looking through
 8   Exhibit 106, the pamphlet without the staple in it --
 9   A.   Yes.
10   Q.   -- do you see unstapled pages that contain the same
11   content as what is shown on the screen in Government's
12   Exhibit 16?
13   A.   Yes, I do.
14   Q.   Could you hold up that particular page of the
15   unstapled pamphlet and show it to the jury?
16   A.   Would you like me to take it out?
17   Q.   Yes, please.
18   A.   Okay.
19   Q.   Now do you see a sticky note pad and pen to your
20   right?
21   A.   Yes.
22   Q.   Could you -- using the sticky pad and the pen, could
23   you mark on that page you just held up for the jury which
24   government exhibit that corresponds to?
25   A.   Okay.
```

1      MS. BERKOWER:  Now if we could have Government's

2  Exhibit 17 in evidence please?

3      THE WITNESS:  I'm sorry, do you want me to put

4  this note on the page?

5  Q.  (By Ms. Berkower) Yes.

6  A.  Okay.

7  Q.  Do you see Government's Exhibit PX-17 on the screen

8  in front of you?

9  A.  I do.

10  Q.  Is there a page in the pamphlet that doesn't have the

11  staple that matches Government's Exhibit 17?

12  A.  I'm sure there is.

13      Yes, I'm sorry.  It's the back of what I just marked,

14  so, yes.

15  Q.  Could you hold that up for the jury to see?

16  A.  (Indicating.)

17  Q.  Could you then take the sticky note and the pen and

18  put a sticky note marking which exhibit that matches up

19  to?

20  A.  Okay.  (Indicating.)

21      MS. BERKOWER:  Now, Ms. McKenna, if we could

22  please have Government's Exhibit 19 in evidence?

23  Q.  (By Ms. Berkower) Mr. Rhoads, is there a page in the

24  unstapled pamphlet that you have in front of you from

25  Government's Exhibit 106 that matches the pages shown in

1   PX-19?

2   A.   Yes.

3   Q.   Could you please locate that and then hold that up

4   for the jury to see?

5   A.   Sure.  (Indicating.)

6   Q.   Could you mark that as well with a sticky note the

7   way you did for the other pages?

8   A.   Okay.

9           MS. BERKOWER:   Now if we could have, Ms.

10  McKenna, please PX-20 in evidence?

11  Q.   (By Ms. Berkower)  Mr. Rhoads, is there a page in

12  Government's Exhibit 106, that unstapled version of the

13  pamphlet, that matches the pages shown in Government's

14  Exhibit PX-20?

15  A.   Yes, there is.

16  Q.   Could you find that and hold that up for the jury to

17  see, please?

18  A.   (Indicating.)

19  Q.   Could you also mark that with a sticky note as you've

20  done for the other pages?

21  A.   All right.  (Indicating.)

22  Q.   Thank you.

23       Now let's go back for a moment to the Decision

24  America Northeast Tour in 2019.  You testified earlier

25  that there were some precursor events, some kick-off

1  events, and then a main event in West Springfield.  Did I

2  remember that correctly?

3  A.  Yes, correct.

4  Q.  During those events did the Billy Graham Evangelistic

5  Association distribute tracts?

6  A.  Yes, we did.

7  Q.  Did it distribute evangelistic literature?

8  A.  Yes.

9  Q.  Was Steps to Peace With God distributed at some of

10  those events?

11  A.  Yes, it was.

12      MS. BERKOWER:  No further questions for this

13  witness, Your Honor.

14      THE COURT:  Cross-exam?

15      MS. O'NEILL-GREENBERG:  May I?

16      THE COURT:  Sure.

17      MS. O'NEILL-GREENBERG:  Thank you.

18  **CROSS-EXAMINATION**

19  Q.  Good morning.

20  A.  Good morning.

21  Q.  I want to talk to you first about one of those

22  training events that happened before the Big E event --

23  A.  Sure.

24  Q.  -- in Springfield.

25      One of those events was at a church called Bethany

1    Assembly of God?

2    A.    Yes.

3    Q.    That's a church in Agawam?

4    A.    I believe so.

5    Q.    Okay.  And that training event at that Bethany Church

6    of God was to train counselors, right?

7    A.    Correct.

8    Q.    Counselors where people would then be at the Big E

9    event to sort of help out with Franklin Graham's

10   presentation, right?

11   A.    Correct.

12   Q.    And obviously this training event at Bethany with the

13   counselors happened before the Big E event?

14   A.    Right.

15   Q.    And the counselors -- how many counselors were there,

16   do you know?

17   A.    Well, we train a larger group and then out of that

18   larger group some make application to become a counselor

19   and they go through a series of checks and applications

20   and all that, and then we wind up with a smaller group

21   that actually is approved -- that actually are approved to

22   serve as counselors.

23   Q.    So at the Billy Graham event there was about six

24   thousand people that attended; is that right?

25   A.    That sounds right, more or less.

```
1    Q.   Okay.  So the counselors were there to -- so there
2    must have been a lot of counselors?
3    A.   Yeah, there would have been hundreds of counselors.
4    Q.   Okay.  So at this training event of the hundreds of
5    counselors they were each given that Steps to Peace With
6    God tract, right?
7    A.   At the training they were.
8    Q.   They were given it at the training?
9    A.   Right.
10   Q.   Each counselor was given two tracts, right?
11   A.   Yeah, two copies of that Steps to Peace With God.
12   Q.   Okay.  And then they took their two copies from the
13   training.  They brought them to the Big E event, right?
14   A.   They -- I suppose they could have.  At the actual Big
15   E event, they didn't use that tract in their work as
16   counselors.  But I suppose they could have, they could
17   have but they weren't instructed to do so.
18   Q.   Okay.  So after they had the Bethany training, all
19   those counselors kept their two tracts?  They didn't have
20   to give them back, right?
21   A.   That's right.
22   Q.   And they could have also brought them to the actual
23   Big E event?
24   A.   Correct.
25   Q.   So you don't know what happened to all those tracts
```

1   after the Big E event, right?

2   A.   I don't.

3   Q.   They could have been given out to some of the six

4   thousand people that attended?

5   A.   Sure.  Well, at an event like that with that many

6   people and the work of the counselors is a little

7   complicated, and particularly that event was very crowded.

8   So we thought that -- I'm getting to your answer -- the

9   less paper they have, the better.  So because to carry all

10  that stuff and then to try to wade into the crowd to help

11  people is complicated.  So we try to advice them just

12  bring a different book that we're not talking about here

13  called Living With Christ.  So we kind of discouraged them

14  from bringing anything extra which would include Steps to

15  Peace With God.

16  Q.   I guess my point is, you don't know what those

17  consolers did, each one of them, with their two Steps to

18  God pamphlet afterwards?

19  A.   I don't.

20  Q.   They could have given them to somebody else?

21  A.   Right.

22  Q.   They could have kept them for themselves?

23  A.   Correct.

24  Q.   They could have forgotten them somewhere and left it?

25  A.   Right.

```
1    Q.   They could have thrown it away?
2    A.   Right.  Any of those.
3    Q.   And the Steps to Peace With God tract that you were
4    looking at, it was also given to pastors, right?
5    A.   Not -- you know, I don't recall.  Not in a deliberate
6    way I don't believe.  There were pastors I know that were
7    at the training so they would have gotten it there, but
8    beyond that I can't really remember.  Unless one of our
9    contractors -- I guess maybe unless one of our contractors
10   had it and handed it to a pastor, I couldn't tell you.
11   Q.   Okay.  There was a lot of pastors at the training
12   events, right?
13   A.   I don't know what a lot means.
14   Q.   Well, how many pastors?
15   A.   I don't know.  Generally what happens is that there
16   aren't as many pastors as there are people in the church.
17   So it's a smaller subset.
18   Q.   Okay.
19   A.   I couldn't speak to that though.
20   Q.   Okay.  All those pastors at the training event got
21   the Steps to Peace With God pamphlet?
22   A.   They would have gotten what every other counselor
23   gets.
24   Q.   And could they only take one or could they take as
25   many as they wanted?
```

1    A.   Well, they were given two and because we don't know

2    how many people are going to show up for training, I don't

3    know.  I don't know.

4    Q.   Okay.  And after they took that pamphlet and after

5    the Big E event happened in May, they didn't have to give

6    those pamphlets back?

7    A.   No.

8    Q.   They could do whatever they wanted with them?

9    A.   Correct.

10   Q.   It's a pretty popular pamphlet?

11   A.   What do you mean?

12   Q.   I don't know.  Well, you said it's one that you've

13   had for years?

14   A.   Right.  We used it around the world.

15   Q.   Okay.  So it's been published a lot by your

16   organization?

17   A.   Yes.  This particular version was new just because we

18   were constantly refreshing it, and so this one was

19   reasonably new, a newer version.

20   Q.   But that version you used thousands of them to get

21   ready for this Big E event, right?

22   A.   Yes, all over New England.  Right.

23            MS. BERKOWER:  Okay.  Thank you.  No further

24   questions.

25            THE WITNESS:  Sure.

1          THE COURT:  Any follow up?

2          MS. BERKOWER:  No redirect, Your Honor.

3          THE COURT:  All right.

4     Ladies and gentlemen, I want to tell you regarding

5     that last -- this last witness and what was admitted, I

6     told you -- I think I told you in the opening statements

7     that sometimes exhibits or pieces are evidence will be

8     admitted for a certain purpose or a limited purpose.  This

9     is one of those things.

10         So the purpose of admitting these items, these

11    pamphlets, have nothing to do with what they might say or

12    what message they intend to deliver.  But they have --

13    what they do have to do with for this case is where they

14    came from, access to that particular type or that pamphlet

15    or that type of pamphlet, availability of that type of

16    pamphlet.  Those are the -- that is the purpose for this

17    testimony.  All right.  Thank you.

18         MS. BERKOWER:  May the witness step down?

19         THE COURT:  Absolutely.  Thank you, sir.

20         THE WITNESS:  Okay.  I assume you want me to

21    leave all this here?

22         MS. BERKOWER:  Yes, sir.

23         THE WITNESS:  Okay.

24         MS. BERKOWER:  And you can take off the gloves

25    and throw them away.

```
 1                    THE WITNESS:  Thank you, Your Honor.

 2                    THE COURT:  Thank you.

 3                    MS. BERKOWER:  Your Honor, our next witness is

 4       Bob Hill.  May I go get him?

 5                    THE COURT:  Sure.

 6                    MS. BERKOWER:  Your Honor, may I move one of the

 7       exhibits to the other stand?

 8                    THE COURT:  Yes.

 9            Ladies and gentlemen, just so you know -- it's

10       another step that I didn't realize we were doing here but

11       we are, so every morning a cleaner comes in with a

12       disinfectant sprayer and a backpack and sprays the aerosol

13       spray with the backpack cleaner all over the courtroom on

14       all the surfaces and in the air.  I guess that happens

15       between, what, five and six in the morning?

16                    THE CLERK:  Yes.

17                    MS. BERKOWER:  Your Honor, may we proceed?

18                    THE COURT:  Yes.

19                    MS. BERKOWER:  We call Robert Hill.

20                    MR. WATKINS:  Note our objection again.

21                    THE COURT:  A continuing objection, yes.

22                    THE CLERK:  Would you please raise your right

23       hand?

24

25
```

1    **Robert Hill (Sworn)**

2    **DIRECT EXAMINATION**

3    Q.   (By Ms. Berkower)  Good morning, sir.

4    A.   Good morning.

5             MS. BERKOWER:  Your Honor, may I proceed?

6             THE COURT:  I just wanted the parties to have

7    WhisperTech at counsel table in case I wanted to talk to

8    you about anything.

9         Defense, do you have yours?

10            MS. O'NEILL-GREENBERG:  We have earphones but

11   not.

12            THE COURT:  So come get it.  The batteries are

13   charged.

14            MS. BERKOWER:  May I proceed with this witness?

15            THE COURT:  I'd like to discuss something with

16   the parties.

17   (Sidebar conference.)

18            THE COURT:  My concern is just the form of you

19   making an objection.  I recognize the continuing objection

20   and the basis of it, Attorney Watkins.  I just want to

21   make sure the record is protected and I think to be sure

22   you should enter a more thorough objection.

23        So you do object to the last witness and this witness

24   and some of the contents of their testimony.  Do you want

25   to just make that a little clearer on the record right

1    now?

2            MR. WATKINS:  Sure.  As I did yesterday, we made

3    a motion in limine before trial objecting to these

4    witnesses that there was limited relevance; that it was

5    outweighed by the risk of prejudice by talking about these

6    issues.  That ultimately at the end of the case there

7    wasn't going to be any connection to Mr. Rathbun.

8        As the government well knows, his mother denies that

9    she picked up this particular pamphlet there.  So, in

10   essence, these witnesses are completely irrelevant and

11   again confusing to the jury and bringing unfair prejudice.

12           THE COURT:  All right.  There is -- so I've

13   heard you on that and the court did have a ruling and the

14   court did give a limiting instruction after the last

15   witness regarding the area of consideration of those

16   documents or pamphlets that were introduced.

17       The ruling stands, but I just wanted to perfect the

18   record to the extent that might be necessary in making the

19   objection.  There's different case law regarding a

20   standing objection and continuing objection, and I think

21   you're better off being on the safe side of that by just

22   memorializing it in a fuller way as you just did.

23           MR. WATKINS:  Thank you, Your Honor.

24           THE COURT:  All right.  I don't think you need

25   to comment.

```
 1              Does the government want to say anything?
 2                    MS. BERKOWER:  No, Your Honor.
 3      (End of sidebar discussion.)
 4                    THE COURT:  Go right ahead.
 5                    MS. BERKOWER:  Thank you, Your Honor.
 6      Q.   (By Ms. Berkower)  Good morning, sir.
 7      A.   Good morning.
 8      Q.   Could you please say your name and spell it for the
 9      court reporter?
10      A.   Robert Hill, R-o-b-e-r-t H-i-l-l.
11      Q.   What state do you live in, sir?
12      A.   South Carolina.
13      Q.   What town do you live in?
14      A.   Fort Mill.
15      Q.   Prior to coming here today, did you ensure that you
16      complied with this state of Massachusetts's health rules
17      concerning COVID-19 precautions for out-of-state
18      travelers?
19      A.   Yes.
20      Q.   Sir, are you employed?
21      A.   Yes.
22      Q.   Where do you work?
23      A.   I work for the Billy Graham Evangelistic Association.
24      Q.   And where is the Billy Graham Evangelistic
25      Association?
```

1    A.    Charlotte, North Carolina.

2    Q.    What do you do for that organization?

3    A.    I'm the director of data management and analysis.

4    Q.    How long have you had that job?

5    A.    Three years.

6    Q.    What does your job entail?

7    A.    I work with our databases to classify and categorize

8    data, accuracy, completeness, and then analyze any

9    information we have.

10   Q.    Why does the Billy Graham Evangelistic Association

11   employ people with your skill set?

12   A.    It's important to us to understand where our

13   information comes from, who the people are, and that we're

14   effectively utilizing that to carry out our ministry.

15   Q.    Now in connection with this case, were you asked to

16   search a database that you oversee for Jeffrey and Sheila

17   Rathbun's name?

18   A.    Yes.

19   Q.    Did you find a record for them?

20   A.    Yes.

21   Q.    I'll ask you more questions about that in a moment,

22   but first let me cover a few other things.

23         So in your job do you collect and input data from

24   events hosted by Billy Graham?

25   A.    Yes.

1    Q.   Are you familiar with the Billy Graham Evangelistic

2    Association's Decision America Tour in 2019?

3    A.   Yes.

4    Q.   What was that event very briefly?

5    A.   It was a tour of cities in the Northeast including

6    one in Springfield, a series of evangelistic events.  We

7    engaged with churches and volunteers and people who

8    attended the event.

9    Q.   So the tour went to Springfield, Massachusetts?

10   A.   Yes.

11   Q.   And to be clear, did you travel to Massachusetts for

12   that event?

13   A.   No.

14   Q.   How do you know about the tour then?

15   A.   My team and I are involved in setting the events up,

16   looking at the data that's going to come from the events,

17   making sure we categorized it, and we understand what

18   we're going to do with it.

19   Q.   So was your work on the tour remote from North

20   Carolina?

21   A.   Yes.

22   Q.   Let's talk about the database that you run.  What is

23   your database called?

24   A.   Studio Enterprise.

25   Q.   What does it do?

1    A.    It allows us to input and track information on

2    churches, pastors, volunteers, spiritual inquirers,

3    donors.

4    Q.    And how does information get input into that

5    database?

6    A.    Typically two ways.  One is through paper, so forms

7    or surveys and so that's keyed into the system.  The other

8    is through imports, through websites, a variety of forms

9    on our website.

10   Q.    Now are there opportunities during Billy Graham

11   Evangelistic Association events for participants to

12   provide information that then gets entered into your

13   database?

14   A.    Yes.

15   Q.    Let's talk more about what information gets input

16   into your database when someone attends that kind of event

17   and provides their information.

18         When a record is created in your database, what

19   categories of information are included?

20   A.    First name, last name, mailing address, an email

21   address if it's provided, phone number.  The source of it,

22   where did it come from; a date when it entered into our

23   system.  There could be a variety of categories that it's

24   assigned to.

25   Q.    Could you explain how this database helps your

1    organization keep track of who has attended?

2    A.   Sure.  So we are asked questions of how many and

3    where different categories of people or churches and so

4    having these different codes allows us to be able to

5    identify audiences to communicate with and to track the

6    effectiveness of the ministry.

7    Q.   What does this database do to help your organization

8    keep track of when someone provided their information?

9    A.   Sure.  There's a date, it's called an incept date in

10   the system and that's when the data was actually created,

11   the record was created within the database.

12   Q.   And what does this database do to help your

13   organization keep track of where someone was when they

14   provided their information to you?

15   A.   There's what we call an intercepting source code and

16   so that's a code in the system that tells us where that

17   information came from.  So that would identify a web form

18   or a card, and there may additional codes that give us

19   more specific information about that.

20   Q.   Why is the database designed to track all of that

21   information?

22   A.   Again, we get asked questions all the time from

23   leadership or from churches on how many people did this or

24   how many people did that.  We communicate with people once

25   they provide us with their information.  Over a period of

1    time we might mail them things or email things and so it

2    helps us to track them.

3    Q.   In connection with this case you mentioned that you

4    checked that database -- you checked a database for

5    Jeffrey and Sheila Rathbun?

6    A.   Yes.

7    Q.   Is the database that you checked for this case, the

8    one you just were describing to us?

9    A.   Yes.

10   Q.   So was there a record in that database for Jeffrey

11   and Sheila Rathbun?

12   A.   Yes.

13   Q.   Were there also individual records in your database

14   for Jeffrey and Sheila Rathbun?

15   A.   Yes.

16           MS. BERKOWER:  If we could, Ms. McKenna, please

17   have Government's Exhibit PX-86 just for the witness,

18   court, and counsel?

19   Q.   (By Ms. Berkower)  Do you have that front of you,

20   sir?

21   A.   Yes.

22   Q.   Do you recognize what that is?

23   A.   Yes.

24   Q.   What is it?

25   A.   It's an account profile report that shows the

1    information that's in our database for Sheila Rathbun.

2    Q.   And based on your understanding of your database is

3    this an accurate copy of the record in your system for

4    Sheila Rathbun?

5    A.   Yes.

6    Q.   Is that a document that you maintain in the normal

7    course of your business activities?

8    A.   Yes.

9         MS. BERKOWER:  Your Honor, I'd ask to admit

10   Government's Exhibit PX-86.

11        MS. O'NEILL-GREENBERG:  No objection.

12        THE COURT:  All right.  No objection.  That will

13   be admitted.

14   **(PX-86 was admitted.)**

15        MS. BERKOWER:  May we publish it as we speak

16   with this witness?

17        THE COURT:  Yes.

18   Q.   (By Ms. Berkower)  Mr. Hill, if you could walk us

19   through this record.  Could you explain what the

20   categories of information are starting at the top?

21   A.   Sure.  There's an account number so that's a unique

22   identifier for this record.  There's title, first and last

23   name for the record.  There's a phone number, an add date,

24   that's when the record was created.  There's a mailing

25   address.

1    Q.   Let me stop you there.  Maybe we should go through a

2    little more carefully or a little slowly on my part.

3    A.   Okay.

4    Q.   So who is this account record for?  What's the name

5    on this account?

6    A.   Mrs. Sheila Rathbun.

7    Q.   And is there a mailing address given?

8    A.   Yes.

9    Q.   What is that mailing address?

10   A.   20 Lori Lane, East Longmeadow, Massachusetts.

11   Q.   And in this record, can you tell how Mrs. Rathbun

12   came to provide her information to your organization?

13   A.   Yes.  At the top, there's a section that's called

14   basic.  It says source code and there's an identifier that

15   says this came from the Decision Northeast free shirt sign

16   up card.

17            MS. BERKOWER:  Ms. McKenna, do you see that

18   portion of the record?  Could you blow that up a little

19   bit?

20   Q.   (By Ms. Berkower)  Mr. Hill, is that the section of

21   the record you're talking about?

22   A.   Yes.

23   Q.   All right.  Now does this record also contain

24   information concerning the date on which that information

25   was provided?

1    A.   Yes.  So the record was created on June 3, 2019.

2    It's in the upper right-hand corner.

3    Q.   And about how long after information is provided do

4    you usually input data into your system?

5    A.   It's typically seven to ten days from the card.

6    Q.   Now, are you able from this record to say -- to

7    determine what city this information was provided to you?

8    A.   Yes.  Under the section called category codes,

9    there's a code type that says DTR which is the Decision

10   Tour and the code there represents Springfield.

11          MS. BERKOWER:  Ms. McKenna, could you please

12   expand on that part of the record?

13          THE COURT:  I think it be helpful -- are the

14   people in the front having a hard time seeing?  Right.

15   Can you turn that screen around?  That's maybe the best we

16   can do.

17          MR. DESROCHES:  This one may be easier.

18          MS. BERKOWER:  I can do it.

19       I don't know what I did.  This is now black.

20          THE CLERK:  That's okay.

21          THE COURT:  That's very helpful.  Thank you.

22          MS. BERKOWER:  May I proceed?

23          THE COURT:  Sure.

24   Q.   (By Ms. Berkower)  Mr. Hill, could you please show us

25   which part of this record tells you where the information

1   in this record for Ms. Rathbun was provided to your

2   organization?

3   A.   It says DTR, the Decision Tours, and then there's a

4   code MASPTSH19 and the description is free shirt sign up

5   Springfield, Massachusetts.

6   Q.   Based on your work with this database, do you know

7   what that refers to?

8   A.   Yes.

9   Q.   Could you explain what it refers to?

10   A.   Yes.  So this information would have been collected

11   at the free T-shirt sign up in Springfield.  The card was

12   handed in in Springfield.

13   Q.   What is the free T-shirt sign up?

14   A.   So there's a booth or a table.  In exchange for

15   filling out a card, we give people a T-shirt and brochure

16   so they filled in a card and got a T-shirt.

17   Q.   And when you enter the information obtained from the

18   card in your system, is that how you categorize that?

19   A.   Yes.

20   Q.   Based on the record, how certain are you that Mrs.

21   Sheila Rathbun attended the Big E event?

22   A.   Very certain.

23          MS. BERKOWER:  Now moving on to Government's

24   Exhibit PX-87.  If we could have that just for the court,

25   counsel, and the witness please?

1        Your Honor, I think our computer froze here for a
2  moment.
3              THE COURT:  Okay.
4              MS. BERKOWER:  If the court would prefer, I can
5  approach with a paper copy and just leave it on the side
6  for the witness so we can move on with our examination.
7              THE COURT:  That's fine too.  Sometimes it might
8  resolve quickly.  I don't know what the problem is.
9              MS. BERKOWER:  Thank you, Your Honor.
10        Do you have it?
11             MR. WATKINS:  Sure.  If you want to switch
12  over.
13             MS. BERKOWER:  I think we had to restart our
14  computer over here so that might take a moment.  If Mr.
15  Watkins is willing to do that, that would be preferable.
16             THE COURT:  Okay.
17             MR. WATKINS:  The clerk will need to switch over
18  to my computer.
19             THE CLERK:  It is.  You won't view it.  It's not
20  going to be viewable to everybody.  Just on your
21  screens.
22             MR. WATKINS:  Right.
23             MS. BERKOWER:  Thank you, Mr. Watkins.
24  Q.   (By Ms. Berkower)  Mr. Hill, are you able to see the
25  exhibit in front of you?

1    A.   Yes.

2    Q.   Now, do you recognize what this is?

3    A.   Yes.

4    Q.   What is it?

5    A.   It's an account profile report for the account for

6    Mr. Jeffrey Rathbun.

7    Q.   And how do you know it's his account?

8    A.   His name is at the top, the address, phone number,

9    additional information for him.

10   Q.   What address is provided for him?

11   A.   20 Lori Lane, East Longmeadow, Massachusetts.

12   Q.   Do you recognize this to be taken from your database

13   at Billy Graham?

14   A.   Yes.

15   Q.   Is this an accurate copy?

16   A.   Yes.

17   Q.   Is it something that you maintain in the normal

18   course of your business?

19   A.   Yes.

20           MS. BERKOWER:  Your Honor, I would ask to admit

21   Government's Exhibit PX-87.

22           MS. O'NEILL-GREENBERG:  No objection.

23           THE COURT:  All right.  No objection.

24   **(PX-87 was admitted.)**

25           MS. BERKOWER:  May I publish it?

```
1            THE COURT:  Yes.  That's allowed.  Admitted, and
2    it can be published.
3    Q.   (By Ms. Berkower)  Now for this record, are you able
4    to determine how Mr. Jeffrey Rathbun's name got into your
5    system?
6    A.   Yes.
7    Q.   Could you explain that please?
8    A.   Yes.  It's the same as his wife.  The source code is
9    the same and the DTR, Decision Tour code, is the same.  So
10   it would have been the free shirt sign up in Springfield.
11   Q.   So how certain are you that he was at this event?
12   A.   Very certain.
13   Q.   Now in connection with this case were you asked to
14   check the database for John Rathbun's name?
15   A.   Yes.
16   Q.   Did you find a record for him?
17   A.   No.
18   Q.   Now after the Rathbuns' information was put in your
19   database, did the Billy Graham Evangelical Association
20   maintain contact with the Rathbuns?
21   A.   Yes.
22   Q.   And by that I mean Jeffrey and Sheila?
23   A.   Yes.
24   Q.   What was the nature of that contact?
25   A.   We began to mail and so we called them prayer
```

1    letters, and typically it's monthly.  It might be more

2    often with that.  So I believe that we mailed them for

3    about a year through mailings and we also sent them

4    several emails.

5    Q.   How do you know that you sent them those materials?

6    A.   So I believe it's either page 2 or 3 of this

7    document.  It's at the top it's called COMMS.  Perhaps

8    page 3.  So this is a listing of mail and email that were

9    sent to them.

10   Q.   And about how often you said were these documents

11   being sent?

12   A.   Usually our prayer letter is monthly.  Sometimes more

13   often, depending on the seasonality.

14   Q.   What was the address to which these mailing were

15   delivered?

16   A.   The Lori Lane address that's on the account.

17   Q.   Is there also an email account associated with this

18   file?

19   A.   Yes.  On page 1 it's called email and there's a home

20   email there that's a hot mail account.

21   Q.   Could you read the email address please?

22   A.   Let's see.  It's pixelating.  So

23   sheilar1013@hotmal.com.

24              MS. BERKOWER:  Now if we could have Mr. Watkins

25   indulge me again please with Government's Exhibit 85,

1    PX-85.

2         If we could have that just to the court, counsel, and

3    the witness please?

4         Mr. Watkins, I can actually use the Elmo if that

5    would be easier for you.

6         Madam clerk, may I have the Elmo please?

7              THE CLERK:  Sure.

8              MS. BERKOWER:  Just to the court, counsel, and

9    the witness please.

10   Q.   (By Ms. Berkower) Now, Mr. Hill, do you recognize

11   what's in Government's Exhibit 85?

12   A.   Yes.

13   Q.   What is it?

14   A.   It's a prayer letter from June of 2019.

15   Q.   And is this -- when you refer to mailings that your

16   organization sent to the Rathbun home, is this an example

17   of what you were talking about?

18   A.   Yes.

19   Q.   Did you review Government's Exhibit 85 prior to

20   coming to court today?

21   A.   Yes.

22   Q.   Was this a fair and accurate copy of the materials

23   that were sent to the Rathbun family?

24   A.   Yes.

25   Q.   And were they sent in the normal course of business

1    as represented by that COMMS page listed in your database?
2    A.   Yes.
3              MS. BERKOWER:   Your Honor, I would ask for the
4    admission of Government's Exhibit PX-85.
5              MS. O'NEILL-GREENBERG:   No objection.
6              THE COURT:   No objection that will be admitted.
7    **(PX-85 was admitted.)**
8    Q.   (By Ms. Berkower)   Based on your COMMS page, was it
9    your understanding that these materials were sent to the
10   Rathbun home at 20 Lori Lane?
11   A.   Yes.
12             MS. BERKOWER:   If we could publish this please?
13   Q.   (By Ms. Berkower)   Taking just this first page as an
14   example, could you explain to the jury what this is?
15   A.   So this is the prayer letter itself.   It's typically
16   two to four pages of text.   So it's dated June 19, 2019 as
17   we would have mailed this along with an envelope, a reply
18   device, possibly an insert within an envelope to the
19   Rathbuns.
20   Q.   Thank you, sir.
21        You can turn off the Elmo.
22        Now moving on to a different area.   During your work
23   at the Billy Graham Evangelistic Association do you know
24   if your organization publishes religious literature aside
25   from those mailings?

1    A.    Yes.

2    Q.    Are you familiar with a booklet called Steps to Peace

3    With God?

4    A.    Yes.

5    Q.    You have what's been admitted into evidence as

6    Government's Exhibit 4 in front of you; do you see that?

7    A.    Yes.

8    Q.    Do you recognize that to be Steps to Peace With God?

9    A.    Yes.

10            MS. BERKOWER:  Could we also have Government's

11   Exhibit 54?  I think we're back on on our computer system

12   here.  That's been admitted into the evidence.

13   Q.    (By Ms. Berkower)  Do you see that in front of you?

14            Can we have that published as well please?

15   A.    Yes.

16   Q.    Based on your familiarity with this pamphlet, do you

17   know if it's published in Massachusetts?

18   A.    No, it's printed in South Carolina.

19   Q.    So is it printed in South Carolina?

20   A.    Yes.

21   Q.    Does anything concerning the creation of this

22   pamphlet take place in Massachusetts?

23   A.    No.

24            MS. BERKOWER:  No further questions, Your Honor.

25            MS. O'NEILL-GREENBERG:  May I inquire?

1        THE COURT:  Yes.

2   **CROSS-EXAMINATION**

3   Q.   (By Ms. O'Neill-Greenberg) Good morning.

4   A.   Good morning.

5   Q.   You were asked some questions about the registration

6   of Sheila and Jeffrey Rathbun.  They weren't -- they

7   attended that Big E event, right?

8   A.   Yes.

9   Q.   That's what you said.

10       They weren't volunteers for that event, right?

11  A.   No.

12  Q.   They weren't counselors for that event?

13  A.   No.

14  Q.   They were just there to see the event?

15  A.   Yes.

16  Q.   Okay.  And they got free T-shirts?

17  A.   Yes.

18  Q.   And your organization didn't mail out the Steps to

19  Peace With God pamphlet to people who just attended,

20  right?

21  A.   Correct.  We did not.

22  Q.   And this Steps to Peace With God tract or pamphlet, a

23  lot of churches in the Springfield area ordered it before

24  the event happened in May, right?

25       MS. BERKOWER:  Objection, Your Honor.  I think a

1    lack of foundation on that.

2              THE COURT:  Overruled.

3              THE WITNESS:  I can't say a lot of churches.

4    I'm aware that it would have been made available to

5    churches, but I don't know what churches actually received

6    it.

7    Q.   (By Ms. O'Neill-Greenberg)  Okay.  Hundreds of

8    churches were involved in the prep for this event, right?

9    A.   It would have been hundreds of churches.

10   Q.   More than hundreds?

11   A.   Uh-huh.

12   Q.   In this area in Springfield --

13   A.   Yes.

14   Q.   -- more than hundreds?

15   A.   Within the Northeast tour it would have been hundreds

16   of churches.

17   Q.   And one of the churches in this area that ordered

18   these Steps to Peace With God tracts was the Bethany

19   Church in Agawam, right?

20   A.   I'm not aware of that.  I haven't reviewed that in

21   our system.

22   Q.   You're not aware of an invoice that you reviewed that

23   showed an order from Bethany Church?

24   A.   Is that -- that would not be in our system, but that

25   would have been I think Ruth's Attic.  It's possible if

1    they ordered through a website.

2    Q.   Okay.  So if these churches ordered through a

3    website, you didn't keep track of that?

4    A.   It would have been kept track of in that system.

5    Q.   Okay.  But not through your department?

6    A.   Correct.

7    Q.   Okay.  So you don't know how many churches in the

8    area did or didn't order that pamphlet through online?

9    A.   Correct.

10   Q.   Is that through the bookstore?

11   A.   Yes.  It's called Ruth's Attic Bookstore.

12   Q.   But churches did order packets of these tracts?

13   A.   Yes.  I'm sure they did.

14             MS. O'NEILL-GREENBERG:  Thank you.

15   **REDIRECT EXAMINATION**

16   Q.   (By Ms. Berkower)  Just to clear up that last

17   question that Ms. O'Neill-Greenberg asked you, you said

18   churches did order this pamphlet.  Are you aware of

19   churches in Springfield, Massachusetts area that ordered

20   this pamphlet based on your view of your records?

21   A.   No.

22             MS. BERKOWER:  Nothing further, Your Honor.

23             THE COURT:  Thank you.  All right.

24        Ladies and gentlemen, similarly to what I told you

25   when the last witness introduced exhibits, any exhibits --

1    the material that were introduced through this witness

2    again have the purpose -- they are being admitted and are

3    relevant for a limited, as I explained to you, purpose of

4    where these materials came from; individual's access to

5    those materials; the availability of those types of

6    materials.  That's what they're admissible for, not for

7    the content, not for the writing or any messages or

8    anything that's written inside of them.  All right?

9         Okay.  Thank you, sir, very much.  You can step down.

10        All right.  And as our jury is familiar with, we take

11   a break now.  Our cleaning crew will come in and clean the

12   witness stands and it's generally less than ten minutes.

13   So it will be a quicker break and then we will still be on

14   track probably for a longer coffee morning break.  Okay?

15        All right.  So we're planning on this being a quick

16   turnaround for cleaning and then we're back on.

17             THE CLERK:  All rise.

18             THE COURT:  The same instructions.  Do not talk

19   about the case.  Don't look up the case on the internet;

20   all the same instructions apply.

21   **(A recess was taken at 10:31 until 10:43.)**

22             THE CLERK:  I just want to remind you there is a

23   screen on top of you.  So if you want to move your chair

24   up, that probably would be good.  Thank you.

25             THE COURT:  All right.  Go head.

```
 1              MS. BERKOWER:  Your Honor, the government calls
 2    Natalie Rathbun.  May I get her from the hallway?
 3              THE COURT:  Yes.
 4              THE CLERK:  Ma'am, can you please stand and
 5    raise your right hand?
 6              THE COURT:  Could you have her stand?
 7              THE CLERK:  Can you please stand?  Thank you.
```
 8    **Natalie Rathbun (sworn)**
```
 9              MS. BERKOWER:  Does the court prefer that the
10    witness remove her mask?
11              THE COURT:  Yes.
12              MS. BERKOWER:  Please remove your mask.
13              THE COURT:  Thank you.
```
14    **DIRECT EXAMINATION**
```
15    Q.   (By Ms. Berkower) Good morning.
16    A.   Good morning.
17    Q.   Could you please say your name and spell it for the
18    court reporter?
19    A.   My name is Natalie Rathbun; N-a-t-a-l-i-e
20    R-a-t-h-b-u-n.
21    Q.   How old are you, Natalie?
22    A.   I'm 18 years old.
23    Q.   Are you currently in school?
24    A.   Yes.
25    Q.   What year are you in school?
```

```
 1    A.   I am a freshman in college.

 2    Q.   When did you graduate high school?

 3    A.   I graduated this past spring in 2020.

 4    Q.   Do you also work?

 5    A.   Yes.

 6    Q.   What kind of work do you do?

 7    A.   I work at a restaurant.  I'm a take out phones

 8    person.

 9    Q.   Do you know John Rathbun?

10    A.   Yes.

11    Q.   Who is he?

12    A.   He's my dad.

13    Q.   We are going to talk more about him in a moment, but

14    first I'm going to ask you about a few other things. Okay?

15    A.   Uh-huh.

16    Q.   Before we get too much further, how are you feeling

17    about being here today?

18    A.   I'm feeling a little nervous.

19    Q.   Why are you nervous?

20    A.   Why am I nervous?

21    Q.   Yes.

22    A.   Because there's a lot of people looking at me and

23    I've never done this before.

24    Q.   If you need to stop for a moment and drink some water

25    or take a breath, will you tell me?
```

1    A.   Yes.

2    Q.   Okay.  So you --

3              MR. WATKINS:  Could I ask she move the little

4    microphone a little closer?  Thank you.

5    Q.   (By Ms. Berkower) So you mentioned that you're in

6    college now; is that right?

7    A.   Yes.

8    Q.   Before you started college, who did you live with?

9    A.   I lived with my grandparents and my dad.

10   Q.   Who owns the house that you lived in with your

11   grandparents and your dad?

12   A.   My grandparents.

13   Q.   What's the address there?

14   A.   The address is 20 Lori Lane in East Longmeadow.

15   Q.   Is it fair to say that you lived there your whole

16   life before college?

17   A.   Yes.

18   Q.   Did your dad also live there with you?

19   A.   Yes.

20   Q.   What about your mother, did she live there?

21   A.   No.

22   Q.   Is your mother in a relationship with your dad?

23   A.   No.

24   Q.   What do you call your dad usually?

25   A.   John.

```
 1    Q.   Did John also grow up in the house at 20 Lori Lane?
 2    A.   Yes.
 3    Q.   And did he live there with you and your grandparents
 4    for most of your life?
 5    A.   Yes.
 6    Q.   Now that you're in college, do you still live with
 7    your grandparents full time?
 8    A.   No.
 9    Q.   Who do you live with now?
10    A.   During the weekdays I live with my mom in Feeding
11    Hills and on the weekends I go to my Nana's house in East
12    Longmeadow.
13    Q.   You call your grandmother your Nana?
14    A.   Yeah.
15    Q.   Okay.  Back in January through April of this year,
16    2020, were you living at your Nana's house?
17    A.   Yes.
18    Q.   Full time?
19    A.   Yes.
20    Q.   Do you have a close relationship with your
21    grandparents?
22    A.   Yes.
23    Q.   Are they members of a church?
24    A.   Yes.
25    Q.   What church are they members of?
```

```
1    A.   They're members of Heritage Baptist Church in
2    Springfield.
3    Q.   Who is the pastor there?
4    A.   Pastor Rowe.
5    Q.   How do you spell that, do you know?
6    A.   R-o-w-e.
7    Q.   How often do your grandparents attend the church?
8    A.   They attend very often, usually at least once a week
9    on Sundays.
10   Q.   Is your grandmother also active in the church
11   community?
12   A.   My grandfather?
13   Q.   Your Nana, sorry.
14   A.   Yeah.  My Nana is very active in the church.
15   Q.   How is she active in the church?
16   A.   I believe she works at the church I think with
17   finances.
18   Q.   And what about your grandfather, is he active in the
19   church?
20   A.   He's not as active as my Nana because he has trouble
21   walking.
22   Q.   Do you also go to that church currently?
23   A.   No.
24   Q.   Does John attend that church?
25   A.   No.
```

1    Q.   Did he used to go to that church?

2    A.   Yes.

3    Q.   Did you used to go to that church?

4    A.   Yes.

5    Q.   Now does Heritage Church keep religious literature on

6    hand at the location?

7    A.   Yes.

8    Q.   Are you familiar with the word tract?

9    A.   Yes.

10   Q.   What is a tract to you?

11   A.   A tract is like a religious pamphlet that explains

12   the word of God and it tries to persuade other people to

13   have a relationship with God and get saved so that they

14   can go to heaven.

15   Q.   Now the religious literature you mentioned that's

16   kept at the Heritage Church, are those tracts?

17   A.   Yes.

18   Q.   Are you familiar with the tracts that the Heritage

19   Church had?

20   A.   Yes.

21   Q.   How do are -- where at the church are the tracts

22   kept?

23   A.   They're kept on the side of both the doors.

24   Q.   The entry doors to the church?

25   A.   Yes.

1   Q.   How is it that you came to be familiar with the

2   tracts at the Heritage Church?

3   A.   I grew up in that church so when I was younger, I

4   used to read all the tracts.

5   Q.   When you say you grew up in that church, what do you

6   mean by that?

7   A.   I've been going there weekly pretty much my entire

8   life up until I got older.

9   Q.   You said when you went, you would read the tracts?

10  A.   Yes.

11  Q.   Could you tell us a little bit about what you read

12  there?

13  A.   A lot of tracts had the same message.  It was just

14  explaining that Jesus died on the cross for our sins and

15  that we should accept him into our hearts to get saved and

16  lot of them included different Bible verses.

17  Q.   Was there a particular tract that you especially

18  liked when you were a kid?

19          THE COURT:  The relevance please?  Is there an

20  issue here with relevance?

21          MS. O'NEILL-GREENBERG:  I was going to let her

22  go, but yes.

23          THE COURT:  All right.  Sustained.

24  Q.   (By Ms. Berkower)  Now when you went to the church,

25  what was taught there about the right way for someone to

```
 1    get through a difficult time?

 2              MS. O'NEILL-GREENBERG:  Objection.

 3              THE COURT:  Sustained.

 4    Q.   (By Ms. Berkower)  Do members of the Heritage Church

 5    distribute tracts to other people?

 6    A.   Yes.

 7    Q.   What's the reason for doing that?

 8    A.   It's a personal --

 9              MS. O'NEILL-GREENBERG:  Objection.

10              THE COURT:  Sustained.

11    Q.   (By Ms. Berkower)  Have you seen anyone in your own

12    family hand out tracts?

13    A.   Yes.

14    Q.   Who have you seen in your own family hand out tracts?

15    A.   My grandmother.

16    Q.   Let's talk a little bit more now about your grandma's

17    involvement in handing out tracts.  Where does she

18    distribute tracts?

19              MS. O'NEILL-GREENBERG:  Objection, Your Honor.

20              THE COURT:  If she knows; if there can be a

21    foundation that this witness would know.

22    Q.   (By Ms. Berkower)  Have you seen your grandmother

23    hand out tracts?

24    A.   Yes.

25    Q.   Where have you seen her do that?
```

1    A.    When we go out in different stores, she likes to hand

2    them to the cashiers.

3    Q.    And where does she get those tracts from?

4    A.    She either gets them from the church or there's one

5    tract that my grandfather wrote up and made and they would

6    print those out.

7    Q.    Do you know where she keeps those tracts that she

8    then hands out?

9    A.    She usually keeps them in her purse or sometimes

10   they're around the house.

11   Q.    Does she also sometimes keep them in the front part

12   of her car?

13   A.    Yes.

14   Q.    Where in the front part of her car does she keep

15   them?

16   A.    It's over by the gear shift in the cup holder.

17            MS. BERKOWER:  Now if we could have Government's

18   Exhibit 56 just for the court, counsel, and the witness

19   please?

20   Q.    (By Ms. Berkower)  Do you have that on your screen?

21   A.    Yes.

22   Q.    Is this exhibit a photo?

23   A.    Yes.

24   Q.    Do you recognize where that photo was taken?

25   A.    Yes.  It was taken over on the right side of my

1    living room.

2    Q.   In your Nana's house?

3    A.   Yes.

4    Q.   Is that an accurate picture taken from your living

5    room?

6    A.   Yes.

7         MS. BERKOWER:  Your Honor, I would ask to admit

8    Government's Exhibit PX-56 please?

9         MS. O'NEILL-GREENBERG:  No objection.

10        THE COURT:  All right.  No objection, that's

11   allowed.

12   **(PX-56 was admitted.)**

13        MS. BERKOWER:  May we publish it?

14        THE COURT:  Yes.

15   Q.   (By Ms. Berkower)  Now, Natalie, could you describe

16   what you see in the center of that photo?

17   A.   On the table there's a tract over on the left and

18   there's a picture and I guess a massage thing.

19   Q.   So that piece of paper on the table in the center you

20   say that you recognize that to be a tract?

21   A.   Yes.

22   Q.   When you said that your grandmother keeps tracts in

23   the house, is this the kind of thing you meant?

24   A.   Yes.

25   Q.   And based on the photo could you explain a little

1    more about where in your house this was found?

2    A.   This is over on the right side of my living room over

3    where my grandfather usually sits.  He usually keeps a

4    table or two to hold his stuff.

5    Q.   You said your grandmother also keeps tracts on her

6    person, right?

7    A.   Yes.

8    Q.   Where on her person does she keep tracts?

9    A.   She usually keeps them in her purse.

10   Q.   And what does she do with the tracts that she keeps

11   in her purse as far as you know?

12           MS. O'NEILL-GREENBERG:  Objection, Your Honor.

13           THE COURT:  Overruled.

14           THE WITNESS:  She likes to distribute them to

15   other people to try and spread the word of God.

16   Q.   (By Ms. Berkower)  How far back in time do you

17   remember her doing that?

18   A.   I've always remembered that ever since I was young.

19   Q.   What was the most recent time you saw her do that?

20   A.   A couple weeks ago we went to Marshals and she handed

21   one there.

22   Q.   I think I forgot to ask you, what is your Nana's

23   name?

24   A.   Sheila Rathbun.

25   Q.   What your grandpa's name?

1    A.   Jeff Rathbun.

2    Q.   Let's talk a little more now about a different topic,

3    specifically life at your grandparents' house this year.

4         Before you moved out to your mom's house to attend

5    college, did you have your own car?

6    A.   Yes.

7    Q.   What kind of car do you have?

8    A.   It's a red Sonata.

9    Q.   When did you get it?

10   A.   My sophomore year of high school.

11   Q.   Who else in the house had a car?

12   A.   My grandma did and John did.

13   Q.   What type of car did your grandmother have?

14   A.   She drives a silver Rav4.

15   Q.   What about John, what kind of car did he have?

16   A.   A navy blue van.

17             MS. BERKOWER:  If we could please have

18   Government's Exhibit PX-105 just for the court, counsel,

19   and the witness.  Go to page 3.  Thank you.

20   Q.   (By Ms. Berkower)  Do you have that on your screen a

21   picture?

22   A.   Yes.

23   Q.   Do you recognize that picture?

24   A.   Yes.

25   Q.   What does it show?

A.   It shows John's van on the right and mine and my
grandma's car on the left.

Q.   Is that an accurate view of what those vehicles look
like?

A.   Yes.

          MS. BERKOWER:  Your Honor, I'd ask to admit
Government's Exhibit 105, PX-105.

          MS. O'NEILL-GREENBERG:  No objection.

          THE COURT:  No objection, that's allowed.

          MS. BERKOWER:  May it be published?  Actually,
Your Honor, I should say let me go back a moment because
this is a multi-page exhibit so before I seek to admit it,
let me have the witness review those other pages.  My
apologies.

     Could you go to page 1 please?

Q.   (By Ms. Berkower)  Do you recognize what's on page 1
of this exhibit?

A.   Yes.

Q.   What is that?

A.   It's mine and my grandma's house at 20 Lori Lane.

Q.   Is that an accurate picture of what the front of your
house looks like?

A.   Yes.

          MS. BERKOWER:  Going to page 2 of this exhibit
please, Ms. McKenna.

1    Q.   (By Ms. Berkower) Natalie, do you see what's on the

2    screen in front of you now on page 2 of this exhibit?

3    A.   Yes.

4    Q.   Do you recognize what that is?

5    A.   Yes.

6    Q.   What is it?

7    A.   It's the side door of my house.  It's where we come

8    and leave and there's a deck on it.

9    Q.   Is that an accurate picture of what that part of your

10   house looks like?

11   A.   Yes.

12          MS. BERKOWER:  So, Your Honor, I'd seek to admit

13   the entire three pages of this exhibit at this time.

14          MS. O'NEILL-GREENBERG:  No objection.

15          THE COURT:  No objection, it's admitted and can

16   all be published.

17   **(PX-105 was admitted.)**

18          MS. BERKOWER:  Now going back, Ms. McKenna, if

19   we could to page 3 of this exhibit please and if we can

20   publish that to the jury?

21        Thank you.

22   Q.   (By Ms. Berkower)  Could you explain for the jury

23   which vehicle is which in this picture?  Where is John's

24   van?

25   A.   It's on the right side.  Should I touch it?

```
1    Q.   I think they don't want us touching those today.

2    A.   Okay.  It's the navy blue van.

3    Q.   Is your car pictured in this photo?

4    A.   Yes.  It's the car on the left, the first one.

5    Q.   The red one?

6    A.   Yes.

7    Q.   And what car is behind your car?

8    A.   My grandma's car.

9    Q.   Now when you lived with your Nana, did John ever

10   drive your car, the red Sonata?

11   A.   Rarely.

12   Q.   Did he ever drive your grandmother's car?

13   A.   Yes, frequently.

14   Q.   How do you know that he drove your grandmother's car?

15   A.   Because where my room is situated, I have a window

16   that shows where the driveway is so I can see whenever any

17   comes and leaves.

18   Q.   Looking at the exhibit in front of you, do you see

19   that window in this picture?

20   A.   Yes.  It's over on the top right corner.

21   Q.   Now how often, based on what you saw, did John take

22   your grandmother's car?

23   A.   I'd say maybe about a couple times a week.

24   Q.   Do you know why he took her car?

25   A.   No.
```

1   Q.   How did he get the keys to her car?

2              MS. O'NEILL-GREENBERG:   Objection, Your Honor.

3              THE COURT:   If she knows.   Please ask a

4   foundation question of how she knows.

5   Q.   (By Ms. Berkower)   Do you know how your dad got the

6   keys to that car?

7   A.   Well, we usually left the keys either on the kitchen

8   table or we have a cup that holds spare keys in the

9   kitchen.   The keys are pretty accessible.

10  Q.   Now thinking about the first few months of this year,

11  how often did you see John go out at night?

12  A.   I'd say at least once a week.

13  Q.   And how did you know that he was going out at night?

14  A.   Because I could hear the car turn on and I could see

15  outside my window.

16  Q.   When you saw him go out at night during those months,

17  what car was he driving?

18  A.   It was usually my grandma's car; occasionally it was

19  his own car.

20  Q.   Around what time of night did you see him leaving?

21  A.   It usually varied between different times.

22  Q.   Would you usually see him return home?

23  A.   Sometimes I would; sometimes I wouldn't.   I would

24  usually go to bed so I wouldn't sit around and wait for

25  him to come home.

1   Q.   Now, do you remember that the pandemic started in
2   about March of 2020?
3   A.   Yes.
4   Q.   Did he still go out after the pandemic started?
5   A.   Yes.
6   Q.   About how often did he go out after the pandemic
7   started?
8   A.   I'd say about the same time, maybe a couple times a
9   week.
10   Q.   Did that include during that initial lock-down
11   period?
12   A.   Yes.
13   Q.   Do you know whether or not your grandparents knew
14   that John was going out during that period of time?
15         MS. O'NEILL-GREENBERG:  Objection.
16         THE COURT:  Sustained.
17   Q.   (By Ms. Berkower)  Now, you mentioned that John would
18   go out in your grandmother's car some of those nights,
19   right?
20   A.   Yes.
21   Q.   Did that cause any disputes between him --
22         MS. O'NEILL-GREENBERG:  Objection.
23         THE COURT:  Can you finish the question please?
24   Q.   (By Ms. Berkower)  Did that cause any disputes
25   between him and your grandmother?

```
 1                THE COURT:  That's allowed.  You can ask that
 2    question.
 3                THE WITNESS:  It would cause problems sometimes
 4    because my grandmother would need to leave and use her car
 5    but sometimes the car wouldn't be there.
 6    Q.   (By Ms. Berkower)  And during the first -- so during
 7    the few months of this year, were there times when John
 8    had your Nana's car when she needed it?
 9    A.   I don't remember like specifically what time, but I
10    do know it happened.
11    Q.   And when they got in those disputes, what would
12    happen between them?
13                MS. O'NEILL-GREENBERG:  Objection.
14                THE COURT:  Did you see these disputes?  Did you
15    see them happen?
16                THE WITNESS:  I overheard them when I was
17    upstairs.
18                THE COURT:  You heard their voices?
19                THE WITNESS:  (Indicating.)
20                THE COURT:  Okay.  You can answer the
21    question.
22                THE WITNESS:  What was the question?
23    Q.   (By Ms. Berkower)  When your grandmother and John had
24    disputes over her car, were you able to hear what they
25    were saying?
```

```
 1    A.    Yes, most of the time.

 2    Q.    What were they saying as far as you heard?

 3    A.    Usually my grandmother would get upset because he

 4    would take the car without asking and they would usually

 5    -- John would be yelling, swearing, and they would just

 6    bicker about it.

 7    Q.    Now, do you remember a day in April of this year when

 8    FBI agents came to your house?

 9    A.    Yes.

10    Q.    In the time -- in the weeks leading up to that day,

11    how often was John going out at night in your

12    grandmother's car?

13    A.    I'd say it was about the same amount that he usually

14    did, just a couple times a week.

15    Q.    And during that period of time was there a stretch of

16    two weeks where he stayed home the entire time based on

17    what you saw?

18    A.    No.

19    Q.    Let's go back a moment to your grandmother.  Does she

20    work?

21    A.    Yes.

22    Q.    What type of work does she do?

23    A.    She works at Carr Property Management.  She's an

24    accountant.

25    Q.    And what kind of company is Carr, if you know?
```

1    A.   I believe they manage a couple of buildings.   That's

2    all I know.

3    Q.   So let's move on to a different topic.

4         Are you familiar with a place called Genesis House?

5    A.   Yes.

6    Q.   What is Genesis House?

7    A.   Genesis House is where my great-grandmother used to

8    live.

9    Q.   What kind of building is Genesis House?

10   A.   An elderly facility I believe.

11   Q.   Did you ever visit her there?

12   A.   Yes, when I was younger.

13   Q.   How far -- are you familiar with how far away from

14   your grandparents' house Genesis House is located?

15   A.   Yes.

16              MS. BERKOWER:   If we could have Government's

17   Exhibit 82 just for the court, counsel, and the witness

18   please?

19   Q.   (By Ms. Berkower)  Do you recognize what's on

20   Government's Exhibit PX-82?

21   A.   Yes.

22   Q.   What does that show?

23   A.   It shows the destination from my house to 832

24   Converse Street.

25   Q.   And is that around where you know Genesis House to

1   be?

2   A.   Yes.

3   Q.   Does this map accurately show how you get from your

4   Nana's house to Genesis House?

5   A.   Yes.

6          MS. BERKOWER:  Your Honor, I would ask for

7   admission of Government's Exhibit 82.

8          MS. O'NEILL-GREENBERG:  No objection.

9          THE COURT:  All right.  It's allowed.

10  **(PX-82 was admitted.)**

11         MS. BERKOWER:  May we publish it?

12         THE COURT:  Yes.

13  Q.   (By Ms. Berkower)  Could you show or describe on that

14  map where your Nana's house is?

15  A.   It's at 20 Lori Lane so it's over on the right side.

16  Q.   Is that spot marked on the map?

17  A.   Yes.

18  Q.   And you said that it -- do you also see a spot for

19  832 Converse Street on that map?

20  A.   Yes.

21  Q.   Around where in the map is that if you can just

22  describe it?

23  A.   It's over in the middle next to Glenmeadow.

24  Q.   And based on what you know from visiting your Nana,

25  about how long does it take to get from your Nana's

1   house -- excuse me, from visiting your great-grandmother,

2   how long does it take to get from your Nana's house to

3   Genesis House?

4   A.   I'd say less than five minutes.

5   Q.   Is that consistent with -- your knowledge of how long

6   it takes to get there, is that consistent with what's on

7   this map?

8   A.   Yes.

9            MS. BERKOWER:  All right.  You can take that

10  down please.

11  Q.   (By Ms. Berkower)  So let's move on to a different

12  topic.

13       You said earlier that you do not currently attend

14  church, right?

15  A.   Yes.

16  Q.   Did you go to church when you were younger?

17  A.   Yes.

18  Q.   And you said earlier that you grew up in the church.

19            MS. O'NEILL-GREENBERG:  Objection, Your Honor.

20            THE COURT:  I'll let her finish the question.

21  Q.   (By Ms. Berkower)  Could you explain what that means?

22            THE COURT:  Relevance?  Sustained.

23            MS. BERKOWER:  Your Honor, may I explain?

24            THE COURT:  Sure.

25  (Sidebar conference.)

1          MS. BERKOWER:  Can you hear me?

2          THE COURT:  Yes.

3          MS. BERKOWER:  Your Honor, this witness is going

4     to be asked about photos that she saw that were shown to

5     her by the FBI concerning this pamphlet, and I'm going to

6     establish a foundation for her knowledge of what the

7     content of those photos was.

8        I think she is going to -- I expect she will say that

9     she grew up and was familiar with tracts and therefore was

10    familiar with the contents to some degree but did not

11    actually recognize the photo that the FBI showed her, but

12    she believed it to be a tract based on that prior

13    knowledge.

14         THE COURT:  So she would say she knows it was a

15    tract generally.  But she has no ability to say where it

16    came from?  If it came from that church?  How old it was?

17    Whether it was there the last time she was in the church,

18    or whether she even seen this specific tract in her house?

19         MS. BERKOWER:  That is correct, Your Honor, and

20    part of the reason for asking is the FBI initially showed

21    her and she said she didn't recognize it.  I expect the

22    defense will explore that with her.

23         THE COURT:  There's different levels of

24    recognition.  She probably does not recognize that

25    specific one but probably would recognize a general tract.

1      Defense?

2           MS. O'NEILL-GREENBERG:  So I don't think this is

3      relevant at all.  She has no -- she has never seen it

4      before.  She has no idea what it is or isn't.  I think she

5      already said she was familiar with the subject matter of

6      tracts from church so that's already been covered, and

7      this is just irrelevant and it's prejudicial and it's

8      bordering on what the court already said the government

9      wasn't allowed to get into.

10          THE COURT:  All right.  Thank you.  Objection

11     sustained.

12          MS. BERKOWER:  May I respond very briefly?

13          THE COURT:  Okay.

14          MS. BERKOWER:  I understand the court's ruling,

15     but I think that -- I expect the defense will say that

16     she's not familiar with the tracts that her grandmother

17     hands out.

18       I expect that they will argue that she didn't know

19     anything about that in order to make the implication that

20     she doesn't know if the tract may or may not have been in

21     her house.  I think it is relevant that she doesn't have

22     to read a tract to be able to spot one and know what it

23     is.

24          THE COURT:  So if this situation developed like

25     that, then you would be able to conduct a redirect

1    examination.  I think that might be appropriate depending

2    upon what defense says, but right now at this current

3    stage it's sustained.

4    (End of sidebar discussion.)

5              THE COURT:  Okay.  The objection is sustained.

6    As you know, the objection sustained means I agree with

7    the objection so that cannot come in.  So the answer

8    cannot come in and so we will move on to the next

9    question.

10   Q.   (By Ms. Berkower)  Now, Natalie, you talked earlier

11   about a day -- remembering a day when the FBI came to your

12   house?

13   A.   Yes.

14   Q.   When the FBI came to your house, did they show you

15   pictures?

16   A.   Yes.

17             MS. BERKOWER:  If we could have -- well, Your

18   Honor, I'm sorry, may we go back to sidebar just for a

19   moment?

20             THE COURT:  Uh-huh.

21   (Sidebar discussion.)

22             MS. BERKOWER:  Your Honor, I was about to move

23   to an area that I think is dissimilar enough to the

24   court's ruling that it will be permitted, but I want to

25   make sure before I did so.

1       I was going to ask her about the pictures the FBI

2   showed her when they came to the house, which is of the

3   Steps to Peace pamphlet.  That seems relevant to this case

4   and I wanted to but I didn't want to run afoul with the

5   court's ruling.

6               THE COURT:  I do think that is a little

7   different.

8         What does the defense say about that?

9               MR. WATKINS:  Sorry, I didn't hear, judge.

10              MS. O'NEILL-GREENBERG:  I can't hear.

11              THE COURT:  On the government's request to show

12  pictures that the FBI showed her when they went to the

13  house in which the pictures would be of -- are these

14  pamphlets that the FBI seized?

15              MS. BERKOWER:  Yes.  Well, the Longmeadow Police

16  Department seized, yes.

17              MS. O'NEILL-GREENBERG:  We are objecting to

18  that.

19              THE COURT:  All right.  I'll let you do that.

20  That will be allowed.

21              MS. BERKOWER:  Thank you.

22  (End of sidebar discussion.)

23              MS. BERKOWER:  All right.  Ms. McKenna, if we

24  can please have Government's Exhibit 16 in evidence?  I

25  believe it's admitted already into evidence so we can

```
 1    publish it to the jury.
 2    Q.   (By Ms. Berkower)  Now, Natalie, do you recognize
 3    this as one of the pictures the FBI showed you that day?
 4    A.   Yes.
 5    Q.   When you first saw it, did you recognize the specific
 6    item that this is?
 7    A.   No.
 8    Q.   Even though you don't recognize it, was the content
 9    familiar to you in any way?
10              MS. O'NEILL-GREENBERG:  Objection.
11              THE COURT:  Overruled.
12              THE WITNESS:  What was the question?
13    Q.   (By Ms. Berkower)  Even though you didn't recognize
14    this, was the content familiar to you in any way?
15    A.   Yes.
16    Q.   What about the content is familiar to you?
17    A.   Most of the stuff that it says on the right side like
18    the Bible verses, the sentence in the beginning that
19    explains how Jesus died on the cross and rose from the
20    grave, that's a lot of what the other tracts say.
21              MS. BERKOWER:  Now, Your Honor, I actually have
22    an exhibit that I probably should have put up there
23    before.
24         May I approach the witness?
25              THE COURT:  Yes.
```

1          MS. BERKOWER:  I have what's been admitted into

2     evidence as Government's Exhibit PX-4.  I'm going to set

3     it down close to the witness box.

4     Q.   (By Ms. Berkower)  Natalie, in connection with this

5     case, did the FBI show you Government's Exhibit 4?

6     A.   Yes.

7     Q.   When the FBI showed it to you, did you recognize it?

8     A.   No.

9     Q.   Did you look through it?

10    A.   Yes.

11    Q.   Even though you didn't recognize it, was the message

12    similar and familiar to you?

13    A.   Yes.

14         MS. O'NEILL-GREENBERG:  Objection.

15         THE COURT:  What's the objection?

16         MS. O'NEILL-GREENBERG:  She's already been asked

17    and answered this before, but the same irrelevant

18    objection as before.

19         THE COURT:  All right.  On the relevance it's

20    overruled.  I will note some of these questions if you

21    were to raise an objection regarding the leading nature of

22    the question, they might be sustained.  So you're allowed

23    to answer.  Go ahead.

24    Q.   (By Ms. Berkower)  I think the question was even

25    though you didn't recognize it, was the message familiar

1    to you?

2    A.    Yes.

3    Q.    How is it familiar to you?

4    A.    Because a lot of the contents that it explains lists

5    a lot of Bible verses and it explains how you can get

6    saved.  I believe on one of the last pages it explains a

7    prayer that you can say to let Jesus into your heart, and

8    it's a lot of what I read in the other tracts at my

9    church.

10   Q.    All right.  Let's go back now and talk a little bit

11   more about John.

12         So at the start of this year was John working?

13   A.    I believe so, yes.

14   Q.    What kind of work did he do?

15   A.    I'm not sure exactly.  I think it has to do with

16   construction or electrician work.

17   Q.    At some point this year did he lose his job?

18   A.    Yes.

19   Q.    What month was that?

20   A.    Somewhere around February.

21   Q.    How did you find out that he lost his job?

22   A.    Because before when he had a job, he would be leaving

23   every single day in his car.  But once he stopped leaving

24   and started staying home throughout the days, I eventually

25   realized that he didn't have a job.

1    Q.   After that, as far as you knew, did he find work

2    again?

3    A.   No.

4    Q.   At the end of January of this year, did you and he

5    get into an argument?

6                MS. O'NEILL-GREENBERG:  Objection.

7                THE COURT:  Yes or no.  You can answer yes or

8    no.

9                THE WITNESS:  Yes.

10               THE COURT:  All right.

11   Q.   (By Ms. Berkower)  How significant an argument was

12   it?

13               MS. O'NEILL-GREENBERG:  Objection.

14               THE COURT:  Overruled.

15               THE WITNESS:  It was very significant to the

16   point where we used to live across the hall from each

17   other upstairs and they had to move his room downstairs.

18   Q.   (By Ms. Berkower)  What started the argument?

19   A.   Because it was my birthday in January and we had

20   plans to go out to eat and he blew me off a couple of

21   times, and then there was an argument about a week later.

22   Q.   After that, were you on speaking terms with him?

23   A.   No.

24   Q.   How long did that last that you were not on speaking

25   terms with him?

1    A.   It lasted for a couple of months up until the ending

2    of March.

3    Q.   Now during that time when you were not on speaking

4    terms, did you still live in your grandparents' house with

5    him?

6    A.   Yes.

7            MS. BERKOWER:  And if we could have Government's

8    Exhibit 105 in evidence please?

9    Q.   (By Ms. Berkower)  That's the house you were all

10   living in?

11   A.   Yes.

12           MS. BERKOWER:  If you can publish it to the jury

13   please?

14   Q.   (By Ms. Berkower)  Now starting in March of 2020,

15   after the pandemic started, how often were you at home?

16   A.   I was home almost all the time except for when I had

17   to leave for work.

18   Q.   And even though you were not speaking to John for

19   several months in 2020, did you still see him at your

20   home?

21   A.   Yes, in passing.

22   Q.   Did you still hear him interact with your

23   grandparents?

24   A.   Yes.

25   Q.   And even though you were not speaking to John, were

1    you still interacting with your grandparents?

2    A.   Yes.

3    Q.   Over the course of your life, how well do you know

4    John's moods?

5              MS. O'NEILL-GREENBERG:  Objection.

6              THE COURT:  I'll sustain it, but I think you can

7    lay a foundation for asking it.  So without more

8    foundation, I'll sustain the objection.

9    Q.   (By Ms. Berkower)  Based on your living with John,

10   did you become familiar with his moods?

11   A.   Yes.

12   Q.   How well do you know his moods?

13             MS. O'NEILL-GREENBERG:  Objection.

14             THE COURT:  Overruled.

15             THE WITNESS:  I know them very well.

16   Q.   (By Ms. Berkower)  And after John lost his job, based

17   on what you heard and saw in the house, what was his mood

18   like?

19   A.   It seemed like he was very irritable.  It seemed like

20   he was starting to get depressed because he would usually

21   sit in his room most of the time, and there were a lot of

22   arguments between him and my grandma.

23   Q.   Based on what you saw, what did you know him to do

24   during the day?

25   A.   Most of the day he would sit in his bed and watch TV.

1  He would drink.

2  Q.   Do you know if he was abusing substances during that

3  time?

4  A.   I can't be 100 percent sure about that.  I had a

5  hunch but I can't confirm it.

6  Q.   Why did you have a hunch?

7  A.   Because I could tell on the way he was acting.

8  Whenever he acts very irritable and very angry and

9  defensive is usually when I can tell that he's using

10  substances.

11  Q.   Did you say he was also drinking?

12  A.   Yes.

13  Q.   How did you know he was drinking?

14  A.   Because there were empty beer cans.  There were beer

15  cans in the fridge and nobody else in our household

16  drinks.

17  Q.   Neither of your grandparents drink alcohol?

18  A.   No.

19  Q.   And you're only 18?

20  A.   Yeah.

21  Q.   So from what you could see, how did John being at

22  home and engaging in what you've just described impact his

23  relationship with your grandparents?

24         MS. O'NEILL-GREENBERG:  Objection.

25         THE COURT:  Well, again there's no -- there

1   seems to be an obvious ability to lay a foundation that

2   she was living in the same household.  Based upon her

3   living in the same household from her testimony, she would

4   have an ability to observe the interactions of everyone in

5   the household.  I'll allow the question.

6   Q.   (By Ms. Berkower)  Based on what you heard and what

7   you saw living in the household, how did what you just

8   described your dad was doing during the day impact his

9   relationship with your grandparents?

10  A.   It was a very hostile environment.  My grandmother

11  kept on asking him if he was getting a job and that would

12  usually turn into an argument.  It seemed like they were

13  very worried about him.

14  Q.   So you said that your dad got into arguments with

15  your grandmother or there were arguments between them?

16  A.   Yes.

17  Q.   How loud were those arguments?

18  A.   They were pretty loud.  I could usually hear them

19  when I was upstairs.

20  Q.   What were the arguments about?

21           MS. O'NEILL-GREENBERG:  Objection.

22           THE COURT:  Overruled.

23           THE WITNESS:  It usually varied depending on

24  what was happening that week.  Most of the time I would

25  say it was about getting a job and stuff and looking for a

1    job.  Sometimes it would be about the car.  Sometimes

2    they'd get into arguments about cigarettes.

3    Q.   (By Ms. Berkower)  Did they also get in arguments

4    over groceries?

5    A.   Yes.

6    Q.   Could you tell us about the arguments you heard them

7    get in about groceries?

8                MS. O'NEILL-GREENBERG:  Objection.

9                THE COURT:  At this point it's just redundant.

10   It's repetitive.  Sustained.  No need for that.

11   Q.   (By Ms. Berkower) What was John's tone of voice

12   during these arguments based on what you heard?

13               MS. O'NEILL-GREENBERG:  Objection.

14               THE COURT:  Overruled.  Go ahead.

15               THE WITNESS:  He was very aggressive and stuff.

16   He was never physical but he was yelling a lot.  He would

17   swear a lot.  My grandmother was usually the opposite.

18   She didn't yell or swear.

19   Q.   (By Ms. Berkower)  And I think you said a moment ago

20   you thought -- you got the impression your grandparents

21   were worried about him?

22               MS. O'NEILL-GREENBERG:  Objection.

23               THE COURT:  Sustained.

24   Q.   (By Ms. Berkower)  Based on what you saw and heard,

25   did it appear to you that your grandparents were worried?

```
 1              MS. O'NEILL-GREENBERG:  Objection.
 2              THE COURT:  Sustained.
 3    Q.   (By Ms. Berkower)  Based on you could see and hear,
 4    did you believe that the first few months of this --
 5              MS. O'NEILL-GREENBERG:  Objection, Your Honor.
 6              THE COURT:  Let her finish the question.
 7    Q.   (By Ms. Berkower)  Based on you could see and hear,
 8    did you think that the first few months of this year were
 9    a difficult time for your dad?
10    A.   Yes.
11              MS. O'NEILL-GREENBERG:  Objection.
12              THE COURT:  Overruled.  That answer will
13    remain.
14    Q.   (By Ms. Berkower)  What made you think that?
15    A.   Well, after not having a job, he was usually staying
16    his room a lot.  It seemed like he was unmotivated to get
17    a job.  And especially after we got into and argument and
18    were not on speaking terms, the entire household just was
19    kind of hostile.
20    Q.   Now I've been asking you questions generally about
21    the first few months of 2020, right?
22    A.   Yes.
23    Q.   Did the arguments between John and your grandmother
24    that you described continue up until the time around when
25    the FBI came to your house?
```

1    A.   Yes.  It was usually normal for them to argue.

2    Q.   And did the tension that you described in those first

3    few months of 2020 continue up to the time around when the

4    FBI came to your house?

5    A.   Yes.

6    Q.   Now at some point did you and John start speaking

7    again?

8    A.   Yes.

9    Q.   Around when was that?

10   A.   I'd say this was a couple of weeks prior to the FBI

11   coming, so maybe late March.

12   Q.   So before the FBI came to your house and showed you

13   the photographs you've been talking about here?

14   A.   Yes.

15   Q.   One final thing.  Do you see John in the courtroom

16   here today?

17   A.   Yes.

18   Q.   Would you point him out by something that he's

19   wearing?

20   A.   He's wearing a blue shirt.

21   Q.   Is he sitting at the table to my right?

22   A.   Yes.

23            MS. BERKOWER:  Your Honor, if the record could

24   reflect that the witness has identified this defendant?

25            THE COURT:  All right.  Ma'am, can tell me what

1    else is he wearing?

2              THE WITNESS:  He's wearing a white button up --

3    I'm sorry, a blue button up.  There's a white shirt under.

4    He's wearing a black mask.

5              THE COURT:  All right.  Thank you.

6    Identification on the record will be recognized, yes.

7              MS. BERKOWER:  No further questions for this

8    witness, Your Honor.

9              THE COURT:  All right.  Okay.  We will take

10   about 15 minutes and then we'll come back and we will

11   finish with this witness.  I am planning on taking our

12   lunch break at around 1:15, maybe 1:30 depending if

13   there's a witness on the stand, but we will see if we do

14   about a 15-minute break right now.  Okay.

15             THE CLERK:  All rise.

16             THE COURT:  No discussing the case; the same

17   instructions with each other or anyone; no internet

18   activity regarding the case.  The same instruction

19   applies.  Thank you.

20   **(A recess was taken at 11:27 until 11:45.)**

21             MS. O'NEILL-GREENBERG:  Can we address something

22   with the court?

23             THE COURT:  Go ahead.

24             MS. O'NEILL-GREENBERG:  Thank you.  We would

25   like to make a motion to strike all of the testimony that

1    was about the family conflict that was going on.  I don't

2    think it's relevant.  It's obviously highly prejudicial.

3    We move to strike all of it.  I don't see how it's

4    relevant to the government's theory of even our client's

5    state of mind.

6              THE COURT:  Do you want to be heard?

7              MS. BERKOWER:  Yes, Your Honor.  Our response

8    would be that we tailored that testimony to comply with

9    the court's ruling on the motion in limine on this issue.

10   In our view it's relevant for the reasons we litigated at

11   the time and we submit that it is appropriate and in

12   compliance with the court's order.

13             THE COURT:  It seems to be completely in

14   compliance with the court's order.  I find it's relevant.

15   I find that it's history and gives context to the

16   situation in the life and lifestyle at the time in the

17   house that is at issue here.

18        This is the house where the authorities first engaged

19   Mr. Rathbun.  He had his car parked there.  He was living

20   there, and his thought process, what's going on in his

21   life, and all those types of things that were addressed by

22   preliminary motions I think are relevant and I've

23   explained this in pretrial litigation.  So the request is

24   denied.  All right.  Thank you.

25             MR. DESROCHES:  Your Honor, would you like the

1   witness to resume the stand prior to the jury?

2          THE COURT:  That's fine.

3   **(The jury entered at 11:48.)**

4          THE COURT:  Was everyone able to follow my

5   instructions during the break not to talk to each other?

6   To anyone?  Access the internet?  Post anything?  Read

7   anything about the case?  All right.  My instructions in

8   full?

9       Affirmative answers from everyone nodding their head

10  suggests to me that, yes, they did.  The jury remains fair

11  and impartial.

12      Okay.  You can start again with the witness.  It's

13  cross-examine.

14          MS. O'NEILL-GREENBERG:  Thank you.

15          THE COURT:  All set.

16  **CROSS-EXAMINATION**

17  Q.   Good afternoon.

18  A.   Good afternoon.

19  Q.   I want to ask you a bit about the specific tract the

20  government talked to you about that the FBI agent showed

21  you, the Steps the Peace With God tract.

22  A.   Okay.

23  Q.   When you looked at that pamphlet, tract, you didn't

24  recognize -- you never seen that specific tract before,

25  right?

```
 1    A.    Yes.
 2    Q.    You've never seen it before, correct?
 3    A.    No.
 4    Q.    Okay.  Now, in those early months of 2020 you had
 5    your fight about your birthday with your dad in the end of
 6    January; is that right?
 7    A.    Yes.
 8    Q.    Okay.  And after that you really stopped talking to
 9    him?
10    A.    Yes.
11    Q.    And you didn't really talk to him for the next three
12    to four months; is that right?
13    A.    Yes.
14    Q.    And you had started to only interact with him a
15    little bit right at the end of March?
16    A.    Yes.
17    Q.    That was you guys played volleyball outside in your
18    backyard a couple of times?
19    A.    Yes.
20    Q.    You both played with your dog together outside a
21    couple of times?
22    A.    Yes.
23    Q.    He was trying to sort of maybe try to get you to be a
24    little more friendly?
25    A.    Yes.
```

1    Q.   You still sort of weren't ready?

2    A.   Yes.

3    Q.   Okay.  That was really the only interactions you had

4    in those three to four months?

5    A.   Well, when I would go to the kitchen, he would try to

6    talk to me a lot but usually I would ignore it.

7    Q.   And that was it?

8    A.   Okay.

9    Q.   After that fight he moved downstairs, right?

10   A.   Yes.

11   Q.   So your bedroom was still on the second floor?

12   A.   Yes.

13   Q.   So that was easier for you to just sort of avoid him

14   during the day, right?

15   A.   Yes.

16   Q.   Okay.  And that spring or just recently you were

17   still a high school senior?

18   A.   Yes.

19   Q.   So you graduated in May?

20   A.   Yes.

21   Q.   So in that January, February, March, April you were

22   finishing up your senior year; is that right?

23   A.   Yes.

24   Q.   Okay.  And so you were busy finishing up all your

25   school work?

1   A.   Not too busy.  Senior year, so I didn't really have a
2   lot of work or Zoom classes to go to.
3   Q.   Were you applying to college?
4   A.   No.
5   Q.   Were you doing senior events?
6   A.   No.
7   Q.   You didn't do any senior events?
8   A.   No.  They were all canceled because of COVID.
9   Q.   Okay.  So you were doing your school online because
10  of COVID, right?
11  A.   Yes.
12  Q.   Did that start in March?
13  A.   I'm sorry, what?
14  Q.   Did that start in March?
15  A.   Yes.
16  Q.   And so you would have a full school day in March but
17  it was all online?
18  A.   Yes.
19  Q.   Okay.  And you had a school room where you did your
20  school work online, right?
21  A.   No, I would do my school work in my bedroom.
22  Q.   Okay.  But did you also use that other bedroom
23  upstairs to do your school?
24  A.   I didn't start using that until this September.
25  Q.   Okay.  So you would stay in your bedroom all day to

```
1    be online at school?
2    A.   Yes.
3    Q.   And to do your homework?
4    A.   Yes.
5    Q.   Okay.  And you did that every day Monday through
6    Friday?
7    A.   Yes.
8    Q.   Okay.  From nine to 3:30?
9    A.   Yes.
10   Q.   Okay.  And you were also working at the time; is that
11   right?
12   A.   Yes.
13   Q.   And would you go out to work at the restaurant that
14   spring?
15   A.   Yes.
16   Q.   And did you work -- you had a few shifts during the
17   week?
18   A.   Yes.
19   Q.   Was it Tuesday, Wednesday, and Thursdays?
20   A.   I don't remember what specific days they were.  They
21   were usually sporadic.
22   Q.   Was it few shifts a week?
23   A.   Yes.
24   Q.   Would you also sometimes pick up shifts of other
25   co-workers that would give you their shifts?
```

```
 1    A.    Occasionally.

 2    Q.    Okay.  And sometimes those shifts were at night?

 3    A.    Yes.

 4    Q.    Sometimes they were during the day?

 5    A.    No, they were usually at night.

 6    Q.    Okay.  And you talked about in March and April

 7    hearing your grandmother Sheila and your dad quarreling,

 8    right?

 9    A.    Yes.

10    Q.    She would -- she, Sheila, would quarrel with him

11    about using her car, right?

12    A.    Yes.

13    Q.    About she wanted him to get a job?

14    A.    Yes.

15    Q.    They quarreled about her buying him certain kinds of

16    foods?

17    A.    Yes.

18    Q.    And her buying him cigarettes?

19    A.    Yes.

20    Q.    Okay.  Now, you've always lived in your grandparents'

21    house, right?

22    A.    Yes.

23    Q.    Okay.  You've also lived with your dad for a lot of

24    the time, correct?

25    A.    Yes.
```

1  Q.   Okay.  And you're aware your dad struggles with a
2  drug addiction?
3  A.   Yes.
4  Q.   But your family kind of tried to shield you away from
5  the details of it, right?
6  A.   Yes.
7  Q.   But you know he's had the problem for a while,
8  correct?
9  A.   Yes.
10 Q.   Okay.  And it's sort of hard for you to tell when he
11 is or isn't using drugs, right?
12 A.   I mean, it's not -- I'd say it's kind of obvious
13 usually when he's using drugs.
14 Q.   So over the years you've seen him be cranky, right?
15 A.   Yes.
16 Q.   And irritated?
17 A.   Yes.
18 Q.   Be moody?
19 A.   Yes.
20 Q.   Sleep a lot sometimes?
21 A.   Yes.
22 Q.   Stay in his room a lot sometimes?
23 A.   Yes.
24 Q.   Go through periods where he just wasn't going out to
25 work?

1    A.    Yes.

2    Q.    Kind of just kind of lazy?

3    A.    Yes.

4    Q.    Not really doing anything with himself?

5    A.    Yes.

6    Q.    And obviously quarreling with your grandmother?

7    A.    Yes.

8    Q.    And quarreling with you?

9    A.    Yes.

10   Q.    And this was the cycle of behavior you were pretty

11   familiar with, right?

12   A.    Yes.

13   Q.    Because he had gone through it many times before?

14   A.    Yes.

15   Q.    Over many years?

16   A.    Yes.

17   Q.    And it's frustrating to live with someone like that,

18   right?

19   A.    Yes.

20   Q.    Especially when they keep doing the same thing over

21   and over again?

22   A.    Yes.

23   Q.    Like your dad has done, right?

24   A.    Yes.

25   Q.    And I think you said that it was pretty normal in

1   March for your Nana and your dad to be arguing?

2   A.   Yes.

3   Q.   Now your dad, he hasn't gone to church in years,

4   right?

5   A.   Yes, a couple years.

6   Q.   So it's been a couple of years since he's gone to

7   church, correct?

8   A.   Yes.

9   Q.   And you've never heard him make any racist comments,

10  right?

11  A.   No.

12  Q.   He's never said anything anti-semitic?

13  A.   No.

14  Q.   He's never behaved in a way that was racist or

15  anti-semitic?

16  A.   No.

17          MS. O'NEILL-GREENBERG:  Thank you.  No further

18  questions.

19          THE COURT:  Follow up?

20          MS. BERKOWER:  Yes, Your Honor, just a few

21  things.

22  **REDIRECT EXAMINATION**

23  Q.   (By Ms. Berkower)  Natalie, Ms. O'Neill-Greenberg

24  just asked you just now how your dad moved his room

25  downstairs after your fight --

1  A.   Yes.

2  Q.   -- over your birthday?

3  A.   Uh-huh.

4  Q.   Who required him -- who moved -- who told him to

5  move?

6  A.   I believe it was a joint decision between my

7  grandparents.

8  Q.   Your grandparents decided to move your dad's room

9  downstairs?

10  A.   Yes, because after we had gotten into an argument, I

11  called my grandmother and explained what happened and

12  explained that I couldn't be near him anymore.

13          MS. BERKOWER:  Your Honor, may we speak at

14  sidebar for a moment please?

15          THE COURT:  Yes.

16  (Sidebar conference.)

17          MS. BERKOWER:  Your Honor, I think that on

18  cross-examination they brought up this argument and made

19  some implications about the nature of the fight.  There's

20  really more to it.  I have not gotten into it on direct

21  examination because it seemed like areas the court wanted

22  us to stay away from, but she was asked about it on cross

23  so we should be able to redirect.

24      I can proffer to the court that this was not just

25  some teenage spat about after he blew her off several

1    times on her birthday.  She came home and saw her

2    grandmother shoveling snow by herself in the dark.  She

3    went to her father's room and asked him to get up and go

4    help his grandmother, and they got into a big fight over

5    it.  That's what led to them moving rooms.

6         I think to the extent this jury could be wondering if

7    this is just teenage nonsense, we have a right to come

8    back and explain the substance of the fight.

9              THE COURT:  Defense?

10             MS. O'NEILL-GREENBERG:  I think on cross I

11    simply asked her what she had said before which is that

12    she got in a fight with her dad about her birthday.

13    That's it.  I didn't go into details anymore so I don't

14    think the door has been opened more, and I think all of

15    this is really irrelevant to why we are here and

16    prejudicial, overly prejudicial.

17             MS. BERKOWER:  We'd suggest it goes to the

18    credibility of this witness.

19             THE COURT:  Okay.  I'm not going to allow you to

20    go there.  I don't think that door --

21             MS. BERKOWER:  I'm sorry, I can't hear.

22             THE COURT:  I'm sorry.  I am not going to allow

23    any further inquiry.  I do not believe the door was

24    opened, Nor do I think there's really any relevance to

25    talk about more sources of problems in this family.  It's

already been explained the problems the family was having

between daughter and father and grandmother and Mr.

Rathbun.

It's already been explained and so it would be

excessive and cumulative at this point to go any further.

I think the government asked permission because of where

we are so permission is not granted to ask that question,

but I do appreciate you bringing it to the court's

attention first to preview.  Thank you.

MS. BERKOWER:  Your Honor, there's one other

area that I would raise since we are all here.

We had not asked about the defendant's cycle of

substance use and getting clean.  In our view that was

outside the purview of Your Honor's order but it was

something the witness was asked about.

I think if we asked this witness how she would know

how her father in the past had gotten cleaned, she would

say that he went to a rescue mission and that was

religions oriented.  And when he came back, he had found

God and listening to Christian music.  He had sort of been

able to get back on the right path through that

experience.  In our view they asked questions of the

witness about how he had fallen in and out of addiction

and got clean.

They also implied he is not -- also they asked he

1    didn't go to church.  He's not religious and in our view

2    that door was opened by the cross-examination.

3              THE COURT:  Defense?

4              MS. O'NEILL-GREENBERG:  Thank you.  All I asked

5    was that he had not gone to church in a couple of years.

6    I didn't ask how he felt about religion or how religious

7    he was or what his thoughts were on that so I don't think

8    the door was opened at all on that.

9         I think it's completely irrelevant his periods of

10   sobriety and how he got sober.  She said in her direct

11   that he had a problem with drugs and drinking so I touched

12   on that with her and moved on.  The details of his falling

13   off the wagon, being on the wagon is irrelevant and highly

14   prejudicial.

15             MS. BERKOWER:  Also implied he is not religious

16   in anyway and in our view that shows that he actually is

17   when he's not using.  And in our view considering their

18   opening statement saying he's not religious, he doesn't

19   practice religion, then today asking this witness on cross

20   about how he is not a member of a church, doesn't go to

21   church, is not religious, doesn't have opinions about

22   other religions, we view that as relevant.

23             THE COURT:  So your offer of proof is that you

24   would have testimony to show that he did engage in

25   church-faith related efforts in his rehabilitation?

```
 1                MS. BERKOWER:  Yes, Your Honor.
 2                THE COURT:  All right.  I'll let you go there.
 3                MS. BERKOWER:  Thank you.
 4      (End of sidebar discussion.)
 5      Q.   (By Ms. Berkower)  Natalie, now on cross-examination
 6      Ms. O'Neill-Greenberg asked you about times when your dad
 7      -- about your dad's long-time struggles with substance
 8      abuse; do you remember being asked about that?
 9      A.   Yes.
10      Q.   And she asked if he had had periods where he had been
11      sober, right?
12      A.   Yes.
13      Q.   And also periods where he was not?
14      A.   Yes.
15      Q.   Do you know him to have engaged in treatment in order
16      to get sober or gone to a facility in order to get sober a
17      few years ago?
18      A.   I believe when I was younger we used to go to a
19      facility in the morning, but I'm not sure what it was for.
20      Q.   Do you know him to also have gone away to live at a
21      facility that helped him become sober a few years ago?
22      A.   Yes.
23      Q.   What facility was that?
24      A.   It was called the Springfield Rescue Mission in
25      Springfield.
```

1   Q.   And what was your understanding of what he was doing

2   there?

3   A.   I believe he stayed there full time.  I believe it

4   was a Christian facility.  There was a bunch of other guys

5   there too.  It was just to help I guess get them on the

6   right track.

7   Q.   When he came back, was he sober as far as you knew?

8   A.   Yes.  As far as I know, yes.

9   Q.   When he came back, was he more religious?

10  A.   Yes.

11  Q.   Could you explain what you mean by that?

12  A.   We started going to church more frequently.  We

13  started listening to the Christian station on the radio.

14  He was reading his Bible a lot.

15  Q.   When he went to church, what church was he attending

16  as far as you knew?

17  A.   Heritage Baptist.

18  Q.   Now on cross-examination --

19       THE COURT:  Can I just the witness when in a

20  time frame did that happen?  You said when he came back,

21  you started going to church and you explained what was

22  going on.  In a time frame, using the date that the FBI

23  came to your house, like when did that happen using that

24  as your time reference?

25       THE WITNESS:  I'd say maybe about five to seven

```
 1    years prior.

 2              THE COURT:  Oh, that far back?

 3              THE WITNESS:  Yes.  It was when I was younger.

 4              THE COURT:  All right.

 5         Sidebar.

 6    (Sidebar conference.)

 7              MS. BERKOWER:  Your Honor, it's my understanding

 8    that happened in about 2017 and that was my understanding

 9    of what this witness would have said.  I understand that

10    now she has now said it was further back in time.

11              THE COURT:  Okay.  I certainly take you at your

12    word, but her answer was that it was five years.

13              MS. BERKOWER:  I don't hear the court, I'm

14    sorry.

15              THE COURT:  Her answer was that it was five

16    years ago.  I do accept you at your word absolutely that

17    you thought her answer was going to be different, but she

18    just testified it was five years or more.  I don't know

19    exactly what her answer was, but that's too far.  That is

20    not related at all and so I'm prepared to strike the

21    testimony.

22              MS. O'NEILL-GREENBERG:  We would move to strike

23    it, Your Honor.

24              MS. BERKOWER:  Your Honor, would it be possible

25    just to ask the witness a few more questions?  I know when
```

1    we meet with her with regard to time, sometimes she

2    remembers things better by what year in school she was.  I

3    don't know if that might help clarify her memory on that

4    point.  And if the court is unsatisfied that it's still

5    relevant given the answer to that, I would not object to

6    striking the testimony.

7            THE COURT:  This witness is a very smart, young

8    lady and I asked her to use the time reference to the time

9    the FBI was there.  So I think if we go any further on

10   this, it becomes more prejudicial than it is and becomes

11   more difficult to deal with after I strike it, so no.

12   It's stricken.

13   (End of sidebar discussion.)

14           THE COURT:  Okay.  Ladies and gentlemen, the

15   testimony that you just heard regarding this witness

16   saying that the defendant went to a place called the

17   Springfield Rescue Mission and that when he came home he

18   started to read the Bible and they started to go to church

19   together, that what happened about five years before the

20   date that the FBI showed up at the house, all of that, all

21   of it is stricken.  It's erased.  Cross it out in your

22   notebooks; cross it out of your memory.  There's no

23   bearing on this case as if it was never said.  All right.

24   It's stricken from the record.

25           Everyone understand?  All right.  Everyone is nodding

```
 1   their head that they understand.  Okay.  Perfect.  Thank
 2   you.  Very good.
 3              MS. BERKOWER:  Your Honor, may I continue?
 4              THE COURT:  Absolutely.
 5   Q.   (By Ms. Berkower)  Now, on cross-examination Ms.
 6   O'Neill-Greenberg asked you questions about how busy you
 7   were with school this year in the spring; do you remember
 8   being asked about that?
 9   A.   Yes.
10   Q.   And also how busy with work you were?
11   A.   Yes.
12   Q.   On direct examination though you described hearing
13   arguments between John and your grandma, right?
14   A.   Yes.
15   Q.   Fair to say you only heard those arguments at the
16   times you were home?
17              MS. O'NEILL-GREENBERG:  Objection.
18              THE COURT:  Overruled.
19              THE WITNESS:  Yes.
20   Q.   (By Ms. Berkower)  And so whether or not there were
21   additional fights on top of that when you were away from
22   home, that's not something you would know?
23              MS. O'NEILL-GREENBERG:  Objection.
24              THE WITNESS:  Yes.
25              THE COURT:  Sustained.  The question is
```

1    stricken.

2    Q.   (By Ms. Berkower)  During the time that you were

3    home, were you able -- the fights that you described

4    earlier, how well could you hear them?

5    A.   I could hear them pretty well because the way that my

6    house is set up, the only door blocking the sound from the

7    living room and the kitchen to my room is my own door.  So

8    if I just left it open, I could hear the conversation very

9    well.

10   Q.   Now, you were asked on cross-examination about some

11   of the fights that your Nana and your dad got into.  Do

12   you remember being asked about that?

13   A.   (Indicating.)

14   Q.   I think that Ms. O'Neill-Greenberg specifically

15   mentioned that you heard them get into a fight about

16   cigarettes?

17   A.   Yes.

18   Q.   What's the fight you remember them getting into about

19   cigarettes?

20   A.   Usually my grandma would get John cigarettes and

21   sometimes she would forget or she would not have time to

22   get them and it would cause an argument.

23   Q.   When you said that they would fight, I think she

24   mentioned that they would get into fights about groceries.

25   Do you remember being asked about that on

1    cross-examination?

2    A.    Yes.

3    Q.    What were those fights about specifically?

4    A.    It was just about small groceries that my grandma

5    didn't get.  Usually John would get upset about it if she

6    didn't get everything that he asked for.

7    Q.    And you mentioned that -- on cross-examination you

8    were asked if your Nana and John would get in fights about

9    his work; do you remember being asked about that?

10   A.    Yes.

11   Q.    Describe more specifically what those fights were,

12   how they went?

13   A.    Usually it would start with my grandma asking John if

14   he started working on getting a job or started researching

15   any job openings and usually he would brush it off and say

16   that he was working on it, but it would usually eventually

17   grow into an argument because I guess my grandma wanted

18   more than he was just working on it.  And it would

19   eventually just turn into an argument because he got very

20   defensive whenever she would ask if he was getting a job.

21   Q.    Did those fights gets loud?

22              THE COURT:  This has been asked and answered.

23   We are going to have move on.

24   Q.    (By Ms. Berkower)  Now, on cross-examination Ms.

25   O'Neill-Greenberg asked you about the Steps to Peace With

1    God pamphlet.  Do you remember being asked about that?

2    A.   Yes.

3    Q.   And she asked -- and you said you had never seen it

4    before the FBI showed it to you, right?

5    A.   Yes.

6    Q.   In 2020 how often did you see something similar

7    around the house?

8              MS. O'NEILL-GREENBERG:  Objection, Your Honor.

9              THE COURT:  Overruled.  You can answer that.

10             THE WITNESS:  What was the question again?

11   Q.   (By Ms. Berkower)  So you had never seen the Steps to

12   Peace With God pamphlet before, right?

13   A.   Yes.

14   Q.   In 2020 how often did you see something like that

15   around the house?

16   A.   I wouldn't really see it very often just because I

17   wouldn't go out of my way looking for it because I haven't

18   been to church in awhile and I wouldn't just walk around

19   the house searching for tracts.

20   Q.   But did you have knowledge of whether there were

21   tracts in the house?

22             MS. O'NEILL-GREENBERG:  Objection.

23             THE COURT:  Sustained.

24   Q.   (By Ms. Berkower)  How often did you -- you described

25   earlier that you had seen your Nana hand out tracts,

1   right?

2   A.   Yes.

3   Q.   Had you seen your Nana hand out tracts like the Steps

4   to Peace With God pamphlet in 2020?

5             MS. O'NEILL-GREENBERG:  Objection.

6             THE COURT:  Overruled.

7             THE WITNESS:  Yes, because most of the tracts,

8   especially the ones from my church, are fairly similar.

9   They usually have the same message.  So, yes, I believe

10  that she would hand out tracts similar to that one.

11            MS. BERKOWER:  No further questions, Your Honor.

12  Thank you.

13            THE COURT:  Thank you.

14            MS. O'NEILL-GREENBERG:  No further questions,

15  Your Honor.

16            THE COURT:  Okay.  Thank you very much, ma'am.

17            MR. DESROCHES:  Your Honor, may we have one

18  moment?

19            THE COURT:  Of course.  You want the noise on?

20            MR. DESROCHES:  Yes, please.

21  (Short pause in the proceeding.)

22            MR. DESROCHES:  Thank you, Your Honor.  The

23  government calls Alana Darby.

24            THE COURT:  Ma'am, can you stand?  We are going

25  to swear you in.

1              THE CLERK:  Please raise your right hand.

2    **Alana Darby (Sworn)**

3    **DIRECT EXAMINATION**

4    Q.   (By Mr. Desroches)  Good afternoon.

5    A.   Good afternoon.

6    Q.   Could I ask you to remove your mask?  The Plexiglas

7    will serve the purpose of the mask.

8         Could you please introduce yourself for the jury and

9    for the record spell your last name?

10   A.   My name is Alana Darby, D-a-r-b-y.

11   Q.   Are you employed?

12   A.   Yes.

13   Q.   How are you employed?

14   A.   I am a Forensic Scientist II at the DNA unit at the

15   Mass. State Police Crime Lab.

16   Q.   Can you please describe what a Forensic Scientist II

17   is?

18   A.   So I'm a Forensic Scientist II which I became after I

19   completed my training and I was originally a Forensic

20   Scientist I.

21   Q.   And for how long have you been a Forensic Scientist

22   II?

23   A.   For a two, about ten and a half years.

24   Q.   How long have you been employed by the Mass. State

25   Police Crime Lab?

```
 1    A.    Around eleven and a half.

 2    Q.    Prior to being hired by the State Police Crime Lab,

 3    did you go to college?

 4    A.    Yes.

 5    Q.    Where did you go to college?

 6    A.    Merrimack College.

 7    Q.    Did you obtain a degree from that college?

 8    A.    Yes.

 9    Q.    What was that degree?

10    A.    I have a bachelor's of science in chemistry with a

11    concentration in forensic science and a minor in

12    criminology.

13    Q.    So you've indicated that you became a Forensic

14    Scientist II at some point after you graduated; is that

15    right?

16    A.    Yes.

17    Q.    Did you -- between the time you became a Forensic

18    Scientist II and the time you graduated, did you undergo

19    any training associated with being a Forensic Scientist I?

20    A.    Yes.

21    Q.    And what is that training?

22    A.    So after I was originally hired as a Forensic

23    Scientist I, I attended a 17-week training academy at the

24    Northeast Regional Forensic Institute where I was trained

25    in population, genetics, and statistics, and also DNA
```

1    typing methods.  Then I also obtained more training at the
2    lab that I now currently work at using our own specific
3    protocols and procedures.
4    Q.   Now can you describe generally what the trainings
5    that you have received at the lab are?
6    A.   Yes.  So we are trained in basically each one of the
7    procedures that we're going to be using.  I was -- I
8    believe I tested approximately 52 samples during that
9    time, and I used the protocols and procedures that I would
10   be using in casework on practice samples.
11   Q.   Now some of these protocols and procedures that
12   you've just described, what is the purpose of these
13   protocols and procedures?
14   A.   So they have been validated by our lab so we know
15   that they work and we can make sure that we're all
16   following the same protocols and procedures in the lab and
17   making sure that we're all doing the tests basically the
18   same as we've been trained.
19   Q.   So after becoming a Forensic Scientist II, have you
20   continued with these ongoing trainings?
21   A.   Yes.
22   Q.   Have you attended any other additional specialized
23   trainings?
24   A.   Yes.
25   Q.   What are those trainings?

```
1    A.   So we are at minimum required an eight-hour training

2    every year by the FBI, but I have also done some 40-hour

3    trainings, some like national meetings that we go to where

4    we can meet with other labs and talk over different

5    trainings and see how other labs are handling things.  And

6    also we have trainings that come to our lab and work on --

7    they train us on things in house that we use.

8    Q.   So presently what is the nature of your work?

9    A.   Our unit receives forensic evidence samples and does

10   the necessary forensic DNA testing typing methods to

11   obtain a DNA profile.  We then compare the DNA profile

12   obtained from any evidence samples to any known samples in

13   a case, and then we would write a report outlining our

14   findings and then sometimes testify in court.

15   Q.   Are you familiar with a term called a competency

16   test?

17   A.   Yes.

18   Q.   What is a competency test?

19   A.   So a competency test is given to an analyst at the

20   end of their training.  It's a hands-on test that

21   basically makes sure that I can follow the proper

22   protocols and procedures that I've been trained on and

23   obtain the correct answer at the end.

24   Q.   Have you taken any competency tests?

25   A.   Yes.
```

1    Q.   How many have you taken?

2    A.   I don't know off the top of my head how many

3    competency tests I taken, but I took one at the end of my

4    specific training that encompassed all of the protocols

5    and procedures that I was using.

6    Q.   And did you pass that test?

7    A.   Yes.

8    Q.   Are you familiar with proficiency tests?

9    A.   Yes.

10   Q.   What are proficiency tests?

11   A.   So proficiency tests are given to an analyst

12   approximately every six months after that initial

13   competency test.  It's very similar.  It's a hands-on test

14   with lab work, and the goal is to again arrive at the

15   correct results and those results are actually sent to an

16   outside agency that does the grading of the test.

17   Q.   And have you taken any of those types of tests?

18   A.   Yes.

19   Q.   How many?

20   A.   Approximately 20.

21   Q.   What were the results of those tests?

22   A.   I have passed all of my DNA proficiency tests thus

23   far.

24   Q.   So approximately how many samples have you performed

25   DNA analysis methods on at your lab?

1    A.    It's approximately a thousand at this point I think.

2    Q.    Have you testified in the past about DNA?

3    A.    Yes.

4    Q.    Approximately how many times?

5    A.    Around probably 40 to 45 times.

6    Q.    Now based on your training and experience in

7    analyzing DNA, can you describe what DNA actually is?

8    A.    DNA stands for deoxyribonucleic acid and it's the

9    fundamental building blocks of all living organisms.  You

10   get half of your DNA from your mother and half of your DNA

11   from your father, and it is unique between individuals

12   with the exception of identical twins.

13   Q.    Now is the DNA the same in every cell of a person's

14   body?

15   A.    Yes.

16   Q.    Can you explain generally the process that you use to

17   analyze DNA at the lab?

18   A.    Yes.  So it is a four-step process using instruments

19   and chemicals.  We start with the sample and then at the

20   end we have a DNA profile that we obtain from that item.

21   Q.    Can you describe how a sample that you just described

22   is received and then processed by the lab?

23   A.    Yes.  So originally it will be brought to the lab

24   either by an investigating agency or collected at a crime

25   scene from our crime scene unit, and then typically it

1    goes through what is called our criminalistics unit.  They

2    would do any necessary biological screening tests and make

3    a report outlining their findings.

4        They also take samples of a bigger sample.  So, for

5    instance, if a pair of pants was submitted to the lab, the

6    criminalistics unit would look at the entire pair of pants

7    but the DNA unit would get just a small cutting from that

8    pair of pants.

9    Q.   So are there any documents created in this process?

10   A.   Yes.

11   Q.   What type of documents are created during that

12   process?

13   A.   So during our process we basically document every

14   single step of the process.  From when we obtain the item

15   from storage, we document what it looks like, any seals or

16   identifying labels that are on the evidence, and then with

17   each step of the process we also generate a worksheet that

18   corresponds to that process.

19   Q.   So now as a Forensic Scientist II, do you review the

20   documents that are created during this process at any

21   point?

22   A.   Yes.

23   Q.   Can you describe how it would come to you reviewing

24   those documents?

25   A.   So it first starts I would review any documents that

1    were originally produced in the criminalistics unit just

2    to see if there were any biological fluids that were

3    identified on the item that we would be testing.

4         At that point I would then also review the item that

5    had been selected for testing and determine what testing

6    we should do from there.

7    Q.   Are you also looking for any sort of irregularities

8    in the process as you're reviewing those documents?

9    A.   Yes.

10   Q.   And would they be evident in those documents that you

11   are reviewing?

12   A.   Yes.  If I was able to notice anything that stood out

13   to me at that point, I would bring it forward.

14   Q.   So you indicated that the DNA unit will receive a

15   snippet from the criminalistics unit?

16   A.   Yes.

17   Q.   What happened after that snippet is received from the

18   criminalistics units?

19   A.   So the criminalistics unit would put that item into

20   storage when they are done with it and when we are ready

21   to begin our processing, we would obtain it from that same

22   location and then we would start our four-step process.

23   Q.   So where would it be stored?

24   A.   Typically it is stored in our cold storage unit which

25   is basically like a big walk-in freezer/fridge sort of

1   like you may have seen on TV like for restaurants and

2   stuff.

3   Q.   Are there any precautions to ensure that the items

4   inside of that unit are not tampered with?

5   A.   Yes.   There are locked doors that we access with key

6   fobs.   One is on the outside of the storage itself and

7   then in the hallway to get to the storage, as well as the

8   items are in what we call heat-sealed packs which are

9   basically just sealed pieces of plastic and the items are

10  within that.   And they are labeled when they are sealed

11  and have identifying information on them as well.

12  Q.   So when an item is retrieved from the locker, is

13  there any sort of documentation that's created to document

14  that it was removed?

15  A.   Yes.   We would scan it in our LIMS System which is

16  our Laboratory Information Management System.   We would

17  scan it into our custody and that is an electronic chain

18  of custody of the item.

19  Q.   After the item is removed, what's the next step in

20  the process?

21  A.   So after we take the item out of the storage, we

22  document what it looks like on our sample prep worksheet

23  and then we would start the extraction process.

24  Q.   Can you describe what the extraction process is?

25  A.   Yeah, so that is the first step of the four steps.

1    We use heat and chemicals that we apply to the sample to

2    open up any DNA cells that are inside the sample and that

3    way we can access the DNA.

4    Q.   Why is that step necessary?

5    A.   In order to really obtain a good quality DNA sample,

6    you have to be able to open the cells that the DNA is

7    inside of.

8    Q.   Who typically performs this step in the process?

9    A.   It would be an analyst within our lab.

10   Q.   Is that consistent with the procedures and protocols

11   that you described earlier?

12   A.   Yes.

13   Q.   What is the next step in the process?

14   A.   The second step is called quantitation.  We use an

15   industry to approximately determine how much DNA is in

16   each sample that we are processing.

17   Q.   Why is that necessary?

18   A.   For the final step, our third and fourth steps, it's

19   important to know how much DNA we have.  There is a

20   certain point where we know we will not obtain a DNA

21   profile, a reliable DNA profile from having too little

22   DNA, and in that case we would halt testing on a sample.

23       It's also important because to get an ideal DNA

24   profile, there's an ideal amount of DNA that we have to

25   put into our system.

1    Q.   Who typically performs this step?

2    A.   That would also be a DNA lab analyst.

3    Q.   Again, is that consistent with the procedures and

4    policies in place at the laboratory?

5    A.   Yes.

6    Q.   What is the next step in the process?

7    A.   The third step is called amplification.  We are

8    looking at very specific sections on the DNA that vary

9    between individuals and to really get a good look at that,

10   we need to make millions of copies of those specific

11   regions on the DNA over and over again.

12   Q.   So why is that necessary?

13   A.   So if we didn't make all of those copies, our DNA

14   profile wouldn't give us as much information as it does.

15   Q.   So you indicated previously in the extraction phase

16   there was something removed.  Is there any sort of

17   byproduct to this that is separated?

18   A.   So for the quantitation step, we take a small sample

19   of that original sample that we make an extraction.  So

20   just that small sample goes forward for the quantitation

21   step and the original sample stays in the cold storage

22   locker that I described earlier.

23        And then for the third step, the amplification step,

24   we also take another portion of the sample at that point

25   and combine it with other chemicals to then become a final

1    product that gets run in the four step.

2    Q.   Why would you do that?

3    A.   For the second step we do it to minimize any possible

4    negative impact on the sample, any possible contamination.

5    The less that you are fiddling with the original sample,

6    the better for the integrity of it.  And then for the

7    second sample, for the third step, we only need to input

8    that certain amount of DNA like I said.  So for that step,

9    we only take the amount that we need for that step.

10   Q.   You said there was a fourth step in this process; is

11   that right?

12   A.   Yes.

13   Q.   What is that step?

14   A.   That step is called detection.  We use an instrument

15   that separates the DNA samples based on size so the

16   smaller fragments would travel through the instrument more

17   quickly and the larger fragments more slowly.  Each DNA

18   sample gets identifying numbers based on these sizes and

19   that is what makes up a DNA profile.

20   Q.   What do the results of this step look like?

21   A.   So when it comes off the instrument, it sort of looks

22   like an EKG or a graph with peaks going across it

23   horizontally.

24   Q.   So who conducts this step in the process?

25   A.   The fourth step itself is conducted by another DNA

1    lab analyst.

2    Q.   Like yourself or is there another position that would

3    do that?

4    A.   I am competent in doing it, but typically right now

5    it would be a lab analyst, another individual.

6    Q.   And again is that consistent with your procedures and

7    protocols in place at the laboratory?

8    A.   Yes.

9    Q.   What is the purpose of having these other analysts

10   conduct those portions of the test?

11   A.   So I have been working there for eleven and a half

12   years as I said and we have what are called interpreting

13   analysts and lab analysts.  We recently got a lot of new

14   people in our laboratory so they have been trained on the

15   lab aspect of our job and are still undergoing the

16   interpretation aspect, so the interpretation of a DNA

17   profile at the end.

18        Since I can do that and they can't do at this point,

19   I do all of the interpreting.  So I interpret the DNA

20   results, write a report, and then sometimes testify in

21   court, and for now they are doing the lab heavy portion.

22   Q.   What type of training do they receive?

23   A.   So they have received the same training in the

24   laboratory with our protocols and procedures that I did.

25   It's just the final end step of the interpretation that

1    they haven't had yet.

2    Q.   So after these four steps are complete, what happens

3    next in the analysis of the DNA?

4    A.   So after we obtain the DNA profile, that is where I

5    would start my DNA interpretation on that profile and then

6    write a report and outline any findings.

7    Q.   Can you describe what you mean by -- what do you do

8    when you write the report and outline your findings?  What

9    are you looking at?

10   A.   So I'm comparing any unknown evidence samples to any

11   known samples that I have in a case.

12   Q.   Once you complete your step in this process, what

13   happens with the results?

14   A.   So after I finish writing my report, it goes into

15   review and it is a two-step review process.  There is a

16   technical review which is done to ensure scientific

17   accuracy and that I followed the proper protocols and

18   procedures, and then there's an administrative review

19   which is mostly for spelling and grammatical type errors.

20   Q.   Who conducts the technical review?

21   A.   Another interpreting DNA analyst in the lab.

22   Q.   Is that consistent with the protocols and procedures

23   in place at the laboratory?

24   A.   Yes.

25   Q.   Are there any controls -- other types of controls in

1  place to ensure the results of your analysis is accurate?

2  A.   Yes.

3  Q.   What are those?

4  A.   So we have two types of controls; one called a

5  positive control and one is called a negative control.

6  They are both run alongside every batch of samples that we

7  do.

8       A positive control has a known DNA profile in it.  So

9  we start it with the samples and at the end I can see

10  whether or not I got the DNA profile that I am expected to

11  get from my test.  And then a negative control has no DNA

12  in it.  So we want that to have no DNA profile at the end,

13  and that is to look for contamination.

14  Q.   Now is the Massachusetts State Police Crime

15  Laboratory accredited?

16  A.   Yes.

17  Q.   What does that mean?

18  A.   So we are accredited by outside agencies.  That is

19  very common in the forensic community to make sure that we

20  are up to the proper standards that are accepted in the

21  forensic community.

22  Q.   Now drawing your attention to this case, did the DNA

23  laboratory receive any requests related to this matter?

24  A.   Yes.

25  Q.   And what was the first request that was received by

1    the laboratory?

2    A.   To do DNA testing on two samples.

3    Q.   What were those samples?

4    A.   One was item number 1-2.1.1, which is the sample from

5    Stain Two on a pamphlet from Converse Street, and then the

6    other 1-4.1.1 which was a sample from Stain One on the

7    handle of a dieseal can found on Converse Street.

8    Q.   Now based on your training and experience if an item

9    such as blood or material such as blood were removed from

10   an item during the criminalistic phase, would you expect

11   it be completely removed or potentially completely removed

12   from the original item that it was on?

13   A.   It would depend.  So in criminalistics what they

14   would do is take a swab of that area most likely and it

15   would depend on how big the stain is.  If it's a very

16   small stain, it could perhaps be completely removed from

17   the item.  If was a very largely stained item, we don't --

18   we wouldn't need that much blood swabbed for that item.

19   Q.   So during the criminalistic phase, they're actually

20   taking a swab and removing the material from the item that

21   it was deposited on; is that correct?

22   A.   Yes, so it should be then on the swab.

23   Q.   Now in this case you said the laboratory received two

24   items, specifically a pamphlet and a gas can; is that

25   right?

1    A.    Yes.

2    Q.    A yellow fuel container I should say?

3    A.    I did not see the item in its entirety.  I just

4    received the swabs.

5    Q.    Have you reviewed the documentation that we describe

6    it previously?

7    A.    Yes.

8    Q.    Did you see a description of the items that you just

9    -- that you received?

10   A.    I do -- yes.  Yes.

11   Q.    Did you just describe them a minute ago?

12   A.    Yes.

13   Q.    And do you recall what the items were?

14   A.    Yes.  The snippets that we received, yes.

15   Q.    Yes.

16   A.    Were 1-2.1.1 which was the sample from Stain Number

17   Two on a pamphlet, and 1-4.1.1 which was a sample from

18   Stain One on the handle of a diesel can.

19   Q.    Now let's talk the pamphlet first.

20         What happened after the laboratory received the

21   pamphlet -- sorry, the snippet of the pamphlet?

22   A.    So that would start the four-step process as I had

23   explained.  An analyst would take that sample from the

24   storage locker that we have and start the process.

25   Q.    And the process being the four-step process you

1   described?

2   A.   Yes.

3   Q.   Did the snippet from -- the sample from the snippet

4   from the pamphlet go through the extraction phase as you

5   testified to?

6   A.   Yes.

7   Q.   And what was the next phase that this particular

8   snippet went through?

9   A.   Then it would be the quantitation step.

10  Q.   Did it then go through the third step in the process?

11  A.   Yes, the amplification step.

12  Q.   Did it go through the fourth step in the process?

13  A.   Yes, the detection step.

14  Q.   Have you had an opportunity to review the

15  documentation created as a result of that process?

16  A.   Yes.

17  Q.   And what did you do with it after you received that

18  documentation?

19  A.   So after I received that documentation, I reviewed

20  the worksheets from the lab analyst.  I then do my

21  interpretation of the DNA profile.

22  Q.   Did you -- sorry.

23       Did you form any conclusions about the sample from

24  that pamphlet?

25  A.   Yes.

1   Q.   And did you form any conclusions further about the

2   process itself?  Did you notice any irregularities during

3   that process?

4   A.   I did not.

5   Q.   What were the conclusions that you formed just on the

6   sample from the pamphlet?

7   A.   A male DNA profile was obtained from that item.

8   Q.   Drawing your attention to item 1.1 -- 1-4.1.1 that

9   was, as you described it, a swabbing from the dieseal can?

10  A.   Yes.

11  Q.   Did an analyst receive that from the criminalistics

12  unit as well?

13  A.   Yes.

14  Q.   And what happened after that analyst received that

15  item?

16  A.   Then they would also go through the four-step

17  process.

18  Q.   Was documentation that you described earlier created

19  as a result of that process?

20  A.   Yes.

21  Q.   Have you reviewed that documentation?

22  A.   Yes.

23  Q.   Did you notice any irregularities during that

24  process?

25  A.   I did not.

1    Q.    During the analysis of both this item and the item

2    from the pamphlet, did you consult with analysts during

3    the four steps of the process?

4    A.    Yes.

5    Q.    Once you received information from the analysts, did

6    you further analyze it?

7    A.    Yes.  So after the four steps have been completed, I

8    then do my interpretation of the DNA profile.

9    Q.    And were you able to form any conclusions about this

10   item?

11   A.    Yes.  A male DNA profile was obtained from that item.

12   Q.    At some point did the laboratory receive a third

13   sample associated with this case?

14   A.    Yes.

15   Q.    What was that sample?

16   A.    Item 2-1.1 which was the known standard from John

17   Michael Rathbun.

18   Q.    What is your understanding of a known sample?  What

19   does that mean?

20   A.    So basically that's a sample where we know where it

21   came from.  It's either most typically a swab from

22   someone's mouth.  It can also be blood but that we know it

23   came from an individual.

24   Q.    And in this case you know that it came from John

25   Michael Rathbun?

```
1    A.    Yes.
2    Q.    So did an analyst in your unit receive that from the
3    criminalistics unit?
4    A.    The known samples do not always go through the
5    criminalistics unit first.
6    Q.    Can you describe the process that's in place for
7    receiving a known sample?
8    A.    So the known standards are submitted to the
9    laboratory and they will be snippeted in a similar way
10   that criminalistics does so they take a whole item and
11   take a smaller portion of that item, but we do that in the
12   DNA unit ourselves.
13   Q.    So now once it's there, does an analyst conduct the
14   four steps that you described previously?
15   A.    Yes.
16   Q.    Did you review documentation created as a result of
17   those steps?
18   A.    Yeah.  I reviewed the DNA profile obtained at the end
19   of those four steps, yeah.
20   Q.    Can you again just remind us what a DNA profile is?
21   A.    So a DNA profile is just a series, essentially a
22   series of numbers at different locations.  And for a known
23   standard, that would be one or two numbers at each
24   location.
25   Q.    Does the known sample undergo the same analysis and
```

1    abide by the same procedures and policies that you

2    described previously?

3    A.   Yes.

4    Q.   So essentially once your unit receives it, it's

5    processed in the same way?

6    A.   Yes.

7    Q.   Were you able to form any conclusions based on your

8    review of the analysis of the known sample?

9    A.   Yes.

10   Q.   What were those conclusions?

11   A.   So for item 1-2.1.1, a male DNA profile was obtained

12   from that item and John Michael Rathbun matched the DNA

13   profile that item.  And then for 1-4.1.1, a male DNA

14   profile was obtained from that item and John Michael

15   Rathbun matched the DNA profile.

16   Q.   Okay.  Let's take a step back.

17        So were you able to compare the known sample to the

18   other items that you described?

19   A.   Yes.

20   Q.   So first drawing your attention to the sample taken

21   from the pamphlet, did you compare the known sample to the

22   DNA profile from that?

23   A.   Yes.

24   Q.   Can you describe what you actually did in comparing

25   those two items?

1    A.    So you take the DNA profile that's obtained from the

2    unknown items, the evidence samples, and compare them at

3    each location to any known standards that you would have

4    in a case.

5    Q.    So what exactly are you comparing?

6    A.    Essentially you're comparing the peaks or the numbers

7    in an evidence profile to the peaks or the numbers from a

8    known profile.

9    Q.    Did you create a chart that demonstrated the numbers

10   of the DNA profile of the known sample?

11   A.    For the known sample I did not.

12   Q.    Was there a chart created?

13   A.    Yes.

14   Q.    Did you review that chart?

15   A.    I did.

16            MR. DESROCHES:  Can I have Exhibit PX-43 for the

17   -- I'm sorry, 42 for the witness and counsel?

18   Q.    (By Mr. Desroches) Drawing your attention to the

19   screen in front of you, do you recognize what that is?

20   A.    Yes.

21   Q.    What is that?

22   A.    This is the DNA profile for the known standard as it

23   appears in my report.

24   Q.    Is this the -- are these the numbers that you were

25   describing earlier?

1    A.    Yes.

2    Q.    Did you review these numbers in conducting the

3    comparison that you described?

4    A.    Yes.

5            MR. DESROCHES:  Your Honor, at this time I would

6    move to introduce PX-42 and publish to the jury.

7            MR. WATKINS:  No objection.

8            THE COURT:  No objection, it will be allowed

9    into evidence and published.

10   **(PX-42 was admitted.)**

11   Q.    (By Mr. Desroches) Can you please describe what is on

12   the screen?

13   A.    So this is the chart that we make in the DNA unit to

14   present a DNA profile.

15         On the left side, you will see it says sample

16   description and to the right of that is the description of

17   the item that we are looking at.

18         Below that you see item number and to the right of

19   that is the item number of the item we were looking at.

20   And below from starting where it say A-M-E-L down to the

21   very last line in the chart, those are all locations of

22   the DNA that we are looking at. And to the right, those

23   are the numbers that are present at each one of those

24   locations.

25            THE COURT:  Can you blow this chart up a little

1    more?

2              MR. DESROCHES:   Ms. McKenna, can you blow up a

3    portion of the chart?

4    Q.   (By Mr. Desroches)   So the record is clear, we are

5    now looking at the two columns from the top of the chart

6    down to the CSF1PO.

7         So when you say locations, what do you mean by that?

8    A.   So DNA has many different -- it's very long and it

9    has many different locations that do all sorts of things

10   in one's body.

11        The sections that we look at have no functional

12   purpose but they do vary greatly between individuals.  So

13   the fact that they vary between individuals helps us in

14   identifying a more unique DNA profile.

15   Q.   So then what is in the right column here?

16   A.   So those are the numbers that represent this specific

17   DNA profile.  The first one says AMEL.  It's short for a

18   Amelogenin, A-M-E-L, and that's the sex determining gene

19   and that is X, Y in this occasion which would mean it is a

20   male DNA profile.

21   Q.   And below that there are numbers.  What are those

22   numbers?

23   A.   So the 14, 16, is the length of the DNA fragment that

24   is at that particular location identified to the left.  So

25   there is a length that is 14 and a length that is 16 at

1    the location D3S1358.

2    Q.   How do you use these numbers in comparing something,

3    for example, this sample to the other items that you

4    described?

5    A.   So we test the same locations between known items and

6    unknown items and then we look at the fragments at each

7    location and compare the two and see if they are the same

8    or different.

9              MR. DESROCHES:  If we can take that down?

10   Q.   (By Mr. Desroches)  You indicated that the two

11   snippets that were analyzed by the DNA unit were of blood;

12   is that correct?

13   A.   Yes.  They were tested in criminalistics and I

14   believe identified as such, yes.

15   Q.   Does blood provide a higher quality or lower quality

16   of DNA samples typically speaking?

17   A.   Typically they are good quality samples.

18   Q.   Why is that?

19   A.   It can depend, but there's reliably a lot of DNA in

20   blood usually so if you have a lot of blood especially,

21   you would get -- you would have a lot of -- enough DNA to

22   do our tests and to obtain a profile.

23   Q.   Does the quality of the sample affect your ability to

24   analyze it?

25   A.   Yes.

1    Q.   How so?

2    A.   So a sample that has been left outside to the

3    elements and in like hot sun would probably not fair as

4    well as a sample that was collected immediately and put

5    into cold storage like we do.

6    Q.   Now in this case how would you describe the quality

7    of the samples from the pamphlet and the fuel container?

8    A.   They were single source samples that seemed of

9    sufficient quality for interpretation.

10          MR. DESROCHES:  Your Honor, I'm going to ask

11   that PX-43 be placed on the screen for just counsel and

12   the witness.

13   Q.   (By Mr. Desroches)  Can you review what's on the

14   screen and look up when you're done?

15   A.   So this is a similar table as to the first one,

16   except this is the table that I created based off of the

17   DNA profile from the two evidence samples.

18        So at the top there are the two sample descriptions

19   from each item.  Right below that are the item numbers for

20   each item and then below that are the DNA profiles for

21   each item.

22   Q.   Did you review this table and conduct your comparison

23   to the known sample of John Rathbun?

24   A.   Yes.

25          MR. DESROCHES:  Your Honor, I move to introduce

1    PX-43 into evidence and publish to the jury.

2                MR. WATKINS:  No objection.

3                THE COURT:  All right.  No objection, that will

4    be admitted.  Publication can happen.

5    **(PX-43 was admitted.)**

6                THE COURT:  If there's any way to just magnify

7    that a little bit without losing some of the columns?

8                MR. DESROCHES:  Yes, Your Honor.

9         And for the record, highlighted is the first three

10   columns -- or the three columns of this table down to the

11   row labeled CSF1P0.

12   Q.   (By Mr. Desroches)  Ms. Darby, can you please

13   describe what's displayed on the screen at this point?

14   A.   So this is again just a section of the table that I

15   made.  It has -- so the top two lines are the item

16   descriptions from the two evidence items.

17        The middle lines are the item number for each of

18   those items, and then below that for the DNA profile

19   similar to the table format of the known standard.  The

20   top one again is Amelogenin, the sex determining gene,

21   which in both of these is X, Y or a male DNA profile.

22   Q.   And the column on the left, is that the same in this

23   chart as it is in the known sample chart that we just saw?

24   A.   Yes.

25   Q.   Why is that?

1   A.   So we look at the same locations to make comparisons

2   between any evidence items and known standards in a case.

3   Q.   How did you use this chart in your analysis in this

4   case?

5   A.   So basically this is a summary of the results.  So

6   this is an easy way to look at and compare the profile

7   from any evidence to any profile of any known standards,

8   and basically you would go line by line and see if the two

9   or three profiles matched.

10  Q.   Have you ever analyzed a sample in which you didn't

11  have information at each one of these locations?

12  A.   Yes.

13  Q.   And why would that be?

14  A.   So that can happen when we don't have the optimal

15  amount of DNA in a sample, which is fairly common.

16      One particular example is something that we would

17  call a handler sample.  So as we discussed, a red brown

18  stain typically has a lot of DNA present in it, and

19  something that's more like a handler item would be a pen

20  that someone picked up and used a couple of times.  I

21  wouldn't expect that to have as much DNA on it as there is

22  in a red brown stain.

23      So in that case if you go through the four-step

24  process, sometimes you will not have all of the

25  information present and it would be reflected in this

1    chart.

2    Q.    Now, in this case, in this chart are you missing any

3    information?

4    A.    I am not.

5    Q.    So what does that indicate to you based on your

6    training and experience about the sample?

7    A.    So we would call these full single source profiles.

8    Q.    What does that mean for the jurors?  Is that a good

9    thing or a bad thing?

10   A.    It just means that this has -- it's a full DNA

11   profile which gives me a lot of information to make

12   comparisons between.  And single source just means that it

13   looks to come from one, a single source or a single

14   contributor or a single person.

15   Q.    When you have this much information, are you able to

16   make -- are you able to be more confident in your

17   conclusions?

18   A.    It does help, yes.

19   Q.    So in this case when you compared this chart to the

20   previous chart --

21            MR. DESROCHES:  If we could have them brought

22   upside by side.  Just for the record, we now have Exhibits

23   42 and 43 on the screen.

24   Q.    (By Mr. Desroches)  You said you compared these two

25   things; is that correct?

1    A.   Yes.

2    Q.   Just generally speaking, can you describe how it was

3    -- with these now up so the jurors can see -- how it was

4    you compared them?

5    A.   So for sake of ease in this example, you would

6    compare the numbers at each location from the known

7    standard to the numbers at each location in the evidence

8    sample and see whether or not that they match or don't

9    match and continue down through the entire profile.

10   Q.   So in this case do they match at each location?

11   A.   They do.

12   Q.   So the match -- both the pamphlet and the can samples

13   matched the known sample at each location; is that what

14   you're saying?

15   A.   Yes.

16   Q.   Based on this review were you able to form any

17   conclusions?

18   A.   Yes.

19   Q.   And what are those conclusions?

20   A.   For 1-2.1.1, a male DNA profile was obtained and John

21   Michael Rathbun matched that DNA profile.  And then for

22   1-4.1.1, a male DNA profile was obtained and John Michael

23   Rathbun matched that DNA profile.

24   Q.   Are you able to generate any statistics to support

25   that conclusion?

1    A.   Yes.

2    Q.   What is that?

3    A.   So as a laboratory we do not just say a sample

4    matches a person without giving some sort of weight to it,

5    and so in our lab we do a statistical analysis.  And so

6    for each one of these, a stat also accompanies it in my

7    conclusion.

8    Q.   And in this case, what is that statistical

9    conclusion?

10   A.   So John Michael Rathbun matched the DNA profile, and

11   the expected frequency of occurrence of that profile was

12   one in 568.2 octillion unrelated individuals.

13   Q.   Now can you just provide a little more context to

14   that.  For example, that number sounds very big.  How many

15   people are on the planet earth?

16   A.   Approximately 8 billion.

17   Q.   Eight billion?

18   A.   Yes.

19   Q.   Now have you had an opportunity to --

20            MR. DESROCHES:  Actually, if I could have the

21   Elmo, madam clerk, just for the witness and the counsel

22   please?

23   Q.   (By Mr. Desroches)  Now do you recognize what's

24   depicted on that screen right now?

25   A.   Yes.

1   Q.   What is that?

2   A.   568.2 octillion.

3        MR. DESROCHES:  May this be published to the

4   jury, Your Honor?

5        THE COURT:  Yes.

6        MR. WATKINS:  No objection.

7   Q.   (By Mr. Desroches)  So you just said this number

8   that's on the screen represents 568.2 octillion; is that

9   correct?

10  A.   Yes.

11  Q.   Have you had an opportunity to know how many zeros

12  are in an octillion?

13  A.   Yes.  There are 27 zeros in an octillion.

14  Q.   Do you know how many zeros are in a billion?

15  A.   Yes.  There are nine zeros in a billion.

16       MR. DESROCHES:  Thank you.  No further

17  questions.

18       MR. WATKINS:  May I have the computer for just a

19  moment?

20  **CROSS-EXAMINATION**

21  Q.   (By Mr. Watkins)  Showing you what's been admitted as

22  Government's Exhibit 14.

23       MR. WATKINS:  It's already been admitted.  We

24  can show it.

25       THE CLERK:  You want to publish this?

```
 1              MR. WATKINS:  Yes, on all.
 2    Q.   (By Mr. Watkins) This is the gas can that is at
 3    issue; do you know?
 4    A.   I do not know.
 5    Q.   I want to ask more generally about your training and
 6    experience in collection.
 7         You see what appears to be a dark brown stain on that
 8    handle?
 9    A.   It appears to be a red brown stain, yes.
10    Q.   And you talked about blood being good quality
11    material to get DNA from, correct?
12    A.   Generally speaking, yes.
13    Q.   Generally speaking.
14         And assuming this gas handle was plastic, this is a
15    good quality material on a hard plastic surface?
16    A.   I don't -- there's no scale here so I don't really
17    know how much is present.  But in general blood is a good
18    sample.
19    Q.   So my question here is are you able to tell when this
20    particular stain was deposited by some scientific method
21    including DNA?
22    A.   No.
23    Q.   So when you do DNA, there's no way to determine when
24    the material was actually put or how old it is?
25    A.   No.
```

1   Q.   In fact, now we're learning cases 50, 75 years ago

2   where we can find DNA from those, right?

3   A.   It very much depends on the situation.

4   Q.   So this particular blood sample left on this can

5   could have been days or weeks or months or years; no way

6   to tell?

7   A.   Yeah, I have no way of telling.

8           MR. WATKINS:  That's all I have, Your Honor.

9           MR. DESROCHES:  Brief follow up.

10  **REDIRECT EXAMINATION**

11  Q.   (By Mr. Desroches)  Now based on your training and

12  experience are you familiar with what will happen to blood

13  when it's left outside, bloodstains like you just saw?

14  A.   So any DNA sample can experience what we call

15  degradation when exposed to any sort of elements or not

16  properly retained.

17  Q.   And what would happen to the sample that was taken

18  from something that was degraded like that?

19  A.   We would expect to see a loss of information at some

20  point.  So at each location I was able to -- there was DNA

21  present to compare to, and sometimes, especially with a

22  degraded sample, you do not have DNA at every location

23  that you can reliably compare to.

24  Q.   And in this case did you testify that you had

25  information at every location?

1    A.    Yes.

2    Q.    And are you familiar with what happens to the

3    appearance of blood, a bloodstain when it's left to dry?

4    A.    Yes.

5    Q.    In particular the color, does the color change over

6    time?

7    A.    It can, yes.

8    Q.    How would it change?

9    A.    Usually I think it just gets darker.

10        MR. DESROCHES:  Thank you.  No further

11   questions.

12        MR. WATKINS:  Just two more questions.

13   **RECROSS-EXAMINATION**

14   Q.    (By Mr. Watkins)  For purposes of DNA, does it matter

15   whether the color has changed on the handle?

16   A.    Well, it doesn't matter for red brown stain if the

17   color has changed to my knowledge, no.

18   Q.    What is the half-life of DNA?

19   A.    I don't believe there is a half-life of DNA

20   specifically.  It depends on everything that the sample is

21   being exposed to.

22   Q.    Right.  So organic material will degrade somewhat

23   more quickly if it's left out in the sun; is that correct?

24   A.    Yes.

25   Q.    So, for example, cadavers that are left out in the

1   sun, DNA might degrade for weeks, right, until it's gone?

2   A.   Yes.

3   Q.   On the other hand, the opposite part is true.   A good

4   quality material on a hard surface, that can last for

5   years, right?

6   A.   Again, it would depend on so many factors.   Where

7   it's being kept and anything that it's being exposed to.

8   Q.   The fact that you were able to get readings at every

9   single site has nothing to do with how long this was put

10  here, right?

11  A.   I can't cannot speak to the length of time.

12  Q.   Thank you.

13  A.   No.

14          THE COURT:  All right.  Thank you very much.

15      All right.  So at this point we're going to have to

16  clean the witness stands anyway so we'll take the lunch

17  break.

18      The same instructions apply.  Don't talk to each

19  other about the case or anyone else.  Don't go on the

20  internet or look up things.  Don't post things; read

21  things; media accounts, don't read them.  The same

22  instructions apply as well.  Okay.  Thank you.  So quarter

23  of, we'll come back at quarter of.

24      So my understanding is the lunch is not here yet.  If

25  lunch takes longer to come in, then we'll come back later.

1    We'll come back closer to two o'clock.  All right.

2    **(A recess was taken at 1:05 until 2:06.)**

3    **(Mr. Rathbun is present.)**

4    (Sidebar conference.)

5              THE COURT:  Defense, can you hear me?

6              MS. O'NEILL-GREENBERG:  Yes.

7              THE COURT:  Government?

8              MR. DESROCHES:  We can hear you, Your Honor.

9              THE COURT:  Attorney Watkins, I have no idea

10   what completely happened in the hallway.  So do you want

11   to make a record?

12             MR. WATKINS:  Yes, Your Honor.

13        As I was headed out to use the men's room, I heard

14   the court officer cautioning the jurors to stop; that they

15   were not going into the courthouse or into the courtroom

16   because we were waiting on the defendant.

17        He said it twice because I suppose different jurors

18   were coming down the hallway to come into the court.  But

19   clearly he yelled down the hallway to where every juror

20   who was in line heard that it was the defendant we were

21   waiting on.  Of course, the jurors I think had already

22   certainly seen me already in the courtroom, probably the

23   prosecution and Ms. O'Neill already also.

24             THE COURT:  There's no way the jurors saw who

25   was in the courtroom because they were down the other end

1     of the hall.  They were walking down the hallway toward

2     the courtroom, and they're using the public hallway under

3     these circumstances now because that's the way we are set

4     up in the pandemic.  They are using the public hallway.

5            MR. WATKINS:  Nevertheless the issue is the

6     waiting on the defendant part.

7            THE COURT:  Exactly.  Sure.  So the public uses

8     -- I'm sorry, the jurors use the public hallway.  They're

9     using the courtroom next door to ours for essentially

10    their jury room.  So they come out the front door of that

11    courtroom, walk down a public hallway to come next door to

12    our courtroom.

13       So from what I can piece together, they were coming

14    out of the courtroom where they are seated getting ready

15    to walk down the hall.  Now that's not the longest walk

16    and into our courtroom.  I had told the court officer not

17    to let the jurors in because we were waiting.  In other

18    words, to hold up.  I put my hand up in a hold fashion so

19    no one seen my two hands saying no, hold them until the

20    defendant is in here and then he picked up his radio and I

21    heard what you heard.

22       I heard him either talking to the radio or talking to

23    however many jurors might have been out in the hallway.  I

24    didn't see.  I don't know how many jurors were in the

25    hallway.

1          You're telling me it looked like there was a good

2     number; is that correct?

3               MR. WATKINS:  That is correct.  I would guess at

4     least eight but more likely twelve.  I didn't really

5     look.

6               THE COURT:  Okay.  And I never heard him say

7     anything about using the word prisoner or held or anything

8     like that, did you?

9               MR. WATKINS:  No, but he was using his radio to

10    communicate with the marshals to bring up the defendant in

11    that vestibule before the court and the hallway.

12              THE COURT:  Well, that was not actually in the

13    hallway.  That was in a little area between the courtroom

14    and the hallway itself, right?

15              MR. WATKINS:  That is true.  But I think again

16    I'm guessing within ten yards of the first juror that was

17    going to walk in.  Ms. O'Neill-Greenberg reminds me he

18    said prisoner or bring the prisoner up.

19              THE COURT:  He did not say that in the hallway;

20    that I know for sure.  I was watching.  He did not say

21    that in the hallway.  I heard him say that either in the

22    courtroom or I agree with you headed towards the little

23    vestibule area where the doors are that have a little

24    waiting area before the hallway.  So it's concerning, yes,

25    but he didn't say it in the hallway.  Okay.

1          So what would you like to do?  Do you have any

2     requests about if I ask the jurors about if they heard

3     anything and if they did hear something, do you have any

4     suggestions?  Do you want to tell them something -- say

5     anything about it?

6               MR. WATKINS:  No, Your Honor.  I mean, any

7     instruction at this point will merely put more focus on

8     the particular issue so I don't think it's curable.  I

9     think it's a mistrial.

10         Can you hear me now, Your Honor?

11              THE COURT:  Now I do, yes.

12              MR. WATKINS:  I don't think there's any curative

13    instruction that is going to help.  It will simply focus

14    the issue even more.  I think the only proper remedy is a

15    mistrial.

16              THE COURT:  The court -- I have no idea how far

17    away the jurors were from the court officer when he was

18    saying hold up or waiting for the defendant.  That's what

19    was said, "Hold up.  We are waiting for the defendant."

20    The word prisoner was said while still inside our

21    courtroom or in what we are calling the vestibule area.

22    The doors -- there's four doors before you get into the

23    hallway and that was said in that way.

24         I'm not telling you it was good practice or a good

25    thing to do to even say the word prisoner.  It was not.

1      I can't tell you, I just don't know how close any jurors

2      were and if they heard anything, if they could have heard

3      that.  I don't know even if they were out in the hallway

4      at that point.

5          So I could make an inquiry of the jury if they heard

6      anything.  If they heard the court security saying

7      anything, then individually ask each one what, if

8      anything, was said.  Yes, I heard him saying... I can

9      individually meet with them and ask them what they

10     heard.

11             MR. WATKINS:  Your Honor, as to whether the

12     jurors heard it, as I was observing him, I think his

13     intention was he said it in a very loud voice.  This

14     particular court officer does have a loud voice

15     ordinarily, and I believe he was projecting so he could be

16     heard down at the end of the line to tell people why we

17     were holding up.  And again, he said it twice in a loud

18     voice.

19             THE COURT:  Right.  Right.  But I need to

20     differentiate between saying we are waiting for the

21     defendant and a suggestion that people could hear him say

22     bring up the prisoner.  Those are different things.

23             MR. WATKINS:  I cannot say other than he was in

24     the vestibule.  I obviously was not out where the jurors

25     were to be able to determine whether they heard that

1     particular remark.

2            THE COURT:  Well, the court is prepared to do

3     individual voir dire with anyone who says they heard

4     anything, any word come out of the court security

5     officer's mouth.  We can do an individual voir dire.

6     Would you like the court to do that?

7            MR. WATKINS:  No, Your Honor.  I think really I

8     would insist the only remedy here is a mistrial.  We try

9     very hard to avoid --

10           THE COURT:  There can't be a remedy until we

11    know what happened.  We have not established factors what

12    happened to apply to your requested relief.

13           MR. WATKINS:  Your Honor, I think that the court

14    officer yelling down the hallway we're waiting for the

15    defendant is enough in and of itself, and I think that's

16    going to be undisputed that he intended for each juror to

17    hear that.

18           THE COURT:  Well, we have been waiting for

19    different people to come into the courtroom, including

20    jurors to come into the courtroom before we could get

21    started, so that in and of itself, I don't think that in

22    itself or we are waiting for anyone -- and after that, by

23    the way, I asked our clerk to put all the jurors -- remove

24    them from the hallway and put them back into their

25    courtroom.  Did you visibly see that happen?

1          MR. WATKINS:  No, Your Honor.  By that time I
2     had come in and reported to the court.
3          THE COURT:  All right.  I will ask our clerk one
4     moment if that happened.
5          Jarrett, just identify for the record so we have a
6     record who's speaking.
7          THE CLERK:  Jarrett Lovett, courtroom deputy
8     clerk.
9          THE COURT:  Okay.  Jarrett, when just a few
10    minutes ago when I asked you to put the jurors back into
11    their holding courtroom area, their jury courtroom area
12    where they're gathering, because I specifically said to
13    you because the court security officer is talking loudly
14    in the hallway, did you ask all jurors to go back in the
15    courtroom?
16         THE CLERK:  As soon as I got outside the door,
17    the defendant was already in the courtroom so there was no
18    need for them to go back, and a couple of them went to the
19    bathroom.
20         THE COURT:  You got out in the hall and there
21    were still jurors standing in the hallway?
22         THE CLERK:  As soon as I got out in the hallway,
23    they were still lined up and at that very same point the
24    defendant was already in the courtroom.
25         THE COURT:  Okay.  And the defendant obviously

1    enters the courtroom from a separate door inside our

2    courtroom so no juror would have seen the defendant walk

3    by them essentially to enter the courtroom.  He came in in

4    a separate door inside this courtroom.

5            THE CLERK:  They were far enough not to be able

6    to see inside the courtroom.

7            THE COURT:  Okay.  From where they were

8    standing, could they see the door that enters into this

9    courtroom?

10            THE CLERK:  No.

11            THE COURT:  So from where the jurors are

12    standing they could not see the front entry door to get

13    into the courtroom where we are having the trial?

14            THE CLERK:  No.

15            THE COURT:  All right.  Attorney Watkins, do you

16    want to add anything?

17            MR. WATKINS:  Just completely make the record as

18    to the prisoner comment, of course, as the court can see

19    here and we all know the outer doors are opened to that

20    vestibule so I think there's at least a chance that one or

21    more of them heard that particular comment.  That in

22    addition to the fact that the defendant is the only one

23    entering by a different exit than the front doors of the

24    courtroom I think is grounds for a mistrial.

25            THE COURT:  Factually I agree with both things

1     that you said.  Regarding his use of the word prisoner and

2     wait was not in a soft voice.  I have no idea if people

3     down the hall could have heard it, but they might have.

4     His voice was loud enough.

5          Where we stand right now I don't have a basis for

6     entertaining a mistrial request without an individual voir

7     dire of the jurors which you have not requested.

8          Does the government want to say anything?

9               MR. DESROCHES:  Your Honor, first, I would agree

10    with your assessment of the motion for a mistrial.  At

11    some point I think the delay being attributed to the

12    defendant hardly rises to the threshold finding.

13         I also find that the delay was negligible as a matter

14    of less than a minute.  I think if the court were to

15    conduct a voir dire, it be limited to whether or not they

16    heard security staff say anything and then determine from

17    there.  My concern is that a voir dire may raise the issue

18    and I'm not sure how to go about doing that.

19              THE COURT:  All right.  So at this point I'm

20    going to pick up with the trial.  The defendant has no

21    request.  The defendant has made a request for a mistrial.

22    It's noted.  It's on the record.  It's denied at this

23    point.  There are no requests for individual voir dire

24    from either side.  We will proceed with the trial.

25    (End of sidebar discussion.)

1    **(The jury entered.)**

2              MR. DESROCHES:  Your Honor, the government calls

3    Jessee Dabrea.

4              THE CLERK:  Raise your right hand.

5    **Jessee Dabrea (sworn)**

6    **DIRECT EXAMINATION**

7    Q.   (By Mr. Desroches)  You may be seated.

8         Could you also remove your mask?  The Plexiglas in

9    front of you will serve the purpose.

10        Good afternoon.

11   A.   Good afternoon.

12   Q.   Could you please introduce yourself to the jurors and

13   for the record spell your last name?

14   A.   Jessee Dabrea, D-a-b-r-e-a.

15   Q.   Are you employed?

16   A.   Yes.

17   Q.   How are you employed?

18   A.   By the town of Longmeadow.

19   Q.   In what capacity are you employed by the town of

20   Longmeadow?

21   A.   A police detective.

22   Q.   For how long have you been -- I'm sorry, is it

23   possible to get a little to the microphone?

24   A.   Yes.

25   Q.   I'll do the same.

```
 1          So you said that you were a detective with the
 2   Longmeadow Police Department?
 3   A.   Yes.
 4   Q.   For how long have you been detective?
 5   A.   Since September 1, 2020.
 6   Q.   How long have you been employed by the Longmeadow
 7   Police Department.
 8   A.   A year and a half.
 9   Q.   And prior to becoming employed by the Longmeadow
10   Police Department, did you have any other jobs in law
11   enforcement?
12   A.   Yes.  I was a federal police officer for the
13   Department of Veteran Affairs.
14   Q.   For how long were you a federal police officer?
15   A.   Two years.
16   Q.   When you became a Longmeadow police officer, did you
17   go to any sort of police academy?
18   A.   Yes, a full-time police academy.
19   Q.   Did you successfully complete it?
20   A.   Yes.
21   Q.   And did you as a result of graduating that academy,
22   is that when you went to the Longmeadow Police Department?
23   A.   Yes.
24   Q.   Did you participate in any in-service training as a
25   Longmeadow police officer?
```

1    A.    Yes, annually.

2    Q.    So you said you were a detective and you became a

3    detective when?

4    A.    September 2020.

5    Q.    Prior to being a detective, what was your position

6    with the police department?

7    A.    A patrolman.

8    Q.    Generally speaking, what are your responsibilities as

9    a patrolman?

10    A.    Patrol the town, enforce laws, traffic, traffic laws,

11    respond to scenes, investigate crimes.

12    Q.    What type of vehicle would you drive and patrol the

13    town?

14    A.    A Ford Explorer; a fully marked Ford Explorer.

15    Q.    How are the police vehicles marked in Longmeadow?

16    A.    They are black and white.  Our Longmeadow patch is on

17    the side of the vehicle.  Longmeadow police is stamped on

18    the side doors as well as the rear of the vehicle.

19    Q.    Is there a light rack on these vehicle as well?

20    A.    Yes, on the top of the vehicle.

21    Q.    Are these vehicles equipped with cruiser cams?

22    A.    Yes, they are.

23    Q.    Can you speak generally to how they work?

24    A.    They're always recording.  The audio is picked up 30

25    seconds after the emergency lights are activated.

1    Q.   So now drawing your attention to April 2nd of 2002 --
2    sorry, 2020, were you working that day?
3    A.   Yes.
4    Q.   What was your shift?
5    A.   Midnights.
6    Q.   For how long had you worked midnights prior to that
7    point?
8    A.   Prior to that point about four and a half months.
9    Q.   Did you continue working midnights past April 2nd?
10   A.   Yes, up until I became a detective.
11   Q.   So approximately how many months was that?
12   A.   About nine months.
13   Q.   As a patrolman working the midnight shift, did you
14   have an opportunity to observe traffic over those hours?
15   A.   Yes.
16   Q.   At approximately four or five in the morning between
17   those hours can you describe what traffic is like in
18   Longmeadow in the area of Converse Street?
19   A.   Usually it's beginning to pick up from a light to a
20   medium traffic.   It's the start of the early morning
21   commuters.
22   Q.   Also are you able to observe foot traffic in the area
23   of Converse Street at that same time frame, four to five
24   in the morning?
25   A.   I have, yes.

1    Q.   Can you describe that for the jurors?

2    A.   It depends on the day.  Sometimes it's light;

3    sometimes it's medium, but there are a lot of joggers and

4    walkers in the area.

5    Q.   Even that early in the morning?

6    A.   Yes.

7    Q.   Now, going back to April 2, 2020, you said you worked

8    the midnight shift; is that right?

9    A.   Yes.

10   Q.   At approximately 1:30 in the morning did you receive

11   any calls?

12   A.   Yes.

13   Q.   What was the nature of the call you received at that

14   time?

15   A.   I received a call for an unattended death at the

16   Genesis House.

17   Q.   Where is Genesis House located?

18   A.   On Converse Street.

19   Q.   Is it unusual for you as a police officer to be

20   responding to a call of an unattended death?

21   A.   Is it usual?

22   Q.   Is it usual?

23   A.   Yes.

24   Q.   So after receiving that call, what did you do?

25   A.   I responded directly to the Genesis House.

1    Q.   Do you know approximately how long it took to get

2    there?

3    A.   I cannot say.  I don't know how long it took.

4    Q.   Did you go directly there after you received the

5    call?

6    A.   Yes.

7    Q.   You indicated that you had a cruiser cam in your

8    police vehicle; is that right?

9    A.   Yes.

10   Q.   And was the cruiser cam working on April 2, 2020?

11   A.   Yes.

12   Q.   Have you had an opportunity to view a video made by

13   that cruiser cam of the time you spent at the Genesis

14   House in response to that call?

15   A.   Yes.

16            MR. DESROCHES:  May I have Exhibit 83 just for

17   the witness and counsel table?

18   Q.   (By Mr. Desroches) So, Officer Dabrae, do you

19   recognize what's depicted on the screen right now in front

20   of you?

21   A.   Yes.

22   Q.   And what is being depicted right now?

23   A.   It's a still shot or a paused image of my cruiser cam

24   sitting in the parking lot of the Genesis House.

25   Q.   So where is this cruiser cam mounted?

1    A.   Right on the windshield of the vehicle; on the inside

2    of the windshield.

3    Q.   Just so we're clear, when we're talking about a

4    cruiser cam, can you explain what is?

5    A.   It's a small camera that's mounted on the inside of

6    the cruiser.

7    Q.   And you said it records at all times.  Does it

8    overwrite itself at some point?

9    A.   Does it overwrite itself?

10   Q.   Correct.

11   A.   Not to my knowledge.  It's always recording.

12   Q.   So on the screen before you, you said you recognize

13   that as being Genesis House?

14   A.   The parking lot of, yes, correct.

15   Q.   Have you had a chance to view this video that is

16   currently on your screen?

17   A.   Yes.

18   Q.   Is that video a fair and accurate depiction of the

19   scene as it unfolded on April 2, 2020?

20   A.   Yes.

21            MR. DESROCHES:  Your Honor, at this point I move

22   to introduce Government Exhibit 83.

23            MR. WATKINS:  No objection.

24            THE COURT:  All right.  That will be introduced

25   and published.

**(PX-83 was admitted.)**

Q.    (By Mr. Desroches)   Now you indicated that you
responded to this call at approximately 1:30 in the
morning; is that right?

A.    Yes.

        THE COURT:   Can you move the screen?

Q.    (By Mr. Desroches) So you said you responded to this
call at 1:30 in the morning, correct?

A.    Correct.

Q.    What time did you leave the grounds of Genesis House?

A.    About 4:50 in the morning.

Q.    Now can you please describe what's depicted on the
screen at this moment for the jurors?  What are we looking
at here?

A.    You're looking at -- I'm parked in the parking lot of
the Genesis House.  I believe it's building Echo.  There's
several buildings as part of the Genesis House.  My
cruiser is faced towards the Jewish nursing home which is
across the access, the access road.  The access road that
you can see is right by the stop sign ahead of my cruiser,
but I'm parked in that parking lot.

        MR. DESROCHES:  So I'm going to ask the clerk if
we could have the Elmo and on the Elmo is Government's
Exhibit  104 which has been admitted.

        Just to be clear, this will be 104-A for the record.

```
1    Q.   (By Mr. Desroches)  Detective Dabrae, do you
2    recognize what's on the screen as Exhibit 104-A?
3    A.   Do I recognize it?
4    Q.   Yes.
5    A.   Correct.  Yes.
6    Q.   What do you recognize it to be?
7    A.   It is a portion of Converse Street.
8    Q.   Do you recognize the building that you described as
9    Genesis House in this photograph?
10   A.   Yes.
11   Q.   I'm going to zoom in on an area and point to these
12   buildings here.
13        Do you recognize these buildings here?
14   A.   Yes.  That's the cluster of those buildings is the
15   Genesis House.
16   Q.   So that's what you were referring to?
17   A.   Correct.
18   Q.   So in that video -- in the still shot that we've seen
19   so far, where on this screen or where on this picture
20   rather are you parked?
21   A.   The far right two brown cluster buildings there's a
22   little circle that looks -- right there.  If you go up a
23   little further, it looks like a piece of grass, a little
24   medium.  I'm parked to the left of that.
25   Q.   Right about in this area here?  (Indicating)
```

1    A.   Yes, facing towards the left of your pen down that

2    access road.

3              MR. DESROCHES:  So if we could now have the

4    video?

5        At this point can we play the video?  Just for the

6    record, we are starting at the 14:45 mark.

7    (Video playing.)

8              MR. DESROCHES:  If we can pause it right here?

9    Q.   (By Mr. Desroches)  Officer Dabrae, we have paused it

10   at the 15:26 mark or approximately at that mark.  Can you

11   describe what's depicted at this point?

12   A.   I am now facing Converse Street about to pull out

13   onto Converse Street.

14   Q.   So what we are -- just in terms of the signage, what

15   does that signage there?

16   A.   The signage?

17   Q.   Yes.  It's hard to read them.  Clearly there appears

18   to be a stop sign on the right.  What are the signs?

19   A.   Keep right.

20   Q.   At some point did you learn that there was a follow

21   up investigation in this same area?

22   A.   Did I learn?

23   Q.   Yes.

24   A.   Yes.

25   Q.   So is this the intersection leaving Genesis House

1    onto Converse Street?

2    A.   Correct.

3    (Video playing.)

4              MR. DESROCHES:  For the record we have stopped

5    at the 15:56 mark.

6    Q.   (By Mr. Desroches)   Detective Dabrae, what street did

7    you just turn on?

8    A.   Redfern.

9              MR. DESROCHES:  Now if I could have the Elmo

10   again?

11   Q.   (By Mr. Desroches)  So now back on the screen is

12   Government's Exhibit PX-104-A.  Does this depict the area

13   of the route that you took while leaving Genesis House?

14   A.   Yes.

15   Q.   So did you start at the area that we described

16   earlier as in this area to the middle of the page just to

17   the right of center?

18   A.   Correct.

19   Q.   And can you describe in words the route you took

20   using -- if you're going in this direction, you say go up

21   and in that direction you can say going left.

22   A.   Yes.  I went up towards the cluster of trees and the

23   road continues underneath the trees, and then I continued

24   on the way as you're going with the pen towards -- and

25   that's Converse Street.

1    Q.   Right now my pen is at what appears to be an
2    intersection, is that where we paused the video?
3    A.   Correct.
4    Q.   And then did you take a left from there?
5    A.   Correct.
6    Q.   And then if you can tell me -- you said you took a
7    turn onto Redfern?
8    A.   Correct.
9    Q.   So is Redfern depicted on what's on your screen right
10   now?
11   A.   Correct.
12   Q.   So is this Redfern right here?   (Indicating)
13   A.   Yes.
14   Q.   So you traveled from this location and then took a
15   turn onto Redfern; is that right?
16   A.   Yes.
17   Q.   Approximately how far in terms of distance is that
18   from the exit of JGS onto Converse Street to that turn you
19   took onto Redfern?
20   A.   About a hundred to two hundred yards.
21   Q.   When you passed by that stop sign, did you observe
22   any items that were suspicious to you?
23   A.   I did not.
24   Q.   Specifically did you observe a yellow fuel can?
25   A.   I did not.

1    Q.   So have you had an opportunity to review the time of

2    that video?

3    A.   Yes.

4    Q.   Is there a time-stamp on it?

5    A.   Right now on my screen?

6    Q.   I'm sorry.  Can we just play until we get to the stop

7    sign?

8    (Video playing.)

9                MR. DESROCHES:  Again we can pause it right now.

10        So for the record we are at the 15:26 mark.

11   Q.   (By Mr. Desroches)  Did you learn what time

12   approximately this was taken?

13   A.   Approximately 4:50 a.m. approximately.

14   Q.   Now is there a time-stamp on this video?

15   A.   Not that I can see.

16   Q.   So how are you able to testify to 4:50?

17   A.   To 4:50?

18   Q.   How do you know you're saying that's 4:50 a.m.?

19   A.   That's the time I cleared the call and on the video

20   -- I believe that's just on the call when I recalled the

21   call, the actual call log.  It was 4:50 when I cleared.

22   Q.   So when did you clear the call?  Sorry, what do you

23   mean when you say when you cleared the call?  What did you

24   do to clear the call?

25   A.   I radioed.

1    Q.   And you radioed at approximately 4:50?

2    A.   Correct.

3    Q.   At what point in this drive did you radio?

4    A.   I cannot be sure.  There's no audio on the video.

5    Q.   But at some point before you left you radioed?

6    A.   Correct.

7    Q.   It could have been at any point from the point you

8    started to leave until you time you exited?

9    A.   It could have.  I'm not sure.

10        MR. DESROCHES:  Thank you.  I have no further

11   questions.

12        MR. WATKINS:  Can I get my computer hooked in?

13        THE COURT:  Of course.

14   **CROSS-EXAMINATION**

15   Q.   Good afternoon.

16   A.   Good afternoon.

17   Q.   Did you receive a subpoena from my office to testify

18   at trial?

19   A.   I did.

20   Q.   And that was served by my investigator Alicia Hutton?

21   A.   I did.

22   Q.   You communicated with Ms. Hutton about meeting you

23   and talking with you about this video, right?

24   A.   I did.

25   Q.   And we were going to make arrangements to meet about

1   it last Wednesday I think, right?

2   A.   Yes.

3   Q.   And later on you told us that you would no longer

4   meet with us?

5   A.   Correct.

6   Q.   That's on the instructions of a superior?

7   A.   Correct.

8   Q.   And that superior got their instructions from the

9   prosecutor here, right?

10  A.   I'm not sure, sir.

11  Q.   But you were told you could not meet with us,

12  correct?

13  A.   Correct.

14  Q.   And we've never met each other before today; is that

15  correct?

16  A.   Correct.

17  Q.   I want to go --

18          MR. WATKINS:   This is just going to the witness.

19  It hasn't been admitted, the witness and counsel.

20  Q.   (By Mr. Watkins)  You were testifying a moment ago

21  about -- you were testifying about I think you said it was

22  around 4:50 that you pulled out of the driveway?

23  A.   Correct.

24  Q.   Now, I want to show you a different version, a

25  different view of the dash cam.  Do you recognize this

1    that's in front of you?

2    A.   Yes, sir.

3    Q.   What is this?

4    A.   It's a still shot of the cruiser cam.

5    Q.   On this still shot does it actually include the exact

6    time?

7    A.   Yes, sir.

8    Q.   What is that exact time?

9    A.   4:51:44 seconds.

10   Q.   Do you recognize this particular screenshot?

11   A.   Yes.

12   Q.   And that is where we were just looking a moment ago

13   on the video just one frame except with the time in it,

14   right?

15   A.   Correct.

16           MR. WATKINS:  I would ask to move this in -- I'd

17   move to admit this as 83-A.

18           MR. DESROCHES:  No objection, Your Honor.

19           MR. WATKINS:  And publish it to the jury.

20           THE COURT:  No objection, that will be allowed

21   and it can be published.

22   **(PX-83-A was admitted.)**

23   Q.   (By Mr. Watkins)  Once again here, we're almost at

24   the same exact place where Mr. Desroches paused it a

25   minute ago, correct?

```
1    A.   Yes.

2    Q.   You can see the tree here, right?

3    A.   I can't make out what that is, sir, a bush, a tree.

4    Q.   Okay.  But at the top here I'm going to try to blow

5    this up for you.  There we go.

6         What time does it say?

7    A.   4:51:44 seconds.

8    Q.   So that's exactly what time it was at that moment?

9    A.   Correct.

10   Q.   And you know that because that's how your cruiser

11   cam, your dash cam, works, correct?

12   A.   Correct.

13   Q.   I want to put before you Exhibit 104.

14        Similar to what Mr. Desroches just showed us, do you

15   recognize this?

16   A.   Yes, sir.

17   Q.   Here is the entrance to Genesis House where I'm

18   curling around with the curser?

19   A.   That's one of the entrances, yes.

20   Q.   Correct.  To the point where -- well, this is a

21   one-way street here; is that correct?

22   A.   Yes, sir.

23   Q.   All right.  If you came in here this direction, you

24   couldn't get to where you were going, right, because

25   that's a one-way street?
```

1    A.    Correct.

2    Q.    All you can do is get up to Ruth's House going that

3    way, correct?

4    A.    Correct.

5    Q.    So going up this one-way street from this direction,

6    this is where you were parked with your lights facing out

7    that way, correct?

8    A.    Facing towards the left but, yes, I was in that area.

9    Q.    Where we started the video, originally you were

10   pointing that way, right?

11   A.    Correct.

12   Q.    But you looked at the whole video and it starts when

13   you're pointing this way, correct?

14   A.    Yes.

15   Q.    And you were there for an unattended death, right?

16   A.    Yes.

17   Q.    And this was the beginning of the pandemic, right?

18   A.    Correct.

19   Q.    So earlier on in the video, there is a van that shows

20   up in front of you with your lights on?

21   A.    Correct.

22   Q.    That's a hearse, right?

23   A.    Yes.

24   Q.    That's removing the remains of the person who passed

25   away here, right?

1    A.   Correct.

2    Q.   And you left and the hearse was still there, right?

3    A.   Correct.

4    Q.   Okay.  And then you took a left here and a right

5    here, correct?

6    A.   Yes, sir.

7    Q.   Now, up here at this end, this would be the end of

8    the road where someone driving from East Longmeadow

9    towards Forest Park say would be coming from, right?

10   A.   Yes, sir.

11   Q.   So, for example, if someone was coming down to get

12   into Genesis House or Ruth's House, they would actually

13   have to pass by you -- they could pass by you at that

14   point if both of you were in that same vicinity?

15   A.   Correct.

16            MR. WATKINS:  That's all I have, Your Honor.

17            THE COURT:  Anything?

18            MR. DESROCHES:  No redirect, Your Honor.  Thank

19   you.

20            THE COURT:  All right.  Thank you.  You can step

21   down.

22            MR. DESROCHES:  Your Honor, the government calls

23   Dustin Wong.

24            THE COURT:  All right.

25            THE CLERK:  Would you raise your right hand

1    please?

2    **Dustin Wong (sworn)**

3            MR. DESROCHES:  May I proceed, Your Honor?

4            THE COURT:  Yes.

5    **DIRECT EXAMINATION**

6    Q.   (By Mr. Desroches)  Good afternoon.

7    A.   Good afternoon.

8    Q.   Could you please introduce yourself to the jurors and

9    for the record spell your last name?

10   A.   My name is Dustin Wong, W-o-n-g.

11   Q.   Are you employed?

12   A.   Yes, I am.

13   Q.   How are you employed?

14   A.   I am currently employed as an information technology

15   specialist forensic examiner for the Federal Bureau of

16   Investigation.

17   Q.   Can you please describe what your responsibilities

18   are in that position?

19   A.   Yes.  Digital forensics is the identification and

20   documentation of digital devices followed by validating

21   that nothing has changed before and after the examination.

22         I conduct forensic examinations on digital devices

23   followed by a -- under a quality assurance guideline.

24   Q.   How long have you held that position?

25   A.   Since June of 2017.

```
1    Q.   Did you receive an education prior to obtaining that
2    position?
3    A.   Yes, I did.
4    Q.   What was that education?
5    A.   I received my batcher of science in cyber security
6    systems concentrated in digital forensics at St. John's
7    University.
8    Q.   Now more specifically, where are your job duties in
9    this position?
10   A.   I examine digital devices such as Windows computers,
11   Mac computers, and mobile devices.
12   Q.   When you say digital devices, what do you mean?
13   A.   Like laptops and cell phones and tablets.
14   Q.   So are cell phones and tablets what you mean when you
15   refer to mobile devices?
16   A.   Correct, yes.
17   Q.   So you examine all those types of digital equipment,
18   correct?
19   A.   Correct.
20   Q.   Did you receive any training before you started to
21   fill these responsibilities?
22   A.   Yes, I did.
23   Q.   Can you describe that training?
24   A.   Yes.  I received training under the FBI's Computer
25   Analysis Response Team or what is known as CART program.
```

1   Q.   Can you describe what that CART training is like?

2   A.   Yes.  It is an approximately 12-week program that

3   specializes in different functions such as analyzing and

4   examining Windows computers, Mac computers, and mobile

5   devices.  And there is a written and practical exam at the

6   end of each course that we must pass in order to move on

7   to the next course.

8   Q.   Did you take those exams?

9   A.   Yes, I did.

10  Q.   Did you pass each of them?

11  A.   Yes, I did.

12  Q.   Did you participate in any external training?

13  A.   Yes, I have.

14  Q.   What is external training?

15  A.   I have received external training from a third-party

16  vendor called SANS Institute.  SANS Institute is a

17  well-known training institute that offers digital

18  forensics training.

19  Q.   Can you describe what digital forensics training is?

20  A.   Yes.  So digital forensics, like I said, is the

21  identification and documentation of digital devices.

22  These trainings allow us to keep up to date with forensic

23  tools.

24  Q.   Do you receive certifications after completing these

25  trainings?

1    A.   Yes, I have.  After the external trainings I have

2    taken tests after each course.

3    Q.   Have you passed those tests?

4    A.   Yes, I did.

5    Q.   Do you receive regular ongoing trainings with the

6    FBI?

7    A.   Yes, I do.

8    Q.   Can you please describe how frequently you receive

9    those trainings?

10   A.   Yes.  So there are about approximately three to four

11   trainings every fiscal year.  These courses are to keep us

12   updated with our approved tools.

13   Q.   So now let's talk about what you do on a daily basis.

14        What is the name of the lab that you work for again?

15   A.   I work for the New England Regional Computer

16   Forensics Laboratory under the FBI.

17   Q.   And how does that laboratory examine devices?

18   A.   We have a quality assurance program -- a guideline

19   that we follow and we make sure the evidence that we touch

20   has not been altered before and after the examination.

21   Q.   So after that is completed, what is the next step in

22   the process?

23   A.   Then I will create a report for investigative review.

24   Q.   Is that typically the type of work that you do in a

25   high-level altitude view of it?

1    A.    Correct, yes.

2    Q.    So you indicated that you examine computers; is that

3    right?

4    A.    Yes.

5    Q.    What types of computers do you examine?

6    A.    I examine Windows computers, Mac computers.

7    Q.    What's the difference?

8    A.    Window -- they are different operating systems so

9    Apple is the ones like you would use on your iPhone and

10   Windows is another operating system.

11   Q.    What types of mobile devices do you examine?

12   A.    I examine primarily Apple devices and Android

13   devices.

14   Q.    What types of information can you get from both

15   computers and mobile devices?

16   A.    Specifically from mobile devices you can grab --

17   there are emails that you can collect.  Specifically from

18   mobile devices you can grab text messages, internet

19   history, voice mails.

20   Q.    The history of the phone basically?

21   A.    Data off the phone, yes.

22   Q.    And what type of tool do you use in order to get that

23   information from a phone?

24   A.    Sorry, from a phone?

25   Q.    Yes.

```
1    A.    We use a program that is created by a company called
2    Cellebrite.
3    Q.    You said -- can you spell that for the record?
4    A.    Cellebrite is spelled C-e-l-l-e-b-r-i-t-e.
5    Q.    What is that?
6    A.    Cellebrite is a company that produces software for
7    commercial uses so retail cell phone stores run to back up
8    your phone, and Cellebrite also creates applications for
9    extracting cell phones.
10   Q.    Do you typically use Cellebrite in your line of work?
11   A.    Yes, I do.
12   Q.    Have you received any training on how to use
13   Cellebrite?
14   A.    Yes, I have.
15   Q.    Can you describe that training?
16   A.    Yes.  So referring back to the CART training program,
17   I received a week course in mobile devices and handling
18   and using Cellebrite.
19   Q.    How is it that you actually use Cellebrite to get
20   information from a phone?
21   A.    Yes.  So Cellebrite is the company.  The tool we use
22   by Cellebrite is called Physical Analyzer, Physical
23   Analyzer, and it allows us to extract the data off from
24   phones.
25   Q.    What is an extraction?
```

A.   Extraction is, to sum it up, we're pulling data --
I'm pulling data off from the phone.

Q.   So what types of data are you pulling from the phone?

A.   These could be text messages, MMS messages, internet
history and more.

Q.   And are you familiar with the term metadata?

A.   Yes, I am.

Q.   Can you describe what metadata is?

A.   So metadata is if you're looking at the back of a
baseball card, there's stats on the back of a baseball
card.  Metadata is the stats for a file.  So metadata for
a file can include the create date and time.

Q.   So, for example, in a phone if you were to take a
text message from a phone, would that have metadata?

A.   Correct, yes.

Q.   What would that look like?

A.   The metadata of the text message would have the date,
the date and time the text message was sent.

Q.   How many cell phones have you examined during the
course of your career so far?

A.   Approximately over a hundred mobile devices.

Q.   Now turning to computers, is there a similar process
that you use to extract information from a computer?

A.   Typically we pull out the hard drive from a computer
and we make sure that we -- what we call is imagining

1    where we are making -- like we are making an exact replica
2    of a book but in this case data off the hard drive.
3    Q.   So you're making an exact replica of the data from
4    the hard drive?
5    A.   Correct, yes.
6    Q.   Is there any difference between the process you use
7    for a Windows computer versus a Mac computer?
8    A.   There are different approved tools that we use for
9    Windows and Mac computers.
10   Q.   What are the approved tools for Windows computers?
11   A.   What we use for Windows computers to image the data
12   off the hard drive is called FTK Imager.
13   Q.   Have you received any training in how to use FTK
14   Imager?
15   A.   Yes, I have.
16   Q.   Can you describe that training?
17   A.   Yes.  So we -- the first week of our training we
18   train on how to use FTK Imager on how to create a forensic
19   image of the hard drive while maintaining the integrity of
20   the actual evidence item.
21   Q.   Have you used FTK Imager to examine computers in the
22   past?
23   A.   We use FTK Imager to create the image.  We use a
24   separate processing tool to process the image.
25   Q.   And what's that tool?

1    A.    We use AD Access Data Lab as well as Internet

2    Evidence Finder.

3    Q.    Just so we're clear, is that Access Data Lab?

4    A.    Access Data Lab, yes, AD Lab.

5    Q.    And can you describe what that is?

6    A.    AD lab is another approved forensic tool that we use

7    in the laboratory to process the forensic image and to

8    parse out all the data from the image.

9    Q.    Have you received training in how to use that tool?

10   A.    Yes, I have.

11   Q.    Can you describe what that training is?

12   A.    I have received training, another two-week training

13   course in how to process forensic image in AD Lab as well

14   to look at the data in AD Lab.

15   Q.    Approximately how many Windows machines have you

16   examined thus far in your career?

17   A.    Approximately over a hundred.

18   Q.    Now drawing your attention to this case, at some

19   point were you asked to examine any items relating to John

20   Rathbun?

21   A.    Yes, I have.

22   Q.    And what were those items specifically?

23   A.    The items specifically was an Apple iPhone 8 as well

24   as a Dell laptop.

25   Q.    Can you describe how you first received those items?

1    A.    I received it from our evidence control facility.

2    Q.    What is the evidence control facility?

3    A.    Our evidence control facility is where we intake all

4    our new and store our evidence items from different cases.

5    Q.    Are there any safeguards in place to protect the

6    integrity of the items inside of that?

7    A.    Yes, there is.

8    Q.    Can you describe those for the jurors?

9    A.    So it's what is called an evidence vault.  We have

10   our evidence technicians to control the vault and to make

11   sure that they only have -- they're the only ones that

12   have the code to unlock the vault.

13   Q.    Is there any documentation created that shows who may

14   have examined an item or removed an item from that

15   location?

16   A.    Yes, there is.

17   Q.    What is that documentation?

18   A.    Oh, there is -- we have unique labels to identify the

19   evidence items.

20   Q.    So in this case when you first received the iPhone

21   and the laptop, what did you do?

22   A.    We made unique identifiers for these devices and I

23   photographed them.

24   Q.    So first in regards to the iPhone, because there's

25   two separate items, correct?

1    A.   Correct, yes.

2    Q.   Did you have an opportunity to physically examine the

3    iPhone?

4    A.   I did.

5    Q.   What type of iPhone was it?

6    A.   It was an Apple iPhone 8.

7    Q.   After physically examining it and documenting it,

8    what did you do next with the iPhone 8?

9    A.   After I finished documenting and photographing the

10   iPhone, I then proceeded to create -- to process the

11   extraction of the iPhone.

12   Q.   When you say you continued to process the extraction,

13   what do you mean by that?

14   A.   When I say extraction, I mean -- pulling, like I said

15   earlier, pulling the data off from the phone.

16   Q.   So did you complete that step in the process?

17   A.   Yes, I did.

18   Q.   Did you have any problems during that step in the

19   process?

20   A.   No, I did not.

21   Q.   After you completed the extraction, what did you do?

22   A.   I created a report of the data of the phone.  I made

23   it available for investigative review.

24   Q.   And what type of tool did you use to do this?

25   A.   This was all in Cellebrite Physical Analyzer.

```
 1    Q.   And that's what you previously described to the
 2    jurors?
 3    A.   Correct, yes.
 4    Q.   You said you generated a report or Cellebrite
 5    generated a report; is that correct?
 6    A.   Yes.
 7    Q.   And what form -- what does this report actually look
 8    like?
 9    A.   It is called a Cellebrite report.  It's an easier
10    graphic interface that allows easier views for
11    investigative review.
12    Q.   Did you review the report that you created from the
13    Rathbun iPhone?
14    A.   I did, yes.
15    Q.   Did you review it to ensure that the process worked
16    properly?
17    A.   I did, yes.
18    Q.   Did you notice any problems with the process?
19    A.   I did not.
20    Q.   Based on that review did you form any conclusions
21    about the accuracy of the report?
22    A.   Sorry, what was that?
23    Q.   Based on your review of the report, did you form any
24    conclusions about its accuracy?
25    A.   I reviewed that the data in the report was accurate.
```

1    Q.   So what types of files generally did you extract from

2    the Rathbun item?

3    A.   These files were text messages as well as internet

4    history and voice mails.

5    Q.   What kind of media was this report stored on?

6    A.   Sorry?

7    Q.   Was this on a disk or was it on a hard drive?

8    A.   I put the report on a Blu-ray disk.

9    Q.   Do you do anything to label that Blu-ray disk?

10   A.   Yes, we labeled the disk and made it -- we created a

11   unique identifier for the disk.

12   Q.   And what did you do after you labeled that disk?

13   A.   After the disk was created, I shipped it out to

14   Special Agent Ryan McGonigle.

15   Q.   And do you know where Agent McGonigle works?

16   A.   He works with -- yes, I do.

17   Q.   Where is that?

18   A.   He works in the Springfield Resident Agency in the

19   Federal Bureau of Investigation.

20   Q.   Now drawing your attention to the laptop that you

21   indicated that you also received in this case.

22   A.   Yes.

23   Q.   What's the first thing you did with the laptop?

24   A.   Like the iPhone, I created a unique identifier for

25   the laptop as well as photographed the laptop.

1    Q.   After you took those steps, what's the next thing you
2    did with it?
3    A.   I pulled out the hard drive from the laptop and then
4    created a forensic image of the hard drive.
5    Q.   After you created the forensic hard drive, did you
6    review it for accuracy?
7    A.   Yes, I did.
8    Q.   Based on that review, did you form any conclusions
9    about the accuracy of that image?
10   A.   The image was an accurate representation of the hard
11   drive itself.
12   Q.   What types of files were you able to extract from the
13   Rathbun laptop?
14   A.   These files were internet history and mainly
15   documents.
16   Q.   Documents you said?
17   A.   Correct, yes.
18   Q.   How was this information stored?  Was this on a hard
19   drive or was this on a Blu-ray?
20   A.   I created the report on a -- I believe it was a -- I
21   put it on a Blu-ray disk for investigative review.
22   Q.   Again, did you create a unique label for it as you
23   did for the iPhone?
24   A.   Yes, I did.
25   Q.   After you took those steps, what's the next thing you

1    did in relation to this item?

2    A.   In relation to, sorry?

3    Q.   To the Blu-ray disk.

4    A.   I shipped the Blu-ray disk out to Special Agent Ryan

5    McGonigle.

6    Q.   How is it that you shipped it to him?

7    A.   I went through our evidence facility and our evidence

8    technicians shipped out the Blu-ray disk to Special Agent

9    McGonigle.

10   Q.   Is that the same way you sent the iPhone information

11   to Agent McGonigle?

12   A.   Correct, yes.

13   Q.   Is that in compliance with the protocols and

14   procedures in place governing the handling of evidence by

15   the FBI?

16   A.   Yes, that is.

17   Q.   Did you maintain copies of this information anywhere

18   else?

19   A.   No, I did not.

20   Q.   So they went to -- the copies went to Special Agent

21   McGonigle, correct?

22   A.   Correct, yes.

23           MR. DESROCHES:   Thank you.   I have no further

24   questions.

25

**CROSS-EXAMINATION**

Q.   (By Mr. Watkins)   Good afternoon, Agent Wong.

A.   Good afternoon.

Q.   In addition to sending the report to Special Agent McGonigle, did you do any other kinds of review of the different kinds of reports that can be created by Cellebrite?

A.   After I created the report and -- after I generated the report and shipped it out to Special Agent McGonigle, I did not review any of the reports.

Q.   So, for example, Cellebrite permits you to create a timeline of events, right?

A.   Yes.   Cellebrite does create a timeline of the data within the phone.

Q.   Can you describe what a timeline of the data on a phone is in particular?

A.   Yes.   So a timeline and what Cellebrite creates, it takes all the different types of artifacts that is found. So let's say, text messages that were sent on one day and text messages that were sent on another day, it creates a timeline and chronologically orders it.

Q.   And other items go in there.   Web searches can go in there and other digital activities on a particular phone also go into the timeline, correct?

1    A.   Yes, that's correct.

2    Q.   But you did not yourself print out any kind of

3    timeline?

4    A.   I did not print out any timeline.

5         MR. WATKINS:  This should just go to the witness

6    for now, my computer.

7    Q.   (By Mr. Watkins)  I'm showing your what's been marked

8    Government's Exhibit 52.  Do you see that up on your

9    screen?

10   A.   Yes, I do.

11   Q.   Now you haven't seen this document, have you?

12   A.   I have seen this document, yes.

13   Q.   Oh, you have seen this document?

14   A.   Yes.

15   Q.   When did you see this particular document?

16   A.   When I was reviewing it with the case agent.

17   Q.   Okay.  Well, great.

18        So this is the document that was created from

19   Cellebrite downloaded to an Excel spreadsheet, right?

20   A.   So Special Agent Ryan McGonigle went into the

21   Cellebrite report and created this specific timeline.

22   Q.   But you've reviewed it in preparation for your

23   testimony today?

24   A.   Correct, yes.

25        MR. WATKINS:  Okay.  I move to introduce

1    Government's Exhibit 52.

2             MR. DESROCHES:  Your Honor, may we be heard?

3             THE COURT:  Sure.  Go ahead.

4    (Sidebar discussion.)

5             MR. DESROCHES:  Your Honor, the government

6    objects at this point.  I don't believe a proper

7    foundation was laid.  This witness did not create the

8    document.  He has reviewed it.  It was created by another

9    agent, and I object to the purpose of the introduction of

10   the document which is I think at this point quite unclear.

11            MR. WATKINS:  I thought I laid sufficient

12   foundation.  I'm happy to continue and do that.  This

13   agent recognizes this particular spreadsheet as being

14   created off of the extraction that he did.  I don't know

15   that any other authentication is necessary.

16            THE COURT:  Government, what other

17   authentication would be needed?

18            MR. DESROCHES:  Well, Your Honor, again, I don't

19   know that this is a complete timeline of this.  I'm not

20   sure this witness can look at this and tell whether or not

21   things are missing from it or the purpose that it was

22   created.

23            THE COURT:  Authentication and relevance are

24   different things.  What's your main objection here?

25            MR. DESROCHES:  Well, Your Honor, I suggest

1    there's two.  First, this is outside the scope of the
2    direct.
3         Second, I understand Your Honor's point about
4    authentication and relevance being separate things, but
5    right now there's no offer for the relevance and it
6    appears completely irrelevant.  And authentication, as I
7    have already stated, I think is also short.  I would ask
8    also the document be scrolled further to the right so we
9    can see the contents on the right-hand column just to
10   ensure what that is.
11             THE COURT:  All right.  So right now I'm going
12   to sustain the government's objection, but having said
13   that I don't think there's a high bar here for the
14   defendant to be able to lay a foundation to get it in so
15   go right ahead, Attorney Watkins.
16             MR. WATKINS:  Thank you, Your Honor.
17   (End of sidebar discussion.)
18   Q.   (By Mr. Watkins) So continuing with Exhibit 52 that
19   you have in front of you, let's go back to how Cellebrite
20   works.
21        You create a report, is that correct, or Cellebrite
22   creates the report?
23   A.   I'm sorry, can you?
24   Q.   It was very -- when Mr. Desroches was asking you
25   about the process of what Cellebrite does when it extracts

1  all the information, it creates a Cellebrite reader report

2  that all of us can take a look at, right?

3  A.   I have to generate the Cellebrite reader report.

4  Q.   And that's what you generated to send to Agent

5  McGonigle, right?

6  A.   Correct, yes.

7  Q.   It takes a little bit of experience to navigate one

8  of those reports, but even us idiots can do it every once

9  in a while, right?

10 A.   Cellebrite reader report categories each artifact

11 into different categories.  So there are different

12 categories to find text messages, internet history, voice

13 mails, et cetera.

14 Q.   And one of those categories is timelines, right?

15 A.   A timeline, yes.

16 Q.   Right.  So once you create that, that's part of that

17 Blu-ray disk that you send to Agent McGonigle, right?

18 That report included a timeline feature?

19 A.   Correct, yes.

20 Q.   And so one can print that timeline feature off the

21 Cellebrite Blu-ray disk to a spreadsheet, Excel

22 spreadsheet, right?

23 A.   One would have to export the timeline into Excel and

24 then be able to print it off an Excel spreadsheet.

25 Q.   So looking at Exhibit 52 then, that is an Excel

1    spreadsheet, right?

2    A.   Correct, yes.

3    Q.   And you compared that to what you did that you put on

4    the Blu-ray disk for Agent McGonigle, right?

5    A.   I did not verify the timeline.  Agent McGonigle

6    exported the timeline into Excel.

7    Q.   So he represented to you that this is the timeline

8    that I printed off from Cellebrite?

9    A.   This spreadsheet was created within Cellebrite, yes.

10            MR. WATKINS:  With that, Your Honor, I would

11   move to introduce Government's Exhibit 52.

12            MR. DESROCHES:  May I be heard again?

13            THE COURT:  Of course.

14   (Sidebar discussion.)

15            THE COURT:  Go ahead, government.

16            MR. DESROCHES:  Your Honor, the concern is that

17   this is but one page of I believe one hundred and I

18   believe the type of information is pretty varied.  It

19   includes the content of text messages which I would object

20   as inadmissible hearsay.  So I believe if this were to be

21   admitted properly, the hearsay should be redacted from it.

22        At this point, Your Honor, there's simply no

23   exception to the hearsay that's included -- to include the

24   contents of the text messages.

25            MR. WATKINS:  Your Honor, I would note this is

```
1    an exhibit that the government put on its witness list

2    that they were intending to introduce.  It's hard for me

3    to believe now that the government can insist that it's

4    inadmissible.

5              MR. DESROCHES:  Your Honor --

6              THE COURT:  Is your propose to put the entire

7    whatever hundred pages in?

8              MR. WATKINS:  I'm sorry?

9              THE COURT:  Are you proposing to put the entire

10   document in?  The government says this is a hundred pages

11   approximately.

12             MR. WATKINS:  It's an Excel spreadsheet.  I

13   think it's printed out.  I don't know how many pages it

14   actually prints out to.  I think it's in the government's

15   binder.

16             MR. DESROCHES:  Your Honor, I can represent it

17   is exactly one hundred pages, and I would also suggest

18   that the government may introduce statements that are not

19   hearsay which the defendant cannot because they are

20   hearsay.  So whether it's on our list or not, if it does

21   not affect the admissability for purposes of it being

22   proffered --

23             THE COURT:  I think for authentication you've

24   shown where it came from, how it was made, how this

25   witness knows about this information being compiled.  But
```

1      I'm failing to see the purpose of relevance right now.

2      Can you tell me about that?

3              MR. WATKINS:  Yes.  What I intend to do with

4      this witness is go through Mr. Rathbun's internet search

5      history from midnight to four, approximately 4:30 in the

6      morning.  It's not hearsay.  This is state of mind which

7      the government has clearly, clearly put into play.

8              THE COURT:  So those are isolated parts -- those

9      are portions of this report.  What's the necessity of

10     introducing the whole report as opposed to just isolating

11     the portions you want?

12             MR. WATKINS:  Judge, again, this is a government

13     exhibit that they were planning to introduce in its

14     entirety.  They provided it to me in its entirety.  They

15     were not talking about particular aspects of it being held

16     back.  They were going to introduce it and they're going

17     to introduce specific sections of it.

18             THE COURT:  Just because the government has it

19     on their list as something they want to introduce, doesn't

20     mean it's admissible.  It doesn't mean the court would

21     have allowed it in.  It doesn't mean you would not have

22     had an objection.  Unless the parties are telling me

23     everything that was on the exhibit list was agreed to by

24     each side to be admissible, is that what you're saying?

25             MR. WATKINS:  I certainly didn't object to it.

1    I guess I'm just flabbergasted the government is objecting

2    to its own exhibit.

3              THE COURT:  I think the government has raised

4    technical but valid objections, but I do think you should

5    be allowed to explore what you want to explore regarding

6    the search history.

7         Is there any reason you can't do that on a

8    search-by-search basis with the document right now and

9    introducing those portions that support or deal with your

10   particular inquiry about a search at a certain day or

11   time?

12             MR. WATKINS:  Yes, absolutely I can do that.

13             THE COURT:  All right.  Thank you.

14             MR. DESROCHES:  Your Honor, I'm sorry, just so

15   I'm clear.  As I stated, this document contains all sorts

16   of different information other than recent history.  I

17   think it is possible to have it isolated to just web

18   history.  Is that what the defendant is intending to do?

19             THE COURT:  Well, right now we're going to talk

20   about web history because the defendant has satisfied me

21   that has obvious relevance.  If the defendant shows me

22   that there's other relevant portions of this document,

23   then we will go through those.

24        You know, if the government is making this objection

25   to frustrate what they know is an otherwise admissible

1     document and you plan on introducing this later, I think

2     you better withdraw your objection right now.  If you have

3     a good-faith basis for the objection, fine.  I'll go alone

4     with this procedure and I'll have the defendant go piece

5     by piece.

6              MR. DESROCHES:  Your Honor, I can represent that

7     the government was intending to use the web history not

8     the timeline.  This is a different document.  It is on the

9     exhibit list.  However, given that it's on the exhibit

10    list does not necessarily make it -- does not make it

11    admissible.  We have to be overly inclusive in order to

12    ensure that we put the defendant on notice should we

13    decide to use it, but at this point the intention is to

14    use just the web history.

15             THE COURT:  Okay.  Understood.  I understand

16    that.  So the web history, the web history portion, is

17    there a way to separate this out because I'm prepared to

18    admit the web history portion?  Or is that something that

19    technically is not possible, Attorney Watkins?

20             MR. WATKINS:  No, it's certainly possible.  Yes,

21    absolutely I can certainly for testimony right now limit

22    it to simply web history.

23             THE COURT:  Okay.  The document upon

24    reconsideration and now superceding whatever ruling I

25    previously made the web history is admissible.

1      The exact format of that can be taken care of after

2    the close, after the close of business today.  The parties

3    can look at whatever the document should look like.  It

4    might need redaction, et cetera, et cetera.  So we can

5    take care of that after.

6      Right now the web history is admissible and the

7    parties can show me what they propose to be the format

8    after, perhaps later today or next week now.  Thank you.

9            MR. DESROCHES:  Thank you, Your Honor.

10   (End of sidebar discussion.)

11   Q.   (By Mr. Watkins)  Agent Wong, going back to Exhibit

12   52 one more time.

13      I think what you told is that on a timeline view, one

14   downloads everything.  It can be web history; it can be

15   text messages; it can be a number of things off a phone,

16   correct?

17   A.   Sorry, what does what download?  I didn't catch the

18   first part.

19   Q.   I'm sorry, a timeline view, when you're producing a

20   timeline through Cellebrite includes all kind of different

21   data, right?

22   A.   Correct, yes.

23   Q.   Including web searches, right?

24   A.   Correct, yes.

25   Q.   It also includes things such as log entries, call

1    logs, things of that nature, right?

2    A.   Yes, system logs.

3    Q.   When one prints out a timeline, one can limit it but

4    to a particular date, right?

5    A.   Correct, yes.

6    Q.   So, for example, this exhibit in front of you right

7    now begins on April 2nd of 2020 at 12:07 in the morning

8    eastern daylight time, right?

9    A.   Correct, yes.

10   Q.   And just to go the other way, it ends at April 2,

11   2020 at 11:51:23 p.m. again eastern daylight time, right?

12   A.   Correct, yes.

13   Q.   Okay.  So a 24-hour period from this particular phone

14   is what this document is?

15   A.   Correct, yes.

16   Q.   So I want to take you to -- I want to take you to --

17   do you see where I am at 12:49, ten minutes to one o'clock

18   in the morning on April 2nd?

19   A.   There are multiple entries around that time.

20   Q.   Correct.  I want to direct you to the entry that says

21   temp agency.

22   A.   Yes, I see it.

23   Q.   Now, that says Searched Items in type, right?

24   A.   Correct, yes.

25   Q.   So does that mean somebody was searching through

1   their internet browser on their phone for a temp agency?

2   A.   There was a Google search for a temp agency.

3            MR. WATKINS:  Your Honor, I'd ask to publish

4   this to the jury?

5            THE COURT:  That isolated box or the entire

6   document?

7            MR. WATKINS:  This particular screen.

8   Q.   (By Mr. Watkins)  Well, all of these in that left --

9   second to left-hand column, all of those say either web

10  history or searched items, correct?

11  A.   Sorry, what was that?

12  Q.   On the spreadsheet that we're looking at, this is

13  Exhibit 52, there's a column that says Type and it has Web

14  History and Searched Items; do you see that?

15  A.   Yes.

16  Q.   All of that is internet browsing history, correct?

17  A.   Correct, yes.

18            MR. WATKINS:  So I would ask to publish the

19  entire page.

20            THE COURT:  So the screen page shows the number

21  for each item for 184 through and including 193?

22            MR. WATKINS:  Correct.

23            THE COURT:  Is that correct?

24            MR. WATKINS:  That's correct.

25            THE COURT:  Government?

1          MR. DESROCHES:  There's no objection, Your

2     Honor, just as long as this is what's displayed and it's

3     not scrolled any further.

4          THE COURT:  All right.  So, yes, that can be

5     displayed as what Attorney Desroches said.  The screen as

6     I'm looking at right now is admitted.  If you can take a

7     -- if there's way we can print it.

8          MR. WATKINS:  I'm sorry?

9          THE COURT:  Is there a way we can print that out

10    to make it admissible?

11         MR. WATKINS:  I'm going to keep going through

12    more entries and then I think we'll have a whole history

13    that we can print and give it the court and the jury.

14         THE COURT:  Okay.  But the government's point is

15    for it not to scroll more left or more right; is that

16    correct?

17         MR. DESROCHES:  Yes, Your Honor.  Thank you.

18         THE COURT:  So with that understood, Attorney

19    Watkins, go ahead.

20         MR. WATKINS:  Do you need me to scroll more to

21    the left or the right?

22         MR. DESROCHES:  No.  Your Honor, I can be clear.

23    I don't believe scrolling left to right is the problem.

24    It's the up or down that's the problem.

25         THE COURT:  I see.  Okay.  Thank you.  So as

1    long we stay on 184 through 193 that's in.  That would be

2    admissible right now.

3    **(Entries 184 - 193 from Exhibit 52 was admitted.)**

4              MR. WATKINS:  We can make that public.

5              THE COURT:  As far as marking this, so that will

6    become an exhibit.  You're moving that in as an exhibit?

7              MR. WATKINS:  Yes, I think when I'm done, we can

8    introduce it as Exhibit 52-A from the Government's 52.

9              THE COURT:  All right.  I just don't want to

10   lose that.  I want our exhibit sheet to make sure we are

11   referencing what we are doing.

12   Q.   (By Mr. Watkins)  Agent Wong, let's go through item

13   numbers 184 to 193 there now that the jury can see it all.

14        What does it say for Type in that column?

15   A.   In the column for number 188?

16   Q.   Just generally all of the columns -- the Type column,

17   does it say Web History and Searched Item?

18   A.   Web History and Searched Items.

19   Q.   And in Description, in the middle of the page, that

20   describes what is being searched for?

21   A.   Correct, yes.

22   Q.   So at 12:49 in the morning this phone belonging to

23   Mr. Rathbun was searching for temp agency?

24   A.   Correct, yes.

25   Q.   And you see that search repeated here a few times

1    within a couple minutes or even a few seconds; is that

2    correct?

3    A.   Yes.

4              MR. WATKINS:  Now take this off the screen and

5    I'll scroll down some more.  This should just be to the

6    witness at this point.

7    Q.   (By Mr. Watkins)  I now have on the screen 194 -- if

8    I can get there.  Let's go to 193 down to 202.  Again the

9    type is Web History, Searched Items, Cookies.  These are

10   all related to internet searches from his phone, correct?

11   A.   Correct, yes.

12             MR. WATKINS:  I move now to introduce as part of

13   52-A this screen and have it reproduced to the jury.

14             MR. DESROCHES:  There's no objection to that,

15   Your Honor.

16             THE COURT:  All right.  No objection, that can

17   be done.

18   **(Entries 193 - 202 from Exhibit 52 was admitted.)**

19             THE COURT:  My only concern is we are having all

20   these problem for the jurors in the front.  There's no

21   screens that's available for them to be able to see this

22   very well.

23        So I'm communicating with one of our clerks in the IT

24   department to try and bring in another screen because this

25   isn't working well.

```
 1              MR. WATKINS:  Perhaps we can turn one of these
 2   screens.
 3              THE COURT:  Right.  That's what we're doing, but
 4   turning the screen is a quick fix.  That is not proving to
 5   be a good reliable fix because then we have to keep
 6   switching it back, and the same thing for the computer at
 7   the end of the clerk's table.  We can keep turning it for
 8   now and that's what we're going to do for the rest of the
 9   afternoon.
10        So for the jurors over here, we're going to turn this
11   screen.  But then as soon as we change and there's things
12   that you shouldn't be seeing because they're not public
13   yet, those screens have to be turned back around.  All
14   right.  So go ahead.
15              MR. WATKINS:  Thank you.
16              THE COURT:  To this juror on the floor, you can
17   see that better now?  Does that help you?
18              A JUROR:  Yes.
19   Q.   (By Mr. Watkins)  Again, what we see on this page
20   searches for temp agencies?
21   A.   Correct, yes.
22   Q.   All right.  Let's take this off the screen.  We will
23   go to a different one.
24        Okay.  I'm showing you now entries 356 to 365.  Do
25   you see those on the screen?
```

1    A.    Yes, I do.

2    Q.    And again all of these are work history -- I'm sorry,

3    Web History, except for the top ones which is Log Entries

4    which I just can't get off the screen.  But anyway it's

5    Web History except for that one, correct?

6    A.    Correct, yes.

7    Q.    And in the description -- what does the description

8    indicate is being searched for at 1:27 in the morning?

9          Now I lost my screen.  There we go.

10         What is the description for an entry at 1:37:27 in

11    the morning?

12    A.    Would you like me to read the description?

13    Q.    Why not.  It's porn.  He's searching for porn, right?

14    A.    Free porn videos and sex movies; porno XXX; porntube;

15    pornhub.

16    Q.    And all on this page the same kind of stuff.

17          Critical threat, what does that indicate to you as a

18    specialist in these kind of searches?

19    A.    I believe it's one of the popups that when you go to

20    these websites, those websites pop up.

21                MR. WATKINS:  So I'd ask that this be published

22    to the jury, that's 356 to 365.

23                MR. DESROCHES:  No objection.

24                THE COURT:  No objection, that will be

25    admitted.

**(Entries 356 - 365 from Exhibit 52 were admitted.)**

Q.   (By Mr. Watkins)   Again this is now 1:37 in the

morning to, well, to 1:38 in the morning.   That's what

those entries indicate?

A.   Correct, yes.

              MR. WATKINS:   Back to just the witness and

counsel.

Q.   (By Mr. Watkins)   Looking at Government's Exhibit 52,

entries 402 to 411.   Do you see those in front of you?

A.   Yes, I do.

Q.   Is the type consistent with web searches?

A.   Search Items and Web History.

Q.   I'm sorry?

A.   The types are Search Items and Web History.

Q.   And the first --

              MR. WATKINS:   Well, I think we can just publish

this to the jury at this point.

              MR. DESROCHES:   There would be no objection

subject to the previous agreement.

              THE COURT:   All right.   Under the same

conditions, that can be published.

**(Entries 402 - 411 from Exhibit 52 was admitted.)**

Q.   (By Mr. Watkins) On this description now at 2:53 in

the morning, he's searching around for Home Depot really

all through here, 2:53 to 2:56, right?

1    A.   The Google search is for Home Depot.

2              MR. WATKINS:  And I think we have to go back to

3    the parties and the witness.

4    Q.   (By Mr. Watkins)  While we're doing that, I'm going

5    to ask you, this description it describes the websites

6    sometimes or sometimes not, right?

7    A.   Sorry, can you rephrase?

8    Q.   The description column there when Cellebrite

9    downloads it, sometimes you get a description of the

10   website, the name of the website, what the IP address is

11   -- not the IP address but a description of what the

12   website is?

13   A.   It came back as a Google search for Home Depot.

14   Q.   Right.  And so when it's a Google search for Home

15   Depot, say, for example, anti-semitic web searches, those

16   would also turn up in the Cellebrite search of data

17   through the phone, right?

18   A.   If they were searching for, sorry, what was it?

19   Q.   Like anti-Semetic websites if there were search terms

20   such as that, that would also show up here?

21   A.   The Google -- it would appear for the Google

22   searches.

23   Q.   So turning to Government's Exhibit 52, entries 421 to

24   430 -- up to 429 anyway, does that indicate Web History?

25   A.   Correct, yes.

1        MR. WATKINS:  And may we publish this to the

2   jury?

3        THE COURT:  Yes.  Any objection?

4        MR. DESROCHES:  No.  Thank you, Your Honor.

5        THE COURT:  Go right ahead.

6   **(Entries 421 - 429 from Exhibit 52 was admitted.)**

7        THE COURT:  We're going to get to the point

8   where you should just come up and turn it yourself.

9   Q.   (By Mr. Watkins)  Now this indicates then that Mr.

10  Rathbun on his phone is looking for Milwaukee Tools, an

11  18-volt lithium-ion brushless cordless combo kit?

12  A.   There were entries for that, for that tool on the

13  phone.

14  Q.   And that is at 3 o'clock in the morning, correct?

15  A.   It's from -- I see from number 421 it starts at

16  2:57:03 a.m. to 3 a.m., three o'clock 59 a.m.

17  Q.   Thank you.

18        MR. WATKINS:  I think just one more time

19  spinning the monitors around, if we can?

20  Q.   (By Mr. Watkins) Showing you Government's Exhibit 52

21  entries 445 to 454.  Do those all indicate Web History and

22  Cookies?

23  A.   The types are Cookies and Web History.

24        MR. WATKINS:  And can we publish this to the

25  jury?

```
1              THE COURT:  Government?

2              MR. DESROCHES:  No objection, Your Honor.  Thank

3    you.

4              THE COURT:  Okay.  Yes, you can.

5    (Entries 445 - 454 from Exhibit 52 was admitted.)

6    Q.   (By Mr. Watkins) So at 4:23 in the morning, what is

7    Mr. Rathbun searching for?

8    A.   At 4:23 in the morning that's where number 454 is,

9    it's slightly cut off.

10   Q.   Sorry.

11             THE COURT:  Please scroll it more.

12             MR. DESROCHES:  I'm sorry, I believe it's

13   scrolled down.

14             THE COURT:  Yes, it was.

15             MR. WATKINS:  I was trying to get it in between.

16   Q.   (By Mr. Watkins)  Instead of 4:23 let's do 4:22:08,

17   what is he looking for there?

18   A.   The last visited -- that entry was for the Milwaukee

19   M-18, 18-volt lithium-ion cordless combo kit tool.

20             MR. WATKINS:  I think that's all for this

21   exhibit.  I'm going to take it down now.

22   Q.   (By Mr. Watkins) And you talked about the laptop you

23   created a --

24             THE COURT:  Hold on one second.

25        Now, ladies and gentlemen, that was -- as you can
```

1    tell, there some technical -- it was a challenge to kind

2    of get that up and show you parts of that graph that was

3    trying to be displayed to you.

4        Okay.  So it was being identified through the numbers

5    and the dates as to what was being introduced and what was

6    being focused on.  If at any time you saw things because

7    it over-scrolled or moved too far to the right or moved

8    too far up or down and you think you read things that were

9    beyond what the parties were intending to show you, you

10   should disregard anything you saw or think you saw.

11       If you happen to read anything that was out of --

12   that was something that wasn't included in the portion

13   that was being shown to you, completely disregard that and

14   strike that, just like I told you to strike other things

15   you may have seen or heard.

16       Does everyone understand that?  All right.  I see

17   affirmative answers from everyone.  All right.

18           MR. WATKINS:  Thank you, Your Honor.

19   Q.   (By Mr. Watkins)  The laptop you created an internet

20   evidence binder report?

21   A.   I created a Portable Case that is one of -- that is

22   the report that we generate from the tool that we use,

23   yes.

24   Q.   And that was given to Special Agent McGonigle as

25   well, right?

1    A.   Correct, yes.

2    Q.   Did you review that report before coming in to

3    testify today?

4    A.   I reviewed it to make sure that there were entries in

5    the Portable Case.

6    Q.   But you didn't look at it substantively to do

7    searches through Internet Evidence Binder?

8    A.   I did not do searches myself.

9         MR. WATKINS:  That's all I have, Your Honor.

10        MR. DESROCHES:  May I just have one moment, Your

11   Honor?

12        THE COURT:  Yes.

13   **REDIRECT EXAMINATION**

14   Q.   (By Mr. Desroches)  Now, Mr. Wong, you were just

15   asked some questions about the web history that was on the

16   phone that you did the extraction from?

17   A.   Correct, yes.

18   Q.   I'll pick up where we left off.

19   A.   Yes.

20   Q.   You indicated that the information that you just

21   looked at and we all saw together indicated that there was

22   a search history that began on approximately April 1st, or

23   in the late hours of April 1st early hours of April 2nd

24   until the early morning hours of April 2nd; is that right?

25   A.   The timeline was from April 1st twelve in the morning

1    until April 1st 11:59 p.m.  That was the timeline that was

2    shown.

3    Q.   Now didn't -- I'm sorry.  One second.

4         Do you mean April 1st to April 2nd?

5    A.   Correct, yes.

6    Q.   So we saw some of the web history go from April 1st

7    into the early morning hours of April 2nd; is that right?

8    A.   I would have to look back at the date and times.

9              MR. DESROCHES:  Could we put that exhibit back

10   up just for the witness please and counsel?

11             MR. WATKINS:  Let me get my computer back.

12             MR. DESROCHES:  Can we go to approximately line

13   155?

14             MR. WATKINS:  I'm sorry?

15             MR. DESROCHES:  Approximately line 155.

16             MR. WATKINS:  Here?

17             MR. DESROCHES:  Yes.  This is fine.  Thank

18   you.

19   Q.   (By Mr. Desroches)  So, Mr. Wong, looking at this

20   screen that's in front of you today, this is the same

21   document that you were reviewing with Attorney Watkins; is

22   that correct?

23   A.   Correct, yes.

24   Q.   And what you're looking at right now appears to show

25   some web history beginning at 1:47 a.m. on April 2nd; is

1   that right?

2   A.   Yes.

3   Q.   And then it goes -- it shows another few entries that

4   go to 1:56 a.m.; is that right?

5   A.   Correct, yes.

6            MR. DESROCHES:  Attorney Watkins, I hate to ask

7   you to scroll down.  I wish there were a better way.

8   Q.   (By Mr. Desroches)  Now as we scroll down we're at

9   lines 396 to 404 on this; is that correct, Mr. Wong?

10   A.   Can you repeat that?

11   Q.   Just on your screen right now, so the record is

12   clear, it's line 397 to 406; is that right?

13   A.   Correct.

14   Q.   Again, this shows Web History on April 2nd from 1:59

15   a.m. until 2:53 a.m. on April 2nd; is that right?

16   A.   Correct.

17            MR. DESROCHES:  Attorney Watkins, if you could?

18   Q.   (By Mr. Desroches)  And so the record is clear, we

19   are looking at lines 412 to 421.

20        Mr. Wong, does this show web activity from 2:56 a.m.

21   until 2:57 a.m. on April 2nd?

22   A.   That's correct, yes.

23            MR. DESROCHES:  Attorney Watkins, can you scroll

24   down again?

25   Q.   (By Mr. Desroches)  Now we are looking at lines 424

1    through 432.

2         And is it your understanding, Mr. Wong, that this

3    shows web history on April 2nd from 2:58 a.m. until 3:35

4    a.m.?

5    A.   That is correct, yes.

6             MR. DESROCHES:  And if we can scroll down again,

7    Attorney Watkins.

8    Q.   (By Mr. Desroches)  For the record, lines 436 through

9    445 are on the screen.

10        And, Mr. Wong, does this show web history on April

11   2nd beginning at 3:38 a.m. or encapsulating 3:38 a.m. and

12   4:18 a.m.?

13   A.   Correct, yes.

14            MR. DESROCHES:  If you can scroll down?

15   Q.   (By Mr. Desroches)  So now we are at line 448 -- 445

16   and then ends at 454.  Does this demonstrate web activity

17   from 4:18 a.m. on April 2nd until 4:23 a.m. on April 2nd?

18   A.   Yes, that's correct.

19            MR. DESROCHES:  And can you scroll down again?

20   So if we can scroll up one?

21   Q.   (By Mr. Desroches)  So at line 455 it indicates web

22   history at 4:25:01; is that correct?

23   A.   Correct, yes.

24   Q.   In terms of searching the internet or using the

25   internet as would typically be expected, from line 458 --

1    I'm sorry, line 456 which indicates web history at 4:25

2    a.m. looking down to line 462, do you see any other search

3    history or web usage?

4    A.   I'm sorry, can you repeat that?

5    Q.   Sure.  Directing your attention to line 455 -- I'm

6    sorry, 456 to 461, do you see any activity in those boxes

7    that indicate a web search or internet usage by the user

8    of the phone?

9    A.   From row 456 to 461 I do not see any web history, the

10   type web history.

11           MR. DESROCHES:  Can you scroll down please?

12   Q.   (By Mr. Desroches)  So now lines 462 to 467, do you

13   see any information there indicating any web history?

14   A.   From row 462 to 467 I do not see any web history.

15           MR. DESROCHES:  Can you scroll down again

16   please?

17   Q.   (By Mr. Desroches)  So now looking beginning at line

18   468 to 473, do you see any information indicating web

19   usage?

20   A.   From row 466 to row 473 I do not see any web history.

21           MR. DESROCHES:  Can you scroll down further,

22   please?

23   Q.   (By Mr. Desroches) Now from lines 475 to 483, do you

24   see any information indicating web usage by the user?

25   A.   From row 475 to 483 I do not see any web entries.

```
 1              MR. DESROCHES:  Can you scroll down?
 2    Q.   (By Mr. Desroches)  So now from lines 484 to 489, do
 3    you see any information indicating web usage by the user?
 4    A.   Nothing related to web usage.
 5              MR. DESROCHES:  Can you scroll down further?
 6    Q.   (By Mr. Desroches)  Now from lines 493 to 498, do you
 7    see anything indicating web usage by user?
 8    A.   I do not see any web history created by the user.
 9              MR. DESROCHES:  Can you continue to scroll down?
10    Q.   (By Mr. Desroches)  So now on the screen lines 500 to
11    506, do you see any information indicating web usage by
12    the user?
13    A.   I do not see any web usage.
14              MR. DESROCHES:  Can you continue to scroll down?
15    Q.   (By Mr. Desroches) So from 508 to 514, do you see any
16    usage indicating web usage by the user?
17    A.   From 508 to 514 I do not see any web history.
18              MR. DESROCHES:  Can you scroll down?
19    Q.   (By Mr. Desroches)  From 514 to 521 do you see any
20    information indicating web usage?
21    A.   From row 514 to 521 I do not see any web usage.
22              MR. DESROCHES:  Can you scroll down one more
23    time?
24         Sorry, can you scroll up a little bit?
25              MR. WATKINS:  Sorry.
```

1          MR. DESROCHES:  521 please.

2    Q.   (By Mr. Desroches)  So now, Mr. Wong, on lines 520 to

3    526 do you see any web usage?

4    A.   I see one searched item in row 526.

5    Q.   What time is indicated that item was searched?

6    A.   That was searched at April 2, 2020 at 7:53:33 a.m.

7    eastern daylight.

8    Q.   Now based on your review of what we just went over,

9    is it fair to say that there was no web usage from 4:25

10   a.m. until that time 8:03 a.m.?

11   A.   There were none.

12          MR. DESROCHES:  Thank you.  I have no further

13   questions.

14          MR. WATKINS:  Nothing else, Your Honor.

15          THE COURT:  All right.  Thank you.

16       Thank you, sir.

17       We are going to take ten minutes and have them come

18   up and clean the witness stands.  All right.

19       During the break don't discuss the case.  The same

20   rules.  Don't discuss it with each other, anyone else.

21   Don't get on the internet to search or post or read any of

22   the articles, if there are any.  All right.

23       So it should be ten minutes and we'll come get you

24   when we're ready.

25          THE CLERK:  All rise for the jury.

1    **(The jury left at 3:45.)**

2           THE COURT:  All right.  It's usually under ten

3    minutes.

4           MR. DESROCHES:  Thank you, Your Honor.

5           THE COURT:  I think we will do one more witness.

6    I plan on not going past 4:30 but we will go up to 4:30.

7           MR. DESROCHES:  Thank you, Your Honor.

8    **(A recess was taken at 3:46 until 3:55.)**

9           THE COURT:  Government, you have your next

10   witness ready?

11          MR. DESROCHES:  Your Honor, I believe this is an

12   issue that we'd like to front considering the last witness

13   so we don't have to take the jury's time in here using the

14   WhisperTec.

15          THE COURT:  So the jury is still in their room;

16   is that correct?

17          THE CLERK:  Yes.

18          THE COURT:  They're nowhere near this courtroom

19   is what I want to make sure of?

20          THE CLERK:  Yes.

21          THE COURT:  We are good confirmed by the clerk

22   that the jury is in -- all right.  Confirmed.  We are

23   good.  The jury is sill in their jury assembly room,

24   makeshift room.

25          Go ahead.

1          MR. DESROCHES:  Thank you, Your Honor.  We are

2     just trying to avoid the situation we just had with that

3     last witness.

4          The next -- the government's next witness would

5     provide testimony regarding the location of the

6     defendant's cell phone.  He produced a report that also

7     incorporated the contents of text messages.  That does not

8     affect his analysis of the location of the cell phone, but

9     we want to address this issue beforehand because the

10    government is not at this point intending to introduce the

11    content of those text messages because it's our view that

12    it would be inadmissible hearsay.  We could probably

13    introduce it as an admission of a party but we are not

14    seeking to do that.

15         THE COURT:  Are those the text messages that I

16    saw?  I was looking at those?

17         MR. DESROCHES:  They would be yes, different

18    form.

19         THE COURT:  So as I saw these text messages on

20    the non-published portions when you were scrolling

21    through?

22         MR. DESROCHES:  Correct.  So we want to be able

23    to address this with Your Honor now.  That would affect

24    potentially the government's presentation of the direct.

25    So, in essence, what it would be is a map of the phone

1    calls that would show communications, the time of the

2    communications, the type of communication but would not

3    have content.

4        The defendant I believe would plan to do what they

5    did in this case which is on cross get into the content of

6    the text messages.  From the government's position this is

7    inadmissible hearsay, and from the defendants -- I'm not

8    sure what their position is, but I know this is their

9    intention.

10        THE COURT:  Okay.  So, for instance, one of the

11    text messages about I got a hundred dollars sitting here,

12    you know, what do you want to do, whatever.  Is that

13    right?

14        MR. WATKINS:  Yes, they're going to -- I think

15    there's a total of a dozen, maybe 18, that are

16    drug-seeking behavior.

17        THE COURT:  Right.  The government does not want

18    those in but --

19        MR. DESROCHES:  Correct.

20        THE COURT:  -- the defense does?

21        MR. WATKINS:  Judge, just to make the record

22    clear, until five minutes ago, I thought the government

23    wanted them in too because they submitted an exhibit,

24    Exhibit 41, which included the text messages.  So this is

25    brand new to me that all of a sudden they're deciding that

1    they don't want those particular messages in.

2        But, Your Honor, it's neither here nor there.  They

3    are indeed -- there are not hearsay.  It's state of mind

4    here, once again, where the government is alleging and

5    trying to prove a particular state of mind at that time in

6    the morning.

7        It's absolutely relevant that these text messages

8    mean something completely different from what the

9    government's state -- what the government wants the jury

10   to believe here.

11           MR. DESROCHES:  Your Honor, I would suggest that

12   it is a fine distinction.  I would suggest the purpose of

13   introducing these is to prove the defendant was seeking

14   drugs, so it's self-serving.

15           THE COURT:  Help me out.  What's the fine

16   distinction?

17           MR. DESROCHES:  That between the defendant

18   arguing this being -- these text messages are evidence of

19   a state of mind, I would suggest in effect what they're

20   really trying to do is show that he was in fact out

21   seeking drugs and which adds to their argument of the

22   location as well.

23       So this is not going to necessarily his state of mind

24   that he was at -- he can't focus on anything but drugs.

25   It's going to that he was searching for drugs in

1       Springfield in particular.  So I think that's a

2       distinction I'm talking about being a fine distinction.

3       And I can't understand how it's not being introduced to

4       show that he was in fact seeking drugs.

5               THE COURT:  Well, you have to analyze each

6       statement in and of itself to determine what would be the

7       truth of the matter that's being asserted.

8           So, for instance, the only text I think I remember

9       seeing was something like, dude, I have a hundred dollars

10      sitting here.  What do you want to do with it?  It seems

11      pretty clear they're talking about the purchase of drugs.

12      You know, that seems to me to be clear state of mind.  I

13      don't know what the truth -- what's the truth of the

14      matter is.  That he has a hundreds dollars sitting here?

15              MR. DESROCHES:  That the defendant in fact wants

16      drugs, I would say that's the truth of that statement.

17              THE COURT:  But, no, that's the state of mind.

18      That's state of mind.  The truth of the matter asserted is

19      that you have a hundred dollars sitting here; that's the

20      truth of it.  I mean, I think when you look at from a

21      hearsay perspective --

22              MR. DESROCHES:  There's also -- I understand

23      Your Honor's position.  There's also --

24              THE COURT:  Correct me if you think I'm making a

25      mistake.  I mean, that's how I'm reading that.  That's how

1    you assess hearsay.  What's the truth of the matter that's

2    being asserted by in this case the written material?

3              MR. DESROCHES:  In this case, Your Honor,

4    there's also statements of his location.  So he's

5    indicating I'm outside your door, items such as that which

6    are intertwined in all of this.

7              THE COURT:  Well, that's a good point.  I mean

8    I'm outside your door.  Okay.  These are statements of him

9    or someone else that he's texting with?

10             MR. DESROCHES:  Of the defendant to the person

11   he's texting.

12             THE COURT:  So then they're his own statements?

13             MR. DESROCHES:  They're the defendant's

14   statements, right, which I would suggest are self-serving

15   statements and don't fall into any exception.

16             THE COURT:  How can they be self-serving if he

17   didn't know that they were going to be recorded to be

18   introduced at a trial?

19             MR. DESROCHES:  Well, it's the same as in a more

20   simple matter --

21             THE COURT:  You're saying he's setting up to do

22   a drug deal and making sure he's careful about what he

23   says in his text messages in case anyone ever read it so

24   that he would be leaving himself some type of out --

25             MR. DESROCHES:  Or an alibi.

1              THE COURT:  -- while he's writing these text

2        messages to buy drugs.

3              MR. DESROCHES:  Or an alibi which would be a

4        self-serving statement.

5              THE COURT:  Wow.  That is quite, that is quite a

6        stretch.  I mean, creative.  I like it but a stretch.

7              MR. DESROCHES:  I understand, Your Honor, and I

8        think I can read where this is going and I think we will

9        --

10             THE COURT:  I mean, I think it's a hearsay

11       statement.  I am -- his location like I'm right outside

12       your door, like, that's a different story.  That's for the

13       truth of the matter asserted.

14           You know, drug lingo, using drug language to try to

15       buy drugs is a different story.  That's state of mind.

16       But where you are, that statement being offered for the

17       truth of the matter asserted, which is where you actually

18       are is where you're saying you are, I'm outside your door

19       at 123 whatever street, I think that would be hearsay.

20       But I'm not sure you need that anyway because don't you

21       have GPS that is going to indicate that anyway?

22             MR. WATKINS:  Right.  That's the issue.  Yes, it

23       may be true of him being there but that's what the cell

24       phone guy is going to testify to next is that's actually

25       where he was or in that vicinity there.

1   Judge, there are a lot of text messages.  Again, this

2   is a surprise to me that the government was not going down

3   this route given that they provided me an exhibit that had

4   all the text messages clearly spaced out through there.

5   I think this might be something better done on

6   Monday.  It was a little clunky going through this

7   particular examiner.  I don't -- if the government is

8   truly wanting me to do it, I want to put it in a little

9   smoother way.  I would want to get prepared for those

10   particular things because that one is a tough little

11   cross-examination if I have to do it.  Again, I thought

12   the government was putting it in and we weren't arguing

13   about it very much.

14   THE COURT:  Fair enough.  So, you know, maybe

15   the two parties can talk about what they want to do.

16   I think Attorney Desroches has made some good points.

17   I think there are potential hearsay components of each

18   text message, but I also think there's components of state

19   of mind without a doubt within each text message.

20   If you want to slice and dice, I'm absolutely happy

21   to do it, but I just need a printout to point me in the

22   direction so that I can highlight the arguments on each

23   particular part of the text message.

24   It's not a problem.  That's an interesting

25   evidentiary type of endeavor.  I'm happy to do it, but if

1    you're going to hold the positions you have, I think

2    you're both making good points, talk about it and then we

3    can deal with it on Monday.  But at the very least if

4    you're going to stay at these opposing positions, I think

5    we are going to need a little more preparation to help you

6    smoothly go through it.

7        So, fine.  All right.  We'll just end for the day.

8    Is that okay with the government?

9            MR. DESROCHES:  It is, Your Honor.  I just

10   wanted to say that we have made quite a bit of progress

11   today and so I feel good about breaking for the day.

12           THE COURT:  We have actually.  I mean, I don't

13   know what your witness list looks like but, yeah, we

14   covered a lot of ground.  All right.

15       Mike, could we bring the jury in?  I'm going to let

16   them go for the day and I just want to do that in open

17   court and on the record.  All right.  Thank you.

18           MR. WATKINS:  Your Honor, quickly while we're

19   here waiting on the jury.  Do we have a witness order for

20   Monday?

21           MR. DESROCHES:  Yes, Your Honor.  I think I just

22   don't have it handy and I don't want to -- if we could

23   report to the defense, if we could, once the dust settles

24   a little bit?

25           MR. WATKINS:  You may have seen, we're kind of

1   scrambling.  I know the government's got a lot of

2   logistical problems, but by the same token we need to know

3   who's testifying and what exhibits are coming in.

4          THE COURT:  Well, you can -- I have never

5   ordered -- I mean, actually I don't know what each of the

6   parties -- what each of the lawyers are used to doing.  I

7   have never ordered -- this is something, that little

8   nuance is the decision between parties as to how they get

9   along and how much they want to tell each other.

10      I've never ordered one side to tell the other side

11  who they're calling next.  If you want to try your case by

12  not telling them, then that's how you try your case.  So

13  I'm not ordering either side to tell the other side what

14  they're planning on doing.  That's the relationship

15  between the defense and the prosecution.

16      All right.  We're just waiting for the jury to come

17  in and we will excuse them for the weekend.  All right.

18  That is probably better because now by Monday we will have

19  a different screen and we won't be going through all these

20  logistics with moving all the screens around.  So we will

21  have a big flat screen TV on the floor which will cover

22  the viewing for the first row of jurors so we don't have

23  to keep turning screens.

24  **(The jury entered at 4:09.)**

25          THE COURT:  Thanks for coming back.

1        Okay.  So we have some things going on including

2   technical issues that we're trying to make better.  You

3   can see we brought a bigger screen to try to deal with the

4   people in the front so we're working on things.

5        So we are going to be done for the weekend but in

6   order to let you go, we have make a record with all of you

7   sitting here that we are finished for today.  All right.

8        So the evidence is concluded for today but it's going

9   to restart now on Monday.  So the weekend, you have the

10  full weekend, all of the instructions apply.

11       So just quickly:  Don't talk to anyone else; don't

12  talk to each other; if you exchanged cell phones and

13  things like that; if you see any articles, don't read

14  them; no internet searching; no internet posting on blogs

15  or social media; no investigation; no driving by locations

16  where you think are relevant.

17       Don't do anything that might try to give yourself

18  more information about things you heard in this case;

19  nothing, nothing, nothing like that.

20       If you hear anything that you think you're not

21  supposed to be hearing, if you hear someone talking about

22  something out in the hallway and you hear something said,

23  or anything like that, tell me about it if you think

24  you've been exposed to something and then we'll just talk

25  about it and determine what it was and see if it would

1    interfere with your ability to be fair and impartial.

2        Everyone understand?  Those rules apply to all the

3    times when you're here all the time?

4        All right.  Also, now this is very difficult because

5    it's human nature to think about things, but I really want

6    you to make every effort not to go home and spend the

7    weekend thinking and analyzing the testimony you just

8    heard.  Because if you did that, you're really consciously

9    beginning a deliberation with yourself, thinking and

10   reviewing the evidence.  Not that that's not important and

11   you should and, of course, that's your -- that's

12   everyone's mental functioning level.

13       But as I said, jury deliberations are a collaborative

14   effort where all of you share your thoughts when the jury

15   is altogether.  So I absolutely expect you to be thinking

16   about, to some extent, what you heard to try to just

17   organize things in your mind.  But it should not be an

18   effort for you to sit down and start thinking about how

19   you assess credibility or what you think about certain

20   things.  Do not come to any conclusions in your mind

21   absolutely not.

22       All right?  Perfect.  Very good.  Thank you.  And

23   thank you for being so good and cooperative in this

24   pandemic effort to conduct a jury trial.  So I'll see you

25   on Monday at nine.

1           A JUROR:  I know there's been delays.  I was

2    wondering if you can give us a forecast of the timeline

3    just for work purposes?  Is that possible?

4           THE COURT:  Yeah.  I still think we're pretty

5    good for thinking that this will go through Friday.  Now

6    when I say go through Friday, I really do think the

7    evidence will be done over by Thursday or Friday.  It

8    could be earlier.  But the second part of that is jury

9    deliberations take as long as jury deliberations take.

10       I think, and please help me parties, that's my

11   estimate that I think the evidence from -- I don't know,

12   the defendant doesn't have to put any evidence so I don't

13   know.

14       What's the government's estimate?

15           MR. DESROCHES:  Your Honor, I think that's fair

16   to say.  If there's -- it's likely to be before Thursday,

17   but I think it's fair to say Thursday is reasonable.

18           THE COURT:  All right.  It's just -- I see you

19   trying get away; I see you trying to get that head start.

20           A JUROR:  I'm first up.

21           THE COURT:  Did you see that?

22       Don't forget Wednesday is a half day.  We will go

23   until like 1:30 or two.  Have a nice weekend.

24           THE CLERK:  All rise for the jury.

25   **(Court recessed at 4:16.)**

1   (The certification of this transcript does not apply to
    any reproduction of this transcript, unless under the
2   direct control and/or supervision of the certifying
    reporter.  I assume no responsibility for the accuracy of
3   any reproduced copies not made under my control or
    direction.)

4

5                           CERTIFICATION

6

7           I certify that the foregoing is a correct

8   transcript of the record of proceedings in the

9   above-entitled matter to the best of my skill and ability.

10

11

12

13  /s/ Alice Moran                    November 28, 2020
    Alice Moran, RMR, RPR
14  Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25