<pre>
 1                  UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
 2                        WESTERN SECTION

 3

 4   United States of America  )
                               )            20cr30018-MGM
 5        vs                   )
                               )           November 16, 2020
 6   Jonathan Michael Rathbun  )
     _____)

 7

 8                    Jury Trial Held Before

 9                The Honorable Mark G. Mastroianni

10                 United States District Judge.

11

12   APPEARANCES:

13

     On behalf of the government:  Risa Berkower, United States
14   Department of Justice, 950 Pennsylvania Avenue, NW,
     Washington, DC 20532.

15

16   Neil L. Desroches, Assistant United States Attorney, 300
     State Street, Suite 230, Springfield, MA 01105-2926.
17
     On behalf of the defendant: Timothy G. Watkins, Esq., 51
18   Sleeper Street, 5th Floor, Boston, MA 02210.

19   Forest J. O'Neill-Greenberg, Esq., 51 Sleeper Street, 5th
     Floor, Boston, MA 02210.
20

21
                        Alice Moran, CSR, RPR, RMR
22                     Official Federal Court Reporter
                         United States Courthouse
23                     300 State Street, Room 303D
                          Springfield, MA 01105
24                           (413)731-0086
                        alice.moran@verizon.net
25
</pre>

1                            INDEX

2

3    Witness:                                          Page:

4

5

6    **Ryan Burke**

7

8    Direct examination by Mr. Desroches              33

9    Cross-examination by Mr. Watkins                 62

10   Redirect examination by Mr. Desroches            72

11   Recross-examination by Mr. Watkins               75

12

13

14   **Patrick Carnahan**

15

16   Direct examination by Mr. Desroches              90

17   Cross-examination by Ms. O'Neill-Greenberg      102

18

19

20   **Ryan McGonigle**

21

22   Direct examination by Ms. Berkower              103

23

24

25

| | Exhibit No. | Description | Page |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | PX-112 | Verizon records | 42 |
| 4 | PX-41 | Agent Burke's report | 45 |
| 5 | PX-38 | Page from Exhibit 41 | 56 |
| 6 | PX-39 | Slide 13 from Exhibit 41 | 61 |
| 7 | PX-40 | Slide 12 from Exhibit 41 | 61 |
| 8 | PX-73 | Photos of Sheila Rathbun's car | 100 |
| 9 | PX-79 | Video of drive test | 118 |
| 10 | PX-58 | Photo of red gas can and yellow nozzle | 141 |
| 11 | PX-59 | Photo of red gas can and yellow nozzle | 141 |
| 12 | PX-60 | Photo of yellow nozzle at 20 Lori Lane | 141 |
| 13 | PX-61 | Photo of yellow nozzle and gas can | 141 |
| 14 | PX-62 | Photo of red gas can at 20 Lori Lane | 141 |
| 15 | PX-2 | Yellow gas nozzle | 144 |
| 16 | PX-5 | Advice of Rights form | 150 |
| 17 | PX-71 | Photos of Mr. Rathbun's hands | 158 |
| 18 | PX-72 | Map and photos | 193 |
| 19 | PX-67 | Photo of shed | 222 |
| 20 | PX-68 | Photo of shed | 222 |
| 21 | PX-69 | Photo of shed | 222 |
| 22 | PX-70 | Photo of shed | 222 |
| 23 | PX-63 | Photo of Sheila Rathbun's computer | 224 |
| 24 | PX-88 | Decision America Northeast Tour flyer | 230 |
| 25 | PX-99 | 7/16/20 audio recording | 243 |

1    **(Trial commenced at 9:08.)**

2    **(Mr. Rathbun is present.)**

3              THE CLERK:  Court is back on the record in the

4    matter of the United States versus John Michael Rathbun,

5    Criminal Action 20-30018.

6         Will counsel please identify themselves for the

7    record?

8              MR. DESROCHES:  Good morning, Your Honor.  Neil

9    Desroches on behalf of the United States.

10             MS. BERKOWER:  Risa Berkower also for the United

11   States.

12             MR. WATKINS:  Good morning, Your Honor.  Tim

13   Watkins, Federal Defender Office, on behalf of John

14   Rathbun who's present in court with us today.

15             MS. O'NEILL-GREENBERG:  Forest O'Neill-Greenberg

16   also for Mr. Rathbun.

17             THE DEFENDANT:  Good morning.

18             THE COURT:  Good morning, everyone.

19        So what are the issues we should talk about?

20             MR. WATKINS:  I'm always happy to go first.

21   There are a number of exhibits that are coming in today

22   that will be disputed.  The government has indicated

23   they're intending to put in jail calls from Mr. Rathbun.

24   Late yesterday I filed a motion in limine concerning those

25   jail calls.

1            THE COURT:  I saw that.

2            MR. WATKINS:  That's going to be the second

3  witness up today.  The first witness I do not -- I don't

4  want to speak for the government, perhaps an hour with

5  that witness?

6            MR. DESROCHES:  I think that's a fair

7  assessment.

8            THE COURT:  An hour with the first witness?

9            MR. DESROCHES:  Correct.

10            MR. WATKINS:  So that's one of the issues we

11  have to work through.

12        There's an Exhibit 53.  The government wants to put

13  in texts received by a different witness -- I don't think

14  the court has heard about yet -- Glenn Miliken.  I believe

15  those are trying to come in today.  We are seeking to keep

16  those out.

17        There's an Exhibit 73 which include photos of Sheila

18  Rathbun's car.  That exhibit comes in.  The question is,

19  there are a couple of photographs in there that we do not

20  believe should come in.

21        And then finally, Your Honor, there's an issue of our

22  access to Mr. Rathbun that I want to raise to the court.

23            THE COURT:  What do you want to deal with first?

24  What's coming up first, the jail phone calls?

25            MR. WATKINS:  On the disputed stuff the jail

1  phone calls are the first thing coming up.

2          THE COURT:  Okay.  What time did you file that?

3          MR. WATKINS:  It's all running together.  I

4  think maybe eight o'clock last night.

5          THE COURT:  Eight o'clock, right.  So I had

6  reading material while I was watching the Patriots.  So

7  thank you.

8          MR. WATKINS:  I'm always happy to oblige.  I

9  will tell the court -- I think I can speak for both

10  parties -- that we've been working pretty hard over the

11  weekend.  We definitely were able to consult late

12  yesterday.  I didn't want to file the motion.

13          THE COURT:  So what's the issue on the -- when

14  we left, we were talking about -- is it all resolved

15  regarding the web?  Searches, the web site issues?  That's

16  all set?

17          MR. WATKINS:  Yes.  We came to an agreement on

18  that.  I got to prepare the final exhibit for the court.

19  I will do that and we will submit it to the court at some

20  point.

21          THE COURT:  Okay.  So these are about jail phone

22  calls and your objection is relevance and prejudice, not

23  privacy interest, anything like that?  But relevance and

24  prejudice?

25          MR. WATKINS:  That's correct.

```
1              THE COURT:  All right.  And you also raise the
2    Doctrine of Completeness?
3              MR. WATKINS:  I'm sorry.
4              THE COURT:  You also raise the Doctrine of
5    Completeness issue?
6              MR. WATKINS:  Yes, for a couple of them there
7    are.
8              THE COURT:  Which is obvious.  I mean the
9    Doctrine of Completeness would apply; of course, it
10   applies.
11             MR. WATKINS:  We believe so.
12             THE COURT:  So what's the quickest way to do
13   this?  Just one by one you want to go through them?
14             MR. WATKINS:  I think we've raised our objection
15   as a general matter.  This is, at least in my experience,
16   somewhat unusual.
17        Ordinarily when I see jail calls, there is a pretty
18   specific admission, a specific admission of guilt frankly
19   as to a charge.  Here it is much more amorphous than that.
20   I believe the government is introducing these as
21   circumstantial evidence of Mr. Rathbun's state of mind
22   several weeks before.
23        So just on that general level all of the, as I
24   understand it, all of the government's efforts to get
25   these in relate back to things such as did he really know
```

1    that -- or did he really not know the area where this gas

2    container was placed.  I believe, I don't want to speak

3    for the government, but I believe that's why they want to

4    talk about some of the issues of grandma stayed there and

5    things of that nature.

6              THE COURT:  So first things first.  Exhibit 93,

7    the yellow gas can, the defendant's statements regarding

8    the yellow gas can.

9        When you put in this line that says relevant context,

10   that's not on the call?  You're just giving me the

11   editorial comment?

12             MR. WATKINS:  It is editorialized.

13             THE COURT:  All right.

14             MR. WATKINS:  I at least wanted to give the --

15   it's somewhat of a summary of some of the other calls, but

16   it is editorial.  There's nothing --

17             THE COURT:  All right.  So I have the first part

18   of this where they're talking -- John, it says John

19   talking about the yellow gas can, and then you have this

20   column that says if admitted add.  Is that part obviously

21   of the same conversation or is it a different phone call?

22             MR. WATKINS:  No.  It's, generally speaking,

23   either a portion before the excerpt that the government

24   wants in or a portion after.  I think in one case it might

25   have been inside between two different quotes.

1          THE COURT:  Okay.  So to the government, the

2     first question is, if you pass the first hurdle and I say,

3     yes, it looks like it's admissible because it's relevant

4     and not overly prejudicial, if you get past that, do you

5     have an issue with the completeness theory?  The

6     completeness doctrine that's being raised?

7          MS. BERKOWER:  Yes, judge.  And the reason for

8     that, as you can see in this call, I think Mr. Watkins was

9     gracious enough not to characterize our view on this.  As

10    he said, he thought it might be tangential.  In our view

11    this is crucial.

12        I mean, this defendant is claiming he didn't place

13    this can.  His blood got on it through who knows how, and

14    here he's saying "The FBI doesn't know yet, but maybe they

15    will eventually, just them knowing that I had possession

16    of the yellow can.  I don't care.  I'm saying that on this

17    phone.  I had possession of the yellow can is very big,

18    very big and very bad," and in our view that is directly

19    probative of this.

20         THE COURT:  Okay.  So assume I agree with you --

21         MS. BERKOWER:  Okay.

22         THE COURT:  -- so if I agree with you, what do

23    you say about the second part that the defense says, well,

24    you have to introduce the complete conversation?

25         MS. BERKOWER:  Your Honor, I think -- I don't

1    think they want the complete conversation.  They just want

2    this additional piece.  But the rule of completeness

3    doesn't -- it just says, "If a party introduces all or a

4    part of a writing or recorded statement, an adverse party

5    may require the introduction of any other writing or

6    recorded statement that in fairness ought to be considered

7    at the same time."

8        And really the purpose of Rule 106 is to avoid

9    misleading the jury and giving them some misimpression

10   that this was taken out of context and in fairness the

11   contextual -- the context of the rest of the statement

12   means that it's something different than what the

13   government represented it to be.

14       And in our view, the fact that he's complaining about

15   being stuck in jail and they could wind up finding, you

16   know, him guilty, that does not -- any context that's

17   required to understand what he's saying concerning the

18   yellow can, he doesn't want to be found guilty of this.

19   Okay.  That's fine.

20       We would actually argue that that piece of it is

21   prejudicial to the government because he's talking about

22   I'm going to stay in jail for a long time and in our view

23   the jury is not supposed to consider punishment when it's

24   looking at the facts of this case.

25       So to the extent that, you know, that is something

1    that he would be getting out there to the jury, that would
2    actually be prejudicial to the government because it's
3    outside the jury's province to consider those things.
4         But even setting that aside, there's nothing about
5    that excerpt that they want to add that changes the
6    meaning or reveals the true context or makes it clear what
7    he's actually talking about when he admits in the first
8    piece of this that we're proposing to use that he actually
9    owned the yellow can and acknowledges that that's very
10   big.
11              THE COURT:  How long is the phone conversation?
12              MS. BERKOWER:  I think it's about 15 minutes.
13   So this is just about like maybe a 30-second clip out of
14   15 minutes.
15              THE COURT:  How soon after the yellow can
16   sentences is the proposed addition?
17              MS. BERKOWER:  He says it right before he talks
18   about the yellow can.  So actually what he's saying is
19   "It's just a terrible F'ing thing.  I'm gonna be stuck in
20   here forever."  This quote that they have used and his
21   mother says, "Well, they have to have evidence."  And he
22   says, "Yeah, well, maybe they do.  Who knows?"
23              THE COURT:  And that's when he starts talking
24   about the yellow can?
25              MS. BERKOWER:  Exactly.

1          THE COURT:  I get it.  All right.

2          MS. BERKOWER:  In our view that additional piece

3     is not necessary.  There's nothing that Rule 106 requires

4     to add that here, and on top of that it's prejudicial.

5          THE COURT:  Okay.  I think it is necessary.  I

6     think it does satisfy the Doctrine of Completeness and is

7     a more fair recitation of the statement.

8          It definitely does not prejudice the government,

9     especially in the context of now you've explained to me

10    which came first.  So it's a fuller picture.  It's a more

11    complete statement.  That's what the Doctrine of

12    Completeness talks about.

13         Now the defense you know that you are, by asking this

14    to be admitted, you know you're interjecting punishment.

15    You're interjecting that he's held in a facility.  You

16    understand that?

17         MR. WATKINS:  We do, Your Honor.  We've come to

18    the conclusion if the court is going to let in any of

19    these recordings, at this point I think we've given up on

20    that particular issue.

21         THE COURT:  All right.  So that's the ruling on

22    the first phone call.

23         The second phone call is, "Hang in there."  I guess

24    it's his mother.  I don't know who it is. "Hang in there.

25    Timeout.  Things are going to get better; move forward."

1       So the government wants to introduce this?

2          MS. BERKOWER:  Yes, Your Honor.

3     In our view this is a discussion between the

4 defendant and his mother of the time leading up to the

5 crime in this case, and to the extent that his state of

6 mind is relevant and what was going on with his life is

7 relevant, we've already -- the court has already ruled

8 that --

9          THE COURT:  What do you mean leading up to the

10 crime?

11          MS. BERKOWER:  I think she says, "Things were

12 kind of going out of control with you."

13          THE COURT:  Oh, there.  Okay.

14          MS. BERKOWER:  "This is a timeout."  He agrees

15 with her.  He kind of acknowledges, "yeah, yeah, things

16 were going out of control."

17     To the extent that the court has already ruled that

18 that context of his state of mind and state of the life in

19 the time immediately preceding this crime is relevant.  In

20 our view this further illuminates that and actually it's

21 the defendant agreeing that, yes, in fact, that's true.

22 It corroborates to a great degree what his daughter

23 testified to and some of the other evidence.

24          THE COURT:  I hear you.  So the female is saying

25 "things were getting kind of out control," and John is

1    saying, "Okay.  All right."

2              MS. BERKOWER:  Yes, exactly.  Then she says,

3    "Now you're going to get better and move forward."  He

4    says, "Okay."  She says, "All right."  He says, "Yep."

5    Like they're just discussing this.

6              THE COURT:  All right.  And this is his mother

7    talking?

8              MS. BERKOWER:  Correct.

9              THE COURT:  You're saying that this goes to his

10   -- not his mother's state of mind, but his state of mind

11   because he's agreeing with the mother on the phone call?

12             MS. BERKOWER:  Yes, Your Honor.

13             THE COURT:  All right.  That's going to be

14   excluded.  I don't find that that's relevant.  I find that

15   it's overly prejudicial.  It's his mother's state of mind.

16   I don't find that he's adopting that to make it his state

17   of mind rather just saying, yeah, mom.  Okay.  Okay, mom,

18   whatever.

19        Okay.  The next one is we have a female talking --

20   again I'm assuming mother -- "because they're checking the

21   phone, they already have all this information."  All

22   right.  So John, John is saying they already have it.

23             MS. BERKOWER:  Your Honor, there's actually a

24   longer -- I think that this is a longer excerpt and I

25   think the defense just for brevity sake, if you can see

1   there's an ellipsis in the middle.  I can read the full

2   thing if that would be helpful to the court?

3                   THE COURT:  Sure.  Go ahead.

4                   MS. BERKOWER:  Okay.

5                   MR. WATKINS:  Just to make the record clear, the

6   ellipsis -- there were two separate -- there was a break

7   between what the government wanted to introduce.  The

8   ellipsis was for the portion that I thought that they did

9   not want to introduce.  Perhaps I misunderstood their

10  highlighting.

11                  THE COURT:  I do find that this seems relevant

12  to me where he is on that street at certain times.  That

13  is showing -- that is showing his state of mind.  How is

14  that --

15                  MS. BERKOWER:  Your Honor, there might have

16  actually been a mistake on this one.  I'm wondering if

17  they looked at a different quotation than what we were

18  looking at.  The court's brief indulgence?

19                  THE COURT:  Uh-huh.

20                  MS. BERKOWER:  Actually, I'm sorry about this.

21  I think there was a different quote that we had tried to

22  point them to and we may have not identified it correctly.

23  So I can -- if you'd like, I can hand this to them and

24  they can look at it and we can talk about it.

25                  THE COURT:  Sure.  Does it make more sense to --

```
 1    I mean, this is not the first witness, right?  It's just
 2    the jurors are all here if we have a witness ready to
 3    go.
 4              MR. WATKINS:  I don't know if they're handing me
 5    something new I haven't seen?
 6              MS. BERKOWER:  It's just a different part of the
 7    same call.  I think the part that they identified is not
 8    the part we're intending to use.  We had highlighted for
 9    them several parts of a call and it looks like they put
10    the wrong part in the chart.
11              THE COURT:  Okay.  Tim, take a look at it.
12              MS. BERKOWER:  It's the end of the call.
13              THE COURT:  Is it correct on the next one, the
14    May 23rd?
15              MS. BERKOWER:  Yes.  We can move on to the next
16    one.
17              THE COURT:  Well, I'm going to let Attorney
18    Watkins look at that.
19              MR. WATKINS:  So I do now see which portion that
20    they're trying to introduce.
21              THE COURT:  Can you read it to me?
22              MS. BERKOWER:  Yes.  So it starts with the
23    defendant's mother saying, "Okay.  Well, what should I
24    pray, specifically, is that from 4:30 to 8:30."
25          Actually, Ms. McKenna is here.  We can play it for
```

1   the court and I can hand you the transcript.  That might

2   be the easiest.

3          THE COURT:  It's just that I'm so aware of all

4   the jurors being here.

5          MS. BERKOWER:  Okay.

6          THE COURT:  I'm trying to just get this done as

7   quick as possible because I told them nine o'clock and

8   it's now 9:30 and we're not bringing them in.

9          MS. BERKOWER:  Okay.  So it starts with the

10  defendant's mother saying, "Okay.  Well, what should I --

11  what I should pray, specifically, is that from 4:30 to

12  8:30" and the defendant says "That I wasn't on Converse

13  Street, but I'm telling you I was.  I know I was because

14  the only way that I get from my house to everyplace that I

15  go to get drugs is to go straight to the highway down

16  fucking Converse Street."

17       Mother, "Yes.  But you called that other kid, the kid

18  that" --

19       John:  "It doesn't matter.  Every -- well, you're not

20  listening to me.  You're not listening to the words coming

21  out of my mouth.  Every person I called to go meet to get

22  drugs, I drive from our house down Converse Street onto

23  the highway."

24       Mother:  "Okay."

25       John:  "So, I don't know.  So, I'm just praying that

between 4:30 and 8:30 that hopefully I didn't, but I don't -- I don't know.  I think I did.  So, then from there, what's going to happen is when they do say that I did, they're going to start getting video.  And they're going to go to the neighbors, because they already did go to the neighbors, and get the video from people who have video cameras on Converse Street in front of Ruth's House.  And then, they can get a video of me driving down Ruth's -- down Converse Street on top of the phone, on top of the blood.  It's just going to be wonderful."  That's the quote that we would like to use.

MR. WATKINS:  So a couple things.  Number one, as far as driving down the street, that's going to be cumulative.  As you're going to hear during today's testimony, Mr. Rathbun told the agent that when he was interviewed at the scene.  And I think you've heard there's really no dispute that this is the street one drives down to get to I-91 from where Mr. Rathbun lives so in that sense it's cumulative.

The rest of the portion gets very confusing to the jury because of the context that it's being presented in.  Right.  As the court can gather there, Mr. Rathbun is waiting to find out what the cell site location information is going to say about it.  They're speculating; they're ruminating about various things, and

1    we now know exactly what the cell site location

2    information says.

3         And indeed it says that Mr. Rathbun went by at that

4    period.  It's a critical question, as the court is going

5    to hear, whether he -- regardless of the fact whether he

6    could have placed this thing on the way given what we're

7    going to hear from the cell site location information.

8         So this is going to confuse the jury because we are

9    at a state of the evidence when Mr. Rathbun is talking

10   that has nothing to do with the state of the evidence now.

11   It really is just speculation and rumination between his

12   mother and himself.  This is now six weeks after he's been

13   in jail waiting on discovery from the government.

14             THE COURT:  What did you want to add if there

15   was to be a completeness doctrine addition?

16             MR. WATKINS:  There is nothing in this

17   particular call that we could add.

18             THE COURT:  All right.  Can you forward that

19   electronically either to LeeAnn if you have her email or

20   to the clerk just so I can print it out here and mark it

21   up?

22             MS. BERKOWER:  Would it be easiest for me to

23   just hand up a copy that we -- this is the same copy we

24   provided to the defense.

25             THE COURT:  I'd rather you just do it

1   electronically.

2           MS. BERKOWER:  Okay.  We will do that.

3           THE COURT:  I'll still in the middle of my

4   phobia about touching papers and all that kind of thing.

5           MS. BERKOWER:  I understand.

6       May I speak to Mr. Watkins' arguments briefly?

7           THE COURT:  Sure.

8           MS. BERKOWER:  Your Honor, in our view this is

9   crucial evidence to the government's case.  The key

10   question here is what the defendant admitted in this phone

11   call.  Did he drive past the location where the device was

12   placed at the time it was placed?  He has an alibi --

13           THE COURT:  I heard your argument and I think

14   it's a good argument.  I'm not sure I'm going to let the

15   entire portion in.  I'm not going to commit myself to

16   anything right now, but that's why I want to see it so I

17   can line by line make a ruling.

18           MS. BERKOWER:  We will send that to you

19   immediately.

20           THE COURT:  All right.

21           MR. WATKINS:  Judge, given where we are on this,

22   I'm wondering whether -- I don't mind them recalling this

23   witness at a later time to put in these calls.  I'm

24   worried that we're going to be still arguing all morning

25   here about these.  We have a few more to go.

```
 1              THE COURT:  Right.  But when is the witness
 2   about this coming on?  This is the second witness?
 3              MR. WATKINS:  It is the second witness today,
 4   but it sounds like -- I don't know that it needs to be
 5   done today.  I don't want to speak for the government, but
 6   it sounds like the kind of thing that could be put on
 7   later on on a different day.
 8              THE COURT:  Let's just move to the next one.
 9   The May 23, '20 "You're not alone in this, son."  And then
10   there's all the talk about getting a Bible.
11              MS. BERKOWER:  Yes, Your Honor.  If I may step
12   back to one before, I think you actually do have the
13   transcript.  It's Exhibit 96 in your binder that we
14   provided.
15              THE COURT:  I remember reading exactly what you
16   just said.
17              MS. BERKOWER:  It's Exhibit 96 and then it's
18   page 14, line 9 --
19              THE COURT:  Perfect.
20              MS. BERKOWER:  -- through page 15, line 4.
21              THE COURT:  Okay.
22              MS. BERKOWER:  That's the proposed place.
23              THE COURT:  Thank you.
24              MS. BERKOWER:  You're welcome.
25              THE COURT:  So now the issue about getting the
```

1    Bible.

2           MS. BERKOWER:  Yes, Your Honor.

3       So in this case in the defense opening, and through

4    some of the questioning of witnesses, including the

5    defendant's daughter, they've made a pretty significant

6    point that this defendant is not religious.  That he does

7    not -- he doesn't care about any religion.  They've made

8    that point in connection with the fact there is a

9    Christian tract lit --

10          THE COURT:  I get that, but there's a lot of

11   people who aren't religious at all and then when something

12   happens life-changing like ending up in jail, they run to

13   religion.

14          MS. BERKOWER:  Yes, Your Honor.

15          THE COURT:  People get an illness, they seek

16   solace and comfort in religion.  Things like this happen

17   and they go back to what they remember when they were very

18   young.  They go back to religion, especially if you're

19   dealing with your parents who are very religious and your

20   parents are on your side and you need your parents to be

21   on your side.  So, I mean, there's a very different reason

22   why he would be claiming a religious interest at the point

23   after he's incarcerated.

24          MS. BERKOWER:  Yes, Your Honor, but I think in

25   our view it's not just that.  It's the tie to violence.

1    One of the main points that the defense has made in this

2    case is he's not violent.  He doesn't have a violent bone

3    in his body and here he says he's going to start a prison

4    riot if he doesn't get a Bible.  And, in fact, he started

5    picking up things and "throwing shit around."  He took off

6    his shoes.  He started throwing them around.

7        He threatened to literally cause 30 people in his

8    whole pod to riot, and in our view that rebuts the

9    defense's contention that he's not violent and that

10   violence doesn't play any role -- that violence and

11   religion don't go together for this man, and that's

12   important in our view that the jury understands that in

13   his own words, even after he's sober, in prison, talking,

14   he's connecting those two things.

15            THE COURT:  Okay.  What do you want to say?

16            MR. WATKINS:  So it's a subsequent bad act, a

17   404(b) state of mind.  No.  What they're doing is saying

18   because he was threatening to be violent here, he was

19   violent there.  It's excludable under 404(b).

20       I'll just note, as the court I'm sure is aware, he

21   did not get any kind of disciplinary report.  It's very

22   unclear that really anything happened other than him

23   blowing off stream with his parents.

24            THE COURT:  I really like -- I really appreciate

25   in the sense of legal arguments the creative argument by

1    the government.  Sincerely, I think it was a good

2    argument.

3         It's so tenuous.  I mean, you're arguing basically --

4    you're trying to link religion and violence in his mind

5    because he said he's going to basically throw things

6    around and start a riot if he doesn't get a Bible.

7         I don't know if he would be saying the same thing if

8    they didn't give him a roll of toilet paper.  I'm going to

9    start a riot here.  You know, I'm going to yell and scream

10    until I get what I want.

11         I don't know that that makes him the religious -- the

12    person where religion and violence are tied together by

13    this phone call which took place after.  I think it's

14    unduly prejudicial.  I don't think it's relevant.

15              MS. BERKOWER:  Your Honor, in that case then we

16    would ask that they be limited in their cross-examination

17    to suggesting he's not religious and suggesting he's not

18    violent, and in closing they can't make those points

19    either.  Because in our view this tends to rebut that and

20    if the court is excluding it as unduly prejudicial, those

21    are not points they should be allowed to make.  It will

22    mislead the jury.

23              THE COURT:  So far there's been statements --

24    well, questions to his daughter about I think, please

25    correct me if I'm wrong, questions to his daughter about,

1    you know, has he ever been violent?  Other than yelling at
2    people and having a foul mouth sometimes, has he ever been
3    violent?  Then there's questions about is he religious?
4    So the religious answer was, no, not really religious.
5    And also I think she said, no, he's never really violent.
6    He's just in a bad mood a lot; is that fair?
7            MS. BERKOWER:  She did say he's not violent, but
8    the defense also elicited testimony that he's not
9    religious.  He doesn't have a religious practice.
10       When we brought up the -- you know, there was that
11   part that the court excluded because I think the witness
12   gave an unexpected answer that his religious practices
13   were further back in time, but this actually suggests that
14   perhaps he actually is more religious.
15       I know Your Honor mentioned that at times in
16   difficult periods people do turn to religion, but this
17   tends to support that he may have been more religious than
18   the defense has represented all along given that he's had
19   these periods where he's gone through religiosity.
20       I will say that I was taking notes during the defense
21   opening and they said that he doesn't care about any
22   particular religion; that was something they said in their
23   opening.  And they also said he could not and would not
24   harm JGS.  He doesn't have a violent bone in his body.  In
25   our view, you know, this indicates religious practice, and

1     it also indicates a willingness to start a riot if you

2     don't get what you want.  I mean, we've had these jail

3     calls for --

4                 THE COURT:  I hear you, but that's not evidence.

5     It's an opening statement.

6                 MS. BERKOWER:  Yes, but we would ask that in

7     light of this call and the representations that that's

8     where it seems like where they want to go, that if we are

9     not permitted to introduce this type of evidence, they be

10    limited in going there.

11        I think they got there somewhat with Natalie Rathbun

12    on Friday but I expect with the witnesses who are

13    testifying today, in particular the case agent, that's an

14    area they plan to explore in depth or at least try to.

15                THE COURT:  All right.  So, all right.  I will

16    hold off ruling on that one because I think you're right

17    that my mind may change about that, but we'll see.  Right

18    now it's not admissible, but that ruling is without

19    prejudice to revisit --

20                MS. BERKOWER:  Thank you, Your Honor.

21                THE COURT:  -- on that call.

22        Next one:  "Grandma used to live here.  We went there

23    for Christmas," according to John.

24        What is the issue with that from the defense?

25                MR. WATKINS:  We're now talking May, June, July,

1    three months after the event.  It's cumulative.

2         I don't quite know what it is that the government is

3    trying to get at here.  Again, I think part of what

4    they're trying to do is prove up through a statement three

5    months after the fact that indeed when Mr. Rathbun talked

6    to the agents, he knew about JGS; he knew about Ruth's

7    House at that time.  It's very, very thin.

8         By this time, of course, we've gone through a couple

9    of detention hearings where it's been talked about the

10   Ruth's House versus Genesis House, versus all kinds of

11   allegations that the government was making concerning this

12   particular facility.  So he has learned, as the case has

13   gone along, about a lot of facts here and learned

14   obviously that -- or recognized that this is a place that

15   his grandmother lived ten years beforehand.

16        I think given that there's very little probative

17   evidence -- very little of anything to tend to show that

18   he knew on April 13th by this statement in July that he

19   knew there was some connection between his mother or his

20   grandmother and that address.

21            THE COURT:  All right.  I think it's relevant

22   and probative to his state of mind and arguments about the

23   weight that should be given to that, that inference of

24   state of mind.  You know, when did he learn?  Did he just

25   remember?  The things that you were just talking about can

1    be argued.

2         Do you want any additional statements in for

3    completeness?  I'm looking at your column that you might

4    want added.

5              MR. WATKINS:  Yes, on that one we do ask that

6    the remainder of that portion.  This follows the proposed

7    excerpt.

8              THE COURT:  I mean, so you want in this

9    conversation where he and his mother are talking about

10   essentially "Well, there might not be paperwork or

11   anything showing that she actually lived there?"

12             MR. WATKINS:  I'm, sorry, Your Honor?

13             THE COURT:  You want in the conversation between

14   him and his mother where they're talking about "There

15   might not even paperwork that would show the grandmother

16   lived there?"

17             MR. WATKINS:  Yes.  I mean, the government is

18   going to put in paperwork indeed showing that she did live

19   there.  What we're saying is that he is welcoming of the

20   paperwork to show that she lived there.

21             THE COURT:  Okay.  So I'll allow all of it to

22   come in.

23             MS. BERKOWER:  Is Your Honor requiring the

24   additional portion as well then?

25             THE COURT:  Right.

1          MS. BERKOWER:  Okay.

2          THE COURT:  And I'm allowing the additional

3     portion -- I'm using Attorney Watkins' paperwork as a

4     chart.  So his first one, Exhibit 93, all of it comes in.

5          What's referred to as 94, none of it comes in.

6     That's excluded.

7          What's referred to as 96, I'm going to be looking at

8     that new statement.

9          What's referred to as it says NA5/23/20, that ruling

10    is deferred.  Right now it's excluded without prejudice to

11    be renewed regarding issues regarding religiosity or

12    violence.

13         Now what's referred to as Exhibit 99, date of

14    recording 7/16/20, the complete statement is allowed

15    "Grandma used to live here," and then the additional

16    portion that the defense wants in.

17         We are now on what's Exhibit 102, 8/13/20 talking

18    about the van, getting the van back, et cetera, and I

19    think that's relevant.  I think that's probative.

20         What's the defense position on that?

21         MR. WATKINS:  Your Honor, I would ask -- again,

22    it's at this point on August 13th call now four, five

23    months -- four months afterward.  Again, what is happening

24    is as Mr. Rathbun is getting additional information about

25    his case and trying to work through it, ruminating about

1    some of the issues that were going on, I think what the

2    court is going to find by the end of this case is there's

3    very little probative of this particular statement.

4         If the court were inclined to let it in, I think it

5    should excise "it's so flimsy and ridiculous."  What Mr.

6    Rathbun's assessment of the FBI is or the case is, is not

7    particularly relevant.

8              THE COURT:  You don't want that in there, his

9    asserting that the case that has him charged is flimsy and

10   ridiculous?

11        I do think it's relevant.  I definitely agree with

12   what you said that it might not have -- at first glance it

13   looks like it has some powerful impact.  I'm not sure -- I

14   think I agree with you about how important it really is,

15   but it is relevant I think.

16        The weight that you would give to it, I'm not sure it

17   has as much weight as it kind of pretends to have when you

18   first read it.  So I'm going to allow it in.  And is that

19   your final word about excising that last part?

20             MR. WATKINS:  May I have just a minute, Your

21   Honor, to consider that?

22             THE COURT:  Sure.

23             MS. BERKOWER:  Your Honor, just to go back, 96-2

24   is that one you were going to revisit with the transcript?

25             THE COURT:  Exactly.  Yes.

1          MS. BERKOWER:  Okay.  Thank you.

2          MR. WATKINS:  Your Honor, Exhibit 102-1 without

3  reiterating our objection to it coming in at all, if it

4  does come in, we want the entire statement as is set

5  forth.

6          THE COURT:  All right.  It's allowed.  The

7  entire statement as is on this piece of paper.  Okay.  So

8  I'm going to be reading 96.  I'll go line by line on that.

9      All right.  Can we bring the jury in?

10          MS. BERKOWER:  I think, Your Honor, there is

11  another issue with a piece of evidence that's coming in

12  through the next witness, although we could switch the

13  order up of the witnesses if that would be better.

14          THE COURT:  I have to get the jury in here.

15          MS. BERKOWER:  Okay.

16          THE COURT:  Even if it's something we do at

17  sidebar, I need a jury in here right now.  It's just

18  simply not fair to them to tell them to come in at nine

19  o'clock and this happens.  If it's short, we can talk

20  about it over the WhisperTech while the jury is in the

21  room.

22          MS. BERKOWER:  Yes.  Your Honor, there is one

23  thing I did want to raise with the court which is before

24  we forget --

25          THE CLERK:  All rise for the jury.

1    **(The jury entered at 9:44.)**

2              THE COURT:  Good morning, everyone.

3              THE JURY:  (Good morning.)

4              THE COURT:  I hope you had a nice weekend.  Was

5    everyone able to follow my instructions not to talk to

6    each other or anyone else about the case?  Not to do any

7    internet research at all about the case?  Not to read any

8    articles, if there were any?  No reading or posting on

9    social media?

10        All right.  Affirmative answers from everyone that my

11   instructions were followed.  The jury remains fair and

12   impartial.

13        All right.  So, government, call your next witness.

14   If there's any sidebar issue, we can go on WhisperTech to

15   discuss that.

16             MR. DESROCHES:  The government calls Special

17   Ryan Burke.

18             THE COURT:  Is there any issue?

19             MR. DESROCHES:  Not for this witness.  Thank

20   you, Your Honor.

21             THE COURT:  All right.

22             THE CLERK:  Would you please raise your right

23   hand?

24   **Ryan Burke (Sworn)**

25             THE COURT:  Is there any way we can get the

1    doors opened?

2              SECURITY OFFICER:  Yes.

3    **DIRECT EXAMINATION**

4    Q.   (By Mr. Desroches) Good morning.

5    A.   Good morning.

6    Q.   Would you please remove your mask?

7    A.   Sure.

8    Q.   And the microphone that's in front of you also

9    amplifies, so if you can try to remain close to that.

10   A.   Okay.

11   Q.   Could you please introduce yourself to the jury?

12   A.   My name is Ryan Burke.  I'm a special agent with the

13   FBI.

14   Q.   How do you spell your last name?

15   A.   B-u-r-k-e.

16   Q.   You've indicated that you're a special agent with the

17   FBI.  What is your current assignment?

18   A.   I'm assigned to our Cellular Analysis Survey Team,

19   otherwise known as CAST, which is managed out of FBI

20   headquarters in D.C.

21   Q.   For how long have you had that position?

22   A.   I've been a part of the CAST team for about five

23   years.

24   Q.   Have you been an agent for longer than that?

25   A.   I have.  I've been an agent for about eight years.

1    Q.   Did you go to college before you became an FBI agent?
2    A.   I did.  I went to UMass Amherst for my undergrad in
3    sociology and UMass Lowell for my master's in criminal
4    justice.
5    Q.   So now drawing your attention specifically to what
6    you referred to as the CAST team, can you describe,
7    generally speaking, what your responsibilities are as a
8    member of that team?
9    A.   We provide or I provide assistance to local, state,
10   and federal investigators with the analysis of cellular
11   records for the purpose of determining where a phone was
12   located when it was utilized.  We call that historical
13   cell site analysis.
14   Q.   So you assist other agencies with this type of
15   analysis?
16   A.   I do.
17   Q.   Now how is it that investigators would typically
18   contact you to become involved in an investigation?
19   A.   So I can be contacted directly either by members of
20   my agency or outside my agency.  Individuals can submit
21   requests to our unit at headquarters and oftentimes the
22   cellular providers themselves will refer individuals
23   needing assistance to the CAST team.
24   Q.   How many members are in the CAST team?
25   A.   There's about 60 to 70 nationwide right now.

1    Q.   How did you become a member of the team?

2    A.   I completed the certification process which consists

3    of approximately 300-plus hours of training and testing in

4    the fields of records analysis, radio frequency theory,

5    cellular network architecture, and drive testing.

6    Additionally, we receive training and direction directly

7    from the five major cellular providers in the United

8    States.

9    Q.   When you complete the 300 hours of training, are you

10   considered certified?

11   A.   Yes.

12   Q.   Are you certified today?

13   A.   Yes, I am.

14   Q.   Has your certification ever lapsed?

15   A.   No, it has not.

16          MR. DESROCHES:  Just one moment?

17   Q.   (By Mr. Desroches)  So you've indicated that your

18   certification has never lapsed?

19   A.   Correct.

20   Q.   Can you describe what you've referred to as the

21   training from all five major cell phone providers?  Who

22   are those cell phone providers?

23   A.   The cell phone providers are AT&T, Sprint, Verizon,

24   T-Mobile, and UScellular.

25   Q.   And what type of training did you receive from them?

A.    We met with -- we actually meet with representatives

annually from those companies, personnel from their

records department, and also radio frequency engineers as

well.  We learn essentially how their networks operate,

what type of records they maintain and what those records

mean, and equally as important what they don't mean.

Q.    Do you regularly use cellular telephone technology in

your work?

A.    Yes, I do daily.

Q.    Have you ever provided instructions in the field of

historical cell site analysis?

A.    I do.  Pre-COVID we would host trainings for various

law enforcement agencies and teach them the basics of

historical cell site analysis.

Q.    Have you testified regarding historical cell site

analysis in courts of law?

A.    Yes, many times.

Q.    Drawing your attention again back to what you refer

to as the major carriers, are you familiar with the

carriers that operate in the Longmeadow, Massachusetts

area?

A.    Yes.  That would be the major four, which is AT&T,

Sprint, T-Mobile, and Verizon.

Q.    Do each of these carriers operate independent of each

other?

A.   They do.  Meaning a Verizon phone will only utilize
Verizon towers when available.
Q.   What does a tower, as you refer to it, what does that
actually do?
A.   So, generally speaking, cell towers provide wireless
service to their customers by way of radio waves and
signals that are broadcast from the towers.
Q.   What is the range of a cellular tower?
A.   The range of every cell tower is different.  It
depends on the location of the tower within the network,
the density of the network in a particular area.
Generally speaking, in areas with more people, there's
more towers and because of that they cover smaller areas
than areas with less people and fewer towers that cover
larger areas.
Q.   Are cell towers responsible for providing coverage to
a particular area?
A.   Yes.  Regardless of location they're generally
providing service to the immediate area surrounding them.
Q.   Can you explain what a sector of a tower is?
A.   So a sector is a term for a set of antennae on a
tower.  Generally most towers have three sectors or three
sets of antennae, and each of those sectors are
broadcasting a signal in a particular direction which is
unique, the signal that is, unique to other sectors on

1    that tower and unique to other signal from neighboring

2    towers.

3    Q.   How does a cell phone actually engage a cell tower?

4    A.   So cell phones are constantly scanning the

5    environment.  Even as we sit here with phones in our

6    pocket, they're constantly scanning the environment to

7    keep tabs on the best quality signal in the area.

8         And when they're doing that, it can recognize from

9    the signal what tower and sector that the signal

10   originated from.  It does that so when a call comes into

11   your phone or you go to use your phone, the device already

12   knows through which tower and sector it's going to access

13   the network.

14   Q.   Does the phone have to be within a converge area of a

15   tower in order to utilize it?

16   A.   Yes, it does.  It has to be within the coverage area.

17   Q.   Is it possible for a phone to use a tower when it is

18   not in the coverage area?

19   A.   No.  It's not possible.

20   Q.   Are you able to pinpoint the exact location of a

21   phone using the information that you described earlier?

22   A.   No.  We can never pinpoint the phone.  We can usually

23   either approximate or illustrate the coverage area of the

24   tower and sector used.

25   Q.   Can you explain how the line of site could affect

1    which tower a cell phone engages with?

2    A.   So the signal that is broadcast from a tower is when

3    it leaves the antennae, it's going to travel in that

4    direction until it's either obstructed or dissipates and

5    just runs out of energy.

6        So when a phone is scanning its environment for a

7    detectable cell signal, oftentimes the tower with the best

8    line of sight or obstruction free path between the tower

9    is the one that it will select.  Typically that's the

10   closest tower but it's not always necessary the closest

11   tower.

12   Q.   In conducting a cell site location analysis, do you

13   typically rely on records provided by a carrier?

14   A.   Yes, I do.

15   Q.   Could you describe how it is you do that?

16   A.   So we receive records upon requests from phone

17   companies and those records contain -- they differ based

18   from one provider to the next, but they'll contain the

19   date and time the phone was used; what type of

20   communication occurred, whether it was a voice call, a

21   text message or so on, the duration of call, additionally

22   the cell tower and sector that was used.

23   Q.   Do cell providers also maintain a list of their

24   location of their towers.

25   A.   They do.  They also maintain master tower lists.

1    Q.   How do you use those records to determine where a
2    phone is located at a particular time?
3    A.   So we use the combination of the actual call detail
4    records specific to the phone number, which includes the
5    tower that was used and sector.  We also use the tower
6    list which has every tower in that particular provider's
7    network, and by mapping out all of those towers in an area
8    and identifying which one, which of those towers are used
9    by the particular phone we're interested in, we can
10   generally approximate where the phone was located.
11   Q.   How do you estimate the coverage area of a particular
12   sector?
13   A.   So without what's called a drive test when we
14   estimate a coverage area of a tower and sector, we
15   generally estimate that it's between -- somewhere between
16   the tower that was used and the next neighboring tower.
17   Q.   You mentioned drive testing, what is drive testing?
18   A.   So drive testing is something that's done within the
19   cellular industry and also done by the CAST team.  It's
20   the act of going out into an area of interest with an
21   antonymous receiver and measuring the signal that's
22   present in a particular area, and those measurements that
23   are collected are also simultaneously geo-stamped with the
24   location where they are collected.  We're able to do that
25   and map out more precisely where the signal from a

1    particular tower stops.

2    Q.   At some point did you become involved in an

3    investigation of the matter before this court today?

4    A.   I did.

5    Q.   How did you first become involved in that

6    investigation?

7    A.   One of the local FBI agents here in Springfield

8    contacted me to inquire if I could analyze some Verizon

9    cell phone records.

10   Q.   And what was the first step you took after being

11   contacted by that agent?

12   A.   When I received the records, I first sort of

13   preliminarily analyzed them on the particular date of

14   interest that was provided to me, which is April 2, 2020.

15        I identified the towers that were used by the device,

16   and then I determined that a drive test was probably

17   necessary to identify more precisely the coverage areas of

18   the towers that were used.

19   Q.   Just one moment, agent, I'm going to ask you to look

20   at a document on your screen.

21             MR. DESROCHES:  First, Mr. Clerk, I believe that

22   the large screen in front of the witness stand is right

23   now displaying.

24        Ms. McKenna, if we could have Exhibit 112 on the

25   screen please?

1    Q.   (By Mr. Desroches)  Now, Agent Burke, I'm going to

2    ask you to review the document that's on your screen

3    before you today.  Do you recognize what that is?

4    A.   Yes.  That's a certificate of authenticity for the

5    Verizon records.

6    Q.   And are these the records that you reviewed in

7    conducting the analysis that you're testifying about

8    today?

9    A.   Yes.

10           MR. DESROCHES:  Your Honor, I would move to

11   introduce Exhibit 112 --

12           MR. WATKINS:  No objection.

13           MR. DESROCHES:  -- which is a series of

14   documents.

15           THE COURT:  No objection, that will be

16   allowed.

17   (**PX-112 was admitted.**)

18   Q.   (By Mr. Desroches) Agent Burke, you indicated that

19   these are the records that you reviewed in this matter.

20   Can you explain what they consist of?

21   A.   So Verizon sends a series of records, each one

22   contains different information.  There's records of voice

23   calls that occurred, text messages, data sessions.

24   There's subscriber information.

25   Q.   In this case who do these records belong to?

1   A.   They were subscribed to John Rathbun at 20 Lori Lane

2   in East Longmeadow, Massachusetts.

3   Q.   How was it that you obtained -- how was it you knew

4   to obtain records relating the John Rathbun?

5   A.   They were provided to me by the FBI in Springfield.

6   Q.   What agent in particular provided it to you?

7   A.   Agent Ryan McGonigle.

8   Q.   So after reviewing these records, what did you do

9   next in this investigation?

10  A.   After I reviewed them initially, I determined that a

11  drive test was necessary and so I traveled to Springfield

12  -- well, to the Springfield area to conduct a drive test.

13  Q.   How did you know which area to focus on?

14  A.   So after I had initially mapped out these Verizon

15  records and determined the locations of the towers used by

16  the defendant's phone, I came out to that particular area

17  and with the drive test equipment that the CAST team has

18  and I drove that area in detail up and down as many roads

19  as I could to collect measurements from the signals of

20  those towers.

21  Q.   So did you conduct a drive test in this area?

22  A.   Yes, I did.

23  Q.   Can you describe how it was you went about conducting

24  this drive test in this area?

25  A.   So once I arrived to the area of East

1    Longmeadow/Longmeadow where the two towers of interest
2    were located, I set up my equipment which is essentially
3    again a receiver with multiple antennas that I affix to
4    the top of my vehicle.
5        One being an antenna that can measure the cell
6    signal; another antenna being a GPS antenna so it can
7    record where I am when the measurements are being
8    collected.  I then simply and sort of mindlessly drive up
9    and down every street in a particular area where I expect
10   the signal to be reviewing the data as I go and then
11   continuing on until I have an accurate depiction of the
12   cell towers' coverage area.
13   Q.   What was the next step you took after conducting that
14   drive test?
15   A.   Once the drive test was complete, then I produced a
16   report to visually display my analysis.
17            MR. DESROCHES:  Ms. McKenna, can we have Exhibit
18   41 just for the witness, counsel, and the court?
19   Q.   (By Mr. Desroches)  Agent Burke, do you recognize
20   what's on the screen before you at this point?
21   A.   Yes.  It's the cover page of my report.
22            MR. DESROCHES:  Ms. McKenna, can you please
23   scroll through the pages?
24   Q.   (By Mr. Desroches)  Agent Burke, have you had a
25   chance to view all the pages?

1    A.   Yes.  This is my report.

2    Q.   And is this the report that you just described the

3    process for which you undertook to write?

4    A.   Yes, it is.

5                MR. DESROCHES:  At this point, Your Honor, I

6    would move to introduce PX-41.

7                MR. WATKINS:  No objection.

8                THE COURT:  No objection, that will be admitted

9    in.

10   **(PX-41 was admitted.)**

11   Q.   (By Mr. Desroches) Now, Agent Burke --

12               MR. DESROCHES:  If this also could be published,

13   Your Honor?

14               THE COURT:  Okay.  It can be published.

15   Q.   (By Mr. Desroches)  Agent Burke, I'd like now just to

16   walk through the report with the jurors if we could.

17               MR. DESROCHES:  Ms. McKenna, can we scroll to

18   page 2?  All right.  Page 3.

19   Q.   (By Mr. Desroches)  Now on the screen before the

20   jurors is page 3 of Exhibit PX-41.  Can you describe for

21   the jurors what is depicted on page 3?

22   A.   This is an overview of Verizon cellular network in

23   April of 2020, and since the defendant's phone was a

24   Verizon phone, this is the relevant network for my

25   analysis.

1           You can see -- I should say all the red dots all are
2    locations where Verizon cell towers are located.  As I
3    mentioned, you can see Springfield there's a cluster of
4    dots, a cluster of towers there.  Again, more people more
5    towers covering smaller areas and then we sort of get out
6    to outskirts of town, you can see that there's less
7    towers.
8    Q.   How did you know where those towers were located?
9    A.   All that information is listed in Verizon's tower
10   list.
11   Q.   And that's in the records that you reviewed prior to
12   completing this report?
13   A.   Yes, it is.
14           MR. DESROCHES:  Can we have the next page
15   please?
16   Q.   (By Mr. Desroches)  Can you please describe for
17   jurors what's depicted on page 4 of PX-41?
18   A.   It's just examples of cell towers that I'm sure
19   everyone has seen.  On the right that's an attempt at a
20   camouflage tower that's broadcasting a signal, just the
21   same way as the sort uncamouflaged tower on the left.
22           On the left also is a good display of sectors as I
23   discussed previously.  There's two triangular brackets,
24   each contain sets of antennae on the triangle spaces.
25   Those are sectors broadcasting signal in that direction,

1    and you see in this particular tower there's sets of

2    antenna broadcasting a signal in different directions.

3                    MR. DESROCHES:  Can we have the next page?

4    Q.    (By Mr. Desroches) Can you describe for the jurors

5    what is included on slide 5 of this presentation?

6    A.    Again, just a display of the impacts that a network

7    density has on a sector coverage area.  Downtown Boston on

8    the bottom right with many towers and then Pittsfield, the

9    top left, with only two towers for that particular

10   network.  So a great impact on how precise we're able to

11   approximate the location of a device.

12   Q.    Can you further explain how the density of towers

13   affects your ability to pinpoint the location?

14   A.    Sure.  So, for example, if I reviewed cellular

15   records for a device that utilized that tower -- one of

16   the two towers in Pittsfield, very simply I would not be

17   able to narrow it down very much.  I would only be able to

18   say what side of Pittsfield the device was on.  Whereas in

19   downtown Boston if it used any of those towers, I would be

20   able to sort of narrow down the location of the phone to

21   maybe a few blocks.  So it impacts our ability to analyze

22   where the phone was greatly.

23   Q.    Did you indicate that there is a relatively dense

24   population of towers in Springfield?

25   A.    Yes, more so than Pittsfield for sure.

1          MR. DESROCHES:  Can we have the next exhibit

2     please?

3     Q.   (By Mr. Desroches)  Can you describe what's depicted

4     in slide 6 of your report?

5     A.   So this is an example of how on the following slides

6     the use of a tower in a sector will be represented.  On

7     the top right, that wedge is going to represent the use of

8     a sector on a tower and that would be a three-sector

9     tower.  So the small shaded area is not the boundary of

10    the coverage, that's simply representing what direction

11    the signal is being broadcast.

12         Then on the bottom right that will represent the use

13    of an omni-directional antenna.  So that's an antenna -- I

14    haven't discussed that -- but that's an antenna that's

15    broadcasting a signal in all directions.

16          MR. DESROCHES:  Can we have the next exhibit?

17    Q.   (By Mr. Desroches)  Can you describe what's depicted

18    in this slide for the record number 7?

19    A.   Yes.  So this will show in areas where I conducted

20    the drive test how the use of those towers in sectors will

21    be represented.

22         So in the top left, again that wedge, that wedge will

23    be utilized where the drive test wasn't conducted to

24    estimate the coverage area of the tower sector.

25         On the bottom right you can see that shaded area and

1    the color will vary, but that will represent a tower and

2    sector that was tested by my drive test equipment.  And

3    essentially what that means is in the dark shaded area,

4    that is areas where the signal from that tower and sector

5    is the strongest relative to other towers in the area.

6    And then the lighter shaded area are areas where the

7    signal is still usable but just not the strongest signal

8    in that area.  So essentially what does what mean?  When

9    we display the results of drive test, the phone could have

10   been located anywhere within the colored area.

11              MR. DESROCHES:  Now, could we have the next

12   slide please?

13   Q.   (By Mr. Desroches)  Page 8 is just indicating you're

14   moving on to another section?

15   A.   It is.

16   Q.   Can you describe what's depicted in slide 9?

17   A.   The map legend, as you can see, the red dots will

18   continue to represent the location of Verizon cell towers;

19   CS will represent the location of the crime scene; the 20

20   in the blue box will represent 20 Lori Lane; 90 will

21   represent 90 El Paso Street in Springfield.  And then the

22   red wedge for the drive test, the color coded areas will

23   represent use of towers and sectors by the defendant's

24   phone.

25              MR. DESROCHES:  Could we have the next slide?

1    Q.    (By Mr. Desroches)   And page 10 again indicates
2    you're moving on to another section of this report?
3    A.    Yes, it is.
4    Q.    Now, slide 11, can you describe generally what's
5    depicted in slide 11 and then we will get more specific
6    after that?
7    A.    Sure.   I was asked to focus in on April 2, 2020 as I
8    mentioned.   So this slide represents all of the activity
9    from the Verizon records that occurred between 12:10 a.m.
10   and 5:05 a.m. on that day.
11   Q.    So now I'd like to discuss some of the markings on
12   this map.
13         On the bottom right hand there appears to be a blue
14   box with a 20 in it.   Can you explain to the jurors what
15   that indicates?
16   A.    That represents the location of 20 Lori Lane in East
17   Longmeadow, Massachusetts which was provided to me as the
18   defendant's residence.
19   Q.    Now more towards the center of the map there's a red
20   square with a CS in it, what does that indicate?
21   A.    That represents the location of the crime scene which
22   was provided to me as 780 Converse Street in Longmeadow,
23   Massachusetts.
24   Q.    And what are all the red dots?
25   A.    The red dots are locations of Verizon cell towers.

1    Q.    Now there are also areas shaded in purple and gray.

2    What do those indicate?

3    A.    Those indicate the coverage areas of two towers and

4    sectors that were utilized during this 12:10 to 5:05 time

5    frame.

6    Q.    Does the fact that they are different colors have any

7    significance?

8    A.    No, it doesn't.

9    Q.    You indicated previously that there's a difference in

10   the strength of the coverage in the darker shaded areas

11   than the lighter shaded areas?

12   A.    That's correct.

13   Q.    And can you please describe on this map where that's

14   evident?

15   A.    So for either color, the darker shaded area is an

16   area where the signal from the particular tower and sector

17   is the strongest.  The lighter shaded area is still a

18   usable signal but there just happens to be another tower

19   in that area providing the strongest signal.

20   Q.    I'd like to draw your attention to the boxes that

21   contain text.

22         In the bottom box marked CID-66142, there appears to

23   be a date and some numbers.  First, I'd like to draw your

24   attention to 413-636-4047.  Does that number have

25   significance?

1    A.    That was the phone number for which the Verizon

2    records were obtained.

3    Q.    And in this case is that John Rathbun?

4    A.    That's correct.

5    Q.    So can you describe what this box summarizes?

6    A.    So on that bottom box that you described, CID-66142,

7    that is -- 66142 is the name of the Verizon tower which

8    the arrow is pointing at, that number on the left on the

9    first line is again the defendant's phone number followed

10   by the date and time of the activity, so 12:10:26 a.m.

11        The 51 represents the duration of the event, 51

12   seconds, followed by voice to indicate that it was a voice

13   call so a 51-second voice call occurred at 12:10 a.m.  And

14   then those two numbers, phone numbers next to each other,

15   the from and to numbers, so the first one being the

16   calling number which is the defendant's phone and then the

17   second one being who the defendant called at that time.

18   Then the final number is just the orientation or the

19   aspect of the sector that was utilized.

20   Q.    So there's a line below that one that you described.

21   What does that indicate to you?

22   A.    That would indicate another voice call which occurred

23   at 4:34 a.m. lasting nine seconds.

24   Q.    Again, all that information that you described

25   previously has the same meaning in this line; is that

1    correct?

2    A.   It does.

3    Q.   After reviewing all the records that you described

4    and doing the drive test that you performed, what

5    conclusions, if any, can you draw regarding these

6    communications?

7    A.   So at 12:10:26 a.m. and 4:3434; a.m. at the beginning

8    of each voice call the device was located somewhere within

9    the purple shaded area, whether it be the dark shaded

10   area, the light shade area.  There's no way to determine

11   that, but the phone was located in that purple area at

12   those two times.

13        And then following that 4:34 a.m. call, the phone

14   traveled to the coverage area represented in gray and

15   again engaged in a voice call.  That one beginning at 5:01

16   a.m. which lasted three seconds.  So at 5:01 a.m. the

17   device was now located somewhere in the gray area.

18   Q.   Did you observe any other contact with towers between

19   4:34 a.m. and 5:01 a.m.?

20   A.   No.

21   Q.   So we're clear, the purple shaded area in the bottom

22   right, does that include the defendant's residence?

23   A.   Yes, it does.

24   Q.   Now, let's talk about the gray shaded area in the

25   left-hand side of this.

1          Can you explain to the jury what geographic features

2     are included in that portion?

3     A.    Well, you can see that the tower is located on the

4     west side of the Connecticut River, and then at least this

5     particular sector is providing probably the majority of

6     the signal to I-91 on the east side of the river.

7     Q.    Did you drive that particular area during your drive

8     test?

9     A.    I did.

10    Q.    And does this accurately reflect the earliest point

11    where the cell tower would connect with a cell phone on

12    91?

13    A.    Yes, down in the Forest Park area.

14    Q.    Just so we're clear, there appears to be a 91 logo

15    right near the bottom of that coverage area; is that

16    correct?

17    A.    That's correct.

18    Q.    In the uppermost region where this phone -- I'm

19    sorry, in this case it would be the southern most portion

20    would be the Basketball Hall of Fame; is that correct?

21    A.    Correct.

22    Q.    Again, the fact that a red dot appears out of that

23    gray shaded area, does that affect your analysis in any

24    way?

25    A.    Can you repeat the question?

1    Q.    Sure.

2          In this area it appears that the red dot, which is

3    the tower, isn't inside of the coverage area, does that

4    affect your analysis or is that what you would expect to

5    see?

6    A.    That's not uncommon.

7    Q.    So based on your review of all these records and your

8    drive test, are you able to make any conclusions about

9    what happened between 4:34 a.m. and 5:01 a.m. with that

10   cell phone?

11   A.    Well, there's no way to determine where it was during

12   that time frame because there's no activity in the records

13   that allows me to do that.  However, it's quite clear that

14   the phone would have moved from some location in the

15   purple shaded area to some location in the gray shaded

16   area during that time.  There's no way it could have

17   connected to the gray shaded area from anywhere in the

18   purple shaded area so the movement is evident.

19              MR. DESROCHES:  Now for purposes of the record,

20   I'm going to ask that Exhibit No. 38 be put on the screen

21   for the witness and counsel.

22   Q.    (By Mr. Desroches)  Agent Burke, is it fair to say

23   that PX-38 is a copy of that page of your report that you

24   just referred to?

25   A.    It is.

1          MR. DESROCHES:  Your Honor, I'd move to

2     introduce PX-38 as the next government exhibit.

3          MR. WATKINS:  No objection.

4          THE COURT:  That will be allowed.

5     **(PX-38 was admitted.)**

6          A JUROR:  The defendant's screen, I can't make

7     it out totally, but it is facing towards this way and I

8     have a view of his screen.

9          THE COURT:  I see.  Okay.  You mean when you

10    shouldn't be having it?

11         A JUROR:  Yes.

12         THE COURT:  Thank you very much.  I appreciate

13    that.  So that adjustment is all set.

14         MR. DESROCHES:  Ms. McKenna, can we go back to

15    the report?  Can we go to page 12?  Actually can we go to

16    page 13 first?

17    Q.   (By Mr. Desroches)  Agent Burke, now on the screen is

18    page 13 of your report.  Do you recognize what this is?

19    A.   Yes.  This is the activity from the Verizon records

20    that occurred between 5:05 and 8:25 a.m. on April 2nd.

21    Q.   Now this appears to be a map of some sort; is that

22    correct?

23    A.   It is a map.

24    Q.   What area is depicted here?

25    A.   So the phone utilized four towers during this three

1    hour and twenty minute time period, all located in

2    Springfield, Mass. in the vicinity of 90 El Paso Street.

3    Q.    And why was 90 El Paso Street in Springfield

4    significant to you at the point you made this report?

5    A.    Agent McGonigle had relayed to me that it was the

6    address associated with one of the defendant's associates.

7    Q.    Can you describe what's depicted in terms of these

8    areas with the arrows the dots with the arrows; what is

9    that?

10   A.    Those are the omni-directional sites in that area

11   which oftentimes cover small pockets or small areas where

12   the larger towers can't cover.  That just represents use

13   of an omni-directional tower.

14   Q.    And these wedge shapes, are those the same --

15   A.    Those would be towers that were utilized that

16   contained three sectors.  So they represent the direction

17   of the sectors' signal.

18   Q.    Can you summarize what is depicted in this slide?

19   A.    Yes.  So in this slide that device was located.

20   Again, I can't pinpoint where the phone was located, but

21   it's fair to say the device was located in the immediate

22   vicinity of 90 El Paso Street for the majority of this

23   time frame.  And then on the top right, that circle with

24   arrows, 8:05, 8:09, 8:09 again, utilized that site

25   possibly leaving that area.

1    Q.   Now, for points of reference, we also see in this map

2    there's a 20 in a blue box.  Is that 20 Lori Lane?

3    A.   Yes, that is.

4    Q.   And there's also a CS in a red box, is that the crime

5    scene?

6    A.   Yes, it is.

7    Q.   Which is the JGS Lifecare in Longmeadow; is that

8    correct?

9    A.   Yes.

10   Q.   Now while you were conducting this investigation and

11   analysis, did you have the opportunity to review a

12   forensic extraction of the defendant's cell phone?

13   A.   Yes, I did.

14   Q.   And who was that provided to you by?

15   A.   That was provided to me by Agent McGonigle.

16   Q.   Did you learn that it was completed by Dustin Wong?

17   A.   Yes, I did.

18   Q.   And what in particular did you look at when you

19   examined the forensic extraction?

20   A.   I looked at the messages that were exchanged on the

21   device during the time frames for which I analyzed.

22           MR. DESROCHES:  Could we have slide 12, please

23   of the previous page?

24   Q.   (By Mr. Desroches)  We're looking at page 12 of your

25   report, can you explain what this includes?

1    A.   This is just essentially a spreadsheet containing

2    four messages, the only four messages that were exchanged

3    between 12:10 a.m. and 5:05 a.m.

4    Q.   So we're clear, there are four columns on this chart,

5    correct?

6    A.   Yes, there is.

7    Q.   Can you describe what information is included in the

8    first column?

9    A.   The date and the time that the message that occurred.

10   Q.   Can you explain what appears in the second column?

11   A.   The from number or the device that sent the message.

12   Q.   And in this case it appears that the number is the

13   same in each entry; is that correct?

14   A.   Yes, it is.  It's the defendant's phone number.

15   Q.   So does that indicate to you that the defendant sent

16   those messages?

17   A.   Yes.

18   Q.   And in the third column labeled To, can you explain

19   what that is?

20   A.   That's the phone number for which the message was

21   sent to.

22   Q.   And finally the fourth column labeled Message, what

23   does that indicate?

24   A.   That's the actual content of the message that was

25   sent.

1    Q.   Again, this came from the forensic download provided

2    or completed by Dustin Wong; is that correct?

3    A.   Yes, that is correct.

4              MR. DESROCHES:  Can we have slide 14?

5    Q.   (By Mr. Desroches)  Now again, we're referring to

6    slide 14 of Agent Burke's report which is PX-41.  Can you

7    describe what's depicted here?

8    A.   This is additional messages; these occurring between

9    5:05 and 7 a.m.

10   Q.   And in this case is it -- are all the columns the

11   same as what we just saw?

12   A.   Yes, they are.

13   Q.   There does appear to be some difference though in the

14   message portion.  For example, there are entries that

15   indicate Audio Call, Tap To Call Again.  What is your

16   understanding of those entries?

17   A.   All but the first message in this case are messages

18   or activity that occurred on Facebook.

19   Q.   So they're Facebook messages?

20   A.   Facebook messages, yes.

21   Q.   Now, Agent Burke, I'd like us to do a few more

22   housekeeping matters and ask that PX-39 be placed on the

23   witness's exhibit -- I'm sorry, the witness's screen and

24   also displayed for the court and counsel.

25            Do you recognize what's labeled PX-39?

1    A.    Yes.

2    Q.    What is it?

3    A.    That's slide 13 from my report.

4                MR. DESROCHES:  Your Honor, I'd move to

5    introduce PX-39 as a stand-alone exhibit.

6                MR. WATKINS:  No objection.

7                THE COURT:  Allowed.

8    **(PX-39 was admitted.)**

9                MR. DESROCHES:  May I have Exhibit 40 placed on

10   the screen for the witness?

11   Q.    (By Mr. Desroches)  Do you recognize what's been

12   labeled PX-40?

13   A.    That is slide 12 from my report.

14               MR. DESROCHES:  Your Honor, I would ask that

15   PX-40 be admitted as a stand-alone exhibit.

16               MR. WATKINS:  No objection.

17               THE COURT:  Allowed.

18   **(PX-40 was admitted.)**

19   Q.    (By Mr. Desroches) Agent Burke, I'd like to refer

20   back to if we could Exhibit No. 38.

21               MR. DESROCHES:  And if that could be published?

22               THE COURT:  Go right ahead.

23   Q.    (By Mr. Desroches) Now based on investigation and the

24   analysis you conducted in this matter, can you please

25   explain the conclusion -- any conclusions that you were

1    able to make, if any, about the movement of the phone

2    between 4:34 a.m. and 5:01 a.m.?

3    A.   Yes.  The phone would have left somewhere in the

4    purple shaded area and traveled to the area depicted in

5    gray.

6    Q.   And you indicated that the area depicted in gray is

7    primarily consisting of Route 91; is that correct?

8    A.   Much of the signal covers 91, correct.

9              MR. DESROCHES:  Thank you.  I have no further

10   questions.

11             THE COURT:  Cross?

12             MR. WATKINS:  Thank you, Your Honor.

13   **CROSS-EXAMINATION**

14   Q.   (By Mr. Watkins)  Good morning, Agent Burke.

15   A.   Good morning.

16   Q.   I want to talk first about the drive test that you

17   did.

18   A.   Okay.

19   Q.   To put it colloquially, you're the modern version of

20   the can-you-hear-me-now guy?

21   A.   Thank you.

22   Q.   But you have electronic equipment in the car that

23   you're driving around, correct?

24   A.   Yes.  That's correct.

25   Q.   In this case you didn't do any walking around like

1    that guy did.  You're always driving around, hence the

2    drive test?

3    A.    Yes.

4    Q.    And the equipment you have in the car is both

5    hardware and software; is that correct?

6    A.    Yes.

7    Q.    The hardware and software that's actually developed

8    by cell tower industry to determine coverage areas,

9    correct?

10    A.    Yes.

11    Q.    And that was to improve the consumer experience, the

12    can-you-hear-me-now guy, right?

13    A.    Yes.  The providers do the same thing when they're

14    trying to troubleshoot network problems.  They go out and

15    drive test areas and determine what's wrong.

16    Q.    And you talked a couple of times -- well, actually

17    I'll go to Exhibit 41 here.  Let's see if I get the right

18    page here.

19         You write here the actual coverage area determined by

20    a drive test but it's actually estimated, right?

21    A.    There is still some estimation in the areas where I'm

22    not able to drive.

23    Q.    Well, it's not just estimation there, but doing a

24    drive test is really a snapshot in time; is that fair to

25    say?

1   A.   That is fair to say.

2   Q.   So, for example, here you did your drive testing on

3   September 8th I think it was?

4   A.   That's correct.

5   Q.   And this event was back in April, right?  April 2nd

6   we heard?

7   A.   Correct.

8   Q.   So there are a lot things that can affect various

9   aspects of the drive test; is that fair to say?

10  A.   It is possible that the network could have changed

11  slightly during that time.

12  Q.   The network can change, environmental factors can be

13  different, right?

14  A.   Yes.

15  Q.   So it really is -- and, in fact, a drive test months

16  after an incident is not going to show exactly the same

17  results as a drive test if you had done it that day on

18  April 2nd, right?

19  A.   Not necessarily.  Correct.

20  Q.   And when you see these coverage areas here, this is

21  just an example one you did.  This one here has the kind

22  of striated coverage lines.  Yours are all kind of round;

23  is that right?

24  A.   Yes.

25  Q.   And this is not something you're doing, right?  When

```
1    you collect the data to make these circles and things,
2    that's not something you do yourself, right?
3    A.   No.  That's the software piece that does that.
4    Q.   And there's some kind of algorithm within the
5    software that tries to determine what the coverage area is
6    as it goes through?
7    A.   It does.  It uses the cellular measurements and the
8    GPS measurements.
9    Q.   So again, for example, here on the gray area it has
10   these rounded curves but you don't know for certain
11   sitting here today how they came up with the rounded curve
12   that stretches into Forest Park, right?
13   A.   Well, it's based on the measurements that were taken,
14   but, sure, an area is -- obviously I didn't drive through
15   the river so there's some estimation there.
16   Q.   Just for example, you're aimlessly driving around and
17   you were driving up Route 91 quite a bit, right, to get
18   these drive test readings?
19   A.   I did drive Route 91, yes.
20   Q.   And were you driving through Forest Park doing a
21   little four-wheeling down here?
22   A.   I did drive quite a bit of Forest Park.
23   Q.   And inside on the roads presumably?
24   A.   Yes.
25   Q.   But the coverage area includes this grass here,
```

1    right?

2    A.   It does.

3    Q.   So you also have this -- well, let me go back to

4    here.

5         But really on the drive test it reveals that when

6    this cell tower was hit, a car could be as far as here?

7    Maybe even further depending on what the conditions were

8    that day, right? (Indicating)

9    A.   Not further, but it could have been anywhere in the

10   gray area, yes.

11   Q.   I think what you said is this is an estimate based on

12   September 8th, right?

13   A.   I'm sure if there had been some significant change in

14   the network between which my review of the tower list

15   didn't indicate that there was.  But if there had been,

16   sure.

17   Q.   Also environmental conditions and just the fact that

18   radio waves are not static, right?

19   A.   Well, the environmental conditions wouldn't have much

20   of an impact.  The environment wouldn't have changed or

21   trees -- I don't know that a forest would have been

22   planted in between or cut down, but there could have been

23   changes.  In my review of the tower list from April to

24   September, it didn't indicate any changes.

25   Q.   So again, this is an estimate.  I think you've agreed

1    this is an estimate of the coverage area, correct?

2    A.   It's an estimate in the sense that there's quite

3    clearly, again with the river, there's areas that the

4    software is displaying coverage that I didn't drive and so

5    that is an estimate.

6    Q.   Now, while we're on -- well, let's talk about this

7    page of your report.

8         So you've identified two voice calls that occurred

9    down in this area overnight, one at 12 a.m. and one at --

10   A.   4:34.

11   Q.   -- 4:34.

12        You would say those are both consistent with the

13   phone being here at 20 Lori Lane, right?  (Indicating)

14   A.   Yes, that's possible.

15   Q.   Absolutely inconsistent with a phone being in that

16   area, right?  (Indicating)

17   A.   Correct.  The phone was not at the crime scene at

18   12:10.

19   Q.   Indeed, just to be sure, all of the maps that you've

20   done there was never, never any indication that the phone

21   was in this particular area, correct, where you've marked

22   as CS?  (Indicating)

23   A.   Correct.  It did not use a tower sector that covered

24   the crime scene.

25   Q.   And you've identified and we can see some of the

1    towers that indeed anyone in that area would have hit off

2    of, right?

3    A.    Correct.

4    Q.    And you had not identified any signal from that 4047

5    phone that hit off a cell tower consistent with 780

6    Converse Street, right?

7    A.    Correct.  There were no records that indicated that.

8    Q.    I want to continue back through this time period of

9    12:10 a.m. until 5:05 a.m.  You've got those two calls.

10        Did you also see text messages in some of the

11   materials that Agent McGonigle provided to you?

12   A.    Yes, there were messages.

13   Q.    Did you also see web browsing that was going on on

14   the phone in the materials provided by Agent McGonigle?

15   A.    There was web browsing activity, yes.

16   Q.    So that also would be consistent, wouldn't it, with

17   the phone being at 20 Lori Lane, correct?

18   A.    No.  Those text messages -- Verizon doesn't retain

19   location information for text messages so there would be

20   no way to know where the phone was at those given times.

21   Q.    You anticipated my next question.

22        That's correct, if the text messages are sent from 20

23   Lori Lane, you actually wouldn't know -- they wouldn't go

24   off a cell tower?  You wouldn't know, correct?

25   A.    They would go off a cell tower; they're just not

1    recorded by Verizon.

2    Q.    And the same for web browsing.  For example, a phone

3    can be connected to a WiFi system in that house or really

4    anywhere, right?

5    A.    Right.  If it's connected to WiFi, Verizon would not

6    see that or record it.

7    Q.    Verizon is not going to know a thing about that

8    because they're going off the WiFi in a particular place

9    that you are, right?

10   A.    That's correct.

11   Q.    So the fact that -- well, strike that.

12         I want to next go up here.  Let's kind of take them

13   all.  All kinds of voice calls and data going off the cell

14   towers, Verizon's cell towers in this area, correct?

15   (Indicating)?

16   A.    That's correct.

17   Q.    Just to be clear, I think it's fairly obvious, a

18   phone up here -- a phone that is in that area up there --

19   I'm sorry, a phone down here in this area absolutely is

20   not going to be hitting off any of those cell towers up

21   there?  (Indicating)

22   A.    Correct.  It would not be.

23   Q.    It's just impossible, right?

24   A.    Impossible.

25   Q.    Because you have all these other phones in between,

1    right?

2    A.    Correct.

3    Q.    It could be anywhere.

4          So really starting at 5:29 for up to and you put it

5    here as 8:25, all of the cellular activity was hitting off

6    of towers up in East Springfield way up here in this area,

7    right?  (Indicating)?

8    A.    Yes.  Now that's the time frame -- the specific

9    points in time during that time frame are listed in the

10   box so it's not continuous, but, yes.

11   Q.    And we see them here, 5:29, 5:30, 7:15, 7:24.

12         And just as you -- the reason we are seeing these in

13   different boxes is because there's quite a few cell towers

14   up in this area?  It's pretty heavily populated, right?

15   A.    Each box represents or is associated with a specific

16   tower represented there.

17   Q.    And indeed one person could be sitting in one place

18   all of that time and could have hit off of two different

19   towers resulting in what's happened here, right?

20   A.    That's possible if it was located on a boundary.

21   Q.    Because of the proximity of these four towers here,

22   could have been walking around or movement of even just a

23   few hundred yards might mean a different cell tower?

24   A.    That's correct.

25   Q.    And if one cell tower was especially busy that

1    morning, even if someone is standing in one place it might

2    have gone off a different cell tower?

3    A.   Not so much with the busy angle, but it's definitely

4    possible that it was either stationary or moving very

5    little.

6    Q.   So that would be the conclusion there is that this

7    4047 phone from 5:05 to 8:25 absolutely nowhere near this

8    area here, right?  (Indicating)

9    A.   Well, again just to clarify, only at the points in

10   time.  So you can see that there's some gaps within the

11   actual activity where with no record, there's no way to

12   determine the location.

13   Q.   So I mean, just to put it bluntly, 5:29, 5:30, all of

14   these times, impossible for someone to be in that area,

15   correct?  (Indicating)

16   A.   Correct, in those --

17   Q.   If they're holding onto that 4047.  We're all

18   assuming that John has the phone in his hand while he's up

19   there in that area, right?

20   A.   Yes.

21   Q.   You presented a report talking about your findings

22   from that morning up to 9:15 in the morning.  Let me go to

23   this one.

24        So 9:15 in the morning still the same thing, this

25   phone is up in this area or at least hitting off of this

1    particular tower?  (Indicating)

2    A.   Yes, at those times and then travels back towards the

3    vicinity of 20 Lori Lane.

4    Q.   It doesn't look like you did the drive test up there,

5    right?

6    A.   I did not, correct.

7    Q.   But, again, you can conclude that given the face of

8    the cell tower it was nowhere near this 780 Converse

9    Street down here?  (Indicating)

10   A.   That's correct.  It was not.

11   Q.   And that's at 8:29, 8:54, and 8:58, right?

12   A.   That's correct, sir.

13   Q.   So the previous screen you had up to 8:25, that time

14   stretches all the way to 9:15 that this phone is not in

15   the area of 780 Converse Street, correct?

16   A.   Correct.

17            MR. WATKINS:  That's all I have, Your Honor.

18            MR. DESROCHES:  Thank you, Your Honor.

19   **REDIRECT EXAMINATION**

20   Q.   (By Mr. Desroches)  Agent Burke, just so we're clear,

21   does the cell site location information that you can

22   review, does that give you the location of a phone 24

23   hours a day seven days a week?

24   A.   It only records the location for Verizon specifically

25   when voice calls occurred or potentially in some cases

1    when a data session was initiated.

2    Q.   So when Attorney Watkins asked you about the phone

3    being in the area of the crime scene, you can't say that

4    it was not there, correct?  Just that it didn't make a

5    call while it was in that location; is that fair to say?

6    A.   Right.  It didn't make a voice call or receive a

7    voice call in that vicinity.

8    Q.   So because of that, are you able to make any

9    conclusion about where that phone was at that time or at

10   any time during that time?

11   A.   No.  If there's no record, there's no way to

12   determine where it was located.

13   Q.   You also indicated that you reviewed records

14   regarding the location of cell towers provided by Verizon;

15   is that right?

16   A.   That's correct.

17   Q.   Did you review it to note whether or not there was

18   any significant changes in the network coverage between

19   April 2, 2020 and the time you conducted that drive test?

20   A.   I did review that.  That's something that we do when

21   we do drive tests, particularly in a much longer after the

22   date of the incident.  In this case it was relatively

23   close, only a few months, and I didn't notice any changes

24   in the towers themselves.  I felt like a drive test would

25   be worthwhile.

1   Q.   So if there was a change in the network coverage,
2   would you do a drive test?
3   A.   If there were significant changes, no, I wouldn't
4   because ultimately it wouldn't reflect the network on the
5   date of the incident.
6   Q.   But in this case you were comfortable doing that?
7   A.   I was.
8   Q.   Again just to conclude, did you see any changes in
9   the network coverage based on your review of the records?
10  A.   Not I could see, no.
11  Q.   You were also asked some questions about
12  environmental factors that may affect a network coverage.
13  Can you explain what type of environment factors, if any,
14  affect cell network coverage?
15  A.   I'm not sure exactly what was meant by that term.  I
16  guess, fall foliage is something that has sort of a
17  minimal impact on a cell signal.  I don't know how much
18  fall foliage was there in downtown Springfield, but I'm
19  not sure of any other environmental factors that would
20  impact it.
21  Q.   So the area of 91 that you described being covered by
22  the tower on the left side of your map, was there -- were
23  there a number of trees between that between and 91 that
24  you saw?
25  A.   I don't recall anything that would impact the cell

1    coverage.

2    Q.   Are things such a weather, things like that, would

3    that affect the network coverage?

4    A.   No.  Weather really only becomes an issue at much

5    higher frequencies.  They aren't used within the cellular

6    communication industry.

7            MR. DESROCHES:  Thank you.  I have no further

8    questions.

9            MR. WATKINS:  Just quickly.

10   **RECROSS-EXAMINATION**

11   Q.   (By Mr. Watkins) You talked about calls going off a

12   cellular tower, correct?

13   A.   Correct.

14   Q.   But more than just calls will show a cellular tower

15   hit, right?

16   A.   Data sessions sometimes, yes.

17   Q.   Correct.  So someone browsing on their phone outside

18   of their house outside, that will be reflected at a cell

19   tower, correct?

20   A.   In some circumstances, yes.

21   Q.   And sometimes a cell tower simply sends out signals

22   to the phone to connect with it to see what it's doing,

23   right?

24   A.   There is communication, yes.  That's not recorded

25   necessarily by the company, yes.

1    Q.   So those kinds of routine things, those would also

2    show cell phone tower hits, right?

3    A.   No.  No, not in the records provided.  The phone may

4    be in constant communication with a network or there may

5    be periodic check-ins and whatnot, but we're at the mercy

6    of what Verizon records.  You know, what makes business

7    sense and those types of records aren't generally

8    recorded.

9    Q.   But you put on your report times where data was

10   received at a cell tower location, right?

11   A.   There are two records where data sessions were

12   initialized with the relevant time.

13   Q.   And none of those was anywhere near 780 Converse

14   Street, correct?

15   A.   Neither was, no.

16           MR. WATKINS:  That's all I have.

17           THE COURT:  Okay.  Thank you, sir.  You can step

18   down.

19           THE WITNESS:  Thank you, Your Honor.

20           MS. O'NEILL-GREENBERG:  Your Honor, I'm sorry.

21   Could I ask for a quick break at this point?

22           THE COURT:  Sure.

23           THE CLERK:  All rise for the jury.

24           THE COURT:  Ladies and gentlemen, before we

25   leave, the instructions apply.  Don't talk about the case

1    with each other or with anyone; no internet searches or

2    posting.  All the same instructions.

3        So I think what we'll do is we'll have the witness

4    stand cleaned up now instead of waiting for a second

5    witness so that when we come back -- we'll use this as our

6    morning break.  We'll just take our 15, 20 minutes now and

7    be ready to go through two witnesses when we come back.

8    Okay?  Thank you.

9    **(The jury left at 10:47.)**

10        THE COURT:  So let's finish up on this phone

11   call issue.

12        What was given to me from Attorney Watkins' printout

13   at Document 177-1 where he lays out the phone calls, I

14   wanted to look at the transcript for what is listed on

15   that piece of paper as 96, 5-14-20.  I was referred to

16   transcripts.  I was referred to transcript Exhibit 96

17   pages 14 and 15.  All right.

18        And the government wants to start with line 9?

19        MS. BERKOWER:  The court's brief indulgence,

20   Your Honor.  I'm just getting the transcript back out.

21        THE COURT:  Uh-huh.

22        MS. BERKOWER:  Yes, judge.  Page 14, line 9

23   would be the start of our proposed clip.

24        THE COURT:  Okay.  All right.  And between line

25   9 and line 22 -- from line 9 to line 22, is there a

1    defense objection?

2              MR. WATKINS:  I'm sorry, Your Honor.  I'm still

3    catching up.  We are at 96?

4              THE COURT:  Exhibit 96, page 14.

5              MS. BERKOWER:  I think Ms. McKenna can put it on

6    the screen if that would be helpful, Your Honor.

7              THE COURT:  Okay.

8              MR. WATKINS:  I think I got it.  This one is

9    96-2?

10             MS. BERKOWER:  Yes.

11             THE COURT:  All right.  The government wants to

12   start at line 9.

13             MS. BERKOWER:  If you switch to Ms. McKenna, she

14   has it and she can pull it up.

15             MR. WATKINS:  I think Jarrett has to switch the

16   screen.

17             THE COURT:  So line 9 starts female voice "Okay.

18   Well, so, what should I pray for, specifically, is that

19   from 4:30 to 8:30."

20        John then says, "That I wasn't on Converse Street,

21   but I'm telling you I was.  I know I was.  Because the

22   only way that I get from my house to everyplace that I go

23   to get drugs, is to go straight to the highway down F'ing

24   Converse Street."

25        The female says, "Yes.  But you called that other

1   kid, the kid that" --

2        John says, "It doesn't matter.  Every -- well, you're

3   not listening to me.  You're not listening to the words

4   coming out of my mouth.  Every person I called to go meet

5   to get drugs, I drive from our house down Converse Street

6   onto the highway."

7        Female, "Okay."

8        John, "So, I don't know.  So, I'm just praying that

9   between 4:30 and 8:30 that hopefully I didn't, but I don't

10  -- I don't know.  I think I did."

11       Up to that point, line 22, was there a defense

12  objection?

13       MR. WATKINS:  Once again, I just want to make

14  sure I'm in the right place here.

15       MS. BERKOWER:  If we can switch the feed to Ms.

16  McKenna's laptop, she has it pulled up.

17       THE COURT:  Pulled up and highlighted.  Nice.

18       MR. WATKINS:  I have it now.  So the court's

19  question is?

20       THE COURT:  Between lines 9 and 22 and also as

21  it's on the screen highlighted, is there an objection to

22  that portion?

23       MR. WATKINS:  There is.

24       THE COURT:  And the objection is what?

25       MR. WATKINS:  I'm sorry, Your Honor.  Now we're

1   at page 9?

2           MS. BERKOWER:  Here.

3           MR. WATKINS:  Just what is it evidence of?  It's

4   Mr. Rathbun and his mother just assessing the evidence

5   that's in the case.  I guess the expectation that the GPS

6   is going to help -- I'm sorry, the CSLI is going to help

7   at this point?  We're way beyond that stage.

8       It's going to become confusing to explain to the jury

9   that this was a conversation that occurred before we had

10  the full information in the case versus after what we do

11  in front of the jury now.

12      I don't know what the reason for introducing it is.

13  Is it consciousness of guilt?  The answer is no.  I think

14  it's just an appraisal of discovery and the obligations

15  that the government is making here.

16      There's never a point which Mr. Rathbun says I did

17  it.  I placed it here.  It's quite the opposite.  He's

18  constantly maintained his innocence, but he's talking

19  about this is what the evidence looks like or could look

20  like if certain things happen.  Those things didn't happen

21  the way he worried about it.  It's going to become quite

22  confusing to the jury to parse through all of this.

23          THE COURT:  I think it's probative.  I think

24  it's probative of his familiarity with and frequency of

25  use of the area where the crime is alleged to have

1    occurred.  I'm going to allow in lines 9 through 22,

2    ending with "I think I did" at 22.

3        I'm not going to allow any of the other proffered

4    evidence from the government which would be from line 23

5    through the next pages.  I'm not going to allow that in.

6              MS. BERKOWER:  Your Honor, I guess, I guess -- I

7    understand the court's ruling, but may I ask the court

8    leave open the opportunity for us to reconsider the rest

9    of that section given some of the cross-examination that I

10   expect may happen concerning whether the defendant knew

11   what Ruth's House was?  Because I think that that might be

12   an issue in the case, and to the extent that now he's

13   talking about it like he knows where it is, we'd like to

14   revisit that.

15             THE COURT:  So your point is if something comes

16   up expressing or asserting a lack of familiarity with

17   Ruth's House, you're saying this would show his

18   familiarity with Ruth's House because he uses that name?

19             MS. BERKOWER:  Exactly.

20             THE COURT:  Okay.  I haven't seen that yet.  But

21   if that comes up, your right is preserved to ask that that

22   Ruth's House segment also be looked at freshly at that

23   point.

24             MS. BERKOWER:  Thank you, Your Honor.

25             THE COURT:  All right.  But right now the ruling

1    stands and I think the record is clear as to the portion

2    you can use.  Okay.  So I think we've discussed all of the

3    phone calls at least.

4         Thank you for document 177-1, Attorney Watkins, it

5    did help.  It made it easier to go through the phone

6    calls.

7         All right.  So what time?  It's about eleven o'clock.

8    Probably 11:15, 11:20 I guess.

9              MR. DESROCHES:  Your Honor, there is one other

10   point.  It seems like they're endless.

11        Given we were -- I was expecting to have one more

12   witness and then a break and address this, but there is an

13   issue of Government's Exhibit 107 that I believe the

14   defendant is objecting to.  So that would come in through

15   who would be the second witness and I think without --

16   depending on the court's ruling, there may be no --

17             THE COURT:  What's Exhibit 107?

18             MR. DESROCHES:  Exhibit 107 is the pamphlet that

19   was found at the Heritage Baptist Church, which is the

20   church of the defendant and his mother.

21             THE COURT:  Is this a new exhibit?

22             MR. DESROCHES:  It is, yes.

23             THE COURT:  Because the book doesn't go up to

24   107.

25             MR. DESROCHES:  Which we believe forms one of

1    the bases for the defendant's objection to it.  So I'll

2    give you a little background.  This is --

3              THE COURT:  This was found where?

4              MR. DESROCHES:  That was found in the vestibule

5    of the Heritage Baptist Church on April 20th -- I'm sorry,

6    on April 15th of 2020.

7        The witness would testify that he was part of the

8    search of the defendant's home.  After that search he and

9    an agent went to several churches in the area looking for

10   pamphlets.

11       At that point they had not identified the Steps to

12   Peace With God pamphlet that we had seen previously

13   through other witnesses.  So they generally grabbed --

14   yes, Your Honor, thank you.

15       This was identified by witness Steve Rhoads on

16   Friday.  Today's testimony would include, as I just

17   described, the task force officer who located that,

18   amongst others, but this particular item at the Heritage

19   Baptist Church which is the defendant's parents' church

20   and also where the defendant went.

21       So I would suggest that it is relevant to this case.

22   It is essentially the contents being as Mr. Rhoads

23   testified to as the wick that was used in the device in

24   this case.

25             THE COURT:  This piece of paper was the wick?

1          MR. DESROCHES:  No.  It's a different version, a

2     different edition of the pamphlet that was used as the

3     wick.  I would suggest the relevance is that the

4     defendant's mother's church had and so the defendant's

5     mother had access to pamphlets that were very similar to

6     that which was used as the wick.

7          I know also the defendant will object to the late

8     disclosure of this, and I will just give the court some

9     background there.

10         As I was saying, the wick was not identified as a

11    Steps to Peace With God pamphlet initially.  It was just

12    charred paper.  It took quite a bit of investigation to

13    actually determine what it was.

14         This was found before the wick was identified as a

15    Steps to Peace With God pamphlet, and so the immediate --

16    the evidentiary value of it when it was found was not

17    apparent.  As a consequence, it wasn't prioritized and

18    wasn't properly documented and stored with other evidence.

19    It was discovered only in preparation for this trial I

20    believe last week.

21         THE COURT:  Weren't there also pamphlets similar

22    to this in the mother's car?

23         MR. DESROCHES:  Not this similar.  There was

24    religious material in the mother's vehicle, but this is

25    again, as Mr. Rhoads testified to, a different version of

1    the same Steps to Peace With God.  So there's different

2    pictures; there's a different word choice here or there,

3    but essentially it's the same exact message.

4          THE COURT:  The same message but a different

5    version from what was in the funnel?

6          MR. DESROCHES:  Correct.

7          THE COURT:  And this was found at the Heritage

8    Baptist Church?

9          MR. DESROCHES:  Right, and we've had evidence

10   from Natalie Rathbun that that's the church attended by

11   the defendant's mother and had been attended by the

12   defendant.

13         THE COURT:  And it was found at the Heritage

14   Baptist Church how long after the alleged crime?

15         MR. DESROCHES:  The crime occurred April 2nd.

16   That was found on April 15th.

17         THE COURT:  Okay.  Defense?

18         MS. O'NEILL-GREENBERG:  So this pamphlet, which

19   I think Mr. Rhoads said he didn't know when it was

20   published or how long it was published or how many is a

21   completely different format and version.  It's two weeks

22   after the can is found at JGS.  It's basically a year

23   after the Big E event in May of 2019.

24        There is no evidence that Sheila Rathbun ever picked

25   this up, had it in her house, had it in her car.  There's

1    no evidence that this Steps to Peace With God tract, which

2    obviously seems like a popular tract, was ever in her car,

3    in her house, or anywhere.  There's just no --

4            THE COURT:  You can take that off.  We'll wait

5    for you.  Actually, what you're doing is more important

6    than what we're doing right now.  Thank you very much for

7    coming in.

8            CLEANING STAFF:  I didn't want to disturb you.

9            THE COURT:  Thanks.

10           MS. O'NEILL-GREENBERG:  There's no relevance

11   here and there's no connection.  I can't even think of

12   what the connection is other than it is --

13           THE COURT:  Well, so they're establishing that

14   his mother had access and availability, perhaps had access

15   and availability to this and so --

16           MS. O'NEILL-GREENBERG:  Sure, but there's no

17   evidence that she ever was there when it was available or

18   she picked it up or what other pamphlets were there that

19   she did or didn't pick up.  And Mr. Rathbun --

20           THE COURT:  But there's at least an inference

21   that can be drawn that the mother might have had access

22   and availability to this.

23           MS. O'NEILL-GREENBERG:  Well, there's no

24   evidence she ever had it anywhere in her car, house,

25   person.

1           THE COURT:  But that's why you can draw an --
2    you can draw an inference from everything else we know
3    that she would have had access to it.  Access to something
4    and actually taking it are two different things.
5           MS. O'NEILL-GREENBERG:  Sure.  Of course.
6    Access to something that happened was available after the
7    --
8           THE COURT:  Okay.  But don't you want to be
9    arguing with me, like, okay, sure, there's an inference
10   that the mother could have had access to it, but what
11   about the next step that somehow that the defendant got
12   it?
13          MS. O'NEILL-GREENBERG:  Yes.
14          THE COURT:  Okay.  You win.  Excluded.
15          MS. O'NEILL-GREENBERG:  All right.  Thank you.
16          THE COURT:  There's simply not a connection.
17   It's much too tenuous to go from what's at the church that
18   the mother had available to her.  I get it.  I see the
19   circumstantial evidence, but then to go from there to the
20   defendant, and I'm concerned with the late disclosure
21   frankly.  All right.  Thank you.
22          MR. DESROCHES:  Your Honor, what time should we
23   report back?
24          THE COURT:  Now we're at about 20 after.
25          MR. DESROCHES:  Thank you, Your Honor.

1    **(A recess was taken at 11:02 until 11:20.)**

2             MS. BERKOWER:  Judge, before we bring the jury

3    in, we have a quick issue.

4        The next -- not the next witness, this will be a

5    short witness and then the witness immediately after that

6    will involve testimony concerning Special Agent Eric

7    Mastroianni, and I think if the court would like to

8    instruct the jury about your family relationship --

9             THE COURT:  Right.

10            MS. BERKOWER:  -- or lack thereof.

11            THE COURT:  Or lack thereof, yeah.

12            MS. BERKOWER:  We just wanted to bring that to

13   the court's attention.

14            THE COURT:  Okay.

15            MS. BERKOWER:  Also that witness will be talking

16   about Exhibit 53, the text.  There's an exhibit that that

17   same witness will be talking about that I think the

18   defense has an objection to.  So when we are getting close

19   to that time, would you like me to just tell Your Honor?

20            THE COURT:  We can do a modified sidebar with

21   WhisperTech.

22            MS. BERKOWER:  It may be a little more involved

23   than that, Your Honor, but I will flag it for the court

24   when it comes.  I think we might actually be at the lunch

25   break by then anyway.

1          THE COURT:  Okay.

2          MS. O'NEILL-GREENBERG:  Who's coming next?

3          MS. BERKOWER:  Patrick Carnahan and then Ryan

4      McGonigle.

5          MR. WATKINS:  So this is Exhibit 73?  We can do

6      this pretty quickly.

7          MS. BERKOWER:  I was talking about 53.  You're

8      objecting to 73.  Oh, that's true.  I guess -- sorry.  I

9      forgot about 73, yes.  Go ahead.

10          MR. WATKINS:  Exhibit 73 is pretty

11      straightforward.  We can do that right now.

12          MS. BERKOWER:  Yeah.

13          THE COURT:  The jury is going to be walking in.

14          MR. DESROCHES:  We can also do that on

15      WhisperTech.

16          THE CLERK:  All rise for the jury.

17      **(The jury entered at 11:23.)**

18          THE COURT:  Did everyone -- speaking to the jury

19      -- did everyone follow my instructions not to talk about

20      this case with anyone including each other?  Not to access

21      it on the internet?  Post anything?  Look at anything on

22      the internet?  Or do any type of research or read any type

23      of news articles about the case?

24          All right.  By the affirmative responses, everyone

25      followed my instructions.  The jury remains fair and

```
 1    impartial.  Great.  Thank you.
 2              MR. DESROCHES:  Your Honor, the government calls
 3    Special Agent Patrick Carnahan.
 4              THE CLERK:  Raise your right hand.
 5    Patrick Carnahan (Sworn)
 6              MR. DESROCHES:  May I proceed, Your Honor?
 7              THE COURT:  Yes.
 8    DIRECT EXAMINATION
 9    Q.   (By Mr. Desroches)  Can you please remove your mask?
10    A.   (Indicating.)
11    Q.   Good morning.
12    A.   Good morning.
13    Q.   Could you please introduce yourself to the jury and
14    for the record spell your last name?
15    A.   Patrick S. Carnahan, C-a-r-n-a-h-a-n.
16    Q.   Are you employed?
17    A.   I am.
18    Q.   How are you employed?
19    A.   I'm a special agent with the Federal Bureau of
20    Investigation.
21    Q.   How long have you been a special agent?
22    A.   Approximately 23 years.
23    Q.   What is your current assignment?
24    A.   The current assignment I have is national security
25    division counterintelligence program working mainly
```

1    national security threats against the U.S. national
2    security.
3    Q.    And what office are you working?
4    A.    I work in the Boston division and the Springfield
5    resident agency, which is located here in Springfield,
6    Mass.
7    Q.    How long have you been in the Springfield office?
8    A.    Approximately eleven years.
9    Q.    What are your general responsibilities in your
10   position?
11   A.    I investigate allegations of criminal wrongdoing
12   against the United States, specifically the national
13   security program to include things like industrial
14   espionage, foreign agents, economic espionage, things like
15   that.
16   Q.    At some point during your employment did you become
17   involved in an investigation that brings us to this court
18   today?
19   A.    I have.
20   Q.    Specifically drawing your attention to April 15th of
21   2020, did you have any involvement with the investigation?
22   A.    I did.
23   Q.    Can you describe for the jurors what that was?
24   A.    I assisted on a search of vehicles at 20 Lori Lane.
25   Q.    And did 20 Lori Lane have any significance to you?

1    A.    It was the residence of the subject John Rathbun.

2    Q.    What was your role in that search?

3    A.    I was what they called search team leader.  I merely

4    documented the search that agents conducted on two

5    vehicles in the driveway.

6    Q.    So you've indicated you were the search team leader

7    and your job was to document the search?

8    A.    Correct.

9    Q.    Is that consistent with the procedure that the FBI

10   employs that governs searches?

11   A.    Yes, it is.

12   Q.    Did you actually respond to 20 Lori Lane?

13   A.    Yes, I did.

14   Q.    When you arrived, what did you see?

15   A.    The residence was there.  There was three vehicles in

16   the driveway, a white van, a red Hyundai, and a gray SUV.

17   There was a shed behind the van.

18   Q.    Was your attention drawn to any particular vehicles

19   in the driveway?

20   A.    Well, all three vehicles were of interest but one

21   vehicle was going to be inspected, searched at a different

22   location.  So the two other vehicles, the Sonata and the

23   gray SUV were of particular interest.

24   Q.    So the van was going to be removed and searched

25   somewhere else?

1    A.    Yes, sir.

2    Q.    What did you do with the others, as you refer to the

3    Sonata and the gray SUV?

4    A.    Both vehicles were inspected by agents and

5    documented.

6    Q.    When you say documented --

7            THE COURT:  Excuse me, one second, Attorney

8    Desroches.

9        Allen, could you open the doors?

10            SECURITY OFFICER:  You want both opened?

11            THE COURT:  Yes, please.  Thanks.

12            MR. DESROCHES:  May I proceed, Your Honor?

13            THE COURT:  Yes.

14   Q.    (By Mr. Desroches)  You said that you documented the

15   search.  Were there photographs taken?

16   A.    Yes, there were.

17   Q.    Specifically in regards to what you've referred as

18   the gray SUV, were there photos taken?

19   A.    Yes, there were.

20            MR. DESROCHES:  Ms. McKenna, may I have PX-73

21   for just the witness, counsel, and the court?

22   Q.    (By Mr. Desroches) Agent Carnahan, I'm going to

23   direct your attention to the screen in front of you and

24   ask that you just observe it as Ms. McKenna scrolls

25   through the photographs.

1    A.   Do you want me to just view them first?

2    Q.   Yes.

3    A.   Okay.

4    Q.   Do you recognize what's depicted in PX-73?

5    A.   Yes, sir.

6    Q.   What is PX-73?

7    A.   It is the gray SUV Toyota, and the first photograph

8    is the exterior of the vehicle with all the compartments,

9    the exterior compartments opened.

10   Q.   Are these the photographs that you described that

11   were taken of the search?

12   A.   Yes, sir.

13   Q.   Are each of them fair and accurate depictions of the

14   scene as you observed it on April 15, 2020?

15   A.   Yes, sir.

16            MR. DESROCHES:  At this point, Your Honor, I

17   would move to introduce this exhibit as Exhibit 73.

18            MS. O'NEILL-GREENBERG:  The defense has an

19   objection.

20            THE COURT:  Sidebar.

21   (Sidebar discussion.)

22            THE COURT:  Go ahead.

23            MS. O'NEILL-GREENBERG:  The defense is objecting

24   to the exhibit in its entirety.  The last two photos are

25   of religious music CDs and handwritten note cards, and I

1   believe that the court already excluded handwritten

2   pamphlets and note cards.

3       So consistent with the court's order, we don't think

4   that the handwritten notes should come in.  And then the

5   music CDs are obviously not pamphlets, they're not

6   anything like what's connected with the crime.  They are

7   irrelevant and they're prejudicial.

8       And then the photos -- the other photos I believe are

9   Good News door knockers, a completely different substance

10  and format than anything else, and so they're irrelevant

11  and outweighed by prejudice.

12          THE COURT:  What photograph am I looking at

13  right now?

14          MR. DESROCHES:  Your Honor, this is one of the

15  photographs I think the defendant objects to.  It does

16  depict items that were found in the front passenger area

17  of the SUV.  Specifically this is a CD of religious songs.

18  The item labeled You've Got The Time would be described as

19  an MP3 religious teaching, and then there is a card.

20  Basically it's a calling card of the Heritage Baptist

21  Church that the defendant's mother and the defendant had

22  attended.

23          THE COURT:  Okay.  Move to the next picture.

24      Okay.  Move to the next picture.

25          MS. BERKOWER:  Just for clarity of the record,

1    we just showed you the last two pages of this exhibit.   If

2    you want to start from the top, I know that the defense

3    primarily had an objection to the last two pages which is

4    why we showed those two first.   But for clarity sake, we

5    can start at the top of the exhibit if you would prefer.

6                THE COURT:   Start at the top and tell me what

7    each thing is.   Walk me right through quickly so I have a

8    flavor for it.

9                MR. DESROCHES:   Your Honor, this is the SUV

10   with the doors open.   There's not a religious nature

11   depicted in it.

12               THE COURT:   So there's no objection to that?

13               MS. O'NEILL-GREENBERG:   No objection to just the

14   car picture.

15               THE COURT:   Next.

16               MR. DESROCHES:   Your Honor, this is a box of

17   religious materials.   These are door hangers typically

18   used to spread the word as --

19               THE COURT:   Is there an objection to this?

20               MS. O'NEILL-GREENBERG:   Yes.

21               THE COURT:   Objection overruled.   That

22   photograph is admitted.   It's consistent with material

23   that was at least generally similar to the pamphlet type

24   of information that we have been talking about.   One

25   picture of it is admissible so there's not duplicate

1    pictures of the door hangers; that is, there's one

2    photograph that's admissible so, government, you choose

3    which picture you want of the door hangers because I think

4    you have three.

5        The picture that I'm being shown right now, what

6    number is it?

7            MR. DESROCHES:  One moment, Your Honor.  We're

8    confirming the number, but I can describe that these are

9    all collection envelopes from the Heritage Baptist Church

10   or receipts.

11           THE COURT:  Right.  They're collection

12   envelopes.  I guess if you have a general familiarity with

13   collection envelopes, they're an envelope you can put

14   money inside.  There's people's names or a space for

15   someone to write their name, a dollar amount of their

16   donation.  They can check a box as to where they want

17   those dollars allocated, and Heritage Baptist Religious

18   Center is indicated on the card.  These are excluded.  I

19   don't find any relevance.

20           MR. DESROCHES:  Your Honor, I had previously

21   described this photograph which is number 6 in a composite

22   exhibit.  Again, it's a religious card.

23           THE COURT:  Okay.  I'm sorry to cut you off.

24   I've seen it now for a while.  This is excluded.  I don't

25   see the relevance.  There is no relevance.  This is the

1    mother's car.  It's already been established that the

2    mother would be likely to have all these church-related

3    materials because this was a very important part of her

4    life.  But there's nothing regarding CDs or disks or MP3s

5    that tie into pamphlets or any accessibility to anything

6    that was in the nozzle.

7         The government already has a good amount of

8    information connecting him to the grandmother's (sic)

9    house or car, and clearly established that the grandmother

10   (sic) and her house and car had materials,

11   religious-related material consistent with her church

12   involvement and so I don't find there's any harm or

13   prejudice to the government proving its case.

14        I find that what relevance now with these CDs and MP3

15   are also cumulative.  It's getting overdone at this point

16   with the connection that the grandmother (sic) had.  So

17   these CDs are excluded.

18             MR. DESROCHES:  Your Honor, I just think I would

19   be remiss if I didn't state that this was the vehicle that

20   the defendant was driving at the time of the alleged

21   offense.  To the extent that makes a difference, Your

22   Honor, I want to raise that point.

23             THE COURT:  Thank you very much.  Yeah, that

24   does make a difference and there are pamphlets that are

25   going to be allowed in.  Paper material pamphlets that are

1    generally, underscore the word generally, similar to a
2    pamphlet that was stuffed in a nozzle.
3        When I say generally, it's a piece of paper that is a
4    religious message.  It's a consistent religious message
5    with an item that was the pamphlet.  One could listen to
6    all the evidence and draw some inferences regarding the
7    same religious faith and consistency of the message that
8    the grandmother (sic) was very interested in and involved
9    in.
10       I'm sorry, I'm referring to her as the defendant's
11   grandmother.  It's his mother.  So every time I said
12   grandmother, it's the defendant's mother.  And, therefore,
13   it's the defendant's mother through her interest and
14   collection and involvement with disseminating those
15   materials, she certainly had this, and it's also been
16   established that the defendant has access to the car.
17       The CDs are cumulative.  I'm not finding the
18   probative value outweighs the danger of being
19   prejudicially cumulative and not quite on point.  This is
20   getting to the point of more over stressing a religious
21   type involvement than it is, access to something tangible,
22   some tangible item that was used in the crime.  So it's
23   excluded.
24            MR. DESROCHES:  Your Honor, may I ask for
25   permission to lead a little bit through this?  The witness

1    won't have any idea what's going on and I don't want the

2    agent to refer to other photos.  So just if I could ask

3    the court's indulgence there?

4            THE COURT:  Sure.

5    (End of sidebar discussion.)

6            MR. DESROCHES:  So at this point, Your Honor, I

7    would move to introduce PX-73 with the court's ruling in

8    mind for further redaction later.

9            THE COURT:  Any objection?

10           MS. O'NEILL-GREENBERG:  Sorry, I didn't hear

11   you.

12           MR. DESROCHES:  We're moving to introduce PX-73

13   with the caveat of the court's ruling.

14           MS. O'NEILL-GREENBERG:  No objection.

15           THE COURT:  All right.  That will be allowed.

16   **(PX-73 was admitted.)**

17   Q.   (By Mr. Desroches) Agent Carnahan, can you please

18   describe for the jurors what's depicted in the photograph

19   currently on the screen which is the first in PX-73?

20   A.   The first photograph here is the exterior of the gray

21   SUV with all the compartment hatches opened.

22   Q.   Where was this photograph taken?

23   A.   In the driveway at 20 Lori Lane.

24           MR. DESROCHES:  Now could we have the second

25   photograph?

1    Q.    (By Mr. Desroches)   Agent Carnahan, can you describe

2    what's depicted in this photograph?

3    A.    These are pamphlets that go on doors to houses.   They

4    were found in the trunk area in the van or the SUV, excuse

5    me.

6    Q.    Did you have an opportunity to more closely examine

7    these?

8    A.    I did.

9    Q.    Is it fair to say that the content of these flyers

10   are religious in nature?

11   A.    Yes, sir.

12   Q.    And can you further -- can you explain again these

13   were found in the trunk area of the SUV?

14   A.    Yes, sir, in the brown box that they're in right now

15   in the photograph.

16   Q.    Can you approximate the size of that box?

17   A.    I think it was about the size of a copy paper box for

18   one ream of copy paper.

19   Q.    Why were these items photographed?

20   A.    Because they were of a religious nature and those

21   were items that were identified in the warrant that we

22   should be looking at or looking for.

23            MR. DESROCHES:   Thank you.   I have no further

24   questions.

25            MS. O'NEILL-GREENBERG:   Thank you.   Just

1    briefly.

2    **CROSS-EXAMINATION**

3    Q.   (By Ms. O'Neill-Greenberg) Good morning.

4    A.   Good morning.

5    Q.   When you were looking at the RAV4, the gray SUV, the

6    trunk of the SUV is -- I don't how to describe it -- it's

7    opened to the rest of the car, right?

8    A.   Yes, ma'am.

9    Q.   It's not a closed trunk?

10   A.   No.  I mean, you close it.  There's probably some

11   kind of a little top thing that comes over it.  But, yes,

12   it's open in the passenger compartment to the vehicle.

13            MS. O'NEILL-GREENBERG:  Thank you.  That's it,

14   Your Honor.

15            THE COURT:  All right.  Thank you, sir.

16            MS. BERKOWER:  Your Honor, may I call the next

17   witness?

18            THE COURT:  Yes.

19            MS. BERKOWER:  The government calls Special

20   Agent Ryan McGonigle.

21            THE CLERK:  Raise your right hand.

22

23

24

25

1   **Ryan McGonigle (sworn)**

2   **DIRECT EXAMINATION**

3   Q.   (By Ms. Berkower)   Good morning.

4   A.   Good morning.

5   Q.   Could you please give your name and spell it for the

6   court reporter?

7   A.   My name is Ryan McGonigle; R-y-a-n M-c-G-o-n-i-g-l-e.

8   Q.   Where do you work, sir?

9   A.   I work for the FBI.

10  Q.   What's your position with the FBI?

11  A.   I'm a special agent.

12  Q.   How long have you been a special agent?

13  A.   Just over three and a half years.

14  Q.   And at what FBI office do you work?

15  A.   I work for the Boston division but in the Springfield

16  resident agency.

17  Q.   Now in your job as a special agent with the FBI, do

18  you work on criminal investigations in the Springfield,

19  Massachusetts area?

20  A.   I do.

21  Q.   Does the FBI have jurisdiction to investigate certain

22  crimes involving fire or explosives?

23  A.   The FBI does.

24  Q.   Have you worked on the case currently before the

25  court?

1    A.    I have.

2    Q.    What's your role in that case?

3    A.    I am the case agent.

4    Q.    In that role did you interview John Rathbun about the

5    placement of the device at JGS?

6    A.    I did.

7    Q.    Did you investigate connections between the defendant

8    and Genesis House?

9    A.    I did.

10   Q.    Did you also investigate the origins of the Christian

11   proselytizing pamphlet that were used as a wick in the

12   device?

13   A.    I did.

14   Q.    Did your investigation include searching the

15   defendant's cell phone?

16   A.    It did.

17   Q.    Did your investigation include searching a laptop

18   computer belonging to the defendant's mother?

19   A.    It did.

20   Q.    Did your investigation include obtaining recorded

21   conversations in which the defendant talked about this

22   case?

23   A.    It did.

24   Q.    So we're going to talk about all those different

25   things that you did in your investigation, but, first,

```
 1    let's start with the defendant's cell phone records and

 2    cell tower location data and the additional investigative

 3    steps that you took based on that data.  Okay?

 4    A.   Okay.

 5    Q.   So in your role as the lead case agent, are you

 6    familiar with an analysis conducted by FBI Special Agent

 7    Ryan Burke of the FBI's CAST team concerning the

 8    defendant's cell phone tower location data?

 9    A.   I am familiar with that.

10    Q.   Did you review his report?

11    A.   I did.

12         MS. BERKOWER:  If we could have Government's

13    Exhibit PX-38 already in evidence please for the court,

14    counsel, and the witness and the jury since it is in

15    evidence?

16    Q.   (By Ms. Berkower)  Now based on the exhibit, did you

17    obtain information from the cell phone tower location

18    data?

19    A.   Yes.

20    Q.   At 4:34 a.m. and 34 seconds, did the defendant make a

21    phone call?

22    A.   He did.

23    Q.   In what area did that call hit a cell tower?

24    A.   In the purple area on the bottom right of the screen.

25    Q.   Is his home address in that purple area?
```

1   A.   The home address is where the blue 20 is.

2   Q.   Now when was the next phone call from the defendant's

3   phone?

4   A.   At 5:01:44 a.m.

5   Q.   In what area did that phone call hit a cell tower?

6   A.   In the gray area along 91.

7   Q.   Now in addition to this cell phone tower location

8   data, are you also familiar with Facebook Messenger

9   messages that were found on the defendant's phone?

10  A.   I am.

11            MS. BERKOWER:  If we could please have

12  Government's Exhibit 41 page 14, PX-41 page 14 already in

13  evidence?

14  Q.   (By Ms. Berkower)  If I could focus your attention on

15  the second row of messages from the top, could you please

16  read the data in that second row of messages?

17  A.   Yes.  On April 2, 2020 at 5:34:39, a.m. John

18  Rathbun's Facebook account sent a message to Devin

19  Austin's Facebook account and he said, "Yeah.  I've been

20  sitting at your house since 5:15."

21  Q.   Do you know who Devin Austin is?

22  A.   I do.

23  Q.   Who is he?

24  A.   He's a resident in Springfield at 90 El Paso Street.

25  Q.   So based on the records we just reviewed, did you

1  have three data points concerning the defendant's location

2  on the morning of April 2nd?

3  A.   I did.

4  Q.   What was the first data point?

5  A.   The first data point was a phone call that the

6  defendant made at 4:34 a.m.

7  Q.   And that was in the area of his house?

8  A.   That was in the area of his house.

9  Q.   What was the second data point?

10  A.   The second data point was the phone call at 5:01 a.m.

11  and 44 seconds and that was along 91.

12  Q.   Was that also a phone call?

13  A.   That was also a phone call.

14  Q.   And what about the third data point, what was the

15  third data point?

16  A.   The third data point was the defendant's own words

17  saying that he was at a specific location and had been

18  there since 5:15.

19  Q.   And what location did you determine that to be?

20  A.   That was near or around 90 El Paso Street in

21  Springfield, Massachusetts.

22  Q.   So based on this set of information, those three data

23  points, did you take another investigative step concerning

24  the distances between those locations?

25  A.   I did.

1    Q.   What was that step?

2    A.   I conducted a drive test going from the JGS property

3    to 90 El Paso Street.

4    Q.   Why did you decide to drive the route from JGS to 90

5    El Paso Street?

6    A.   I wanted to see the amount of time it would take to

7    get from that location to 90 El Paso Street.

8    Q.   So let's go into a little more detail about that.

9         MS. BERKOWER:   If we could have Government's

10   Exhibit 83 and maybe also could we have 83-A side by side?

11        We cannot.   Okay.

12   Q.   (By Ms. Berkower) Are you familiar with a cruiser

13   camera video taking by Officer Dabrae of the Longmeadow

14   Police Department?

15   A.   I am familiar with that.

16   Q.   So in addition to the information you just described

17   about the defendant's location from his phone, you also

18   knew about that video?

19   A.   I did.

20   Q.   And where was Officer Dabrae when she made that video

21   in her cruiser?

22   A.   So Officer Dabrae started in the back of Genesis

23   House which is located on the JGS campus.

24   Q.   And what date was she driving?

25   A.   That was on the morning of April 2nd.

```
1              MS. BERKOWER:  Could we actually have
2     Government's Exhibit 83-A?  Do we have that?
3          Mr. Watkins, I think the other day you showed
4     Government's Exhibit 83-A.  I don't know that we have that
5     in our system yet.  If we could briefly switch to him, so
6     we can show that to the witness please?
7              MR. WATKINS:  Can you hold on for just a moment?
8     That's my email.
9              MS. BERKOWER:  Thank you.
10             MR. WATKINS:  We need to change the computer
11    again.
12             MS. BERKOWER:  Thank you.
13    Q.   (By Ms. Berkower)  Now, Special Agent McGonigle,
14    based on this exhibit, can you tell what time Officer
15    Dabrae was leaving the Genesis House area?
16    A.   Yeah.  It's at 4:51:44 on the morning of April 2nd.
17    Q.   Can you orient us please as to what direction her
18    cruiser camera was pointing at this time?
19    A.   She is driving out of the JGS entrance essentially,
20    that Ruth's House entrance, and perpendicular to that is
21    Converse Street.
22    Q.   Now while your cruiser cam -- have you reviewed her
23    cruiser camera footage?
24    A.   I have.
25    Q.   While her cruiser camera was facing Converse Street,
```

1    does any traffic pass along in the direction of I-91?

2    A.    From going towards -- there's no one that drives

3    towards 91, no.

4    Q.    And which direction is toward 91 based on the

5    photograph in front of you, right or left?

6    A.    Going from the left side of the screen to the right

7    side of the screen.

8    Q.    Was there a car that passed in other direction?

9    A.    There was a car that passed in the other direction.

10   Q.    And based on your investigation, did Officer Dabrae

11   pass by the location of the device on her way out to

12   Converse Street?

13   A.    She did.

14   Q.    Did she see the device as she passed?

15   A.    She did not see the device.

16           MR. WATKINS:  Objection.

17           THE COURT:  Sustained.

18   Q.    (By Ms. Berkower)  Did she tell you whether -- did

19   you interview her?

20   A.    I spoke to her.

21   Q.    Did she tell you whether she had seen the device?

22   A.    She said she had not.

23   Q.    Now if we could watch --

24           MS. BERKOWER:  If we could go back to the

25   government's table please?

```
 1          If we could watch Government's Exhibit 38 from
 2     time-stamp 15:25 to 15:42?
 3     (Video playing.)
 4               MS. BERKOWER:   Thank you.
 5     Q.   (By Ms. Berkower)  Now could you describe what we
 6     just saw in that video?
 7     A.   That's Officer Dabrae's squad car leaving Genesis
 8     House through the Ruth's House entrance; taking a left
 9     onto Converse Street and then taking her first right onto
10     Redfern.
11     Q.   And after she left Genesis House or the Ruth's House
12     entrance and turned left onto Converse Street, how much
13     time elapsed before she turned right onto Redfern?
14     A.   I believe it was between 15 and 17 seconds.
15     Q.   Now are you familiar with this area of Longmeadow?
16     A.   I am.
17     Q.   And when Officer Dabrae turned left out of Genesis
18     House onto Converse Street, was she driving toward or away
19     I-91?
20     A.   She was driving away from I-91.
21     Q.   Are you familiar with the location of 20 Lori Lane,
22     the defendant's house?
23     A.   I am.
24     Q.   What direction when she turned left was she going
25     with regard to the defendant house?
```

1  A.   She would be going straight toward -- or in the
2  direction of 20 Lori Lane.
3  Q.   And if she had turned right instead of left, would
4  she have been driving towards I-91 from the direction of
5  the defendant's house?
6  A.   She would have been driving in the same direction
7  that you would have taken to get from the defendant's
8  house to I-91.
9  Q.   Now as you investigated this case, was this
10 information from the cruiser camera significant to you?
11 A.   Yes.
12 Q.   What about it was significant?
13 A.   It told us a spot in time where the device had not
14 been placed yet.
15 Q.   And what impact did that information have on your
16 decision to drive from JGS to 90 El Paso Street?
17 A.   We made a decision to essentially conduct our drive
18 test right after -- at 4:52 right after Officer Dabrae
19 would have left JGS.
20 Q.   And what were you trying to determine?
21 A.   If, given the time and conditions, if it would be
22 possible or what the time would be to get from the
23 entrance of JGS to 90 El Paso Street.
24 Q.   Let's talk more about that.
25         MS. BERKOWER:  Your Honor, if we may go to

1    sidebar very briefly?

2    (Sidebar conference.)

3          MS. BERKOWER:  Your Honor, we are about to get

4    to the part of the exam where the witness will establish

5    something he did with Special Agent Eric Mastroianni.  I

6    didn't know if the court wanted to instruct the jury at

7    this point about what they're about to hear.

8          THE COURT:  Is that agent actually going to

9    testify, Mastroianni?

10          MS. BERKOWER:  He is on a video announcing his

11   name and he's the one that did the driving, but they did

12   this together.  This agent was videoing and Special Agent

13   Mastroianni was driving.  He announced his name at the

14   start of the video.

15          THE COURT:  Does the defense have any suggestion

16   or objection if I was to tell the jury that I don't

17   believe there is any relationship?  And if there is, it's

18   extremely distant.  I've met this person once in my life,

19   but that they shouldn't infer anything by the similarity

20   of the name.

21          MR. WATKINS:  We leave that to the court's

22   discretion.

23          THE COURT:  I mean, I should probably say

24   something because it's just peculiar to hear the same

25   name.  I don't want them to spend more than half a second

1    thinking about it if this is, I don't know, my brother or

2    something like that.  I'll say something to the jury.

3           MS. BERKOWER:  Thank you, Your Honor.

4    (End of sidebar conference.)

5           THE COURT:  All right.  Ladies and gentlemen,

6    you're about to hear some further testimony and you may

7    hear the name again.  You're going to hear a law

8    enforcement officer referenced.  That law enforcement

9    officer's name is Eric Mastroianni; the same last name as

10   mine.

11       I didn't want you to hear the last name and then all

12   of a sudden wonder is that my nephew?  Is that my brother?

13   How does that relate to this case?  This person Eric

14   Mastroianni I met I think once in my life and it was only

15   recently.  I do not think we're related.  As I said, I

16   never met him until this year.  We could be related, but

17   if so, it's very far down the road.

18       The point is, don't infer anything positive or

19   negative by the same last name.  It means absolutely

20   nothing here.  All right?  Thank you.

21          MS. BERKOWER:  May I proceed?

22          THE COURT:  Yes.

23   Q.   (By Ms. Berkower)  So let's talk more about the test

24   that you did to drive from JGS to 90 El Paso Street.

25       At what time of the day did you do the test?

1    A.    We began at 4:52 I believe.

2    Q.    Was that a.m.?

3    A.    A.m., yes.

4    Q.    And why did you pick that time of day?

5    A.    Because that was when -- that would have been right

6    after Officer Dabrae's cruiser had left JGS.

7    Q.    Did you do this alone?

8    A.    No.

9    Q.    Who did you do this with?

10   A.    Special Agent Eric Mastroianni.

11   Q.    Is he also an FBI agent in your office?

12   A.    He is.

13   Q.    Why did you take a partner with you?

14   A.    I wanted to make sure that there was one person who

15   could drive and focus on the accuracy of the drive, and I

16   was going to tape the drive and time the drive.

17   Q.    So who drove?

18   A.    Special Agent Mastroianni drove.

19   Q.    And you were in the passenger seat?

20   A.    I was.

21   Q.    What route did you take?

22   A.    We took -- we drove -- we exited the Genesis House --

23   excuse me, the Ruth's House entrance.  We drove down

24   Converse Street.

25   Q.    Which direction did you turn on Converse Street?

1    A.    We took a right, so the opposite direction from where

2    Officer Dabrae turned in that video.

3    Q.    And where did you go after you took a right?

4    A.    We drove all the way down to Route 5 in Longmeadow,

5    which is also Longmeadow Street.

6    Q.    And after you got on Route 5, where did you go from

7    there?

8    A.    We took a right onto Route 5 and Route 5 connects to

9    91.  We drove all the way down a short distance to the

10   entrance to 91 and took the on-ramp to 91.

11   Q.    And you went to 90 El Paso Street from there?

12   A.    Right.  From there we went to 90 El Paso Street.

13   Q.    Did that route take you through the gray area shown

14   on Government's Exhibit 38?

15   A.    It did.

16   Q.    Now with regard to the first part of the route to get

17   to I-91, was there more than one route you could have

18   chosen?

19   A.    There is.

20   Q.    So why did you take the route that you chose?

21   A.    We went to Google Maps and put in the directions and

22   we took the route that Google Maps suggested to us.

23   Q.    At the time you took that route, how certain were you

24   that the defendant had driven past JGS on Converse Street

25   to get to I-91?

1    A.    I was fairly certain.

2    Q.    Why were you fairly certain?

3    A.    During my in-person interview with the defendant, he

4    told me that he drove down Converse Street every single

5    day.

6    Q.    Now after you did this test, did you learn of

7    evidence that impacted how certain you were that the

8    defendant had passed JGS on his way to I-91?

9    A.    I did.

10   Q.    So we'll come back to that evidence in a little

11   while, but let's talk more about the drive test now.

12          So how fast did you drive when you did the drive

13   test?

14   A.    The speed limit.

15   Q.    Why did you pick that speed?

16   A.    That's the prescribed speed on that road.

17          MS. BERKOWER:  If we could have Government's

18   Exhibit 79, please?

19   Q.    (By Ms. Berkower)  Now are you familiar with what

20   Government's Exhibit 79 is?

21   A.    The drive test, yes, I am.

22   Q.    And did you review that video before you came to

23   court here today?

24   A.    I did.

25   Q.    Is it an accurate copy of what you recorded when you

```
1    did this exercise with Special Agent Mastroianni?
2    A.   It is.
3              MS. BERKOWER:  Your Honor, we would ask to admit
4    this video into evidence as PX-79 and publish it to the
5    jury as we go.
6              THE COURT:  Defense?
7              MS. O'NEILL-GREENBERG:  No objection.
8              THE COURT:  All right.  That will be admitted.
9    You can publish it.
10   (PX-79 was admitted.)
11   Q.   (By Ms. Berkower)  Now before we start playing the
12   video here, could you explain how you started doing the
13   test or where you were when you started?
14   A.   So we went in the entrance, inside the entrance to
15   JGS.  So we were on the Ruth's House Road facing out
16   towards Converse Street.
17             MS. BERKOWER:  Ms. McKenna, if you could hit
18   play on this just so we can -- play and pause, and we may
19   be able to orient ourselves.
20   (Video playing.)
21             MS. BERKOWER:  Pause it.
22   Q.   (By Ms. Berkower) At what time did you start the
23   test?
24   A.   It's either 4:51 or 4:52.
25             MR. WATKINS:  Sorry, I didn't hear the answer.
```

```
1              THE WITNESS:  Either 4:51 or 4:52 a.m.

2              MS. BERKOWER:  If we could have Government's

3    Exhibit PX-26, please?

4    Q.   (By Ms. Berkower)  Are you familiar with what this

5    exhibit shows?

6    A.   Yes.  That shows basically looking the opposite

7    direction to where we were faced.  That shows Ruth's House

8    Road.

9    Q.   Based on this photograph, could you point out where

10   the device was found for the jury?

11   A.   The device was found right next to this tree here on

12   the left.  (Indicating)

13   Q.   The tree on the left side of the screen?

14   A.   That's right, closest to -- the tree closest to the

15   photographer.

16   Q.   And where was your car parked when you first started

17   the drive test that you did with Special Agent

18   Mastroianni?

19   A.   It was probably 10 to 15 feet back from where that

20   stop sign is on -- facing the stop sign; in front of the

21   car facing the stop sign.

22   Q.   Was it light out or dark out when you started the

23   drive test?

24   A.   It was dark out.

25   Q.   Now going back to Government's Exhibit 79, if we
```

1   could play just the beginning part starting from the

2   beginning to about 17 seconds in?

3   (Video playing.)

4           MS. BERKOWER:  Your Honor, I think there

5   actually may be a slight delay between the audio and the

6   video at least on the screen that I had.

7           THE COURT:  Yeah, there was.

8           MS. BERKOWER:  So can we have a moment and maybe

9   try to figure this out on our end?  My apologies to the

10  court.

11      Your Honor, we may want to turn off the jurors' view

12  of this for the moment.  I think we might have a

13  workaround.

14      I think we can have the screens back up again.  Thank

15  you.

16      Ms. McKenna, if we can please play this video

17  starting from the very beginning to 17 seconds in?

18  (Video playing.)

19          MS. BERKOWER:  If we can stop there?

20  Q.   (By Ms. Berkower) Now, Special Agent McGonigle, in

21  that brief clip that we watched, what did you do?

22  A.   I started a timer on my phone.

23  Q.   Why did you start a timer?

24  A.   To show how long it would take to get from the JGS

25  facility to 90 El Paso Street.

1    Q.   Why did you start a timer?  I'm sorry, you just

2    answered that.

3         How long had the video camera you were using been

4    running before you started that timer?

5    A.   Well, it does say 16 seconds underneath there.  I

6    know that when I previously watched the video, it was 17

7    seconds so I'm not sure if we're still having issues, but.

8    Q.   Well, 16 or 17 seconds, is that a good estimate of

9    how long after you started your video you started your

10   timer?

11   A.   Yes.

12   Q.   What does that mean about the video player's

13   time-stamp for the footage that you took that day?

14   A.   It's 16 seconds faster than the actual drive would

15   take.

16   Q.   So let's get back to the test itself.

17        During the test, what does Special Agent Mastroianni

18   do right when you started the timer?

19   A.   He opened the car door.

20             MS. BERKOWER:  If we could play this up to 40

21   seconds, please?

22   (Video playing.)

23   Q.   (By Ms. Berkower) So in that segment of the video,

24   what is Special Agent Mastroianni doing?

25   A.   He is taking an object that is meant to simulate the

1  device and placing it near where the device was placed.

2  Q.   At what pace did he move toward the tree?

3  A.   Deliberately; slowly.

4  Q.   Now, when you did the test, did Special Agent

5  Mastroianni pause when he got to the tree before returning

6  to the car?

7  A.   He did.

8         MS. BERKOWER:   If we could watch from 40 seconds

9  to 47 seconds, please?

10  (Video playing.)

11  Q.   (By Ms. Berkower) So based on that video, how long

12  did he pause before retrieving the object and returning to

13  the car?

14  A.   About six or seven seconds.

15  Q.   Was that delay something that you preplanned with

16  him?

17  A.   It was.

18  Q.   Why?

19  A.   We wanted to simulate the amount of time it would

20  take to put the device down and light the device.

21         MS. BERKOWER:   Now if we could play the video

22  from 47 seconds to 104 seconds, please?

23  (Video playing.)

24  Q.   (By Ms. Berkower)  Based on your timer, how long did

25  it take for Special Agent Mastroianni to leave the car,

1    walk to the tree, put down the bag he was carrying, pause

2    for six or so seconds, and walk back to the car?

3    A.    Just over 48 seconds.

4    Q.    Now when he returned to the car, can you remind us

5    how are you positioned in relation to Converse Street?

6    A.    If the car -- we get in the car and start the car and

7    we drive straight, we are going to drive directly into

8    Converse Street.  It is perpendicular to where the car is

9    parked.

10   Q.    After you got back to the car, did you start to drive

11   to 90 El Paso Street?

12   A.    We did.

13          MS. BERKOWER:  If we could play up to time-stamp

14   128, please?

15   (Video playing.)

16   Q.    (By Ms. Berkower)  So in that section of the video,

17   did Special Agent Mastroianni announce what time you

18   actually were leaving to 90 El Paso Street?

19   A.    He did.

20   Q.    Based on the 47 seconds that it took to undertake the

21   initial getting out of the car, placing the device and

22   coming back, does that inform you of what time you started

23   the test?

24   A.    We started the test, yes, 4:52.

25   Q.    Is that when you started the test?

```
 1   A.   Yes.
 2   Q.   Now as you're driving, what's the first thing that
 3   you do?
 4   A.   So as you can see we're coming or passing a crosswalk
 5   here and this is Converse Street that we're looking at,
 6   and we're going to take a right onto Converse Street.
 7   Q.   And from there, where did you go?
 8   A.   We drove down Converse Street all the way until we
 9   hit Route 5 which is Longmeadow Street.
10          MS. BERKOWER:   So if we can continue playing
11   this up until 5:27 on the time-stamp.
12   (Video playing.)
13   Q.   (By Ms. Berkower)  Special Agent McGonigle, do you
14   see a green sign in the middle of the screen?
15   A.   I do.
16   Q.   What does that green sign indicate to you about where
17   you are on your route?
18   A.   That sign is informing me that we're about to get
19   onto 91 north.
20          MS. BERKOWER:   Now if we can briefly go back to
21   Government's Exhibit 38 in evidence, please?
22          If we can please have the Elmo, that would be
23   helpful.  Thank you.
24   Q.   (By Ms. Berkower)  So going back just briefly to
25   Government's Exhibit 38, when you did the drive test was
```

1   the portion on Interstate 91 significant to you?

2   A.   It was.

3   Q.   Why?

4   A.   Because as you can see here, Interstate 91 is covered

5   by that cell tower.

6   Q.   When you say that cell tower, which one are you

7   referring to?

8   A.   The cell tower that has CID-66215 with an arrow

9   pointing to it is on the other side of the bridge.  Here

10   is apparently the cell tower.

11   Q.   So that cell tower, how is the coverage area

12   represented on this map?  What color is it?

13   A.   It's gray.

14   Q.   Does that gray portion cover -- where does that gray

15   portion cover primarily?

16   A.   91.

17   Q.   What did you know about the defendant's location at

18   5:01:44 a.m.?

19   A.   That his phone had hit off that tower so that he was

20   somewhere in this gray area.

21   Q.   And that includes that main gray area near what's

22   labeled Forest Park on the map?

23   A.   Forest Park, right.

24   Q.   And also that gray area above it near the Springfield

25   label on the map?

```
 1    A.   That's correct.
 2    Q.   So when you did your drive test, were those gray
 3    sections of the map important to you?
 4    A.   They were.
 5    Q.   Why?
 6    A.   Because that would establish where the car could or
 7    was when it hit the cell tower.
 8    Q.   On this map could you explain where you entered the
 9    highway?
10    A.   Yes.
11    Q.   If you narrate it, I will try to point it out on
12    this.
13    A.   Sure.  So Forest Park, which is on the middle left
14    here, Route 5 cuts right through it.  The on ramp to 91 --
15    yeah, it's right there -- it comes onto 91.  Actually a
16    little lower to the left.  Right there.  That's where the
17    on ramp from 5 to 91.
18    Q.   So when we look at those green signs, is that where
19    you were approximately at that point on the drive?
20    A.   Yeah.  Actually as you see, there's a little white
21    path that cuts through, where those blinking lights were,
22    that's actually exactly where we were.
23    Q.   Right there?  (Indicating)
24    A.   Yeah.
25    Q.   So then could you describe on this map what your
```

1  route looked like?  I'll follow with my pen as you

2  describe it.

3  A.    Sure.  So we continued onto 91 and then we drove

4  north on 91 all the way up towards the top.  And right

5  beyond that, right where you have your pen right now, is

6  the exit to 291.

7  Q.    Is that an exit that you took?

8  A.    That is.

9  Q.    So during your drive, did you pass between both of

10 those two gray bubbles that cover 91?

11 A.    We did.

12            MS. BERKOWER:  So if we can go back to

13 Government's Exhibit 79?  Thank you, Ms. McKenna.

14     Can you continue playing that video from time-stamp

15 5:27 to 8:43?

16 (Video playing.)

17 Q.    (By Ms. Berkower)  Now as you're traveling, what

18 speed were you traveling in your car?

19 A.    The speed limit.

20 Q.    Do you see other cars that pass you?

21 A.    Yes.

22 Q.    Were they going above or below the speed limit?

23 A.    They are going above the speed limit.

24            MS. BERKOWER:  We can stop there, please?

25 Q.    (By Ms. Berkower) So in that clip that we just

1    watched, could you describe what happened?

2    A.   So we entered onto 91 from the Longmeadow exit and

3    drove all the way to 291 and you see us getting on the off

4    ramp to 291 in this still shot.

5    Q.   So during that time that we just watched, did you

6    pass all the way through both of those gray bubbles of

7    cell tower coverage?

8    A.   Yes.  We were beyond the last bubble.

9            MS. BERKOWER:  If we can just go back quickly to

10   PX-38 please if we can have the Elmo again?

11   Q.   (By Ms. Berkower)  So when you started, you were

12   here?  (Indicating)

13   A.   That's right.

14   Q.   And when you ended in that clip we watched, where

15   were you?

16   A.   We were all the way up the top left of the screen.

17   Q.   Up here?  (Indicating)

18   A.   Yes.

19   Q.   So all the way through those gray coverage areas?

20   (Indicating)

21   A.   Yes.  Not that it matters that much, but the off ramp

22   is just right there.  So we're not still on 91; we're

23   actually getting off onto 291.

24   Q.   Thank you.

25           So from the time --

1      MS. BERKOWER:  If we can go back to the vide?

2   Q.  (By Ms. Berkower) So from the time you started at JGS

3   to the time you completed the portion of your route off of

4   91 onto 291, how much time had elapsed on this video?

5   A.   On the actual video player?

6   Q.   Yes.

7   A.   8:43 I believe.

8   Q.   Now you testified earlier you started your timer,

9   when you actually started the drive test, about 16 or 17

10  seconds after the video started?

11  A.   That's right.

12  Q.   So how much time did it take to get from JGS all the

13  way to that 291 off ramp?

14  A.   Eight minutes and twenty-seven seconds.

15  Q.   Now going back --

16      MS. BERKOWER:  I'm sorry, Ms. McKenna, if you go

17  back to Government's Exhibit 38 one more time?

18  Q.   (By Ms. Berkower)  So was that 8 minute and 27 second

19  ride that you just described the exact length of the gray

20  coverage areas from JGS?

21  A.   Yes.  So just to be clear, it is from where this red

22  CS is all the way to the top left, yes.

23  Q.   Was the drive you took longer, shorter, or the same

24  as the length of the coverage areas?

25  A.   It was longer.  So we went past that last bubble.

1    Q.   So let's talk now about how the information you

2    learned from this test that you did affected your

3    investigation into this case.

4         You just said that 8 minutes and 27 seconds elapsed

5    from the start of the test at JGS to after you exited 91

6    onto 291 and you had fully passed through that gray

7    coverage area?

8    A.   Right.

9    Q.   Based on that time, did you reconsider Officer

10   Dabrae's squid car video?

11   A.   I did.

12   Q.   Did you also consider it in light of the cell tower

13   hit in that gray coverage area at 5:01:44?

14   A.   I did.

15   Q.   Did you work backward to determine whether the

16   defendant, if his phone had hit at 5:01:44 would have

17   been -- if he would have been seen on Dabrae's squad car

18   video?

19   A.   Yes.

20   Q.   And what did you find?

21   A.   I found that even driving past this last coverage

22   area that we have here, that the defendant's car would

23   have still traveled past JGS after Officer Dabrae's car

24   left the JGS campus.

25   Q.   All right.  So how, if at all, did that information

1    affect the significance of the cruiser camera to your

2    investigation?

3    A.    It was significant.

4    Q.    Could you explain why?

5    A.    Because the device was not at JGS prior to Officer

6    Dabrae leaving JGS, which meant that it had to have been

7    put down after she left.

8    Q.    And you just -- and why was the -- how did the drive

9    then affect your view of that squad car video?

10   A.    That the defendant's car and the defendant himself

11   was at JGS after Officer Dabrae left JGS.

12   Q.    And still would have hit off of those cell towers in

13   the gray coverage area?

14   A.    That's right.

15   Q.    So let's move on to another area.

16         You said you're the lead case agent for this case?

17   A.    I am.

18   Q.    How did you learn about -- how did you first learn

19   about the incident that happened involving the placement

20   of the device at JGS?

21   A.    The Longmeadow Police Department called the FBI and

22   asked for assistance in this case.

23   Q.    So when you got that call, what did you do?

24   A.    I went to the Longmeadow Police Department.

25   Q.    And what did do you at the Longmeadow Police

1    Department?

2    A.   I met with acting-Chief Fontaine and Detective

3    Chaplin.

4    Q.   While you were there, did you talk to them about what

5    had happened at JGS?

6    A.   I did.

7    Q.   What did they tell you?

8    A.   They told me that a device had been left outside of

9    Ruth's House entrance and that the device consisted of a

10   wick and a fuel can; that the fuel can and the wick was

11   lit on fired in an attempt to light the fuel can, and that

12   there was blood on both the full can and multiple pages of

13   the wick.

14   Q.   Did you see crime scene photos when you were at the

15   Longmeadow Police Department?

16   A.   I did.

17        MS. BERKOWER:  Ms. McKenna, if we can please

18   have Government's Exhibit 7 which is in evidence?

19        I think we are missing a signal on this screen down

20   here.  Okay.  We can fix this at the next break.  I'll

21   move on with this.  Actually I can turn this around

22   because I think everything we will be talking about is in

23   evidence.

24   Q.   (By Ms. Berkower) Is this one of the photos that you

25   saw when you met with Officers Fontaine and Chaplin at

1  Longmeadow Police Department?

2  A.   It is.

3       MS. BERKOWER:  Could you go to Exhibit 8 please?

4  Q.   (By Ms. Berkower)  Is this another one of the photos

5  they showed you?

6  A.   It is.

7       MS. BERKOWER:  Could we go on to Exhibit 9

8  please?

9  Q.   (By Ms. Berkower)  What about this one?

10 A.   That is another photo I saw.

11 Q.   And Exhibit 10, did you also see that one?

12 A.   Yes.

13 Q.   Did you also review photos of the individual pieces

14 of the device?

15 A.   Yes, I did.

16      MS. BERKOWER:  If we could please have

17 Government's Exhibit in evidence PX-16?

18 Q.   (By Ms. Berkower)  Is this one of the photos they

19 showed you?

20 A.   It is.

21      MS. BERKOWER:  If we could have 17, please?

22 Q.   (By Ms. Berkower)  Is this one of the photos they

23 showed you?

24 A.   Yes.

25      MS. BERKOWER:  If we could have 18, please?

1    Q.   (By Ms. Berkower) Is this one of the photos they
2    showed you?
3    A.   Yes.
4           MS. BERKOWER:   If we could have 19, please?
5    Q.   (By Ms. Berkower)  Is this one of the photos they
6    showed you?
7    A.   Yes.
8           MS. BERKOWER:   And if we could have 20, please?
9    Q.   (By Ms. Berkower)  Is this one of the photos they
10   showed you?
11   A.   Yes.
12   Q.   Did anything stand out to you or was significant to
13   you as an investigator when you looked at these photos
14   that we just saw of the paper pamphlet they recovered?
15   A.   With regard to paper pamphlet there was three things
16   that were very important to me.
17   Q.   What were those three things if we can start with the
18   first one?
19   A.   The first is that there appears to be a lot of blood
20   on the pamphlet.
21   Q.   Why did that stand out to you?
22   A.   Blood is an excellent marker for DNA.  As I'm sure
23   most people know, blood is quite frequently used to solve
24   crimes and people are identified specifically through the
25   DNA they carry in their blood.

1    Q.    What else stood out about the paper pamphlet to you?

2    A.    It was charred and looked like it had been lit on

3    fire.

4    Q.    Why was that significant to you?

5    A.    Because the content in the fuel container at that

6    time we believed was gasoline, and it appeared that

7    someone lit this pamphlet on fire in an attempt to ignite

8    the gasoline.

9    Q.    What else did you know -- did you notice about this

10   particular paper pamphlet that was recovered?

11   A.    The religious content.

12   Q.    And why was that significant to you?

13   A.    The device was placed at a Jewish facility and the

14   content appears to be Christian.  We believed it was

15   possible this was an explanation for the motive for why

16   the device was placed.

17             MS. O'NEILL-GREENBERG:  Objection.

18             THE COURT:  Sustained.  The answer to the last

19   question will be stricken regarding motive.

20             MS. BERKOWER:  Your Honor, may I ask a slightly

21   different question that I think --

22             THE COURT:  Yes.

23   Q.    (By Ms. Berkower)  Did you view the pamphlet as

24   something that could help identify the perpetrator?

25   A.    I did.

1    Q.   Why was that?

2    A.   Because the pamphlet appeared to come from -- well,

3    my assumption was that it came from a church and that we

4    may be able to narrow down a group of people who had

5    access to this specific pamphlet.

6    Q.   Now, did you actually see the pamphlet pages in

7    person when you visited the Longmeadow Police Department

8    that day?

9    A.   No, I did not.

10   Q.   Why not?

11   A.   The Longmeadow police were in the process of

12   packaging it to send it to the State Lab for testing.

13   Q.   And what about the fuel container, were you able to

14   see that in person that day?

15   A.   I did not see that that day either.

16   Q.   Why not?

17   A.   They were packaging both items to send to the State

18   Lab.

19   Q.   And what was the State Lab going to do with the paper

20   pamphlet?

21   A.   They were going to test both for DNA from the blood

22   and for fingerprints.

23   Q.   Did they do that on both the paper pamphlet and the

24   device?

25   A.   Yes.

1    Q.   I'm sorry, the canister?

2    A.   Yes.

3    Q.   So after you met with Officers Chaplin and Fontaine

4    and reviewed this evidence, what did you do next?

5    A.   I went to the crime scene.

6    Q.   What did you find there?

7    A.   Well, the device and everything had been collected.

8    So what I found there was simply what the actual entrance

9    itself looked like.

10   Q.   Now at that time did you know who had placed the

11   device at JGS?

12   A.   No, I did not.

13   Q.   And based on your review of the scene, how far away

14   was device placed from the public sidewalk?

15   A.   So if you could actually put photos up?

16   Q.   If we could have Government's Exhibit 7, sorry.

17   A.   When I went there, I went there with these photos so

18   I was able to review these photos and I used the tree as a

19   landmark for where the device was placed because the

20   device itself was not there when I viewed the scene.

21   Q.   How far away from the sidewalk was that device placed

22   was that tree?

23   A.   Four to five feet.

24   Q.   So after you went to the scene, did you start to take

25   more investigative steps to learn more about who placed

1    the device there?

2    A.   Yes.

3    Q.   You mentioned that the Christian nature of the

4    pamphlet was significant to you in terms of identifying

5    who had done this, right?

6    A.   That's right.

7    Q.   Did you take steps to figure out where the pamphlet

8    came from?

9    A.   I did.

10   Q.   Could you describe what you did at that point in

11   time?

12   A.   Yes.  So at that time as we continued on with  the

13   case the Longmeadow Police Department were going to be a

14   co-case with us on this.

15   Q.   Can you move the microphone a little closer to you?

16   A.   Sure.

17        Detective Chaplin went to some local churches and

18   either sent them a copy of the religious document we found

19   or showed them in person to ask if they were familiar with

20   the document.

21   Q.   And what response -- did you get any positive

22   responses at that time?

23   A.   Most of the responses were that they -- well, all of

24   the responses were that the pamphlet itself did not come

25   from their specific church.  Some of the people were

1    providing maybe if you look here or there, but ultimately

2    we did not get any positive response for those interviews.

3    Q.   As a result did you have to continue to investigate

4    where the pamphlet came from?

5    A.   Yes.

6    Q.   So let's talk now about the search warrant that you

7    executed in this case.

8         On April 15th of 2020, did you execute a warrant at

9    20 Lori Lane in East Longmeadow?

10   A.   I did.

11   Q.   What were you searching for at that location?

12   A.   We were looking for evidence related to the placement

13   of the device.

14   Q.   In particular were there certain things that you

15   wanted to keep an eye out for there?

16   A.   Yes.

17   Q.   What were those?

18   A.   The device consisted of three things:  It was the

19   fuel, the canister, and the pamphlet.

20   Q.   So were you looking for those things when you

21   executed the warrant?

22   A.   Right.  So we wanted to find evidence that may have

23   ties to those specific parts of the device.

24   Q.   When you went to the house did you or to that

25   address, was it a house?

1    A.   It was a house.

2    Q.   Did you also want to try to talk to the occupants

3    there?

4    A.   Yes.

5          MS. BERKOWER:  If we could have Government's

6    Exhibit PX-105 please for the court, counsel -- actually,

7    I believe that's in evidence.  So if you can display that

8    to everyone please?

9    Q.   (By Ms. Berkower) Do you recognize what's in

10   Government's Exhibit 105?

11   A.   Yes.  That's a picture of the front of 20 Lori Lane.

12   Q.   And looking at --

13         MS. BERKOWER:  If we can go to page 2 of this

14   please?  Scroll down.

15   Q.   (By Ms. Berkower)  Is that also part of the house?

16   A.   Yeah, that's the side of the house.

17   Q.   When you first walked up to the house, did you see

18   anything of significance to you?

19   A.   Yes.

20   Q.   What did you see?

21   A.   There was a gas can lying on the -- it was placed on

22   the porch.

23         MS. BERKOWER:  If we could have Government's

24   Exhibit only for the court, counsel and the witness 58

25   please?

1        If we could have 59 please?

2        Could we have 60?

3        And 61?

4        And 62?

5    Q.   (By Ms. Berkower)  Special Agent McGonigle, do you

6    recognize what is in Government's Exhibit 58, 59, 60, 61,

7    and 62?

8    A.   I do.

9    Q.   What is in those exhibits?

10   A.   Those are pictures of the gas can that I was just

11   describing.

12   Q.   Are those accurate images of what you saw when you

13   went to the house that day?

14   A.   They are.

15           MS. BERKOWER:  I'd asked for admission of

16   Government's Exhibit 58, 59, 60, 61, and 62.

17           MS. O'NEILL-GREENBERG:  No objection.

18           THE COURT:  No objection; that will be admitted.

19           MS. BERKOWER:  May I publish as I go?

20           THE COURT:  Yes.

21   **(PX-58, PX-59, PX-60, PX-61, PX-62 were admitted.)**

22   Q.   (By Ms. Berkower) Special Agent McGonigle, could you

23   explain what part of the house this shows?

24   A.   This is -- there's a porch that is attached to the

25   side of the defendant's house and that side porch there's

1    a door that you can get into the kitchen from.

2    Q.   Is this when you were looking at Government's Exhibit

3    105 a moment ago, did you see the front part of that

4    porch?

5    A.   Right.  Yes, where the shovels were is the front part

6    of the porch.

7    Q.   What part of the porch is this?

8    A.   This is the back part of the porch.

9    Q.   So when you first walked up to the house, you said

10   you saw a gas can.  Do you see that in this photo?

11   A.   I do.

12   Q.   Could you point it out to the jury, please?

13   A.   It's the red gas can that's in this photo.

14   Q.   And was that significant to you?

15   A.   It was.

16   Q.   Why?

17   A.   Because we had -- we knew that the device that was

18   placed at the JGS campus was a gas can partially filled

19   with gasoline.  And when we were going there, we wanted to

20   see if the defendant had access to gas or fuel cans and

21   the first thing that we saw upon arriving at the house was

22   just that, a gas can on the porch.

23          MS. BERKOWER:  Now if we can go to Government's

24   Exhibit 62, please?

25   Q.   (By Ms. Berkower) When you looked at the canister,

1    were you able to determine whether there's any liquid in
2    it?
3    A.   By looking you can see there's sort of a darkened
4    portion in the bottom third that suggested it has liquid
5    in it.
6    Q.   Later on during the search, was that liquid
7    collected?
8    A.   It was, yeah.
9    Q.   Was it later analyzed?
10   A.   It was.
11   Q.   So we'll come back to that in a moment.
12        Now you mentioned --
13            MS. BERKOWER:  If we can go back to Government's
14   Exhibit 58, please.  Actually let's do 61.  Sorry.
15   Q.   (By Ms. Berkower) What do you see on the ground or on
16   the porch next to --
17            THE COURT:  Hang on one second.  Now that we
18   lost the use of the TV that we had put in here, Jarrett,
19   could you turn this screen like we were doing before so
20   the jurors on this side of the room can use this screen?
21        We are waiting for IT to come up and take a look at
22   the TV to see why it's not working any more.  All right.
23   Q.   (By Ms. Berkower) Now, in this exhibit do you also
24   see a spout on the ground?
25   A.   Yes.

1    Q.    Could you point that out for the jury?

2    A.    It's the yellow spout with a one, the number one next

3    to it.

4    Q.    Was that significant to you?

5    A.    It was.

6    Q.    Why?

7    A.    Well, it was the same color as the device which was

8    placed at the JGS campus.

9    Q.    Did you collect it as evidence in this case?

10   A.    We did.

11           MS. BERKOWER:  Your Honor, may I approach the

12   witness and set this off to the side?

13           THE COURT:  Yes.

14   Q.    (By Ms. Berkower) Special Agent McGonigle, if you

15   could please examine what I just brought up to you marked

16   as Government's Exhibit 2.  Do you recognize what that is?

17   A.    Yes.

18   Q.    What is it?

19   A.    That's the nozzle, the gas nozzle that was in the

20   picture that you just showed that had the one next to it.

21           MS. BERKOWER:  Your Honor, I'd ask that this

22   exhibit be moved into evidence at this time.

23           MS. O'NEILL-GREENBERG:  No objection.

24           THE COURT:  That will be admitted.

25   **(PX-2 was admitted.)**

1    Q.    (By Ms. Berkower)  So did you go into the house at 20

2    Lori Lane when you first arrived there for the search?

3    A.    No.

4    Q.    Why not?

5    A.    So it's important that before any search is conducted

6    that the house is deemed safe for the agents who are going

7    to be inside.

8    Q.    And so did other agents go in to make that

9    determination?

10   A.    Yes.  After the family was asked to come to the door

11   and exit the premises, the FBI had a team that went into

12   what's called clearing the house and they did just that.

13   Q.    So you said that residents were brought outside?

14   A.    Yes.

15   Q.    Who was brought outside?

16   A.    When we got to the house, the defendant's father,

17   Jeffrey Rathbun, actually saw us coming and exited the

18   house at that time.  So he was outside the house when we

19   went to the door.  There was still three individuals who

20   were inside the house:  The defendant's mother, Sheila

21   Rathbun; the defendant's daughter, Natalie Rathbun, and

22   the defendant himself.

23            THE COURT:  Could you hold the next question?

24       Tom, could you take a quick look?  If a wire fell out

25   or something came unplugged, we can do it now.  Otherwise

1    you'll have to do a more detailed look.

2    (Short pause in the proceeding.)

3              THE COURT:  All right, Tom.  Thank you.

4              MS. BERKOWER:  Your Honor, may I proceed again?

5              THE COURT:  Yes.

6    Q.   (By Ms. Berkower)  So you said that the residents of

7    the house were brought outside?

8    A.   That's right.

9    Q.   And while the agents were clearing the house, did

10   another agent come up to you and comment to you about

11   something he observed on the defendant?

12   A.   Yes.

13   Q.   So what did he tell you?

14   A.   So when the defendant came outside the house, he was

15   -- someone else was dealing with him in terms of just

16   making sure that he got into the right place.

17        Prior to going to the house, I had told people about

18   what we were looking for.  One of the things that we were

19   interested in was was the defendant going to have cuts on

20   his hand.

21   Q.   Why were you interested in that?

22   A.   Because the way the blood appeared on both the fuel

23   container and the pamphlets suggested to me and other

24   people that it's likely that blood came from a cut

25   somewhere on the defendant's hands that would have smudged

 1   when he touched something.
 2   Q.   And when the agent came up to you as the house was
 3   being cleared and made a comment to you about the
 4   defendant's appearance, what was that comment?
 5   A.   He said, "Look at the defendant's hands.  They're a
 6   mess."
 7   Q.   And what did you understand him to mean by that?
 8   A.   It meant exactly what we expected to see we were
 9   going to see.
10   Q.   Now, we'll get into that more later, but did you
11   follow up with your own observations after you learned
12   that information from this other agent?
13   A.   Yes.
14   Q.   So after the teams cleared the house of occupants and
15   screened for safety, did the agents start to search the
16   house?
17   A.   They did.
18   Q.   While they were doing that, did you talk to the
19   defendant?
20   A.   I did.
21   Q.   Let's talk more about that now.
22        So when you first saw the defendant, what was he
23   wearing?
24   A.   He was just in boxer shorts.
25   Q.   When you saw he was just in boxer shorts, what was

1    the temperature outside that day?

2    A.   It was cold.

3    Q.   What did you do?

4    A.   So I told him if you'll just sit tight for a minute,

5    I will make sure that they get the bottom part of the

6    house cleared and I will go to your room and get you

7    something to wear.

8    Q.   Did you do that?

9    A.   I did.

10   Q.   So was he able to put on more clothing?

11   A.   He did put on more clothing.

12   Q.   Now when you saw him, did he talk to you?

13   A.   He did.

14   Q.   What did he say?

15   A.   The defendant immediately wanted to know why we were

16   there; what we were doing there.  He had said, you know,

17   you have the wrong person.  We didn't do this.  I didn't

18   do anything.

19   Q.   How did you respond when he said that to you?

20   A.   I said to him, Listen, we're going to get to all of

21   this stuff.  I'll explain exactly what's going on but we

22   need to handle some administrative stuff first.

23   Q.   By administrative stuff, what did you mean?

24   A.   I meant that I wanted to read him his rights.

25   Q.   Are those commonly known as *Miranda* rights?

1    A.    They are commonly known as *Miranda* rights.

2    Q.    Why did you want to inform him of his rights?

3    A.    Out of an abundance of caution.

4    Q.    How did you go about informing him of his rights?

5    A.    So the FBI has a standard form that we use that

6    explains exactly what to read to a defendant, and what I

7    did is I took that form.  I filled it out, and then I read

8    line by line what it said on that form to the defendant.

9    I then asked the defendant to take the form himself and

10   read it himself and when he felt comfortable, I asked him

11   to sign it.

12           MS. BERKOWER:  If we could have Government's

13   Exhibit 5 for the court, counsel, and the witness only

14   please?  And I see that this TV is still on.

15   Q.    (By Ms. Berkower)  Do you recognize what's in

16   Government's Exhibit 5?

17   A.    I do.

18   Q.    What is it?

19   A.    That was the Advice of Rights form I was just

20   describing.

21   Q.    And that's the one you used to inform him of his

22   rights?

23   A.    That's right.

24   Q.    Did he sign it?

25   A.    He did.

1    Q.   Is this an accurate copy of the *Miranda* rights form

2    that he signed that day?

3    A.   It is.

4         MS. BERKOWER:   Your Honor, I would ask that this

5    be published to the jury -- or admitted and published to

6    the jury.

7         MS. O'NEILL-GREENBERG:   No objection.

8         THE COURT:   No objection.   That's fine.   It will

9    be admitted and it can be published.

10   **(PX-5 was admitted.)**

11   Q.   (By Ms. Berkower) So on this form, you said that you

12   read this form to him?

13   A.   That's right.

14   Q.   Could you read the first part of this form under Your

15   Rights?

16   A.   "Before we ask you any questions, you must understand

17   your rights."

18   Q.   Could you read the next line?

19   A.   "You have the right to remain silent."

20   Q.   Did you read that to him?

21   A.   Yes.

22   Q.   Did he tell you whether he understood it or not?

23   A.   So I read the entire document to the defendant and

24   then asked him at the conclusion if he understood it.

25        MS. O'NEILL-GREENBERG:   Your Honor, may we be

1    heard at sidebar?

2    (Sidebar conference.)

3              MS. O'NEILL-GREENBERG:  We would object to this

4    witness referring to Mr. Rathbun again and again as the

5    defendant, and ask that he just be called by his name.

6              MS. BERKOWER:  I don't understand the basis for

7    that.  He is the defendant in this case.  That's well

8    known.  The case is United States versus John Rathbun,

9    defendant.  I don't think it's prejudicial.

10             THE COURT:  Objection overruled.  He can be

11   referred to as the defendant or Mr. Rathbun or John

12   defendant under these circumstances.

13             MS. BERKOWER:  Thank you, judge.

14   (End of sidebar conference.)

15   Q.   (By Ms. Berkower) So going back to the Advice of

16   Rights form that you read to the defendant --

17   A.   Yes.

18   Q.   -- could you read then the portion of this form that

19   you read to the defendant that morning?

20   A.   Yes, I can.  Should I read the whole thing?

21   Q.   Yes.

22   A.   "You have the right to" -- so I just read the first

23   sentence and now I'm going to start with the second

24   sentence.

25        "You have the right to remain silent.  Anything you

1    say can be used against you in court.  You have the right
2    to talk to a lawyer for advice before we ask you any
3    questions.  You have the right to have a lawyer with you
4    during the questioning.  If you cannot afford a lawyer,
5    one will be appointed for you before any questioning if
6    you wish.  If you decide to answer questions now without a
7    lawyer present, you have the right to stop answering at
8    any time."
9    Q.    Now under that could you read the section that says
10   consent?
11   A.    Yes.  It says, "I have read this statement of my
12   rights and I understand what my rights are.  At this time
13   I am willing to answer questions without a lawyer
14   present."
15   Q.    Did he then sign the form?
16   A.    He did.
17   Q.    Do you see his signature on here?
18   A.    I do.
19   Q.    Did you also watch him sign it?
20   A.    I did.
21   Q.    Could you point that out for the jury, please?
22   A.    The signature is in the consent section where it says
23   signed and above the printed name John Rathbun.
24   Q.    Did you also sign this form?
25   A.    I did.

1    Q.   What was the purpose of you signing this form?

2    A.   As a witness.

3    Q.   Did you have another person witness it as well?

4    A.   I did.

5    Q.   Who was that?

6    A.   To be honest with you, I can't read their signature.

7    Q.   Do you remember someone else witnessing and signing

8    this form from the FBI?

9    A.   I do.

10   Q.   Now, after you went through this form with him and he

11   signed it, did you talk to him?

12   A.   I did.

13   Q.   And based on what you observed, did it appear that he

14   understood?  Do you have any reason to doubt he understood

15   what he was signing?

16   A.   No.

17   Q.   When you talked to him, who else was with you?

18   A.   Detective Chaplin of the Longmeadow Police

19   Department.

20   Q.   Why was she did?

21   A.   Detective Chaplin was involved in the investigation

22   and she was going to interview the defendant with me.

23   Q.   So if you could set the scene for us, where did this

24   conversation with the defendant happen?

25   A.   So we were on the back porch on the back steps and

1   then also in the back yard.

2   Q.   And what was the defendant doing while you talked to

3   him?

4   A.   So this was -- the conversation lasted over three to

5   four hours.  So during the course of the conversation the

6   defendant was smoking cigarettes.  He was kicking a soccer

7   ball around in the back yard.  He was generally pacing,

8   sitting, standing.

9   Q.   Did you talk to him that entire time?

10  A.   Not me personally, no.

11  Q.   Were there breaks in the conversation?

12  A.   Yes, multiple.

13  Q.   Now did there come a time when the defendant said he

14  was done meeting with you?

15  A.   There was.

16  Q.   At that point what did you do?

17  A.   We stopped talking to him.

18  Q.   At any time prior to that, did he indicate that he

19  didn't want to talk to you anymore?

20  A.   No.

21  Q.   And in between while you were talking to him with

22  Officer Chaplin, how engaged was he in the conversation?

23  A.   He was engaged.

24  Q.   What made you feel that he was engaged?

25  A.   The defendant made multiple statements to us that he

1    wanted to figure this out.  He wanted to find out what was

2    going on.  That he wanted to make sure that we knew what

3    was going on and we would all figure this out.

4    Q.   And based on what you were observing, did it seem

5    like he wanted to keep talking to you throughout that

6    time?

7    A.   Yes.

8              MS. O'NEILL-GREENBERG:  Objection.

9              THE COURT:  The objection is?

10             MS. O'NEILL-GREENBERG:  It calls for speculation

11   about what Mr. Rathbun did and didn't want to do.

12             MS. BERKOWER:  Your Honor, my response would be

13   that this agent observed him and can speak to what he

14   observed in his personal interaction with the defendant.

15             THE COURT:  All right.  Objection sustained.

16   It's leading.

17   Q.   (By Ms. Berkower)  What, if anything, did you --

18             MS. BERKOWER:  May I rephrase then, Your Honor?

19             THE COURT:  Yes.

20   Q.   (By Ms. Berkower)  What, if anything, did you observe

21   while you were talking to him about his demeanor and

22   whether he wanted to keep talking to you?

23   A.   The defendant made multiple statements to me that he

24   was interested in continuing the conversation.

25   Q.   Now, did you record this conversation?

1    A.   I did not record it, no.

2    Q.   Meaning like an audio recording or a video recording?

3    A.   Right.  I didn't do that, no.

4    Q.   Does the FBI policy require you to record a

5    conversation such as this?

6    A.   No.

7    Q.   Now just to be clear, in this case did you conduct

8    other witness interviews?

9    A.   I did.

10   Q.   How many of those did you record?

11   A.   None.

12   Q.   Does the FBI policy require you to record those

13   interviews?

14   A.   No.

15   Q.   Did you document the interview in some other way?

16   A.   Yes.

17   Q.   How did you document it?

18   A.   During the course of the interview notes were taken

19   and at the conclusion of the interview, I wrote a summary

20   of the investigation or a summary of the interview, excuse

21   me.

22   Q.   Is that the same way or a different way from how you

23   documented the other interviews that you did in this case?

24   A.   The same way.

25   Q.   Let's talk now about what the defendant actually told

1   you when you talked to him.

2        You said earlier you were looking for evidence

3   relating to the device placed at JGS.  Did I remember that

4   correctly?

5   A.   That's right.

6   Q.   When you first started talking to the defendant, did

7   anything about his physical appearance stand out to you?

8   A.   Right.  As we just discussed, his hands did.

9   Q.   And what did you notice about his hands?

10  A.   That there appeared to be an open cut on his thumb.

11  Q.   How quickly did you notice that?

12  A.   Well, I was looking for it right away.

13  Q.   And why was that significant to you?

14  A.   Because someone or blood was smeared on both the

15  device and multiple pages of the pamphlet in the device,

16  and the person I was speaking to had a cut which would

17  suggest to me that the blood came from that cut.

18  Q.   Now did you ask to take a closer look at his hands?

19  A.   I did.

20  Q.   At some point did you take photographs of his hands?

21  A.   I did.

22        MS. BERKOWER:  If we could have for the court,

23  counsel, and the witness only Government's Exhibit 71,

24  please?

25        If you could scroll through, Ms. McKenna, the pages

1    of that for the witness, the witness could just look

2    through those pages.

3    Q.   (By Ms. Berkower) Special Agent McGonigle, do you

4    recognize Government's Exhibit 71?

5    A.   I do.

6    Q.   What is it?

7    A.   It's a picture of the defendant's hands.

8    Q.   Is that an accurate representation of what you saw

9    that day?

10   A.   It is.

11        MS. BERKOWER:  If we could, I would move to

12   admit at this time Government's Exhibit 71, PX-71.

13        MS. O'NEILL-GREENBERG:  No objection.

14   **(PX-71 was admitted.)**

15        MS. BERKOWER:  May we publish it?

16        THE COURT:  Yes.

17   Q.   (By Ms. Berkower)  Now, Special Agent McGonigle,

18   could you explain what's on this first page of

19   Government's Exhibit PX-71?

20   A.   Yes.  That's essentially a far view of both the

21   defendant's hands.

22        MS. BERKOWER:  Could we go to page 2 of this

23   exhibit, please?

24   Q.   (By Ms. Berkower) Now you mentioned you saw a cut.

25   Is that visible in this picture?

1    A.   It is.

2    Q.   Could you point out where it is?

3    A.   It's on his right thumb.

4              MS. BERKOWER:   If we could go to page 3 of this

5    exhibit?

6    Q.   (By Ms. Berkower)   What do you see in this photo?

7    A.   That's his right thumb just closer.

8    Q.   Is that the cut you were referencing earlier?

9    A.   It is.

10             MS. BERKOWER:   And if we could go to page 4,

11   please?

12   Q.   (By Ms. Berkower)   What does that show?

13   A.   That's his same thumb.

14   Q.   Now when you saw these cuts, did you ask the

15   defendant about them?

16   A.   I did.

17   Q.   What did he say?

18   A.   He said that he picks at his hands and they sometimes

19   bleed.

20             MS. BERKOWER:   Now, Your Honor, I see that it is

21   one o'clock and I think we may be at a good stopping

22   point.

23             THE COURT:   Okay.   Good suggestion.

24        All right.   So we'll take our lunch break.   The same

25   instructions as always apply.   Don't talk to each other;

1    don't talk to anyone else; don't read any articles; do not

2    access the internet, or do any type of investigation of

3    the case.

4        Were you allowed to bring your cell phones up today?

5    You were?  Okay.  So your cell phones are there.  I'll

6    talk to you more about cell phones.  This was the first

7    day you were allowed to bring them up, correct?

8                THE JURY:  (Yes.)

9                THE COURT:  Okay.  I issued the order on Friday

10   to allow you to keep your cell phones so that it would be

11   more convenient for you to get during breaks like this.

12   Obviously don't bring them in the courtroom.  Okay.

13                THE CLERK:  All rise for the jury.

14                THE COURT:  Let me just emphasize now again, now

15   that I'm giving you more access to your cell phones, I

16   just want to reemphasize do not use the cell phones to go

17   on the internet and do any of the things that I have told

18   you not to do.  I know you understand that, but I want to

19   make a record that I'm emphasizing it.  Thank you.

20   **(The jury left at 1:02.)**

21                THE COURT:  Okay.

22                MS. BERKOWER:  Your Honor, very quickly.  I know

23   he is currently on the stand.  Are we permitted to talk to

24   him during his direct testimony up until he stands for

25   cross examination?

```
1            THE COURT:  About what he's testified about or
2    subsequent questions coming?
3            MS. BERKOWER:  Subsequent questions and things
4    of that nature.
5            THE COURT:  Yeah, what's your position on that?
6    It will be regular witness preparation which is
7    appropriate.
8            MR. WATKINS:  I'm sorry, I didn't hear, whether
9    they can talk to him or not?
10           MS. BERKOWER:  Yes.  I've been in different
11   courts where the rules are different and I just wanted to
12   clarify that before he's on cross-examination if we are
13   still permitted to talk to him about upcoming things he
14   has not yet testified about.
15           MR. WATKINS:  Sounds fair to me.
16           THE COURT:  My view is it will come under
17   witness preparation which is appropriate, but you cannot
18   revisit testimony he's already given.  It would be only
19   covering things he will -- so you can't talk to him about
20   testimony he's given.
21           MS. BERKOWER:  Yes, Your Honor.
22           THE COURT:  He's still on the witness stand.
23           MS. BERKOWER:  Yes.  I know I have a few
24   questions I may have missed that I will go back to but we
25   will not cover that with him.
```

1           THE COURT:  Okay.  Yes, you can talk to him

2      about other topics that you're about to cover with him

3      that you haven't started yet.  All right.

4           MS. BERKOWER:  Thank you, Your Honor.

5           MR. WATKINS:  What time are we coming back?

6           THE COURT:  Two.

7      **(A recess was taken at 1:04 until 2:00.)**

8           MR. WATKINS:  Can I raise one quick matter

9      before the jury comes in?  In regard to this particular

10     witness, I don't know if we're getting to

11     cross-examination today or not.

12          I will tell the court that as it may seem, I took the

13     lead in the part about --

14     **(Mr. Rathbun entered the courtroom.)**

15          MR. WATKINS:  I took the lead in regard to the

16     cell site location information and some of the timing

17     issues and the scene at JGS fully expecting that the other

18     witness, Agent Mastroianni, would be testifying to those

19     things.  So I have the cross prepared about that.

20          I did not realize that the government was going to

21     put it in in a different way.  That's my bad.  I should

22     have more specifically requested who was going to put that

23     in.

24          So it's all by way of saying ordinarily one or the

25     other of us would take over the entire cross.  Ms.

1    O'Neill-Greenberg is prepared to cross Agent McGonigle on

2    everything but that.  So I'm asking permission if I could

3    take over the cross examination at least to that one point

4    and then turn it over to Ms. O'Neill?

5              THE COURT:  Yeah, I don't see a problem with

6    that.  Does the government have a problem?

7              MS. BERKOWER:  I guess not, Your Honor.

8              THE COURT:  Well, why would be there?

9              MS. BERKOWER:  It's just a little

10   unconventional, but I don't have a problem with it.

11             THE COURT:  I think it's fine.

12             MS. BERKOWER:  It's fine with us.

13             THE COURT:  Yeah, it's fine.  It's topics.  In

14   other words, I wouldn't let cross-examination be on the

15   same topic.  You go on the same topic, but if they're

16   completely separate topics --

17             MR. WATKINS:  Correct.

18             THE COURT:  -- under what you've just told me

19   regarding your preparation, as long as the topics are

20   completely separated and there's no crossover.  You're not

21   going to be able to go back and cover up what you wish was

22   asked when you weren't cross-examining, right?

23             MR. WATKINS:  That's correct.

24             THE COURT:  Okay.  Fine.

25             MR. WATKINS:  Thank you.

1          MS. BERKOWER:  Your Honor, I know that we're

2     about to -- the witness is actually going to get I think

3     in this next chunk of testimony to an exhibit that the

4     defense has objected to that might take a little bit more

5     time to work through.

6          THE COURT:  So what is it?

7          MS. BERKOWER:  It's Government's Exhibit 53.

8     Since they're moving to exclude, they can go first or I

9     can explain the issue, whatever the court prefers.

10          THE COURT:  Go ahead explain.

11          MS. BERKOWER:  Your Honor, Government's Exhibit

12     53 is -- Ms. McKenna, do you actually mind pulling that up

13     so the court can see it?

14        So Government's Exhibit 53 are text messages that the

15     defendant sent to an associate of his named Glenn Miliken,

16     and in this case when we did --

17          THE COURT:  Hold on.

18          MS. BERKOWER:  When we did a search of the

19     defendant's phone, we found that Mr. Miliken was a contact

20     in the phone.  We found this photo, Your Honor can see,

21     was sent from Mr. Rathbun to Mr. Miliken.  And as a

22     result, Special Agent McGonigle went to identify Mr.

23     Miliken and ask him questions about Mr. Rathbun.

24        In doing that, he learned from Mr. Miliken that the

25     defendant -- if you can see on April 3rd of this year --

1    at 12:05 a.m. sent text messages to Mr. Miliken saying "If
2    you're up at six and want cash, call me to meet at drop."
3          If you can go to the next page, Ms. McKenna?  Thank
4    you.
5          "Few spots, depot to start, have black everything,
6    been doing it alone past three night.  I'm leaving soon."
7    And to the extent that this indicates that the defendant
8    has been out of the house the past three nights, that
9    seems very relevant to our investigation.  It was sent the
10   day after the crime.  He's saying to Mr. Miliken I've been
11   out the last three nights doing whatever.  He's referring
12   to depot to start; have black everything.
13         In our view this is important information concerning
14   Mr. Rathbun's whereabouts on the day of the crime.  He had
15   represented to the FBI he hadn't been out of the house in
16   two weeks and here we have him texting the day after the
17   crime saying I've been out every night; about to leave; do
18   you want to come with me?
19         So in order to authenticate the series of text
20   messages, the agent said, all right.  How do I know this
21   is actually from Mr. Rathbun?  The witness, Mr. Miliken,
22   deleted the contact from his phone so that the agent could
23   see the phone number that it came from and it was Mr.
24   Rathbun's phone number.
25         We then checked that against authenticated business

1     records from Verizon Wireless showing text messages at the

2     same time that these were exchanged between Mr. Rathbun's

3     phone number and Mr. Miliken's phone number.

4          We're not intending to call Mr. Miliken today but we

5     are planning to introduce these text messages as evidence

6     of the defendant's whereabouts with the authentication

7     and foundation for their admissibility laid by the process

8     I just described.

9          The agent saw the messages; had the contact deleted

10    so he could see which phone number it was coming from, and

11    then cross-referenced that with the authenticated Verizon

12    Wireless records that the defense -- it's already in

13    evidence.  They haven't objected to it.

14         I know the defense objects to this exhibit, but in

15    our view that's why it's admissible and it is highly

16    relevant here and so I will put it to Your Honor that we'd

17    submit it's admissible.

18              THE COURT:  Thank you.

19              MR. WATKINS:  Well, the first problem is

20    authentication.  They've got the wrong witness up here to

21    authenticate somebody's else phone and the transmissions

22    back and forth from somebody's else phone.

23         If they want to put this in, they need to call that

24    witness, Mr. Miliken.  It would be --

25              THE COURT:  This is a picture of Miliken's

1    phone?

2              MR. WATKINS:  That's correct.

3              MS. BERKOWER:  Yes, Your Honor.  This is a

4    picture of Mr. Miliken's phone having received text

5    messages from Mr. Rathbun.

6         If you can go to the next page, Ms. McKenna?  Go up

7    to the top, the third page of the exhibit but show the top

8    of the exhibit.

9         You can see the agent had him delete the contact from

10   -- Mr. Miliken deleted the contact from his phone so the

11   agent can see who's this coming from.  He then

12   cross-referenced it.

13             THE COURT:  So that he can see the phone number

14   instead of the name?

15             MS. BERKOWER:  Yes.  To make sure to

16   authenticate that Mr. Miliken's representation that this

17   was Mr. Rathbun, he saw this information once the contact

18   was deleted.  Went back and looked at the cell phone

19   records and said, oh, yeah, there are messages between

20   these two phone numbers -- Mr. Rathbun's phone number and

21   Mr. Miliken's phone number -- at the relevant time.

22             THE COURT:  Okay.

23             MS. BERKOWER:  So the picture above it of the

24   drugs was found on Mr. Rathbun's phone.

25             THE COURT:  That picture was found on Mr.

1    Rathbun's phone also?

2             MS. BERKOWER:  Correct.

3             THE COURT:  So you're saying that picture was

4    sent to Miliken's phone from Rathbun's phone?

5             MS. BERKOWER:  Yes.

6             THE COURT:  And you're saying it was Rathbun who

7    said "If you're up at six and want cash, call me to meet

8    at drop?"

9             MS. BERKOWER:  Correct.  I've been out the past

10   three nights.

11            THE COURT:  Can you scroll down?

12            MS. BERKOWER:  "Been doing it alone."

13            THE COURT:  Who says, "few spots, depot to

14   start, have black everything?"

15            MS. BERKOWER:  The ones with the red bar next to

16   them are Mr. Rathbun; the ones with the blue bar next them

17   are Mr. Miliken's.

18            THE COURT:  Okay.

19            MS. BERKOWER:  If you look at the Verizon

20   records, you can see a message going from Rathbun's phone

21   to Miliken's phone at 12:05, 12:06, 12:07, 12:08.  The

22   records match up with the time of transmission listed on

23   this screenshot.

24            THE COURT:  And you're saying it says he's been

25   out?

```
1          MS. BERKOWER:  Yeah.  He says, "If you're up at
2     six and want cash, call me to meet at drop.  Few spots,
3     depot to start, have black everything; been doing it alone
4     past three night.  I'm leaving soon."
5          This is on April 3rd when he had represented to the
6     FBI that he had not been out of the house in two weeks;
7     hadn't been out the night of the offense.  This is the day
8     after the offense with the defendant saying I've been out
9     the last three times.  I'm leaving again soon.
10         THE COURT:  So it says, "been doing it alone the
11    past three nights."
12         MS. BERKOWER:  Yeah, that's Mr. Rathbun saying
13    I've been doing it alone the past three nights.  I'm
14    leaving soon.
15         THE COURT:  Right.  But you keep saying that it
16    says I've been out the last three nights.  It says, "been
17    doing it alone past three nights."
18         MS. BERKOWER:  Well, if you look at the first
19    message, he's indicating call me to meet up.
20         THE COURT:  Yeah.
21         MS. BERKOWER:  I've been doing it alone the past
22    three nights.  I'm leaving soon.  Like he's trying to meet
23    up.  Mr. Miliken says where?  Like, where do you want to
24    meet up.  He says, few spots, depot to start, have black
25    everything; been doing it alone past three nights; I'm
```

1    leaving soon.  So the where I think actually is important

2    because --

3              THE COURT:  Been doing what alone the past three

4    nights?  Using drugs alone?

5              MS. BERKOWER:  Well, I don't know that we're

6    introducing this for purposes of saying what he's been

7    doing so much as he's been out.  He represented to the FBI

8    that he had not been out of the house in two weeks.  This

9    is the day after the crime and it's a message saying --

10             THE COURT:  But you said multiple times that the

11   message says been out last three nights.  It just doesn't

12   say that.

13             MS. BERKOWER:  Those are not the exact words,

14   Your Honor, but --

15             THE COURT:  How can you stand here and make an

16   argument saying like so sure that it says something and

17   I'm looking at it and it doesn't say it.

18             MS. BERKOWER:  Well, Your Honor --

19             THE COURT:  Attorney Watkins.

20        Thanks.  That's enough.

21             MR. WATKINS:  Your Honor, you see what the

22   difficulties are here.  The government wants to portray

23   this in a particular way.  There's a whole host of

24   difficulties here.  One is this is April 3rd that this

25   message was put here.  It implicates some kind of

1    subsequent bad act?  I don't know what it implicates but
2    it's 404 as well.
3         The government knows, because it has the cell phone
4    information from Mr. Rathbun, that he wasn't out those
5    past three nights.  So to introduce this as --
6              THE COURT:  Wait.  One more time.  I'm sorry, I
7    missed that.  The government has cell phone information to
8    show?  I just didn't hear you.
9              MR. WATKINS:  I'm sorry, cell cite information
10   to show that that is certainly not true of that night.
11   They do have that he was out -- we've been talking about
12   it -- the night before.  Indeed he was out.  There's
13   plenty of evidence of that.
14        The question is the two nights or I think at that
15   point the two nights before that whether he was out.  The
16   government has other information that they can get that
17   from.
18        I should note what the indictment alleges is a
19   specific, a specific date which would be April 2nd.  That
20   that is where the lie was that Mr. Rathbun being out on
21   April 2nd, that that was where the lie in the past two
22   weeks goes.  They have plenty of information on that to
23   argue to the jury.  They don't need anything further.  It
24   will get incredibly confusing as the court has seen.  I
25   don't --

1          THE COURT:  I'm confused.  I must say I'm

2    confused, but maybe it's just because I'm not -- it helps

3    knowing who's saying what on this.

4          Rathbun, "If you're up at six and want cash, call me

5    to meet at drop."

6          "Where?"

7          "Few spots, depot to start, have black everything."

8    Then "been doing it alone past three night; I'm leaving

9    soon."

10         So I'm leaving soon clearly means -- I think you can

11   take that to be I'm going to be away from my house or

12   you're traveling somewhere.

13         "Been doing it alone past three night," I don't know

14   if that means using drugs alone.  I don't know what -- I

15   certainly don't see that that means I've been traveling.

16   I've been in my car going places.  I guess it could.  I

17   guess it could mean that he's driving around looking to

18   buy drugs.  All right.  What are your other objections?

19   You said you had an authentication objection?

20         MR. WATKINS:  Because of precisely what we're

21   talking about here, is that these text messages on

22   somebody else's phone is coming through a different

23   witness; that is the person who should be talking about

24   this particular exchange.

25         Just to finish up on this --

1          THE COURT:  I don't know about that.  Why?  Just

2     walk through that with me.  Agents would testify they got

3     this phone, who they got the phone from, and then what

4     they did with the phone and how they got down to looking

5     at the number where the messages came from and then

6     matching that to the known Rathbun number.

7          MR. WATKINS:  Without Mr. Miliken in front of

8     the court to talk about how he got the phone, whether it

9     is his phone, things of that nature, right there he is

10    telling the agent this is my phone.  That's a hearsay

11    statement out of court for the truth of it.

12         THE COURT:  Does it matter who -- does it matter

13    who the agent got the phone from?  I mean, he can connect

14    it to a Rathbun -- a Mr. Rathbun call or text message

15    going into it.  So isn't that more important for -- you

16    can authenticate that it's coming from the Rathbun phone,

17    the message?  Does it really matter whose phone -- that

18    it's Miliken or John Doe's?

19         MR. WATKINS:  What the court is asking could

20    they corroborate it from Mr. Rathbun's phone?  The answer

21    is yes, or they can corroborate it from his I guess it's

22    going to be from his phone that there was this message

23    sent there.  The substance of the message does not appear

24    from Mr. Rathbun's phone I believe.  I believe.

25         THE COURT:  So in Mr. Rathbun's outgoing texts,

1    it doesn't show this?

2            MR. WATKINS:  The substance of it I would have

3    to look to see.

4            THE COURT:  Does the government know that?

5            MR. WATKINS:  Your Honor is quite -- I think my

6    stronger argument here is just the confusion that comes

7    from this and the undue prejudice.

8        All of a sudden we talking about few spots, depot,

9    have black everything.  That has nothing to do with this

10   case here whatsoever.  It's very, very -- if there is any

11   probative value, it's very, very slight and to bring this

12   on --

13           THE COURT:  So when he says I'm leaving soon, on

14   what date is this?  This is the 2nd or 3rd?

15           MR. WATKINS:  This is the 3rd.

16           THE COURT:  So when he says I'm leaving soon,

17   talking about on the 3rd, how is that implicated by the

18   indictment?

19           MR. WATKINS:  It is 15 hours after the event of

20   leaving the -- that somebody left the gas can.  So this is

21   sent 15 hours after that event.  I think what the

22   government is trying to argue is that this is

23   circumstantial evidence that he was out and about for the

24   past three nights.

25       I agree with the court, I don't see that -- I think

1    the jury would have to speculate to get to that particular

2    place.  The 3rd itself is actually outside of the two-week

3    period if we're going to use that as a hard and fast

4    measure.  I think April 3rd is itself outside of that

5    two-week period.  And as the government knows, or should

6    know, from the cell phone records, Mr. Rathbun actually

7    did not leave his home on April 3rd after this text

8    message.

9              THE COURT:  So is this relevant to an indicted

10   false statement?

11             MR. WATKINS:  I believe that is where the

12   government is trying to go here, but again their focus

13   here in the indictment was that April 2nd, at the time

14   that Mr. Rathbun left to go up that night, up into that

15   area, that is where the false statement lies.  That he

16   lied by telling them he had not left the house on April

17   2nd.  This is April 3rd.

18             THE COURT:  In other words, hadn't left the

19   house two weeks before April 2nd?

20             MS. BERKOWER:  No.

21             THE COURT:  No?

22             MR. WATKINS:  April 13th, right?

23             MS. BERKOWER:  The agents asked him on April

24   15th if he had -- where he had been on April 2nd and he

25   said -- I'm proffering what I expect the agent -- if you

1    want him to leave, he can.  He's standing right there.

2              THE COURT:  I got to tell you.  This is like

3    ridiculous.  Obviously an experienced agent.  Obviously an

4    -- and I didn't even notice that was the agent from the

5    distance and he stands there and he listens to the whole

6    thing with a sequestration order.  This just keeps getting

7    better and better.

8              MS. BERKOWER:  Your Honor, I would apologize.

9              THE COURT:  I don't want an apology.  I really

10   don't.  Just please explain to me your point.  I'm still

11   trying to get over your representations to me, your

12   misrepresentations of what this text said over and over

13   and over, but go ahead and finish what you were going to

14   say.

15             MS. BERKOWER:  Your Honor, I think the defense

16   raised the point about us having his phone and Your Honor

17   was interested in knowing whether these text messages were

18   found on the defendant's phone and so I can speak to that

19   first.

20             THE COURT:  Right.

21             MS. BERKOWER:  The answer is, no, they are not

22   on his phone.  It appears -- we believe they were deleted

23   from his phone because the phone records show a text

24   exchange and there's no text messages corresponding to the

25   phone records on the memory of his phone.

1           So it is our belief that given that the recipient,

2    the recipient phone number had these texts, the phone

3    records show there was a text exchange but there's nothing

4    on the defendant's phone when you go back and search it.

5    It is our belief that he deleted them from his phone, and

6    so that answers Your Honor's question about that.

7           With regard to why we believe it means he was out

8    that night, my apologies to the court for not quoting the

9    text directly when I was speaking about it, but our belief

10   as to why we think this shows he was out that night really

11   relates to the web searches that the defense brought in

12   through Mr. Wong on Friday.

13          He was searching Home Depot; he was searching tools.

14   In our view depot relates to that.  He's speaking about --

15   I mean, Mr. Watkins alluded to it himself, another bad act

16   relating to depot which, in our view, is contextualized by

17   his web searches late night the night before for Home

18   Depot.

19          So in our view, "Have black everything, been doing it

20   alone past three nights" is put into context by those

21   prior web searches.  In our view this is relevant.  We

22   agree with the court it is authenticated by the process

23   that we saw.

24          And Your Honor is right it does speak to the false

25   statements because on April 15th the agent asked the

1    defendant where were you on April 2nd?  He said, I haven't

2    been out of the house in two weeks.  In our view this

3    contradicts that and that is why we are offering it as

4    relevant to that false statement because in context we

5    think it shows he was out.

6              THE COURT:  Okay.

7              MS. BERKOWER:  If I may briefly address the

8    agent standing here, he is excluded from the court's order

9    concerning witnesses observing proceedings.  And to the

10   extent he was not supposed to see what was going on here,

11   my apologies to the court.

12        Our view -- our belief was since he was excluded from

13   the sequestration order, it would not be a problem for him

14   to stand here to view the proceeding.

15             THE COURT:  He was excluded from the

16   sequestration order?

17             MS. BERKOWER:  Yes, Your Honor.  As the lead

18   case agent, you permitted him to be excluded and so I

19   don't want -- to the extent we didn't understand Your

20   Honor's order --

21             THE COURT:  No.  Maybe that's my fault.  I don't

22   remember that, but if I excluded him, then he had the

23   right to be standing there.  I don't remember excluding

24   him because there's no more room for anyone.

25             MS. BERKOWER:  I think Your Honor permitted him

```
 1      to watch the proceedings online in the same way we

 2      permitted the defense investigators to watch the

 3      proceedings online.

 4              THE COURT:  I think you might be right.

 5          Do you remember that?

 6          Yeah, all right.  So I apologize then.  I think

 7      you're correct on that.

 8              MS. BERKOWER:  Thank you, Your Honor.

 9              THE COURT:  All right.

10              MR. WATKINS:  Your Honor, just to finish up.  So

11      it does sound like the government does understand that

12      this is 404(b) evidence which, of course, requires special

13      relevance to some issue here.  And given the very, very

14      low probative value and the disincentive to admit prior

15      bad act evidence unless there's a special relationship,

16      this simply doesn't qualify and should not come in.

17              THE COURT:  Well, it's admissible for perhaps a

18      limited purpose and that is the traveling.  I mean, not

19      the bad act of drug use.  I mean, you can actually even --

20      there could be an instruction you can't consider this for

21      the act of drug use.

22          Although this isn't being hidden from the jury that

23      he's a drug user, but this really only goes -- if this

24      were to be admitted, it's admitted only to whether or not

25      he had traveled, traveled somewhere beside sitting at the
```

1    house for a certain period of time.

2         What's the prejudice?  You're saying prejudice is the

3    drug use when both sides are making it pretty clear he's a

4    drug user.

5              MR. WATKINS:  I think what the government

6    intends to argue is that Mr. Rathbun was going out to

7    commit crimes; was going out to Home Depot to steal

8    things, wear black, or other aspects.  I think certainly

9    that's something the jury could conclude or speculate from

10   this.

11             THE COURT:  Did I miss that?  I didn't hear them

12   suggest that.

13             MR. WATKINS:  "Few spots; depot to start; have

14   black everything."

15             THE COURT:  I have no idea what that means.

16             MR. WATKINS:  Nor do I, but I can see where the

17   government has now said it relates to the searches Mr.

18   Rathbun was doing that they expect to fully have the jury

19   draw that same conclusion.

20        It's absolutely -- the prejudice is very, very high

21   as the jury starts to speculate what does this all mean?

22   And at the end of the day, it has so little to do with any

23   charge here that it should be excluded.

24             THE COURT:  The question is where do you want to

25   meet and he said "few spots, depot to start, have black

everything."  I don't know how that -- I'm not getting the
jump to we're going to break into Home Depot.

MR. WATKINS:  Well, it's hard to make out
because the texts are so cryptic.

THE COURT:  Well, not really.  Let's meet at the
Home Depot parking lot.  It's dark and I'll buy my drugs
from you.

I've been doing it -- but I just don't know, "been
doing it alone past three nights," I'm not sure.  Yes,
that could mean -- I guess that could mean I've been out
buying drugs alone the past three nights or just using
drugs myself.  I don't know the history with him and
Miliken.  I don't know if he buys him and they use
together.  All right.

I'm going to step out for a minute and take a look at
something.  Be right back with a ruling.  Okay.

MR. WATKINS:  Thank you.

**(A recess was taken at 2:25 until 2:33.)**

THE COURT:  Okay.  So I'm looking at the
indictment.  I think this statement does encompass Count 3
when we were talking about past two weeks.  Count 3, the
past two weeks.

Count 3 indicates that "On or about April 15, 2020,
in East Longmeadow, in the District of Massachusetts, the
defendant did" and then the false statement was "he had

1    not left the house in the past two weeks."

2         So I think the date of this text message is within

3    Count 3, false statements.  I think that an inference, not

4    the only inference, but an inference from the text message

5    can be argued that that can be taken as he in fact did

6    leave the house the past three nights as was said.

7         There's other inferences that could be argued, but

8    I do -- so I think it's admissible for the limited purpose

9    of showing the leaving the house relative to the

10   indictment that I just cited.

11        So I think the photograph -- although there's a lot

12   of discussion about drug use and his drug use -- I think

13   the photograph is a little too much and is prejudicial.

14   So the photograph would be deleted or sanitized.  Okay.

15   Thank you.

16        All set?

17             MR. WATKINS:  Just note our objection.

18             THE COURT:  Absolutely.

19             MS. BERKOWER:  Yes, Your Honor.  That's fine.  I

20   think Ms. MeKenna is going to work on redacting that now.

21   We may need to circle back and use that exhibit later in

22   the day so she has time to make the appropriate

23   redactions.

24             THE COURT:  Perfect.  All right.

25             MR. WATKINS:  Judge, one more quick matter

before you bring the jury in.

The client access issue is this. Ms. O'Neill-Greenberg and I attempted to meet with Mr. Rathbun over the weekend at the Hampden County Jail where he's detained.

We were told we cannot meet with him there because he is in quarantine because he comes back and forth to court and all through the trial that will be the case. So we have a problem now that we are not able to meet with him and will not be able to meet with him any place other than the courthouse.

We're asking the court -- I know we are breaking early one day, but we did attempt to meet with him extensively over the weekend, whether the court might consider breaking early tomorrow or alternatively if the marshals were willing to stay quite late, we could perhaps do something in that measure. We will have to fix this particular problem.

THE COURT: Sure. So when do you want access to him, tomorrow morning for an hour or today from four to five? What are you asking? I'll definitely work with you on this.

MR. WATKINS: I suppose today would be the best time if we can stay a little later.

THE COURT: Mr. Toperowski, what's the latest

```
1    can we have pick up from Ludlow?
2              A MARSHAL:  They are known to be here for five
3    o'clock.
4              THE COURT:  All right.
5              A MARSHAL:  It's only because the CSOs are
6    shutting down everything and they have to leave.
7              THE COURT:  What's the latest they've done it in
8    the past before?  Have they done 5:30, six?
9              A MARSHAL:  5:30.
10             THE COURT:  All right.  So, okay.  Thanks.  So
11   we will try to give you at least an hour today.  And then
12   what time does he get here in the morning?
13             A MARSHAL:  8:30.
14             THE COURT:  So we can start at 9:30 instead.  We
15   don't start until 9:30 anyway usually.
16             MR. WATKINS:  If things go as they have the last
17   few days, we're going to be in court before the court
18   arguing various issues in the morning.  I don't know if
19   that's a great outcome.
20        Not to complicate matters further, but our office
21   policy has been until we are convinced that the lockup
22   area is a safe space, that we would have to have some kind
23   of larger space in which to meet with Mr. Rathbun which
24   means we're up here maybe in an empty courtroom rather
25   than downstairs in the lockup.  Again, I know that's
```

1   complicating matters, but.

2           THE COURT:  All right.  So I will let that --

3   let's get moving and then we'll make an arrangement for

4   you to stay in the courtroom and talk to him when we are

5   finished today.  Yeah, I see the issues.  Okay.

6   **(The jury entered at 2:38.)**

7           THE COURT:  Ladies and gentlemen, during the

8   break were you able to follow my instructions not to talk

9   to each other or anyone else about the case?  Not to look

10  on the internet?  Read any articles or post anything or

11  read any posts?

12      All right.  Affirmative answers from all the jurors.

13  They remain fair and impartial.

14      The witness can take the stand.  Thank you.

15          MS. BERKOWER:  Your Honor, may the witness

16  retake the stand?

17          THE COURT:  Yes.

18          MS. BERKOWER:  May I proceed?

19          THE COURT:  Yes.

20  Q.  (By Ms. Berkower)  Good afternoon.

21  A.  Good afternoon.

22  Q.  Let's pick up with the interview that you did of Mr.

23  Rathbun on April 15th of this year.

24  A.  Okay.

25  Q.  When you started talking to him, did you talk to him

1    about the part of Converse Street where JGS is located?

2    A.   Yes.

3    Q.   How did you ask him about that?

4    A.   We asked him if he was familiar with Converse Street

5    in Longmeadow.

6    Q.   What did he say?

7    A.   He said he was.

8    Q.   Did he give any explanation of how he was familiar

9    with it?

10   A.   He did.  He said he drove down Converse Street every

11   day to go to the Methadone clinic.

12   Q.   Now based on that answer, did you ask him more

13   questions about Converse Street?

14   A.   Yes.

15   Q.   What questions did you ask?

16   A.   We were interested to gauge his knowledge of the

17   street and we specifically -- we started very big and

18   tried to work our way down.

19   Q.   So when you say you started very big, what kinds of

20   questions -- what questions were you asking him?

21   A.   So we asked him if he was familiar with any Jewish

22   locations on the street.

23   Q.   What was his answer to that?

24   A.   He was familiar with a Jewish private school on

25   Converse Street.

```
1    Q.   Is that the only Jewish landmark on that street?
2    A.   No.
3              MS. O'NEILL-GREENBERG:  Objection.
4              THE COURT:  Overruled.
5              THE WITNESS:  It's not the only Jewish landmark
6    on the street.
7    Q.   (By Ms. Berkower)  Did you ask him about the other
8    Jewish buildings or landmarks on that street?
9    A.   Yes.  So we spoke generally about that's a very
10   heavily populated street, a number of Jewish businesses
11   and worship centers, specifically the Jewish Community
12   Campus or center.  There's synagogues on the street and
13   then, of course, there's a Jewish facility, JGS.
14   Q.   What does JGS stand for?
15   A.   Jewish Geriatric Services.
16   Q.   So did you ask him about each of those landmarks?
17   A.   Yes.
18   Q.   Could you explain your conversation with regard to
19   those landmarks?
20   A.   Yes.  We told him specifically we were trying to get
21   an idea from his familiarity with the area, and we sort of
22   were trying to gauge -- trying to draw him in to where we
23   were talking about.
24   Q.   And what was his response when you asked him about
25   those landmarks?
```

```
 1    A.   He just said he didn't know what we were talking
 2    about; that he was only familiar with the school.
 3              MS. BERKOWER:  Now, Ms. McKenna, if we can
 4    please have Government's Exhibit 82 just for the court,
 5    counsel, and the witness, please?  I see that -- I think
 6    that screen may be on, sir.
 7              THE CLERK:  I don't think it works.
 8    Q.   (By Ms. Berkower)  Special Agent McGonigle, do you
 9    recognize what's in Government's Exhibit PX-82?
10    A.   I do.
11    Q.   What is it?
12    A.   That is a map, a Google map of the directions from 20
13    Lori Lane to the JGS campus.
14              MS. BERKOWER:  Your Honor, my colleagues have
15    informed me that this is actually already in evidence so I
16    think we can publish to it the jury.
17              THE COURT:  Fine.  It can be published.
18    Q.   (By Ms. Berkower) Now, is there a route in blue -- do
19    you see a route in blue marked on that map?
20    A.   I do.
21    Q.   Could you explain what that is?
22    A.   That's the most direct route from 20 Lori Lane to
23    JGS.
24    Q.   Are you familiar with that area yourself?
25    A.   I am.
```

1    Q.   Have you driven from 20 Lori Lane to JGS?

2    A.   I have.

3    Q.   How far about is that drive?

4    A.   It's a little under a mile and a half.

5    Q.   How long does it take to drive?

6    A.   Four minutes.

7    Q.   Now given the defendant's answer to you that he drove

8    down Converse Street every day, did you talk to him more

9    about the surrounding area when he expressed unfamiliarity

10   with it?

11   A.   Yes.

12   Q.   Could you explain what else you asked him about?

13   A.   Well, as I explained before, we tried to get him

14   orientated to where we were talking about.  Like I said,

15   specifically mentioning some of the other landmarks on the

16   street he may have been familiar with.

17   Q.   Do you mention a location called Ruth's House?

18   A.   So I first referred to it as a Jewish nursing home.

19   Q.   Why?

20   A.   That specific terminology was very important to us at

21   the time.

22   Q.   So when you asked him -- and did you mention Ruth's

23   House in particular?

24   A.   So it was -- I started off specifically asking about

25   a Jewish nursing home and I did also mention Ruth's House.

1    I spoke about the Ruth's House entrance.

2    Q.    Why did you mention Ruth's House?

3    A.    At the time we mistakenly believed that the building

4    that the device had been placed closest to was named

5    Ruth's House.

6    Q.    Did you later learn it had a different name?

7    A.    I did.

8    Q.    What was the name you later learned it to have?

9    A.    Genesis House.

10   Q.    Now, what made you think at the time that that

11   building was called Ruth's House?

12   A.    When we spoke to the Longmeadow Police Department,

13   they had referred to it as Ruth's House.  The entrance to

14   the building, there's a sign and it says Ruth's House on

15   it.  It does not actually say Genesis House, and where the

16   device had been placed was from the Ruth's House entrance

17   and so I was under the impression that the building

18   closest to the entrance was Ruth's House.

19               A JUROR:  Can you move the mic closer to the

20   witness?

21               THE COURT:  Sure.  Thank you for saying

22   something.

23               THE WITNESS:  Is that better?  Sorry.

24               THE COURT:  Do you need the past answer

25   repeated?

1          A JUROR:  No, I can kind of hear but it's work.

2          MS. BERKOWER:  Ms. McKenna, if we could please

3     have Government's Exhibit 23 in evidence?

4     Q.   (By Ms. Berkower)  Special Agent McGonigle, are you

5     familiar with this photograph?

6     A.   Yes.

7     Q.   Could you read the words on the sign to the right of

8     the photograph?

9     A.   Ruth's House Assisted Living.

10    Q.   Is that part of why you referred to the building as

11    Ruth's House?

12    A.   It is.

13    Q.   And where on this photograph was the device placed,

14    if you can orient the jury, please?

15    A.   So if you follow the crosswalk, the first tree off

16    the sidewalk there is where the device was placed.

17    Q.   Now when you talked to the defendant about Ruth's

18    House and whether he was familiar with it, what did he

19    say?

20    A.   He was not.

21    Q.   In order to continue your conversation about this

22    area, did you show him anything?

23    A.   We showed him a map in an attempt to sort of refresh

24    his recollection about where we were speaking about.

25         MS. BERKOWER:  Now if we could please have

1    Government's Exhibit 72 just for the court, counsel, and

2    the witness please?  So I think we have the TV on now.

3    Thank you.

4    Q.   (By Ms. Berkower) Do you recognize what is

5    Government's Exhibit 72?

6    A.   I do.

7    Q.   What is it?

8    A.   That is the map that I showed him.  However, I will

9    say that this map is significantly lighter than the one I

10   believe we had.

11   Q.   It's lighter in color?

12   A.   Yeah, the outline of the roads and I believe there's

13   an outline on the building.

14   Q.   Now, when you went to meet with the defendant that

15   day or went to execute the warrant that day, did you bring

16   anything with you?

17   A.   Yeah, I had a folder full of documents that I wanted

18   to show him.

19          MS. BERKOWER:  Ms. McKenna if you can please

20   scroll through Exhibit 72.

21   Q.   (By Ms. Berkower)  Special Agent McGonigle, if you

22   can look through the exhibit as she does so.

23       Special Agent McGonigle, do you recognize the other

24   pages of Government's Exhibit 72?

25   A.   I do.

1    Q.   What are those?

2    A.   Those are the additional pictures that I brought with

3    me to show him.

4              MS. BERKOWER:  Your Honor, I'd ask for admission

5    of Government's Exhibit 72.

6              MS. O'NEILL-GREENBERG:  No objection.

7              THE COURT:  Admitted.

8    **(PX-72 was admitted.)**

9              MS. BERKOWER:  If we could please publish it?

10             THE COURT:  Go right ahead.

11   Q.   (By Ms. Berkower) Special Agent McGonigle, is this

12   the map that you said you brought with you that day?

13   A.   It is.  Like I mentioned, it looks a little lighter

14   to me, but.

15   Q.   When you say lighter, do you just mean fainter?

16   A.   Yes, fainter.  It was a white background.  It wasn't

17   like colored or anything, but.

18   Q.   And in the copy that you brought -- and we'll see if

19   we can get a better copy -- but you reference there was a

20   building that you could see the outline of on the map?

21   A.   Very faintly.

22   Q.   Where was that building?

23   A.   It was inside the -- in between Ruth's House and

24   Converse house. (sic) Although I will note -- sorry.  It

25   was in the Ruth's House/Converse house.

1   Q.   When you say Converse house, do you mean Converse

2   Street?

3   A.   Sorry.  Ruth's House Converse Street, yes.

4   Q.   And what quadrant of this exhibit are you referring

5   to?

6   A.   It would have been right around 9 o'clock if you're

7   looking at it like a clock.

8   Q.   What building did you later learn that to be?

9   A.   Genesis House.

10  Q.   Now is there handwriting on this map?

11  A.   There is.

12  Q.   Where is the handwriting?

13  A.   There's an X right at the intersection of Ruth's

14  House Road and Converse Street.

15  Q.   What did the -- who wrote the X there?

16  A.   I did.

17  Q.   What was the X for?

18  A.   The X is where the device was placed.

19  Q.   Did you show the defendant this map?

20  A.   I did.

21  Q.   What did you ask him about it?

22  A.   I used it to refresh his recollection about the area.

23  I didn't ask him pointed questions about the map.

24  Q.   Did it refresh his recollection about the area?

25  A.   No.

1    Q.   Approximately how far is the X that you marked from

2    his house?

3    A.   1.4 miles.

4    Q.   And had he told you that he drives down the street

5    every day?

6    A.   He did.

7    Q.   Now, what was the defendant's demeanor as you talked

8    to him about Converse Street?

9    A.   So this was at the very beginning of the interview

10   and he was very adamant that we get to the point of what

11   we were doing there and tell him exactly what we were

12   there for.

13   Q.   And at that point had you said anything to him about

14   a device being found at that spot marked with an X?

15   A.   No.

16   Q.   Why not?

17   A.   We were interested in seeing what he was willing to

18   say to us before we told him why we were there.  We felt

19   like we might get more truthful answers if he didn't know

20   all the information that we had.

21   Q.   Now, as you talked to him more about Converse Street,

22   did he give you any more information about his familiarity

23   with that area?

24   A.   None.

25   Q.   Now if we could -- oh, before I move on, during this

```
 1    part of the conversation did you have any doubts about
 2    whether the defendant understood what you were asking him
 3    about?
 4    A.   No.
 5    Q.   Why are you so confident that he understood you?
 6    A.   We spent a lot of time trying to explain what we were
 7    talking about.  We did use the term Jewish nursing home
 8    and the term Ruth's House, but we gave a lot of contextual
 9    clues about where we were trying to direct the defendant's
10    attention.
11    Q.   And that included by showing him that map?
12    A.   Right.
13    Q.   And even as you were speaking with him, were you at
14    his house?
15    A.   Yes.
16    Q.   So how far away were you from the location you were
17    talking about?
18    A.   1.4 miles.
19    Q.   Let's now move on and talk about a moment earlier
20    when you first approached the defendant's house.
21         You said earlier when you first approached his house,
22    you saw red gas cans?
23    A.   Yes.  A red gas can.
24    Q.   Sorry, a red gas can.
25    A.   Yes.
```

```
1    Q.   After you talked to the defendant about the JGS
2    location on Converse Street, did you talk to him about the
3    gas can?
4    A.   Yes.
5              MS. BERKOWER:  If we could have Government's
6    Exhibit 58, please?
7         And I believe that's in evidence so we can publish
8    that to the jury.
9              THE COURT:  All right.  Published.
10             MS. BERKOWER:  I think, Your Honor, that screen
11   seems to be out now.
12             THE COURT:  Right.  Thanks.
13   Q.   (By Ms. Berkower)  Did you ask him about this gas
14   can?
15   A.   Yes.
16   Q.   Could you explain how that part of your conversation
17   went?
18   A.   We were actually on the porch literally standing
19   right next to it and one of the questions we asked was
20   what's going on with all this stuff?  What's going on with
21   this gas can on your porch?
22   Q.   What did he say?
23   A.   He said that he had recently cleaned out his
24   basement.  His mom asked him to, and that the gas can was
25   a mix of gasoline and some other oil.
```

1    Q.   Now the can on that porch is red.  Did you ask him

2    about a yellow gas can?

3    A.   I did.

4    Q.   What specifically did you ask him about a yellow fuel

5    container?

6    A.   We were interested if he had had a yellow gas can.

7    Q.   What did he say?

8    A.   He didn't.

9    Q.   Did you explicitly ask him?

10   A.   Yes.

11   Q.   What was the question you asked him?

12   A.   Do you have a yellow gas can?

13   Q.   What was his answer?

14   A.   Oh, yellow -- I probably said a gas can.  Technically

15   it's a fuel can, but.

16   Q.   What was his answer?

17   A.   He answer was he didn't.

18   Q.   Did you ask him more broadly about his familiarity

19   with a yellow fuel can?

20   A.   So we wanted to know if he had ever owned a yellow

21   fuel can.

22   Q.   What did he say?

23   A.   No.

24   Q.   Did you go even more broadly than that?

25   A.   Yes.  Did your parents ever own a fuel can that was

1    yellow.

2    Q.   What was his response?

3    A.   No.

4    Q.   After you asked him those questions about the yellow

5    fuel can, did you show him a picture?

6    A.   Yes.

7            MS. BERKOWER:  If we can go to Government's

8    Exhibit 72, page 2?

9    Q.   (By Ms. Berkower)  Did you show him this picture?

10   A.   Yes.

11           MS. BERKOWER:  Can we go to page 3, please?

12   Q.   (By Ms. Berkower) Did you show him this picture?

13   A.   Well, those are technically two pictures but I did

14   show him both of those pictures.

15   Q.   What did you tell him or ask him about these

16   pictures?

17   A.   Well, I asked him if he was familiar with this gas

18   can.

19   Q.   What did he say?

20   A.   No.

21   Q.   Did you tell him anything about the yellow can in

22   those photos?

23   A.   Yes.

24   Q.   What did you tell him?

25   A.   I said his blood was found on the handle of that

```
1    yellow gas can.
2    Q.    What did he say?
3    A.    He said, "I don't have any idea how my blood could
4    have gotten there."
5    Q.    Now you did ask him more questions about how his
6    blood could have gotten on the handle?
7    A.    Yes.
8    Q.    What did you ask him?
9    A.    We first off told him this was important and we
10   wanted him to think about it.  He said he has no idea how
11   his blood could have gotten there.  I then allowed him --
12   I suggested to him, is there any possible way the blood
13   could have gotten there.
14   Q.    What did he say?
15   A.    He said there's not.
16   Q.    Did you suggest any particular ways in which his
17   blood could have gotten there?
18   A.    Yes.
19   Q.    What particular way did you suggest his blood may
20   gotten on there?
21   A.    I said, do you do a lot of work in people's houses?
22   Is it possible that you could have been at someone's
23   house, your hand could have been bleeding and you could
24   have picked up or touched someone's gas can and your blood
25   could have gotten on it.
```

1    Q.   What did he say to that?

2    A.   He said, "That's not possible."

3    Q.   Now at some point in the interview did you talk to

4    the defendant about his drug use?

5    A.   Yes.

6    Q.   During the interview did he seem open to talking

7    about this?

8    A.   Yes.

9    Q.   What drugs did he tell you he used?

10   A.   He said his drug of choice is heroin.  He also used

11   crack cocaine.

12   Q.   When you first asked him about his drug use, what did

13   he say about how recently he had used?

14   A.   He hadn't used in a month.

15   Q.   Later on did he change his answer to that?

16   A.   Yes.

17   Q.   What did he say?

18   A.   He said he last used two weeks ago.

19   Q.   And then later on in your conversation, did he change

20   his answer again?

21   A.   Yes.

22   Q.   What did he say?

23   A.   I asked him if he was willing to take a drug test.

24   He said that he was but that he would fail it because he

25   had scraped the bottom of the bag the previous night.

1    Q.   Now when he said that to you, did it raise any
2    concerns for you as to whether he was impaired during your
3    conversation with him?
4    A.   Yes.
5    Q.   Did you ask him about that?
6    A.   I did.
7    Q.   What did he tell you?
8    A.   I asked him are you -- have you taken any drugs this
9    morning.
10   Q.   What was his answer?
11   A.   He said that he had taken Methadone.
12   Q.   Based on that, did you ask follow-up questions?
13   A.   I did.
14   Q.   What did you ask him?
15   A.   I asked him was he impaired in any way.
16   Q.   What did he say?
17   A.   He said no.
18   Q.   Now, you're standing there watching him.  Did you
19   observe anything indicating that he was impaired?
20   A.   I did not.
21   Q.   As this conversation continued with him, did you ask
22   him about his whereabouts on the morning of April 2nd of
23   this year?
24   A.   Yes.
25   Q.   What did he tell you about that?

1  A.   He told me that he had not left his house in two
2  weeks.
3  Q.   Could you explain sort of how that piece of the
4  conversation came about so that we can understand how this
5  exchange occurred between you?
6  A.   Yeah.  I mean, I said to him, you know, we're
7  interested in what happened on April 2nd.  Can you explain
8  where were you?  And he said, no, I have not been out of
9  the house for two weeks.  He said that he remembers that
10  because he used to go pick up Methadone every day and he
11  hasn't had to do that because they've been giving him
12  multi-packs.  I guess it's relevant that this is right at
13  the beginning of COVID so people are starting to change
14  how they handle the virus.
15  Q.   When you first started talking to him, did you
16  anticipate talking to him so much about his drug use?
17  A.   No.  That was not why we were there.
18  Q.   As the interview progressed, did that topic come more
19  than once?
20  A.   Frequently.
21  Q.   Did you discuss with him how drugs affect his state
22  of mind?
23  A.   I mean with regard to if he was impaired in any way,
24  we did.
25  Q.   Did you also talk -- did he mention an incident --

1           MS. O'NEILL-GREENBERG:  Objection.

2           THE COURT:  The objection is?  Do you want a

3   sidebar?

4           MS. O'NEILL-GREENBERG:  Yes.

5   (Sidebar conference.)

6           THE COURT:  Okay.

7           MS. O'NEILL-GREENBERG:  So I believe what this

8   witness is going is to talk about is a prior bad act where

9   he had told the Chicopee police some months ago that he

10  had believed someone was breaking into his van and called

11  the police.

12     He talked about being on Xanax and thinking that a

13  bunch of people had broken into his van that evening.  So

14  this is a prior bad act.  They're trying to use it as

15  propensity evidence to show that this strange incident

16  happened.  I think it was over a month earlier.

17          THE COURT:  What's the -- it's a bad act because

18  he lied about the breaking into the van?

19          MS. O'NEILL-GREENBERG:  It depicts him in the

20  hotel with a prostitute having some sort of conflict with

21  that person and some other perceived people that he was in

22  a fight with or maybe he thought was breaking into his

23  van.

24          THE COURT:  Okay.  Government?

25          MS. BERKOWER:  Your Honor, we were not intending

based on the court's order prohibiting discussion of that,
we were not intending to elicit any of those details.  But
rather, during this interview the defendant mentioned that
he had taken a lot of drugs that evening and he was high
out of his mind and was so impaired he did not remember
what he was doing.  That was the only part of the incident
that I was planning to elicit with the witness.

I'm happy to lead the witness but it's our
understanding that the court ruled that his state of mind
with regard to drug use and the time leading up to this
offense, this incident was ten days before the offense, is
relevant.  So I'm happy to lead the witness just to limit
it to that exchange without getting into the details of
the underlying event.

THE COURT:  So it would be ten days prior he had
some type of conversation with law enforcement during
which he was under the influence and had some difficulty
kind of keeping his thoughts together and conveying those
thoughts because of the drugs?

MS. BERKOWER:  I think the way I would ask the
question is did you discuss with him how drugs affect his
state of mind generally and did he relay an incident to
you in which ten days earlier he had been on a cocktail of
drugs that rendered him so high that he didn't remember
what he was doing and just leave it at that.

1           THE COURT:  Okay.  So the mention of the police

2      being involved in that conversation, you don't need to

3      mention the word police?

4           MS. BERKOWER:  Correct.

5           THE COURT:  Okay.  I'm going to overrule the

6      objection.

7      (End of sidebar conference.)

8      Q.   (By Ms. Berkower)  Special Agent McGonigle, during

9      this interview did you discuss with the defendant how

10     drugs generally affect his state of mind?

11     A.   Yes.

12     Q.   Did he -- during that part of the conversation, did

13     he tell you that ten days earlier --

14          MS. O'NEILL-GREENBERG:  Objection.

15          THE COURT:  Overruled.  Go ahead.

16     Q.   (By Ms. Berkower)  During that part of the

17     conversation did he tell you that ten days earlier he had

18     taken a cocktail of drugs and was so high that he did not

19     remember what he was doing?

20     A.   He did tell me that.

21     Q.   Now did you ask him, after you learned that from him,

22     did you ask him whether drugs may have impacted his state

23     of mind in the same way on April 2nd?

24     A.   Yes.  I asked him if it was possible that he had

25     placed this device on the JGS campus and that he was so

1   intoxicated that he could not remember.

2   Q.   What did he say to that?

3   A.   He said it wasn't possible.

4   Q.   Can you repeat that?  I think -- just the last bit of

5   that.  I didn't hear what you said.

6   A.   He said -- I asked him if it was possible that he had

7   placed the device on the JGS campus but was so intoxicated

8   that he couldn't remember it.

9   Q.   How did he answer?

10  A.   He said that that was not possible.

11  Q.   Okay.  So let's take a step back a moment from your

12  interview with the defendant.

13       When you got to 20 Lori Lane, were there cars parked

14  in the driveway?

15  A.   There were.

16  Q.   What cars were parked there?

17  A.   There were three cars:  A red sedan, a gray SUV, and

18  a blue work van.

19            MS. BERKOWER:  Now if we could have Government's

20  Exhibit 105 please and go to page 3 of that exhibit?

21  Q.   (By Ms. Berkower) Does that exhibit --

22            MS. BERKOWER:  And I think this is in evidence

23  so we can publish to the jury.

24  Q.   (By Ms. Berkower)  Does this exhibit show the cars

25  you just described?

```
 1    A.    Yes.
 2    Q.    When you went to the house that day, did you plan to
 3    search these cars?
 4    A.    Yes.
 5    Q.    Why?
 6    A.    We were looking for evidence that the defendant may
 7    have transported the device in one of these cars.
 8    Q.    Because of that, were you looking for blood?
 9    A.    We were looking for blood.
10    Q.    Were you looking for --
11              MS. O'NEILL-GREENBERG:  Objection.
12              THE COURT:  Basis?
13              MS. O'NEILL-GREENBERG:  The form of the
14    question.
15              THE COURT:  Sustained.  Rephrase the question in
16    a non-leading way.
17    Q.    (By Ms. Berkower)  What, if anything, forensically
18    were you looking for in these cars?
19    A.    I was looking for blood.
20    Q.    Why were you looking for blood?
21    A.    Because the device had blood on it and that it was
22    possible that one of these cars would also have blood in
23    it.
24    Q.    And what about the blood on the device made you think
25    there may have been blood in the car?
```

1    A.   It appeared that the defendant was bleeding a lot.

2    We believed it was possible that there would be traces of

3    blood in one of these cars.

4    Q.   Were you also looking for evidence relating to the

5    pamphlet?

6    A.   Yes.

7    Q.   Why?

8    A.   The pamphlet -- and I don't know if counsel wants to

9    show it -- but it was ripped out and there were parts of

10   the pages which were -- there was a part of the page which

11   appeared not to have been ripped out with the rest of the

12   pamphlets.  It also did not appear to be a complete

13   pamphlet.  We believed it was possible that part of the

14   pamphlet may have been in one of these cars.

15   Q.   Before you got to the house, did you plan to search

16   the cars on site or did you plan to take them to a

17   different location?

18   A.   We intended to search one of the cars off-site to do

19   a more thorough examination.

20   Q.   Which cars were you going to search onsite and which

21   were you going to impound and take to a different

22   location?

23   A.   We were going to search the red sedan and the silver

24   SUV onsite, and we were going to take the defendant's blue

25   work van and search it off-site.

1    Q.   Why were you going to leave the cars, the red car and
2    the silver car, onsite and only take the blue van?
3    A.   Because we believe the defendant was driving the blue
4    van on April 2nd.
5    Q.   Why did you think that?
6    A.   It was a work van that he used frequently, and during
7    the course of the interview he also suggested to us that
8    that was his car.
9    Q.   So did that decision to only take the defendant's car
10   involve an assumption on your part about who drove what
11   cars?
12   A.   It did.
13   Q.   Now when you talked to the defendant that day, did
14   you ask him about the cars shown in this picture?
15   A.   I did.
16   Q.   What did you ask him?
17   A.   Well, I directed him to his car and asked if it was
18   his and what we would find in it.
19   Q.   What did he say?
20   A.   A bunch of tools, basically just find work tools in
21   it.
22   Q.   Now during the search at 20 Lori Lane, did you and
23   the other agents at the house get information as to who
24   used the other two cars shown in that picture?
25   A.   Yes.

1    Q.    What information did you get?

2    A.    That the defendant's daughter Natalie drove the red

3    car and the defendant's mother Sheila drove the SUV.

4    Q.    As you talked to the defendant, did he give you any

5    indication that he used the red car or the silver car?

6    A.    No.

7    Q.    Now based on the information that you knew ahead and

8    that you got that day, what decisions did you make about

9    searching the three cars?

10   A.    We decided that we would search two of the cars

11   onsite, get them done quickly, and allow the family to

12   either sit in the cars to stay warm or to leave if they

13   would care to, and we were going to take the blue van and

14   search it off-site.

15             THE COURT:  Can you hold on one second?

16         Do you want to take a break and get some water?

17             A JUROR:  If I can?

18             THE COURT:  Absolutely.  Why don't we take five

19   minutes to get a drink of water.

20         The same rules apply.  Okay?  The same instructions

21   as always when you leave the courtroom as a group.  Take a

22   break.  Get a drink of water and come back in five to ten

23   minutes.  I'll have Jarrett check with you and see when

24   everyone is ready to come back in.

25             THE CLERK:  All rise for the jury.

1    **(The jury left at 3:09.)**

2              THE COURT:  So five or ten minutes.

3         So the record is clear, the juror was having a

4    continual problem coughing and/or sneezing.  I couldn't

5    tell which but it was obviously distracting to her and

6    everyone kept looking over.  Every time the poor woman

7    coughed or sneezed, everyone stared at her so we'll give

8    her a break to get that together.  All right.

9    **(A recess was taken at 3:10 until 3:20.)**

10   **(Mr. Rathbun is present.)**

11             THE COURT:  Was everyone able to follow my

12   instructions during that break no conversations?  No

13   investigating this case?  No internet access or reading of

14   articles?  All the instructions as usual?

15        All right.  Affirmative responses from all jurors,

16   they remain fair and impartial.

17        Okay.  Go right ahead.

18             MS. BERKOWER:  Thank you, Your Honor.

19   Q.   (By Ms. Berkower) Special Agent McGonigle, before the

20   break we were talking about the search of the defendant,

21   the cars that were at Lori Lane the day of your search.

22   Do you remember speaking about that?

23   A.   I do.

24   Q.   So you said that the FBI impounded the defendant's

25   van for further searching?

1    A.    Yes.

2    Q.    But the other cars were searched onsite?

3    A.    That's right.

4          MS. BERKOWER:   If we could have Government's

5    Exhibit 73 in evidence for the court, counsel, the witness

6    and the jury?

7          Thank you.

8    Q.    (By Ms. Berkower)   So do you recognize what's in

9    Government's Exhibit 73?

10   A.    Yes.

11   Q.    What is it?

12   A.    That's the defendant's mother's car.

13   Q.    So were those searches taken -- was that a photo

14   taken outside on April 15th?

15   A.    I believe so, yes.

16          MS. BERKOWER:   And if we could go to the next

17   page of that exhibit only?

18   Q.    (By Ms. Berkower)   Do you recognize what's in that

19   photo?

20   A.    Yes.

21   Q.    What is that?

22   A.    Those are door hangers, religious door hangers.

23   Q.    Where were those found?

24   A.    In the trunk of the defendant's mother's SUV.

25   Q.    Now, was there a search for blood in this car?

1    A.    No.

2    Q.    Why not?

3    A.    We had no reason to believe the defendant was driving

4    it on April 2nd.

5    Q.    At that time you mean?

6    A.    At that time.

7    Q.    And as a result, where was the search of this car

8    completed?

9    A.    In the driveway.

10   Q.    Now did the warrant authorize you to take the car for

11   further searches?

12   A.    Yes.

13   Q.    Did you do that?

14   A.    No.

15   Q.    Why not?

16   A.    We only -- first off, as a matter of courtesy, we

17   didn't want to take cars that we didn't need to take.  And

18   we didn't have any reason to believe we'd find any

19   additional evidence in that car had we took it and

20   searched it.

21   Q.    Now to be clear, did you ask the defendant if he had

22   been out of the house on the morning of April 2nd?

23   A.    I did.

24   Q.    What did he say?

25   A.    He said he had not been out of the house in two

1    weeks.

2    Q.    Did he give any indication that he had been out of

3    the house in his mother's car?

4    A.    No indication that he did that.

5    Q.    And if he had, what would you have done?

6    A.    We would have taken that car.  We would have

7    impounded it and we would have searched it for blood.

8    Q.    So let's go back to your conversation with the

9    defendant again.

10        You mentioned that earlier when you went to the

11   house, you were also looking for evidence relating to the

12   pamphlet?

13   A.    Yes.

14   Q.    During the time you were at the house, did you walk

15   through it?

16   A.    I walked through the first floor.

17   Q.    And before you went in, did other agents tell you

18   material they had found in the house?

19   A.    They did.

20   Q.    What did they tell you they had found?

21   A.    They found religious documents and literature.

22             MS. BERKOWER:  If I could show -- if we could

23   please have, Ms. McKenna, Government's Exhibit 56, PX-56,

24   in evidence?

25        That's in evidence so it can be shown.  Thank you.

1    Q.    (By Ms. Berkower)   Did you see this inside the house?

2    A.    Yes.

3    Q.    Is this one of the pieces of religious material that

4    you were just referring to?

5    A.    Yes, it is.

6    Q.    Did the FBI find other religious material in other

7    parts of the house?

8    A.    Yes.

9    Q.    Where in the house were those materials found?

10   A.    There's some found in the basement and some found in

11   the kitchen.

12   Q.    Now after you became aware of these materials, did

13   you talk to the defendant about his involvement with

14   religion?

15   A.    Yes.

16   Q.    What did he tell you?

17   A.    He told me that he was not personally religious but

18   that his parents were involved in the church.

19   Q.    Did he tell you the name of that church?

20   A.    He said it was Heritage Baptist Church.

21   Q.    Did he give you anymore information about the

22   Heritage Church?

23   A.    He recited the address of Heritage Baptist to me.

24   Q.    Now, did you ask him about religious pamphlets?

25   A.    Yes.

```
1    Q.   What did you ask him about religious pamphlets?
2    A.   I was referring to the religious pamphlet as just
3    that, religious pamphlets, and the defendant told me that
4    they were actually called tracts.
5    Q.   Did you know that word before he told you?
6    A.   I was not familiar with that term.
7    Q.   Did he explain what he meant?
8    A.   They're essentially just religious pamphlets, but I
9    guess they have a specific -- they contain certain
10   religious scripture in them.  I'm honestly not totally
11   sure how they're different.  They're really just
12   pamphlets.
13   Q.   The word he used was tract?
14   A.   That's right.
15   Q.   What did he say about religious tracts?
16   A.   That his family, specifically his mother, passed them
17   out and that his mother and/or father had created their
18   own at some point.
19   Q.   Now did you ask him for more details about those
20   tracts?
21   A.   Yes.
22             MS. O'NEILL-GREENBERG:  Objection.
23             THE COURT:  I don't know where it's -- I'll let
24   you have this one.  Go ahead.  Overruled.
25             MS. BERKOWER:  Well, I'll move on.
```

```
 1              THE COURT:  Okay.  So the question is withdrawn?
 2              MS. BERKOWER:  I will withdraw that question,
 3    yes, Your Honor, and move on.
 4              THE COURT:  All right.
 5    Q.   (By Ms. Berkower)  After the defendant told you about
 6    the Heritage Church and gave you the address and mentioned
 7    -- used the word tract with you, what did you do?
 8    A.   I contacted some -- so half of our agents were not
 9    allowed to be on site because of COVID restrictions, and I
10    contacted those agents and asked them to go to Heritage
11    Baptist Church and see if they could find the pamphlet.
12    Q.   Did they find the pamphlet that matched the wick of
13    the device?
14    A.   No.
15    Q.   Now at that point had you talked specifically about
16    the wick of the device with the defendant?
17    A.   No.
18    Q.   At this point did you bring it up?
19    A.   I did bring it up at the conclusion, yes, towards the
20    end.
21    Q.   Sorry.  Finish your answer.  I didn't mean to
22    interrupt.
23    A.   I brought up the religious pamphlet at the end of the
24    interview.
25    Q.   So what did you say to bring it up?
```

1   A.   Well, I asked him if he could explain how his blood

2   got on multiple pages of a religious pamphlet.

3   Q.   And how did he respond?

4   A.   That he could not explain it.

5   Q.   Did you show him photographs of what you were talking

6   about?

7   A.   Yes.

8           MS. BERKOWER:  If we could have Government's

9   Exhibit 72, which is already in evidence please?  Going to

10  page 6, then 7, 8, and 9.  If you can just display those

11  in order.

12          That's page 6, 7, 8, and 9.

13  Q.   (By Ms. Berkower)  Are those the photographs you

14  showed him?

15  A.   Yes.

16  Q.   How did he respond when you showed him those

17  photographs?

18  A.   He stopped talking to us.  He sort of stepped back.

19  He sat down on the step.  He put his hand in his head or

20  his head in his hands, and at some point after that he

21  said that he felt like he was going to start crying.

22  Q.   Now before he saw those photos, how had he been

23  acting?

24  A.   He was convinced that we were all going to work this

25  out.  That we were going to figure out how his blood got

1    on the device, the fuel can.

2    Q.   Was he still actively engaging with you?

3    A.   Prior to seeing these photos he was.

4    Q.   After he saw the photos, how much did his demeanor

5    change?

6    A.   It changed significantly.

7    Q.   Could you explain what you mean when you say it

8    changed significantly?

9    A.   He was almost joking with us at some points.  There

10   was one situation where Detective Chaplin walked away from

11   him and he had said, "Hey, where are you going?  I thought

12   we were having a fun conversation here."

13        He continuously said, you know, we're going to figure

14   this out.  He was asking when I would walk away, where I

15   was going; what I was doing.  And after we spoke about

16   these pamphlets, he was done talking to us.

17   Q.   When you say he was done talking to you, did he

18   expressly tell you that?

19   A.   He affirmatively told me he didn't want to talk to me

20   anymore.

21   Q.   After that, did you talk to him any more?

22   A.   No.

23   Q.   So let's talk a little bit more about some of the

24   other observations you made at 20 Lori Lane that day.

25        You said a moment ago you went into the house, right?

1    A.   I did.

2    Q.   In addition to that, did you walk around the

3    property?

4    A.   Yes.

5    Q.   Were there any outbuildings on the property?

6    A.   There was a shed.

7    Q.   Did you search the shed?

8    A.   I personally didn't search the shed.  I viewed the

9    shed though.

10   Q.   Was there anything of significance to you in the

11   shed?

12   A.   There was.

13          MS. BERKOWER:  If we could have Government's

14   Exhibit 67 for the court, counsel, and the witness only

15   please?

16          I think we still have the TV on.  Thank you.

17   Q.   (By Ms. Berkower)  Special Agent McGonigle, do you

18   recognize this photo?

19   A.   Yes.

20   Q.   And what is it?

21   A.   It's a picture of the shed located at 20 Lori Lane.

22          MS. BERKOWER:  Actually we'll do these in a

23   batch.  So if you could also show the witness Exhibit 68

24   please and 69 and 70 please?

25   Q.   (By Ms. Berkower) Special Agent McGonigle, do you

1    recognize all of those exhibits that were just displayed

2    on the screen for you?

3    A.    I do.

4    Q.    What are all of those exhibits?

5    A.    Those are pictures from inside the shed located at 20

6    Lori Lane.

7    Q.    Are those accurate photographs of the shed as you saw

8    it that day?

9    A.    Yes.

10             MS. BERKOWER:   I would ask to admit Government's

11   Exhibit PX-67, 68, 69, and 70.

12              MS. O'NEILL-GREENBERG:   No objection.

13             THE COURT:   No objection; those will be

14   admitted.

15   **(PX-67, PX-68, PX-69 and PX 70 were admitted.)**

16             MS. BERKOWER:   Can I publish them as we go?

17             THE COURT:   Yes.

18   Q.   (By Ms. Berkower)  Let's start with 67 please.  Could

19   you describe what you see here?

20   A.    So that's the entrance to the shed and it has two red

21   gas cans right at the entrance.

22   Q.    Were those of significance to you?

23   A.    They were.

24   Q.    Why?

25   A.    Well, first off, there was fuel in one of them, but

1    also this gas can or fuel can was the device that was

2    placed at JGS and it was part of the evidence that we were

3    looking for.

4    Q.    And did you take samples of the liquid that was in

5    one of those cans?

6    A.    Yes.

7    Q.    Was it later processed by the Massachusetts State

8    Crime Laboratory?

9    A.    It was.

10   Q.    Now, going on to 68 if we could.  What does 68 show?

11   A.    That shows two different gas cans, one without a

12   nozzle on it and one with a nozzle on it.

13   Q.    So the one on the left -- which one are you saying --

14   which one is the missing the nozzle?

15   A.    The one on the left is missing a nozzle.  The one on

16   the right has a black nozzle.

17              MS. BERKOWER:  Going on to Government's Exhibit

18   69, please, and if we could actually have Government's

19   Exhibit 70, please?

20   Q.    (By Ms. Berkower) Could you explain what you see in

21   Government's Exhibit 70?

22   A.    There's another gas can.

23   Q.    Where was that can located?

24   A.    Also in the shed at 20 Lori Lane.

25   Q.    Does that gas can have a nozzle on it?

```
 1    A.    It doesn't.
 2    Q.    Now before we go to a different area, let's talk
 3    about one more thing you did at Lori Lane that day.
 4          You said that you went into the house, right?
 5    A.    I did.
 6    Q.    While you're inside, did you see any computers?
 7    A.    I did.
 8    Q.    Where did you see a computer?
 9    A.    In the living room.
10          MS. BERKOWER:  If we could have Government's
11    Exhibit 63 for the court, counsel, and the witness only,
12    please?
13    Q.    (By Ms. Berkower) Do you recognize what this is?
14    A.    I do.
15    Q.    What is it?
16    A.    That's the defendant's mother's computer.
17    Q.    And is that an accurate picture of what it looked
18    like the day that you saw it?
19    A.    It is.
20          MS. BERKOWER:  Your Honor, I'd ask to admit
21    Government's Exhibit 63, please.
22          MS. O'NEILL-GREENBERG:  No objection.
23          THE COURT:  All right.  That will be admitted.
24    (PX-63 was admitted.)
25          MS. BERKOWER:  May we publish it to the jury,
```

1    please?

2             THE COURT:  Yes.

3    Q.   (By Ms. Berkower)  So you said that was the

4    defendant's mother computer?

5    A.   That is correct.

6    Q.   How did you figure that out?

7    A.   I believed that she identified it as her computer to

8    other agents.

9    Q.   Now was the laptop seized by the FBI?

10   A.   It was.

11   Q.   And did you later examine a digital copy of it?

12   A.   I did.

13   Q.   At the time that the laptop was seized, did you know

14   where the pamphlet pages found in the device had come

15   from?

16   A.   No.

17   Q.   And initially did you look for them on this laptop?

18   A.   I did.

19   Q.   Did you find them there?

20   A.   No.

21   Q.   Later on, in your investigation did you learn where

22   the pamphlet pages came from?

23   A.   I did.

24   Q.   Where did they come from?

25   A.   The Billy Graham Association or the Billy Graham

```
 1    Evangelical Association.

 2              MS. BERKOWER:  If we could have Government's

 3    Exhibit 4?

 4    Q.   (By Ms. Berkower)  I'm holding up Government's

 5    Exhibit 4.  Is this the source of those pages?

 6    A.   It is.

 7              MS. BERKOWER:  And if we could also have

 8    Government's Exhibit 54, please?

 9    Q.   (By Ms. Berkower) Is that a digital copy of the same

10    thing?

11    A.   Yes.

12    Q.   So let's focus now on the Billy Graham Evangelistic

13    Association.

14         In connection with your investigation into the

15    pamphlet, what, if anything, did you learn during your

16    investigation about their activities in western

17    Massachusetts?

18    A.   The Billy Graham Evangelical Association held a

19    series of events in the Northeast.  They called it the

20    Decision America Northeast Tour.  To support that tour,

21    they held a number of events prior to the tour or prior to

22    Franklin Graham coming and speaking, and during those

23    events local churches and clergy would get involved in

24    trying to promote the tour and get other people from their

25    churches involved.
```

```
1              MS. O'NEILL-GREENBERG:  Objection.

2              THE COURT:  And the objection is?

3              MS. O'NEILL-GREENBERG:  This has already been

4    testified to.

5              THE COURT:  It has been.  I'll let it go.

6    Overruled.  You can go ahead.

7              MS. BERKOWER:  We'll move on from that.

8              THE COURT:  All right.

9    Q.   (By Ms. Berkower)  After you learned about the

10   Decision America Tour in 2019, did you look again at the

11   defendant's mother's laptop?

12   A.   I did.

13   Q.   And this time what were you looking for?

14   A.   I was looking to see if she was involved with the

15   tour or the lead up to the tour.

16             MS. BERKOWER:  Now if we could have Government's

17   Exhibit 88 for the court, counsel, and the witness only,

18   please?

19   Q.   (By Ms. Berkower) Special Agent McGonigle, do you

20   recognize Government's Exhibit 88?

21   A.   I do.

22   Q.   What is it?

23   A.   That is a flyer for the Decision America Northeast

24   Tour.

25             MS. BERKOWER:  If you could scroll through the
```

1    pages of that exhibit for the witness please, Ms. McKenna?

2    Q.    (By Ms. Berkower)  Do you recognize the other pages

3    of the exhibit?

4    A.    I do.

5    Q.    What are they?

6    A.    They are additional pages that were found on the

7    defendant's mother computer, but specifically they're

8    documents that relate to the organization of the Decision

9    North America -- Decision America Northeast Tour.

10   Q.    How did you find these documents?

11   A.    So when the FBI seizes a computer, we bring the

12   computer to our RCFL, which is our computer analyst.  They

13   take an image of the computer and they allow the agent to

14   access a digital copy of the computer from their actual

15   desktop.  So when we're searching a computer, we do not

16   ever open the computer and click through it.  We only look

17   through an image of that computer.

18   Q.    And in this case how did you get the image of the

19   computer?

20   A.    Dustin Wong, who is a member of the RCFL, provided me

21   with access to the image of Sheila Rathbun's computer or

22   laptop.

23   Q.    Are the pages in Government's Exhibit 88 accurate

24   copies of material you found on the defendant's mother's

25   laptop -- the image of the defendant's mother's laptop?

A.   Yes.

            MS. BERKOWER:  Your Honor, I'd ask to admit
Government's Exhibit 88.

            MS. O'NEILL-GREENBERG:  We have an objection
subject to our last objection.

            THE COURT:  Why don't you just tell me again.

            MS. O'NEILL-GREENBERG:  Sure.  This has already
been testified to.

            THE COURT:  Okay.  So that it's just cumulative?

            MS. O'NEILL-GREENBERG:  And we have a prior
motion in limine about it.

            THE COURT:  All right.  WisperTech please;
sidebar.

(Sidebar conference.)

            MR. WATKINS:  Judge, we are renewing the motion
in limine which was docket entry 75.  The court has
already ruled on it, but again the First Circuit tells us
that we have to object when the evidence comes in at trial
as well.  So I recognize the court's already ruled but we
are simply preserving the objection.

            THE COURT:  Okay.  I understand.  So this is
coming in under my previous ruling regarding access to
availability.

            MR. WATKINS:  Exactly.

            MS. BERKOWER:  Yes, judge.  That's the purpose

1    for which it's being offered.

2              THE COURT:  The objection is preserved.  Thank

3    you for making the record clear.  All right.

4    (End of sidebar conference.)

5              THE COURT:  Overruled.  You can continue.

6              MS. BERKOWER:  I'd ask to admit Government's

7    Exhibit 88 at this time.

8              THE COURT:  Admitted.  You can publish it.

9              MS. BERKOWER:  Thank you, Your Honor.

10   **(PX-88 was admitted.)**

11             MS. BERKOWER:  So if we could go to, Ms.

12   McKenna, please, let's start with page 4 of this exhibit?

13   Q.   (By Ms. Berkower)  Special Agent McGonigle, could you

14   please explain what is on this page of the exhibit?

15   A.   So when I went into the account, I wanted to take a

16   -- or I did take a screenshot of the names of the

17   documents that were on the computer.

18   Q.   And which documents did you make a screenshot of?

19   A.   Well, exactly what you see here is what I took the

20   screenshot of, but I was particularly interested in

21   capturing the documents that have stars next to them.

22   Q.   Were those materials that related to the Decision

23   America Tour?

24   A.   They were.

25   Q.   Specifically the event held in Springfield in 2019?

1    A.   That's right.

2    Q.   So directing your attention to the item with number

3    43 on the left-hand side, could you please read the file

4    name for that document?

5    A.   Graham Flyer.

6    Q.   And when was it last modified?

7    A.   The last access you're asking for?

8    Q.   Well, if you can go to the main part of the exhibit,

9    if you look at the top row, the third column in, I believe

10   it's -- if you can read that?

11   A.   So February 16, 2019.

12   Q.   Yes.  What date is that according to the screenshot

13   that you took?

14   A.   February 16, 2019.

15   Q.   What happened on that day according to the

16   screenshot?

17   A.   The file was created I believe.

18   Q.   So did you open that document?

19   A.   I did.

20          MS. BERKOWER:  If we could go to page 1 of the

21   exhibit?

22   Q.   (By Ms. Berkower)  Was this that document that you

23   just referenced?

24   A.   Yes.

25   Q.   Now, going back to page 4 of the exhibit and

```
 1    directing your attention to the item with number 62 next
 2    to it, what is the file name for that item?
 3    A.    The same; it's Graham Flyer.
 4    Q.    Now going back to page 1 of the exhibit, is that what
 5    that file was?
 6    A.    Yes.
 7    Q.    Directing your attention to the text box of this,
 8    could you please read starting with the second sentence of
 9    the flyer?
10    A.    "Come enjoy fellowship and refreshments, and hear the
11    heart behind the tour from Steve Rhoads, vice president at
12    Billy Graham Evangelistic Association.  You will also
13    learn -- you will also learn about the upcoming city
14    schedule and ways you and your church can get involved to
15    reach lost people in your community."
16    Q.    What was the date of this event that the flyer was
17    advertising?
18    A.    March 5, 2019.
19    Q.    Now in connection with this case, did you meet Steve
20    Rhoads the vice president at the Billy Graham Evangelistic
21    Association?
22    A.    I did.
23    Q.    Do you know if he testified here in this case?
24    A.    He did.
25    Q.    Going back to page 4 of the exhibit and directing
```

1    your attention to the item with number 23 next to it,

2    could you please read the file name for that document?

3    A.   HBC Meeting for Franklin Graham, 2-21-19.

4           MS. BERKOWER:   If we could go to pages 2 and 3

5    of this exhibit?

6    Q.   (By Ms. Berkower) What is pages 2 and 3?

7    A.   It's a list of names, email addresses, and some

8    physical addresses.

9    Q.   Are those -- is that the file that's associated with

10   item number 23 that you just read the file name for?

11   A.   Yes, the HBC meeting.  This is the file that was

12   opened, the HBC meeting.

13   Q.   Now when you saw those documents, what steps did you

14   take -- well, did they impact your investigation?

15   A.   They did.

16   Q.   What steps did you take in light of this information

17   that you found on the defendant's mother's laptop?

18   A.   Can you repeat the question?

19   Q.   Well, did you take additional investigative steps

20   after you found this information on the defendant's

21   mother's laptop?

22   A.   Yes.

23   Q.   Did that include contacting the Billy Graham

24   Evangelistic Association?

25   A.   Yes, it did.

1    Q.   Did you have them search their files?

2    A.   I did.

3    Q.   And what did they find?

4    A.   So they found that the defendant's parents were

5    present at the culmination event where Franklin Graham

6    spoke at the Big E in West Springfield.

7    Q.   Now, you mentioned that during your investigation you

8    were able to determine that the wick came from the Steps

9    to Peace With God pamphlet.  Is that Government's Exhibit

10   4?

11   A.   That's right.

12   Q.   Let's move to a different area.

13        How far into your investigation into this device at

14   JGS were you when you went to the defendant's house for

15   the search and talk to him?

16   A.   Less than two weeks into the investigation.

17   Q.   As you continued to investigate the case, did you

18   learn other evidence that contradicted what the defendant

19   had told you that day?

20   A.   Yes.

21   Q.   So let's turn to some of that evidence now.

22        Now you testified earlier that you asked the

23   defendant about his familiarity with Converse Street,

24   right?

25   A.   I did.

1   Q.   Did that include the location where the device was

2   placed at JGS?

3   A.   It did.

4   Q.   And what did he say when you asked him about that

5   area of Converse street?

6   A.   Not familiar.

7              MS. O'NEILL-GREENBERG:  Objection.  This has

8   already been asked and answered a few times.

9              THE COURT:  It has been asked and answered.  It

10  has.  Good point.  Sustained.  All right.

11  Q.   (By Ms. Berkower) As you investigated the case, did

12  you learn information that caused you to question what the

13  defendant told you during his interview?

14  A.   Yes.

15  Q.   In June of this year, did you receive a phone call

16  from someone who knew the defendant's mother?

17  A.   Yes.

18  Q.   What did you learn from that phone call?

19  A.   That individual told me that the defendant's mother

20  --

21              MS. O'NEILL-GREENBERG:  Objection, Your Honor.

22              THE COURT:  Sustained.

23              MS. BERKOWER:  Your Honor, may I actually say

24  this is purely for the fact it was said to explain the

25  witness's next steps in the investigation rather than

1    being offered for the truth of the matter asserted?

2              THE COURT:  All right.  Okay.  Go ahead.

3    Overruled.  I will instruct the jury after that.  Go

4    ahead.

5    Q.   (By Ms. Berkower)  So in June of this year, did you

6    receive a phone call from someone who knew the defendant's

7    mother?

8    A.   Yes.

9    Q.   What did you learn from that phone call?

10   A.   That individual told me that the defendant's mother

11   managed Genesis House and that the defendant's grandmother

12   lived at Genesis House.

13   Q.   Now, prior to that phone call had you made that

14   connection, any connection between Genesis House and the

15   defendant?

16   A.   No.

17   Q.   Based on that phone call, did you investigate

18   connections between the defendant and Genesis House?

19   A.   Yes.

20             THE COURT:  Okay.  Ladies and gentlemen, the

21   question about what did this person tell the agent in the

22   phone call, that information was that the defendant had

23   relatives who resided or stayed at Genesis House.

24        Now, that is not being admitted, nor should you

25   consider it, for the truth.  All right?  That should not

1     tell you anything about whether or not the defendant's

2     relative or grandmother, whoever it was, actually had a

3     connection to Genesis House.  That's not the purpose that

4     that was allowed in.

5          It was allowed only in to explain, to give you

6     context, to what the agent did next so why the agent may

7     have taken another investigative step in the case.  That's

8     what it explains.  Why the agent did something next. It

9     does not go to the truth of the matter of what the agent

10    was told by that person.  All right.

11               MS. BERKOWER:  May I proceed, Your Honor?

12               THE COURT:  Yes.

13    Q.   (By Ms. Berkower)  Now what building was Genesis

14    House in relation to where the device was placed?

15    A.    It was the building that was closest to where the

16    device was placed.

17    Q.    Did you take additional investigative steps to

18    determine where the defendant's mother worked after

19    receiving that phone call?

20    A.    Yes.

21    Q.    What did you do?

22    A.    Well, first I wet on to the Carr Property website and

23    determined that from the website it was quite obvious that

24    they managed Genesis House.

25    Q.    Let me stop you there.  When you say Carr Properties,

```
1   what are you referring to?
2   A.   Sorry.  I was informed that the defendant's mother
3   worked for Carr Properties, but that they managed/owned --
4   it was a little unclear exactly what their relationship
5   was, but they were the ones that were responsible for the
6   maintenance and for the upkeep of Genesis House.
7   Q.   So you said you went on to the Carr Properties
8   website and what did you learn?
9   A.   I learned that they were in fact responsible for
10  Genesis House.
11  Q.   After that, what did you do next?
12  A.   I called Carr Properties.
13  Q.   What did you learn from Carr Properties?
14  A.   They told me Sheila Rathbun worked for them.
15  Q.   Did you obtain records confirming that?
16  A.   Yes.
17  Q.   Based on that information, what did you determine
18  about the defendant's mother's employment?
19  A.   That she was an accountant for Carr Properties and
20  that she managed the accounts for Genesis House.
21  Q.   Did you also take investigative steps concerning the
22  information about the defendant's great-grandmother --
23  about the defendant's grandmother, excuse me?
24  A.   Yes.
25  Q.   What steps did you take with regard to her?
```

1   A.   I began by trying to find out what her name was and I
2   was able to find that out online.
3   Q.   What was her name?
4   A.   Sheila Tipton.
5   Q.   What did you do to investigate any connection between
6   Sheila Tipton and Genesis House?
7   A.   I spoke to the head, the CEO, of JGS, Jewish
8   Geriatric Services.  I spoke to the owner of Carr
9   Properties and his son, and I spoke to the manager who was
10  physically at the location on Genesis House.
11  Q.   What did you learn from those investigative steps?
12  A.   Sheila Tipton lived at Genesis House for six or seven
13  years ending with her death in 2010.
14  Q.   Now when you interviewed the defendant, what had he
15  said about this area of Converse Street?
16  A.   He did not know, was unaware of any areas on Converse
17  Street.
18  Q.   Now in light of this, was this information about the
19  mother's employment and the grandmother having lived at
20  Genesis House significant to you?
21  A.   Yes.
22  Q.   Why?
23  A.   It suggested to us that the defendant would likely
24  have known exactly where we were directing his attention.
25            MS. O'NEILL-GREENBERG:  Objection, Your Honor.

```
 1              THE COURT:  Overruled.
 2   Q.   (By Ms. Berkower)  Now when you were talking to the
 3   defendant on April 15th, did it ever occur to you that
 4   perhaps the defendant just didn't understand what you were
 5   asking about when you were talking about this location?
 6   A.   No.
 7              MS. O'NEILL-GREENBERG:  Objection.
 8              THE COURT:  Sustained.  So the question and the
 9   answer that was given is stricken.
10   Q.   (By Ms. Berkower)  After learning that the
11   defendant's mother worked for the property manager and
12   that the defendant's grandmother lived at Genesis House,
13   did you find other information that contradicted what the
14   defendant had told you about his familiarity with that
15   location?
16   A.   Yes.
17   Q.   In particular, did you obtain a recorded telephone
18   call?
19              MS. O'NEILL-GREENBERG:  Objection.
20              THE COURT:  The objection is?
21              MS. O'NEILL-GREENBERG:  Leading.
22              THE COURT:  Yes.  Sustained.
23   Q.   (By Ms. Berkower)  Did you come to find recorded
24   statements by the defendant about --
25              MS. O'NEILL-GREENBERG:  Objection; leading.
```

1          THE COURT:  It's leading, yes.  Sustained.

2    Q.   (By Ms. Berkower)  What, if any, recorded statements

3    of the defendant did you find about Genesis House?

4    A.   We found a call between the defendant and his mother.

5          MS. BERKOWER:  Now if we could have just for the

6    witness, court, and counsel Government's Exhibit 99 and

7    99-2 please?

8          You Honor, if we may -- well, never mind.

9          Your Honor, may we briefly take a sidebar?

10   (Sidebar conference.)

11         MS. BERKOWER:  Your Honor, I realize we are

12   about to get to the portion where we are dealing with

13   recorded conversations.  Those were the subject of a

14   stipulation I believe we had reached with the defense on

15   authenticity.  But as I got to this section, I realized

16   that we had not actually received their signature on that.

17        I wanted to just front the issue and find out if

18   there would be an objection, in which case I guess we

19   could go on to another area.  It's my understanding based

20   upon representations from the defense that there will be

21   no objection, but I did want to front it before we got

22   into this exhibit.

23         MR. WATKINS:  That's correct.  There won't be an

24   objection to authentication, Your Honor.

25         THE COURT:  Okay.  So we are stopping at 4

```
1    o'clock.  You want to get this first phone call in, or
2    should we just pick it up all tomorrow?
3              MS. BERKOWER:  Your Honor, I think after we do
4    this phone call, we will be at a good stopping place.  It
5    should not take more than a couple of minutes to do.
6              THE COURT:  Okay.  Thanks.
7    (End of sidebar conference.)
8    Q.   (By Ms. Berkower)  Special Agent McGonigal, are you
9    familiar with Government's Exhibit 99?
10   A.   Yes.
11   Q.   Is this a recorded conversation from July 16th of
12   this year?
13   A.   It is.
14   Q.   Did you review this recorded conversation before you
15   came to court?
16   A.   Yes.
17   Q.   And during this recording did the defendant refer to
18   Genesis House?
19   A.   He did.
20   Q.   Who participated in this phone call?
21   A.   The defendant and his mother Sheila Rathbun.
22             MS. BERKOWER:  I would ask to admit Government's
23   Exhibit 99.
24             MS. O'NEILL-GREENBERG:  No objection.
25             THE COURT:  It's admitted.
```

```
1              MS. O'NEILL-GREENBERG:  Subject to our --
2              MR. WATKINS:  We have docket entry 177 where we
3     objected.
4              THE COURT:  All right.  Very good.  Noted.
5     Thank you.
6     (PX-99 was admitted.)
7     Q.   (By Ms. Berkower)  On the call how many speakers are
8     there?
9     A.   Two.
10    Q.   Who is the male -- is there a male voice?
11    A.   Yes.
12    Q.   Who is it?
13    A.   John Rathbun.
14    Q.   Is there a female voice?
15    A.   Yes.
16    Q.   Who is it?
17    A.   Sheila Rathbun.
18    Q.   If we could --
19             MS. BERKOWER:  Your Honor, I'm learning from Ms.
20    McKenna that to comply with the order previously, if we
21    could have this screen turned off very briefly and also
22    the others screens?
23             THE COURT:  Turn all the screens off?
24             MS. BERKOWER:  Yes, please.  Thank you.
25        Ms. McKenna, if you can please pull up Government's
```

1    Exhibit 99 timestamp 4:30 and go until 4:57?

2         And before you play it, if we could please have the

3    TVs back on?  Your Honor, at this time I note for the

4    court that there are transcripts here.  I don't know if

5    the court wanted to instruct the jury concerning the

6    transcripts that they will be viewing in connection with

7    this exhibit.

8         THE COURT:  No, I didn't know that you -- do you

9    have a proposed instruction for transcripts?

10        MS. BERKOWER:  Yes, Your Honor.  My apologies to

11   the court.  To the extent the exhibit is the audio and the

12   transcript is just an aid to the jury as they watch.

13        THE COURT:  All right.  Is there an objection to

14   the accuracy of the transcript?

15        MR. WATKINS:  No, there's not.

16        THE COURT:  Okay.  So the transcript will be

17   scrolling on the television; is that what you're saying?

18        MS. BERKOWER:  Correct.

19        THE COURT:  Okay.  So there's an agreement

20   between -- as I was just told, there's an agreement

21   between the parties that the transcript is accurate and

22   correct as you are watching it and listening to what the

23   recording is.  Okay.

24        MS. BERKOWER:  May we proceed?

25        THE COURT:  Yes.

```
1              MS. BERKOWER:  Ms. McKenna, if we could have
2       4:30 to 4:57?
3       (Audio playing.)
4       (Loud sound.)
5              THE COURT:  Wow.
6              MS. BERKOWER:  I see it's four o'clock.  Maybe
7       that's a sign.
8              THE COURT:  That's a good way to end.  Okay.
9          So we're going to stop for the day.  You know, we
10      haven't been -- despite our best intentions, we're just
11      not getting you in court at nine o'clock because there
12      seems always to be things in the morning that we are in
13      here talking about and working on.
14         So tomorrow plan on being in the courtroom at 9:30.
15      So that means you don't -- you can adjust your time a
16      little bit.  So you're not coming into the court for nine
17      o'clock because that just isn't happening.  So come here
18      as if you're going to be walking into the courtroom at
19      9:30.
20         All right.  So the same instructions apply.  Don't
21      talk to each other; don't talk to anyone else; don't
22      investigate the case; read any articles about it; read
23      blogs; post blogs.  Nothing on social media about the
24      case.  All right?  Thank you.
25             THE CLERK:  All rise for the jury.
```

**(The jury left at 4:00.)**

        THE COURT: So Attorney Watkins will stay in court and a place is set to conference with the defendant downstairs by the marshal. All right.

        MS. O'NEILL-GREENBERG: Thank you.

        THE COURT: Okay. Attorney Watkins, I don't know if that helps any. There might be issues we need to talk about tomorrow at 9 o'clock in the morning, but we're not planning on starting with the jury until 9:30 and so that will give you some time downstairs with the defendant.

        MR. WATKINS: Perfect. It seems like we always have something to talk about.

        THE COURT: Right.

**(Court recessed at 4:01 until 4:22.)**

        THE COURT: The juror is coming in. We are back on the record in the Rathbun case.

    Hi.

        JUROR NO. 26: Sorry. I hope I'm not keeping you later.

        THE COURT: Okay. The clerk's office indicated that you wanted to tell me something.

        JUROR NO. 26: Yes, I did want to make you aware that -- so I know this is the only case being held currently in this courthouse right now. Well, the other

1    day, maybe Friday or Saturday, I went to Verizon to go

2    work on some stuff on my phone and I had mentioned that I

3    was just leaving jury duty because I think -- my cousin

4    was there.

5        The worker that was at Verizon actually said, he

6    said, oh, were you at the Springfield courthouse and he

7    brought up this case.  I just said that I can't talk about

8    it, but he said that he does have a friend that's on the

9    jury service that told him about the case.  So I just

10   wanted to make you aware.

11            THE COURT:  So this person at Verizon said he

12   has a friend who's on the jury that told him about the

13   case?

14            JUROR NO. 26:  Yes.

15            THE COURT:  All right.

16            JUROR NO. 26:  And I did notice that also -- I

17   wasn't sure about the notebooks if we were supposed to

18   keep them or leave them.  I just know some of the people

19   took theirs and some people didn't.

20            THE COURT:  The notebooks are usually left here

21   on the chairs.

22            JUROR NO. 26:  I do believe that some people

23   have taken their notebook.  I just noticed that today when

24   I was leaving.

25            THE COURT:  Okay.  So did you have any

1   conversation with the person at the Verizon about the

2   case?

3               JUROR NO. 26:  No.  I just told him I couldn't

4   talk about.  I just figured since you said -- I knew that

5   he knew about it and so I just wanted to tell somebody,

6   so.

7               THE COURT:  Right.  Okay.

8               JUROR NO. 26:  I shut it down anyway.

9               THE COURT:  Good.  Well, thank you very much.

10  You did exactly what I asked that you to do under those

11  circumstances so thank you for that information.

12              JUROR No. 26:  Yes, of course.

13              THE COURT:  I appreciate it.  See you tomorrow.

14              JUROR NO. 26:  I'll see you in the morning.

15              MR. WATKINS:  Judge, can we put the juror number

16  into the record?

17              THE COURT:  We can do that.

18              JUROR NO. 26:  I'm 26.

19              MR. WATKINS:  Thank you.

20              THE COURT:  Juror 26 and that's seat 11?

21              MS. BERKOWER:  I think it's 12.

22              THE CLERK:  Eleven.

23              THE COURT:  Juror 26, seat 11.  All right.

24  (Juror left the courtroom.)

25              THE COURT:  So I'm a little concerned with the

1    issue of the notebooks.  I mean, remind me, I told the

2    jurors to leave the notebooks on their chairs.  Does

3    anyone remember that?

4              THE CLERK:  Yes.

5              THE COURT:  So there are -- how many notebooks

6    are we missing right now?

7              THE CLERK:  One, two, three.

8              THE COURT:  Can you write down the seats and

9    make a record, the seats that don't have notebooks?

10             THE CLERK:  Seat number 13, seat number 12, and

11   seat number 3.

12             THE COURT:  Okay.  Now I don't know -- I didn't

13   look to know if those are jurors who are not even taking

14   notes or not, but it's worth me reviewing in the morning

15   who is taking their notebooks home.

16        Any suggestions as to this issue with a person from

17   Verizon saying someone told them about the case?

18             MR. DESROCHES:  Your Honor, from the

19   government's perspective the concern is -- it's obviously

20   concerning that the juror wouldn't follow the court order

21   not to discuss the case.  But in terms of there being an

22   ongoing issue with the jury, perhaps the solution is to

23   conduct a voir dire to learn first who that person is; see

24   if that person is in fact on this jury.  Second, whether

25   or not there was a dialogue back and forth where that

1    juror would have been essentially tainted by outside

2    information.

3              THE COURT:  Well, we don't need the -- the juror

4    that just came in, you're not suggesting a further

5    conversation with her?

6              MR. DESROCHES:  No.

7              THE COURT:  You're talking about if we can

8    determine who the person was that had a conversation?

9              MR. DESROCHES:  Correct.  I think perhaps --

10             THE COURT:  I mean, we're the only trial

11   happening.

12             MR. DESROCHES:  Right.  So perhaps a voir dire

13   with each individual juror to find out if they in fact

14   discussed the case with anybody.  And if we can find

15   someone who did, then we follow up about the content of

16   what that conversation was.

17             THE COURT:  Should the inquiry be as specific as

18   did you discuss this with anyone including anyone at a

19   Verizon store?

20             MR. DESROCHES:  I would agree that maybe just

21   simply because it would --

22             THE COURT:  -- get right to it.

23             MR. DESROCHES:  Right.

24             THE COURT:  What does the defense say?

25             MR. WATKINS:  I agree.

1          THE COURT:  So you want to do that with every

2     juror and you want it to just be -- the question is did

3     you happen to be in a Verizon store since this trial

4     started and speak with anyone about the case?

5          MR. DESROCHES:  I think it should be maybe

6     broader than that just in case this person knows the

7     Verizon employee outside of the store.

8          THE COURT:  Right.  Okay.  Okay.  That's what

9     we'll do.

10       Ms. Healy, can you orchestrate that for the morning?

11          THE CLERK:  Yes.  Sure.

12          THE COURT:  Now they're coming in at 9:30.  This

13    would have been something we could have done between nine

14    and 9:30 I guess but they're coming in at 9:30.

15       So you'll just line them up in whatever order that

16    makes most sense and go one by one.

17          THE CLERK:  Certainly.

18          THE COURT:  All right.  I would say for the

19    record I appreciate very much this juror bringing this to

20    our attention.  It's exactly what I had instructed the

21    jurors to do.

22    **(Court recessed at 4:30.)**

23    ----------------

24

25

1    (The certification of this transcript does not apply to
     any reproduction of this transcript, unless under the
2    direct control and/or supervision of the certifying
     reporter.  I assume no responsibility for the accuracy of
3    any reproduced copies not made under my control or
     direction.)

4

5                          CERTIFICATION

6

7              I certify that the foregoing is a correct

8    transcript of the record of proceedings in the

9    above-entitled matter to the best of my skill and ability.

10

11

12

13   /s/ Alice Moran                     November 30, 2020
     Alice Moran, RMR, RPR
14   Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25