<pre>
 1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2                         WESTERN SECTION

 3

 4   United States of America  )
                               )            20cr30018-MGM
 5        vs                   )
                               )            November 17, 2020
 6   Jonathan Michael Rathbun  )
     _____)
 7

 8                    Jury Trial Held Before

 9             The Honorable Mark G. Mastroianni

10               United States District Judge.

11

12   APPEARANCES:

13

     On behalf of the government:  Risa Berkower, United States
14   Department of Justice, 950 Pennsylvania Avenue, NW,
     Washington, DC 20532.

15

16   Neil L. Desroches, Assistant United States Attorney, 300
     State Street, Suite 230, Springfield, MA 01105-2926.
17
     On behalf of the defendant: Timothy G. Watkins, Esq., 51
18   Sleeper Street, 5th Floor, Boston, MA 02210.

19   Forest J. O'Neill-Greenberg, Esq., 51 Sleeper Street, 5th
     Floor, Boston, MA 02210.
20

21
                        Alice Moran, CSR, RPR, RMR
22                     Official Federal Court Reporter
                         United States Courthouse
23                     300 State Street, Room 303D
                          Springfield, MA 01105
24                           (413)731-0086
                         alice.moran@verizon.net
25
</pre>

1                               INDEX

2

  Witness:                                          Page:
3

4

5   **Ryan McGonigle**

6

7   Direct examination by Ms. Berkower                  27

8   Cross-examination by Mr. Watkins                    56

9   Cross-examination by Ms. O'Neill-Greenberg          97

10  Redirect examination by Ms. Berkower              171

11

12

13  **Daniel Marshall**

14

15  Direct examination by Ms. Desroches               174

16  Cross-examination by Mr. Watkins                  190

17

18

19  **Susan Goldsmith**

20

21  Direct examination by Ms. Berkower                192

22  Cross-examination by Ms. O'Neill-Greenberg        202

23

24

25

| | Exhibit No. | Description | Page |
|---|---|---|---|
| | 46 | Cellebrite report | 32 |
| | 44 | April 2, 2020 transcript | 33 |
| | 45 | Voice mail | 33 |
| | 49 | April 2, 2020 text message | 35 |
| | 110 | Excerpt of Verizon Wireless records | 40 |
| | 53 | Text messages | 43 |
| | 96 | May 14, 2020 phone call recording | 47 |
| | 102 | August 13, 2020 phone call recording | 50 |

1    (Trial commenced.)

2    (Mr. Rathbun is present.)

3            THE CLERK:  The matter before the court is

4    20cr30018, the United States versus John Michael Rathbun.

5        Counsel, please introduce yourself for the record

6    starting with the government.

7            MS. BERKOWER:  Risa Berkower for the government.

8            MR. DESROCHES:  Good morning.  Neil Desroches

9    on behalf of the United States.

10           MR. WATKINS:  Tim Watkins, Federal Defender

11   Office, on behalf of John Rathbun who's with us in court

12   today.

13           MS. O'NEILL-GREENBERG:  Good morning.  Forest

14   O'Neill-Greenberg also for Mr. Rathbun.

15           THE DEFENDANT:  Good morning.

16           THE COURT:  We are going to start with the voir

17   dire of the individual jurors.  We are going to start in

18   reverse order bringing Juror 14 in first.

19       You want the -- should it be a specific question

20   whether or not they had any conversations about the case

21   with anyone, including if they happened to have a

22   conversation with someone including that works for

23   Verizon?

24           MR. DESROCHES:  That sounds good.

25           MR. WATKINS:  That's fine.  And where will the

1    jurors be?

2              THE COURT:  I'm going to have each one stand

3    right about here.  (Indicating).

4    (Juror No. 42 entered the courtroom.**)**

5              THE COURT:  Good morning.

6              JUROR NO. 42:  Good morning.

7              THE COURT:  We are asking all the jurors

8    questions at this point.  We wanted to ask you if you have

9    had any conversations with anyone outside the court about

10   anything that's going on with this case?

11             JUROR NO. 42:   No.

12             THE COURT:  And perhaps anyone -- this may not

13   make sense to you, but if any employee from Verizon has

14   talked to you --

15             JUROR NO. 42:  No.

16             THE COURT:  -- about the case?

17             JUROR NO. 42:  No.

18             THE COURT:  Okay.  Do you leave your notebook

19   here, right?

20             JUROR NO. 42:  Yes.

21             THE COURT:  I just want to confirm that you

22   leave the notebook here.  We're asking -- we're bringing

23   all jurors in and asking these questions.  Thank you.

24             MR. WATKINS:  Your Honor, could we get the

25   juror's number?

```
 1                    THE COURT:  Yes.  That was Seat No. 14.

 2                    JUROR No. 42:  Number 42.

 3                    THE COURT:  Thank you.

 4         I just want to tell you, don't discuss with any of

 5     the other jurors any questions or anything that we talked

 6     about in this last minute.

 7                    JUROR NO. 42:  Okay.

 8                    THE COURT:  Thank you.

 9     (Juror No. 42 left the courtroom.)

10     (Juror No. 39 entered the courtroom.)

11                    THE COURT:  Good morning.

12                    JUROR NO. 39:  Good morning.

13                    THE COURT:  Can you stand right by the

14     microphone so we can hear you?

15          Okay.  You are in Seat 13 and you are juror, what

16     number?

17                    JUROR NO. 39:  Thirty-nine.

18                    THE COURT:  Okay.  Sir, I wanted to ask you, and

19     we're asking all the jurors similar questions, I want to

20     confirm have you had any conversations about this case,

21     anything about the case with anyone outside the court,

22     including any conversations about the case with any

23     Verizon employee?

24                    JUROR NO. 39:  No.

25                    THE COURT:  Okay.  And you don't take notes
```

1    during the trial; is that correct?

2                   JUROR NO. 39:  I have taken occasional notes,

3    yes.

4                   THE COURT:  Okay.  I was just wondering if

5    you're taking notes, I was wondering where your notebook

6    was because it's not on your chair.

7                   JUROR NO. 39:  I have it in my bag.

8                   THE COURT:  Okay.  So the notebook shouldn't go

9    home with you.  Can you leave the notebook here every

10   night?

11                  JUROR NO. 39:  Sure.

12                  THE COURT:  Okay.  And the last thing I would

13   say is we're asking similar questions of every juror

14   today.  Don't discuss with your fellow jurors anything we

15   talked about here.

16                  JUROR NO. 39:  No, I know.

17                  THE COURT:  Thank you.

18   (Juror No. 39 left the courtroom.)

19   (Juror No. 22 entered the courtroom.)

20                  THE COURT:  Hi.  You are Seat No. 12, right?

21                  JUROR NO. 22:  This?  I was.

22                  THE COURT:  I know.  I do the same thing.  And

23   you're juror number?

24                  JUROR NO. 22:  Twenty-two maybe.

25                  THE COURT:  Okay.  Can we check?

1          I wanted to ask you -- we are bringing in everyone

2     and asking a similar question.  Have you had any

3     discussions with anyone outside the court about anything

4     to do with this case, including a discussion with any

5     Verizon employee?

6                    JUROR NO. 22:  No.

7                    THE COURT:  No?

8                    JUROR NO. 22:  No.

9                    THE COURT:  Okay.  And I'm looking at your seat

10    and your notebook is not on your seat.  Do you generally

11    leave the notebook on the seat?

12                   JUROR NO. 22:  No.

13                   THE COURT:  You take it with you?

14                   JUROR NO. 22:  Yes.

15                   THE COURT:  So we wanted you to leave the

16    notebook in the courtroom every night.

17                   JUROR No. 22.  Okay.

18                   THE COURT:  Do you write anything?

19                   JUROR NO. 22:  Just a few things, just who the

20    witnesses are.

21                   THE COURT:  But I mean when court is over, are

22    you writing anything in your notebook?

23                   JUROR NO. 22:  I'm sorry?

24                   THE COURT:  When court is over, are you -- in

25    other words, when you go home are you taking notes?

```
 1              JUROR NO. 22:  No.

 2              THE COURT:  So you're not writing anything extra

 3     when you go home at night?

 4              JUROR NO. 22:  No.

 5              THE COURT:  So you're only writing in it while

 6     you're in court?

 7              JUROR NO. 22:  Absolutely.

 8              THE COURT:  Okay.  Perfect.  So from now on, can

 9     you just leave it on your seat?

10              JUROR NO. 22:  I will leave it.

11              THE COURT:  Thank you.

12              JUROR NO. 22:  You're welcome.

13              THE COURT:  And don't discuss with your fellow

14     jurors -- I'm talking to everyone this morning about a

15     similar type of thing, but don't tell them anything that

16     we talked about or I asked you.

17              JUROR NO. 22:  Okay.

18              THE COURT:  Thanks.

19     (Juror No. 22 left the courtroom.)

20              THE COURT:  Did you want to say something?

21              MR. WATKINS:  I was going to suggest a different

22     way to phrase the question.

23              THE COURT:  Okay.  We can --

24     (Juror No. 26 entered the courtroom.)

25              THE COURT:  Hi.  Good morning.  How are you?
```

1          JUROR NO. 26:  Good.  How are you?

2          THE COURT:  Good.  I just wanted to let you know

3    that we are bringing everyone in order.  We are bringing

4    everyone in to talk about the issue that you raised.

5       I'm not telling everyone how I have the information,

6    but I am asking people have you had any conversation with

7    anyone outside the court.  Specifically did you have a

8    conversation with anyone from Verizon, and then I'm

9    reminding everyone just about notebooks.

10          JUROR NO. 26:  Okay.

11          THE COURT:  I'm not telling anyone how the

12   information was reported to me.  So I'm just bringing you

13   in with everyone else, and I'm also instructing everyone

14   and I'm going to instruct you not to talk to the fellow

15   jurors about anything I'm asking questions about that.

16   I'm simply asking questions of every juror.  That happens

17   in some cases and that it shouldn't be discussed with

18   fellow jurors what the conversation was about.

19          JUROR NO. 26:  Okay.

20          THE COURT:  Okay.  Thanks.

21          MR. WATKINS:  Can we put the juror number and

22   seat on the record?

23          THE COURT:  Yes, that's Seat No. 11.

24          JUROR NO. 26:  Juror 26.

25          THE COURT:  Seat 11; Juror 26.  Okay.  All set.

1   Thank you.

2   (Juror No. 26 left the courtroom.)

3   THE COURT:  Mike, could you just let the door

4   close for one minute while I talk to the lawyers?

5   THE CLERK:  Yes.

6   MR. WATKINS:  The court is asking including with

7   a Verizon employee.  I'm wondering whether the better

8   phrase would be a friend who is a Verizon employee.  I

9   think that's the way we understood it rather than --

10  THE COURT:  I don't see that it makes much of a

11  difference.  A Verizon employee includes friends who are

12  Verizon employees.

13  MR. WATKINS:  One would think so, but I was

14  thinking maybe a juror is thinking about having been

15  approached by somebody from Verizon and it may not be the

16  same.

17  THE COURT:  I'll try to include that.  Okay.

18  Next.

19  (Juror No. 19 entered the courtroom.)

20  THE COURT:  Hi.  Good morning.

21  JUROR NO. 19:  Hi.

22  THE COURT:  How are you?

23  JUROR No. 19:  I'm good.

24  THE COURT:  Good.  We're talking with all the

25  jurors this morning and asking them, just making sure,

1    have you had any conversations with anyone outside the

2    courtroom about anything to do with this case?

3              JUROR NO. 19:  No.

4              THE COURT:  Specifically with any Verizon

5    employee or any friend that's employed by Verizon?

6              JUROR NO. 19:  No.

7              THE COURT:  No?  Okay.  And you are Seat No. 10?

8              JUROR NO. 19:  Yes.

9              THE COURT:  Juror number?

10             JUROR NO. 19:  Nineteen.

11             THE COURT:  Nineteen.  Okay.  All right.  And so

12   we're also talking to all the jurors and I'm asking them

13   not to discuss with your fellow jurors anything I asked

14   you.  We really didn't talk about much, but don't ask them

15   about what was going on when I brought you in.  Okay?

16             JUROR NO. 19:  Got it.

17             THE COURT:  Okay.  Thanks.

18             JUROR NO. 19:  Thank you.

19   (Juror No. 19 left the courtroom.)

20   (Juror No. 18 entered the courtroom.)

21             THE COURT:  Hi.  Good morning.

22             JUROR NO. 18:  Good morning.

23             THE COURT:  How are you?

24             JUROR NO. 18:  Good.  How are you?

25             THE COURT:  Good.  You're Seat 9; is that

1    correct?

2            JUROR NO. 18:  Correct.

3            THE COURT:  Seat 9, juror number?

4            JUROR NO. 18:  Eighteen.

5            THE COURT:  Okay.  Thanks.

6        We are bringing all the jurors in this morning for me

7    to ask the question just to make sure, have you talked to

8    anyone outside the court about this case?  Has anyone

9    tried to talk to you about the case?  Specifically any

10   friend who might be employed by Verizon or any Verizon

11   employee?

12           JUROR NO. 18:  No.

13           THE COURT:  You haven't talked to anybody about

14   the case?

15           JUROR NO. 18:  No.

16           THE COURT:  All right.  Okay.  And you are in

17   seat?

18           JUROR NO. 18:   Nine.

19           THE COURT:  Nine.  And your notebook, do you

20   leave your notebook here?

21            JUROR NO. 18:  Yes, it's the blue one.  It

22   should be on my seat.

23           THE COURT:  Okay.  I'm looking where your seat

24   is.

25           JUROR NO. 18:   Right there.

```
 1              THE COURT:  Next to Seat 5.  Okay.  Very good.
 2   So we are brining everyone in, but I'm asking all jurors
 3   not to tell their other jurors specifically what was said
 4   during any of our conversations this morning.  So don't
 5   share anything I asked you.  We didn't talk about much,
 6   but just don't share anything with any of your fellow
 7   jurors.  Everyone is getting a similar instruction.  Okay?
 8              JUROR NO. 18:  Okay.
 9              THE COURT:  Thanks a lot.
10              JUROR NO. 18:  Thank you.
11   (Juror No. 18 left the courtroom.)
12   (Juror No. 25 entered the courtroom.)
13              THE COURT:  Hi.  Good morning.
14              JUROR NO. 25:  Good morning.
15              THE COURT:  You are Seat No. 8, and your juror
16   number?
17              JUROR NO. 25:  Twenty-five.
18              THE COURT:  Okay.  Great.  We are bringing
19   everyone in this morning just for me to ask a few
20   questions.
21       I wanted to ask if you've talked to anyone about this
22   case or if anyone has tried to talk to you about this case
23   outside the courtroom?
24              JUROR NO 25:  No.
25              THE COURT:  Specifically any friend who might
```

```
1    work for Verizon or any employee for Verizon?
2              JUROR NO. 25:  No.
3              THE COURT:  Okay.  Thank you.  And the notebook
4    that you're -- do you leave your notebook in court every
5    night?
6              JUROR NO. 25:  I do.
7              THE COURT:  Perfect.  So as I said, we're
8    talking and asking similar questions to every juror.  I'm
9    also telling every juror not to discuss with your fellow
10   jurors anything that I asked you or anything that was
11   said.
12             JUROR NO. 25:   Okay.
13             THE COURT:  All right?
14             JUROR NO. 25:  Yes.
15             THE COURT:  Thanks.
16    (Juror No. 25 left the courtroom.)
17   (Juror No. 36 entered the courtroom.)
18             THE COURT:  Hi.  Good morning.
19             JUROR NO. 36:  Good morning.
20             THE COURT:  How are you?
21             JUROR NO. 36:  Good.  How are you?
22             THE COURT:  Good.  We're bringing all the jurors
23   in so that I can just ask them some questions.  I wanted
24   to ask if you've had any conversations with anyone outside
25   the courtroom about the case?  Specifically, any friend
```

1   who might work for Verizon or any Verizon employee?

2             JUROR NO. 36:  No.

3             THE COURT:  Any discussion about the case?

4             JUROR NO. 36:  No.

5             THE COURT:  All right.  And as for your

6   notebook, do you leave your notebook in court every night?

7             JUROR NO. 36:  Yes.

8             THE COURT:  Okay.  So as you know, I'm bringing

9   every juror in.  I'm also instructing every juror don't

10  discuss anything that I said to you or anything.  We

11  didn't have much of a conversation, but don't discuss

12  anything that happened in here with your fellow jurors.

13  All right?

14            JUROR NO. 36:  Got it.

15            THE COURT:  Thank you.

16            MR. WATKINS:  Can we put the juror number on the

17  record?

18            THE COURT:  So that's juror --

19            JUROR No. 36:  Thirty-six.

20            THE COURT:  Juror 36 in Seat 7.

21            MR. WATKINS:  Thank you.

22  (Juror No. 36 left the courtroom.)

23  (Juror No. 23 entered the courtroom.)

24            THE COURT:  Hi.  Good morning.

25            JUROR NO. 23:  Good morning.

1              THE COURT:  How are you?

2              JUROR NO. 23:  Good.  Thank you.

3              THE COURT:  You are Seat 6, juror number?

4              JUROR NO. 23:  Juror 23.

5              THE COURT:  Twenty-three.  Okay.

6         As you can see, we are bringing everyone in this

7    morning just for me to ask them some questions.  Have you

8    had any conversations with anyone about anything to do

9    with this case outside of the courtroom, including any

10   friend that you might have who works at Verizon or any

11   Verizon employee?

12             JUROR NO. 23:  No, sir.

13             THE COURT:  Okay.  And you take notes during the

14   trial, right?

15             JUROR NO. 23:  Correct.

16             THE COURT:  I see you're leaving your notebook

17   on your chair.  I'm just confirming that people are

18   leaving their notebooks here instead of bringing them

19   home.

20             JUROR NO. 23  Sure.

21             THE COURT:  All right.  So as is obvious, we are

22   bringing everyone in, but I'm also asking everyone not to

23   discuss with their fellow jurors anything that I asked or

24   anything we might have talked about.  We really didn't

25   have much of a conversation, but don't discuss with any of

1   your fellow jurors anything that was said here.  All

2   right?

3            JUROR NO. 23:  Certainly.

4            THE COURT:  Thank you.

5            JUROR NO. 23:  You're welcome.

6   (Juror No. 23 left the courtroom.)

7   (Juror No. 11 entered the courtroom.)

8            THE COURT:  Hi.  Good morning.

9            JUROR NO. 11.  Good morning.  How are you?

10            THE COURT:  I'm good.  How are you?

11            JUROR NO. 11:  I'm good.

12            THE COURT:  So we're bringing everyone in just

13   for me to ask some quick questions.  Have you had any

14   discussions about this case, anything to do with this case

15   with anyone outside the courtroom, including any friends

16   or people you know or anyone who works for Verizon or any

17   Verizon employee?

18            JUROR NO. 11:  No, I haven't said a single

19   thing.

20            THE COURT:  Okay.  And you take notes and you

21   leave your notebook on the chair, correct?

22            JUROR NO. 11:  Yeah.

23            THE COURT:  I'm just confirming that people

24   aren't taking their notebooks home.

25            JUROR NO. 11:  No, I left it on my chair.

```
 1            THE COURT:  Perfect.  So as you can see, we're
 2   asking everyone a similar set of questions.  We're also
 3   asking everyone not to discuss with your fellow jurors
 4   anything that we talked about.  We didn't have much of a
 5   conversation, but I don't want the topic of conversation
 6   to be during the break, hey, what was the judge asking
 7   you?  Nobody can talk about what was said in here.  All
 8   right?
 9            JUROR NO. 11:  Understood.
10            THE COURT:  Great.  Thank you.
11            JUROR NO. 11:  Thank you.
12   (Juror No. 11 left the courtroom.)
13            THE COURT:  Did we get the seat number?
14      Mike, that was Seat 5.  What juror number?
15            THE CLERK:  Eleven.
16            THE COURT:  Thank you.
17   (Juror No. 10 entered the courtroom.)
18            THE COURT:  Good morning.
19            JUROR No. 10:  Good morning.
20            THE COURT:  How are you?
21            JUROR NO. 10:  I'm doing well.
22            THE COURT:  Okay.  So you're Seat 4 and juror
23   number?
24            JUROR NO. 10:  Ten.
25            THE COURT:  Ten.  We're bringing everyone in to
```

1    ask them some quick questions.

2              JUROR No. 10:  Okay.

3              THE COURT:  I just need to know if you've had

4    any conversations about anything to do with this case with

5    anyone outside the courtroom, including any friends or

6    friends who work at Verizon or employees of Verizon?

7              JUROR NO. 10:  I have not.

8              THE COURT:  Okay.  Do you take notes during the

9    case?

10             JUROR NO. 10:  I do.

11             THE COURT:  Do you leave your notebook on your

12   chair?

13             JUROR NO. 10:  Yes.  Right there.

14             THE COURT:  Okay.  We are confirming that

15   everyone leaves it.  Okay.  Great.

16       Okay.  We're also asking everyone that comes in not

17   to discuss with your fellow jurors anything that was

18   talked about here in court.  I don't want that to be a

19   topic of conversation.

20             JUROR NO. 10:  Okay.

21             THE COURT:  So the instruction to all jurors is

22   they can't talk about whatever it was they were asked when

23   they were brought in this morning.

24             JUROR NO. 10:  Okay.

25             THE COURT:  Thanks a lot.

1              JUROR NO. 10:  Thank you.

2      (Juror No. 10 left the courtroom.)

3      (Juror No. 8 entered the courtroom.)

4              THE COURT:  Hi.  Good morning.

5              JUROR NO. 8:  Good morning.

6              THE COURT:  How are you?

7              JUROR NO. 8:  Good.

8              THE COURT:  You are Seat 3?

9              JUROR NO. 8:  Yes.

10             THE COURT:  And juror number?

11             JUROR NO. 8:  Eight.

12             THE COURT:  Okay.  We're bringing everyone in

13     this morning for me to ask some quick questions.  Have you

14     discussed this case outside the courtroom with anyone,

15     including any friend who works at Verizon or any Verizon

16     employee?

17             JUROR NO. 8:  No.

18             THE COURT:  No.  All right.  And you take notes

19     during the trial?

20             JUROR NO. 8:  Minimum.

21             THE COURT:  Okay.  Do you leave your notebook in

22     the courtroom?

23             JUROR NO. 8:  No.

24             THE COURT:  You take it home with you?

25             JUROR NO. 8:  Yes.

1        THE COURT:  So we would request that you leave

2   the notebook in the courtroom at the end of the day.  All

3   right.  The door is locked so no one looks at them.

4        JUROR NO. 8:  That's fine.

5        THE COURT:  And when you go home with your

6   notebook, do you continue to write notes after court is

7   finished or do you just bring it home?

8        JUROR NO. 8:  I just started taking notes

9   yesterday and I just took a few notes, and I just took it

10  out when I was getting ready to come in here.  No, I have

11  not added to it.  I haven't even looked at.

12       THE COURT:  Perfect.  Again, as I instructed,

13  take as many or as few notes as you want.  Just leave the

14  notebook.  That's something we are confirming with

15  everyone.  Just leave the notebook in the courtroom at the

16  end of the day.  Okay?

17       JUROR NO. 8:  Okay.

18       THE COURT:  Also, we're telling every juror not

19  to discuss anything we said right now this morning when

20  you came into court.  That can't be a topic of

21  conversation at breaks.  Hey, what did the judge say to

22  you when he brought you in?  So I'm instructing everyone

23  that they can't talk to each other about why everyone was

24  brought in this morning, what questions were asked.

25       JUROR NO. 8:  Okay.

```
 1              THE COURT:  Okay.  Thank you.  And we have your
 2    juror name and seat number, right?
 3              JUROR NO. 8:  Seat 3, Juror 8.
 4              THE COURT:  Okay.  Thank you.
 5    (Juror No. 8 left the courtroom.)
 6    (Juror No. 7 entered the courtroom.)
 7              THE COURT:  Sir, good morning.
 8              JUROR NO. 7:  Good morning.
 9              THE COURT:  How are you doing?
10              JUROR NO. 7:  Good.  Yourself?
11              THE COURT:  I'm doing pretty good.  Thank you.
12    You are in Seat No. 2 and you're juror what number?
13              JUROR NO. 7:  Seven.
14              THE COURT:  So we're bringing everyone in this
15    morning just to ask a quick question to you.  Have you had
16    any discussions with anyone outside this courtroom about
17    anything to do with this case, including any friend who
18    might be employed by Verizon or any Verizon employee?
19              JUROR NO. 7:  No, I have not, Your Honor.
20              THE COURT:  Okay.  And you take notes during the
21    case?
22              JUROR NO. 7:  No, I do not.
23              THE COURT:  You don't.  All right.  We are just
24    confirming that if you take notes during the case, that
25    you leave your notebook.
```

1          JUROR NO. 7:  I leave it there anyway.

2          THE COURT:  Perfect.  We're also asking that you

3   not discuss with your fellow jurors anything that we

4   talked about.  I don't want the jurors talking to each

5   other at break about what the judge asked you this

6   morning.  So no juror is allowed to discuss with other

7   jurors anything that was said in this very brief

8   conversation.

9          JUROR NO. 7:  Okay.

10          THE COURT:  All right.  Thanks a lot.

11          JUROR NO. 7:  Okay.

12   (Juror No. 7 left the courtroom.)

13   (Juror No. 2 entered the courtroom.)

14          THE COURT:  Hi.  Good morning.

15          JUROR NO. 2:  Good morning.

16          THE COURT:  I hope you're doing well.

17          JUROR NO. 2:  Yes.

18          THE COURT:  Okay.  We are bringing everyone in

19   this morning to ask them and just to confirm, have you had

20   any conversations with anyone about this case outside the

21   courtroom including any friend or who might work for

22   Verizon or any Verizon employee?

23          JUROR NO. 2:  No.

24          THE COURT:  Okay.  And do you take notes during

25   the case?

```
1              JUROR NO. 2:  I do.

2              THE COURT:  I just want to confirm, do you leave

3    your notebook in court every night?

4              JUROR NO. 2:  Yes.

5              THE COURT:  Perfect.  All right.  The next thing

6    I'm telling every juror is do not discuss with your fellow

7    jurors anything that we talked about in here this morning.

8    I said the same thing to every juror when I asked them

9    questions.

10             JUROR NO. 2:  Okay.

11             THE COURT:  So what was said in here this

12   morning can't be a topic of conversation amongst

13   yourselves.

14             JUROR NO. 2:  You mean what we're talking about

15   right now?

16             THE COURT:  Right now.

17             JUROR NO. 2:  Okay.

18             THE COURT:  Very good.  Thank you.

19             JUROR NO. 2:  You're welcome.

20             MR. WATKINS:  Juror number?

21             THE COURT:  Juror No. 2 in Seat No. 1.

22   (Juror No. 2 left the courtroom.)

23             THE COURT:  All right.  So I mean, is there any

24   request further?  I don't know.

25             MR. DESROCHES:  The government is satisfied,
```

1    Your Honor.

2              MR. WATKINS:  Nothing from the defendant.

3              THE COURT:  All right.  But I do appreciate that

4    juror bringing that to our attention and who knows where

5    her information could have came from.  It could have been

6    quite innocuous.  Like I got called for jury duty and

7    someone said that in a passing way.

8          We need IT for a few minutes to get the Zoom working.

9              MS. BERKOWER:  Your Honor, the witness from

10   yesterday is outside.  Should we have him get in place?

11             THE COURT:  No.  I think this might take a few

12   minutes.  I don't know what's going on with Zoom.

13   Apparently, Ms. Cote from the U.S. Attorney's Office got a

14   new computer and it hijacked our system is what I'm being

15   told.  I think there might be some kind of warrant out

16   soon for her.

17   **(The jury entered at 10:18.)**

18             THE COURT:  All right.  Good morning.  I just

19   need to ask before we start, was everyone able to follow

20   my instructions not to talk to each other?  Talk to anyone

21   else?  Do any research?  Investigate the case in any way?

22   Post anything on social media?  Read anything on social

23   media?  Also, was everyone able to stay away from any

24   coverage, any news stories about the case?  All right.

25         Okay.  Affirmative answers from every juror.  They

```
 1    remain fair and impartial.
 2           Government, if you could, recall your witness.
 3               MS. BERKOWER:  Good morning, Your Honor.  We
 4    would call Special Agent Ryan McGonigle to retake the
 5    stand at this time.
 6               THE COURT:  Agent McGonigle, just for the
 7    record, I remind you that you are under oath from
 8    yesterday.
 9               THE WITNESS:  Yes, Your Honor.
10               THE COURT:  All right.
11    Ryan McGonigle (Previously sworn)
12    CONT'D DIRECT EXAMINATION
13    Q.   (By Ms. Berkower)  Good morning.
14    A.   Good morning.
15    Q.   So yesterday when we left off, you were testifying
16    about a recorded conversation that the defendant had with
17    his mother.  Do you remember testifying about that?
18    A.   I do.
19    Q.   And what was discussed in that conversation that was
20    of significance to you?
21    A.   So if I remember correctly, the conversation involved
22    the defendant's grandmother living at Genesis House which
23    is on the JGS campus, and that he used to go there for
24    Christmas.
25    Q.   Now, how did that recording impact your
```

1    investigation?

2    A.    The reality was it was clear to us that the defendant

3    was well aware of the area.

4              MS. O'NEILL-GREENBERG:   Objection.

5              THE COURT:   Sustained.   Any part of that answer

6    before the objection was sustained is stricken out of your

7    memory and out your notes.   All right.

8    Q.    (By Ms. Berkower)   How did that recording compare to

9    what he told you in April?

10   A.    It directly contradicted what he had told us.

11   Q.    Now after he told you in your April interview that he

12   was unfamiliar with the area of Converse Street where the

13   device was placed, did you spend time investigating what

14   he told you?

15   A.    Yes.

16   Q.    And if he had told you about his connections to that

17   location, would you have taken those same investigative

18   steps?

19   A.    If he had told us initially, I'm sorry?

20   Q.    If he had told you when you spoke to him in April

21   that he had these connections to JGS or Genesis House,

22   would you have taken the same investigative steps that you

23   described at the end of your testimony yesterday?

24   A.    Yes.

25   Q.    So you would have -- okay.   Let me move on.

```
 1          So when you interviewed the defendant in April, April
 2   15th, did you ask him where he had been on April 2nd?
 3   A.   Yes.
 4   Q.   What was his response?
 5   A.   That he had not left the house in two weeks.
 6               THE COURT:  Was there an objection?
 7               MS. O'NEILL-GREENBERG:  No, I.
 8               THE COURT:  That's okay.  So there was no
 9   objection.  The question and answer were fine, were
10   appropriate.
11   Q.   (By Ms. Berkower) When you talked with him on April
12   15th, how clear were you with him about what you were
13   asking?
14   A.   We were asking about April 2nd.  That was the only
15   thing that really mattered to us.
16   Q.   And did you get the impression that he misunderstood
17   you?
18   A.   No.
19   Q.   As you continued to investigate this case, did you
20   find evidence that contradicted what he told you?
21   A.   Yes.
22   Q.   Now during the search of 20 Lori Lane, did you seize
23   the defendant's phone?
24   A.   Yes.
25   Q.   When you searched the phone, did you find evidence
```

```
1    concerning the defendant's whereabouts in the early
2    morning hours of April 2nd?
3    A.   Yes.
4    Q.   What kind of evidence did you find on his phone that
5    was significant to you?
6    A.   I found a voice mail from his mother.
7    Q.   And so let's talk about that voice mail.
8              MS. BERKOWER:  If we could have Government's
9    Exhibit 46 only for the court, counsel, and the witness
10   please?
11             A JUROR:  Is it stricken what he said about the
12   defendant going or being called to the mother's house
13   around Christmas or the grandmother's house?  Was that
14   stricken?
15             THE COURT:  I'm sorry, I don't recall the
16   question.
17        Alice, can you help me get to the question that was
18   stricken?
19   (Question and answer read back.)
20             THE COURT:  So that was the only portion that
21   was stricken.
22             A JUROR:  All right.
23             THE COURT:  Does that help?
24             A JUROR:  Yes.
25             MS. BERKOWER:  May I state for the record that
```

1    Government's Exhibit 99 is in evidence.  That was the
2    recording that the agent was discussing at the time.
3           THE COURT:  I think we're still just trying to
4    work the screen.
5           MS. BERKOWER:  May I proceed?
6           THE COURT:  Yes.
7    Q.   (By Ms. Berkower)  So you mentioned that you found a
8    voice mail on the defendant's phone, agent?
9    A.   Yes.
10   Q.   Now you have Government's Exhibit 46 on the screen in
11   front of you.  Do you recognize what that is?
12   A.   Yes.
13   Q.   What is it?
14   A.   That's a report from our Cellebrite program.  What it
15   does is when we ask to export a specific document, it
16   tells us where the document came from, when the document
17   was made, and when it was exported.
18   Q.   How did you get Government's Exhibit 46, the
19   Cellebrite report?
20   A.   To Cellebrite report came from the cell phone image
21   that we took from the defendant's house, the defendant's
22   phone.
23        The Cellebrite program was provided to me by Dustin
24   Wong in our RCFL and I personally -- I don't know if this
25   specific one, it actually looks like Dustin did this

1    specific one, but I reviewed it and identified the

2    important voice mail and Dustin exported it, created a

3    report to export it.

4    Q.    Is this an accurate copy of the report that Dustin

5    Wong created for you with regard to this voice mail?

6    A.    Yes.

7              MS. BERKOWER:  Your Honor, I would ask for

8    Government's Exhibit 46, PX-46, to be admitted into

9    evidence please.

10             MS. O'NEILL-GREENBERG:  No objection.

11             THE COURT:  No objection, that will be

12   admitted.

13   **(PX-46 was admitted.)**

14             MS. BERKOWER:  May we publish it?

15             THE COURT:  Sure.

16   Q.    (By Ms. Berkower)  So drawing your attention to this

17   report, can you tell us the date and time of the voice

18   mail that you found?

19   A.    It was on April 2, 2020 and it was at --

20   Q.    Well, let's go on to another exhibit.

21   A.    Yeah, I don't know.

22             MS. BERKOWER:  If we could have just for the

23   court, counsel, and the witness please Government's

24   Exhibit 44 and 45 side by side, Ms. McKenna?

25             I think we need the other screens turned off.

1    Q.   (By Ms. Berkower)  Special Agent McGonigle, are you

2    familiar with Government's Exhibit 44 and 45?

3    A.   Yes.

4    Q.   What are exhibits -- what is Exhibit 44?

5    A.   Exhibit 44 is a transcript of the voice mail left on

6    the defendant's phone.

7    Q.   What is Exhibit 45?

8    A.   45 is the actual voice mail.

9    Q.   And where did these -- where did 45 the voice mail

10   come from?

11   A.   That came from the defendant's phone.

12   Q.   Did you listen to it before coming to court today?

13   A.   Yes.

14   Q.   Did you also review Government's Exhibit 44, the

15   transcript?

16   A.   I did.

17   Q.   Is it an accurate copy of what's said on the voice

18   mail?

19   A.   It is.

20           MS. BERKOWER:  Your Honor, I would ask to admit

21   both of these Exhibits, 44 and 45.

22           MS. O'NEILL-GREENBERG:  No objection.

23           THE COURT:  No objection, that will be admitted.

24   **(PX-44 + PX-45 were admitted.)**

25   Q.   (By Ms. Berkower)  Special Agent McGonigle, before we

1    listen to this, Government's Exhibit 45, could you please

2    explain the date and time of the voice mail?

3    A.   So the date is April 2, 2020, the date the device was

4    placed.  And the time -- it actually just went off my

5    screen, but I think it was 7:40.  If we can put that back

6    on my screen, I can confirm that.

7         Yeah, 7:40 a.m. in the morning on April 2, 2020.

8              MS. BERKOWER:  If we could please play

9    Government's Exhibit 45 at this time, Ms. McKenna?

10   (Audio playing.)

11   Q.   (By Ms. Berkower)  Now after you found this voice

12   mail, did you take additional investigative steps

13   regarding its content?

14   A.   Yes.

15   Q.   What did you do?

16   A.   I reviewed additional messages on the phone.

17   Q.   So when you found additional messages on the phone,

18   were they consistent or inconsistent with what the

19   defendant told you about his whereabouts on April 2nd?

20   A.   Inconsistent.

21   Q.   Let's talk about some of those text messages now.

22              MS. BERKOWER:  If we could have just for the

23   court, counsel, and the witness please Government's

24   Exhibit 49.

25   Q.   (By Ms. Berkower)  Special Agent McGonigle, do you

| | |
|---|---|
| 1 | recognize Government's Exhibit 49? |
| 2 | A.   I do. |
| 3 | Q.   What is it? |
| 4 | A.   That's a text message from -- it's labeled from mom, |
| 5 | who I know to be Sheila Rathbun, to the defendant John |
| 6 | Rathbun. |
| 7 | Q.   And how did you get this text message? |
| 8 | A.   From the defendant's phone. |
| 9 | Q.   Did you go through the same process you described |
| 10 | with Dustin Wong to obtain a copy of this message from the |
| 11 | image copy of the defendant's phone? |
| 12 | A.   I obtained it from the image copy.  I don't know that |
| 13 | Dustin produced a report. |
| 14 | Q.   Did you get the image copy from Dustin Wong? |
| 15 | A.   I did. |
| 16 | Q.   And is this an accurate copy of the message that you |
| 17 | found on the defendant's phone? |
| 18 | A.   It is. |
| 19 |         MS. BERKOWER:  Your Honor, I'd ask for admission |
| 20 | of Government's Exhibit 49? |
| 21 |         MS. O'NEILL-GREENBERG:  No objection. |
| 22 |         THE COURT:  No objection, that will be admitted. |
| 23 | It can be published. |
| 24 | **(PX-49 was admitted.)** |
| 25 | Q.   (By Ms. Berkower)  Special Agent McGonigle, if you |

```
 1    can please read the message in Government's Exhibit 49?
 2    A.   "I need my car for 8:15.  It is now 8:09.  You did
 3    not leave your car -- you did not leave your key car, your
 4    car keys so I can't use yours.  So where are you and get
 5    home."
 6    Q.   What's the time on that message and the date?
 7    A.   The time is 8:09:52.  The date is April 2, 2020.
 8    Q.   Now, in addition to this, did you also obtain other
 9    messages that gave you information about the defendant's
10    location in the early morning hours of April 2nd?
11    A.   Yes.
12    Q.   In connection with this case, did you find contacts
13    in the defendant's phone, the image copy you referenced?
14    A.   Yes.
15    Q.   Did you find one for someone named Glenn Miliken?
16    A.   I did find one for Glenn Miliken although it wasn't
17    under that specific name.
18    Q.   What name was it under?
19    A.   I think it was Flynn.
20    Q.   Did you use that contact to try and locate the person
21    who had that phone?
22    A.   I actually didn't.  That person reached out to me.
23    Q.   Okay.
24    A.   Or reached out to me through the Longmeadow police
25    office.
```

1    Q.   So when you got in touch with this person that

2    reached out to you, what was his name?

3    A.   His name was Glenn Miliken.

4    Q.   And did he have the same phone number as the contact

5    listed for Flynn in the defendant's phone?

6    A.   Yes.

7    Q.   Did you meet with Mr. Miliken?

8    A.   I did.

9    Q.   And when you met with him, did he provide you with

10   text messages that he said were sent to him by the

11   defendant?

12   A.   He did.

13   Q.   What was the date of the messages that he said were

14   sent to him by the defendant?

15   A.   There was a message late on April 2nd and there was

16   messages very early on April 3rd.

17   Q.   Did those text messages concern the defendant's

18   whereabouts in the early morning hours of April 2nd?

19   A.   Yes.

20   Q.   Now, when Mr. Miliken showed you these messages, who

21   did they appear to be from based on the contact in his

22   phone?

23   A.   The contact information said Rathbun.

24   Q.   Did you do anything to check whether in fact those

25   messages came from the defendant John Rathbun?

1    A.    Yes.

2    Q.    What did you do to check whether the texts were

3    actually from John Rathbun?

4    A.    So on some phones the text message will have both the

5    name and the number underneath it, but this phone did not.

6    The way it displayed did not have both the name of the

7    individual and their phone number.  So I asked Glenn to

8    remove the contact information from his phone so that when

9    I viewed the text message, all that would come up was the

10   phone number that it was sent from.

11   Q.    In addition to that, did you take other steps to

12   verify whether these messages were exchanged with the

13   defendant, between Mr. Miliken and the defendant?

14   A.    Yes.

15   Q.    What did you do?

16   A.    We had gotten the toll records from the defendant's

17   phone which showed us when he was making phone calls or

18   when he was sending texts.  I reviewed those messages and

19   I found that there were five messages sent between the

20   defendant and Glenn Miliken on the morning of April 3rd.

21   And the text messages that I saw on Glenn's phone, the

22   times matched up exactly with the toll records suggesting

23   that the messages that John sent from his phone -- or the

24   messages that Glenn had on his phone were sent from John

25   Rathbun's phone.

```
 1              MS. BERKOWER:  If we could please just for the

 2     court, counsel, and the witness have Government Exhibit's

 3     110?

 4     Q.   (By Ms. Berkower)  Do you recognize Government's

 5     Exhibit 110?

 6     A.   I do.

 7     Q.   What is it?

 8     A.   Those are the text message data or the historical

 9     text message data that I was just describing.

10     Q.   Where did you get the information or where did the

11     information in this exhibit come from?

12     A.   Verizon Wireless.

13     Q.   Is this the complete Verizon Wireless records for

14     that time period?

15     A.   No.

16     Q.   What does this contain?

17     A.   That's just a snapshot that we're describing right

18     now.  There were numerous other calls that were not

19     relevant to Glenn.

20     Q.   And is this an accurate -- does this contain accurate

21     information taken from the Verizon records?

22     A.   It does.

23              MS. BERKOWER:  Your Honor, I'd ask at this time

24     to admit Government's Exhibit PX-110.

25              MS. O'NEILL-GREENBERG:  No objection.
```

1           THE COURT:  No objection.

2           MS. O'NEILL-GREENBERG:  Subject to our previous

3    objection.

4           MS. BERKOWER:  Were those admitted?

5           THE COURT:  Sorry.  What was admitted?

6           MS. BERKOWER:  110.

7           THE COURT:  110 is subject to -- and I just need

8    to be refreshed on the objection, would you remind me?

9    (Sidebar discussion.)

10          THE COURT:  Can you tell me your objection

11   again?

12          MR. WATKINS:  So this is tied to the next

13   exhibit that they're going to introduce which is the

14   Miliken text that we went through yesterday.

15          THE COURT:  All right.  I understand completely

16   now.  It's the Miliken text objection.  Okay.  I just

17   wanted to make sure I knew which of your objection you are

18   referring to.  Objection noted.  Okay.  Over your

19   objection, this is admitted.

20          MS. O'NEILL-GREENBERG:  Thank you, Your Honor.

21   (End of sidebar discussion.)

22          THE COURT:  This exhibit is admitted.

23   **(PX-110 is admitted.)**

24          MS. BERKOWER:  In that case, Your Honor, may we

25   publish Government's Exhibit PX-110 to the jury?

```
1              THE COURT:  Yes.
2    Q.   (By Ms. Berkower) Special Agent McGonigle, if you can
3    using this exhibit, could you explain the date and time of
4    the first message that you saw between Mr. Miliken and Mr.
5    Rathbun's phone?
6    A.   The picture you're asking about?
7    Q.   No.  Sorry, the historical -- under the historical
8    text message data.
9    A.   So the first message was sent from -- the defendant's
10   phone is 4047.
11   Q.   Those are the last four digits?
12   A.   Those are the last four.
13   Q.   What are the last four digits of Glenn Miliken's
14   phone?
15   A.   0680.
16   Q.   What was the date and time of the first message that
17   you reviewed from Mr. Miliken?
18   A.   It's April 3, 2020 at 12:05 a.m.
19   Q.   And who sent that message?
20   A.   John Rathbun.
21   Q.   Who received it?
22   A.   Glenn Miliken.
23   Q.   Now if we could -- and going through those messages
24   in that same column, the message send date for the
25   historical text message data, did you check those records
```

1    against the text message times and dates that Glenn
2    Miliken showed you?
3    A.    Yes.  So one of the text messages showed the times
4    each of the messages were sent and they were the same as
5    the times that occurred here in the Verizon business
6    records.
7            MS. BERKOWER:  So if we could have just for the
8    court, counsel, and the witness please Government's
9    Exhibit 53?
10   Q.    (By Ms. Berkower)  And, Special Agent McGonigle, do
11   you recognize Government's Exhibit 53?
12   A.    I do.
13   Q.    Starting below whatever is blacked out at the top,
14   could you explain what is in -- not including whatever is
15   redacted off, could you explain what is in this exhibit?
16   A.    So this is -- these are five text messages that are
17   sent between the defendant and Glenn Miliken.  Starting
18   with the message from the defendant -- do you want me to
19   read them?
20   Q.    No, don't read it yet.
21   A.    Okay.
22   Q.    Is this what Glenn Miliken showed you when you met
23   with him?
24   A.    Yes.  That's actually a picture of Glenn Miliken's
25   phone.

1    Q.   Who took that picture?

2    A.   I did.

3              MS. BERKOWER:  Now if we can go to the second

4    page of that exhibit?  Zoom out a little bit.  We can't

5    zoom out.  Okay.

6    Q.   (By Ms. Berkower)  Looking at the top, what does the

7    second page of this exhibit show?

8    A.   That's a screenshot of Glenn Miliken's phone with the

9    Rathbun contact information deleted.

10   Q.   Are these accurate copies of the messages that you

11   saw on Glenn Miliken's phone?

12   A.   Yes.

13             MS. BERKOWER:  Yes, Your Honor, I would ask for

14   admission of Government's Exhibit 53.

15             THE COURT:  Over the noted objection, those will

16   be admitted, yes.

17   **(PX-53 was admitted.)**

18             MS. BERKOWER:  Now if we can please publish this

19   exhibit?

20             THE COURT:  Yes.

21   Q.   (By Ms. Berkower) So looking at this exhibit now, if

22   you could explain based on this exhibit which messages

23   came from the defendant?

24   A.   So the message on the left with the red line next to

25   them are sent from the defendant.  The messages on the

1    right with the blue line next to them were sent by Glenn
2    Miliken.
3    Q.   Is that reflected in the phone records that you
4    looked at in Government's Exhibit 110?
5    A.   It is.
6    Q.   So if you could please note the date and timestamp of
7    those messages on this exhibit?
8    A.   Yes.  Actually the next picture has a better -- is
9    better to show the time stamps.
10              MS. BERKOWER:   Okay.  Going to page 2 of the
11   exhibit, Ms. McKenna, if you can scroll to the top?
12   Q.   (By Mr. Berkower)  Does this page show the same
13   messages from the page before?
14   A.   It does.
15   Q.   And what's the difference between the two of them?
16   A.   This is after I asked Glenn to take the defendant's
17   contact information out of his phone so that we can see
18   the number the messages were sent from.
19   Q.   And at the top do you see the number?
20   A.   I do.
21   Q.   What are the last four digits of the number that sent
22   these messages?
23   A.   4047.
24   Q.   If you could please read the date and timestamp of
25   the messages?

1   A.   The first one is sent April 3, 2020 at 12:05 a.m.

2   Q.   And could you read the first message with the red bar

3   next to it?

4   A.   "If you're up at six and want cash, call me to meet

5   at drop."

6   Q.   Was there a response from Mr. Miliken?

7   A.   Yes.

8   Q.   Could you read what it says?

9   A.   "Where?"

10   Q.   Was there another message from Mr. Rathbun?

11   A.   Yes.

12   Q.   Could you read that?

13   A.   "Few spots, depot to start, have black everything."

14   Q.   Was there another message from Mr. Rathbun after

15   that?

16   A.   Yes.

17   Q.   Could you please read that?

18   A.   "Been doing it alone past three night; I'm leaving

19   soon."

20   Q.   Did Mr. Miliken respond to that?

21   A.   Yes.

22   Q.   What did he write?

23   A.   "Be careful."

24   Q.   And what is the time of the first message in this

25   exchange?

1    A.    12:05 a.m.

2    Q.    What is the time of the last message in this

3    exchange?

4    A.    12:08 a.m.

5    Q.    After getting these messages from Glenn Miliken, did

6    you continue your investigation into the defendant's

7    whereabouts in the early morning of April 2nd?

8    A.    Yes.

9    Q.    Did you obtain recorded telephone calls between the

10   defendant and his mother in which this topic was

11   discussed?

12   A.    Yes.

13           MS. BERKOWER:   All right.   Now if we could

14   please have just for the court, counsel, and the witness

15   Government's Exhibit 96 and 96-2 side by side please?

16   Q.    (By Mr. Berkower)   Do you recognize Government's

17   Exhibit 96 and -- well, what is Government's Exhibit 96?

18   Do you know what it is?

19   A.    That appears to be the recording of the phone call.

20   Q.    And what was the date of this recording?

21   A.    May 14, 2020.

22   Q.    Did you review this recording before coming to court?

23   A.    I did.

24   Q.    In it who is speaking on this recording?

25   A.    The defendant and the defendant's mother Sheila

1    Rathbun.

2    Q.   In the recording do they describe -- do they discuss

3    -- does the defendant discuss his whereabouts on the

4    morning of April 2nd?

5    A.   Yes.

6              MS. BERKOWER:  Your Honor, I would ask at this

7    time if we could admit Government's Exhibit 96 but pause a

8    moment pending to publish pending admission.

9              MS. O'NEILL-GREENBERG:  This is subject to our

10   previous objection.

11             THE COURT:  All right.  Noted and this may be

12   admitted, yes.

13   **(PX-96 was admitted.)**

14             MS. BERKOWER:  Now, Ms. McKenna, if we can

15   return just to Exhibit 96?  Before this is published, cue

16   to timestamp 15:41.

17        If we can publish now please?

18   Q.   (By Ms. Berkower)  Now before we play this recording,

19   is there a male voice on the recording?

20   A.   There is.

21   Q.   Who is the male voice?

22   A.   John Rathbun.

23   Q.   Is there a female voice?

24   A.   Yes.

25   Q.   Who is the female voice?

1    A.   Sheila Rathbun.

2              MS. BERKOWER:  Ms. McKenna, we can please play

3    this from timestamp 15:41 to 16:28?

4    (Audio playing.)

5    Q.   (By Ms. Berkower)  Let's take a step back for a

6    moment.

7         Earlier I asked you about the drive test that you and

8    Special Agent Mastroianni conducted in this case.  Do you

9    remember testifying about that?

10   A.   I do.

11   Q.   And I asked you how you chose the route, the route

12   for your drive test, right?

13   A.   Yes.

14   Q.   You also testified -- well, what was the reason at

15   the time you did the drive test for doing that?

16   A.   We went onto Goggle Map and put the two addresses in

17   and chose the most direct route.

18   Q.   Now you also said earlier that you later found

19   evidence that confirmed the defendant drove down Converse

20   Street; is that right?

21   A.   I did.

22   Q.   Is this recorded conversation, Government's Exhibit

23   96, the evidence you were referencing?

24   A.   Yes.

25   Q.   Now in addition to this, did you obtain another

1    recording in which the defendant discussed driving by JGS

2    on the morning of the crime?

3    A.   Yes.

4              MS. BERKOWER:  If we could have just for the

5    court, counsel, and the witness Government's Exhibit 102

6    and 102-2, please?

7    Q.   (By Ms. Berkower)  Special Agent McGonigle, do you

8    recognize what is Government's Exhibit 102?

9    A.   Yes.

10   Q.   Is this a recorded conversation between the defendant

11   and his mother?

12   A.   It is.

13   Q.   What is the date of this conversation?

14   A.   August 13, 2020.

15   Q.   In this recording did they discuss being out of the

16   house -- the defendant being out of the house in his

17   mother's car?

18   A.   Yes.

19   Q.   Are you familiar -- did you listen to this recording

20   before coming to court?

21   A.   I did.

22             MS. BERKOWER:  Your Honor, at this time I would

23   ask for admission of Government's Exhibit 102.

24             MS. O'NEILL-GREENBERG:  Subject to our previous

25   objection.

```
 1              THE COURT:  Yes.  Noted.  Thank you.  So, yes,
 2     that's allowed over objection.
 3     (PX-102 was admitted.)
 4              MS. BERKOWER:  Prior to publishing, we just want
 5     to get to the right place.
 6     Q.   (By Ms. Berkower)  So before we return to play this
 7     recording, is there a male voice on the tape?
 8     A.   Yes.
 9     Q.   Who is the male voice?
10     A.   John Rathbun.
11     Q.   Who is -- is there a female voice?
12     A.   Yes.
13     Q.   Who is the female voice?
14     A.   Sheila Rathbun.
15     Q.   And during this call did they talk about the
16     defendant's van?
17     A.   They do.
18     Q.   What is the reason they're talking about the
19     defendant's van?
20     A.   We, being the FBI, not me personally, recently or
21     maybe that day returned the defendant's van to 20 Lori
22     Lane.
23              MS. O'NEILL-GREENBERG:  Objection.
24              THE COURT:  The objection is?
25              MS. O'NEILL-GREENBERG:  This has already been
```

1    testified to.

2              THE COURT:  I'm not sure.  I'll hear it.  Go

3    ahead.  Objection overruled.

4         Could you re-ask the question again so I can have

5    some context here?  Go ahead.

6              MS. BERKOWER:  Yes.  I'll try and remember it.

7    Q.   (By Ms. Berkower) During this call do the defendant

8    and his mother discuss the FBI returning the defendant's

9    van?

10   A.   Yes.

11   Q.   And when had the van been seized?

12   A.   In April.

13   Q.   During your search?

14   A.   That's right.

15   Q.   So did this conversation occur the day that the van

16   was returned?

17   A.   It seems likely.  I'm actually not sure what day it

18   was returned.

19             MS. BERKOWER:  So if we can play Exhibit 102

20   starting at timestamp 6:18 until timestamp -- sorry, 6:18

21   through 6:36.  We need to publish.

22             THE COURT:  Yes.  Allowed.

23   (Audio playing.)

24             MS. BERKOWER:  May we approach sidebar very

25   briefly?

1    (Sidebar conference.)

2              MS. BERKOWER:  Your Honor, I think that the cue

3    -- Ms. McKenna cut it short.  The defendants wanted the

4    "flimsy and ridiculous" part.  So we can fix that or we

5    can move on depending on what the defense's preference.  I

6    thought we had gotten the timestamp right but she cut it

7    just before that additional part, and so I wanted to bring

8    that to your attention before we move on.

9              THE COURT:  Sure.  Thank you.

10        Defense, do you want the full recording played?

11             MR. WATKINS:  I think we've heard enough.

12             THE COURT:  It did delete out a statement from

13   the defendant that says "They know now, but they didn't

14   when they took it.  You know, they didn't -- I mean, they

15   were so -- it's so flimsy and ridiculous."  That part was

16   left out.  So you do not want that played?

17             MR. WATKINS:  No.

18             MS. BERKOWER:  Thank you.

19   (End of sidebar conference.)

20   Q.    (By Ms. Berkower) Special Agent McGonigle, did the

21   recordings that were played this morning impact your

22   investigation into the defendant's whereabouts on the

23   morning of April 2nd?

24   A.    Yes.

25   Q.    And going back to that last call where the defendant

```
1    referred to "These idiots, they didn't know I didn't even
2    take the van," how did that impact your investigation?
3    A.    It --
4              MS. O'NEILL-GREENBERG:  Objection.
5              THE COURT:  Overruled.
6              THE WITNESS:  We didn't take the van because --
7    sorry, we took the van, not the defendant's mother car,
8    because at that time there was nothing -- on April 15th no
9    one told us anything that would lead us to believe the
10   defendant was driving his mother's car on April 2nd.
11   Q.    (By Ms. Berkower) In fact, what had the defendant
12   told you about whether he was out at all that morning?
13   A.    He said he was not out.  That he had been home for
14   two weeks.
15   Q.    Now, if you had known on April 15th --
16             MS. O'NEILL-GREENBERG:  Objection.
17             THE COURT:  Let me hear the question.
18   Q.    (By Ms. Berkower) If you had known on April 15th that
19   the defendant had been out in his mother's car, would you
20   have still searched it in the driveway?
21   A.    No.  We wanted to search the car.
22             THE COURT:  Hold on.  What's the objection?
23             MS. O'NEILL-GREENBERG:  It's already been
24   testified for awhile yesterday.
25             THE COURT:  It has been; asked and answered.
```

```
 1            MS. BERKOWER:  Your Honor, I would submit to the
 2   court that this speaks to one of the elements of the
 3   statutes that's charged.  If you'd like us to be heard at
 4   sidebar, I can explain.
 5            THE COURT:  But it was asked and answered
 6   yesterday.  That's insufficient?
 7            MS. BERKOWER:  Your Honor, I think -- may we be
 8   heard at sidebar briefly?
 9            THE COURT:  Okay.
10   (Sidebar conference.)
11            MS. BERKOWER:  Your Honor, to the extent that
12   the materiality part of 1001 requires that the false
13   statement affected an agency decision, I was trying to
14   elicit if the agent had known that the defendant had been
15   out in the mother's car he would have taken it off site
16   to search for blood.
17       Yesterday he testified that he didn't do that because
18   he didn't know.  Now he's testifying that if he had known,
19   he would have done it and so in our view it's
20   appropriate.
21            THE COURT:  All right.  I do understand.  All
22   right.  Given that explanation and that is a distinction.
23   I think there's a difference.  It's a distinction with a
24   difference from how he answered it so I will reverse my
25   ruling and allow the question.  Thank you.
```

1    (End of sidebar discussion.)

2              THE COURT:  Upon reconsideration, the objection

3    is overruled and you may ask the question and it may be

4    answered.

5    Q.   (By Ms. Berkower)  If you had known on April 15th

6    that the defendant had been out in his mother's car on

7    April 2nd, would you still have searched the car -- his

8    mother's car in the driveway?

9    A.   Our intention was always to take the car the

10   defendant was driving on April 2nd, the morning of April

11   2nd.  So we would have -- had we known the defendant was

12   driving his mother's car, we would have taken that car.

13   Q.   And what would you have done on top of what you did

14   on April 15th with that car?

15   A.   We would have towed it to an off-site and we would

16   have tested that car.

17   Q.   Tested it for what?

18   A.   For forensics specifically for blood and any other

19   trace evidence.

20   Q.   Now going back just very briefly to the defendant's

21   statement to you that he was not familiar with Converse

22   Street and the subsequent evidence you learned about his

23   connections to Genesis House, how did his initial denial

24   of familiarity with that area affect the timing of your

25   inquiry into Genesis House?

A.   We did not know the defendant's personal connection
to that property until we learned about the fact that his
grandmother lived there for a number of years and that his
mother had worked for the company or did work at that
moment for the company that managed Genesis House and
worked there for a number of years.
Q.   If you had known that on April 15th, would the timing
of your additional investigative steps into that
connection been different?
A.   Yes.
         MS. BERKOWER:  Your Honor, I have no further
questions.
         THE COURT:  Thank you.
     Defense?
         MR. WATKINS:  Thank you, Your Honor.
     May I get the computer?
         THE CLERK:  Yes.

**CROSS-EXAMINATION**

Q.   (By Mr. Watkins)  Good morning, Agent McGonigle.
A.   Good morning, counsel.
Q.   I'm going to start asking you about the drive test
and then after that, I'm going to turn you over to Mr.
O'Neill-Greenberg to ask you some questions.  Okay?
A.   Okay.
Q.   By the time that you conducted the drive test, you

1    had learned through your investigation that the fuel

2    canister had been placed there or when it's first observed

3    at 8:30 in the morning, correct?

4    A.    The -- I'm sorry, can you -- that was a long

5    question.  Can you?

6    Q.    Sure.  By the time you conducted that drive test, you

7    had learned, you learned very early in the case that the

8    fuel canister was first observed at 8:30 in the morning,

9    right?

10   A.    There was an initial -- there was a 911 call at a

11   certain time and then the person on the 911 call said they

12   had seen it earlier.  I'm not sure exactly what time they

13   said they saw it.

14   Q.    So the call was at 11:40?  That's when it was called

15   into 911, right?

16   A.    I don't have that in front of me.  I don't know.

17   Q.    And that person reported seeing it at 8:30 or

18   observing it at approximately 8:30?

19   A.    Again, I don't have that call in front of me so I

20   can't testify to that.

21   Q.    And so the fuel container -- knowing just that

22   information, right, that it had been left there, it was

23   first observed at 8:30, it could have been placed there at

24   7:30 in the morning, right?

25   A.    I'm sorry, the fuel container could have been placed

1    any time I suppose before 8:30.

2    Q.    Right.  But we also know after, right, 4:51:44

3    because that's when Officer DaBray drives down and the

4    fuel canister is not there, right?

5    A.    Correct.

6    Q.    So this drive test and this period of time we're

7    concentrating on is just ten minutes of a three and a half

8    hour period when that can was there, right?

9    A.    Well, I'm not sure how long.  I mean, the drive test

10   is longer than ten minutes but we started at 4:52.

11   Q.    You were talking about going down I-91 and we stopped

12   it there and you talked about how long it took there.

13   That was 8 minutes and 27 seconds, right?

14   A.    Correct.

15   Q.    So that's the time period we're talking about out of

16   that three and a half hour period, right?

17   A.    We were focused on when the defendant had passed JGS,

18   correct.

19   Q.    You're focusing on Mr. Rathbun, not on anybody else

20   in the world but Mr. Rathbun, right?

21   A.    Are you talking about in my investigation?

22   Q.    At that time when you did the drive test, you were

23   focusing on Mr. Rathbun, right, for that ten-minute period

24   of time?

25   A.    We were focusing on the person whose blood was on the

1    device, correct.

2    Q.   And you've learned in your investigation through the

3    cell tower information that Mr. Rathbun after five in the

4    morning is up in East Springfield all morning, right?

5    A.   After he hit on the towers at 91, he continued into

6    Springfield, correct.

7    Q.   That's correct.  And at 8:30 when that gas can is

8    first observed, Mr. Rathbun is clearly up in East

9    Springfield nowhere near JGS, right?

10   A.   Yes.  If you have the actual cell tower info, I can

11   review that and confirm that for you.  Off the top of my

12   heard, I can't do that.

13   Q.   I will put that up for you then.

14        Do you recognize this report?

15   A.   I do.

16   Q.   This is the CAST report from Ryan Burke?

17   A.   Yes.

18   Q.   You watched him while he went through the report,

19   right?

20   A.   I actually did not see his full examination, no.

21   Q.   But previously you've talked quite a bit about his

22   analysis of the cell site location information, right?

23   A.   I'm familiar with the report.

24   Q.   When I say CSLI, you'll understand that that's what I

25   mean, cell site location information, right?

1    A.   If that's how you're going to refer to it, I

2    certainly can follow along.

3    Q.   Well, do you refer to it in some other way?

4    A.   Cell tower information.

5    Q.   So looking at -- this is Exhibit 41, yes, 41.

6    Looking here at some of the timestamps from East

7    Springfield, does that help you?

8              THE COURT:  Do you want this displayed?

9              MR. WATKINS:  I'm sorry, yeah.  This is already

10   in evidence.

11             THE COURT:  So we're not going to display unless

12   there's a request to display.  So that's fine.  Just

13   checking.

14             MR. WATKINS:  I'm not seeing it on the big TV.

15   It's everywhere but the big screen.

16             THE COURT:  You're talking the big screen on the

17   floor or the one on the wall?

18             THE CLERK:  The floor.

19             THE COURT:  Yeah, we did have a problem

20   yesterday.

21             A JUROR:  Excuse me.  May I be excused for a

22   bathroom break?

23             THE COURT:  Absolutely.  Sure.  So everyone can

24   go and take five minutes and it will give us a chance to

25   figure out the screens.

1          All right.  The same instructions apply.  No talking

2     about the case or any access to the case.

3               THE CLERK:  All rise.

4               THE COURT:  The witness can step down.  We will

5     take at least ten minutes or so, or however long it takes

6     to get the TV going.

7     **(The jury left at 11:04.)**

8               THE COURT:  I'm thinking ten minutes.  It could

9     go longer.  I don't know what we are going to do with the

10    screen.  Maybe we turn this into a little longer morning

11    break, so.

12    **(A recess was taken at 11:05 until 11:31.)**

13              THE COURT:  Ladies and gentlemen, was everyone

14    able to follow my instructions not to talk to each other

15    about the case?  Anyone about the case?  Don't research

16    the case?  No posting on social media?  No reading

17    articles about the case?  The entire instruction, was

18    everyone able to follow?

19         All right.  Affirmative responses from all jurors.

20    They remain fair and impartial.

21         I'm sorry about not being very efficient today with

22    your time.  This break -- the problem is we're just having

23    problems again with the screens.  So we had wires out and

24    we're re-plugging wires in and trying to get things

25    working.  It's just not happening.

1        So we have problems.  We're waiting for IT to get out

2   here to help us.  So we'll probably go back to using the

3   two screens on the edge of the table and hope that holds

4   up.  Okay.

5           MS. BERKOWER:  Your Honor, may we be briefly

6   heard at sidebar?

7           THE COURT:  Yes.

8   (Sidebar conference.)

9           MS. BERKOWER:  Your Honor, I just wanted to very

10  quickly report to the court that during the break I went

11  to the ladies' room on the floor below and as I was

12  exiting the door, I ran into the juror in Seat 7.  She

13  sort of was surprised and said sorry.  I just looked away.

14  We had no further interaction, but I wanted to put that on

15  the record that that occurred.

16          THE COURT:  Thank you.  It doesn't sound like we

17  need to do anything further about that.

18       Defense?

19          MS. O'NEILL-GREENBERG:  We agree.

20          THE COURT:  All right.  Thank you for

21  reporting.

22          MS. BERKOWER:  Thank you.

23  (End of sidebar discussion.)

24          THE COURT:  Out IT person from Boston called my

25  cell phone so I handed my cell phone to our clerk Bethany.

1    I'm just trying to give you all the information I can.

2    All right.

3              MR. WATKINS:  May I proceed?

4              THE COURT:  Absolutely.

5    Q.   (By Mr. Watkins)  Agent McGonigle, before we broke --

6    I lost my computer.  The exhibit is way down in the

7    bottom.  There we go.

8        Before we broke we were talking about the three and a

9    half hour period of time where the fuel canister could

10   have been left down at JGS; do you remember that?

11   A.   Yes.

12   Q.   And I asked you about times that Mr. Rathbun was in

13   East Springfield, right?

14   A.   Yes.

15   Q.   And you asked me to remind you about what times --

16   you wanted to look at something, right?

17   A.   I just wanted to be directed to where you were

18   speaking about --

19   Q.   Okay.

20   A.   -- or what times you're speaking about.

21   Q.   Before I get there, you've been investigating this

22   case now since April 2, 2020, right?

23   A.   Yes.

24   Q.   You were called the first day, right?

25   A.   I was.

1    Q.   And you were the lead case agent and are the lead

2    case agent?

3    A.   I am.

4    Q.   You've poured over hundreds of -- thousands of pages

5    of records, right?

6    A.   I don't know the number, but I've certainly looked at

7    a lot of information.

8    Q.   You collaborated with Dustin Wong and you've

9    collaborated with Ryan Burke, right?

10   A.   I've worked with Dustin Wong and I've worked with

11   Ryan Burke.

12   Q.   And this is -- for you it's been your priority since

13   April 2nd, right?

14   A.   I'm not sure I'm willing to testify to that.

15   Q.   I'm sorry?

16   A.   I'm not willing to testify to that.  I am the case

17   agent in this case.

18   Q.   Right.  And in the last two months you've been

19   working nonstop on this case, right?

20   A.   I'm working very hard on this case.

21   Q.   And so anyway, with all of that, I'm now going to go

22   here and help remind you about where Mr. Rathbun was for

23   the periods of time after 5 a.m.  Okay?

24   A.   Thank you.

25   Q.   So what I asked you was if Mr. Rathbun -- or if the

```
 1      fuel container was left at JGS at six in the morning, Mr.
 2      Rathbun couldn't have done that; is that true?
 3                  THE COURT:  Attorney Watkins, what do you want
 4      displayed?  Do you want this displayed for everyone?
 5                  MR. WATKINS:  I'm sorry, yes.  I thought it was
 6      up on everybody's screen again.
 7                  THE COURT:  It's only on the attorneys' screens.
 8            So, Bethany, full publication and that screen turned
 9      toward the jurors.
10                  THE CLERK:  Okay.
11      Q.   (By Mr. Watkins)  One more time.  Exhibit 41, this is
12      the CAST report that's in evidence, I've highlighted a
13      line.  Can you tell me what time that line says?
14      A.   6:04 a.m.
15      Q.   And this is in East Springfield, correct?
16      A.   So I do see it's off of a tower here.  Is that East
17      Springfield?  It's Springfield.  I wouldn't be able to
18      tell you that it was East Springfield.
19      Q.   Now you've gone to 90 El Paso Street?
20      A.   I have.
21      Q.   You've been to other locations in East Springfield,
22      right?
23      A.   Again, I'm not familiar with Springfield as East
24      Springfield.  I'm familiar with Springfield just
25      generally.  I'm not from Western Massachusetts so I don't
```

1    necessarily know the neighborhoods of Springfield.

2    Q.   You're in the Springfield resident agency office;

3    that's where you're assigned to?

4    A.   I am.

5    Q.   And you don't know Springfield?

6    A.   No, I said I don't know the name East -- I don't

7    refer to that area as East Springfield.  So I'm happy to

8    -- if you want to tell me it's 90 El Paso, I'm very

9    familiar with that area.

10   Q.   We'll refer to it as this area around Carew Street

11   and St. James.  Does that make sense?

12   A.   Yes.

13   Q.   So let's go back to this.

14        At 6 o'clock in the morning in this area of Carew and

15   St. James in Springfield, Mr. Rathbun's phone was there.

16   It's not down here at JGS, right?

17   A.   His phone did not hit a tower near JGS; that's

18   correct.

19   Q.   And we heard from Ryan Burke, and maybe you watched

20   it, that that means it can't be down there at JGS, right?

21   A.   It means his phone is not there.

22   Q.   That's correct.

23        I asked you about whether or not Mr. Rathbun could

24   have placed the container at 7 o'clock.  Can you read what

25   time is here?

1    A.    7:06 a.m.

2    Q.    And at 7:06 his phone is bouncing off a tower in the

3    St. James and Carew Street area?

4    A.    So this is a data log and it's different than a call

5    log, and I'm not an expert on how those -- I know that

6    they differ, and I don't that I'm qualified to answer

7    where his phone is at that time because that is a

8    different thing than a cell phone call hitting off a

9    tower.

10   Q.    Agent McGonigle, are you saying Mr. Rathbun could be

11   down at JGS at 7:06 when this entry is made here?

12   A.    I'm saying I'm unqualified to speak about what that

13   data point means because it's not a call.  It's a data

14   transmission.

15   Q.    Here is 7:12.  That says voice?

16   A.    It does.

17   Q.    So there you would agree with me that it reflected

18   off a cell tower in the St. James and Carew Street area?

19   A.    His phone hit a cell tower there.

20   Q.    If the container were placed at 8 a.m. at JGS, tell

21   me what time this particular entry says?

22   A.    It says 8:05 a.m.

23   Q.    And this indicates that the phone was bouncing off of

24   a tower in the St. James and Carew Street area, right?

25   A.    Yes.

1    Q.   The can was found no later than 8:30 in the morning,

2    right?  We can agree on that?

3    A.   No.  I told you that I was not familiar with that.

4                MR. WATKINS:  Can I read a stipulation into the

5    record, Your Honor?

6                MS. BERKOWER:  No objection, Your Honor.

7                THE COURT:  Okay.  Now let me just instruct the

8    jury on a stipulation.

9         A stipulation, which is what is about to be read into

10   the record, is an agreement between each side.  An

11   agreement between the defense and the prosecution as to a

12   certain fact or facts.  So both sides agree and they agree

13   the facts are true.

14        So the stipulation you can accept it as evidence.

15   It's not challenged by either side.  It's agreed to by

16   either side, and so you accept the stipulation as evidence

17   as agreed to by each side.  There's no dispute there.  All

18   right.

19                MR. WATKINS:  Thank you, Your Honor.  May I?

20                THE COURT:  Yes.

21                MR. WATKINS:  "The government and the defendant

22   agree Stipulation Number 1:  "Regina Ellis, who lives near

23   the location where the yellow fuel canister was placed,

24   first observed the canister at approximately 8:30 a.m. on

25   April 2, 2020."

1    Q.   (By Mr. Watkins)   Agent McGonigle, did the

2    prosecution team consult with you before they entered into

3    that stipulation?

4    A.   I'm aware that there was a phone call.  They don't

5    ask me about stipulations between you and them.

6    Q.   Is what we just read and just agreed to inconsistent

7    with anything that you investigated?

8    A.   No.

9    Q.   And you've read reports about an interview with

10   Regina Ellis, right?

11   A.   Yes.

12   Q.   And you tried to -- you've talked with Regina Ellis

13   yourself?

14   A.   I have.

15   Q.   Did she ever say anything different from 8:30 in the

16   morning?

17   A.   No.

18   Q.   So before when I asked the question, what was the

19   confusion there?

20   A.   That was her estimation of when the can was placed.

21   You were trying to get me to agree that that was when she

22   observed it.  I'm telling you that was her estimation.

23   Q.   Showing you this entry from Exhibit 41 at 8 -- well,

24   what time does it say?

25   A.   8:29.

1    Q.   And that's not in the Carew and St. James area but a

2    little closer over here where Western England University

3    is a landmark, right?

4    A.   Yes, that appears to be the towers.

5    Q.   JGS is way down here, right?  (Indicating)

6    A.   That's correct.

7    Q.   So that would indicate that Mr. Rathbun's phone, and

8    if Mr. Rathbun was holding it, was nowhere near JGS at

9    8:30, right?

10   A.   The phone is not hitting off a tower down there.

11   Q.   Now you learned from Ryan Burke and Dustin Wong that

12   there are a couple of data points about where Mr. Rathbun

13   was during that early part of the period, early morning of

14   April 2nd, correct?

15   A.   Which time period are you speaking about?

16   Q.   April 2nd, again looking at Exhibit 41, the title

17   says 12:10 a.m. to 5:05 a.m. on April 2nd; is that what it

18   says?

19   A.   It is.

20   Q.   It indicates here various text messages, right?

21   A.   Yes.

22   Q.   They're all text messages actually; is that correct?

23   A.   It appears to be that way, yes.

24   Q.   Well, listen.  You investigated this thing.  You've

25   gone through a bunch of these records.  You know the

1  difference between the text messages and phone calls and
2  Facebook messages, right?
3  A.   Counsel, there's SMS messages; there's MFS messages;
4  there's Facebook Messenger messages, and so I'm telling
5  you that they appear to be text messages.  That's all.  I
6  don't -- there's iPhone messages.
7  Q.   But they are text messages?
8  A.   They are messages sent -- they are words that are
9  sent through phones.
10  Q.   So going back to data points of time, this 4:38 here
11  -- I'll blow that one up.  Now my screen is frozen.  Okay.
12  Sorry about that.  Let's try that one again.
13       4:38:38 in the morning, right?  And what does that
14  text say?
15  A.   "Do you just put it in your mailbox.  I'll be."
16  Q.   Right.  And we've heard from Ryan Burke.  That's
17  where that one is, consistent --
18  A.   No.
19  Q.   -- with Mr. Rathbun being at home?
20  A.   No.
21  Q.   All right.  Let me go back.  You're right.
22       This is a text message just after that 4:38:38.  We
23  heard from Dustin Wong -- or I'm sorry, Ryan Burke at four
24  minutes before there's a voice call from an area that is
25  consistent with where Mr. Rathbun lives, right?

1    A.    There's a voice call that hit in that bubble I think

2    is what Ryan testified to.

3    Q.    And it's inconsistent with being at JGS?

4    A.    That's correct.

5    Q.    The next text message is at 5 o'clock in the morning,

6    right?

7    A.    Yes.

8    Q.    And it says "knock, knock, knock," right?

9    A.    It does say that.

10   Q.    And there's also a voice call here at 5:01:44, right?

11   A.    Yes.

12   Q.    And that's the one you were testifying to about when

13   you were doing the drive test.  That was an important data

14   point for you?

15   A.    That's correct.

16   Q.    And your drive test, what you're trying to do is

17   determine how far away from JGS that call could have hit

18   up there, right?

19   A.    We were trying to show how -- the time it would take

20   to get from JGS to 90 El Paso Street.

21   Q.    So this was the data point you used was this 5:01:44

22   a.m., right?

23   A.    That was one of the ones, yes.

24   Q.    And you stopped us at the intersection of 91 and 291,

25   right?  And that's when you determined how long it had

1   taken to get up there, right, or the whole thing had

2   taken?

3   A.   So just to be clear, the video did go until 90 El

4   Paso but when we showed it in court here, we ended the

5   video at the on-ramp or off-ramp to 291.

6   Q.   I'm sorry, I didn't hear that.  Can you say that

7   again?

8   A.   The video stopped -- when we finished the video that

9   we were showing, that was the off-ramp to 291.

10  Q.   Right.  You stopped there and that's when you told

11  the jury at that point it's been 8 minutes and 27 seconds

12  since you started the phone, right?

13  A.   That's correct.

14  Q.   All right.  So that means -- well, let me -- because

15  I'm not terribly good at math, I did some homework on

16  this.  I want to show it to you and see if we can agree on

17  this.

18          MS. BERKOWER:  Your Honor, I think the jury

19  screens are on right now so I'm not sure.

20          MR. WATKINS:  That's true.  We should turn the

21  jurors' screens off.

22          THE COURT:  Okay.  Thank you.

23  Q.   (By Mr. Watkins) Special Agent McGonigle, do you see

24  what I have done here?

25  A.   I do.

1    Q.    Okay.  So I've taken that 5:01:41 that you used as a

2    data point and subtracted 8 minutes and 27 minutes.  Are

3    you with me so far?

4    A.    Well, actually I think it's 5:01:44.

5    Q.    Forty-four seconds.  All right.

6    A.    And the math isn't correct.

7    Q.    Okay.  So it should be 5:01:44 rather than what I've

8    written 5:01:41?

9    A.    And the actual subtraction is not correct.

10   Q.    The actual subtraction is not either.  What I should

11   have -- the subtraction is actually -- I should have put

12   5:01:44 and then it adds up correctly, correct?

13   A.    So you want me to change all the numbers?

14   Q.    No.  What I want you to do is we'll go back -- I'll

15   withdraw this for a moment.

16              THE COURT:  Can I ask you a question, Agent?

17        The number that we're talking about is eight -- your

18   drive time is 8:01, the amount of time you're testifying

19   to.

20              THE WITNESS:  So, Your Honor, I'm sorry to where

21   we stopped the video?

22              THE COURT:  To where you stopped -- well, what's

23   been referenced is when you were getting to that

24   off-ramp.

25              THE WITNESS:  Yes.

1           THE COURT:  That point, we've been referring to

2      that.  What time was that?

3           THE WITNESS:  I believe it was 8:27 from JGS to

4      the farthest possible point you could -- past the farthest

5      possible point you could have hit that tower on.

6           THE COURT:  All right.  That was to where that

7      off-ramp was?

8           THE WITNESS:  That's where the video went to,

9      correct.  But the actual data itself stopped before that

10     off-ramp.

11          THE COURT:  Okay.  Your ultimate destination was

12     where?  Your ultimate destination wasn't the off-ramp.

13     Where was your ultimate destination.

14          THE WITNESS:  90 El Paso Street.

15          THE COURT:  Okay.  So 90 El Paso Street was an

16     extra how many minutes from the off-ramp?

17          THE WITNESS:  I'll be honest, Your Honor, I'd

18     have to review the video.  I don't remember.

19          THE COURT:  Okay.  I was trying to know in my

20     mind what your markers were.  So that helped explain using

21     the off-ramp and the time.

22          Attorney Watkins, absolutely ask any questions you

23     need to clarify if I confused anything more.

24          MR. WATKINS:  I want everybody to be clear on

25     this and I'm trying to go step by step.

1    Q.   (By Mr. Watkins)  So let me go back and point out

2    again here, 5:01:44 in the morning, right?  That is the

3    same spot where yesterday you told us 8 minutes and 27

4    seconds had elapsed, right?

5    A.   No.

6    Q.   What did you tell us?

7    A.   My testimony is the video -- the video shows us

8    exiting the 291 off-ramp and at that point there's 8

9    minutes and 27 seconds elapsed.  That's not -- I don't

10   know that I'm qualified to speak about this.  Ryan Burke

11   did.  That doesn't prove anything.  It's just these are

12   the bubbles where he could have been.  We merely drove

13   that to show that at the last possible minute where we

14   were or the farthest possible destination.

15   Q.   That's right.

16        So that's why I talked about 291 here because that's

17   getting close to 291 up there, right?

18   A.   Yes.

19   Q.   So this area is where you said 8 minutes and 27

20   seconds had elapsed, right?

21             THE COURT:  Do you want this displayed?

22             MR. WATKINS:  Yes.  This is in evidence, Exhibit

23   41.

24             THE COURT:  Thank you.

25   Q.   (By Mr. Watkins) I'm going to go back for the jurors.

1        So 5:01:44 in the morning a voice call bounces off of

2   this cell tower.  You with me so far?

3   A.   Yes.

4   Q.   And Ryan Burke has told us that this area here would

5   hit that cell tower, right?

6   A.   I think that's right.  I don't want to testify for

7   Ryan.

8   Q.   Well, you reviewed this exhibit with him and you

9   reviewed the cell tower information with him, right?

10  A.   I did.  Counsel, I'm not an expert on this.  Ryan

11  Burke -- my understanding is that was Ryan Burke's

12  testimony, but I don't want to testify for what he said.

13  Q.   And I appreciate that.  But you've read this report,

14  right?

15  A.   Yes.

16  Q.   And you've discussed the report with him, right?

17  A.   Yes.

18  Q.   And so that's why you picked that spot is because

19  that was still within the coverage area of that cell

20  tower, right?

21  A.   I guess I'm a little unclear.  We drove the whole

22  length of 91.  We stopped the video at the end of 291 to

23  show the entire length of the cell tower coverage.

24  Q.   Right.  And at that point where you stopped the

25  video, how much time had elapsed?

1    A.   Eight minutes and 27 seconds.

2    Q.   Okay.  So subtracting 8 minutes and 27 seconds from

3    5:01:44, what is the answer to that?

4    A.   Do you want -- I'd have to do the math I guess.

5    Q.   How about 4:53 in the morning and 17 seconds?

6    A.   Well, I don't understand where you're getting the 17

7    seconds from.

8    Q.   I'm sorry?

9    A.   You mean 17 tenths of a second or 17 seconds?  I'm

10    still not sure where you're getting the 17 seconds from.

11    Q.   You said 27 seconds, 8 minutes and 27 seconds.

12    A.   Okay.

13    Q.   Is 4 o'clock -- 4:53:17 plus 8 minutes and 27

14    seconds, is that not 5:01:44 a.m.?

15    A.   Yes, I suppose.  Counsel, if I could have a

16    calculator, I'll do it myself.  I didn't realize -- I

17    wasn't expecting to do math on the witness stand today.

18    Q.   You did the drive test in order to show that Mr.

19    Rathbun could have placed that device at JGS, right?

20    A.   That's what the drive test showed us.

21    Q.   So are you telling me you didn't bother to calculate

22    times going back as you were doing that?

23    A.   I did.  I'm saying I don't have them in front of me.

24    Q.   I put on screen now what's already been admitted as

25    Exhibit 83-A.

1       Agent McGonigle, do you recognize this screenshot

2   from Officer DaBrae's cruiser cam?

3   A.   I do.

4   Q.   And do you recognize that time?

5   A.   Yes 4:51:44.

6   Q.   First when you said we started the -- I think I

7   lost -- can we get the exhibit?

8       THE CLERK:   I'm working on it.

9   Q.   (By Mr. Watkins) When you said you might have started

10  the drive test experiment at 4:51, that would have been an

11  inaccurate thing to do because the cruiser was there at

12  4:51?  There was nobody else there, right?

13  A.   I think we said it was 4:52.

14  Q.   I'm sorry?

15  A.   I think I said it was 4:52.

16  Q.   You said 4:51 or 4:52, you couldn't remember?

17  A.   But then counsel redirected me and I did remember.

18  Q.   But you will agree with me that as Officer DaBrae is

19  approaching this stop sign at 4:51:44, there is no one

20  else -- there's no one parked here?  There's no one else

21  in the area, correct?

22  A.   That's correct.

23  Q.   And when you started your drive test expirement, you

24  and Agent McGonigle (sic) were parked right in this area,

25  right?   (Indicating)

1    A.   Myself and Agent Mastroianni.

2    Q.   I'm sorry.  And Agent Mastroianni, the two of you

3    were parked in this area?  (Indicating)

4    A.   Yes.

5    Q.   Almost where the cruiser is but perhaps pulled over

6    to the side a little bit?

7    A.   Yeah.

8    Q.   If somebody had come down this ramp, they couldn't

9    get by you there because it's a narrow one way or a narrow

10   right side of the driveway, right?

11   A.   We were parked far enough back from the stop sign.  I

12   think someone could have gone around us.

13   Q.   Now, I want to keep in mind this 4:51:44 time on

14   there because you mentioned that you started the video at

15   4:52.  Why did you decide 4:52?  Why did you decide to

16   begin the drive test at 4:52?

17   A.   Because of Officer DaBrae's video.

18   Q.   Okay.  So let's take a look at Officer DaBrae's video

19   next.

20   (Video playing.)

21   Q.   (By Mr. Watkins)  Do you recognize where we are in

22   Officer DaBrae's video?

23   A.   Yes.

24   (Video playing.)

25   Q.   (By Mr. Watkins)  She's just going over the speed

1   bumps, some of them.  This is Exhibit 83 by the way.

2       Right there is where we -- right about there is where

3   the screenshot was taken?

4   A.   That seems reasonable.

5   Q.   I'm sorry?

6   A.   That seems reasonable.

7   Q.   Well, you've looked at the screenshot.  You've looked

8   at the video.  We all have at this point, so 5:41:44.

9       Okay.  Continuing on.

10  (Video playing.)

11       MS. BERKOWER:  I'm sorry, could we get a

12  timestamp where you stopped it before and then asked him

13  that question?  I'm sorry.

14  Q.   (By Mr. Watkins)  So putting the screenshot back up

15  which is where the timestamp is.

16       MS. BERKOWER:  Your Honor, the basis for my

17  objection is that there's no timestamp on the video.

18  There's only a timestamp on the screenshot.  So to the

19  extent that Mr. Watkins is referring to certain parts of

20  the video, we just want to understand where on the video

21  he is referring to.

22       MR. WATKINS:  Okay.

23       MR. WATKINS:  I lost it again.

24       THE COURT:  Hold on one second.  We have an

25  issue up here with the video.

1        Where does he get the timestamps?  He can just call

2   it out by what's on the video?

3            MS. BERKOWER:  Yes, Your Honor.  I think there

4   should be like a video bar on the bottom that says the

5   time on the video that Officer DaBrae took.  The

6   screenshot has additional information that's not

7   unfortunately on the video, but we just want to orient

8   ourselves on the video itself.

9            MR. WATKINS:  I see.  So you want the time on

10  the video?

11           MS. BERKOWER:  Yes, please.

12           MR. WATKINS:  Okay.  I need the exhibit back.

13  Q.   (By Mr. Watkins)  All right.  Let's back things up

14  here.  So the timestamp on the video is 15:14.

15           MS. BERKOWER:  I think our question wherever you

16  paused to say is this the time, that makes it.

17           THE COURT:  Is that workable?  Okay.

18  (Video playing.)

19           MR. WATKINS:  And stop.  This is going to be at

20  15:33.

21           MS. BERKOWER:  Thank you.

22  (Video playing.)

23  Q.   (By Mr. Watkins)  Okay.  You testified and we've seen

24  that Officer DaBrae turns left.  I'm just going to stop it

25  here, 15:34.

1        It goes down to this next intersection and begins to

2   turn.  This is 15:41.

3        What you told us yesterday was that you estimated it

4   took 15 to 17 seconds for her to drive that distance

5   between the driveway of JGS and then make this turn,

6   correct?

7   A.   I did say that, yes.

8   Q.   So going back to the Officer DaBrae's video there,

9   4:51:44, 15 to 17 seconds takes us to 4:52, right?

10  A.   So I'm sorry, you're trying to have me add 15 seconds

11  to the video, the screenshot?

12  Q.   Correct.

13  A.   I don't agree with that.

14  Q.   You don't agree with adding?

15  A.   I don't agree with the data points you're providing.

16  Q.   So Officer DaBrae's screenshot was at 4:51:44; do you

17  disagree with that?

18  A.   No.

19  Q.   Do you disagree with your testimony yesterday that it

20  took 15 to 17 seconds to get to this point?

21  A.   No.

22  Q.   Then 4:52 would be the time at this point; do you

23  disagree with that?

24  A.   If we wanted to subtract the math on the actual

25  screen, I mean I think that would be a more accurate way

1     to figure it out.

2     Q.   So you're saying your testimony yesterday was

3     inaccurate?

4     A.   I'm not saying that.  Are you asking me to say

5     whether it was 15 or 17 seconds and I agree with that.

6     Q.   I'm sorry?

7     A.   I asked -- you asked me to say if it was 15 to 17

8     seconds and I agree with that.  If you're asking for an

9     actual time, we'd have to do the math on the screen.

10    Q.   Okay.  Looking at this video it is showing down the

11    road towards East Longmeadow, correct?

12    A.   This is still Longmeadow.  If you follow this street

13    all the way down, it will eventually hit East Longmeadow.

14    Q.   And you've testified before that that would be the

15    direction where Mr. Rathbun was coming, right?

16    A.   That's correct.

17    Q.   So on this shot of Officer DaBrae's dash cam, there

18    was no car coming down there, right?

19    A.   That's correct.

20    Q.   And, in fact -- so, for example, if Mr. Rathbun's car

21    drove by there a minute later, we're at 4:53 at this

22    point, right?

23    A.   A minute after 4:52, yes.

24    Q.   But again there's no car passing right by Officer

25    DaBrae at this point going into that driveway?

A.   When this shot is being taken, there's no car
driving.

Q.   It's true, but you told us -- you've agreed that the
screenshot's at 4:51:44 and that this took 15 to 17
seconds to get from that screenshot spot to this corner so
that's 4:52.  Another minute goes by, that's 4:53; is that
correct?

A.   I guess, yes.

Q.   And I'm going to go back for a second to talk about
that 8 minutes and 27 seconds you took off the cell tower
at 291 and 91 and the figure we came up with was 4:53:17,
right?

A.   That's -- okay.  That's the figure subtracting 8:27
which again is longer than it would have taken the
defendant to hit the end of that bubble.

Q.   So your testimony was when you estimated yesterday 15
to 17 seconds, that was wrong?

A.   No.  That's not what I'm saying.

Q.   But when you decided to start that drive test at
4:52, you didn't take into account that Officer DaBrae had
turned left and that there was no car coming down from
East Longmeadow, right?

A.   I don't understand the question.

Q.   You decided to start the drive test at 4:52 in the
morning, right?

1    A.   Yes.

2    Q.   Fifteen seconds after the screenshot of Officer

3    DaBrae's cruiser said nobody was there, right?

4    A.   The screen here does not show anyone coming.

5    Q.   Let's go back to 83-A.

6         So Officer DaBrae's cruiser cam says it's 4:51:44

7    when she's just a few feet away from the stop sign, right?

8    A.   Yes.

9    Q.   It's a similar but not exact place to where you and

10   Agent Mastroianni began the drive test, right?

11   A.   Correct.

12   Q.   You decided you're going to start it at 4:52, right?

13   A.   Yes.

14   Q.   Which is 15 seconds after this screenshot is taken,

15   right?

16   A.   Yes.

17   Q.   Sixteen seconds?

18   A.   Okay.

19   Q.   What I'm asking is you didn't take into account that

20   there was actually a longer period of time because Officer

21   DaBrae went down the road to the left for 15 seconds and

22   then there's no car being seen coming the other way,

23   right?

24   A.   Taking it into how?  How would you expect us to take

25   it into the account?  I'm not sure.

```
1    Q.   About when you were going to start your drive
2    experiment?
3    A.   You're suggesting it should have started 15 seconds
4    after we started it?
5    Q.   What do you think?
6    A.   I'm asking the question, counsel?  I'm not sure what
7    you're directing me to answer.
8    Q.   You've become familiar with the area of Converse
9    Street over the course of this investigation, correct?
10   A.   That's correct.
11   Q.   Showing you Exhibit 104 here, are you able to orient
12   yourself on what we're seeing?
13   A.   I am.
14   Q.   This is the driveway where you and Agent Mastroianni
15   are parked doing the drive test experiment, right?
16   A.   Correct.
17   Q.   Here is where Officer DaBrae turns left and I stopped
18   it right there where she's turning right onto that street,
19   right?
20   A.   Correct.
21   Q.   Here is the road where we're not seeing any cars come
22   down, correct?
23   A.   Correct.
24   Q.   This driveway here is the entrance to Genesis House;
25   it's one way, right?
```

1    A.   It is a one-way street.

2    Q.   And again, this is the driveway where you and Agent

3    Mastroianni parked to begin at 4:52, right?

4    A.   That's where the device was placed.

5    Q.   So to get to that particular spot where you were

6    parked, someone would have to drive one of two ways.  One

7    is through the Genesis House road and then stop here and

8    then they would have been where you and Agent Mastroianni

9    were parked, right?

10   A.   You could do that.

11   Q.   And along here there are speed bumps every little

12   ways, right?

13   A.   I saw some speed bumps in the video, yes.

14   Q.   And we've heard testimony that there was actually a

15   hearse in this area with agent or with Officer DaBrae

16   when she left just before -- just after that screenshot in

17   the video that we saw, right?

18   A.   Yes.

19   Q.   So here if one were to go in this way, so an

20   additional minute or so to get around that whole loop;

21   would you agree with me on that?

22   A.   I've never timed that.

23   Q.   You've never timed it but you've been over there a

24   whole lot now, right?

25   A.   I would never drive that way.

1    Q.   I'm sorry?

2    A.   I would never take that route to get to the entrance

3    to JGS.

4    Q.   You've never gone into Genesis House, this part of

5    Genesis House?

6    A.   I can't conceive of a reason why I would get to the

7    entrance to Genesis House -- to the Ruth's House entrance,

8    I cannot conceive of a reason why I would ever drive that

9    way.

10   Q.   Interesting.  I think you've testified about Mr.

11   Rathbun's grandmother being at Genesis House, right, but

12   you never actually went to Genesis House that way?

13   A.   The testimony I just provided was I can't conceive of

14   a reason why I would drive around Genesis House to get to

15   the Ruth's House entrance.

16   Q.   Okay.  So that's one way.  But it is -- you will

17   agree with me looking here and having driven that road,

18   it's significant extra time to get to that position there,

19   right?

20   A.   It would take you longer to drive around Genesis

21   House than it would drive directly down Converse Street to

22   get to Ruth's House entrance.

23   Q.   I'll show now what's been admitted as Exhibit 22.

24   This is a view of the driveway into Ruth's House, correct?

25   A.   Yes.

1    Q.   And just to orient all of us here, this is where

2    we're talking about the fuel container having been left?

3    A.   Right.  Next to the tree, yes.

4    Q.   And this is where you and Agent Mastroianni started

5    your drive test expirement at 4:52, right?

6    A.   That's about where, yes.

7    Q.   Now, the other way to get to that point would be to

8    come down, turn into Ruth's House, do a three-point turn

9    perhaps, and you turn here to park there, right?

10   (Indicating)

11   A.   I actually just did this and you don't need to do a

12   three-point turn.  It's an easy turn.  You would not have

13   to -- you can simply make the turn.

14   Q.   But what you don't do is just magically appear facing

15   out to Converse Street when you are parking there, you and

16   Agent Mastroianni?  It takes time also to do that, to make

17   that U-turn there?

18   A.   It would take some time.

19   Q.   Again, when you decided to start the drive test

20   experiment at 4:52, you didn't factor into the fact that

21   it would take some extra time even just to get to that

22   spot given Officer DaBrae's cruiser cam, right?

23   A.   We started the video from a parked position.

24   Q.   You were already parked there?

25   A.   We were.

1    Q.   In your video you set the time I think you said to 45

2    seconds to get out of the car, place something by the

3    tree, and then come back to the car; is that accurate?

4    A.   I think just over 48 seconds.

5    Q.   I'm sorry?

6    A.   Just over 48 seconds I believe.

7    Q.   Forty-eight seconds that it took?

8    A.   Over 48 seconds.

9    Q.   More than 48 seconds.

10        But, of course, none of us knows sitting here right

11   now exactly what happened out there in front of the tree?

12   How that container was left?

13   A.   Can you repeat the question?

14   Q.   Sure.

15        You walked -- you've gotten something out of your

16   car.  You walked over to put it or Agent Mastroianni

17   walked over to put it next to the tree, leave it there for

18   a few seconds, came back.  But sitting here today, you

19   don't know how long it took to leave that or how it was

20   put, right?

21   A.   I can't -- I did not personally witness the defendant

22   place anything there so I don't know how long it took.

23   Q.   So it could have been longer than that?

24   A.   Again, I didn't witness it, so.

25   Q.   And the item you picked up looked like a camera bag

```
 1    or something; was that what it was?

 2    A.   It was a camera bag, yes.

 3    Q.   And that's what you walked out to put there.  But I

 4    think the allegation here is a five-gallon fuel can that's

 5    one third full of gasoline, right?

 6    A.   That's correct.

 7    Q.   So that's not something you keep on the floor in the

 8    passenger seat with you, right, to pull out and grab;

 9    would you agree with me there?

10         MS. BERKOWER:  Objection.  I think this calls

11    for speculation.

12         THE COURT:  Overruled.

13         THE WITNESS:  You're asking me if I personally

14    keep a gas can in the car?

15    Q.   (By Mr. Watkins)  Let me do this.  We've learned, of

16    course, that the car Mr. Rathbun was driving around in

17    that day was a Toyota RAV4, right?

18    A.   Yes.

19    Q.   And it has no trunk in it, right?

20    A.   Yeah, it has a hatchback.

21    Q.   It's a hatchback.  It's got a little covering but no

22    trunk to it, right?

23    A.   Yeah.  I don't know if it pulls up from underneath,

24    but I saw that it was a hatchback.

25    Q.   And the allegation you're trying to show in your
```

1   experiment is that somebody pulled up there at 4:52,

2   pulled out the gas can to put it out there, right?

3   A.   Yes.  We were trying to replicate what could have

4   happened.

5   Q.   Did you go back to the trunk of Agent Mastroianni's

6   car and open up the trunk and pull out the gas can and

7   then put it there?

8   A.   We did not.

9   Q.   And you would agree with we that it takes even more

10  time, right, if in fact you had reenacted it in that way?

11  A.   If we had gone to the trunk, it would have taken

12  slightly more time than taking it out, yes.

13  Q.   I want to go back to that 8 minutes and 27 seconds.

14  We're talking about 4:53:17 that Mr. Rathbun, if he was

15  there, would have to have left there, right, to make it to

16  that point?

17  A.   It wouldn't have to have been at 4:53.  It could have

18  been far later than that, but that was just the latest

19  place he would have hit the tower.  If he had hit the

20  tower earlier, it would have been much later than that --

21  well, maybe not much, but certainly later.

22  Q.   But he didn't hit the tower earlier.  We know when he

23  hit the tower?

24  A.   Excuse me?

25  Q.   We know when he hit tower.  That was at 5:01?

1    A.   We don't know which part of the tower he hit.

2    Q.   I'm sorry?

3    A.   We don't know which part of the tower he hit.

4    Q.   You and Ryan Burke have agreed that by I-91 and 291

5    that is where it could have hit the tower, right?

6    A.   It is equally possible it could have hit there as it

7    could have hit at the beginning -- the exit of 91.

8    Q.   But none of us knows.  We're doing the best we can

9    with the data that we have, right?

10   A.   Right.

11   Q.   Okay.  It's also true that you made a couple of green

12   lights along the way?

13   A.   We --

14   Q.   In the video?

15   A.   When we drove the traffic light, there was green

16   lights.

17   Q.   So if someone had hit a red light where you hit a

18   green, it actually might have taken longer than you took

19   to get up there?

20   A.   Yeah, if they hit a red light, they could have.

21   Q.   When you did your experiment and walked out placing

22   this gas can out by the tree, did you take time to try to

23   push a piece of paper into the camera box?

24   A.   We did not.

25   Q.   Did you try to reenact lighting a piece of paper off

1    at the scene?

2    A.   Counsel, I can imagine you can recognize that that

3    may not -- the circumstances we find ourselves in trying

4    to light a piece of paper at the same site where this

5    device was placed would probably not sit well with many of

6    the neighbors and the individuals at JGS.

7    Q.   You would agree with me that those things in addition

8    take extra time to do, right?

9    A.   No.  I think those were factored into the video.

10   Q.   How were they factored in?

11   A.   The multiple seconds pausing when the device was left

12   down.

13   Q.   But you didn't get down on your knees to try to light

14   anything; is that right?

15   A.   I personally did not, no.

16   Q.   Did Agent Mastroianni?

17   A.   No.

18   Q.   The fact is where this 48 seconds there, you have no

19   idea, right?

20   A.   No idea of what?

21   Q.   No idea why it's 48 rather than 40 rather than a

22   minute or a minute and a half?

23   A.   We walked out and made a reasonable estimation.

24   Q.   But you didn't calculate the extra time it would take

25   to go in the back of the car get out the gas can and put

1    in a piece of paper and try to light it?

2    A.   We accounted for -- as I said, we accounted for the

3    paper.

4    Q.   So again from your testimony of 8 minutes and 27

5    seconds takes us back to 4:53:17, right, in the morning?

6    A.   That's one possible time the device could have been

7    placed.

8    Q.   But there's outside limits, right?  That's why you

9    did this test, right, is to show, right?

10   A.   Yeah.  It could have been placed at 4:53 and it could

11   have also been placed at 4:56.

12   Q.   At 4:56, 8 minutes and 27 seconds no longer hits off

13   that cell tower?

14   A.   It does.

15             MR. WATKINS:  I have nothing further, Your

16   Honor.

17             THE COURT:  All right.  Now this is

18   cross-examination now on a completely different topic,

19   correct?

20             MS. O'NEILL-GREENBERG:  Completely different,

21   Your Honor.

22             THE COURT:  Okay.

23

24

25

**CROSS-EXAMINATION**

Q.   (By Ms. O'Neill-Greenberg)  You've been in the
Springfield resident office for three years?

A.   Yes, here in Springfield three years.

Q.   And how many miles is that office -- the office is in
Springfield, right?

A.   It is.

Q.   How many miles is that office from the location where
the gas can was found?

A.   Probably three and a half to four miles.

Q.   Three and a half to four miles.  Okay.

     And that morning -- I'm now going to go back to that
morning of April 2nd.

A.   Okay.

Q.   That morning of April 2nd, you testified yesterday
that you talked to the Longmeadow Fire Department people,
right?

A.   No.

Q.   I'm sorry.  The Longmeadow Police Department people?

A.   I spoke to Officer Chaplin, Detective Chaplin and
acting-chief Fontaine.

Q.   That's whose name I was thinking of.

     Okay.  And you testified yesterday that when you
talked to them, the name they referred to as the location
where the gas can was found they referred to that as

1    Ruth's House, right?

2    A.   Yes.

3    Q.   Okay.  And you testified yesterday that they were

4    initially mistaken about calling that location Ruth's

5    House, right?

6    A.   I think that I was mistaken about calling Genesis

7    House Ruth's House.

8    Q.   You got that name from them, Ruth's House, right?

9    A.   The sign -- the name of the entrance, yes.

10   Q.   And then you were mistaken and you called it Ruth's

11   House?

12   A.   I continued -- yes, I called it Ruth's House.

13   Q.   Got it.  Okay.

14        So then you spoke to Mr. Rathbun later that morning,

15   right?

16   A.   What morning?

17   Q.   I'm still on April 2nd.

18   A.   No.  I didn't speak to him on April 2nd.

19   Q.   I'm sorry.  You spoke to Mr. Rathbun the two weeks

20   following on April 15th, right?

21   A.   Yes.

22   Q.   Okay.  And when you spoke to him, you asked him --

23   you spoke to him for awhile, right?

24   A.   Yes.

25   Q.   On and off I think you said for three to four hours?

1    A.   That's right.

2    Q.   And you asked him if he was familiar with Ruth's

3    House, right?

4    A.   A Jewish nursing home and eventually Ruth's House.

5    Q.   So you said two things.  You said a Jewish nursing

6    home, one, right?

7    A.   Yes.

8    Q.   And you said Ruth's House, two?

9    A.   Correct.

10   Q.   Got it.  And you never asked him if he was familiar

11   with Genesis House, right?

12   A.   Correct.

13   Q.   You never asked him if he was familiar with Jewish

14   Geriatric Services, right?

15   A.   No.

16   Q.   And you didn't ask him if he was familiar with -- I'm

17   going to abbreviate it -- JGS?

18   A.   No.

19   Q.   Okay.  Now I'm still talking about April 15th.  When

20   you were speaking to Mr. Rathbun, you showed him some

21   photos that morning, right?

22   A.   Yes.

23           MS. O'NEILL-GREENBERG:  Okay.  Actually could I

24   just call up Government's Exhibit 72?  It's in evidence so

25   it can be for everyone.

```
 1              MS. BERKOWER:  I think we need to switch over to
 2    our table for that.
 3              MS. O'NEILL-GREENBERG:  We can do it.
 4              MS. BERKOWER:  I think she has it.  They just
 5    have to change the cameras over.
 6              MS. O'NEILL-GREENBERG:  Okay.
 7    Q.   (By Ms. O'Neill-Greenberg) So this is the map you
 8    showed him, right?
 9    A.   Yes.
10    Q.   This is the only map you showed him that day?
11    A.   That's correct.
12    Q.   So there's Converse Street that's depicted there,
13    right?
14    A.   Yes.
15    Q.   Okay.  And then there is this road that's called on
16    this map Ruth's House, right?
17    A.   Right.
18    Q.   Now, in real life there is nothing at -- no street
19    sign that says Ruth's House, right?
20    A.   Well, there is a sign that says Ruth's House.
21    Q.   I'm asking about the street sign?
22    A.   A green street sign?
23    Q.   Is there a posted street sign that says Ruth's House?
24    A.   I don't believe so.
25    Q.   Okay.  You've been to that location a lot, right?
```

1    A.    Yes.

2    Q.    Okay.  And you don't believe so?

3    A.    Right.

4    Q.    Are you sure?

5    A.    No, I'm not sure.

6    Q.    You didn't show -- well, also there's no other marked

7    side streets on this map you showed him, right?

8    A.    You can see a little bit of Redfern.

9    Q.    What letters can you see of that?

10   A.    D-N.

11   Q.    Okay.  So that's not really legible, right?

12   A.    No.  You wouldn't be able to tell the street.

13   Q.    And there is no -- okay.

14         You didn't pull up your phone and show him a Google

15   Map of the area that day, did you?

16   A.    No.

17             MS. O'NEILL-GREENBERG:  Can I just scroll to the

18   second page?

19             THE COURT:  Whose computer is controlling this?

20             MR. WATKINS:  (Indicating.)

21             MS. O'NEILL-GREENBERG:  Can you just scroll

22   through the photos?  Okay.

23   Q.    (By Ms. O'Neill-Greenberg) These are the other photos

24   you showed him that morning, right?

25   A.    Yes.

1    Q.   Okay.  So there's the up-close photo of the pamphlet

2    that was found in the gas can, right?

3    A.   Yes, that's the picture.

4    Q.   And then the gas can itself, correct?

5    A.   Yes.

6    Q.   And there is no other landmarks in any of those

7    pictures, right?

8    A.   If you go back to the -- you're right, there's no

9    landmarks.

10   Q.   No signs?

11   A.   You do see a sign on the corner, but I don't think

12   you can read it in one of the photos.

13   Q.   Nothing you can read?

14   A.   No.

15   Q.   Okay.  You were played a call today between John and

16   his mother.  Actually, no, I think this was a call you

17   were played yesterday, a call between John and his mother

18   using the term Ruth's House?

19   A.   Which so --

20          MS. BERKOWER:  Objection, Your Honor.  May we be

21   heard at sidebar on this?

22   (Sidebar conference.)

23          MS. BERKOWER:  Your Honor, the term Ruth's House

24   was excised out of that clip on the defense objection, and

25   so that portion of the clip was not played.  I just wanted

1    to put that before the court because I don't think that

2    that was played in court.

3              THE COURT:  Can you tell me the reference to the

4    clip again so I can look at my papers here?

5              MS. BERKOWER:  I think if Ms. O'Neill-Greenberg

6    could tell us what exhibit she's talking about, my memory

7    on that was the reference was excluded at the defense

8    request.

9              MS. O'NEILL-GREENBERG:  I'm trying to pull it

10   up.  My screen is frozen.  Hang on.

11             THE COURT:  We just need an evidence number.

12             MS. BERKOWER:   Your Honor, I believe it's 96,

13   Government's Exhibit 96.  The part of the clip that we had

14   originally proposed using included Ruth's House and then

15   the court limited it subject to the cross-examination and

16   other evidence.

17             THE COURT:  All right.  So this was the call

18   that started off with John saying so I'm just praying

19   between 4:3 and 8:30; is that right?

20             MS. BERKOWER:  I believe so, Your Honor.

21             THE COURT:  I did delete or ask to be excised

22   the reference to Ruth's House from that.

23        Now, let me ask the defense is that what you're

24   referring to?  Do you want that played now?

25             MS. O'NEILL-GREENBERG:  Well, I can strike it,

```
 1    but it's probably going to be played later today I

 2    imagine.

 3              THE COURT:  Okay.  I'm a little confused.  It's

 4    not necessarily fair to the witness if that was not part

 5    of the exhibit when it was originally put in and then you

 6    asked him a question about it.

 7              MS. O'NEILL-GREENBERG:  I can just move on from

 8    it.

 9              THE COURT:  You can move on or you can play it

10    all now.

11              MS. O'NEILL-GREENBERG:  It's okay.

12              THE COURT:  Okay.  So the objection will be

13    sustained.  The question will be withdrawn and you get

14    back to it if you want to.

15              MS. O'NEILL-GREENBERG:  Okay.

16    (End of sidebar discussion.)

17              THE COURT:  The objection is sustained.  So the

18    last question is withdrawn or stricken so don't consider

19    anything about the last question.  I don't believe there

20    was any portion of an answer.  If there had been, you

21    would not consider that either.

22         All right.  Next question.

23    Q.   (By Ms. O'Neill-Greenberg) So on April 15th, the

24    focus of the investigation, the word you were using was

25    Ruth's House, right?
```

```
1     A.    Both Ruth's House and Jewish nursing home.

2     Q.    And the complaint that charged the crimes Mr. Rathbun

3     is faced with stated Ruth's House, right?

4     A.    Sorry, which complaint are we talking about?

5     Q.    When he was charged in the complaint, the complaint

6     used the word Ruth's House, right?

7     A.    I'd have to -- if you wouldn't mind, I would like to

8     review the complaint before I answer that question.

9     Q.    You don't remember you wrote the affidavit?

10    A.    I'm not saying I don't remember.  I'm testifying in

11    federal court and I want to make sure I'm correct.

12          MS. BERKOWER:  Your Honor, may we approach

13    sidebar again?  I'm sorry to interrupt for a second time.

14    (Sidebar conference.)

15          MS. BERKOWER:  Your Honor, in this case, as you

16    may remember, there was a lot of information that included

17    the filings and documents at the beginning of the case

18    that I know the defense does not want to get into.  We

19    agreed with the defense that we will not get into that.

20          I want to flag this for the court because honest

21    responses to certain questions about the complaint from

22    Agent McGonigle could in theory reference that.  He's been

23    cautioned not to, but he's also told me if he's asked a

24    question that requires an honest answer, he's going to

25    give it.
```

1      I'm going to object to things that could get close to

2   that.  I would ask with regard to documents from the

3   beginning of the case, such as the complaint, out of an

4   abundance of caution with regard to any of these documents

5   with the witness, to avoid getting into an area that we

6   cautioned him not to go and we agreed with defense not to

7   go, I think is the best way to avoid those pitfalls.

8           THE COURT:  I do agree that asking this witness

9   about the complaint or indictment language that is

10  included is an area that you should tread cautiously.

11      I mean, you can do whatever you'd like, but would you

12  prefer to have the witness to have -- it's your

13  cross-examination, but would you want the witness to have

14  the document you're referring to so that you can carefully

15  cross-examine and not invite an answer that you're not

16  looking for?

17          MS. O'NEILL-GREENBERG:  Exactly.  That's all I

18  want, just the name.  That's all I'm doing is just the

19  name.

20          THE COURT:  Are you going to ask any more

21  questions?

22          MS. O'NEILL-GREENBERG:  No about the complaint

23  and affidavit, no.

24          THE COURT:  All right.  So we can leave it right

25  there.  If there is any more questions about the complaint

```
 1    and affidavit, I think it's fair to let him have it and
 2    look at it while you're asking.
 3              MS. O'NEILL-GREENBERG:  I don't have any
 4    questions about it.
 5              THE COURT:  Okay.
 6              MS. BERKOWER:  Thank you.
 7    (End of sidebar discussion.)
 8              THE COURT:  You can move on to the next
 9    question.
10    Q.   (By Ms. O'Neill-Greenberg) So I want to move on to
11    now Genesis House, which is a term you learned later,
12    right?
13    A.   The name of the building.
14    Q.   Yes.
15    A.   Yes, I learned later.
16    Q.   Okay.  Genesis House is subsidized low-income
17    housing, right?
18    A.   Yes.  I believe that's correct.
19    Q.   Okay.  It's for people who are 62 years and older?
20    A.   I think that's right.  I don't know what the entry
21    requirements are.
22    Q.   Okay.  Fair enough.  It's for older folks?
23    A.   Seniors.  I don't know what the ages are.
24    Q.   It's for seniors.  It's not a nursing home, right?
25    A.   No.
```

```
1     Q.    And it's non-denominational, right?

2     A.    No, it is of Jewish character.

3     Q.    People who live there can be of any faith, right?

4     A.    They can be of any faith, but it is run under Jewish

5     principles.

6     Q.    That's not what I'm asking you.

7           People who practice any faith can live there, right?

8     A.    Yes.

9     Q.    People who have no faith can live there?

10    A.    Yes.

11    Q.    Okay.  And you were just showed a minute ago --

12            MS. O'NEILL-GREENBERG:  If I could just pull up

13    Exhibit 104?

14    Q.    (By Ms. O'Neill-Greenberg)  So if you are traveling

15    on Converse Street --

16    A.    Am I supposed to be looking at something right now?

17    Q.    No.

18          If you were traveling on Converse Street from the

19    east, you're driving along, the entrance to Genesis House

20    is on your right; is that correct?

21    A.    You're asking if you're driving from east, like East

22    Longmeadow towards 91?

23    Q.    Yes.  You're driving in the direction -- east is

24    behind you when you're driving down Converse Street?

25    A.    Okay.
```

1    Q.   The entrance to turn into Genesis House is on the
2    right; is that correct?
3    A.   If you're coming from East Longmeadow towards 91, the
4    entrance to Genesis House is on your right.
5    Q.   Okay.  And that's a one-way street, correct?
6    A.   Which entrance are we talking about?
7    Q.   The same one.
8    A.   Well, there's multiple entrances.  They're all on
9    your right.
10   Q.   The entrance to Genesis House.  I'm driving on
11   Converse Street just like we said and Genesis House
12   entrance is on your right.  Okay.  Is this going to help?
13   Do you see that?
14   A.   This is actually not a particularly good angle for
15   this question.
16   Q.   So there we go.
17        So if I could put my mouse where the entrance to
18   Genesis House is.  Okay.
19        So you take a right into that entrance and it's a
20   one-way street there; is that correct?  (Indicating)
21   A.   That's a one-way street.
22   Q.   Okay.  And that street also doesn't have a street
23   sign; is that correct?
24   A.   I don't know.
25   Q.   You don't know.  Okay.

```
 1            And there is a sign there, correct?
 2      A.    The entrance to -- I believe so.
 3      Q.    It doesn't say Ruth's House?
 4      A.    The entrance to that -- I wasn't very concerned about
 5      that entrance.
 6      Q.    I'm asking you.
 7      A.    I don't know what the sign says.  I know there is a
 8      sign.  I don't know what it says.
 9      Q.    You don't know.  All right.
10            Are you aware that that part is called Harold
11      Grinspoon campus?
12      A.    No.
13      Q.    Have you ever been in that grouping of buildings that
14      make up Genesis House?
15      A.    Yes.
16      Q.    And you're aware that none of them have a sign on
17      them that say Genesis House?
18      A.    I'm not personally aware of that.
19      Q.    You're not what?
20      A.    I'm not personally aware of that, no.
21      Q.    You're not -- are you aware that none of those
22      buildings have a sign that says Ruth's House?
23      A.    I'm not personally aware of that either.
24      Q.    You have no idea what the signs say or don't say on
25      any of those houses, is that right?
```

A.   On the building -- the Genesis House campus is this whole thing.  I have not looked at each and every building to determine what the signage says on it.

Q.   Okay.  Mr. Rathbun's mother, Sheila Rathbun, is employed for a company called Carr Management Property, right?

A.   Carr Property Management.

Q.   Carr Property Management.  Okay.

And that is a property management company in Springfield, right -- in East Longmeadow?

A.   Yeah.  I don't know where it is.  I think it's East Longmeadow but I can't say for sure.

Q.   Okay.  Are you aware that the address is 24 Deer Park Drive?

A.   No.

Q.   You don't know.

Are you aware that it manages 19 different properties?

A.   No.

Q.   Are you aware that it manages Genesis House?

A.   Yes.

Q.   And Ms. Rathbun -- Sheila Rathbun, excuse me, is a part-time accountant for Carr Property Management, correct?

A.   She's currently a part-time accountant.

```
 1    Q.   Previously she was a full-time comptroller?
 2    A.   That sounds right, yes.
 3    Q.   Are you aware of that?
 4    A.   I'm aware she works for them.  Her exact title I'm
 5    not aware of.  She worked full time for them.
 6    Q.   And you're aware that her office was always at 24
 7    Deer Park Drive?
 8    A.   I'm not aware of that.
 9    Q.   You're not aware of that?
10    A.   No.
11    Q.   You're aware that she never had a physical office at
12    Genesis House, correct?
13    A.   I'm aware of that, yes.
14    Q.   Now, in early July you spoke to two of the I'm going
15    to call them the founders of Carr Property Management,
16    correct?
17    A.   I spoke to Chris Carr, Sr. and his son Chris Carr,
18    Jr.
19    Q.   Those are two of the founders or owners of the
20    company, right?
21    A.   Certainly Chris Carr, Sr. is.  I'm not sure what his
22    son's role is.
23    Q.   So the dad, his name is the company?
24    A.   That's correct.
25    Q.   Okay.  And that was July 8th when you talked to them,
```

1    correct?

2    A.    I don't know for sure.

3    Q.    You did write a report about that?

4    A.    Yes.  I would have written a report about it.

5    Q.    Okay.  And so would that report refresh your

6    recollection?

7    A.    It would.

8    Q.    Hang on.

9              MS. O'NEILL-GREENBERG:  Just for the witness.

10   Q.    (By Ms. O'Neill-Greenberg)  Okay.  Is it on your

11   screen?

12   A.    It is.

13   Q.    Okay.  Is there a date on there that indicates --

14   well, is this the report you wrote?

15   A.    If you scroll down, it does appear to be.  Yes, it

16   is.

17   Q.    Okay.  So does that refresh your memory?

18   A.    Actually can you scroll down one more time?  I just

19   want to make sure that was me and not Eric.  Yeah, that

20   was me.

21   Q.    That was you?

22   A.    Yes.

23   Q.    You wrote it on July 8th, right?

24   A.    I believe the interview was on July 8th.

25   Q.    You talked to Mr. Carr, Sr. on July 8th?

1    A.   Both.

2    Q.   Senior and junior?

3    A.   Right.

4    Q.   Okay.  And after you talked to them you also obtained

5    records from Genesis House, correct, or from Carr

6    Properties?

7    A.   From Carr Properties, yes.

8    Q.   And you learned that, as you testified yesterday I

9    think, John Rathbun's grandmother at one point resided at

10   Genesis House; is that correct?

11   A.   Yes.

12   Q.   Okay.  And she began living there around 2000; is

13   that right?

14   A.   In my head it was 2003 but I don't know.  It was

15   early in the 2000s.

16   Q.   So early in the 2000s?

17   A.   Yes.

18   Q.   Okay.  Then she stopped living there in 2010, right?

19   A.   She did.

20   Q.   She passed away?

21   A.   That's right.

22   Q.   And are you aware before she lived at Genesis House,

23   she lived in a different subsidized housing property?

24   A.   I am aware that she did.  I don't know where.

25   Q.   That was not near Genesis House?

```
 1    A.   I don't know.  I think it was a Carr Property.  I
 2    don't know where.
 3    Q.   Carr Management Properties has lots of different
 4    properties in the area, right?
 5    A.   I don't know.
 6    Q.   You don't know?
 7    A.   No.
 8    Q.   So you don't know where this other location was that
 9    grandma lived?
10    A.   Are you asking if I know where she lived?
11    Q.   I'm confirming that you don't know the other earlier
12    location that grandmother lived at?
13    A.   Prior to Genesis House I don't know where, no.
14    Q.   But you're aware she did live in an earlier
15    subsidized housing?
16    A.   I know she lived in an earlier Carr Property.  I
17    don't know if it was subsidized or not.
18    Q.   And you testified about listening to a call between
19    John Rathbun and his mom that references John's
20    grandmother, Sheila's mother, right?
21    A.   Yes.
22    Q.   And that call is from July 16th of this year, right?
23    A.   I'd have to double check, but.
24    Q.   That is -- hold on.
25              MS. O'NEILL-GREENBERG:  Can we pull up Exhibit
```

1   99-1 just for the witness?  We got it.  Never mind.

2          THE WITNESS:  You have to go to the top for me

3   to get the date.

4   Q.   (By Ms. O'Neill-Greenberg)  This is the call I'm

5   talking about.  Can you confirm that?

6   A.   Okay.  I listened to that call.

7          MS. O'NEILL-GREENBERG:  And can you scroll up to

8   where the date is?

9   Q.   (By Ms. O'Neill-Greenberg)  Okay.  The date is July

10   16, 2020?

11   A.   That's right.

12   Q.   Okay.  Yesterday -- I'm going to skip now to a new

13   topic.

14       You testified yesterday a bit about religious

15   pamphlets or tracts, right?

16   A.   Yes.

17   Q.   Okay.  And the paper that was found in the diesel can

18   on April 2nd was a religious pamphlet, right?

19   A.   Sorry, I can't -- it was a religious pamphlet?

20   Q.   It was a religious pamphlet?

21   A.   Yes.

22   Q.   Okay.  And you have learned that that religious

23   pamphlet has a specific name, right?

24   A.   The Steps to Peace With God.

25   Q.   The Steps to Peace With God.  Okay.

1          And this specific pamphlet that was in the gas can is

2    produced by the Billy Graham Evangelical Association,

3    right?

4    A.    That's right.

5    Q.    And this specific iteration of Steps to Peace With

6    God was produced by Billy Graham for their regional tour

7    in 2019, right?

8    A.    I mean, I don't know if it was directly produced for

9    that or they just used it for that tour.

10   Q.    They used it; you know that?

11   A.    They did use it here, yes.

12   Q.    Okay.  And they had a big event at the Big E in May

13   of 2019, right?

14   A.    That's right.

15   Q.    Okay.  And that event was attended by thousands of

16   people?

17   A.    That sounds reasonable.  I don't know the attendance

18   numbers.

19   Q.    And that pamphlet, that particular pamphlet was

20   produced for that event -- sorry, was used for that event,

21   correct?

22   A.    Can you maybe -- can you rephrase your question?

23   Q.    Yes.  That specific Steps to Peace With God pamphlet

24   was used by the Billy Graham Evangelical Association in

25   relation to that Big E event; is that correct?

1   A.   Yes.  It was used to train people I believe.  Stephen

2   Rhoads would be able to dial that in a little more than

3   me.

4   Q.   I think we're good just at that.

5   A.   Okay.

6   Q.   And this specific pamphlet -- and I think I said it

7   but I'll just be sure, we're talking about May of 2019,

8   right?

9   A.   Right.

10  Q.   Okay.  And this specific pamphlet was never found in

11  the home of Sheila Rathbun, right?

12  A.   It was not found during our search warrant on April

13  15th.

14  Q.   And it was not found in her car, correct?

15  A.   Not during the search warrant on April 15th.

16  Q.   And you also didn't when you searched the other cars

17  find it in either one of the other cars?

18  A.   Not during the search warrant, no.

19  Q.   The search warrant for the shed, it was not in the

20  shed?

21  A.   No.

22  Q.   You have never had any evidence that indicated Sheila

23  Rathbun had this particular pamphlet, correct?

24  A.   No.

25  Q.   Now when you were executing the search warrant at

1    John Rathbun's house -- well, he shared this house with

2    his family, right?

3    A.    That's right.

4    Q.    His mom lived there?  His dad lived there, correct?

5    A.    And Natalie lived there.

6    Q.    Who?

7    A.    Natalie.

8    Q.    His daughter lived there?

9    A.    Right.

10   Q.    They had a dog?

11   A.    Tucker.

12   Q.    Tucker.

13        Okay.  So when you executed this search warrant, you

14   testified yesterday that there was some gas cans?

15   A.    Yes.

16   Q.    Okay.  And in particular there was some photos of one

17   gas can on the porch of the house, right?

18   A.    Yes.

19   Q.    Okay.  And that gas can is a red can; is that right?

20   A.    It is.

21   Q.    And a red can is for gasoline; is that right?

22   A.    So there's a specific color that you are supposed to

23   use to determine what fuel you're putting into it and red

24   is the color for gasoline, right.

25   Q.    Red is the color for gasoline.  Okay.

1     And yellow is the color for diesel?

2  A.   If used properly.

3  Q.   Okay.  Okay.  And for that red gas can that was on

4  the porch, you testified I think that it was a blend of

5  something, right?

6  A.   No.  I said that that was what the defendant told me.

7  Q.   So John told you it was a 50-50 mix of things, right?

8  A.   Right.

9  Q.   A 50-50 mix of oil and gasoline?

10 A.   I think so.  I don't know.  And it was tested to the

11 extent that you're interested in actually what it was.

12 Q.   I'm just asking you, is that what he told you it was

13 a blend?

14 A.   Yes.

15 Q.   And he told you that the blend was for the leaf

16 blower he used?

17 A.   Something.  It was a small machine to use in the

18 yard, a leaf blower, weed whacker, something like that,

19 yeah.

20 Q.   And that little red gas can had a 50-50 mark written

21 on it, right?

22 A.   No.

23       THE COURT:  Do you want anything published, any

24 photographs?

25       MS. O'NEILL-GREENBERG:  Yes, Government's

1    Exhibit 61.  Thank you.

2    Q.   (By Ms. O'Neill-Greenberg) Do you have it?

3    A.   Uh-huh.

4    Q.   So that one had written on it gas?

5    A.   Right.  Not 50-50.

6    Q.   Okay.  And that looks like it was handwritten on with

7    a black marker?

8    A.   Sure.

9    Q.   Okay.  And then there was another gas can that you

10   located that morning, right?

11   A.   There were multiple other gas cans.

12   Q.   And John told you that another one his mother had

13   filled with gasoline; is that right?

14   A.   That's right, yes.

15   Q.   And then other gas cans were empty in the shed; is

16   that right?

17   A.   To be honest with you, I don't know.  I know that one

18   of them had fuel in it and it was taken -- a sample was

19   taken.  I'm not sure whether the other ones were empty or

20   not.

21           MS. O'NEILL-GREENBERG:  Okay.  Can I go back to

22   that exhibit?  Thank you.

23   Q.   (By Ms. O'Neill-Greenberg) Before I talk about that

24   one, do you remember there was -- one of the gas cans had

25   50-50 written on it?

1    A.   I don't remember that.  If you have a picture, I can
2    refresh my memory.
3    Q.   I will see if I can find it.  This yellow nozzle you
4    were asked a couple of questions about it yesterday,
5    right?
6    A.   Yes.
7    Q.   You're aware that that is -- I can't say it right. --
8    a Scepter nozzle?
9    A.   A Scepter nozzle.
10   Q.   A Scepter nozzle, right?
11   A.   Uh-huh.
12   Q.   And that nozzle actually fits that gas can right next
13   to it, right?
14   A.    It fits both that gas can, and I don't want to step
15   on -- it's not -- it likely fits that gas can.  We have
16   never put it on that gas can and tried it.  So I guess I'd
17   be speculating to say that it fit that gas can.
18   Q.   Are you aware that it's the same generation as that
19   gas can?
20   A.   No, I'm not aware of that.
21   Q.   You're not aware that it would likely have been sold
22   with that gas can?
23   A.   No, I'm not aware of that.
24   Q.   And are you aware that that nozzle is a newer, more
25   recent generation than the yellow diesel can that was

1    found at the scene?

2    A.   You're asking me about the nozzle now?

3    Q.   I'm asking you if you were aware that this yellow

4    nozzle that's sitting there was a newer generational model

5    than what was found at the scene on April 2nd, the yellow

6    dieseal can?

7    A.   Am I comparing the nozzle that was found on the

8    yellow fuel can to this nozzle right here?

9    Q.   No.  I'm asking you -- it's probably my fault.  I

10   apologize.

11       Are you aware that this yellow nozzle that's sitting

12   here is a newer version, a newer generational make than

13   the yellow dieseal can at the scene?

14   A.   So I guess -- I'm sorry.  I think maybe if you ask me

15   a more precise question, I can give you a better answer to

16   that question.

17   Q.   Okay.  Are you aware that this yellow nozzle is a

18   Fourth Generation?

19   A.   Yes.  I have heard that it's Fourth Generation.

20   Q.   Okay.  Make from Scepter?

21   A.   We can call it Fourth Generation.

22   Q.   Okay.  The yellow dieseal can that was found on April

23   2nd is an older generation; are you aware of that?

24   A.   I'm -- honestly I'm not sure that I can agree with

25   that.  I don't know that -- I know that -- the answer to

1    the question is no, I'm not aware of that.

2    Q.   You're not aware of that.  Okay.

3         Now, when you were executing the search warrant at

4    John's house on April 15th, you testified about some cars

5    that were there, right?

6    A.   That's right.

7    Q.   Okay.  So there was a blue van, correct?

8    A.   Yes.

9    Q.   There was a red four-door sedan?

10   A.   Correct.

11   Q.   Then a silver RAV4?

12   A.   Yes, silver-gray, yeah.

13   Q.   Okay.  The RAV4 was identified as Sheila Rathbun's

14   car; is that right?

15   A.   Yes.

16   Q.   And the red Sonata I think was identified as

17   Natalie's car?

18   A.   That's right.

19   Q.   Mr. Rathbun's daughter?

20   A.   That's right.

21   Q.   And the blue van was identified as Mr. Rathbun's

22   vehicle?

23   A.   Yes.

24   Q.   Okay.  And I think you testified yesterday that

25   during questioning of him -- sorry -- of Mr. Rathbun on

April 15th, you asked him to identify which vehicle was
his; is that right?

A.   Yes.

Q.   Okay.  And he told you the blue van was his?

A.   Yes.

Q.   Okay.  And that day you never asked him if he drove
any of the other cars, correct?

A.   That's correct.

Q.   Okay.  And now during this when you were at his house
on April 15th, his family was there too, right?

A.   They were.

Q.   Okay.  You didn't ask his mom if John sometimes drove
any of the other cars?

A.   I didn't personally speak to his mother.

Q.   So, no, you didn't ask her?

A.   I personally did not ask her that.  Other agents did
interview her though.

Q.   No one asked her?

A.   I can't tell you what they asked.  I wasn't there.

Q.   But you didn't obviously because you didn't speak to
her?

A.   I didn't speak to her.

Q.   And that morning you had search warrants for all
three cars?

A.   We did.

1    Q.   So there was an agent assigned to the RAV4 to take

2    photos?

3    A.   Yes.

4    Q.   Okay.  You didn't take photos?

5    A.   No.

6    Q.   Okay.  So this agent that was his job to take the

7    photos of the RAV4, right?

8    A.   Yes.

9    Q.   So he opened up the car; is that right?

10   A.   I wasn't there.

11   Q.   The photos were taken of the inside of the RAV4,

12   right?

13   A.   Yes.  There's photos of inside of the RAV4.

14   Q.   And the point of that was to take pictures of what

15   was inside the car, right?

16   A.   Right.

17   Q.   Okay.  And, for example, there were photographs taken

18   of door hangers in the car, right?

19   A.   Right.

20   Q.   You're familiar with that?

21   A.   Yes.

22   Q.   Okay.  So the objective is to take pictures of things

23   that seemed like they could be relevant evidence, right?

24   A.   Right.

25        Can I just -- the FBI does have a standard way they

1    take photos of things.  So not every photo is intended to

2    be of evidence.  There are entry and exit photos.  I don't

3    want to just say that every photo is taken is only taken

4    because of its evidentiary value.

5    Q.   Sure.  You also took sort of the wide angle view of

6    the cars?

7    A.   Right.

8    Q.   Then sort of like pictures that were just the whole

9    trunk, right?

10   A.   Right.

11   Q.   And then the front, front passenger side, the front

12   driver's side.  So pictures to sort of orient you to what

13   you're looking at, right?

14   A.   Right.

15   Q.   And then more specific pictures of areas that were of

16   more potential relevance?

17   A.   Again, I didn't take the pictures but if we're

18   talking generally, that's right.

19   Q.   That's the policy?

20   A.   Right.

21   Q.   And that policy was followed, correct?

22   A.   Again, I don't -- I have every reason to believe it

23   is, but I wasn't personally watching what they were doing.

24   Q.   You were the case agent in this case, right?

25   A.   Right, but I don't personally oversee every aspect of

1    the case.

2    Q.   You have no reason to believe --

3    A.   Absolutely reason to believe anybody did anything

4    wrong.

5    Q.   -- that someone deviated from policy when they took

6    the photos of the RAV4?

7    A.   No reason to doubt that.

8    Q.   Okay.  Now, one of the things that you did on April

9    15th was to question Mr. Rathbun, right?

10   A.   Yes.

11   Q.   Okay.  And you did that with one other person; is

12   that right?

13   A.   Yes.

14   Q.   You did that with Detective Chaplin?

15   A.   Yes.

16   Q.   Okay.  There was just you and her that did the

17   questioning of Mr. Rathbun, right?

18   A.   Yes.

19   Q.   Okay.  And Detective Chaplin took some

20   contemporaneously notes during the questioning, right?

21   A.   She took notes, yes.

22   Q.   You did not take notes?

23   A.   I did not take notes.

24   Q.   Okay.  You were the one who wrote the report of that

25   questioning, right?

1    A.    Yes.

2    Q.    Okay.  And these reports are called 302s?

3    A.    That's right.

4    Q.    Okay.  And you wrote that report the next day?

5    A.    I believe I started it the next day.  It wasn't

6    completed.

7    Q.    You drafted it the next day?

8    A.    Yes.

9    Q.    Is that right?

10   A.    Yes.

11   Q.    And when you drafted it, did you look at Detective

12   Chaplin's notes too?

13   A.    Yes.

14   Q.    And when you talked to Mr. Rathbun that day, you did

15   tell him that his blood had been found on the can, right?

16   A.    Yes.

17   Q.    You did tell him that his blood had been found on the

18   pamphlet, right?

19   A.    Yes.

20   Q.    And he voluntarily spoke with you?

21   A.    He did.

22   Q.    He voluntarily gave a DNA sample?

23   A.    He did.

24   Q.    He let you take pictures of his hands?

25   A.    He did.

1    Q.   And he explained to you why the conditions of his

2    hands were the way they were, right?

3    A.   He provided an explanation.

4    Q.   He told you that he had bad psoriasis, right?

5    A.   He didn't specifically say that.  I think he said he

6    had dry hands.

7    Q.   He told you that he picks at his hands?

8    A.   He said that.

9    Q.   That they bleed?

10   A.   He said that.

11   Q.   He told you that typically usually he drives down

12   Converse Street every morning, right?

13   A.   He said that.

14   Q.   Around 6 a.m.?

15   A.   Yes.

16   Q.   Okay.  And he told you that he was familiar with a

17   Jewish school on Converse Street, right?

18   A.   Yes.

19   Q.   And he maintained his innocence throughout the

20   interview, right?

21   A.   He did.

22   Q.   I'm going to step back for a second.

23        So on your direct yesterday, there was a lot of

24   different photos and evidence that was shown to you,

25   correct?

1    A.    Yes.

2    Q.    Okay.  Different kinds of items that were either

3    seized or documented in your investigation in this case?

4    A.    Yes.

5    Q.    Okay.  I'll be more specific.

6    A.    Okay.

7    Q.    Things like photographs of the pamphlets, right, the

8    gas can, the inside of the cars, his hands, the scene

9    where the gas can was found on April 2nd, right?

10   A.    Yes.

11   Q.    Okay.  And for all those photos someone was assigned

12   to take those pictures?

13   A.    Well, the photos at the scene were not taken by the

14   FBI.

15   Q.    That's true.  That was taken by Longmeadow police?

16   A.    Right.

17   Q.    They were taken to document how things appeared at

18   that moment in time, right?

19   A.    Which photographs are you talking about?

20   Q.    All of the photos.

21   A.    I mean, I don't know that I'd say every single photo

22   was taken for that purpose.

23   Q.    They were taken to document what was being looked at,

24   right?

25   A.    The search photos, yes.

1   Q.   Okay.  And to photograph how they actually looked and

2   appeared, right?

3   A.   Yes.

4   Q.   Okay.  And then, of course, today you testified a lot

5   about the drive test video that you and Agent Mastroianni

6   made, right?

7   A.   Yes.

8   Q.   Okay.  And you made that video and then you also

9   timed that video on your phone, right?

10  A.   Yes.

11  Q.   That was just your cell phone, your iPhone?

12  A.   Yes.

13          MS. BERKOWER:  Your Honor, I'm going to object.

14  I think there were some parameters set out by the court

15  about questioning about the different areas of the agent's

16  direct.

17          THE COURT:  That is true.  Attorney Watkins was

18  covering the video and that drive so that was an area

19  where you cannot repeat the cross-exam.

20          MS. O'NEILL-GREENBERG:  Okay.  I'm sorry.

21  Moving on.

22  Q.   (By Mr. O'Neill-Greenberg)  Other evidence in this

23  case was some of the things we listened to today, recorded

24  calls, right?

25  A.   I didn't record those calls.

```
1    Q.   Sure.  I'm just talking about the evidence in this
2    investigation that you have, right?
3    A.   Yes.
4    Q.   And then there are transcripts of those calls,
5    correct?
6    A.   Yes.
7    Q.   And there's cell phone data, correct?
8    A.   There's cell phone data.
9    Q.   So cell phone -- cell site data that you talked about
10   today, right?
11   A.   Uh-huh.
12   Q.   Google searches; is that correct?
13   A.   Yeah.
14   Q.   All different types of cell messaging, right, cell
15   phone messaging?
16   A.   Yes.
17   Q.   Texts?  Facebook Messenger texts?  SMS texts?  iPhone
18   texts?
19   A.   Yes.
20   Q.   And all of these things were gathered and preserved I
21   guess safe to say because they're possibly relevant or
22   important somehow to the case, right?
23   A.   We document all -- try to document what we can, yes.
24   Q.   Okay.  It's important to do that because these are
25   things that are later going to maybe be analyzed by other
```

```
 1    people, right?

 2    A.   Yes.

 3    Q.   It can go to a judge to review?  To lawyers, right?

 4    A.   Yes.

 5    Q.   Obviously in this situation the finder of fact, the

 6    jury?

 7    A.   Yes.

 8    Q.   Okay.  Now the questioning you did of Mr. Rathbun on

 9    April 2nd (sic), you said it was about three to four hours

10    long?

11    A.   Yes.

12    Q.   And the statements he made are obviousLy important to

13    this case, right?

14    A.   Yes.

15    Q.   Especially because he's charged with making false

16    statements, right?

17    A.   Yes.

18    Q.   And that's a serious charge, right?

19    A.   Yes.

20              MS. BERKOWER:  Objection, Your Honor.

21              THE COURT:  Overruled.

22    Q.   (By Ms. O'Neill-Greenberg)  So you agree it's

23    important, especially in the context of him being accused

24    of making a false statement, that it's important to

25    understand the questions he was asked, right?
```

1    A.   I didn't know he was going to make a false statement
2    when I went to interview him.
3    Q.   What I'm saying is it's important in the context of a
4    statement, it's important to understand what he actually
5    said, right?
6    A.   Yes.
7    Q.   And what he was responding to, right?  What questions
8    he was responding to?
9    A.   Yes.
10   Q.   Now you testified yesterday that you didn't record
11   Mr. Rathbun's questioning; is that right?
12   A.   That's right.
13   Q.   Okay.  You had a cell phone on you?
14   A.   I did.
15   Q.   And your cell phone has recording capabilities?
16   A.   It's actually against FBI policy to record on my cell
17   phone.
18   Q.   It has recording capabilities?  It can record, right?
19   A.   I don't violate FBI policy during interviews.
20   Q.   You're aware that in 2014 I believe the Department of
21   Justice issued a new policy that recommends recording when
22   possible?
23         MS. BERKOWER:  Objection, Your Honor.  This has
24   already been ruled on by the court and it is not part of
25   this case.

1          THE COURT:  Go to sidebar please.

2     (Sidebar conference.)

3          THE COURT:  Go ahead.

4          MS. BERKOWER:  Your Honor, in this case there

5     was some litigation about excluding a defendant's

6     statement because the FBI policy had changed in 2014 to

7     require custodial interviews post-arrest be recorded.

8          They didn't even claim that.  That's not an issue in

9     this case bringing up that policy here, which is

10    completely irrelevant.  It risks both inflaming the jury

11    and confusing the jury.

12         There's been no allegation that this was an

13    involuntary interview in violation of his rights, such

14    that that policy would be implicated, and we think it

15    really would be confusing to bring that in here.  As a

16    result, the court ruled the statements are admissible but

17    there's no reason to confuse that and muddy the water with

18    the policy.

19         THE COURT:  When you say I ruled they were

20    admissible, was there -- I don't recall there being a

21    motion to suppress --

22         MS. BERKOWER:  That's right.

23         THE COURT:  -- a statement.

24         MS. BERKOWER:  They filed a motion in limine

25    asking Your Honor to exclude the statement on the ground

1   that they were not recorded because the FBI policy

2   required recording under completely different

3   circumstances.  There was never a suppression motion in

4   this case.  There's never been an allegation that they

5   were in violation of *Miranda* or involuntary such that they

6   be excludable under the Fifth or Six Amendment.

7           THE COURT:  I'm looking back at the docket

8   history.

9       Okay.  I see on the docket history the court denied

10  the defendant's Number 81 Motion in Limine to Exclude

11  Statements and Observations From Defendant's Unrecorded

12  Encounter With Agents on its request to suppress evidence,

13  but will entertain giving jury instructions on the issue

14  of the lack of recording.  Okay.  That was my ruling.

15      So, I mean, everything you're saying is -- I'm not

16  really disputing the accuracy.  I don't think there is any

17  way to dispute the accuracy of everything that you're

18  saying, but why can't the defense ask these questions

19  essentially at their peril for what the responses might

20  be?

21          MS. BERKOWER:  Your Honor, I think it risks

22  confusing the issue.  There was no custodial interview

23  here.  That policy only applies to in custody interviews.

24  At the same time we could redirect, but that's a legal

25  concept that's quite complicated, that huge body of case

1    law what is and is not in custody to interview.

2         This witness is not a lawyer.  He's just an agent.

3    Well, he is a lawyer I guess, but he's not here to testify

4    about the law.  That's for sure.

5         I think it just really interjects confusion to the

6    jury about whether that policy should be applied when

7    there's no question it shouldn't have applied.  That's a

8    legal determination for them to raise for the court.  They

9    did not do it.  Even without doing it, Your Honor ruled

10   they were admissible so I think this will risk jury

11   confusion on an extraneous issue.

12        They can ask him whatever they want about the absence

13   of a recording, but to inject FBI policy that applies in a

14   completely different situation is just inappropriate and

15   risks confusing the jury.

16             THE COURT:  Okay.  So what's the good-faith

17   basis from the defense for asking the questions?

18             MS. O'NEILL-GREENBERG:  So, first of all, I'm

19   pretty sure that the policy didn't just apply to

20   custodial.  It also says that it should be considered to

21   be extended to all types of interviews whether they are

22   also at a facility or somewhere else.  But I think we

23   absolutely have the right to cross-examine on the fact

24   that they didn't record, and I have the right to be able

25   to ask him if he's aware of this policy.

1          THE COURT:  I'm going to let the jury go and ask

2     you to provide me with support for your contention.  So

3     have the policy ready.

4          MS. BERKOWER:  Your Honor, we have spoken with

5     --

6          THE COURT:  I'm going to take a break.

7     (End of sidebar conference.)

8          THE COURT:  All right.  So, lunch break.

9     Obviously the same instructions.  No talking to each

10    other; no talking to anyone about the case; no research;

11    no internet; no investigation.  No paying attention to

12    social media about the case.  All right.  Thank you.

13    **(The jury left the courtroom at 1:18.)**

14         MS. BERKOWER:  May I very briefly be heard about

15    the policy?

16         THE COURT:  Hold on one second.  We're just

17    pulling up the motion.

18       I cut you off a little bit.  I just wanted to get the

19    jury done for lunch.

20         MS. BERKOWER:  Understood.

21       Your Honor, I do believe we do have the policy in

22    question.  I obtained it with a little bit of difficulty,

23    but I obtained it from the FBI CDC, the counsel's office

24    there.

25         THE COURT:  Could I ask the agent if you can

1    step out please?

2              THE WITNESS:  Yes, sir.

3              THE COURT:  Joe, could you close the doors too?

4    Thanks.

5              THE WITNESS:  Your Honor, should I just go

6    downstairs?

7              THE COURT:  Yes.  Thank you.

8    (Witness left the courtroom.)

9              THE COURT:  I remember talking about the policy

10   and being -- I don't remember doing research on the policy

11   myself but being informed and thinking it was pretty well

12   established that it applied to custodial.

13             MS. BERKOWER:  Yes, Your Honor.  I can provide

14   it.  I've been asked by the FBI not to distribute it.  So

15   I can provide it.  I guess I would be asking it not be

16   made part of the public record.  If Your Honor wants to

17   review it in camera, I can show it to the defense as well.

18             THE COURT:  Okay.

19             MS. BERKOWER:  They asked it not be distributed,

20   and I believe we have all of the provisions that apply to

21   this circumstance.  If we don't, I can try to get them but

22   it might take a little bit of time to do so.  We will get

23   right on that during lunch break.

24             THE COURT:  Well, hold on because I asked the

25   defense to show me their good-faith basis for this.  What

do you have to say?

MS. O'NEILL-GREENBERG:  I'm pulling up those documents for you now.

THE COURT:  What do you think they're going to say?

MS. O'NEILL-GREENBERG:  I think that they say -- it mainly discusses custodial and it also says that the person doing the interrogation or questioning should also consider recording in other circumstances, whether it is somewhere at the scene or whether it is at a police station or whether it's at FBI headquarters or whether it's at some other sort of location and there's equipment that can be used.

I also think because the witness on the stand said I can't do that, it's against FBI policy, that opens the door for me to say, well, there is a policy that recommends recording.

THE COURT:  I don't know that you're -- I mean, I hear what you're saying, but I'm not sure you're correct that the policy says -- or I'm saying, show me.

MS. O'NEILL-GREENBERG:  Okay.

THE COURT:  I don't know that what you're telling me is correct without being shown.

MS. O'NEILL-GREENBERG:  I'm happy to show you and pull it up.  It's going to take me a second.  I just

1   have to get on WiFi again.

2           THE COURT:  We'll come back maybe a little after

3   two o'clock.  I have a judge's meeting at 1:30.  Our IT

4   person is coming in here.  So over lunch try to pull up

5   what you need and when we come back together, we'll start

6   looking at this.

7           MS. O'NEILL-GREENBERG:  Okay.

8           THE COURT:  I'm a little bit concerned about the

9   policy or policies and the applicability.  Yeah, I didn't

10  see this coming.  I thought this issue was resolved.

11          MS. O'NEILL-GREENBERG:  I mean, honestly it's

12  just that one question, whether he is aware or not and

13  that's it.

14          THE COURT:  Well, it's not that easy.  It's not

15  just that one question.

16          MS. O'NEILL-GREENBERG:  Sure.  I'm just saying

17  --

18          THE COURT:  That question had significant import

19  behind it.  We'll take a look at what's pulled up by each

20  side.

21  **(A recess was taken at 1:23 until 2:11.)**

22  (Mr. Rathbun is present.)

23          MS. BERKOWER:  Your Honor, do you want Special

24  Agent McGonigle out of the room?

25          THE COURT:  Do we still need to talk about the

1    issue that we were talking about, the policy and the

2    custodial?

3              MS. BERKOWER:  Yes, Your Honor.  I think we are

4    going to object to that, and during the break --

5              THE COURT:  Hold on.  Let's officially call the

6    case.

7              THE CLERK:  Your Honor, it's 20cr30018, the

8    United States of America versus Rathbun.  We are back on

9    the record.

10             THE COURT:  Okay.  All right.  So I guess let me

11   ask the defense since they are seeking to go down this

12   road about the recording of a statement, you were talking

13   about policy and referencing a policy.  You were trying to

14   pull it up, the exact policy.  So where do we stand?

15             MS. O'NEILL-GREENBERG:  I sent it to your clerk.

16   I sent it to Bethany's email and I sent it to the parties.

17   It's 9-130001.

18             THE COURT:  Can you print it please?

19             THE CLERK:  Yes.

20             THE COURT:  This is an FBI policy?

21             MS. O'NEILL-GREENBERG:  It's the DOJ attorney

22   manual or a DOJ manual, obtained evidence, and then

23   electronic recording of statements and it goes through the

24   presumption of recording statements for individuals in

25   custody.

1       Then it says, "This policy also encourages agents and
2    prosecutors to consider electronic recording in
3    investigative or other circumstances.  Where the
4    presumption does not apply, the policy encourage agents
5    and prosecutors to consult with each other in such
6    circumstances."  That's what I'm talking about.
7            MS. BERKOWER:  Our response to that, Your Honor,
8    is to the extent this encourages the agents to seek legal
9    advice from the prosecution team, that's an inappropriate
10   area to discuss.
11       I know in this case Special Agent McGonigle did
12   consult with a prosecutor at the U.S. attorney's office
13   about this, and I don't think the legal advice that he
14   gave is really an appropriate area for discussion here.
15       In our view the policy in terms of who should and
16   shouldn't be recording things applies only to custodial
17   interrogation.  To the extent it asks the FBI to consult
18   the prosecutors for legal advice in other circumstances is
19   simply not relevant and it's not appropriate to get into
20   here.
21           THE COURT:  So is this -- whatever I'm reading,
22   this is from the DOJ manual?
23           MS. BERKOWER:  I believe it's from the
24   Department of Justice Criminal Resource Manual; is that
25   right, Forest?

1              MS. O'NEILL-GREENBERG:  Department of Justice

2    Manual, Criminal Manual.

3              MS. BERKOWER:  It's the criminal justice manual.

4    This is the policy that -- there's a separate FBI policy

5    that's internal to the FBI from what's in front of the

6    court, but I think to the extent Ms. Greenberg is

7    referencing this in our view --

8              THE COURT:  This is the DOJ policy, but the FBI

9    has their own policy regarding this?

10             MS. BERKOWER:  Well, the Department of Justice

11   includes the FBI within it, but the FBI has more specific

12   guidance for their agents than is represented here.  I

13   think it's very similar, but I don't know that it includes

14   the part guiding agents and prosecutors to consult with

15   each other because there are no prosecutors at the FBI.

16             THE COURT:  All right.  And there is -- is there

17   or is there not an assertion that this was custodial?  I'm

18   asking the defense, is it your view this is or is not or

19   was or was not custodial?

20             MS. O'NEILL-GREENBERG:  I mean, I know that we

21   haven't I don't think litigated that or made any reference

22   to that.  I do think it probably was custodial.  He was

23   not allowed to leave.  He was arrested at the end of it.

24             MS. BERKOWER:  That's simply not true, Your

25   Honor.  They never --

1          THE COURT:  But you haven't raised any motion

2     regarding this.

3          MS. O'NEILL-GREENBERG:  No.  In this situation I

4     am referring to this policy encouraging in investigative

5     and other situations recording and specifically in

6     non-custody settings.  So I'm not going to go into any he

7     was in custody.

8          MS. BERKOWER:  Your Honor, I expect that the

9     agent will say he is not familiar with this paragraph

10    which will imply he's doing something improper, when this

11    is not the policy that's given to him for review.

12     This is the policy for all of the Department of

13    Justice.  I know I frankly consult this policy myself as a

14    prosecutor.  This is where I go.  Where he goes is to the

15    FBI policy directing specific to agents.  I don't know

16    that this language appears there.  I don't think that it

17    does, and for him to say I'm not familiar with that

18    implies that he did something wrong when I don't think

19    that's a fair representation to make to the jury.

20         MS. O'NEILL-GREENBERG:  I don't know if it aids

21    the court at all, but my experience has been that agents

22    are aware of this policy specifically.  It's an issue that

23    came up in a trial I was involved in in front of Judge

24    Young, and the fact that agents were aware of it we asked

25    if they were familiar with it, they knew.  So that's been

1    my experience is that they are aware.

2            THE COURT:  All right.  So you filed a motion in

3    limine asking to exclude the evidence -- exclude the

4    statement because it wasn't recorded and that was denied.

5    And how is this not a variation of re-litigating that?

6            MS. O'NEILL-GREENBERG:  Well, I believe when we

7    litigated that, the court specifically said this is an

8    area for cross-examination and you would --

9            THE COURT:  I said I would consider an

10   instruction, right.

11           MS. O'NEILL-GREENBERG:  Yes.  So I think what

12   they did and didn't do is relevant.  And I think

13   especially because when I asked him about the cell phone,

14   he said I can't violate policy.  That entitles me to at

15   least say do you know about this policy.  If he doesn't,

16   fine.

17           THE COURT:  Okay.  Well, true, the motion in

18   limine was denied, but I did say I would consider it and

19   that kind of includes if I'm going to consider it, I have

20   to hear what type of evidence would come in regarding it.

21       I don't think -- you're not telling me this and so

22   I'm not saying that you're trying to do this, but I'm

23   concerned that you are -- that this may go into an area of

24   implying custodial interrogation.  Is that at all your

25   intent?

1            MS. O'NEILL-GREENBERG:  No.  No.  To be as

2     transparent as possible, this is the end of you didn't

3     record it.  There's a policy that records it.  You didn't.

4     You had recording equipment.  The end.  There's nothing

5     about voluntariness or was he in custody or nothing.

6            THE COURT:  Okay.  All right.  I'll let you

7     explore the area over the objection.  Objection noted.

8         All right.  We are all set.

9     **(The jury entered at 2:20.)**

10           THE COURT:  I'm just checking was everyone able

11    to follow my instructions during the lunch break not to

12    talk to each other or anyone else about the case?  No

13    researching it?  No internet searches?  Nothing on social

14    media?  No posting or reading and no media readings?

15        All right.  Affirmative answers from everyone.  The

16    jury remains fair and impartial.

17        All right.  Okay.  Attorney O'Neill-Greenberg, go

18    right ahead.

19           MS. O'NEILL-GREENBERG:  Thank you.

20    Q.   (By Ms. O'Neill-Greenberg)  Good afternoon.

21    A.   Good afternoon.

22    Q.   Right before the lunch I was just asking you a

23    question about Department of Justice policy on recording

24    in 2014.

25        Are you familiar with this Department of Justice

1    policy in 2014 that encourages and recommends recording in

2    investigations when possible?

3    A.   So I'd have to review the policy that you're talking

4    about.

5    Q.   Okay.  If I gave you the number, would that --

6    A.   No.

7    Q.   -- mean anything to you?

8         That morning when you were headed to 20 Lori Lane to

9    execute the search warrant, that morning was planned?  You

10   knew where you were going that morning, right?

11   A.   We knew we had a search warrant, yes.

12   Q.   And the plan was to execute the search warrant and

13   also potentially question John, right?

14   A.   That's right.

15   Q.   And you said your office was a few miles away, right?

16   A.   It was a few miles away from JGS.  It was more than

17   that from East Longmeadow but not that much more.

18   Q.   A few miles away?  From Converse Street a few miles

19   more?

20   A.   Call it six.

21   Q.   Okay.  And there's audio and video recording

22   equipment in your office, right?

23   A.   In the FBI space?  Yes.

24   Q.   Okay.  Now, you've received training on writing

25   reports, right?

1   A.   Yes.

2   Q.   We talked about writing reports.  I referenced them

3   as 302s, right?

4   A.   Yes.

5   Q.   Okay.  And these trainings include what kinds of

6   information should be included in a 302 report, right?

7   A.   Yes.

8   Q.   And you'd agree that a 302 report should be complete

9   and accurate, correct?

10   A.   Yes.

11   Q.   And that complete and accurate means including all of

12   the material facts about the events that's being

13   described, right?

14   A.   Yes.

15   Q.   And you'd agree that if the target of the

16   investigation makes any pertinent statements, the contents

17   of those statements should be accurately reflected in a

18   report, right?

19   A.   Yes.

20   Q.   And the accuracy and completeness of the report is

21   important because it's used to make prosecutorial

22   decisions, right?

23   A.   Yes.

24   Q.   On who to charge if you're going to charge someone

25   with a crime, correct?

1    A.    Yes.

2    Q.    It's an official document?

3    A.    It is.

4    Q.    And it's used by lawyers?  It's used by the court,

5    correct?

6    A.    Yes.

7    Q.    Okay.  And in your case you were the case agent so

8    you wrote a variety of reports in this case; is that

9    right?

10   A.    I did.

11   Q.    And you've used them to refresh your recollection in

12   preparation for your testimony?

13   A.    Some of them.

14   Q.    Okay.  And you're familiar with them from your work

15   on the case I would imagine?

16   A.    It depends on which one you're talking about, but,

17   yes.

18   Q.    Okay.  The one you wrote for John after you

19   questioned him on April 15th, you reviewed that one,

20   right?

21   A.    I have.

22   Q.    And you would say it's a complete and accurate

23   report, right?

24   A.    Yes.

25   Q.    Okay.  And that's always important but it's

```
 1    specifically important here where that's the only

 2    documentation of his statement, right?

 3    A.   Yes.

 4    Q.   Because there was no recording of the statement,

 5    right?

 6    A.   Yes.

 7    Q.   And you never wrote a supplemental report of his

 8    statement, right?

 9    A.   No.

10    Q.   And I think we talked about it earlier, but when you

11    drafted that report, it was April 16th; is that right?

12    A.   I believe I began the document on April 16th.

13    Q.   Okay.  Then you finished it a couple of weeks later?

14    A.   I don't know the date I finished it, when it was

15    actually completed.

16    Q.   If I showed it to you, would that refresh your

17    recollection?

18    A.   Yes.

19              MR. O'NEILL-GREENBERG:  If I could just show

20    this?

21              MR. DESROCHES:  Your Honor, I believe all the

22    screens are on.

23              THE COURT:  Is this for publish?

24              MS. O'NEILL-GREENBERG:  No.  It's just for the

25    witness and the parties.
```

1    Q.    (By Ms. O'Neill-Greenberg)   Okay.   Do you have that

2    in front of you?

3    A.    I do.

4    Q.    Is this the report that you wrote after questioning

5    John Rathbun?

6    A.    It is.

7    Q.    Okay.   Does it look like you started drafting it on

8    April 15th; is that right?

9    A.    April 16th.

10   Q.    April 16th.   Sorry.   The date after you actually went

11   to his house?

12   A.    Right.

13   Q.    Okay.   And that has your name on it, right?

14   A.    It does.

15   Q.    Okay.   And then it has the date that you finalized it

16   as well; is that correct?

17   A.    It has the date that my supervisor signed it.

18   Q.    So you actually had someone else review it as well?

19   A.    The supervisor reviews all 302s.

20   Q.    Okay.   And the date that they signed off on it was at

21   the top; is that correct?

22   A.    Yes.

23   Q.    Okay.   So a week later, two weeks later?

24   A.    Yes.

25   Q.    Okay.   Now, Agent McGonigle, yesterday when you were

1    testifying, it was your testimony that you said you had

2    specifically asked John if he had left his house the

3    morning of April 2nd, right?

4    A.   I think I asked him where he was on April 2nd.

5    Q.   Okay.  Sort of the same question, right?

6    A.   (Indicating.)

7    Q.   Okay.  And you told the jury -- I think you told the

8    jury yesterday and perhaps also your testimony today that

9    John's answer to that question was he had not left his

10   house in two weeks; is that right?

11   A.   That's correct.

12   Q.   And you're familiar with this report, right?

13   A.   Yes.

14   Q.   Okay.  So you're aware that actually nowhere in your

15   report do you specifically document that you asked him a

16   question of where he was the morning of April 2nd, right?

17   A.   I'm aware of that.

18   Q.   Okay.  And nowhere in your report do you document

19   that John responded to that answer talking specifically

20   about the morning of April 2nd, right?

21   A.   Sorry, what answer are you asking me to address?

22   Q.   So you're aware that nowhere in your report do you

23   document that John in answering that question was

24   specifically speaking about April 2nd, the morning of

25   April 2nd, right?

1    A.   I write his response down.  I don't -- I didn't say

2    what it was in response to.

3    Q.   So nowhere in your report does it say the morning of

4    April 2nd, right?

5    A.   That's correct.

6    Q.   Okay.  And since you're familiar with this report

7    that you wrote the date after you talked to John, you'd

8    agree that John actually told you that he had left the

9    house in the last two weeks, right?

10   A.   I'm not sure I would agree with that.

11   Q.   Do you not agree or you just don't remember?

12   A.   I don't remember that specific statement or I don't

13   remember -- if you can point me to that specific

14   statement, I can give a more accurate answer.

15   Q.   If I could have you look at page 3 of your report at

16   the bottom.  Okay?  And it is --

17           MS. BERKOWER:  Your Honor, I'm going to object

18   at this point.  I'm a little unclear if we're going to

19   have this document be in evidence or not.  Because

20   initially I thought the purpose of this was to refresh his

21   recollection, but now he's testifying about what is and

22   isn't in it and so I just want some clarity for the record

23   if we're going to admit this or not.

24           THE COURT:  It hasn't been moved for admission.

25   Is this still just being used for purposes of refreshing

recollection?

MS. O'NEILL-GREENBERG:  Yes.

THE COURT:  All right.

MS. O'NEILL-GREENBERG:  Okay.

Q.   (By Ms. O'Neill-Greenberg)  If you can just read that last full paragraph to yourself, and then just look up what you're done?

A.   I'm sorry, what paragraph?

Q.   The last full paragraph at the bottom that begins with the word "Rathbun."

Does that refresh your memory of what you wrote the day after you talked to him?

A.   It does.

Q.   So would you agree that John actually told you that he had filled a multi-day Methadone prescription within the last two weeks so he hadn't been traveling to the clinic every day?

A.   That was an answer to a different question.

Q.   Okay.  You're aware that the two-week time period you were talking about -- well, actually let me move back for a second.

You also reviewed the notes that Detective Chaplin made during the interrogation, right?

A.   I did.

Q.   Okay.  And you're aware that in those notes she

1    documented that John had told you and her that he had gone

2    on a dump run the past Saturday?

3    A.    I'd have to review those notes again.

4             MS. O'NEILL-GREENBERG:  Okay.  Can we pull up

5    the notes?

6    Q.    (By Ms. O'Neill-Grenberg)  Okay.  Do these look

7    familiar?

8    A.    They do.

9    Q.    These are Detective Chaplin's notes from April 15th?

10   A.    Yes.

11            MS. O'NEILL-GREENBERG:  If I could just scroll

12   to the second page?

13   Q.    (By Ms. O'Neill-Greenberg)  If you can just read the

14   fourth line -- no, seventh line down to yourself and then

15   just look up.

16   A.    Yes, I see it.

17   Q.    So you're aware that that reads "dump run last

18   Saturday;" is that right?

19   A.    Yes.

20   Q.    Now let me just switch back to your report again.

21            Is it your testimony today that when John said he had

22   left the house within the last two weeks to get his

23   prescription, he was talking about something totally

24   different?

25   A.    So I think you're asking me to address the

1    inconsistencies in the defendant's own testimony.  I write

2    down what he says.  I put it in a 302.  That a defendant

3    was inconsistent in his statements to me is not a

4    reflection of the report.

5    Q.   You'd agree that he didn't actually say two weeks.

6    He said I haven't left the house within two weeks.  It's

7    been about two weeks, right?

8    A.   "Rathbun told agents that he had not left his house

9    in the last two weeks."

10   Q.   And the sentence before that you would agree reads

11   "Rathbun stated that he had filled the multi-day

12   prescription of Methadone within the last two weeks so he

13   had not been traveling to the clinic each day."  Did I

14   read that --

15   A.   These are answers to different questions.

16   Q.   Did I read that sentence correctly?

17   A.   You did.

18   Q.   Okay.  Did you write that?

19   A.   I did.

20   Q.   And now, in the statement none of this is a verbatim

21   response of what MR. Rathbun said to you, right?

22   A.   It's not verbatim, no.

23   Q.   You do in many different moments put in quotes what

24   he actually said to you, right?

25   A.   Again, I'd have to review the document.

1    Q.   Okay.  Sure.  Let's go to page 4.

2         Do you see quotations there the third sentence of the

3    top paragraph?

4    A.   I do.

5    Q.   And that's a quotation of something he said to you?

6    A.   Yes.

7    Q.   Okay.  And then also on page 4, four lines up from

8    that middle paragraph, there's another quotation of

9    something he said to you?

10   A.   Yes.

11   Q.   Okay.  And then at the bottom of page 4, that top

12   paragraph that last sentence, there's another quotation of

13   a phrase he told you?

14   A.   There is.

15   Q.   Okay.  And then on page 5, that middle paragraph?

16        MS. BERKOWER:  Your Honor, I'm going to object

17   at this point.  I mean, I thought this document was to

18   refresh his recollection and now defense counsel is

19   reading off of the report and asking the agent to read off

20   of the report.

21        I don't know that this is the proper way to recollect

22   -- to refresh someone's recollection.  If counsel wants to

23   introduce this into evidence, I'm sure we can find an

24   appropriate way to do so.  I know there's content that's

25   not relevant, but I would object that this is not a proper

1    way to refresh this witness's recollection.

2         THE COURT:  All right.  Overruled.

3    Q.  (By Ms. O'Neill-Greenberg) Let's see, I'm just

4    counting.  Six lines up from that middle paragraph there's

5    another phrase that you put in quotations that he said to

6    you; do you see that?

7    A.  Yes.

8    Q.  Then that same paragraph, the bottom that last full

9    sentence, that last half, that's another quotation of

10   something he actually said to you?

11   A.  Yes.

12   Q.  Okay.  The paragraph that discusses when he had left

13   the house in two weeks, none of that is in quotations,

14   right?

15   A.  That's correct.

16   Q.  Okay.  Now, just to be clear, the yellow gas on

17   Converse Street was found on April 2nd, right?

18   A.  Yes.

19   Q.  And you went to John's house and you talked to him on

20   April 15th, right?

21   A.  Yes.

22   Q.  That's 13 calendar days between when the gas can was

23   found and when you talked to him, right?

24   A.  Yes.

25   Q.  Okay.  And when you were talking to John that

1    morning, you didn't take a calendar and ask him to mark

2    the days he had left, right?

3    A.   I didn't need a calendar, no.

4    Q.   You didn't show him a calendar and say, here point,

5    and tell me specifically when you left and when you

6    didn't, right?

7    A.   No.

8    Q.   You testified I think yesterday about how you gave

9    John his *Miranda* rights, right?

10   A.   Uh-huh.

11   Q.   And I believe you were shown and then it was admitted

12   into evidence the *Miranda* form you showed him and read to

13   him, right?

14   A.   Yes.

15   Q.   You read it out loud actually?

16   A.   I did.

17   Q.   Okay.  Those are the rights, the right to remain

18   silent, the right to have a lawyer, all of those rights?

19   A.   Yes.

20   Q.   So you showed him that paper, right?

21   A.   Yes.

22   Q.   And you read him that paper?

23   A.   Yes.

24   Q.   Did you also let him read the paper?

25   A.   Yes.

1 Q. Okay.  Then you had him sign it?

2 A. Yes.

3 Q. You signed it?

4 A. Yes.

5 Q. And you had another witness sign it?

6 A. Yes.

7 Q. Okay.  And you did that because it was important that

8 he understood what his rights were, right?

9 A. Yes.

10 Q. And he understood what he was agreeing to?

11 A. Yes.

12 Q. And that you guys were on the same page with what he

13 was communicating to you, right?

14 A. Can you -- I don't quite understand the last

15 question.

16 Q. You agree that you did all of that because it was

17 important he understood what you were saying and what he

18 was agreeing to, right?

19 A. Yes.

20 Q. Okay.  It was a means to make sure there was no

21 question about what was being communicated to him and that

22 he was agreeing to talk to you?

23 A. It was a standard FBI form.  It's how we're asked to

24 do it.

25 Q. Okay.  After you and Detective Chaplin finished

1    questioning him, so that was about four hours later; is

2    that right?

3    A.   Approximately.

4    Q.   Okay.  At the end of that, Detective Chaplin had

5    about three pages of her notes; is that right?

6    A.   I mean, if you want me to give you an exact answer,

7    I'll have to review the document again.

8    Q.   Is that -- okay.  Sure.

9         Just scroll through it.

10        Okay.  Two and a half, three page of notes?

11   A.   Yeah.

12   Q.   Okay.  When you finished questioning John, you didn't

13   read those notes back to him, right?

14   A.   No.

15   Q.   You didn't let him read the notes?

16   A.   No.

17   Q.   You didn't ask him if they were accurate?

18   A.   No.

19   Q.   You didn't have him sign it to confirm accuracy?

20   A.   No.

21   Q.   You never asked him to write down in his own words

22   the answers to your questions, right?

23   A.   The defendant always has the ability to write an

24   affidavit right at the FBI.

25   Q.   You never gave him any paper and pen said here, you

1    can write it down?

2    A.    No.

3    Q.    Now, in all of the evidence you've reviewed in this

4    case, the texts, the Google searches, the cell data, you

5    seize his mom's computer too I think you testified about

6    that yesterday, you never found any evidence that John is

7    anti-Semetic, right?

8    A.    No, I don't think we did.

9    Q.    That he has obviously animus or hate towards a group

10   of people, Jews or?

11   A.    No.

12   Q.    And there's no evidence that he builds bombs, right?

13   A.    Other than his blood on the device?

14   Q.    Evidence of him collecting -- not the things the

15   government is accusing him of, but that --

16   A.    That's evidence.

17   Q.    Okay.  In the Google searches, in the texts, in the

18   electronics, in everything you examined in his life, there

19   is no evidence that he builds bombs?

20   A.    Again, all the evidence I examined includes the

21   device with his blood on it.

22   Q.    Okay.  In the things I just listed, right, there's no

23   evidence of that, correct?

24   A.    Can you list them again?

25   Q.    Sure.  All of his text messages, his Google searches,

1    his CSLI, but I guess you call it cell data, right?

2    A.   Well, the cell data put him at the site.

3    Q.   I'm asking, is there any evidence of him researching

4    how to build bombs?

5    A.   No.

6    Q.   Ordering bomb parts?

7    A.   No.

8    Q.   Talking to bomb building experts?

9    A.   No.

10   Q.   And in the CSLI, you reviewed all that, right?

11   A.   I don't have -- I reviewed it certainly, but I don't

12   have like a memory of it.

13   Q.   Well, early on you were asked about some texts from

14   Glenn Miliken, right?

15   A.   Yes.

16   Q.   Okay.  And those texts were around midnight on April

17   3rd, right?

18   A.   They were.

19   Q.   Okay.  And some of the statements were "I'm leaving

20   soon," something like that, right?

21   A.   Do you want to show it to me again?

22   Q.   Sure.  Well, maybe this is my workaround.

23        Are you aware that the cell site data from midnight

24   April 3rd indicates he hadn't left his house?

25   A.   Are you talking about from the text messages?

1    Q.   I'm talking about the cell site data from that time
2    period on April 3rd that indicates he was at home?  Are
3    you aware of that?
4    A.   I'm not aware of that.
5              MS. O'NEILL-GREENBERG:  Thank you.  No further
6    questions.
7              THE WITNESS:  Thank you.
8              MS. BERKOWER:  Your Honor, may we have a brief
9    sidebar?
10   (Sidebar conference.)
11             MS. BERKOWER:  Your Honor, there's one area that
12   we wanted to bring to the court's attention that we would
13   like to go into on redirect examination.
14       With regard to Exhibit 96, the Government's Exhibit
15   96, I think yesterday you had excised out part of the call
16   that referenced Ruth's House, and on cross-examination of
17   this witness he was asked about using that term with the
18   defendant during his interview.
19       I expect that the defense is trying to imply that he
20   didn't know where Ruth's House was because he knew where
21   Genesis House was.  In that phone call the part that was
22   excised out referenced Ruth's House and so we would ask to
23   play that now because it shows that in fact the defendant
24   did know where it was.
25       We think the jury would be left with the

misimpression that he had no idea where this was because he was thinking about a different location when Special Agent McGonigle talked to him.  That shows he does know where it was.

In addition to that, I think Mr. Watkins implied that the defendant may have gone down Ruth's House way when he placed the device and that would have taken extra time to get to that location beyond what the drive test showed.

In the quote from Government's Exhibit 96, the defendant implies that -- he seems to say he drove down it, and I can direct the court to the specific part of the transcript if you'd like.

THE COURT:  I'm looking at it.  It says, "Because they already did go to the neighbors and get the video from people who have video cameras on Converse Street in front of Ruth's House.  And then, they can get a video of me driving down Ruth's."

MS. BERKOWER:  Yes, Your Honor, that's the part. And so we would seek to admit the rest of the originally proposed exhibit excising out "It's just going to be wonderful," but the part he says -- to include that second reference to Ruth's House.

THE COURT:  I guess the question would be these statements that bring up Ruth's House are made from the jail after he's been getting the discovery and talking to

1      his attorneys and talking about locations.  It doesn't

2      necessarily mean the day he was arrested or the day I

3      talked to Agent McGonigle, or before that he knew where

4      Ruth's House was.  But certainly after the investigation

5      and talking to his lawyers or reviewing discovery, then he

6      knows where Ruth's House was.

7          So how do I make that distinction that references

8      Ruth's House from a jail tape that shows state of mind and

9      what he knew at the time that the crime was committed or

10     the time he talked to Agent McGonigle?

11         MS. BERKOWER:  Your Honor, I think two things.

12     The first is to the extent that the timing of it makes a

13     difference, that's something the defense can argue to the

14     jury, but it doesn't necessarily mean that the defendant

15     did not know.

16         The second thing is it's actually almost an implicit

17     admission.  "They can get a video of me driving down

18     Ruth's," and that street is Ruth's House way.

19         The defense has made a very big deal of that; that

20     the street that the drive test started on is named Ruth's

21     House Way.  That the map that was shown to the defendant

22     was Ruth's House Way and that he may not have been

23     familiar with that.  Here, he's almost admitting that he

24     drove down it.  And so to the extent that the implication

25     from the defense is he didn't even know where it was, this

1    looks like an admission by him that in fact he was there.

2    So we submit it's relevant for that reason as well.

3         THE COURT:  Well, it's not -- I'm not sure it's

4    as clear an admission as you've stated.  It looks more

5    like a confused recitation of the facts that are being

6    given to him and him not knowing what he did or didn't do

7    or where he did or didn't drive.  But your point is well

8    taken, well made.

9         Defense, what do you say?

10         MR. WATKINS:  With permission I'll argue this.

11   The court's right, we're at May 14th now.  We're a month

12   into when Mr. Rathbun was arrested.

13        As the court will remember, during the government's

14   appeal of the detention order, it was Ruth's House; Ruth's

15   House; Ruth's House; Ruth's House.  From then on that was

16   the issue that Mr. Rathbun and me, as his representative,

17   were dealing with there.  That's what we were talking

18   about and that's the kind of evidence we are talking about

19   here.

20        There's nothing in that statement on the call that

21   suggests that Mr. Rathbun was actually there as the court

22   pointed out.  It's simply an evaluation of where the

23   evidence was going.

24        As the court quite rightly has pointed out, it's not

25   an admission at all.  He stops himself.  They know I drive

1    down Converse Street on top of the phone, which is exactly

2    what we argued today; that indeed he went down Converse

3    Street, but he did not stop at Ruth's House.

4        To the extent that my cross on the drive opened the

5    door -- of course, it does not, but I was talking about

6    hypothetically a person making that U-turn there.  That

7    means nothing about what Mr. Rathbun did or didn't do.

8        There are a whole host of reasons but mostly it's

9    incredibly confusing and incredibly misleading to allow

10   the government to argue that this means he knew where

11   Ruth's House was.

12       THE COURT:  I think that it helps to compare the

13   reference to Ruth's House to the references to Converse

14   Street he uses, and the way he used Converse Street makes

15   it clear that he knows where it is and he drives it every

16   day.  It's just clear indicia that he knows where it is

17   and he's familiar with it.

18       I don't find that same indicia to Ruth's House,

19   especially since this statement is made -- I'm taking you

20   as being correct, I don't know how many days after the

21   arrest, you're saying 14 days, and the history of the case

22   does corroborate what you're saying.

23       I recall the history of the case.  Certainly my

24   review of the case shows that the term Ruth's House was

25   really being heavily used in the government's presentation

1    and paperwork.

2        I mean, I just don't know.  He may not have known

3    about Ruth's House before but he had gotten the term

4    Ruth's House in his mind after the arrest.  It's just not

5    established as clearly as the Converse Street is

6    established in the phone calls.  So I don't think it's

7    helpful to establishing his knowledge of Ruth's House from

8    that phone call.

9        I think it's confusing and potentially misleading

10   because of all the contextual background that would need

11   to be explained, the circumstances and timing of him

12   saying that, so I'm not going to allow that portion to be

13   played.

14           MS. BERKOWER:  Thank you, judge.

15   (End of sidebar discussion.)

16   **REDIRECT EXAMINATION**

17   Q.    (By Ms. Berkower)  Special Agent McGonigle, on

18   cross-examination the defense asked you certain questions

19   about your interview and the importance of understanding

20   your questions and the defendant's answers.  Do you

21   remember being asked about that?

22   A.    I do.

23   Q.    How certain are you that you asked the defendant

24   about his location on April 2nd?

25           MS. O'NEILL-GREENBERG:  Objection; leading.

```
 1              THE COURT:  Sustained.
 2    Q.   (By Ms. Berkower)  On cross-examination the defense
 3    asked you certain questions about your interview and the
 4    importance of understanding your questions and answers.
 5    How certain are you that you asked the defendant about his
 6    location on April 2nd?
 7              MS. O'NEILL-GREENBERG:  Objection.
 8              THE COURT:  Sustained.
 9    Q.   (By Ms. Berkower)  Could you describe whether you
10    were certain or not that you asked the defendant about his
11    location on April 2nd?
12              MS. O'NEILL-GREENBERG:  Objection.
13              THE COURT:  Sustained.
14              MS. BERKOWER:  Your Honor, may I ask for the
15    reason why?
16              THE COURT:  Leading.
17    Q.   (By Ms. Berkower)  What did you ask the defendant
18    about his location on April 2nd?
19    A.   We asked him where he was.
20    Q.   What was his answer?
21    A.   That he hadn't left the house in two weeks.
22    Q.   How clear is your memory about you asking him that
23    question?
24              MS. O'NEILL-GREENBERG:  Objection.
25              THE COURT:  Overruled.
```

1          THE WITNESS:  That's the whole reason we were

2     there.  The device was placed on April 2nd and we needed

3     to know where the defendant was.

4     Q.   (By Ms. Berkower)  How clear is your memory that that

5     was what the defendant's response was?

6     A.   That he hadn't left the house in two weeks?

7     Q.   Yes.

8     A.   Yes.  I mean, my memory is clear on that.  That's

9     what he said.

10          MS. BERKOWER:  Nothing further, Your Honor.

11          THE COURT:  Okay.  Anything on that?

12          MS. O'NEILL-GREENBERG:  All set.

13          THE COURT:  Okay.  Thank you, agent.

14          THE WITNESS:  Thank you, Your Honor.

15          MR. DESROCHES:  May we proceed, Your Honor?

16          THE COURT:  Yes.

17          MR. DESROCHES:  The government calls Daniel

18     Marshall.

19          THE CLERK:  Would you please raise your right

20     hand?

21

22

23

24

25

1    **Daniel Marshall (sworn)**

2    <u>**DIRECT EXAMINATION**</u>

3    Q.   (By Mr. Desroches) Good afternoon.

4    A.   Hello.  Let me move forward here.

5    Q.   You're not the first one to have trouble with that

6    chair.

7         Could you please remove your mask?

8    A.   (Indicating.)

9    Q.   Thank you.

10        Could you please introduce yourself to the jurors and

11   spell your last name for the record?

12   A.   Sure.  Dan Marshall, M-a-r-s-h-a-l-l.

13   Q.   Mr. Marshall, before we go any further, have you --

14   in what state do you reside?

15   A.   Ohio.

16   Q.   Have you received a negative COVID-19 test?

17   A.   I have.

18   Q.   So, Mr. Marshall, you indicated that you live in

19   Ohio.  Do you work in Ohio?

20   A.   I do.

21   Q.   What do you do for a living?

22   A.   I'm vice president of marketing for Scepter

23   Corporation.

24   Q.   What is the Scepter Corporation?

25   A.   Scepter is a business unit owned by Myers Industries.

1    Scepter is primarily responsible for the manufacture,

2    design, distribution of gasoline cans, ammunition

3    containers, and a few other products.

4    Q.    You said you were vice president there?

5    A.    Correct.

6    Q.    What specifically are your responsibilities?

7    A.    I'm responsible for marketing, business development

8    strategy work, and for most of the last three years also

9    I'm in the engineering and product development teams.

10   Q.    Drawing your attention specifically to engineering a

11   new product development, do you have a background in

12   engineering?

13   A.    I do.  My bachelor's is in a mechanical engineering.

14   Q.    And where did you receive your bachelor's?

15   A.    Penn State University.

16   Q.    Did you go on beyond your bachelor's to obtain

17   another degree?

18   A.    I have a master's in business administration from

19   Indiana University.

20   Q.    So can you describe briefly what product development

21   is?

22   A.    Simply in my market it's understanding what the

23   consumer and the market needs, figure out the projects

24   they need before they need them, and get them in the

25   market in such a way they're safe, reliable, and solve

1    problems.

2    Q.   You indicated that Scepter manufactures gas cans; is

3    that right?

4    A.   Yes.

5    Q.   Is it more accurately described as fuel cans?

6    A.   Fuel containers is a brooder category.  Gas

7    containers is one type of fuel can.

8    Q.   So there are gas cans and other types of cans that

9    are similar in nature?

10   A.   Correct.  Scepter manufactures gasoline cans,

11   kerosene cans, dieseal cans, also water containers as

12   well.

13   Q.   So just specific to the gas, the dieseal, and

14   kerosene cans, what are the difference between those

15   three?

16   A.   Mechanically there's very little difference between

17   them.  The way they're manufactured today, there's a color

18   difference as mandated by law.  We changed the colors.  We

19   changed some of the markings on the side of the cans, but

20   generally the construction is nearly identical.

21   Q.   In product development is it important to consider

22   safety features?

23   A.   It's paramount to consider safety features,

24   especially with this category of products.

25   Q.   Why is it paramount?

1    A.   What Scepter actually sells is an empty plastic

2    product, but the reality is what it's going to be used for

3    is for holding a very potentially flammable or explosive

4    material.  We do that with both our fuel and with our

5    ammunition containers.  So making a product that can hold

6    them, handle drops, handle containment, meet state

7    regulations, meet federal regulations, and keep the

8    consumer safe is what we do above all else.

9    Q.   Does Scepter have any safety features that are unique

10    to it amongst the industry?

11    A.   To a Scepter container or to fuel containers?

12    Q.   To fuel containers.

13        I'll rephrase the question.

14    A.   Please.

15    Q.   Does Scepter make any -- have any safety features

16    that other companies don't have?

17    A.   Scepter has probably a few extra elements; we have

18    probably a higher level of safety.  We take the standards

19    and we make sure we exceed them.  We probably have

20    additional warnings on the sides of containers that are

21    not mandated by law in addition to the ones that are

22    mandated by the law.

23    Q.   So are these features helpful in identifying where a

24    particular fuel can or device came from?

25    A.   They are.

1    Q.   Specifically first let's talk about you said there
2    are additional warnings on a fuel can?
3    A.   Correct.
4    Q.   Why are there warnings in general on the side of a
5    fuel can?
6    A.   There's a couple reasons to have warnings on the side
7    of a container.  It's the same reason you have a warning
8    my coffee is hot on the side of your cup.
9         So there is actually first and primary a mandate by
10   law and so there's an ASTM standard for legal language
11   that should be on the side of the can.  So we have all of
12   those particular warnings.  But then also through
13   experience, through understanding the consumer, through
14   situations like court cases where we've learned about
15   other ways we can keep consumers safe so we'll add those.
16   Some of those warnings might be no smoking around our
17   products.  It's not by mandated by law but it's good
18   advice.
19   Q.   So are there any other features that are specific to
20   Scepter in terms of safety?
21   A.   So Scepter in terms of safety, there are five
22   different categories of safety products -- safety elements
23   that go into a fuel container.
24        The first is the construction of the container.  So
25   how strong is it?  Does it handle a drop from 6 feet so

1  that if you dropped it, it would potentially break.

2       The second category with warnings and that gets

3  around what should be on the side of the container and

4  what color the container should be.

5       Third is emissions.  You know, CARB and EPA are both

6  from a safety standpoint, from an emission and

7  environmental standpoint.  We want to make sure that the

8  gas fumes stay in the container and don't leak out

9  providing a risk.

10      The fourth is going to be around child safety, both

11  on the color and on the spout for an ability for a child

12  to get in there and get any fuel out.  Additionally,

13  there's an auto-locking closing feature on the side so

14  that once you're done using it, it automatically closes.

15      The fifth and the final one, which is a relatively

16  new one, is a flame mitigation device, FMD.  It's not yet

17  mandated by law, but it's something Scepter has been

18  putting in its containers since late '18.

19  Q.   Let's first talk about the flame mitigation device.

20  What specifically does that prevent against?

21  A.   So a flame mitigation device is a small plastic cone

22  or device that's installed inside the container that has

23  holes really small enough so that flame can't propagate

24  into the container.  So a spark or ignition source outside

25  the can -- you got to understand that with fuel, it's an

1    invisible fume and it's incredibly dangerous.

2         The visual I like to use is dry ice, and so if you

3    can kind of imagine how dry ice just slowly wafts out of a

4    container, fumes and fuel is doing that when it's active

5    all the time.  So an open container is going to have fuel

6    or fumes coming out.

7         A flame mitigation device, if those fumes are subject

8    to a spark or ignition source or fire of some type, it

9    will prevent the flame from getting into the can and

10   making the can become a further weapon.  When used

11   properly, all fuel containers are safe.  It misuses where

12   there's a problem.

13   Q.   So the purpose of the flame mitigation device is to

14   prevent an ignition source or a flame from getting inside

15   of the can?

16   A.   Correct.  It doesn't do anything to protect any of

17   the fumes or the vapors that are outside the container,

18   but it does prevent the fire from getting inside the can

19   and creating what could be a situation where jetting, when

20   the flame would come out of the can or explosion.

21   Q.   How long did it take to develop that device?

22   A.   So various forms of flame mitigation devices have

23   been around for 50 plus years.  The challenge with a

24   portable fuel container is that you have to balance some

25   of the needs of the consumer being able to fill it up and

1    have this flame mitigation capability and balance the type

2    of materials and shrinkage and whatnot.

3         Scepter spent a little over ten years and a couple

4    million dollars developing its own version of a flame

5    mitigation device, as of several other manufacturers as

6    well, both independently on our own products and in

7    concert to develop some of the standards in the testing

8    methodology.

9    Q.   Now over those ten years did Scepter do any research

10   on the effectiveness of the flame mitigation device?

11   A.   They did, but Scepter is also --

12             MR. WATKINS:  Judge, I'm going to object here.

13             THE COURT:  Okay.

14   (Sidebar conference.)

15             MR. WATKINS:  Your Honor, as I understand what

16   this witness is testifying to is recent developments,

17   these flame mitigation issues.  The can that was actually

18   left there is five or six years old when this company was

19   not putting these mitigation devices on their gas can so

20   we don't know what the relevance is here.

21             MR. DESROCHES:  Your Honor, this witness will

22   identify the can so at this point we are building a

23   foundation to his ability to recognize a product.  He is

24   laying a foundation for his knowledge of Scepter as a

25   company and the product that it makes.  It goes to his

1    credibility, Your Honor.

2              MR. WATKINS:  Which is why I let it go this far.

3    You're now talking about going further and the why we put

4    them on there.

5              THE COURT:  All right.  So the government's

6    offer is one more time, it goes to his credibility and his

7    ability to identify the can in this case?

8              MR. DESROCHES:  Yes, Your Honor, and also to

9    identify the age of the product and when it was made.

10             THE COURT:  Okay.  I don't think special design

11   development in 2018 is relevant to what you have just

12   offered as the reason to support your inquiry or further

13   inquiry so objection sustained.

14             MR. DESROCHES:   Thank you, Your Honor.

15   (End of sidebar discussion.)

16   Q.   (By Mr. Desroches)  Now, Mr. Marshall, drawing your

17   attention to the Scepter products that were being

18   manufactured in about 2017, were there any special safety

19   features on cans built at that time?

20   A.   Yes.  There was the very first four that I mentioned,

21   which would be around construction of the container, which

22   included the barrier layer of material for emissions; the

23   warnings on the sides of the container; the full carbon

24   EPA emissions design within the spout; and the child

25   safety capabilities within the spout, as well for

1  auto-closing and for keeping kids out.

2  Q.   Now, cans manufactured in that time frame, do they

3  also include a feature that was designed to help keep

4  flames out of the can?

5  A.   They did not include a flame mitigation device but

6  they did if used properly with the correct spout on the

7  -- the auto-closing spout would be a device that would

8  allow the emissions to stay sealed inside the container

9  and prevent it from becoming something that would be more

10  dangerous.

11  Q.   Now, Mr. Marshall, I'm going to ask you to look to

12  the floor of the area behind you.  Do you see an item back

13  there?

14  A.   I do.

15  Q.   Could you please put on a glove or two, however you

16  feel comfortable, and pick up that device?

17       So for the record, the witness has just placed

18  Exhibit PX-1 on the stand in front of him.

19       Mr. Marshall, if you can just take a moment to review

20  that item.  Do you recognize what that item is?

21  A.   I do.

22  Q.   What is it?

23  A.   It's a Scepter dieseal fuel container.

24  Q.   How -- what factors are you looking at to determine

25  that it's specifically a Scepter dieseal container?

1    A.   Both the shape, the branding on the front label, the

2    markings of the Scepter name on the bottom, our individual

3    warnings, our name on the top of the collar.

4    Q.   Drawing your attention first to the warnings that you

5    just described, can you please hold that up and show the

6    jurors where the warnings are located?

7    A.   So we have English on this side and Spanish on this

8    side.

9    Q.   Now referring to the English side --

10   A.   In addition to warnings that are placed within the

11   POP label on the front.

12   Q.   Just in terms of the warnings that are on the side of

13   the can in English, is there a warning that starts with

14   vapors?

15   A.   There is.

16   Q.   Would you please read to the jury?

17   A.   "Vapors can explode when ignited by a spark or

18   flame."

19   Q.   Is that a warning that is required by the federal

20   government or something that's placed there by Scepter?

21   A.   It is required by the federal government.

22   Q.   And are there other warnings that are unique to

23   Scepter?

24   A.   There are several.  I think I mentioned one earlier

25   which is do not smoke when using container would be unique

1    to Scepter.

2    Q.   That's not required by the federal government?

3    A.   It is not.

4    Q.   Now, this can is yellow.  Does that have any

5    significance to you?

6    A.   When we sell a dieseal container, which is what this,

7    it's mandated to be yellow by law.

8    Q.   Are there other colors that are mandated by law?

9    A.   Correct.  For gasoline it's red; for kerosene it's

10   blue.

11   Q.   What's the purpose of that?

12   A.   For easy identification and safety purposes so that

13   you don't grab the wrong fuel and use it for the wrong

14   purpose.

15   Q.   Now can you again please hold that can up so the jury

16   can see?

17       Are there any items on this can that it was not sold

18   with?

19   A.   So this is not a Scepter spout on the top of the

20   container.  It's not the spout that was initially provided

21   with it, which you can see in the picture in the front.

22   Q.   Now, in regards to that spout, based on your training

23   and experience in engineering and design of fuel

24   containers, do you recognize what that is?

25   A.   I do by looking at an earlier inspection.  You're

1    looking at the brand which is a little hard to read but

2    it says Rubbermaid on the top of the spout.  It's an old,

3    very old Rubbermaid spout that looks to be broken.

4    Q.   So when you said that it's old, are you able to based

5    on your training and experience form an opinion as to how

6    old that is?

7    A.   It's at least before 2009.

8    Q.   How are you able to say that?

9    A.   In 2009 the federal government mandated that these

10   relatively open spouts where you just have an open tip and

11   an open bottom with no sealing were effectively deemed

12   illegal and to this emission standards required a

13   self-closing and sealed spout along with a container that

14   had barrier layer materials in it so that all the

15   emissions would stay inside.  So this just a simple open

16   spout.

17   Q.   Now you indicated also it appeared to be broken.  How

18   are you able to form that opinion?

19   A.   The simple version is knowing what this spout looked

20   like originally.  It was probably usually about at least

21   twice as long and there's also cuts and -- not cuts but

22   tears, tears on the end of the spout such that it's broken

23   or worn away.

24   Q.   So you indicated that that type of nozzle would not

25   be made after 2009; is that correct?

1    A.    Correct.

2    Q.    Based on your review of this item, are you able to

3    determine when it was manufactured by your company?

4    A.    This container but not the spout was manufactured --

5    and I had a chance to look at this earlier on the bottom

6    -- it looks to be a manufactured date of January 22nd or

7    23rd of 2017.

8    Q.    I'm sorry, Mr. Marshall.  Just one moment please.

9          Now you described several safety features previously

10   just as you began your testimony.  Are there any safety

11   features on this can that are missing?

12   A.    Well, the Scepter spout is the one element that's not

13   on here so that would have the CARB EPA emissions that

14   keep the fumes inside, but also would have a child safety

15   feature built into that spout, a lock, and it would also

16   have an auto-closing feature such that it would seal after

17   use.

18   Q.    Are there any safety features manufactured by Scepter

19   that would prevent against improper use?

20   A.    That would prevent against improper use that are

21   still on it or missing?

22   Q.    That are missing.

23   A.    So that spout would be the one element that would --

24   the ability to auto-close would prevent auto -- would

25   prevent misuse.  Because once you use it, it would seal

1   shut again and so the fumes wouldn't be able to become a

2   source of ignition -- a source of combustibility when they

3   see a source of ignition.

4   Q.   Is there anything on this can that would prevent the

5   introduction of a source of ignition into that can?

6   A.   There is not.

7            MR. DESROCHES:  So now if we could have Exhibit

8   No. 12 placed on the screen and be published?

9            THE COURT:  I think our screens are working

10  now.

11           MR. DESROCHES:  Sorry, that would be Exhibit 70,

12  not 12.

13  Q.   (By Mr. Desroches)  Mr. Marshall, have you had an

14  opportunity to view this photograph prior to today?

15  A.   I have.

16  Q.   And I'm going to draw your attention to the item with

17  the No. 12 on it.

18       Based on your training and experience, are you able

19  to deduce anything from that, what appears to be a red gas

20  can?

21  A.   Yes.  So that is a -- I'm going to say it appears to

22  be a can from pre-2009 and it looks to be manufactured by

23  TPG, although I can't be certain of that.  But there is an

24  air vent on the back corner.  Those air vents at the same

25  time this spout that I showed you a second ago from

1    Rubbermaid were made illegal.  That air vent on the very

2    back right side of that corner was also removed from all

3    containers.

4    Q.   Thank you.  And one final question about the can

5    itself.  Based on your review of it, are you able to

6    determine where it was manufactured?  I'm sorry, Exhibit

7    No. 1.

8    A.   Exhibit No. 1.  Yes, this was made in Miami,

9    Oklahoma.

10   Q.   I'm sorry, can you just repeat that?

11   A.   This container was made in Miami, Oklahoma.

12   Q.   How do you know that?

13   A.   I know that Scepter has only ever made its gas cans

14   in two locations, Scarborough, Canada and Miami, Oklahoma.

15   The markings on this can both on the label and on the

16   bottom say made in the USA.

17       It's also the same -- it's a five-gallon 18.8 liter

18   can and not a 20 liter can that would be made in Canada

19   and so I can tell from the several markings that it's been

20   made in Oklahoma.

21   Q.   Do you have any information about who manufactured

22   the collar in that can?

23   A.   It says Scepter branding on the collar which is this

24   element right here.  I'll pull this out so you can see.

25   This is the collar.  It's got Scepter branding on the

1  outside of it.  It most likely was manufactured with this

2  container, and it could have been manufactured in Canada.

3           MR. DESROCHES:  One moment please, Your Honor.

4       Thank you.  I have no further questions.

5           MR. WATKINS:  Can I just get the screen for one

6  moment?

7  **CROSS-EXAMINATION**

8  Q.   (By Mr. Watkins) Good afternoon, Mr. Marshall.

9  A.   Hi.

10 Q.   Welcome to Massachusetts.

11 A.   Thank you.

12 Q.   I'm putting up again Exhibit 70 on the screen.

13 A.   Okay.

14 Q.   You talked about that being maybe a TPG gas can but

15 you don't know for sure?

16 A.   I do not know for certain.  I cannot see the markings

17 from this picture.

18 Q.   And that spout that's in the yellow gas can there, I

19 think you told us that that was Rubbermaid?

20 A.   Correct.  I can see that on markings.

21 Q.   So Rubbermaid and TPG, those two things wouldn't have

22 been sold together, correct?

23 A.   Not to my knowledge.

24           MR. WATKINS:  That's all I have, Your Honor.

25 Thank you.

1          THE COURT:  All right.

2          MR. DESROCHES:  Nothing on redirect.

3          THE COURT:  Okay.  Thank you very much, sir.

4          MR. DESROCHES:  Your Honor, I believe there's

5    been two witnesses testifying.

6          THE COURT:  Right.  Okay.  What else do you have

7    lined up for today?  I should ask how long the next

8    witness will be?

9          MR. DESROCHES:  The next witness is pretty

10   brief.  I think with the court's cleaning, we still can

11   get in that witness' testimony by four o'clock.

12         THE COURT:  Okay.  So let's see where we are.

13   Let's get the witness stands cleaned.  Thank you.

14      Ladies and gentlemen, during this short break please

15   don't talk to each other or anyone else about the case.

16   All instructions apply about access to internet, social

17   media, or media reports.

18         THE CLERK:  All rise.

19   **(A recess was taken at 3:19 until 3:34.)**

20         THE COURT:  So about ten minutes, certainly no

21   later than five of because I have to be off the bench.

22   There's a seminar meeting that I have to be involved in, a

23   bench bar type conference that I think you're obviously

24   not signed up for, right?

25         MR. DESROCHES:  As I understand it, it's about

1    trials during COVID era?

2    (Discussion held off the record.)

3    **(The jury entered at 3:35.)**

4    **(Mr. Rathbun is present.)**

5             THE COURT:  All right.  Was everyone able to

6    follow the standard instructions of the court?  No

7    discussing the case?  No looking up the case?  No reading

8    news articles about the case?  No internet access about

9    the case?

10        All right.  Affirmative responses from all the

11   jurors.  They remain fair and impartial.

12        Call the witness.

13             MS. BERKOWER:  Thank you, Your Honor.  The

14   government calls Susan Goldsmith.

15             THE CLERK:  Please raise your right hand.

16   **Susan Goldsmith (Sworn)**

17   **DIRECT EXAMINATION**

18   Q.   (By Ms. Berkower)  Ma'am, you can take your mask off

19   now that you're in the jury box or the witness box.

20   Sorry.

21             MS. BERKOWER:  May I proceed, Your Honor?

22             THE COURT:  Yes.

23   Q.   (By Ms. Berkower) Could you please say and spell your

24   name?

25   A.   Susan Goldsmith, S-u-s-a-n G-o-l-d-s-m-i-t-h.

1    Q.   What state do you live in?

2    A.   Massachusetts.

3    Q.   What town do you live in?

4    A.   Longmeadow.

5    Q.   Are you employed?

6    A.   Yes, I am.

7    Q.   What kind of employment do you do?

8    A.   I'm a business owner.

9    Q.   What business do you own?

10   A.   Marcus Printing Company.

11   Q.   Do you also volunteer?

12   A.   Yes.

13   Q.   What kind of volunteer work do you do?

14   A.   I do volunteer work at JGS Lifecare and at Holyoke

15   Community College.

16   Q.   Could you explain what volunteer work in particular

17   you do at JGS Lifecare?

18   A.   I've done volunteer work there for the last 25 years,

19   all kinds of volunteer work.  I'm currently the chairman

20   of the board at JGS.

21   Q.   What does JGS stand for?

22   A.   Jewish Geriatric Services.

23   Q.   And what type of organization is JGS?

24   A.   JGS is a large non-profit organization whose mission

25   is to serve the needs of -- to provide full range of

1    services to the elderly and their family in our community,
2    and our mission is to do it founded by the Jewish values
3    of our founding women.
4    Q.   So is JGS a Jewish facility?
5    A.   It's a Jewish facility but it serves people of all
6    faiths.
7    Q.   Could you talk briefly about the characteristics that
8    make JGS a Jewish facility?
9    A.   Some of the characteristics are we have a rabbi on
10   staff who provides pastoral care to the Jewish residents
11   and other residents, as well as coordinates pastoral care
12   for residents of other faiths.
13        We hold Chavis or Sabbath services for the Jewish
14   residents every Saturday as well as arrange for services
15   of other faiths, and we are a kosher facility which means
16   we follow the strict dietary laws of the traditional
17   Jewish standards.
18   Q.   Let's talk about the JGS campus in Longmeadow.  Are
19   you familiar with that facility from your work there?
20   A.   Yes, I am.
21   Q.   Is it fair to call it that, a campus?
22   A.   It is a campus, yes.
23   Q.   How many properties make up the JGS campus?
24   A.   Well, there's many entities on the campus.  There's
25   probably six or seven buildings.

1    Q.   Can you explain what those buildings are?

2    A.   The largest building is the Leavitt Family Jewish

3    Nursing Home which is a 200 bed long-term and short-term

4    rehabilitation nursing home.

5        We have Ruth's House, which is another building that

6    is an assisted living center that has about 75 units.  We

7    have an adult daycare, Wernick Adult Daycare, which is on

8    our campus.  We have an office for a home healthcare and

9    hospice service, and we have Genesis House which is a

10   group of three buildings that is subsidized --

11   HUD-subsidized housing for people over the age of 62.

12   Q.   How large in acreage is the JGS campus if you could

13   estimate?

14   A.   Twenty to 25 acres I think.

15               MS. BERKOWER:  And if we could have Government's

16   Exhibit 104 in evidence published to the jury or 104-A,

17   sorry?

18       Actually, I'll just put this on the Elmo if I can

19   please have that?

20       I think it's not on anyone's screen.  Is it possible

21   to get the screen up for the Elmo?  Thank you.

22               THE COURT:  Anything?

23               MS. O'NEILL-GREENBERG:  It flickered.

24               THE CLERK:  Can you use your computer?

25               MS. BERKOWER:  Use the computer you said?

```
 1              THE CLERK:  Yes.
 2              MS. BERKOWER:  Do you mind pulling up
 3    Government's Exhibit 104 then?
 4              MS. O'NEILL-GREENBERG:  Certainly.
 5              MS. BERKOWER:  Thank you.
 6         Thank you, Mr. Watkins.  I appreciate it.
 7    Q.   (By Ms. Berkower)  Ms. Goldsmith, do you see on the
 8    screen in front of you an area that you recognize?
 9    A.   Yes, I do.
10    Q.   Could you point out or just describe I guess where on
11    that exhibit you see the JGS campus that you just said the
12    20-some acres?
13    A.   It's the whole area from the street surrounded by the
14    woods, all the buildings that are in that area.
15    Q.   Could you point out where Genesis House is on that
16    map?
17    A.   Genesis House is to the far left end from what I'm
18    looking at of this area.  I don't know how to describe it.
19    Q.   Now, does JGS own Genesis House?
20    A.   Yes, it does.
21    Q.   Who operates Genesis House?
22    A.   Genesis House is managed by a company called Carr
23    Property Management on behalf of JGS.
24    Q.   What's the arrangement between JGS and Carr?
25    A.   Carr takes care of the day-to-day operations, the
```

1     maintenance, the rent collection, providing the services.

2     We hire them to do that.

3     Q.   How many people live on the JGS campus that you've

4     described?

5     A.   Live on the entire campus?  Close to, close to 350.

6     Q.   And that's across all the different buildings?

7     A.   Yes.

8     Q.   Where do the residents at JGS come from?

9     A.   Primarily from the greater Springfield area but

10    really from all over.

11    Q.   Do they come from outside Massachusetts?

12    A.   Yes.  There are some from outside Massachusetts, yes.

13    Q.   And are the services provided by JGS, either at

14    Ruth's House, Genesis House or the other facilities, are

15    those free services?

16    A.   No.  They're paid for by the people who are getting

17    the services or Medicaid and Medicare.

18    Q.   And for Genesis House, did you say that was an

19    independent living facility?

20    A.   Genesis House is just a regular apartment facility

21    for elderly.  It's not assisted living.

22    Q.   Does it contain rental properties?

23    A.   It contains rental properties, yes.

24    Q.   Do residents pay rent?

25    A.   They do.

1    Q.   And do residents also receive federal subsidies?

2    A.   From HUD, yes.

3    Q.   Could you also tell us how many staff members work on

4    this JGS campus?

5    A.   About 310, 300 to 310.

6    Q.   So let's go on to a different topic now.

7         MS. BERKOWER:  We can take that exhibit down,

8    and if you could please transfer that back to the

9    government table?

10   Q.   (By Ms. Berkower)  So are you familiar with the

11   different entrances to the JGS campus?

12   A.   Yes, I am.

13   Q.   How many entrances are there?

14   A.   Five.

15        MS. BERKOWER:  And if we could have Government's

16   Exhibit 23 in evidence please?  If we can have that for

17   everyone please?

18        Thank you.

19   Q.   (By Ms. Berkower)  Do you recognize what's shown in

20   this exhibit?

21   A.   I do.

22   Q.   What is that?

23   A.   That's the entrance to Ruth's House which is our

24   assisted living facility, and it's also an entrance to

25   Genesis House and the office where our Spectrum Home

1    Healthcare is.

2    Q.    Do you see a sign on the right-hand side of the

3    screen?

4    A.    Yes.

5    Q.    Could you read that sign please?

6    A.    "Ruth's House Assisted Living Wernick Adult Day

7    Health Care."

8    Q.    Is there a directional signal on that sign?

9    A.    Yes.   There's arrows pointing into the drive in from

10   the street.

11   Q.    Why are those directional signals there?

12   A.    So that people going to those facilities know how to

13   get there and where they are.

14   Q.    Now if you turn and you're driving -- do you see the

15   cars on the left side of the screen?

16   A.    Yes.

17   Q.    What street are they on?

18   A.    Converse Street.

19   Q.    If you're driving in the direction of the white car

20   you see on the left side of your screen and you turn right

21   at this Ruth's House sign, what is the first building that

22   you get to?

23   A.    The first building that you get to would be on the

24   right-hand side which is one of the Genesis buildings.

25   Q.    About how far do you have to drive to get to that?

1    A.    To get to Genesis, I'm not good with distance.

2    Q.    Is it a long distance or a short distance?

3    A.    A short distance.

4    Q.    Now, let's talk about the border of the JGS property

5    on Converse Street.

6              MS. BERKOWER:  If you can keep that photo up

7    please?

8         Well, actually you can take it down.  Thank you.

9    Q.    (By Ms. Berkower)  As the chairman of the board of

10   JGS, do you have familiarity with the borders of the JGS

11   property?

12   A.    Yes.

13   Q.    At the Ruth's House entrance along the sidewalk --

14             MS. BERKOWER:  Actually if we could have

15   Government's Exhibit 23?  Sorry.

16        Thank you, Ms. McKenna.

17   Q.    (BY Ms. Berkower) Looking at this exhibit, if you

18   look at this in front of you past the sidewalk, where does

19   the JGS property end?

20   A.    At the road.

21   Q.    So are you saying the JGS property extends all the

22   way to the road?

23   A.    To the road, yes.

24   Q.    Across the sidewalk even?

25   A.    Yes.

1   Q.   And does JGS maintain that part of the land?

2   A.   We do.  We plow the sidewalk and mow the grass.

3              MS. BERKOWER:  Now, if we could have

4   Government's Exhibit 7 please?

5   Q.   (By Ms. Berkower) In connection with this case, have

6   you looked at photographs taken by the Longmeadow Police

7   Department?

8   A.   Have I looked at them?

9   Q.   Yes.

10  A.   Just one similar to what you have up there now.

11  Q.   Do you recognize the photograph in front of you?

12  A.   Yes.

13  Q.   Do you see a yellow object in that photograph?

14  A.   Yes.

15  Q.   Are you familiar with where it is placed?

16  A.   It's in the wooded area between the driveway that was

17  in the previous picture and the nursing home.  It's on JGS

18  property.

19  Q.   Is it on JGS property?

20  A.   Yes.

21  Q.   And are their residents who live at JGS who are able

22  bodied?

23  A.   Yes, they are.  There are.

24  Q.   Do residents -- are residents of the various

25  facilities at JGS permitted to make use of the grounds at

1    JGS?

2    A.   Yes.

3    Q.   Have you seen residents doing so?

4    A.   Yes.

5             MS. BERKOWER:  No further questions, Your Honor.

6             THE COURT:  Thank you.

7         Any cross?

8             MS. O'NEILL-GREENBERG:  Yes, please.

9    **CROSS-EXAMINATION**

10   Q.   (By Ms. O'Neill-Greenberg) Good afternoon.

11   A.   Hello.

12            MS. O'NEILL-GREENBERG:  Is this up for

13   everybody?  I'm just going to put back that aerial map of

14   JGS.

15   Q.   (By Ms. O'Neill-Greenberg) So just let me clarify,

16   JGS would you agree is nondenominational?

17   A.   Correct.

18   Q.   So anyone with any faith or no faith can have

19   services there?

20   A.   Yes.

21   Q.   Okay.  And do you see the map on your screen?

22   A.   Yes.

23   Q.   Okay.  So the entrance that you take to drive up all

24   the way back to Ruth's House, so where the cursor is right

25   there.  (Indicating)

A.   Yes.

Q.   That street, if you turn up it, the first building on your left is GS Family Medical Care; is that correct?

A.   No, not any more.  That's where the hospice is, the Spectrum Home Hospice is.  The medical offices aren't there anymore.

Q.   Okay.

A.   They haven't been.

Q.   I got it.  And that road that you turn onto, at the intersection of that road and Converse Street, there's no posted sign, right?

I guess what I mean is there's a street sign that says Converse Street, right?

A.   I don't know if there's -- you mean like a city street sign?

Q.   Yeah.  There's no city street sign posting a name for that sign when you turn on Converse Street?

A.   I don't know.  Because I know where I'm going, so I don't know -- I wouldn't be looking for a street sign.

Q.   Okay.  You don't need to read the street signs because you're driving?

A.   Right.

Q.   That makes sense.

And Ruth's House is the facility that's all the way farthest in the back, right?

1    A.    Correct.

2    Q.    Okay.  And back to that intersection that I was

3    talking about, that second entrance and Converse Street,

4    you were just shown a photo of the sign that's there; is

5    that right?

6    A.    Yes.

7    Q.    That sign has been there for about two years?

8    A.    The lettering on that sign is about two years old.

9    The sign was actually put up about eight or nine years

10   ago.

11   Q.    Eight or nine years ago.  I can't do the math.  Okay.

12   And then before that it was a wooden sign; is that right?

13   A.    I don't remember.

14   Q.    Okay.  It was still in the same spot, right?

15   A.    The same spot, the same shape.  We just changed the

16   lettering when we re-branded.

17   Q.    So it's still set back from the road a bit on the

18   opposite side of the sidewalk?

19   A.    Yes.

20   Q.    Okay.  And perpendicular to the road, right?

21   A.    Yes.

22   Q.    Okay.  And Genesis House, that is the subsidized

23   housing for older folks?

24   A.    Yes.

25   Q.    Not older, but people over 62.

1    A.    Over 62.

2    Q.    Okay.  And JGS doesn't run that property, right?

3    A.    Well, we hire the people that manage it for us.  We

4    own it.

5    Q.    Carr Property Management --

6    A.    Yes.

7    Q.    -- manages it.  JGS doesn't do any of that daily

8    management?

9    A.    No.

10   Q.    Okay.  And so in that sense -- and it's the only

11   property like that on JGS, right, that's managed by

12   someone else?

13   A.    Yes.

14   Q.    So in that way it's distinct?

15   A.    I didn't hear you.

16   Q.    In that sense it's distinct, right?

17   A.    In that sense it's?

18   Q.    In that sense it's different from the other JGS

19   properties?

20   A.    Yeah, only because it's HUD housing, it's managed by

21   people who do that but it's still -- I'm not sure -- I

22   don't.

23   Q.    There's no JGS staff there on a daily basis, right?

24   A.    No.  We have somebody who's there multiple times a

25   week providing some personal -- not personal services but

1    activity guidance for the people there, coordinating any

2    kind of care that they might need with our other -- with

3    the other entities that are a part of JGS.

4    Q.    Okay.  But it's not staffed like you would have at a

5    nursing home or --

6    A.    No.

7    Q.    -- or at, you know, assisted care?

8    A.    Correct.

9    Q.    Okay.  And there's no temple or religious services in

10   the Genesis House complex, right?

11   A.    I don't think so.

12   Q.    Okay.  There's no kosher food dining hall, right?

13   A.    No.  There is a public kitchen that they ask to

14   maintain and follow the kosher rules if you're going to

15   use it, but each apartment there has its own kitchen and

16   they can do their own thing.

17   Q.    Okay.  So everyone who's living and renting an

18   apartment there has their own cooking kitchen private

19   facility?

20   A.    Yes.

21   Q.    Okay.  And they can cook whatever they need to?

22   A.    Yes.

23   Q.    Okay.  And there is also a sign -- so if you're

24   driving along Converse Street and you pull into the

25   Genesis House entrance, there's a sign there as well,

1    right?

2    A.   Yes.

3    Q.   And that sign doesn't say Ruth's House, right?

4    A.   Correct.

5    Q.   Okay.  It doesn't say Jewish Geriatric Services,

6    right?

7    A.   I don't know.  I think -- I don't know if our logo is

8    on it or not.

9    Q.   Are you -- does it sound right if I say it just has

10   the JGS three letter symbol?

11            MS. BERKOWER:  Your Honor, I'm going to object.

12   I think the witness says she doesn't know.

13            THE WITNESS:  I don't know.

14            THE COURT:  Overruled.  Okay.  The answer is she

15   doesn't know.

16            MS. O'NEILL-GREENBERG:  Okay.  That's fine.

17   Q.   (By Ms. O'Neill-Greenberg)  Are you -- do you know

18   that sign is called Harold Grinspoon Campus?

19   A.   Yes.

20   Q.   Okay.

21   A.   Well, I know that the campus is called Harold

22   Grinspoon.  I don't know what the sign is.

23   Q.   Is it the campus of Genesis House that's called

24   Harold Grinspoon Campus?

25   A.   No.  It's the entire JGS campus that's called the

1     Harold Grinspoon Campus.

2     Q.   So when we're talking about the campus, we're

3     referring to the Harold Grinspoon Campus; is that right?

4     A.   Yes.

5     Q.   Okay.  And you don't know if that's on the Genesis

6     House sign or not?

7     A.   Correct.

8     Q.   Okay.  And in the buildings that make up Genesis

9     House, they're labeled A, B, C, D, right?

10    A.   I think they're numbered one, two, three.

11    Q.   Okay.

12    A.   That's the way we refer to them, one, two, three.  I

13    don't know how they're labeled.

14    Q.   Okay.  Are you aware that they don't have any signs

15    on them that say Genesis House?

16    A.   I'm not aware whether they do or don't.

17    Q.   Okay.

18              THE COURT:  We're going to have to suspend for

19    the day.

20              MS. O'NEILL-GREENBERG:  I'm done.

21              THE COURT:  You're sure?

22              MS. O'NEILL-GREENBERG:  Yep.  I'm sure.

23              THE COURT:  All right.

24              MS. O'NEILL-GREENBERG:  Sorry, one last

25    question.

```
 1    Q.   (By Ms. O'Neill-Greenberg) The entrance you turn onto
 2    if you're going to Genesis House, that's a one-way street?
 3    A.   No.  The road that you turn onto to go to Genesis
 4    House -- from Converse Street?
 5    Q.   If I'm driving on Converse and I turn into Genesis
 6    House, that is a one-way street; are you aware of that?
 7    A.   I'm not aware of that.
 8    Q.   Okay.  Thank you.
 9              THE COURT:  You're sure you're all set?
10              MS. O'NEILL-GREENBERG:  I'm all set.
11              MS. BERKOWER:  No redirect, Your Honor.
12              THE COURT:  No redirect.  All right.
13              MS. BERKOWER:  May we excuse this witness?
14              THE COURT:  Yes.  Thank you very much, ma'am.
15    You're all set.
16         Ladies and gentlemen, we're done for the day.  The
17    same instructions apply.  Don't talk to each other or
18    anyone else.  Don't access any media reports; no internet;
19    no research; no postings; no reading of postings about the
20    case.
21         Let's try tomorrow morning -- because tomorrow is a
22    shorter day so I'm asking everyone, and the attorneys, to
23    try to get you here sitting down at 9:15.
24         So we've tried nine; we've tried 9:30.  Neither of
25    those worked so let's try 9:15.  Okay?  So we'll try to
```

1   have you in your seats at 9:15.  That will be the plan.

2   Remember a short day tomorrow, 1:30 to two o'clock, and

3   that will be it.  Okay?

4          THE CLERK:  All rise for the jury.

5          THE COURT:  Can everyone just leave their

6   notebooks on their chairs please?  See you all tomorrow.

7   **(Court recessed at 3:59.)**

8   --------------------

9

10  (The certification of this transcript does not apply to
    any reproduction of this transcript, unless under the
11  direct control and/or supervision of the certifying
    reporter.  I assume no responsibility for the accuracy of
12  any reproduced copies not made under my control or
    direction.)

13

14                      CERTIFICATION

15

16          I certify that the foregoing is a correct

17  transcript of the record of proceedings in the

18  above-entitled matter to the best of my skill and ability.

19

20

21  /s/ Alice Moran                    December 5, 2020
    Alice Moran, RMR, RPR
22  Federal Official Court Reporter

23

24

25