1               UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2                     WESTERN SECTION

3

4   United States of America  )
                              )        20cr30018-MGM
5        vs                   )
                              )        November 18, 2020
6   Jonathan Michael Rathbun  )
    _____)

7

8                  Jury Trial Held Before

9            The Honorable Mark G. Mastroianni

10              United States District Judge.

11

12  APPEARANCES:

13

    On behalf of the government:  Risa Berkower, United States
14  Department of Justice, 950 Pennsylvania Avenue, NW,
    Washington, DC 20532.

15

16  Neil L. Desroches, Assistant United States Attorney, 300
    State Street, Suite 230, Springfield, MA 01105-2926.

17
    On behalf of the defendant: Timothy G. Watkins, Esq., 51
18  Sleeper Street, 5th Floor, Boston, MA 02210.

19  Forest J. O'Neill-Greenberg, Esq., 51 Sleeper Street, 5th
    Floor, Boston, MA 02210.

20

21
                    Alice Moran, CSR, RPR, RMR
22                  Official Federal Court Reporter
                    United States Courthouse
23                  300 State Street, Room 303D
                    Springfield, MA 01105
24                      (413)731-0086
                    alice.moran@verizon.net

25

1                            INDEX

2

3   Witness:                                              Page:

4

5   **Mary Jacobs Sherry**

6

7   Direct examination by Ms. Berkower                       8

8
    Cross-examination by Ms. O'Neill-Greenberg              20
9

10  Redirect examination by Ms. Berkower                    30

11

12

13  **John Drugan**

14  Direct examination by Mr. Desroches                     34

15  Cross-examination by Mr. Watkins                        65

16  Redirect examination by Mr. Desroches                   68

17

18  **Sheila Rathbun**

19  Direct examination by Ms. O'Neill-Greenberg            103

20

21

22  Exhibit No.
    Description                                           Page
23

24  PX-84    Sheila Tipton's tenant file                   19

25

1    **(Trial commenced at 9:23.)**

2    **(Mr. Rathbun is present.)**

3              MS. BERKOWER:  Before the jury comes in, I  just

4    mentioned this to clerk a few minutes ago, but we have

5    some stipulations that I think we're going to ask the

6    court to read into record this morning.  Some of them were

7    signed.  I think we tried to file one on Friday and some

8    were filed yesterday that appeared over ECF, and I just

9    wanted to flag that for the court.

10             THE COURT:  So are they -- who's reading them?

11   Attorney Watkins or you?  How are they going to get in?

12   Will they be introduced?  Will they become an exhibit that

13   will go to the jury?

14             MS. BERKOWER:  I think it would be useful for it

15   to be an exhibit, and perhaps if Your Honor could read

16   them?

17        You'll note in the ones that were filed yesterday,

18   which is ECF-182, I think the full document can be read to

19   them.  The one that we signed and submitted on Friday

20   starting with the first three -- or the first two -- the

21   first three, excuse me, are complete.

22        The next few anticipated, they have blanks for

23   exhibit numbers.  So we would just ask that you don't need

24   to read that because that would be confusing.  That was

25   remedied in the subsequent filing, but we would ask the

1    court to read it.  If you want, I can give you a specific

2    list of which document we'd like which numbers read.

3              THE COURT:  Is this part of the same stipulation

4    agreement that you read, Attorney Watkins?

5              MS. BERKOWER:  The one from yesterday is.

6              THE COURT:  It's already in there?

7              MS. BERKOWER:  The one from yesterday, Document

8    182, has a list of six stipulations and he read the first

9    one yesterday.  That was filed as 182.

10        The one that we submitted to the clerk on Friday has

11   eight, but we only actually completed the first three at

12   the time.  We were still waiting to sort out exhibit

13   numbers and just didn't excise those others from the

14   document, and those have not been read at all to the jury.

15   They're mostly chain of custody things relating to the DNA

16   evidence.

17             THE COURT:  We should move these into evidence.

18   So the one that you read, the one that you read

19   previously, we should did put in evidence.  If we didn't,

20   we should mark it.

21             MS. BERKOWER:  I think we can make that

22   Government's Exhibit 113 and 114.

23             THE COURT:  In front of the jury we will do

24   that.

25             MS. BERKOWER:  Okay.

1          THE COURT:  The delay happens to be is one of

2     the jurors is not here yet and so that's what we're

3     waiting for.

4          MS. BERKOWER:  Your Honor, we'll move these into

5     evidence when we start and then we can provide a list to

6     the court of which ones we'd like read at which time.

7          THE COURT:  Sure.  Okay.

8          MR. WATKINS:  Judge, perhaps we could talk about

9     scheduling while we have a moment?

10          THE COURT:  Go ahead.

11          MR. WATKINS:  As I understand it from the

12     government, they're prepared to rest mid-morning after two

13     witnesses.  We have one witness prepared to go on today

14     but that would be all we are prepared for.

15          I've indicated to the government, I will indicate to

16     the court, that Mr. Rathbun will be testifying, but we

17     would not be ready to begin that today for the access

18     issues we talked about before.

19          While the marshals have told us today we can have

20     access to Mr. Rathbun, we were not able to do that

21     yesterday because of problems with Ludlow.  So we may end

22     up I think perhaps a little bit early wrapping up today,

23     but it looks like --

24          THE COURT:  So you think you'll wrap up before

25     one, like eleven, twelve?  How early?

1              MS. BERKOWER:  Your Honor, I think the
2     government will -- we expect that our witnesses will take
3     about an hour, maybe a little more, so depending what time
4     we start.  And then I know we have the stipulations to
5     address and possibly a motion from the defense, but that's
6     what we envision for this morning.
7              THE COURT:  How long is your witness?
8              MS. O'NEILL-GREENBERG:  That's a good question.
9     Twenty minutes, half an hour.
10             THE COURT:  Okay.  So we will be ending early
11    today.  Do you think all evidence is done by Friday?
12             MR. WATKINS:  I think it's all done tomorrow.  I
13    mean, we have the full day tomorrow.  It will just be Mr.
14    Rathbun.  I can't speak for the government whether they're
15    going to put on a rebuttal.
16             THE COURT:  So the question would be if we can
17    keep open some time tomorrow for a charging conference.
18             MR. WATKINS:  I think that makes sense.
19             THE COURT:  We'll see how it goes.  If not, we
20    will bring the jury in late on Friday to do a charging
21    conference in the morning.  We'll see how it goes.  Okay.
22             MR. WATKINS:  So just for preparation sake, the
23    court would not be anticipating closings being tomorrow
24    then for example?
25             THE COURT:  You think you're going to be done at

1   like ten or eleven tomorrow morning?  We haven't had a

2   charging conference.  That will be tough.

3              MR. WATKINS:  Okay.  I don't know -- I do expect

4   that we would be done by one o'clock, again without

5   knowing how far the government is going to go into

6   cross-examination on Mr. Rathbun, and then we would have

7   the afternoon.  I'm happy to leave the closings until

8   Friday.

9              THE COURT:  Yeah, I think we should probably

10  plan for tomorrow to be a half day again and then full day

11  on Friday; closings and charge on Friday morning.

12             MS. BERKOWER:  To make sure I understand, Your

13  Honor, depending on -- are you -- does that assume that we

14  would get our full cross in?  We would go the full day if

15  required?

16             THE COURT:  When tomorrow?

17             MS. BERKOWER:  Yes.

18             THE COURT:  Yeah, right.  Absolutely.

19             MS. BERKOWER:  Thank you.

20             THE COURT:  So I shouldn't even tell them that

21  it's a half day tomorrow.  It just might end up being a

22  half day.

23             MS. BERKOWER:  Understood.  Thank you.

24             THE COURT:  All right.

25

 1    **(The jury entered at 9:44.)**

 2            THE COURT:  All right.  Hi, everyone.

 3            THE JURY:  (Good morning.)

 4            THE COURT:  Did everyone follow my instructions

 5    overnight not to talk to each other?  Talk to anyone else?

 6    Research the case?  Social media posts or social media

 7    read?  Also stay away from any news articles or reports

 8    about the case, as well as follow all my other

 9    instructions?

10        Affirmative answers of all jurors, yes, they remain

11    fair and impartial.

12        Okay.  Go right ahead.

13            MS. BERKOWER:  Your Honor, the government calls

14    Mary Jacobs Sherry.  May I get her?

15            THE COURT:  Sure.

16            THE CLERK:  Ma'am, will you please raise your

17    right hand?

18    **Mary Jacobs Sherry (sworn)**

19    <u>**DIRECT EXAMINATION**</u>

20    Q.   (By Ms. Berkower)  You may take your mask off now

21    that you're in the witness box.

22        Good morning.

23    A.   Good morning.

24    Q.   Could you sit a little closer and pull the microphone

25    toward you please?

1    A.    Good morning.

2    Q.    Could you please tell us your name?

3    A.    It's Mary Sherry.

4    Q.    How do you spell your last name?

5    A.    Just like the wine, S-h-e-r-r-y.

6    Q.    And what town do you live in, Ms. Sherry?

7    A.    I live in East Longmeadow, Massachusetts.

8    Q.    Are you employed?

9    A.    Yes.

10   Q.    Where do you work?

11   A.    I work for Genesis House or Carr Property.

12   Q.    What do you do at Genesis House or Carr Property?

13   A.    I'm the manager.

14   Q.    Do you work onsite?

15   A.    I do.

16   Q.    How long have you had that job?

17   A.    Since 2001.

18             MR. WATKINS:  May I ask just to move the mic a

19   little bit closer?

20             THE COURT:  Sure.  If you can grab the mic and

21   pull it closer to you, maybe that will make it easier.

22             THE WITNESS:  Since 2001.

23   Q.    (By Ms. Berkower)  And are you familiar with someone

24   named Sheila Rathbun?

25   A.    Yes.

1   Q.   Are you familiar with someone named Sheila Tipton?

2   A.   Yes.

3   Q.   I'm going to ask more questions about those

4   individuals in a moment, but first we're going to go on to

5   another topics.   Okay?

6   A.   Can I just take my coat off?

7   Q.   Of course.

8        Ms. Sherry, before we get into your testimony, how

9   are you feeling about being here today?

10  A.   Good.

11  Q.   Okay.  Do you feel nervous today?

12  A.   Yes.

13  Q.   Could you explain a little why you're feeling

14  nervous?

15  A.   This is just uncomfortable.

16  Q.   So if you need to take a breathe or a drink of water,

17  will you let me know as we go along?

18  A.   Yes.

19  Q.   So you said a moment ago that you're the manager of

20  Genesis House --

21  A.   Uh-huh.

22  Q.   -- for 19 years.

23       Could you explain what Genesis House is?

24  A.   Okay.  It's for 62 and older.  It's a subsidized

25  independent living facility for 62 and over.

```
 1    Q.    Where is Genesis House located?

 2    A.    It's 832 Converse, Longmeadow, Mass.

 3    Q.    Who owns the property where Genesis House is located?

 4    A.    The Jewish Nursing Center, nursing home.

 5    Q.    Now you mentioned you work for Carr Properties?

 6    A.    Correct.

 7    Q.    So what is the relationship between Carr Properties

 8    and the Jewish nursing home?

 9    A.    They're the contractor; they subcontract.

10    Q.    So as the site manager for Genesis House, are there

11    certain Jewish customs that your house obeys?

12    A.    Yes.

13    Q.    Could you explain what those are?

14    A.    If we have social functions, we have to have a kosher

15    kitchen, serve kosher meals.  The religious celebrations,

16    we have to do the Jewish celebrations as well as the

17    Christian celebrations.

18    Q.    So is it fair to say you have a large number of

19    Jewish residents?

20    A.    Yes.

21    Q.    Do you have residents of other faiths as well?

22    A.    Yes.

23    Q.    So are there other facilities at the JGS campus

24    besides Genesis House?

25    A.    Well, the nursing home, the daycare center, Genesis
```

1    House, assisted-living facility as well.

2    Q.   Do residents from Genesis House ever transfer over to

3    those other facilities?

4    A.   Yes, they do.

5    Q.   Could you explain how that would happen?

6    A.   If we have a resident who gets dementia or can't live

7    at Genesis House because they're no longer independent, we

8    will transition them to either assisted-living or the

9    nursing home.

10   Q.   Now, as the site manager of Genesis House, do you

11   have an office at the building?

12   A.   I do.

13   Q.   How many units are in Genesis House?

14   A.   Total is 109.

15   Q.   How many people live in those units currently?

16   A.   Well, it varies.  Currently about 126.

17   Q.   And back in April of this year, do you remember what

18   your occupancy was then?

19   A.   It was about 120 people.

20   Q.   Where did the people who live at Genesis House come

21   from geographically speaking?

22   A.   All over the country.  I mean, mostly Western

23   Massachusetts though.  They can come from all over the

24   country.

25   Q.   What is the average age of your residents?

1    A.   I'd say about 80, 86 maybe.

2    Q.   Eight-six years old?

3    A.   Yes.

4    Q.   Do your residents sign lease agreements?

5    A.   They do.

6    Q.   Do they pay rent?

7    A.   They do.

8    Q.   Do they pay the full cost of the housing?

9    A.   No.  It's subsidized.

10   Q.   Who subsidizes it?

11   A.   It's Housing Urban Development, HUD.

12   Q.   Commonly known as HUD?

13   A.   Correct.

14   Q.   And how many staff work with you onsite at Genesis

15   House?

16   A.   I have a maintenance supervisor, two maintenance

17   floaters, a housekeeper, a social worker that reports to

18   me, so somewhere between five and six people.

19   Q.   Now in your job as manager, are you familiar with the

20   grounds outside your building?

21   A.   Yes.

22        MS. BERKOWER:  If we can have, Ms. McKenna,

23   Government's Exhibit 23 please?

24   Q.   (By Ms. Berkower)  Ms. Sherry, do you see that on

25   your screen?

1   A.   I do.

2   Q.   Are you familiar with what this photo shows?

3   A.   Yes.

4   Q.   Do you see the sign that says Ruth's House Assisted

5   Living in the right corner of the screen?

6   A.   Yes.

7   Q.   Could you explain if you can access Genesis House --

8            MS. BERKOWER:   Sorry, can you publish this?

9   It's in evidence.

10            THE CLERK:   I don't have it in evidence.

11            THE COURT:   This picture here?

12            MS. BERKOWER:   Twenty-three.

13            THE CLERK:   When?

14            MS. BERKOWER:   I think it was admitted the first

15   day.

16            THE COURT:   I think I do remember this picture

17   seeing it quite often.

18            THE CLERK:   Okay.

19            THE COURT:   Might there have been another

20   picture exactly the same but with a different number?   I

21   do remember seeing this picture before.

22            MS. BERKOWER:   Your Honor, I can authenticate it

23   through this witness again if you'd like.

24            THE COURT:   I don't think that's necessary.

25        Attorney Watkins, is that necessary?

| | |
|---|---|
| 1 | MR. WATKINS:  I think it was admitted, yes. |
| 2 | THE COURT:  We will just taken out the exhibit |
| 3 | list when we have a chance.  Thanks for noting that, |
| 4 | Jarrett, but I do think it's admitted. |
| 5 | MS. BERKOWER:  Thank you, Judge.  If we can |
| 6 | please publish it? |
| 7 | THE WITNESS:  Am I supposed to do something |
| 8 | here? |
| 9 | THE COURT:  No.  You're good.  Just look at the |
| 10 | screen. |
| 11 | THE WITNESS:  Okay. |
| 12 | Q.  (By Ms. Berkower)  Ms. Sherry, we are talking about |
| 13 | Government's Exhibit 23, this photo on the screen in front |
| 14 | of you.  Do you see -- does that -- what does that photo |
| 15 | show? |
| 16 | A.  This is the entrance. |
| 17 | Q.  And can you access Genesis House from this entrance? |
| 18 | A.  Yes. |
| 19 | Q.  How would you access Genesis House from this |
| 20 | entrance? |
| 21 | A.  You just take a right. |
| 22 | Q.  How far after you take a right would you get to |
| 23 | Genesis House? |
| 24 | A.  200 feet maybe. |
| 25 | Q.  Now who maintains the grounds immediately around |

1    Genesis House?

2    A.    We do.   My maintenance people do.

3    Q.    Meaning Carr?

4    A.    Yes.

5    Q.    And are the residents of Genesis House able to make

6    use of the grounds that your staff maintains?

7    A.    Yes.

8    Q.    Do they also make use of the property that JGS

9    maintains on the larger campus?

10    A.    They do.

11    Q.    Have you seen that yourself?

12    A.    Yes.

13    Q.    Let's go on to another area.

14         You mentioned earlier that you know someone named

15    Sheila Rathbun, right?

16    A.    Yes.

17    Q.    How do you know her?

18    A.    She works for my company, Carr Property.

19    Q.    How long have you known her?

20    A.    Since 2001 probably.

21    Q.    Has she worked there that entire time?

22    A.    I believe she has.

23    Q.    And what does Ms. Rathbun do for Carr Properties?

24    A.    She was the accountant but then she retired and she

25    comes back for two days a week I believe.

1    Q.   So did she used to be full-time employed --

2    A.   Yes.

3    Q.   -- at the company?

4    A.   Yes.

5    Q.   Now what is she?

6    A.   Part time.

7    Q.   Now you said she's an accountant.  Has she done

8    accounting work for Genesis House?

9    A.   Yes.

10   Q.   Has that work for Carr Properties brought her onsite

11   to Genesis House periodically?

12   A.   Yes.

13   Q.   When was the last time you saw Ms. Rathbun onsite at

14   Genesis House?

15   A.   About a year ago.

16   Q.   Let's go on to a final area.

17        You also said you knew someone named Sheila Tipton;

18   is that right?

19   A.   Correct.

20   Q.   Who is Sheila Tipton?

21   A.   She was one of my residents.

22   Q.   Around when was she one of your residents?

23   A.   I think she passed in 2009.  She had lived there a

24   couple of years.

25   Q.   So did you get to know her while she was there?

```
 1    A.    Yes.

 2    Q.    Did you get to know most of your residents?

 3    A.    I do.

 4    Q.    With Ms. Tipton in particular though, where was her

 5    apartment located in relation to your office?

 6    A.    She was right next to my office.

 7    Q.    And did you have a family member who also knew her?

 8    A.    I did.

 9    Q.    Could you just briefly explain that?

10    A.    My mother also lived at Genesis House and they were

11    neighbors so they would visit frequently.

12              MS. BERKOWER:  Now if we could have just for the

13    court, counsel, and the witness please Government's

14    Exhibit 84?

15    Q.    (By Ms. Berkower)  Before you came to court today,

16    Ms. Sherry, did you review a set of documents starting

17    with this page that is Government's Exhibit 84?

18    A.    Yes.

19    Q.    Do you recognize what it is?

20    A.    Yes.

21    Q.    What is it?

22    A.    Her certification.

23    Q.    And what do you mean by her certification?

24    A.    Once a year we do their certification.  It's part of

25    their lease agreement.  We calculate their rent and that's
```

1    the certification.

2    Q.   Who is this the certification for?

3    A.   Sheila Tipton.

4    Q.   Are these -- is this set of materials that's

5    Government's Exhibit 84 accurate records that you kept at

6    Genesis House?

7    A.   Yes.

8    Q.   Did you keep them in the course of business?

9    A.   Yes.

10   Q.   And from what you reviewed, do they seem to be

11   accurate copies?

12   A.   Yes.

13          MS. BERKOWER:  Your Honor, I would ask to admit

14   Government's Exhibit 84 into evidence.

15          MS. O'NEILL-GREENBERG:  No objection.

16          THE COURT:  No objection, that will be

17   admitted.

18   **(PX-84 was admitted.)**

19          MS. BERKOWER:  Can we please publish that?

20   Q.   (By Ms. Berkower) So would it be fair to characterize

21   this as the tenant file for Ms. Tipton?

22   A.   Yes.

23   Q.   During the time that Ms. Tipton lived at Genesis

24   House, did she have visits from her family?

25   A.   She did.

```
1    Q.   How did you know that?
2    A.   Because Sheila used to visit her mother and she had
3    to go by my office; plus her two sisters would come by my
4    office.
5    Q.   Okay.  And when you say -- did you just mean that
6    Sheila Rathbun visited Sheila Tipton?
7    A.   Yes, correct.
8              MS. BERKOWER:  No further questions, Your Honor.
9              THE COURT:  Thank you.
10             MS. O'NEILL-GREENBERG:  Thank you.
11   CROSS-EXAMINATION
12   Q.   (By Ms. O'Neill-Greenberg) Good morning.
13   A.   Good morning.
14   Q.   Hi.  So you work for Carr Property Management?
15   A.   Right.
16   Q.   Okay.  And they manage 19 different properties in the
17   area; is that right?
18   A.   Yes.
19   Q.   And for each of their 19 properties, they have a site
20   manager?
21   A.   Correct.
22   Q.   And you're the site manager for Genesis House?
23   A.   Yes.
24   Q.   Okay.  And Carr Property Management the company is
25   not located at Genesis House?
```

1   A.   Correct.

2   Q.   The address is 24 Deer Park Road?

3   A.   Yes.

4   Q.   And there's about eight to ten employees in the main

5   office; is that right?

6   A.   Yeah, I guess so.

7   Q.   Ish?

8   A.   Yes.

9   Q.   And Sheila Rathbun she worked -- her office is at 24

10  Deer Park Road?

11  A.   Yes.

12  Q.   It's always been at 24 Deer Park Road?

13  A.   Yes.

14  Q.   And currently Sheila Rathbun is a part-time

15  accountant?

16  A.   Correct.

17  Q.   Okay.  So she does the accounting for all of Carr

18  Property?

19  A.   Yes.

20  Q.   Previously she was a comptroller; is that right?

21  A.   Accountant/comptroller; I'm not sure her position,

22  her title.

23  Q.   Okay.  So you two work in different departments?

24  A.   Correct.

25  Q.   Okay.  And you said the last time you saw Sheila

1    Rathbun was a year ago; is that right?

2    A.   Yes.

3    Q.   You only see her maybe physically once a year, if

4    that, correct?

5    A.   Correct.

6    Q.   And when you saw her last year, it was for the yearly

7    company meeting?

8    A.   Yes.

9    Q.   And that yearly company meeting obviously for

10   everyone is held at different places every year?

11   A.   Uh-huh.

12   Q.   Last year it was held --

13   A.   -- at Genesis House.

14   Q.   Before it's also been held at Interfaith?

15   A.   Sometimes.

16   Q.   And now I want to talk about Sheila Tipton, so Sheila

17   Rathbun's mother, correct?

18   A.   Correct.

19   Q.   So she lived -- Sheila's grandmother (sic), Sheila

20   Tipton, lived at Genesis House for a few years you said?

21   A.   Yes.

22   Q.   It's been about a decade since she lived there?

23   A.   Correct.

24   Q.   And before Sheila Tipton lived for those few years at

25   Genesis House a decade ago, she lived at a different

1    subsidized housing facility; are you aware?

2    A.    That I don't remember.  I don't remember where she

3    came from before.

4    Q.    Okay.  You said that you recall your mother and

5    Sheila Tipton knew each other?

6    A.    Correct.

7    Q.    Okay.  And Sheila Tipton didn't have that many

8    visitors?

9    A.    No.  She was a quiet person.  She kept to herself.

10   Q.    Okay.  But you do recall some visits with Sheila

11   Rathbun and her sisters?

12   A.    Yes.

13   Q.    And these apartments at Genesis House, they have full

14   kitchens; is that right?

15   A.    Yes, they do.

16   Q.    So people cook for themselves there?

17   A.    It's independent, correct.

18   Q.    So people live there and since they have full

19   kitchens and independent living, they don't have to do any

20   -- they don't have to go into some communal kitchen to

21   cook?

22   A.    No.  Unless we have social events and then they come

23   to the social events and we cook.

24   Q.    Okay.  But you can opt not to do any social events?

25   A.    Correct.

1   Q.   Okay.  And you said that Sheila Tipton was a quiet
2   private person?
3   A.   Yes.
4   Q.   So she didn't really engage in social things?
5   A.   No, never.
6   Q.   And you talked about how sometimes residents from
7   Genesis House if they're older or sicker they can transfer
8   to other facilities?
9   A.   True.
10   Q.   They could transfer to a facility inside that JGS
11   property but they could also be transferred to another
12   facility somewhere in the area?
13   A.   True.
14   Q.   Okay.  And you're the property manager so did you
15   actually have any involvement in transferring people?
16   A.   Yes.
17   Q.   Okay.  If someone worked in accounting, would they
18   have any involvement in transferring?
19   A.   No.
20   Q.   And you never meet John Rathbun before, right?
21   A.   No.
22   Q.   You don't know him?
23   A.   No, I do not.
24   Q.   Now, if we could just pull up Government's Exhibit
25   23.

1    A.    I don't have anything here.

2    Q.    For everybody.

3          MR. WATKINS:  I'm waiting for the monitors.

4          MS. O'NEILL-GREENBERG:  Sorry.  Just a second.

5          MS. BERKOWER:  We can do it, Your Honor.  If you

6    transfer that back to us, we can pull it up.

7          THE COURT:  Thank you.

8    Q.    (By Ms. O'Neill-Greenberg) So this sign has only been

9    there for a couple years, right; do you know?

10   A.    No.  It's been there awhile.

11   Q.    It's been there --

12   A.    You're talking about Ruth's House Assisted Living?

13   Q.    Yes.

14   A.    No, that's been there awhile.

15   Q.    Are you aware --

16   A.    This is a second sign.

17   Q.    Okay.

18   A.    It's just a little bit nicer than the one we used to

19   have.

20   Q.    So there was an older -- so this one is a replacement

21   that's about a couple years old; is that right?

22   A.    Right.

23   Q.    And this isn't -- this isn't the main -- let me start

24   again.

25         Genesis House is made up of a few different

1    buildings, right?

2    A.   Correct.

3    Q.   And to access those buildings, there's another

4    entrance that you use?

5    A.   Correct.

6    Q.   It's not this entrance?

7    A.   Correct.

8    Q.   This is the entrance if you want to get to -- turn in

9    to get to the adult daycare?

10   A.   You can get to Genesis House, the nursing home, and

11   Ruth's House which is assisted living.

12   Q.   And Ruth's House is --

13   A.   It's much further away.

14   Q.   All the way --

15   A.   It's up the hill.

16   Q.   All the way in the back?

17   A.   Yes.

18            MS. O'NEILL-GREENBERG:  If I could now pull up

19   Exhibit 104 which is also in evidence.  I don't know if

20   can we do it?

21   Q.   (By Ms. O'Neill-Greenberg)  This is just an ariel

22   view of the whole property.  Does that look familiar to

23   you?  This looks familiar to you?

24   A.   Yes.

25   Q.   Do you recognize it?

```
 1    A.    Yes.
 2    Q.    So do you see this is Genesis House right here,
 3    correct, these buildings?  (Indicating)
 4    A.    Correct.
 5    Q.    And this is the entrance to get to Genesis House
 6    here, right?  (Indicating)
 7    A.    Correct.
 8    Q.    And this is a one-way street; is that right?
 9    A.    Yes.
10    Q.    So when you pull in here, this is how you access the
11    buildings where everyone lives in Genesis House, right?
12    (Indicating)
13    A.    Yes.
14    Q.    Okay.  And these buildings are labeled; is that
15    right?
16    A.    They are.
17    Q.    They're labeled A, B --
18    A.    -- C and D, correct.
19    Q.    That's the only sign that they have on them, right?
20              THE COURT:  Can everyone hear?
21         Okay.
22              THE WITNESS:  Well, they have their number
23    whether it's A-20, A-32.
24    Q.    (By Ms. O'Neill-Grennberg)  Okay.  They have their
25    numbers and then they have their letter?
```

1    A.   Correct.

2    Q.   And they don't have any other signs on them?

3    A.   Correct.

4    Q.   Okay.  There's nothing on them that says Ruth's

5    House?

6    A.   Our buildings do say Genesis House.

7    Q.   But there's nothing on these buildings on the door

8    that says Genesis House, correct?

9    A.   Correct.

10   Q.   It just says A, B, C, D?

11   A.   Correct.

12   Q.   Okay.  And there's no other labels or signs on the

13   doors when you walk in, right?

14   A.   No.

15   Q.   Okay.  And there's a sign right here, correct?

16   A.   Correct.

17   Q.   And that sign says Harold Grinspoon Campus?

18   A.   Correct.

19   Q.   There's nothing on that sign that says Ruth's House,

20   correct?

21   A.   Correct.

22   Q.   I don't have any -- -- do you know which building

23   Sheila Tipton lived in?

24   A.   Sheila lived next to my office which is the first

25   building.

1   Q.   So which letter is that?

2   A.   That would be A.

3   Q.   A?

4   A.   A.

5   Q.   That's this building here?  (Indicating)

6   A.   Correct.

7   Q.   Okay.  And her apartment was over here on the side?

8   (Indicating)

9   A.   She was right in back of me.  So as you enter the

10   office, she was right in back of me.

11   Q.   So if someone is going to visit her, they could pull

12   in here and park, right?  (Indicating)

13   A.   Yes.

14   Q.   They could access it from right on the side?

15   A.   Correct.

16   Q.   And then they could go in?

17   A.   Correct.

18   Q.   Okay.  And she lived on -- this is building A.  She

19   lived on the side of it?

20   A.   Correct.

21   Q.   Thank you.

22   A.   You're welcome.

23        MS. BERKOWER:  Very briefly, Your Honor.  May I

24   also go over to this?

25        THE COURT:  Of course.

```
 1        Ladies and gentlemen, usually when our equipment
 2   isn't all taken down and re-put together for the
 3   circumstances we're under, someone could just touch their
 4   screen.  The witness could put their finger on the screen
 5   and you would all see where they're pointing to and they
 6   could circle things and highlight things and make arrows
 7   so there wouldn't need to be this what's happening now.
 8        We had to unplug everything and reconfigure it all,
 9   and so a lot of the functions don't work.  For what it's
10   worth, a side story.  Okay.
11             MS. BERKOWER:  May I proceed?
12             THE COURT:  Yes.
```
13   **REDIRECT EXAMINATION**
```
14   Q.   Good morning again, Ms. Sherry.
15   A.   Hi.
16   Q.   So you were just asked questions about the one-way
17   street here?  (Indicating)
18   A.   Correct.
19   Q.   Do you remember being asked about that?
20   A.   Yes.
21   Q.   So you said Ms. Tipton's apartment was right here in
22   this area?  (Indicating)
23   A.   Correct.
24   Q.   And if you were driving up Converse Street, you can
25   just pull in and park, right?
```

1  A.   Correct.

2  Q.   When you left, since it's a one-way street, where

3  would you have to go?

4  A.   You would have to go around.  It's like a circle.

5  Q.   Is this the direction you go?  (Indicating)

6  A.   Correct.

7  Q.   Would you exit here?  (Inciting)

8  A.   Yes.

9  Q.   Is the sign that says Ruth's House right here?

10  (Indicating)

11  A.   Yes.

12           MS. BERKOWER:  So if we could have Government's

13  Exhibit 23 very briefly?

14  Q.   (By Ms. Berkower) So if you followed that one-way

15  street, would you end up here to leave the facility?

16  (Indicating)

17  A.   Correct, yes.

18           MS. BERKOWER:  No further questions, Your Honor.

19           THE COURT:  Okay.  Thank you.

20           MS. O'NEILL-GREENBERG:  No more.

21           THE COURT:  I have one question.

22       I've heard you talk about the campus -- well, talk

23  about the overall area and the different buildings and

24  names of buildings, and I've heard it referenced before

25  and you referenced it today as the Harold Grinspoon

1    Campus.

2            THE WITNESS:  Uh-huh.

3            THE COURT:  Is there a story behind that?  Like

4    how did it get that name?  What does it encompass and

5    what's the relationship?

6            THE WITNESS:  Okay.  He's a Jewish

7    philanthropist.  A lot of people in this city know him.

8    He gave us the money for Genesis House.

9            THE COURT:  All right.

10           THE WITNESS:  He gave it to develop Genesis

11   House years ago.  I think it was like 30-some years ago.

12           THE COURT:  I see.

13           THE WITNESS:  So that's how he got his name on

14   the sign.

15           THE COURT:  Did he donate the property or he

16   gave the money?

17           THE WITNESS:  He donated the property.

18           THE COURT:  Okay.  And so when you refer to the

19   campus --

20           THE WITNESS:  Correct.

21           THE COURT:  -- what does the campus -- how big

22   is the campus?  The campus encompasses everything that

23   you've been talking about, all these buildings?

24           THE WITNESS:  Yes.  The campus is made up of the

25   Jewish nursing home which is a very large facility, then

```
 1   Genesis House and then Ruth's House which is up the hill,
 2   and then the daycare center.  So it's a pretty large
 3   campus.
 4              THE COURT:  I see.  Thank you.
 5              THE WITNESS:  You're welcome.
 6              THE COURT:  Any follow-up questions on that?
 7              MS. BERKOWER:  Not from the government, Your
 8   Honor.
 9              MS. O'NEILL-GREENBERG:  Nothing.
10              MS. BERKOWER:  May this witness be excused?
11              THE COURT:  Yes.
12              MS. BERKOWER:  Thank you, ma'am.
13              THE WITNESS:  Thanks.
14              MR. DESROCHES:  Your Honor, the government calls
15   John Drugan.
16              THE CLERK:  Please raise your right hand.
17   John Drugan (sworn)
18              THE WITNESS:  Remove the mask?
19              MR. DESROCHES:  Yes, please remove the mask.
20   You can pull that chair up if you'd like.
21              THE WITNESS:  Thank you.
22              MR. DESROCHES:  I'd also ask, as you testify, if
23   you can make sure that the microphone is close to you
24   because it amplifies for everyone to hear.
25
```

**DIRECT EXAMINATION**

Q.   (By Mr. Desroches) Good morning.

A.   Good morning.

Q.   Could you please introduce yourself to the jury and for the record spell your last name?

A.   Yes.  My name is John E. Drugan; last name is spelled D-r-u-g-a-n.

Q.   Are you employed?

A.   Yes.

Q.   How are you employed?

A.   I'm a chemist at the Massachusetts State Police Crime Laboratory in Sudbury, Mass.

Q.   For how long have you been a chemist at the State Police Crime Laboratory?

A.   Thirty-six years.

Q.   What is your current position at that laboratory?

A.   Right now I'm a technical leader.  I oversee the Trace Arson and Explosives Unit of the laboratory.

Q.   For how long have you had that position?

A.   Since 2011.

Q.   Did you receive any education prior to becoming employed by the State Police Crime Laboratory?

A.   Yes.

Q.   Can you describe what education is?

A.   I received a bachelor of silence in chemistry at

1    Merrimack College in North Andover, Mass.

2    Q.   What are your current job responsibilities?

3    A.   Current job duties I oversee case reviews, casework

4    within our unit, validate equipment, purchase equipment,

5    maintain our accreditation standards, troubleshoot

6    equipment.

7    Q.   And you indicated that you're assigned to a

8    particular unit within the laboratory?

9    A.   Yes.

10   Q.   What unit are you assigned to?

11   A.   The Trace Arson and Explosives Unit.

12   Q.   Can you describe what that unit does?

13   A.   Our unit we receive trace evidence collected from

14   crime scenes and that trace evidence could be anything

15   from gunshot residue, to explosives, to paint, to tape, a

16   variety of different physical evidence.

17        We do physical matches.  So in a hit and run where

18   maybe a broken headlight is left at the scene and we

19   recover the vehicle, we will do a physical match to that

20   item.

21        We do serial number restorations on weapons.  If

22   obliterated numbers have been removed or obliterated, we

23   have a process we can recover or attempt to recover those

24   numbers.  So we do a variety of different things, but like

25   I said, physical evidence.  We do fire debris analysis we

1    also do.

2    Q.   So I'd like to talk about fire debris analysis in

3    just one moment, but first I'd like to talk about the

4    laboratory in general.

5         Is the laboratory certified or accredited in any type

6    of way?

7    A.   It is.

8    Q.   And can you describe how it's accredited?

9    A.   We are -- we go through a five-year accreditation

10   cycle.  We're currently accredited.  We became accredited

11   in 2002.

12   Q.   Are you part of the accreditation process?

13   A.   Yes.

14   Q.   What part do you play in that process?

15   A.   I oversee my unit and the accreditation entails a

16   variety of different things, protocol reviews, protocol

17   writings.  The accrediting bureau will review casework.

18   They will review reagent control, quality assurance,

19   quality control, things like that.

20   Q.   Are you yourself a member of any professional

21   organizations?

22   A.   Yes.

23   Q.   What organizations are you a part of?

24   A.   Right now I'm part of an OSAC group.  It's

25   Organization of Scientific Area Committee.  It's sponsored

1    by the federal government.  It's actually under NITS,

2    National Institute of Standards and Technology.  That

3    group right now I'm part of the ignitable liquids, gunshot

4    residue, and explosives.  Those three kind of

5    sub-disciplines, and what we do is try and create national

6    standards to be used in the forensic science community.

7    Q.   On a regular basis do you participate in any

8    trainings at the laboratory?

9    A.   Yes.

10   Q.   What are those trainings?

11   A.   As part of our accreditation, we're required to

12   attend at least one training per year and that could be

13   anything from a three-day seminar.  My participation in

14   OSAC, we meet twice a year, that kind of covers our

15   accreditation.  But trainings that come up, we just bought

16   a new piece of equipment and we did a two-day in-house

17   virtual training, which was a little strange but things

18   like that.

19   Q.   Do you actually provide trainings anywhere in your

20   field?

21   A.   Yes.

22   Q.   Can you describe what trainings you provide?

23   A.   I've participated or conducted trainings for fire

24   personnel, police personnel, district attorneys, defense

25   attorneys on basically lab capabilities, evidence

1  collection techniques.  You know, kind of let people know

2  what we do within or lab within my unit specifically.

3  Q.   You said that your unit -- one of the

4  responsibilities, one of the types of analysis that it

5  does is fire debris analysis?

6  A.   Yes.

7  Q.   What is that?

8  A.   Fire debris analysis we receive evidence recovered

9  from a fire scene.  The evidence recovered sometimes is

10  collected as a result of a canine alert where they might

11  indicate the presence of an ignitable liquid, or they

12  might not use a canine but that evidence is packaged up

13  and our job is to test it to determine the presence of an

14  ignitable liquid or the absence.

15  Q.   How many fire debris samples have you yourself

16  analyzed over the course of your career?

17  A.   Too many.  Several thousands.

18  Q.   Do flammable liquids fall into the category of fire

19  debris analysis?

20  A.   Yes.

21  Q.   Can you describe what flammable liquids are?

22  A.   A flammable liquid is really as it sounds, a type of

23  liquid that is able to sustain combustion.  There are

24  different classes of flammability, but that's kind of it

25  in a nutshell.  That's what it is.

1    Q.   Is gasoline a flammable liquid that you could

2    characterize -- or would you characterize gasoline as a

3    flammable liquid?

4    A.   Yes.

5    Q.   Could you describe how it falls into that category?

6    A.   Gasoline is on the lighter end of a flammability

7    chart.  It has a very low flashpoint, easily ignitable in

8    conditions up to minus 45 degrees Fahrenheit.

9    Q.   You said it's on the -- I'm not sure if I heard you

10   correctly, the lighter end of the flammability spectrum?

11   A.   Yeah, I guess I should explain that a little better.

12   Q.   Could you please?

13   A.   So gasoline would be something that's highly

14   flammable.  On the opposite end it would be something like

15   dieseal fuel, home heating fuel, and within that kind of

16   range we are able to identify mineral spirits or kerosene,

17   lamp oils, Coleman fuel, camping fuels, things like that.

18   Q.   So how does gasoline compare to other flammable

19   liquids on that spectrum that you're describing?

20   A.   Usually we classify things under flashpoint.  A

21   flashpoint is -- the basic definition is the temperature

22   at which a liquid needs to be heated in order to produce

23   enough vapor to ignite with an open flame.

24   Q.   So where does gasoline fall in that?

25   A.   Like I said, it's minus 45 degrees Fahrenheit which

1   is, you know, highly flammable.

2   Q.   Have you testified regarding your analysis of fire

3   debris in the past?

4   A.   Yes.

5   Q.   Approximately how many times have you testified?

6   A.   In that subcategory of fire debris?

7   Q.   Yes.

8   A.   Roughly a hundred times.

9   Q.   Now, generally speaking, how do you identify

10   flammable liquids at the laboratory?

11   A.   Generally speaking, there's a few different tests.

12   One is just an olfactory test, it's a smell, and that

13   would be the first thing that we do in an examination of a

14   liquid or a fire debris sample itself.

15   Q.   Specifically now let's talk about identification of

16   liquids.

17   A.   Yes.

18   Q.   After you smell it, what's the next thing that you

19   do?

20   A.   We have a couple of different pieces of equipment

21   that we would prepare that sample, and then the two

22   different pieces of equipment are used to identify the

23   presence of and the type of ignitable liquid present.

24   Q.   What are those two pieces of equipment?

25   A.   One is a gas chromatograph flame ionization detector

1   and the second instrument is a gas chromatograph mass

2   spectrometer.

3   Q.   So in regards to the first instrument that you just

4   described, do you receive training in how to use that?

5   A.   I have in the past.

6   Q.   How frequently do you use that piece of equipment?

7   A.   It's used on a daily basis.  Myself, like I said, my

8   job now is more administrative but, you know, in the past

9   I've used it several thousand times.

10  Q.   Can you describe in general terms how we understand

11  how this works?

12  A.   The gas chromatograph is a GC FID, that's the acronym

13  instead of telling it out.  The instrument itself is a

14  large, a large heated box basically and within that heated

15  box is a separating column and that column -- the sample

16  runs through and it's heated from roughly 35 degrees to

17  240 degrees and that sample is injected into the

18  instrument.

19       The instrument is also equipped a flame ionization

20  detector and when that vapor eludes or emits from into the

21  detector, it records a peak or a presence of a peak.  And

22  when that happens, certain liquids that go through have a

23  certain characteristic pattern that's recorded on a chart

24  or data.  So that instrument is used.  Our first test is

25  really kind of a screening type instrument.

1    Q.    Does this instrument make use of any quality

2    controls?

3    A.    Yes.

4    Q.    Can you describe what those are?

5    A.    A quality control is basically a check of the

6    instrument to make sure that it's functioning properly.

7    Q.    So what types of quality controls does this

8    instrument make use of?

9    A.    We'll run through a standard, a reference standard

10   through the instrument and that typically is gasoline.  We

11   also have a -- it's called an A1618 it's a collection of

12   alcaine products that are run through and those two things

13   are run on a regular basis.

14   Q.    So basically a reference standard is something that

15   is a known liquid, correct?

16   A.    Correct.

17   Q.    Then you just make sure that the machine is properly

18   detecting the characteristics of that known liquid?

19   A.    Right.

20   Q.    Are there any other controls in place?

21   A.    We'll run blanks, which is just a known blank sample.

22   Typically we use carbon disulfide in our testing or

23   pentane, one of those two, and those blanks are run

24   through.  With samples unknowns, you'll run a blank before

25   and a blank after and it just shows that the instrument is

1    not -- there's no carryover.  There's no contamination

2    going on between samples.

3    Q.   So you said there were two instruments that you

4    routinely use in identifying liquids?

5    A.   Yes.

6    Q.   What is the second?

7    A.   The second is a gas chromatograph mass spectrometer.

8    It's very similar to the GC FID but it has a different

9    detector connected to it.

10        So you're getting -- the sample is injected into the

11   instrument.  You're getting that separation.  You're

12   getting what's called a total ion chromatogram or a

13   printout of peaks and valleys, but also the mass

14   spectrometer identifies components that are present in

15   gasoline or kerosene or mineral spirits or things like

16   that.

17   Q.   Does this instrument also have quality controls?

18   A.   Yes.

19   Q.   Are they the same as you described for the first

20   instrument?

21   A.   Yes.

22   Q.   How frequently is this instrument used at the

23   laboratory?

24   A.   Again, on a daily basis.

25   Q.   Now drawing your attention to this case in

1    particular, did you become involved in the analysis of

2    liquids associated with John Michael Rathbun?

3    A.   Yes.

4    Q.   How was it that the lab first became involved in

5    this?

6    A.   The samples came into the lab.  The first sample came

7    in on April 13th of this year, 2020.  It was submitted by

8    a Trooper Nancy Crew who's an evidence officer assigned to

9    the State Fire Marshal's Office.

10   Q.   Now is this the item that was recovered from Converse

11   Street in Longmeadow?

12   A.   Yes.

13   Q.   After the laboratory initially received it, how did

14   it make its way to you?

15   A.   The evidence typically goes in through an evidence

16   intake window.  So there are evidence technicians that

17   accept evidence.  They'll give it an individual bar code

18   and it will be scanned into our custody.  So with this

19   case, it was submitted on the 13th.  It was given an

20   individual LIMS number, and that is packaged up and it's

21   brought down to our evidence storage unit.

22   Q.   What is the evidence storage unit?

23   A.   We have our own evidence storage within our lab, the

24   arson lab, and we'll store all our evidence to include

25   fire debris, explosives, and gunshot residue kits.

1   Q.   Are there any controls within that storage facility

2   to ensure that the items kept inside are not going to be

3   altered in any way?

4   A.   Yes.

5   Q.   Can you describe what those controls are?

6   A.   There's limited access to this.  So the people that

7   work within our unit have access to it.  So it's got a

8   scanned code or a scan box and when you enter that room,

9   that's scanned.  You're entering is on a time basis, you

10  know.  It records a time and who entered it.

11       The room itself is temperature controlled.  The

12  evidence is packaged separately associated with each kind

13  of crime or crime scene or basic scene and so everything

14  is prepackaged and stored separately.

15  Q.   Now in this case, with regard to the sample that was

16  taken from Converse Street in Longmeadow, did you retrieve

17  it from this facility?

18  A.   Yes.

19  Q.   Did you notice any irregularities with how it was

20  stored?

21  A.   No.

22  Q.   What did you do after you received it?

23  A.   The evidence was taken out of the evidence storage.

24  I scanned that to my custody and general observation made,

25  the contents of the packaging.

1    We actually have laptop computers and everything is

2    entered electronically.  So the evidence itself was a

3    general observation.  It was a yellow liquid.  I took that

4    liquid and measured it out in a graduated cylinder.  It

5    was approximately 20 mills of a yellow liquid and had an

6    odor of gasoline.

7    Q.   So the odor of gasoline was consistent with what you

8    had smelled in the past to be gasoline?

9    A.   Yes.

10   Q.   Was the container that you first received it in

11   sealed in any way?

12   A.   Yes.

13   Q.   How was it sealed?

14   A.   It was sealed in I believe a one-quart container and

15   within that was a glass vial containing an unknown liquid.

16   Q.   After you then initially poured the contents out and

17   smelled it, what did you do with it next?

18   A.   A small portion of the contents of the yellow liquid

19   was transferred to a glass vial and to that glass vial was

20   added carbon disulfide which is a solvent that mixes with

21   petroleum products.  That sample was taken, shaken up, and

22   a small portion of that was entered into the GC FID.

23   Q.   That's what you described as the first instrument?

24   A.   Yes.

25   Q.   Did you conduct a test on that liquid?

1    A.   Yes.

2    Q.   Did you observe the results of that test?

3    A.   Yes.

4    Q.   At that point were you able to make any conclusions?

5    A.   Yes.

6    Q.   What conclusions were you able to make?

7    A.   It was a yellow gasoline.

8    Q.   Gasoline you said?

9    A.   Correct.

10   Q.   Did you then take it to the next instrument or a

11   sample to the next instrument?

12   A.   Yes.

13   Q.   What instrument was that?

14   A.   That was the GC mass spec.

15   Q.   That's the second instrument that you described

16   earlier?

17   A.   Yes.

18   Q.   And did you run the test as you described it earlier?

19   A.   I did.

20   Q.   Were there any problems during that test?

21   A.   No.

22   Q.   Did it produce any results that you could analyze?

23   A.   Yes.

24   Q.   Were you able to form any conclusions from that

25   analysis?

1    A.   I did.

2    Q.   What was that conclusion?

3    A.   It was a yellow gasoline.

4    Q.   Now did you receive additional items associated with

5    this matter?

6    A.   I did.

7    Q.   And were those two items that were seized from 20

8    Lori Lane in East Longmeadow?

9    A.   Yes.

10   Q.   And did you receive them in the same manner that you

11   described previously?

12   A.   Yes.

13   Q.   And that was at the storage facility?

14   A.   That was at the evidence intake.  It was submitted to

15   us and delivered to our storage unit, correct.

16   Q.   So now you said there were two samples.  Let's take

17   them one at a time.

18   A.   Sure.

19   Q.   And one of those -- the first one that you received,

20   did you label item 2-1?

21   A.   Yes.

22   Q.   Can you describe what you did with 2-1?

23   A.   A similar type observation.  I took the evidence from

24   the evidence storage unit.  I took that out.  I observed

25   the packaging within the inside of it.  I took a photo of

the packaging.  I measured out the liquid that was present

within that packaging.  I determined it to be a total of

67 milliliters of a two-layered liquid.

Q.   So when you say two-layered liquid, what do you mean

by that.

A.   The solvent -- the material itself there were two

layers.  There was a lower layer which I assumed was

water.  It was clear.  The top layer was a yellow unknown

liquid.

Q.   You said you assumed it was water, what did you base

that assumption on?

A.   Just its appearance.  I didn't do any physical

testing on it, but typically we do get at times materials

that are taken from a fire scene that may be mixed with

water.  You're using water to try and stop the fire and

you're also getting ignitable liquids that might be

present too.

Q.   So you've seen this before in your experience?

A.   Yes.

Q.   And in your training have you also seen that?

A.   Yes.

Q.   Now you said that you made certain notes when you

first retrieved it.  Did you note that this item, item

2-1, was taken from a five-gallon red gas can without a

top on it from Lori Lane?

```
 1    A.    Yes.

 2    Q.    So after you made these initial observations, did you

 3    -- were you able to smell it at all?

 4    A.    Yes.

 5    Q.    What did it smell like?

 6    A.    It had an odor of gasoline.

 7    Q.    After you smelt it, what did you do with it?

 8    A.    A similar type process I did with the first item is I

 9    took that top layer, a very small portion of that, mixed

10    it with carbon disulfide and created an auto sample vial

11    of that and that vial was injected into the GC FID.

12    Q.    Were you able to -- did you run that test without any

13    problems?

14    A.    Yes.

15    Q.    Were you able to form any conclusions based on the

16    results of that test?

17    A.    Yes.

18    Q.    What were the conclusions that you were able to draw?

19    A.    It was a yellow gasoline.

20    Q.    Did you then run it through the second instrument

21    that you described?

22    A.    I did.

23    Q.    Were there any problems during that test?

24    A.    No.

25    Q.    Were you able to analyze the results?
```

1   A.   Yes.

2   Q.   What was the conclusion, if any, were you able to

3   draw from that?

4   A.   It was a yellow gasoline.

5   Q.   Now, drawing your attention to the second item, item

6   2-2, did you also inspect that in the ways that you

7   described you inspected item 2-1?

8   A.   I did.

9   Q.   What were the initial observations that you were able

10   to make?

11   A.   Again, I measured out the amount.  It was

12   approximately 18 milliliters of a dark colored liquid.

13   Q.   Were you able to smell it as you were doing that?

14   A.   Yes.

15   Q.   What did it smell like?

16   A.   It had an odor of gasoline.

17   Q.   After you measured it out, what did you do with that

18   sample?

19   A.   Again, a similar type extraction.  A small portion

20   was placed into a glass vial and added to that is carbon

21   disulfide, mixed that up, and entered it into the -- I

22   call them -- they're auto sample vials.  They're a small

23   vial and we transfer that liquid to introduce it into the

24   instrument.

25   Q.   Did you run the test through the first instrument

1   that you described previously?

2   A.   Yes.

3   Q.   Were you able to form any conclusions based on your

4   analysis of that test?

5   A.   Yes.

6   Q.   What was that conclusion?

7   A.   It was a dark colored gasoline.

8   Q.   Did you then run it through a second instrument?

9   A.   I did.

10  Q.   The same instrument you described three times or two

11  times already?

12  A.   Yes.

13  Q.   And were the results of that test?

14  A.   Again, it was the same, a dark colored gasoline.

15  Q.   Now, Mr. Drugan, you previously explained a

16  flashpoint of gasoline.  Can you describe in a little more

17  detail what the flashpoint is?

18  A.   A flashpoint -- years and years ago we did flashpoint

19  testing and it was called an open cup flashpoint test.  A

20  portion of the liquid was placed into a small cup and it

21  had, sorry to say, it had mercury as a material that you

22  would heat that up with a Bunsen burner, and you would

23  record the temperature and slowly introduce an open flame

24  to that and record the temperature.  And when you saw that

25  blue flash, that was the actual flashpoint of the liquid.

Now liquids have different flashpoints, different flammabilities.  Anything under a hundred degrees Fahrenheit is a flammable liquid; anything other a hundred degrees Fahrenheit is a combustible liquid.

So things like home heating fuel, very difficult to burn.  It burns in your furnace but if you put that down on a surface and apply a match to it, it's not going to burn unless it's on a combustible material like paper or carpet, things like that.

Q.   So in regard specifically to gasoline, is it the liquid that burns or what part of the gasoline actually burns?

A.   It's the vapor.

Q.   So how does that work?

A.   Gasoline left in an open environment creates -- goes from a liquid to a vapor state.  So what's actually burning is the vapor, it's not the actual liquid itself.

Q.   How does that affect the flammability or the explosive nature of gasoline?

A.   Well, it creates vapor at lower temperatures.  So I described a flashpoint, that kind of puts it in perspective.  Gasoline has a flashpoint of minus 45 so people in Alaska can drive their cars, usually can start them up if it's anything less than minus 45 degrees Fahrenheit.

```
1     Q.   Now in your training and experience have you become

2     familiar with the term headspace?

3     A.   Headspace?

4     Q.   Yes.

5     A.   Yes.

6     Q.   What is that?

7     A.   Headspace is --

8               MR. WATKINS:  Objection.

9               THE COURT:  Yes?

10              MR. WATKINS:  This is not notice testimony.

11              THE COURT:  Sidebar?

12              MR. WATKINS:  Yes.

13    (Sidebar conference.)

14              THE COURT:  Okay.  Is everyone good?

15              MR. DESROCHES:  The government can hear.

16              MR. WATKINS:  Yes, Your Honor.

17         This testimony is beyond what was noticed to the

18    defendant as far as the subject matter of this witness's

19    testimony.

20         As the court is well aware, we had a long Daubert

21    hearing over the witness who was slated to testify about

22    this.  Had I known the government was going to go here

23    with this particular witness, I would have challenged his

24    qualifications to start talking about these issues here.

25    I think that this was not noticed.
```

1          THE COURT:  So the objection was made after the

2    question regarding headspace; is that correct?

3          MR. WATKINS:  That is correct.  I actually

4    didn't hear the word when Mr. Desroches first said it but

5    that's correct.  I did not object to anything up to that

6    because I was noticed.  They clearly put the flashpoint in

7    there.  I didn't object to that because that was noticed.

8    We are now going beyond the notice.

9          THE COURT:  Tell me, government, tell me either

10   side, tell me what the notice is.

11         MR. DESROCHES:  Your Honor, the government has

12   noticed the defendant and I will quote from the notice we

13   sent them.  "Mr. Drugan will testify to background

14   scientific information about explosives, including a

15   definition of the terms flashpoint, fuel-to-air ratio,

16   vapors" --

17         THE COURT:  Sorry.  I'm sorry.  Someone coughed

18   and those are so sensitive it picked it up.  Start again

19   as to what you said.

20         MR. DESROCHES:  Yes, Your Honor.  So we noticed

21   that the witness will testify to "background scientific

22   information about explosives, including a definition of

23   the terms flashpoint, fuel-to-air ratio, vapors, vapor

24   density, and other similar terms.  He will also testify

25   about the chemical properties of gasoline, including the

1    flammability of gasoline, the flashpoint for gasoline, and
2    the process by which gasoline vapors ignite."
3          Your Honor, this is docketed as document entry number
4    70.  I would suggest the evidence falls directly under
5    that notice.
6                THE COURT:  Attorney Watkins, what do you think?
7                MR. WATKINS:  Your Honor, as we heard during the
8    *Daubert* testimony, the headspace issue was a very, very
9    live issue.  It is not something that specifically every
10   --
11               THE COURT:  I'm just looking for either -- I
12   don't know if Jarrett has his headphones on.  I need
13   printed out the docket where it's noticed.
14         Thanks.  Okay.
15         Go right ahead, Attorney Watkins.  Sorry.
16               MR. WATKINS:  Again, the issue of headspace does
17   not show up in what they're noticing this particular
18   witness for.  It's going to -- it's not noticed.  I have
19   secondary arguments why this should not come in, but they
20   would be related to *Daubert* kind of objections.  Confusion
21   of the issues at this point.
22         If indeed the government wants to get into the
23   headspace issue, we're going to have to break and find out
24   whether this witness is qualified to testify about it and
25   whether the opinion actually fits the facts of this

1    case.

2            THE COURT:  Attorney Watkins, can you correct me

3    if I'm mistaken or applying an inaccurate knowledge or

4    definition of the term, but it seems to me that headspace

5    would include a discussion and analysis of fuel-to-air

6    ratio including vapor and vapor density?  In other words,

7    covered generally by the broad terms that the government

8    noticed you on.  Do you disagree with that?

9            MR. WATKINS:  I don't disagree with it in the

10   abstract.  But as the court heard during the *Daubert*

11   hearing, the issue with this testimony is it's very

12   specific to the container that it was in.  When we talked

13   about headspace, we talked about the amount of fuel-to-air

14   mixture within a particular spot.

15       This expert -- this witness did no testing.  He had

16   no -- he did no testing on this particular gas can so what

17   he's going to start talking about is very general ideas of

18   headspace that are completely unconnected to this

19   particular container.

20           THE COURT:  Okay.  I see.  So your point is he

21   was not noticed as an expert that's going to talk about

22   giving an opinion regarding this specific yellow container

23   and the details of the yellow container on the day; is

24   that correct?

25           MR. WATKINS:  That's accurate both about the

headspace generally and that specifically.  As the court

heard during the *Daubert* hearing, headspace is directly --

it's device specific.  It's specific, and to hear this

kind of evidence without being able to talk about the

specific can would I think be more than confusing and

misleading.

THE COURT:  I don't know.  I think that -- I

mean, I definitely hear you.  You're driving home the

point about this witness was not noticed relative to the

yellow gas can and talking about the headspace and vapor

to ratio within that yellow gas can at the time of the

alleged crime.  But the concepts of fuel-to-air ratio and

vapors, to the extent that they embrace or include or

inform what headspace is in general terms, I think that

might be fair game.

We have a picture of a yellow gas can.  We have

testimony -- or I'm sorry, we have a picture of a yellow

fuel canister that actually was a dieseal can but we have

the picture.  We know what it contains.  This witness

testified it was gasoline, at least if you accept his

testimony.

We know that it contained, if you accept the

testimony, a charred piece of paper.  And we know the size

of the container and the amount of the liquid in the

container versus the amount of the container that was

1  empty because one of the photographs shows the level of
2  the liquid rising from the bottom to a certain portion on
3  the gas can, and then obviously empty from where the
4  liquid ends to the top of the gas can.

5      So it seems -- I don't know that it would be
6  confusing in the general principles of fuel-to-air ratio
7  and vapors, et cetera, as I already talked about were
8  discussed.  I think you're correct that this witness
9  should not be talking about the specific yellow container
10 in this case.

11     I'm interested in your comments on my observation and
12 thoughts I just shared with you, Attorney Watkins.

13          MR. WATKINS:  So, once again, we are beyond what
14 the government noticed here.  They did not notice
15 testimony that this witness was going to opine about the
16 features of headspace as it relates to this can.  It's
17 true we have that information.

18          THE COURT:  But I'm agreeing with you about
19 that.  I'm agreeing with you 100 percent.  I'm not saying
20 this witness would be allowed to look at that can and say
21 anything.  But as I explained, I think he might be able to
22 testify generally about fuel-to-air ratio and those kinds
23 of things, and then the jurors -- that would inform the
24 jurors if they wanted to, if they felt appropriate, they
25 could apply that to the other evidence they heard in this

1       case.  As I just explained, yellow gas can, testimony
2       there was fuel in it, picture of the level of fuel.
3            So not for a minute am I disagreeing with you what he
4       should not be -- should not be an expert on.  Okay.  This
5       yellow gas can, I'll examine it and this is what I
6       think...  But why not the general testimony that was
7       noticed?
8                 MR. WATKINS:  If that's -- I mean, I don't know
9       where the government is going on the headspace issue.  As
10      I understood it from the *Daubert* examination, the
11      headspace is intimately involved with the container in
12      which you're testifying to.
13           I don't -- again, I guess I don't know where the
14      government is going to end up on all of this.  I could
15      keep on objecting as we go along or as we get from the
16      general to the specific, but it's going to be very slow
17      going.
18                THE COURT:  Okay.  Government, you want to tell
19      me generally where you plan on going with this?
20                MR. DESROCHES:  Yes, Your Honor.  As Your Honor
21      indicated --
22                THE COURT:  How about this?  How about we let
23      the jury go for a few minutes?  This might take longer.
24      All right.
25                MR. DESROCHES:  Thank you, Your Honor.

```
 1   (End of sidebar conference.)

 2             THE COURT:  Ladies and gentlemen, the discussion

 3   I'm having is probably going to take me longer.  It will

 4   be easer for us to have in open court and there's no

 5   reason to have you sit here while we're whispering in

 6   these machines.

 7        So we will take a break.  I don't know how long it's

 8   going to be.  It may not be that long.  So during the

 9   break the same instructions as always apply.  Don't talk

10   to each other about the case or anyone else; internet

11   searches; social media reading; reading newspaper

12   articles; no print or anything like that.  Okay.  Follow

13   all the instructions.  Thank you.

14             THE CLERK:  All rise for the jury.

15   (The jury left the courtroom at 10:48.)

16             THE COURT:  Mr. Drugan, could you step down

17   please.

18             THE WITNESS:  Sure.

19             THE COURT:  You can just wait outside.

20        I'm going to take, and maybe everyone else should,

21   five minutes and then we'll come in and talk this

22   through.

23             MR. DESROCHES:  Thank you, Your Honor.

24   (A recess was taken at 10:49 until 11:01.)

25             MS. BERKOWER:  Your Honor, before we continue, I
```

1    have the stipulations.  May I hand them up to the court?

2              THE COURT:  Sure.

3              MR. DESROCHES:  Your Honor, I also just wanted

4    to inform the court before we get started because I think

5    it's going to affect the conversation that follows is I

6    will withdraw the question about headspace and just follow

7    up with a few questions before we finish up with Mr.

8    Drugan.

9              THE COURT:  Okay.

10             MR. WATKINS:  Your Honor, just to be prepared,

11   Mr. Desroches told me he's going to ask a couple of

12   questions about volatility.  My objection is going to be

13   asked and answered I think from here on in.

14             THE COURT:  So we no longer need to have a

15   conversation about fuel-to-air ratio or headspace or

16   things like that?

17             MR. DESROCHES:  Correct, Your Honor.  I think

18   that's fair to say.

19             THE COURT:  Okay.  All right.

20        So the jury can come back in and I am reading the

21   entirety -- no, please read 1, 2, 3, and 9 and please read

22   the entire document.  Okay.  Got it.

23             MR. DESROCHES:  Thank you, Your Honor.

24        May the witnesses resume the stand?

25             THE COURT:  Yes.

1          MR. DESROCHES:  Your Honor, also I'd ask the

2    stipulations be read upon the conclusion of Mr. Drugan's

3    testimony and then we would rest after the stipulations

4    are read.

5          THE COURT:  You're going to rest after the

6    stipulations?

7          MR. DESROCHES:  Yes, Your Honor.

8          THE COURT:  Okay.

9    **(The jury entered at 11:05.)**

10          THE COURT:  Okay.  Did everyone follow my

11    instructions not to talk about the case with each other or

12    anyone else?  No looking at the internet?  Post anything?

13    No social media?  No media?

14       Yes, affirmative responsibilities from everyone.  The

15    jury remains fair and impartial.

16          MR. DESROCHES:  May I proceed, Your Honor?

17          THE COURT:  Yes.

18    Q.   (By Mr. Desroches) Mr. Drugan, just a few final

19    questions.

20          THE COURT:  Let me just make a record.  As to

21    the last question before we broke and went to sidebar, the

22    government is withdrawing that question?

23          MR. DESROCHES:  Yes, Your Honor.  Thank you.

24    Q.   (By Mr. Desroches)  Mr. Drugan, are you familiar with

25    the term volatility of a flammable liquid?

```
1    A.    Yes.

2    Q.    What does that mean?

3    A.    It's a basic term that's used for determining again

4    flammability, flashpoint, things all kind of coincide with

5    that.

6    Q.    Can you lean towards the mic?

7              A JUROR:  Actually it was you I couldn't hear.

8              MR. DESROCHES:  Sorry.

9              THE WITNESS:  Oh, you could hear me fine but you

10   couldn't hear him.

11             MR. DESROCHES:  It's not you; it's me.

12   Q.    (By Mr. Desroches)  So are you familiar with the term

13   volatility?

14   A.    Yes.

15   Q.    Can you please describe what that is for the jurors?

16   A.    A volatile liquid is something that produces vapor

17   readily, easily.

18   Q.    And what is the volatility of gasoline?

19   A.    I don't know the actual figure.  I know that again --

20             MR. WATKINS:  Objection.

21             THE WITNESS:  -- I described flashpoint.

22             MR. WATKINS:  Objection.

23             MR. DESROCHES:  I can withdraw that question and

24   ask it a different way.

25             THE COURT:  All right.
```

1    Q.   (By Mr. Desroches)  How does the volatility of

2    gasoline compare with other flammable liquids?

3    A.   It would be again a highly flammable liquid versus

4    something that I described earlier as something like

5    dieseal fuel which is not.

6              MR. DESROCHES:  Thank you.  No further

7    questions.

8              MR. WATKINS:  May I, Your Honor?

9              THE COURT:  Uh-huh.

10   **CROSS-EXAMINATION**

11   Q.   So it's actually three samples altogether -- I'm

12   sorry.

13        Good morning.

14   A.   Good morning.

15   Q.   It's actually three samples altogether that you

16   analyzed at the laboratory, correct?

17   A.   Yes.

18   Q.   For this case?

19   A.   Yes.

20   Q.   One was the Converse Street gasoline I'm going to

21   call it?

22   A.   Correct.

23   Q.   The two others were samples from Lori Lane, right?

24   A.   Yes.

25   Q.   Going to sample number one from Lori Lane, that's the

1    one that you talked about being two layers?

2    A.   Yes.

3    Q.   And you talked about the gasoline being on top and

4    then a clear liquid that you thought was water on the

5    bottom?

6    A.   Right.

7    Q.   And you only measured the gasoline portion?  You

8    didn't dip down into getting the water?

9    A.   Well, I measured the total volume for both layers.

10   The top I believe was 27 mills and the bottom was 40.

11   Q.   And it was the top layer that you tested to make sure

12   it was gasoline, right?

13   A.   Yes.

14   Q.   And did you see that in the Converse Street sample,

15   did you see that same two-level feature?

16   A.   No.

17   Q.   Going to the second item from Lori Lane and going

18   back to some of the things that you do when a sample comes

19   in, you talked about observations that you make?

20   A.   Yes.

21   Q.   And one of the observations you testified was

22   olfactory; just smell it?

23   A.   Right.

24   Q.   Another one is a visual observation which you

25   documented here, right?

1    A.    Right.

2    Q.    That it was a dark colored gasoline?

3    A.    Yes.

4    Q.    And you compared that to the yellow gasoline that you

5    found in the Converse Street sample?

6    A.    I did not do a comparison.  I mean, just general

7    observations.

8    Q.    It was darker?

9    A.    Yes.

10   Q.    Okay.  And you're familiar with two-cycle engine kind

11   of tools, weed whackers, and things of that nature?

12   A.    Yes.

13   Q.    And those kinds of tools do not use -- don't always

14   use straight gasoline.  They will use a mixture of

15   gasoline and oil, right?

16   A.    Correct.

17   Q.    And we talk about 50-to-1 and 40-to-1 or 25-to-1

18   kinds of ratios, right?

19   A.    Right.

20   Q.    Those are common ratios for these kinds of smaller

21   engines?

22   A.    Right.

23   Q.    A chainsaw, for example, or as I said a weed whacker,

24   things of that nature, right?

25   A.    Right.

1    Q.   And so this darker color that you observed here,

2    that's consistent with that kind of mixture of fuel and

3    oil for a two-cycle engine?

4    A.   It's possible.

5              MR. WATKINS:   Thank you.

6              MR. DESROCHES:   If I may, Your Honor?

7    **REDIRECT EXAMINATION**

8    Q.   (By Mr. Desroches)  Mr. Drugan, just to be clear, the

9    fluid that you tested from the first item, which was found

10   on Converse Street on Longmeadow, was that purely

11   gasoline?

12   A.   Yes, it was a yellow gasoline.

13   Q.   And item 2-1, you indicated that was a two-layered

14   liquid?

15   A.   Correct.

16   Q.   And the gasoline was on top?

17   A.   Yes.

18   Q.   How are you able to get the gasoline out of that

19   without mixing it when you tested it?

20   A.   I just took a small pipette and it draws up the top

21   layer.  So I took a portion of that and put it into a

22   glass vial and tested it.

23   Q.   And the gasoline set on top of the water; is that

24   right?

25   A.   Yes.

1    Q.   Why is that?

2    A.   It floats.  Gasoline floats on water.

3              MR. DESROCHES:  Thank you.  No further

4    questions.

5              MR. WATKINS:  Nothing, Your Honor.

6              THE COURT:  Thank you, sir.

7              THE WITNESS:  Thank you.

8              THE COURT:  Government?

9              MR. DESROCHES:  Your Honor, we'd ask the

10   stipulations be read to the jury.

11             THE COURT:  All right.  Ladies and gentlemen, I

12   instructed you earlier as to what a stipulation was or

13   what a stipulation is.  It's when Attorney Watkins had

14   read a stipulation.

15        There are additional stipulations between the

16   parties, and that is an agreement between each side that

17   certain facts are accurate, are correct.  Neither side is

18   disputing those facts.  They're agreed upon.

19        So these additional stipulations that the parties

20   have reached they have asked that I read those into the

21   record, and I would also like that the stipulations --

22   some written form of the stipulations, including the one

23   that Attorney Watkins read earlier, be introduced as

24   exhibits so that the jury would have those during

25   deliberations.

1    Let me read right now portions of those stipulations.

2    All right.  These stipulations, stipulation number 1 --

3    and, by the way, the stipulations are signed actually.

4    I've told you that each side agrees and so on the written

5    stipulations they're signed by the attorneys for each

6    side. These are all agreed.

7    "Number 1:  On April 2, 2020, officers from the

8    Longmeadow Police Department, LPD, recovered a yellow

9    diesel fuel canister and a charred paper pamphlet from 832

10   Converse Street in Longmeadow, Massachusetts.  The fuel

11   canister contained an unidentified liquid.

12   "Subpart (a) of Number 1:  An officer from the

13   Longmeadow Fire Department emptied the unidentified liquid

14   from the fuel container and stored it in a secure

15   location.  On April 13, 2020, a sample of that liquid was

16   brought to the Massachusetts State Police Trace Arson and

17   Explosives Unit for analysis.

18   "Subpart (b) of the stipulation 1:  On April 3, 2020,

19   LPD, Longmeadow Police Department, officers brought the

20   yellow fuel container and the charred paper pamphlet

21   recovered from 832 Converse Street to the Mass. State

22   Police Crime Lab for analysis.

23   "The Massachusetts State Police Crime Laboratory

24   tested two samples taken from reddish-brown stains found

25   on the pamphlet and one sample taken from a reddish-brown

1   stain on the handle of the fuel can.

2        "The Crime Lab determined that all three

3   reddish-brown stains were human blood.  Analysts in the

4   Mass. State Police Crime Lab then developed a DNA profile

5   from the three samples using the scientific techniques of

6   DNA extraction, quantification, amplification, and

7   detection.

8        "Stipulation Number 2:  On April 15, 2020, a special

9   agent from the Federal Bureau of Investigation took a

10  buccal swab from the defendant, John Michael Rathbun.

11  That swab was sent to the Massachusetts State Police Crime

12  Laboratory which developed a DNA profile for the defendant

13  from the swab using the scientific techniques of DNA

14  extraction, quantification, amplification, and detection."

15       All right.  "Stipulation Number 3 is Massachusetts

16  does not produce crude oil or refine it.  Any gasoline

17  used in Massachusetts was brought into Massachusetts from

18  out of state."

19       And Stipulation Number 9 is that "These stipulations

20  may be read to the jury and introduced as evidence" as I

21  have instructed you.  All right.

22       Now there is one additional group of stipulations and

23  that is as follows:  In this group -- in this separate

24  document entitled stipulation, "Number 1, Regina Ellis,

25  who lives near the location where the yellow fuel canister

1    was placed, first observed the canister at approximately

2    8:30 a.m. on April 2, 2020.

3         "Stipulation 2:  On the Massachusetts State Crime

4    Laboratory, MSP Crime Lab, examined the yellow fuel

5    container, Government Exhibit PX 1, for fingerprints.  No

6    fingerprints were found on the container.

7         "Stipulation Number 3:  Government's Exhibits PX-74,

8    75, 76, 78, and 110 consist of cell phone records from

9    Verizon Wireless for telephone number 413-636-4047.  These

10   records are authentic business records from Verizon

11   Wireless that meet the admissibility requirements under

12   the Federal Rules of Evidence, Federal Rule 803(6)

13        "Stipulation Number 4:  Government Exhibits PX-45,

14   46, 49, 50, 52, and 109 contain excerpts from a digital

15   image of the defendant's iPhone.  That digital image is an

16   accurate copy of the data on the defendant's iPhone.

17        "Stipulation 5:  Government Exhibit PX-88 consists of

18   excerpts from a digital image of a laptop that belongs to

19   Sheila Rathbun.  That digital image is an accurate copy of

20   the data on the laptop.

21        "Stipulation 6:  Government Exhibits PX-93, 94, 96,

22   99, 102, and 108 are portions of consensually-recorded

23   telephone conversations in which the defendant

24   participated.  These recordings are accurate copies of

25   those consenually recorded telephone calls.

1      Stipulation Number 7 is that "These stipulations may

2  be read to the jury and introduced as evidence."

3          MR. DESROCHES:  Your Honor, there's just one

4  actual correction that both parties would request at this

5  point.

6      In regards to Stipulation Number 1 on Document 182.

7          THE COURT:  Okay.

8          MR. DESROCHES:  I'm sorry, it's the second

9  Stipulation Exhibit No. 1.

10          THE COURT:  All right.  The one that starts

11  April 2nd?

12          MR. DESROCHES:  Yes, Your Honor.  The parties

13  request that the address be corrected so that the

14  stipulation be read "On April 2, 2020, officers from

15  Longmeadow Police Department, LPD, recovered a yellow

16  dieseal fuel canister and charred paper pamphlet from 780

17  Converse Street, Longmeadow, Massachusetts."  That's

18  docket 183.

19          THE COURT:  All right.  So I initially read, as

20  was written down, recovered it from 832 Converse?

21          MR. DESROCHES:  Correct.

22          THE COURT:  And now, Attorney Watkins, is that

23  agreed?

24          MR. WATKINS:  Yes.

25          THE COURT:  All right.  So the stipulation now

1    is that the fuel canister and charred paper pamphlet

2    recovered from 780, 780, Converse Street, and I trust that

3    the parties will make a written correction before anything

4    is submitted as an exhibit?

5              MR. DESROCHES:  Yes, we will.  Thank you.

6              THE COURT:  Very good.

7              MR. DESROCHES:  Your Honor, with that the

8    government rests.

9              THE COURT:  All right.  The government resting

10   means it's concluded its evidence in its direct case.

11      All right.  Defense, do you want to be heard on

12   anything or would you like a sidebar?

13             MR. WATKINS:  There will be a motion at this

14   time.

15             THE COURT:  Do you want to do that on the

16   WhisperTech, or how do you want to proceed with that?

17             MR. WATKINS:  I think probably it will go on for

18   some length.  Perhaps we can excuse the jury once again.

19             THE COURT:  All right.  Okay.

20      All right.  So, ladies and gentlemen, generally the

21   format of a trial is that after the government rests,

22   there is a period of time where the parties need to

23   discuss various procedural things.  Sometimes it can take

24   a long time; sometimes not too long, but I'll excuse you

25   back now.  We will call you back in as soon as we decide

1   how we're going to proceed.  All right?

2        No discussing the case or anything about the case.

3   Obviously all the same rules and instructions that I've

4   given you every time you leave continue to apply.  Thank

5   you.

6             THE CLERK:  All rise for the jury.

7   **(The jury left the courtroom at 11:24.)**

8             THE COURT:  Okay.  We are all set.

9             MR. WATKINS:  Yes, Your Honor.

10       The defense would be making a motion for judgment of

11  acquittal pursuant to Rule 29 on all three of the counts.

12  The grounds would be different as to Counts 1 and 2 then

13  of Count 3.  So I'll start with one and two.

14       At this state of the case, after the government has

15  rested, we would argue that there is insufficient evidence

16  from which any reasonable juror could conclude that the

17  device left in front of the tree was an explosive as

18  required for both Counts 1 and 2.

19       There's been no evidence to indicate that this gas

20  can would as it sat there on Converse Street constitute an

21  explosive as defined by the statute, either in 844, 18

22  U.S.C 844 or in 18 U.S.C. 232(5).  It meets none of the

23  definitions.

24       More precisely, for an explosive the definition is

25  that it would have to at a minimum, reading from jury

1    instructions, Sand's jury instruction, "To find that a

2    substance as used was such that when it ignited, it may

3    cause an explosion.  The term explosion is used in a

4    customary or ordinary sense.  That is, an explosion and

5    rapid expansion of gases caused by a rapid combination of

6    a combustion of material which may cause a sharp noise or

7    report."

8        At a minimum that's where the government has to get

9    here.  There's been absolutely no evidence as to this

10   device as it sat there whether that qualifies under that

11   or any other definition.  So that would be one ground upon

12   which we would argue that Counts 1 and 2 fail for a lack

13   of sufficient evidence.

14       We would also argue that the government has submitted

15   insufficient evidence of an intent to destroy property, to

16   injure persons or intimidate or any combination thereof.

17   The government simply has not come up with any evidence

18   that there is intent here.

19       As the court has heard, the gas can is left in a

20   wooded area next to a tree.  While it is somewhat close to

21   a sidewalk, there is no indication of an intent to

22   actually put it on a sidewalk or somehow injure someone

23   there.

24       The mere placement of the device suggests a lack of

25   intent to do any of those items.  So I would -- and the

1    government has no other evidence of intent beyond the mere

2    placement of the device and the circumstances of the

3    device itself.

4          THE COURT:  Is it sufficient for there to be an

5    intent -- I think you might have said this -- to damage or

6    destroy just real or personal property?

7          MR. WATKINS:  It would be, but we don't have any

8    intent of that here given the placement of the device.  It

9    was not a case where gasoline was scattered across the

10   grounds trying to cause some kind of property damage

11   there.

12       The fact that it was next to a tree, could a tree

13   have been damaged?  Perhaps.  But, once again, we have no

14   evidence of intent other than that placement there.

15       I analogize I think as I have before --

16          THE COURT:  Well, I mean, it's not just

17   placement.  It's placement and a charred pamphlet

18   indicating that it was attempted to be -- there was a

19   lighting process that could be inferred to have taken

20   place.

21          MR. WATKINS:  Once again, I think those

22   circumstances are insufficient without some kind of other

23   evidence of intent to alone support the charge here.

24       I think, as we may have argued before, we can posit a

25   can left out in a desert on Bureau of Land Management

1    property for example with the exact same features as this,

2    a charred pamphlet inside a gas can.

3        I don't think anyone could find at that point that

4    there's an intent to damage or destroy property in that

5    circumstance.  So then it becomes, well, it was next to

6    the tree.  But that again is not sufficient in and of

7    itself, we would argue, to supply the intent necessary to

8    get the government over the bar.

9            THE COURT:  Okay.  In this case though it wasn't

10    out in the middle of nowhere given what you offered as an

11    analogy.  It was near a sidewalk, near a main road, near

12    what's been referred to as a campus and a driveway that

13    leads to a number of buildings.

14        You can see those buildings through a little bit of a

15    wooded area from where the can was; the can was up against

16    the tree.  I mean there's photographs obviously of where

17    it was, in an otherwise residential neighborhood, some

18    commercial.  When I say commercial, I mean there's an

19    assisted living facility but mostly residential

20    neighborhood.

21        Okay.  On one and two let me ask the government

22    regarding the explosive device, the definition of

23    explosive as argued by Attorney Watkins?

24            MS. BERKOWER:  Yes, Your Honor.  It's the

25    government's position that the evidence -- and I would

1    also note that the evidence at this point in the trial has

2    to be drawn with all inferences in favor of the

3    government, but we would submit that the evidence showed

4    that the device in this case more than met the definition

5    of explosive for two reasons.

6         The first is that 844(j) defines "explosive to

7    include any device that contains ingredients, in such

8    proportions, quantity or packing that ignition by fire or

9    by detonation of any part may cause an explosion."  I know

10   I'm eliminating some of the language in this statute as I

11   read through that, but I think Your Honor will see that

12   that is included in the definition.

13        The other terms I eliminated just now when I was

14   speaking don't really apply here, but they do cover what

15   we had in this case.  This was a device that contained

16   ingredients which ignition by fire may cause an explosion.

17             THE COURT:  Can you hold on one second?

18        I'm just making sure I'm in the correct portion of

19   the draft jury instructions to be following along.  Okay.

20   Go ahead.

21             MS. BERKOWER:  Yes, Your Honor, and in our view

22   this device contained gasoline which the court heard

23   evidence from Mr. Drugan today and also from Mr. Marshall

24   is highly flammable.

25        The court heard evidence yesterday from Mr. Marshall

1    that the safety spout that was sold with this particular

2    can was taken off.  An open spout that had no protection

3    from outside flames or sparks was inserted on top.  And on

4    top of that we know from all the other evidence that there

5    was a paper pamphlet stuffed in the top that was ignited.

6         And given the flammable properties of gasoline, the

7    fact that the wick was stuffed into that open spout with

8    nothing preventing the flame from getting inside, and the

9    fact that it was lit clearly shows that this meets that

10   definition of a device that contains ingredients for which

11   ignition by fire may cause an explosion.

12        I would also note that at the outset of this case the

13   defense moved to exclude evidence concerning whether this

14   device could have exploded and Your Honor excluded

15   evidence of that, and we raised the issue with the court

16   and said to the extent that this evidence is now excluded,

17   if they start arguing that this could not have exploded,

18   that leaves us in a little bit of a difficult spot.

19   Because we tried to present that evidence to the jury and

20   Mr. Watkins asserted vigorously that that was not

21   something that we should be allowed to explain to the

22   jury.  That it would cause confusion.

23        In our view, we have adequately shown through the

24   witnesses that we did present that, in fact, there's

25   gasoline in there.  Gasoline is highly flammable.

1    Everybody knows based on common sense it also could
2    explode, and in this case the device was designed in
3    exactly the way that fits the statutory definition.  It
4    had a wick in it.  It contained gasoline and it had been
5    lit, it could have caught fire and exploded.  So in our
6    view --
7            THE COURT:  So you're floating between a
8    definition of explosive and a definition of incendiary
9    device.
10           MS. BERKOWER:  Well, yes, Your Honor.  I think
11   844(j) references incendiary device and that's the second
12   part of the definition I'd like to talk about.
13           THE COURT:  Okay.
14           MS. BERKOWeR:  In our view this device satisfies
15   both pieces.  So that's the argument with regard to
16   844(j).
17       With regard to 232(5), which is the definition of
18   incendiary devices, that includes "any incendiary bomb,
19   fire bomb, or similar device."  And in our view the
20   evidence here certainly satisfied that definition of
21   explosive.  Because as we heard, the safety spout had been
22   ripped off, gasoline was put in, paper was stuffed into
23   that open spout with nothing preventing the vapors from
24   coming out or the spark going in, and the defendant then
25   lit it on fire.

1        If that's not a fire bomb, Your Honor, which is not

2   further defined in this statute, if that's not an

3   incendiary bomb --

4            THE COURT:  I'm sorry, you said if that's not a

5   fire bomb which is or is not further defined.

6            MS. BERKOWER:  Fire bomb, incendiary bomb, or

7   similar device are not further defined.

8            THE COURT:  Okay.

9            MS. BERKOWER:  But based on the common

10  understanding of what those terms would mean this

11  certainly, certainly meets that definition especially when

12  the court draws all inferences in favor of the government.

13  And unless Your Honor has further questions, I can move on

14  to a different area.

15           THE COURT:  Okay.  Move on.

16           MS. BERKOWER:  Well, I think Your Honor had

17  asked me first to address Mr. Watkins' argument about

18  explosive.

19           THE COURT:  Right.  That was all I wanted to

20  talk about first.  Did you want to be heard on the intent

21  --

22           MS. BERKOWER:  Yes, I would.

23           THE COURT:  -- to damage portion?

24           MS. BERKOWER:  Yes, I would.  Thank you.

25           THE COURT:  I don't think you need to add

1    much.

2              MS. BERKOWER:  Yes.  Your Honor, we would submit

3    that the intent can be drawn by -- the inference of intent

4    can be drawn from the act itself.  There's no special

5    intent required to see that the jury could draw the

6    inference that if you put a fire bomb outside of an old --

7    you know, a senior living facility in a populated area,

8    that that would have the intent to cause the damage that

9    lighting that on fire would cause.

10             THE COURT:  So are you talking about -- I mean,

11   when I was talking to Attorney Watkins I was just really

12   talking about the property type of damage.  You're talking

13   about the location.  You're talking about the intent --

14   the intimidation portion or injury portion?

15             MS. BERKOWER:  Both, Your Honor.  To the extent

16   that this was clearly on JGS land and if it had gone off,

17   it would have caused damage in the immediate area

18   surrounding the device, which is real property owned by

19   JGS.  In our view that satisfies it.

20        On top of that, if this had gone off when ignited, it

21   would have been a fire bomb at the steps, the front steps

22   of a senior living facility at five in the morning and in

23   our view --

24             THE COURT:  Well, I'm not sure front steps is

25   entirely accurate.

1              MS. BERKOWER:  Entrance.

2              THE COURT:  Near it.  I understand.

3              MS. BERKOWER:  The entrance gate I guess.

4              THE COURT:  Okay.

5              MS. BERKOWER:  And to the extent that I think

6    you heard testimony from Mary Sherry and Ms. Goldsmith the

7    nearest building was about 200 feet away.  In our view

8    that type of incident would certainly be expected to

9    intimidate the residents who live there.

10             THE COURT:  Okay.  All right.

11        At this point viewing all inferences in favor of the

12   government, I think the government clearly for the reasons

13   they stated have the better of the argument.

14        The intent -- I think there clearly can be an

15   inference of intent from all the facts and circumstances

16   in the light favorable to the government, regarding

17   intimidation of individuals, if there were ignition of

18   that device of that canister, also damage to real or

19   personal property I think that intent can be inferred.

20        As to the definition of explosive, devices, or device

21   similarly with inferences favorable to the government, for

22   explosive, a device containing ingredients in such

23   proportions -- and these are separate, these are

24   essentially disjunctive -- proportions, quantities, or

25   packing, that ignition by fire may cause an explosion.

1    There was testimony that there was a quantity of

2    gasoline.  There was testimony about what gasoline does,

3    the property of gasoline.  Its flashpoint was defined;

4    that it's highly flammable.

5    On the definition of incendiary device and we

6    certainly have been through this.  We've, you know, laid a

7    long hard -- a hard route to get here.  We're all very

8    familiar through the *Daubert* hearing about the statute and

9    definitions, and so I will just reference back to that.

10   We do all have that familiarity.

11   So, you know, when we're looking at the technical

12   definitions it brings us into incendiary device also which

13   includes, but is not limited, to any device which consists

14   or includes a breakable container, including a flammable

15   liquid or a compound.  And it does say incendiary bomb or

16   grenade, fire bomb, or similar device.  It does say that.

17   And then it goes on say this includes, but is not

18   limited to, any device which consists of or includes a

19   breakable container, and we know what the rest of it says.

20   We've been through it.

21   Inferences in favor of the government at this point I

22   think the government easily survives the motion at this

23   point.

24   Do you want to be heard on the next count?

25            MR. WATKINS:  Yes, Your Honor, as to Count 3 --

1          THE COURT:  So motion denied if I didn't say

2     that for the record.

3          MR. WATKINS:  Motion denied as the Counts 1 and

4     2 and now we're going on to Count 3?

5          THE COURT:  That's right.

6          MR. WATKINS:  Count 3, again we're asking the

7     court to grant a motion for judgment of acquittal on the

8     two counts or the two separate aspects of the government's

9     allegations.

10         First, that he was familiar with the location where

11    the device was placed.  They alleged is a lie.  The second

12    is he had left his house during the early morning of April

13    2, 2020.

14         We'd argue that the evidence is insufficient as to

15    either of those.  To sustain a charge here, of course, the

16    government has to prove beyond a reasonable doubt that the

17    answers would be truthful to some version of the question

18    that the person asked at the time.

19         The difficulty we have here is that it is very, very

20    unclear what exactly the agent was asking about.  That's

21    particularly so with the -- he was familiar with the

22    location where the device was placed.

23         THE COURT:  Can you just back up for one second

24    and frame for me again the two statements?

25         MR. WATKINS:  The two statements that survive --

1    the court has directed that the government can't go

2    forward on the third of the three statements.  The two

3    statements that the government has specified here is,

4    number one, that Mr. Rathbun was familiar with a location

5    where the device was placed.  And, number two, he had left

6    his house during the early morning hours of April 2nd of

7    2020.

8              THE COURT:  That's right.  Okay.

9              MR. WATKINS:  As to that he was familiar with

10    the location where the device was placed, we heard

11    testimony from the agent himself that he was confused with

12    the nomenclature of where the device was placed.  That at

13    the time he directed Mr. Rathbun's attention to Ruth's

14    House and talked about Ruth's House.

15        He showed him a map of Ruth's House that included --

16    well, dare I use the word sketchy sketch of the area

17    around there that included the name Ruth's House Drive and

18    Converse.

19        That theory that the government is going on now has

20    changed substantially.  That it is now Genesis House that

21    was at issue that Mr. Rathbun should have well known we'll

22    say -- obviously we dispute even that -- but that it is

23    Genesis House that he would have known.  It is no longer

24    talking about Ruth's House.

25        The difficulty we have here is that's what the agent

1   asked about with Ruth's House at the time.  So we now have

2   this situation where the question asked is truthful or at

3   least the government has not disproved any aspect of the

4   truthfulness of his statement at the time.

5        We have a question that is susceptible now to a

6   number of different kinds of truthful answers.  They're

7   never going to be able to get to the point where it's

8   clear -- it can be clear to the jury that he understood

9   what the agent was asking at that time and specifically

10  and knowingly made a misleading statement.  So that is as

11  to the first one.

12            THE COURT:  The first one is the indicted

13  language is he's not familiar with the location on

14  Converse Street where the device was placed?

15            MR. WATKINS:  Correct.

16            THE COURT:  You're saying that by the agents

17  referring to that during the questioning as Ruth's House,

18  that created -- but a map -- there was a diagram shown

19  also.

20            MR. WATKINS:  That's correct.  But all it shows

21  is Converse Street and Ruth's House Drive and an X.  That

22  is the sum total of the map that was shown at that time.

23  There is no context.  It was not a wider area.  It did not

24  show Genesis House.  It did not name Genesis House.  It

25  did none of those things, and that is now the government's

1    theory is that because Mr. Rathbun knows where Genesis

2    House was, that he lied at the time he answered the

3    question do you know Ruth's House where this was placed?

4              THE COURT:  Well, okay.  But I think all the

5    government needs to show is that he's not familiar with

6    the location on Converse Street where the device was

7    placed.

8              MR. WATKINS:  But reading further --

9              THE COURT:  You're getting very granular about

10   Ruth's House I mean for purposes of this motion and what

11   the charge is about Ruth's House versus --

12             MR. WATKINS:  Because the government's

13   allegation here is broader but the focus is on the

14   question for purposes of sufficiency of the evidence, a

15   question is asked and an answer is given.

16        So even though the indictment is broadly phrased, the

17   government has to prove the answer to the specific

18   question and we've heard the specific question was about

19   Ruth's House and that's why we would contend the evidence

20   is insufficient to support that theory.

21             THE COURT:  All right.  Let me hear what the

22   government on that and then we will get to the next

23   statement.

24             MS. BERKOWER:  Yes, Your Honor.

25        Your Honor, there is a lot of testimony from several

1    witnesses that explained that the defendant clearly was

2    familiar with this area or at least certainly the jury

3    could draw the inference and given the evidence -- all the

4    benefit of the inferences toward the government, there is

5    certainly a lot of evidence that this defendant was

6    familiar with this location.

7            THE COURT:  No doubt, but how about the exact

8    argument though about this Ruth's House -- I agree with

9    you, a lot of evidence that he's very familiar with

10   Converse Street.  He drives it all the time, but what

11   about this argument regarding Ruth's House and the

12   confusion of the question?

13           MS. BERKOWER:  Well, Your Honor, the agent

14   testified yesterday, and drawing all inferences in favor

15   of his testimony, as we must on this particular type of

16   motion, he testified that he had a broad-based

17   conversation with the defendant about this location.

18       He started off broad.  Do you drive down Converse

19   Street?  What landmarks do you know?  Do you know this

20   landmark?  Do you know that landmark?  Do you know the

21   other landmark?  And the defendant only responded by

22   saying he knew one of those landmarks that was one of the

23   -- the Jewish school I believe is what he said.

24       So the agent went more granular.  Do know the Jewish

25   nursing home?  Do you know Ruth's House, and drawing

1    inferences in favor of the government here, there's a big

2    sign right there that says Ruth's House.  And the defense

3    made great pains of pointing out that the driveway through

4    Genesis House is a one-way street that lands you right at

5    that sign at the end of your ride to get back onto

6    Converse Street once you exit.

7          And so the agent was clear that he was trying to hone

8    this defendant in on this area of Converse Street.  He was

9    trying to orient him.  He showed him a map.  He had an X

10   on the map.

11         THE COURT:  An X on the map that was at the

12   intersection of another street or near an intersection I

13   think.

14         MS. BERKOWER:  It was the intersection -- it was

15   the spot was the device was placed.  He was showing him --

16   he was saying this is Converse Street.  This is the cross

17   street, the driveway there.  This is where the device was

18   placed and the inference to the government is that the

19   defendant was clearly oriented as to what the agent was

20   talking about, yet still maintained that he had no

21   familiarity with this area despite all of the other

22   evidence that indicates he certainly did have familiarity

23   with the area.

24         So in our view there is certainly -- especially when

25   considering this evidence in the light most favorable to

1     the government, there's certainly evidence in the record

2     that supports that piece of the charge.

3                  THE COURT:  All right.  I agree with the

4     government that the inferences in this case in favor of

5     the government support -- well, they support that this

6     area of Converse Street, the statement being unfamiliarity

7     or a lack of familiarity with Converse Street in a broad

8     sense using multiple ways of describing Converse Street,

9     the defendant's knowledge of Converse Street.  Converse

10    Street begins and ends, we've heard testimony regarding

11    where Converse Street runs to and from and how long it

12    takes to get there, et cetera, et cetera, or travel, and

13    the multiple JGS-related locations on Converse Street.

14         But I think, I think that the not familiar with the

15    location on Converse Street and the taking out of the map

16    and the description and the discussion and the marking on

17    the map, it wasn't the most detailed map, but at this

18    point inferences favorable to the government require me to

19    deny that motion on that particular statement.  So the

20    motion is denied on that.

21         Now we're on the statement of not leaving the house

22    in the past two weeks.

23                  MR. WATKINS:  Your Honor, again, that's

24    susceptible to different meanings.  As the court has

25    heard, it seems technically that was 13 days prior to that

1    particular time when -- the allegation here is that by

2    saying I have not left in the two weeks prior, that he

3    lied about April 2nd in particular.

4        The question again is not a clear cut question

5    whatsoever.  Again, the government must disprove all

6    possibilities of a truthful answer.  They simply can't do

7    it here given the circumstances of a question about a

8    couple of weeks or two weeks where arguably the events

9    here did not fall precisely on one side or the other.  So

10    I would say again there would be insufficient evidence for

11    any juror to find Mr. Rathbun guilty on that aspect.

12        THE COURT:  So you're measuring past two weeks

13    from the date of the event or the date that he was

14    interviewed?

15        MR. WATKINS:  As I understand the testimony and

16    the indictment, in the past two weeks from when the agent

17    appeared on April 15th, which would take it to April 1st.

18    While the April 2nd date does fall within line as the

19    court has heard, it's the very, very early hours of April

20    2nd.

21        THE COURT:  Well, drawing all inferences

22    favorable to the government, how do you persuade me that

23    this -- that you should succeed on this motion?

24        MR. WATKINS:  Your Honor, I think the question

25    was ambiguously worded in the circumstances in which the

1   agent was asking Mr. Rathbun.  So it would be impossible

2   for the jury to conclude that Mr. Rathbun answered it

3   falsely and knowingly falsely.

4           THE COURT:  Do you think there's any argument

5   that he actually answered it truthfully when he said that

6   he left the house to get Methadone for two weeks and then

7   said really almost in the same breath or the same

8   conversation at least, if not the same breath, that I

9   haven't left the house?  Then he said but I did leave the

10  house to go get my Methadone.

11          MR. WATKINS:  I would agree that the evidence is

12  extremely strong that Mr. Rathbun actually did tell them

13  he had been out in the previous two weeks, and so I think

14  the count could fall on that matter.

15      Of course, I think what the government's argument is

16  it doesn't matter if he was truthful about some things but

17  when he answered specifically April 2nd I was gone or I

18  was not out of the house, that that is where the lie is.

19  But I think I would agree with you that it certainly

20  sounds like Mr. Rathbun was being forthcoming.

21          THE COURT:  All right.  What does the government

22  have to say?  I'm troubled about that part about I did

23  leave.  I went and got my Methadone.

24          MS. BERKOWER:  Yes, Your Honor, and I would

25  submit that the agent was very clear with Mr. Rathbun that

1    the reason they were at that house on Lori Lane that day
2    was because of an incident on April 2nd.

3         There is no question that they were there on April
4    2nd.  This was not the kind of circumstance where they
5    happened to encounter the defendant or the defendant came
6    in to meet with them.  They executed a search warrant at
7    the house that day because of an incident that happened on
8    April 2nd and that's what the agent was talking about.

9         The agent was very clear that he had a clear memory
10   of asking Mr. Rathbun about that date and Mr. Rathbun said
11   I haven't been out of the house in two weeks, inferring to
12   him and misleading him that he had not been out in his
13   mother's car.

14        I would also note that with regard to, you know,
15   there are other witnesses that have talked about him being
16   out of the house including his own daughter.  He would go
17   out every few nights in his mother's car.  And so to the
18   extent that he's misleading the FBI about his activities,
19   even if the jury were to credit, which at this point we
20   have to assume that they credit us, our view of this,
21   rather than Mr. Rathbun's assertion, that even if they
22   credit that, he's still not telling them that he's going
23   out of the house late at night every night or every few
24   nights in his mother's car.

25        He's misleading them as to what his activities were

1  in that time period.  And so I would submit to the court

2  that to the extent there's any question that Your Honor

3  has pointed out that there may have been inconsistent

4  statements that Mr. Rathbun made to the FBI agent that

5  day, those are really for the jury to decide.  And at this

6  point in time, the inference goes to the government that

7  in fact the agent was clear with him about what he was

8  asking about.  The date was April 2nd that the agent was

9  interested in, and Mr. Rathbun in the context of that

10  inquiry was like I haven't been out of the house.

11        You heard on the jail call, Your Honor, Mr. Rathbun

12  was laughing about it after the fact that the FBI took the

13  wrong car.  They didn't even search his mother's car for

14  forensics because Mr. Rathbun misled them as to what he

15  was doing that night.  I think that shows consciousness of

16  Mr. Rathbun's guilt in that conversation back with Special

17  Agent McGonigle.

18              THE COURT:  I'm just concerned that he told them

19  that he wasn't out of the house but then he told them of

20  one instance when he was out of the house.  So he gave a

21  convoluted answer.

22              MS. BERKOWER:  Well, Your Honor --

23              THE COURT:  What would the government want him

24  to say?  Well, you think you can charge him with a false

25  statement if he says -- unless he says anything except,

oh, yeah, I was out of the house.  I went and placed a gas
can at the corner of Converse Street and then I came back
home.  I mean, it doesn't need to be that.

MS. BERKOWER:  No, Your Honor, but he certainly
gave the agents the impression, and I think Special Agent
McGonigle testified to this, that he was not going out at
night in the location that they're describing to him.

If he had mentioned, you know, I might have gone out
for Methadone but that's it, that gives a very different
impression to the agents investigating this case than if
he had said I go out all the time.

THE COURT:  I agree with you.  But wasn't the
question, isn't the question -- isn't the indictment just
about did you leave the house in the last two weeks?

MS. BERKOWER:  Yes, Your Honor.  But I would ask
the court to view that piece of the statement in line with
the next sentence of the indictment that explains the way
in which the statement was false.

So the indictment reads that "The defendant stated
that he had not left the house in the past two weeks
because of the COVID-19 pandemic," and then the next
statement in the indictment says "In truth and in fact, as
the defendant well knew, his statements were false in that
he had left his house during the early morning hours of
April 2, 2020."

 1          And so I think that grounds this charge and the

 2     discussion that he had with the agent about that day, and

 3     in our view the evidence more than adequately meets the

 4     Rule 29 standard for that.

 5               THE COURT:  Interesting.  Yeah, I think you just

 6     saved it by your last sentence.

 7               MS. BERKOWER:  Thank you, Your Honor.

 8               THE COURT:  Inferences favorable to the

 9     government, motion denied.  All right.

10          And when I say the last sentence I mean the context

11     of "In truth in fact, defendant knew his statements were

12     false in that he had left the house during the early

13     morning hours of April 2nd."

14          The conversation was grounded on that specific time,

15     and at this point the inference in favor to the government

16     the defendant's motion is denied.  Well argued, but

17     denied.

18          So what do we have coming up?

19               MR. WATKINS:  We have one witness.  We have

20     Sheila Rathbun who I think is close by the courthouse

21     now.

22               THE COURT:  She's not here yet?

23               MS. O'NEILL-GREENBERG:  I'm just finding out.

24               THE COURT:  Okay.

25               MR. WATKINS:  She is very close by.

1        Before we get to her, I just want to make a couple of

2   things clear.  Ms. Rathbun is represented by counsel.  She

3   was subpoenaed to the grand jury.  She is represented by

4   David Hoose who I've spoken with.  Attorney Hoose is

5   available by telephone should anything need to come up.  I

6   don't see anything coming up, neither does Attorney Hoose.

7        THE COURT:  I would prefer if we could arrange

8   and if you confirm if Attorney Hoose is watching over the

9   Zoom link.

10       MR. WATKINS:  I will do that right now.  It

11   might take a minute or two.

12       THE COURT:  No problem.  I'm going to step out.

13   We are waiting for her to get here.  This witness isn't

14   going to be more than an hour between two of you, is it?

15       MS. O'NEILL-GREENBERG:  Not -- I don't have much

16   to do with her on direct, but I don't know.

17       THE COURT:  All right.  I'm just sensitive to

18   the time.  I mean, I don't want to cut off between -- I

19   mean, I can stay.  I can be here up until 2:30 so.

20       MR. DESROCHES:  It's very difficult to assess.

21       THE COURT:  I know.  Well, let's step off.

22   Somebody notify the clerk or someone to come get me as

23   soon as she gets here, and you can make sure Attorney

24   Hoose is watching by Zoom.  All right.

25       MR. DESROCHES:  Thank you, Your Honor.

```
 1              THE COURT:  Thanks.

 2              THE CLERK:  All rise.

 3    (A recess was taken at 12:00 until 12:17.)

 4              THE COURT:  So it's fair to say -- it's fair to

 5    tell the jury this is the last witness of the day?  We

 6    might get through her.  We may not, but it's the last one

 7    of the day.

 8              MS. O'NEILL-GREENBERG:  Yes.

 9              THE COURT:  All right.  Is it also fair to tell

10    the jury that we may go a full day tomorrow?  I'm just not

11    quite sure, but that we're thinking in the big picture

12    view we would be doing closings on Friday.

13              MS. BERKOWER:  I think that's fair, Your

14    Honor.

15              MR. WATKINS:  Yes.

16              THE COURT:  I don't want to pour it in stone but

17    just give them a general view.  Okay.

18              MR. WATKINS:  Maybe an hour to 90 minutes for me

19    and then whatever the government wants to do after that

20    tomorrow.

21              THE COURT:  Tomorrow.  Okay.

22              MR. WATKINS:  Not for closing.

23              THE COURT:  Got it.  We might need a while for

24    our charging conference.  Maybe I'll be surprised and we

25    don't, but we might need a while.
```

1          MR. WATKINS:  Judge, when Mr. Lovett comes in,

2     perhaps we can test the screens before we get going just

3     to make sure.  We expect to show a couple of things and

4     they were not working the last time.

5          THE COURT:  Okay.

6     **(The jury entered at 12:19.)**

7          THE COURT:  Okay.  Ladies and gentlemen, was

8     everyone able to follow my instructions during that break

9     not to talk to each other?  Not look anything up on the

10    internet?  No reading any news articles?

11         All right.  Everyone affirmatively responded; the

12    jury remains fair and impartial.  All right.

13         I can tell you a little bit of the set up for how

14    it's going to go from here.  The government has rested.

15    The defense is going to begin the process of calling

16    witnesses.  It's their choice.  As you know, they don't

17    have to put on any case at all, but they're going to call

18    a witness right now.

19         We're going to go today until around 1:30, maybe a

20    little later.  It depends.  We might push it to two

21    o'clock.  I don't want to go too far.

22         So they're going to call one witness today.  Tomorrow

23    there is likely or could be more witnesses or a witness

24    tomorrow, but there's also chance that it won't go the

25    full day.  So there's a chance that tomorrow might be

1   either a half day or three-quarters of a day.  I just

2   don't know, but I wanted to let you know that tomorrow may

3   end up being a little shorter.

4        The general plan -- don't hold me to this -- but the

5   general plan, after talking to all the parties, is that

6   Friday, Friday morning is likely that we could have

7   closing arguments.  Closing arguments on Friday morning

8   and then I would give you my instructions and you can

9   start deliberating on Friday.

10        So the closing arguments say that takes an hour both

11  sides combined.  The instructions are not short.  The

12  instructions are at least 45 minutes.  I don't think quite

13  over an hour but that's a general overview, a very general

14  overview.  Okay.  So I would expect Friday you would here

15  all day.  Tomorrow, I'm not so sure.  You might be out

16  early.

17             MS. O'NEILL-GREENBERG:  The defense calls Sheila

18  Rathbun.

19             THE COURT:  All right.

20             THE CLERK:  Ma'am, can you please raise your

21  hand?

22

23

24

25

1    **Sheila Rathbun (Sworn)**

2    **DIRECT EXAMINATION**

3    Q.   (By Ms. O'Neill-Greenberg) Okay.  Good afternoon.

4    Mrs. Rathbun, you can take your mask off now that you are

5    in the plastic booth.

6         Okay.  So, Mrs. Rathbun, to begin, if you could just

7    introduce yourself to the jury.  Just state your name and

8    just spell your last name for the record?

9    A.   Okay.  My name is Sheila Rathbun, R-a-t-h-b-u-n.

10   Q.   And, Mrs. Rathbun, where do you live?

11   A.   20 Lori Lane in East Longmeadow, Massachusetts.

12   Q.   And what do you do for work?

13   A.   Right I'm doing special projects.  I'm in accounting.

14   Q.   I'm going to get back to that more in a little bit,

15   but do you know John Rathbun?

16   A.   Yes, I do.  He's my son.

17   Q.   Okay.  And, Mrs. Rathbun, I want to jump right to the

18   date of April 2, 2020.  Do you remember -- that morning,

19   do you remember that morning?

20   A.   Yes, I do.

21   Q.   Can you tell me what, if anything, stands out for you

22   that day?  Or tell the jury don't tell me actually.

23   A.   I had to go to work that day.  I usually go to work

24   for 8:30 and John had borrowed my car that morning.  That

25   was not unusual.  We switch and swap cars all the time,

1    and I remember that it was like about 7:30ish, 7:40ish,

2    around there, and he was not back yet.  And I remember

3    texting and then calling him because I was concerned

4    because I wanted him to be back on time so I could go to

5    work.

6    Q.   And what happened?  Did you get your car back?

7    A.   No.  He didn't respond to my phone call so I borrowed

8    -- my granddaughter lives with us and I borrowed -- my

9    husband and I together borrowed my granddaughter's car and

10   he brought me to work.

11   Q.   Did you ever learn what happened?  Why you didn't

12   have your car back in time?

13   A.   He had forgot.  He --

14            MR. DESROCHES:  Objection, Your Honor.

15            THE COURT:  I'm sorry?

16            MR. DESROCHES:  The basis for this answer is

17   relying on hearsay.

18            THE COURT:  Could I hear the question please?

19   Q.   (By Ms. O'Neill-Greenberg) Did you learn why you

20   didn't get your car back that day?

21   A.   Yes.

22            THE COURT:  Overruled.  It goes to state of

23   mind.  All right.  Overruled.  It goes to state of mind.

24   You can answer.

25            THE WITNESS:  Okay.  He told me he had forgotten

1   that I had to go to work and he actually did come home

2   between 8:30 and nine.

3           MR. DESROCHES:  Objection.  This is being

4   asserted for the truth of the matter and it is hearsay.

5           THE COURT:  As to the time arriving back?

6           MR. DESROCHES:  Yes, Your Honor.

7           THE COURT:  Okay.  The last part of the question

8   as to when he came back, the exact time is stricken.  That

9   portion of the answer is stricken to be disregarded.  It

10  was also nonresponsive and beyond the scope of the

11  question so it is not considered.  Go ahead.

12  Q.   (By Ms. O'Neill-Greenberg) Did you -- what time did

13  you get home that day?

14  A.   That night I got home between 5:15 and 5:30.

15  Q.   Okay.  And did you see John that day once you got

16  home?

17  A.   Yes.  I did see him later that day.

18  Q.   Did you use your car at all again that day or go in

19  your car?

20  A.   No.  Did I use any car?

21  Q.   Did you?

22  A.   No, I didn't -- well, yes, I did use my car because

23  my husband used it to come pick me up from work.

24  Q.   So you were in your car riding home that day?

25  A.   Yes.

1    Q.   Okay.  And how did your car seem?

2    A.   There was junk in the trunk.  I have an SUV and in

3    the back of the SUV there was junk.

4    Q.   Okay.  Did it smell in any way?

5    A.   I was afraid that there would be a smell but, no, I

6    didn't smell anything because I'm kind of particular about

7    my car and I like it nice and clean.

8    Q.   What smell were you worried about?

9    A.   I was worried of a garbage smell.  You know, because

10   if he had picked something up to put in there that wasn't

11   pleasant, but there wasn't anything like that.  So when we

12   got home, we checked to see what was back there.

13   Q.   In the front of the car in the driver's side, did you

14   notice anything else like anything on the steering wheel

15   or anything else at all?

16   A.   No.  There was nothing in the front because my

17   husband and I were in the front and it was fine.

18   Q.   Okay.  Mrs. Rathbun, does your son John have a

19   problem with drugs?

20   A.   Yes, he does.

21   Q.   When did that start?

22   A.   It's been a long struggle, probably since he's been a

23   teenager.

24   Q.   And is that something that he still struggles with?

25   A.   Yes, it is.

1    Q.   On April 2nd, his behavior that day not bringing the

2    car back in time, did that raise any concerns with you in

3    relation to his struggles with drugs?

4    A.   Yes.  We were concerned that he may have been having

5    struggles, yes.

6    Q.   And when you say having struggles, you mean using

7    drugs?

8    A.   Yes.

9    Q.   Okay.  Is this the first time you had noticed him

10   using drugs again?

11   A.   No.  It's been an off-and-on problem since he's been

12   a teenager.  He has good spells and then he goes through

13   bad spells.

14   Q.   And so we're talking about April 2nd of this year.

15   So in March, that spring of that year, was John working

16   full time?

17   A.   He was and then in March, no, he was no longer

18   working.

19   Q.   So how was he spending his days, just generally?

20   A.   He would do side jobs or cleanup jobs, and he was

21   looking for work to get another job.

22   Q.   Did he leave the house a lot?  Did he go out at night

23   a lot?

24   A.   No.  He may have gone for like the cleanup, he would

25   do a cleanup job.  He was a handyman.  He can do just

1    about anything.  He might do small jobs, but he's kind of

2    a homebody.  He does like to be at home.

3    Q.   And at that time in March, was he very active?  Was

4    he staying in his room a lot?  How did he seem?

5    A.   I would say he was more in his room and he wasn't as

6    active.

7    Q.   Did you have any concerns at that time that he was

8    exhibiting behaviors that seemed like he was using again?

9    A.   Yes.  We were starting to see signs that we were

10   concerned about, yes.

11   Q.   And what are those signs generally?

12   A.   I would say probably mostly would be he'd spend a lot

13   of time in his room.  He would be sleeping, not as

14   communicative or interacting with us.

15   Q.   Is it hard sometimes to tell when he's in his room?

16   A.   It is.  Sometimes it is hard to tell.  You can't

17   always tell.

18   Q.   How come?

19   A.   I would assume -- I'm not really a drug expert, but

20   some drugs affect you in different ways and some of them I

21   couldn't tell.  You can't really tell, and he could take

22   something that he would be able to work fine.

23   Q.   So he was sort functional?

24   A.   Yes.  He could be a functional person that was --

25   because he wasn't taking excessive drugs, it wasn't an

1    excessive thing.

2    Q.   And you just talked a little bit about him doing side

3    jobs or I think that's what you said.  Can you explain

4    what you mean?

5    A.   You can -- he would go online and he'd get --

6                MR. DESROCHES:  Objection, Your Honor.

7                THE WITNESS:  -- cleanup jobs.

8                MR. DESROCHES:  The basis of this answer would

9    be rooted in hearsay.

10               THE COURT:  As to what he did?

11               MR. DESROCHES:  Correct.  His activities in

12   finding jobs.

13               THE COURT:  I don't know, can you -- I will

14   sustain the objection and ask you to rephrase to lay a

15   foundation that there's a basis or what the basis of

16   knowledge is.

17               MS. O'NEILL-GREENBERG:  Sure.

18   Q.   (By Ms. O'Neill-Greenberg) In asking you about what

19   you knew about his odd jobs or side jobs, what did you

20   observe about him doing odd jobs or side jobs?

21   A.   I know he was going because he told me he was going

22   online and he --

23               THE COURT:  So objection sustained.

24   Q.   (By Ms. O'Neill-Greenberf)  What would he actually

25   do?

1              THE COURT:  That's stricken as to what was told

2    to this witness by Mr. Rathbun.  That's stricken from the

3    record.

4    Q.   (By Ms. O'Neill-Greenberg)  When he would do odd jobs

5    or side jobs, what would he actually do?

6    A.   He would do clean up.  Someone may ask him to remove

7    trash.  He had electrical ability.  They may tell him to,

8    you know, put in a fan or some small electrical job.  He

9    could do plumbing.  He could do carpentry, small carpentry

10   jobs.  You know, things like that.

11   Q.   Do you have any memory in March of him doing any

12   cleanout jobs?

13   A.   He did have one cleanup job in March.  I know it was

14   a very large job and I know that he came -- he has a work

15   van and it was stuffed with stuff from that cleanup job.

16   Q.   When you say stuffed, what did you observe or what

17   was it?

18   A.   Well, the doors in the back were hard to be closed

19   and he had obviously had to get rid of that stuff and it

20   must have smelled because the windows started to fog.  He

21   opened the doors to the car to kind of air it out.

22   Q.   You mean the junk smelled?

23   A.   Yes.

24   Q.   Do you remember how -- so you were saying the junk

25   was in the back of the van.  Do you have any memory as to

1    how long it was in there or not?

2    A.   I'd say it was a good week.

3    Q.   Okay.  Now, do you remember what kind of junk it was

4    or do you know?

5    A.   You could see -- I could see some of it and there was

6    a -- they look like stairs, like a set of stairs, wooden

7    stairs.  There was wood.  There was like, I don't know if

8    it was drywall or plaster or something.  It was just a

9    whole bunch of crazy stuff.

10   Q.   Could you see everything that was in the back of the

11   van?

12   A.   No, I couldn't see everything.  I could just see that

13   from the back door.  Some of that stuff was easy to see.

14   Q.   Do you remember when in March that was?

15   A.   It was -- it wasn't the middle.  It was more towards

16   maybe the third week of March.

17   Q.   Okay.  Now, Mrs. Rathbun, I want to sort of jump to a

18   different area and talk to you about being religious.  Are

19   you religious?

20   A.   I know people say that but I don't really consider

21   myself religious.  I consider myself like everyone else.

22   I do have a relationship with God, and I do take my faith

23   seriously.

24   Q.   Okay.  Do you actively practice your faith?

25   A.   Yes, I do.

1    Q.   And can you just explain a little bit to the jury
2    about how you do that?
3    A.   Well, we go to church on Sundays, like most people
4    do, and I am the church bookkeeper.  My profession is
5    accounting so I help them with doing the bookkeeping.
6    I've helped this church as secretary when they've needed
7    this and I'm a Sunday school teacher.
8    Q.   What church do you go to?
9    A.   Heritage Baptist Church.
10   Q.   Where do you teach Sunday school?
11   A.   At Heritage Baptist Church.
12   Q.   You do that every Sunday?
13   A.   No, I do not.  We are on a rotating schedule so right
14   now I'm doing it every third week.
15   Q.   Are you familiar with an organization called the
16   Billy Graham Evangelical Association?
17   A.   Yes, I am.
18   Q.   And what do you know -- how do you know them?
19   A.   Last year Franklin Graham came to West Springfield to
20   put an event on there and my pastor was involved with it
21   for the Western Mass. area.
22   Q.   And did you go?
23   A.   Yes, I did.
24   Q.   Did you go alone?
25   A.   No, I went with my husband and then my sister came

```
 1    with us too.
 2    Q.   Did you get anything from that event?
 3    A.   I got a T-shirt and I was all excited.
 4    Q.   Did you get anything else?
 5    A.   Nope.  That's all I got.  I don't know if there was
 6    other stuff there or not.  I just wanted the T-shirt.
 7    That was my focus.
 8    Q.   Did your husband get a T-shirt?
 9    A.   No, he wasn't interested in it.
10    Q.   Mrs. Rathbun, are you familiar with a pamphlet or a
11    religious tract I'll call it called Steps to Peace With
12    God?
13    A.   I wasn't until they came to our house on April 15th
14    and then they -- and I didn't know it was that then
15    either.  They just showed me parts of it but since then,
16    yes, now I am.
17    Q.   Okay.  Let me just back up.
18         When you say they came to your house on April 15th.
19    A.   The FBI came to our house on April 15th.
20    Q.   Okay.  What did they show you?
21    A.   It was in a plastic bag and it was torn and it was
22    pieces of it so you couldn't really see.  I couldn't
23    really tell what it was.  It wasn't a completed booklet.
24    It was just like pages.
25    Q.   Okay.  And were those pages familiar to you?
```

1    A.   No, I hadn't seen those specific pages.  There are a

2    lot of tracts like that so I was familiar with the

3    content, but I had not seen that particular tract.

4    Q.   Okay.  Did you ever get shown like the full booklet

5    that it came from?

6    A.   No, I have never seen the full booklet.

7    Q.   Do you know what color it actually is?

8    A.   Yes.  When they showed the full -- they showed the

9    full booklet, but I never got to see -- I just got to see

10   the front cover.  It was red.

11   Q.   Okay.  And you said there's a lot of pamphlets like

12   that, but that particular one, you've never seen it

13   before?

14   A.   No, that particular one I have not seen.

15   Q.   And how do you know?

16   A.   Well, I would think because it's red, it's not the

17   kind of pamphlet that I -- my husband and I don't use

18   those kind of pamphlets.  We have a simpler style that we

19   like to use.  It's just not something I've seen or used.

20   Q.   When you say you use pamphlets, what do you do with

21   them or how do you get the pamphlets you use?

22   A.   Most of the pamphlets that we get, we get through our

23   church.  The church purchases them.

24   Q.   Okay.

25   A.   Some of them my husband and I have made.

```
1    Q.   How do you make them?
2    A.   You can make them on the computer.  It's simple.
3    It's not a big process at all, and you buy the correct
4    type of heavier paper, stock paper and we would make them.
5    Q.   Okay.
6    A.   They're just very simple ones.  These ones that
7    you're talking about are booklets.  It's a bigger project
8    kind of thing.
9    Q.   Okay.  And the ones you did get from the church, did
10   you ever see at your church that particular pamphlet that
11   was found in the gas can?
12   A.   No.  I never have seen that red pamphlet at church,
13   no.
14   Q.   Mrs. Rathbun, at the beginning when you introduced
15   yourself to the jury, I asked you a little about your
16   work.
17        Can you tell me now -- I want to ask you a few more
18   questions about your work.  Do you work for a company?
19   A.   Yes.  I work for Carr Property Management.
20   Q.   Okay.  How long have you worked there?
21   A.   Probably about eleven years.
22   Q.   What's your job title?
23   A.   Right now it's special projects for accounting.  I
24   was the comptroller and I retired a couple of years ago
25   and they asked me to stay on and I work two days a week.
```

1    Q.   And so just, generally speaking, what are your

2    responsibilities when you were comptroller and now?  What

3    are you doing?

4    A.   Well, I was in charge of the finances and the

5    accounting department.  So we have 19 properties that we

6    manage and I work at 24 Deer Park Drive.

7    Q.   Okay.  And so the properties you manage, you're

8    responsible for dealing with financial stuff with them?

9    A.   Yes, we would pay their bills.  We do their budgets.

10   Anything that they need to have done financially, we would

11   take care of.  We were the administrative office for the

12   sites.

13   Q.   Is Genesis House one of those sites that is managed?

14   A.   Yes, that is one of the sites that we manage.

15   Q.   Did you ever work there?

16   A.   At Genesis House?

17   Q.   Yes.

18   A.   No.  We wouldn't work there.  We're the

19   administrative office.  We're at 24 Deer Park Drive.

20   Q.   Okay.  Did you ever go there for work?

21   A.   To Genesis House?

22   Q.   Yes.

23   A.   No, there's no work over there for me to do.  They

24   send, they send their work to us and we do it at 24 Deer

25   Park Drive.

1   Q.   Were you ever there for any work purposes ever?

2   A.   We have an annual required meeting and we would go to

3   different sites if they have a community room and I may

4   have gone there maybe once or twice over the years for the

5   annual meeting.

6   Q.   Do you have any family that ever lived at Genesis

7   House?

8   A.   My mother lived at Genesis House ten years ago.  She

9   passed away ten years ago.

10  Q.   I'm sorry to hear that.

11  A.   Thank you.

12  Q.   How long did she live there about?

13  A.   She lived there maybe several years.  I don't

14  remember exactly to be honest.

15  Q.   Did she -- Genesis House is subsidized housing?

16  A.   Yes.  It's subsidized housing and you have to be 62

17  or older to live there.

18  Q.   Did she ever live at any housing facilities before

19  Genesis House?

20  A.   Yes.  Before that she lived at Brownstone Gardens in

21  East Longmeadow.

22  Q.   Okay.  And when your mother lived at Genesis House,

23  how often did you visit?

24  A.   I have four sisters and we would rotate and make sure

25  we would visit her.  So I would say we probably -- I would

1    say maybe once every couple weeks, once a month at least.

2    Q.    Would you bring John to visit with you on those

3    visits?

4    A.    No.  John was an adult working.  No, I would bring my

5    granddaughter Natalie who was young.  She would come.  So

6    her and I would go out with grandma and we would go to

7    lunch or an activity.

8    Q.    Do you have any memory of John ever visiting your

9    grandmother (sic) when she lived at Genesis House?

10   A.    I don't think so.  I can't remember or recall.  We

11   didn't have -- when we got together for the holidays, it's

12   a very small apartment.  It's only got one bedroom and she

13   couldn't really entertain there so we would go to my house

14   or one of my sisters to celebrate any holidays.  We didn't

15   really go there to socialize.  We would pick her up and

16   bring her out.

17   Q.    Did John have a close relationship with your mom?

18   A.    I don't think they were particularly close.  I think

19   it was just a normal grandma/grandson relationship you

20   know, just normal.

21   Q.    Okay.  And how did you refer to where your mom lived?

22   What did you call it?

23   A.    Grandma's house.

24   Q.    You called it grandma's house?

25   A.    Yeah.  We'd say we're going to grandma's.  We're

```
 1    going to go get grandma.  We're going to grandma's house.
 2    Q.   And do you remember --
 3              MS. O'NEILL-GREENBERG:  Actually could I pull up
 4    Exhibit 104?
 5    Q.   (By Ms. O'Neill-Greenberg) I just want to show you a
 6    map of the area.
 7    A.   Oh, okay.
 8    Q.   Do you see that?
 9    A.   Yes.
10    Q.   Does that look familiar to you?
11    A.   Not really.  I can't figure out what's what.
12    Q.   Okay.
13    A.   Where's -- I don't even know where, sorry.
14    Q.   If I can orient you.  Do you see this long road?
15    (Indicating)
16    A.   Is that Converse Street?
17    Q.   That's correct.
18    A.   Okay.  So that's Converse Street.  Okay.
19    Q.   And then do you see this grouping of brown buildings
20    here where the cursor is?  (Indicating)
21    A.   Yeah.
22    Q.   Does that look familiar at all?
23    A.   I don't know for sure.  I'm guessing you're going to
24    say that's Genesis House?
25    Q.   It is Genesis House.
```

1      It's a weird aerial view, but does it look at all
2  familiar to you?
3  A.   Not particularly.
4  Q.   Okay.  Can you tell me when you would drive down
5  Converse Street from your house to visit your grandmother
6  (sic), how would you get there?  What way would you turn
7  into Genesis House?
8  A.   We'd go down Converse Street and then you would take
9  a right into that entrance where Genesis House is.
10  Q.   Okay.  Can you just pull your microphone a little
11  closer?
12  A.   Sorry.
13  Q.   No, it's fine.
14      Can you say that one more time?
15  A.   We would go down Converse Street and we would take a
16  right into the entrance to Genesis House.
17  Q.   Okay.  And was that the first right you would take?
18  A.   Yes, it's the first right.
19  Q.   Okay.  Then where would you park?
20  A.   You can see those cars there, that's where we would
21  park.
22  Q.   Okay.  And then how would you get -- which building
23  did your grandmother -- sorry, your mother live in; do you
24  remember?
25  A.   Let's see.  I'm thinking that it's the first building

because we didn't have to go into the entrance.  She was

in the first building closest to the street right there

where you park.

Q.   Okay.  (Indicating)

A.   Right there.  That's where she was, and she was on

the end and she had a back entrance so we would always go

through the back entrance.

Q.   Okay.  When you would get out of your car, how would

you get to that entrance?

A.   Well, there's a little sidewalk there and you would

walk down the sidewalk to the left and then you would take

a right and she's actually the first apartment on the

corner.  She was on the end there.

Q.   So do you mean closest to where your car was parked?

A.   Yes.

Q.   And then how would you leave, do you remember?

A.   It's one way so you have to circle all the way around

and come out the other entrance back onto Converse Street.

Q.   Now, obviously you support your son.  You know what

he's accused of?

     MR. WATKINS:  This was in evidence.  The clerk

is telling me it's not being shown to the jury.  Can we

publish this to the entire jury?

     THE COURT:  Oh, you want it published?

     MR. DESROCHES:  I don't believe the witness

1    recognizes this picture, Your Honor, so I think at this

2    point it shouldn't be used.

3              THE COURT:  It's an exhibit.  So it can be

4    shown.  So that can be shown to the jury.

5              MS. O'NEILL-GREENBERG:  Sorry, I didn't realize

6    that.

7              MR. WATKINS:  We didn't realize the jury was not

8    watching.

9              THE COURT:  The testimony was that she did not

10   -- this witness did not recognize the picture, but what is

11   up on the screen is an exhibit.  What exhibit is it?

12             MR. WATKINS:  104.

13             THE COURT:  Okay.  Are you finished with this

14   now?

15             MS. O'NEILL-GREENBERG:  I think so.

16   Q.   (By Ms. O'Neill-Greenberg) Do you recognize it now?

17   A.   Yes, I do.

18   Q.   It just took you a minute?

19   A.   Yes.

20   Q.   You've never seen it before.

21   A.   To adjust.

22   Q.   And just to clarify, when you would take that right

23   into the Genesis House driveway, your grandmother's (sic)

24   apartment was the first building on the left; is that

25   right?

1   A.   Yes.

2   Q.   Okay.  And her apartment was closest to the parking

3   lot and street?

4   A.   Yes, it was the first apartment there.

5   Q.   Okay.  Okay.  So, Mrs. Rathbun, obviously you support

6   your son.  You know why we're here.  You know what he's

7   charged with.

8   A.   Yes.

9   Q.   When you first learned in April about the location of

10  what he was accused of and the location of where that gas

11  can was found, was that location meaningful to you?  Did

12  you think anything about it?

13           MR. DESROCHES:  Objection, Your Honor.

14           THE COURT:  Basis.

15           MR. DESROCHES:  Relevance of this witness's

16  feelings or thought process.

17           THE COURT:  Sustained.

18  Q.   (By Ms. O'Neill-Greenberg) Did you -- when did you

19  realize -- or did you think when your grandmother (sic)

20  lived at Genesis House, did you think it was connected to

21  any other facilities?  Sorry, your mother?

22           MR. DESROCHES:  Objection again, the same

23  basis.

24           THE COURT:  Well, she is asking this witness on

25  her own personal knowledge if she knew what the connection

1    between the facilities on that campus was.  That's fine.

2    You can answer that.

3            THE WITNESS:  I'm not sure I quite understand,

4    but I wasn't -- I didn't think about my mother living

5    there in connection with this at the time because I didn't

6    see what matter there was to that.

7            MR. DESROCHES:  Objection, Your Honor.

8            THE COURT:  Sustained.  That was not responsive.

9    I just think -- you didn't do anything wrong, ma'am.  I

10   just think you misunderstood the question.  That answer is

11   stricken.

12       Can you re-ask a question to kind of start over?  I

13   think this witness misunderstood between the two

14   questions.

15           MS. O'NEILL-GREENBERG:  Yes.

16   Q.   (By Ms. O'Neill-Greenberg)  When your mom was living

17   at Genesis House, did you have any -- did you also

18   believe -- did you know anything about the greater

19   facility connected to Genesis House?

20   A.   No, not at first.  The only way I learned about the

21   facility more was when I went to work for Carr Property

22   and she was living there before I went to work for Carr

23   Property.

24   Q.   Okay.  Did you believe that where she lived was

25   connected to a place called Ruth's House?

```
1              MR. DESROCHES:  Objection; the same basis, Your
2    Honor.  This witness's belief is not relevant.
3              THE COURT:  Overruled.  You can answer.
4              THE WITNESS:  No, Genesis House is not connected
5    to Ruth's House.  They're in the same campus but they
6    don't interact with each other in any way.
7    Q.   (By Ms. O'Neill-Greenberg) Did you ever talk to your
8    son about how your mom lived at a place called Genesis
9    House, using the name Genesis House?
10   A.   I don't think so.  I mean, we always just called it,
11   you know, grandma's house where grandma lived.  It didn't
12   seem significant.
13   Q.   And did you talk to your son about -- did he know the
14   specifics of your work at all?  Like, did he know -- what
15   did he know about the specifics of your work?  How much
16   did you talk about work at home?
17   A.   No.  He knew that I worked in accounting.  He -- not
18   to any depth, you know.  Nobody would be really
19   interested.  It's kind of boring.  It's not the kind of
20   stuff I'm going to talk about at home.
21   Q.   Okay.
22   A.   They wouldn't particularly care for any reason, you
23   know.  They were just glad that I had a good job near
24   where we lived.
25   Q.   Okay.  Mrs. Rathbun, how old is your son?
```

1    A.   He was 37 yesterday.

2    Q.   Okay.  So you've known him for 37 years.  Have you

3    ever observed him or seen him act in any way that was

4    anti-Semetic or intolerant of Jewish people?

5    A.   No, I have never.

6              MR. DESROCHES:  Objection.

7              THE WITNESS:  I have never seen that.

8              THE COURT:  There was an objection.  Could I

9    have the parties at sidebar?

10   (Sidebar conference.)

11             THE COURT:  So what does the anti-Semetism

12   question have to do still with the case?  It's not just

13   this witness.  I hear it pop up now and again this

14   question about anti-Semetism.  So explain that to me.

15             MS. O'NEILL-GREENBERG:  Sure.  So what he has

16   been charged with and indicted with has to do with the

17   focus of Jewish Geriatric Services.  And I think for a

18   very long time the government has been alleging that to a

19   certain degree these crimes were committed on this

20   property because of what the property is and who the

21   property -- you know, who lived there.

22             THE COURT:  But the special finding is dismissed

23   as far as I know.  Please correct me if I'm mistaken.

24   There's nothing in the indictment or the charges that

25   references an anti-Semetism overtone; is that correct?

1          MS. O'NEILL-GREENBERG:  I think that is correct,

2     but I think the government, when we talked about

3     dismissing the special finding, also indicated that just

4     because they don't have to meet the finding for the

5     special finding does not mean it's still not relevant to

6     their case, and the fact is that it's still a Jewish

7     facility.  They have elicited testimony from their

8     witnesses about the Jewish nature of the facility and so I

9     think it's still relevant.

10          THE COURT:  Okay.  Yes, that's true.  The

11     government did ask I think it was Agent McGonigle

12     regarding the Jewish customs and religious focus and

13     observations of the entire facility.

14          MS. O'NEILL-GREENBERG:  Your Honor, also Mary

15     Sherry and Susan Goldsmith as well, Goldburg.

16          THE COURT:  You're correct.  Okay.

17        Government, do you want to say anything?

18          MR. DESROCHES:  Yes, Your Honor.

19        We suggest, first, that the question is

20     impermissible.  If this were a crime of violence, it would

21     be tantamount to ask whether or not she ever seen her son

22     act in a violent manner.

23        Secondly, in regards to Special Agent McGonigle's

24     testimony regarding the Jewish nursing home, that was

25     important contextual information.  That was the

```
 1    conversation he had with the defendant in his attempts to
 2    identify the location of the device with the defendant.
 3                THE COURT:  Right.  You're correct, but it's
 4    hard to ignore the very slight but present undertone of
 5    the anti-Semetism here through the thread that's kind of
 6    been woven through a couple of witnesses' testimony
 7    regarding the Jewish faith, the campus, the name of the
 8    campus, the affiliation of all the buildings.  I am going
 9    to allow the question.
10    (End of sidebar conference.)
11                THE COURT:  You can re-ask the question.
12    Overruled
13    Q.   (By Ms. O'Neill-Greenberg) Mrs. Rathbun, in the 37
14    years you've known your son, have you ever seen him or
15    heard him or observed him act or say anything in a way
16    that seemed anti-Semetic or intolerant of Jewish people?
17    A.   No, I have not.
18    Q.   And in the lifetime you've known your son, have you
19    ever seen him have an interest in building bombs or
20    explosives or anything of that nature?
21    A.   No, I have not.
22    Q.   Okay.  Thank you.
23    A.   You're welcome.
24                MS. O'NEILL-GREENBERG:  No further questions
25    from me.
```

1          THE COURT:  Cross-exam?

2          MR. DESROCHES:  Your Honor, I'd note the time.

3   I'm not sure if this would be a good time to break or

4   you'd like the government to proceed?

5          THE COURT:  How is everyone doing regarding your

6   time?  If we stayed until 1:30, I don't think you've had

7   lunch and I don't want to -- so, would you want to pick up

8   tomorrow morning or stay here today?  I mean, you haven't

9   had lunch.  We don't have lunch ordered.

10      All right.  Show of hands.  Who would rather come in

11  and just pick up tomorrow morning?

12      Okay.  That's enough for me.  All right.  We have to

13  leave at 1:30 anyway and so we'll pick up at 9:15, 9:15

14  tomorrow.

15      The same instructions apply.  All right?  Don't

16  discuss the case with each other, with anyone else.  No

17  reading of media accounts.  No internet searches; posting

18  or reading any social media accounts.  All the same

19  instructions.  All right.  9:15 tomorrow morning.  Thank

20  you.

21          THE CLERK:  All rise for the jury.

22  **(The jury left at 1:00.)**

23          THE COURT:  Ma'am, you're all set.  You can step

24  down.

25          THE WITNESS:  Thank you.

1          MR. DESROCHES:  Your Honor, I just want to note

2     that with the court's sequestration order that the witness

3     now currently stands on cross-examination which would

4     preclude conversation regarding the witness's testimony

5     with counsel.

6          THE COURT:  Yes.  The direct examine is

7     completed.  So all right.  Counsel understands the

8     sequestration order.  I don't need to reassert it.

9          MR. DESROCHES:  Yes, sir.

10         THE COURT:  Okay, 9:15.

11         MR. WATKINS:  Just so I understand, should we be

12    ready to do a charge conference tomorrow then or on

13    Friday?

14         THE COURT:  No, tomorrow.

15         MR. WATKINS:  Sorry?

16         THE COURT:  Tomorrow.

17         MR. WATKINS:  Okay.

18    **(Court recessed at 1:01.)**

19    --------------------

20

21

22

23

24

25

1

2    (The certification of this transcript does not apply to
     any reproduction of this transcript, unless under the
3    direct control and/or supervision of the certifying
     reporter.  I assume no responsibility for the accuracy of
4    any reproduced copies not made under my control or
     direction.)

5

6                            CERTIFICATION

7

8          I certify that the foregoing is a correct

9    transcript of the record of proceedings in the

10   above-entitled matter to the best of my skill and ability.

11

12

13

14   /s/ Alice Moran                    December 2, 2020
     Alice Moran, RMR, RPR
15   Federal Official Court Reporter

16

17

18

19

20

21

22

23

24

25