<pre>
 1                 UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
 2                        WESTERN SECTION

 3

 4    United States of America  )
                                )          20cr30018-MGM
 5         vs                   )
                                )          November 19, 2020
 6    Jonathan Michael Rathbun  )
      _____)
 7

 8                    Jury Trial Held Before

 9               The Honorable Mark G. Mastroianni

10                 United States District Judge.

11

12    APPEARANCES:

13

      On behalf of the government:  Risa Berkower, United States
14    Department of Justice, 950 Pennsylvania Avenue, NW,
      Washington, DC 20532.

15

16    Neil L. Desroches, Assistant United States Attorney, 300
      State Street, Suite 230, Springfield, MA 01105-2926.
17
      On behalf of the defendant: Timothy G. Watkins, Esq., 51
18    Sleeper Street, 5th Floor, Boston, MA 02210.

19    Forest J. O'Neill-Greenberg, Esq., 51 Sleeper Street, 5th
      Floor, Boston, MA 02210.
20

21
                       Alice Moran, CSR, RPR, RMR
22                    Official Federal Court Reporter
                        United States Courthouse
23                   300 State Street, Room 303D
                         Springfield, MA 01105
24                         (413)731-0086
                       alice.moran@verizon.net
25
</pre>

INDEX

Witness:                                                      Page:


**Sheila Rathbun**

Cross-examination by Mr. Desroches                              5

Redirect examination by Ms. O'Neill-Greenberg                 48

Recross-examination by Mr. Desroches                          53


**John Rathbun**

Direct examination by Mr. Watkins                             61

Cross-examination by Ms. Berkower                            107

Redirect examination by Mr. Watkins                         185

Recross-examination by Ms. Berkower                         189



Exhibit No.
Description                                                  Page


PX-113    Stipulation                                        60

PX-114    Stipulation                                        60

DX-1      Bank of America statement                          92

1      **(Trial commenced at 9:17.)**

2              THE CLERK:  The matter before the court is the

3      United States of America versus John Rathbun.

4          Counsel, would you please identify yourselves for the

5      record, starting with the government?

6              MR. DESROCHES:  Good morning, Your Honor.  Neil

7      Desroches on behalf of the United States.

8              MS. BERKOWER:  Good morning, Your Honor.  Risa

9      Berkower for the government as well.

10             MR. WATKINS:  Tim Watkins on behalf of John

11     Rathbun.  Good morning.

12             THE COURT:  Good morning.

13             MS. O'NEILL-GREENBERG:  Forest O'Neill-Greenberg

14     also for Mr. Rathbun.  Good morning.

15             MR. WATKINS:  I believe Mr. Rathbun is entering

16     the courtroom as we speak.

17     **(Mr. Rathbun entered the courtroom.)**

18             THE COURT:  We're just getting Zoom set up.

19     **(The jury entered at 9:32.)**

20             THE COURT:  Hi.  Good morning.

21         All right.  Was everyone able to follow my same

22     instructions as usual not to talk about the case with each

23     other or with anyone else?  Not investigate the case in

24     any way or go on the internet, post, or read any new

25     articles about the case?

1      Okay.  The jury remains fair and impartial based upon

2  all the affirmative responses.

3      So this morning's delay was -- I give you a reason

4  every morning I think, but today's excuse is we had

5  problems with Zoom.

6      We broadcast because we can't -- I might have

7  explained this to you, but one of the very important

8  fundamental things about our system of justice is public

9  access, having a courtroom open for the public to come and

10  watch trials.  We can't do that because there's a capacity

11  limit because of COVID-19.  We are at maximum capacity.

12  We can fit maybe one or two more people that come in.

13      So what we do is we broadcast the trial.  We

14  simulcast it downstairs in a room with a TV and audio and

15  in other courtroom in the building.  We also broadcast it

16  on Zoom for anyone to sign in and watch.  The Zoom this

17  morning was down.  We just had technical problems getting

18  it up and running and signing people out in the public who

19  wanted to watch it getting them in, and that's why we were

20  late this morning.  Tomorrow I'll give you another one.

21  (Laughter.)

22          THE COURT:  All right.

23          MR. WATKINS:  Your Honor, may we put her in the

24  first booth here to start the testimony?

25          THE COURT:  Sure.

1          Ma'am, I need to remind you for the record you remain

2    under oath from yesterday.

3               THE WITNESS:  Yes.

4               THE COURT:  All right.

5               MR. DESROCHES:  May I proceed, Your Honor?

6               THE COURT:  Yes.

7    **Sheila Rathbun (Previously sworn)**

8    **CROSS-EXAMINATION**

9    Q.    Good morning.

10   A.    Good morning.

11   Q.    Before we get started, how would you like me to

12   address you?  Is it Ms. Rathbun, Mrs. Rathbun?

13   A.    You can say Sheila.

14   Q.    I would, but this is a formal setting so I want to

15   make sure --

16   A.    I would say Mrs. Rathbun.

17   Q.    Thank you, Mrs. Rathbun.

18   A.    Or Mrs. Sheila; however.

19   Q.    Mrs. Rathbun, I'd like to just start today by just

20   talking about your family.

21         Now you have two children; is that right?

22   A.    Yes, I do.

23   Q.    And one of your -- you have both sons, right?

24   A.    Yes, I do.

25   Q.    And John the defendant is your oldest son?

1    A.    Yes.

2    Q.    And you have a son younger than John whose name is

3    Paul; is that right?

4    A.    Yes.

5    Q.    John lives at your home with you right now; is that

6    correct?

7    A.    Yes.

8    Q.    Where does Paul live?

9    A.    Paul lives -- he lives around the corner on Allendale

10   in East Longmeadow.

11   Q.    I'm sorry.  Allendale Drive in East Longmeadow?

12   A.    Yes.

13   Q.    And for a short time Paul worked out in Boston; is

14   that right?

15   A.    Yes, he did.

16   Q.    Paul is doing well for himself?

17   A.    Yes.

18   Q.    And John as you indicated is your oldest son; is that

19   right?

20   A.    Yes.

21   Q.    He's living at home with you and his daughter Natalie

22   as well, correct?

23   A.    Yes.

24   Q.    How long has John lived with you?

25   A.    It's been about three years.

```
 1    Q.   Prior to that was he married?
 2    A.   Yes.
 3    Q.   For how long was he married?
 4    A.   A couple years.
 5    Q.   And before he got married, was he living at home with
 6    you then?
 7    A.   Yes.  Yes.
 8    Q.   And you said that John just had a birthday recently.
 9    How old is he now?
10    A.   Thirty-seven.
11    Q.   You said that prior to John moving in the second
12    time, he went through a divorce; is that right?
13    A.   Yes.
14    Q.   It was a difficult divorce, wasn't it?
15    A.   Yes.
16    Q.   And when John moved in, he had some trouble dealing
17    with the divorce; is that correct?
18    A.   Yes.  Like anyone would, yes.
19    Q.   And at some point he also then started to turn to
20    alcohol and drugs; is that right?
21    A.   Eventually, yes.
22    Q.   And you certainly wanted to help him turn away from
23    drugs; is that right?
24    A.   Well, of course.
25    Q.   And you also helped John out by taking Natalie in
```

1    because John was very young when Natalie was born, right?

2    A.    Yes.   Natalie has always lived at our home.

3    Q.    You've been a very important figure in Natalie's

4    life, haven't you?

5    A.    I'm sorry?

6    Q.    You've been a very important figure in Natalie's

7    life?

8    A.    I believe so.

9    Q.    You're close with Natalie?

10   A.    Yes.

11   Q.    And you were helping John out by taking his daughter

12   in as well, correct?

13   A.    Yes.

14   Q.    Just like you helped him out when you took him back

15   in after the divorce; is that right?

16   A.    Yes.

17   Q.    And after he moved in with you, you continued to try

18   to help him out get back on his feet; is that right?

19   A.    Somewhat.

20   Q.    At some point though he lost his job?

21   A.    Yes.

22   Q.    That was in about January of this year 2020?

23   A.    No, it was in March.

24   Q.    He didn't lose his job in January of 2020?

25   A.    No, it was in March.

```
1    Q.   After he lost his job in March -- even before that
2    you were helping John by giving him money and helping him
3    out with expenses; isn't that correct?
4    A.   No.  I would not give him money.  I would -- we would
5    buy groceries for the family, things like that, but no,
6    not particularly.
7    Q.   So you wouldn't just spot him money here and there
8    before he lost his job in March?
9    A.   No.  You don't give a person that has a drug problem
10   cash or money.
11   Q.   Okay.  We can get back to that.
12        But you would also just help him out with his life,
13   isn't that right, before he lost his job?
14   A.   Say that one more time.
15   Q.   You were looking out -- you're saying John had a drug
16   habit before he lost his job?
17   A.   Yeah.  He's had a drug problem I think we said
18   yesterday since he was a teenager.
19   Q.   And you said you would never give him any money
20   because he was a drug addict?
21   A.   No, you don't give cash to someone that has problems
22   with drugs.
23   Q.   You would help him out in other ways though, right?
24   If he needed a ride somewhere, you would give him a ride;
25   is that right?
```

1    A.   Yes.  I would do something like that, yes.

2    Q.   And that continued until after he lost his job; isn't

3    that correct?

4    A.   I wouldn't need to give him rides anywhere because he

5    has his own van.  I'm not really sure where you're going

6    with that.

7    Q.   Well, I'm just asking how you were helping him out in

8    various ways.

9    A.   No, I didn't give him rides anywhere.  He's a grown

10   adult.

11   Q.   But you let him use your car, right?

12   A.   Yes, because his van is -- he has a work van and it

13   eats gas ridiculously.

14   Q.   Right.  So you let him use your car and you would pay

15   for the gas for that?

16   A.   No.  He'd put gas money in.

17   Q.   So in what time frame are we talking about right now?

18   Just for point of reference, are we talking before he lost

19   his job or after he lost his job?

20   A.   For which thing?

21   Q.   Well, in you letting him borrow your car --

22   A.   Yes.

23   Q.   -- was that both before and after he lost his job?

24   A.   Yes, because he would sometimes, like I said, to

25   conserve on gas.

1    Q.   And John actually had, like you said yesterday, he

2    actually had some skills he could rely on, right?

3    A.   Yes, he does.

4    Q.   Was he an electrician or did he have a job in the

5    electrical field?

6    A.   He went to school to be an electrician, but he did

7    not get his license.

8    Q.   So when he lost -- and you said he's also pretty

9    handy; is that right?

10   A.   That's correct.

11   Q.   So he has the ability to work other than his

12   addiction; is that right?

13   A.   Yes.

14   Q.   So it must have been somewhat difficult for you, as

15   his mother, to see him out of work when he had these

16   skills he could be using to be productive?

17   A.   Yes.  He wouldn't stay out of work for long.  He'd

18   get another job.

19   Q.   But that in March he lost his job, correct?

20   A.   Yes, that is correct.

21   Q.   And he didn't find any regular employment for some

22   time until April?  Well, at least through April; is that

23   right?

24   A.   Yes, the problem was the COVID.

25   Q.   And so he had -- he's only kind of catching jobs here

1    and there small little jobs, right?

2    A.    Right.  He had trouble because of COVID.

3    Q.    And you said that -- were you giving him money at

4    this point to help him through?

5    A.    Again, we already covered that.  I didn't give him

6    any.  I don't give him cash.

7    Q.    But he asked you for cash; isn't that right?

8    A.    No, he's not asking me because he knows.

9    Q.    He's never asked you for cash?

10   A.    Maybe he would have tried, but he knows he's not

11   going to get it.  He knows how I am.

12   Q.    You tried to encourage John to find work at some

13   point?

14   A.    I really didn't have to do much encouraging.  John

15   was always looking for it.  You've been through his phone,

16   you know that he's got many Glassdoor and different apps

17   to try to get jobs.

18   Q.    So have you been through his phone?

19   A.    No, I have not been through his phone.

20   Q.    So then how do you know what is on his phone?

21   A.    Because that's what I was told.

22   Q.    By whom?

23   A.    I'm trying to remember who it was that mentioned

24   that.  I don't know his name.

25   Q.    So a stranger told you what was on John's phone?

```
1    A.   No, it wasn't a stranger that told me what was on
2    John's phone.  It must have been a report; maybe it was a
3    report, a statement that I had read.
4    Q.   So you read through the --
5    A.   They said that -- it must have -- they said the
6    things that they found on John's phone.
7    Q.   So you've read through reports in this case?
8    A.   It must have been.  It would be something you would
9    have given us.  It wouldn't have been something I could
10   have gotten on my own.
11   Q.   Right.  So the point is though you've read through
12   the investigatory materials in this case?
13   A.   Yes, I would read.
14   Q.   And they were shared with you by John, isn't that
15   right?
16   A.   No.  They couldn't have been shared with me with John
17   because he was in jail.
18   Q.   So then who shared them with you?
19   A.   They were probably the attorneys.  The attorneys
20   would give them to me.  I have a stack of statements and
21   what was being, you know, investigated.
22   Q.   And you've reviewed all those documents; isn't that
23   right?
24   A.   As far as I know.  I can't say for sure that I have
25   everything.
```

1    Q.   And you were prepared to testify today by the

2    attorneys; isn't that right?

3    A.   I'm what?  Say that again.

4    Q.   You were prepared -- you were prepared by the

5    attorneys to testify today?

6    A.   No, not today.  We had no contact.

7    Q.   I'm not saying today.  I'm just saying so you could

8    testify?  It's common for witnesses to be prepared by

9    attorneys.  You don't have to worry about that, but isn't

10   it true that --

11   A.   Okay.  No, we hadn't -- nothing for today but before

12   today, yes.

13   Q.   And, in fact, you've also discussed this at great

14   length with John; isn't that right?

15   A.   Discussed what?

16   Q.   Your testimony today?

17   A.   With John?

18   Q.   Right.

19   A.   He's in jail, no.  How can I be discussing things

20   like this with John in jail?

21   Q.   Well, John has access to a phone at the jail, doesn't

22   he?

23   A.   Say that again.

24   Q.   John has access to a phone, doesn't he?

25   A.   Yes, but we don't discuss things that --

1   Q.   You've never discussed the events of April 2nd with

2   John?

3   A.   On the phone?

4   Q.   Right.

5   A.   I don't believe so.

6   Q.   You've never discussed this case with John on the

7   phone; is that correct?

8   A.   No, not in any detail that I'm aware of.

9   Q.   Do you remember talking to John on July 25th of this

10  year?

11  A.   I think that would be difficult for me to recall a

12  specific day and a specific thing.

13  Q.   Do you remember telling John that the government

14  subpoena your work records?

15  A.   I told John that?

16  Q.   Do you remember that?

17  A.   No, I don't.

18  Q.   Would reviewing a transcript of that phone call

19  refresh your recollection?

20  A.   Say that again.

21  Q.   Would reviewing a transcript of that call refresh

22  your recollection?

23  A.   I'm reviewing a transcript?

24  Q.   If you saw the transcript of that call, would it

25  remind you of the content of that call?

1    A.   I'd have to read it.  No, I have not -- I do not

2    remember a conversation like that.

3              MR. DESROCHES:  Madam clerk, can we have the

4    Elmo for just the witness, counsel, and the court?

5    Q.   (By Mr. Desroches)  I'm just going to draw your

6    attention to the first line in what's on the screen before

7    you.

8    A.   Okay.

9    Q.   Just review that if you could.  Just look up when

10   you're done reviewing that please.

11   A.   Okay.  So basically I guess what you're saying here

12   is -- I'm having trouble reading it because -- let me see

13   if I can?  It's too small.

14   Q.   We can zoom in if that's better.

15   A.   Okay.  So what's your question?

16   Q.   So does that refresh your recollection about talking

17   to John about records subpoenaed from your work?

18   A.   Yeah, that doesn't -- it doesn't say that.  It says

19   that you were looking at my work records.

20   Q.   Right.  Just so we're clear, now you remember telling

21   John that "my work records that's because they're

22   desperately trying" and John said "to what?  They called

23   Chris Car?"

24   A.   Yes.

25   Q.   "Yep, they did.  They talked to him.  Yeah, they

1    did;" is that correct?

2    A.   Well, yes, it's what it's saying here.  I don't

3    honestly remember the conversation, but I don't see what

4    the problem is.

5    Q.   Well, I'm not saying there's a problem.  I'm just

6    refreshing your recollection about a conversation.

7         So does that refresh your recollection about talking

8    to John about work records?

9              MS. O'NEILL-GREENBERG:  Objection, Your Honor.

10   I think she's answered the question.  It's getting

11   argumentative.

12             THE COURT:  She answered it does not refresh her

13   recollection.  Right.  Move on.

14             THE WITNESS:  Yes, it refreshes my

15   recollection.

16   Q.   (By Mr. Desroches)  So then in fact you did --

17             THE COURT:  Hold on.

18             MR. DESROCHES:  Sorry.

19             THE COURT:  That's okay.

20        Ma'am, did you say it does or does not refresh your

21   recollection?

22             THE WITNESS:  Well, now that I read it, I

23   honestly don't remember the conversation because, you

24   know, it was back in July, but in reading this --

25             THE COURT:  Hold on.  The question is after

1   reading that to yourself, after reading that to yourself,

2   does that refresh your recollection so now that you have a

3   personal memory of engaging in some type of conversation?

4          THE WITNESS:  Not really.

5          THE COURT:  Okay.  Thank you.  Move on.

6   Q.   (By Mr. Desroches)  So who is Chris Carr?

7   A.   Chris Carr is my boss.

8   Q.   John knows who Chris Carr is, correct?

9   A.   Yes.

10  Q.   And you've talked to him about -- you talked to John

11  about Chris Carr, haven't you?

12  A.   In what context?  I'm not sure I understand what

13  you're saying.

14  Q.   Well --

15  A.   He knows he's my boss.

16  Q.   So how would he know that if you didn't tell him?

17  A.   Okay.  So he knows I work at Carr Property Management

18  and he knows that my boss is Chris Carr.

19  Q.   But the question was, how would he know that if you

20  didn't tell him?  Is there another way, just so the jurors

21  can understand?

22  A.   Okay.  He knows that I work at Carr Property

23  Management and that my boss is Chris Carr, yes.

24  Q.   Did you tell him that?

25  A.   Specifically tell him?  I don't think I needed to

1   specifically tell him that.  I think he knew because I

2   worked at Carr Property Management and he knew that Chris

3   Carr was my boss.

4   Q.   Do you recall telling the jury yesterday that you

5   never discuss your work with John?

6   A.   No, I don't discuss my work.  But you don't tell your

7   children where you work or who you work for?  I don't go

8   into any specifics about my job.

9   Q.   Just do you remember telling the jury yesterday that

10  you never discussed your job with John?

11  A.   I never discussed the details of my job with John

12  because he would not be interested in the details of my

13  job, but he would know where I worked and who my boss

14  would be.

15  Q.   Okay.  Now you indicated that John never asked you

16  for money; is that right?

17  A.   No, he never asked me for -- well, no, I didn't say

18  that.  I said, he may try to but he knows that I'm not

19  going to give him any.

20  Q.   So do you recall a text exchange between you and John

21  that occurred in March of 2020, March 20, 2020?

22  A.   No, I do not obviously.

23  Q.   So this would be about the third week of March,

24  right?  March 20th would be the third week of March?

25  A.   Okay.

1   Q.   I'm sorry, bad question.   I'm sorry?

2   A.   I said okay.

3   Q.   Okay.   So you don't recall a text exchange with John

4   where John told you that he needs like 120 bucks when I

5   come home?   You don't recall that?

6            MS. O'NEILL-GREENBERG:   Objection.

7            THE WITNESS:   No, I don't.

8            THE COURT:   Basis?

9            MS. O'NEILL-GREENBERG:   She doesn't remember.

10           THE COURT:   I don't -- it's appropriate

11   cross-examine I think.   Objection overruled.

12   Q.   (By Mr. Desroches) So that was on March 20th, you

13   don't remember that text message?

14   A.   No, I do not.

15   Q.   Do you remember a text message from November "need

16   gas money for tonight and money for tomorrow?"

17           THE COURT:   Can I ask, are these texts that

18   you're reading from in evidence?

19           MR. DESROCHES:   Not yet, Your Honor.   I'm just

20   asking if the witness remembers.

21           THE COURT:   Sustained.

22           MR. DESROCHES:   Your Honor, may we be heard?

23           THE COURT:   Sure.

24   (Sidebar conference.)

25           MR. DESROCHES:   Thank you, Your Honor.

1          I would suggest whether I'm reading them from my

2     script or reading them from the Cellebrite extraction is

3     irrelevant.  It's the question of whether or not this

4     witness remembers.  Her answer is the evidence, the

5     question is not.

6          I would suggest this is appropriate fodder for

7     cross-examination.  She just testified that the defendant

8     did not ask her for money and she never gave him money.

9     This impeaches her credibility.  This also goes to her

10     memory, her ability to remember specifically.  The

11     evidence would show this came from the exact time where

12     she had a very specific memory of other factors.

13               THE COURT:  Okay.  Right now you're not

14     refreshing her recollection with your reading of the text.

15     You're impeaching her and you're impeaching her with

16     something that's not in evidence; that's not

17     authenticated; that she has not indicated is true.  So

18     you're impeaching her with some unknown.  I just think you

19     need to lay the foundation for whatever it is you're using

20     for impeachment.

21               MR. DESROCHES:  I can lay a further foundation,

22     Your Honor.

23               THE COURT:  Was that the defense objection?

24               MS. O'NEILL-GREENBERG:  It was.  I mean, he was

25     refreshing recollection, but you don't get to read the

details of whatever the thing you want somebody to
remember is if they don't remember.  I would ask that it
be stricken.

THE COURT:  Well, I mean, the rule is a little
loose on refreshing recollection.  I think you might be
able to read it and see if the actual reading of the
words, hearing them, refreshes her recollection but I
didn't take it as refreshing recollection.  I really took
it more as impeachment, and so I think the defense might
-- I'm sustaining the objection and so you're getting to
the end you want to get to for the defense.  The
government says that they can lay the foundation for
whatever it is they're going to be using for impeachment
material.  All right.  Thank you.

(End of sidebar conference.)

THE COURT:  All right.  Ladies and gentlemen,
the objection is sustained, which means the question or
questions where Attorney Desroches was reading what he was
referencing as text messages is excluded, stricken from
your notes and your memory.  Any responses that may have
been elicited during that exchange is also excluded.

So I've explained my ruling to the parties and you
can kind of circle around and see if you want to try
again.  But right now everything that was elicited is
excluded.  All right.

1              MR. DESROCHES:  Thank you, Your Honor.

2    Q.   (By Mr. Desroches) So, Mrs. Rathbun, your cell phone

3    number in March of 2020 and November, 2019 did that end in

4    8237?

5    A.   Yes.

6    Q.   So your testimony is that you do not recall text

7    messages first starting in March of 2020 in which the

8    defendant asked you for money; is that right?

9    A.   No, I do not.

10             MS. O'NEILL-GREENBERG:  Objection.

11             THE WITNESS:  I do not recall that.

12             THE COURT:  Overruled.

13   Q.   (By Mr. Desroches) Would reviewing those text

14   messages refresh your recollection?

15   A.   How are we going to do that?  What are you going to

16   do?

17   Q.   So the question was, would reviewing them refresh

18   your recollection?

19   A.   If you have this, yes.

20             THE COURT:  This item that's being put up, is

21   that an exhibit?

22             MR. DESROCHES:  It is not, Your Honor.

23             THE COURT:  Okay.  Is there an agreement as to

24   authenticity of that document?

25             MS. O'NEILL-GREENBERG:  No.

1            MR. DESROCHES:  At this point, Your Honor, we

2    would just simply move it for refreshing recollection.

3            THE COURT:  All right.  Okay.  So it's available

4    only to the witness.  We'll take it one step at a time.

5    Q.   (By Mr. Desroches)  So we're clear, Mrs. Rathbun, if

6    you can just review that document, specifically the

7    highlighted portion that I just pointed to just quietly to

8    yourself.  When you're done looking at that, look up to

9    let me know when you're done.

10   A.   Oh, okay.  So I see the first one.

11        Let me see the second one.  Okay.

12   Q.   So does that refresh your recollection?

13   A.   I don't recall this, but you're showing me that --

14           THE COURT:  Hold on.  Okay.  The only question

15   was, does it refresh your recollection of these text

16   exchanges that the attorney is referencing?

17           THE WITNESS:  Well, what does that mean?

18           THE COURT:  Does it refresh your memory?  Does

19   it help your memory so now that you recall certain text

20   messages?

21           THE WITNESS:  Oh, okay.  This does refresh my

22   memory.  There were times when John would say what he

23   would need for work or whatever and, yes.

24   Q.   (By Mr. Desroches) Okay.  So then you do now remember

25   John telling you that he would need like 120 bucks when he

1   comes home?  That he owes somebody one hundred bucks?

2           MS. O'NEILL-GREENBERG:  Objection.

3           THE COURT:  Sustained.

4           MR. DESROCHES:  I'm sorry, Your Honor.  She

5   remembers this text message.

6           THE COURT:  That doesn't mean you can read it

7   into evidence.

8           MR. DESROCHES:  I'm asking her a question, Your

9   Honor.

10           THE COURT:  Sustained.

11   Q.   (By Mr. Desroches)  So can you explain to me what

12   occurred in that text?  What is he saying?

13           MS. O'NEILL-GREENBERG:  Objection.  She answered

14   the question.

15           THE COURT:  No.  She said she remembers.  She

16   can now explain the context of the text.  The question

17   was, what's going on in the text?  You can explain that.

18           THE WITNESS:  Well, I don't know -- I can't

19   remember what was going on in that particular text.  I'm

20   just going by what it says.  Okay.  Is that what you're

21   saying?

22           THE COURT:  So from what was said, explain the

23   relationship with you and John regarding asking or you

24   asking -- him asking and you providing money.  Does that

25   help refresh your memory about that part of the

1    relationship between you and John?

2              THE WITNESS:  Okay.  I know that sometimes I

3    would give him gas cards.  I would not give him the money

4    to buy items, but I would provide what was needed.

5    Q.   (By Mr. Desroches) That's not the only time that he

6    asked you for money, correct?

7    A.   No.  I already said that sometimes he would ask me

8    for money.

9    Q.   In fact, that was a pretty regular occurrence?

10   A.   No, it was not.

11   Q.   So you read two text messages.  One of them is from

12   November 2019; is that right?

13   A.   Right.  That's November, December, January, February,

14   March.  That's quite a distance in between those two.

15   Q.   Well, we'll fill that gap.  But I'm just asking about

16   from March -- from November to March --

17   A.   Right.

18   Q.   -- 2020.  And in November he was telling you he

19   needed gas money --

20             MS. O'NEILL-GREENBERG:  Objection.

21             MR. DESROCHES:  -- and cigarette money, wasn't

22   he?

23             THE COURT:  Overruled.

24             THE WITNESS:  Yes, and I told you that just

25   because he says that doesn't mean he gets that.

1    Q.   (By Mr. Desroches) It's okay.  I'm just asking about
2    whether or not he was asking you for money.
3    A.   I already said that he would ask me.  We already said
4    that.
5    Q.   Okay.  So you said that wasn't regular; is that
6    correct?
7    A.   No, it is not regular but he did, he would ask.
8    Q.   Now he was doing this back regularly as early as
9    2019, wasn't he?
10   A.   I have no idea.
11   Q.   You would frequently buy cigarettes for him, wouldn't
12   you?
13   A.   I would buy cigarettes, yes.
14   Q.   And you would frequently give him money, wouldn't
15   you?
16   A.   No.  I would not frequently give him money.
17   Q.   There was a time when you thought that John was out
18   of control, didn't you?
19   A.   What do you mean by out of control?
20   Q.   Well, didn't you tell him that he was out of control
21   right around the beginning of April?
22   A.   I do not recall that conversation.  You'd have to
23   give more details about it.
24   Q.   Sure.  Do you remember talking to John on the phone
25   on May 2, 2020 or thereabouts?

1    A.   I cannot say I can recall that exact day and

2    conversation.

3    Q.   Do you recall ever telling John that he was out of --

4    that he was --

5              MS. O'NEILL-GREENBERG:  Objection.

6              MR. DESROCHES:  -- kind of going out of control?

7              THE WITNESS:  No, I do not.

8              THE COURT:  Objection sustained.  If there's a

9    document -- if she doesn't recall, show the document

10   please to the witness to see if it refreshes her memory.

11   She reads it to herself.  You do not read it out into the

12   record.

13        So the question is stricken, and just go on with the

14   process of refreshing the recollection with whatever

15   document you have.

16             MR. DESROCHES:  May we go sidebar, Your Honor?

17             THE COURT:  Sure.

18   (Sidebar conference.)

19             MR. DESROCHES:  May I start, Your Honor?

20             THE COURT:  Yes.

21             MR. DESROCHES:  I'm simply trying to lay the

22   foundation to refresh her recollection specifically to

23   certain comments that she does not remember.

24             THE COURT:  Right.  But, Attorney Desroches, the

25   question will be she says I don't remember; I don't

particularly remember that conversation.  Well, if I

showed you a transcript of a phone call that was recorded

or taken from wherever between you and John on that date,

might it refresh your memory?  She's going to say yes.

You're going to put it in front of her.  She's going to

read it to herself.

     I don't think it's appropriate for you to be reading

it aloud because you're reading it aloud and it's getting

into the record.  The jury is hearing it before she even

says that it refreshes her memory.  So if she was to say

no, that doesn't refresh my memory, you've now injected it

into the jury and I have to rule that it's being stricken

and that's potentially a prejudicial thing.

          MR. DESROCHES:  Understood, Your Honor.

(End of sidebar conference.)

Q.   (By Mr. Desroches) So, Mrs. Rathbun, you indicated

that you don't recall a phone call with the defendant on

May 2, 2020; is that correct?

A.   No, I don't recall that.

Q.   If I could direct your attention to the screen in

front of you, just silently ask that you silently review

it and then look up when you're done.

A.   Okay.

Q.   Does that refresh your recollection?

A.   Yes.

1    Q.   And do you now recall telling John that things were

2    kind of --

3                MS. O'NEILL-GREENBERG:  Objection.

4                THE COURT:  Overruled.

5    Q.   (By Mr. Desroches)  -- that things were kind of going

6    out of control with you?

7    A.   Yes, we were -- we had concerns of his struggles and

8    we thought that a timeout was good.  Maybe the choice of

9    words the way it's sounding here, it wasn't -- it was just

10   his struggles that he was having.

11   Q.   Okay.  But you do now remember saying that he was out

12   of control, correct?

13   A.   Well, it's taken out of context.

14   Q.   But the question is do you now recall saying that he

15   was out of control; is that right?

16   A.   I did say that in that conversation, but there's more

17   to that than what you're saying.

18   Q.   Okay.  And just referring back to the text message

19   that you don't remember, that was March 20, 2020, correct?

20   A.   I don't remember 'cause you've shown me a lot of

21   things now and so I'm a little confused.

22   Q.   Would seeing it again refresh your recollection as to

23   the date?

24   A.   Okay.  So now what are you asking?

25   Q.   Just drawing your attention to the box that's now

1   being pointed to, that text occurred on March 20th; is
2   that right?
3   A.   That says March 20th.
4   Q.   Of 2020?
5   A.   Yes.
6   Q.   The third week of March, correct, or thereabouts?
7   A.   Yes.
8   Q.   Mrs. Rathbun, do you remember telling the jury
9   yesterday that your son never visited your mother at
10  Genesis House?
11  A.   No, I never said that.  I said -- I never said he
12  never visited.  I said that it would be very rarely that
13  he would visit my mother at Genesis House.
14  Q.   So you didn't tell the jury that he had never been
15  there?
16  A.   No, I never said that he had never been there.
17  Q.   Because in fact he had been there, correct?
18  A.   Well, he could have gone there, yes, but it wasn't a
19  regular thing.
20  Q.   But I'm not asking if he could have gone there.  I'm
21  asking if you know that he did go there?
22  A.   He could have gone there, yes.  I don't -- I can't
23  remember anything exact, but he could have gone there.
24  Q.   So do you remember filling out an affidavit in this
25  case?

```
1    A.    A what?

2    Q.    An affidavit?

3    A.    No, I don't.

4    Q.    First before we go any further, you understand what

5    your son is charged with, correct?

6    A.    I certainly do.

7    Q.    And in regards to certain false statements, you

8    understand what those charges are, correct?

9    A.    False statements by who?

10   Q.    By the defendant.

11   A.    No, I don't know what -- I do not know what false

12   statements he's been accused of.

13   Q.    Well, you know that -- you've certainly had

14   conversations with him about these things, haven't you?

15   A.    How?  It's very hard to when he's in jail.

16   Q.    Well, we just saw some of the calls that you had with

17   him and you've testified that you've spoken with him over

18   the phone; isn't that right?

19   A.    That's not really talking about things.  John and I

20   have not been able to sit and talk about any of this in

21   any depth or in any way because everything is recorded at

22   the jail.

23   Q.    So you understand though the importance of Ruth's

24   House and Genesis House; isn't that right?

25   A.    Importance in what way?
```

1    Q.   Well, you've reviewed all the investigation in this

2    case, haven't you?

3    A.   I don't know if I reviewed all.  I have seen

4    statements and things.  I cannot say that I have reviewed

5    all.

6    Q.   So you know that your son then is accused of placing

7    a bomb in that area of Ruth's House, Genesis House, and

8    JGS in general, don't you?

9    A.   If I understand correctly, he was accused of placing

10   it at Ruth's House.

11   Q.   Correct.  So you understand the significance of that

12   area; isn't that right?

13   A.   The significance in what way?  That because he --

14   that you're saying that he placed the gas can there?

15   Q.   Sure.  That's significant, isn't it?

16   A.   Well, that's what you're accusing him of.  I don't

17   know what you're trying to get me to say.

18              MS. O'NEILL-GREENBERG:  Objection.  She's

19   answered the question and I think it's just getting

20   argumentative at this point.

21              THE COURT:  Overruled.

22   Q.   (By Mr. Desroches) So, Mrs. Rathbun, just to be

23   clear, I'm not trying to get you to say anything.  I'm

24   just trying to get to the truth in all this and so the

25   jury can understand your testimony.

1        I'm not trying to get you to say anything.  If you

2    don't understand my questions, certainly feel free to ask

3    me to rephrase them.  I'm not trying to mislead you or

4    confuse you in any way.

5    A.   Okay.

6    Q.   So if you have any questions about what I'm asking,

7    just ask me to rephrase it.  I can certainly stumble with

8    questions.  I understand that, so.

9    A.   Okay.

10   Q.   When I say that Ruth's House was significant, you

11   know that the FBI was asking you questions about Ruth's

12   House, right?

13   A.   When they came on April 15th they asked us about

14   Ruth's House, yes.

15   Q.   And you spoke to a female agent at your house, didn't

16   you?

17   A.   Yes.

18   Q.   And do you recall telling that female agent that the

19   defendant John could have been high and done something

20   stupid when asked about that?

21   A.   I don't recall that.  I don't remember saying that.

22   I'm sorry, I don't recall that.

23   Q.   But that's possible, right?

24            MS. O'NEILL-GREENBERG:  Objection.

25            THE WITNESS:  I can't --

1          THE COURT:  Sustained.   The question as to

2    what's possible is excluded.

3          THE WITNESS:  Yes, I can't say that.

4    Q.   (By Mr. Desroches) Now, Mrs. Rathbun, just going back

5    to the defendant visiting Genesis House.  You indicated

6    that he could have gone but you're not sure of that,

7    right?

8    A.   No, I'm not sure because John was a grown adult and

9    he would be working, so.

10   Q.   So as a child he never went to Genesis House?  I'm

11   sorry, when your mother was living there --

12   A.   No, my mother --

13   Q.   -- he never went to Genesis House for Christmases?

14   A.   No.  I explained that yesterday.  It's a small,

15   one-bedroom apartment.  We never had any social gatherings

16   there.  It was not conducive to that.  We would go to

17   either my house or my sisters' houses to celebrate any

18   holidays or anything festive.  But, no, we did not go to

19   my mother's house to celebrate.

20   Q.   Do you remember talking to the defendant on the phone

21   when he told you that he went to Christmases there?

22   A.   No.

23   Q.   So you don't remember that?

24   A.   No, because we never did.  That's not true.

25   Q.   Well, the question is, did he tell you that though?

1    A.    No.  I can't imagine where that came from.

2    Q.    So your testimony is you don't remember him telling

3    you that?

4    A.    No.

5    Q.    Would reviewing a transcript of that call potentially

6    refresh your memory?

7    A.    Yes.  I would be very interested to see that.

8              THE COURT:  Okay.  This is witness and attorneys

9    only, right?

10             MS. BERKOWER:  Yes, Your Honor.

11   Q.    (By Mr. Desroches) So, Mrs. Rathbun, if you can just

12   review what's on the screen in front of you and when

13   you're done, just look up.

14   A.    Okay.

15   Q.    Does that refresh your recollection?

16   A.    Yes.  I see what you're putting on the screen here,

17   but --

18             THE COURT:  The only question is does it refresh

19   your memory?

20             THE WITNESS:  I honestly don't remember the

21   conversation to be truthful.  I'm just going by what's

22   written on here, but I honestly don't remember it.

23             THE COURT:  All right.

24   Q.    (By Mr. Desroches) So, Mrs. Rathbun, now this is

25   several times that you don't remember something happening.

```
 1    Is it fair to say that there's a lot been going on with
 2    this case, right?
 3    A.   Well, you're putting up a lot of things up here and
 4    they were a long time ago.  I would say that most people
 5    in this room don't remember conversations from that long
 6    ago.
 7    Q.   Would that phone conversation -- I'll strike that
 8    question, Your Honor.
 9         So we're clear, you testified that you don't remember
10    text messages that you got in March, on March 20th of
11    2020, correct?
12    A.   That's a long time ago to remember.
13    Q.   It is.
14    A.   You know, I'm 69 years old.  It's hard to remember
15    things.
16    Q.   I think that's true of all of us.
17         But still, that was March 20th of 2020, correct?
18    A.   What was?
19    Q.   That text message.
20    A.   The last one you just showed me?
21    Q.   Going back a little bit in your testimony, that March
22    20, 2020, correct?
23    A.   Okay.
24    Q.   The third week of March, right?
25    A.   I'm getting confused because you've shown me so many
```

1    things that I'm not sure.

2    Q.   Now drawing your attention --

3    A.   You're referring to this one?

4    Q.   Correct.  That's March 2020, correct?

5    A.   Yes.

6    Q.   You don't remember a phone call in May with your son;

7    is that correct?

8    A.   What was in May?

9    Q.   The phone call that we looked at; you don't recall

10   that?

11   A.   Which one is that?

12   Q.   The call --

13   A.   You're putting a lot of things in front of me and so

14   I just want to be clear what I'm --

15   Q.   Thank you for pointing that out.  We will make sure

16   we put it in front you again.

17   A.   So this one was in May?  It doesn't say so I don't

18   know.

19   Q.   Okay.  But you just don't remember this phone call,

20   correct?

21   A.   I already stated that I don't remember this phone

22   call.

23   Q.   So now going back to the affidavit that I asked you

24   about, do you remember signing a document under the pains

25   and penalty of perjury?

```
1    A.    No, I don't remember.  Which document is that --
2              MS. O'NEILL-GREENBERG:  Objection.
3              THE WITNESS:  -- when they came to my house?
4              THE COURT:  Overruled.
5    Q.    (By Mr. Desroches) So I'm going to put a document on
6    the screen and if you saw this document, do you think it
7    would refresh your recollection about it?
8    A.    I'm not sure.  I need to see it.
9    Q.    So, Mrs. Rathbun, this is a multiple-page document.
10   We will try to go through it one page at a time so when
11   you're done reviewing the first page, if you can just look
12   up and then we will flip to the second page.
13   A.    Okay.  This says draft on it.
14   Q.    I'm just asking you to review it to refresh your
15   memory.
16   A.    Okay.
17   Q.    Okay.  So now if you could just review this page and
18   when you're done, just look up.
19         Do you need it zoomed in at all?
20   A.    When you go too big, you lose it.  And when you go
21   too small, it's too small to see.
22   Q.    So we can zoom in and then we will scroll it.  So
23   look up when you're done with that section and we can just
24   move it further down.
25   A.    Okay.  So what is your question?
```

1    Q.   There's still -- do you remember this document now?

2    A.   This was done with my attorney.

3    Q.   Okay.  One second.

4         MR. DESROCHES:  Can we just have the last page?

5    Q.   (By Mr. Desroches) And that's your signature right

6    there, correct?

7    A.   Yes.

8    Q.   And do you remember doing this now?

9    A.   Yes.

10   Q.   And right above your signatures is sworn to under the

11   pains and penalties of perjury; is that correct?

12   A.   That is correct.

13   Q.   So in that statement -- why did you do this

14   affidavit?

15   A.   Why did I do this?  Because they --

16        MS. O'NEILL-GREENBERG:  Objection, Your Honor.

17        THE COURT:  Sustained.

18   Q.   (By Mr. Desroches) When you signed this affidavit,

19   you knew that it was important in this case, correct?

20        MS. O'NEILL-GREENBERG:  Objection.

21        THE COURT:  Overruled.

22        THE WITNESS:  I did this because I was told that

23   I had to do this.

24   Q.   (By Mr. Desroches)  Well, you certainly read it

25   before you did it, correct?

1    A.    Correct.

2    Q.    And you agreed with the contents of it; is that

3    right?

4    A.    Yes.

5    Q.    And in it didn't you say that John and Jeff, your

6    husband, visited there -- referencing Genesis House --

7    infrequently?

8    A.    Yes, I did infrequently.  I said they very rarely

9    did.

10   Q.    Sure.  But your testimony today has been he could

11   have gone, right?

12   A.    Well, that's the same thing as infrequently.  I mean

13   I can't remember specific because I thought you were going

14   to ask me specific times that he went there and I can't

15   remember that.

16   Q.    So you signed this affidavit on October 5th of 2020,

17   correct?

18   A.    October what?

19   Q.    Fifth.

20   A.    Yes, that's when it was signed.

21   Q.    And it's fair to say that you didn't -- until you saw

22   it, you don't remember signing this document; is that

23   right?

24   A.    Say that again.

25   Q.    Until you saw it, you didn't remember that you did

1   sign this document; is that right?

2   A.    No, it's because of the way you presented it.

3               MR. DESROCHES:  Your Honor, may we go sidebar?

4               THE COURT:  No.  Hang on.  She can finish her

5   answer.

6               THE WITNESS:  It's the way you presented it.  I

7   didn't -- when you said I signed an affidavit, I didn't

8   realize that it was this.  If you had told me it was the

9   document from my attorney or the document that the

10   government asked me to do, I would have understood.  But

11   because you just called it a vague affidavit, I didn't

12   know what it was.

13   Q.    (By Mr. Desroches)  Okay.  Thank you.

14               THE COURT:  Sidebar?

15               MR. DESROCHES:  Yes.

16   (Sidebar discussion.)

17               MR. DESROCHES:  I'm concerned that Attorney

18   Watkins is wildly gesturing answers to the witness by

19   nodding his head yes, no.  I'd ask he not communicate with

20   the witness or with the jurors.

21               MR. WATKINS:  I'm sorry, Your Honor.  I'll try

22   to do better on it.  The witness is quite right that Mr.

23   Desroches is being confusing.  I don't think it's

24   intentional but he's being confusing.

25               THE COURT:  But the point is, Attorney Watkins,

1    your frustration with what's going on cannot be conveyed

2    through physical gestures either for the jury or for the

3    witness to see.  Okay?

4              MR. WATKINS:  Yes.  Sorry.  I apologize.

5    (End of sidebar conference.)

6    Q.   (By Mr. Desroches) A couple more questions, Mrs.

7    Rathbun, before we wrap up.

8         You testified a little bit yesterday about a

9    particular pamphlet that was at the Heritage Baptist

10   Church or a tract; do you remember that?

11   A.   Are we speaking about the red booklet?

12   Q.   Correct.

13   A.   Okay.  They are not at Heritage Baptist Church.

14   Q.   Okay.  But you know it's a red booklet, right?

15   A.   Yes.  I've never actually seen it.  I've seen -- I've

16   had a picture of the front of it that it is a red booklet.

17   Q.   And you saw this picture in the materials related to

18   this case that was provided to you, correct?

19   A.   Correct.

20   Q.   You indicated that the Heritage Baptist Church did

21   not have a pamphlet like that, correct?

22   A.   I said they did not have that red pamphlet.

23   Q.   Correct.  And you know this because you look at the

24   pamphlets regularly; is that right?

25   A.   Not so much that I look at them regularly.  Because

1    it's red, I mean it would kind of stand out and I had not

2    seen that -- I have never seen that booklet.

3    Q.   So there is a number of pamphlets laid out there;

4    isn't that right?

5    A.   Yes.  We have a little wall display and we have a

6    bunch of different pamphlets on there.

7    Q.   And have you memorized each of those pamphlets?

8    A.   Of course not.

9    Q.   So it's possible that there was one in there for a

10   period of time that you just missed?

11   A.   No, not if it's red.  You would -- it would stand

12   out.  Certain things would stand out, no.  They searched

13   our church and it was not there.

14   Q.   How do you know they searched your church?

15   A.   That's in something.

16   Q.   Again, so you know this from reviewing all the

17   documents?

18   A.   With the what?

19   Q.   You know this from reviewing all the documents?

20   A.   Yes.  I'm pretty sure that's how come I know that.

21   Q.   And that's something you did to prepare for today; is

22   that right?

23   A.   Is that what?

24   Q.   Something you did to prepare for today?

25   A.   Something I -- one more time.

```
1    Q.   I'm sorry.  You read all these documents to prepare
2    your testimony for today?
3    A.   No.  I've been reading the documents as we went along
4    because I wanted to know what my son was being accused of.
5    Q.   Right and that's important.  You don't want to see
6    your son get in trouble?
7    A.   Of course not.  No one wants their children to be in
8    trouble.
9    Q.   There's really not much you wouldn't do for your son,
10   right?
11   A.   No, that's not true.  If he did something that he
12   shouldn't do, then he should pay the consequences for it.
13   Q.   Now let's just review.  You don't remember texts that
14   were sent in March; is that right?
15            MS. O'NEILL-GREENBERG:  Objection.
16            THE WITNESS:  No, I honestly don't remember the
17   ones that you showed me.
18            THE COURT:  Hold on.  There's an objection.
19            MS. O'NEILL-GREENBERG:  This question has been
20   asked --
21            THE COURT:  Asked and answered, yes.
22            MS. O'NEILL-GREENBERG:  -- many times.
23            THE COURT:  It has.  So sustained.  We've
24   already gone down this road.
25   Q.   (By Mr. Desroches)  Now, lastly, regarding your
```

```
 1    conversation with the special agent at your home.
 2    A.   Okay.  Was it the lady you're talking about?
 3    Q.   Yes.
 4    A.   I don't know her name.
 5    Q.   If I said -- well, the female agent that you spoke
 6    to, do you remember telling her that John does not deal
 7    well with stress?
 8    A.   Do I remember telling her what?
 9    Q.   That John, your son, does not deal well with stress?
10    A.   No, I actually don't.
11    Q.   That happened on April 15th, correct?
12    A.   When they came to my house?  They came to my house on
13    April 15th; that is correct.
14    Q.   And they showed you pictures of the bomb that was at
15    JGS, correct?
16              MS. O'NEILL-GREENBERG:  Objection.
17              THE COURT:  Overruled.
18              THE WITNESS:  They showed me pictures of a
19    yellow gas can.
20    Q.   (By Mr. Desroches)  So you knew exactly what they
21    were talking about when they were there, right?  You knew
22    what they were asking you about?
23    A.   Of course, I did and I had no idea of anything.
24    Q.   But they explained it to you at some point, right?
25    A.   Not really.  They just showed you -- they said -- no,
```

1    they did not.  That was one of the problems.  We didn't

2    know what was going on.

3    Q.   But they showed you pictures?

4    A.   Yes, they did.

5    Q.   And you knew that they were asking about those

6    pictures; isn't that right?

7    A.   Yes.  They -- yes.  They asked us if we had seen

8    these things or knew of them.

9    Q.   And in response to a question about whether John

10   could do this, you told them that John could have been

11   high and done something stupid, didn't you?

12               MS. O'NEILL-GREENBERG:  Objection.

13               THE WITNESS:  No, I did not.  I don't recall

14   saying such a statement.

15               THE COURT:  Is there an objection?

16               MS. O'NEILL-GREENBERG:  Yes.

17               THE COURT:  All right.  Overruled.

18               MR. DESROCHES:  Thank you.  I have no further

19   questions.

20               MS. O'NEILL-GREENBERG:  Your Honor, may I?

21               THE COURT:  No.  Hang on.

22        On reconsideration I'm going to strike the last

23   question and answer about did you tell them could John do

24   this.  This witness's belief, opinion, about what could be

25   is speculative and not relevant.  What this witness

1    thought could or could not be is stricken.  The question

2    and her answer is stricken.  All right.  Go ahead.

3              MS. O'NEILL-GREENBERG:  Thank you.

4    **REDIRECT EXAMINATION**

5    Q.   (By Ms. O'Neill-Greenberg) Mrs. Rathbun --

6    A.   Yes.

7    Q.   -- you were asked some questions about that red

8    pamphlet and whether you've seen it before, and then you

9    were asked a question about how you knew what pamphlets

10   were at your church.

11        Did you talk to your -- did your pastor talk to you

12   about the FBI searching the church?

13   A.   Yes, he did.

14   Q.   So you also learned from your -- what did you learn

15   from your pastor about the FBI trying to find those

16   pamphlets?

17   A.   Well, he actually went to look for them.  They did

18   search the church.

19              MR. DESROCHES:  Objection, Your Honor.

20              THE COURT:  Well, it can stand as he went to

21   look for them.  The answer can -- nothing beyond that is

22   allowed to be considered.  Anything else is stricken.

23   Q.   (By Ms. O'Neill-Greenberg)  Did he communicate that

24   to you?

25   A.   Yes, he did.

1    Q.   Now, you were asked some questions about when your

2    mother a decade ago lived at Genesis House and whether a

3    decade ago or longer than a decade ago you had visited

4    there and had Christmases there.

5         Did you ever celebrate a Christmas -- I'm sorry, it's

6    your mother.  Did you ever celebrate with your mother at a

7    different subsidized housing facility?  Do you have any

8    memory of that?

9    A.   No.  Once she had moved into those smaller

10   apartments, we had them elsewhere.

11   Q.   Do you recall where you would spend -- what is your

12   memory of where you would spend most Christmases with your

13   mother?

14   A.   We actually would do Christmas Eve and we would most

15   of the time we would go to my sister Mary's house.

16   Q.   For Christmas Eve?

17   A.   For Christmas Eve.  And then on Christmas day we kind

18   of split up and sometimes she would eat at my sister

19   Faith's house or my sister Mary's house, and then others

20   would come to my house.  Then we would have some of it at

21   our house.  We kind of spread it out on Christmas day, but

22   on Christmas Eve we would all get together at my sister

23   Mary's house.

24   Q.   And that's what your memory is?

25   A.   Yes, we've been doing that.  We did that for many

1    years and we're still doing that.

2    Q.    Okay.  And on cross you were asked some questions

3    about a phone call.  Have you had a lot of phone calls

4    with your son?

5    A.    Not really.  We have had phone calls but we haven't

6    had a whole ton.

7    Q.    Do you remember every word you said on those calls?

8    A.    No.  It's very hard to recall phone calls and text

9    messages from, you know, even a week or two ago, never

10   mind months ago.

11   Q.    When you were asked some questions about this call

12   you had with your son in May, where you were asked if you

13   told him -- or you said he was out of control and you

14   indicated that you were telling him to hang in there

15   because he was having some struggles, what struggles did

16   you mean?  What were you talking about?  What is the

17   context of that?

18   A.    Well, I was saying struggles in general because he

19   was struggling with his addiction and because of the COVID

20   and trying to get another job and, you know, just general

21   life struggles.

22   Q.    Were you hoping this would be a period of time for

23   him to get sober?

24   A.    Yes.  I figured this was good that he could -- you

25   know, I called it a timeout.  You know, kind of reflecting

1    and pull things together.

2    Q.   Break the cycle of using substances?

3    A.   Yes.

4            MR. DESROCHES:  Objection.

5            THE COURT:  That's a leading question.  The

6    question will be stricken.  Can you just ask a non-leading

7    question?

8    Q.   (By Ms. O'Neill-Greenberg)  What were you hoping a

9    timeout would give him?

10   A.   Well, I know that because he is in jail, that it

11   would help with his drug addiction.

12   Q.   Was this the first time he had struggled with a drug

13   addiction like this?

14   A.   No.  He's had these struggles since he was a

15   teenager.

16   Q.   And you've seen him go through these struggles many

17   times before?

18   A.   Yes.

19   Q.   And, Mrs. Rathbun, you were asked a lot of questions

20   about giving your son money or your son asking you for

21   money or, you know, letting your son live with you, caring

22   for your son.  Have you ever considered whether or not

23   over the years you are enabling your son at all?  Have you

24   worried about that?

25   A.   Yeah, it's a fine line because you do want to help.

1    You know, I do want to help him but we had to draw the

2    line.  There were -- he knew that there were certain

3    things that we just were not going to tolerate and it is

4    difficult.

5    Q.   Have there been times when you've drawn the line with

6    him?

7    A.   Yes.  Yeah, we definitely have.

8    Q.   What have you done?

9    A.   I'm sorry?

10    Q.   What have you done?

11    A.   This was probably a years ago now.  We've thrown him

12    out of the house two or three times, but it was quite a

13    while ago.

14    Q.   And this is all related to drug use?

15    A.   This was all related to his drug use.

16    Q.   Something you've dealt with for a long time?

17    A.   Yes.

18    Q.   And would you ever -- you love -- do you love your

19    son?

20    A.   Of course.

21    Q.   Would you ever lie for him to try to help him?

22    A.   No, I would never lie.

23         MR. DESROCHES:  Objection.

24         THE COURT:  Overruled.

25         MS. O'NEILL-GREENBERG:  Thank you.  No further

```
 1    questions.
 2               MR. DESROCHES:  If I may?
 3               THE COURT:  Sure.
 4    RECROSS-EXAMINATION
 5    Q.   (By Mr. Desroches) So just to pick up where we left
 6    off, the struggles that son has had that you said you may
 7    have enabled him at times in the past, just drawing your
 8    attention back to when your son was going through a
 9    divorce or was divorced -- first he didn't have any
10    children with his ex-wife, correct?
11    A.   No.
12               MS. O'NEILL-GREENBERG:  Objection.
13               THE WITNESS:  I don't understand why.
14               THE COURT:  I'll overrule it and see where it
15    goes.
16               MR. DESROCHES:  Thank you, Your Honor.  I
17    believe it will tie in with this enabling point.
18               THE COURT:  All right.
19    Q.   (By Mr. Desroches)  So there's no children, correct?
20    A.   No.  Yes, there were children but not his.
21    Q.   But not your sons, correct?
22    A.   No.
23    Q.   And you know as a result of that divorce that John's
24    ex-wife did not want to have contact with him; is that
25    right?
```

 1              MS. O'NEILL-GREENBERG:  Objection.

 2              THE COURT:  Sidebar.

 3    (Sidebar conference.)

 4              THE COURT:  So what is your offer of proof on

 5    this?  It's getting a little -- it's making me a little

 6    nervous as to where you're about to go.

 7              MR. DESROCHES:  Thank you, Your Honor.

 8         Where we are is this witness just testified that she

 9    has enabled his behavior in the past but there are limits.

10    The testimony I would expect to elicit at this point is

11    that despite that the defendant's ex-wife did not want to

12    have contact with him, this witness reached out to her,

13    drove by her house, made observations, and reported those

14    observations back to the defendant despite knowing that

15    there was actually a restraining order in place.  I'm not

16    going to go there.  I'll just leave it there being no

17    contact requested by her.

18              THE COURT:  Defense?

19              MS. O'NEILL-GREENBERG:  First of all, I don't

20    believe she said she does enable him.  She said on the

21    stand that she considers that it's a fine line and

22    something that she thinks about.  I don't believe she

23    said, yes, I enable him or, no, I don't.  She just said

24    she's thoughtful about it first of all.

25         Second of all, I think this is totally irrelevant and

1    falling into propensity evidence and bad act that has

2    nothing to do with the question she was asked, which is

3    supporting her son and providing for him and that sort of

4    thing.  We are getting far, far away from anything that's

5    relevant and things that are very prejudicial.

6          THE COURT:  Well, she did testify in a way that

7    made it -- it could be considered that perhaps she did or

8    may have enabled him.  I don't think -- I think you're

9    right she was not definitive, and I also agree that we're

10   very close to a line of what we all know would be not

11   allowable evidence regarding the domestic relationship.

12        I don't think, Attorney Desroches, that you should be

13   asking questions that say things like you know that his

14   ex-wife didn't want to see John.  That being said, I think

15   it's -- I do think it's relevant regarding if there was

16   something established -- you're saying it was about

17   visitation with the child or it was just about seeing the

18   ex-spouse?

19          MR. DESROCHES:  Your Honor, it was really

20   neither.  It was this witness essentially conducting

21   reconnaissance on his ex-wife and reporting back to the

22   defendant.

23          MS. O'NEILL-GREENBERG:  Your Honor, this has

24   nothing to do with Natalie or custody at all.  These

25   allegations have to do with some interpersonal

1    relationship John did or didn't have with his ex-wife.  It
2    has nothing to do with this case.
3             THE COURT:  You know, I do think it does have
4    some relevance.  I think, Attorney Desroches, you have to
5    be extraordinarily careful in how to ask this question.
6    It should be something to the effect that you knew that
7    John and the spouse were not on speaking terms and
8    essentially you acted -- you can say it just the way you
9    did, you acted as reconnaissance to try to get the spouse
10   to agree to talk to John and just leave it at that and see
11   what she says.
12            MR. DESROCHES:  Thank you, Your Honor.
13    (End of sidebar discussion.)
14            THE COURT:  The objection is overruled.
15            MR. DESROCHES:  May I proceed, Your Honor?
16            THE COURT:  Yes.
17   Q.   (By Mr. Desroches) So, Mrs. Rathbun, just to pick up
18   where we left off.
19   A.   Okay.
20   Q.   You knew that the defendant and his ex-wife were not
21   on speaking terms at a point after the divorce; is that
22   correct?
23   A.   Yes.
24   Q.   And do you recall -- or isn't it true that in May of
25   2019 you essentially conducted reconnaissance on the

1    ex-wife and reported back to John what you saw?

2    A.   I have no idea what you -- you have to be clear.  I

3    have no idea what you're talking about.

4    Q.   You didn't drive by her house, observe a dumpster in

5    front of the house, and report that back to John?

6    A.   I don't recall that, no.

7    Q.   So just we're clear, you don't recall that in May you

8    did this?

9              MS. O'NEILL-GREENBERG:  Objection.

10             MR. DESROCHES:  I'm establishing the time frame,

11   Your Honor.

12             THE COURT:  Just establish time frame.  That's

13   it.  The question is, do you recall that in May?

14   Q.   (By Mr. Desroches)  Of 2019?

15   A.   No, I do not recall that.

16   Q.   Now you indicated on redirect that you were concerned

17   that John's addiction was -- he needed some time away from

18   -- time out to break the addiction, correct?

19   A.   Yes.  I thought that it would be good for him, yes.

20   Q.   And that's because the addiction was causing John to

21   act in an irresponsible way, correct?

22   A.   Well, if you're -- yes, I would say that you're not

23   acting as you should, yes, when you're addicted, yes.

24             MR. DESROCHES:  Thank you.  I have no further

25   questions.

1          MS. O'NEILL-GREENBERG:  We're fine.  Thank
2     you.
3          THE COURT:  Ma'am, you can step down.  Thank you
4     very much.  Put the mask back on and you are all set.
5     Thanks.
6          THE WITNESS:  You're welcome.
7          THE COURT:  Next witness?
8          MR. WATKINS:  The next witness is John Michael
9     Rathbun.
10          THE COURT:  All right.  I'll take -- let's take
11     ten minutes.  My ten minutes usually means... well, you
12     fill in the blank.  All right.  So we will take a break
13     let's call it that.
14          THE CLERK:  All rise.
15     **(The jury left at 10:40.)**
16          THE COURT:  All right.  We're starting to look
17     at an instruction regarding not considering the defendant
18     being held.  There's been obviously a lot of testimony
19     about him being in jail.  We're working to try to craft
20     some rough language, but be thinking about that because
21     that will obviously be an instruction if you want it that
22     I will entertain giving.
23          MR. WATKINS:  We will think about it.
24          THE COURT:  Okay.
25          MR. DESROCHES:  Thank you, Your Honor.

**(A recess was taken at 10:41 until 10:53.)**

       MR. DESROCHES:  Your Honor, before we get started, we just have the replacement stipulations.  I believe Your Honor requested that we just replace them with clean copies considering we had the correction from yesterday.

       THE COURT:  Right.  So you're going to admit these?

       MR. DESROCHES:  Yes, Your Honor.

       MR. WATKINS:  There's no objection.

       THE COURT:  No objection to the admission of two separate documents, each being a stipulation and each was fully read to the jury; is that correct?

       MR. DESROCHES:  Correct, Your Honor.

       MS. BERKOWER:  One of them we asked you to read certain parts and not certain parts, but.

       THE COURT:  The parts that I did not read are contained in this stipulation?

       MS. BERKOWER:  They are, but we signed the whole thing.  They had blank spaces in them to add exhibit numbers that were then added in the second stipulation, and so I don't think either party objects to both being entered into evidence in their entirety.

       THE COURT:  Is that correct?

       MR. WATKINS:  Yes.

| | |
|---|---|
| 1 | THE COURT:  So they'll both be admitted. |
| 2 | MS. BERKOWER:  If I may say, those are marked as |
| 3 | Government's Exhibit 113 and 113 (sic). |
| 4 | THE COURT:  113? |
| 5 | MS. BERKOWER:  And 114, sorry, for the record. |
| 6 | THE COURT:  Okay. |
| 7 | **(PX-113 + PX-114 admitted.)** |
| 8 | MR. WATKINS:  Your Honor, would you like Mr. |
| 9 | Rathbun in the witness stand now or wait? |
| 10 | THE COURT:  No.  We'll wait. |
| 11 | **(The jury entered at 10:56.)** |
| 12 | THE CLERK:  All rise for the jury. |
| 13 | THE COURT:  Very good.  During that break was |
| 14 | everyone able to follow my instructions, the general |
| 15 | instruction that always applies not to talk to each other |
| 16 | about the case?  Anyone else about the case?  Research it? |
| 17 | Access the internet?  Post on any social media or read any |
| 18 | social media or news coverage? |
| 19 | Okay.  Affirmative responses from all, the jury |
| 20 | remains fair and impartial. |
| 21 | Defense, call your witness please. |
| 22 | MR. WATKINS:  I didn't hear you. |
| 23 | THE COURT:  You call your witness. |
| 24 | MR. WATKINS:  The defense calls John Michael |
| 25 | Rathbun. |

1      THE CLERK:  Mr. Rathbun, please raise your right

2  hand.

3      THE WITNESS:  Yes, ma'am.

4  **John Rathbun (Sworn)**

5      THE CLERK:  You may be seated.

6      THE WITNESS:  Thank you.

7  **DIRECT EXAMINATION**

8  Q.   (By Mr. Watkins) You can pull your mask off now.

9  A.   Okay.

10  Q.   Good morning, Mr. Rathbun.

11  A.   Good morning.

12  Q.   Will you please state your name and spell your last

13  name for the record?

14  A.   My name is John Rathbun, R-a-t-h-b-u-n.

15  Q.   Mr. Rathbun, how old are you?

16  A.   I just turned 37.

17  Q.   When did you turn 37?

18  A.   November 17th.

19  Q.   That's two days ago?

20  A.   Yes, sir.

21  Q.   Before your arrest last April, where did you live?

22  A.   I lived at 20 Lori Lane, East Longmeadow.

23  Q.   Who were you living with at 20 Lori Lane?

24  A.   I lived with my father, my daughter, my mother.

25  Q.   Over the years, have you lived at this house many

1   times?

2   A.   Yes, I have.

3   Q.   For many years?

4   A.   Yes, sir, I have.

5   Q.   Most recently when was the last time you moved into

6   20 Lori Lane?

7   A.   It was about three years ago.

8   Q.   I want to go back to your childhood.  Did you always

9   grow up in East Longmeadow?

10  A.   We did live in Springfield until I was about ten

11  years old or so, and then we moved to East Longmeadow.

12  Q.   When you moved to East Longmeadow, was it 20 Lori

13  Lane or some other address that you moved to?

14  A.   It was to 20 Lori Lane.

15  Q.   How was your childhood?  How were things when you

16  were growing up?

17  A.   My childhood was good.  I had a good childhood.

18  Q.   Did you go to school?

19  A.   I did.  I went to Christian school.  I went to First

20  Baptist Christian Academy.

21  Q.   And up to what grade did you go to Christian Baptist

22  Academy?

23  A.   That was up to fifth grade.

24  Q.   After that, did you change schools?

25  A.   I did.  I moved to a public school.  I went to

1   Birchland Park Middle School in sixth grade.

2   Q.   And how old were you when you moved to the public

3   school?

4   A.   I want to say 15-ish, 14, 15.

5   Q.   During your childhood were you also a church-going

6   kid?

7   A.   I was.

8   Q.   Did you go with your family?

9   A.   I did.

10   Q.   How often would you go to church when you were a kid?

11   A.   When I was younger, I went on -- we had Wednesday

12   night youth group and then Sunday morning service.

13   Q.   Did you enjoy church back in your youth?

14   A.   I did.

15   Q.   Are you still a spiritual person to this day?

16   A.   I am.

17   Q.   Do you continue to go to church now?

18   A.   No, not right now.  I'm incarcerated.

19   Q.   Going back to the switch to public school, how was

20   that transition for you?

21   A.   It was a very difficult transition.

22   Q.   And how was it difficult?

23   A.   Well, I was -- I needed to make new friends in sixth

24   grade and most of the social circles were already

25   established and so I wound up being friends with the wrong

1    crowd I guess you could call them.

2    Q.   In your mid-teens did your behavior start to change?

3    A.   It did.

4    Q.   Particularly in regard to experimenting with

5    substances, did you start to experiment with prescription

6    medications?

7    A.   It started with marijuana but then, yes, I started to

8    use prescription medication.

9    Q.   And tell us a little bit about that.  How did you

10   first get involved with pain medication?

11   A.   So my father had a severe back issue and he was

12   prescribed OxyContin and I would take them from him, but

13   at that time I didn't really know what they were and the

14   outcome and how you could become physically dependant.

15   Q.   When you first started taking the pain medications,

16   what did you think about the experience?

17   A.   I enjoyed it.

18   Q.   Did you start or did you continue to take

19   medications, pain medications while you were in your

20   teens?

21   A.   I did.

22   Q.   For how long?

23   A.   Probably up until I was probably 18-ish, 17, 18, 19.

24   Q.   We're going to pick up there in a minute, but what

25   else -- when you moved to the public school, did you also

```
1    begin getting involved in relationships?
2    A.   I did.  I became sexually active you could say.
3    Q.   And how old were you then?
4    A.   Fifteen, 16.
5    Q.   And was there a particular relationship that you had
6    while you were in high school?
7    A.   There was.  My daughter's mother and I dated all
8    through high school.
9    Q.   And what is your daughter's mother's name?
10   A.   Her name is Mary O'Keefe.
11   Q.   Does she go by a different name now?
12   A.   Yes.  She married.  I think it's Mary Diaz now.
13   Q.   So the two of you dated or were sexually active in
14   high school?
15   A.   That is correct.
16   Q.   Did she also have a substance abuse problem?
17   A.   She did.
18   Q.   How long were you and Mary Diaz together altogether?
19   A.   From 15, 16, 17, right along all in high school.
20   Q.   How old were you when Natalie was born?
21   A.   I believe I was 16.
22   Q.   And by this point I think you told us you were
23   already taking your father's pain medications?
24   A.   That is correct.
25   Q.   And was Mary Diaz also?
```

```
 1    A.    She was.

 2    Q.    So did you begin to get difficulties in school around

 3    this time?

 4    A.    I did.

 5    Q.    Tell us about those kinds of difficulties.

 6    A.    Well, from my substance abuse I was kicked out of one

 7    school and I dropped out of school because of my substance

 8    abuse.

 9    Q.    And what happened as far as your relationship with

10    the church during your teens?

11    A.    My desire to go to church kind of took a back seat to

12    friends in the wrong circle and my drug addiction and my

13    sexual interactions.

14    Q.    So why did that -- what did that mean as far as going

15    to church and being involved with the church?

16    A.    I just lost interest.  It was kind of the opposite of

17    what I was doing at the time.

18    Q.    You talked about going into your father's pain

19    medications up until about 18 years old.  What happened to

20    stop that?

21    A.    Well, pain medication -- my father filled a

22    prescription every two weeks and between me stealing them

23    and then him taking too many, we would run out and so we

24    would have to buy them on the street.  Eventually my

25    father got cleaned and I stayed using, but prescription
```

1   medication is very expensive on the street and so I turned

2   to heroin.

3   Q.   When did you start using heroin?

4   A.   I was around 18.

5   Q.   And at age 18 did you continue to use heroin?

6   A.   I did.

7   Q.   You are now 37 years old?

8   A.   I am.

9   Q.   Since you started using heroin at 18, has there ever

10   been a time when you've conquered your heroin addiction?

11   A.   There's been a couple of times when I was clean for

12   two or three years.

13   Q.   Now in addition to heroin, are there other drugs that

14   you've experimented with and used?

15   A.   Yes, sir.  I've experimented with pretty much

16   everything, crack, powder cocaine, extacy, mushrooms,

17   acid, Xanax.

18   Q.   So all of those drugs you've tried at some point in

19   your life?

20   A.   I have.

21   Q.   And some you use more than others?

22   A.   That is correct.

23   Q.   What are your drugs of choice?  Of all those drugs,

24   which ones do you particularly use?

25   A.   It kind of depends.  I mean, right now I'm on

1    Methadone and so when I was on Methadone, I picked up a

2    cocaine habit.  If I'm not on Methadone, then I have a

3    heroin problem.  I'll take pills also, Xanax, and also

4    still use cocaine and crack.

5    Q.   When you say cocaine and crack, just explain what are

6    the differences between cocaine and crack?

7    A.   So cocaine powder I would inject and crack I would

8    smoke.

9    Q.   Over the years, the 20 years, that you've been

10   abusing drugs, have there been consequences to your

11   health?

12   A.   There have been severe consequences to my health.

13   Q.   Like what kinds of things have happened to you

14   because of your use of drugs?

15   A.   I'm overweight.  I definitely don't have the lung

16   capacity that I've had before.  I have vein issues from

17   collapsed veins and scars.

18   Q.   Now, have there been consequences for relationships

19   over the years?

20   A.   Absolutely.

21   Q.   Have you had other relationships other than Mary

22   Diaz?

23   A.   I have.

24   Q.   And we just heard about you being married for a short

25   period of time, right?

1   A.   That's correct.

2   Q.   What was the cause of that break up?

3   A.   Drugs and alcohol.

4   Q.   And have other relationships soured because of drugs

5   and alcohol during your lifetime?

6   A.   That's correct.

7   Q.   What about working and jobs and careers, have you had

8   consequences with those as a result of your substance

9   abuse?

10  A.   Yes, sir.  I've lost amazing career opportunities

11  that I've had.  I've had second and third chances of just

12  amazing jobs that I've also ruined.

13  Q.   I want to talk about Natalie.  She was born when you

14  were first starting to experiment and getting addicted to

15  heroin when she was born; is that right?

16  A.   Yes, sir.

17  Q.   Have you been able to be a good father to Natalie

18  because of your issues?

19  A.   I wish I could say that I have been but I have not.

20  I have been a poor example for her, and I have not been

21  the father that she deserves.

22  Q.   So what makes you say that?  What kinds of things

23  have you not done?

24  A.   Well, I was involved in her life but say we'd go to a

25  volleyball game, I'd be out drinking beers in the car

```
 1   going back in.  The same thing, I would be out smoking a
 2   joint or something, smoking cigarettes, and not being a
 3   father that I should have been.
 4   Q.   So who raised Natalie then?
 5   A.   Pretty much my parents, my mother and father.
 6   Q.   Are you partly being treated for substance abuse?
 7   A.   I am.
 8   Q.   And that's at the jail?
 9   A.   That's correct.
10   Q.   And what is that treatment?  What do you do for that
11   treatment?
12   A.   So I get Methadone, which is just a replacement so
13   that I can still function without going through withdrawal
14   symptoms and I get counseling once a week.
15   Q.   How long have you been on Methadone?
16   A.   For about two to three years.
17   Q.   And that was prescribed to you when you were in the
18   community?
19   A.   That was, yes, sir.
20   Q.   Now, you told us that you've most recently been
21   living at your parents' house for the past three years?
22   A.   Correct.
23   Q.   But that was also the home that you grew up in at
24   least after sixth grade?
25   A.   Yes, sir.
```

Q.   Starting in the last three years, have you had steady
work, paid work?

A.   I have.  I had a solar job.  I worked at All Energy
Solar for a year.  I also have a business JMR Construction
where I do handyman stuff, small electrical jobs.

Q.   What other kinds of work have you done in the last
three years?

A.   I've worked in residential properties doing framing,
siding, windows, doors, you name it.

Q.   Do you have particular licenses for any of this?

A.   I have had a construction supervisor's license but
not anymore.

Q.   So these are skills that you've learned over the
years?

A.   That's correct.

Q.   Do you enjoy working?

A.   Yes, I enjoy working very much.

Q.   What is it about working that you enjoy?

A.   I've always had a good work ethic from since I was
young.  I just enjoy doing things with my hands and the
satisfaction of building something or doing something
that, you know, I can drive by and see or know that I
accomplished.

Q.   So during this period of time, the three years we're
talking about, when you came back to your parents' house,

1    were you also struggling with addiction during that time?
2    A.   Yes, sir.
3    Q.   What kinds of drugs were you using most recently in
4    the last three years?
5    A.   Most recently it was crack cocaine and benzos and
6    heroin.
7    Q.   At some point you did get on Methadone, right?
8    A.   That's correct.
9    Q.   And I think you said about two years ago for
10   Methadone, two to three years ago?
11   A.   Yes, sir.
12   Q.   How did the Methadone help your ability to or hinder
13   your ability to work and do daily living?
14   A.   So again Methadone is a replacement drug so I didn't
15   have to go out every day and try to get heroin to go to
16   work.  It gives me the stability to still go to work and
17   have a job, but I was still an addict and so I started
18   doing more pills and crack.
19   Q.   So you were also doing heroin on top of the Methadone
20   sometimes?
21   A.   Sometimes, yeah, absolutely, but not as much.
22   Q.   But during this period of time so it was cocaine and
23   crack cocaine and benzodiazepines?
24   A.   Yes, sir.
25   Q.   But nevertheless, you were working?

1    A.   I was working still.

2    Q.   So how do you work and be taking these kinds of

3    drugs?

4    A.   I'm a functioning addict.  You know, I would take

5    pills but not excessively at work.  It would be more after

6    work, but I would still be taking them at work but not to

7    the point where I was impaired enough not to be able to do

8    my job.  I was actually a good employee surprisingly and

9    they liked me.

10   Q.   So how did you manage your drug abuse?  Were you

11   doing it during the week or on the weekends or how did it

12   work during this period of time?

13   A.   So at this job I was paid every two weeks, and so I

14   would kind of go -- I would use drugs on that Friday,

15   Saturday, Sunday weekend when I got paid every two weeks.

16   Q.   But you might also still be doing drugs during the

17   week?

18   A.   I would be doing them during the week but not to the

19   point where I was on Friday, Saturday, Sunday when I got

20   paid.

21   Q.   We heard from Agent McGonigle that you told him about

22   an occasion where you were out of your mind on drugs.

23   What does that -- what did you mean by out of your mind on

24   drugs?

25   A.   That means I was using a lot of drugs.  I was very

1    high.

2    Q.   But it sounds like you also used drugs all the time.

3    How was being out of my mind on drugs different than any

4    other time for you?

5    A.   It's just an excessive amount of everything, benzos,

6    crack, heroin.

7    Q.   After these binges kind of weekends, did you have any

8    kind of remorse or did you try to change your life at all?

9    A.   I mean, not really.  There is remorse, mostly

10   financial remorse because I would be mad that I spent all

11   my money on drugs that past weekend when I needed it to

12   last me for two weeks.

13   Q.   Over your lifetime is conditions where you would

14   describe yourself as out of your mind or out of your mind

15   on drugs, is this something special to a month ago or that

16   happened on other occasions?

17   A.   This has happened multiple times.

18   Q.   You started to talk about All Energy Solar.  Describe

19   what you were doing for All Energy Solar?

20   A.   My job at All Energy Solar entailed installation of

21   the solar track and the solar panels on residential and

22   commercial property roofs.

23   Q.   Did you like it?

24   A.   I did.  I did a lot.  It was a great job.

25   Q.   Were you good at it?

1    A.   I was good at it.

2    Q.   How was the pay?

3    A.   The pay was definitely worth it for being on top of

4    roofs.

5    Q.   What happened that you lost that job?

6    A.   The same thing, drugs, drugs and alcohol.

7    Q.   What specifically was the breaking point for All

8    Energy Solar?

9    A.   So I had a day where I took too much benzos and it

10   was noticeable to my fellow employees, and I also had a

11   few calls back to the center that I was driving

12   recklessly.

13   Q.   So what happened as a result of that?

14   A.   As a result of that I was fired.

15   Q.   So this is in early March of this year?

16   A.   That's correct.

17   Q.   So by then you lost your job, you're living with your

18   parents at age 36, and there's a pandemic raging.  How did

19   you feel about yourself at that point?

20   A.   I was very depressed.  You know, just the same circle

21   over and over again of my addiction.  It was really tough.

22   I was alone a lot, secluded.

23   Q.   Did you take efforts to address your drug addiction?

24   A.   I did not.

25   Q.   Were you proud of your life at that point?

```
1    A.   No, I was not proud of my life at all.
2    Q.   Is this the first time in your last 20 years of
3    substance abuse that you've been not proud of your life?
4    A.   No.  It's an ongoing constant thing over and over.
5    Q.   Now we've heard that -- well, first, once you lost
6    the job at All Solar, did you continue to find work?
7    A.   I still did, yes.  I had a buddy who had property up
8    in Palmer that he was renovating and I had some electrical
9    and carpentry work done there.  I also continued to search
10   my apps, Glassdoor, and Craigslist for side jobs, cleanout
11   jobs.
12   Q.   And were you giving money to your mother for rent and
13   other kinds of amenities at that point?
14   A.   I was.  That was more for I would borrow money
15   sometimes from her and I'd have to pay her back and then,
16   yes, I would -- she would help me 'cause I'm very bad with
17   money.  So I would give it to her and she would buy
18   cigarettes for the week or give me a gas card, buy
19   groceries because I'm not good with money.  I would just
20   blow it on drugs.
21   Q.   Beside -- well, after All Solar Energy and doing the
22   work out in Palmer, what other kinds of work were you
23   doing?  What other jobs?
24   A.   I had cleanout jobs.  I starting doing a lot of trash
25   removals and scrapping.
```

1  Q.   Did you do salvage work?

2  A.   Correct.  Scrapping, salvage work, the same thing.

3  Q.   What would salvage work be?  How would that work?

4  A.   So salvage work is where I'd go to a house and I'd

5  take metal, appliances, metal siding, copper, aluminum,

6  brass, anything of that nature.

7  Q.   When you would do salvage work or cleanouts, the

8  things you took that you couldn't use, did you take them

9  to the town dump?

10  A.   No, I did not.

11  Q.   Where would you take those items once you cleaned

12  out?

13  A.   I would find dumpsters on residential properties that

14  were abandoned, maybe even being renovated, and I would

15  dump stuff there.  Just find random spots.

16  Q.   Why would you do that?  Why were you just dumping

17  them?

18  A.   Because there's no money left if I pay for dump fees

19  to dump the stuff.

20  Q.   So this is illegal for you to be dumping these things

21  in other people's dumpsters, right?

22  A.   That is correct.

23  Q.   Are you proud of the fact that you were engaged in

24  illegal behavior during this period of time?

25  A.   Absolutely not.  Of course not.

1   Q.   You heard some testimony about arguments between you

2   and Natalie and your mother during this period of time.

3   Did you argue?

4   A.   Yeah.  We had some arguments, yes.

5   Q.   Was it an every day basis or every couple of days?

6   Tell us about those arguments.

7   A.   I'd say weekly there would be an argument.  I mean, I

8   was kind of a jerk.  I was really a jerk.  When she would

9   get groceries, she might have forgotten something or

10  forgotten to get me cigarettes and it would turn into an

11  argument.  I was a jerk.

12  Q.   So you heard Natalie testify about that period of

13  time?

14  A.   I did.

15  Q.   How was it to listen to that testimony here?

16  A.   It was very emotional.  It was very heartbreaking to

17  hear from your daughter how, just how not a good father

18  I've been.

19  Q.   I want to talk now about the events on the morning of

20  April 2nd.  In the hours leading up to -- the hours in the

21  early morning.  I want to start actually on the previous

22  evening, April 1st, April fools day.

23       Do you know what you were doing the night before?

24  A.   I believe so.  I believe I was getting drugs, using

25  drugs.

1  Q.   What makes you believe that you were out getting

2  drugs the night before?

3  A.   It's something I normally do.  I also saw in the

4  transcripts from reading my text messages and emails and

5  phone calls what I was doing.

6  Q.   Did you get drugs the night before?

7  A.   I did.

8  Q.   What drugs did you get the night before on April 1st?

9  A.   April 1st it was crack cocaine.

10  Q.   And once you got the crack cocaine the night before,

11  where did you go?

12  A.   I went back to my house.

13  Q.   And is that ordinarily what you do once you get

14  drugs?

15  A.   Yeah.  I usually use in my car and then drive home

16  and depending on how much drugs I have, continue to use.

17  It depends how much money I have.

18  Q.   So the night of April 1st then you came back to

19  your -- the late hours of April 1st and the early hours of

20  April 2nd you came back to your house?

21  A.   That's correct.

22  Q.   And you were in your room at your house?

23  A.   That's correct.

24  Q.   Putting on the -- this has been admitted as Exhibit

25  52.

1          We saw this through Dustin Wong, the FBI agent; do

2    you remember this exhibit?

3    A.   I do, yes.

4               THE COURT:  Do you want this published?

5               MR. WATKINS:  Yes.  This is in evidence.

6    Q.   (By Mr. Watkins) So if I understand your testimony,

7    this time line in Exhibit 52 starts just after midnight?

8               THE COURT:  Can you enlarge it at all?

9               MR. WATKINS:  I'm sorry?

10              THE COURT:  Could you make it bigger?

11              MR. WATKINS:  Yes.  I absolutely can.

12   Q.   (By Mr. Watkins) You said you've looked at this.

13   You've had a chance to look at this?

14   A.   Yes, sir.

15              A JUROR:  Is this the document that we saw all

16   the pages of?  Because there was one document where page

17   after page was confirmed by Mr. Wong but we did not

18   actually see the pages, and I don't think we actually saw

19   all these pages.  I just want to make sure we're not

20   seeing something that hasn't been admitted.

21              THE COURT:  Let me just ask.  Can you clarify

22   are we looking at something -- can the parties clarify,

23   each clarify that we're looking at something that is an

24   exhibit?

25              MR. WATKINS:  I will clarify.  That is true we

introduced line by line.  After court that day we agreed

that the entire thing or most of everything could come

into the jury and so it will now be an exhibit for the

jurors to have.

MR. DESROCHES:  That will be Exhibit 52.

THE COURT:  So this is Exhibit 52 that we're

looking at?

MS. BERKOWER:  It is, Your Honor.  It's

Government's Exhibit 52.

THE COURT:  Okay.

So, ladies and gentlemen, there's some exhibits that

get admitted without you seeing them in their entirety or

sometimes at all in court but they're admitted and you can

look at them during your deliberations.  This document

might be somewhere in between that.

MR. WATKINS:  Thank you.

Q.   (By Mr. Watkins) So again this starts at midnight.  I

think what you told us by then you've already done a

little bit of crack, right?

A.   That's correct.

Q.   So leafing through here, some of the things that

you're looking for are Home Depot.  Why are you looking

through Home Depot?

THE COURT:  Hold on one second.

THE WITNESS:  I touched my monitor.

```
1              THE COURT:  That's okay.
2              THE WITNESS:  Sorry.  Okay.  We're good.  Sorry.
3    Q.   (By Mr. Watkins) Do you see Home Depot is a search in
4    this column?
5    A.   Yes, sir.
6    Q.   We'll talk about Home Depot in a minute.
7         Peopleready, what is that search?  Why are you
8    searching through Peopleready?
9    A.   Peopleready is a -- it's a job place that's like a
10   temp-to-hire position so you can go there and scroll
11   through jobs.
12   Q.   And have you worked there before trying to get jobs
13   before?
14   A.   I have, yes, sir.
15   Q.   Openskill trade positions, the same thing as
16   Peopleready?
17   A.   That's correct.
18              THE COURT:  Attorney Watkins, I'm sorry to
19   interrupt you again.  The larger you can make that, the
20   easier it will be because I'm having trouble on my screen
21   as well.
22              MR. WATKINS:  Exhibit 52 I'm going to focus.  We
23   will lose some of the columns but we have the date.  The
24   limitation is the exhibit itself.  Is that a little
25   better?  Perhaps I will sit down for this portion and go
```

1   through it this way.

2   Q.   (By Mr. Watkins) So again this is -- well, solar

3   installer needed, what was that?

4   A.   I was looking at jobs.  That was probably Craigslist

5   where I was looking at -- somebody was looking for a

6   solar, or maybe I typed it in like solar installer needed

7   into Google search looking for jobs.

8   Q.   Are you looking for long-term jobs or are you looking

9   for something for the next day?

10  A.   Both, long-term, short-term, anything.

11  Q.   And, of course, the pandemic was raging at this

12  point?

13  A.   That is correct.  It made it very difficult to find

14  work.

15  Q.   So I'm just going to keep going through here.

16       Temp agency, why were you searching through temp

17  agencies at 12:50 in the morning?

18  A.   Well, one, because I'm high on crack; and, two,

19  because I'm looking for work.

20  Q.   When you say high on crack, what does that have to do

21  with temp agencies?

22  A.   When I smoke crack, I get very go, go, go.  You know,

23  constantly like working.

24  Q.   I'll keep scrolling through here.

25       So you're searching for temp jobs until at least

1    sometime before 1:37 in the morning.  And we know what

2    this is, right?  What are you searching for here?

3    A.   This is pornography.

4    Q.   These particular entries right around two in the

5    morning now Nextdoor.com, what is it that you're searching

6    for there?

7    A.   Again, searching for more jobs.  Nextdoor is an app I

8    have in my phone.  I get cleanout jobs from it.

9    Q.   We're back to Home Depot here at three in the

10   morning, right?

11   A.   Yes, sir.

12   Q.   We skip a little bit of time there, about 45 minutes

13   or an hour.  Are you always on your phone or are you doing

14   other things in your room during this period of time?

15   A.   I'm doing other things to.  I binge on Netflix

16   usually too.

17   Q.   But you have no particular memory of other things you

18   were doing that night?

19   A.   No, just this and smoking crack.

20   Q.   Now, about this time, again three o'clock in the

21   morning, there's a particular entry here for a Milwaukee

22   tool.  Why are you searching around at three o'clock in

23   the morning about the particular tool at Home Depot?

24   A.   There's a couple different reasons.  I enjoy looking

25   at tools.  I like to see prices on tools because I know

1    people who steal them and so I can get a price estimate of

2    what it is and how much they're worth.

3    Q.   You continue to search through those?

4    A.   That's correct.

5    Q.   And now this is 4:32 in the morning.  Let's go up

6    here.

7         At 4:23 in the morning, you're searching around for

8    those tools you've been searching for some time?

9    A.   Correct.

10   Q.   4:32 in the morning there's a text message.  Do you

11   recall sending this text message?

12   A.   I do.

13   Q.   So what is happening in your mind at this point where

14   you're sending this text message?

15   A.   So I'm probably running out of crack so I'm texting

16   Devin Austin to see if he's awake and see if I can get

17   drugs from him.

18   Q.   Do you think the drugs are -- well, it was crack

19   cocaine on this particular night that you're telling us

20   about, right?

21   A.   Correct.

22   Q.   Crack cocaine, how long does the high last off of

23   crack cocaine?

24   A.   Twenty minutes, half an hour.

25   Q.   So do you know, were you under the influence at this

1    time or were you withdrawing?

2    A.   I wouldn't say I was withdrawing but I mean I was

3    probably running out, starting to come down from the crack

4    high so I was trying to get more.

5    Q.   So you've read this text message "Dude, I got a

6    hundred in cash sitting in front of me."  First, was that

7    true?

8    A.   That's actually a lie.  No, I was lying.

9    Q.   Why are you lying to Devin Austin about having a

10   hundred dollars in cash sitting in front of you?

11   A.   Well, the truth was I had a check for a hundred

12   dollars that I was going to cash in the morning so I was

13   going to try to get something on the front.

14   Q.   You mentioned about getting licks; what are licks?

15   A.   Licks could be a couple things.  Going dumpster

16   diving and getting stuff out of there; possibly stealing,

17   going into people's cars possibly.

18   Q.   Then at 4:38 you said -- what is the text message

19   that you send to Devin Austin?

20   A.   It's supposed to say dude, but it says "do you just

21   put it in your mailbox."  Dude, you should just put it in

22   your mailbox is what I'm saying.

23   Q.   So what are you trying to get Devin Austin to do here

24   when you're sending this message?

25   A.   I'm trying to get him to sell me crack.

1    Q.   And by put it in the mailbox, were you hoping not to

2    meet him?

3    A.   Right.  I mean, it was very early in the morning.  I

4    still didn't want to like bother him so much.  I think --

5    I figured it would be easier if he just puts it in the

6    mailbox and then I just grabbed it.

7    Q.   Now looking at these text messages, where do you

8    think you were when you were sending this particular text

9    message?

10   A.   I was on my way to where he lives.

11   Q.   Do you think you already started on your way?

12   A.   I believe -- yes, absolutely.

13   Q.   But you don't know for sure sitting here?

14   A.   I don't.

15   Q.   This next message here, "knock, knock, knock."  What

16   is the purpose of sending that to Devin Austin?

17   A.   That's something that I typically do when I'm getting

18   closer to the area of where he lives to let him know I'm

19   getting close.  It usually around 291.

20   Q.   And we don't see any responses to Devin Austin in

21   these text messages.  Is that unusual that you would start

22   out for his house without getting a response from him?

23   A.   No, it's not unusual.  He lives in an area where

24   there's also a housing project over there that I've gone

25   to also to purchase drugs, and there's other people that

1   live over there that I could get drugs from also.

2   Q.   So it sounds to me as if this is not your first time

3   through the rodeo going through this early in the morning?

4   A.   No.  No, it's not.

5   Q.   Is there anything particularly unusual in the kinds

6   of searches that you're doing while you're at home on

7   crack cocaine?

8   A.   I'm sorry, say that again.  I couldn't hear.

9   Q.   Is there anything unusual about those kinds of -- is

10  that out of the ordinary for you to be searching around

11  for tools and porn and jobs while you're on crack cocaine?

12  A.   No.  This is normally what I do every time.

13  Q.   Let me take this off the screen for now.

14       So once you left your house, where were you headed?

15  What was the address?

16  A.   I believe it's 90 Deslo (sic).  I just know where he

17  lives.  I don't know the exact address, but I think it's

18  over near St. James Ave., Deslo Road maybe.

19  Q.   And why did you take your mother's car?

20  A.   I take her car as it's easier.  My car is a big blue

21  van truck that I use for work.  It sticks out like a sore

22  thumb.  Her car is small and compact.  It eats less gas.

23  It's just better.  It warms up quicker.  It's easier to

24  take hers.

25  Q.   And what kind of car is it?

1    A.   She has a Rav4.

2    Q.   Now does a Rav4 have a trunk in it?

3    A.   No, it's a hatchback.

4    Q.   Did you take a fuel container out your truck or out

5    of the garage and put it in your mom's car before you

6    left?

7    A.   No, sir, absolutely not.

8    Q.   And how did you get up to El Paso Street from 20 Lori

9    Lane?

10   A.   I drove down Converse Street to get to the highway.

11   I drove down 91 to 291, and then I got off at the St.

12   James exit.

13   Q.   That would be the way you go to East Springfield any

14   time?

15   A.   Every single time.

16   Q.   On the way to 90 El Paso, did you stop anywhere?

17   A.   Absolutely not.

18   Q.   Did you stop at Jewish Geriatric Services?

19   A.   No, I did not.

20   Q.   Did you stop at Jewish Geriatric Services and get out

21   of your car and put a fuel container next to the tree?

22   A.   No, sir, I did not.  Absolutely not.

23   Q.   Did you put a fuel container with gas in it and stick

24   a wick in it?

25   A.   No, absolutely not.

1    Q.   And did you try to light that wick that was in the
2    fuel container next to the tree?
3    A.   No, I did not at all.
4    Q.   I want to show you what's already been admitted as
5    Exhibit 41 so it could be published to the jury.
6         You've seen this exhibit here at trial, right?
7    A.   Yes, sir.
8    Q.   This indicates as the title says 5:05 a.m to 8:25 in
9    the morning?
10   A.   That's correct.
11   Q.   The different places -- well, at least the different
12   cell towers that were being used while you were up there?
13   A.   Yes.
14   Q.   Is that -- first, well, let me ask, so what were you
15   doing up there at all these different times from 5:05 to
16   8:25 in the morning?
17   A.   Solely trying to get crack, purchase crack from
18   somebody.
19   Q.   Was it just Devin Austin or do you think you were
20   going to other people?
21   A.   No.  Like I said, there's a housing project over near
22   St. James that I can go to also.
23   Q.   But again, all in this same area here?
24   A.   That is correct.
25        Yes, can see St. James there.

1    Q.   So having looked at the different cell towers and

2    text messages that were going on for this period of time,

3    can you think about some of the people that you were

4    getting crack from or you're trying to get crack from?

5    A.   Yes, sir.

6    Q.   Who was it?

7    A.   There's Devin; there's Macho; there's JJ.  There's

8    quite a few people over there.

9    Q.   So you have different sources of supply for your

10    drugs?

11    A.   I do.

12    Q.   Were you also doing dumpster diving at the same time?

13    A.   I probably was possibly, yup.

14    Q.   You don't remember for sure?

15    A.   Not for sure.

16    Q.   But you do remember drugs?

17    A.   I do.  I know when my mindset is on getting more

18    drugs, that's getting more drugs is what I'm doing.

19    Q.   And again is this unusual behavior for you?

20    A.   Again, unfortunately this is not unusual behavior.

21    This is the same thing I've done probably a hundred times.

22         MR WATKINS:  This next exhibit is not yet in

23    evidence so if we can just have the parties.

24    Q.   (By Mr. Watkins)  So I'm showing you a Bank of

25    America statement from your account in March of 2020 and

1    April 2020.  Do you see what I put in front of you?

2    A.   I do see it.

3    Q.   And is that your name and account number as best you

4    remember it --

5    A.   Yes, sir.

6    Q.   -- from that period of time?

7    A.   Yes, sir.

8    Q.   So this is your bank account?

9    A.   This is.

10   Q.   A record of your bank account?

11   A.   This is a record of my bank account.

12            MR. WATKINS:  I'd ask that this admitted as

13   Defendant's Exhibit 1 and published to the jury.

14            MS. BERKOWER:  No objection.

15            THE COURT:  All right.  That can be published.

16   **(DX-1 was admitted.)**

17   Q.   (By Mr. Watkins) Showing a particular page of this

18   bank statement, it indicates here that you had deposited a

19   check on March 23rd.  Do you see that?

20   A.   I do see that.

21   Q.   And what is the date of the withdrawal of a hundred

22   dollars?

23   A.   April 2, 2020.

24   Q.   And so that was the same day at least that you took

25   out a hundred dollars that day?

1    A.   Yeah, I cashed the check that I had.

2    Q.   And when was that?  When did you get the cash that is

3    showing here the withdrawal?

4    A.   Immediately when the bank opened.  It was either 8:30

5    or 9 o'clock.

6    Q.   When you say the bank opened, which bank and where?

7    A.   That would be the Bank of America over by St. James

8    again.

9    Q.   So going back to Exhibit 41 here, that's in this area

10   down here, correct?  (Indicating)

11   A.   That's correct.

12   Q.   And what did you do once you got that hundred

13   dollars?

14   A.   I immediately went to purchase drugs.

15   Q.   Staying on Exhibit 41 here for a minute, do you see

16   some activity here between 8:29 and 9 o'clock?  And then

17   by 9:15 you're back down by East Longmeadow again.  Do you

18   see that?

19   A.   Yeah, I'm back by my house.

20   Q.   So having seen that sequence of events, the Bank of

21   America and then going off another cell tower at 8:58 and

22   then 9:15 or thereabouts, what do you think was happening

23   that morning?

24            MS. BERKOWER:  Your Honor, I'm actually going to

25   object at this point.  I don't think this witness has said

1    -- it doesn't appear he has any actual memory of this, and

2    he's just testifying off of documents and so I would

3    object to this line.

4              THE COURT:  All right.  Objection sustained.

5    Can you please clarify through your questioning regarding

6    -- the witness can only testify obviously as to his

7    memory.  Can you please clarify?  Right now the objection

8    is sustained.

9              MR. WATKINS:  Thank you.

10   Q.   (By Mr. Watkins) So, Mr. Rathbun, I think what Ms.

11   Berkower is getting at here is we've heard testimony that

12   you were a little bit hazy about where you had been in the

13   last couple of weeks when you talked to Agent McGonigle.

14             MS. BERKOWER:  Your Honor, objection again.  I

15   don't know what he's referring to with regard to

16   commenting on other testimony.  If he could lay a

17   foundation?

18             THE COURT:  Sustained.

19   Q.   (By Mr. Watkins)  Did you hear the testimony of Agent

20   McGonigle?

21   A.   I did.

22   Q.   Did you hear that he testified that you were a little

23   bit hazy about where you had been the last couple of

24   weeks?

25   A.   This is true.

```
 1    Q.    And at some point you told him you hadn't been out of
 2    the house in a couple of weeks, right?
 3    A.    I told him about two weeks.
 4    Q.    So now we've been fairly precise about where you were
 5    that morning?
 6    A.    Yes, sir.
 7    Q.    What has changed between April 15th and now that
 8    you're able to talk about where you were and what were you
 9    doing?
10    A.    You have given me the printout of my text messages,
11    voice calls, GPS, and from that information I was able to
12    recall what happened that day.
13    Q.    So when you're testifying here -- while I'm helping
14    you with these maps -- you're testifying from your memory?
15    A.    That is correct.
16    Q.    Now, you don't remember every single minute that you
17    were there, right?
18    A.    This is true.
19    Q.    But certainly you now -- do you now remember events
20    of April 2nd?
21    A.    Yes, sir, absolutely.
22    Q.    So from your memory of the events of April 2nd in the
23    morning at 9:11, where do you think you were?
24    A.    I had gotten drugs and gone back to my house now.
25    Q.    When you got back to your house, were people a little
```

1    annoyed with you?

2    A.    Well, my mom was at work and my daughter was up in

3    her room and my father was very annoyed.

4    Q.    What was he annoyed about?

5    A.    He was mad because I was supposed to be home in time

6    for my mom to use the car to take it to work.

7    Q.    We've heard text messages and voice mails that she

8    left for you.  Was that about having the car to get to

9    work?

10   A.    Yes, sir.

11   Q.    Was that unusual that you would put your mom out in

12   that way?

13   A.    Unfortunately, no.

14   Q.    I want to go to April 15th, the day the FBI came to

15   your house.

16   A.    Yes, sir.

17   Q.    When was the first -- what was the first thing you

18   noticed when the FBI came to your house?

19   A.    It was about 7:30 in the morning.  I was in bed

20   sleeping, and I heard rustling in the front door so I

21   opened up my door.  I came out and there was a man with a

22   rifle in front of me and an FBI vest on and he told me to

23   come out.

24   Q.    And how were you dressed when you came out?

25   A.    I was in my boxers still.

1    Q.   Now you must have been a little bit sketched at that

2    point?

3    A.   I was, yeah, extremely.

4    Q.   What did you think was happening?

5    A.   I had no idea.  I had no idea.  I wasn't sure what

6    this was all about.

7    Q.   Well, the FBI comes to your house.  It sounds like

8    you know some people that do drugs and the like.  What

9    were you thinking?

10   A.   This is true.  I was thinking it could have had

11   something to do with maybe one of the stealing things I

12   did or something drug-related.  But I mean with the FBI

13   there, it was serious.  I wasn't sure what it was about.

14   Q.   Now there's two -- it was quite sometime that you

15   were talking to the agents there, right?

16   A.   That's correct.

17   Q.   Some of the first things they wanted to do is get a

18   swab from you for your DNA?

19   A.   That's correct.

20   Q.   And did you agree to do that?

21   A.   I did agree.

22   Q.   And they began talking a little bit about what it was

23   they were looking into, right?

24   A.   Very little.  They were questioning me more than

25   giving me information.

1    Q.   I want to focus on the two things that we've been

2    focusing on at trial.  One of those things was your

3    whereabouts for the last two weeks, right, and also about

4    Ruth's House?

5         Before I get to those two items, I do want to ask

6    were you completely -- well, Agent McGonigle asked you

7    about your drug use several times --

8    A.   Yes, sir.

9    Q.   -- during the interview?

10   A.   Yes.

11   Q.   Were you completely honest and forthright with him

12   about your drug use?

13   A.   At first I wasn't.  It's not something I'm happy

14   about or want to broadcast or talk about.  So at first I

15   did lie about my drug use, but by the end of the interview

16   I told him the truth.

17   Q.   In regard to them questioning you about where you had

18   been for the last couple of weeks, how did that --

19   describe how that subject came up.

20   A.   I mean, they asked me approximately where I had been

21   for the past two weeks and I told them I had a

22   prescription what I had to fill and I did a dump run on

23   Saturday, and I said I was home approximately two weeks.

24   I was -- how I got to that conclusion was the day they

25   came was the 15th and so I figured from the 1st to the

1    15th was approximately two weeks.

2    Q.    Did they ever ask specifically about April 2nd and

3    where you were in the morning of April 2nd?

4    A.    No, sir, they did not.

5    Q.    Did they ever bring a calendar or anything to show

6    the weeks there?

7    A.    No, sir.

8    Q.    When you answered that I haven't been out of the

9    house in approximately two weeks other than the dump run

10   and the Methadone, were you trying to cover up the fact

11   you've been a drug binge a couple weeks before?

12              MS. BERKOWER:  Objection; leading.

13              THE COURT:  Sustained.  It's leading.

14   Q.    (By Mr. Watkins) Were you trying to cover up anything

15   by telling him I hadn't been out of the house in last two

16   weeks?

17   A.    Absolutely not.

18   Q.    Before that morning on April 15th when the agents

19   came to see you, did you hear of Ruth's House?

20   A.    Before that morning, no.

21   Q.    Did Ruth's House have any meaning to you at all when

22   they began asking about it?

23   A.    At that time point, no.  It didn't mean nothing to

24   me.

25   Q.    On April 15th did you know the whereabouts of various

1  Jewish nursing homes on Converse Street?

2  A.   No, sir.

3          MR. WATKINS:  I'm going to show you an exhibit

4  but first it should go the parties so that the government

5  can remind me what number it is.

6          MS. BERKOWER:  I believe that's 72.  I can just

7  briefly check.

8          MR. WATKINS:  Your assistant is nodding her

9  head.  She probably knows better than any of us.

10         MS. BERKOWER:  She probably does.

11         MR. WATKINS:  This has been admitted into

12 evidence as Exhibit 72 and so it can be published to the

13 jury.

14         THE COURT:  Yes, that's 72.

15 Q.   (By Mr. Watkins)  John, do you remember being shown

16 this map by Agent McGonigle?

17 A.   Yes, sir, I do.

18 Q.   And when you looked at this -- well, first, describe

19 all the information that you see on the map?

20 A.   I mean, beside Converse Street, that's about the only

21 thing I knew.  I don't know what Ruth's House was as a

22 street.

23 Q.   And to be clear, you know where Ruth's House is now

24 after this case got going, right?

25 A.   That's correct.

1    Q.   But when he showed you this map, was there anything
2    else that indicated that you might have been anywhere on
3    this property or known anything about this property in
4    your mind?
5    A.   No.  No, sir.
6    Q.   We have heard about jail calls between you and your
7    mother, one of which is a statement from you that says
8    "grandma used to live there."  When did you first realize
9    that there was a connection between Genesis House and
10   Ruth's House?
11   A.   I would say shortly after they -- after the 15th you
12   had given me paperwork saying that the -- or actually you
13   told me that the FBI was investigating where my grandma
14   lived and getting paperwork and documents from her and
15   that's when I remembered that she lived there.
16   Q.   How many times do you think you were actually at your
17   grandma's house over the years that she lived there?
18   A.   Maybe twice a year.
19   Q.   Did you know its name as being Genesis House?
20   A.   No, I did not.
21   Q.   Did you -- before we started talking about this, did
22   you know that Genesis House was actually on the same
23   campus as Ruth's House?
24   A.   I did not.  We always called it going to grandma's.
25   Q.   How often did you go to grandma's between 2003 and

1    2010?

2    A.   Maybe four or five times maybe, yeah.

3    Q.   Did you actually ever go there for Christmas?

4    A.   When I said that, I meant that we would stop by there

5    so that she could give me a present.  We didn't stay there

6    very long because she had a very small place where she

7    lived.

8    Q.   Again, you had not previously recognized the

9    importance of Genesis House to the government before that

10    time?

11    A.   I had no idea.  Correct.

12    Q.   Agent McGonigle and Officer Chaplin questioned you

13    about how could your blood be on this gas can and

14    pamphlet.  Do you remember them questioning you about

15    that?

16    A.   Yes, sir.

17    Q.   What were you thinking when you heard that

18    information from them?

19    A.   I was very concerned, confused.  I couldn't

20    understand how my blood at that time, how my blood could

21    have gotten on that gas can.

22    Q.   And Officer McGonigle asked you to think about is

23    there any point that you might have owned a yellow gas

24    can; do you recall that?

25    A.   I do recall that.

1    Q.   Did you ever own a yellow gas can?

2    A.   No, sir.  I'd have no reason to own a yellow diesel

3    gas can.

4    Q.   So given that you never owned it, what again were you

5    thinking and feeling at that point?

6    A.   Like I said, I was extremely confused.  I was

7    thinking in my mind how it could possibly have happened,

8    extremely emotional.

9    Q.   When you say how it could have happened, how what

10   could have happened?

11   A.   How my blood could have gotten on that gas can.

12   Q.   Did it get on there because you placed it there at

13   Jewish Geriatric Services?

14            MS. BERKOWER:  Objection.

15            THE COURT:  Sustained.  The question itself is

16   not a proper question.  It is stricken.

17   Q.   (By Mr. Watkins)  When you saw the photographs and

18   you told Agent McGonigle you didn't want to talk about it,

19   it that because you thought you had been caught?

20   A.   No.  Where they said how I put my hands in my head,

21   no, that was because I was -- I understood at that point

22   how serious of a thing this was and how I was going to get

23   myself out of it.

24   Q.   So how did your blood get on that can and that

25   pamphlet?

1    A.   It was from a cleanout job.

2    Q.   When was the cleanout job?

3    A.   The cleanout job was end of March, middle of March.

4    Q.   Do you remember the exact date?

5    A.   I don't remember the exact date.

6    Q.   So tell us about this cleanout job that you did.

7    A.   It was me and my buddy Chris.  We went to a Chicopee

8    residential house to do a cleanout.  They had a lot of

9    pressure-treated wood stairs, a lot of metal, metal

10   siding.  They had a lot of junk, a lot of fencing, wood,

11   metal.  All kinds of stuff.

12   Q.   And was there a gas can there as well?

13   A.   There was a gas can there.

14   Q.   So all of the material that you were cleaning out

15   from there, where did that go to?

16   A.   It all went into my van, yeah, my van.

17   Q.   And once you finished that cleanout job, where did

18   you go?

19   A.   So it was in the middle of the pandemic also, and I

20   wasn't sure where to get rid of it.  So I drove back to my

21   house and it stayed in my car for maybe a week or so

22   before I dumped it.

23   Q.   And when you say you dumped it, it's illegal to dump

24   it?

25   A.   That is correct.

1    Q.   When you illegally dumped the remnants of that
2    cleanout, was the gas can dumped as well?
3    A.   Yes, sir.
4    Q.   Now going back to April 15th, Agent McGonigle asked
5    you to think about all the places that you might have
6    touched a gas can.  Why didn't you tell him about the
7    cleanout then?
8    A.   You have to understand that I was using drugs a
9    couple days prior to this.  I was very hazy.  It was a lot
10   to take in at that moment that the FBI was there.  I was
11   very confused and it just was so much to take in so I just
12   didn't remember that morning.
13   Q.   But are you sure now that that's when you touched the
14   yellow gas container?
15   A.   I'm 100 percent sure.
16   Q.   And did that yellow gas container have gas in it when
17   you picked it up on the cleanout?
18   A.   It might have had a little something in it, but, no,
19   not that I remember.
20   Q.   Putting on the screen what's already been admitted as
21   Government's Exhibit 7.  Do you see that up on your
22   screen?
23   A.   Yes, sir.
24   Q.   On April 2nd of 2020, did you have something against
25   Jewish Geriatric Services?

1    A.   No, sir.

2    Q.   Did you have something against Ruth's House?

3    A.   I absolutely did not.

4    Q.   Did you have a bone to pick with Genesis House?

5    A.   I don't.

6    Q.   Did you have a dispute with anyone on Converse Street

7    at all?

8    A.   I did not.

9    Q.   On April 2nd in the morning, did you want to harm

10   people?

11   A.   No.  Absolutely not, sir.

12   Q.   Did you want to destroy property?

13   A.   No, sir.

14   Q.   Were you trying to intimidate people on Converse

15   Street or Ruth's House or Genesis House or anyone?

16   A.   No, sir, absolutely not.

17   Q.   On that morning did you stop by Jewish Geriatric

18   Services, get out of your car, put a fuel container with

19   case it in, a wick in the spout, and try to light it on

20   fire?

21   A.   No, sir.

22               MS. BERKOWER:  Objection.

23               THE COURT:  Overruled.

24               THE WITNESS:  No, sir.  Absolutely not.

25               MR. WATKINS:  That's all.

```
 1              THE COURT:  All set?
 2              MR. WATKINS:  Yes.
 3   CROSS-EXAMINATION
 4   Q.  (By Ms. Berkower)  So, Mr. Rathbun, you just told
 5   this jury that someone else committed this crime; did I
 6   understand you right?
 7   A.  Yes, sir -- yes, ma'am.  I'm sorry.
 8   Q.  And you asked the jury to believe you on that, right?
 9              MR. WATKINS:  Objection.
10              THE COURT:  Sustained.
11   Q.  (By Ms. Berkower)  So let's talk about this crime
12   that according to you somebody else committed.  Okay?
13        You can agree, right, that this was a serious
14   crime?
15   A.  Yes.
16   Q.  It involved gasoline, right?
17   A.  It did.
18   Q.  It's a highly flammable substance, right?
19   A.  It is.
20   Q.  Gasoline can easily catch fire, right?
21   A.  Yes, ma'am.
22   Q.  Gasoline can easily explode, right?
23   A.  That's what the guy said.
24   Q.  What's that?
25   A.  Yes.
```

```
1    Q.   And anyone who goes to the gas station to fill up
2    their car knows that, right?
3    A.   Sure.
4    Q.   And you have to be careful around gas because even a
5    spark from a distance could ignite it, right?
6    A.   That's what we heard.
7    Q.   Any flame near gasoline could cause a fire, right?
8    A.   Sure.
9    Q.   And you're a handyman so, you know, you understand
10   that -- you deal with this kind of thing all the time?
11   You just described picking up a gas can with a little bit
12   of gas in it, right?
13   A.   Not all the time, but this time I did.
14   Q.   And you know you have to be careful around substances
15   like gas when you encounter them, right?
16   A.   I think we all do.
17   Q.   And in this case there was gasoline in the yellow
18   container that was found at JGS, right?
19   A.   That's what we've been told.
20   Q.   And the yellow canister that was found there, that
21   didn't really have any safety features on it, did it?
22   A.   I wasn't aware of any.
23   Q.   The spout on that can was totally open?
24   A.   That's what we were told.
25   Q.   And most cans now have safety features on the spout,
```

1   right?

2   A.   Yeah.

3   Q.   But this one did not, right?

4   A.   That's what we were told.

5   Q.   Someone took the safety spout off of this can, right?

6   A.   Yes, I guess.

7          MR. WATKINS:  Objection.

8   Q.   (By Ms. Berkower)  And they put on an open --

9          MR. WATKINS:  Objection.

10         THE COURT:  Sustained.  The question and answer

11  are stricken.

12  Q.   (By Ms. Berkower) Now for this can, anything can come

13  out of it, right?

14  A.   That's what we were told.

15  Q.   And anything could come in?

16         MR. WATKINS:  Objection, Your Honor.

17         THE COURT:  Sustained.

18         MS. BERKOWER:  Your Honor, he testified about

19  the can.  He had it in his possession.  According to him

20  he's seen it in person.  I'm just asking him about the

21  characteristics of the can.

22         THE COURT:  Based upon his observations of it.

23  All right.

24  Q.   (By Ms. Berkower)  So you had this in your

25  possession, right, at some point?

1    THE COURT:  You can answer.

2    THE WITNESS:  Yes.

3    Q.   (By Ms. Berkower) And you saw this spout, right?

4    A.   I did not look at the spout specifically.

5    Q.   Okay.  But you would agree that if the spout were

6    open, a spark could go in?

7    A.   If it were open.

8    Q.   Now the canister in this case had warning labels on

9    it, right?

10   A.   That's what we were told.

11   MS. BERKOWER:  If we could have Government's

12   Exhibit 11 please for the court, counsel, the witness, and

13   the jury?

14   Q.   (By Ms. Berkower) There's a warning printed right on

15   the side of that canister, isn't there?

16   A.   There is.

17   Q.   It says "Extremely flammable," right?

18   A.   It does.

19   Q.   It says, "May cause flash fire," right?

20   A.   It may cause.

21   Q.   Now in this case when the police found the canister

22   at JGS, there was paper stuffed into the spout, right?

23   MR. WATKINS:  Objection?

24   THE COURT:  Well, I'm concerned regarding what

25   you are -- based upon what?  Are you asking him based upon

1    his reviewing photographs?  Reviewing evidence?  Listening

2    to witnesses.

3              MS. BERKOWER:  I would based on his knowledge of

4    the case that he's seen and reviewed.

5              THE COURT:  All right.  Go ahead.  Overruled.

6              THE WITNESS:  Can you repeat the question,

7    please?

8    Q.   (By Ms. Berkower)  In this case when the police found

9    this canister at JGS, there was paper stuffed into the

10   spout, right?

11   A.   That's what we've been told.

12   Q.   And the can wasn't sold with paper in the spout, was

13   it?

14   A.   I don't know.

15             MR. WATKINS:  Objection.

16             THE COURT:  Sustained.  Stricken.

17   Q.   (By Ms. Berkower) So in this case the paper that was

18   found was charred, right?

19   A.   That's what we've been told.

20             MS. BERKOWER:  If we could have Government's

21   Exhibit 18, please?

22   Q.   (By Ms. Berkower)  Do you remember seeing that photo?

23   A.   I remember seeing this photo.

24   Q.   So this was the paper that the police took out of the

25   spout, right?

```
1    A.    That's what I've been told.

2    Q.    And it was charred?

3    A.    Yeah.

4              MR. WATKINS:  May we be seen at sidebar, Your

5    Honor?

6              THE COURT:  Sure.

7    (Sidebar conference.)

8              MR. WATKINS:  The fact that Mr. Rathbun has

9    reviewed the discovery does not open the door for the

10   government to put its entire case in through him to say

11   this is true; that is true; that is true.  Mr. Rathbun has

12   denied that the container -- that he left the container at

13   the scene.

14       What the government is trying to do is get an

15   admission from him that those features as it appeared

16   there are true, and presumably argue that he has admitted

17   all of those things were true at the scene.  I think it's

18   improper for the government to ask him to comment on every

19   piece of its evidence.

20             THE COURT:  Response?

21             MS. BERKOWER:  My response would be, Your Honor,

22   that on direct examination he was asked questions about

23   the device.  He was asked whether he put it there.  He was

24   asked all kinds of questions relating to the canister and

25   he was also asked to comment on other witnesses that have
```

1    testified in this case.

2         I'm just trying to bring that back around.  He was

3    also asked about his state of mind frankly to the extent

4    that he had no animosity or interest in harming anybody,

5    and I'm trying to make the point that whoever did this may

6    well have had animosity and interest in hurting people or

7    killing people.

8         He's claiming it was not him, but to the extent that

9    that is implicit in the nature of what the police found

10   that day, I'm just trying to make that point.  If he

11   doesn't want to agree, he does not have to, but I think we

12   should be allowed to explore it.  He's put his own version

13   of events directly in question here.

14             THE COURT:  I think your way of asking questions

15   is inappropriate.  There's certainly nothing wrong with

16   you showing him exhibits, and you can ask leading

17   questions about what the exhibit shows to walk him

18   through, but the way you're asking it I agree with

19   Attorney Watkins is inappropriate.

20        So the general nature of what you're trying to get

21   at, you certainly can get to but try a different method of

22   questioning.

23             MS. BERKOWER:  I will, Your Honor.

24   (End of sidebar conference.)

25             MS. BERKOWER:  All right.  If we could please

1    have Government's Exhibit 7 in evidence?

2    Q.    (By Ms. Berkower)  Now, Mr. Rathbun, you've reviewed

3    this photograph, right?

4    A.    I have seen it.

5          MS. BERKOWER:  And if we could also have

6    Government's Exhibit 9, please?

7    Q.    (By Ms. Berkower) When you handled the can, did it

8    have that paper in the spout?

9    A.    When I picked that up at the jobsite, no.  The paper

10   was not in the spout.

11   Q.    So would you agree that someone put the paper there?

12   A.    That is correct.

13   Q.    Whoever put the device here, put the paper in?

14   A.    They did.

15   Q.    And you can see -- do you see on this photograph the

16   paper was charred?

17   A.    It's hard to say but I can see it.

18         MS. BERKOWER:  If we can go to Government's

19   Exhibit 18, please?

20   Q.    (By Ms. Berkower) You're familiar with that

21   photograph, right?

22   A.    I have seen this photograph.

23   Q.    That's the paper that was taken out of that spout?

24   A.    That's what I've been told.

25   Q.    And that paper was charred?

1    A.    It is.

2    Q.    Now going back to Government's Exhibit 9, the

3    charring on this paper looks like it's outside of the can,

4    right?

5    A.    It's in the nozzle, yeah.

6    Q.    So it didn't make it all the way inside, right?

7    A.    Some of it might be.  I'm not sure.

8    Q.    Well, if you compare that photograph --

9              MS. BERKOWER:  I don't know if we can do this,

10   Ms. McKenna, could we compare that photograph to

11   Government's Exhibit 18?

12   Q.    (By Ms. Berkower)  It looks like it didn't burn all

13   the way down, right, if you compare those two?

14   A.    Correct.

15   Q.    So it went out before it got into the can?

16   A.    I don't know.  It must have.

17             MS. BERKOWER:  Now, if we could have

18   Government's Exhibit 7, please?

19   Q.    (By Ms. Berkower)  You're familiar with this

20   photograph, right?

21   A.    I have seen it.

22   Q.    This device -- and would you agree, it was a device

23   at this point?

24   A.    No.

25   Q.    This gas can with the wick in it was put under that

1   tree, right?

2   A.   It was.

3   Q.   And that's close to the sidewalk, right?

4   A.   It's about 6, 7 feet away.

5   Q.   Have you been there yourself to check?

6   A.   No.  I can tell.  I'm a contractor.  I have a pretty

7   good eye.

8   Q.   And it's near a road, right?

9   A.   It's near Converse Street.

10  Q.   It's also about 200 feet from the entrance to Genesis

11  House, right?

12  A.   That's what I've been told.

13  Q.   This device could have hurt somebody walking by,

14  right?

15  A.   I don't know.

16            MR. WATKINS:  Objection.

17            THE COURT:  Sustained.

18  Q.   (By Ms. Berkower)  Now you're familiar that the

19  average age of residents at Genesis House is 86, right?

20            MR. WATKINS:  Objection.

21            THE COURT:  Overruled.

22  Q.   (By Ms. Berkower)  You may answer I think.

23  A.   I'm not aware, no.

24  Q.   You didn't hear that testimony here in court?

25  A.   I don't remember hearing that, no.

```
1    Q.   And this device on April 2nd was found at the height
2    of the COVID-19 pandemic, right?
3                MR. WATKINS:  Objection, Your Honor.
4                THE COURT:  Overruled.
5                THE WITNESS:  I don't know if we were in the
6    height of it.  I mean, we're doing pretty bad now too.  So
7    I could say it was during the COVID period, yes.
8    Q.   (By Ms. Berkower)  At the beginning more though?
9    A.   Yeah, it was at the beginning.
10   Q.   That was a scary time at senior facilities, wasn't
11   it?
12   A.   I don't know.
13   Q.   Now, if this device had gone off, it could have
14   really scared the people who lived there, couldn't it?
15   A.   I guess, yes.
16   Q.   And it could have hurt somebody?
17   A.   It could have.
18   Q.   And it could have damaged the property there, right?
19   A.   It could have.
20   Q.   Would you agree that this was a serious crime?
21   A.   Yes.
22   Q.   It was a dangerous crime?
23   A.   It was.
24                MR. WATKINS:  Objection, Your Honor.
25                THE COURT:  I'll hear you.  Do you want to be
```

1    heard?

2              MR. WATKINS:  Yes.

3    (Sidebar conference.)

4              MR. WATKINS:  Your Honor, Ms. Berkower is

5    putting her closing argument in through this particular

6    witness.  I think it's inappropriate for cross

7    examination.  If she's got something to ask him about what

8    he observed, independently of what she is arguing in a

9    closing, I think that's proper, but we are way beyond that

10   at this point.  She is specifically asking him to comment

11   on other evidence here to argue.

12             MS. BERKOWER:  Your Honor, my response to that

13   would be that the witness testified he's familiar that

14   gasoline is very explosive.  He knows that it was in the

15   can.  He saw there was a wick there he observed.  He knows

16   from his experience as a contractor that it's 6 or 7 feet

17   from the walkway.  I'm just asking for his personal view

18   on whether this was dangerous or not.  I think that

19   there's a foundation for it.  It's not inappropriate.

20             THE COURT:  I don't see the appropriateness or

21   value -- I don't even -- I'm not even sure this is a

22   recognized or appropriate form of cross-examination.

23   You're showing him all the pictures and asking him to

24   confirm what the picture shows.

25        I don't know what the question is trying to get at

     1   other than give you the opportunity to make a statement

     2   knowing that he's going to say, well, that's what I've

     3   been told; that's what I've been told; that's what I've

     4   been told.  So I'm not going to allow any further

     5   questions like this.

     6        If you have other questions in the general nature of

     7   this, we will take them one a time and see if I feel

     8   differently about how the other questions come out.  All

     9   right?  So the objection is sustained.

    10   (End of sidebar conference.)

    11   Q.   (By Ms. Berkower)  Okay.  So let's talk about some of

    12   the evidence in this case as it pertains to you, and we'll

    13   start with the blood.

    14        So you know there was blood found on the handle of

    15   the canister, right?

    16   A.   Correct.

    17   Q.   And that's your blood, right?

    18   A.   Correct.

    19   Q.   There was also blood found on the pages of the wick,

    20   right?

    21   A.   Correct.

    22   Q.   That's also your blood?

    23   A.   Correct.

    24   Q.   So your blood was on the handle of the canister?

    25   A.   Uh-huh.

1    Q.    And on more than one pages of the wick, right?

2    A.    Correct.

3    Q.    Nobody else's DNA was found there, was it?

4    A.    Nobody else's would have; I touched it.

5    Q.    Well, but according to you didn't somebody else place

6    the device at JGS?

7    A.    Of course.

8    Q.    So at the same time --

9              MR. WATKINS:  Objection.

10   (Sidebar conference.)

11             THE COURT:  Go ahead.

12             MR. WATKINS:  Where to start?  So we are

13   burdening shifting now that the defendant has to prove

14   that there were other people's DNA on there.  That was not

15   the testimony at trial.  The testimony was that there was

16   DNA of Mr. Rathbun found on there.  There was no effort to

17   exclude that there was any other DNA on there or that they

18   looked.

19        The testimony was there was a particular spot that

20   was identified so the question is extremely misleading

21   that there was some other DNA on there.  There's

22   absolutely no evidence of that.  It's improper to phrase a

23   cross-examination question on a premise the government

24   does not know to be true.

25             THE COURT:  So what does the government say with

1     the DNA evidence as it stands that was introduced

2     regarding other individuals or partial readings?

3              MS. BERKOWER:  The DNA analyst said this was a

4     single source of DNA.  That was the basis for my question

5     was that she was specifically asked during her examination

6     whether there was any other contributors to the DNA in the

7     area of the handle that she examined and she said no, it

8     was single source DNA.  And so --

9              THE COURT:  Did she say -- she swabbed the

10    bloodstain and from the bloodstain there was a single

11    source.  Please correct me, but did she say anything about

12    swabbing the handle versus talking about swabbing the

13    bloodstain?

14             MS. BERKOWER:  She -- I think she did say that

15    the can was swabbed.  It's true that the testing was done

16    only on the bloodstain, but there's also a stipulation in

17    evidence, Your Honor, that there were no fingerprints so

18    this is kind of where I'm going with this.  There were no

19    one else's fingerprints on this can.  His blood was found

20    on it and the spot where his blood was found is a single

21    source of DNA.  I think that's relevant to explore with

22    this witness based on his testimony.  He claims somebody

23    else did this.

24             THE COURT:  Okay.  I'll excuse the jury.  I want

25    to talk about this in a little more detail.

1    (End of sidebar conference.)

2         THE COURT:  Ladies and gentlemen, we're going to

3    take a break as opposed to sitting there while we're

4    working through legal issues using WispherTech.

5         So we'll take a break and when we are finished

6    resolving that, we will have you back in.  I'm balancing

7    the time.  I know lunch has been ordered.  So we'll be

8    balancing the time between can I get you back in here or

9    is the lunch going to be here so we will see what happens.

10        During the break obviously the same rule applies.

11   Don't talk to each other or anyone else about the case.

12   No internet; no reading articles; no posting or reading

13   social media.  All the usual instructions apply.  Thank

14   you.

15   **(The jury left the courtroom at 12:24.)**

16        THE COURT:  I'm going to take a break and so we

17   should plan on coming back in 10 or 15 minutes.  I'm

18   trying to look at the exhibits.  Is there an exhibit

19   number for the DNA -- the DNA exhibit is there an exhibit

20   and if so, what number?

21        MR. DESROCHES:  Your Honor, there are two charts

22   that shows the readout of the particular location.  They

23   are Exhibits 42 and 43.

24        THE COURT:  Thank you.  Okay.  So 15 minutes

25   minimum, so.

1    **(A recess was taken at 12:25 until 12:48.)**

2              THE COURT:  All right.  Can I ask the court

3    reporter to look if you are able to read back the

4    government's questions which led to the break that we

5    took?

6      (Testimony read back.)

7              THE COURT:  Okay.  Thank you.

8              MR. WATKINS:  Your Honor, I'm moving for a

9    mistrial and the basis is there's a number of problems

10   with the particular question Ms. Berkower asked.  One is

11   it's asking Mr. Rathbun to comment on the evidence.

12        Number 2, it is suggesting burden shifting.  If he

13   does not have an answer for why there's nobody else's DNA,

14   then he must be guilty.

15        Number 3, and most importantly, it is an improper

16   comment on the evidence.  It's not supported.  No one else

17   would have touched the handle is incorrect.  The only

18   thing that was swabbed was the bloodstain on that

19   particular gas can.  Nothing else was swabbed on there.

20        I've looked through the reports provided to me.  That

21   was what was requested was DNA on the bloodstain only.  To

22   suggest that because Mr. Rathbun touched the -- left the

23   blood there, that nobody else could have touched the

24   handle is absolutely and positively not supported by

25   anything at trial and indeed is absolutely wrong on the

1    evidence as presented here.

2        It's the cumulative nature of asking for him to

3    comment on the evidence and explain why he is not guilty

4    given that, the only way to cure that is by a mistrial.

5            THE COURT:  So break this down a little bit.

6    You've asked for a lot and kind of squeezed them all

7    together and said it very quickly.

8        So your first comment was -- I want to make sure I

9    everything -- is that it's improper asking him to comment

10   on the evidence?

11           MR. WATKINS:  I did not hear everything the

12   court reporter said, but she says no one else would have

13   touched it.  I believe that was one of the parts of the

14   questions.  No one else would have touched the can.  What

15   is Mr. Rathbun's response supposed to be at that juncture?

16   He can say, you're right.  He can say, no.  It is a

17   question that at its essence asked Mr. Rathbun to explain

18   evidence that would be consistent with his innocence.

19           THE COURT:  Could I -- I don't know the answer

20   to this.  This is a question for the court reporter.  Can

21   the court reporter print out that questioning that lead up

22   to the objection which stopped the trial that we are all

23   now talking about, or is your rough transcript not

24   produced in a way to print out those questions?

25           COURT REPORTER:  I would just need a few

1    minutes.

2              THE COURT:  Do you think it would be beneficial

3    to the parties if we took some time and printed that out

4    so we know exactly what we are talking about as opposed to

5    just trying to remember what was said?

6        I'm asking both sides if you think it would be

7    beneficial to your arguments?  You're asking for quite a

8    significant remedy here and so I want to make sure that we

9    pay attention to fine detail including exactly how the

10   questions were phrased.

11             MR. WATKINS:  I appreciate that.  I would also

12   ask the government to look in its files if it can find any

13   evidence whatsoever that the entire can was swabbed for

14   DNA.

15             THE COURT:  I reviewed a rough transcript -- I

16   have had access to a rough transcript of the DNA witness's

17   testimony and I can't say I've studied it but from my

18   looking at it quickly, it does not look like there was any

19   such testimony.

20       This witness I think received the sample from whoever

21   was at the scene and did swabbing and the witness who

22   testified just took whatever they gave her, which I

23   believe was only the bloodstain, but I'm not telling you

24   that's me studying the transcript.  That's quickly looking

25   at it.

1          MR. WATKINS:  I will tell the court my review of

2     the chain of custody was that it was always the bloodstain

3     that was sent and identified for testing.

4          THE COURT:  Right.

5          MS. BERKOWER:  Your Honor, I think Mr. Desroches

6     can address this.  It was his witness that testified.

7          MR. DESROCHES:  Your Honor, I would agree that

8     the bloodstain was swabbed and tested.  The entire can was

9     not swabbed, but I would suggest the evidence -- the

10    testimony regarding --

11         COURT REPORTER:  Excuse me.  Could you use the

12    microphone, please?

13         MR. DESROCHES:  So there was testimony about

14    handler DNA and what that is in that this blood did not

15    have additional DNA mixed in I think is the point.  So

16    this was a single sourced DNA.

17         THE COURT:  I agree with you, but from that

18    sample from the -- there's a picture on the can of a

19    blood, of a bloody deposit on the can, and that was what

20    was swabbed to be tested.  Is that correct so far?

21         MR. DESROCHES:  Yes, Your Honor.

22         THE COURT:  So within that sample that was

23    extracted from the bloodstain that we're all familiar with

24    in looking at the picture of the can, within that sample

25    single source DNA, no partial profiles?  No other

1    contributor?

2           MR. DESROCHES:  That's accurate.

3           THE COURT:  So we're -- okay.  Fine.  So we're

4    talking about the right thing.  So we're talking about

5    from that sample.

6        My concern is that -- and that's why I want to look

7    at the question closer -- the question talked about the

8    entire can.  Like no one else is on that can and as

9    opposed to talking about the sample, the single spot.

10       So I do think I need the benefit of having it written

11   out in front of me what the exact question was because

12   it's potentially, potentially a fairly big issue.

13          MS. BERKOWER:  Your Honor, I would -- may I just

14   say that to the extent that this defendant has given an

15   explanation of what happened that day and how the can got

16   where it got, he gave -- the jury is entitled to test that

17   story and for us to be able to explore that story and

18   whether or not it makes sense, especially because he's

19   charged with giving a different story when Special Agent

20   McGonigle asked him about the blood also.

21       So I just want to respond in that way to Mr. Watkins'

22   claim that we are burden shifting here.  We are not burden

23   shifting.

24          THE COURT:  Well, here's the thing.  The

25   government has the burden of proof.  You could have had

1    the entire can tested to see if it produced DNA from

2    anyone else or prints from anyone else that didn't match,

3    or were not readable because they were imperfect.  They

4    were imperfect samples.

5        The defendant has no obligation to do that test

6    himself; has no obligation to exclude others or include

7    others.  The question did invite -- my memory of the

8    question did invite that conclusion from the jury.  And

9    the question -- my memory of the question and that's why I

10   want the question in front of me with the transcript, the

11   question also, if it's as I remembered it, misstated the

12   evidence.

13       Misstated the evidence in a way -- I don't know how

14   strongly without seeing it printed out for me -- misstated

15   the evidence in a way that would lead to the conclusion or

16   inference that the entire can was tested and so,

17   therefore, he is the only print or the only DNA source,

18   the only person who would have touched it which would be

19   an improper comment, especially in the context of since

20   it's the government's burden to be doing the testing.

21            MS. BERKOWER:  May I address the fingerprints?

22            THE COURT:  You absolutely can, but I just

23   really want to see the question.

24            MS. BERKOWER:  I think, Your Honor, we can at

25   least take fingerprints off the table because the parties

1   stipulated and the stipulation that was filed earlier

2   today that the can was tested for fingerprints and none

3   were found.

4           THE COURT:  Okay.

5           MS. BERKOWER:  So at least I think we can take

6   that off the table.

7           THE COURT:  Okay.  Great.

8       So, Attorney Watkins, that's a good point.  Thank you

9   for that.  So you don't dispute that?  That there were no

10  prints on the can?  So the can we have evidence,

11  government's evidence that there was no fingerprints on

12  the can?

13          MR. WATKINS:  No fingerprints of anybody at all,

14  including Mr. Rathbun; that's correct.

15          THE COURT:  Okay.  So we are only talking about

16  DNA.

17      So I'm going to ask our stenographer to take whatever

18  time she needs to produce for me the specific question and

19  then we'll all have copies of it and we can talk about

20  where we go from there, including any suggestion -- if the

21  court does find that there was something inappropriate,

22  whether or not there is a remedy by way of instruction.

23  All right.

24          MR. WATKINS:  Your Honor, in that regard if I

25  can?  While the court is looking, the remedy is -- or at

1    least some remedy would be *United States v. Munyenyezi*,

2    that's M-u-n-y-e-n-y-e-z-i, and the citation for that is

3    781 F.3d 532.

4         In that case a prosecutor asked a question without a

5    proper factual basis and a misleading question.  It talks

6    about having the government concede to the jury that the

7    question was improper.  I think that's at least one step

8    the court can take.  Having said that, we do think that

9    this is a case for a mistrial.  It is a very, very serious

10   hiccup here in the trial.

11             THE COURT:  I'll see the parties back after we

12   get the printout.  Okay.

13   **(A recess was taken at 1:01 until 2:15.)**

14   **(Mr. Rathbun is present.)**

15             THE COURT:  Back on the record.  The parties

16   have the questions and answers for the relevant section

17   that we are now talking about that caused a defense

18   request for a mistrial.

19        Now that we have the printed out the question,

20   Attorney Watkins, did you want to supplement or comment

21   any further?

22             MR. WATKINS:  Judge, I think it makes it clear

23   as to both points.  As to the burden shifting, the next

24   question that Ms. Berkower asked after this exchange about

25   the blood was "Well, but according to you didn't somebody

1   else place the device at JGS?"  That I would suggest is

2   clearly burden shifting.  That it requires Mr. Rathbun to

3   explain something that is consistent with innocence.

4        As to the factual inaccuracy, it's also quite clear

5   -- I'll read the exchange starting with "And that's your

6   blood, right?"

7        "Correct."

8        "There was also blood found on the pages of the wick,

9   right?"

10       "Correct."  Mr. Rathbun says correct.

11       "That's also your blood?"

12       "Correct."

13        "So your blood was on the handle of the canister?"

14       "Uh-huh."

15       "And on more than one page of the wick, right?"

16       "Correct."

17       "Nobody else's DNA was found there, was it?"

18       That is factually -- it's unsupported by any

19  testimony here and in fact it's unsupported by anything,

20  any fact whatsoever in discovery or the case.  It is

21  clearly, clearly misleading.

22       In a fundamental way it's clear that what Ms.

23  Berkower is trying to do is get across to this jury

24  through Mr. Rathbun that there was no one else that could

25  have touched this and still be consistent with someone

1  else putting it there.

2        There simply is no support in any of the discovery or

3  the evidence.  It's a fundamental problem here that the

4  jury has heard this now.  I don't believe there's any kind

5  of remedial measures that the court can take to unring

6  this particular bell, particularly given the combination

7  of key fundamental kinds of issues like this.

8              THE COURT:  Government?

9              MS. BERKOWER:  Yes, Your Honor.

10       I don't think that that conclusion is warranted from

11  the exchange here.  I mean, the good-faith basis for

12  asking him about his DNA was a reference back to his

13  blood, and there was testimony by the DNA analyst that it

14  was a single source.  There was no DNA in that blood other

15  than his own.  That was the only purpose of that question.

16       The fact that he went above and beyond that in his

17  answer is not something that I elicited.  And the purpose

18  of asking, you know, "That was your blood found on the

19  pages of the wick, right?"

20       "Correct."

21       "That's also your blood, correct?"

22       "So your blood was on the handle of the canister?"

23       "Uh'huh."

24       "And on more than page of the wick, right?  Nobody

25  else's DNA was found there?"

1    That's a direct reference to the blood.  I don't

2  think that it is the -- the inference that Mr. Watkins is

3  drawing I just don't think is there.  That was not the

4  purpose of the question.

5    The purpose of the question was to hearken back to

6  the testimony about the single source of the DNA in that

7  blood, and it certainly is not something that warrants the

8  relief that he's seeking.  I don't think it was improper,

9  but it certainly doesn't -- because it's not improper, I

10 don't think it warrants any of the relief that he's

11 seeking here.

12   In addition to that, I would also note that there's

13 some authority on this point from the First Circuit.  The

14 case is *United States v. Glantz*.  The cite is 810 F.2d 316

15 and the pin cite is 323.

16   In that case the First Circuit quoting the Supreme

17 Court in a case where the prosecutor actually commented on

18 the defendant's failure to testify, so a far more

19 problematic comment than anything that could even remotely

20 be inferred from this, the court cautioned that the

21 prosecutor's language obviously was susceptible to more

22 problematic interpretation.  "But a court should not

23 lightly infer that a prosecutor intends an ambiguous

24 remark to have its most damaging meaning or that a jury,

25 sitting through lengthy exhortation, will draw that

1     meaning from the plethora of less damaging

2     interpretations."

3          I would submit that based on now that we actually see

4     what the questions are, what the answers were, we know

5     that there was testimony about a single source of DNA in

6     that bloodstain, and the authority I just cited from the

7     First Circuit in our view none of the relief Mr. Watkins

8     is seeking is warranted.

9          THE COURT:  All right.  I'm glad that we have

10    and grateful that our stenographer could have provided it

11    because it does put it in a different light when you look

12    at the actual questions and answers when they're printed

13    out as opposed to the memory of how it was asked.

14         So I think that when I see the questions and answers

15    printed out in transcript form, it creates less of an

16    issue than the defense has characterized.

17         I don't fault the defense at all because I sensed

18    that as well when it was originally asked, the same sense

19    that the defense had.  It's not to say the questioning I

20    think is perfect.  I don't.

21         There is an invitation by the nature of the question

22    that the DNA and testing covered more of an area than just

23    the very small little blood spot that was tested and

24    that's the only area in that small little size of a

25    fingernail blood print or bloodspot that there was found a

1    single source and that's all that was tested.

2         The questioning invites an inference that the

3    canister itself, that's what's being talked about, but I

4    agree with Attorney Berkower that she asked that question

5    after asking but, look, it's on the wick, right?  It's on

6    -- that's the blood found on the handle.  So it's not as

7    bad as I thought it was is my conclusion.

8              MR. WATKINS:  Well, judge, the fact that both

9    you and I thought at the time when it went by that it

10   would be worse than that.  The jury is not going to have

11   the benefit of the transcript to talk about it as we did.

12        My suggestion is the jury heard it exactly as we did.

13   It's very, very sharp here if that's what we're talking

14   about because Ms. Berkower says there's also your blood --

15   "So your blood was on the handle of the canister and on

16   more than one page of the wick.  Nobody else's DNA was

17   found there."  What does "there" refer to?  There refers

18   to the handle.  It does not refer to the blood.  Nobody's

19   DNA was found.

20             THE COURT:  I hear you.  I'm not disagreeing

21   with you.  I mean, I know that's how you can hear that

22   because there, what does "there" mean?  Is there talking

23   about that little small piece of blood sample that was

24   tested?  Or is there referring to the handle or the entire

25   canister?  I know what you're saying.

1          MR. WATKINS:  The distinction is going to go

2     right by the jury as it did when we heard it.

3          THE COURT:  So what does each side say about an

4     instruction from me regarding the DNA that was tested and

5     that the DNA source that was tested was only that

6     thumbnail print of blood on one small section of the

7     handle that's pictured?  And we can even put up the

8     picture and that's it.  That's all.  That's the only area

9     that was tested.

10          MS. BERKOWER:  Your Honor, to the extent Your

11     Honor is trying to craft an instruction, we would think it

12     would be appropriate to say that the reference to DNA that

13     you heard at the end of the questioning was referencing

14     only the bloodstain.  Just leave it at that.  I think that

15     clarifies any ambiguity in the word "there."

16          THE COURT:  I don't think it does.  I don't

17     think it does.  I think to clarify "there," I need to tell

18     them that that's the only area -- and I don't think it's

19     disputed -- that was the only area on the canister that

20     was tested.

21          MS. BERKOWER:  That's fine, Your Honor.

22          THE COURT:  You don't dispute that?  It's

23     accurate?

24          MS. BERKOWER:  Your Honor, that's consistent

25     with my memory of the evidence.  We've been trying to

1    track down the spots of the record that Mr. Watkins is

2    referring to.  We are fine with that instruction.

3             THE COURT:  Okay.  I mean, we all know -- we've

4    all -- well, I don't know if we've all, but at crime

5    scenes sometimes they swab the entire area.  Sometimes

6    they swab more than just a stain, but that wasn't the

7    evidence in this case.

8             MS. BERKOWER:  Yes, Your Honor.  I know that in

9    this case -- and I don't remember if the DNA analyst

10   testified to this or not but I know that she observed all

11   over and looked for other places potentially to swab and

12   that's why I'm hesitating in my answer to the court.  But

13   I think the instruction given what I think the testimony

14   was seems accurate and we do not oppose the instruction,

15   Your Honor.

16            THE COURT:  So that it would be the DNA

17   reference before we took the break, we're talking only

18   about that -- and could I put a picture up while this

19   happens?  Could you choose a picture?  We're talking only

20   about that.  We're not talking about any other location

21   because the parties agree DNA evidence was taken only from

22   that right there.  Would that be fair?

23            MS. BERKOWER:  That's fine, Your Honor.

24            THE COURT:  Okay.  Thank you.  So we can leave

25   this picture up or put this picture up when the jury comes

1   in.  All right.

2       Objection noted.

3           MR. WATKINS:  Yes.  I'm still pressing for a

4   mistrial.

5       Your Honor, I'm now worried -- not now but I was and

6   continue to be worried about the next question that didn't

7   get answered because of my objection.  "Well, but

8   according to you didn't someone else place the device at

9   JGS?"  So at the same time, I don't know where we're going

10  with this.

11          THE COURT:  But putting it into perspective now

12  that we're only talking about a DNA sample from that very

13  small section, you know, I think it's addressed.  I think

14  it puts it into context for the jury.

15          MR. WATKINS:  I'm talking now about the burden

16  shifting that I think is about to come up here.  I don't

17  know where Ms. Berkower was going with this and what she's

18  questioning Mr. Rathbun about at this point.

19      As the court knows, I've been constantly objecting as

20  she puts in various evidence from the case asking Mr.

21  Rathbun to comment on it.

22          THE COURT:  Yes.

23          MR. WATKINS:  So again --

24          THE COURT:  I think that contributed -- I think

25  all those questions leading up to this point I think

1    contributed to the immediate perception and reaction that

2    I am telling you the court had and that you are telling me

3    you had.  But the next question "According to you, didn't

4    someone else place the device at JGS?"  I think is a fair

5    question.  And the next question is, well, it's your DNA

6    that came back.  I think that's a fair question if it's in

7    the context of from that small portion that was tested it

8    was only yours.

9               MR. WATKINS:  I think the question is

10   rhetorical.  The question that Mr. Rathbun answered is

11   rhetorical which is why he answered it of course, because

12   that is the only answer.  So we're not eliciting answers

13   here.  We are having Ms. Berkower testify to evidence

14   that's already coming in to make her conclusion and to

15   have Mr. Rathbun ratify that particular conclusion.  I

16   think it's improper on cross-examination, and I will

17   continue to object to putting in the entire case and

18   having Mr. Rathbun agree.

19               THE COURT:  Well, I've addressed this issue and

20   I concur that it's an unusual form of cross-examination.

21   It's just simply restating your own case, and it's getting

22   close to I think being a bigger problem than

23   cross-examination should be.

24               MS. BERKOWER:  Your Honor, I was planning to

25   move on to a different area after the break.

1              THE COURT:  All right.  Is the defense asking me

2    to strike that question?  If you're asking me to strike

3    that question, that means I re-read the question.  I tell

4    them to strike it, which I'm not sure you want that

5    re-highlighted.  The "Well, but according to you didn't

6    someone place the device," are you asking me to read the

7    question and then strike it?  I can't just strike it

8    without telling the jury what I'm striking.  They're not

9    going to remember.

10             MR. WATKINS:  No.  I do not want the court to

11   strike the testimony.  I do want my objection noted as to

12   the line of it.  I think what I'm trying to get at is the

13   very last question "So at the same time," I will object.

14   I think the next question --

15             THE COURT:  But that's an unfinished question.

16   There was no question.  It was stopped, and Ms. Berkower

17   now has the benefit of this whole conversation and I don't

18   know what the next question is going to be.

19             MS. BERKOWER:  Yes, Your Honor.  I'm going to

20   move to a different area.

21             THE COURT:  Okay.

22        Mr. Rathbun will resume the stand.

23   **(The jury entered at 2:30.)**

24             THE COURT:  Ladies and gentlemen, I guess it was

25   pizza day during the lunch break.  No one told me and no

1    one shared.

2              A JUROR:  There was some left.

3              THE COURT:  All right.  Was everyone able to

4    follow the instructions that I always give?  No talking

5    about the case?  No internet access?  No reading articles,

6    the entire instruction?  All right.

7         Affirmative responses from all jurors.  The jury

8    remains fair and impartial.  All right.

9         Can you put up that exhibit and tell me what exhibit

10   number it is?

11             MS. BERKOWER:  Yes.  Government's Exhibit 13.

12             THE COURT:  All right.  Is it on everyone's

13   screens?  All right.

14        You said Government's Exhibit 13?

15             MS. BERKOWER:  Yes, PX-13, Your Honor.

16             THE COURT:  Government's Exhibit 13.  Ladies and

17   gentlemen, the last questions that were asked before we

18   took our break were relative to DNA being found on the

19   canister, and the parties agree that the DNA that we are

20   talking about -- if you look at the picture -- is from

21   that reddish brown stain in the center of the handle.

22   That's where the DNA was taken from.

23        There should be no confusion that anywhere else on

24   that handle or anywhere else on that canister was tested

25   for DNA.  The test was at that location where you see the

```
1    red brown print only.

2          Is that the agreement of the parties?

3                 MS. BERKOWER:  Yes, Your Honor.

4                 MR. WATKINS:  That's correct.

5                 THE COURT:  All right.  Thank you.

6                 MS. BERKOWER:  Your Honor, may I proceed?

7                 THE COURT:  Absolutely.

8    Q.   (By Ms. Berkower)  Mr. Rathbun, let's talk about the

9    wick in this device.

10                MS. BERKOWER:  So if we could please have

11   Government's Exhibit 16 in evidence for everyone?

12   Q.   (By Ms. Berkower)  Now, you've seen this photo

13   before, right?

14   A.   I have.

15   Q.   You know that also called a tract, right?

16   A.   Correct.

17   Q.   And how do you know that word?

18   A.   It was from church.  Growing up in the church I

19   learned about it.

20   Q.   Now, is that what you would describe yourself as

21   having grown up in the church?

22   A.   Correct.

23   Q.   So the message in tracts is generally the same,

24   right?

25   A.   Generally.
```

1   Q.   And if you've read one, you pretty much know what to

2   expect?

3   A.   They vary but, yeah, you pretty much know.

4   Q.   Now is it fair to say that not everybody knows what a

5   tract is?

6   A.   Sure.

7   Q.   That's a pretty specific word, right?

8   A.   It is.

9   Q.   And when the FBI came to talk to you at your house,

10  the agents didn't know that word, right?

11  A.   I'm not sure if they did or not.

12  Q.   Well, did you have to ex -- did you call it that

13  yourself when they showed you pictures of it?

14  A.   I don't recall.

15  Q.   So when they came, where they calling it a pamphlet?

16          MR. WATKINS:  Objection.

17          THE COURT:  Overruled.

18          THE WITNESS:  I believe so, yes.

19  Q.   (By Ms. Berkower) And you knew it was a tract?

20  A.   I knew it was a tract.

21  Q.   Now tracts are generally quite small in size, right?

22  A.   They vary.  Some have more pages than others.

23  Q.   But in terms of like how tall they are, they're

24  pretty short, right?

25          Let me get something to -- I'll withdraw that

1    question and ask a different question.

2         I'm holding up Government's Exhibit 4.  Would you say

3    this is about how large most tracts are?

4    A.   About.

5    Q.   So pretty small compared to like a book or a

6    magazine, right?

7    A.   Right.

8    Q.   Now your mom hands out tracts to people, right?

9    A.   She does.

10   Q.   And she keeps tracts in her purse?

11   A.   She does.

12   Q.   She keeps them in her car?

13   A.   She does.

14   Q.   And you heard that Natalie said your mom always keeps

15   one in the front seat cup holder.  Do you remember her

16   testifying to that?

17   A.   I do remember that.

18   Q.   That's true, right?  She does keep one in the cup

19   holder?

20   A.   She does.

21   Q.   Now your mom prints some of her own tracts, right?

22   A.   I actually didn't know that.  I know my dad made one

23   but I didn't know that she does.

24   Q.   Other tracts she gets from your family's church,

25   Heritage Baptist Church, right?

1    A.    Correct.

2    Q.    And you've seen her hand out these tracts to

3    strangers, right?

4    A.    It's been a long time since I've seen her hand them

5    to strangers, but, yes, she does.

6    Q.    Is that because you haven't been out with her in a

7    long time though?

8    A.    Correct.

9    Q.    So for all you know, she's still doing it?

10   A.    Correct.

11   Q.    And you heard Natalie say she does, right?

12   A.    I did.

13   Q.    No reason to doubt that?

14            MR. WATKINS:  Objection.

15            THE COURT:  Overruled.

16            THE WITNESS:  No.

17   Q.    (By Ms. Berkower)  So in this case the FBI figured

18   out the source of the tract, right?  Or have you been told

19   that?

20   A.    I have been told that.

21   Q.    And it's from a Billy Graham publication called Steps

22   to Peace With God.  Are you familiar with that now?

23   A.    I'm not.  I've heard them say that, but, yeah.

24   Q.    Well, have you compared the pages yourself ever?

25   A.    No.  So I wouldn't know.

1    Q.   Now the Billy Graham Evangelical Association had

2    events in Springfield last year, right?

3    A.   That's what I've been told.

4    Q.   They had a series of events, right?

5    A.   Yes.

6    Q.   And your mom was involved in organizing those events,

7    right?

8          MR. WATKINS:  Note my continuing objection

9    here.

10         THE COURT:  All right.  Overruled.

11    Q.   (By Ms. Berkower)  Your mom was involved in those

12    events, right?

13    A.   I learned that here, yes.

14    Q.   So you didn't know that at the time?

15    A.   I did not.

16    Q.   Are you aware that both of your parents attended the

17    main event though?

18    A.   I did not know that.

19    Q.   Until this case?

20    A.   Correct.

21    Q.   Now, on direct examination you were asked questions

22    by your lawyer about your interview with the FBI.  Do you

23    remember being asked about that?

24    A.   I do.

25    Q.   And you testified then -- well, actually let me take

1    a step back from that.  Before we get to that, I want to
2    make sure that we're clear about what you testified on
3    direct.
4        So you told this jury that you did not commit this
5    crime.  Did I understand that right?
6    A.   Yes, ma'am.
7    Q.   And you're not claiming that you might have committed
8    the crime, right?
9    A.   No.
10   Q.   You're not claiming you're confused about what you
11   did that night, are you?
12   A.   No.
13   Q.   You're not claiming that you blacked out and don't
14   remember that night, are you?
15   A.   No.
16   Q.   You're claiming you do clearly remember that night,
17   right?
18   A.   Yes.
19   Q.   And that you absolutely did not commit this crime?
20   A.   Yes.
21   Q.   Okay.  So now let's talk about your FBI interview.
22   Okay?
23       So on direct examination when you were asked
24   questions about that, you said that you were kind of hazy,
25   right?

1    A.   I was.

2    Q.   You had used drugs the night before?

3    A.   Correct.

4    Q.   You had taken Methadone that morning?

5    A.   That doesn't affect it.

6    Q.   Okay.  So the Methadone doesn't actually affect how

7    coherent and able you are to follow what's going on?

8    A.   Correct.

9    Q.   In fact, you took Methadone today I think you said?

10    A.   That is correct.

11    Q.   So that has no impact whatsoever on how you can

12    perceive and remember things?

13    A.   Correct.

14    Q.   Okay.  And I think you said actually on direct,

15    didn't you say that Methadone actually allows you to focus

16    on what's in front of you?

17    A.   Did I say that?

18    Q.   Well, you said that Methadone helped you keep a job,

19    right?

20    A.   I said that Methadone helped me get stability in my

21    life I believe is what I said.

22    Q.   And it allowed you to focus on things other than drug

23    seeking, right?

24    A.   It gave me stability in my life, yes.

25    Q.   It allowed you to go to work, right?

```
 1   A.   It allowed me to keep a steady job.
 2   Q.   Okay.  And when you were not on Methadone and you
 3   were using heroin, you were not able to do that, right?
 4   A.   I was still working.  Yes, I was.
 5   Q.   So what is the benefit of Methadone?  I want to make
 6   sure I understand your testimony.
 7   A.   It's timing so that I don't have to wake up in the
 8   morning and I can go to work as opposed to searching for
 9   heroin all morning before I go to my job.
10   Q.   Okay.  So when you take Methadone, heroin is not on
11   your mind?  You're able to go to work; is that right?
12   A.   Correct.
13   Q.   And the morning of this interview with the FBI you
14   took Methadone, right?
15   A.   That is correct.
16   Q.   And you were not -- you didn't have drugs on your
17   mind?  You weren't distracted by drugs that morning?
18   A.   No.
19   Q.   Okay.  But you also said that you had used drugs the
20   night before, right?
21   A.   I did.
22   Q.   And I think you said earlier that when you're on
23   Methadone, you don't usually take heroin, right?
24   A.   I don't.
25   Q.   You use crack?
```

1   A.   Correct.

2   Q.   Is that what you used the night before?

3   A.   Yes, crack and some heroin.

4   Q.   Okay.  Crack and heroin the night before?

5   A.   I did.  I was board so I scraped a couple bags.

6   Q.   Okay.  And you testified earlier that crack has about

7   20 minutes effect on you, right?

8   A.   Yes.

9   Q.   And then it wears off?

10   A.   Correct.

11   Q.   And with regard to the heroin, that was really a

12   small dose, right?  It was just the bottom scrapings?

13   A.   It was.

14   Q.   Right.  But according to you, you were hazy that

15   morning?

16   A.   I was.  It's been a couple of days of drug use

17   leading up to that point.

18   Q.   So when you were in your FBI interview, the topic of

19   your drug use came up several times, right?

20   A.   It came up once or twice, yeah.

21   Q.   And when it first came up, you told the agents you

22   had not used drugs in a month, right?

23   A.   I did.

24   Q.   Then later on you changed your answer, right?

25   A.   That is correct.

1  Q.   You said it had actually been two weeks since you

2  used drugs?

3  A.   I believe that's what I said.

4  Q.   And then later on you said what you said here today;

5  you had scraped the bottom of the bag the night before,

6  right?

7  A.   Correct.

8  Q.   Now during that conversation you had three different

9  accounts about your drug use; is that right?

10  A.   Yes.

11  Q.   And when you actually told the agents that you had

12  used drugs the night before and that you were currently

13  being treated with Methadone that morning, they asked you

14  if you were impaired, didn't they?

15  A.   They did.

16  Q.   And they invited you to explain whether or not you

17  were hazy, right?

18  A.   Correct.

19  Q.   And you assured them you were fine, didn't you?

20  A.   I mean, I was hazy but I was fine.  I wasn't my

21  optimum.

22  Q.   Okay.  But you were fine you just said, right?

23  A.   Sure.

24  Q.   So during the interview you understood what they were

25  asking you, right?  You were fine?

```
1    A.   I did, but there was a lot to handle that morning.
2    There was a lot of questions.  I had FBI at my house.  It
3    was a very stressful situation.
4    Q.   But the drugs didn't factor into whether it was
5    stressful, did it?
6    A.   I mean, they didn't help being on drugs for the past
7    couple days, not getting sleep.
8    Q.   Well, you just said you were fine?
9    A.   Well, I wasn't fine.  I take that back.
10   Q.   Okay.  So now you're saying you were not fine that
11   morning?
12   A.   I wasn't.
13   Q.   But the agents asked you if you were fine, right?
14   A.   I don't recall.
15   Q.   Well, they asked you if you were impaired?
16   A.   Well, impaired or -- request the question again,
17   please?
18   Q.   I think -- I'm just trying to make sure this is
19   clear.  We were just talking earlier about the agents
20   asked you if you were impaired and you said you told them
21   you were not, right?
22   A.   Correct.
23   Q.   So you never said that you were confused, did you?
24   A.   I don't believe so.
25   Q.   You answered their questions, right?
```

```
 1    A.    To the best of my knowledge.

 2    Q.    And they invited you to say whether you were impaired

 3    or not that day?

 4    A.    I wouldn't say they invited me.  But, yes, if I was

 5    impaired that day, I could have told them.

 6    Q.    And they asked you that specifically, right?

 7    A.    I don't recall exactly them asking me if I was

 8    impaired that morning, no.

 9    Q.    Well, I think you know what I mean, right?  They were

10    asking you if you were feeling like you couldn't

11    understand what was going on, right?

12    A.    I mean, yeah.

13    Q.    You told them you could?

14    A.    Right.

15    Q.    Okay.  So now though it sounds like you're saying you

16    don't have -- you were actually kind of hazy that day and

17    you were not able to be as sharp as you otherwise would?

18    A.    Again, it was a lot to process.  The FBI at my house

19    and the same questioning.  I mean, it was a lot.

20    Q.    Well, when they got there though, you were in your

21    boxer shorts you said, right?

22    A.    Yes, ma'am.

23    Q.    And they went and got you clothes, right?

24    A.    Eventually, yes.

25    Q.    So you were outside.  You put on clothes and you
```

 1    wanted to talk to them, right?

 2    A.   I wanted to find out why they were there.  What the

 3    problem was and what's going on, yes.

 4    Q.   And they stopped you before talking to them, right?

 5    A.   Because they wanted to *Mirandize* me.

 6    Q.   Right.  They told you your rights, right?

 7    A.   Yes, they did.

 8         MS. BERKOWER:  And if we could have Government's

 9    Exhibit 5 up please?

10    Q.   (By Ms. Berkower) The very first line of that says

11    "Before we ask you any questions, you must understand your

12    rights," right?

13    A.   Yes.

14    Q.   They went through this whole form with you before

15    they talked to you about the incident in this case, didn't

16    they?

17    A.   That's correct.

18    Q.   And it says, "You have the right to remain silent,"

19    right?

20    A.   Yes.

21    Q.   You read through all of this, right?

22    A.   I did not want to remain silent, correct.

23    Q.   And you signed this form?

24    A.   Yes, I did.

25    Q.   They confirmed with you that you understood what it

1    meant, right?

2    A.   Correct.

3    Q.   And you were not impaired such that you couldn't

4    understand this, right?

5    A.   Correct.

6    Q.   And then you went and talked to them, right?

7    A.   Yes.

8    Q.   Okay.  Let's talk about what you said during that

9    interview.

10        When Special Agent McGonigle met with you at his

11   (sic) house, he asked you about a yellow fuel canister.

12            MS. BERKOWER:  We can take that down, Ms.

13   McKenna.

14   Q.   (By Ms. Berkower)  Right?

15   A.   He showed me a picture.

16   Q.   He showed you a picture?

17   A.   Correct.

18            MS. BERKOWER:  If we could have Government's

19   Exhibit 72, page 2 please?

20   Q.   (By Ms. Berkower)  He showed you that picture, right?

21   A.   Yes, he did.

22            MS. BERKOWER:  And if we can go to the next page

23   please?

24   Q.   (By Ms. Berkower)  He showed you that picture also,

25   right?

1  A.   He did.

2  Q.   And the picture on the bottom of the screen there

3  too, right?

4  A.   Yes, ma'am.

5  Q.   And he asked you if you ever had a yellow canister

6  like that, right?

7  A.   He did.

8  Q.   You said you did not?

9  A.   At the time I did not remember I had it.  That is the

10  answer that I gave him.

11  Q.   Okay.  So you said you didn't have it, right?

12  A.   At that time I did not remember that I had it and I

13  told him, no, that I did not.

14  Q.   He asked you if your family ever had one, right?

15  A.   Correct.

16  Q.   You said no?

17  A.   Correct.

18  Q.   And all of that just was not true, was it?

19  A.   All of what was not true?

20  Q.   You did have this canister?

21  A.   At one point, yes, I did.

22  Q.   So when you told him that you did not have it, that

23  was not true, was it?

24  A.   It wasn't -- I could not remember.  It was a lot to

25  process.  Again, the FBI was at my house.  It was

```
 1    extremely stressful and trying to figure out why they were
 2    there, what's going on with the yellow gas can.  It was a
 3    lot to process.
 4    Q.   But you didn't say you didn't remember, did you?
 5    A.   At the time I said that I didn't own one; didn't have
 6    one because I didn't.
 7    Q.   Right.  But now you're saying that you just didn't
 8    remember that day that you had one, right?
 9    A.   Correct.
10    Q.   And that's not the answer you gave Special Agent
11    McGonigle, right?
12    A.   No.  It took me time to process everything and put
13    together what happened that day.
14    Q.   And, in fact, the canister in the photo you held with
15    your own hands, right?
16    A.   I did.
17    Q.   That's how your bloodstain ended up on it?
18    A.   Exactly.
19    Q.   And you knew that when the FBI eventually discovered
20    that in fact you did possess that yellow can, it would be
21    very big and very bad for you, right?
22    A.   It wasn't a good thing.  I mean, it didn't look good
23    for me absolutely.
24    Q.   Well, you talked about it with your mom, right?
25    A.   Talked -- say again what I talked to her?
```

1   Q.   You talked about when the FBI found out that you

2   actually did have the can, it would be very big and very

3   bad for you?

4   A.   Those were the words that I used, yes.

5          MS. BERKOWER:   Okay.   So let's -- if we can

6   introduce what's been previously marked as Government's

7   Exhibit PX-93?   If we can play from 5:08 to 5:28 in that

8   recording please.

9          I think actually if we can take down the screen for

10  everyone and just have it for the court, counsel, and the

11  witness just for a moment while Ms. McKenna cues the

12  tape?

13         If we can please publish what's going to be on the

14  screen?

15         If we can play 5:08 to 5:28, Ms. McKenna?

16  (Audio playing.)

17  Q.   (By Ms. Berkower)   Now that was on April 27th of this

18  year, right, that you said that to your mom?

19  A.   Yes.

20  Q.   When the agent at your house asked you about the

21  yellow can, you flat out denied ever having it, right?

22  A.   At that time I did not remember, correct.

23  Q.   And the reason the FBI didn't know about it yet is

24  because when Special Agent McGonigle asked you about it,

25  you didn't tell the truth?

```
 1    A.   I did not remember at that time.  It was a lot to
 2    process.  Again, the FBI was at my house, lots of
 3    questioning, thrown outside.  It was a lot to process.
 4    Q.   So your memory improved afterward?
 5    A.   After I saw text messages, phone numbers, GPS,
 6    everything, yes.  Absolutely.
 7    Q.   So before I thought you said that you did not -- you
 8    absolutely remembered the night of this offense, right?
 9    A.   I did, correct.
10    Q.   But now you're saying that you had to look at your
11    phone and your text messages and whatnot because you
12    actually didn't remember?
13    A.   No.  Those absolutely helped me in remembering
14    everything put both together.
15    Q.   So when Special Agent McGonigle was at your house, he
16    made clear that he wanted to talk to you about the device
17    at JGS, right?
18    A.   I believe he did.
19    Q.   Well, that's why he was there, right?
20    A.   I guess, yes.
21    Q.   He wasn't there to talk to you about drugs, was he?
22    A.   He did.
23    Q.   Well, but you brought that up, didn't you?
24    A.   Of course.
25    Q.   He didn't bring that up?
```

```
1    A.   Uh-huh.

2    Q.   Is that yes?

3    A.   Yes.

4    Q.   He was there because someone tried to light a gas can

5    at JGS, right?

6              MR. WATKINS:  Objection.

7              THE COURT:  Sustained.

8    Q.   (By Ms. Berkower)  So he asked you about your

9    whereabouts on the morning of when the gas can was

10   discovered, right?

11   A.   He did.

12   Q.   And in response you said you hadn't left the house in

13   two weeks, right?

14   A.   No, that's not what I said.  I said I had not left

15   the house in about two wreaks.  I then went on to tell him

16   about the Saturday dump run and how I got my prescription

17   of Methadone filled.

18   Q.   Okay.  But you know he was asking you about a

19   specific day, right?

20   A.   No, not specifically.

21   Q.   So he did not make clear to you that he was there to

22   talk about the day the device was left at JGS?

23   A.   He was just talking about the device.

24   Q.   And he asked you where were you on April 2nd, right?

25   A.   Yes, he did.
```

1  Q.   And you said I haven't been out of the house in two

2  weeks?

3  A.   About two weeks is what I said to him over and over

4  and over again.  I had not left the house in about two

5  weeks.

6  Q.   Now during that time period that was not true, was

7  it?  You had been going out?

8  A.   About two weeks, yes.  Correct.

9  Q.   Well, you had been going out almost every night,

10  right?

11  A.   No, I was not going out every night.

12  Q.   Well, you had been going out to buy drugs, right?

13  A.   No, I was not.  Before, before April 2nd I was and

14  after that I did not.  I was staying at home.  I was not

15  using that week because it was the Corona.  I was staying

16  home.

17  Q.   So you heard Natalie testify, right?

18  A.   I did.

19  Q.   And she said you were going out in your mom's car

20  every few days right up until when the FBI came to your

21  house?

22  A.   She was wrong.  She couldn't have even known that

23  because she was at work.

24  Q.   Well, you go out night, right?

25  A.   If I go out, I go out mornings and nights.

1    Q.   And she testified that her bedroom window is right

2    over the driveway at your house, right?

3    A.   Yes, it is.

4    Q.   And so she could hear you coming and going, right?

5              MR. WATKINS:  Objection.

6              THE COURT:  Sustained.

7    Q.   (By Ms. Berkower)  Well, did you hear her testify to

8    that?  That she could hear you coming and going?

9    A.   I heard her testify to that.

10   Q.   And her window is right above the driveway, right?

11   A.   It is.

12   Q.   And your mom also knew that you were going out during

13   that time period, right?

14             MR. WATKINS:  Objection.

15             THE COURT:  Sustained.

16   Q.   (By Ms. Berkower)  Well, you were taking your mom's

17   car, right?

18   A.   If I went out, sometimes I took my car; sometimes I

19   took my mom's car.

20   Q.   And there were times when you took your mom's car and

21   she needed it, right?

22   A.   There were times.

23   Q.   And that would lead to an argument between you

24   sometimes, right?

25   A.   Sometimes.

1    Q.   So she knew you were going out at night and --

2              MR. WATKINS:  Objection.

3              THE COURT:  Well, as to what another person

4    knew, this witness can't testify to the state of mind what

5    someone else may have known.  So that's sustained.

6              MS. BERKOWER:  I'll rephrase.

7    Q.   (By Ms. Berkower)  You were in arguments with your

8    mother about you going out at night in her car, right?

9    A.   Sometimes, yeah.

10   Q.   Including up until when the FBI came to your house,

11   right?

12   A.   Probably, yeah.  A couple times if I didn't tell her.

13   Q.   Now you also texted your friend Glenn about going out

14   during this time period at night, right?

15   A.   I did send a Glenn text message.

16             MS. BERKOWER:  If we can have Government's

17   Exhibit 53 please?

18   Q.   (By Ms. Berkower)  These are the text messages that

19   you sent to him, right?

20   A.   They are.

21   Q.   And one of those if you -- can you read the date and

22   time-stamp on that gray bubble in the middle there?

23   A.   You want me to read it?

24   Q.   Yes.

25   A.   July -- or April 3, 2020, 12:05 a.m.

1    Q.   So you would agree that that's after April 2nd,

2    right?

3    A.   It is after April 2nd, yes.

4    Q.   And in those text messages you talked about meeting

5    up with him, right?

6    A.   I did.

7    Q.   He said, where do you want to meet up?  You said a

8    "few spots, depot to start, have black everything," right?

9    A.   I did say that.

10   Q.   And then you said, "been doing it alone past three

11   night.  I'm leaving soon," right?

12   A.   That is what I said, but it was a lie.

13   Q.   It was a lie?

14   A.   I was lying to him.  Absolutely.

15   Q.   You were lying about having been out in the past

16   three nights?

17   A.   Correct.

18   Q.   Well, when you sent these text messages, you didn't

19   know that we would be in court here today, did you?

20   A.   No.

21   Q.   You had no reason to lie to him?

22   A.   It has nothing to do with being in court whether I

23   was lying to him or not.

24   Q.   Okay.  So what your testimony is is that when you

25   told your friend unprompted that you wanted to go meet up

```
 1    with him, you were lying that you had done the same thing
 2    the past three nights; that's what you're saying?
 3    A.   I was lying, correct.  I lied to him that I was doing
 4    stuff for the past -- doing it alone for the past three
 5    nights.
 6    Q.   Okay.  So when Special Agent McGonigle talked to you
 7    about April 2nd, you told him that you had not been out.
 8             MS. BERKOWER:  We can take that exhibit down,
 9    Ms. McKenna.  Thank you.
10    Q.   (By Ms. Berkower)  You told him you hadn't been out
11    much, right?
12    A.   I told him I had not been out much the past two
13    weeks, about.
14    Q.   About?
15    A.   Correct.
16    Q.   Okay.  And I think, I think on direct testimony you
17    said, you said that when you were talking to him about two
18    weeks, you assumed you were talking about 14 days exactly,
19    right?
20    A.   That's how I figured out two weeks.  That's how I
21    came up with about two weeks was that they came on the
22    15th and then going back two weeks is the 1st, 2nd.
23    Q.   Well, you didn't have a calendar with you, did you?
24    A.   I just did the math in my head.
25    Q.   So you were counting back in your head as a calendar
```

1    as you're talking to him?

2    A.   Correct.  I'm trying to figure out my whereabouts on

3    April 2nd, yes.

4    Q.   Okay.

5    A.   Going back approximately two weeks.

6    Q.   I thought you testified though before that you didn't

7    really remember much about your comings and goings until

8    later on when you looked at the stuff from your phone?

9    A.   I knew that I was sitting at home.  I told him onsite

10   I knew I was sitting at home because it was Corona.  It

11   was in the middle of Corona so I had been sitting at home

12   and I went out to do a dump run and then I went out to get

13   my Methadone prescription, ma'am.

14   Q.   But didn't you say earlier that you stopped doing

15   drugs on the 2nd because of COVID?

16   A.   What does that -- I don't understand.  What does that

17   have to do?

18   Q.   Well, you used -- well, let's move on actually.

19        You did know though that you had been out in your

20   mother's car the night -- the morning of April 2nd,

21   right?

22   A.   Yes.

23   Q.   And when you -- according to you, you had like this

24   mental calendar of 14 days in your head as you're talking

25   to Agent McGonigle, right?

```
 1    A.   Well, he showed up at my house on the 15th and he was
 2    asking me about two weeks back.  So 14 days, so 15 minus
 3    14 is one so that put me at April 1st approximately.
 4    Q.   Okay.  But you admit you were out on April 2nd,
 5    right?
 6    A.   I did.
 7    Q.   And you didn't tell him that, did you?
 8    A.   I didn't recall at the time he interviewed me.
 9    Q.   Well, I thought you just said you had this accurate
10    mental calendar of 14 days going back?
11    A.   I never used the word accurate, ma'am.
12    Q.   Okay.  So the morning of this offense you were out in
13    your mom's car, right?
14    A.   That's correct.
15    Q.   You had taken it around 4:30 in the morning, right?
16    A.   Yes.
17    Q.   And you drove it to Springfield, right?
18    A.   Correct.
19    Q.   And the route you take every time is to drive right
20    past JGS, right?
21    A.   I go down Converse Street to get to the highway 91
22    where I go to get my Methadone.  To go to the mall, go
23    anywhere from my house, I have to go down Converse Street.
24    Q.   You didn't tell Agent McGonigle any of that, right?
25    A.   Yeah, I did.
```

1    Q.   Well, you didn't tell him you had been out that

2    morning?

3    A.   I told him that I go down Converse Street every day

4    to go to the Methadone clinic.

5    Q.   You didn't tell him you had been out on April 2nd,

6    did you?

7    A.   I did not recall that morning when I was interviewed.

8    Q.   And that day the FBI impounded your van to search for

9    blood, right?

10   A.   They impounded the van.  I don't know why for what.

11   Q.   Well, they searched the van, right?

12   A.   Yes.

13   Q.   They impounded it to search it?

14   A.   Yes.

15   Q.   And they did not impound your mother's car, right?

16   A.   No.

17   Q.   They just searched that in the driveway, right?

18   A.   Correct.

19   Q.   So they didn't run a lot of tests on it, did they?

20   A.   I'm not sure.  It sure looked like they did.

21   Q.   Well, you've reviewed the evidence in this case to

22   some degree, right?

23            MR. WATKINS:  Objection.

24            THE COURT:  Sustained.

25   Q.   (By Ms. Berkower) Now based on what you said though

1   to Agent McGonigle, there was no reason for him to search

2   your mom's car, was there?

3               MR. WATKINS:  Objection.

4               THE COURT:  Sustained.

5   Q.   (By Ms. Berkower)  You didn't give Agent McGonigle

6   any indication you had been out in your mom's car, did

7   you?

8   A.   I did not recall that on April 2nd I was out in my

9   mom's car at the time of my interview.

10  Q.   And that's because you told them you hadn't been out

11  at all?

12  A.   I have not been out in about the past two weeks.  I

13  went on Saturday to the dump run and I went to get my

14  Methadone prescription refilled.

15  Q.   Now afterward you talked about the fact that they

16  impounded your van and not her car on a phone call, right?

17  A.   I did.

18  Q.   And, in fact, you called the FBI "those idiots" for

19  impounding your van instead of your mother's car, right?

20  A.   I did.

21  Q.   And the reason though the FBI didn't impound your

22  mother's car is because of what you said, right?

23              MR. WATKINS:  Objection.

24              THE COURT:  Sustained.

25  Q.   (By Ms. Berkower)  Well, they didn't search your --

```
 1    they didn't impound your mother's car, did they?
 2                MR. WATKINS:  Objection.
 3                THE COURT:  Overruled.
 4                MR. WATKINS:  Asked and answered.
 5                THE COURT:  As far as you know, you can answer.
 6    That's fine as far as you know.
 7                THE WITNESS:  Can you ask the question again
 8    please?
 9    Q.   (By Ms. Berkower) They did not impound your mother's
10    car?
11    A.   Not that I know of, correct.
12    Q.   You had the chance to tell them that you had been out
13    in it that morning, right?
14    A.   Again, the FBI was at my house.  It was a lot to
15    process.  It was very stressful, and I did not remember
16    all the events of April 2nd at that time.
17    Q.   But your memory has improved?
18    A.   Of course it has, yes, ma'am.  I've seen text
19    messages.  I've seen GPS.  I've gone through more
20    paperwork on myself than I have in a million years.
21    Q.   So during your meeting with Special Agent McGonigle,
22    he did tell you that your blood was on the yellow
23    canister, right?
24    A.   Yes, he did.
25    Q.   And he asked you if there was any possible way your
```

1   blood could have ended up on the canister, right?

2   A.   Yes.

3   Q.   You said there was no possible way?

4   A.   At that time I could not figure out that morning why

5   my blood was on that gas canister, yes, ma'am.

6   Q.   Well, several times in the interview you said there

7   was no way your blood could have ended up on that

8   canister, right?

9   A.   I could not figure out that morning why my blood was

10  on that gas canister, correct.

11  Q.   Well, Special Agent McGonigle asked you about what

12  you've told the court here today, didn't he?

13  A.   What did he ask me?

14  Q.   He asked you it is possible you were doing a trashout

15  at somebody's house and your blood got on the canister,

16  didn't he?

17  A.   He did, but with the whole FBI there I could not

18  process two weeks prior on the 2nd what happened and where

19  I was exactly.

20  Q.   Okay.  But that's not asking about April 2nd.  That's

21  just asking about your job, right?

22  A.   It was asking me all kinds of questions.  It was a

23  very stressful situation.  It was very difficult for me to

24  figure out everything and why my blood was on that gas

25  canister.  I could not figure it out on that morning.

```
1    Q.   Right.  And he talked to you more about why it could
2    have been there, didn't he?
3    A.   I mean, he gave me ideas but I could not remember
4    that morning again why my blood was on that gas canister.
5    It was an extremely stressful morning having the FBI at my
6    house throwing my parents and me outside trying to figure
7    this out.
8    Q.   Okay.  But you didn't say you didn't remember, right?
9    A.   Correct.  I said there was no possible way is what I
10   said, yes.
11   Q.   So on April 15th you told Special Agent McGonigle
12   there was no possible way that your blood could have
13   gotten onto that canister during a trashout?
14   A.   At that morning I did not know how my blood got on
15   that gas canister.
16   Q.   That was not the answer -- that was not what I asked
17   you.
18   A.   Would you repeat the question?
19   Q.   On April 15th isn't it true that you told Special
20   Agent McGonigle that there was no possible way your blood
21   could have gotten on that yellow canister during a
22   trashout?
23   A.   Everything except the trashout part is correct.
24   Q.   Well, he -- okay.
25        So he said it could have been during a job that you
```

1    were doing, right?

2    A.   Yes.

3    Q.   So let me rephrase because we should be precise about

4    this.

5    A.   Yes, we should.

6    Q.   We should.

7         So you said on April 15th when Special Agent

8    McGonigle asked you is it possible that your blood got on

9    that yellow canister while you were working on a job?

10   A.   Correct.  Yes, he did.

11   Q.   And your answer was it is not possible?

12   A.   Again, I could not recall on that morning what I did

13   and how my blood got on that gas container.

14   Q.   You didn't say I don't remember, did you?

15   A.   On that morning I was adamant that my blood --

16   because I couldn't figure it out.  There was not enough

17   time to put the pieces together and figure out how my

18   blood got on that gas container, ma'am.

19   Q.   You didn't say, I don't remember?

20   A.   I said that.

21   Q.   You did say you don't remember?

22   A.   Correct.

23   Q.   You said it was not possible?

24   A.   That is what I said at that time, correct.

25   Q.   And now you're saying that's how it got there, right?

1    A.   After going through all the paperwork, going through

2    my GPS, going through my text messages, all of that, yes,

3    I absolutely put it together that it was from that job.

4    Q.   So now you're offering the same excuse that you

5    rejected with Agent McGonigle, right?

6    A.   That's not an excuse, ma'am.  It's the truth.

7    Q.   Okay.  The same story of how your blood got on that

8    canister is what you're telling the court today, right?

9    A.   Yes.

10   Q.   But you rejected that explanation back in April 15th,

11   right?

12   A.   I did not have enough time to think about it clearly

13   and go over everything with my text messages.  Again, the

14   FBI is at my house, the FBI.  It was a very stressful

15   morning.

16   Q.   So let's make sure we understand what you are saying

17   here today.

18        According to you, someone found the yellow canister

19   abandoned in a dumpster and took it to make a homemade

20   bomb, right?

21   A.   Somebody --

22             MR. WATKINS:  Objection.

23             THE COURT:  I'm sorry, I didn't hear you.

24   Overruled.

25             THE WITNESS:  Can you ask the question again

1   please?

2            MS. BERKOWER:  Yes.

3   Q.   (By Ms. Berkower)  According to you, someone found

4   the yellow canister abandoned in a dumpster and took it to

5   make a homemade bomb?

6   A.   I don't believe it was a random person.  I believe it

7   was somebody who obviously has a problem with Jewish

8   people, a white supremacist of some sort.

9   Q.   Okay.

10   A.   It's not a random person.

11   Q.   Well, according to you, that person picked up the

12   canister without smearing your bloodstain, right?

13   A.   They might have grabbed it from a different angle,

14   ma'am.

15   Q.   Okay.  That person put gasoline in it, right?

16   A.   I'm not aware if they did or did not, ma'am.

17   Q.   Well, you know gasoline was found in the container,

18   right?

19   A.   That's what I'm told.

20   Q.   So that person must have put gasoline in it, right?

21            MR. WATKINS:  Objection.

22            THE COURT:  Sustained.

23   Q.   (By Ms. Berkower)  Now according to you, that person

24   also found a very small set of papers that also had your

25   blood on it, right?

1  A.   They would have been right next to each other in the
2  same dumpster, ma'am.
3  Q.   So now you're saying they were in the same dumpster?
4  A.   Of course.
5  Q.   And those papers are similar to the kind of papers
6  that your mom has in her pocketbook at all times, right?
7  A.   I believe my mother said on the stand under oath that
8  she's never had that in her possession, period.
9  Q.   Well, that's not the question I asked you.  I didn't
10  ask you about that.
11      I asked you if the papers that were stuffed in the
12  wick of that can were similar to the kind that she keeps
13  in her purse?
14  A.   All tracts are similar, ma'am.
15  Q.   And they're similar to what she always has in her cup
16  holder, right?
17  A.   All tracts are similar, correct.
18  Q.   Now, according to you this person rolled up the
19  papers, right?
20  A.   That is correct.
21  Q.   Stuffed them into the canister spout, right?
22  A.   Well, as the FBI told me, there was something on the
23  Blackweb about Jew Kill Day that they were investigating,
24  so, yes --
25  Q.   Okay.

1    A.   -- somebody rolled up that.  Go ahead.

2            MS. BERKOWER:  Your Honor, may we be seen at

3    sidebar?

4            THE COURT:  Sure.

5    (Sidebar conference.)

6            MS. BERKOWER:  Your Honor, I just want to flag

7    that answer to the court.  It was not responsive to my

8    question.  I did not elicit that information.  I just

9    asked if the person who did this rolled up the papers and

10   stuffed them in the spout.  The defendant himself brought

11   up some of the material from earlier on in the case

12   referencing white supremacist activity and Jew Killing

13   Day.  That's not at all where I was going.

14       I did not expect to get anything close to that answer

15   given the question and the very limited nature of the

16   question.  I don't intend to follow up on it, but I don't

17   -- I mean, it does kind of create a misimpression that I'm

18   not sure how we should address.  I think I might even ask

19   that answer be stricken given it's something the parties

20   agreed is not going to go into here.

21           THE COURT:  All right.  Well, I invite the

22   defense to comment.  I agree you did nothing to elicit

23   that comment.  That came straight from the witness.

24       Attorney Watkins.

25           MR. WATKINS:  Yes.  Well, the difficulty with

1    these questions when she's asking him about what somebody

2    else did, we can expect those kind of answers where on a

3    previous occasion the FBI said this was how it was done.

4    I think it's a natural response.  I don't think he

5    intended to do anything about it, but I think the

6    government is stuck with these kinds of answers if this is

7    the route they're going to go down to start having Mr.

8    Rathbun speculate what was in some mythical person's

9    mind.

10           THE COURT:  Well, yes, I don't think we strike

11   it.  I think it just stays and no further comment on it.

12           MS. BERKOWER:  That's fine, Your Honor.  I just

13   want to make the record clear that I did not elicit that

14   in any way with my question.  Thank you.

15           THE COURT:  Right.  And at this point I'm not

16   going to allow any further questions that kind of creates

17   a narrative as if the witness gave it from the witness

18   stand.

19       The questions such as so you're saying this, this,

20   and this and you're saying this, this, and this, isn't

21   that correct?  Because he didn't say that.  You're

22   creating a narrative that he actually didn't say and then

23   asking him to adopt it.  So there will be no questions

24   like that.

25           MS. BERKOWER:  Sure.  I'm going to move on to a

1    different area anyway.

2    (End of sidebar conference.)

3    Q.   (By Ms. Berkower)   Okay.   So during your direct

4    testimony you testified that when you went out on the

5    morning of April 2nd, you were going to buy I believe it

6    was crack cocaine; is that right?

7    A.   In the early morning, yes.

8    Q.   And before that -- you said that that was your single

9    minded focus at that point?

10   A.   That is correct.

11   Q.   But, in fact, you were actually up all night that

12   night, right?

13   A.   Using crack cocaine, yes, ma'am.

14   Q.   And you were also doing other things, right?

15   A.   The things I normally do when I smoke crack, yes.

16   Q.   Well, you were looking for jobs, right?

17   A.   I do that when I get on the -- when I smoke crack, I

18   get extremely vibrant and energetic and want to do stuff

19   so I play with my phone.   Yes, ma'am.

20   Q.   So you were doing other things on top of using drugs,

21   right?

22   A.   Yes.

23   Q.   You were looking at Home Depot, right?

24   A.   I was playing with my phone because I was high on

25   crack, ma'am.   Yes.

1    Q.   And the website you went to was for Home Depot,
2    right?
3    A.   Yes.
4    Q.   You also looked at tools, right?
5    A.   Yes, ma'am.
6    Q.   You also looked at temp agencies, right?
7    A.   Yes, ma'am.
8    Q.   And you also looked at pornography, right?
9    A.   Yes.  I played on my phone when I was high on crack,
10   ma'am.  Yes.
11   Q.   So that is what you were doing between about midnight
12   to 4:30 a.m., right?
13   A.   That is correct.
14   Q.   You were able to do that while also using drugs,
15   right?
16   A.   I was smoking crack, yes.  I play with my phone.
17   Q.   So that's when you left your house, right?
18   A.   That is correct.
19   Q.   Then you drove down Converse Street?
20   A.   To go get more crack, yes, ma'am.
21   Q.   To go to Springfield, right?
22   A.   That's correct.
23   Q.   Now, those things that you were searching for all
24   that time, all those hours, none of those related to
25   drugs, did they?

```
1    A.   Of course not.
2    Q.   You were able to do more than one thing at one time,
3    right?
4    A.   I was playing with my phone high on crack cocaine,
5    ma'am.  Yes.
6    Q.   But you were able to use your phone, right?
7    A.   Yes, ma'am.  It's not that difficult.
8    Q.   It was you who typed in the search terms, right?
9    A.   Usually I speak into it.
10   Q.   Okay.  But you were able to operate your phone,
11   right?
12   A.   Very easily.
13   Q.   You were able to review those websites, right?
14   A.   Yes, ma'am.
15   Q.   So you were reading what the sites had on them?
16   A.   I was more looking, looking.  High on crack just
17   going, going, going.
18   Q.   Okay.  But you were able to do both of those things
19   at the same time, right?
20   A.   Yes.
21   Q.   Can I ask you when you were smoking crack, what hand
22   were you using your lighter in?
23   A.   What hand do I use my lighter in?   My right hand.
24   Q.   Now, you said on direct examination when Special
25   Agent McGonigle was at your house and he mentioned Ruth's
```

1    House to you, you knew nothing about it, right?

2    A.   That's correct.

3    Q.   You actually know that area in pretty great detail,

4    don't you?

5    A.   No, I don't.

6    Q.   Well, you talked about it with your mother just a few

7    days after that interview with Special Agent McGonigle,

8    didn't you?

9    A.   After I spoke to my lawyer and getting paperwork and

10   going over things, he told me how you guys were looking

11   for paperwork, going through her home records, and that's

12   when I remembered that she lived over there.

13   Q.   Well, that's not what I asked you.

14        You're familiar with that area off of Converse

15   Street; that's the JGS campus, aren't you?

16   A.   No, I'm not.

17   Q.   You didn't talk about it with your mother just a few

18   days after Agent McGonigle interviewed you?

19   A.   I spoke to my mother a few days after about where

20   grandma lived after I remembered where she lived and was

21   told by my lawyer.

22   Q.   Well, didn't you also say on April 21st of this year

23   "I don't think I dumped at Ruth's House.  I can tell you

24   this much for a thousand percent sure I never went, like,

25   okay, driving down the main drive you take a right to go

1   onto Ruth's House -- well, I never did that.  I've never

2   gone behind that building.  I've never -- the only place

3   that I think I possibly might have gone is when you pull

4   right in and you take that left into the parking lot."

5   Didn't you say that?

6   A.   Of course.

7   Q.   So you did actually know the area around Ruth's

8   House, didn't you?

9   A.   I did not know the area around Ruth's House.  Where I

10  was talking about was right where my grandma lived.

11  Again, this is late in April after speaking with my mother

12  and my lawyer about where my grandmother lived.

13  Q.   Okay.  But you're familiar with that area, aren't

14  you?

15  A.   No, I am not familiar with that area.

16  Q.   Well --

17  A.   I drive by it.

18  Q.   In that call your mom then said after the part I just

19  read, she said "Yeah, right to the right.  Yeah, yeah,"

20  and you said, "That's the only place I might have gone.  I

21  wouldn't dump there; I wouldn't dump there because there's

22  cars everywhere.  There's people everywhere," right?

23  A.   Yes, ma'am.  That's correct.  When I drive by, you

24  can see people there all the time and cars there.

25  Absolutely.

```
1    Q.    But you're familiar with that area, right?
2    A.    I'm not familiar with that area, ma'am.
3    Q.    You know there's cars there?
4    A.    It's a place of operation.  There's going to be cars
5    there, yes.
6    Q.    And you know there's people everywhere, right?
7    A.    I do see people, yes.
8    Q.    You've been there before?
9    A.    No, I have not been there before.  I've been to where
10   my grandmother lives.  That's a long time ago.
11   Q.    Well, you told your mom you had never been behind the
12   building, right?
13   A.    That is correct.
14   Q.    Not that you didn't know the building, right?
15   A.    I've never been on that property other than where my
16   grandmother lived.
17   Q.    You didn't tell her that you didn't know where Ruth's
18   House was, did you?
19   A.    No, I don't believe so.
20   Q.    You just said you had never been behind it, right?
21   A.    I have never been on that property other than where
22   my grandmother lived.
23   Q.    You also knew when you talked to her that day that a
24   person would pull off and go to the right, right?
25   A.    That's where my grandmother lived.
```

| | |
|---|---|
| 1 | MS. BERKOWER:  No further questions, Your Honor. |
| 2 | THE COURT:  All right.  Thank you. |
| 3 | Attorney Watkins. |
| 4 | MR WATKINS:  Just a couple. |
| 5 | **REDIRECT EXAMINATION** |
| 6 | Q.   (By Mr. Watkins) We were talking about that recorded |
| 7 | phone call about Ruth's House in late April.  You were |
| 8 | arrested on April 15th? |
| 9 | A.   That is correct. |
| 10 | Q.   And you've been in custody -- well, you were released |
| 11 | for two days, right? |
| 12 | A.   I was released for one day. |
| 13 | Q.   And then you were back in custody again? |
| 14 | A.   That is correct. |
| 15 | Q.   Now, so in those two days did you attend a court |
| 16 | hearing about the case? |
| 17 | A.   You mean when I got pulled back? |
| 18 | Q.   When you were initially arrested, we did a zoom court |
| 19 | hearing? |
| 20 | A.   Yes, we did.  Correct. |
| 21 | Q.   And by that time there was a complaint in the case? |
| 22 | A.   I believe so, yes. |
| 23 | Q.   And without getting into the substance, you and I |
| 24 | discussed what was in the complaint? |
| 25 | A.   Correct. |

```
1    Q.   And the complaint was all about Ruth's House, right?
2    A.   Correct.  That is correct.
3    Q.   And for three hours we had a hearing about Ruth's
4    House and where this device had been found, right?
5    A.   That is correct.
6    Q.   And then two days later we were here in this court
7    again going through those kinds of issues about Ruth's
8    House, right?
9    A.   Yes, sir.
10   Q.   So by then you had heard about Ruth's House for hours
11   and hours in court, right?
12   A.   That is correct, sir.
13   Q.   And you've read through a complaint that talked about
14   Ruth's House, right?
15   A.   Correct.  I've also --
16   Q.   It didn't talk about Genesis -- I'm sorry.
17   A.   I've also seen pictures, a lot of pictures too, yes,
18   sir.
19   Q.   That's correct.  It didn't talk about Genesis House
20   at that point, right?
21   A.   No, sir.
22              MS. BERKOWER:  Objection, Your Honor, leading.
23              THE COURT:  Well, it certainly is leading.  I'll
24   give you some leeway about the leading, but that's about
25   -- you're at about the end of the line for leading.
```

1    Q.   (By Mr. Watkins)   So that was the context of when you
2    were talking about Ruth's House approximately a week
3    later, right?
4    A.   That is correct.
5    Q.   And locations around Ruth's House?
6    A.   That is correct.
7                MR. WATKINS:   May I get the video exhibits?
8    Q.   (By Mr. Watkins) Putting up Exhibit 53 already in
9    evidence.
10        Ms. Berkower asked you about these texts in the early
11   morning hours of April 3rd; do you recall that?
12   A.   I do.
13   Q.   And now knowing what time -- well, this is some 18
14   hours after the gas can was found, right, approximately?
15   A.   Yes, approximately.
16   Q.   Twelve hours.
17        And this is a text to Glenn Miliken?
18   A.   It is.
19   Q.   And he -- what is Glenn Miliken to you?
20   A.   He's a friend of mine.  I've known him a long time.
21   Q.   Is he anything else in regard to drugs?
22   A.   Yeah.  We're drug buddies you can call us.
23   Q.   And you talk about going into the future tomorrow at
24   six, meet up with me, right?
25   A.   If you're up at six, I believe that's in the -- yeah,

1    in the future, yes, in the morning.

2    Q.    Now, again you've looked through your text messages

3    and social media history.  Did you actually meet with

4    Glenn Miliken the next morning?

5    A.    I did not.

6    Q.    What were you doing by that next morning?

7    A.    I believe I was smoking crack.  I believe -- wait.

8    Yeah, I believe.

9    Q.    But where were you at that point?

10   A.    I was home.

11   Q.    Did you leave on April 3rd?

12   A.    No.

13   Q.    When you talk about doing it alone the past three

14   nights, were you doing something alone the past three

15   nights?

16   A.    No, I was lying.

17   Q.    Why were you lying to Glenn Miliken about doing

18   something alone for the past three nights?

19   A.    Just to kind of make myself look better.  You know,

20   make myself look like I'm doing things that are like

21   better than him kind of.  If that makes sense?

22   Q.    Well, tell us why.  Why were you trying to make

23   yourself look better?

24   A.    We always have a competition.  There's a lot of

25   jealousy between us.  We've known each other a long time.

1    We try to one up each other, as you call it.  So I make it

2    seem like I've been out doing all kinds of crazy things in

3    the past three nights -- well, I wouldn't say crazy

4    things.  I would say that I've been doing things the past

5    three nights.

6    Q.   But having looked at the text messages and cell tower

7    information and social media history now, were you indeed

8    going out and doing other things those past three nights?

9    A.   No, sir.

10   Q.   And that's information that the government has given

11   to us as well?

12   A.   That is correct, sir.

13        MR. WATKINS:  That's all I have.

14        MS. BERKOWER:  Very briefly, Your Honor.

15   **RECROSS-EXAMINATION**

16   Q.   (By Ms. Berkower)  So, Mr. Rathbun, you just said

17   that you lied to make yourself look better?

18   A.   To my friend, Glenn, yes.

19   Q.   To your friends?

20   A.   To my friend Glenn.

21   Q.   Okay.

22   A.   Yes.

23   Q.   And you also said that you're sure from Government's

24   Exhibit 30 that you were lying there, right, about being

25   out the past three nights?

1   A.   Yes.

2   Q.   In fact, you've talked yourself about looking at the

3   cell phone records in this case, right?

4   A.   Yes.

5   Q.   And you know you were out the night before, right?

6   A.   I don't believe my cell phone records say that.

7   Q.   Well, I thought you just testified that you were out

8   buying drugs the night before in Springfield?

9   A.   When was this?  April 2nd?  Oh, yes, yes.  Correct.

10  Q.   Okay.

11          MS. BERKOWER:  Thank you, Your Honor.

12          MR. WATKINS:  Nothing further.

13          THE COURT:  All right.  You can step down, sir.

14  Thank you.

15          THE WITNESS:  Thank you.  Appreciate it.

16          THE COURT:  Can I have a sidebar?

17  (Sidebar conference.)

18          THE COURT:  Is there going to be any more

19  witnesses?

20          MR. WATKINS:  No.  We would be resting at this

21  point.

22          THE COURT:  Okay.  Any rebuttal case?

23          MR. DESROCHES:  There is not, Your Honor.

24          THE COURT:  Okay.  You know, I've been thinking

25  when I gave the jury that instruction about the gas -- the

1    yellow gas canister and red bloodstain on the canister

2    regarding DNA, I did not mention a similar type of

3    instruction for the wick, for the paper that was the wick.

4    That all that testing on that piece of paper was the blood

5    brown stain and that's the source of the DNA that was

6    being discussed.

7        Does the defense want me to consider expanding that

8    initial instruction regarding the yellow canister to now

9    include the paper wick as well?

10            MR. WATKINS:  Yes.  I think that's appropriate.

11            THE COURT:  What does the government say?

12            MS. BERKOWER:  That's fine with us, Your Honor.

13            THE COURT:  All right.  So essentially to the

14   extent that I can recreate it, basically the same thing I

15   said about the yellow gas container I'm going to say about

16   wick.  Is that agreeable to the parties?

17            MS. BERKOWER:  That's fine with the

18   government.

19            MR. WATKINS:  Subject to my motion for a

20   mistrial, yes.

21            THE COURT:  Sure.  Okay.  Could I have the

22   picture please and the exhibit number of that pamphlet?

23   There's a picture that shows it opened so that you can see

24   two pages and the red bloodstain kind of smeared across

25   the two pages.

1          MR. DESROCHES:  If we can have one second to get

2     the correct red brown stain?

3          THE COURT:  Sure.

4          MS. BERKOWER:  Your Honor, I think we can pull

5     up 16 and 20 side by side.

6          THE COURT:  That's the one.  So that's all we

7     would need.

8          MS. BERKOWER:  Your Honor, I think there's

9     actually two pages with red brown stains for the wick.  I

10    thought Your Honor wanted them side by side.

11         That's Government's Exhibit 20 I think Ms. McKenna

12    has pulled up.  I don't see it appearing.  Mr. Watkins has

13    it.  If the court transfers to Ms. McKenna, she has it

14    cued up.

15         MR. WATKINS:  I've also got it.

16         THE COURT:  Okay.  So can you publish that?

17         MR. WATKINS:  Yes.

18    (End of sidebar discussion.)

19         THE COURT:  Ladies and gentlemen, I wanted to

20    supplement -- when you first came back in from your break,

21    I gave you an instruction regarding the yellow container

22    and the red brown stain and talked to you about that's

23    where the DNA was taken from.  Okay.

24         I should have and I now want to supplement that to

25    say the same thing about the exhibits that are on your

1    screen right now, Exhibits 16 and 20, the pieces of paper.

2    And that is, that the tests, test or tests, any test that

3    was done for DNA was from the red brown stains on the

4    piece of paper.  That is the only evidence of the area

5    that was tested for DNA the red brown stains alone.  Not

6    the entire piece of paper.

7         So I want that to be the same information and the

8    same understanding for the pieces of paper as for the

9    yellow gas container.

10             A JUROR:  Are you stating that the exhibit

11   tested -- they tested the whole, like the whole page?

12   They just tested the blood?

13             THE COURT:  I am saying for the yellow container

14   and for these pieces of paper up on the screen now,

15   Exhibits 16 and 20, the DNA testing was done on the red

16   brown stains only on both the yellow container and paper

17   only.  Those were the only sections of those items that

18   were tested, the red brown stains.

19        Is that agreed to by the defense?

20             MR. WATKINS:  Yes.

21             THE COURT:  Is that agreed by the prosecution?

22             MS. BERKOWER:  That's fine, Your Honor.

23             THE COURT:  Okay.

24             MR. WATKINS:  With that, the defense rests.

25             THE COURT:  All right.  The defense rests.  All

1    right.

2        Ladies and gentlemen, the case is now concluded.  The

3    evidence is over.

4        Let me ask -- so tomorrow, tomorrow we're going to

5    have closing arguments.  I'm going to give you

6    instructions and then the case will be yours.  Closing

7    arguments are somewhere in the range of half hour, maybe a

8    little longer apiece.  I don't know the exact time and 45

9    minutes or so for instructions.

10       Do the parties think that we should plan on starting

11   at 9:30 or ten to give us time in the morning?

12           MR. WATKINS:  Whatever the court would like to

13   do.

14           MS. BERKOWER:  9:30 is fine, Your Honor.

15           THE COURT:  I was thinking 9:30 as well but we

16   all are being overruled by the clerk.  We are starting at

17   -- who generally is correct so we will start at ten.

18       You know, through this whole proceeding you've been

19   so patient and I don't think you realize how terrible I

20   feel, and we all feel, that you sit on all the downtime

21   while we're dealing with all these issues.

22       You know, I can't apologize enough and that's why

23   we're trying to figure out when you come in so we don't

24   have you sitting here.  So let's play on ten o'clock

25   tomorrow.  We'll be busy doing what we do here in the

1     morning.  All right?  So we'll see you at ten o'clock.

2          The same exact instruction applies.  You know, now

3     that the case is over, it requires a little more of a

4     mental exercise for you not to start going through

5     everything in your mind and having your own personal

6     deliberations as I explained to you at the beginning of

7     the case.  That's not what a jury deliberation is all

8     about.  It's collective.

9          So the case is over, which means, yes, you're going

10    to be thinking about things but do not begin processing

11    and making, you know, categories of who you believe and

12    who you don't believe and evaluating evidence.  You have

13    to wait to do that until you're collectively together as a

14    jury.

15         All right.  Obviously don't speak to anyone.  Don't

16    speak to each other.  Don't research.  Don't post

17    anything.  Don't read anything on social media.  Don't

18    read any news articles if there are any.  Okay?  See you

19    tomorrow at ten.  Thank you.

20    **(The jury left at 3:35.)**

21              THE COURT:  Does everyone want to catch their

22    breath before we start talking about the charge?

23              MS. BERKOWER:  Yes, judge.

24              THE COURT:  All right.  Ten minutes or so.

25    **(A recess was taken at 3:36 until 3:56.)**

1              THE COURT:  Okay.  We are all set.  All right.

2    So we'll go over the draft and it was a draft that was

3    sent to everyone to take a look at.

4         So why don't we start with Attorney Watkins.  Or who

5    from the defense team is going to be dealing with the

6    instruction issues?

7              MS. O'NEILL-GREENBERG:  That's mostly me.

8              THE COURT:  Okay.  Great.  Let's just start at

9    the beginning.

10             MS. O'NEILL-GREENBERG:  One by one?

11             THE COURT:  Yeah, one by one.

12             MS. O'NEILL-GREENBERG:  All right.  So one by

13   one are we talking page 1?

14             THE COURT:  Go by page, yes.  Bring us to the

15   first page.

16             MS. O'NEILL-GREENBERG:  The introduction I think

17   we're fine with that.

18             THE COURT:  What page is your first objection or

19   suggestion for change?

20             MS. O'NEILL-GREENBERG:  Sorry.  Obviously 7 I

21   just had circled, page 7, since obviously Mr. Rathbun

22   testified.

23             THE COURT:  Right.  Page 7 will be taken out.

24             MS. O'NEILL-GREENBERG:  Then our next one I just

25   had it 18, page 18.  There's something about the defendant

1     briefly lowering his mask.

2              THE COURT:  All right  Let me get there.  Yeah,

3     we didn't do that for any identification.  Where is that?

4              MS. O'NEILL-GREENBERG:  I had it listed on page

5     18, somewhere in the middle.

6              THE COURT:  Yes.  So take out the reference to

7     briefly lowering his mask because that didn't happen.  All

8     right.

9              MS. O'NEILL-GREENBERG:  Right.  Then page 26

10    which is false statement and consciousness of guilt.

11             THE COURT:  I'm sorry, which page?

12             MS. O'NEILL-GREENBERG:  Page 26, false

13    statements.  It says consciousness of guilt, and I think

14    we had in our joint jury instructions our objection to

15    that pages 15 and 16 of that document.  But we object to

16    that because I think the evidence -- so for this

17    instruction, it refers to clearly exculpatory statements

18    that are false, and I don't think the evidence fits that

19    here.

20        For example, I'll give you one of the cases that the

21    First Circuit instruction cites is *U.S. v. Littlefield*,

22    and the situation is that there's a false exculpatory

23    statement where I think police officers specifically said

24    they didn't go to this gas station, which was the false

25    exculpatory statement.

1      So it's very, very specific, very clear exculpatory

2  lies.  This just isn't what the evidence here is.  And the

3  other situation where this instruction is given is when

4  there's a situation where the evidence exhibits flight or

5  threatening a witness, none of which obviously has

6  happened here.

7      So I don't think the evidence fits or calls for this

8  type of instruction.  And then obviously it becomes unduly

9  prejudicial in the sense that it's sort of heightening his

10  false statement -- potential false statement.

11          THE COURT:  *Littlefield* stands for the

12  proposition that when a defendant makes a statement

13  tending to show his innocence and his explanation or

14  statement is later shown to be false, the jury may

15  consider whether this is circumstantial evidence pointing

16  to a consciousness of guilt.

17      So one more time why you don't think *Littlefield*

18  supports this?

19          MS. O'NEILL-GREENBERG:  Well, I think in this

20  situation where you have these two ambiguous questions and

21  then these ambiguous answers that are sort of actual

22  answers to the questions, they aren't clear exculpatory

23  false statements.

24      Then the only way that you would think that they were

25  a false statement is if you first believed that Mr.

1    Rathbun is actually guilty of the crimes he's accused of
2    because then you would believe that he's actually guilty
3    of placing this gas can and then you would believe, okay,
4    he lied about the two things he's being charged with as
5    false statements.
6         I think *Littlefield* specifically says you can't sort
7    of have that circular reasoning.  If the only way you
8    would believe the statement false is if you first believed
9    the thing that they're being accused of are false, then
10   you're not --
11             THE COURT:  But the jury needs to find that the
12   defendant gave a false statement before any of this
13   applies.  So the jury would have to first make the
14   determination of falseness.
15             MS. O'NEILL-GREENBERG:  Yes.  Yes, but I think
16   *Littlefield* says an instruction on consciousness of guilt
17   should not be given when, as was in *Littlefield*'s case,
18   the jury could only find that the exculpatory statement at
19   issue was false only if it already believed the evidence
20   directly established the defendant's guilt.
21        So here I think for the jury to find -- so that's the
22   only way that they would find Mr. Rathbun was lying about
23   those two things is if they first believed he actually put
24   the gas can out there that morning.
25             THE COURT:  So the instruction says, "You may

1    not, however, find on the basis of consciousness of guilt

2    alone that the defendant is in fact guilty of the crime

3    for which he is charged under Count 1 or Count 2."

4         All right.  What does the government say?

5              MS. BERKOWER:  Your Honor, in our view this is

6    appropriate for several reasons.  I think that the defense

7    is reading *Littlefield* a little bit out of context.

8    *Littlefield* contemplated allowing the jury to consider

9    false statements as it assessed consciousness of guilt.

10        Here I would note, just off the bat, that Mr. Rathbun

11   is not only accused of making false statements in

12   connection with the charged counts of the indictment --

13   sorry, Count 3 of the indictment.  He's also alleged to

14   have lied about possessing the gas can.  He's also alleged

15   to have lied about his drug use and evolving changing

16   stories with regard to that.  There are a number of false

17   statements that he gave to the FBI that the jury

18   absolutely should be permitted to consider when it looks

19   to Counts 1 and 2.  So on that basis alone we think the

20   instruction is important.

21        I also think that the court's reading of *Littlefield*

22   is the correct one, and the defense is cabining it a

23   little bit too narrowly.

24              THE COURT:  All right.  Over the defense

25   objection I'm going to leave that in.

1    Move on to the next one.

2    MS. O'NEILL-GREENBERG:  On page 30, which is the

3    instruction for failure to properly investigate, I would

4    just ask that -- so the second sentence which starts "in

5    other words, you may but you're not required to infer that

6    such tests," instead of the word tests just investigative

7    procedures or tests.

8    THE COURT:  To be consistent with the first

9    sentence?

10   MS. O'NEILL-GREENBERG:  Yes, so it's clear.

11   THE COURT:  So the first sentence reads

12   "investigative procedures or tests."

13   MS. O'NEILL-GREENBERG:  Or even just procedures

14   and tests, but just to make sure that it's still both.

15   THE COURT:  Yeah.  I see that.

16   Government, do you have any issue with that?

17   MS. BERKOWER:  Yes, Your Honor.

18   We objected to this from the outset.  In our joint

19   filing I think we made clear why in those papers.  This

20   instruction improperly tells the jury that certain tests

21   were inadequate and raises -- and as a result of that on

22   its own raises reasonable doubt, and that improperly

23   invites the jury to draw a negative inference from the

24   failure of police to do certain things and to infer that,

25   you know, if done properly would have resulted in evidence

1   that's favorable to the accused.

2        Those are all speculative inferences that the jury

3   just isn't supposed to be drawing.  It's misleading.  It's

4   unsupported by the case law, and it really just should not

5   be applied here.

6        Really, the only support offered by the defense for

7   this instruction is a 40-year old state law case that

8   talks about how it was improper for a state trial court

9   judge to have instructed the jury not to consider the

10  nonexistence of certain evidence.

11       In that case the court held that it invaded the

12  province of the jury by removing evidence from its

13  consideration, but nothing based on that suggests that

14  this court should or may instruct the jury that they can

15  draw a negative inference from the nonexistence of certain

16  evidence, let alone that they can speculate about the

17  substance of evidence that doesn't exist.  So in our view

18  this instruction is misleading and it should not be

19  included.

20            THE COURT:  Okay.  I'm going to include that

21  instruction, some version of it.  I might work on the

22  language a little bit, but some version of it will be

23  given.

24       Next?

25            MS. O'NEILL-GREENBERG:  Next is the -- well, I

1    suppose it starts at page 38, elements of the charges for

2    844(d) and then also for 844(I), the definition of

3    explosive versus the definition of incendiary device and

4    so that's I suppose page 41.

5            THE COURT:  So where do you want to start?

6            MS. O'NEILL-GREENBERG:  Page 41 and page 45.

7    It's the same argument for both.

8            THE COURT:  Okay.

9            MS. O'NEILL-GREENBERG:  So our argument, which I

10    think we also put down in our joint jury instructions, is

11    just that the evidence doesn't support the definition of

12    explosive.  So we would be objecting to that part and just

13    asking for the definition of incendiary device.

14            THE COURT:  Right.  I certainly thought about

15    this a lot and read your points that you made.

16        What does the government say?

17            MS. BERKOWER:  Your Honor, this is the statutory

18    definition and this is what the jury is being asked to

19    opine on.  They are being asked to determine whether the

20    facts fit this definition.  It's taken directly from the

21    statute, and I don't see a problem with it.

22        I think in our view, you know, the definition of

23    explosive, as we've been over many times in this case, has

24    a lot of different pieces to it, some of which undoubtedly

25    don't apply here.  But the ones that do apply, which he

1     was charged with and which there's been evidence on, are

2     included in this instruction.  And so really it's a

3     question for the jury at this point and this instruction

4     appropriately summarizes the applicable law.

5             THE COURT:  All right.  Well, as I said, this

6     was an area that I gave considerable thought to and

7     appreciated the parties expressing their opinion on this

8     in the joint submissions.  Over the objection of the

9     defendant, I'm going to allow the language to remain.

10            MS. O'NEILL-GREENBERG:  Next brings me to page

11    50, the definition for false statements.  And in page 52

12    of the joint jury instructions we submitted, we submitted

13    our sort of detailed false statement instructions.  So

14    we're just sort of renewing our request for that,

15    understanding it seems that the court is going to give the

16    false statements instruction that's on page 50.

17        So as to what's written on page -- well, page 51

18    after element one -- in element one, the knowing and

19    willfully part, the end of that sentence which I believe

20    is stating "the statement was not made because of a

21    mistaken understanding of the question under a reasonable

22    interpretation," I would just ask that that be specified

23    more clearly as we have requested before.

24            THE COURT:  That language was actually put in

25    there specifically because of what you requested.

1          MS. O'NEILL-GREENBERG:  Yes, I understand.  I

2     think what we wrote was if the question asked by the

3     government agent can be interpreted in several ways, then

4     you must prove --

5          THE COURT:  Right.  I didn't give you verbatim

6     everything you wanted, but.

7          MS. O'NEILL-GREENBERG:  I'm just asking that

8     under any reasonable interpretation of that question just

9     to make sure it's clear.

10          THE COURT:  All right.  I think you're doing

11     pretty good for how you've already had me adjust it.  So

12     I'm going to leave it the way it is.

13          MS. BERKOWER:  Yes, Your Honor.  For the record,

14     we would object to the additional language that the court

15     has added to that instruction.

16          THE COURT:  Of course, right.  I expected you

17     would.

18          MS. BERKOWER:  Right.

19          THE COURT:  That's my balancing act with how I

20     phrased it.  All right.  I'm going to leave that the way

21     it is.

22          MS. O'NEILL-GREENBERG:  And then for us we also

23     just request -- so on page 43 of our joint instructions,

24     we had a failure to record instruction.  I would just make

25     a request for that as well.

1            THE COURT:  LeeAnn, what page did that find its

2      way onto?  That found its way in there.

3            MS. O'NEILL-GREENBERG:  I didn't see that in the

4      draft that you gave us.

5            THE COURT:  No.  No.  No.  That found its way in

6      there.  Page 25, statements by the defendant.

7            MS. O'NEILL-GREENBERG:  Okay.

8            THE COURT:  In making those decisions, so it's

9      for you -- "it's for you to decide, number one, whether

10     the defendant made a statement.  Number two, if so, how

11     much weight to give it."

12         "In making those decisions you should consider all of

13     the evidence about the statement, including the

14     circumstances under which the statement may have been made

15     and the procedures that were or could have been used to

16     memorialize, record, or report the statement.  You should

17     also consider any facts or circumstances tending to

18     corroborate or contradict the version of events described

19     in the statement."

20         I'm quite sure the government is going to object to

21     how I modified that or the way that it's written, but.

22            MS. O'NEILL-GREENBERG:  We are satisfied with

23     that.

24            THE COURT:  Okay.

25            MS. O'NEILL-GREENBERG:  I'm sorry that I missed

1    that.

2              THE COURT:  It's okay.

3              MS. O'NEILL-GREENBERG:  Then also I know the

4    court had indicated that we should consider drafting an

5    instruction about Mr. Rathbun being incarcerated and not

6    drawing a negative inferences from that.

7              THE COURT:  Okay.  We emailed you a version of

8    something.  You might come up with something.

9              MS. O'NEILL-GREENBERG:  I haven't seen it.

10   Sorry.

11             THE COURT:  Check your emails.  You might have

12   some additions to that but, yeah.  Also there was an

13   instruction regarding it's proper that attorneys would

14   prepare witnesses; an attorney would speak to witnesses

15   before they testify.

16             MS. O'NEILL-GREENBERG:  Okay.

17             THE COURT:  So check that out.

18             MS. O'NEILL-GREENBERG:  So we will look at

19   those.  That's it for us.

20             THE COURT:  All right.  So for the government,

21   who's going to be talking about objections?

22             MS. BERKOWER:  It will be me, Your Honor.

23             THE COURT:  Okay.  The same way, let's just

24   start at the beginning.

25             MS. BERKOWER:  So I think we can start, I think

1    we can start with page 20 the part about "It's quite

2    legitimate for defense counsel to try to attack the

3    believability or reliability of a law enforcement witness

4    on the ground that their investigative methods were

5    flawed."  I think that in our view really gets to the same

6    issue that's addressed later in the instructions

7    concerning the statement of the defendant.

8         I think that to the extent that there is an

9    accusation against the FBI here that they didn't record

10   the statement, we don't need to have that twice and this

11   really does raise that twice.

12        I think we would -- I raise it to the court's

13   attention because I think it should it taken out one place

14   or the other place I guess really, either 20 or 25.

15   There's just no reason to have it both places.  I don't

16   know that there's any dispute between the parties on the

17   investigative methods other than that.

18             THE COURT:  All right.

19             MS. O'NEILL-GREENBERG:  To me it seems like this

20   instruction is getting at something different which is how

21   much weight to give or not give someone who's testified

22   from law enforcement.  Of course, we had so many agents

23   here testifying in this case and so I think it's

24   appropriate and I think they're addressing different

25   things.

1          THE COURT:  They are addressing different

2     things, but I mean that's a legitimate point.  I'll think

3     about that, the point that Attorney Berkower made.

4          MS. O'NEILL-GREENBERG:  As to the investigative

5     techniques, I think it's not just the failure to record.

6     It's also the testing or lack of testing that was done in

7     this case as well, which obviously has been highlighted a

8     lot today and so I think that is really important.

9       But I think just making sure the jury understands not

10     to give a witness more weight just because they are

11     working for the government and the government is also

12     prosecuting this case.

13          THE COURT:  Right.  But the instruction would

14     still accomplish that if I took out the objectionable part

15     to the government.

16          MS. O'NEILL-GREENBERG:  I suppose it would, but

17     I think that this extra sentence here makes it a lot more

18     clear and I don't think it prejudices anyone.  It makes it

19     just abundantly clear to the jury that they can't weigh

20     these witnesses more heavily and it doesn't hurt anyone in

21     making sure the jury understands that.

22          THE COURT:  All right.  Under consideration.

23          MS. BERKOWER:  Should I go on?

24          THE COURT:  Yes.

25          MS. BERKOWER:  The next one I guess does pertain

1    to 25 I think part of the one that we just left.  Part of

2    the objection relates to what I just said.  We don't need

3    it in both places.

4        I think though to the extent Your Honor is inclined

5    to include it, it is part of an instruction on page 25.  I

6    think in the sentence that says "In making those decisions

7    you should consider all of the evidence about the

8    statement, including the circumstances under which it was

9    made," I think we would just prefer it says "may."

10       I think that's usually the way courts phrase jury

11   instructions rather than directing them to certain kinds

12   of evidence.  Just say they may consider and then listing

13   out.  In our view if the court is inclined -- like I won't

14   go over what I already went own in terms of the other

15   instruction.

16           THE COURT:  All right.  I agree with the use of

17   the word may.  I do agree with that.

18           MS. BERKOWER:  Okay.

19           THE COURT:  But then in the last sentence it

20   says "you should also consider," so the last sentence

21   should be consistent.

22           MS. BERKOWER:  Yes.  Sorry.  Yes.

23           THE COURT:  All right.

24           MS. BERKOWER:  The next one that I had marked

25   was page 26.  I'm just trying to find the right part of

1   the prior -- I guess, Your Honor, what I'm a little
2   confused about is the last paragraph there.  I don't know
3   that that was something proposed by the parties and so I
4   just wanted to speak about it a little bit more with the
5   court.
6       The part that starts "In your evaluation" --
7           THE COURT:  Right.
8           MS. BERKOWER:  -- I don't know that that was
9   proposed by either party.
10          THE COURT:  No, I don't think it was.
11          MS. BERKOWER:  Yeah.
12          THE COURT:  But what does the defense think
13  about it?
14          MS. O'NEILL-GREENBERG:  I mean, I think that if
15  you're -- we objected to this instruction being given, but
16  if the court is going to give it, then I think that that
17  actually sort of measures the instruction and informs the
18  jurors.
19          THE COURT:  I mean, it brings full circle the
20  consciousness of guilt instruction.
21          MS. O'NEILL-GREENBERG:  Yes.  So certainly if
22  the court is going to give the instruction, we definitely
23  want the last paragraph or what starts at "in your
24  evaluation."
25          THE COURT:  All right.

1          MS. BERKOWER:  The basis for our objection, Your

2     Honor, is the First Circuit has already affirmed in case

3     law consciousness of guilt instructions, we would just ask

4     that the same instruction be given here.

5          THE COURT:  Okay.

6          MS. BERKOWER:  And I think we cited the case law

7     for that.  It was *United States v. Pagan-Ferrer*, 736 F3d,

8     573 at 594.  That's a First Circuit case from 2013.

9          THE COURT:  The section that you're talking

10    about came from First Circuit pattern instructions but

11    from the flight section of consciousness of guilt.

12         MS. BERKOWER:  Okay.  I think the cases that we

13    cited in our proposal were false statements in

14    consciousness of guilt instructions and so in our view

15    that was the best fit.

16         THE COURT:  There is a difference obviously

17    between flight consciousness of guilt and false statement

18    consciousness of guilt because it does have some First

19    Circuit roots there, the language, perhaps not for

20    statements.  All right.  I'm going to leave it in.

21         MS. BERKOWER:  Okay.  The next one -- I think

22    the next one was already addressed by the court and so I

23    don't know that I need to go back over it.  That's page

24    30.  I think we made our arguments concerning that --

25         THE COURT:  Right.  You did.

1            MS. BERKOWER:  -- previously.  I'll just note

2       the objection rather than going back over it.

3            And then the next one was page 39, and I know looking

4       back this jumped out at me today that to prove an attempt,

5       I know that -- I think we actually proposed it this way

6       and the court adopted it this way.  But what jumped out at

7       me today is that it requires the jury to say the defendant

8       intended to commit the crime of transporting or receiving

9       interstate commerce, and to me that struck me today as

10      requiring him to have been thinking in legal terms, which

11      usually is not something that's required for an attempt.

12      And so, you know, that he knew --

13           THE COURT:  So you're saying just the defendant

14      intended to transport or receive?

15           MS. BERKOWER:  Yes.  I think that's right.  Let

16      me confer briefly with Mr. Desroches, but something --

17      yeah, I think that would be our request.  I just checked

18      back and I see we originally proposed it that way so maybe

19      I'm wrong here today, but that jumped out at me today.

20           THE COURT:  You originally said intended to

21      commit the crime?

22           MS. BERKOWER:  I think that is what we submitted

23      jointly or maybe just us.

24           MS. O'NEILL-GREENBERG:  I think we agreed with

25      that.

1              THE COURT:   What do you think about that?

2              MS. O'NEILL-GREENBERG:   I thought it was

3    appropriate.   I thought it was --

4              THE COURT:   But it does infer that he knew the

5    crime.   You know, that he would know what the crime

6    required.   He intended to commit the crime of --

7              MS. O'NEILL-GREENBERG:   Yes.

8              THE COURT:   -- as opposed to he intended to

9    transport or receive, it's a subtle difference, but there

10   is a distinction.

11             MS. O'NEILL-GREENBERG:   But I think then with

12   the knowledge and intent that it will be used to -- when

13   you clarify that second part of the specific knowledge and

14   intent to harm, kill, injure, then it clarifies the first

15   intent as the sentence is using it.

16             THE COURT:   I'm not sure either version would be

17   incorrect or prejudice either side.   All right.   I'm going

18   to leave it the way it is.

19             MS. BERKOWER:   Your Honor, if I may just briefly

20   confer with Mr. Desroches?

21             THE COURT:   Uh-huh.

22             MS. BERKOWER:   I would just note attempt is

23   redefined on page 44.   So if the court were to change

24   anything about it, it's in two places so --

25             THE COURT:   Okay.

1          MS. BERKOWER:  -- just for consistency sake.

2          THE COURT:  Right.  Okay.

3          MS. BERKOWER:  And I believe that's it, Your

4    Honor.

5          THE COURT:  All right.  There is -- there are

6    some fairly minor changes that I want to work in myself

7    after going through them again.

8       So we'll give you a red lined correction version in

9    the morning.  The red lined will bring you right to where

10   we made some changes.  There is a couple areas, I think

11   two, that I made note that I'm going to think about

12   tonight.  And then in the morning we will also have a

13   verdict form that we can spend some time talking about in

14   the morning as well.

15      All right.  Did you propose -- I should know this.

16   Did you propose a verdict form?

17         MS. O'NEILL-GREENBERG:  I don't think we did.

18         THE COURT:  So it seemed to be a joint

19   suggestion that I read the indictment.  I wanted to know

20   what you each thought about that.

21      It has never been my practice to read the indictment.

22   It's always been my practice to succinctly but clearly

23   indicate what the crime charged is in the verdict form,

24   but not to read the indictment because the court goes out

25   of its way to tell jury that the indictment is just that,

1    it's an allegation.  You should give no weight to it.

2    It's merely an allegation, et cetera.

3         So what do you think?

4              MR. WATKINS:  Judge, at least from the defense

5    perspective, we didn't know what the court's preference

6    was.  Many judges prefer to read it particularly in

7    complicated cases.  This is not a complicated case and I

8    agree with the court.  I don't think it needs to be read

9    in this case.

10             THE COURT:  Okay.  And that avoids me having to

11   talk about -- there was something else like and or or and

12   things like that.  Certain language that's used in the

13   indictment.

14        Does the government have a preference one way or

15   another if I read the indictment or not?

16             MS. BERKOWER:  We don't object either way, Your

17   Honor.

18             THE COURT:  All right.  Thank you.

19        All right.  So tomorrow morning you'll get a red

20   lined version of the jury instructions and then it will be

21   your first look at the verdict form.  We'll have until ten

22   o'clock to talk about it.  All right.

23        So, for the closings we'll set up, unless you have

24   another suggestion, we'll set up the podium or lectern,

25   which one is it?

1          MR. DESROCHES:  It's a lectern.

2          MS. O'NEILL-GREENBERG:  It's a lectern.

3          THE COURT:  All right.  That's what we will set

4    up.  So we will have some wipes.  The wipes are here and

5    so after the first person goes, the next person before

6    they go you can wipe it if you'd like to wipe it.

7          It's just a microphone issue, so, Ms. Healy, would we

8    be able to kind of angle a microphone before we start the

9    closings?

10          THE CLERK:  Yes.  If you want, I can a take a

11    minute after this and we can set the lectern up.

12          THE COURT:  The lectern.  Right.

13          Is everyone all set for how you're going to be using

14    the exhibits?  You know, everything's gone pretty smoothly

15    but not entirely smoothly, and so I'd just hate to see

16    someone in the middle of their closing start to want to

17    try to show something on the video.

18          Bring back memories?

19          MR. DESROCHES:  Bad memories.

20          THE COURT:  Start to try to show something and

21    it not work.  So I just -- who is going to be using

22    pictures and putting up exhibits and things like that

23    during the closing?

24          MR. WATKINS:  I intend to use visual aids during

25    my closing.  I put them typically on PowerPoints slides

1    which work.

2              THE COURT:  I just want to make sure if in the

3    morning we can do a run through with Ms. Healy to make

4    sure everything is plugged in and the screens are working.

5    Okay.

6              MR. WATKINS:  We will do it.

7              THE COURT:  Okay.  Great.  Thanks.  See everyone

8    in the morning.

9              MR. DESROCHES:  Thank you, Your Honor.

10             THE CLERK:  All rise.

11   **(Court concluded at 4:28.)**

12   ---------------

13   (The certification of this transcript does not apply to
     any reproduction of this transcript, unless under the
14   direct control and/or supervision of the certifying
     reporter.  I assume no responsibility for the accuracy of
15   any reproduced copies not made under my control or
     direction.)

16

17                        CERTIFICATION

18

19             I certify that the foregoing is a correct

20   transcript of the record of proceedings in the

21   above-entitled matter to the best of my skill and ability.

22

23   /s/ Alice Moran                    November 27, 2020
     Alice Moran, RMR, RPR
24   Federal Official Court Reporter

25