1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2                            WESTERN SECTION


3


4      United States of America   )
                                  )              20cr30018-MGM
5            vs                   )
                                  )            November 20, 2020
6      Jonathan Michael Rathbun   )
       _____)

7


8              **EXCERPT** of Jury Trial, Closing Arguments,

9              Held Before The Honorable Mark G. Mastroianni

10                   United States District Judge.


11


12     APPEARANCES:

13

       On behalf of the government:  Risa Berkower, United States
14     Department of Justice, 950 Pennsylvania Avenue, NW,
       Washington, DC 20532.

15

16     Neil L. Desroches, Assistant United States Attorney, 300
       State Street, Suite 230, Springfield, MA 01105-2926.
17

       On behalf of the defendant: Timothy G. Watkins, Esq., 51
18     Sleeper Street, 5th Floor, Boston, MA 02210.

19     Forest J. O'Neill-Greenberg, Esq., 51 Sleeper Street, 5th
       Floor, Boston, MA 02210.

20


21
                          Alice Moran, CSR, RPR, RMR
22                       Official Federal Court Reporter
                            United States Courthouse
23                       300 State Street, Room 303D
                            Springfield, MA 01105
24                             (413)731-0086
                          alice.moran@verizon.net

25

```
 1                          INDEX

 2

 3      Witness:                                Page:

 4

 5

 6      None

 7

 8

 9

10      Description                             Page

11

12

13      Closing argument by Ms. Berkower         3

14

15      Closing argument by Mr. Watkins         24

16

17      Rebuttal closing argument by Mr. Desroches   49

18

19

20

21

22

23

24

25
```

1    **(Excerpt from 11-20-2020.)**

2    **(Mr. Rathbun is present.)**

3            THE COURT:  Okay.  All right.  So the order is

4    the government, the defendant, and then the government

5    rebuttal.  The time that will be 30 minutes for your first

6    closing.  All right.

7            MS. BERKOWER:  May I proceed?

8            THE COURT:  Yes.  I'm setting up a timer, so go

9    right ahead.

10   <u>**CLOSING ARGUMENT BY MS. BERKOWER**</u>

11           MS. BERKOWER:  On April 2, 2020 John Rathbun set

12   down a makeshift firebomb outside of JGS, lit it and

13   escaped.  You now know that in the early morning hours of

14   that day, as the defendant started to make his way up to

15   Springfield, he stopped on Converse Street, put a yellow

16   diesel container partially filed with gasoline outside on

17   JGS's land, used a balled up Christian proselytizing tract

18   as a wick, stuffed it in the spout, and lit it on fire.

19       You saw that tract, half of it went up in flames, but

20   then it burned out before the fire reached the gasoline.

21   Thankfully that gasoline didn't ignite.  It didn't

22   explode, and thank goodness no one was hurt.

23       But the fact remains John Rathbun lit a firebomb at

24   the gates of a senior living facility right next to a

25   sidewalk that its residents used and that it's also used

1    by members of the public.  It was quick; it was easy, and

2    it was extremely dangerous.

3        Thirteen days later when the FBI came to talk to him

4    about the incident, the defendant made false statements

5    and rejected the very same explanation that he now wants

6    you to believe.

7        At the beginning of this trial, my colleague,

8    Attorney Desroches, told you that the government would

9    prove the charges beyond a reasonable doubt that the

10   defendant committed all three crimes that are charged in

11   the indictment, and that is exactly what this trial

12   proved.

13       The defendant is guilty of receiving an explosive in

14   interstate commerce with the intent to cause various

15   harms.  He is guilty of attempting to use fire or

16   explosives to damage or destroy property; and he is guilty

17   of making false statements to FBI Special Agent Ryan

18   McGonigle during his investigation into the first two

19   crimes.

20       Let's focus first on Counts 1 and 2.  The evidence

21   proves that in the early morning hours of April 2nd, the

22   defendant placed his makeshift bomb under a tree near the

23   entrance to JGS.  That would-be firebomb had three

24   components:  The yellow dieseal fuel canister, the

25   gasoline inside of it, and the bloodied sheets torn from

the Steps to Peace with God tract, a Christian proselytizing tract, that was rolled up and stuffed in the spout as a wick.

The defendant lit the tract on fire and escaped, and he had good reason to put distance between himself and this crime scene.  That tract is small.  It wouldn't take long to burn and gasoline can ignite very quickly.

For his own safety and to escape, he needed to get out of there.  By 5:01:44 a.m., the defendant's cell phone shows that he was on I-91 on his way to Springfield.  Quick; easy; dangerous.

Now no one says that this defendant is some kind of a criminal mastermind, quite the opposite.  He left a trail of evidence that all points back to him.  In fact, a lot of the important facts in this case really aren't in dispute.  I'm going to give you a list about 15 of them right now.

On April 2nd, sometime after 4:34 in the morning, the defendant left his house in East Longmeadow.  He drove away in his mother's car, not his own work van.  His house is a mere 1.4 miles away from JGS, just a five-minute drive.

That morning he drove down Converse Street taking him right past the entrance to JGS where the device was found, and the device was placed after 4:52 a.m.  By 5:01 a.m.

and 44 seconds the defendant was on I-91 driving up to
Springfield.

He left his blood on the yellow fuel canister.  He
left his blood on multiple pages of the Christian
religious tract rolled up into a wick.  His grandmother
used to live at Genesis House, the building closest to
where the device was found.  He visited his grandmother
there including at Christmas.

His mother's company managed Genesis House and the
mother does accounting work for that property.  His mother
keeps religious tracts in her car which the defendant
drove on April 2nd, and she also kept them at her house
where the defendant lived.

The Steps to Peace with God tract that was used as
the wick, the Billy Graham Evangelical Association
distributed this very tract in Springfield in 2019 at
events the defendant's parents both attended.  Keep these
facts in mind as we review how the government has proved
Counts 1 and 2.

Now there's a lot of evidence here, but let's start
with the most obvious and that's the device itself.  There
is no question that the defendant assembled this device.
We know that because his blood is on both pieces of it.
His blood was on the handle of the container and on the
charred tract.

1          Importantly, this device was homemade.  It was
2      improvised.  You can't buy that in a store.  The
3      defendant's blood was on both pieces of it.  That matched
4      to the defendant's blood was one in 568.2 octillion.
5      That's 27 zeros with nine commas on the wick and the
6      canister.  It was a direct match to the defendant.

7          It's such a strong match that the defense even told
8      you in their opening that it was the defendant's blood.
9      John touched this, they told you.  Well, that was an
10     understatement because there's only one reasonable
11     conclusion to draw from the fact that the defendant's
12     blood was on both pieces of the device.  He put it
13     together with his own hands.  There's no other explanation
14     that makes sense, and that's not all that the blood
15     evidence tells you.

16         You saw the photos of the device the day it was
17     found.  In the photograph of the blood on the handle, you
18     can see it looks fresh.  When the police found it, it was
19     still red.  It hadn't dried.  It wasn't brown dried up
20     blood from a piece of trash that had been dumped days
21     earlier.  And that bloodstain, that red bloodstain was
22     tested for DNA.  It matched only the defendant, no one
23     else, no other source, and there were no fingerprints at
24     all on the canister even though it was tested.

25         When the Longmeadow Police Department arrived, they

1     found the defendant's fresh blood in exactly the spot that

2     you would expect to see it after he picked it up and

3     carried it from his mother's car to the tree on JGS's

4     land.

5          That fresh blood on the handle tells you that he was

6     the last person to touch this device.  That red blood is

7     like a signature by the person who built that bomb.  The

8     defendant assembled this device himself.  The blood tells

9     you so.

10          There's another fact about this device that tells you

11     it was handmade by the defendant and that's the religious

12     tract used as a wick.  His blood was on multiple pages of

13     that tract, and you heard during this trial that's a

14     unique document.  It's not just a castaway piece of paper.

15     It carries a message.

16          When law enforcement saw this, they immediately

17     realized that this, along with the blood, could be the key

18     to solving this crime.  Right from the start, FBI Agent

19     McGonigle and LPD Officer Chaplin contacted local churches

20     to see if anyone recognized it but no one did.

21          We now know the source of the wick, the Steps to

22     Peace with God pamphlet.  The Billy Graham organization

23     had distributed it in Springfield only last year at an

24     event the defendant's parents attended.  There is a clear

25     chain of events that took this tract from the Billy Graham

1    print shop in South Carolina to Springfield, Massachusetts

2    to the defendant's own family.

3        His mother keeps tracts like this in her house, on

4    her person, in her car.  She's always got one in the cup

5    holder in the ready.  That's the same car the defendant

6    was driving on the morning of this crime.  A one in 568.2

7    octillion match to his blood smeared over the pages of the

8    tract that was handed out at an event that his mother

9    attended, that's how we know that he put the wick in the

10   fuel container;  He and no one else.

11       Now the evidence that shows that the defendant built

12   this device is not all there is to show that he committed

13   the crimes charged in Counts 1 and 2.  So let's move on to

14   that other evidence now, specifically the cell phone

15   evidence, his recorded phone calls, and his false

16   statements to the FBI.

17       First off, we know that the defendant was out in his

18   mother's car that morning at the time of the crime.  He

19   admitted to you yesterday on cross-examination that when

20   FBI Agent McGonigle asked him where he was on the morning

21   of April 2nd, he said he hadn't left the house in two

22   weeks.  In fact, the evidence on his cell phone shows the

23   exact opposite.

24       The cell tower data shows he was out of the house

25   sometime after 4:30 a.m.  He took his mother's car and he

1   didn't bring it back in time for her to go to work.  You

2   saw her text.  You heard her voice mail.  She was begging

3   him to bring her car home so that she can get to work on

4   time, and his daughter Natalie also explained to you that

5   in the time period he was regularly going out at night in

6   his mother's car.  She would see him leave from her

7   bedroom located directly over the driveway.

8        We also know that when the defendant left his house

9   that morning, he drove down Converse Street right past the

10  Ruth's House entrance to JGS.  He admitted this yesterday.

11  It's the route he always takes to get to the highway, and

12  that admission is important.  It fills in the gaps.

13       On the morning of the crime the defendant, by his own

14  admission, drove right past the crime scene.  Now, think

15  back to the start of this case.  At opening the defendant

16  said it was implausible, if not impossible, that the

17  defendant committed this crime.  Let's see what the

18  evidence actually proved.

19       The defense said that the evidence would show that on

20  April 2nd the defendant was so single-mindedly focused on

21  buying drugs that it was impossible for him to think of

22  anything else.

23       Well, the evidence from his web browser shows the

24  exact opposite of that.  The defendant admitted it.  In

25  the hours before this crime, he was on the internet.  He

1    typed in lots of searches.  He was looking for jobs, temp

2    agencies, tools, Home Depot's website, pornography, all

3    manner of things in those web searches all the way up

4    until just after 4:30 a.m.  That evidence alone shows that

5    the defendant was more than able to focus on other things

6    beyond the sole focus of getting high.

7        He told you himself he's a functional addict.  That

8    suggestion that it was implausible, if not impossible,

9    that he committed this crime before he could think --

10   because he could think of nothing else is soundly

11   disproven by his own browsing history and his testimony.

12       Now let's talk about the defense's claim that if was

13   impossible if not -- implausible, if not impossible, that

14   he was at the crime scene in time to get the firebomb in

15   place.

16       The evidence in this case proved there was time.

17   Special Agent McGonigle tested it himself.  We know that

18   the ride from JGS all the way up to the spot where 91

19   meets 291 past the last possible place where the

20   defendant's phone could have hit that cell tower with

21   coverage along I-91, that was still more than enough time

22   for the defendant to commit this crime and get away.

23       Again, not implausible and certainly not impossible.

24   And don't forget, putting a makeshift firebomb like this

25   on the ground really is quick, simple, and easy.  You can

1    use your common sense about how much time it really took

2    him to do that.  All the defendant had to do was stop his

3    car at JGS, jump out, set down the can, and light it.

4    Mere seconds.

5         Because when you light a short wick like that, you'd

6    better get out of the way.  You saw this wick.  It's

7    short.  It's like lighting fireworks.  When you light the

8    fuse, you only have a few seconds to get away before you

9    will be in danger yourself.  The wick was short and that's

10   exactly what happened here.  When the defendant lit it, it

11   burned so he got out of there.

12        Imagine if the wick had set off that gasoline, the

13   commotion that would -- that that would ensued.  A

14   firebomb outside of a Jewish senior home in the dark hours

15   before 5 a.m. during the early weeks of the COVID

16   pandemic.  That would have drawn attention.  The defendant

17   had every reason to do this quickly and get out of there,

18   drugs or not.

19        Now Judge Mastroianni will instruct you about the

20   elements of the crimes that are charged in the indictment,

21   and I also want to speak to you about them.

22        To prove Count 1, the government must prove that the

23   defendant transported or received, or attempted to

24   transport or receive, in interstate commerce an explosive

25   with the knowledge or intent that the explosive would be

1    used to harm or intimidate any person or damage or destroy

2    any property, including real property like land.

3         For the purpose of Count 1, the phrase transport or

4    receive an explosive in interstate commence sounds

5    complicated but it's actually quite simple.  It just means

6    you must find that at least one of the components of the

7    explosive crossed a state line at some point prior to the

8    crime, and this really isn't in dispute here.

9         The fuel canister was manufactured in Oklahoma; the

10   Steps to Peace with God tract was published in South

11   Carolina, and the State of Massachusetts does not

12   manufacture gasoline.  That's more than enough.

13        Now to prove Count 2, the government must show that

14   the defendant maliciously attempted to use fire or

15   explosives to damage or destroy property that was used in

16   interstate commerce, and for these purposes maliciously

17   just use means that the defendant acted intentionally or

18   with willful disregard of the likelihood that that -- of

19   the result and not mistakenly or carelessly.

20        For purposes of Count 2, the phrase property that was

21   used in interstate commerce just means that the property

22   was actively employed for a commercial purpose such as

23   rental property.  That element is also easy.  JGS is used

24   in interstate commerce in many different ways, including

25   the rental units at Genesis House.

1    Now the evidence I have discussed already proves that

2    the defendant built this device with his own hands and

3    tried to light it on fire outside of JGS.  That satisfies

4    most of these elements because the mere fact that he put a

5    firebomb on JGS's front doorstep shows that he certainly

6    intended to damage that property.

7    He told you yesterday on cross-examination gasoline

8    is dangerous.  This was a dangerous device he said.  You

9    can also infer from the conduct itself that he knew this

10   act would intimidate the people who lived there and

11   possibly injure or even kill someone, and that's because

12   anyone who did this would understand that this is a

13   natural consequence of such an act.  Let alone, such an

14   act directly outside of a senior center where the average

15   age is 86 years old.

16   But I also want to talk with you about why this

17   device was an explosive under the definition the judge

18   will give you.  For Count 2, you must find the defendant

19   guilty if you find that he attempted to damage or destroy

20   JGS's property with fire or an explosive.

21   The fire part is easy.  Everyone knows what fire is,

22   and for Count 2 that alone is enough.  But because Count 1

23   requires an explosive and that definition can be

24   confusing, I want to clear that up now.

25   Judge Mastroianni will tell you that the word

explosive means any device that contains ingredients in
this such proportions, quantities, or packing that
ignition by fire may cause an explosion.  This definition
also includes any incendiary device, which means any
incendiary bomb, firebomb, or similar device.

The evidence here meets this definition in more than
one way.  This defendant put a firebomb outside of JGS, an
open canister of gasoline with a paper wick in its spout,
which he lit on fire.  The defendant admitted that
gasoline is flammable; that it can explode, and that it
was dangerous.

And at the start of this case you heard a trained
firearm, Captain Note, who first responded to the scene
tell you he moved his fire truck down the street when he
saw this thing because he knew upon sight that it was
dangerous.  This easily could have caught on fire and it
could have exploded.  That more than proves that the
defendant used the kind of explosive that's charged in
Count 1.

Now before we move on to Count 3, I want to be clear
about what the government is not required to prove here
and that is motive.

The government has to prove that the defendant acted
intentionally when he placed that bomb at JGS, but there's
no requirement that the government prove why he chose to

1    do so.

2         Even so, the trial in this case made something very

3    clear.  On April 2nd this defendant was spiraling downward

4    and as he did so, he committed a senseless act of violence

5    that was bound up in two things.  First, religion which

6    permeated his household.  You saw it in the tract.  Don't

7    forget, of all of the items that he could have used, a

8    paper towel, newspaper, other scrap paper, he picked a

9    religious tract to light on fire.

10             MR. WATKINS:  Objection.

11             THE COURT:  Overruled.

12             MS. BERKOWER:  Second, the location which had

13   multiple ties to his own life and in particular to his

14   mother with whom he was arguing all the time.  The

15   government need not prove a motive here but you can still

16   consider the evidence of it.

17        Now let's move on to Count 3.  As I mentioned to you

18   earlier, Count 3 charges the defendant with making false

19   statements to the FBI.  This charge is based on the

20   voluntary interview that Special Agent McGonigle engaged

21   with him on April 15th, specifically the defendant's

22   statements that he wasn't familiar with the location on

23   Converse Street where the device was placed and that he

24   had not left his house in two weeks prior to the

25   interview.

1       Judge Mastroianni will tell you that to find the
2   defendant guilty of the charge, you must find beyond a
3   reasonable doubt the defendant knowingly and wilfully made
4   a false material statement, that the statement was
5   voluntary and intentional, and that the defendant made a
6   statement in a matter within the jurisdiction of a federal
7   agency.
8       These elements are pretty straightforward and the
9   last one really isn't in dispute.  The defendant made
10  statements to Special Agent McGonigle who was
11  investigating a federal offense, the placement of the
12  device at JGS, so that element is satisfied.
13      You also learned that the defendant's statements were
14  as voluntary and intentional as it gets.  He was fully
15  informed of his right not to give any statement at all and
16  he waived that right in writing.
17      He told you himself yesterday he wasn't impaired
18  during the interview.  He was nervous but he wasn't
19  impaired.  If anything, he could focus pretty well.  He
20  had just taken Methadone which helps cut his cravings for
21  heroin.
22      Now he may regret speaking to the agent sitting here
23  today, but that doesn't mean he was voluntarily -- he
24  wasn't voluntarily engaging with them back in April.
25      You also know that his statements to Special Agent

McGonigle weren't just false.  They mattered here.  They were material.  Judge Mastroianni will tell you that a statement is material if it has a natural tendency to influence or be capable of influencing decisions by the agents, and that's exactly what happened here.

As Special Agent McGonigle talked to the defendant on his porch, agents were searching the mother's car in the driveway.  They impounded the defendant's van but they searched the mother's car in the driveway, and all the while the defendant maintained he hadn't left his house in two weeks.  He never breathed a word that he had actually been out in his mother's car on the morning of the crime and we know the result of this.  His van was searched for blood after it was impounded, but his mother's car was not.

You heard him on a recorded call laughing at the FBI for this.  These idiots he called the agents the day they returned his van.  Think about that call.  Go listen to it again back in the jury room.  It's Government's Exhibit 102.  He says the agents are idiots because they took the wrong car; that the agents didn't find anything in the van because he had actually been driving his mom's car.  Think about that for a moment.

He didn't say these idiots they didn't find anything because they have the wrong guy, or these idiots didn't

1  find anything because I was never near that location.

2  Think about what he did say.  These idiots they know now

3  but they didn't when they took it.  That's an important

4  admission.  It shows that on April 15th he made a material

5  false statement about his whereabouts and those statements

6  absolutely affected this case.

7       Special Agent McGonigle told you if the defendant had

8  told him he had been out in his mother's car, the FBI

9  would have impounded it and searched it for blood.  But

10  any evidence that may have been in that car was lost

11  because the defendant misled the agents to think there was

12  nothing to see there.  This element is proven.  That

13  statement was false and it was material.

14       The defendant also made a second false material

15  statement during that interview.  He insisted he had no

16  idea what Special Agent McGonigle was talking about when

17  the agent told him about the location where the device was

18  placed.

19       Now the agent told you, he tried to orient the

20  defendant to this location in multiple ways.  He tried

21  using landmarks along the street.  He showed him a map

22  with an X on it.  He then specifically asked about the

23  Jewish nursing home.  He asked about Ruth's House, still

24  nothing.  We know that this too was false.

25       The defendant told you that he drives past the sign

1    that you can see in Government's Exhibit 23 every single

2    day.  As he drives to 91, he drives past that sign.

3         And he told you yesterday that he visited his

4    grandmother who lived in a building just 200 feet away

5    from this sign at least every Christmas when he would stop

6    by so she could give him a present.

7         You heard that recorded call I read to him during

8    cross-examination.  Six days after this crime, he was

9    talking with his mother in detail about that location

10   including using the word Ruth's House.  He knew which

11   buildings were where.  He knew when Special Agent

12   McGonigle asked him about this location on April 15th, he

13   knew what he was being asked.  Playing dumb wasted

14   valuable time in this investigation.  That's a second

15   material false statement.

16        Now there's one other thing you should note about

17   false statements.  If you find that the defendant made

18   false statements to the agents, either the ones that are

19   charged in the indictment or other false statements that

20   there is evidence about, you may use them for a second

21   purpose, consciousness of guilt for the counts charged in

22   -- for the crimes charged in Count 1 and 2.  Keep that in

23   mind as you consider all of the evidence.

24        Now Judge Mastroianni will tell you that the

25   government bears the burden of proof in this case beyond a

reasonable doubt.  We bear that burden.

The defense did not have to put on any evidence at
all, but since they did, and the defendant himself
testified, let's consider now what he said.

There's no other way to say it, the defendant's
account of this incident makes no sense whatsoever.  He
told you under cross-examination that he explicitly
remembers this night.  He was clear about that.  So let's
take him at his word.

He does remember that night.  He's just not telling
you the truth about it.  Because what he told you requires
you to shove aside all of the physical evidence in this
case and believe in a series of coincidences one stacked
on top of the other.

To borrow the defense's words any one of these
coincidences is implausible.  Altogether, they're
impossible.

In order for the defendant's story to be true, some
other person found that yellow container with the
defendant's blood on it and decided to fill it with gas
and build a bomb.  That person also found a Christian
tract, the same type that the defendant's mother keeps in
the cup holder of her car which, of course, the defendant
was also driving on the morning of the crime, and decided
to stuff that tract in as the wick and somehow the

1    defendant's blood as also on that tract.

2         The same person then placed it at JGS, which is a

3    five-minute drive from the defendant's house on the same

4    morning that the defendant also drove by.

5         This person somehow also chose JGS out of all the

6    places that he could have selected, the one building that

7    has two separate ties to the defendant's family.  You can

8    use your common sense to see that this is ridiculous.

9         But that unbelievable explanation doesn't mean that

10   the defendant didn't remember that night.  There was some

11   pieces of the truth that slipped out while he was

12   testifying.

13        He acknowledged to you that whoever put the wick into

14   to the device also placed it at JGS, and that the wick

15   with his blood on it was in the dumpster with the fuel

16   canister and that his blood was on both parts of the

17   device.

18        The evidence shows that what really happened is this:

19   When Special Agent McGonigle went to his house, the

20   defendant denied all knowledge of this offense.  He didn't

21   know the location five minutes from his house.  He didn't

22   ever have a yellow fuel canister, and he hadn't been out

23   of the house for two weeks.

24        When the agent told him about the blood and

25   specifically asked him is it possible you touched this

canister at a job site and your blood got on it?  He said
no, it is not possible.  Not that he didn't remember.  He
said it was not possible.

But then afterward he saw the evidence and he
realized he needed a new story, one that explained how his
blood got there and that's what he told you.

After telling Special Agent McGonigle seven months
ago it was not possible that he got his blood on the can
on a job site, now he's in court and wants you to believe
exactly the opposite.

His story simply is not credible.  It asks you to put
away your common sense and shove aside all of the evidence
that you heard that points directly to him.  And his
mother unfortunately is enabling him, as she has done so
many times before.

You saw her testify.  Like, the defendant himself,
she had a selective memory and she kept changing her
story.  She's not credible either.

The evidence here proves beyond a reasonable doubt
that on April 2nd of this year the defendant John Rathbun
did something incredibly dangerous.  He lit a makeshift
firebomb outside of a senior living center at the height
of COVID-19 pandemic.

If that bomb had gone off, he could have hurt or even
killed someone.  He would have terrified the seniors

living nearby and he could have damaged JGS's property.

The evidence from that firebomb all points back directly to him.  The blood on the handle, the blood on the wick, the Christian tract, the cell phone location data, and the false statements to the FBI agent that show his consciousness of guilt.

We know that this was not a random act by a stranger. The defendant did this.  Now is the time to find him guilty as charged because that's the only conclusion that is consistent with all of the evidence.

Thank you, Your Honor.

THE COURT:  Thank you.

Attorney Watkins, you have 40 minutes.

MR. WATKINS:  Thank you.  May I get the screens?

**CLOSING ARGUMENT BY MR. WATKINS**

MR. WATKINS:  Good morning, jurors.

It's been a long couple of weeks.  At the beginning of this case, Ms. O'Neill-Greenberg told you that we thought you were going to see at trial the story of a drug addict with no bone to pick against any particular religion, certainly not against anyone of the Jewish faith, and that there would be no evidence of any kind of motive, any reason why John Rathbun would want to hurt people, destroy property, intimidate.

Isn't that exactly what you saw in the last two

1    weeks?  I'm going to use my few minutes to get a little
2    more granular on these issues, delve a little more deeply
3    into why the government's case does not make sense, and
4    show you that the only conclusion here is that John is not
5    guilty.
6         I want to start out this way.  When my kids were
7    young, the Watkins household, we loved reading stories and
8    stories from Greek mythology, in particular Aesop's Fables
9    and the like.  The stories tend to be simple, but they're
10   also great at getting to some essential truths.
11        During this trial it brought to mind one of the Greek
12   myths that we used to know and love, one of the more
13   macabre myths, but nevertheless one that I think is
14   appropriate here.  That's the myth of Procrustes.  Some of
15   you may know it.
16        Procrustes lived near a highway in Greece that
17   travelers frequented.  He would meet travelers along the
18   road and in pubs, public houses, get to know them, and
19   then offer them a place to sleep in his special bed.
20        When the unlucky traveler would arrive at his home
21   and be escorted to the room with the special bed,
22   Procrustes would show him that and ask him to get in.
23        The bed was special because instead of fitting the
24   bed to the traveler, what Procrustes would do would fit
25   the traveler to the bed.  If he was a little shorter than

the bed, he would hammer and rack the unlucky traveler
until he fit.  If the traveler was a little long for the
bed, he would cut off the offending parts to make sure
that he'd fit.  Either way, of course, the outcome was
catastrophic.

I think Procrustes would be delighted with the
government's case against John Rathbun.  It's what they've
had to do here is stretch their evidence to try to fit
their theory of why John Rathbun is guilty.  And they've
also had to cut away evidence in order to -- evidence
that's inconvenient to them in order to fit what it is
that they're saying here at trial.

So I want to start first to the timing because that
is an issue in this case of course.  The government wants
to focus -- I got to back up to the beginning here.  All
right.

This is the time period that we're starting to know
all too well, 4:51:44 in the morning and 8:30 in the
morning.  Everyone agrees that that is the period of time
at which someone placed the gas can next to that tree.

How do we know that those are the outer limits?
Well, we know from Officer Dabrae's dash cam, cruiser dash
cam that Officer Dabrae went by there at 4:51:44 in the
morning.  No can there.  Officer Dabrae didn't see the
can.  It's not on the video.  We know that outer limit.

1      The other outer limit is a stipulation.  There was a

2  resident who called this in at 8:30 in the morning, and as

3  we all heard the fire department came in at 11:40, several

4  hours after that.

5      Now, of this time the government wants you to focus

6  on about two minutes of this three and a half hour time.

7  Why does it have to be just that two minutes at the early

8  part of this time?  Because, as we've heard, John Rathbun

9  all the rest of the morning was in East Springfield

10  looking for drugs.  No dispute about that, right?

11  Everybody's agreed there's been no serious dispute that

12  after 5:05 a.m. -- actually we're going to find out it was

13  earlier than that, but at 5:05 a.m. John Rathbun was in

14  East Springfield far away from JGS and couldn't have put

15  it there.

16      So that is the time period and the government wants

17  you to go to just two minutes of that and ignore the rest

18  of that period of time, just as Procrustes would love.

19      So let's talk a little bit about those two minutes in

20  time and how we get to those two minutes in time.  So

21  let's review what the two Ryans told us, Ryan McGonigle

22  and Ryan Burke.  Ryan Burke, the cell tower expert; Ryan

23  McGonigle, the agent.

24      What did they tell us about how we know where John

25  Rathbun was?  Well, we got his cell tower -- excuse me,

1    I'm going to go here and pull this around.  And, of

2    course, this one is not working.

3        I'm going to come out here.  We know at 5:01:44 that

4    John Rathbun's phone hit off a tower next to I-91, the

5    other side of the Connecticut River.  And Ryan McGonigle

6    told us he thought that was the upper end of that range at

7    291 and I-91.

8        This is all government testimony that we're hearing

9    now.  And we have other evidence that corroborates that,

10   that John was there and on his way to buy drugs.  Five in

11   the morning "knock, knock, knock."  You heard from John,

12   and again none of this disputed, that's him sending a text

13   to Devin Austin saying be ready.  I'm on my way.  Can you

14   get me some drugs?  Now, that's Ryan Burke.

15       What Ryan McGonigle told us was it took 8 minutes and

16   27 seconds from JGS to get out on their view of the

17   evidence, place the bomb, and then drive to get to this

18   point on the cell tower, 8 minutes and 27 seconds.

19       Again this is the government's testimony.  It has

20   nothing to do with what we argued or the government

21   argues.  This is testimony and evidence.  So that takes us

22   back to 4:53:17 in the morning.

23       Now, we're in an unusual situation here.  If this was

24   a classroom, I would be asking for questions and things

25   but, of course, I can't do that.  But what I want to make

1      sure is everybody knows how I got there because I remember

2      Officer or Agent McGonigle and I were going back and forth

3      about that.  He didn't really want to admit to the math

4      and the like or to commit.  But again, 8 minutes and 27

5      seconds counting backwards from 5:01:44 in the morning

6      that comes out at 4:53:17.

7           So what we know is we have Officer Dabrae's

8      screenshot again.  No cars there.  Obviously no gas can

9      there.  So it wasn't there.  No one, not John Rathbun, not

10     anybody, was there at 4:51:44.

11          According to Ryan McGonigle, he would have had to

12     start putting the device out at 4:53:17 in order to get up

13     to that particular cell tower.  So what we have here is a

14     minute and a half difference out of that three and a half

15     hours, a minute and a half that the government says this

16     is the only time that John Rathbun could have put that

17     there.

18          But guess what?  As you've heard, there's more.

19     Right?  We saw Officer Dabrae's actual video, which I'm

20     going to start now.

21     (Video playing.)

22               MR. WATKINS:  Remember this from the evidence?

23     Officer Dabrae comes and takes a left going towards East

24     Longmeadow remember where everybody -- again undisputed --

25     would say John Rathbun, if he was driving down there,

1   would have to come from that particular direction.

2        I hope everybody is with me still.  And you'll

3   remember this was an exchange between Agent McGonigle and

4   myself, and I'm afraid -- I apologize if my frustration

5   kind of ran over because on direct testimony you will

6   remember he said I estimate that that's about 15 to 17

7   additional seconds.

8        When I asked him on direct (sic) examination, for

9   reasons I don't understand, he tried to run away from that

10  and said, well, I'm not really sure about that.  But guess

11  what?  He was right.  He asked me to go back to the video

12  later and I did.  It's 16 seconds.  He was spot on.  It

13  takes 16 seconds from where that screenshot was to where

14  this is.

15       I just bring this to your attention because I don't

16  understand why Agent McGonigle was arguing about something

17  which at the end of the day we all agreed on.

18       Nevertheless, the issue here is because, right, we've

19  started out at 5:41:44.  We've added 16 seconds, right?

20  We don't see John Rathbun's car, any car coming down here.

21  So now we're at 5:42 -- I hope everybody is still

22  following me -- 5:42 now is the earliest that that gas can

23  could have been left by the tree.

24       But what else do we know?  If there's no car here --

25  number one, even if a car was right next to Officer

1    Dabrae's cruiser at that point, it would have taken 16

2    seconds to get back to that driveway of JGS, 16 seconds.

3         So again these things are important because what the

4    government has said is he could have done it.  That's what

5    Ryan McGonigle said.  That's what the government is

6    arguing here today.

7         So we have 4:53:17.  That's still the absolute latest

8    he could -- John Rathbun, if he did this -- could have

9    started to put this and then driven away.  And now we have

10   4:52:15 as being the earliest he could have shown up.

11        Procrustes would be proud.  We've now put three and a

12   half hours down to one minute.  One minute out of that

13   three and a half hour time, that's the only time John

14   Rathbun could even possibly -- and this is all on the

15   government's evidence, undisputed evidence.  But there's

16   more.

17        Remember now when Officer Dabrae is taking this

18   right-hand turn, there's no cars coming down.  None.  Not

19   John Rathbun's car.  No other car at all.

20        Remember now there's just a one minute gap or John

21   Rathbun couldn't do it.  There are no cars coming down

22   there.  Was he hiding his car in the woods?  No.  One

23   minute left.

24        It's at least 20, 30 seconds, let's think about that.

25   If it was just 20 seconds, if it wasn't a minute, now

1   we're down to 42 seconds.  A 42 second gap where if John

2   Rathbun did it, he had to have done it within that 42

3   second gap.

4        Apologies for my mask.  It's falling down here.

5        So you're going to have all the evidence back there.

6   You're going to have these videos.  You're going to have

7   the cell tower evidence.  You've heard it all.  I

8   encourage you to go through it, and tell me where I'm

9   wrong on this government's evidence.  I want the

10  government -- they get the last shot here.  Maybe they'll

11  tell me where I'm wrong on this because this is

12  mathematics.  This is science, 42 seconds.

13       And what do we know even about the 42 seconds?

14  There's way more, right?  This 42 seconds assumes that it

15  actually did take only 45 seconds for someone to put this,

16  or particularly John, to put this on the government's

17  theory.

18       Ryan McGonigle said that there was no particular

19  reason for the 45 or 47 seconds other than we walked over,

20  put this camera case down, and then walked back to the

21  car.  That's how we came up with that 45 seconds.  But is

22  that really what had to happen if it was John Rathbun

23  doing this?  No.

24       We talked about some of those things with Ryan

25  McGonigle.  Under the government's theory, it was the

1    RAV4; the gas can was there.  You heard John and Sheila

2    talk about how particular they were about smells and the

3    like.  But nevertheless, if the government is right, it

4    was in the back passenger seat?  Who knows.

5         But John's not getting up and simply walking over

6    there as the government wants.  He's going back into the

7    back to get that out, and this is assuming that he went

8    right to that spot and knew that that spot was it.  This

9    is the perfect place for me to do this thing.  I'm not

10   going to look around at all.  I've got it in my head right

11   away that this tree at JGS is my lodestar.  This is where

12   I want to go.  That he didn't think about it at all; that

13   he didn't look around to see if there were other people

14   around, right?

15        And even once -- even if all that were true, there's

16   the walking over to the tree.  As the government puts it,

17   there's someone trying to light it.  It's put down.  These

18   things take time.  Each one of these things takes time.

19        And the reason I say all this is because once they go

20   over that 42 seconds, it couldn't have been John.  It

21   could not have been John.  Their theory doesn't work.

22   John Rathbun did not put it there that morning.

23        When you go back -- when we talked to Officer Dabrae,

24   you'll remember she said the reason I -- Officer Dabrae

25   said the reason I was there is because someone had passed

1    away at Genesis House.  And that when I left, there was

2    still a hearse there finishing up to leave.

3         What do you think about that?  If the government is

4    right that in that one minute or 42 seconds, or however

5    much it was, John's down there doing things.  That hearse

6    is going right by him.  Right?  How could that happen,

7    right?

8         Officer Dabrae says I left.  They were behind me.

9    They were still there but they were getting ready to

10   leave.  Wouldn't they have seen John there?  You haven't

11   heard any evidence of that.

12        So I guess at the end of the day what I'm trying to

13   say is Officer McGonigle can say it and Ms. Berkower can

14   repeat it, but that doesn't make it true that John Rathbun

15   could have placed this container next to this tree.

16        You're going have to agree, each and every one of

17   you, beyond a reasonable doubt that that is exactly how it

18   happened.  I would suggest there's just no way to conclude

19   beyond a reasonable doubt.

20        There are so many variables in the government's story

21   about the only way this could have been placed and the

22   only time that it could have been placed, it's ludicrous.

23   You can stop right there.  That's not guilty.  You don't

24   need to talk about other experts.  You don't need to talk

25   about really anything else in the case.  That's not

1    guilty.

2         I next want to take a look at some of the features of

3    the government's case from a 30,000 foot view, if you

4    will, about some of the things that I heard during trial

5    and I think you probably heard as well.

6         So the government says that John put this next to

7    this tree that morning at 4:53 with a malicious intent to

8    damage property and injure people.  How does that make

9    sense?

10        In the modern age, our phones are now our confessors.

11   They document everything that we do.  How did what he is

12   doing before make sense, square with the fact that he had

13   this premeditated plan to put this gas can next to the

14   tree?

15        There's no brooding or dark acts on the -- there's no

16   dark web or deep web or cabals that he's communicating

17   with on his phone.  He's searching for tools on Home Depot

18   and searching for jobs.  How does that square with this

19   idea that he knew exactly what he wanted to do, was to try

20   to light this thing, and then run away quickly for

21   whatever reason that the government seems unable to come

22   up with?

23        What we do know is that he was searching for drugs.

24   Again, this is evidence that nobody disputes, those text

25   messages.  It's clear to everybody I think the minute you

read those that that's what those texts are all about, and it doesn't square.  It simply does not square.

If someone wanted, John Rathbun or anybody, wanted to damage or destroy property, a tree or intimidate, why at that tree?  If the government is right that it was some vendetta against Ruth's House or Genesis House, there was that sign right there.  Why not put it next to the sign? If you want to make a statement, if you want to intimidate, if you want to damage, you know, light off something next to the sign at the road.  A tree?  I simply don't understand it.

If the beef that John had was against Genesis House -- there's no evidence of that, of course -- but the government seems to constantly suggest that Genesis House was some kind of a target, what's it doing over on the Ruth's House side where you learn somewhat ad nauseam now that the entrance to Genesis House is the next driveway going up there?

It simply doesn't make sense.  It simply doesn't make season.  Why light it and walk away?  If John Rathbun or anybody else wanted to damage and destroy, tries to light this crazy way on this spout, you're going to shrug your shoulders and just walk away?  Again, it doesn't make sense.  It doesn't make sense.

There's other issues that simply don't square well

1    with the government's theory and the idea that this case

2    was well investigated.  Let's look at forensic evidence

3    here.

4        Certainly true, as we've admitted all along, John's

5    blood on that handle, on that one spot on the handle, and

6    the pamphlet.

7        Once again, this is a case of just because someone

8    says it's so doesn't mean it so.  Ms. Berkower says that

9    the blood was fresh.  Listen, good luck with that.  We did

10   not hear any evidence at trial about it.  On the

11   government's theory that John put that out at 4:53 -- this

12   is the government's theory -- it was dried way before

13   11:40 when the fire people pulled up.

14       To the extent that she's arguing that you can infer

15   something that it's a fresh blood drop, I would think

16   she's not being completely level with you.  And you'll be

17   able to see that I think and confirm that of your own

18   common knowledge.  That is something we've all experienced

19   about when blood dries and how long something can stay

20   "fresh."

21       You heard yesterday when the judge stopped Ms.

22   Berkower to clarify here that it was just the DNA at that

23   spot that was tested.  No other part of the can was tested

24   to see if someone else's DNA was on it.

25       I kind of understand that there was this rush to --

you know, it's blood.  We're going to get DNA on that.
But this thought that they didn't look for anything else,
they didn't look for someone else's DNA on some other part
of the can, I think that is something you've got to
consider here about whether we would have gotten a more
fulsome explanation or a more fulsome description of
actually what went on here forensically.

     And isn't it interesting to you that there were no
fingerprints found on this can?  If the government was
right, John Rathbun scurried out there to put this thing
and quickly did it, why aren't his fingerprints there?

     Could it be the person who ultimately did put it
there wiped down the fingerprints?  They didn't care about
that blood spot.  That's not them.  Isn't that as
consistent -- more consistent with the evidence as it
actually is where there are no fingerprints found
whatsoever on the can?

     The judge is going to tell you in the instructions
these are things you can take into account whether the
government should have done -- taken certain actions to
investigate.  They didn't here and I'd ask you to consider
that.

     So some other aspects, the personal connections.
This was always key to the government's case.  You'll
remember that Mr. Desroches promised that the personal

1    connections to Genesis House would show why John Rathbun

2    chose this particular spot.  I remember him saying right

3    off the top, his mother worked there.  Of course, John

4    Rathbun knew where it was.  His mother worked there.  How

5    did that work out?  It didn't.

6         Once we found out the real truth about it, she does

7    the books for Genesis House.  She never goes there in a

8    work capacity.  There's simply no reason why John would

9    know that she does books for Genesis House.  And what does

10   that mean anyway as far as a motive, Genesis House?  The

11   evidence didn't pan out for them there.

12        They also promised you about the deep connections to

13   his grandmother at Genesis House, yet another reason why

14   he would choose this spot or try to later on cover up.

15   But again, did you really conclude that at the end of all

16   the evidence?  That he went to visit his grandmother a few

17   times.  Not even visit, it sounds like they went over to

18   pick her up and bring her other places for the most part.

19        None of them knew it as Genesis House.  It was

20   grandma's house.  Isn't that consistent with the way we

21   deal with places.  Sometimes we might know the names of a

22   ground but other times, particularly if we don't have the

23   deep connection, it's going to be grandma's house.

24        So these personal connections I would suggest the

25   government was relying on it at the beginning of the case,

1    I don't think it's there.  I think that's an indication of

2    yet more of Procrustes doing here that they're trying to

3    stretch very, very thin kinds of evidence to fill a theory

4    that simply doesn't make any sense.

5        I want to turn now to August (sic) 15th when Agent

6    McGonigle showed up at John's house.  Let's not beat

7    around the bush, right.  The Longmeadow Police Department

8    had found this can up there.  It's on the grounds of JGS.

9    There was a bloodstain on the can that led them to John,

10    and they went there looking for an admission, a

11    confession.

12        It's hard for me to fault any of those things.  A gas

13    can on the property of a Jewish-related property, yes, of

14    course, we want the police to investigate, but we also

15    want them to investigate fairly.

16        And what happened here when they got to 20 Lori Lane,

17    they got a series of stop signs, stop signs.  This is not

18    what we expected.  This is not someone who has lots of

19    materials around showing anti-Semitic leanings or really

20    anything else.  This is a guy in his boxer shorts talking

21    about ultimately his drug use and the kinds of things that

22    he used.

23        Just to be clear, he did not see -- they searched his

24    house.  They searched his room.  They searched everything.

25    They delved into his life.  There's not one wit of

1    evidence of any kind of anti-Semitic leaning.

2        What they found was a functioning addict at one of

3    the low points in his life vehemently denying having

4    anything to do with this as he does today.

5        So that's the scene when we go there.  And so what

6    does Agent McGonigle do?  Well, he's still trying to get

7    admissions.  You know, trying to get that gotcha moment

8    there.

9        So let's talk about Ruth's House and JGS.  What do we

10   hear about the actual questions and answers that the

11   government is now relying on to say that John lied?  This

12   map?  This seemed to be key to the government's case here

13   about lying that immediately John would know what's going

14   on here, what they're looking after.  Can you draw that

15   conclusion from this map?  You heard I think from both of

16   them about that.

17       What struck me here, and I think you all heard it,

18   Ryan McGonigle said at the beginning of the case I, Ryan

19   McGonigle, was confused.  I thought it was about Ruth's

20   House.  I thought that that's where this thing was left.

21   Now we're saying it's Genesis House, but back then it was

22   at Ruth's House.

23       If the agent is confused about what it is he's trying

24   to ask, how can we demand that John Rathbun give the

25   perfect answer?  I think the answer is we can't.  I don't

1    think Agent McGonigle was being fair up there.  He

2    certainly wasn't being fair to try to record it or

3    document the actual question and answer in a way that they

4    could then show to you to say this is exactly what

5    happened.

6        As you heard they didn't record it.  We've all got

7    recorders in our hands at this point.  The FBI certainly

8    has the equipment.  They could have had Mr. Rathbun write

9    out the statement about it.  They didn't do that.  They

10   could have had him sign notes; they didn't have him do

11   that.  So you don't have the evidence.  We don't have the

12   evidence.

13       What the government is now saying is the other way we

14   know that that is a lie is, well, he drives by there every

15   day.  Once again, how did that work out?  Because what I

16   remember is a couple things.  The firefighters, the very

17   first day they were called, he said he couldn't remember

18   what was on the signs, right, at Genesis House or Ruth's

19   House.

20       We had Susan Goldsmith I think said, well, I just

21   drive by that sign all the time but I don't... and she

22   works there.  Right?  But remember this is a road where

23   there are lots of facilities that are similar to this.

24   The idea that John Rathbun needs to know every single

25   place on down there and think about it as this agent is

1    taking with him, I think it's simply unfair.

2         I mean, think of any us about the routes we take to

3    get home on a day.  It becomes like wallpaper, doesn't it?

4    Are we all constantly looking out for this landmark and

5    that?  The answer is no.  This idea that by driving by

6    that makes him guilty of lying is ludicrous.

7         The two weeks' question we've gone on at some length

8    about it.  According to Ryan McGonigle the question was,

9    where were you on April 2nd?  The response is, well, I

10   hadn't been there in two weeks.  We've all figured it out

11   at this point.  April 2nd is 13 days, right?  Which of us

12   is not going to get caught in that particular misstatement

13   these days or really any days?

14        Remember, this is the start of the pandemic.  If

15   you're anything like me, the days quickly started fading

16   one into another where we weren't doing specific things on

17   specific days.  It really seems like a gotcha moment at

18   this point where he said, ah, two weeks that includes

19   April 2nd.  Now we know he was out.  He must have known on

20   that day.  That chain of illogic just does not get you to

21   a lie.  It's simply unfair, but you get to determine that.

22        Part of the jury instructions you'll hear from the

23   government (sic) talks about whether the answer was

24   reasonably -- whether the question was reasonably

25   understood and the answer a reasonable answer to the

1    question.  I invite you to look at the law and to really

2    think about what happened up there.

3        At the end of the day in order to find him guilty on

4    the false statement charges, you're going to have to

5    believe Agent McGonigle that he's giving you the whole

6    truth.  You saw him up there.  You're going to draw your

7    own conclusions about it, but I do want you to compare his

8    testimony to the testimony of some of the other even

9    government witnesses we saw.

10       Dustin Wong, Ryan Burke, they answered questions on

11   cross-exam.  They were just giving the facts that they

12   went by.  Dan Marshall from Scepter, a straight shooter.

13   John Drugan from the Mass State Police answered our

14   questions very quickly.

15       Ryan McGonigle a little bit difficult on

16   cross-examination.  He's clearly not as forthcoming to us

17   on cross-examination as he was when the government was

18   reading through their script of questions with him.

19       Is he somebody you can rely upon, Officer McGonigle,

20   if it was your liberty that turned on his testimony?  I

21   think that's what you got to think about when you go into

22   the jury room and consider these particular charges.

23       And then there's John.  John testified.  He didn't

24   have to.  The judge told you at the beginning of this case

25   there's absolutely no requirement that a defendant

1    testify.  He can simply sit by and say to the government

2    prove it, but he did.  And you got a chance to see him

3    with all his warts on display, and that's no easy task to

4    get up on the witness stand when you know the government

5    has been investigating you for six months, every aspect of

6    your life.  Make no mistake about that.

7         Mr. Desroches got up there with Sheila Rathbun and

8    had an email or a text message from a year ago.  The

9    government has looked into every facet of Mr. Rathbun's

10   life.  Did you hear any of that come in?  No.  Because it

11   doesn't help the government.  That's why it didn't come

12   in, and it didn't help the government when they were

13   cross-examining John as well.

14        Make no mistake though, John clearly needs to make

15   some major changes in his life; get some serious help to

16   address his addiction issues.  We told you that from the

17   outset.  He told you that when he was on the stand.  But

18   that's not a reason to find him guilty of these very, very

19   serious charges that the government has alleged.

20        Where is the why?  Why would John Rathbun do this?

21   The government is technically correct motive is not an

22   element of the offense, but people do not do things out of

23   thin air.  They simply don't.

24        I think that is something that you can and should

25   take into account.  Why?  Have they shown you the why?  I

1    think about as close as they got is he was arguing with

2    his mom over cigarettes and food.  How does that end up in

3    I want to put a fuel can on this property next to a tree?

4    If there was a whisper of a hint of why, you would have

5    heard it.  You would have heard it.  There is none because

6    John Rathbun didn't do this.  He didn't put those -- put

7    that gas can up against the tree.

8         The judge is going to read the instructions about

9    what you need to find on each one of the counts and one of

10   the things is intent.  Intent to destroy property, intent

11   to try to injure people or intimidate.

12        How do you get to intent without the why?  In other

13   words, the government might be technically correct that

14   they don't have to prove motive or the why, but they do

15   have to prove that intent.  And aren't those two things

16   really inseparable here?

17        If you knew the why -- if there was a why, you would

18   know the intent, this is why he wanted to do these things.

19   Without that, there's no intent there and the government

20   fails.

21        So as you go back to the jury room, I hope you'll

22   discuss whether the lack of any explanation of why John

23   would do this from the government is satisfactory to you

24   that you can just leave that.  Like Procrustes, cut that

25   out and not consider it.

1      The easy way out of this case is his blood is on the
2  fuel canister.  We never denied that.  John doesn't deny
3  that.  His blood is on the pamphlet.  I understand it
4  could be an easy, well, of course, he left it there.  Who
5  else would have?  Isn't that what the government is
6  arguing here?

7      I expect that the government is going to get up for
8  their second chance at us and repeat what Ms. Berkower has
9  done a few times already is use your common sense.  I
10  don't know about you, but I get very, very careful when
11  anybody tells me to use my common sense these days or
12  otherwise tells me that a decision is easy.  Because what
13  they're doing when they ask you that is to set aside
14  thoughtful, deliberate, logical thinking in favor of
15  instinct, emotion, biases.

16      But there's a reason why we have jurors and jury
17  trials, and it's not simply so you can come in here,
18  listen to a summary of the evidence, raise your hands, and
19  we all go home.  It's not why we spent time making sure
20  that each of you can be thoughtful, deliberative, and
21  logical.  It's really what our system of justice demands
22  here.

23      Intimately tied to our need for the thoughtful,
24  deliberative, and logical jurors is a requirement that the
25  government prove its case beyond a reasonable doubt and

that takes work.  That takes work in the jury room to
really grapple with the evidence and really look into
whether the government has proved its case beyond a
reasonable doubt.

So I'm asking you to be thoughtful, be deliberative,
use your logical thinking to get past that facial appeal
to raw instinct.

You know, I always -- I'm already out of time and I'm
going to get down in a minute, but I know in about ten
minutes I'm going to say, oh, jeez, I forgot to say this
or I forgot to say that.  You've all been very attentive
to this case extraordinarily in very, very difficult
circumstances.  So please if one of you says that idiot
lawyer forgot to say this or that, please say it for me
there because this is a serious decision that you're going
to make.

I think once you use the logical thinking to get past
those facial appeals to just wrap this up, I'm quite
confident that you're going to come to a truly reasoned
decision, a just decision, the right decision.  John
Rathbun is not guilty of transporting explosives.  He's
not guilty of trying to injure persons and property or
intimidate, and he is not guilty of making false
statements to Agent McGonigle.

I thank you for your time.

1          THE COURT:  Attorney Desroches, you can have 12

2     minutes.

3          MR. DESROCHES:  Thank you, Your Honor.

4     **REBUTTAL CLOSING ARGUMENT BY MR. DESROCHES**

5          MR. DESROCHES:  We don't need to reach

6     Procrustes or any other mythology or fable because really

7     when you boil anything -- any fable or myth -- down, the

8     moral of the story is common sense.  It's really what

9     informs us on our daily basis.

10        I don't think Attorney Watkins meant to tell you not

11    to use your common sense when you're assessing the

12    evidence.  I think he's just trying to redefine common

13    sense in a way that's beneficial to his client John

14    Rathbun.

15        He told you that common sense is not thoughtful,

16    logical, or deliberative.  When in, fact, that is exactly

17    what common sense is.  It's what informs our every day

18    life and every decision we make.  It is, of course,

19    thoughtful, logical, and deliberative by its very nature.

20    It is our common sense.  The judge will even tell you to

21    bring it back with you.  We cannot leave that at the door

22    of the courthouse, and common sense tells us that when

23    we're making important decisions, we consider all of the

24    evidence.

25        Certainly look at the video as Attorney Watkins

1    suggested, but don't forget everything else we've heard.

2    There is powerful circumstantial evidence in this case

3    that supports the government's theory and supports a

4    finding of guilt.

5         Let's first turn to the drive or the defendant's

6    theory of the drive that the defendant took on April 2,

7    2020.  But first, as you heard Attorney Watkins' argument,

8    I hope you caught that there are certain assumptions

9    underlying it, and naturally just like his common sense

10   definition benefits the defendant, so do these underlying

11   assumptions.

12        First, the defendant is assuming that -- well, is

13   arguing -- the assumption underlying this argument is that

14   the defendant was driving down Converse Street as Officer

15   Dabrae was taking a left onto it.  That ignores the fact

16   that the defendant could have been behind Officer Dabrae.

17        You heard that the driveway -- could we have 104

18   please?

19        The driveway into JGS loops around in that Officer

20   Dabrae was leaving through the second exit.  We don't see

21   behind Officer Dabrae.  We don't know whether the

22   defendant could have been in that loop behind Officer

23   Dabrae.  He could have been on Converse Street but that's

24   an assumption that benefits the defendant.  Why then is he

25   arguing that?  Because it benefits him.

1    What the government's evidence shows is that this is

2    possible and, as you heard, it is the best-case scenario

3    for the defendant.  It gives him every benefit of the

4    doubt.

5    You saw as Agent Mastroianni sauntered up to that

6    tree, placed the bag down, waited 17 seconds, your memory

7    controls on that and you'll see the video, then strolled

8    back to his car, got into it, drove the speed limit, and

9    still even -- I know this cell site evidence may have been

10   complicated, but it boils down to a very simple

11   proposition.  There's a range that the defendant was in at

12   5:01 a.m.  The closest range, as you can see, at the

13   bottom and the furthest range which is the bubble on the

14   top.

15   They gave him to the very furthest point, the benefit

16   of assuming that he contacted that tower at the latest

17   possible moment.  And guess what?  It still worked.

18   This video shows the defendant could have strolled --

19   driven the speed limit, obeyed all traffic laws, and it

20   still works.  That's not beneficial for the defendant.

21   That's why they're arguing seconds.  It works.  In the

22   best-case scenario for John Rathbun it still works.  This

23   is what happened.  This is what is supported by the

24   circumstantial evidence.

25   Now, the drive shows you the best-case scenario.  It

doesn't show you the likeliest scenario.  As you heard,
the defendant admitted smoking crack cocaine in the hours
before.  He said when he smokes crack cocaine he's go, go,
go.  He's frantic.  What about that suggests that he acted
as cautiously and deliberately as the FBI agents did?

As you heard earlier, he lit a bomb.  You don't stand
around watching a bomb.  You run out of there.  You go.
Even if it were legal, you'd go.  But if it worked, this
is a major scene.  He's running away from a major crime
scene.  Is he going to obey the speed limit?  Stop at
lights when he's on crack and he's go, go, go?  No, he did
not.

Now you also heard evidence about the defendant not
knowing what JGS and Ruth's House was.  They're relying
again on the defendant's testimony.  We'll get to that in
a minute.  The defendant's mom's testimony, we'll get to
that in a minute too.  But the evidence, using your common
sense, shows this defendant knew very well where this
location was.

His grandmother lived there.  He minimized, the
defendant did, his knowledge of visiting there.  Oh, at
one point he said he visited there a couple times a year
and then he backed off and said maybe four or five times
total just to pick up a present from her.

But he drives by that same location every day.  You

1    heard from his own testimony he drives down Converse

2    Street every time he goes to Springfield.  He's constantly

3    on Converse Street.  It's a mile -- 1.4 miles from his

4    house.  Common sense tells you you're aware of your

5    surroundings.

6         By the way also, Attorney Watkins' argument, once

7    again, benefits the defendant, and I would suggest your

8    memory of the evidence controls.  But Ms. Goldsmith

9    testified she wasn't sure about a street sign, not JGS.

10   She was very clear about that JGS sign.  She had very good

11   knowledge of when it was changed, where it was, and what

12   it looked like.  What she wasn't aware of was a small

13   street sign, and again that makes sense because she knew

14   where she was.  She knew where these things were, just

15   like the defendant did.

16        It is illogical to say that he had no idea where this

17   place was.  And just like the defendant's argument

18   benefited him, so did his statements to the FBI.

19        Now, one thing is very clear, you've never heard the

20   government say one thing about anti-Semitism.  The

21   defendant raises this argument just to shoot it down.

22        As Attorney Berkower told you, motive is not an

23   element.  The defendant has argued this makes no sense.

24   Sure, he's right.  It makes no sense to do something as

25   dangerous as this.  In what world, under what

1   circumstances would this act make sense?  You can't make

2   sense of putting a bomb outside of a nursing home.

3        We cannot get inside John Rathbun's head.  That's why

4   motive is not an element, but there's evidence of what it

5   may be.  You heard his life.  He told you himself.  He was

6   depressed.  He was in a cycle of addiction, and he wasn't

7   proud of his behavior.

8        His mom was on his case about getting a job; his

9   daughter wasn't talking to him.  His brother was

10   successful working in Boston, and he was not proud of

11   himself smoking crack all night.  He lashed out.  We

12   cannot get inside his head to answer why, but the evidence

13   in this case clearly shows that he did it.

14        The defendant made no effort to explain the blood on

15   the wick.  When asked by his own attorney on direct about

16   the can and the wick, he only said, oh, I touched the can.

17   He never explained why his blood was on the wick.  Why?

18   Because that's an inconvenient truth for which he has no

19   excuse.

20        We heard his excuse for the blood being on the can

21   and, by the way, that was provided by Special Agent

22   McGonigle on April 15th.  But he couldn't explain why the

23   blood was on a tract that was in the cup holder which was

24   very similar to what we heard was in the cup holder of his

25   mother's car.

1    But what we did hear was that the defendant was

2   smoking crack on April 2nd all night in his room and he

3   left.  You heard that he uses his right hand to smoke

4   crack.  And using his right hand -- because he's a righty

5   I would assume -- probably explains why his blood is on

6   this wick, which I would suggest the inferences that flow

7   from the evidence we've seen occurred when he jammed the

8   wick into the gas can -- Can we have the next one? -- the

9   gas can that he bloodied when he carried it to that

10   location on JGS property.  He was using his right thumb to

11   use the lighter to smoke crack all night in the moments

12   before he did this.  I would suggest to you that that is

13   exactly what happened.

14    Now, as I said, the defendant's testimony.  Just as

15   the underlying assumptions the defendant made in his

16   closing argument, just as the excuses that the defendant

17   has come up with that benefited him, so was his testimony.

18   It was intended to benefit him.

19    You saw how he testified, and using your common sense

20   -- once again, which the defendant has urged you to not

21   use -- you know that that was very rehearsed, almost

22   robotic.

23    As you assess his credibility, what does that tell

24   you?  He did have some moments where he slipped.  Like

25   when he told Attorney Berkower that the person who put the

1    wick in the can, put the device where it was found.

2              THE COURT:  You're going to have to wrap up.

3              MR. DESROCHES:  Now when someone tells you who

4    they are, believe them.  So I'll wrap up where the

5    evidence yesterday wrapped up.

6         When the defendant told you that he lied to make

7    himself look good, recall when Attorney Berkower was

8    asking him about his friend Glenn, the text messages that

9    he was sending to him?  He said, I lied to Glenn to make

10   myself look good.  That's to his drug buddy as he

11   described him.  What does that tell you he would do when

12   the stakes were high?  When the FBI was at his door?  When

13   he's sitting in front of you testifying?  Think about

14   that.

15        Ladies and gentlemen, there's no reasonable doubt

16   that the defendant is guilty.  The evidence and your

17   common sense makes that an easy question.  Thank you.

18             THE COURT:  All right.  Was there any sidebar

19   issues on either side?  No?  All right.  We can talk about

20   them.

21        So I need to set up to be able to do the jury

22   instructions because I want the jury instructions to be

23   able to be displayed on the screen as I'm reading it so

24   you can follow along.

25        So we'll take -- it's probably going to take 10 or 15

1  minutes just to make sure that is all working.  Then when

2  you come in, I'm going to read through the jury

3  instructions and you're going to follow it on the screen

4  and then the case will be yours.

5       Lunch is ordered and so if we start jury instructions

6  at 12:30, a little after 12:30, I think for sure the case

7  will be yours by 1:30.  All right?

8       Okay.  You've heard closing arguments now so I guess

9  I need to just step up the instructions.  Really there is

10  no talking about the case.  The case is not finished yet.

11  I have to give you the instructions.

12       Do not talk about the case with each other and follow

13  all of the other instructions that I've been giving you

14  about the case.  All right?  No research; no jumping on

15  the internet; no reading any posts about the case.  All of

16  the instructions apply.  Okay.  So I'll see you when we

17  get this set up.  I'm thinking about 15 minutes.  Okay?

18            THE CLERK:  All rise.

19  **(The jury left at 12:17.)**

20  (End of excerpt.)

21

22

23

24

25

1    (The certification of this transcript does not apply to
     any reproduction of this transcript, unless under the
2    direct control and/or supervision of the certifying
     reporter.  I assume no responsibility for the accuracy of
3    any reproduced copies not made under my control or
     direction.)

4

5                            CERTIFICATION

6

7            I certify that the foregoing is a correct

8    transcript of the record of proceedings in the

9    above-entitled matter to the best of my skill and ability.

10

11

12

13   /s/ Alice Moran                        December 8, 2020
     Alice Moran, RMR, RPR
14   Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25