```
 1                 UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS
 2                      WESTERN SECTION

 3

 4   United States of America  )
                               )        20cr30018-MGM
 5        vs                   )
                               )        November 12, 2020
 6   Jonathan Michael Rathbun  )
     _____)
 7

 8               Excerpt of Jury Trial Held Before

 9               The Honorable Mark G. Mastroianni

10                 United States District Judge.

11

12   APPEARANCES:

13

     On behalf of the government:  Risa Berkower, United States
14   Department of Justice, 950 Pennsylvania Avenue, NW,
     Washington, DC 20532.

15

16   Neil L. Desroches, Assistant United States Attorney, 300
     State Street, Suite 230, Springfield, MA 01105-2926.
17
     On behalf of the defendant: Timothy G. Watkins, Esq., 51
18   Sleeper Street, 5th Floor, Boston, MA 02210.

19   Forest J. O'Neill-Greenberg, Esq., 51 Sleeper Street, 5th
     Floor, Boston, MA 02210.
20

21
                       Alice Moran, CSR, RPR, RMR
22                    Official Federal Court Reporter
                       United States Courthouse
23                    300 State Street, Room 303D
                        Springfield, MA 01105
24                          (413)731-0086
                        alice.moran@verizon.net
25
```

```
 1                              INDEX

 2
     Witness:                                          Page:
 3

 4   Michael Nothe

 5

 6   Direct examination by Mr. Desroches               29

 7   Cross-examination by Mr. Watkins                  48

 8   Redirect examination by Mr. Desroches             59

 9   Recross-examination by Mr. Watkins                61

10   Redirect examination by Mr. Desroches             62

11   Recross-examination by Mr. Watkins                63

12

13   Gary Fontaine

14

15   Direct examination by Mr. Desroches               64

16

17
     Exhibit No.        Description                    Page
18

19   7    Photo of yellow fuel container               42

20   9    Photo of yellow fuel container               44

21   10   Photo of crosswalk                            46

22   104  Ariel photo of 780 Converse Street            51

23   11   Photo of yellow fuel container                73

24   12   Photo of yellow fuel container                75

25   15   Photo of yellow fuel container                76
```

| | Exhibit No. | Description | Page |
|---|---|---|---|
| 1 | | | |
| 2 | 13 | Photo of yellow fuel container | 76 |
| 3 | 14 | Photo of yellow fuel container | 78 |
| 4 | 16 | Photo of Steps to Peace With God pamphlet | 79 |
| 5 | 17 | Photo of Steps to Peace With God pamphlet | 80 |
| 6 | 18 | Photo of Steps to Peace With God pamphlet | 81 |
| 7 | 19 | Photo of Steps to Peace With God pamphlet | 82 |
| 8 | 20 | Photo of Steps to Peace With God pamphlet | 83 |
| 9 | 3 | Steps to Peace With God pamphlet | 85 |
| 10 | 1 | Yellow fuel container | 86 |
| 11 | 21 | Photograph | 88 |
| 12 | 22 | Photograph | 88 |
| 13 | 23 | Photograph | 88 |
| 14 | 24 | Photograph | 88 |
| 15 | 25 | Photograph | 88 |
| 16 | 26 | Photograph | 88 |
| 17 | 27 | Photograph | 88 |
| 18 | 28 | Photograph | 88 |
| 19 | 29 | Photograph | 88 |
| 20 | 30 | Photograph | 88 |
| 21 | 31 | Photograph | 88 |
| 22 | 32 | Photograph | 88 |
| 23 | | | |
| 24 | | Opening statement by Mr. Desroches | 6 |
| 25 | | Opening statement by Ms. O'Neill-Greenberg | 18 |

1   **(Excerpt from 11-12-20 trial.)**

2   **(The defendant is present.)**

3   THE COURT:  All right.  Now the opening

4   statements are up to -- you can use as much as you want of

5   the 20 minutes, but there's a 20-minute limit.  Go right

6   ahead.

7   MR. DESROCHES:  Thank you, Your Honor.  May I

8   just inquire if the screens display an image?

9   THE CLERK:  Yes.

10  OPENING STATEMENT BY MR. DESROCHES

11  MR. DESROCHES:  The warnings on that fuel can

12  read "Danger; vapors can explode; extremely flammable."

13  These dire warnings are intended to prevent injury and

14  destruction.  However, for the defendant, John Michael

15  Rathbun, that was the desired outcome on April 2, 2020.

16  In the early morning on that day, April 2nd between

17  4:51 a.m. and 5:01 a.m., the defendant took that

18  container, which was filled approximately one third with

19  gasoline, stuffed a religious pamphlet into it and placed

20  it on a property of the very same senior living facility

21  where his grandmother once lived and where his mother

22  worked.

23  The defendant then lit that pamphlet --

24  THE CLERK:  I'm sorry, I'm going to stop you for

25  one minute.

1          THE COURT:  I'm sorry, the issue that we're

2     having -- and you're not losing this time.  I'm sorry for

3     the interruption.

4          In order to have public access, one of the hallmarks

5     of our jury system is that we're open to the public, but

6     we can't keep this open to the public because we are at

7     full capacity.  This is the most people we can fit in this

8     room for health reasons.

9          So we broadcast the trial in a number of ways.  It's

10    broadcast out over Zoom.  If you were to sign into this,

11    you can watch this trial as a member of the public.  It's

12    also broadcast to another room in this building where if

13    you're a member of the public, you can come in and you can

14    sit in that other room and be distanced the appropriate

15    amount and watch the trial.

16         One of the bumps that we're having, one of the things

17    that's just imperfect, is there's no microphone that was

18    picking up from this stand so it's not being sent out to

19    the public to hear.

20         Attorney Desroches, if you wanted to, you can do the

21    opening from your table or if you can somehow find a way

22    to make that work, that microphone.

23              MR. DESROCHES:  So is there a way to test the

24    audio?

25              THE COURT:  There is also, by the way, a

1   hand-held lapel microphone that's portable.  Can you start

2   that up?

3           MS. BERKOWER:  Your Honor, while the court is

4   addressing that, I noticed that when the screens came up,

5   there's like a strange circle on the screen.

6           THE COURT:  We need to contact our IT

7   department.  We have no idea what that is or how to get it

8   off.

9   (Short pause in the proceeding.)

10          THE COURT:  All right.  We will start over.  If

11  you want to pull the screens back up, you can do that.

12          MR. DESROCHES:  Sure, now that you have a

13  preview.

14          THE COURT:  Go right ahead.

15  **OPENING STATEMENT BY MR. DESROCHES**

16          MR. DESROCHES:  The warnings on that fuel can

17  read "Danger; vapors can explode; extremely flammable."

18  These are dire warnings intended to prevent destruction

19  and injury, but on April 2nd of 2020 that is exactly what

20  the defendant, John Michael Rathbun, intended.

21      On that date between 4:51 a.m. and 5:01 a.m. the

22  defendant took that container which was filled

23  approximately one third full of gasoline, stuck a

24  religious pamphlet in it, and placed it on the very same

25  property of the senior living home where his grandmother

1   once lived and where his mother worked, just feet from a

2   sidewalk on a busy Longmeadow Street.

3       He then lit that wick, the pamphlet, and then ran

4   back to his car and drove away.  It was as easy as pulling

5   over to the side of the street, grabbing the can, running

6   maybe 15 feet, putting it next to a tree, and then running

7   back to his car.  It was speedy; it was simple; it was

8   dangerous.

9       If executed properly, the defendant's plan would have

10  destroyed the property of the senior living home and would

11  have endangered anyone who happened to be nearby.

12  Fortunately the defendant did not properly execute this

13  plan and this improvised wick, the pamphlet, failed to

14  light.

15      As unsophisticated and simple as the plan was, the

16  defendant still managed to act too hastily in executing

17  it.  Because not only did he fail to properly light the

18  wick, he left a trail of evidence that leads directly to

19  him.

20      He left his DNA on the canister.  He left his DNA on

21  the wick, and he left digital evidence that clearly

22  demonstrates the defendant's guilt.

23      I'm going to outline for you now the government's

24  case, which as you heard consists of three charges.

25  First, Count 1 charges the defendant with transporting or

receiving in interstate commerce an explosive with the
knowledge and intent that it will be used to kill, injure,
or intimidate any individual; or that it will be used to
unlawfully damage or destroy any building, vehicle, or
real property.

Count 2 charges the defendant with attempting to
maliciously damage or destroy by means of fire or an
explosive any building, vehicle, or real property used in
interstate commerce.

Count 3 charges the defendant with making false
statements to the FBI.

Now let's talk about Counts 1 and 2 first.  As I
said, the evidence in this case will show the defendant
placed the bomb at the driveway of the entrance of the
senior living facility in Longmeadow.  This facility's
name is the Jewish Geriatric Services Lifecare or JGS.

JGS is actually a campus of several assisted living
homes for the elderly, including one by the name of
Genesis House.  This is a subsidized independent living
home for seniors.  The residents used the grounds of this
campus as place to exercise, to get some fresh air, and
socialize.

The campus itself just sits just off of Converse
Street in Longmeadow.  Converse Street is lined with big
old trees and has sidewalks on both sides.  It is a busy

1   street both in terms of vehicular and foot traffic because

2   it provides access to a number of nearby shops and further

3   down the road Route 91 in Springfield.

4        Unfortunately, like most elderly care facilities, it

5   is not uncommon for the police to have to respond to that

6   location to assist with medical emergencies and one such

7   instance occurred on April 2nd of 2020.

8        At 4:51 in the morning a police officer who had just

9   responded to a medical call was leaving JGS and she drove

10   right by the location where the bomb would ultimately be

11   found.  At that time the bomb was not there.

12        Later in the morning Longmeadow firefighters

13   responded to JGS for a much different reason, a suspicious

14   device had been reported to the police.  When they

15   received that call, they responded, just as firefighters

16   usually do.  They suited up, got into a fire truck, and

17   raced towards the threat.

18        Upon arriving at JGS, firefighters saw the yellow can

19   that we just looked at.  It was just feet from the

20   sidewalk on Converse Street and near a tree on JGS

21   property.  When they saw it, they immediately recognized

22   the danger.  As a result, they did not approach it and

23   they took steps to keep the public away from it.

24        Even from a distance, the firefighters realized the

25   potential danger of this situation.  They saw a charred

1   wick was protruding from the nozzle and they were

2   concerned that it could explode.  After taking time to

3   ensure that the wick was not lit, firefighters approached

4   the can and made sure it was safe.

5       Once the threat was neutralized, the investigation

6   began.  Longmeadow police officers on the scene approached

7   it and immediately observed what appeared to be

8   bloodstains on the handle.  They then collected the device

9   and transported it back to the Longmeadow Police Station

10  where they more closely examined it.

11      First, they removed the wick and they saw that it was

12  partially burnt and discovered it was a Christian

13  proselytizing pamphlet.  They also saw that it, like the

14  can, appeared to be stained with blood.  They then

15  notified the FBI and sent the evidence to the Mass. State

16  Police Crime Lab so they can analyze the stains.

17      The chemist at the Mass. State Police Crime Lab will

18  tell you that she analyzed the bloodstains that the

19  officers found both on the can and on the wick.  She will

20  tell you that the blood on the handle and on the wick was

21  a match to the defendant's DNA.  In fact, she will

22  describe the chances of that DNA coming from anyone else

23  as being one in 568 octillion.  That is a number with 27

24  zeros and nine commas.

25      As the lab was analyzing this evidence, FBI agents

1    took over the investigation.  As part of that

2    investigation, they spoke to the defendant who lived just

3    five minutes from JGS.

4         At the outset of their conversation with the

5    defendant, they noticed his hands.  They were covered in

6    cuts and wounds, including an open wound on his right

7    thumb which they photographed.  You will see these

8    photographs and as you review them, think about what we

9    just heard about the device and the wick.  They were

10   stained with the defendant's blood.

11        Evidence will also show that the defendant was in the

12   area of JGS the morning of April 2nd and had the

13   opportunity to drop the device, light it, and run.  The

14   defendant's cellular telephone gives us some of that

15   evidence.

16        An FBI agent will tell you that phone data can show

17   where a phone is located, and they reviewed this data

18   which shows that at 4:34 a.m. on April 2nd the defendant's

19   phone was in the area of this home.  Again, approximately

20   five minutes from JGS.

21        At 5:01 a.m. the defendant's cellular phone was next

22   to the Forest Park bridge in Springfield which was

23   approximately five minutes further down the road from JGS.

24        Now as you hear this, keep in mind that you will also

25   hear the defendant traveled down Converse Street past JGS

1    every time he goes to Springfield.  And that in a recorded

2    call which you will hear he admitted to driving to

3    Springfield that morning.

4         Agents drove from JGS to Springfield to the Forest

5    Park bridge to get a sense of the route and found that it

6    took just five minutes to get from JGS to the bridge.  In

7    fact, JGS is directly in the middle of the route between

8    the defendant's home and that bridge.  In other words, the

9    defendant would have to pass right by JGS to get to that

10   bridge that morning.

11        The evidence will show that the defendant had ample

12   time during this trip to stop, get out of his car, drop

13   the device, try to light the wick, get back in the car,

14   and drive away.

15        Agents also conducted a search of the defendant's

16   home and recovered a cell phone.  An analyst was able to

17   extract text messages, phone call logs, a web history, and

18   voice mails from that phone.  These records demonstrate

19   that the defendant was using his phone essentially all

20   night beginning April 1, 2020 until the afternoon of April

21   2, 2020.

22        The analyst was also able to recover a voice mail

23   from the defendant's phone that was from the defendant's

24   mother and it was left at 8:09 a.m.  In that voice mail

25   the defendant's mother is begging him to return her car

1    because she needed it for work that day.

2        Now Counts 1 and 2 arise from the placement of the

3    homemade incendiary device at JGS on April 2nd so let's

4    talk about the device itself.

5        You will hear that it has three components:  The

6    wick, the fuel, and the canister.  A forensic analyst

7    examined the fluid found in the device and determined that

8    it was gasoline, a volatile, flammable substance.

9        This is important because Count 1 alleges that the

10   defendant received an explosive, which the judge will tell

11   you means any device that contains ingredients which if

12   ignited by fire may cause an explosion or any incendiary

13   device which the judge will also define.

14       Count 2 alleges that the defendant attempted to

15   maliciously damage or destroy real property by means of

16   fire or explosive.

17       The wick, one of the components of the device, also

18   provides evidence.  As you heard, it was actually several

19   pages of a Christian proselytizing pamphlet and it was

20   stained with the defendant's blood.  The defendant had

21   easy access to similar pamphlets.  His mother routinely

22   kept them in their shared home and in her car, the car

23   that he drove on April 2nd of 2020.

24       Over the course of the trial you will hear that these

25   pages were torn from a pamphlet entitled Steps to Peace

1    With God, which is published and distributed by the Billy

2    Graham Evangelical Association which is based in

3    Charlotte, North Carolina.

4        You will hear that the organization held a series of

5    events in Springfield in 2019 that the defendant's mother

6    attended and that that pamphlet was distributed at some of

7    those events.

8        The defendant's 18-year-old daughter who lived with

9    the defendant and his parents at their home in East

10   Longmeadow will tell you that the Steps to Peace With God

11   pamphlet looked very similar to those that she had seen

12   around the house and which her grandmother had passed out

13   to strangers.

14       On April 15th of 2020, law enforcement officers

15   searched the defendant's home.  After investigators

16   arrived, they spoke to the defendant off and on for a

17   period of three to four hours.  Initially the defendant

18   appeared to be at ease.  He was smoking cigarettes,

19   kicking a soccer ball around the backyard, and telling

20   officers and investigators that he wanted to help to

21   figure this out.  However, when confronted with the

22   evidence this will change.

23       At one point during the conversation investigators

24   told the defendant that they had found a fuel container

25   with his blood on it.  The defendant could not explain how

1    his blood got there and asserted that he had never owned a

2    yellow fuel can.

3        Agents then showed the defendant photographs of the

4    charred religious pamphlet, the wick, that contained his

5    blood.  When he saw these photographs, his demeanor

6    changed.  Before, as I said, he was kicking a soccer ball

7    and offering his assistance.  After he put his head in his

8    hands, looked visibly upset, and said he wanted to cry.

9        Now, turning to Count 3, the false statements.

10   Specifically this count alleges that the defendant made

11   two material false statements to the FBI.  First, that he

12   was not familiar with the location on Converse Street JGS

13   where he placed the device.  Second, that he had not left

14   his house in the past two weeks because of the COVID-19

15   pandemic.

16       The evidence will show that in fact the defendant

17   knew these statements were false.  First, he was familiar

18   with the location where he placed the device.  And,

19   second, that he had left his house at least during the

20   early morning hours of April 2, 2020.

21       When asked if he was familiar with the location where

22   the device was found, the defendant admitted that he

23   routinely drives down Converse Street but he claimed to be

24   unfamiliar with JGS.

25       The defendant maintained this even after he was shown

1    a map of the location with an X marking the location of

2    JGS.  As you hear this evidence, keep in mind that you

3    will hear that the driveway of JGS is clearly marked with

4    a large sign.  It is five minutes from the defendant's

5    home, a home where he had lived nearly his entire life,

6    and the defendant admitted routinely driving down this

7    street.

8         Furthermore, the defendant's grandmother lived at one

9    of the buildings in JGS, the Genesis House.  That was in

10   the mid to late 2000s, and the defendant's mother is a

11   long-term employee of the company that manages JGS

12   property.

13        You'll also hear a recorded call between the

14   defendant and his mother that took place on July 25th of

15   2020.  In that call, while discussing his grandmother's

16   residence at Genesis House, he indicated about her

17   residence where she lived was right on that side too where

18   the bomb was found.  In another call he reminisces about

19   spending Christmases there.

20        Agents also asked the defendant about his whereabouts

21   on the day of the crime.  The defendant responded that he

22   had not left his house in two weeks because of the

23   COVID-19 pandemic.

24        However, the cellular site location that we discussed

25   earlier that shows he was at the Forest Park bridge near

1    Springfield on April 2nd contradicts this and it does so

2    clearly.

3         You will also hear a recorded call between the

4    defendant and his mother when the defendant admitted that

5    he was in fact on Converse Street at the time of the

6    crime.

7         Now consider this -- consider what this tells us

8    about what the defendant actually knew when he told the

9    FBI that he did not know where JGS was or he was

10   unfamiliar with it and that he had not left his house in

11   two weeks before.  The evidence will show that he

12   carefully chose when to give these false statements and

13   that he intended to mislead investigators.

14        You may hear that the defendant claims he was not

15   near JGS at the time of the crime.  But as you listen to

16   this, consider that you will also hear evidence that shows

17   the defendant drove by JGS.  He had ample opportunity to

18   place it and then continue on into Springfield -- to place

19   the device.  And ask yourself as you hear this, how long

20   would it take to place the device, light it, and run?  It

21   was speedy; it was simple; it was dangerous.

22        Now after you've heard all the evidence, my

23   colleague, Attorney Risa Berkower, will ask you to find

24   the defendant guilty of all three counts because at that

25   time there will be no reasonable doubt that he is in fact

1    guilty.  Thank you.

2            THE COURT:  Defense, would you like to make an

3    opening?

4            MS. O'NEILL-GREENBERG:  Yes.

5            THE COURT:  All right.

6            MR. WATKINS:  We'll need the overhead at some

7    point.

8            THE COURT:  Okay.

9            MR. WATKINS:  At one particular point.

10           THE COURT:  Why don't we just get it started now

11   so we know it's working.

12           MS. O'NEILL-GREENBERG:  I think we are going to

13   go old school, Your Honor.

14           THE CLERK:  I'm sorry, I can hear it but it's

15   just not responding.

16           MS. O'NEILL-GREENBERG:  It's fine.

17   **OPENING STATEMENT BY MS. O'NEILL-GREENBERG**

18           MS. O'NEILL-GREENBERG:  John Rathbun is a

19   serious drug addict.  He's struggled with this disease for

20   a long time and when he's off the wagon, he's got one

21   thing on his mind - get drugs and get high, and that's

22   exactly what was going on for him that morning on April

23   2nd.

24       He wasn't planning on making a bomb that morning.  He

25   wasn't assembling ingredients to make an explosive.  He

1    wasn't jumping out of his car to run onto Jewish Geriatric

2    Services, JGS, property to put that can there.

3         That morning he was busy trying to reach out to his

4    drug connections.  He was trying to get high.  He was

5    incessantly calling and texting all on a single-minded

6    goal to find drugs.  And the government's evidence --

7    which we tried to show you but we'll show you old school

8    -- is going to document itself where he was that morning

9    and how he was busy searching for drugs driving around.

10        In that whole time he was incessantly texting and

11   calling these drug connections, his cell phone was pinging

12   off cell towers that was marking his location as he went,

13   locations that put him in specific spots at specific times

14   that make it implausible, if not impossible, that he could

15   have done the thing the government is accusing him of

16   doing.

17        Now, let's just get one thing cleared away right now.

18   Of course, John touched that yellow gas can that was later

19   found at Jewish Geriatric Services.  Of course, he touched

20   that pamphlet that was later found in that gas can.  His

21   blood was on both of those things.  There is no question,

22   but that's the DNA evidence in this case.

23        The only thing it can tell you is that John touched

24   those things, and you're going to learn that that DNA

25   evidence it only gets you that far and that's the problem.

1   Because it cannot tell you when John touched those things.

2   It cannot tell you who touched those things when they put

3   the can on Jewish Geriatric Services property; and they

4   can't tell you why that person, whoever it was, placed

5   that can on Jewish Geriatric Services.

6       And pay very important attention to the why in this

7   case.  Because the government, in charging John, is

8   alleging that the why is that that can was placed on

9   Jewish Geriatric Services for the specific reason to harm

10  Jewish Geriatric Services, hurt its people, and destroy

11  its property.  And you're going to see that one thing is

12  really clear, John is somebody who doesn't have an

13  anti-Semitic bone in his body.

14      He's a guy who does odds and end jobs.  He does jobs

15  that he finds on Craigslist, junk cleanout jobs, trash

16  cleanout jobs.  He salvages trash.  He scraps metal.  And

17  when he goes on a job, a cleanout job, everything he gets

18  from the junk cleanout he throws in his van.  And then he

19  goes through it and what he doesn't resell, he dumps in

20  dumpsters around town.

21      It is not a crime that John touched that yellow gas

22  can and touched that pamphlet when he was doing junk

23  cleanout jobs and when he was dumping that trash.  And

24  John is not somebody who could care one way or another

25  about any type of particular religion, let alone want to

1    cause harm to make some kind of point.

2        You're going to learn that John is a hundred percent

3    not that guy, that guy who's making off-color remarks

4    about Jewish people or worse or is railing against

5    religion or is researching explosives and bombs and

6    practicing how to build explosives and bombs.

7        John has no negative beliefs about Jews or about any

8    other group of people.  As I said, he himself is not even

9    very religious.  He hasn't gone to church in years, and he

10   doesn't have strong feelings about the way different

11   people practice religions.  He doesn't have strong

12   feelings about religion one way or another.  It's

13   basically a nonstarter for him.

14       And so when the FBI about two weeks later, after they

15   found the can, knocked on his door to talk to him and came

16   to his house, John that morning still in his boxers, hazy

17   from using drugs the night before, he talked to the

18   agents.  He talked to the agents voluntarily.  He

19   voluntarily gave a DNA sample.

20       He answered their questions and his answers are

21   nowhere -- they are not you're going to hear -- you're

22   going to see they are not the lies or false statements

23   that the government is claiming them to be.  They were

24   answers, his answers that were true and honest and as

25   honest as he could be understanding what was going on and

1   pay very close attention to what he was being asked.

2        His answers were honest and true because that morning

3   he -- there was no possible way that he could have hit

4   pause on his overwhelming preoccupied need to find drugs

5   and get drugs that morning and somehow instead go and

6   plant that can at JGS, and he had no reason to ever want

7   to cause them harm.

8        Now, at the end of this case we'll have a chance to

9   come back to you in closing arguments and we will go

10   through all of the evidence with you.  That will be clear

11   that John could not and would not have done these things

12   that the government is accusing him of; could not and

13   would not have ever wanted to harm JGS, and we'll ask you

14   at that point to return the only verdict that the evidence

15   is going to support in this case and that is a verdict of

16   not guilty for John.  Thank you.

17            THE COURT:  All right.  Thank you.

18        All right.  At this point we will take the lunch

19   break and then we'll come back and start with the first

20   witness.  I understand from the clerk's office the lunch

21   is here.  It's been delivered.

22        Now during the break I'm going to be telling you this

23   every time you leave the courtroom and if I don't tell

24   you, these rules apply.  These rules apply every time you

25   leave the courtroom.  Do not talk with each other or with

anyone else about the case.

As the case continues to develop, don't start talking
about it with anyone, amongst yourselves, or calling any
friend or family or going on the internet; don't post
anything; don't Google anything; don't research anything.
Don't let yourself be exposed to news coverage, if there
is any.

That applies to every time you leave this courtroom
those rules apply.  Then when you come back I'll ask you,
so did everything go okay and were you able to follow all
my rules?  If something happened, you'll raise your hand
and you'll come up and tell me what was going and on what
happened.  All right?  Okay.  So we'll come back at 2:15.

THE CLERK:  All jurors can go down to the first
floor and lunch will be served there.

**(The jury left at 1:22.)**

THE COURT:  All right.  Attorney Watkins, maybe
you can stay for a second to see if we can figure that
out.

THE CLERK:  He doesn't need to stay.  I will
have IT work through it with me and we'll do it.

THE COURT:  Okay.

THE CLERK:  That's fine.

THE COURT:  Okay.

MR. WATKINS:  Your Honor, There's one additional

```
1    matter.  Ms. O'Neill I think can speak to it.
2              MS. O'NEILL-GREENBERG:  I think that one of the
3    alternates was maybe nodding off during openings.  Either
4    he's listening with --
5              THE COURT:  The gentleman in the front?
6              MS. O'NEILL-GREENBERG:  Yes.
7              THE COURT:  I noticed that too.
8              MS. O'NEILL-GREENBERG:  I thought I saw you
9    notice that.
10             THE COURT:  I don't know if that's the way -- I
11   don't know if he's really sleeping because I've seen him
12   do it not only in the openings but when I was talking to
13   him as well, he was doing the same thing.
14             MS. O'NEILL-GREENBERG:  I just wanted to put it
15   on the record.
16             THE COURT:  I did notice it.
17       Did the government notice it?
18             MR. DESROCHES:  I didn't notice it, Your Honor.
19   I'm not sure.
20             MS. BERKOWER:  I didn't, Your Honor, but he's
21   kind of a little bit --
22             THE COURT:  Yeah, it's one of these things.  I
23   don't know what to tell you because I noticed it
24   throughout my instructions and every time I looked back at
25   him, his eyes would open and he's looking at me but then
```

1    I'll look again... So I don't know what to tell you.  We

2    will see how it goes.

3              MS. O'NEILL-GREENBERG:  Okay.

4              THE COURT:  All right.

5    **(A recess was taken at 1:24 until 2:18.)**

6              THE COURT:  The health protocol issue -- I was

7    advised afterwards that apparently we violated protocol by

8    using the same podium or lectern because two people used

9    it one after another and it wasn't cleaned.

10        Because of that situation, all questioning has to be

11   done from counsel table.  I have to limit you to counsel

12   table which I'm sorry to do.  I didn't like doing it that

13   way, but that's what we have to do.  All questions from

14   counsel table.  Okay.

15             MR. WATKINS:  Your Honor, I'm having -- would

16   you mind using the microphone because there's background

17   noise out here.

18             THE COURT:  Sure.  So all questioning has to be

19   done from counsel table.  The lectern can't be used by

20   multiple people.  It has to be cleaned after every person

21   would go behind it and so the lectern can't be used.  So

22   just ask questions from counsel table.

23             MR. WATKINS:  For my portion of

24   cross-examination, I may sit down every once in a while to

25   run the computer.

1          THE COURT:  It's not a problem.  It's fine.  You

2     don't even have to ask.

3          MR. WATKINS:  Your Honor, I think we're going to

4     get to one of the Billy Graham Evangelical Association

5     witnesses today.

6          As the court recalls, we filed a motion in limine to

7     prevent all of that.  The court -- that was Docket Number

8     98.  The court overruled that objection and is going to

9     allow the testimony and that was order Number 152, but the

10    First Circuit says I need to object during -- we need to

11    object during trial.  And so when that witness comes up, I

12    will softly make an objection and that will be the basis

13    based on the ruling that the court made before.

14         THE COURT:  All right.  So this first witness is

15    the pastor or someone else?

16         MR. WATKINS:  I'm sorry, it's going to be the

17    third witness today, but we're going to have -- I don't

18    want to speak for the government -- but I think two scene

19    witnesses now and then if we finish those by the end of

20    the day, then one of the people from South Carolina will

21    be testifying.

22         THE COURT:  I understand.  And the ruling was

23    essentially we were limiting that for a connection to the

24    pamphlet either in the car and/or the car and the gas can

25    and that being available to your client was my theory.  So

1    I will be monitoring the limitations, but I do understand

2    your objection.  Absolutely fine.

3              MR. WATKINS:  I just wanted to the alert the

4    judge -- the court.

5              THE COURT:  Yes.  You can tell -- I'll tell the

6    judge that you told him.

7         To the attorneys, for sidebar conferences obviously

8    we'll be using WhispterTech.  It's kind of up to you.  You

9    can do WhisperTech from your seats or you can move over

10   here to this general area and stay distanced and we can be

11   looking at each other closer.

12   **(The jury entered at 2:29.)**

13             THE CLERK:  All rise for the jury.

14             THE COURT:  Okay.

15             THE CLERK:  You may be seated.

16             THE COURT:  Was everyone able to follow my

17   instructions during the lunch break not to talk to anyone?

18   Not talk to each other?  No internet searching?  No

19   posting?  Anything like that?

20        Affirmative answers from every juror, yes.  The jury

21   remains fair and impartial.  All right.  Very good.

22        We can start.  Government.

23             MR. DESROCHES:  Your Honor, the government calls

24   Michael Nothe.

25             THE COURT:  Does everyone have their notebooks

1   if you want to use them?  Do you need one?  So everyone

2   who needs a notebook and pen, raise your hand.  We will

3   get more notebooks and pens.

4       If at any time if something comes up on the screen,

5   if you don't have a screen that let's you see it clearly,

6   or sometimes they go out for no reason, one will just lose

7   connection, please let me know.  Okay?

8       Sir, you're going to go behind the first witness

9   stand.  There you go.

10      If you can remain standing, we are going to swear you

11  in.

12  **Michael Nothe (Sworn)**

13          THE CLERK:  Thank you.

14          THE COURT:  All right.  Is there a chair back

15  there for you?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  Sir, as soon as you sit down, you

18  are able because you're behind and surrounded by plexiglas

19  I want you to know that we're concerned about your safety

20  as well, you can take your mask down because you have that

21  plexiglas surrounding you.  Okay?

22          THE WITNESS:  Very good.  Thank you.

23          MR. DESROCHES:  May I proceed, Your Honor?

24          THE COURT:  The notebooks are on their way up.

25  As soon as they are here, you will get one.  Okay?

1              Go ahead.

2                   MR. DESROCHES:   Thank you.

3    **DIRECT EXAMINATION**

4    Q.   (By Mr. Desroches) Good afternoon.

5    A.   Good afternoon.

6    Q.   Would you please introduce yourself to the jury and

7    then for the record and spell your last name?

8    A.   Yes.  My name is Michael Nothe, N-o-t-h-e.

9    Q.   Are you employed?

10   A.   I am.

11   Q.   How are you employed?

12   A.   I am a full-time captain and paramedic with the town

13   of Longmeadow Fire Department.

14   Q.   For how long have you been employed by the Longmeadow

15   Fire Department?

16   A.   Nine years.

17   Q.   You indicated that you are a captain.  When did you

18   attain that rank?

19   A.   Approximately one year ago.

20   Q.   Can you describe your profession through the ranks of

21   the Longmeadow Fire Department?

22   A.   Sure thing  I started out as a firefighter/paramedic

23   in 2011.  I was promoted to position of lieutenant in

24   approximately 2017 and promoted for rank of captain in

25   2019.

1  Q.   Have you received any education during your career?

2  A.   Yes, I have.  I have received a bachelor's degree in

3  fire science and a master's degree in public

4  administration.

5  Q.   When did you obtain the bachelor's degree?

6  A.   In 2018.

7  Q.   When did you obtain the master's degree?

8  A.   2019.

9  Q.   As a captain do you have special responsibilities

10  within the department?

11  A.   That's correct.

12  Q.   What are those responsibilities?

13  A.   Personal management, operational oversight, instant

14  command of emergency scenes.

15  Q.   Have you received any training in connection with

16  your employment?

17  A.   Yes, I have.  I've received -- I started my career

18  with recruit firefighter training a three-month program at

19  Massachusetts Fire Academy, and throughout my career I've

20  pursued continuing education in the field of fire

21  extinguishment and emergency medical services.

22  Q.   Was any of that training designed specifically for

23  handling dangerous items or hazardous material?

24  A.   Yes.  As part of my initial training as a

25  firefighter, I underwent a 24-hour HAZMAT operations level

1    responder's course at the Massachusetts Firefighting
2    Academy and in addition to attending ongoing continuing
3    education related to HAZMAT.  I've delivered group level
4    trainings to my shift as well in this discipline.
5    Q.   Have you had any training specifically to address
6    flammable liquid fires?
7    A.   I have had training to address flammable liquid fires
8    both during my initial training as a firefighter as well
9    as continuing throughout my career.
10   Q.   Now what is a flammable liquid fire?
11   A.   A flammable liquid fire is liquid that has a high
12   ignition point.  It burns violently and burns at hotter
13   temperatures compared to other materials such as paper or
14   wood.
15   Q.   Does that require a special response from a
16   firefighter?
17   A.   It does in the sense of we still wear the same
18   turnout gear however it's much more challenging to
19   extinguish.  Typically water alone is a good extinguishing
20   agent for fires, but for fires involving flammable liquids
21   it often requires the use of firefighting foam.
22   Q.   Did you receive any in-service trainings as a
23   firefighter?
24   A.   I do receive in-service trainings as a firefighter.
25   Monthly we are required to participate and engage in ten

1    hours of training a month on various subjects.

2    Q.   As a captain, do you provide any of those trainings

3    for fellow firefighters?

4    A.   Yes, I do.

5    Q.   Can you describe what those are generally like?

6    A.   So they are composed of my group members attending

7    classroom sessions; sometimes it's a hand's on session.

8    We have different topics each month.  For example, one

9    month may be familiarization of the apparatus; another

10   month it may be re-familiarization with firefighting foam;

11   another month may be practice with deploying ground

12   ladders.

13   Q.   So now drawing your attention to April 2nd of 2020,

14   were you working that day?

15   A.   I was.

16   Q.   What was your shift?

17   A.   My shift was 8 a.m. until 8 a.m. the following

18   morning, 24 hours.

19   Q.   So it was a straight 24-hour shift?

20   A.   That's correct.

21   Q.   Now at approximately 11:40 in the morning, where were

22   you?

23   A.   I was in the fire station in the dispatch room.

24   Q.   At that point did any calls come in?

25   A.   Yes.  At approximately that time I was dispatched to

1    the area of 780 Converse Street.

2    Q.   I'm sorry, can you just repeat that number?

3    A.   Yes.  The area of 780 Converse Street in Longmeadow.

4    Q.   7-8-0?

5    A.   Yes, sir.

6    Q.   What was the nature of that call?

7    A.   The nature of the call was a suspicious package in

8    the area.

9    Q.   When you first received that call, what did you do?

10   A.   At that time I went out to the apparatus bay floor.

11   I put on my firefighting turnout gear.

12   Q.   After you put on that gear -- actually can you just

13   describe what that gear is for the jurors?

14   A.   Sure thing.  So what that gear consists of is it

15   helps to protect firefighters from extreme heat conditions

16   encountered during fire situations.  It's not fire proof

17   however.  It's not as though we can walk through a fire

18   and be fully protected.

19   Q.   Is it the type of equipment that you would typically

20   expect to see a firefighter in when they respond to a fire

21   call?

22   A.   Yes, sir.

23   Q.   After you suited up, what did you do next?

24   A.   After that I proceeded to get into the driver's seat

25   of the fire engine.  The fire engine we boarded carries a

1    thousand gallons of water.  It's got a fifteen-hundred

2    gallon per minute pump and also has firefighting foam on

3    board it.

4    Q.   You said we, how many other firefighters were with

5    you at that time?

6    A.   Myself and Captain Carl Zinnack was with me.  There

7    was another member on duty who proceeded to take the

8    ambulance and respond to the scene.

9    Q.   Why was the ambulance also dispatched?

10   A.   The ambulance was dispatched to the scene as part of

11   our protocol for a suspicious package response.  In the

12   event that the suspicious package were to cause harm to

13   either civilians or firefighters, we would have an

14   ambulance on scene to transport injured parties to the

15   hospital.

16   Q.   So after you geared up and boarded the fire engine,

17   where did you go?

18   A.   We proceeded in emergency response mode to the scene

19   to the area of 780 Converse Street.

20   Q.   What is the emergency response mode?

21   A.   That means lights and sirens, having traffic yield

22   for us to quickly and safely make it to an emergency

23   scene.

24   Q.   Now you described the address as 780 Converse Street.

25   Is there anything else at that address?

1    A.    Yes.  So the physical address for 780 Converse Street

2    is Ruth's House Assisted Living and there's also in the

3    area a Jewish nursing home at 770 Converse Street, as well

4    as an elderly housing complex at 824 and 832 Converse

5    Street.

6    Q.    When you arrived on the scene, what did you observe

7    first?

8    A.    When I arrived on scene initially, I observed a

9    yellow what appeared to be a fuel container sitting in the

10   area of the tree belt of the property.

11   Q.    So you said it was in the area of the tree belt, how

12   far off the road was it?

13   A.    Based on my estimation, I'd say in the neighborhood

14   of 10 to 15 feet.

15   Q.    Was there anything else nearby?

16   A.    I guess could you be more specific?

17   Q.    So you described it as being on the tree belt.  Was

18   there anything on the tree belt in addition to the yellow

19   canister that you described?

20   A.    Not that I directly observed upon initial approach to

21   the scene.

22   Q.    Was there a sidewalk in that area?

23   A.    Yes, there was.

24   Q.    So after observing the canister in that area, what

25   did you do?

A.   At that time I proceeded to move the fire engine to what I felt to be a safe distance away from the fuel container.

Q.   Why did you move the fire engine at that point?

A.   At that point I was treating the fuel container as a suspicious package based on the initial dispatch information.  I was unsure if the fuel container could pose a hazard to myself or the fire apparatus.

Q.   When say pose a hazard, what type of hazard do you mean?

A.   Based on the training that I've received, there was the potential in my mind for a suspicious package to be potentially remotely detonated causing harm to either myself or others around.

Q.   Now after you moved the fire truck, what did you do next?

A.   At that point I proceeded to exit the fire truck, put chock blocks on the wheels for safety.  At that point I was still keeping my distance from the fuel container just trying to make initial observations about what might be in the container, any clues in the area of why the container might be there.

Q.   You said you kept your distance, how far away from it were you?

A.   Initially I was approximately 30 to 40 feet away from

1    the fuel container.

2    Q.   Were you able to make any observations of it from

3    that distance?

4    A.   Not initially, no, other than just appeared to be in

5    a stationary upright position.

6    Q.   You said you were with a captain by the last name of

7    Zinnack at that point; is that correct?

8    A.   Yes, that's correct.

9    Q.   As you were making those initial observations, what

10   was Captain Zinnack doing?

11   A.   At that point Captain Zinnack was as well keeping his

12   distance from the container doing what we call a

13   360-degree walk around of the scene just to kind of gather

14   initial information and an assessment on the scene.  It's

15   very common for an initial arriving company to perform

16   this tactic.

17   Q.   After you made these initial observations, what's the

18   next thing you did upon arriving at that scene?

19   A.   After that I approached a gentleman who identified

20   himself as a maintenance worker for the facility to

21   inquire of him if by chance he or another one of his

22   coworkers had been using gasoline-powered equipment in the

23   area and if they had left it there by mistake.

24   Q.   After having that conversation, what did you do?

25   A.   After that time I returned back towards the fire

1  engine in the area of the fuel container.  At that point I

2  approached the container a little more closely within a

3  distance of approximately 10 to 15 feet.

4  Q.   Let me just back up a little bit.

5       You said that you spoke to an employee; is that

6  correct?

7  A.   Yes, that's correct.

8  Q.   Were your concerns about the canister the same after

9  that conversation as they were before?

10  A.   I was a little more concerned at that point based on

11  the fact that a maintenance worker hadn't just left it

12  there which was my -- was something I was looking to rule

13  out initially, just that a maintenance worker forgetting

14  it.

15  Q.   So you did rule that out?

16  A.   Yes, sir.

17  Q.   You said that you got within 10 to 15 feet of the

18  canister at that point?

19  A.   Yes, sir.

20  Q.   Were you able to make any additional observations

21  that you couldn't make from 30 to 40 feet out?

22  A.   Yes.  At that point I was able to observe what

23  appeared to be a blackened and charred wick on the fuel

24  container.

25  Q.   When you -- just to be clear, Captain Zinnack was he

1    still on the scene at that point?

2    A.   Yes, he was.

3    Q.   And where was he when you were looking at the wick in

4    the container?

5    A.   He was back towards the fire engine at this point

6    just standing by.

7    Q.   How far away was the fire engine?

8    A.   The fire engine was approximately 50 to 60 feet away

9    from the fuel container.

10   Q.   So after observing that the canister had a wick, what

11   did you do?

12   A.   After observing the fuel container had a wick, my

13   likelihood of this being a suspicious container increased

14   substantially.  It indicated to me that this fuel

15   container had attempted to be ignited at some point.

16           MR. WATKINS:  Objection.

17           THE COURT:  Sorry?

18           MR. WATKINS:  Objection.

19           THE COURT:  Overruled.

20   Q.   (By Mr. Desroches)  You may continue with your

21   answer.

22   A.   I'm sorry, can you just?

23   Q.   Sure.  I asked you after making the observation of

24   the wick, what did you do?

25   A.   Okay.  Yes.  So after I observed the charred wick, I

1    consulted with Captain Zinnack about requesting a response
2    from the Mass. State Police Bomb Squad or the Mass
3    Department Fire Services Hazardous Materials Team.
4    Q.   What about the wick made you think about the Bomb
5    Squad?
6    A.   I was concerned that this container had attempted to
7    be ignited at one point and I still did not know what the
8    liquid was in the container.
9    Q.   So what led you to believe that there was an attempt
10   to ignite that?
11   A.   Based on the charred and blackened wick on the fuel
12   container.
13   Q.   After you had that conversation with Captain Zinnack,
14   what happened?
15   A.   After that I closely monitored the scene.  I provided
16   scene safety to a degree by ensuring that no one was
17   walking from the east to the west on the sidewalk;
18   ensuring there was no pedestrian traffic that would be
19   walking by at that point.
20   Q.   Why were you ensuring that no pedestrians would walk
21   by?
22   A.   At that point I was still concerned about the
23   potential for the fuel canister.  I didn't know what was
24   in the fuel canister.  I just -- there were a lot of
25   unanswered questions at that point about what the fuel

1    container was holding.

2    Q.    At some point did additional firefighters arrive?

3    A.    Yes.  Approximately 15 minutes after the arrival of

4    myself, Deputy Chief Macsata arrived on scene.

5    Q.    When Deputy Chief Macsata arrived, did he approach

6    the can?

7    A.    Yes, he did to closely observe it.

8    Q.    From how far away did he observe it?

9    A.    Approximately one foot.

10   Q.    At some point did additional emergency responders

11   arrive on the scene?

12   A.    Yes.  After I had identified that there was a charred

13   wick on the fuel container, I requested a police

14   department supervisor respond to the scene.

15   Q.    Did one respond?

16   A.    Yes.  At that time the acting-chief Gary Fontaine and

17   Detective Pam Chaplin responded to the scene.

18   Q.    Did either of those officers approach the canister?

19   A.    They did in conjunction with Deputy Chief Macsata.

20   Q.    Prior to the officers or the police officers

21   approaching that canister, did you observe anyone touch

22   the canister?

23   A.    I did not.

24   Q.    Did you yourself touch it?

25   A.    I did not.

1        MR. DESROCHES:  Now if I could have PX-7 just

2    for the witness?

3        THE COURT:  Just for the witness you said?

4        MR. DESROCHES:  Yes, please.

5    Q.   (By Mr. Desroches)  Now, Captain Nothe, I'm going to

6    draw your attention to the monitor in front of you and ask

7    you if recognize what's pictured on it?

8    A.   Yes.  I recognize that as the fuel container that I

9    observed on that date during the described response.

10   Q.   Is that a fair and accurate representation of this

11   scene as it was when you first observed it?

12   A.   Yes, it is.

13       MR. DESROCHES:  Your Honor, I'd move to

14   introduce PX-7 as an exhibit.

15       MR. WATKINS:  No objection.

16       THE COURT:  No objection, that will be

17   admissible.

18   **(PX-7 was admitted.)**

19       MR. DESROCHES:  I'd ask it be published to the

20   jurors, Your Honor?

21       THE COURT:  It may be published.

22       MR. DESROCHES:  Your Honor, I believe -- I'm not

23   sure, I think we can turn one of these monitors to the

24   jurors.

25       THE COURT:  All right.

```
 1              THE CLERK:  They also have the large screens so

 2     they can see.

 3              THE COURT:  To the jurors, is everyone satisfied

 4     they have a screen somewhat near them that they can see?

 5              A JUROR:  Because your back is to me, it's a

 6     little hard to hear you sometimes.  I don't know if

 7     there's any way -- it's really muffled.

 8              MR. DESROCHES:  I'll try to use the microphone.

 9     Q.   (By Mr. Desroches)  Now, Captain Nothe, in reference

10     to what's on the screen right now can you describe

11     generally what is depicted?

12     A.   Yes.  So it's a yellow fuel container like I said

13     initially with an unknown liquid in it approximately 5 to

14     7 feet away from the sidewalk.

15     Q.   You said it's 5 to 7 feet from the sidewalk.  Is the

16     sidewalk depicted in this picture?

17     A.   Yes, it is in the lower corner.

18     Q.   And just so we're clear, there's apparently a gray

19     area in the lower corner.  Is that what you're referring

20     to?

21     A.   Yes.  So on the right side that's newer sidewalk and

22     the left side is older sidewalk.

23     Q.   And you're referring to the different color shades,

24     right --

25     A.   Yes, that's correct.
```

1    Q.   -- different shades?

2         MR. DESROCHES:  Now if I may have PX-9 just for

3    the witness?

4    Q.   (By Mr. Desroches)  So now again, Captain Nothe,

5    drawing your attention to the screen in front of you, do

6    you recognize what's depicted in that photograph?

7    A.   Yes, I do.  That is the same fuel container depicted

8    in PX-7 just from a different vantage point.

9    Q.   Is that a fair and accurate representation of the

10   container as you first observed it on April 2nd?

11   A.   Yes, it is.

12        MR. DESROCHES:  Your Honor, I move to introduce

13   PX-9 into evidence.

14        MR. WATKINS:  No objection.

15        THE COURT:  No objection, that will be admitted

16   and it may be published.

17   **(PX-9 was admitted.)**

18   Q.   (By Mr. Desroches)  Can you describe what's depicted

19   in this photograph?

20   A.   Yes.  I guess you could call this the front of the

21   fuel container.  What I observed, based on this, is a

22   blackened charred wick coming out of the spout of the fuel

23   container.

24   Q.   Now, I believe we can -- we have the technology to

25   actually have you circle the wick on the screen.

```
1             MR. DESROCHES:  I want to make sure, madam
2    clerk, we can do that?
3             THE COURT:  We have the technology.  The
4    question is, is it going to work.
5             THE CLERK:  No, we can't.
6             THE COURT:  Okay.
7             THE CLERK:  If we use annotation, then that
8    monitor does not work at all.
9             THE COURT:  Okay.  We don't have the
10   technology.
11   Q.   (By Mr. Desroches)  Now, Captain Nothe, we're just
12   going to circle an item and ask that you describe what's
13   being circled.
14   A.   Yes.  So the lower I don't -- I guess you can call it
15   an off-white color portion sticking up out of the black
16   circle is what I considered to be the spout of the fuel
17   container.  At the top of that off-white spout, for lack
18   of a better term, is what I observed regarding the
19   blackened charred wick.
20            MR. DESROCHES:  So now I'd ask that the witness
21   be shown PX-10 and only the witness.
22   Q.   (By Mr. Desroches)  Captain, do you recognize what's
23   depicted in this photograph?
24   A.   Yes, I do.  This is the driveway entrance to 780
25   Converse Street with the ensuing sidewalk and the tree
```

1   belt nearby.

2   Q.   Is this a fair and accurate representation of the

3   scene as it appeared on April 2nd of 2020?

4   A.   Yes, it is.

5           MR. DESROCHES:  Your Honor, I'd move to

6   introduce PX-10 into evidence.

7           MR. WATKINS:  No objection.

8           THE COURT:  No objection, that will be allowed

9   into evidence and published.

10  **(PX-10 was admitted.)**

11  Q.   (By Mr. Desroches)  Captain, can you describe for the

12  jurors what's depicted in this photograph?

13  A.   In this photograph is the driveway entrance to 780

14  Converse Street Ruth's House Assisted Living as well as

15  the sidewalk nearby as well as the tree belt.  In addition

16  there is one marked police unit as well as an unmarked

17  supervisor's unit from the police department.

18  Q.   So can you describe in relation to the photographs

19  that we just saw, the two photographs that depicted the

20  yellow canister as you described, where would that be in

21  this photograph?

22  A.   If I were standing in said position based on where

23  the picture was taken using a clock reference, if you

24  will, I would describe the fuel container at approximately

25  my 7 to 8 clock position.

1    Q.   Can you describe -- that's not easy for everyone,

2    including me -- what quadrant of this photograph would it

3    be?

4    A.   I guess lower left.

5    Q.   So, in other words, as we're looking at the

6    photograph we see what appears to be a crosswalk in the

7    lower left-hand side of that; is that correct?

8    A.   Correct, behind the picture.

9              MR. DESROCHES:  Can we see PX-9 please?

10   Q.   (By Mr. Desroches)  Drawing your attention to the

11   upper right-hand portion of this photograph, do you see

12   what appears to be a crosswalk there?

13   A.   Yes, I do, different vantage point of PX-10.

14   Q.   And on top of that, just what appears to be the left

15   of the crosswalk, do you see what's depicted there?

16   A.   Yes, the sign for the entrance of 780 Converse

17   Street, Ruth's House.

18             MR. DESROCHES:  Thank you.  I have no further

19   questions.

20             MR. WATKINS:  May I, Your Honor?

21             THE COURT:  Yes.

22

23

24

25

1    **CROSS-EXAMINATION**

2    Q.   (By Mr. Watkins)  Captain Nothe, when you receive a

3    call for service, are you given additional information

4    about the call?

5    A.   It depends on what is provided by the dispatch

6    center.

7    Q.   In this case you understood that this container had

8    already been out there for several hours?

9    A.   I was not made aware of that, sir.

10   Q.   You later were made aware that this had been out

11   there for several hours?

12   A.   I do not recall.

13   Q.   You worked for the fire department now for some nine

14   years?

15   A.   Yes.

16   Q.   And you're familiar with Converse Street, correct?

17   A.   I am.

18   Q.   And that is what is depicted on --

19            MR. WATKINS:  Actually may I have the monitor

20   now?

21            THE CLERK:  Do you want to publish this to

22   everyone?

23            MR. WATKINS:  This is already in.  I was going

24   to show the exhibit.

25            THE CLERK:  Do you want everyone to see it at

1    this time now?

2              MR. WATKINS:  Yes.  It's already been admitted.

3    Q.  (By Mr. Watkins)  Again, this is Exhibit 10 which we

4    saw just a minute ago.  This is Converse Street over on

5    this edge, correct?

6    A.  That's correct.

7    Q.  Now you're familiar with Converse Street from working

8    in Longmeadow, correct?

9    A.  Yes.  I've traveled on Converse Street before.

10   Q.  Do you travel down it also for non-work reasons?

11   A.  Not typically, no.

12   Q.  But you've responded many times to various locations

13   on Converse Street, correct?

14   A.  That's accurate.

15   Q.  And Converse Street is several miles long, correct?

16   A.  To the best of my knowledge, yes.

17   Q.  It starts out right at the edge of East Longmeadow

18   and goes all the way down to Forest Park, right?

19   A.  So it starts out and crosses with Dwight Road in

20   Longmeadow on the upper end and then on the western most

21   end it crosses with Longmeadow Street, Route 5.

22   Q.  And the speed limit going along that street is 35

23   miles per hours posted speed limit?

24   A.  I'm not sure exactly.  I'd estimate though based on a

25   somewhat residential neighborhood of 30 to 35 miles an

1    hour.

2    Q.   Of course, you guys get to go whatever speed you

3    want.

4    A.   No, sir.  We don't travel in excess of the speed

5    limit.  We need to proceed to the scene with due regard

6    for other traffic.

7    Q.   But again you've responded to many different

8    locations and you're familiar with Converse Street more

9    generally, correct?

10    A.   Yes.

11         MR. WATKINS:  This one will just go to the

12    witness.

13    Q.   (By Mr. Watkins)  I'm showing you what's been marked

14    Government's Exhibit 101(sic).  Can you see that up on

15    your screen?

16    A.   Yes, I can.

17    Q.   Are you able to identify what's being depicted in 101

18    (sic)?

19    A.   It appears to be an ariel shot of the area of 780

20    Converse Street.

21    Q.   Correct.  So you see Genesis House?  You see Ruth's

22    House.  Do you see a number of buildings associated with

23    the campus?

24    A.   That's correct.

25    Q.   But we're also seeing it from a wider view, a

1    satellite view, right?

2    A.   Yes, that's correct.

3    Q.   And you can see Converse Road in there as well,

4    right?

5    A.   Converse Street.

6    Q.   Sorry, Converse Street.  That's correct.

7            MR. WATKINS:  I'd move for admission of

8    Government's Exhibit 101 (sic).

9            MR. DESROCHES:  There's no objection, Your

10   Honor.

11           THE COURT:  All right.  No objection, that will

12   be admitted and can be published.

13   **(PX-104 was admitted.)**

14   Q.   (By Mr. Watkins)  I'm going to use my pointer here to

15   try to show longer.

16       So if I put my pointer right about here, is that the

17   location at which that gas can was placed?  (Indicating)

18   A.   Based on where your pointer is right there, I would

19   say approximately yes, based on the very wide view I'm

20   looking at.

21   Q.   So we're now -- I want to ask you about Converse

22   Street.

23       Here, no stop lights?  No nothing?  Cars traveling at

24   35 miles per hour close to that speed limit?

25   A.   The closest stop light is at the intersection of

1    Converse Street and Dickinson Street which is just out of

2    the picture, and there is a stop sign at Converse Street

3    and Redfern Drive.  If you can move your cursor along

4    Converse Street, I can identify that.

5    Q.   I'm sorry, you're going to have to tell me which way.

6    A.   No problem.  So travel with your pointer right on

7    Converse Street, if you will.

8    Q.   Yes.

9    A.   Continue please.

10        You just went by Redfern Drive.

11   Q.   Here?  (Indicating)

12   A.   Yes, sir, right there.

13   Q.   But there's no stop light there?

14   A.   There is a stop sign, no stop light.

15   Q.   It's not a stop sign for Converse Street?

16   A.   No, sir.  There's a stop sign at the end of Redfern

17   Drive.

18   Q.   But the Converse Street traffic does not stop there?

19   A.   That's accurate.

20   Q.   So cars traveling down here on Converse Street going

21   the speed limit do not need to stop along that way at all?

22   A.   The only time they need to stop is if somebody is

23   traveling westbound on Converse Street and someone is

24   looking to make a left onto Redfern Drive.

25   Q.   But, generally speaking, they can move at the rate of

1    traffic?

2    A.   That's correct.

3    Q.   Now up here in my -- the upper right corner of

4    Exhibit 101 (sic) where I'm circling around, that's

5    another complex, isn't it?

6    A.   It is.

7    Q.   Do you know what complex that is?

8    A.   That's identified as Glenmeadow Retirement, 24 Tabor

9    Crossing.

10   Q.   Again, that's similar to the JGS campus where there

11   are a number of different -- there's assisted living

12   there; there's independent living, all kinds of stuff?

13   A.   Yes, 24 Tabor Crossing is a mix of independent living

14   and assisted living.

15   Q.   And very similar to JGS?

16   A.   I guess.  Would you like me to specify the different

17   capabilities of different campuses because 770 Converse

18   Street is strictly a nursing home as opposed to 780

19   Converse Street is assisted living.

20   Q.   That's the nursing home over there?  (Indicating)

21   A.   No, sir.  The nursing home is this large complex that

22   your pointer is on currently.

23   Q.   Right.  And there is another complex just past JGS;

24   is that correct?

25   A.   Yes.  Depends on what direction past you're talking

1    about.

2    Q.   I'm sorry.  Where my pointer is, if we're going from

3    East Longmeadow towards Forest Park here --

4    A.   Yes.

5    Q.   -- there's another complex there as well?

6    (Indicating)

7    A.   That's correct.  That property actually belongs to

8    the city of Springfield.  The only address within the

9    border of Longmeadow is the swimming pool and tennis court

10   by that front parking lot.

11   Q.   I want to go back to Exhibit 10 which is out in front

12   of you, right?

13   A.   Uh-huh.

14   Q.   This was taken that morning April 2nd sometime, do

15   you know?

16   A.   Yes, sir.

17   Q.   And this is the sign here.  It's out of focus but we

18   can see that that's the sign that you're indicating,

19   correct?

20   A.   Yes, sir.  That indicates the entrance to 780

21   Converse Street.

22   Q.   So for someone driving down the street from East

23   Longmeadow coming around the road, for part of the time

24   it's blocked by these trees here; is that correct?

25   A.   What do you mean blocked by, sir?

Q.   If someone were driving from this direction down this
road at 35 miles per hour, this sign would initially be
obscured by trees?

MR. DESROCHES:  Objection, Your Honor.

THE COURT:  Overruled.

Overruled means I will allow him to answer.  Go
ahead.

THE WITNESS:  I guess to a certain extent, but
at some point the sign does become visible from the
street.

Q.   (By Mr. Watkins)  And do you know -- that sign
actually doesn't say Jewish Geriatric Services on it; is
that correct?

A.   I do not know the answer to that question, sir.

Q.   Now, on Converse Street, in addition to some of those
complexes that we saw, there are also schools on Converse
Street as well, correct?

A.   That is correct.

Q.   There are two different Jewish schools there, Jewish
private schools?

A.   So there is Yeshiva Academy located in the, if my
memory serves me correct, 1100 block of Converse Street;
and then there's the Jewish Community Center in the
approximately 600 block of Converse Street; and in the
upper 500 block of Converse Street is a school owned by

1    the city of Springfield.  It's a charter school.

2    Q.   So turning to the Jewish Community School, there is a

3    sign there for the Jewish Community School as well; is

4    that correct?

5    A.   So I just want to make sure we're talking about the

6    same thing.  So the Jewish Community Center is actually

7    located within the city of Springfield.  I'm honestly not

8    sure if there's a school located at the Jewish Community

9    Center.  The one address that's in Longmeadow belongs to

10   the Springfield Charter School which I believe is 594

11   Converse Street.

12   Q.   So going to the Jewish Community Center, that's a

13   campus.  It's in Springfield but you're familiar with it?

14   A.   Yes, sir.

15   Q.   And the sign for the Jewish Community campus actually

16   is quite large, 8 feet high, correct?

17   A.   Approximately.

18   Q.   And what we saw down in -- well, I'll put it on the

19   screen again perhaps.

20        This sign is maybe 4 feet high?

21   A.   Approximately.  I'm 6 feet tall myself and I'd say

22   that's fair.

23   Q.   We kind of -- we can't see it, but we can see

24   lettering on it. There's quite a bit of lettering there?

25   A.   Yes.

1    Q.   Going back to Exhibit 101 (sic) one more time, there

2    is this sidewalk that continues all down the length of

3    Converse Street; is that correct?

4    A.   Yes, that's correct on the north side of the street

5    there.

6    Q.   And pretty long distances between these facilities,

7    500 yards; am I right?

8    A.   I guess which facilities are you referring to, sir?

9    Q.   Let's start first up here.  What's the name of that

10   facility again?

11   A.   Glenmeadow, 24 Tabor Crossing.

12   Q.   Between Glenmeadow --

13             MR. DESROCHES:  I'm sorry to interrupt, but I

14   believe we're now looking at a different picture so I'd

15   ask for a reference to an exhibit number here.

16             MR. WATKINS:  I'm sorry, this is Exhibit 101.

17             THE COURT:  Is this a different picture that was

18   up before, a different aerial view?

19             MR. DESROCHES:  I'm sorry, Your Honor.  The

20   exhibit number is wrong.  This is not Government's Exhibit

21   101.  Perhaps we can clarify later but I think --

22             MR. WATKINS:  I'm sorry, it's Exhibit 104.

23             THE COURT:  It's defense exhibit.

24             MR. WATKINS:  Well, I'll take it but it was the

25   government's.

1          THE COURT:  The exhibit was a government exhibit

2     in discovery but it was offered into evidence by the

3     defense.  Correct?

4          MR. WATKINS:  Right.

5          THE COURT:  Okay.

6          MR. WATKINS:  And the number is 104.  Mr.

7     Desroches is quite right.  I was saying 101.

8          THE COURT:  Okay.

9          MR. WATKINS:  So this was identified as

10    Government's Exhibit 104 which the defense has now put

11    in.

12         THE COURT:  All right.  You put in the

13    government's exhibit.

14         MR. WATKINS:  Sometimes you got to do it.

15         THE COURT:  I understand that.  I'm just trying

16    to keep track for the record.  It doesn't matter.  The

17    exhibit is the exhibit.

18    Q.   (By Mr. Watkins)  So again Exhibit 104 in front of

19    you, we were talking about Glenmeadow down to the site of

20    where this fuel canister was left.  Can you estimate a

21    distance there?

22    A.   I could estimate a rough guess of an eighth of a

23    mile, but I'm not exactly sure, sir.

24    Q.   Then from here down to the Springfield facility?

25    A.   Possibly another eighth of a mile, maybe a little bit

1    less.

2          MR. WATKINS:  That's all I have, Your Honor.

3    Thank you.

4          THE COURT:  All right.

5          MR. DESROCHES:  May I proceed?

6          THE COURT:  Go right ahead.

7    **REDIRECT EXAMINATION**

8    Q.   (By Mr. Desroches) Captain, I'm just going to draw

9    your attention right back to that screen.  You indicated

10   that the device you found was located let's say on the

11   right side of the screen, correct?

12         Can you just describe, generally speaking so the jury

13   knows where we are talking about, where you found that

14   device?

15   A.   Sure.  So that device was located along the tree belt

16   in the area where the pointer is currently positioned.  As

17   we can see based on this picture there are houses across

18   the street, the --

19         MR. DESROCHES:  Your Honor, may I ask the

20   witness to approach the large screen?

21         THE COURT:  Sure.  With the mask on right.

22   Q.   (By Mr. Desroches) So everyone can hear you and see

23   you, I'll sit, can you please point to the spot where you

24   found that device?

25   A.   Approximately in this location right here.

1    (Indicating)

2    Q.   For the record, you're pointing to the right third or

3    so.

4         There's a street that appears to be going towards the

5    top of this picture; is that right?

6    A.   Are you indicating this here?  (Indicating)

7    Q.   Correct.

8              THE COURT:  Sir, as loud as you can.

9              THE WITNESS:  Yes, sir.  This is the driveway

10   that leads to 780 Converse Street.

11   Q.   (By Mr. Desroches)  There appears to be a cluster of

12   buildings that appear to be brown on the right -- to the

13   right of that street; do you see those?

14   A.   Yes.

15             THE COURT:  Attorney Desroches, please closer to

16   the microphone.

17   Q.   (By Mr. Desroches)  So you said yes, you see those.

18   Do you know what the name of that cluster of buildings is?

19   A.   I believe that cluster is referred to as Genesis

20   House even though it's multiple buildings.

21   Q.   Now, what is across the street from Genesis House?

22   A.   Across the street --

23   Q.   I'm sorry, so if you're going left across the street.

24   A.   This way?  (Indicating)

25   Q.   So if you can point to Genesis House?

1    A.    This campus here.   (Indicating)

2    Q.    Now the street that's accessible to Genesis House,

3    what's on the other side of that?

4    A.    A Jewish nursing home is this complex over here.

5    (Indicating)

6              MR. DESROCHES:   Thank you.   I have no further

7    questions.

8              THE COURT:   Attorney Watkins, anything?

9              MR. WATKINS:   No, Your Honor.

10             THE COURT:   Okay.

11             MR. WATKINS:   Oh, may I?

12             THE COURT:   Sure.

13   **RECROSS-EXAMINATION**

14   Q.    (By Mr. Watkins)   To get into Genesis House, there is

15   another driveway right here where I'm pointing; is that

16   correct?   Is that the entrance to Genesis House?

17   (Indicating)

18   A.    I'll put it this way, sir.   The most commonly used

19   driveway for 780 Converse Street, Ruth's House is the

20   driveway where the sign was depicted in one of the

21   pictures entered into the courtroom here.

22   Q.    I got that about Ruth's House.   I'm asking about

23   Genesis House where Mr. Desroches talked about.

24   A.    Yes, sorry, sir.   Yes, that driveway can be used for

25   Genesis House.

1    Q.   In fact, this is a one-way road here; is that

2    correct?

3    A.   Yes.  It's depicted as a one-way driveway.  It's not

4    a named road.

5    Q.   In fact, if you went up this road, you actually

6    couldn't go to Genesis House; is that correct?

7    A.   So you could access -- if you wouldn't mind moving

8    your pointer down please?

9    Q.   Yeah.

10   A.   You could access that building, which is 832 Converse

11   Street, C building.  You can access from that driveway,

12   but the other buildings technically you would be going

13   against the flow of traffic.

14   Q.   Because this is one way coming up all around here?

15   (Indicating)

16   A.   Yes.

17          MR. WATKINS:  That's all I have, Your Honor.

18   Thank you.

19          MR. DESROCHES:  If I can have just one or two

20   questions?

21   **REDIRECT EXAMINATION**

22   Q.   (By Mr. Desroches) So the street next to where the

23   bomb was found was a two-way street, correct?

24   A.   Yes, sir.

25   Q.   And that street offers access to not only Genesis

House as you described but everything else back there; is

that right?

A.   It offers access to 780 Converse Street as well as a

New York wing of 770 Converse Street, and it offers access

to 832 Converse Street, C Charlie building as well.

Q.   And based on what you said, is that the busier of the

intersections between the two that you discussed with

Attorney Watkins?

A.   I would say yes.  780 Converse Street is fairly

heavily visited using that main driveway there to go to

the circle depicted in the middle of the picture per se.

            MR. DESROCHES:  Thank you.  That's all.

            MR. WATKINS:  I will have one more if the court

will let me?

            THE COURT:  This is the last round.

            MR. WATKINS:  Thank you, Your Honor.

**RECROSS-EXAMINATION**

Q.   (By Mr. Watkins)  This is the Ruth's House complex up

there; is that correct?  (Indicating)

A.   That is correct.

Q.   And this road is the only way to get up to Ruth's

House, correct?

A.   That is correct.

Q.   And the way to get to Genesis House for these

buildings here is through this one-way street here?

1    A.   That is correct.

2    Q.   And there's a sign here as well, isn't there?

3    A.   Sir, I honestly do not know.

4            MR. WATKINS:  That is it, Your Honor.  Thank

5    you.

6            THE COURT:  All right.  Okay.  Very good.  Thank

7    you very much, sir.

8            THE WITNESS:  Thank you.

9            MR. DESROCHES:  Your Honor, may I approach the

10   witness stand to make the exhibits accessible?

11           THE COURT:  Yes.

12           MR. DESROCHES:  Your Honor, the government calls

13   Gary Fontaine.

14           THE COURT:  All right.

15           THE CLERK:  Sir, please raise your right hand.

16   **Gary Fontaine (sworn)**

17   <u>**DIRECT EXAMINATION**</u>

18   Q.   (By Mr. Desroches)  First can you please remove your

19   mask?

20        Good afternoon.

21   A.   Good afternoon.

22   Q.   Could you please introduce yourself to the jurors and

23   for the record spell your last name?

24   A.   My name is Gary Fontaine, F-o-n-t-a-i-n-e.

25   Q.   Are you currently employed?

1    A.   I am not.

2    Q.   Were you previously employed?

3    A.   I was.

4    Q.   What was your previous employment?

5    A.   I was with the Longmeadow Police Department for 32

6    years.

7    Q.   Why are you no longer with the Longmeadow Police

8    Department?

9    A.   I retired in September.

10   Q.   What rank did you obtain with the Longmeadow Police

11   Department?

12   A.   I was interim chief for three months prior to my

13   retirement.

14   Q.   Can you please describe your progress with the ranks

15   within the department?

16   A.   I was a patrolman in 1988.  I became a detective in

17   1995 maybe, then promoted to sergeant, shortly thereafter

18   lieutenant, then captain which was my last rank to being

19   interim chief.

20   Q.   Prior to becoming a police officer more than 30 years

21   ago, did you go to any sort of academy?

22   A.   I did.

23   Q.   Can you describe what that academy was?

24   A.   It was a 16-week program at the Agawam Municipal

25   Academy in Agawam, Mass.

1    Q.   Did you successfully complete that academy?

2    A.   I did.

3    Q.   Have you received any training while you were a

4    police officer?

5    A.   I have, yes.

6    Q.   Can you -- I know it's been more than 30 years of

7    experience, but can you just generally describe what that

8    training was like?

9    A.   Training in all aspects of policing, whether it's

10   enforcement.  I've been -- I oversaw the detective bureau

11   for a while so I did have training in regards to crime

12   scenes and evidence control, those types of things.

13   Q.   Now let's talk specifically about your training and

14   experience with crime scenes.

15        What types of trainings generally have you received

16   in regard to crime scenes?

17   A.   Specifically I can't remember the exact terminology

18   they use but crime scene control, processing scenes,

19   fingerprints, lifting fingerprints.  Those type of things.

20   Securing evidence, that type of training.

21   Q.   Have you had an opportunity to provide any training

22   to your fellow officers regarding crime scene control?

23   A.   Our training officer does send -- well, tries to send

24   all officers to those types of trainings as well with

25   regard to crime scene control, especially the detective

| | |
|---|---|
| 1 | unit would have specialized training as well. |
| 2 | Q.   And you were a detective you said, correct? |
| 3 | A.   I was, yes. |
| 4 | Q.   Did you receive any specialized training that was |
| 5 | specific to the handling of dangerous items? |
| 6 | A.   We've had training with regards to devices that could |
| 7 | potentially be dangerous and how to secure areas and who |
| 8 | the people we should call to handle those types of things. |
| 9 | MR. WATKINS:  Your Honor, could I ask him to |
| 10 | move the mic just a little closer? |
| 11 | THE COURT:  Sure. |
| 12 | MR. WATKINS:  Thank you. |
| 13 | Q.   (By Mr. Desroches)  Now drawing your attention to |
| 14 | April 2nd of 2020, what was your rank on that date? |
| 15 | A.   I was interim chief. |
| 16 | Q.   Were you working on that day? |
| 17 | A.   I was. |
| 18 | Q.   What was your shift? |
| 19 | A.   I worked eight to four. |
| 20 | Q.   Did you respond or did the police department receive |
| 21 | a call at approximately 11:40 that morning? |
| 22 | A.   Yes, it did. |
| 23 | Q.   What was the nature of that call? |
| 24 | A.   A suspicious item. |
| 25 | Q.   Did you immediately respond to it? |

```
1    A.   I did not initially respond, but I did at the request
2    of the officers on the scene responded.
3    Q.   So is there a reason why you didn't go immediately to
4    that?
5    A.   Normally our patrol would be the ones that would be
6    sent out there and they would determine whether a
7    detective response would be needed.
8    Q.   And as acting-chief you weren't necessarily on
9    patrol; is that right?
10   A.   No.
11   Q.   At some point you said you did go to the scene of
12   this call, correct?
13   A.   Yes.
14   Q.   And where was this scene located?
15   A.   On Converse Street, the entrance to the Ruth's House.
16   Q.   Can you describe for the jurors what Converse Street
17   is?
18   A.   Converse Street is a main thoroughfare in our
19   community.  It's heavily traveled both with commercial
20   vehicles as well as regular vehicle traffic and pedestrian
21   traffic as well.  It is an access road to the highway for
22   East Longmeadow and Hampden residents.  It's a very busy
23   street.
24   Q.   Is there any -- you said there was some pedestrian
25   traffic.  Are there any shops nearby?
```

```
 1    A.   There is.   There's the shops, Longmeadow Shops which

 2    is on William Street which is parallel to Converse Street.

 3    It's a short walk, maybe an eighth of an mile from that

 4    location.

 5    Q.   So what is a short walk from that location?

 6    A.   Sorry?

 7    Q.   Just so we're clear what location we're talking

 8    about, what is an eighth of a mile from those shops?

 9    A.   I'm not sure I understand your question.

10    Q.   Sorry.

11         Are you saying that the scene where you responded to

12    is about an eighth of a mile from the shops?

13    A.   An eighth to a quarter mile, yes.

14    Q.   Now, based on your experience driving on that street,

15    is it common to see pedestrians?

16    A.   It is.

17    Q.   So where specifically did you go when you responded?

18    A.   We came in from Redfern Drive and turned left onto

19    Converse and the location where there was a fire truck

20    there as well as police vehicles.   I could see where they

21    were all congregating at the entrance to the Ruth's House.

22    Q.   You said the entrance of the Ruth's House?

23    A.   Correct, off of Converse Street almost into the

24    parking lot of the Genesis House as well.

25    Q.   When you arrived, you said that you observed others
```

1  congregating.  Where specifically were they congregating?

2  A.   If you go into the entrance to Ruth's House, there

3  was a fire truck that was there.  They were all standing,

4  I don't know, maybe 20 yards from Converse Street.

5  Q.   Did you make any other observations when you first

6  arrived?

7  A.   I could see to the left a yellow container.

8  Q.   How close were the people you described congregating?

9  How close were they to that container?

10  A.   Maybe 15 yards.

11  Q.   Fifteen yards?

12  A.   Yes.

13  Q.   Now after you first arrived on the scene, what was

14  the first thing that you did?

15  A.   I spoke with Captain Macsata from the fire department

16  to find out what we had.  Actually I did speak with

17  Sergeant Wojnowski and he briefed me as to what we had.

18  Q.   So the sergeant, was that a police officer?

19  A.   It is.

20  Q.   After having those conversations, what did you do?

21  A.   Myself and Captain Macsata went over to look at this

22  container.

23  Q.   How close did you get to the container?

24  A.   Pretty close.  Right above it actually.

25  Q.   What observations did you make from that location?

1    A.    I could see that it had some paper that was in the

2    nozzle of the container and it appeared to be charred on

3    the end.

4    Q.    Did you make any other observations from that

5    location?

6    A.    No, nothing at that point.  There was also a small

7    container of brake fluid maybe 5 to 6 feet away, kind of

8    in the dirt as well.  That was the other observation I

9    made.

10   Q.    Just addressing that brake container, did you find

11   any connection to that brake container to any other aspect

12   to this investigation?

13   A.    No.

14   Q.    So after you made these initial observations, what

15   did you do?

16   A.    I instructed Officer Chaplin to photograph the scene.

17   We determined that we would return that item back to the

18   station to examine the contents of the nozzle, the paper

19   in there, as well as package it for submission to the

20   State Police.

21   Q.    At some point did you have an opportunity to more

22   closely examine the canister on scene?

23   A.    Yes.

24   Q.    Did you make any additional observations that you

25   didn't make initially upon that first review?

1    A.    There was a brown stain on the container.

2    Q.    Based on your training and experience did you take

3    note of that brown stain?

4    A.    I did.

5    Q.    Why did you take note?

6    A.    It looked like blood.

7    Q.    Did you take any steps to preserve that?

8    A.    When handling the item we wore gloves, yes.

9    Q.    Were you -- did you make sure not to touch that area

10   as well?

11   A.    Yes.

12   Q.    How was it that you collected the canister?

13   A.    Officer Chaplin actually just picked it up while

14   wearing gloves.  We put it into the vehicle that we

15   arrived in and we transported it.  She held it because it

16   did contain a fluid inside.  She held that as I drove back

17   to the station.

18   Q.    Once you get back to the police station, what did you

19   do?

20   A.    We went to the sallyport and we began to remove the

21   contents inside the nozzle.

22   Q.    And how would you describe the contents inside the

23   nozzle?

24   A.    A religious pamphlet.

25   Q.    Did you take photographs in that location?

1    A.   We did.

2              MR. DESROCHES:  Now I would ask for PX-11 to be

3    displayed just to the witness.

4    Q.   (By Mr. Desroches)  Can you see the screen?

5    A.   It's blank right now.

6    Q.   Give it a second.

7    A.   Yes.

8    Q.   So do you recognize what's depicted on the screen in

9    front of you right now?

10   A.   I do.

11   Q.   What is that?

12   A.   That is the container that we retrieved at that

13   location.

14   Q.   And is that the photograph that you -- one of the

15   photographs that you just described taking?

16   A.   Yes.

17   Q.   Is it a fair and accurate representation of the can

18   that you collected from the scene on Converse Street?

19   A.   Yes.

20             MR. DESROCHES:  Your Honor, I'd move to

21   introduce PX-11 into evidence.

22             MR. WATKINS:  No objection.

23             THE COURT:  No objection, that will be allowed

24   and can be published.

25   **(PX-11 was admitted.)**

1   Q.   (By Mr. Desroches)  So assistant or acting -- now

2   that you're retired, you're not an acting-chief.  How

3   would you -- is captain your rank?

4   A.   Yes.

5   Q.   So, Captain Fontaine, can you please describe what is

6   on the screen right now?

7   A.   That is the container that we retrieved from that

8   location.

9        MR. DESROCHES:  I'd ask now that -- I'm actually

10  going to ask that in succession for just the witness be

11  displayed PX-12, 15, and 13.

12       MR. WATKINS:  None of these will be objected to.

13  I'm happy to have Mr. Desroches go through them.

14       THE COURT:  All right.  Then we can introduce

15  those as a group or however you'd like to do that,

16  Attorney Desroches.

17       MR. DESROCHES:  If you can please place PK-12 on

18  the screen?

19  Q.   (By Mr. Desroches)  What is depicted in this

20  photograph?

21       MR. DESROCHES:  I'd ask it be published as

22  well.

23       THE COURT:  All right.  Let's go through them

24  quickly and introduce them so we have a record and then

25  you can publish them.

1   Q.   (By Mr. Desroches)  Can you describe what's in this

2   photograph?

3   A.   That is the same container.

4   Q.   Is this a fair and accurate representation of the

5   container as it appeared on April 2nd?

6   A.   Yes.

7        MR. DESROCHES:  I'd move to introduce this into

8   evidence.

9        THE COURT:  No objection, that's admitted and

10   can be published.

11   **(PX-12 was admitted.)**

12        MR. DESROCHES:  Now if I can have PX-15?

13   Q.   (By Mr. Desroches)  Can you describe what's on the

14   screen at this point?

15   A.   That is the same container that we recovered at that

16   scene.

17   Q.   Is it fair to say this is the front of the container?

18   A.   Yes.

19   Q.   And is this a fair and accurate representation of how

20   it appeared when you found it?

21   A.   Other than at this point the items that were in the

22   nozzle had been removed.  So in this picture it doesn't

23   have the paper that was inside the container.

24   Q.   And as you've described, you removed them at the

25   station, correct?

1    A.   Correct.

2              MR. DESROCHES:  I'd ask that PX-15 be moved into

3    evidence.

4              THE COURT:  Yes.  No objection that will be

5    admitted.  It can be published.

6    **(PX-15 was admitted.)**

7              MR. DESROCHES:  If I can have PX-13?

8    Q.   (By Mr. Desroches)  Captain, do you recognize what's

9    depicted in this photograph?

10   A.   It was the same container that we recovered.

11   Q.   Is it fair to say though that this would be the

12   opposite side of PX-11; is that right?

13   A.   Correct.

14   Q.   Now is this a fair and accurate representation of the

15   can as you found it on Converse Street?

16   A.   Less the material that was in the nozzle.

17             MR. DESROCHES:  I would move to introduce PX-13

18   into evidence.

19             THE COURT:  No objection, that will be admitted

20   and can be published.

21   **(PX-13 was admitted.)**

22   Q.   (By Mr. Desroches) Captain, you indicated that you

23   found a stain on the can that drew your attention.  Do you

24   see that depicted in this photograph?

25   A.   I do.

1    Q.   Can you please describe where it is?

2    A.   It's on the handle of the container.

3             MR. DESROCHES:  Can you isolate that please?

4         Now, for the record, we've isolated the handle of the

5    container and zoomed in on it.

6         I'm not sure --

7             THE CLERK:  There it goes.

8             MR. DESROCHES:  Thank you.

9    Q.   (By Mr. Desroches) Can you describe, generally

10   speaking, what's depicted in this isolation?

11   A.   It's a reddish-brown stain that was on the handle.

12   Q.   Is this the stain that you described based on your

13   training and experience led you to believe that it was

14   blood?

15   A.   It appeared, yes.

16            MR. DESROCHES:  Thank you.  Could I have PX-14,

17   please?

18   Q.   (By Mr. Desroches)  Can you describe what's depicted

19   in PX-14?

20   A.   That is the same red-brownish stain that I observed

21   on the container on the handle.

22            MR. DESROCHES:  I'd move to introduce PX-14 into

23   evidence.

24            MR. WATKINS:  No objection.

25            THE COURT:  No objection, that will be admitted.

1    It can be published.

2    **(PX-14 was admitted.)**

3    Q.   (By Mr. Desroches)  Now, captain, you indicated that

4    you removed what you referred to as the wick and

5    photographed that as well; is that correct?

6    A.   Yes.

7         MR. DESROCHES:  So I'd ask that -- without

8    objection?

9         MR. WATKINS:  Without objection.

10        MR. DESROCHES:  -- PX-16 be placed on the

11   screen.

12   Q.   (By Mr. Desroches)  Do you recognize that?

13   A.   I do.

14   Q.   Can you please describe what's depicted in this

15   photograph?

16   A.   That was part of some of the religious pamphlet that

17   was inside the nozzle of that container.

18   Q.   Can you describe the steps you took to remove this

19   from the container?

20   A.   The paper that was in there was actually twisted and

21   placed into that nozzle.  Some of the outside part was

22   charred so some of the papers has char on it and when we

23   removed it all, it came apart in I believe three pieces.

24   Q.   So what's depicted in PX-16 is that a fair and

25   accurate representation of one of those pieces?

A.   Yes.

MR. DESROCHES:  Your Honor, I'd move to
introduce PX-16 into evidence and to publish it to the
jury.

THE COURT:  There was no objection so that's
admitted and, yes, it can be published.

**(PX-16 was admitted.)**

Q.   (By Mr. Desroches) Captain, I'm going to draw your
attention to the middle of that pamphlet.  There appears
to be a ripped portion at the bottom of the pamphlet.  Do
you see where I'm referring to?

A.   Yes.

Q.   Can you describe what it is that appears to be
smudged right above that rip?

A.   Again a brown-reddish stain.

Q.   Based on your training and experience did you
recognize this as anything in particular?

A.   I believed it to be blood.

MR. DESROCHES:  I'd ask that PX-17 be placed on
the screen?

Q.   (By Mr. Desroches) Do you recognize what PX-17
depicts?

A.   That is more of the pamphlet that was in the nozzle
of the container.

Q.   Again, is this a fair and accurate representation of

1    the pamphlet?

2    A.   Yes.

3              MR. DESROCHES:  I'd move to introduce PX-17 into

4    evidence.

5              MR. WATKINS:  No objection.

6              THE COURT:  No objection, that's admitted.  Yes,

7    published.

8    **(PX-17 was admitted.)**

9    Q.   (By Mr. Desroches) Is it fair to say that this is the

10   reverse side of PX-16?

11   A.   It would appear so, yes.

12             MR. DESROCHES:  I'd now ask that PX-18 be placed

13   on the monitor.

14   Q.   (By Mr. Desroches)  Do you recognize what's depicted

15   in PX-18?

16   A.   I do.

17   Q.   What is in this picture?

18   A.   Again, that's the material that was stuffed into the

19   nozzle of the container and had been partially charred.

20   Q.   Is this a fair and accurate representation of this

21   portion of the pamphlet as you observed it on April 2nd at

22   your police station?

23   A.   Yes.

24             MR. DESROCHES:  Your Honor, I'd move to

25   introduce PX-18 into evidence.

1          MR. WATKINS:  No objection.

2          THE COURT:  No objection, that's admitted and

3    can be published.

4    **(PX-18 was admitted.)**

5    Q.   (By Mr. Desroches)  Now you indicated there appeared

6    to be a charred area.  Can you describe for the jurors

7    where that appears in this photograph?

8    A.   Again, the left portion of that pamphlet.

9    Q.   So when you found the can, where was this charred

10   portion sticking out of?

11   A.   From the outer most part of the nozzle.

12          MR. DESROCHES:  I'd asked that PX-19 be placed

13   on the screen.

14   Q.   (By Mr. Desroches)  Do you recognize what that is?

15   A.   Yes.

16   Q.   What is that?

17   A.   That is the pamphlet that was in the nozzle of the

18   container.

19   Q.   So is this the same pamphlet that we saw in 18?

20   A.   I am not sure whether it's the same one.

21   Q.   Fair to say that you flattened out the pamphlet and

22   took more pictures?

23   A.   Yes.

24   Q.   Is this a fair and accurate representation of the

25   pamphlet as it appeared on April 2nd at the police

1    station?

2    A.   Yes.

3         MR. DESROCHES:  Your Honor, I'd move to

4    introduce PX-19 into evidence.

5         MR. WATKINS:  No objection.

6         THE COURT:  No objection, that's admitted and

7    can be published.

8    **(PX-19 was admitted.)**

9    Q.   (By Mr. Desroches)  Now, Captain, bringing your

10   attention to the center of this there appears to be a

11   paragraph number 3 that says "Believe that Jesus Christ

12   died for you on the cross and rose from the grave;" do you

13   see that paragraph?

14   A.   I do.

15   Q.   There appears to be something to the left of that.

16   Did you have an opportunity to observe that at the police

17   station?

18   A.   Yes.

19   Q.   And what did it appear to be to you based on your

20   training and experience?

21   A.   A brown-reddish stain that appeared to be blood.

22        MR. DESROCHES:  May I have PX-20 please?

23   Q.   (By Mr. Desroches)  Again, Captain, I'll ask that you

24   -- I'll give you the screen and ask if you recognize what

25   that is?

1    A.    I do.

2    Q.    What is that?

3    A.    That is the material that was in the nozzle of the

4    can that we recovered.

5    Q.    Is it fair to say that this is a reverse side of what

6    we had just seen in PX-19?

7    A.    Yes.

8    Q.    Is that a fair and accurate representation as it

9    appeared on that day?

10   A.    Yes.

11          MR. DESROCHES:  Your Honor, I'd move to

12   introduce PX-20 into evidence.

13          MR. WATKINS:  No objection.

14          THE COURT:  It's admitted.  No objection, it can

15   be published.

16   **(PX-20 was admitted.)**

17   Q.    (By Mr. Desroches)  Now, again, captain, I'm going to

18   draw your attention to a portion of this.  There appears

19   be words on it that says "How You Can Pray," and again

20   there appears to be some smudging on it.  Did you have an

21   opportunity to observe that smudging in person?

22   A.    I did.

23   Q.    Were you able to, based on your training and

24   experience, form any conclusions about it?

25   A.    It appeared to be blood.

1    Q.   Now, captain, I'm going to draw your attention to the

2    table in front of the area in front of you on the witness

3    stand.  Do you see any items there?

4    A.   I do.

5    Q.   Can you please just review those items?

6         Do you recognize what those are?

7    A.   Yes.

8    Q.   What are they?

9    A.   Those are the items that we removed from the nozzle

10   of the container.

11   Q.   Are those the actual items the pictures of which we

12   have just seen?

13   A.   Yes.

14   Q.   Is there any difference in the actual items there

15   compared to what's depicted in the photographs?

16   A.   Yes.

17   Q.   What is the difference?

18   A.   There appears to be portions of the paper that have

19   been cut out.

20   Q.   Is there also some handwriting on there?

21   A.   There is.

22   Q.   Is it your understanding that that occurred at the

23   State Police Crime Lab?

24   A.   Yes.

25   Q.   Now, captain, I'm going to ask if you could put the

```
1    gloves on.  I believe there's some gloves there for you.
2              MR. DESROCHES:  I'm sorry, before we do that,
3    Your Honor, I move to introduce the pamphlet as a physical
4    exhibit as Exhibit 3.
5              MR. WATKINS:  No objection.
6              THE COURT:  No objection, that will be admitted.
7    (PX-3 was admitted.)
8    Q.   (By Mr. Desroches)  Captain, are you gloved up?
9    A.   I have one glove.  That's fine.
10   Q.   Are there any other items on the witness stand right
11   now?
12   A.   There is.
13   Q.   Do you recognize what that item is?
14   A.   Yes.
15   Q.   What is that?
16   A.   It appears to be the container that we recovered at
17   the scene.
18   Q.   Is it in the same condition as it was when you
19   observed it?
20   A.   No.
21   Q.   What is the difference?
22   A.   There appears to be black powder over the container,
23   the entire container.
24   Q.   Now based on your training and experience in crime
25   scene control and just as a police officer, are you
```

1    familiar with what that dust is?

2    A.   Yes, it's dusting powder.  It appears to be dusting

3    powder.

4    Q.   For fingerprints?

5    A.   Correct.

6    Q.   Other than that, is it in substantially the same

7    condition as it was when you removed the wick?

8    A.   Yes.

9            MR. DESROCHES:  Your Honor, I would next move to

10   introduce this as Government 1.

11           MR. WATKINS:  No objection.

12           THE COURT:  No objection, that will be

13   admitted.

14   **(PX-1 was admitted.)**

15   Q.   (By Mr. Desroches)  Would you please pick that up and

16   show it and display it for the jurors?

17         Thank you, captain.

18         Now, captain, there's another -- just one more point,

19   you indicated that you observed a bloodstain on that can,

20   is that right, on the scene?

21   A.   Yes.

22   Q.   Is that bloodstain still there?

23   A.   I do not see it, no.

24   Q.   Is it your understanding that would have been removed

25   at the State Police Crime Lab?

1    A.   Most likely, yes.

2              MR. DESROCHES:  Your Honor, may I have one

3    moment to confer?

4              THE COURT:  Yes.

5              MR. DESROCHES:  Your Honor, after conferring I

6    believe that Exhibits PX-21 through 32 would be introduced

7    without objection.

8              MR. WATKINS:  That's correct, Your Honor.

9              THE COURT:  All right.  Very good.  Without

10   objection, you're going to do that right now?

11             MR. DESROCHES:  I'm sorry, Your Honor?

12             THE COURT:  Right now?

13             MR. DESROCHES:  Yes.

14             THE COURT:  Okay.

15             THE CLERK:  Are they admitted?

16             THE COURT:  They are admitted.  Can you just

17   list them off one by one so we can keep track of them for

18   when they're coming in.

19             MR. DESROCHES:  Yes, Your Honor.  They're

20   Exhibits 21, 22, 24, 25, 26, 27, 28, 29, 30, 31, and 32,

21   and I apologize but I missed 23.  So it's essentially 21

22   through 32 consecutively.

23             THE COURT:  All right.  All as premarked

24   exhibits no objection, they will be admitted by the

25   government.

1    **(PX-21 - PX-32 was admitted.)**

2            MR. DESROCHES:  Ms. McKenna, can we see PX-23

3    please?

4        I would ask they be published to the jury as well.

5    Thank you.

6            THE COURT:  Publishing is allowed.

7    Q.   (By Mr. Desroches) Captain, can you describe what's

8    depicted in PX-23?

9    A.   This is the entrance to Ruth's House off of Converse

10   Street.

11   Q.   Is the area where you found the can depicted in it?

12   A.   It is.

13   Q.   Can you describe for the jurors where it was that you

14   found it?

15   A.   It would be above the crosswalk to the right of the

16   sidewalk near that tree there.  It would be on the north

17   side of the tree or to the right of the tree in the

18   picture.

19           MR. DESROCHES:  May we have PX-21 please?

20   Q.   (By Mr. Desroches)  Can you describe what's depicted

21   in PX-21?

22   A.   This appears to be the tree that the container was

23   closest to.

24           MR. DESROCHES:  Could we have PX-22 please?

25   Q.   (By Mr. Desroches)  Captain, can you describe what's

1    depicted in this photograph?

2    A.    This is looking in a southerly direction towards

3    Converse Street at the entrance of Ruth's House.  The stop

4    sign, if you can see that, just to the right of it is the

5    tree which was depicted earlier and where the container

6    was located.

7    Q.    So, in other words, there's a stop sign that you can

8    see in this photograph just to the left of where the tree

9    was depicted in PX-21?

10   A.    Correct.

11   Q.    And is there also a traffic island in this

12   photograph?

13   A.    Yes.

14   Q.    And did we see that traffic island in PX-23?

15   A.    I don't think so.  I'm not sure.  If I can go back

16   and look at that?

17        You can see part of the traffic island, yes.

18   Q.    That's the same traffic island?

19   A.    It is.

20            MR. DESROCHES:  Actually can we get 22 just to

21   make it clear?  I'm going to ask that, Ms. Mckenna, zoom

22   on the stop sign you described and the island.

23        Thank you.

24   Q.    (By Mr. Desroches)  Captain, so the record is clear,

25   can you just describe what's in this zoomed in area?

1    A.    It's the traffic island for the entrance to Ruth's

2    House and the stop sign and the tree where the container

3    was located next to.

4    Q.    And so the tree is on -- is the tree just to the

5    right of the stop sign?

6    A.    Correct.

7              MR. DESROCHES:  Can we have PX-30 please?

8    Q.    (By Mr. Desroches)  Do you recognize what's depicted

9    on the screen now?

10   A.    Yes.

11   Q.    Can you describe for the jurors what it is?

12   A.    This is looking in an easterly direction at that same

13   entrance to Ruth's House with the tree on the left, being

14   the tree where the container was located next to.

15             MR. DESROCHES:  And PX-32 please.

16   Q.    (By Mr. Desroches)  Can you describe what's depicted

17   in this photograph?

18   A.    This is taken from the parking lot entrance to

19   actually Genesis Housing.  The street in front that runs

20   across the screen horizontally is actually the entrance to

21   Ruth's House, and to your far left in the picture is that

22   stop sign that I spoke of and the tree where the container

23   was located.

24             MR. DESROCHES:  Can we just zoom in on the stop

25   sign and the tree that the captain referred to?

1   Q.   (By Mr. Desroches)  So now for the record we're

2   zoomed in on an area that depicts the stop sign.  Is that

3   the area you described?

4   A.   Yes.

5   Q.   So you indicated that this is taken from -- you can

6   remove this one please?  Thank you -- this was taken from

7   the access way to Genesis House; is that right?

8   A.   Yes.

9   Q.   Is Genesis House accessible through this road or by

10   traveling on this road?

11   A.   Yes.

12        MR. DESROCHES:  And could I have 104?

13     Madam clerk, could I have the Elmo?

14   Q.   (By Mr. Desroches)  I'm putting on the Elmo what is a

15   still shot from Exhibit 104.

16     Captain, I'll ask you to take one moment to orient

17   yourself.

18        MR. DESROCHES:  I'd ask it be published to the

19   jury.  It is already an exhibit.

20        THE COURT:  All right.  That's allowed.

21   Q.   (By Mr. Desroches)  Captain, do you recognize what's

22   depicted in this photograph?

23   A.   Yes.

24   Q.   So do you see the scene of the crime in this

25   photograph?

1   A.   Yes.

2   Q.   And just, generally speaking, can you describe for

3   the jurors what you're referring to?

4   A.   The main road that runs from the bottom to the top of

5   this photograph is Converse Street and about two thirds of

6   way up is the entrance to Ruth's House as well as Genesis

7   House.  The buildings on the right portion with the brown

8   roofs is Genesis House.  You can't see Ruth's House.  It's

9   up to the left from there.

10  Q.   So we're clear, you said there's a building with

11  brown roofs?  (Indicating)

12  A.   Those, yes.

13  Q.   In the lower right-hand corner of the photograph?

14  A.   Correct.

15  Q.   Now drawing your attention to this area here that is

16  slightly obscured by trees, is there a road there?

17  A.   Yes.

18  Q.   Is that the road that we just talked about in the

19  photograph that you said gives access to Genesis House?

20  A.   Yes.

21          MR. DESROCHES:  Thank you.  May I have one

22  moment, Your Honor?

23          THE COURT:  Yes.

24  Q.   (By Mr. Desroches)  So when you were working with the

25  canister -- we can take that down.

1          So when you were handling the canister and
2     photographing it, were you able to smell anything?
3     A.   Yes.
4     Q.   What were you able to smell?
5     A.   It smelled like gasoline.
6     Q.   After you photographed the can and the wick, what did
7     Longmeadow Police Department do with it?
8     A.   Requested the fire department to come over so we can
9     take the contents of that container and put them into a
10    different container.
11    Q.   Then what happened with the wick and the canister
12    after that was done?
13    A.   Which, I'm sorry?
14    Q.   The wick -- the pamphlet and the canister, what
15    happened with them?  What did you do with them?
16    A.   They were packaged and sent to the State Police Crime
17    Lab.
18    Q.   Now you indicated previously that you had training in
19    crime scene control?
20    A.   Correct.
21    Q.   Where these items handled consistently with your
22    training and experience to properly process evidence?
23    A.   Yes.
24          MR. DESROCHES:  Thank you, captain.  I have no
25    further questions.

1           MR. WATKINS:  I have no questions.

2           THE COURT:  Okay.

3      All right.  Thank you very much, sir.  You can step

4  down.

5      Government, can I ask you your next witness, how long

6  do you anticipate your next witness is?  We need to take a

7  break right now because we need to clean, and I don't know

8  if it makes sense to come back in for one witness.

9           MS. BERKOWER:  Your Honor, we would expect this

10  witness will take about a half hour.

11          THE COURT:  All right.  So we would not get

12  through him after the witness stands were cleaned so we

13  will break for the day.  All right.

14     All right.  Ladies and gentlemen, we're breaking for

15  the day.  We'll start tomorrow morning at 9 o'clock.  My

16  instructions are not to discuss this case with each other

17  or anyone else.  If there's any news coverage, do not let

18  yourself be exposed to it.  No research, no internet

19  access, no Facebook posting.  None of that.  Nothing to do

20  with this case at all.  Okay.  Very good.

21          THE CLERK:  Rise for the jury.

22          THE COURT:  As for the notebooks, leave the

23  notebooks on your seat.  The courtroom is locked so no one

24  is looking at your notebooks.  They will be left there on

25  the seats.

1      Also, we're going to have these doors open I think

2   for the rest of the trial and I notice when the doors are

3   opened, the air circulation is much more than usual.  It's

4   cold in here.  So, you know, you can bring your ski coats.

5   All right.

6      So, madam clerk.

7      THE CLERK:  Exit out the front door and tomorrow

8   at 9 a.m.

9      THE COURT:  All right.  Thank you.

10  **(The jury left at 3:54.)**

11      THE COURT:  The attorneys, all the paperwork you

12  received regarding the jurors that have the juror numbers

13  and names and all that, can you please get all that back

14  to the clerk?  The clerk's office shreds this material.

15  Other than the material that we marked for ID, that will

16  be in the docket.  Okay?

17      MR. WATKINS:  Judge, I will tell the court the

18  supplemental questionnaires about the medical stuff, I

19  shredded those last night in my office so I'm not

20  returning those.

21      THE COURT:  Okay.  Very good.  Thank you.  See

22  you in the morning.

23  **(Court recessed at 3:57.)**

24  ---------------------

25

1    (The certification of this transcript does not apply to
     any reproduction of this transcript, unless under the
2    direct control and/or supervision of the certifying
     reporter.  I assume no responsibility for the accuracy of
3    any reproduced copies not made under my control or
     direction.)

4

5                            CERTIFICATION

6

7          I certify that the foregoing is a correct

8    transcript of the record of proceedings in the

9    above-entitled matter to the best of my skill and ability.

10

11

12

13   /s/ Alice Moran                     December 8, 2020
     Alice Moran, RMR, RPR
14   Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25