<pre>
 1                     UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2                           WESTERN SECTION

 3

 4   United States of America  )
                               )            20cr30018-MGM
 5        vs                    )
                               )          November 20, 2020
 6   Jonathan Michael Rathbun   )
     _____)
 7

 8                       Jury Trial Held Before

 9                  The Honorable Mark G. Mastroianni

10                    United States District Judge.

11

12   APPEARANCES:

13

     On behalf of the government:  Risa Berkower, United States
14   Department of Justice, 950 Pennsylvania Avenue, NW,
     Washington, DC 20532.

15

16   Neil L. Desroches, Assistant United States Attorney, 300
     State Street, Suite 230, Springfield, MA 01105-2926.
17

     On behalf of the defendant: Timothy G. Watkins, Esq., 51
18   Sleeper Street, 5th Floor, Boston, MA 02210.

19   Forest J. O'Neill-Greenberg, Esq., 51 Sleeper Street, 5th
     Floor, Boston, MA 02210.
20

21
                        Alice Moran, CSR, RPR, RMR
22                     Official Federal Court Reporter
                         United States Courthouse
23                     300 State Street, Room 303D
                          Springfield, MA 01105
24                          (413)731-0086
                        alice.moran@verizon.net
25
</pre>

1                                  INDEX

2

3      Witness:                                              Page:

4

5

6      None

7

8

9

10     Description                                           Page

11

12

13     Closing argument by Ms. Berkower                      23

14

15     Closing argument by Mr. Watkins                       44

16

17     Rebuttal closing argument by Mr. Desroches            69

18

19     Judge Mastroianni's jury instructions                83

20

21

22

23

24

25

1    (Trial commenced.)

2    (Mr. Rathbun is present.)

3              THE CLERK:  The matter before the court,

4    20cr30018, the United States of America versus John

5    Michael Rathbun.

6         Counsel, will you please identify yourselves for the

7    record starting with the government?

8              MS. BERKOWER:  Good morning, Your Honor.  Risa

9    Berkower for the government.

10             THE COURT:  Good morning.

11             MR. DESROCHES:  Good morning, Your Honor.  Neil

12   Desroches also for the government.

13             THE COURT:  Good morning.

14             MR. WATKINS:  Tim Watkins, Federal Defender

15   Office, on behalf of John Michael Rathbun who is with us

16   in court.  Good morning.

17             THE COURT:  All right.

18             MS. O'NEILL-GREENBERG:  Good morning.  Forest

19   O'Neill-Greenberg also for Mr. Rathbun.

20             THE COURT:  Okay.  Great.  Good morning.

21        So we are continuing to be a work-in-progress.  You

22   have a redline version.  If we can go through as quickly

23   as possible, just like we did yesterday, starting with the

24   redline version.

25             MS. O'NEILL-GREENBERG:  Okay.  Sure.  Both we

1    and the government noticed in 844(i) --

2                THE COURT:  Page number?

3                MS. O'NEILL-GREENBERG:  Sorry.  I think it's

4    page 48 -- I'm sorry, yeah, 48.  So 844(i), the

5    maliciousness is left out.

6                THE COURT:  Was it not -- was it there

7    yesterday?

8                MS. O'NEILL-GREENBERG:  No.

9                THE COURT:  So it didn't disappear overnight?

10               MS. O'NEILL-GREENBERG:  It did not disappear

11   overnight.  We have had in our joint recommenced

12   instructions the definition of it in there.  I can pull it

13   up.

14               THE COURT:  Wasn't maliciously a portion when

15   there was actual damage that occurred to property, but not

16   with the attempt?

17               MS. O'NEILL-GREENBERG:  I think it's maliciously

18   trying to either attempt --

19               THE COURT:  I don't know.  Okay.

20        I think that might have been something that we looked

21   at.  I just want to check our notes.

22               MS. O'NEILL-GREENBERG:  Okay.

23               THE COURT:  Okay.  I'm looking at the

24   government's proposed instructions originally -- the joint

25   page 25.

1              MS. O'NEILL-GREENBERG:  Yes.

2              THE COURT:  So you define the term maliciously

3    but it's not included in the elements.

4              MS. O'NEILL-GREENBERG:  I think the way we had

5    it was the way the model instruction was.

6              THE COURT:  What is maliciously attached to if

7    it's not in the elements?

8              MS. O'NEILL-GREENBERG:  That's a good question.

9              THE COURT:  Under an attempt?

10             MS. O'NEILL-GREENBERG:  Yeah.  Well, I think

11   it's for both, either you're maliciously attempting to

12   cause the destruction or you actually do the destruction,

13   but that's the definition for the first element.

14             THE COURT:  So it should include in the first

15   element that the defendant maliciously attempted to

16   destroy?

17             MS. O'NEILL-GREENBERG:  That's what we are

18   asking for.

19             THE COURT:  Government?

20             MR. DESROCHES:  Your Honor, we initially did

21   flag this, but upon Your Honor's raising that issue I do

22   -- I'm seeing this differently.  I think that the attempt

23   infers the malicious intent.  Therefore, I think as it is

24   it's currently correct.

25        It does mirror the language of the statute, but it's

1    not something we feel terribly strongly about as we did

2    flag it initially.  So I think we would just request that

3    it remain as written as it accurately reflects the

4    statute.

5              THE COURT:  Yeah.  Well, I mean, I'm happy to --

6    it's just that I read this as maliciously attaching when

7    there's actual damage, but when the conduct is only an

8    attempt, that it was not applicable.  That it's addressed

9    by the requirement that the defendant intended to commit

10   the crime to damage or destroy, as opposed to whoever

11   maliciously damages or destroys.  I don't quite know the

12   answer.

13             MR. DESROCHES:  I think the attempt incorporates

14   the intent, and the maliciously -- when the act is

15   actually completed, the difference is that it would not

16   have been done maliciously but the attempts to destroy.

17        Like, for example, if it were completed, it would be

18   an, issue whether or not it was done intentionally and

19   with the intent to harm.  For example, an accidental

20   explosion wouldn't be malicious or if there was some other

21   explanation, but the attempt itself infers naturally the

22   intent to do that harm.

23             THE COURT:  So in the joint proposed

24   instructions it's included but it's not attached to

25   anything so it didn't seem to make sense as to why it was

1    in there and so that's why it was taken out.  Now the

2    defense is asking that it go in the first -- it go in the

3    first element of each charge or just the attempt to damage

4    and destroy?

5                    MS. O'NEILL-GREENBERG:  Just the maliciously

6    attempt.

7                    MR. DESROCHES:  Just in 844(i).

8                    THE COURT:  Just in 844(i).  I must say I don't

9    understand why.  I don't understand why.

10                    MS. O'NEILL-GREENBERG:  Well, I think it makes

11    sense that if you're attempting -- I think for the same

12    reason Attorney Desroches sort of articulated right now,

13    that it made sense to me that there could be various

14    reasons why you're trying -- if you try to destroy

15    something, do you maliciously attempt to destroy or

16    maliciously destroy?  I mean, what if you tried to attempt

17    to destroy something for some other purpose?

18                    THE COURT:  So the attempt itself has to be

19    malicious?  You're saying the attempt itself has to be

20    malicious?  It can't just be malicious only if there's

21    actual damage?

22                    MS. O'NEILL-GREENBERG:  What if you tried to

23    attempt to destroy it because you thought it was -- I

24    don't know what -- going to blow up and you were trying to

25    save somebody?

1           THE COURT:  At the bottom line, do you think

2     that makes that much of a difference?

3           MR. DESROCHES:  I don't think so, Your Honor,

4     but I think just to be safe maybe we should include it.

5     If there's an issue, it would be on that.  And because it

6     doesn't make a difference it's better to be safe I

7     guess.

8           THE COURT:  That's a good position.  I mean,

9     perhaps you're absolutely correct.

10          MS. O'NEILL-GREENBERG:  I don't know, but --

11          THE COURT:  Right.

12          MS. O'NEILL-GREENBERG:  -- to be safe.

13          THE COURT:  If all of us are all thinking about

14    it this hard, I think that's a good point to be safe we

15    will put it in there.  Okay.

16          MS. O'NEILL-GREENBERG:  For us we also, or I,

17    neglected to address yesterday that I think we had it in

18    our joint instructions that we are objecting to the aiding

19    and abetting instruction.

20          THE COURT:  Right.

21          MS. O'NEILL-GREENBERG:  I just wanted to put

22    that on the record.

23          THE COURT:  Okay.

24          MS. O'NEILL-GREENBERG:  We don't think there's

25    any evidence that came out at trial as to that theory of

1    liability.

2            THE COURT:  Right.  Objection noted.

3        Does the government want to say something about

4    aiding and abetting?

5            MR. DESROCHES:  No, Your Honor.

6            THE COURT:  All right.

7            MS. O'NEILL-GREENBERG:  I think that's it for us

8    for the new changes.

9            THE COURT:  So I just wanted to make sure, it

10   seemed to me the most significant changes were at page 33

11   of your new redline instruction, the failure to properly

12   investigate.  And also there was a change on page 28 of

13   your redline of statement by the defendant.

14           MS. O'NEILL-GREENBERG:  And I think the court

15   also included the different instruction on Mr. Rathbun

16   being held.

17           THE COURT:  Yes, we used yours.

18           MS. O'NEILL-GREENBERG:  Yes, so obviously we're

19   fine with that.

20           THE COURT:  All right.

21           MR. DESROCHES:  Your Honor, just a question in

22   terms of the failure to properly investigate, what is the

23   --

24           THE COURT:  You're on page?

25           MR. DESROCHES:  Thirty-three.  I'm wondering

1    what the source of this instruction is.

2            THE COURT:  This is taken primarily from the

3    state court *Bowden* instruction.

4            MR. DESROCHES:  Your Honor, I would suggest -- I

5    think the only evidence in regards to this may be the lack

6    of recording, and I would suggest that that is already

7    addressed elsewhere in these instructions.  So to the

8    extent --

9            THE COURT:  I don't know, I think the defendant

10   could argue failure to fully process the pamphlet or the

11   canister or to fully process forensically the cars.

12       I mean, I think there are some issues and that's why

13   I significantly changed it because all of those issues

14   have to be considered in light of all the circumstances

15   and facts.  I viewed this instruction as not nearly as

16   forceful or difficult for the government as the last

17   version.

18           MR. DESROCHES:  Yes, Your Honor.  Thank you.  I

19   think we made our position clear on this and I understand

20   what the court's position is.

21           THE COURT:  I mean, so the changes were

22   essentially -- I mean, I know you don't want an

23   instruction like this at all.  But the instruction went

24   from what was there, which was a rough instruction for the

25   government, I get it.  I heard your comments and this I

1   think changes the tone of the instruction quite a bit, and

2   actually takes out the word you may infer that it would

3   have been favorable for.

4       You know, it injects consideration of all facts and

5   circumstances; uses the word reasonableness several times;

6   highlights that all the evidence has to be -- all

7   considerations have to involve factual determinations.

8   They're all entirely up to the jury.  They give whatever

9   weight they deem appropriate based on all circumstances.

10      Defense, did you want to comment on it?

11          MS. O'NEILL-GREENBERG:  No.  I think just note

12  that we had wanted the instruction in its prior form.

13          THE COURT:  Sure.  Absolutely.  I get it.

14          MS. O'NEILL-GREENBERG:  Beyond that we are

15  fine.

16          MR. DESROCHES:  Your Honor, there's I think one

17  more separate issue regarding the interstate commerce.

18  I'm going to find where it is now on the redline version.

19  It relates to Count 1.

20          THE COURT:  Page 41?

21          LAW CLERK:  No.

22          MS. O'NEILL-GREENBERG:  Page 45 I think.

23          MR. DESROCHES:  Yes, the sentence that we are

24  concerned with indicates that "It is sufficient for the

25  government to satisfy this element by proving that at any

1    time prior to the date charged in the indictment, the

2    explosive (or its components) crossed a state line."

3         We would ask that be changed to reflect or any of its

4    or at least -- I'm sorry, or least one of its components

5    crossed a state line.  I think that would be consistent

6    with the statute.

7              THE COURT:  So instead of or it components or

8    any of its components?

9              MR. DESROCHES:  Yes, or at least one of its

10   components.  I think either way the message is the same.

11             THE COURT:  I'll add or any of its components.

12             MR. DESROCHES:  And I think from the

13   government's perspective that's the end of our concerns.

14             THE COURT:  All right.  Did the parties take a

15   look at the verdict form?

16             MR. DESROCHES:  Your Honor, in regards to Count

17   3 there is a few minor changes.  We would suggest that as

18   to Count 3, the superseding indictment charges the making

19   of a false statement replacing the word "of" with "that,"

20   and just making it consistent with the indictment, the

21   language in the indictment.

22        Then for the second clause of this sentence, we would

23   ask that it be -- it's currently or, we would ask that it

24   be and/or.

25             THE COURT:  And/or is no problem.  Okay.

1          Defense?

2              MS. O'NEILL-GREENBERG:  So that first "of," I'm

3      confused, making of false statement that?  What is that to

4      the of?

5              MR. DESROCHES:  Actually that would -- the

6      changing of that would then be followed by the change to

7      the language in the indictment.  So changing it -- just

8      that one word I agree would not make sense grammatically,

9      but the request is to just then mirror the language in the

10     indictment after changing the word "that."

11         So it would be that the defendant stated that he was

12     not familiar with the location on Converse Street where

13     the homemade incendiary device was placed.  Then and/or he

14     had not left his home in the past two weeks before the

15     COVID-19, just to mirror the indictment.

16             THE COURT:  I see.  Okay.

17             MS. O'NEILL-GREENBERG:  We would request that it

18     be just called a fuel can and not called a homemade

19     incendiary device since that's obviously getting at one of

20     the issues the jury has to decide, just the fuel can.  I

21     think the and/or referred to is fine.

22             THE COURT:  I guess I'm not seeing where the

23     word incendiary device is.

24             MS. O'NEILL-GREENBERG:  Sorry.  That's what

25     Attorney Desroches just called it.

1          MR. DESROCHES:  That came from me and that's
2    coming from the superseding indictment.
3          MS. O'NEILL-GREENBERG:  We would just request
4    that it be called a fuel can.
5          THE COURT:  So in the verdict form it says fuel
6    can.
7          MS. O'NEILL-GREENBERG:  Yes.  We would like it
8    to remain that way.
9          THE COURT:  So we will clearly have a chance to
10   take a look at all the changes that were just made
11   redlined and the verdict form.
12      I imagine we're going to do closings, take 10
13   minutes.  You'll check the verdict forms; you'll check the
14   instructions again.  I'll just check them and then we'll
15   bring them back in and instruct them.  All right.
16      It's kind of a long haul for two closing arguments
17   and then me give all the instructions so we will take a
18   little break in between.  Okay.
19          MR. WATKINS:  Judge, one other matter before we
20   bring the jury in.  I realized this morning that we
21   neglected to renew our Rule 29 motion at the close of
22   evidence.  We'd like to do that now.  I have no particular
23   further argument then at the close of the government's
24   case, but I think it is prudent also for the court to at
25   least consider the Rule 29 motion at this time.

1          THE COURT:  All right.  Very good.

2     Consideration of the same Rule 29, same arguments but now

3     made at the close of the defendant's case, the motion

4     relative to all specific counts is denied.

5          Okay.  We are waiting for a juror.

6          MS. BERKOWER:  In that case may I leave the

7     courtroom briefly?

8          THE COURT:  Sure.

9          To the parties, if the juror is not here by 10:30,

10    I'll consider substituting.  We are going to go with one

11    of the alternates who will be moving into her spot.  All

12    right?

13         MR. DESROCHES:  Thank you, Your Honor.

14         THE COURT:  Okay.  I'll come back out at 10:30.

15    **(A recess was taken at 10:25 until 10:36.)**

16         THE COURT:  The juror in Seat 11 I believe is

17    not here yet.  They were to be here at ten.  It's now

18    almost 10:40 and so I'm going to excuse that juror.

19         I'm sorry.  So Juror No. 11 is not here.  They were

20    told to be here at ten o'clock.  It's now 10:40 or close

21    to 10:40 so I'm going to bring the jury in.  We will go

22    with what we have and the juror in Seat No. 11 will be

23    excused.

24         If there's a position state it.  Don't sigh.  Just

25    tell me what's the issue?

1          Do you want me to wait longer?

2                    MS. O'NEILL-GREENBERG:  No.

3                    THE COURT:  We can wait longer.

4                    MR. WATKINS:  It's very unfortunate that this

5     juror has been here for many hours.

6                    MS. O'NEILL-GREENBERG:  Yeah

7                    THE COURT:  Right.  You know, I'm told that this

8     juror -- many of the mornings where we've had to wait

9     because there has been a juror who's been late it's been

10    this juror, but it's never been this late.

11                   MS. O'NEILL-GREENBERG:  And she's the juror who

12    alerted us to the issue with Verizon.

13                   THE COURT:  Yes.

14                   MS. O'NEILL-GREENBERG:  That's the only reason

15    that I sort of --

16                   THE COURT:  That's true.

17                   MS. O'NEILL-GREENBERG:  It doesn't seem like she

18    doesn't care.

19                   THE COURT:  No, it doesn't seem like that at

20    all.  I mean, we can wait another ten minutes.  I'm fine

21    with waiting another ten minutes but at some point we have

22    to go.  We've tried calling multiple times.

23                   CLERK HEALY:  We left several messages for

24    her.

25                   MS. O'NEILL-GREENBERG:  Okay.

1          THE COURT:  We have a cell phone number; is that

2     right?

3          CLERK HEALY:  Correct.

4          THE COURT:  I hope nothing happened.

5          CLERK HEALY:  I'm a little concerned.

6          THE COURT:  Because although this particular

7     juror has not been on time several mornings, she has shown

8     herself to be very responsible and invested in this case.

9     That's been clear.  The fact that there's been no response

10    from a cell phone either is not a good thing.

11       I just need a record.  That's what I'm planning to

12    do.  I need a record from both sides if there's an

13    objection.

14          MS. BERKOWER:  The government agrees.

15          THE COURT:  I would understand the defense is

16    disappointed or frustrated with this happening, but if you

17    can give me a suggestion for something else, that's great.

18       The government?

19          MS. BERKOWER:  The government has no objection

20    to how the court wants to proceed.  I think it's

21    unfortunate but we also have waited a long time today.  So

22    however the court wants to proceed, we are fine with doing

23    that.

24          MS. O'NEILL-GREENBERG:  I guess we get going.  I

25    don't know what else I can think of that we can do.

1           THE COURT:  I'm going to ask -- Bethany, who's

2    making the phone calls, Michael?

3           CLERK HEALY:  Yes, Michael.

4           THE COURT:  Can you check with him the last time

5    he called?  Have him step in and make a call.

6       Hi, Michael, when was the last time you tried to call

7    this juror in Seat 11?  What number is this juror?

8           CLERK ZAMORSKI:  I can't remember.  We have it

9    written down.

10          THE COURT:  When was the last time you tried

11   calling her?

12          CLERK ZAMORSKI:  Three minutes ago.

13          THE COURT:  Three minutes ago.  Okay.  That's

14   pretty updated.

15          CLERK ZAMORSKI:  I called her three times.

16          THE COURT:  And you're getting voice mails?

17          CLERK ZAMORSKI:  It rings and goes to voice

18   mail.

19          THE COURT:  And you have used that cell phone

20   number to contact her at other times during this week?

21          CLERK ZAMORSKI:  Yes.

22          THE COURT:  And has she picked up?

23          CLERK ZAMORSKI:  She didn't pick up but she

24   called back.  She previously told me that she was late

25   because she was lost and she told me that her phones were

1    broken and that somehow her car was able to call.  I

2    assume it's OnStar and so she called back to the

3    courthouse.  I spoke to her then, and she hasn't called

4    back today at all.

5              THE COURT:  All right.  So, in other words, you

6    calling her cell phone -- however, it happened, you

7    calling her cell phone on other dates ended up with her

8    getting back in touch with you?

9              CLERK ZAMORSKI:  Yes.

10             THE COURT:  And nothing today?

11             CLERK ZAMORSKI:  Nothing today.

12             THE COURT:  And she has your cell phone or where

13   would she be calling you?

14             CLERK ZAMORSKI:  She would call my office work

15   number.

16             THE COURT:  Can someone check downstairs to make

17   sure she hasn't called?

18             CLERK ZAMORSKI:  That's why I was staying down

19   there.  I told the CSO to call me if she shows up.  She

20   may call right now while I'm with the other jurors.

21             THE COURT:  Murph, can you check if there's a

22   juror coming in the front door?

23             CSO OFFICER:  Yes.

24             THE COURT:  Thanks.

25        No?  All right.  So as far as I know, and I'll ask

1    for suggestions, I haven't been in this situation before,

2    so as far as I know I formally go on the record excusing

3    this juror and then instruct the jury that they shouldn't

4    draw any conclusions, any inferences.  You know, jurors

5    get excused, things happen, things come up, and they

6    shouldn't think about it in any way.

7         Is that the procedure as far as you know it,

8    government?

9              MS. BERKOWER:  Yes, Your Honor.

10             THE COURT:  Defense?

11             MS. O'NEILL-GREENBERG:  Yes, Your Honor.

12             THE COURT:  Attorney Watkins, I'm thinking you

13   might have been through this situation before.  I

14   haven't.

15             MR. WATKINS:  I have to say I don't remember a

16   juror simply not showing up without any kind of notice.

17        I was thinking about your instructions to the jury.

18   Obviously we all think when somebody drops away could it

19   be COVID related?  I don't know whether the court was

20   inclined to say it has nothing to do with that or?

21             THE COURT:  We actually don't know though.  I

22   don't know why she hasn't -- it seems like if she was not

23   feeling well, we would have gotten a call.  So, you know,

24   I have a little bit of a concern hoping nothing happened,

25   but it's now quarter of and the jurors were to be here at

1   ten and we have not heard anything.  We just had the

2   update, a pretty recent update, from our court staff, from

3   our clerk staff.  So that's what we're going to do.  All

4   right.

5       Bethany, can I have confirmation for sure we are

6   talking about Seat 11, Juror?

7           CLERK HEALY:  I don't have the juror number with

8   me.

9           THE COURT:  Okay.  If any of you have the juror

10  number?

11          MR. DESROCHES:  According to our list it's Juror

12  No. 26.

13          THE COURT:  Seat 11, Juror 26.  I'll ask the

14  clerk's office to right now collect that juror who's about

15  to be excused notebook off her seat.  Without obviously

16  opening or looking at it, it will be destroyed.  Okay.

17  Bring them in.

18  **(The jury entered at 10:45.)**

19          THE COURT:  All right.  Good morning, everyone.

20      Was everyone able to follow my instructions not to

21  talk to each other about this case or to anyone else about

22  the case?  To read any articles, news articles, or watch

23  any news broadcast about the case?  Not to read or post on

24  social media?  Not to investigate the case in any way?

25  And to generally follow -- well, not generally to follow,

1    but to follow to the letter all the instructions I have

2    previously given?

3         Okay.  Affirmative answers and nods of the heads from

4    all jurors.  The jury remains fair and impartial.  All

5    right.

6         Ladies and gentlemen, you will notice that one

7    juror's seat is empty.  Juror No. 26 in Seat 11 is excused

8    from further juror service.

9         You should not consider in any way or at all any

10   circumstances surrounding why this juror is not here today

11   and is excused.  It is simply totally irrelevant to this

12   case.

13        You shouldn't presume or try to think about anything

14   that has to do with why that juror is not here.  The juror

15   is simply not here.  Things like this happen and that's

16   why we impanel more jurors than we need to deliberate.  So

17   the process is equipped to handle situations like this and

18   we will.

19        So with that said, we are ready for closing

20   statements.  Is each side ready?

21             MS. BERKOWER:  The government is ready, Your

22   Honor.

23             THE COURT:  Okay.  All right.  So the order is

24   the government, the defendant, and then the government

25   rebuttal.  The time that will be 30 minutes for your first

1   closing.  All right.

2           MS. BERKOWER:  May I proceed?

3           THE COURT:  Yes.  I'm setting up a timer, so go

4   right ahead.

5   **CLOSING ARGUMENT BY MS. BERKOWER**

6           MS. BERKOWER:  On April 2, 2020 John Rathbun set

7   down a makeshift firebomb outside of JGS, lit it and

8   escaped.  You now know that in the early morning hours of

9   that day, as the defendant started to make his way up to

10  Springfield, he stopped on Converse Street, put a yellow

11  diesel container partially filed with gasoline outside on

12  JGS's land, used a balled up Christian proselytizing tract

13  as a wick, stuffed it in the spout, and lit it on fire.

14      You saw that tract, half of it went up in flames, but

15  then it burned out before the fire reached the gasoline.

16  Thankfully that gasoline didn't ignite.  It didn't

17  explode, and thank goodness no one was hurt.

18      But the fact remains John Rathbun lit a firebomb at

19  the gates of a senior living facility right next to a

20  sidewalk that its residents used and that it's also used

21  by members of the public.  It was quick; it was easy, and

22  it was extremely dangerous.

23      Thirteen days later when the FBI came to talk to him

24  about the incident, the defendant made false statements

25  and rejected the very same explanation that he now wants

1   you to believe.

2        At the beginning of this trial, my colleague,

3   Attorney Desroches, told you that the government would

4   prove the charges beyond a reasonable doubt that the

5   defendant committed all three crimes that are charged in

6   the indictment, and that is exactly what this trial

7   proved.

8        The defendant is guilty of receiving an explosive in

9   interstate commerce with the intent to cause various

10  harms.  He is guilty of attempting to use fire or

11  explosives to damage or destroy property; and he is guilty

12  of making false statements to FBI Special Agent Ryan

13  McGonigle during his investigation into the first two

14  crimes.

15       Let's focus first on Counts 1 and 2.  The evidence

16  proves that in the early morning hours of April 2nd, the

17  defendant placed his makeshift bomb under a tree near the

18  entrance to JGS.  That would-be firebomb had three

19  components:  The yellow dieseal fuel canister, the

20  gasoline inside of it, and the bloodied sheets torn from

21  the Steps to Peace with God tract, a Christian

22  proselytizing tract, that was rolled up and stuffed in the

23  spout as a wick.

24       The defendant lit the tract on fire and escaped, and

25  he had good reason to put distance between himself and

1    this crime scene.  That tract is small.  It wouldn't take

2    long to burn and gasoline can ignite very quickly.

3         For his own safety and to escape, he needed to get

4    out of there.  By 5:01:44 a.m., the defendant's cell phone

5    shows that he was on I-91 on his way to Springfield.

6    Quick; easy; dangerous.

7         Now no one says that this defendant is some kind of a

8    criminal mastermind, quite the opposite.  He left a trail

9    of evidence that all points back to him.  In fact, a lot

10   of the important facts in this case really aren't in

11   dispute.  I'm going to give you a list about 15 of them

12   right now.

13        On April 2nd, sometime after 4:34 in the morning, the

14   defendant left his house in East Longmeadow.  He drove

15   away in his mother's car, not his own work van.  His house

16   is a mere 1.4 miles away from JGS, just a five-minute

17   drive.

18        That morning he drove down Converse Street taking him

19   right past the entrance to JGS where the device was found,

20   and the device was placed after 4:52 a.m.  By 5:01 a.m.

21   and 44 seconds the defendant was on I-91 driving up to

22   Springfield.

23        He left his blood on the yellow fuel canister.  He

24   left his blood on multiple pages of the Christian

25   religious tract rolled up into a wick.  His grandmother

1    used to live at Genesis House, the building closest to
2    where the device was found.  He visited his grandmother
3    there including at Christmas.

4         His mother's company managed Genesis House and the
5    mother does accounting work for that property.  His mother
6    keeps religious tracts in her car which the defendant
7    drove on April 2nd, and she also kept them at her house
8    where the defendant lived.

9         The Steps to Peace with God tract that was used as
10   the wick, the Billy Graham Evangelical Association
11   distributed this very tract in Springfield in 2019 at
12   events the defendant's parents both attended.  Keep these
13   facts in mind as we review how the government has proved
14   Counts 1 and 2.

15        Now there's a lot of evidence here, but let's start
16   with the most obvious and that's the device itself.  There
17   is no question that the defendant assembled this device.
18   We know that because his blood is on both pieces of it.
19   His blood was on the handle of the container and on the
20   charred tract.

21        Importantly, this device was homemade.  It was
22   improvised.  You can't buy that in a store.  The
23   defendant's blood was on both pieces of it.  That matched
24   to the defendant's blood was one in 568.2 octillion.
25   That's 27 zeros with nine commas on the wick and the

1    canister.  It was a direct match to the defendant.

2         It's such a strong match that the defense even told

3    you in their opening that it was the defendant's blood.

4    John touched this, they told you.  Well, that was an

5    understatement because there's only one reasonable

6    conclusion to draw from the fact that the defendant's

7    blood was on both pieces of the device.  He put it

8    together with his own hands.  There's no other explanation

9    that makes sense, and that's not all that the blood

10   evidence tells you.

11        You saw the photos of the device the day it was

12   found.  In the photograph of the blood on the handle, you

13   can see it looks fresh.  When the police found it, it was

14   still red.  It hadn't dried.  It wasn't brown dried up

15   blood from a piece of trash that had been dumped days

16   earlier.  And that bloodstain, that red bloodstain was

17   tested for DNA.  It matched only the defendant, no one

18   else, no other source, and there were no fingerprints at

19   all on the canister even though it was tested.

20        When the Longmeadow Police Department arrived, they

21   found the defendant's fresh blood in exactly the spot that

22   you would expect to see it after he picked it up and

23   carried it from his mother's car to the tree on JGS's

24   land.

25        That fresh blood on the handle tells you that he was

1    the last person to touch this device.  That red blood is

2    like a signature by the person who built that bomb.  The

3    defendant assembled this device himself.  The blood tells

4    you so.

5         There's another fact about this device that tells you

6    it was handmade by the defendant and that's the religious

7    tract used as a wick.  His blood was on multiple pages of

8    that tract, and you heard during this trial that's a

9    unique document.  It's not just a castaway piece of paper.

10   It carries a message.

11        When law enforcement saw this, they immediately

12   realized that this, along with the blood, could be the key

13   to solving this crime.  Right from the start, FBI Agent

14   McGonigle and LPD Officer Chaplin contacted local churches

15   to see if anyone recognized it but no one did.

16        We now know the source of the wick, the Steps to

17   Peace with God pamphlet.  The Billy Graham organization

18   had distributed it in Springfield only last year at an

19   event the defendant's parents attended.  There is a clear

20   chain of events that took this tract from the Billy Graham

21   print shop in South Carolina to Springfield, Massachusetts

22   to the defendant's own family.

23        His mother keeps tracts like this in her house, on

24   her person, in her car.  She's always got one in the cup

25   holder in the ready.  That's the same car the defendant

1    was driving on the morning of this crime.  A one in 568.2

2    octillion match to his blood smeared over the pages of the

3    tract that was handed out at an event that his mother

4    attended, that's how we know that he put the wick in the

5    fuel container;  He and no one else.

6        Now the evidence that shows that the defendant built

7    this device is not all there is to show that he committed

8    the crimes charged in Counts 1 and 2.  So let's move on to

9    that other evidence now, specifically the cell phone

10    evidence, his recorded phone calls, and his false

11    statements to the FBI.

12        First off, we know that the defendant was out in his

13    mother's car that morning at the time of the crime.  He

14    admitted to you yesterday on cross-examination that when

15    FBI Agent McGonigle asked him where he was on the morning

16    of April 2nd, he said he hadn't left the house in two

17    weeks.  In fact, the evidence on his cell phone shows the

18    exact opposite.

19        The cell tower data shows he was out of the house

20    sometime after 4:30 a.m.  He took his mother's car and he

21    didn't bring it back in time for her to go to work.  You

22    saw her text.  You heard her voice mail.  She was begging

23    him to bring her car home so that she can get to work on

24    time, and his daughter Natalie also explained to you that

25    in the time period he was regularly going out at night in

1    his mother's car.  She would see him leave from her

2    bedroom located directly over the driveway.

3         We also know that when the defendant left his house

4    that morning, he drove down Converse Street right past the

5    Ruth's House entrance to JGS.  He admitted this yesterday.

6    It's the route he always takes to get to the highway, and

7    that admission is important.  It fills in the gaps.

8         On the morning of the crime the defendant, by his own

9    admission, drove right past the crime scene.  Now, think

10   back to the start of this case.  At opening the defendant

11   said it was implausible, if not impossible, that the

12   defendant committed this crime.  Let's see what the

13   evidence actually proved.

14        The defense said that the evidence would show that on

15   April 2nd the defendant was so single-mindedly focused on

16   buying drugs that it was impossible for him to think of

17   anything else.

18        Well, the evidence from his web browser shows the

19   exact opposite of that.  The defendant admitted it.  In

20   the hours before this crime, he was on the internet.  He

21   typed in lots of searches.  He was looking for jobs, temp

22   agencies, tools, Home Depot's website, pornography, all

23   manner of things in those web searches all the way up

24   until just after 4:30 a.m.  That evidence alone shows that

25   the defendant was more than able to focus on other things

1    beyond the sole focus of getting high.

2         He told you himself he's a functional addict.  That

3    suggestion that it was implausible, if not impossible,

4    that he committed this crime before he could think --

5    because he could think of nothing else is soundly

6    disproven by his own browsing history and his testimony.

7         Now let's talk about the defense's claim that if was

8    impossible if not -- implausible, if not impossible, that

9    he was at the crime scene in time to get the firebomb in

10   place.

11        The evidence in this case proved there was time.

12   Special Agent McGonigle tested it himself.  We know that

13   the ride from JGS all the way up to the spot where 91

14   meets 291 past the last possible place where the

15   defendant's phone could have hit that cell tower with

16   coverage along I-91, that was still more than enough time

17   for the defendant to commit this crime and get away.

18        Again, not implausible and certainly not impossible.

19   And don't forget, putting a makeshift firebomb like this

20   on the ground really is quick, simple, and easy.  You can

21   use your common sense about how much time it really took

22   him to do that.  All the defendant had to do was stop his

23   car at JGS, jump out, set down the can, and light it.

24   Mere seconds.

25        Because when you light a short wick like that, you'd

1    better get out of the way.  You saw this wick.  It's

2    short.  It's like lighting fireworks.  When you light the

3    fuse, you only have a few seconds to get away before you

4    will be in danger yourself.  The wick was short and that's

5    exactly what happened here.  When the defendant lit it, it

6    burned so he got out of there.

7        Imagine if the wick had set off that gasoline, the

8    commotion that would -- that that would ensued.  A

9    firebomb outside of a Jewish senior home in the dark hours

10   before 5 a.m. during the early weeks of the COVID

11   pandemic.  That would have drawn attention.  The defendant

12   had every reason to do this quickly and get out of there,

13   drugs or not.

14       Now Judge Mastroianni will instruct you about the

15   elements of the crimes that are charged in the indictment,

16   and I also want to speak to you about them.

17       To prove Count 1, the government must prove that the

18   defendant transported or received, or attempted to

19   transport or receive, in interstate commerce an explosive

20   with the knowledge or intent that the explosive would be

21   used to harm or intimidate any person or damage or destroy

22   any property, including real property like land.

23       For the purpose of Count 1, the phrase transport or

24   receive an explosive in interstate commence sounds

25   complicated but it's actually quite simple.  It just means

1    you must find that at least one of the components of the

2    explosive crossed a state line at some point prior to the

3    crime, and this really isn't in dispute here.

4         The fuel canister was manufactured in Oklahoma; the

5    Steps to Peace with God tract was published in South

6    Carolina, and the State of Massachusetts does not

7    manufacture gasoline.  That's more than enough.

8         Now to prove Count 2, the government must show that

9    the defendant maliciously attempted to use fire or

10   explosives to damage or destroy property that was used in

11   interstate commerce, and for these purposes maliciously

12   just use means that the defendant acted intentionally or

13   with willful disregard of the likelihood that that -- of

14   the result and not mistakenly or carelessly.

15        For purposes of Count 2, the phrase property that was

16   used in interstate commerce just means that the property

17   was actively employed for a commercial purpose such as

18   rental property.  That element is also easy.  JGS is used

19   in interstate commerce in many different ways, including

20   the rental units at Genesis House.

21        Now the evidence I have discussed already proves that

22   the defendant built this device with his own hands and

23   tried to light it on fire outside of JGS.  That satisfies

24   most of these elements because the mere fact that he put a

25   firebomb on JGS's front doorstep shows that he certainly

1    intended to damage that property.

2         He told you yesterday on cross-examination gasoline

3    is dangerous.  This was a dangerous device he said.  You

4    can also infer from the conduct itself that he knew this

5    act would intimidate the people who lived there and

6    possibly injure or even kill someone, and that's because

7    anyone who did this would understand that this is a

8    natural consequence of such an act.  Let alone, such an

9    act directly outside of a senior center where the average

10   age is 86 years old.

11        But I also want to talk with you about why this

12   device was an explosive under the definition the judge

13   will give you.  For Count 2, you must find the defendant

14   guilty if you find that he attempted to damage or destroy

15   JGS's property with fire or an explosive.

16        The fire part is easy.  Everyone knows what fire is,

17   and for Count 2 that alone is enough.  But because Count 1

18   requires an explosive and that definition can be

19   confusing, I want to clear that up now.

20        Judge Mastroianni will tell you that the word

21   explosive means any device that contains ingredients in

22   this such proportions, quantities, or packing that

23   ignition by fire may cause an explosion.  This definition

24   also includes any incendiary device, which means any

25   incendiary bomb, firebomb, or similar device.

1    The evidence here meets this definition in more than
2    one way.  This defendant put a firebomb outside of JGS, an
3    open canister of gasoline with a paper wick in its spout,
4    which he lit on fire.  The defendant admitted that
5    gasoline is flammable; that it can explode, and that it
6    was dangerous.

7    And at the start of this case you heard a trained
8    firearm, Captain Note, who first responded to the scene
9    tell you he moved his fire truck down the street when he
10   saw this thing because he knew upon sight that it was
11   dangerous.  This easily could have caught on fire and it
12   could have exploded.  That more than proves that the
13   defendant used the kind of explosive that's charged in
14   Count 1.

15   Now before we move on to Count 3, I want to be clear
16   about what the government is not required to prove here
17   and that is motive.

18   The government has to prove that the defendant acted
19   intentionally when he placed that bomb at JGS, but there's
20   no requirement that the government prove why he chose to
21   do so.

22   Even so, the trial in this case made something very
23   clear.  On April 2nd this defendant was spiraling downward
24   and as he did so, he committed a senseless act of violence
25   that was bound up in two things.  First, religion which

permeated his household.  You saw it in the tract.  Don't

forget, of all of the items that he could have used, a

paper towel, newspaper, other scrap paper, he picked a

religious tract to light on fire.

MR. WATKINS:  Objection.

THE COURT:  Overruled.

MS. BERKOWER:  Second, the location which had

multiple ties to his own life and in particular to his

mother with whom he was arguing all the time.  The

government need not prove a motive here but you can still

consider the evidence of it.

Now let's move on to Count 3.  As I mentioned to you

earlier, Count 3 charges the defendant with making false

statements to the FBI.  This charge is based on the

voluntary interview that Special Agent McGonigle engaged

with him on April 15th, specifically the defendant's

statements that he wasn't familiar with the location on

Converse Street where the device was placed and that he

had not left his house in two weeks prior to the

interview.

Judge Mastroianni will tell you that to find the

defendant guilty of the charge, you must find beyond a

reasonable doubt the defendant knowingly and wilfully made

a false material statement, that the statement was

voluntary and intentional, and that the defendant made a

statement in a matter within the jurisdiction of a federal agency.

These elements are pretty straightforward and the last one really isn't in dispute.  The defendant made statements to Special Agent McGonigle who was investigating a federal offense, the placement of the device at JGS, so that element is satisfied.

You also learned that the defendant's statements were as voluntary and intentional as it gets.  He was fully informed of his right not to give any statement at all and he waived that right in writing.

He told you himself yesterday he wasn't impaired during the interview.  He was nervous but he wasn't impaired.  If anything, he could focus pretty well.  He had just taken Methadone which helps cut his cravings for heroin.

Now he may regret speaking to the agent sitting here today, but that doesn't mean he was voluntarily -- he wasn't voluntarily engaging with them back in April.

You also know that his statements to Special Agent McGonigle weren't just false.  They mattered here.  They were material.  Judge Mastroianni will tell you that a statement is material if it has a natural tendency to influence or be capable of influencing decisions by the agents, and that's exactly what happened here.

1          As Special Agent McGonigle talked to the defendant on

2     his porch, agents were searching the mother's car in the

3     driveway.  They impounded the defendant's van but they

4     searched the mother's car in the driveway, and all the

5     while the defendant maintained he hadn't left his house in

6     two weeks.  He never breathed a word that he had actually

7     been out in his mother's car on the morning of the crime

8     and we know the result of this.  His van was searched for

9     blood after it was impounded, but his mother's car was

10    not.

11         You heard him on a recorded call laughing at the FBI

12    for this.  These idiots he called the agents the day they

13    returned his van.  Think about that call.  Go listen to it

14    again back in the jury room.  It's Government's Exhibit

15    102.  He says the agents are idiots because they took the

16    wrong car; that the agents didn't find anything in the van

17    because he had actually been driving his mom's car.

18    Think about that for a moment.

19         He didn't say these idiots they didn't find anything

20    because they have the wrong guy, or these idiots didn't

21    find anything because I was never near that location.

22    Think about what he did say.  These idiots they know now

23    but they didn't when they took it.  That's an important

24    admission.  It shows that on April 15th he made a material

25    false statement about his whereabouts and those statements

1    absolutely affected this case.

2        Special Agent McGonigle told you if the defendant had

3    told him he had been out in his mother's car, the FBI

4    would have impounded it and searched it for blood.  But

5    any evidence that may have been in that car was lost

6    because the defendant misled the agents to think there was

7    nothing to see there.  This element is proven.  That

8    statement was false and it was material.

9        The defendant also made a second false material

10   statement during that interview.  He insisted he had no

11   idea what Special Agent McGonigle was talking about when

12   the agent told him about the location where the device was

13   placed.

14       Now the agent told you, he tried to orient the

15   defendant to this location in multiple ways.  He tried

16   using landmarks along the street.  He showed him a map

17   with an X on it.  He then specifically asked about the

18   Jewish nursing home.  He asked about Ruth's House, still

19   nothing.  We know that this too was false.

20       The defendant told you that he drives past the sign

21   that you can see in Government's Exhibit 23 every single

22   day.  As he drives to 91, he drives past that sign.

23       And he told you yesterday that he visited his

24   grandmother who lived in a building just 200 feet away

25   from this sign at least every Christmas when he would stop

1    by so she could give him a present.

2        You heard that recorded call I read to him during

3    cross-examination.  Six days after this crime, he was

4    talking with his mother in detail about that location

5    including using the word Ruth's House.  He knew which

6    buildings were where.  He knew when Special Agent

7    McGonigle asked him about this location on April 15th, he

8    knew what he was being asked.  Playing dumb wasted

9    valuable time in this investigation.  That's a second

10   material false statement.

11       Now there's one other thing you should note about

12   false statements.  If you find that the defendant made

13   false statements to the agents, either the ones that are

14   charged in the indictment or other false statements that

15   there is evidence about, you may use them for a second

16   purpose, consciousness of guilt for the counts charged in

17   -- for the crimes charged in Count 1 and 2.  Keep that in

18   mind as you consider all of the evidence.

19       Now Judge Mastroianni will tell you that the

20   government bears the burden of proof in this case beyond a

21   reasonable doubt.  We bear that burden.

22       The defense did not have to put on any evidence at

23   all, but since they did, and the defendant himself

24   testified, let's consider now what he said.

25       There's no other way to say it, the defendant's

account of this incident makes no sense whatsoever.  He

told you under cross-examination that he explicitly

remembers this night.  He was clear about that.  So let's

take him at his word.

He does remember that night.  He's just not telling

you the truth about it.  Because what he told you requires

you to shove aside all of the physical evidence in this

case and believe in a series of coincidences one stacked

on top of the other.

To borrow the defense's words any one of these

coincidences is implausible.  Altogether, they're

impossible.

In order for the defendant's story to be true, some

other person found that yellow container with the

defendant's blood on it and decided to fill it with gas

and build a bomb.  That person also found a Christian

tract, the same type that the defendant's mother keeps in

the cup holder of her car which, of course, the defendant

was also driving on the morning of the crime, and decided

to stuff that tract in as the wick and somehow the

defendant's blood as also on that tract.

The same person then placed it at JGS, which is a

five-minute drive from the defendant's house on the same

morning that the defendant also drove by.

This person somehow also chose JGS out of all the

places that he could have selected, the one building that
has two separate ties to the defendant's family.  You can
use your common sense to see that this is ridiculous.

But that unbelievable explanation doesn't mean that
the defendant didn't remember that night.  There was some
pieces of the truth that slipped out while he was
testifying.

He acknowledged to you that whoever put the wick into
to the device also placed it at JGS, and that the wick
with his blood on it was in the dumpster with the fuel
canister and that his blood was on both parts of the
device.

The evidence shows that what really happened is this:
When Special Agent McGonigle went to his house, the
defendant denied all knowledge of this offense.  He didn't
know the location five minutes from his house.  He didn't
ever have a yellow fuel canister, and he hadn't been out
of the house for two weeks.

When the agent told him about the blood and
specifically asked him is it possible you touched this
canister at a job site and your blood got on it?  He said
no, it is not possible.  Not that he didn't remember.  He
said it was not possible.

But then afterward he saw the evidence and he
realized he needed a new story, one that explained how his

blood got there and that's what he told you.

After telling Special Agent McGonigle seven months ago it was not possible that he got his blood on the can on a job site, now he's in court and wants you to believe exactly the opposite.

His story simply is not credible.  It asks you to put away your common sense and shove aside all of the evidence that you heard that points directly to him.  And his mother unfortunately is enabling him, as she has done so many times before.

You saw her testify.  Like, the defendant himself, she had a selective memory and she kept changing her story.  She's not credible either.

The evidence here proves beyond a reasonable doubt that on April 2nd of this year the defendant John Rathbun did something incredibly dangerous.  He lit a makeshift firebomb outside of a senior living center at the height of COVID-19 pandemic.

If that bomb had gone off, he could have hurt or even killed someone.  He would have terrified the seniors living nearby and he could have damaged JGS's property.

The evidence from that firebomb all points back directly to him.  The blood on the handle, the blood on the wick, the Christian tract, the cell phone location data, and the false statements to the FBI agent that show

```
 1    his consciousness of guilt.
 2         We know that this was not a random act by a stranger.
 3    The defendant did this.  Now is the time to find him
 4    guilty as charged because that's the only conclusion that
 5    is consistent with all of the evidence.
 6         Thank you, Your Honor.
 7             THE COURT:  Thank you.
 8         Attorney Watkins, you have 40 minutes.
 9             MR. WATKINS:  Thank you.  May I get the screens?
10    CLOSING ARGUMENT BY MR. WATKINS
11             MR. WATKINS:  Good morning, jurors.
12         It's been a long couple of weeks.  At the beginning
13    of this case, Ms. O'Neill-Greenberg told you that we
14    thought you were going to see at trial the story of a drug
15    addict with no bone to pick against any particular
16    religion, certainly not against anyone of the Jewish
17    faith, and that there would be no evidence of any kind of
18    motive, any reason why John Rathbun would want to hurt
19    people, destroy property, intimidate.
20         Isn't that exactly what you saw in the last two
21    weeks?  I'm going to use my few minutes to get a little
22    more granular on these issues, delve a little more deeply
23    into why the government's case does not make sense, and
24    show you that the only conclusion here is that John is not
25    guilty.
```

1        I want to start out this way.  When my kids were

2    young, the Watkins household, we loved reading stories and

3    stories from Greek mythology, in particular Aesop's Fables

4    and the like.  The stories tend to be simple, but they're

5    also great at getting to some essential truths.

6        During this trial it brought to mind one of the Greek

7    myths that we used to know and love, one of the more

8    macabre myths, but nevertheless one that I think is

9    appropriate here.  That's the myth of Procrustes.  Some of

10   you may know it.

11       Procrustes lived near a highway in Greece that

12   travelers frequented.  He would meet travelers along the

13   road and in pubs, public houses, get to know them, and

14   then offer them a place to sleep in his special bed.

15       When the unlucky traveler would arrive at his home

16   and be escorted to the room with the special bed,

17   Procrustes would show him that and ask him to get in.

18       The bed was special because instead of fitting the

19   bed to the traveler, what Procrustes would do would fit

20   the traveler to the bed.  If he was a little shorter than

21   the bed, he would hammer and rack the unlucky traveler

22   until he fit.  If the traveler was a little long for the

23   bed, he would cut off the offending parts to make sure

24   that he'd fit.  Either way, of course, the outcome was

25   catastrophic.

1        I think Procrustes would be delighted with the

2   government's case against John Rathbun.  It's what they've

3   had to do here is stretch their evidence to try to fit

4   their theory of why John Rathbun is guilty.  And they've

5   also had to cut away evidence in order to -- evidence

6   that's inconvenient to them in order to fit what it is

7   that they're saying here at trial.

8        So I want to start first to the timing because that

9   is an issue in this case of course.  The government wants

10  to focus -- I got to back up to the beginning here.  All

11  right.

12       This is the time period that we're starting to know

13  all too well, 4:51:44 in the morning and 8:30 in the

14  morning.  Everyone agrees that that is the period of time

15  at which someone placed the gas can next to that tree.

16       How do we know that those are the outer limits?

17  Well, we know from Officer Dabrae's dash cam, cruiser dash

18  cam that Officer Dabrae went by there at 4:51:44 in the

19  morning.  No can there.  Officer Dabrae didn't see the

20  can.  It's not on the video.  We know that outer limit.

21       The other outer limit is a stipulation.  There was a

22  resident who called this in at 8:30 in the morning, and as

23  we all heard the fire department came in at 11:40, several

24  hours after that.

25       Now, of this time the government wants you to focus

1    on about two minutes of this three and a half hour time.

2    Why does it have to be just that two minutes at the early

3    part of this time?  Because, as we've heard, John Rathbun

4    all the rest of the morning was in East Springfield

5    looking for drugs.  No dispute about that, right?

6    Everybody's agreed there's been no serious dispute that

7    after 5:05 a.m. -- actually we're going to find out it was

8    earlier than that, but at 5:05 a.m. John Rathbun was in

9    East Springfield far away from JGS and couldn't have put

10   it there.

11        So that is the time period and the government wants

12   you to go to just two minutes of that and ignore the rest

13   of that period of time, just as Procrustes would love.

14        So let's talk a little bit about those two minutes in

15   time and how we get to those two minutes in time.  So

16   let's review what the two Ryans told us, Ryan McGonigle

17   and Ryan Burke.  Ryan Burke, the cell tower expert; Ryan

18   McGonigle, the agent.

19        What did they tell us about how we know where John

20   Rathbun was?  Well, we got his cell tower -- excuse me,

21   I'm going to go here and pull this around.  And, of

22   course, this one is not working.

23        I'm going to come out here.  We know at 5:01:44 that

24   John Rathbun's phone hit off a tower next to I-91, the

25   other side of the Connecticut River.  And Ryan McGonigle

1    told us he thought that was the upper end of that range at

2    291 and I-91.

3        This is all government testimony that we're hearing

4    now.  And we have other evidence that corroborates that,

5    that John was there and on his way to buy drugs.  Five in

6    the morning "knock, knock, knock."  You heard from John,

7    and again none of this disputed, that's him sending a text

8    to Devin Austin saying be ready.  I'm on my way.  Can you

9    get me some drugs?  Now, that's Ryan Burke.

10       What Ryan McGonigle told us was it took 8 minutes and

11   27 seconds from JGS to get out on their view of the

12   evidence, place the bomb, and then drive to get to this

13   point on the cell tower, 8 minutes and 27 seconds.

14       Again this is the government's testimony.  It has

15   nothing to do with what we argued or the government

16   argues.  This is testimony and evidence.  So that takes us

17   back to 4:53:17 in the morning.

18       Now, we're in an unusual situation here.  If this was

19   a classroom, I would be asking for questions and things

20   but, of course, I can't do that.  But what I want to make

21   sure is everybody knows how I got there because I remember

22   Officer or Agent McGonigle and I were going back and forth

23   about that.  He didn't really want to admit to the math

24   and the like or to commit.  But again, 8 minutes and 27

25   seconds counting backwards from 5:01:44 in the morning

1     that comes out at 4:53:17.

2          So what we know is we have Officer Dabrae's

3     screenshot again.  No cars there.  Obviously no gas can

4     there.  So it wasn't there.  No one, not John Rathbun, not

5     anybody, was there at 4:51:44.

6          According to Ryan McGonigle, he would have had to

7     start putting the device out at 4:53:17 in order to get up

8     to that particular cell tower.  So what we have here is a

9     minute and a half difference out of that three and a half

10    hours, a minute and a half that the government says this

11    is the only time that John Rathbun could have put that

12    there.

13         But guess what?  As you've heard, there's more.

14    Right?  We saw Officer Dabrae's actual video, which I'm

15    going to start now.

16    (Video playing.)

17              MR. WATKINS:  Remember this from the evidence?

18    Officer Dabrae comes and takes a left going towards East

19    Longmeadow remember where everybody -- again undisputed --

20    would say John Rathbun, if he was driving down there,

21    would have to come from that particular direction.

22         I hope everybody is with me still.  And you'll

23    remember this was an exchange between Agent McGonigle and

24    myself, and I'm afraid -- I apologize if my frustration

25    kind of ran over because on direct testimony you will

1    remember he said I estimate that that's about 15 to 17

2    additional seconds.

3        When I asked him on direct (sic) examination, for

4    reasons I don't understand, he tried to run away from that

5    and said, well, I'm not really sure about that.  But guess

6    what?  He was right.  He asked me to go back to the video

7    later and I did.  It's 16 seconds.  He was spot on.  It

8    takes 16 seconds from where that screenshot was to where

9    this is.

10       I just bring this to your attention because I don't

11   understand why Agent McGonigle was arguing about something

12   which at the end of the day we all agreed on.

13       Nevertheless, the issue here is because, right, we've

14   started out at 5:41:44.  We've added 16 seconds, right?

15   We don't see John Rathbun's car, any car coming down here.

16   So now we're at 5:42 -- I hope everybody is still

17   following me -- 5:42 now is the earliest that that gas can

18   could have been left by the tree.

19       But what else do we know?  If there's no car here --

20   number one, even if a car was right next to Officer

21   Dabrae's cruiser at that point, it would have taken 16

22   seconds to get back to that driveway of JGS, 16 seconds.

23       So again these things are important because what the

24   government has said is he could have done it.  That's what

25   Ryan McGonigle said.  That's what the government is

1    arguing here today.

2         So we have 4:53:17.  That's still the absolute latest

3    he could -- John Rathbun, if he did this -- could have

4    started to put this and then driven away.  And now we have

5    4:52:15 as being the earliest he could have shown up.

6         Procrustes would be proud.  We've now put three and a

7    half hours down to one minute.  One minute out of that

8    three and a half hour time, that's the only time John

9    Rathbun could even possibly -- and this is all on the

10   government's evidence, undisputed evidence.  But there's

11   more.

12        Remember now when Officer Dabrae is taking this

13   right-hand turn, there's no cars coming down.  None.  Not

14   John Rathbun's car.  No other car at all.

15        Remember now there's just a one minute gap or John

16   Rathbun couldn't do it.  There are no cars coming down

17   there.  Was he hiding his car in the woods?  No.  One

18   minute left.

19        It's at least 20, 30 seconds, let's think about that.

20   If it was just 20 seconds, if it wasn't a minute, now

21   we're down to 42 seconds.  A 42 second gap where if John

22   Rathbun did it, he had to have done it within that 42

23   second gap.

24        Apologies for my mask.  It's falling down here.

25        So you're going to have all the evidence back there.

1    You're going to have these videos.  You're going to have

2    the cell tower evidence.  You've heard it all.  I

3    encourage you to go through it, and tell me where I'm

4    wrong on this government's evidence.  I want the

5    government -- they get the last shot here.  Maybe they'll

6    tell me where I'm wrong on this because this is

7    mathematics.  This is science, 42 seconds.

8         And what do we know even about the 42 seconds?

9    There's way more, right?  This 42 seconds assumes that it

10   actually did take only 45 seconds for someone to put this,

11   or particularly John, to put this on the government's

12   theory.

13        Ryan McGonigle said that there was no particular

14   reason for the 45 or 47 seconds other than we walked over,

15   put this camera case down, and then walked back to the

16   car.  That's how we came up with that 45 seconds.  But is

17   that really what had to happen if it was John Rathbun

18   doing this?  No.

19        We talked about some of those things with Ryan

20   McGonigle.  Under the government's theory, it was the

21   RAV4; the gas can was there.  You heard John and Sheila

22   talk about how particular they were about smells and the

23   like.  But nevertheless, if the government is right, it

24   was in the back passenger seat?  Who knows.

25        But John's not getting up and simply walking over

there as the government wants.  He's going back into the
back to get that out, and this is assuming that he went
right to that spot and knew that that spot was it.  This
is the perfect place for me to do this thing.  I'm not
going to look around at all.  I've got it in my head right
away that this tree at JGS is my lodestar.  This is where
I want to go.  That he didn't think about it at all; that
he didn't look around to see if there were other people
around, right?

And even once -- even if all that were true, there's
the walking over to the tree.  As the government puts it,
there's someone trying to light it.  It's put down.  These
things take time.  Each one of these things takes time.

And the reason I say all this is because once they go
over that 42 seconds, it couldn't have been John.  It
could not have been John.  Their theory doesn't work.
John Rathbun did not put it there that morning.

When you go back -- when we talked to Officer Dabrae,
you'll remember she said the reason I -- Officer Dabrae
said the reason I was there is because someone had passed
away at Genesis House.  And that when I left, there was
still a hearse there finishing up to leave.

What do you think about that?  If the government is
right that in that one minute or 42 seconds, or however
much it was, John's down there doing things.  That hearse

1    is going right by him.  Right?  How could that happen,

2    right?

3         Officer Dabrae says I left.  They were behind me.

4    They were still there but they were getting ready to

5    leave.  Wouldn't they have seen John there?  You haven't

6    heard any evidence of that.

7         So I guess at the end of the day what I'm trying to

8    say is Officer McGonigle can say it and Ms. Berkower can

9    repeat it, but that doesn't make it true that John Rathbun

10   could have placed this container next to this tree.

11        You're going have to agree, each and every one of

12   you, beyond a reasonable doubt that that is exactly how it

13   happened.  I would suggest there's just no way to conclude

14   beyond a reasonable doubt.

15        There are so many variables in the government's story

16   about the only way this could have been placed and the

17   only time that it could have been placed, it's ludicrous.

18   You can stop right there.  That's not guilty.  You don't

19   need to talk about other experts.  You don't need to talk

20   about really anything else in the case.  That's not

21   guilty.

22        I next want to take a look at some of the features of

23   the government's case from a 30,000 foot view, if you

24   will, about some of the things that I heard during trial

25   and I think you probably heard as well.

1    So the government says that John put this next to

2    this tree that morning at 4:53 with a malicious intent to

3    damage property and injure people.  How does that make

4    sense?

5        In the modern age, our phones are now our confessors.

6    They document everything that we do.  How did what he is

7    doing before make sense, square with the fact that he had

8    this premeditated plan to put this gas can next to the

9    tree?

10       There's no brooding or dark acts on the -- there's no

11   dark web or deep web or cabals that he's communicating

12   with on his phone.  He's searching for tools on Home Depot

13   and searching for jobs.  How does that square with this

14   idea that he knew exactly what he wanted to do, was to try

15   to light this thing, and then run away quickly for

16   whatever reason that the government seems unable to come

17   up with?

18       What we do know is that he was searching for drugs.

19   Again, this is evidence that nobody disputes, those text

20   messages.  It's clear to everybody I think the minute you

21   read those that that's what those texts are all about, and

22   it doesn't square.  It simply does not square.

23       If someone wanted, John Rathbun or anybody, wanted to

24   damage or destroy property, a tree or intimidate, why at

25   that tree?  If the government is right that it was some

1    vendetta against Ruth's House or Genesis House, there was
2    that sign right there.  Why not put it next to the sign?
3    If you want to make a statement, if you want to
4    intimidate, if you want to damage, you know, light off
5    something next to the sign at the road.  A tree?  I simply
6    don't understand it.
7         If the beef that John had was against Genesis House
8    -- there's no evidence of that, of course -- but the
9    government seems to constantly suggest that Genesis House
10   was some kind of a target, what's it doing over on the
11   Ruth's House side where you learn somewhat ad nauseam now
12   that the entrance to Genesis House is the next driveway
13   going up there?
14        It simply doesn't make sense.  It simply doesn't make
15   season.  Why light it and walk away?  If John Rathbun or
16   anybody else wanted to damage and destroy, tries to light
17   this crazy way on this spout, you're going to shrug your
18   shoulders and just walk away?  Again, it doesn't make
19   sense.  It doesn't make sense.
20        There's other issues that simply don't square well
21   with the government's theory and the idea that this case
22   was well investigated.  Let's look at forensic evidence
23   here.
24        Certainly true, as we've admitted all along, John's
25   blood on that handle, on that one spot on the handle, and

1   the pamphlet.

2        Once again, this is a case of just because someone

3   says it's so doesn't mean it so.  Ms. Berkower says that

4   the blood was fresh.  Listen, good luck with that.  We did

5   not hear any evidence at trial about it.  On the

6   government's theory that John put that out at 4:53 -- this

7   is the government's theory -- it was dried way before

8   11:40 when the fire people pulled up.

9        To the extent that she's arguing that you can infer

10  something that it's a fresh blood drop, I would think

11  she's not being completely level with you.  And you'll be

12  able to see that I think and confirm that of your own

13  common knowledge.  That is something we've all experienced

14  about when blood dries and how long something can stay

15  "fresh."

16       You heard yesterday when the judge stopped Ms.

17  Berkower to clarify here that it was just the DNA at that

18  spot that was tested.  No other part of the can was tested

19  to see if someone else's DNA was on it.

20       I kind of understand that there was this rush to --

21  you know, it's blood.  We're going to get DNA on that.

22  But this thought that they didn't look for anything else,

23  they didn't look for someone else's DNA on some other part

24  of the can, I think that is something you've got to

25  consider here about whether we would have gotten a more

1   fulsome explanation or a more fulsome description of

2   actually what went on here forensically.

3        And isn't it interesting to you that there were no

4   fingerprints found on this can?  If the government was

5   right, John Rathbun scurried out there to put this thing

6   and quickly did it, why aren't his fingerprints there?

7        Could it be the person who ultimately did put it

8   there wiped down the fingerprints?  They didn't care about

9   that blood spot.  That's not them.  Isn't that as

10  consistent -- more consistent with the evidence as it

11  actually is where there are no fingerprints found

12  whatsoever on the can?

13       The judge is going to tell you in the instructions

14  these are things you can take into account whether the

15  government should have done -- taken certain actions to

16  investigate.  They didn't here and I'd ask you to consider

17  that.

18       So some other aspects, the personal connections.

19  This was always key to the government's case.  You'll

20  remember that Mr. Desroches promised that the personal

21  connections to Genesis House would show why John Rathbun

22  chose this particular spot.  I remember him saying right

23  off the top, his mother worked there.  Of course, John

24  Rathbun knew where it was.  His mother worked there.  How

25  did that work out?  It didn't.

1    Once we found out the real truth about it, she does

2    the books for Genesis House.  She never goes there in a

3    work capacity.  There's simply no reason why John would

4    know that she does books for Genesis House.  And what does

5    that mean anyway as far as a motive, Genesis House?  The

6    evidence didn't pan out for them there.

7    They also promised you about the deep connections to

8    his grandmother at Genesis House, yet another reason why

9    he would choose this spot or try to later on cover up.

10   But again, did you really conclude that at the end of all

11   the evidence?  That he went to visit his grandmother a few

12   times.  Not even visit, it sounds like they went over to

13   pick her up and bring her other places for the most part.

14   None of them knew it as Genesis House.  It was

15   grandma's house.  Isn't that consistent with the way we

16   deal with places.  Sometimes we might know the names of a

17   ground but other times, particularly if we don't have the

18   deep connection, it's going to be grandma's house.

19   So these personal connections I would suggest the

20   government was relying on it at the beginning of the case,

21   I don't think it's there.  I think that's an indication of

22   yet more of Procrustes doing here that they're trying to

23   stretch very, very thin kinds of evidence to fill a theory

24   that simply doesn't make any sense.

25   I want to turn now to August (sic) 15th when Agent

1    McGonigle showed up at John's house.  Let's not beat

2    around the bush, right.  The Longmeadow Police Department

3    had found this can up there.  It's on the grounds of JGS.

4    There was a bloodstain on the can that led them to John,

5    and they went there looking for an admission, a

6    confession.

7        It's hard for me to fault any of those things.  A gas

8    can on the property of a Jewish-related property, yes, of

9    course, we want the police to investigate, but we also

10   want them to investigate fairly.

11       And what happened here when they got to 20 Lori Lane,

12   they got a series of stop signs, stop signs.  This is not

13   what we expected.  This is not someone who has lots of

14   materials around showing anti-Semitic leanings or really

15   anything else.  This is a guy in his boxer shorts talking

16   about ultimately his drug use and the kinds of things that

17   he used.

18       Just to be clear, he did not see -- they searched his

19   house.  They searched his room.  They searched everything.

20   They delved into his life.  There's not one wit of

21   evidence of any kind of anti-Semitic leaning.

22       What they found was a functioning addict at one of

23   the low points in his life vehemently denying having

24   anything to do with this as he does today.

25       So that's the scene when we go there.  And so what

1    does Agent McGonigle do?  Well, he's still trying to get

2    admissions.  You know, trying to get that gotcha moment

3    there.

4        So let's talk about Ruth's House and JGS.  What do we

5    hear about the actual questions and answers that the

6    government is now relying on to say that John lied?  This

7    map?  This seemed to be key to the government's case here

8    about lying that immediately John would know what's going

9    on here, what they're looking after.  Can you draw that

10   conclusion from this map?  You heard I think from both of

11   them about that.

12       What struck me here, and I think you all heard it,

13   Ryan McGonigle said at the beginning of the case I, Ryan

14   McGonigle, was confused.  I thought it was about Ruth's

15   House.  I thought that that's where this thing was left.

16   Now we're saying it's Genesis House, but back then it was

17   at Ruth's House.

18       If the agent is confused about what it is he's trying

19   to ask, how can we demand that John Rathbun give the

20   perfect answer?  I think the answer is we can't.  I don't

21   think Agent McGonigle was being fair up there.  He

22   certainly wasn't being fair to try to record it or

23   document the actual question and answer in a way that they

24   could then show to you to say this is exactly what

25   happened.

1      As you heard they didn't record it.  We've all got
2  recorders in our hands at this point.  The FBI certainly
3  has the equipment.  They could have had Mr. Rathbun write
4  out the statement about it.  They didn't do that.  They
5  could have had him sign notes; they didn't have him do
6  that.  So you don't have the evidence.  We don't have the
7  evidence.

8      What the government is now saying is the other way we
9  know that that is a lie is, well, he drives by there every
10 day.  Once again, how did that work out?  Because what I
11 remember is a couple things.  The firefighters, the very
12 first day they were called, he said he couldn't remember
13 what was on the signs, right, at Genesis House or Ruth's
14 House.

15     We had Susan Goldsmith I think said, well, I just
16 drive by that sign all the time but I don't... and she
17 works there.  Right?  But remember this is a road where
18 there are lots of facilities that are similar to this.
19 The idea that John Rathbun needs to know every single
20 place on down there and think about it as this agent is
21 taking with him, I think it's simply unfair.

22     I mean, think of any us about the routes we take to
23 get home on a day.  It becomes like wallpaper, doesn't it?
24 Are we all constantly looking out for this landmark and
25 that?  The answer is no.  This idea that by driving by

1    that makes him guilty of lying is ludicrous.

2         The two weeks' question we've gone on at some length

3    about it.  According to Ryan McGonigle the question was,

4    where were you on April 2nd?  The response is, well, I

5    hadn't been there in two weeks.  We've all figured it out

6    at this point.  April 2nd is 13 days, right?  Which of us

7    is not going to get caught in that particular misstatement

8    these days or really any days?

9         Remember, this is the start of the pandemic.  If

10   you're anything like me, the days quickly started fading

11   one into another where we weren't doing specific things on

12   specific days.  It really seems like a gotcha moment at

13   this point where he said, ah, two weeks that includes

14   April 2nd.  Now we know he was out.  He must have known on

15   that day.  That chain of illogic just does not get you to

16   a lie.  It's simply unfair, but you get to determine that.

17        Part of the jury instructions you'll hear from the

18   government (sic) talks about whether the answer was

19   reasonably -- whether the question was reasonably

20   understood and the answer a reasonable answer to the

21   question.  I invite you to look at the law and to really

22   think about what happened up there.

23        At the end of the day in order to find him guilty on

24   the false statement charges, you're going to have to

25   believe Agent McGonigle that he's giving you the whole

1   truth.  You saw him up there.  You're going to draw your

2   own conclusions about it, but I do want you to compare his

3   testimony to the testimony of some of the other even

4   government witnesses we saw.

5        Dustin Wong, Ryan Burke, they answered questions on

6   cross-exam.  They were just giving the facts that they

7   went by.  Dan Marshall from Scepter, a straight shooter.

8   John Drugan from the Mass State Police answered our

9   questions very quickly.

10        Ryan McGonigle a little bit difficult on

11   cross-examination.  He's clearly not as forthcoming to us

12   on cross-examination as he was when the government was

13   reading through their script of questions with him.

14        Is he somebody you can rely upon, Officer McGonigle,

15   if it was your liberty that turned on his testimony?  I

16   think that's what you got to think about when you go into

17   the jury room and consider these particular charges.

18        And then there's John.  John testified.  He didn't

19   have to.  The judge told you at the beginning of this case

20   there's absolutely no requirement that a defendant

21   testify.  He can simply sit by and say to the government

22   prove it, but he did.  And you got a chance to see him

23   with all his warts on display, and that's no easy task to

24   get up on the witness stand when you know the government

25   has been investigating you for six months, every aspect of

1    your life.  Make no mistake about that.

2         Mr. Desroches got up there with Sheila Rathbun and

3    had an email or a text message from a year ago.  The

4    government has looked into every facet of Mr. Rathbun's

5    life.  Did you hear any of that come in?  No.  Because it

6    doesn't help the government.  That's why it didn't come

7    in, and it didn't help the government when they were

8    cross-examining John as well.

9         Make no mistake though, John clearly needs to make

10   some major changes in his life; get some serious help to

11   address his addiction issues.  We told you that from the

12   outset.  He told you that when he was on the stand.  But

13   that's not a reason to find him guilty of these very, very

14   serious charges that the government has alleged.

15        Where is the why?  Why would John Rathbun do this?

16   The government is technically correct motive is not an

17   element of the offense, but people do not do things out of

18   thin air.  They simply don't.

19        I think that is something that you can and should

20   take into account.  Why?  Have they shown you the why?  I

21   think about as close as they got is he was arguing with

22   his mom over cigarettes and food.  How does that end up in

23   I want to put a fuel can on this property next to a tree?

24   If there was a whisper of a hint of why, you would have

25   heard it.  You would have heard it.  There is none because

1    John Rathbun didn't do this.  He didn't put those -- put

2    that gas can up against the tree.

3         The judge is going to read the instructions about

4    what you need to find on each one of the counts and one of

5    the things is intent.  Intent to destroy property, intent

6    to try to injure people or intimidate.

7         How do you get to intent without the why?  In other

8    words, the government might be technically correct that

9    they don't have to prove motive or the why, but they do

10   have to prove that intent.  And aren't those two things

11   really inseparable here?

12        If you knew the why -- if there was a why, you would

13   know the intent, this is why he wanted to do these things.

14   Without that, there's no intent there and the government

15   fails.

16        So as you go back to the jury room, I hope you'll

17   discuss whether the lack of any explanation of why John

18   would do this from the government is satisfactory to you

19   that you can just leave that.  Like Procrustes, cut that

20   out and not consider it.

21        The easy way out of this case is his blood is on the

22   fuel canister.  We never denied that.  John doesn't deny

23   that.  His blood is on the pamphlet.  I understand it

24   could be an easy, well, of course, he left it there.  Who

25   else would have?  Isn't that what the government is

1   arguing here?

2       I expect that the government is going to get up for

3   their second chance at us and repeat what Ms. Berkower has

4   done a few times already is use your common sense.  I

5   don't know about you, but I get very, very careful when

6   anybody tells me to use my common sense these days or

7   otherwise tells me that a decision is easy.  Because what

8   they're doing when they ask you that is to set aside

9   thoughtful, deliberate, logical thinking in favor of

10  instinct, emotion, biases.

11      But there's a reason why we have jurors and jury

12  trials, and it's not simply so you can come in here,

13  listen to a summary of the evidence, raise your hands, and

14  we all go home.  It's not why we spent time making sure

15  that each of you can be thoughtful, deliberative, and

16  logical.  It's really what our system of justice demands

17  here.

18      Intimately tied to our need for the thoughtful,

19  deliberative, and logical jurors is a requirement that the

20  government prove its case beyond a reasonable doubt and

21  that takes work.  That takes work in the jury room to

22  really grapple with the evidence and really look into

23  whether the government has proved its case beyond a

24  reasonable doubt.

25      So I'm asking you to be thoughtful, be deliberative,

1    use your logical thinking to get past that facial appeal

2    to raw instinct.

3        You know, I always -- I'm already out of time and I'm

4    going to get down in a minute, but I know in about ten

5    minutes I'm going to say, oh, jeez, I forgot to say this

6    or I forgot to say that.  You've all been very attentive

7    to this case extraordinarily in very, very difficult

8    circumstances.  So please if one of you says that idiot

9    lawyer forgot to say this or that, please say it for me

10   there because this is a serious decision that you're going

11   to make.

12       I think once you use the logical thinking to get past

13   those facial appeals to just wrap this up, I'm quite

14   confident that you're going to come to a truly reasoned

15   decision, a just decision, the right decision.  John

16   Rathbun is not guilty of transporting explosives.  He's

17   not guilty of trying to injure persons and property or

18   intimidate, and he is not guilty of making false

19   statements to Agent McGonigle.

20       I thank you for your time.

21           THE COURT:  Attorney Desroches, you can have 12

22   minutes.

23           MR. DESROCHES:  Thank you, Your Honor.

24

25

1    **REBUTTAL CLOSING ARGUMENT BY MR. DESROCHES**

2    　　　　　MR. DESROCHES:  We don't need to reach

3    Procrustes or any other mythology or fable because really

4    when you boil anything -- any fable or myth -- down, the

5    moral of the story is common sense.  It's really what

6    informs us on our daily basis.

7    　　I don't think Attorney Watkins meant to tell you not

8    to use your common sense when you're assessing the

9    evidence.  I think he's just trying to redefine common

10    sense in a way that's beneficial to his client John

11    Rathbun.

12    　　He told you that common sense is not thoughtful,

13    logical, or deliberative.  When in, fact, that is exactly

14    what common sense is.  It's what informs our every day

15    life and every decision we make.  It is, of course,

16    thoughtful, logical, and deliberative by its very nature.

17    It is our common sense.  The judge will even tell you to

18    bring it back with you.  We cannot leave that at the door

19    of the courthouse, and common sense tells us that when

20    we're making important decisions, we consider all of the

21    evidence.

22    　　Certainly look at the video as Attorney Watkins

23    suggested, but don't forget everything else we've heard.

24    There is powerful circumstantial evidence in this case

25    that supports the government's theory and supports a

1    finding of guilt.

2        Let's first turn to the drive or the defendant's

3    theory of the drive that the defendant took on April 2,

4    2020.  But first, as you heard Attorney Watkins' argument,

5    I hope you caught that there are certain assumptions

6    underlying it, and naturally just like his common sense

7    definition benefits the defendant, so do these underlying

8    assumptions.

9        First, the defendant is assuming that -- well, is

10   arguing -- the assumption underlying this argument is that

11   the defendant was driving down Converse Street as Officer

12   Dabrae was taking a left onto it.  That ignores the fact

13   that the defendant could have been behind Officer Dabrae.

14       You heard that the driveway -- could we have 104

15   please?

16       The driveway into JGS loops around in that Officer

17   Dabrae was leaving through the second exit.  We don't see

18   behind Officer Dabrae.  We don't know whether the

19   defendant could have been in that loop behind Officer

20   Dabrae.  He could have been on Converse Street but that's

21   an assumption that benefits the defendant.  Why then is he

22   arguing that?  Because it benefits him.

23       What the government's evidence shows is that this is

24   possible and, as you heard, it is the best-case scenario

25   for the defendant.  It gives him every benefit of the

1    doubt.

2         You saw as Agent Mastroianni sauntered up to that

3    tree, placed the bag down, waited 17 seconds, your memory

4    controls on that and you'll see the video, then strolled

5    back to his car, got into it, drove the speed limit, and

6    still even -- I know this cell site evidence may have been

7    complicated, but it boils down to a very simple

8    proposition.  There's a range that the defendant was in at

9    5:01 a.m.  The closest range, as you can see, at the

10   bottom and the furthest range which is the bubble on the

11   top.

12        They gave him to the very furthest point, the benefit

13   of assuming that he contacted that tower at the latest

14   possible moment.  And guess what?  It still worked.

15        This video shows the defendant could have strolled --

16   driven the speed limit, obeyed all traffic laws, and it

17   still works.  That's not beneficial for the defendant.

18   That's why they're arguing seconds.  It works.  In the

19   best-case scenario for John Rathbun it still works.  This

20   is what happened.  This is what is supported by the

21   circumstantial evidence.

22        Now, the drive shows you the best-case scenario.  It

23   doesn't show you the likeliest scenario.  As you heard,

24   the defendant admitted smoking crack cocaine in the hours

25   before.  He said when he smokes crack cocaine he's go, go,

1   go.  He's frantic.  What about that suggests that he acted

2   as cautiously and deliberately as the FBI agents did?

3          As you heard earlier, he lit a bomb.  You don't stand

4   around watching a bomb.  You run out of there.  You go.

5   Even if it were legal, you'd go.  But if it worked, this

6   is a major scene.  He's running away from a major crime

7   scene.  Is he going to obey the speed limit?  Stop at

8   lights when he's on crack and he's go, go, go?  No, he did

9   not.

10          Now you also heard evidence about the defendant not

11   knowing what JGS and Ruth's House was.  They're relying

12   again on the defendant's testimony.  We'll get to that in

13   a minute.  The defendant's mom's testimony, we'll get to

14   that in a minute too.  But the evidence, using your common

15   sense, shows this defendant knew very well where this

16   location was.

17          His grandmother lived there.  He minimized, the

18   defendant did, his knowledge of visiting there.  Oh, at

19   one point he said he visited there a couple times a year

20   and then he backed off and said maybe four or five times

21   total just to pick up a present from her.

22          But he drives by that same location every day.  You

23   heard from his own testimony he drives down Converse

24   Street every time he goes to Springfield.  He's constantly

25   on Converse Street.  It's a mile -- 1.4 miles from his

1    house.  Common sense tells you you're aware of your
2    surroundings.
3         By the way also, Attorney Watkins' argument, once
4    again, benefits the defendant, and I would suggest your
5    memory of the evidence controls.  But Ms. Goldsmith
6    testified she wasn't sure about a street sign, not JGS.
7    She was very clear about that JGS sign.  She had very good
8    knowledge of when it was changed, where it was, and what
9    it looked like.  What she wasn't aware of was a small
10   street sign, and again that makes sense because she knew
11   where she was.  She knew where these things were, just
12   like the defendant did.
13        It is illogical to say that he had no idea where this
14   place was.  And just like the defendant's argument
15   benefited him, so did his statements to the FBI.
16        Now, one thing is very clear, you've never heard the
17   government say one thing about anti-Semitism.  The
18   defendant raises this argument just to shoot it down.
19        As Attorney Berkower told you, motive is not an
20   element.  The defendant has argued this makes no sense.
21   Sure, he's right.  It makes no sense to do something as
22   dangerous as this.  In what world, under what
23   circumstances would this act make sense?  You can't make
24   sense of putting a bomb outside of a nursing home.
25        We cannot get inside John Rathbun's head.  That's why

1    motive is not an element, but there's evidence of what it

2    may be.  You heard his life.  He told you himself.  He was

3    depressed.  He was in a cycle of addiction, and he wasn't

4    proud of his behavior.

5        His mom was on his case about getting a job; his

6    daughter wasn't talking to him.  His brother was

7    successful working in Boston, and he was not proud of

8    himself smoking crack all night.  He lashed out.  We

9    cannot get inside his head to answer why, but the evidence

10   in this case clearly shows that he did it.

11       The defendant made no effort to explain the blood on

12   the wick.  When asked by his own attorney on direct about

13   the can and the wick, he only said, oh, I touched the can.

14   He never explained why his blood was on the wick.  Why?

15   Because that's an inconvenient truth for which he has no

16   excuse.

17       We heard his excuse for the blood being on the can

18   and, by the way, that was provided by Special Agent

19   McGonigle on April 15th.  But he couldn't explain why the

20   blood was on a tract that was in the cup holder which was

21   very similar to what we heard was in the cup holder of his

22   mother's car.

23       But what we did hear was that the defendant was

24   smoking crack on April 2nd all night in his room and he

25   left.  You heard that he uses his right hand to smoke

1    crack.  And using his right hand -- because he's a righty
2    I would assume -- probably explains why his blood is on
3    this wick, which I would suggest the inferences that flow
4    from the evidence we've seen occurred when he jammed the
5    wick into the gas can -- Can we have the next one? -- the
6    gas can that he bloodied when he carried it to that
7    location on JGS property.  He was using his right thumb to
8    use the lighter to smoke crack all night in the moments
9    before he did this.  I would suggest to you that that is
10   exactly what happened.

11        Now, as I said, the defendant's testimony.  Just as
12   the underlying assumptions the defendant made in his
13   closing argument, just as the excuses that the defendant
14   has come up with that benefited him, so was his testimony.
15   It was intended to benefit him.

16        You saw how he testified, and using your common sense
17   -- once again, which the defendant has urged you to not
18   use -- you know that that was very rehearsed, almost
19   robotic.

20        As you assess his credibility, what does that tell
21   you?  He did have some moments where he slipped.  Like
22   when he told Attorney Berkower that the person who put the
23   wick in the can, put the device where it was found.

24             THE COURT:  You're going to have to wrap up.
25             MR. DESROCHES:  Now when someone tells you who

1    they are, believe them.  So I'll wrap up where the

2    evidence yesterday wrapped up.

3        When the defendant told you that he lied to make

4    himself look good, recall when Attorney Berkower was

5    asking him about his friend Glenn, the text messages that

6    he was sending to him?  He said, I lied to Glenn to make

7    myself look good.  That's to his drug buddy as he

8    described him.  What does that tell you he would do when

9    the stakes were high?  When the FBI was at his door?  When

10   he's sitting in front of you testifying?  Think about

11   that.

12       Ladies and gentlemen, there's no reasonable doubt

13   that the defendant is guilty.  The evidence and your

14   common sense makes that an easy question.  Thank you.

15            THE COURT:  All right.  Was there any sidebar

16   issues on either side?  No?  All right.  We can talk about

17   them.

18       So I need to set up to be able to do the jury

19   instructions because I want the jury instructions to be

20   able to be displayed on the screen as I'm reading it so

21   you can follow along.

22       So we'll take -- it's probably going to take 10 or 15

23   minutes just to make sure that is all working.  Then when

24   you come in, I'm going to read through the jury

25   instructions and you're going to follow it on the screen

1    and then the case will be yours.

2         Lunch is ordered and so if we start jury instructions

3    at 12:30, a little after 12:30, I think for sure the case

4    will be yours by 1:30.  All right?

5         Okay.  You've heard closing arguments now so I guess

6    I need to just step up the instructions.  Really there is

7    no talking about the case.  The case is not finished yet.

8    I have to give you the instructions.

9         Do not talk about the case with each other and follow

10   all of the other instructions that I've been giving you

11   about the case.  All right?  No research; no jumping on

12   the internet; no reading any posts about the case.  All of

13   the instructions apply.  Okay.  So I'll see you when we

14   get this set up.  I'm thinking about 15 minutes.  Okay?

15              THE CLERK:  All rise.

16   **(The jury left at 12:17.)**

17              THE COURT:  Okay.  Attorney Watkins, you placed

18   one objection on the record.  You had placed one objection

19   to the closing on the record.  I just didn't know if you

20   wanted to make any further record, and also to the

21   government if you wanted to make any record just regarding

22   objections to the closing?

23              MR. WATKINS:  Your Honor, my objection was when

24   Ms. Berkower went into the religion being all over the

25   house, strewn all over the house.  There was no evidence

1    on that and it was also getting dangerously close to the
2    court's line on that particular issue.  I will note that
3    it did not go beyond there, but that was the basis of my
4    objection.
5              THE COURT:  Okay.  Obviously the objection was
6    -- well, the objection was overruled.  I don't think she
7    crossed the line.
8              MS. BERKOWER:  May I make just a very brief
9    record on it?  Your Honor, there was testimony by Special
10   Agent McGonigle that there was a pamphlet found in the
11   living room and other similar material around the house.
12   There was no detail about it, but he did say around the
13   house and so that was the good-faith basis for that
14   assertion.  Thank you.
15             THE COURT:  And I certainly remember at least a
16   picture of one on like an end table in the room where I
17   think the father spent some time on the end table, and
18   there was talk about them -- the parents making their own
19   or producing their own.  I didn't think it crossed the
20   line and that's why it was overruled.
21        Anything else?  Does either side want to make an
22   other objections to closings?
23             MR. DESROCHES:  Yes, Your Honor.  The government
24   would object to Attorney Watkins' statement that the
25   government must prove every aspect of its theory when I

1  think it's not the case.  The government must prove the

2  elements of the offense but not the theory of the case.

3          THE COURT:  I'm not sure I recall exactly when

4  that was worked in.

5          MR. DESROCHES:  Your Honor, it was during the --

6  I think at the conclusion of the first chapter of the

7  defendant's closing regarding the drive test, and

8  indicated that it was 47 or 40 some-odd seconds and that

9  that wasn't possible and that the government must prove

10  that theory.

11          THE COURT:  I think that was -- that sounded

12  like the type of thing that argument in closings are all

13  about and persuasive language is all about.  It's going to

14  be clear from the instructions what the elements are so

15  that objection is noted.

16      All right.  So we'll try to get things set up and

17  we'll be back for the instructions.  All right.

18          MS. BERKOWER:  What time, Your Honor?

19          THE COURT:  Earliest 12:35.

20          MS. BERKOWER:  Thank you.

21  **(A recess was taken at 12:21 12:36.)**

22  **(Mr. Rathbun is present.)**

23          MR. WATKINS:  Judge, before you bring the jurors

24  in, at this point the court is going to take one of the

25  alternates to fill in Seat 11?

1           THE COURT:  Well, yeah, after the instructions.

2    Right.

3           MR. WATKINS:  So the difficulty here with this

4    juror in Seat 13 is the one that we talked about

5    occasionally being sleepy or perhaps not paying attention.

6    We did not address that during trial, but I think it is

7    something that we all noticed from time to time.

8        Perhaps the court needs to inquire of him whether he

9    was able to pay attention to all the evidence before

10   actually seating him as an actual juror.

11          THE COURT:  All right.  Hold the jury.

12       I'll inquire of the juror.  It just means you're

13   going to have to put them back and ask that one juror in.

14          THE CLERK:  That is juror in seat?

15          THE COURT:  We confirmed it is Seat 13, Juror

16   39.  So we will make inquiry.

17       Any suggestions, any questions you want asked?

18          MR. DESROCHES:  No, Your Honor.  I would just

19   for the record state that he's been seated right in front

20   of us and after it was initially noticed, I didn't observe

21   anything.  In fact, I observed him listening and observing

22   the evidence.

23          MR. WATKINS:  I think as the court observed,

24   it's difficult to see whether that's the just the way he

25   thinks and processes things versus sleeping, but it can be

1    a very fine line.  I have not heard any snores.

2              THE COURT:  No, I agree.  I've been watching.

3    After I initially saw at the beginning of the trial, I've

4    been watching him throughout and so I will put my comments

5    on the record after we ask him.

6    **(Juror No. 39 entered at 12:41.)**

7              THE COURT:  You can just stand right there.

8         Sir, we wanted to ask you, we're about to enter the

9    instruction phase and during the trial I had noticed

10   sometimes that you close your eyes.

11        You were closing your eyes and then you would open

12   your eyes and you would focus and then you would close

13   your eyes so I need to inquire as to whether or not that's

14   just the way you listen and kind of hear things happen.

15   Or if in fact there has been times when people have just

16   dosed off and fallen asleep so I'm asking you.

17             JUROR NO. 39:  No, I wasn't.

18             THE COURT:  Excuse me?

19             JUROR NO. 39:  I was not dozing off.

20             THE COURT:  So there was no time you lost focus

21   or concentration?

22             JUROR NO. 39:  No.

23             THE COURT:  All right.  Thank you very much.

24   **(Juror No. 39 left the courtroom.)**

25             THE COURT:  All right.  So I questioned the

juror.  I tried to ask the juror in terms of I observed
instead of saying any of the parties observed.  I mean,
you heard his answer.

So I focused on the juror after originally seeing the
way that he -- just his mannerisms originally I did think
-- I think a couple of us did, maybe all of us, his
original mannerisms were he would put his head to the side
or down and close his eyes and then a few seconds would go
by, and I don't really think it ever longer than a minute
or so, and then he would open his eyes.

Certainly when he had his eyes open, he was engaged
and looking at witnesses and looking at things that were
going on in the courtroom.

I never saw his body slouch down in the chair.  I
never saw his head kind of fall to the side as if someone
actually fell asleep.  I never saw that, never, and I kept
looking.

The more I watched him, the more I just sensed that
this was his way; that this was his way.  I never saw any
mannerism or gestures or body movements when he would open
his eyes or close his eyes that were consistent with being
asleep.

So it's a good point to raise.  We asked him.  He
said, no, he never dozed off; never loss his
concentration.  I didn't make any observations of him

1    consistent with actually falling asleep, but I did notice

2    a little bit of his affect.  I don't know how else to

3    describe it.  He was closing his eyes.

4        The government put their observations on the record.

5    He was seated very close to the government's table and so

6    they were able to view him, and I think the government's

7    observations are consistent with the court's.

8        So would the defense like anything else after

9    questioning the juror?

10              MR. WATKINS:  No, Your Honor.

11              THE COURT:  All right.  Very good.  We are all

12   set then.

13   **(The jury entered at 12:45.)**

14              THE COURT:  Ladies and gentlemen, was everyone

15   able to follow my instructions, the same instructions that

16   I always give about not talking about the case?

17   Researching the case?  Reading anything about the case?

18   Posting about the case?  Was everyone able to follow my

19   instructions during that break?

20       All right.  Affirmative responses.  The jury remains

21   fair and impartial.

22        So everyone check your screens or the screens that

23   are available to you.  From that distance, are the front

24   jurors able to follow along you think?  We can also move

25   this screen as well.

1        All right.  Ladies and gentlemen, you have heard the

2    evidence and the closing arguments in this case.  It is

3    now my duty to instruct you on the law that you must

4    follow and apply.

5        The instructions are somewhat complicated, and I ask

6    you to pay very careful attention.  You will also have a

7    copy of the instructions in the jury room with you.

8        The instructions cover several subject areas:  Duties

9    of the jury, the presumption of innocence of Mr. Rathbun,

10   the government's burden of proof, evidence, specific

11   instructions about the charges against Mr. Rathbun, the

12   verdict form, and communication with the court.

13       Throughout the instructions, I will refer to Mr.

14   Rathbun by his name or as "the defendant."

15       Part one, duties:  You have been chosen and sworn as

16   jurors to decide the issues of the facts presented in this

17   case by the allegations the government has made against

18   Mr. Rathbun.

19       It is your duty to find the facts from the evidence

20   admitted in this case.  You are the sole and exclusive

21   judges of the facts.  You shall determine the weight,

22   value, and effect of the evidence that has been presented

23   to you in the course of the trial.

24       You must determine the facts without fear or favor,

25   based solely on a fair consideration of the evidence and

without bias or prejudice to any party.  Our system of law does not permit jurors to be governed by sympathy, prejudice, public opinion, or consideration of or speculation about any potential punishment.

All of the parties and the public expect that you will carefully and impartially consider all the evidence in this case, follow the law as stated by the court, and reach a just verdict, regardless of the consequences.  All parties stand equal before the law and are to be dealt with as equals in a court of justice.

It is your duty to apply the law exactly as I give it to you, whether you agree with it or not.  Even if you disagree with one or more of the rules of law, or don't understand the reasons for them, you are bound to follow them.  This is a fundamental part of our system of government by law, rather than by the individual views of the judge or jurors who have the responsibility of deciding a case.

In following my instructions, you must follow all of them and not single out some and ignore others.  They are all equally important.  Consider these instructions as a whole and apply them sensibly and faithfully in your deliberations.

Nothing I say in these instructions is to be taken as an indication that I have any opinion about the facts of

1   the case or what that opinion might be.  It is not my

2   function to determine the facts.  It is yours.  All of my

3   instructions are about the law that you must apply.  I do

4   not intend for any of my instructions to be understood by

5   you as a comment by me on the facts or on the evidence in

6   this case.

7        Opening statements or closing arguments may have

8   comments on some of these rules of law, but if what was

9   said about the law differs in any way from my

10  instructions, you must be guided only by the instructions

11  on the law as I state them.

12       Defendant's presumption of innocence and the

13  government's burden of proof.  It is a cardinal principle

14  of our system of justice that every person accused of a

15  crime is presumed to be innocent unless and until his or

16  her guilt is established beyond a reasonable doubt.

17       The presumption is not a mere formality.  It is a

18  matter of the most important substance.  The presumption

19  of innocence alone may be sufficient to raise a reasonable

20  doubt and to require the acquittal of a defendant.

21       The defendant has the benefit of that presumption

22  throughout the trial, and you are not to convict him

23  unless you are persuaded of his guilt of that charge

24  beyond a reasonable doubt.

25       The presumption of innocence until proven guilty

1    means that the burden of proof is always on the government

2    to satisfy you that the defendant is guilty of the crimes

3    with which he is charged beyond a reasonable doubt.  This

4    is a strict and heavy burden, but it does not mean that

5    his guilt must be proved beyond all possible doubt, as

6    there are few things in this world that we know with

7    absolute certainty.  It does require that the evidence

8    exclude any reasonable doubt concerning his guilt.

9        A reasonable doubt may arise not only from the

10   evidence produced but also from a lack of evidence.

11   Reasonable doubt exists when, after weighing and

12   considering all the evidence, using reason and common

13   sense, jurors cannot say that they have a firmly settled

14   conviction of the truth of the charge.

15       Of course, a defendant is never to be convicted on

16   suspicion or conjecture.  If, for example, you view the

17   evidence in the case as reasonably permitting either of

18   two conclusions -- one that the defendant is guilty as

19   charged, the other that the defendant is not guilty -- you

20   will find the defendant not guilty of that charge.

21       It is not sufficient for the government to establish

22   a probability, though a strong one, that a fact charged is

23   more likely to be true than not.  That is not enough to

24   meet the burden of proof beyond a reasonable doubt.

25       Now your verdict must be based solely upon the

1   evidence and according to the law.  In reaching your

2   decision as to whether the government has sustained its

3   burden of proof, it would be improper for you to consider

4   anything that is not evidence.

5       Your verdict should be based solely upon the evidence

6   or lack of evidence as to this defendant, without regard

7   to whether the guilt of any other person or persons has or

8   has not been proven.

9       You may not base your verdict on any personal

10  feelings, any type of prejudice, or sympathy you may have

11  about the government or the defendant, or about the nature

12  of the crimes charged.  The government and the defendant

13  stand equal before the law.

14      Now you have heard evidence that Mr. Rathbun has been

15  held in jail and is currently incarcerated.  The fact that

16  the defendant is in jail is irrelevant to this case and

17  must not enter into or affect your verdict.

18      Just like any other individual, Mr. Rathbun stands

19  equal before the law, and he is to be treated as an equal

20  in this court just like any other person of equal standing

21  in the community.  You may not use this information to

22  infer that because he has been held in jail, he carried

23  out the acts charged in this case or is guilty of the

24  offenses he is accused of.  The defendant is presumed

25  innocent of these charges unless and until the government

proves beyond a reasonable doubt the charges he is now on trial for.

In these instructions, I will refer to evidence you may consider as being relevant.  Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence, and the fact which the evidence relates to is of consequence in making a determination on any charge.

Although the government is required to prove a defendant guilty beyond a reasonable doubt, the government is not required to present all possible evidence related to the case or to produce all possible witnesses who might have some knowledge about the facts of the case.

In addition, as I have explained, the defendant is not required to present any evidence or produce any witnesses.

Moving on to what is and what is not evidence.

The evidence in this case consists of the sworn testimony of witnesses, regardless of who called the witness and regardless of who asked the questions; the exhibits that have been received into evidence and any facts to which the lawyers have agreed or stipulated.

Certain things are not evidence.  Arguments and statements by attorneys are not evidence.  They are not witnesses.  What they say in their opening statements and

closing arguments is intended to help you interpret the evidence, but it is not evidence.

If the facts as you remember them from the evidence differ from the way they have stated them, or the way that I have referenced them, it is your correctly memory of the facts that should control.

Questions asked of witnesses, standing alone, are not evidence.  The question and the witness's answers, taken together, are the evidence.

Objections are not evidence.  Parties have a right to object when they believe a question is improper under the rules of evidence.  You should not be influenced by any objection or by my ruling on it.  If an answer or exhibit is excluded, you should not speculate or guess about what the answer might have been or what an exhibit might have shown.

Anything that I have excluded from evidence or ordered stricken from the record and instructed you to disregard is not evidence.

Any evidence received for a limited purpose is not evidence for any other purpose.  During the trial, I indicated for you what evidence was received for a limited purpose and exactly what the limited purpose was.

Anything you may have seen or heard when the court was not in session is not evidence.  You are to decide the

1    case solely on the evidence received at trial.

2         During the course of the trial I may have made

3    comments or spoken to a witness concerning their manner of

4    testifying.  Do not assume from anything that I may have

5    said that I have an opinion concerning any of the issues

6    in this case.  Except for my instructions about

7    disregarding evidence that I ordered stricken from the

8    record, you should not consider anything I may have said

9    during the trial in arriving at your own findings as to

10   the facts.

11        The defendant has been charged by way of an

12   indictment.  You are not to draw any adverse inferences

13   against the defendant from the fact that he was indicted.

14   The indictment is simply an assertion of the charges

15   against the defendant.  It is not evidence of anything.

16        The defendant has pled not guilty and therefore he

17   denies that he is guilty of the crime charged in the

18   indictment.  He is presumed innocent and may not be found

19   guilty by you unless all of you, the trial jurors,

20   unanimously find that the government has proven his guilt

21   beyond a reasonable doubt.

22        The defendant is not charged with committing any

23   crime other than the three charges contained in the

24   indictment.  You may have heard evidence of other acts

25   allegedly committed by the defendant.  The defendant is

1    not on trial for any of those acts.  You may not consider

2    evidence of those other acts as a substitute for proof

3    that the defendant committed the crimes charged.

4         You may not consider evidence of those acts as proof

5    that the defendant has a bad character or any propensity

6    to commit crimes.  Specifically, you may not use the

7    evidence to conclude that because the defendant may have

8    committed other acts, he must have also committed the acts

9    charged in the indictment.

10        Evidence of other committed acts may be considered by

11   you only for the purpose of deciding, if you find

12   appropriate, any of the following:  If the defendant had

13   the state of mind or intent necessary to commit the crimes

14   charged, or if the defendant had a motive or the

15   opportunity to commit the acts charged, or if the

16   defendant acted according to a plan or in preparation for

17   the commission of a crime, or if the defendant committed

18   the acts he is on trial for by accident or mistake.

19        There are two kinds of evidence - direct and

20   circumstantial.  Direct evidence is when a witness

21   testifies about something they know by virtue of their own

22   senses, something they have seen, felt, touched, or heard.

23   A document can also constitute direct evidence.

24        An example of direct evidence could be a simple

25   assertion by someone that it's raining outside.  If you

thought the person who said to you -- who said that to you
was truthful and had a sufficient basis for knowing what
the weather was like outside, you could accept the
statement as direct evidence that it is raining outside.
Alternatively, if you doubted the reliability of the
statement, you could reject it.

Circumstantial evidence is indirect evidence that
tends to prove a disputed fact by the existence of other
facts based on reason and common sense.

To illustrate an example of circumstantial evidence,
let's return to the prior example regarding the weather.
Suppose you are in a courtroom and you cannot look
outside.  Now suppose that instead of having someone
report to you about the weather conditions, someone comes
in from outside wearing a wet raincoat and shaking water
off an umbrella.  Without any words being spoken -- that
is, without any direct statement or assertion being made
-- an observer might conclude that it was raining outside.

The observer thinking about the wet raincoat and a
dripping umbrella might draw a conclusion or an inference
about an unobserved fact, that it was raining.

When assessing circumstantial evidence, the inference
from the evidence need only be reasonable.  It need not be
the only one possible.  Inferences may not, however, be
based on speculation or conjecture.

1    You are committed -- you are entitled to consider

2    both direct and circumstantial evidence.  The law permits

3    you to give equal weight to both or to give greater weight

4    to one or the other.  It remains for you to decide how

5    much weight to give any particular piece of evidence.

6    There are different categories of evidence that you

7    have before you.  This evidence includes exhibits and

8    witness testimony.  I'll instruct you on each form.

9    You have a number of exhibits.  Many of these

10   exhibits have been shown to you in the course of the

11   presentation of the evidence.  You may consider the

12   evidence in your deliberations and give them whatever

13   value or significance you think appropriate.  You will

14   have the exhibits that have been introduced in evidence

15   during the course of the trial with you in the jury room.

16   Some exhibits are in the form of charts and

17   summaries.  Any charts or summaries that were admitted as

18   evidence should be considered in the same way you would

19   consider any other evidence.  You may give them whatever

20   value or significance you think appropriate.  If a summary

21   or chart includes information that is based on witness

22   testimony or other evidence or exhibits, you may consider

23   whether the chart or summary correctly presents that

24   information.

25   Other charts and summaries were shown to you that

were not admitted as evidence.  These charts and summaries were shown to you in an attempt to aid you in considering the evidence that was admitted.  These documents will not be with you in the jury room and are not themselves independent evidence.

It is for you to decide whether they correctly presented information contained in the testimony and admitted exhibits on which they are based.  You may only consider them to the extent they help you analyze or understand admitted evidence.

In addition to exhibits, you have the testimony of witnesses.  You do not have to accept the testimony of any witness if you find the witness was not credible.  You must decide which witnesses to believe and which facts, as testified to by the witnesses, are true.  To do this, you must look at witness testimony in the context of all the evidence, drawing upon your common sense and personal experience.

You may believe everything a witness says, only part of it, or none of it.  It is entirely up to you.  You may also decide how important a witness's testimony is relative to other evidence.

In judging the credibility of any witness, you may want to take into consideration such factors as the witness's conduct and demeanor while testifying; their

apparent fairness, or any biases or prejudices they may
have shown; their relation to either party; any interests
they may have in the outcome of the case; their
opportunities for seeing and knowing the things about
which they have testified; the reasonableness or
unreasonableness of the events they have described; and
any other facts or circumstances disclosed by the evidence
that tend to corroborate or contradict their version of
the events.

The following are kinds of questions you may want to
consider in evaluating a witness's testimony and
credibility.  Did the person seem honest?  Did they have
some reason not to tell the truth?  Did the witness have
an interest in the outcome of the case?  Did they gain any
personal advantage by testifying in this case?  Did the
witness seem to have a reliable memory?  Did the witness's
testimony differ from their earlier testimony or from the
testimony of other witnesses?  Was the witness's testimony
different on direct and cross-examination?

What was the witness's manner while testifying?  What
was the -- all right.  That appeared twice.  So what was
the witness's manner while testifying?  If a witness made
an identification, did the witness have sufficient
personal knowledge and history of contact to make a
reliable information?  These are some, but not all, of the

1    kinds of things that will help you decide how much weight

2    to give to what each witness said.

3         The mere number of witnesses or exhibits or the

4    length of the testimony has no bearing on what weight you

5    give to evidence or on whether you find that the burden of

6    proof has been meet.

7         Weight does not mean the amount of evidence.  Weight

8    means your judgment about the credibility and importance

9    of the evidence.  Whether the government has sustained its

10   burden of proof depends on the nature and quality, not

11   quantity, of the evidence presented.

12        You have heard testimony about lawyers speaking to

13   witnesses about the case before the witness testified at

14   trial.  The law permits an attorney to prepare witnesses

15   for trial, including reviewing with the witness the

16   questions that will or may be asked at trial.

17        You have also heard testimony that a witness read or

18   reviewed certain materials pertaining to the case before

19   the witness testified at trial.  The law permits a witness

20   to do so.  Permitting witnesses to review materials

21   pertaining to the case before the witness testifies is a

22   normal part of preparing for trial.  It is not improper as

23   long as it is not suggested that the witness depart from

24   the truth.

25        You have heard the testimony of law enforcement

officers.  The fact that a witness is employed as a law
enforcement officer does not mean that their testimony
necessarily deserves more or less consideration or greater
or lesser weight than that of any other witness.

You must decide, after reviewing all the evidence,
whether you believe the testimony of the law enforcement
witness and how much weight, if any, it deserves.

Although you may not -- although you may consider
only the evidence presented in this case, in considering
that evidence you are not limited to the explicit
statements made by the witnesses or contained in the
documents.

In other words, you are not limited solely to what
you see and hear as the witnesses testify.  From the facts
that you find to have been proven, you are permitted to
draw such reasonable inferences as you believe are
justified in the light of common sense and personal
experience.  But you may not base your verdict on any
personal feelings, any type of prejudice, or sympathy you
may have about the government, the defendant, or the
nature of the crimes charged.  Again, the government and
the defendant stand equal before the law.

Now inconsistencies or discrepancies in the testimony
of a witness or between the testimony of different
witnesses may or may not cause you to disbelieve or

1    discredit such testimony.

2        Two or more persons witnessing an incident or a

3    transaction may simply see or hear it differently.

4    Innocent misrecollection, like failure of recollection, is

5    not an uncommon experience.

6        In weighing the effect of a discrepancy, however,

7    always consider whether it pertains to a matter of

8    importance or an insignificant detail, and consider

9    whether the discrepancy results from innocent error or

10   intentional falsehood.

11       The testimony of a witness may be discredited or

12   impeached by showing that they previously made statements

13   that are inconsistent with his or her testimony in this

14   trial.

15       If a witness is shown to have given inconsistent

16   statements concerning any material matter, you have a

17   right to distrust that witness's testimony in other

18   respects.  You may reject all of the testimony of that

19   witness or give it such credibility as you may think it

20   deserves.

21       As I just noted, sometimes, of course, people make

22   innocent mistakes, particularly as to unimportant details.

23   Not every contradiction or inconsistency is necessarily

24   important.  Again, you alone are the judges of the

25   witness's credibility.

1       You have heard evidence that the defendant made
2   certain statements.  It is for you to decide, number one,
3   whether the defendant made a statement, and, number two,
4   if so, how much weight to give it.
5       In making those decisions, you may consider all of
6   the evidence about the statement, including the
7   circumstances under which the statement may have been made
8   and the procedures that were or could have been used to
9   memorialize, record, or report the statement.
10      You may also consider any facts or circumstances
11  tending to corroborate or contradict the version of events
12  described in the statement.
13      You have heard evidence that the defendant made
14  certain statements outside the courtroom to law
15  enforcement authorities in which the defendant claimed
16  that his conduct was consistent with innocence and not
17  with guilt.  The government claims that these statements
18  are false.
19      If you find that the defendant gave a false statement
20  in order to divert suspicion from himself, you may, but
21  are not required, to infer that the defendant believed he
22  was guilty.
23      It is reasonable to infer that an innocent person
24  does not usually find it necessary to invent or fabricate
25  an explanation or statement tending to establish his

1  innocence.

2       You may not, however, find on the basis of

3  consciousness of guilt alone that the defendant is in fact

4  guilty of the crime for which he is charged under Count 1

5  or Count 2.

6       In your evaluation, you may consider that there may

7  be reasons for the defendant's statements that are fully

8  consistent with innocence.  Fear of law enforcement,

9  reluctance to become involved, simple mistake, confusion,

10 or nervousness may cause an innocent person to give such

11 statements.

12      Moreover, feelings of guilt, which are present in

13 many innocent people, do not necessarily reflect actual

14 guilt.

15      Whether the evidence as to the defendant's statements

16 shows a consciousness of guilt and the significance, if

17 any, to be attached to any such evidence, are matters for

18 you to decide as the jury.

19      During this trial, exhibits were admitted into

20 evidence that consisted of conversations that were

21 recorded.  This is proper evidence for you to consider.

22      In order to help you, I allowed you to have a

23 transcript to read along as the tape was played.  However,

24 the transcript was merely to help you understand what was

25 said on the tape.  If you believe at any point that the

transcript said something different from what you heard on

the tape, remember it is the tape that is the evidence,

not the transcript.

Any time there was a variation between the tape and

the transcript, you must be guided solely by what you

heard on the tape and not by what you saw in the

transcript.

The government has offered evidence in the form of

tape recordings of conversations with the defendant.

These recordings were made with the knowledge and consent

of the defendant and the other party to the conversations.

The use of this procedure to gather evidence is perfectly

lawful, and the government is entitled to use the tape

recordings in this case.

Now if you determine, under all known circumstances,

the government would be reasonably expected to conduct

certain investigative tests or procedures and that they

failed to do so, this is a factor you may consider in

evaluating the evidence.

With respect to this factor, you may consider three

questions:  Number one, whether any such tests or

procedures were standard steps that would otherwise

normally be taken under the circumstances.

Number two, whether any such tests or procedures

could reasonably have been expected to lead to evidence of

the defendant's guilt or innocence; and Number three, whether the evidence provides a reasonable and adequate explanation for not conducting such tests or procedures.

If you find that any lack of this type of investigation was not adequately explained, you may consider whether the omissions tend to affect the quality, reliability, or credibility of the evidence presented by the government.

All of these considerations involve factual determinations that are entirely up to you, and you are free to give this matter whatever weight, if any, you deem appropriate based on all the circumstances.  There is, however, no legal requirement that the government use any specific investigative techniques to prove its case.

One of the issues in this case is whether the defendant was present at the time and place of the alleged crimes in Counts 1 and 2.  If, after considering all the evidence, you have a reasonable doubt that the defendant was present and you do not find that he aided and abetted someone else who carried out the crime, then you must find the defendant not guilty on Counts 1 and 2.

Now the indictment charges that the offenses were committed on or about, and that's in quotations, specific dates.  The government does not have to prove that the crimes were committed on the exact dates, so long as the

1    government proves beyond a reasonable doubt that the

2    defendant committed the crimes on dates reasonably near

3    the dates stated in the indictment.

4         The evidence in this case includes facts to which the

5    lawyers have agreed or stipulated.  A stipulation means

6    simply that the government and the defendant accept the

7    truth of a particular proposition or fact.

8         Since there is no disagreement, there is no need for

9    evidence apart from the stipulation.  You must accept the

10   stipulation as fact, to be given whatever weight you

11   choose.

12        Now the question of possible punishment of the

13   defendant is of no concern to the jury and should not in

14   any sense enter into or influence your deliberations.  The

15   duty of imposing sentence rests exclusively with the

16   court.  Your function is to weigh the evidence in the case

17   and determine whether or not the defendant is guilty

18   beyond a reasonable doubt, solely upon the basis of such

19   evidence.

20        Under your oath as jurors, you cannot allow a

21   consideration of the punishment which may be imposed upon

22   the defendant, if he were to be convicted, to influence

23   your verdict in any way, or in any sense enter into your

24   deliberations.

25        As I have indicated at the beginning of the trial,

1    you were permitted to take notes, but some cautions apply

2    as you are soon going to begin your deliberations.  You

3    should bear in mind that not everything that is written

4    down is necessarily what was said.  Thus, when you return

5    to the jury room to discuss the case, do not assume simply

6    because something appears in someone's notes that it

7    necessarily took place in court.

8         You should use your notes only to assist you to

9    recall what you have seen, heard, or observed during the

10   trial of this case.  And, whether or not you took notes,

11   you must rely on your memory in the jury room.

12        At the end of each day that you may be here

13   deliberating, your notes will be collected.  No one will

14   be allowed to view them.

15        In addition, to ensure the confidentiality of your

16   deliberations, after you have reached and returned your

17   verdicts in open court, we will collect and destroy any

18   notes that any of you may have taken.  Your notes will not

19   examined by anyone, anyone at all.  They will simply be

20   destroyed.

21        You will not be given a transcript of the trial.  The

22   court reporters have a difficult job and it's a

23   time-consuming job to take what is referred to as a raw

24   record which they create and then turn into a final

25   transcript.  It is not possible to create a final

transcript in time for your deliberations.  Since you will
not have a transcript, you should rely instead on your
collective memory of the evidence.

Those are all referred to as more generalized
instructions regarding evidence and how you should
consider them.  The next part of the instructions will be
relative to the elements, the specific elements involved
in the charges in this case.

Count 1, under 18 United States Code Section
844(d)(2), Count 1 charges the defendant with violating
this section which provides that whoever transports or
receives, or attempts to transport or receive, in
interstate commerce any explosive with the knowledge or
intent that it will be used, used, to kill, injure, or
intimidate any individual or unlawfully to damage or
destroy any building, vehicle, or other real or personal
property shall be guilty of an offense.

To prove Count 1, the government must have proved the
following elements beyond a reasonable doubt that:  One,
the defendant transported or received, or attempted to
transport or receive, in interstate commerce; number two,
an explosive, and number three, the defendant had the
knowledge or intent that the explosive would be used to
kill, injure, or intimidate any individual, or that it
would be used unlawfully to damage or destroy any

1    building, vehicle, or other real or personal property.

2    I will now instruct you further on some parts of

3    these elements.  As to attempt, in element number one, to

4    prove the element of attempt to transport or receive an

5    explosive as charged in Count 1, the government must prove

6    the following two things beyond a reasonable doubt:  The

7    defendant intended to commit the crime of transporting or

8    receiving in interstate commerce an explosive with the

9    knowledge or intent that it will be used to kill, injure

10   or intimidate any individual, or that it will be used to

11   unlawfully damage or destroy any building, vehicle, or

12   other real or personal property; and the defendant engaged

13   in a purposeful act that, under the circumstances as he

14   believed them to be, amounted to a substantial step toward

15   the commission of that crime and strongly corroborated his

16   criminal intent.

17   A substantial step is an act in furtherance of the

18   criminal scheme.  A substantial step must be something

19   more than mere preparation, but less than the last act

20   necessary before the substantive crime is completed.

21   The substantial step may itself prove the intent to

22   commit the crime, but only if it unequivocally

23   demonstrates such an intent.

24   As to interstate commerce in element one, to prove

25   that the explosives the defendant is charged with

transporting or receiving, or attempting to transport or
receive, was in interstate commerce, the government must
prove that at some point prior to the defendant's
possession, the explosive, or any other its components,
had traveled in interstate commerce.

It is sufficient for the government to satisfy this
element by proving that at any time prior to the date
charged in the indictment, the explosive, or any of its
components, crossed a state line.

It is not necessary that the government prove that
the defendant himself carried it across a state line, nor
must the government prove who carried it across or how it
was transported.

It is also not necessary for the government to prove
that the defendant knew that the explosive had previously
traveled in interstate commerce.

In this regard, there has been evidence that the
components of the explosive in question were manufactured
outside of the state of Massachusetts.  You are permitted
to infer from this fact that these components traveled in
interstate commerce.  However, you are not required to do
so.

As to the term explosive in element number two, for
these purposes an explosive is, number one, any device
that contains ingredients in such proportions, quantities,

or packing that ignition by fire may cause an explosion.
Or, number two, an incendiary device.

For these purposes, an incendiary device includes any incendiary bomb or grenade, firebomb, or similar device. This includes, but is not limited to, any device which consists of or includes a breakable container including a flammable liquid or compound, and a wick composed of any material, which when ignited is capable of igniting such flammable liquid or compound, and which can be carried or thrown by one individual acting alone.

The term explosion is used in its customary and ordinary sense; that is, an explosion is a rapid expansion of gases caused by a rapid combustion of a material which may cause a loud noise.

As to knowledge or intent from element number three, for these purposes, knowledge or intent means that the defendant knew and intended that the explosives, or its components, would be used to injure, kill, or intimidate individuals, or to damage or destroy a building, vehicle, or other real or personal property.

Count 2:  Count 2 charges the defendant with violating 18 United States Code, Section 844(i), which provides that whoever attempts to damage or destroy by means of fire or an explosive any building, vehicle, or other real or personal property used in interstate

1    commerce or in any activity affecting interstate or
2    foreign commerce shall be guilty of an offense.
3         To prove Count 2, the government must have proved the
4    following elements beyond a reasonable doubt:  Number one,
5    the defendant maliciously attempted to damage or destroy a
6    building, vehicle, or other real or personal property.
7         Number two, the defendant attempted to do so by means
8    of fire or an explosive; and, number three, the building,
9    vehicle, or other real or personal property was used in
10   interstate commerce, or was used in an activity that
11   affects interstate commerce.
12        I'll now instruct you further on some parts of these
13   elements.  From element number one, the term maliciously
14   means that the defendant acted either intentionally or
15   with willful disregard of the likelihood that the damage
16   will result and not mistakenly or carelessly?
17        The definition of attempt from element number -- from
18   element one for Count 2 is like that for Count 1.  As I
19   have explained to you, to prove the element of attempt to
20   damage or destroy as charged in Count 2, the government
21   must prove the following two things beyond a reasonable
22   doubt.  The defendant intended to commit the crime of
23   damaging or destroying by means of fire or an explosive
24   any building, vehicle, or real or personal property.  And,
25   number two, the defendant engaged in a purposeful act

1    that, under the circumstances as he believed them to be,

2    amounted to a substantial step toward the commission of

3    that crime and strongly corroborated his criminal intent.

4        A substantial step again is an act in furtherance of

5    the criminal scheme.  A substantial step must be something

6    more than mere preparation, but less than the last act

7    necessary before the substantive crime is completed.  The

8    substantial step may itself prove the intent to commit the

9    crime, but only if it unequivocally demonstrates such an

10   intent.

11       The term explosive from element number two for

12   purposes of Count 2, the term explosive has the same

13   definition it had for Count 1.  That is, any device that

14   contains ingredients in such proportions, quantities, or

15   packing that ignition by fire may cause an explosion, or

16   an incendiary device.

17       For these purposes, an incendiary device includes any

18   incendiary bomb or grenade, fire bomb, or similar device.

19   This includes, but is not limited to, any device which

20   consists of or includes a breakable container including a

21   flammable liquid or compound, and a wick composed of any

22   material, which when ignited is capable of igniting such

23   flammable liquid or compound, and which can be carried or

24   thrown by one individual acting alone.

25       To find that the property in question was attempted

1    to be destroyed or damaged by an explosive, you need not

2    find the explosion actually occurred.  You need only find

3    that the substance as used was such that when ignited it

4    may cause an explosion.

5         The term explosion is used in its customary and

6    ordinary sense.  That is, an explosion is a rapid

7    expansion of gases caused by a rapid combustion of a

8    material which may cause a loud noise.

9         Now interstate commerce from element three, to prove

10   that the property the defendant is charged with damaging

11   or destroying, or attempting to damage or destroy, was

12   used in interstate commerce or used in an activity that

13   affects interstate commerce, the government can have

14   proved beyond a reasonable doubt that the property is a

15   business-related property that is actively used for some

16   commercial purposes.

17        Alternatively, to prove the interstate commerce

18   element, the government can have proved beyond a

19   reasonable doubt that a property used for residential

20   purposes is a rental property.  The defendant need not

21   have been aware that the property was used in an activity

22   affecting interstate commerce to be found guilty.

23        Now as to the aiding and abetting in Counts 1 and 2,

24   the defendant is also charged with aiding and abetting

25   those crimes.  This is an alternate theory of liability.

1          To aid and abet a crime means to intentionally help

2     someone else commit the crime charged.  To establish

3     aiding and abetting, the government must prove beyond a

4     reasonable doubt that, number one, the charged crime was

5     actually committed by someone referred to as the

6     principal.

7          Number two, the defendant took an affirmative act to

8     help or cause the charged crime; and, number three, the

9     defendant intended to help or cause the commission of that

10    crime.

11         I will now instruct you further on some of those

12    elements.  As to affirmative act from element two, the

13    second element, which is the affirmative act element, can

14    be satisfied without proof that the defendant participated

15    in each and every element of the charged crime.  It is

16    enough if he assisted in the commission of that crime or

17    caused it to be committed.

18         As to intent, the third element, which is the intent

19    element, is satisfied if the defendant had advance

20    knowledge of the facts that make the principal's conduct

21    criminal.

22         The intent element can be satisfied if the government

23    has proved that defendant knew the conduct he was

24    assisting in was unlawful.  Advance knowledge means

25    knowledge at a time the defendant can opt to walk away.

1    A general suspicion that an unlawful act may occur or

2    that something criminal is happening is not enough.  Mere

3    presence at the scene of a crime and knowledge that the

4    crime is being committed are also not sufficient to

5    constitute aiding and abetting.  But you may consider

6    these things, among other factors, in determining whether

7    the government has met its burden of proof.

8    A defendant need not have actually assisted the

9    principal in committing each element of the crime to be

10   liable as an aider and abettor.  The government does not

11   have to prosecute or identify the principal that the

12   defendant is alleged to have aided and abetted.

13   As to unanimity, in every count where the defendant

14   is charged both as a principal and as an aider an abettor,

15   you may find him guilty only if you unanimously conclude

16   beyond a reasonable doubt that he was at least one of the

17   two.

18   You need not be unanimous as to whether he was a

19   principal as opposed to an aider and abettor.  But to find

20   the defendant guilty, each of you must conclude beyond a

21   reasonable doubt that he was one or the other.

22   Count 3 charges the defendant with violating 18

23   United States Code 1001(a)(2), which provides that

24   whoever, in any manner within the jurisdiction of the

25   executive, legislative, or judicial branch of the

government of the United States, knowingly and willfully,

makes any materially false, fictitious, or fraudulent

statement or representation shall be guilty of an offense.

To prove Count 2, the government must have proved the

following elements beyond a reasonable doubt that, number

one, the defendant knowingly and willfully made a material

false statement; number two, the defendant made the

statement voluntarily and intentionally, and number three,

the defendant made the statement in a matter within the

jurisdiction of a federal government agency during an FBI

investigation.

I will now instruct you further on some of these

elements.

Knowingly and willfully:  A false statement in

response to a question is made knowingly and willfully if

the defendant knew that it was false or demonstrated a

reckless disregard for the truth with a conscious purpose

to avoid learning the truth, and the statement was not

made because of a mistaken understanding of the question

under a reasonable interpretation.

As to the term material, a statement is material if

it has a natural tendency to influence or to be capable of

influencing the decision of the decisionmaker to which it

was addressed, regardless of whether the agency actually

relied upon it.

1       As to the term false, a statement is false if it was

2   untrue when made.  The government is not required to prove

3   that the defendant had a specific purpose to mislead the

4   federal agency to which he made the statement.

5       Now as to unanimity, in Count 3 the government has

6   alleged that the defendant made two separate false

7   statements.  The government need not prove that each and

8   every specific alleged false statement was made by the

9   defendant.  However, the government must prove that Mr.

10  Rathbun made at least one of the specific false statements

11  which are alleged in Count 3 of the indictment.

12      In order to find that the government has proved

13  beyond a reasonable doubt that the defendant is guilty of

14  Count 3, all twelve of you must first unanimously agree on

15  which specific alleged false statement or statements the

16  defendant made.  In other words, all twelve of you must

17  agree on which specific statements meet all of the

18  required elements of the offense.

19      Now as the verdict form, a form with verdict

20  questions has been prepared for you.  It is simply the

21  written notice of the decision you will reach.  I will

22  review the verdict form very briefly with you.  You will

23  take the form with you to the jury room where you will

24  deliberate with a view towards reaching a unanimous answer

25  to each question.

1    The answer to each question must be the unanimous

2    answer of the jury, if such unanimity is possible, meaning

3    that every juror must agree on the answer.

4        Your foreperson will write the unanimous answer of

5    the jury in the space provided under each applicable

6    question.  When you have reached unanimous agreement as to

7    each applicable question on the verdict form, the

8    foreperson should fill in, date, and sign the form at the

9    bottom of the last page.

10       After completing the verdict form, the foreperson

11   should advise the court security officer that you are

12   ready to return to the courtroom and render your verdict.

13       Now when you go to the jury room, your first function

14   will be to select a foreperson to preside over your

15   deliberations.  The foreperson does not have any greater

16   power than any other jurors, and their vote does not have

17   any more importance than the others' votes.

18       The foreperson serves to help you conduct your

19   deliberations in an orderly manner and to make sure each

20   of you has an opportunity to express your opinion.  The

21   foreperson is also responsible for ensuring that you

22   conduct your deliberations in accordance with the court's

23   instructions.

24       Now during the deliberations you are, of course,

25   allowed to take breaks.  However, you may not discuss the

case unless all members of the jury are present.  Thus, if you separate briefly, for example to have a snack or use the bathroom, you must not discuss the case.  You can only discuss the case when all of you are together in the jury room.

If it becomes necessary during your deliberations to communicate with the court, you may send me a note through the jury officer signed by your foreperson or by one or more members of the jury.  You can just give that note to court security officer that will be seated outside of your jury deliberation room.

No member of the jury should ever attempt to communicate with me on anything concerning the case except by a signed writing, and I will communicate with any member of the jury on anything in the case only in writing or orally here in open court.

If you send out a question, I will consult with the attorneys as promptly as possible before answering it, which may take some time.  And you may continue your deliberations while waiting for the answer to any question.

Until your verdict is announced in open court, no juror is permitted to disclose to anyone the status of your deliberations or the nature of your deliberations or your verdict.

1        You are not to tell anyone, including me, how the

2   jury stands, numerically or otherwise, until after you

3   have had reached a unanimous verdict or have been

4   discharged.

5        You may not use any electronic device or service to

6   communicate to anyone any information about this case or

7   to conduct any research about this case.  You may only

8   discuss the case in the jury room with your fellow jurors

9   during deliberations, and this completes the court's

10  instructions.

11       Now I'll ask the assistance of the clerk and court

12  security.  I know that I've allowed you to have your cell

13  phones in the room where you all gathered.  Your cell

14  phones are not allowed to be in the room during

15  deliberations.

16       So the clerk will collect your cell phones, put them

17  somewhere, letting you know where they are, and if anyone

18  needs to take a break to check their cell phone or do

19  something, then you can take that break and do it.  So

20  your cell phones will be up here somewhere, but they're

21  not in the jury room with you when you're deliberating.

22       Now remember if anyone leaves the jury room for any

23  reason, deliberations stop and can only continue when

24  everyone is back in the room together.

25       Can I have the verdict form?

1        Now you're not going to be able to see it perfectly,

2    but this is the verdict form.  If you follow the verdict

3    form, it has a listing of the counts.  All right.  You're

4    going to have the instructions with you so can follow the

5    count listed on the verdict.

6        Is the verdict form up on the screen?  It is.  Okay.

7    Great.

8        So you can read the count.  You can read the language

9    in that count, and then clearly there are spaces for

10   guilty or for not guilty for you to check the box.

11       This verdict form is fairly self-explanatory.  You

12   are not required to go in any specific order.  You're not

13   required to go one, two, three.  You can start three and

14   then go to one, go to two.  You can do whatever you'd

15   like.  Some verdicts forms do require you to go in a

16   certain order and directed that way.  This verdict form

17   you can start wherever you would like.

18       All right.  Let me please hear from the parties.

19   (Sidebar conference.)

20             THE COURT:  Okay.  To the parties, did you want

21   to make any objections to make a record regarding the

22   instructions?

23             MR. DESROCHES:  Your Honor, the government,

24   subject to its previous objection, is satisfied with the

25   instructions.  There is a concern I have about the verdict

1    slip but I think we can address that.

2              THE COURT:  Okay.  After we release the jurors,

3    I will ask you to inspect the verdict form to determine if

4    you're satisfied so you can take up the issue at that

5    point.

6         For the defense?

7              MS. O'NEILL-GREENBERG:  We do.  Subject to our

8    previous objections and because of the First Circuit,

9    actually I have to specify them so as to counts -- as to

10   the definition of explosive under 844(j) that "ingredients

11   in such proportions, quantities, or packing that ignition

12   by fire may cause an explosion," that particular part of

13   the instructions we object to as the definition for both

14   844(d) and 844(i).

15        We object to the aiding and abetting instruction.  We

16   object to the false statements consciousness of guilt

17   instruction.

18        We object in so much as the law enforcement

19   instruction was included.  We asked for our instruction

20   that was submitted and filed under the requested joint

21   instructions of the parties.

22        As to the failure to properly investigate, we object

23   to the different instruction than we requested in our

24   joint requested filed instructions.  So to the extent that

25   the instruction given by the court did not include what we

1    requested, we object to the portion of that instruction

2    that we requested in our joint requested instructions that

3    wasn't included by the court.

4           THE COURT:  All right.  The record is made and

5    objections noted.  I'm not going to make any changes based

6    upon any of the objections.

7         I will review the verdict form with you after the

8    jury is released to their deliberation room and we can

9    discuss -- I think we are going to have a couple of actual

10   hard copies of instructions for the jurors.  There's a few

11   typos and a few numbering issues.  We can deal with those.

12        Then I actually have to check whether or not the

13   instructions are going to be available electronically like

14   the exhibits are for the jury to scroll through on the

15   screen in the deliberation room and the verdict form.  I'm

16   not quite sure if we are there yet, but we can talk about

17   that when the jury is released into their deliberation

18   room.  Okay.  Thanks.

19   (End of sidebar discussion.)

20          THE CLERK:  Juror Number 42 in Seat 14, you will

21   be an alternate.  You can stay here for now.  We will take

22   you out separately from the rest of the jury.

23          THE COURT:  All right.  Thank you.

24        All right.  Everyone, I'm guessing lunch is here for

25   you.  So we will let you know -- is there any special

1    instruction regarding exhibits or accessing the exhibits?

2            THE CLERK:  When I get them loaded.

3            THE COURT:  So the exhibits -- if you have any

4    problem with exhibits, you write it down in a note and

5    bring it to my attention.  But the exhibits will be

6    available to you electronically through the screens in

7    your deliberation room so one person would be able to

8    control that screen and scroll to whatever exhibit you

9    want to see.

10       If for some reason that's not satisfactory to what

11   you need and you need to actually look at an exhibit, let

12   us know and we will devise a way that we can do that.

13   We're not going to be handing around a piece of paper for

14   you to pass back and forth, but we can try to set up a

15   system so you can actually view things if you think that's

16   necessary.

17       We're also going to try to do a couple things.  We

18   are going to give you at least a couple of copies of the

19   paper instructions like I was reading them from the piece

20   of paper.  We're also going to try to load the

21   instructions onto the computer electronically so you can

22   scroll through that; again, to try to avoid handing around

23   paper and also to avoid us having a copy shop here running

24   14 or 12 copies of it.  It would take awhile, but we will

25   give you a couple hard copies to start with.  All right.

1      All right.  So contrary to the instructions that I've

2  given you up to this point, you can now talk about the

3  case but only with each other.  All right.  You can begin

4  your deliberations.  Thank you.

5  **(The jury left the courtroom at 1:54.)**

6                THE COURT:  All right.  So I'm going to need the

7  parties to review what are the exhibits and let me know --

8  let the court know if you're satisfied, make a record of

9  that, and also to discuss the verdict form and let me know

10  if you're satisfied.

11      The government, you mentioned something about the

12  verdict form?

13                MR. DESROCHES:  Yes, Your Honor.  In regards to

14  Count 3 after going through the jury instructions, I

15  realized as it currently is written it may lead to

16  confusion.

17      Specifically Count 3 requires that the jury find that

18  at least one of the false statements be proven beyond a

19  reasonable doubt and it's not broken down into separate

20  sub-counts.

21                THE COURT:  I agree.  The instructions seem

22  different than how it appears on the verdict form.

23                MR. DESROCHES:  Yes, so I'm just concerned that

24  would lead to some confusion.

25                THE COURT:  Well, I mean, they weren't

1   consistent I agree but they weren't necessarily

2   inconsistent, but it said they would have be unanimous as

3   to which one -- they have to be unanimous.  So this

4   actually allows them to show that unanimity by actually

5   checking the box next to the one they unanimously find.

6        So I agree with you it's not consistent.  It's not

7   entirely consistent with the instructions but it's not

8   inconsistent.  This is kind of a workable fashion of them

9   accomplishing what I described.

10       What does the defense say about that?  Does the

11  defense have any position on the verdict form, the Count

12  3?

13            MS. O'NEILL-GREENBERG:  I think we are fine with

14  it and we defer to the court.

15            THE COURT:  If you think this prejudices you in

16  some real way, I'm happy to hear you further.

17            MR. DESROCHES:  I can't say that it does.

18            THE COURT:  But I do recognize it doesn't

19  exactly flow from what I read.

20            MR. DESROCHES:  That's it.  Thank you, Your

21  Honor.

22            THE COURT:  All right.  So the government is

23  satisfied with the verdict form other than what you noted?

24            MR. DESROCHES:  Yes, Your Honor.

25            THE COURT:  All right.  Defense?

1                MS. O'NEILL-GREENBERG:  Yes.

2                THE COURT:  Satisfied with the verdict form?

3                MS. O'NEILL-GREENBERG:  Yes, Your Honor.

4                THE COURT:  All right.  So I will need a similar

5        indication if, if each party is satisfied with the

6        exhibits, I will need that on the record as well.

7                MR. WATKINS:  That may take a little time.

8                THE COURT:  It's going to take some time.  Sure.

9        I will ask that -- let me check, do we have one or two

10       copies of the instructions, hard copy?

11               THE CLERK:  We will.

12               THE COURT:  Let me ask the parties while you're

13       looking at the exhibits, is it agreeable to bring to the

14       jury room the verdict form and one or two hard copies of

15       the instructions during this time that it's going to take

16       to look through exhibits?  Is that an agreeable process?

17               MR. DESROCHES:  It works for the government.

18               MS. O'NEILL-GREENBERG:  Yes, it is.

19               THE COURT:  All right.  There's the verdict

20       form.

21               THE CLERK:  Thank you.

22       **(A recess was taken until 2:18.)**

23               THE COURT:  Going on the record.  We have a

24       question from the jury.  They want the instructions and

25       the verdict form.  I don't blame them.  So we are sending

1    -- so everyone agrees we are sending them the verdict form

2    and a paper copy of the instructions?

3              MS. BERKOWER:  That's fine with the

4    government.

5              MR. WATKINS:  That's fine.

6              THE COURT:  That's what we will do.  The clerk

7    will bring them in and the parties will continue to work

8    on the exhibits telling me that the parties are satisfied.

9              MR. DESROCHES:  We agree making a disk.  Once

10   that disk is brought up and then admit it, we will be

11   satisfied.

12             MR. WATKINS:  That's correct.  Once the JURIS

13   disk goes in.

14             THE COURT:  All right.  What does that mean for

15   you?

16             THE CLERK:  At that point I have to upload it,

17   the 80 exhibits.

18             THE COURT:  Does it take a long time?

19             THE CLERK:  We will find out.

20             MR. DESROCHES:  We have physical exhibits too.

21             THE CLERK:  The physical exhibits can come up

22   here.  I will be happy to bring them in.

23             THE COURT:  Are you satisfied with those?

24             MR. DESROCHES:  We are content with the physical

25   exhibits.

```
 1              THE COURT:  Do you want the exhibits to go in
 2     first now?
 3              MR. WATKINS:  I think they should all go in at
 4     one time.
 5              THE COURT:  All right.  So to start with, I'm
 6     going to send the clerk in with the paper copy of the
 7     instructions and the verdict form, and then the clerk will
 8     be back in the courtroom to finish the exhibit process.
 9     (Court Exhibit 1, jury question, marked for ID.)
10     (A recess was taken until 2:38.)
11              THE COURT:  Each side satisfied with the
12     exhibits?
13              MR. DESROCHES:  The government is satisfied.
14              THE COURT:  Both the physical and the ones that
15     are going to be digital that will be put on a disk?
16              MR. DESROCHES:  Yes, Your Honor, to both.
17              MR. WATKINS:  And the defendant is also content.
18     There are the paper items in the JURIS system, physical
19     items, and there's one more physical item that's the
20     satellite photograph that is on the laptop computer that
21     will be going back to the jury.
22              THE COURT:  That's going to be digital; that's
23     going to be going along with the digital things on the
24     disk?
25              MR. WATKINS:  It's Exhibit 104.  It's the
```

1    satellite photo which requires its own player.

2              THE COURT:  It requires its own player?

3              MR. WATKINS:  Sorry?

4              THE COURT:  I don't understand.  It requires  --

5    so a laptop computer is going back?

6              MR. WATKINS:  That's correct and that contains

7    -- that's displaying Exhibit 104.

8              THE COURT:  And the parties are satisfied that

9    this laptop identified as a court laptop can go back to

10   the jury room?

11             MR. DESROCHES:  Yes, Your Honor.  We actually

12   even sealed or madam clerk sealed the disk drive so it

13   will not be manipulated.

14             THE COURT:  Okay.  So you're satisfied as to

15   every form of exhibit?

16             MR. WATKINS:  Yes.

17             MR. DESROCHES:  Government as well.  Thank you,

18   Your Honor.

19             THE COURT:  Okay.  All right.  Thanks, everyone.

20   **(A recess was taken at 2:40 until 4:31.)**

21             THE CLERK:  Your Honor, we're back on the record

22   in United States of America versus John Michael Rathbun,

23   20cr30018.

24   (Mr. Rathbun is present.)

25             THE CLERK:  I'll get the jury.

**(The jury entered at 4:37.)**

            THE COURT:  Okay.  Everyone.  We are going to
end for the day.  Is it the desire of the jury to end for
the day and come back on Monday?

     Okay.  All right.  The jury is indicating yes.  It's
4:35 on Friday.  So we'll come back and we will start at
9:15 Monday morning.

     So what happens first is we'll come in and we will
plan on you being in court at 9:15 because we have to make
a record that everyone followed my instructions, or if
something happened over the weekend where you somehow
received or exposed to information about case, you will
tell me.  We will go through that process and you will go
back to your deliberations.

     So Monday morning at 9:15.  So obviously the
deliberations have started but the instructions now apply
again.  You can't talk to anyone over the weekend about
this case.  You can't contact each other about this.  If
you exchanged cell phone numbers, you just can't.  You
can't let yourself be exposed to any media coverage.  You
can't do any research.  No postings; no social media
reading or writing.  Everything still applies.

     Remember I told this to everyone multiple times that
the deliberation process is a collective process with all
of you in the room at the same time.  So your

1    deliberations again will start Monday morning when you're

2    altogether again.  All right.  Thank you.  Have a good

3    weekend.

4                THE CLERK:  All rise.

5                THE COURT:  So be here for 9:15.

6    **(Court recessed at 4:39.)**

7    -------------------

8

9

10   (The certification of this transcript does not apply to
     any reproduction of this transcript, unless under the
11   direct control and/or supervision of the certifying
     reporter.  I assume no responsibility for the accuracy of
12   any reproduced copies not made under my control or
     direction.)

13

14                          CERTIFICATION

15

16          I certify that the foregoing is a correct

17   transcript of the record of proceedings in the

18   above-entitled matter to the best of my skill and ability.

19

20

21   /s/ Alice Moran                    December 12, 2020
     Alice Moran, RMR, RPR
22   Federal Official Court Reporter

23

24

25