1               UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2                    WESTERN SECTION

3

4
    United States of America  )
5                              )           20cr30018-MGM
        vs                     )
6                              )           October 21, 2020
    John Michael Rathbun       )
7   _____)

8

9                    Video Hearing Held Before

10              The Honorable Mark G. Mastroianni

11                 United States District Judge.

12

13
    APPEARANCES:

14

15  On behalf of the government:  Risa Berkower, United States
    Department of Justice, 950 Pennsylvania Ave. NW,
16  Washington, DC 20532.

17  Steven H. Breslow, Assistant United States Attorney,
    300 State Street, Suite 230, Springfield, MA 01105-2926.
18

19  On behalf of the defendant: Timothy G. Watkins, Esq., 51
    Sleeper Street, 5th Floor, Boston, MA 02210.
20
    Forest J. O'Neill-Greenberg, 51 Sleeper Street, 5th Floor,
21  Boston, MA 02210.

22                      Alice Moran, CSR, RPR, RMR
                        Official Federal Court Reporter
23                      United States Courthouse
                        300 State Street, Room 303D
24                      Springfield, MA 01105
                             (413)731-0086
25                      alice.moran@verizon.net

**(Video hearing commenced at 10:35.)**

**(Mr. Rathbun is present via video.)**

THE CLERK:  The case before the court via Zoom video is Criminal Matter 20-30018, the United States of America versus John Michael Rathbun.

Counsel, can you please identify yourself for the record starting with the government?

ATTORNEY BERKOWER:  Good morning, Your Honor. Risa Berkower for the government.  I know Steve Breslow, Assistant United States Attorney, is also joining us.  I think he may be having some log on difficulties, but I know he is in the process of doing that.

There he is.  I think he just popped up actually.

THE CLERK:  He is on.

THE COURT:  So Attorneys Berkower and Breslow for the government.  I think Attorney Desroches is on this call as well for the government.

THE CLERK:  Yes.

THE COURT:  I see Attorney Curley for the government.  I don't know if they are appearing or just watching, but I see them on there.

THE CLERK:  I want to say they're just watching, judge.

ATTORNEY DESROCHES:  Your Honor, this is Neil Desroches.  I am just observing.  I have filed an

1    appearance in this matter going forward, but I won't have

2    a role in today's hearing.  Thank you.

3                THE COURT:  Okay.  Very good.  Thank you

4                ATTORNEY CURLEY:  Your Honor, I am just

5    observing as well.

6                THE COURT:  All right.  No appearance from

7    Attorney Curley then.

8            All right.  Attorney Watkins.

9                ATTORNEY WATKINS:  Good morning, Your Honor.

10   Tim Watkins, Federal Defender Office on behalf of John

11   Rathbun who appears at the Hampden County Jail by video.

12       Also I expect to be appearing is Forest O'Neill-

13   Greenberg.  She's currently I believe in front of Judge

14   Saris in Boston at an in-person hearing but will join us

15   as the hearing goes on.

16               THE COURT:  Okay.  I see Mr. Rathbun is joining

17   from Hampden County.  I was mistaken thinking that he was

18   at Wyatt and I was a little concerned regarding him being

19   at Wyatt and what's going on with the uptick in cases at

20   Wyatt.  So all right.  That's good.

21       So the first thing we have to address -- well, I have

22   to talk to Mr. Rathbun and Attorney Watkins about the

23   consent to proceed by way of video, and I think we need to

24   go through an arraignment process for his initial

25   appearance on the superseding indictment.

1          Is that correct, Attorney Watkins?

2               ATTORNEY WATKINS:  That's correct, Your Honor.

3     He has not yet been arraigned and he would be prepared to

4     plead not guilty today.

5               THE COURT:  So, Attorney Watkins, have you

6     discussed with Mr. Rathbun his right to be present in

7     court both for the hearings on today's motions and for the

8     initial appearance but that he can obviously waive that

9     right and consent participating by video?

10              ATTORNEY WATKINS:  We have spoken about that and

11    he will consent to appearing by video.

12              THE DEFENDANT:  Yeah, I do consent.

13              THE COURT:  All right.  Attorney Watkins, in

14    your dealings with Mr. Rathbun is there anything regarding

15    his ability to understand these concepts and knowingly and

16    voluntarily waive rights?  Any issue with his

17    understanding and appreciation and ability to come to

18    those conclusions in your estimation?

19              ATTORNEY WATKINS:  None whatsoever, Your Honor.

20              THE COURT:  All right.  So, Mr. Rathbun, have

21    you had any drugs or alcohol in the last 24 hours?

22              THE DEFENDANT:  No, Your Honor.

23              THE COURT:  All right.  Are you on any

24    medication for any physical issues or any mental health

25    issues?

```
 1              THE DEFENDANT:  Not that we discussed, no.

 2              THE COURT:  All right.  So you're not taking any

 3   medication of any kind?

 4              THE DEFENDANT:  I'm taking Trazadone at night

 5   for my mental health but that doesn't mess up my speaking

 6   to you this morning.

 7              THE COURT:  All right.  It doesn't cause you to

 8   be confused or tired or affect your thought process at

 9   all?

10              THE DEFENDANT:  No, sir.

11              THE COURT:  All right.  Okay.  So you understand

12   you have the right to be in court.  We are obviously

13   presently still going through a pandemic situation, but

14   the courthouse is open.  We are having some matters in

15   court but we're trying to clearly limit the matters in

16   court because any time someone comes into court, it causes

17   a chain reaction of people that need to do their jobs and

18   be in certain places.

19       For you it would require transportation and

20   processing in the court.  So you and your attorney

21   certainly have the right to prefer, if you would like, to

22   have your hearing, this hearing at least, over Zoom video

23   conference as opposed to being brought in and exposed to

24   any possible risk that you might encounter just by being

25   transported.
```

1        Is that what you want to do?  You want to agree to

2    just have the proceedings today, all proceedings, over the

3    video?

4            THE DEFENDANT:  Yes, Your Honor.

5            THE COURT:  All right.  I will find that Mr.

6    Rathbun is knowingly and voluntarily choosing to have his

7    hearing on video.  He's waiving his right to be present in

8    court.

9        I am assessing him based upon what I am observing.

10   He is on a video link.  I see his face clearly.  He is not

11   wearing a mask so I am assessing his facial gestures and

12   demeanor.

13       He's responded to my questions so I've been able to

14   evaluate him and Attorney Watkins I rely upon his

15   representations.  He knows Mr. Rathbun much better than me

16   and dealing with him and he has indicated there is no

17   impediment to that waiver and agreeing to go forward by

18   video.

19       So I will find that we continue to be in a pandemic

20   situation.  There is a need in the interest of justice to

21   avoid exposing Mr. Rathbun and all the other individuals

22   who would be involved in an in-court proceeding, to the

23   extent as possible.

24       We are open for business and we can have cases in

25   court, but in the interests of justice in reducing

1    individual's exposure, when we can, I will find that there

2    continues to be a need that serves the interests of

3    justice and that's occurring in this case and so we can

4    proceed in this case.

5         All right.  So just tell me your full name for the

6    record so I can start the arraignment process on the new

7    charges.  What's your middle name, Mr. Rathbun?

8              THE DEFENDANT:  Michael.

9              THE COURT:  Jonathan Michael Rathbun.  All

10   right.

11        Now, Mr. Rathbun, you had presently been under an

12   indictment in this case which I know you have reviewed

13   with your attorney.  There is a superseding indictment in

14   the case.  Have you discussed that superseding indictment

15   with your attorney?

16             THE DEFENDANT:  Yes, Your Honor.

17             THE COURT:  All right.  Have you read it or has

18   he read it to you or both?

19             THE DEFENDANT:  He's read it to me.

20             THE COURT:  Do you understand the charges?

21             THE DEFENDANT:  I do understand the charges,

22   Your Honor.

23             THE COURT:  All right.  Now you are entitled to

24   have an attorney, and of course you do.  You have Attorney

25   Watkins.  Your situation, to my knowledge, has not

1    changed.  Do you wish to have Attorney Watkins continue to

2    represent you on the new superseding indictment?

3              THE DEFENDANT:  I do.

4              THE COURT:  All right.  Attorney Watkins, have

5    you discussed waiving the right to the full reading of the

6    indictment with Mr. Rathbun?

7              ATTORNEY WATKINS:  We have and we do waive the

8    formal reading of the indictment.

9              THE COURT:  Mr. Rathbun, is that correct, you

10   waive the reading of the indictment?

11             THE DEFENDANT:  Yes, Your Honor.

12             THE COURT:  All right.  Mr. Rathbun, the court

13   will enter not guilty pleas.  Is that your desire to enter

14   a not guilty plea to the superseding indictment?

15             THE DEFENDANT:  That is my desire, yes.  Not

16   guilty.

17             THE COURT:  All right.  So we have that in

18   place.  Now Attorney Watkins will be representing you on

19   that case.

20        I understand, Attorney Watkins, you filed last night

21   a motion to sever; is that correct?

22             ATTORNEY WATKINS:  That's correct.  We did, Your

23   Honor.

24             THE COURT:  All right.  So I think it might be

25   on the docket now but if not, it will go on the docket

1    later this morning giving the government over the weekend

2    until Tuesday morning to file a response to the severance

3    request.

4         It's certainly not fair, I don't think, to talk to

5    the government about that until they have a chance to look

6    at what you have raised on that issue.  All right.  So

7    we'll deal with that at another day and time.

8         Today we have motions in limine.  I think we can go

9    through the motions in limine.  Some may require more

10   discussion than others, but I've looked over them several

11   times and so I'm familiar with them.  I'm very familiar

12   with the background of the case so there's really no need

13   to get into the detail about the background of the case

14   and the facts.

15        So I think we should start taking them -- we will

16   just take the motions by number.  I believe, and someone

17   correct me if I'm mistaken, docket number 74 is the first

18   in line?

19             ATTORNEY WATKINS:  I think that's correct.

20             THE COURT:  All right.  That's defendant's

21   motion number 74 regarding aiding and abetting.  Go ahead,

22   Attorney Watkins.

23             ATTORNEY WATKINS:  Your Honor, as the court

24   knows, the government has been quite clear about what its

25   theory has been regarding this case.  It's that Mr.

1   Rathbun placed this fuel container at the site and tried

2   to light it as part of -- with the intent to destroy

3   property, damage property, injure, or intimidate as well.

4       Now Mr. Breslow has indicated that he may also argue

5   to the jury on a vicarious liability theory, I guess, that

6   Mr. Rathbun need not have placed it there himself.  That

7   he could have aided and abetted someone else to do that.

8       The government has absolutely no evidence that there

9   is another person involved in this.  They would have to

10  have that on some level, whether it's an identified person

11  or not.  What they would have to prove is that Mr. Rathbun

12  aided this other person and engaged in the same intent

13  that that other person engaged in.

14      They don't have evidence of that.  There will not be

15  evidence of that at trial.  It is really an effort to make

16  up a theory that is completely unsupported by any kind of

17  evidence.  It's going to confuse the jury if we start

18  talking from the outset of the case about this kind of

19  liability which already can be somewhat confusing to

20  jurors about what exactly it means to aid and abet.

21      The government has cited in its response some cases

22  talking about a jury can indeed convict without

23  identifying a principal.  The distinction here is that

24  this is a case where they can't even ID if there was a

25  principal.

1    In the cases that this government has cited, these

2  are cases where a crime has been committed, an

3  identifiable crime has been committed and indeed there is

4  no question that a person committed it.  It was only the

5  matter of whether it was the principal as opposed to this

6  person that actually committed it.  In those kind of

7  circumstances courts have found that it's not necessary

8  for the government to identify a particular principal.

9    This case is different, as the court has seen through

10  the other motions in limine here.  This is a case where it

11  will be hotly contested whether any crime was committed at

12  all, whether it was a principal, whoever placed that

13  particular fuel canister there.

14    So this is a very different kind of case then the

15  kinds of cases that the government cites.  They will not

16  be able to identify -- not only not identify a principal

17  but be able to argue at all that there was a second

18  person, some kind of principal that could have placed that

19  gas can there.  So for those reasons I am asking the court

20  to allow the motion in limine and preclude the government

21  from raising that issue at trial.

22        THE COURT:  All right.  I think the government

23  -- I'll hear from Attorney Breslow or Attorney Berkower,

24  whoever chooses to argue it, but I think the government is

25  within its right to bring an alternative charge.

1    The issue with aiding and abetting has always been to

2    guard against any unfair surprise to the defense and there

3    certainly is no or will be no unfair surprise. It's

4    clearly being announced that would be their theory.

5    A government prosecution always runs the risk when

6    they try to have multiple theories in the same

7    prosecution, but that's their right and the case law in

8    the First Circuit and other circuits seem to -- well, not

9    seem to, clearly support that.

10    And I don't think you're a hundred percent -- I guess

11    I disagree with you by saying that the government's desire

12    to go forward with aiding and abetting is stopped in its

13    tracks because they can't identify who the principal might

14    have been.  I don't think at all that it's required that

15    it be whoever the main actor was be identified or named

16    for there to be an aiding and abetting theory.

17    I think the act that occurred that you're talking

18    about and trying to distinguish this case from other

19    cases, the act in this case is leaving the gas can out in

20    a public spot.  So you can argue about the theory whether

21    someone left the gas can there.

22    I don't know -- this seems to be clearly within the

23    government's right.  Any jury confusion can be addressed

24    by jury instructions on the crimes and the different types

25    of crimes and the different instructions that apply to

1    both.  That's the way I'm viewing it.

2         I don't know if you are familiar with an instruction

3    that essentially would say something to the effect that

4    tell a jury that they would have to pick a theory.  I'm

5    asking you as opposed to telling you whether or not there

6    would be an instruction that says the jury has to pick a

7    theory and they would have to be unanimous on the theory.

8    Those are things we can talk about.

9         Attorney Watkins, did you want to respond to anything

10   I said?  It seems I might have stolen the government's

11   thunder with their argument so I'll let you respond if you

12   would like to.

13              ATTORNEY WATKINS:  Your Honor, if the court were

14   inclined to let the government talk about an aiding and

15   abetting theory, indeed at the end of the trial we would

16   be asking for a jury instruction that requires unanimity

17   on which theory the government is proceeding under.

18        I will also telegraph to the court that we would

19   request a ruling at the end of the evidence if indeed

20   there is no indication of any kind of principal in this.

21   Once again, I think it should not go to the jury at that

22   point if the government simply is asking the jury to

23   speculate that there might have been some other person.

24              THE COURT:  I really just do not think the case

25   law supports you in that.  I don't think a principal needs

1     to be identified but all right.  I understand your

2     disagreement with me on that.

3          Do you believe I'm making some type of major clear

4     error on applying the legal principles to the aiding and

5     abetting theory that you'd like to make a record of?

6               ATTORNEY WATKINS:  Well, judge, always when we

7     file a motion in limine it's to make a record for a

8     possible appeal so I'm going to be careful about whether I

9     characterize anything the court does as major versus

10    minor.  We are asking that the court allow the motion in

11    limine and it's clear that the court has denied that at

12    this point.

13              THE COURT:  All right.  So when I said that,

14    that was just simply for the point of actually further

15    discussing right now since we're involved in a dialogue

16    regarding that theory.  So I appreciate that you are

17    objecting to the denial or would be objecting to the

18    denial of that motion.

19         Government, did you want to comment at all about the

20    aiding and abetting theory?

21              ATTORNEY BRESLOW:  No, Your Honor.  Except to

22    underscore that I think you're completely right in that

23    case law supports the government proceeding on this

24    theory.  The case that we cited, *United States v. Yost* is

25    directly on point.

1          Mr. Watkins I'm sure would have cited contrary case

2     law had there been any.  There is none.  It is well

3     settled that we can proceed under this theory on exactly

4     these circumstances, particularly where the defense here

5     is one of alibi, meaning that the defendant himself did

6     not place the device -- in spite of the fact that his DNA

7     is on both parts of the device -- and that someone else

8     did.

9          THE COURT:  All right.  Docket No. 74, aiding

10     and abetting filed by the defendant, is denied.  The

11     government will be allowed to proceed on that theory as

12     well as their alternative theory that Mr. Rathbun was the

13     principal.  I certainly will entertain jury instructions

14     either along the way or at the end of the case so the

15     defendant you should know that.

16          All right.  The next in line is 75, Docket No. 75.

17     That's defendant's motion regarding the confusing nature,

18     relevance, time-consuming nature and prejudice of

19     testimony about the Billy Graham Evangelical Association

20     pamphlets, essentially tracking these pamphlets.  The

21     investigation of where the pamphlets came from, who

22     distributed them, the different events that they might

23     have been distributed at, et cetera, et cetera.

24          ATTORNEY BRESLOW:  Your Honor, Ms. Berkower will

25     be arguing this motion, but I'll note that this is also

the subject of an affirmative motion in limine to admit.

THE COURT:  Right.

ATTORNEY BRESLOW:  That's Docket No. 79.

THE COURT:  So we'll do 75 and 79 together.

So the government's argument really is to focus on the circumstantial evidence that the pamphlets provide as a link to the crime; that is, the nature of the pamphlets themselves, the nature of the pamphlets are something that Mr. Rathbun's family had exposure to and interest in and had reason to have pamphlets like that and did have pamphlets like that.

Pamphlets like that were recovered in the car of Mr. Rathbun's mother and that car does have relevance to the date in question for this crime.  Not the exact same pamphlet for sure, but generally pamphlets about that type of topic.

When I was thinking about this, I was thinking about comparisons in my mind that if someone was an environmental activist and went to different types of meetings and get-togethers regarding environmental activity and had at their house a number of pamphlets some pamphlets regarding clean water, some clean air, some car emissions, those all have to do with protecting the environment and bringing that message to people through handing out pamphlets and talking to people.

1     All the pamphlets may be very different but they all

2   surround that theme.  Well, in this case the theme would

3   be related to more of a faith-based religious theme but

4   clearly the pamphlets were different.  There were

5   different pamphlets in the car than was found in the

6   actual gas can.

7     So I certainly am seeing some relevance.  We can

8   argue about how weak or strong that relevance is, but I am

9   seeing some relevance linking Mr. Rathbun's exposure and

10   availability to that general type of piece of paper with

11   that type of printing on it, the messaging on that piece

12   of paper in general, his access to that and that happening

13   to be in a gas can.

14     It's my understanding the government is also

15   proffering and has proffered in good faith that they

16   expect testimony that DNA on the piece of paper and that

17   gas can come back with a strong, if not match, strong

18   mathematical link to Mr. Rathbun.

19     The court is very concerned about the background

20   information of the investigation of the mother and the

21   entire background as to where the Billy Graham Evangelical

22   Association, the religious purpose of that association,

23   the events that association has, when the mother attended,

24   what type of pamphlets were available, the goal of that

25   association.

1    I'm concerned with allowing that information in.  I

2    think it invites speculation about where the government

3    might be going, and it looks like it might be inviting

4    thoughts about radical extreme religious activities and I

5    don't think the government needs to go there to accomplish

6    what they want to accomplish in this case.

7    I also realize that the government wants to establish

8    a nexus, an interstate nexus, and perhaps the location of

9    the printing of this particular pamphlet that was found in

10   the gas can might be a way for the government to do that,

11   and I would agree with that too.  That might be a way to

12   prove that link, but that doesn't mean you have to go into

13   the whole elaborate background of when and where there

14   were get-togethers surrounding these pamphlets and the

15   theme and the purpose of that religious group.

16   So Attorney Watkins -- well, Attorney Berkower, I

17   guess I'll hear from you first on this one because the

18   government filed a motion as well.

19   ATTORNEY BERKOWER:  Thank you, judge.

20   I think that the court is right.  This really is

21   about proving identity of the defendant, which he himself

22   has put at issue, and the reason we're looking to

23   introduce this evidence the first -- there are two reasons

24   but the first is to disprove his alibi defense that this

25   wasn't him and there's a chain of circumstantial evidence

1    that links him to that pamphlet and I think the court has

2    hit on that absolutely.  I think that we would agree with

3    your characterization of that.

4        But with regard to the second purpose for which we

5    think this is relevant is motive and specifically why

6    would the defendant put this gas can with this pamphlet

7    outside of this particular facility?

8        In our view that's where some of the evidence that I

9    think the court expressed some hesitations about I want to

10   clarify first why I don't think the court should have

11   those hesitations but also why it's still relevant and not

12   unduly prejudicial in any way.

13       So the purpose of introducing how, you know, the

14   defendant's mother's activities with regard to obtaining

15   this pamphlet, going to some of these events, the purpose

16   for which the pamphlet is used, the government has learned

17   that this particular pamphlet is used for individuals who

18   are being counseled on reaffirming their commitment to

19   their faith and to God in a way to get them on a better

20   path.

21       The government has also learned in its investigation

22   that this defendant has been going through some difficult

23   times, including in the time leading up to this event, and

24   his family, rightfully so, was very concerned about him

25   and was trying to get him on a better path.  And his

mother, who often proselytizes in her community and gives

outs pamphlets, we have witnesses who say she gave out

pamphlets to him.  Not this particular pamphlet but other

pamphlets indicating that she wanted to get him on a

better path and that's the reason for the relevance of

this because we want to explain this background in

context, not with any negative inferences about the

defendant's family or their religious practice.  Quite to

the contrary.  Really just showing that this person --

that this family had concern about their son, rightfully

so, and was doing what they could to get him on a better

path.

    We expect that, you know -- and the defendant by

taking this pamphlet with the message of peace and trying

to reaffirm your commitment to God, took it, put it in a

gas can, tried to light it on fire outside of a Jewish

nursing home we would suggest -- we would submit that this

shows that he has an anti-religious motive.

    He is rejecting the very principles of religion that

he is being asked to reconsider by his family to get him

on a better path.  In our view that's really important

here.  Because, first of all, there's a special finding in

the indictment that says that the defendant placed this

device outside the Jewish Nursing home because of the

actual or perceived religion of any person.  It doesn't

1    have to be an anti-semitic motive, any person, religion of

2    any person is sufficient for the jury to convict or make

3    that special finding.

4        And here, this is like -- this very much looks like

5    an anti-religious act to place a pamphlet that has a

6    Christian proselytizing message outside of a Jewish

7    nursing home, light it on fire, that indicates a strong

8    antipathy towards any religion.

9        And we know in fact from the other evidence that's

10   something that he was being encouraged to take back up

11   into his life in the time leading up to this offense.  So

12   we feel that that evidence is really important to

13   understand the motive and to show that chain of events.

14       I don't know if the court has further questions about

15   that, I can speak more to it.  But in our view this is

16   vital evidence both to explain why he did what he did and

17   also his identity.  How his blood got on that pamphlet.

18   Because as the court -- yes.

19           THE COURT:  I'm agreeing with you on the

20   identity.  However I'm not so -- I want to hear from

21   Attorney Watkins obviously and/or Attorney Forest O'Neill,

22   the government's memo talked about a conversion message.

23       There was something in your memo about it was the

24   intent or at least one of the purposes of the Rathbun

25   family -- that may be an over-generalization, maybe his

1    mother, maybe him, maybe anyone who gives out these

2    pamphlets -- the goal was to convert people from one

3    religion to another; convert people from the Jewish faith

4    or other faith to the Christian practices that they were

5    announcing and advocating for with those pamphlets and

6    that was very concerning to me that that might come in as

7    a possible motive, the conversion inviting all the

8    emotional type of information regarding religious

9    violence.

10            ATTORNEY BERKOWER:  Your Honor, may I clarify on

11   that point?  I think Your Honor's referring to one

12   particular pamphlet that was found inside the kitchen of

13   the home where the defendant lived with his parents.  That

14   pamphlet was more like a booklet, a little longer than

15   what I would consider a pamphlet that discussed how to

16   explain Christianity to Jewish individuals for purposes of

17   converting them.

18        And in our view that falls into the category of

19   materials you described with the environmentalist of a

20   pamphlet about something slightly different but related to

21   the topic that's the subject of the pamphlet that's at the

22   scene.

23        So if the pamphlet found at the scene was about clean

24   water, that pamphlet is about clean air.  We are not

25   saying that the defendant was trying to convert anybody or

1    that even ascribing any negative motives to the family for

2    having that pamphlet in their house, but more just to show

3    that this type of material concerning Christian

4    proselytizing was all around the defendant and he had

5    access to it in his home, in the car that he borrowed from

6    his mother on the morning of this offense.  It is

7    certainly not trying to imply that there is any conversion

8    motive behind this, and I apologize to the court if we

9    were not clear about that in our filing.

10        THE COURT:  No.  You absolutely don't need to

11   apologize.

12        So go ahead, Attorney Watkins.

13        ATTORNEY WATKINS:  Well, I'm going to say I'm

14   not clear on it because I thought I just heard part of

15   this was to establish motive; that indeed Mr. Rathbun's

16   mother was inundating him with this kind of conversion

17   material and that that was the reason that Mr. Rathbun

18   placed this fuel container in front of a Jewish-affiliated

19   residence there.  So I guess I'm not understanding myself

20   from the government and it is something I've been

21   grappling with quite along, all along here.

22        I want to kind of back up to the beginning here to

23   talk about a few things that the court needs to know

24   before we go down this particular route.

25        One is which -- one of which is although the

1    government says it and clearly they want to argue it, they

2    will not have the evidence at the end of the day to argue

3    to the jury that they can make the kind of inference that

4    the court -- that it asks the court to allow them to make.

5        What I mean by that is go back to the court's

6    environmentalist's analogy, the environmentalist is Mr.

7    Rathbun's parents, his mother, his father, perhaps other

8    people.

9        What every witness has said, every witness that the

10   government has interviewed, every witness that we know of,

11   that Mr. Rathbun simply was not interested in that.  He

12   was simply not a very religious person at all.  What he

13   was was a man who was struggling with a drug addiction and

14   losing that drug addiction.

15       The extent that he had anything compelling him it was

16   that drug addiction during those times.  It was not

17   antipathy towards any kind of religion.  That is what

18   every witness that the government could put on the stand

19   who knows Mr. Rathbun would say about him.

20       So to go again to your environmental activist, it may

21   be true as to his mother that would be proof of these

22   kinds of these issues that perhaps because she possessed

23   others that she also possessed this one, but that is not

24   the issue at trial.  It's miles away from what the issue

25   at trial here is whether it is Mr. Rathbun that received

that.  And again the government has no evidence that Mr.
Rathbun was given that particular pamphlet.  In fact, far
from it.

They have every witness that they're going to call is
going to either say, no, absolutely not.  That did not
happen.  Or, no, I certainly didn't see that happen here.
So it's important here because the court has already
identified this gets very confusing very fast and it also
brings in these issues of prejudice as we go along each
one of these steps.

As I started to think about it, how can some of these
things be cured by limiting instructions?  What would we
say as this evidence starts to come in?  And I don't know
what the answer to that is.

This is only for identity but, no, it can't be that
because the government is saying this goes to motive.  So
it's only to his mother's motive.  Well, that's not
relevant.  So as I struggle with how this is going to come
in, these are some of the questions I had.

More importantly, so how does this actually play out
at trial?  It's going to take several witnesses to get us
there.  Right.  One or two witnesses from South Carolina
from the Billy Graham Association.  Then I think another
witness, another pastor, from the Springfield area to talk
about what Sheila Rathbun, Mr. Rathbun's mother, what her

1   activities were regarding this.

2        And again no one is going to say that Ms. Rathbun

3   received this pamphlet or was even aware of it.  Then

4   another witness perhaps to say there were these kind of

5   pamphlets around, that might have been one of them.

6        That is as close as the government's evidence is

7   going to get to tie Mr. Rathbun to this pamphlet, and what

8   the government well knows is that it has an affidavit from

9   Sheila Rathbun indicating the exact opposite.  She

10  absolutely denies that she ever gave that pamphlet to Mr.

11  Rathbun; denies ever receiving it from that Billy Graham

12  Association.  So how does that play out?

13       So there's evidence that comes some at which time we

14  have to call six, eight witnesses to come in and testify

15  that Mr. Rathbun had no kind of interest whatsoever in

16  this Christianity conversion theory or the Christianity

17  features that the government wants to argue at the end of

18  the day.

19            THE COURT:  I think you're winning this argument

20  --

21            ATTORNEY WATKINS:  Okay.

22            THE COURT:  -- Attorney Watkins, but that's

23  regarding your motivation portion of it.  It's clear that

24  Mr. Rathbun had access to the information.  Whether or not

25  he was interested in the religious material really doesn't

1    matter.  He just had access to the material because it was

2    in his house.  It was in his mother's car.  It was in the

3    places he lived.  He had access to it.

4              ATTORNEY WATKINS:  Not -- there's no evidence

5    that he had access to the specific piece of paper that was

6    in there.  I liken it --

7              THE COURT:  I agree with you, but I'm not

8    concerned -- I've made a determination that I'm not

9    concerned -- I don't think that these specific exact type

10   face same pamphlet needs to be found throughout the house.

11   It goes back to the example of an environmental activist

12   having multiple types of flyers and pamphlets.  The

13   general nature of it was the same general nature as things

14   he did have access to.

15        Now whether or not that's a weak link or a thin

16   thread of a link that breaks, that's your argument.

17   Whether or not it's a strong enough link that the

18   government can ride through the case, that's their

19   argument.  It's ultimately for the jury to decide but he

20   did have access to that type of general material which

21   that pamphlet would be included in.

22             ATTORNEY WATKINS:  Then we get to the --

23   sorry.

24             THE COURT:  Go ahead.

25             ATTORNEY WATKINS:  Then we get to 403 even if

1    there is some modest relevance, weak relevance as the

2    court has put it, let's think about how we're going to get

3    there.  How we're going to spend an entire morning, if not

4    an entire day, on this subject of these Billy Graham

5    pamphlets and how are we going to tell the jury how to

6    evaluate this evidence?

7         THE COURT:  Why would we need to spend an entire

8    day?

9         ATTORNEY WATKINS:  Two witnesses from South

10   Carolina to talk about the pamphlet, another pastor.

11        THE COURT:  I, quite frankly, don't know why I

12   would entertain having witnesses from South Carolina talk

13   about the pamphlets.  I don't care about the pamphlets

14   other than they're the pamphlets that were recovered in

15   the house and the car.  Here they are.  I don't care where

16   they came from.  I don't care who wants to tell me about

17   what the message is in them, where they came from, where

18   they were printed.  It doesn't matter.

19        ATTORNEY WATKINS:  If I understand the court --

20   so the issue is that the piece of papers or a couple of

21   pieces paper in the spout came from this Billy Graham

22   pamphlet as opposed to any other pamphlet around the

23   world.

24        If the court is saying at this point that government

25   cannot argue that this piece of paper, Mr. Rathbun had

1    access to this specific piece of paper and is more
2    generally saying there were these kind of materials
3    around, then I think the court allows our motion in limine
4    here and we can move onto the next subject.
5            THE COURT:  I think there's going to be a
6    partial allowance of each side's motion in limine on this.
7            ATTORNEY BERKOWER:  Your Honor, may I respond?
8            THE COURT:  Absolutely.  Go right ahead.
9            ATTORNEY BERKOWER:  May I respond?
10       I just want to be clear here.  That, first of all,
11   with regard to prejudice, we would argue there's no
12   prejudice here from anything that these witnesses have to
13   say because there's no anti-semitic motive whatsoever in
14   the pamphlet itself.
15       And to the extent how -- to the extent that these
16   witnesses would be talking about what the pamphlets are
17   used for and where it came from, this isn't a bad act.
18   This is something that is completely innocuous that
19   doesn't ascribe anything negative to any person one way or
20   the other.  These aren't prior crimes.  There's nothing
21   prejudicial whatsoever about any evidence relating to the
22   pamphlet or its distribution in Springfield.
23       I do want to clarify though because it sounds like
24   the court -- maybe I wasn't clear enough with regard to
25   why we think the evidence about this pamphlet having come

1    from Billy Graham is relevant here, and the evidence that

2    we want to offer shows that this pamphlet was distributed

3    in Springfield at events that his family attended.

4        We fully expect that the defense, as they previewed

5    today, is going to say this defendant isn't religious.  He

6    didn't have these pamphlets.  He wasn't interested in any

7    of this.  Why on earth would he have had this in his

8    possession?  And the answer isn't just that there were

9    pamphlets and similar materials in his mother's car and

10   around his house.  It's that this specific pamphlet, which

11   came from South Carolina, was actually distributed at

12   events that his family went to.

13       In our view there's a circumstantial chain of events

14   that links that pamphlet from its production in South

15   Carolina to its distribution at events that his family

16   attended, and we also know that his family keeps this kind

17   of material in their house.

18       The whole chain of events in our view is relevant to

19   answer the jury's question of how did this guy's blood get

20   on that pamphlet because this pamphlet is from Billy

21   Graham in South Carolina and now it's sitting in front of

22   a Jewish nursing home in Springfield.

23       So in our view the jury will have that question.  The

24   defense clearly intends to take advantage of that question

25   and say our defendant he's not religious.  He doesn't have

1    any interest in this.  Why on earth would he be involved

2    with something like this?  And it answers that question

3    and we would say the jury has a right to know the

4    inferences that show this wasn't a case of mistaken

5    identity.

6         And, in fact, there is a reason and an explanation

7    for how this defendant's blood got on the pamphlet and so

8    in our view that whole chain of events, that whole series

9    of evidence, which I don't think Mr. Watkins is correct in

10   that it would take days and days.  It will take a few

11   witnesses because, as with all circumstantial evidence,

12   you know, there's sort of a flow and a chain of events

13   where inferences have to stake on each other so that the

14   entire context can be clear.  It would take several

15   witnesses, but I don't think it will take days and days.

16   But in our view it's highly relevant to how this

17   defendant's blood got on the pamphlet and we have to be

18   able to rebut their argument that there's no good reason

19   for that.

20        This chain of events the jury is entitled to know how

21   that chain of events linked this pamphlet from its

22   distribution and production in South Carolina to

23   Springfield.

24        I would also like to speak briefly with regard to

25   motive, which I think Mr. Watkins actually in a strange

1   way was making our argument for us.  He was saying this

2   defendant, he's not religious.  He doesn't have an

3   interest in any of this stuff in his house, and the

4   question is then why was his blood on a pamphlet stuffed

5   inside a gas can and lit on fire outside a Jewish home?

6         Our answer to that question is he was rejecting

7   religious.  He was rejecting the religion around him.  We

8   are going to have a witness who can speak that the purpose

9   of this pamphlet is the opposite of its use in this gas

10  can.

11        The purpose of this pamphlet is to bring people on

12  the right path.  The purpose of this pamphlet is to guide

13  people who want to renew their faith and to follow an

14  honorable path.

15        We're also going to have witnesses who will say that

16  this defendant was raised in that tradition but of late he

17  had forsaken those teachings.  He was rejecting what was

18  around him.  He was on a bad path and his family in their

19  best efforts to help him, which we have no intention of

20  casting aspersions on whatsoever, they were trying to help

21  him, were trying to deliver this message back to him and

22  bring him back to that.

23        By placing this device with the Christian message of

24  peace and love in front of the Jewish nursing home which,

25  by the way, his mother worked at.  We have evidence that

1    his mother worked there and that his grandmother lived

2    there.  He is rejecting, he is rejecting this, this path

3    that is being -- that he's being -- his family is trying

4    to get him back on to.

5         And so we would say that for the same -- for many of

6    the same reasons that this proves identity, it also is

7    strong evidence of motive.  And we're concerned that when

8    the defense is arguing to the jury there's no motive here,

9    the government can't show this guy's not religious.  He

10   doesn't care about any of this, we should be able to

11   respond to that by saying exactly.  That's exactly right.

12        Everyone around him was trying to get him to accept

13   these principles and instead of accepting them, he lit

14   them on fire outside of the nursing home where his

15   grandmother used to live; that has a Jewish -- it's a

16   Jewish-sponsored facility and where his mother worked.

17        And we feel that in fairness for the jury to

18   understand the full context of this crime, both that

19   motive and the proof showing is not mistaken identity is

20   required.

21             THE COURT:  All right.  Attorney Watkins, you

22   want the last word?

23             ATTORNEY WATKINS:  Your Honor, it's a little bit

24   flabbergasting to me.  I guess the government has made

25   their closing argument before the judge -- before the

1       court about why they need this in order to argue it.

2            The problem the court is going to hear during trial

3       is it's not supported by the evidence.  They can make up a

4       theory and they can ask the jury to go along with them on

5       this ride of speculation about what Mr. Rathbun's motive

6       was.  That he was anti all religions.  The problem is they

7       will have zero evidence of that.  What they will have by

8       then is a --

9                 THE COURT:  But isn't that what happens at most

10      trials?

11                ATTORNEY WATKINS:  But, Your Honor, the problem

12      with this stuff is the court -- this particular evidence

13      as the court has identified it brings all kinds of mis --

14                THE COURT:  Very inflammatory, negative --

15                ATTORNEY WATKINS:  Right.

16                THE COURT:  -- emotional, dramatic, topical

17      unfortunately issues.

18                ATTORNEY WATKINS:  That's correct.  That's

19      correct, and to be able to tamp that down as this evidence

20      comes in would be I would suggest impossible.

21           Just a moment on the identity issue and the

22      interstate nexus, the government is going to have no

23      difficulty proving interstate nexus.  I expect they're

24      going to call the gas can producer to say that that can

25      went into interstate nexus.  That's not an issue that they

1    need to prove this particular chain of evidence.

2         As far as identity, the evidence of Mr. Rathbun's

3    blood being located on the pamphlet it's not going to be

4    challenged.  That's not going to be challenged.  He

5    touched this piece of paper at some time.

6         It is simply -- so then the question becomes why does

7    the government truly want it?  I think you've heard it.

8    It is really this now I think manufactured motive that is

9    not supported by any kind of evidence but from which they

10   would like the jury to speculate off of this long chain of

11   evidence which ultimately they cannot prove.

12             THE COURT:  All right.  Okay.  So thank you both

13   of you.  Under advisement for Dockets 75 and 79.

14        All right, 76 is reactionary testimony and that is

15   defendant's motion; is that correct?

16             ATTORNEY WATKINS:  That's correct, Your Honor.

17             THE COURT:  All right.  So you're looking to

18   preclude the introduction of reactionary testimony as

19   irrelevant and unfairly prejudicial appealing to the

20   emotion of the jury.  Of course, subjective reactions are

21   not important; it's the objective potential threat, but go

22   ahead.

23             ATTORNEY WATKINS:  Your Honor, as you see it's

24   very short.  The disability I have right now of arguing

25   more is I have no idea what the government is actually

1    going to put up on this.

2         This was an intimation from the prosecution team that

3    they were going to be attempting to introduce this kind of

4    evidence.  I have not seen the particular witnesses.  I

5    don't know who it is, but I stand by the motion that the

6    adventure that they're trying to get into to call

7    witnesses after the fact that didn't see it in sight to

8    talk about their reactions to what do you think about the

9    fact that this was found on the property is simply

10   irrelevant and prejudicial.

11             THE COURT:  All right.  Attorney Berkower.

12             ATTORNEY BERKOWER:  Your Honor, we would argue

13   that this kind of evidence of a victim's reaction to an

14   incident like this has been considered relevant by pretty

15   much every court that has considered the issue.

16             THE COURT:  Maybe.  Perhaps but -- perhaps, but

17   it depends on the context.

18        Give us the background like how do you -- Attorney

19   Watkins, nor I, know anything because no person saw it.

20   No person walked out and saw it and you can't gauge the

21   reaction by that immediacy.  This was like several steps

22   removed.  So what's the background?  How did they find

23   out?  Who told them?  That type of things.  What would you

24   propose?

25             ATTORNEY BERKOWER:  Well, Your Honor, there is

1    one witness that we have identified to the defense who did

2    see this.  He is somebody who lives at Genesis House and

3    walks outside periodically several times a day for

4    cigarette breaks right at a sign at the entrance to the

5    facility that's located just steps away from where the

6    device was placed.  He did see this, and so in our view he

7    has both percipient witness testimony about what he saw

8    and then also his reaction to what he saw.  In our view

9    that would be relevant.

10            THE COURT:  Does he live there or work there?

11            ATTORNEY BERKOWER:  He lives there.

12            THE COURT:  Okay.  All right.  Thank you for --

13    I guess I didn't pull that specific out of the motion so

14    thank you for telling me that.  All right.

15            ATTORNEY BERKOWER:  In addition, there are other

16    witnesses.  There's a witness from across the street who

17    saw the device and called 911.  In our view her perception

18    of that would be relevant.

19        Then with regard to witnesses who work at the

20    facility or live at the facility and who didn't see the

21    device themselves, I understand that's probably where the

22    court has most concern.

23        We would say that these individuals' understanding of

24    what happened is relevant to whether or not the defendant

25    had an intent to intimidate because under an objective

reasonable person standard, that is considered probative,

not determinative, not determinative but probative of

whether the defendant had the intent to intimidate because

would a reasonable person find a device placed where it

was placed outside the entrance to your home or your

workplace to be intimidating?

That's relevant for the jury to know because if it

turns out that nobody thought much of it, that speaks in

one way to what his -- that speaks on the one hand to what

his intent may have been versus if it was taken very

seriously, that speaks differently.

The jury wasn't there.  These people live and work

there, and if they were intimidated by what happened, that

speaks to whether or not this was actually placed with the

intent to intimidate them and we would submit that in our

similar kinds of cases courts have permitted this evidence

for that reason.

THE COURT:  It's an objective standard and the

jury makes the determination.  It's an objective standard,

not a standard that the jury just fills in a blank based

upon people who happened to live there might have felt.

It's objective.

The problem I see with people that are one step or

two steps removed is -- for people who walked out and saw

it themselves, that's one thing.  For people who learn

about it, then I'm not sure how they learned about it.
I'm not sure if whoever told them was very excited and
dramatic and scared themselves and told them in a very, in
a very extreme way something to the effect of can you
believe what was out there?  This almost happened, you
know, and was very scared highlighting the danger,
highlighting the potential fire; highlighting their own
fear as a person who's reporting to your potential
observation witness.

I don't know any of that and so I don't know how that
affects what the reaction would then be.  It's so much
cleaner for the people who walked out and saw it.  I
certainly get your argument, but that's my concern with
other people.

ATTORNEY BERKOWER:  Yeah, I think that, Your
Honor, with regard to any concern about what was the
nature in which these folks learned about it, that can be
the subject of cross-examination and then the jury can
judge it for whatever the answer to those questions may
be.

I would also say that like a limited instruction can
be a lot of help here, which is their subjective
understanding of what happened and how they reacted.  You
know, this is an objective person standard and you can
consider it but it's not determinative.  I think that a

limiting instruction could do a lot of good here.

I would also say that with regard to, with regard to
people who learn about things after the fact, let me give
you another example that I think maybe makes this more
clear which is in a case where a husband takes out a hit
on his wife but the plot is disrupted at the last minute,
I don't see a world in which that wife doesn't get to
testify at trial about how this affected her and what this
meant to her.

And I think like here, it's not something that
actually happened to her.  She wasn't killed.  She lived
to tell the tale and the plot was disrupted but her
reaction to that is relevant to the case.  And for the
same reason that it's relevant there, it's relevant here.

These folks -- the device was placed outside of their
workplace or their home, and, yeah, they learned about it
after.  It's possible through cross-examination would come
out that they learned about it in some sensationalistic
way.  But to the extent that we only expect to offer this
for the limited purpose of showing the people who lived
there and worked there were scared and took these
seriously and it wasn't some kind of joke, you know, we
feel that that has probative value.

It doesn't have any tendency to make a fact of
consequence more or less probable, not determinative as

1    the case law has said and it is an objective person

2    standard, but any tendency we feel that that standard is

3    more than met.

4              THE COURT:  All right.  Last word, Attorney

5    Watkins.

6              ATTORNEY WATKINS:  I have nothing to add, Your

7    Honor.  It's irrelevant and the prejudicial is high.  I

8    think the court is leaning towards -- I think the court is

9    right that the two witnesses that actually saw it out

10   there want to testify, we can take that as it goes but

11   other witnesses should not be permitted to testify.

12             THE COURT:  All right.  I have an idea of what

13   I'm going to do on this, but I want to be careful in how I

14   kind of draw the lines.  So 76 is under advisement.

15        Now 77 has to do with referring to the device, the

16   incendiary device label for this.  Now that language is in

17   the statute itself.  I really -- I can't imagine that the

18   government wouldn't call it that during its opening or

19   closing.

20        I don't think the government should be limited from

21   calling it that during the examination of any experts or

22   any people qualified in that area to describe whether or

23   not what it was and describe whether or not it fits the

24   definitions of the statute.

25        That's not to say the government should be able every

third word that comes out of its mouth for every witness
to say incendiary device.  That would be too much and that
would be unfair and I wouldn't allow that.

     But, Attorney Watkins, how do we get around that it's
part of the statute?  This is what they have to prove.
There's a definition for it and you're clearly going to be
arguing that it wasn't.  That's the point.

          ATTORNEY WATKINS:  I'm content with the
guidelines that the court just put out there.  That's
quite correct.  I think the prosecution team doing the
opening can refer once or twice to an incendiary device in
the context of they are going to prove -- they are going
to try to show that indeed it was an incendiary device,
but that is my concern is that the nomenclature would
start to take over the entire trial and I think that would
be inappropriate and in fact wrong.

          THE COURT:  Okay.  So my direction is that you
can say it in your opening and closing.  That's
appropriate.

     During the trial there will be certain witnesses
where it is appropriate to refer to the gas can as an
incendiary device.  Absolutely I can see how you would do
that.  But where it can be avoided and it is not necessary
where it would be something that would be considered just
a gratuitous mentioning of the word for the value of

1    repetition, that's strongly discouraged by the court and

2    you should just refer to the item as gas can for those

3    witness and those times where there's no real good-faith

4    basis for you to refer to it as an incendiary device.

5         All right.  That's 76 -- no, that's 77.

6         Now 78 has to do with the government's -- I'm sorry,

7    it's the defendant's motion for reference to a search

8    warrant.  I think clearly the government needs to be able

9    to explain that they conducted a search pursuant to a

10   warrant, pursuant to a legally-authorized warrant.

11        I think that should be about the beginning and the

12   end of it.  There shouldn't be any drawn out discussion

13   about probable cause and how you establish probable cause

14   and the magistrate's review of it, but I certainly don't

15   think the government should be left trying to create an

16   impression that they just went into someone's house

17   without lawful process.

18        Attorney Watkins.

19        ATTORNEY WATKINS:  I agree exactly, but the

20   government wants more on this.  So having agreed with the

21   court, I will now be quiet.

22        THE COURT:  I'm not sure if the -- government,

23   do you want to go beyond that?  I've never seen the

24   government want to explain the probable cause process.

25        Go ahead.

1          ATTORNEY BERKOWER:  No, Your Honor.  We do not

2    want to go beyond that.  I'm guessing what Mr. Watkins is

3    referring to is our proposed reference to the CODIS

4    database and the initial match between the defendant's DNA

5    and the bloodstains taken from the crime scene.

6          With regard -- I don't know Your Honor wants to hear

7    more about that in particular.  With regard to the search

8    warrant, we do not intend to go beyond the perimeters Your

9    Honor outlined.  With regard to CODIS, I can give a little

10   more explanation.

11          THE COURT:  All right.  So that's the ruling.

12   So we have our ruling, the defendant's motion on 78 is

13   allowed consistent with what I've just said.  We'll get to

14   the other point, Attorney Berkower, when it just comes up

15   logically.

16          There is a motion filed by the government for

17   rebuttal evidence.  I think you raise some interesting

18   points, some interesting points which might be -- which

19   might merit further discussion.

20          I frankly don't know how I do that at this point

21   though without having the benefit of the context of the

22   trial and seeing what came out at the trial and being able

23   to balance what you propose as the rebuttal evidence with

24   what actually happened at the trial.  It's a little bit

25   too speculative at this point and so my plan is to reserve

1    ruling on Docket No. 80 at this point.

2             ATTORNEY BRESLOW:  Your Honor, may I be heard on

3    this briefly?

4             THE COURT:  Sure.

5             ATTORNEY BRESLOW:  Okay.  First, before we go to

6    the instant motion, can I just get clarification?  I'm not

7    sure I fully understood Your Honor's decision on the prior

8    motion and in particular whether we can offer evidence

9    that the Massachusetts State Police Crime Lab conducted a

10   preliminary test of the bloodstains, found them to be

11   human blood and then found them to match the DNA of the

12   defendant in a public database without regard to the

13   criminal nature of that database.

14            THE COURT:  And you're saying -- and maybe

15   Attorney Berkower tried to tell me this, you're saying

16   that falls under the search warrant probable cause motion?

17            ATTORNEY BRESLOW:  Yes.  Exactly.  It's not so

18   much that we want to get into the nature of probable cause

19   or explain that.  We just want to be able to tell the

20   story of the investigation, which is that the --

21            THE COURT:  You can't do that.  You told your

22   story to the magistrate.  You got the search warrant.  The

23   jury will be told that you had a lawful search warrant and

24   you entered with the permission of that warrant.  That's

25   it.

1          MR. BRESLOW:  Okay.  That's very clear now.
2     Thank you.
3          THE COURT:  All right.  Thanks for bringing it
4     back up.  Attorney Berkower, I'm sorry I cut you off if
5     that was the point you were trying to bring back.
6          All right.  So on the rebuttal evidence issue?
7          ATTORNEY BRESLOW:  Yes.  Well, I do agree, Your
8     Honor, that with respect to the incidents that we're
9     outlining, in particular the baseball bat incident that
10    took place one week before April 2nd, the Chicopee Quality
11    Inn incident that took place one month before April 2nd,
12    both of which the defendant talked about in his interview,
13    and then the violation of the abuse prevention order which
14    took place one year earlier and involved threats to burn
15    down the house of his ex-wife, we agree that that's
16    something that we simply wanted to make sure the defense
17    was well aware of that we were going to seek to admit that
18    evidence if the defense raised certain defenses which we
19    outlined in our motion.
20         And so we wanted the court and the defense to be
21    aware that this evidence existed; that we were going to be
22    using it to rebut certain defenses, not a defense of alibi
23    per se but a defense of innocent conduct or otherwise
24    law-abiding conduct as we've explained in our motion.
25         So that I agree we have to wait until the trial plays

1    out, but I do want to speak about another set of evidence

2    that I'll call context evidence that I don't think

3    involves 404(b) evidence per se, and a piece of this is I

4    believe wrapped up in the defense alibi and so I do want

5    to spend a moment or two discussing it with the court and

6    with defense counsel now.

7              ATTORNEY WATKINS:  May I interrupt?  I thought

8    we were on Number 80 still.  Are we going on to something

9    else?

10             THE COURT:  I thought we were on Number 80 still

11   yes.  Is there another motion?

12        Hang on one second.  I have to grab another stack of

13   papers for this next motion.  I will be right back.

14             ATTORNEY BRESLOW:  Okay.

15             THE COURT:  Go right ahead.

16             ATTORNEY WATKINS:  Your Honor, going back to

17   Number 80 which is the government's motion in limine, I

18   will still insist I cannot imagine a universe where any of

19   these incidents, which are far field from the actual

20   offense here, would ever come in.  I recognize the court

21   is reserving ruling to see if there's some door that gets

22   opened.

23        I just want to make completely clear that one

24   statement in the government's motion gave me a little bit

25   of heartburn.  However, they write -- "However in

anticipation of possible defenses, theories, and arguments
that may create a misleading impression," what I am
concerned about is that something in my opening will say,
well, the government will then immediately say that opens
the door to us putting it in now rather than having to
wait until after the defense case is done.  I think I
understand your ruling that that is not something that
would happen.

THE COURT:  An opening is not evidence.  It
would not open a door.  Evidence would open a door.

ATTORNEY WATKINS:  Thank you.  With that, I have
nothing further on that motion.

ATTORNEY BRESLOW:  Okay.  Evidence, Your Honor,
including cross-examination of the government's witnesses?

THE COURT:  Right.

ATTORNEY WATKINS:  So, once again, does that
mean that the government will be introducing this during
their case-in-chief if a cross-examination question
crosses whatever line they think of, that that will begin
to -- they will begin to offer up evidence in their
case-in-chief?

ATTORNEY BRESLOW:  Well, that's exactly our
point, Your Honor, is to make it clear that,
notwithstanding opening statements, that if the defense
seeks to introduce in evidence, even in evidence through

cross-examination of our witnesses a defense of this sort,
that, yes, we should be permitted to introduce in our
case-in-chief the evidence that we've outlined which we
are refraining from doing otherwise.

ATTORNEY WATKINS:  So as I --

THE COURT:  There would have to be quite a door
opened.  That door would have to be opened wide probably
kicked off its hinges.  And if it was, the incidents you
talk about, government, they have, they have quite an
impactful potential value to them.  I'm not ruling out
that something could happen at trial that would make them
relevant and allow me to deal with the prejudicial impact
of them in a fair way or at least do that balance that
they favors the government.  Maybe that can happen.

The reason why I was reserving ruling is I just want
to see how it plays out.  There would have to be quite a
turn of events for that to come in I think.

Attorney Watkins?

ATTORNEY WATKINS:  Nothing further on that, Your
Honor.  Thank you.

ATTORNEY BRESLOW:  Your Honor --

THE COURT:  Go ahead.

ATTORNEY BRESLOW:  -- well, related to this
there is a set of context evidence that I'd like to
discuss with the court but we can wait until the court is

1    through all of the motions if Your Honor prefers.

2            THE COURT:  All right.  Yes, I'd like to just

3    keep moving.

4        The next one I have is 81; 81 is government's motion

5    to rule the interrogation or the questioning

6    unconstitutional because it wasn't recorded.  I don't know

7    of any authority to do that, and I'm not -- I don't think

8    this case is appropriate for me to consider announcing a

9    new view on this.

10       It seems to me it's a fair area of cross-examination

11   to talk about the interview not being recorded.  I

12   understand, and I could be corrected on this, but I

13   understand the interview took place at the scene in a more

14   of an informal nature either inside or outside the house,

15   Mr. Rathbun's house.

16       It was an on-again off-again discussion or

17   conversation between the police and Mr. Rathbun that he

18   was not in custody at the time.  Now again all these

19   perceptions -- all these ideas that I have right now could

20   be changed if you want to give me more information.

21       I certainly would consider a jury instruction similar

22   to *DiGiambattista*, the Massachusetts case, but I think

23   that instruction was designed and meant for more of a

24   custodial situation at a law enforcement facility down at

25   the police station or whatever it might be where recording

1    evidence was clearly available and there was a known

2    policy.

3         I don't know that there really -- there's a policy

4    that the FBI has about recording, but I don't think it's

5    very applicable to when you're walking around the front

6    yard of someone that you're doing an investigation if it

7    really applies there.

8         But I think it might be -- I'd consider modifying

9    some type of or coming up with some type of instruction

10   about in this day and age where there is -- you don't need

11   to carry around a handtruck full of recording equipment to

12   record someone's statement and it wasn't recorded in this

13   context.  That might be something the jury thinks is

14   useful.

15        Attorney Watkins?

16        ATTORNEY WATKINS:  Your Honor, the court is

17   going to have to wait as the evidence comes in to hear a

18   little bit more about this.

19        The issue in this case is there's going to be a lot

20   of subjective opinion from the agent at the scene.

21   There's going to be this suggestion that I think what the

22   government is going to argue is consciousness of guilt

23   when he's confronted with the fact that -- that when Mr.

24   Rathbun is confronted with the fact that his DNA is found

25   on the can and on the paper that his reaction, non-verbal

1    in addition to verbal reaction, indicates a consciousness

2    of guilt.

3         That evidence is obviously very, very powerful in

4    front of the jury.  We have no ability to counteract that

5    by an actual documentation of what actually happened.

6    Certainly Mr. Rathbun would disagree with the

7    characterization of what the agent is going to say.  And

8    with no statement that Mr. Rathbun affirmed without any

9    kind of recording of it, we're really stuck with the 302

10   and it's simply unfair at some level that these kinds of

11   subjective observations come in without any way for a jury

12   to objectively evaluate it.

13             THE COURT:  So it's not so -- I shouldn't say

14   it's not so much, but a component of your motion has to do

15   with his physical reactions to the discussions or

16   conversations with the police?

17             ATTORNEY WATKINS:  That's correct.  That would

18   be included within the motion.

19        Your Honor, if I may, this was actually Ms.

20   O'Neill-Greenberg's portion of the pleadings.  She tells

21   me she could not hear the court so I was arguing her

22   motion probably very poorly.  I want to see if she's able

23   to hear us now.  It looks like no and so I will continue

24   on arguing there and indeed that is at least part of the

25   issue here.

1          There are also, as the court has seen from Count 3,

2     the government has raised this in a very nuanced the

3     actual -- the allegations of lies are very nuanced.

4     Whether something -- when Mr. Rathbun said something

5     didn't happen within the last two weeks, whether it was 13

6     days and 12 hours rather than two weeks; whether he used

7     -- what he used the internet for and failed to talk about

8     one specific thing.

9          These kinds of issues are going to get very, very

10    hotly litigated if this case goes to trial with those

11    three counts there.  We're going to deal with that more on

12    the motion to sever, but I just wanted to make the court

13    aware this is a separate reason why recording an interview

14    if one is going to begin to charge someone with false

15    statements on the basis of the FBI's say-so that becomes

16    very, very problematic.  I think it take this case out to

17    something different from what many of the other cases have

18    said and why judges have not to this point excluded these

19    kinds of interviews.

20              ATTORNEY BERKOWER:  Your Honor, may I respond?

21              THE COURT:  Yes.  I'm getting a message from

22    Attorney Forest O'Neill-Greenberg.  She can't hear anyone

23    she says.

24         Christina, do you know what's going on with that?  Is

25    it on her end or our end?

1            THE CLERK:  It's on her end.

2            ATTORNEY WATKINS:  It looks as though she's

3       trying to log on again.

4            THE CLERK:  It might help if she uses earbuds.

5       I know sometimes that helps.

6            THE COURT:  Attorney Berkower.

7            ATTORNEY BERKOWER:  I want to make a couple of

8       things clear about this, which is with regard to the

9       *DiGiambattista* case and the Massachusetts Supreme Court

10      that case did refer to custodial interrogation.

11          I just want to be very clear and make sure we

12      understand that they aren't even alleging that this was

13      taken -- this statement was taken in violation of his

14      Fifth Amendment rights, which are the primary

15      constitutional provision that governs statements by

16      defendants to law enforcement officers.

17          There's no allegation whatsoever that he was even in

18      custody and if he was the agents out of an abundance of

19      caution Mirandized him and he waived.  They're not even

20      alleging that he was this custody, nor are they alleging

21      that the way his constitutional rights could have been

22      violated in a non-custodial setting -- namely, that he was

23      coerced in some way -- they aren't even alleging that.

24          They're just claiming there are some sort of as yet

25      undefined substantive due process right to record a

1    statement.  That is something that no federal court has

2    ever held, and I understand why in custodial situations

3    courts are very concerned about what it could mean and the

4    jury -- a jury instruction about why something was

5    recorded might be appropriate.  But here, I would like to

6    point out a few things that I think would make that jury

7    instruction really misleading to the jury.

8        The first is that the FBI policy does not require any

9    such recording and doesn't permit agents to use their

10   personal devices to make such a recording.  It expressly

11   prohibits agents from taken out their cell phones and

12   making a recording.  They have to use equipment that is

13   specifically designated by the FBI as appropriate to

14   mistake a recording.

15       And my concern would be that having a jury

16   instruction saying you can draw a negative inference from

17   the fact it wasn't recorded misleads the jury to think

18   these agents did something improper when in fact their own

19   agency policy wouldn't have permitted them to do the thing

20   that Mr. Watkins wanted them to do, which is effectively

21   chaise the defendant around his own yard as he's

22   voluntarily talking to them off and on for several hours

23   to make sure they could get a recording on a device that

24   their employer wouldn't even allow them to use.

25       And so I just want --

1            THE COURT:  I didn't necessarily say that I
2     would give an instruction that allowed a negative
3     inference to be drawn, but I think some type of
4     instruction might be appropriate.  It might be the
5     government asking me for an instruction because Attorney
6     Watkins cross-examines the government witnesses about why
7     they didn't.  You might want the instruction saying
8     there's no obligation or rule saying the front lawn
9     conversation needs to be recorded.
10            ATTORNEY BERKOWER:  I understand.
11            THE COURT:  So you might be asking for an
12     instruction.
13            ATTORNEY BERKOWER:  Okay.  I misunderstood Your
14     Honor because the reference to *DiGiambattista* was a case
15     in which the court said the recording -- the lack of
16     recording could be inferred negatively towards the
17     government and so I misunderstood.
18            THE COURT:  I think I said, maybe I didn't, I
19     said an instruction something like *DiGiambattista* and that
20     meant generally just talking about this recording an issue
21     -- this recording issue because jurors want to know about
22     that now, and so we'll see what instructions each side
23     wants me to give after -- I'm sure there's going to be
24     cross-examination about it.  That will be fair cross-exam.
25            ATTORNEY BERKOWER:  Of course.

1          THE COURT:  But the bottom line I'm not going to

2     suppress -- Attorney Watkins, to the extent you requested

3     a suppression of the statement based upon a lack of

4     recording, that is denied.  All right.

5          What else do we have for motions?  Do we have -- is

6     it a *Daubert* motion?  A motion for a *Daubert* hearing; is

7     that all that's left?

8          ATTORNEY WATKINS:  That's correct, but I don't

9     think that's quite ripe.  I think the government is going

10    to need to respond to that before we can join or the

11    government has going indicated it will respond.

12         THE COURT:  All right.  Can we put that on, can

13    we put the *Daubert* motion on soon?  As soon as we can next

14    week, as well as the severance issue for next week?

15         ATTORNEY BRESLOW:  Your Honor, I believe that

16    the court just set a briefing schedule for the

17    government's response due on October 27th --

18         THE CLERK:  That's correct.

19         ATTORNEY BRESLOW:  -- for the motion to sever.

20       Can you hear me, Your Honor?

21         THE COURT:  (Indicating.)

22       So I'm talking with my clerk about keeping this

23    organized and keeping things in line.  So what is the

24    scheduling that you can do for your response on the

25    *Daubert* and the severance?  I think we got a docket order

1    out that already set a schedule for the severance

2    response.

3                ATTORNEY BRESLOW:  Yes, Your Honor.  Your Honor

4    just recently in the midst of this hearing issued a

5    scheduling order that asked us to respond to the severance

6    motion by October 27th.

7                THE COURT:  All right.  And the response to

8    *Daubert* will be before that or at the same time?

9                ATTORNEY BRESLOW:  I'll let Ms. Berkower

10   respond, Your Honor.

11               ATTORNEY BERKOWER:  Your Honor, I think that

12   they filed that motion on Monday.  We would request we

13   could have them be due -- both responses be due at the

14   same time but that would I think give us an extra day

15   longer on the *Daubert* than on the severance, whatever Your

16   Honor prefers.

17               THE COURT:  The same day sounds fine to me.

18               ATTORNEY BERKOWER:  Thank you, Your Honor.

19               THE COURT:  And as to the *Daubert*, is there

20   going to be -- oftentimes in *Daubert*-type situations

21   there's rulings made without the necessity -- courts find

22   there's no necessity for an actual hearing depending upon

23   the report, a filing of the CV, and the report of the

24   expert findings and proffer as to what the testimony or

25   opinion would be.  Is there going to be something like

1    that in this case?

2              ATTORNEY WATKINS:  Your Honor, my pleading I

3    requested a *Daubert* hearing in advance of trial before the

4    evidence is admitted.

5              THE COURT:  Right.  I know you absolutely did,

6    but one of the things I always look at as to whether or

7    not I'm going to give a full hearing is if I have a fully

8    developed record by way of a report that gives me a view

9    as to what the testimony might be.  So is there going to

10   be that?

11             ATTORNEY WATKINS:  I expect that the government

12   is going to provide that.  I don't believe that there's

13   been a report that supports the expert's testimony at this

14   point.  The government may have a different view of

15   that.

16             THE COURT:  Attorney Berkower, is something like

17   that going to be included in your response?

18             ATTORNEY BERKOWER:  Yes, Your Honor.  We will

19   attach the expert's CV and he did do a written report that

20   we will attach.  I think obviously the defense doesn't

21   think that is enough but we believe that will create a

22   full record for Your Honor to decide the motion without a

23   hearing.

24             THE COURT:  But the defense hasn't seen it yet,

25   right?

1            ATTORNEY BERKOWER:  Oh, no, they've seen it.  We
2     gave it to them as part of our expert disclosures.
3            THE COURT:  Oh, okay.  So it's just the court
4     you're holding back on?
5            ATTORNEY BRESLOW:  Well, the motion was just
6     filed, Your Honor.
7            THE COURT:  Yes, it was.
8            ATTORNEY BRESLOW:  But I do want to confirm
9     because it was a little unclear based on what Mr. Watkins
10    was saying we did provide the report to Mr. Watkins.  I
11    think it's just that Mr. Watkins is deeming it
12    insufficient in some way.
13           THE COURT:  Right.  No.  Yeah, Attorney Watkins,
14    you did give me the impression that you didn't have a
15    report.
16           ATTORNEY WATKINS:  Perhaps I put in the pleading
17    that I had requested something from the government.  They
18    responded and the answer to that is nothing.  They have
19    nothing further to give me.  So it is my position that
20    there is not a report that's responsive to my motion and
21    so that's why I did not attach anything.  Frankly I
22    couldn't figure out what I would attach that would show
23    what the basis of his opinion is and therefore that's why
24    we are having a *Daubert* issue.
25           THE COURT:  I must say, not only are you a good

1    lawyer but that is a politically savvy answer.

2                ATTORNEY WATKINS:  Thank you, Your Honor.

3                THE COURT:  You got a report but not one that

4    you think is... so you're deeming that not -- yeah, okay.

5    Very good.  I'll look at what's filed and we'll deal with

6    it the next time.

7          So, Ms. Rivera, can we have a next court date at some

8    point after the filing deadline which is the 27th?

9                THE CLERK:  We can do Thursday, the 29th at 2

10   p.m.

11               THE COURT:  Thursday the 29th.  I'm looking for

12   my master trial schedule.

13         LeeAnn, how does that date sound?

14         All right.  I don't have it in front of me, but if

15   you're telling me it's a good date.

16               ATTORNEY WATKINS:  That's fine for the defendant

17   as well.

18               THE CLERK:  We would have been on trial on the

19   Velez matter, Judge, so we have that week open.  So the

20   27th is a good due date and then the 29th would be the

21   hearing at 2 p.m.

22               THE COURT:  That's what we'll do then.  All

23   right.

24               ATTORNEY BRESLOW:  That's the hearing on both

25   the *Daubert* and the motion to sever, Your Honor?

1              THE COURT:  Exactly.  Exactly.

2        Now, the timeline starts to get a little closer so if

3    after the *Daubert* hearing I need an evidentiary hearing,

4    your witnesses will be available in pretty short order if

5    we need to do that?

6        Government?

7              ATTORNEY BRESLOW:  Yes, Your Honor.  So now I

8    understand you are expecting simply legal argument on the

9    29th?

10             THE COURT:  Right.  Don't bring in a witness.

11             ATTORNEY BRESLOW:  Okay.

12             THE COURT:  It's legal argument as to whether or

13   not we need to have an evidentiary hearing.  But if we do,

14   if we do need an evidentiary hearing, we obviously need to

15   do it within a few days.

16             ATTORNEY BRESLOW:  Okay.  The witness is

17   available.  He's an FBI agent.  He would be available

18   remotely.  He's in Washington D.C.

19             THE COURT:  All right.  Okay.

20        Attorney Forest O'Neill-Greenberg, you're back.  Can

21   you hear the proceedings now?

22             ATTORNEY O'NEILL-GREENBERG:  I can hear you now

23   for the first time.

24             THE COURT:  Listen, Attorney Watkins had to

25   cover for you.  It was painful.  I hope --

1    (Laughter)

2              THE COURT:  It was painful by his own

3    description, not mine.  I think he's great but, yeah, he

4    was having a hard time covering for you.  So next time I

5    look forward to hearing from you.

6              ATTORNEY O'NEILL-GREENBERG:  So I hope you ruled

7    in his favor then.

8              THE COURT:  He's doing all right.  He's doing

9    okay.  Thank you, everyone.

10             ATTORNEY BRESLOW:  Your Honor, if I may?

11             THE COURT:  Yes.

12             ATTORNEY BRESLOW:  Your Honor, can I double back

13   to what I was going to talk about in the context of the

14   Document No. 80 motion?

15             THE COURT:  Sure.

16             ATTORNEY BRESLOW:  Okay.  So, Your Honor, we

17   don't view this as 404(b) evidence but we wanted to

18   outline it for the court.  If the court wants us to file a

19   motion, we will.  But this is what we would consider more

20   context evidence that sheds light on the defendant's

21   motivation, which as Ms. Berkower explained, involved

22   placing the device as essentially an anti-religious act by

23   somebody who was struggling.

24        The context evidence, some of which will come from

25   the defendant's own interview, some of which will come

1    from the defendant's phone, some of which I believe is

2    embedded in the defense alibi, which is that the defendant

3    was drug-seeking during the period of time in which the

4    device was placed, and some of which may come from people

5    either within the defendant's family or known to him and

6    that is that the defendant was unemployed.

7         He had been fired after being accused of workplace

8    theft.  He was resorting to living in his parents' home

9    with his 17-year-old daughter who was estranged from him

10   in his own house.  He was not contributing to the family

11   welfare.  He was depressed, isolated, not engaged with

12   friends, smoking marijuana, drinking alcohol.

13        Like I said, I believe that the substance abuse is

14   part of the defendant's alibi that he had ceased

15   involvement in his church or in his family's church.  He

16   was arguing with his mother who was in good faith

17   attempting to keep him on the road to recovery and getting

18   him to gain employment.

19        This is the context in which the defendant was living

20   on April 2nd when the device was placed we allege by him,

21   and I wanted to discuss it with the court in part because

22   some of this evidence is actually bound up in the

23   defendant's interview.

24        There are certain false statements that the defendant

25   made regarding his employment, his termination from

1    employment, and regarding his own drug use.  The defense,

2    as Mr. Watkins has indicated from nearly the beginning, is

3    that the defendant could not, could not have placed this

4    device.  He has an ironclad alibi because he was elsewhere

5    seeking drugs and so, so I wanted to front that for the

6    court and for Mr. Watkins to see if the court had concerns

7    or Mr. Watkins had concerns with this kind of evidence and

8    if the court wanted briefing on it.

9           THE COURT:  From my perspective I do have

10   concerns, but I can definitely -- the government has a

11   right to explain their case and put their case into

12   context.  A lot of the information you talked about would

13   be putting that in context.

14        The court generally would try to filter out some of

15   that evidence if it was overly prejudicial.  That becomes

16   difficult if some of that information also is going to be

17   coming from the defense themselves talking about the drug

18   use and the drug use lifestyle.

19        So I think that I should allow the defense to discuss

20   that with the prosecution and formulate any specific

21   objections to it by way of another motion in limine which

22   we can discuss on the 27th.

23        Attorney Watkins or Attorney Forest

24   O'Neill-Greenberg, any opposition to doing it that way?

25           ATTORNEY WATKINS:  No, Your Honor.  It's a lot

1    to unpack in just what Mr. Breslow said here and so I'd

2    like to see it on paper.  I think that would be helpful.

3            THE COURT:  All right.  So the government I

4    would ask you to file a motion in limine requesting

5    permission for this information to come in.

6        I think you gave a very good summary of the argument

7    and the information, and just to be transparent with

8    everyone I do think the government would have a right to

9    talk about some of these things.  How much and how much

10   emphasis, that's another thing, but especially in light of

11   the drug issue that the defense is not going to run away

12   from either.  So it's worth talking about.  Thank you for

13   raising it.  We will discuss it later.

14           ATTORNEY BRESLOW:  Yes, Your Honor.

15           ATTORNEY WATKINS:  Your Honor, given that we are

16   going to be back in court on the 29th, are you going to

17   set a briefing schedule for that as well?

18           THE COURT:  Well, that's going to be a little

19   closer.

20       Government, can you have something filed in a few

21   days, maybe by the same day you need to file your other

22   things?

23           ATTORNEY BRESLOW:  Yes, Your Honor, that's on

24   the --

25           THE CLERK:  27th.

1          ATTORNEY BRESLOW:  -- 27th.  Yes, Your Honor, we
2     should be able to file a motion in limine on that by then,
3     if not sooner.
4          THE COURT:  All right.  Attorney Watkins, if you
5     could respond by the morning of the 29th, by the morning
6     of our hearing.
7          ATTORNEY WATKINS:  We will do our best.
8          THE COURT:  All right.  Okay.  Again, thank you
9     everyone.  Have a good day.
10          THE CLERK:  Thank you, everyone.
11          ATTORNEY BRESLOW:  Good afternoon, everyone.
12     Stay safe.
13     **(Hearing concluded at 12:07.)**
14     ------------------
15
16
17
18
19
20
21
22
23
24
25     (The certification of this transcript does not apply to
       any reproduction of this transcript, unless under the

1   direct control and/or supervision of the certifying
    reporter.  I assume no responsibility for the accuracy of
2   any reproduced copies not made under my control or
    direction.)

3

4                        CERTIFICATION

5

6        I certify that the foregoing is a correct

7   transcript of the record of proceedings in the

8   above-entitled matter to the best of my skill and ability.

9

10

11

12  /s/ Alice Moran                    May 14, 2021
    Alice Moran, RMR, RPR
13  Federal Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25