UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Crim. No. 20-30018-MGM (S-1) |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN MICHAEL RATHBUN, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through Nathaniel R. Mendell, Acting United States Attorney for the District of Massachusetts, and Steven H. Breslow, Assistant United States Attorney (the "Government"), hereby files its Sentencing Memorandum For the defendant John M. Rathbun (the "defendant").

1.    Introduction

In the early morning of April 2, 2020, during a state of emergency caused by a pandemic that had swept through elderly residential facilities, the defendant placed and attempted to light a homemade firebomb at the driveway entrance to a Jewish nursing home complex in Longmeadow, MA called Jewish Geriatric Services Lifecare, Inc. ("JGS").  The defendant's dangerous device consisted of a Scepter diesel fuel container, highly flammable and explosive gasoline, and a partially charred wick comprised of pages from a Christian religious pamphlet.  Less than two weeks later, when federal agents executed a search warrant at the defendant's residence, the defendant repeatedly lied to a Special Agent with the FBI, including by stating that he was not familiar with the location on Converse Street where the device had been placed and that he had not left his house during the past two weeks, including on April 2.

The Government recommends that the Court impose the following sentence:  78 months

of incarceration – the bottom of the defendant's advisory guidelines range; 36 months of supervised release; no fine based upon defendant's inability to pay a fine; no restitution or forfeiture; and a $300 special assessment.[1]

2.      Procedural Background

On October 15, 2020, the Grand Jury returned a three-count Superseding Indictment charging the defendant with three counts:  Count One – Attempt to Transport and Receive, and Transportation and Receipt, of an Explosive (18 U.S.C. § 844(d)); Count Two – Attempt to Damage and Destroy Building, Vehicles, and Real and Personal Property by Fire and Explosive (18 U.S.C. § 844(i)); and Count Three – False Statements to a Federal Official (18 U.S.C. § 1001(a)(2)). [2]  Pre-Sentence Investigation Report dated November 23, 2021 ("PSR"), ¶ 4.

Count Three alleged three false statements, including:  (1) he was not familiar with the location on Converse Street where the homemade incendiary device was placed, when in fact he was familiar with that location; (2) he had not left his house in the past two weeks because of the COVID-19 pandemic, when in fact he had left his house during the early morning hours of April 2, 2020.[3]

_____

[1] JGS has informed the Government that it will not be submitting a restitution request or further Victim Impact Statement beyond those submitted in connection with the defendant's detention hearing.

[2] The Superseding Indictment also alleged a Special Finding that the defendant selected the object of his offense, the Jewish nursing home complex, because of the perceived race, religion, and national origin of any person, pursuant to USSG § 3A1.1(b).  On November 7, 2020, the Government moved to dismiss the Special Finding, and on November 9, 2020, the Court granted the Government's motion.  PSR, ¶¶ 4-5.

[3] On October 30, 2002, the Court severed the defendant's third alleged false statement  - that he only used the Internet to search for work, to use a dating  application called Bumble, and

On November 23, 2020, following an eight-day trial in which the defendant testified, the jury convicted the defendant of the part of Count Three that alleged the defendant falsely stated to the FBI that he had not left his home on April 2, 2020.  D.192, 218.  The jury deadlocked on the remaining two counts and the first alleged false statement in Count Three concerning his unfamiliarity with the location on where the device was placed, and the Court declared a mistrial on the deadlocked counts.  *Id.*

On June 15, 2021, following a second, seven-day trial on Counts One and Two, the jury convicted the defendant of both counts.  PSR, ¶ 8.

The Probation Department has correctly determined that the defendant faces an Advisory Sentencing Guidelines Range of 78 to 97 months based upon a Total Offense Level of 26 and a Criminal History Category of III.  *Id.*, ¶ 118.  The defendant faces a maximum term of imprisonment of ten years on Count One; a mandatory minimum sentence of five years and a maximum term of twenty years of imprisonment on Count Two; a maximum term of five years of imprisonment on Count Three; and a maximum supervised release term of three years.  *Id.*, ¶ 117.

3.   The Defendant Merits the Recommended Guidelines Sentence

a.   Legal Principles

As the Supreme Court explained *in Gall v. United States*, 128 S. Ct. 586, 596-97 (2007), the district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range, and then consider all the factors in 18 U.S.C. § 3553(a) to determine whether they support the sentence requested. The district court may not presume that the Guidelines range is reasonable, but must make an individualized assessment based on the facts presented.  *Id*. at

---

to view pornography.   D.110.   The Government will move to dismiss this remaining false statement at sentencing.

597.

If the district court determines that a non-guidelines sentence is warranted, the court "must consider the extent to the deviation and ensure that justification is sufficiently compelling to support the degree of variance." *Id.* Obviously, a major departure requires greater justification than a minor deviation. *Id.* The district court's explanation must follow for appropriate appellate review and promote the perception of a fair sentencing. *Id.*

In this case, the recommended Guidelines sentence best represents the statutory sentencing goals articulated in 18 U.S.C. § 3553(a). As the Supreme Court observed in *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007), the sentencing judge and the Sentencing Commission are carrying out "the same basic 3553(a) objectives, the one at retail, the other at wholesale." In other words, the Sentencing Commission's guidelines are a "rough approximation of a sentence that might achieve § 3553(a)'s objectives." *Id.* at 2465. *See Gall*, 128 S.Ct. at 596 (stating "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and initial benchmark.").

        b.   <u>The Nature and Circumstances of the Offense</u>

The nature and circumstances of the offense are gravely serious and weigh in favor of the requested Guidelines sentence. *See* 18 U.S.C. § 3553(a)(1).

First, on April 2, 2020, in the midst of a pandemic that was raging through elderly care facilities, the defendant placed, lit, and attempted to ignite a dangerous homemade firebomb at a driveway entrance of a nursing home complex, just a few feet from a heavily traveled sidewalk and the main thoroughfare of the community. PSR, ¶¶ 14-17. The defendant's device was plainly and highly dangerous. The device's canister contained a series of stamped warnings, including the following:

4

VAPORS CAN EXPLODE WHEN IGNITED BY A SPARK OR FLAME
SOURCE MANY FEET AWAY.
PETROLEUM FUEL EXTREMELY FLAMMABLE.
VAPORS MAY CAUSE FLASH FIRE.

In the first trial, Daniel Marshall, the vice president of marketing for Scepter Corporation, the canister manufacturer, testified that because the canister lacked the original spout, there was nothing on the canister that would prevent the introduction of a source of ignition into the can. In the second trial, Marshall testified that if a person put gasoline into the canister with an open spout near a spark or flame, two "nightmare scenarios" could happen: first, the vapors could explode; and second, fire could jet out of the nozzle like a flamethrower. PSR,¶¶ 49-53.

Second, on April 15, 2020, the defendant doubled down on his criminal conduct by repeatedly lying to the Special Agent investigating his crimes, including by: (1) claiming unfamiliarity with the device's location even though he routinely drove up and down that street every day and had frequently visited his grandmother at the building closest to the firebomb's placement; (2) insisting that he had never even seen the yellow fuel container even though his blood was on it (and on the charred pamphlet jammed inside it); and (3) by denying that he had left his house on April 2 or any day in the last two weeks. *Id.* at ¶¶ 18-31. Notably, when the Special Agent asked the defendant how his blood could have gotten on the fuel container, the defendant said it was not possible; and when the Special Agent specifically asked the defendant if he could have gotten his blood on the container when working at someone else's house, he again insisted that this was not possible. *Id.* at ¶ 23. Similarly, when the Special Agent asked the defendant if he had been so intoxicated that he could not remember placing the device, he insisted that this, too, was impossible. *Id.* at ¶ 26.

Lastly, at both trials, the defendant compounded his prior crimes by testifying falsely in a last-ditch effort to avoid responsibility for his misconduct. At the trials, the Government

established that on the morning of April 2, the defendant had clearly left his house in his mother's car and drove down Converse Street past the Jewish nursing home complex, where his own grandmother had lived and where he had repeatedly visited, and that his blood was found on both the fuel canister and the pamphlet that had been stuffed inside it. *Id.* at ¶¶ 32-40, 17.

Faced with this indisputable evidence, the defendant opted to contradict his April 15 denials and testify that he had in fact driven past the Jewish nursing home complex on the morning of April 2, but purely to obtain drugs in Springfield, and that his blood had gotten on the fuel canister when he cut his hand while working on a cleanout job at someone else's house in Chicopee – the exact scenario that he told the Special Agent was impossible. Trial 1, Transcript of November 19, 2020 ("T1,11-19-20 Tr.") at 89-90, 103-04; Trial 2, Transcript of June 11, 2021 ("T2, 06-11-21 Tr."), at 44-45, 64-67. Notably, the defendant did not explain at either trial how his blood had also gotten on the pamphlet that was stuffed into the canister and lit on fire.

At the second trial, the defendant elaborated on his earlier trial testimony about how his blood got on the fuel canister. He testified that the job took place in the middle or end of March, around when he sent an e-mail on March 22 concerning a job to MTAY3553@gmail.com (PX-132); the job was for a man and woman at a house in Chicopee; he enlisted a friend named Chris Murray ("Murray") to help; the trash was in the backyard and included wood from a pool deck, sleds, and other debris; a piece of metal flashing cut his hand right through his work glove; and at some later point he dumped all the trash into a dumpster on Converse Street. T2, 06-11-21 Tr. at 64-68; 06-14-21 Tr. at 57-61. The job was unique in that there was no other job that involved working with Murray at a house in Chicopee that had pool decking, metal, and sleds. T2, 06-14-21 Tr. at 61.

To rebut the defendant's second trial claim of how his blood had gotten on the fuel canister,

the Government called Horace Williamson, the occupant of the Chicopee house where the defendant claimed to have obtained, and bloodied, the gas canister.  Williams rented the house with the intention to purchase it.  T2, 06-14-21 Transcript of Horace Williamson testimony, at 4-5.  The back yard had a pile of junk that Williamson and the owner had created in the course of cleaning the house.  The pile included decking, a pool, metal flashing, children's sleds, and other junk, but no yellow gas canister and no religious papers.  *Id.* at 9-10, 14 (sleds).  If there was a yellow gas canister, Williamson would have noticed it and kept it "because the gas can is something I would have used."  *Id.* at 11-12.

Williamson lived at the house with his girlfriend, Melissa Taylor ("Taylor").  Taylor posted ads online for the clean-out job and used the e-mail address MTAY3553@gmail.com to receive responses, including the e-mail that the defendant sent on March 22, 2020, PX-132.  Williamson and/or Taylor responded to the defendant's e-mail, and Williamson agreed to hire him to remove the pile in the backyard.  He identified the defendant as the person who showed up with another man at his house for the clean-out job.  *Id.* at 12-15.

Williamson watched the defendant and the other man as they worked, and never saw them handle a yellow gas can or any papers.   He never observed the defendant cut his hand or have blood on him, and at the end of the day, Williamson paid the defendant by putting cash directly in his hand, but even then observed no blood.  When shown the yellow fuel canister and the Christian religious pamphlet, Williamson stated he never saw either of these items at the house.  *Id.* at 17-19.

        c.        History and Characteristics of the Defendant

The personal characteristics of the defendant weigh in favor of the requested sentence.  *See* 18 U.S.C. § 3553(a)(1). The most salient features of the defendant's personal history are his

criminal history, his persistent substance abuse, and his entrenched dishonesty.

First, the defendant has thirteen prior convictions from 2001 (when he was 17 years old) to 2019 (when he was 35 years old), including assault and battery, larceny from a person, unarmed robbery, larceny, shoplifting by concealment, breaking and entering to commit a felony, and abuse prevention act violations.  PSR, ¶¶ 71-83.  His instant federal conviction represents a grave escalation from his prior criminal conduct and demonstrates that despite his many prior convictions, he remains unable to control his behavior.

Second, the defendant has suffered from persistent substance abuse for nearly all of his adult life, including "heroin, cocaine, crack cocaine, benzodiazepines, like Xanax and alcohol," and that this abuse has "ruined" the defendant's social relationships and employment.  T2, 06-11-21 Tr. at 14.   The defendant's substance abuse, and its resulting damage to his familial, personal, and professional life, appears to have been a significant contributor to his instant offenses.

Third, the defendant is highly dishonest, having lied not only to the Special Agent and two federal juries, but to his mother, his employers, and the Chicopee homeowner.  *See, e.g.,* T2, 06-11-21 Tr., at 94 (on April 1, defendant falsely told his mother that he needed to borrow her car on April 2 because he had a  job that morning); at 107-08 (first stating that he did not know who he got drugs from on April 2 and then stating that it was two people and he remembered their names); T2, 06-14-21 Tr., at 23-24 (on March 3, defendant falsely denied to his employers that he had used drugs and driven dangerously); 26 (defendant falsely described his location to his drug dealer because he wanted to pressure him into providing drugs); and 69 (defendant falsely claimed to be licensed as a home contractor).  This dishonesty, coupled with his clear lack of contrition for his current convictions, suggests that the defendant's rehabilitation will be a serious challenge for him.

    d.    <u>The Need for the Sentence Imposed</u>

Lastly, the requested sentence is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A) and to afford "adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant." 18 U.S.C. § 2553(a)(2)(B)-(C).

The Government's requested sentence is the very bottom of the defendant's Guideline range.  This 78-month sentence – within the range but at its lowest level – will reflect the seriousness of his offenses and protect the public from his further crimes, but will also reflect that the defendant appears to have attempted his arson for personal reasons, rather than anti-Semitic animus, and that no one was harmed by his dangerous act.

    4.    <u>Conclusion</u>

For the foregoing reasons, the Government respectfully asks that the Court impose a sentence of 78 months of incarceration, 36 months of supervised release, no fine based upon the defendant's inability to pay a fine, no restitution, and a $300 special assessment.

                Respectfully submitted,

                NATHANIEL R. MENDELL
                Acting United States Attorney

STEVEN BRESLOW
Digitally signed by STEVEN BRESLOW
Date: 2021.12.19 22:26:54 -05'00'

By:    */s/ Steven H. Breslow*
           STEVEN H. BRESLOW
           (NY2915247)
           Assistant U.S. Attorney
           300 State Street, Suite 230
           Springfield, MA 01105
           413-785-0330
           steve.breslow@usdoj.gov

Dated:  December 19, 2021

<u>**Certificate of Service**</u>

  I hereby certify that this document was filed by ECF to the registered participants as identified on the Notice of Electronic Filing.

        By:  <u>*/s/ Steven H. Breslow*</u>
           STEVEN H. BRESLOW
           Assistant U.S. Attorney